**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re                                   :
                                        :
RCN CORPORATION, et al.,                :        Chapter 11
                                        :        Case No. 04-13638 (RDD)
                        Debtors.        :        (Jointly Administered)
                                        :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION
OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

D. J. Baker
Thomas J. Matz
Frederick D. Morris
Four Times Square
New York, New York  10036-6552
(212) 735-3000

Attorneys for RCN Corporation, et al.,
  Debtors and Debtors-in-Possession

MILBANK, TWEED, HADLEY & MCCLOY LLP

Dennis F. Dunne
Susheel Kirpalani
Deirdre Ann Sullivan
One Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000

Attorneys for the Official Committee
  of Unsecured Creditors

Dated:   New York, New York
            November 19, 2004

**INDEX OF PLAN SUPPLEMENT DOCUMENTS**

| Plan Supplement Document | Exhibit |
|---|---|
| Reorganized RCN Certificate of Incorporation and By-laws | A |
| New Common Stock Registration Rights Agreement. | B |
| Convertible Second-Lien Notes Registration Rights Agreement | C |
| Warrant Agreement | D |
| New Evergreen Credit Agreement | E |
| Deutsche Bank Exit Facility | F |
| Convertible Second-Lien Notes Financing | G |
| Schedule of Intercompany Claims | H |

**EXHIBIT A**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

———————————————————————

**REORGANIZED RCN CERTIFICATE OF INCORPORATION AND BY-LAWS**

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
OF

RCN CORPORATION

* * * * *

    RCN Corporation, a Delaware corporation (the "Corporation") hereby certifies as follows:

    1. The name of the Corporation is RCN Corporation.  The date of the filing of its original Certificate of Incorporation with the Secretary of State was February 19, 1997.

    2. On May 27, 2004, RCN Corporation and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. [___]). This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 245 and 303 of the DGCL, pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the Joint Plan of Reorganization under Chapter 11 of Title 11 of the United States Code of RCN Corporation, et al. (the "Plan"), as confirmed on [date], 2004 by order (the "Order") of the Bankruptcy Court.  Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the formation of the Corporation.

    3. The text of the Certificate of Incorporation as hereby and heretofore amended or supplemented is hereby restated to read as herein set forth in full:

    FIRST:  The name of the Corporation is RCN Corporation.

    SECOND:  The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.

    THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("Delaware Law" or "DGCL").

    FOURTH:  (a)  Authorized Shares.  The total number of shares of capital stock which the Corporation shall have authority to issue is [_____], all of which shares shall be Common Stock having a par value of $0.01 (the "Common Stock"). Pursuant to Section 1123 of the Bankruptcy Code, notwithstanding any other provision

contained herein to the contrary, the Corporation shall not issue non-voting equity securities.

(b)     Common Stock. All shares of Common Stock will be identical with respect to the rights and privileges to which the holders thereof are entitled, except as otherwise provided herein.

(1)     Voting Rights. Except as set forth herein or as otherwise required by law, each holder of an outstanding share of Common Stock shall be entitled to vote on each matter on which the stockholders of the Corporation shall be entitled to vote, including the election of directors, and each holder of Common Stock shall be entitled to one vote for each share of Common Stock held by such holder.

Dividends and Distributions. Subject to the prior rights of holders of all classes of stock at the time outstanding having prior rights as to dividends, the Board of Directors of the Corporation (the "Board of Directors") may cause dividends to be paid to the holders of shares of Common Stock out of funds legally available for the payment of dividends by declaring an amount per share as a dividend. When and as dividends or other distributions (including without limitation any grant or distribution of rights to subscribe for or purchase shares of capital stock or securities or indebtedness convertible into capital stock of the Corporation) are declared, whether payable in cash, in property or in shares of stock of the corporation, the holders of Common Stock shall be entitled to share equally, share for share, in such dividends or other distributions.

(2)     No Preemptive Rights. The holders of shares of Common Stock shall have no preemptive or preferential rights of subscription to any shares of any class of capital stock of the Corporation or any securities convertible into or exchangeable for shares of any class of capital stock of the Corporation.

(3)     Preferred Stock. The Board of Directors is hereby empowered to authorize by resolution or resolutions from time to time the issuance of one or more classes or series of Preferred Stock and to fix the designations, powers, preferences and relative, participating, optional or other rights, if any, and the qualifications, limitations or restrictions thereof, if any, with respect to each such class or series of Preferred Stock and the number of shares constituting each such class or series, and to increase or decrease the number of shares of any such class or series to the extent permitted by the Delaware Law.

FIFTH: (a) The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors consisting of not less than [three] nor more than [number] directors, the exact number of directors to be determined from time to time solely by resolution adopted by the affirmative vote of a majority of the entire Board of Directors.

(b)     Each director shall serve for a one-year term ending on the date of the annual meeting of stockholders next following the annual meeting at which such director was elected. Notwithstanding the foregoing, each director shall hold office until

such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.  In no event will a decrease in the number of directors shorten the term of any incumbent director.

(c)     There shall be no cumulative voting in the election of directors. Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

(d)     Vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors shall be filled solely by a majority of the directors then in office (even if less than a quorum) or by the sole remaining director.

SIXTH:  A majority of the directors on the Board of Directors shall be independent.  An "independent" director shall mean a person other than an officer or employee of the Corporation or its subsidiaries or any other individual having a relationship, which, in the opinion of the Corporation's Board of Directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.  The following persons shall not be considered independent:

(a)     a director who is, or at any time during the past three years was, employed by the Corporation or by any parent or subsidiary of the Corporation;

(b)     a director who accepted or who has a spouse, parent, child or sibling (whether by blood, marriage or adoption) or who has a person residing in their home (collectively, a "Family Member") who accepted any payments from the Corporation or any parent or subsidiary of the Corporation in excess of $60,000 during the current or any of the past three fiscal years, other than the following:

(1)     compensation for board or board committee service;

(2)     payments arising solely from investments in the Corporation's securities;

(3)     compensation paid to a Family Member who is a non-executive employee of the Corporation or a parent or subsidiary of the Corporation;

(4)     benefits under a tax-qualified retirement plan, or non-discretionary compensation; or

(5)     loans permitted under Section 13(k) of the Securities Exchange Act of 1934, as amended;

(c)     a director who is a Family Member of an individual who is, or at any time during the past three years was, employed by the Corporation or by any parent or subsidiary of the Corporation as an executive officer;

(d)    a director who is, or has a Family Member who is, a partner in, or a controlling shareholder or an executive officer of, any organization to which the Corporation made, or from which the Corporation received, payments for property or services in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000, whichever is more, other than the following:

(1)    payments arising solely from investments in the Corporation's securities; or

(2)    payments under non-discretionary charitable contribution matching programs.

(e)    a director of the Corporation who is, or has a Family Member who is, employed as an executive officer of another entity where at any time during the past three years any of the executive officers of the Corporation served on the compensation committee of such other entity; or

(f)    a director who is, or has a Family Member who is, a current partner of the Corporation's outside auditor, or was a partner or employee of the Corporation's outside auditor who worked on the Corporation's audit at any time during any of the past three years.

SEVENTH:  The Board of Directors shall have the power to adopt, amend or repeal the bylaws of the Corporation.

EIGHTH:  Special meetings of the stockholders may be called by the Board of Directors, the Chairman of the Board of Directors or the Chief Executive Officer of the Corporation and may not be called by any other person or persons.

NINTH:  (1)  A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by Delaware Law.

(2)    (a)  Each person (and the heirs, executors or administrators of such person) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law.  The right to indemnification conferred in this ARTICLE NINTH shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law.  The right to indemnification conferred in this ARTICLE NINTH shall be a contract right.

4

(b)     The Corporation may, by action of its Board of Directors, provide indemnification to such of the employees and agents of the Corporation, and to such persons serving at the request of the Corporation as an employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

(3)     The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under Delaware Law.

(4)     The rights and authority conferred in this ARTICLE NINTH shall not be exclusive of any other right which any person may otherwise have or hereafter acquire.

(5)     Neither the amendment nor repeal of this ARTICLE NINTH, nor the adoption of any provision of this Certificate of Incorporation or the bylaws of the Corporation, nor, to the fullest extent permitted by Delaware Law, any modification of law, shall eliminate or reduce the effect of this ARTICLE NINTH in respect of any acts or omissions occurring prior to such amendment, repeal, adoption or modification.

IN WITNESS WHEREOF, the undersigned has duly executed this Amended and Restated Certificate of Incorporation of RCN Corporation this [__] day of [_____], 2004.

RCN CORPORATION


By: _____
Authorized Officer

AMENDED AND RESTATED

BYLAWS

OF

RCN CORPORATION

* * * * *

ARTICLE I

OFFICES

Section 1.    Registered Office.  The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 2.    Other Offices.  The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 3.    Books.  The books of the Corporation may be kept within or without of the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

ARTICLE II

MEETINGS OF STOCKHOLDERS

Section 1.    Time and Place of Meetings.  All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2.    Annual Meetings.  Annual meetings of stockholders, commencing with the year 2005, shall be held to elect directors and transact such other business as may properly be brought before the meeting.

Section 3.    Special Meetings.  Special meetings of stockholders may be called by the Board of Directors, the Chairman or the Chief Executive Officer of the Corporation and may not be called by any other person.

Section 4.    Notice of Meetings and Adjourned Meetings; Waivers of Notice; Business at Meetings.  (a)  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("Delaware Law"), such notice shall

1

be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting.  Unless these bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)     A written waiver of any such notice signed by the person entitled thereto, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(c)     Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 5.     Quorum.     Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.  A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or by proxy, shall have the power to adjourn the meeting from time to time, in the manner provided in Section 4, until a quorum shall be present or represented.

Section 6.     Voting.     (a)  Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder.  Unless otherwise provided in Delaware Law, the certificate of incorporation or these bylaws, the affirmative vote of a majority of the total number of votes of the shares of capital stock of the Corporation present, in person or by proxy, at a meeting of stockholders and entitled to vote on the subject matter shall be the act of the stockholders, other than with respect to the election of directors.  Except as otherwise provided in the certificate of incorporation and these bylaws, directors shall be elected by a plurality of the votes cast at the meeting and entitled to vote on the election of directors.

(b)     Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after one year from its date, unless the proxy provides for a longer period.

Section 7.   Organization.   At each meeting of stockholders, the Chairman, if one shall have been elected, (or in his absence or if one shall not have been elected, the Chief Executive Officer) shall act as chairman of the meeting.   The Secretary (or in his absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 8.   Order of Business.   The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

Section 9.   Notice of Business.   At any meeting of the stockholders, only such business shall be conducted as shall have been brought before the meeting (a) by or at the direction of the Board of Directors or (b) in the case of an annual meeting of stockholders, by any stockholder of the Corporation who is a stockholder of record at the time of giving of the notice provided for in this Section 9, who shall be entitled to vote at such meeting and who complies with the notice procedures set forth in this Section 9 and such business must be a proper subject for stockholder action under the Delaware General Corporation Law.   For business to be properly brought before an annual meeting of stockholders by a stockholder, the stockholder must have given timely notice thereof in writing to the secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than 60 days nor more than 90 days prior to the meeting; provided, however, that in the event that less than 70 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of the meeting or such public disclosure was given or made, whichever first occurs.   A stockholder's notice to the secretary shall set forth as to each matter the stockholder proposes to bring before the meeting (a) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (b) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business, (c) the class and number of shares of the Corporation which are beneficially owned by the stockholder and (d) any material interest of the stockholder in such business.   Notwithstanding anything in the bylaws to the contrary, no business shall be conducted at a stockholder meeting except in accordance with the procedures set forth in this Section 9, and no business shall be brought by a stockholder before a special meeting of stockholders.   The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting and in accordance with the provisions of the bylaws, and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted. Notwithstanding the foregoing, provisions of this Section 9, a stockholder shall also comply with all applicable requirements of the Securities Exchange Act of 1934, and the rules and regulations thereunder with respect to the matters set forth in this Section 9.

Section 10.   Nomination of Directors.   Only persons who are nominated in accordance with the procedures set forth in these bylaws shall be eligible to serve as directors. Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders (a) by or at the direction of the Board of Directors or (b) by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 10, who shall be entitled to vote for the election of directors at the

meeting and who complies with the notice procedures set forth in this Section 10. Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than 60 days nor more than 90 days prior to the meeting; provided, however, that in the event that less than 70 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of the meeting or such public disclosure was given or made, whichever first occurs. Such stockholder's notice shall set forth (a) as to each person whom the stockholder proposes to nominate for election or reelection as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934 (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); and (b) as to the stockholder giving the notice (i) the name and address, as they appear on the Corporation's books, of such stockholder, (ii) the class and number of shares of the Corporation which are beneficially owned by such stockholder, (iii) a description of all arrangements or understandings between such stockholder and each proposed nominee and any other person or persons (including their names and addresses) pursuant to which the nomination(s) are to be made by such stockholder and (iv) any other information relating to such stockholder that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Section 14A under the Securities Exchange Act of 1934. At the request of the Board of Directors, any person nominated by the Board of Directors for election as a director shall furnish to the secretary of the Corporation that information required to be set forth in a stockholder's notice of nomination which pertains to the nominee. No person shall be eligible to serve as a director of the Corporation unless nominated in accordance with the procedures set forth in this bylaw. The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the procedures prescribed by the bylaws, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded. Notwithstanding the foregoing provisions of this Section 10, a stockholder shall also comply with all applicable requirements of the Securities Exchange Act of 1934, and the rules and regulations thereunder with respect to the matters set forth in this Section.

## ARTICLE III

## DIRECTORS

Section 1. <u>General Powers</u>. Except as otherwise provided in Delaware Law or the certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 2. <u>Number, Classes, Term of Office, etc</u>. The Board of Directors shall consist of not less than [three] nor more than [number] directors, with the exact number of directors to be determined from time to time solely by resolution adopted by the affirmative vote

of a majority of the entire Board of Directors. Except as otherwise provided in the certificate of incorporation, each director shall serve for a one-year term ending on the date of the annual meeting of stockholders next following the annual meeting at which such director was elected. Notwithstanding the foregoing, each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal. In no event will a decrease in the number of directors shorten the term of any incumbent director. Directors need not be stockholders.

Section 3. <u>Quorum and Manner of Acting</u>. Unless the certificate of incorporation or these bylaws require a greater number, 50% of the total number of directors serving as directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors, the directors present at such meeting may adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4. <u>Time and Place of Meetings</u>. The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 5. <u>Annual Meeting</u>. The Board of Directors shall meet for the purpose of electing officers and transacting other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 7 of this Article III or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 6. <u>Regular Meetings</u>. After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 7. <u>Special Meetings</u>. Special meetings of the Board of Directors may be called by the Chairman, the Chief Executive Officer or the President and shall be called by the Chairman, the Chief Executive Officer, the President or the Secretary on the written request of three directors. Notice of special meetings of the Board of Directors shall be given to each director at least three days before the date of the meeting in such manner as is determined by the Board of Directors.

Section 8.  <u>Waiver of Notice</u>.  Whenever any notice is required by law, the certificate of incorporation or these bylaws to be given to any director or member of a committee, a waiver thereof in writing, signed, by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except where the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

Section 9.  <u>Committees</u>.  The Board of Directors shall elect from the directors an executive committee, a compensation committee and an audit committee and may, by resolution passed by a majority of the whole Board, designate one or more other committees, each committee to consist of one or more of the directors of the Corporation.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.  The specific powers and duties of the executive committee, the compensation committee and the audit committee are set forth below:

(a)  The executive committee shall consist of not less than 3 and not more than 6 members as shall be determined by the Board of Directors in addition to the Chairman, who by virtue of his office shall be a member of the executive committee and chairman thereof.  To the fullest extent permitted by Delaware Law, the executive committee shall have all the powers of the Board of Directors in the management of the business and affairs of the Corporation at all times when the Board of Directors is not in session.

(b)  The compensation committee shall consist of such number of members as shall be determined by the Board of Directors, shall make recommendations to the Board of Directors regarding compensation and benefits and shall have such other duties as determined by the Board of Directors.

(c)  The audit committee shall consist of such number of members as shall be determined by the Board of Directors, shall make recommendations to the Board of Directors regarding the auditing of the Corporation's books and records, the audit process and the Corporation's independent public accountants and shall have such other duties as determined by the Board of Directors.  None of the members of the audit committee shall be directly involved in the supervision or management of the financial affairs of this Corporation or any of its subsidiaries.

Section 10.  <u>Action by Consent</u>.  Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 11.  <u>Telephonic Meetings</u>.  Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any

committee thereof, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 12. <u>Resignation</u>. Any director may resign at any time by giving written notice to the Board of Directors or to the Secretary of the Corporation. The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 13. <u>Vacancies</u>. Unless otherwise provided in the certificate of incorporation, vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors may be filled solely by a majority of the directors then in office (even if less than a quorum) or by the sole remaining director. Each director so elected shall hold office for a term that shall coincide with the term of the Class to which such director shall have been elected. If there are no directors in office, then an election of directors may be held in accordance with Delaware Law. Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 14. <u>Removal</u>. No director may be removed from office by the stockholders except for cause with the affirmative vote of the holders of not less than a majority of the total voting power of all outstanding securities of the corporation then entitled to vote generally in the election of directors, voting together as a single class.

Section 15. <u>Compensation</u>. Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

ARTICLE IV

OFFICERS

Section 1. <u>Principal Officers</u>. The principal officers of the Corporation shall be a Chairman, a Chief Executive Officer, a President, a President of Technology, one or more Vice Presidents, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose. The Corporation may also have such other principal officers, including one or more Controllers, as the Board may in its discretion appoint. One person may hold the offices and perform the duties of any two or more of said offices, except that no one person shall hold the offices and perform the duties of President and Secretary.

Section 2.    Election and Term of Office.    The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof. Each such officer shall hold office until his successor is elected and qualified, or until his earlier death, resignation or removal.  Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 3.    Subordinate Officers.    In addition to the principal officers enumerated in Section 1 of this Article IV, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.    Removal.  Any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 5.    Resignations.    Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer).  The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 6.    Chairman.    The Chairman shall preside at all meetings of the Board of Directors and of shareholders, shall be responsible for the observation by the Corporation of these by-laws and shall have such other duties as shall be set forth in the resolution of the Board by which the appointment of the Chairman is made.

Section 7.    Chief Executive Officer.  The Chief Executive Officer shall have general supervision over the business and operations of the Corporation and may perform any act and execute any instrument for the conduct of such business and operations.  In the Chairman's absence, the Chief Executive Officer shall preside at all meetings of the Board and of the shareholders.

Section 8.    Powers and Duties of Other Officers.    The other officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

ARTICLE V

GENERAL PROVISIONS

Section 1.    Fixing the Record Date.  (a)  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of

Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day preceding the day on which notice is given, or, if notice is waived, at the close of business on the day preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 2.     Dividends.  Subject to limitations contained in Delaware Law and the certificate of incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid in cash, in property or in shares of the capital stock of the Corporation.

Section 3.     Fiscal Year.  The fiscal year of the Corporation shall commence on January 1 and end on December 31 of each year.

Section 4.     Corporate Seal.  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 5.     Voting of Stock Owned by the Corporation.  The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6.     Amendments.  These bylaws or any of them, may be altered, amended or repealed, or new bylaws may be made, by the Board of Directors or by the affirmative vote of the holders of not less than a majority of the total voting power of all outstanding securities of the Corporation then entitled to vote generally in the election of directors, voting together as a single class.

**EXHIBIT B**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**NEW COMMON STOCK REGISTRATION RIGHTS AGREEMENT**

REGISTRATION RIGHTS AGREEMENT

Dated as of [_____], 2004

by and among

RCN CORPORATION
as the Company,

and

The Stockholders listed on the Signature Pages hereto

dated as of

_____, 2004

# TABLE OF CONTENTS

1.    Definitions............................................................................................................1

2.    Shelf Registration..............................................................................................4

3.    Registration Procedures....................................................................................6

4.    Black-Out and Suspension...............................................................................12

5.    Indemnification.................................................................................................13

6.    Underwritten Registrations..............................................................................17

7.    Rule 144............................................................................................................17

8.    Miscellaneous...................................................................................................18

# REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is dated as of [_____], 2004, and entered into by and among RCN Corporation, a Delaware corporation (the "Company"), and the stockholders listed on the signature pages hereto.

WHEREAS, the Company proposes to issue and deliver shares of Common Stock (as defined below) to certain entities pursuant to the Company's Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"), confirmed by order of the United States Bankruptcy Court for the Southern District of New York, entered on _____ , 2004; and

WHEREAS, in connection with and pursuant to the Plan, the Company has agreed to grant the registration rights described in this Agreement to the holders of shares of Common Stock issued pursuant to the Plan. All capitalized terms used and not otherwise defined herein shall have the meanings assigned them in the Plan.

The parties hereby agree as follows:

1.     <u>Definitions</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>Agreement</u>" shall have the meaning set forth in the first introductory paragraph hereto.

"<u>Amendment Effectiveness Deadline Date</u>" shall have the meaning set forth in Section 2(d)(i) hereto.

"Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

"<u>Business Day</u>" shall mean any day that is not a Saturday, Sunday or a day on which banking institutions in New York City are authorized or required by law to be closed.

"<u>Closing Date</u>" shall mean [_____], 2004.

"<u>Common Stock</u>" shall mean any share of common stock, par value $0.01 per share, of the Company, outstanding after giving effect to the Plan.

"<u>Company</u>" shall have the meaning set forth in the first introductory paragraph hereto and includes the Company's successors and assigns.

"<u>Controlling Person</u>" shall have the meaning set forth in Section 5 hereof.

"<u>Designated Counsel</u>" shall mean one firm of counsel chosen by the Holders of a majority of Registrable Securities to be included in a Registration Statement for a Shelf Registration and identified to the Company in writing prior to the filing of such Registration Statement.

"Effectiveness Date" shall mean the date that is the 90th day after the date the Initial Shelf Registration is filed with the SEC.

"Effectiveness Period" shall have the meaning set forth in Section 2(a) hereof.

"End of Suspension Notice" shall have the meaning set forth in Section 4(b) hereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Filing Date" shall mean the date that is the 60th day after the later of (1) the date the Company files its Annual Report on Form 10-K for the year ended December 31, 2004, or (2) the Plan Effective Date.

"Holder" shall mean any stockholder listed on the signature pages hereto for so long as such stockholder (i) beneficially (within the meaning of Rule 13d-3 under the Exchange Act) owns 5% or more of the Common Stock of the Company or (ii) provides to the Company a written statement indicating that such Person is deemed, or might reasonably be considered to be, an "underwriter" under Section 1145(b)(1) of the Bankruptcy Code.

"Indemnified Holder" shall have the meaning set forth in Section 5 hereof.

"Indemnified Person" shall have the meaning set forth in Section 5 hereof.

"Indemnifying Person" shall have the meaning set forth in Section 5 hereof.

"Initial Shelf Registration" shall have the meaning set forth in Section 2(a) hereof.

"Inspectors" shall have the meaning set forth in Section 3(l) hereof.

"NASD" shall have the meaning set forth in Section 3(o) hereof.

"Note Purchase Agreement" shall mean the Note Purchase Agreement dated as of [_____], 2004, by and among the Company, certain subsidiaries of the Company that are required to be guarantors under the Indenture (as defined in the Note Purchase Agreement), and the Purchasers, which provides for the sale by the Company to the Purchasers of $[•] aggregate principal amount of the Company's 7 3/8% Convertible Second-Lien Notes Due 2012 (the "Notes"), which are convertible into Common Stock of the Company.

"Notes Registration Rights Agreement" shall mean the Registration Rights Agreement (this "Agreement") dated as of [_____], 2004, and entered into by and among RCN Corporation, a Delaware corporation (the "Company"), and the Purchasers.

"Note Securities" shall mean all Registrable Securities as defined in the Note Registration Rights Agreement.

-2-

"Notice and Questionnaire" shall mean a written notice delivered to the Company containing substantially the information called for by the Form of Selling Securityholder Notice and Questionnaire attached hereto as Appendix A.

"Person" shall mean an individual, partnership, corporation, limited liability company, unincorporated association, trust or joint venture, or a governmental agency or political subdivision thereof.

"Plan Effective Date" shall mean the Effective Date as defined in the Plan.

"Prospectus" shall mean the prospectus included in any Registration Statement (including, without limitation, any prospectus subject to completion and a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Purchaser" shall mean those institutional investors whose names and addresses are listed on Schedule I of the Notes Registration Rights Agreement (collectively the "Purchasers").

"QIU" shall have the meaning set forth in Section 3(o) hereof.

"Records" shall have the meaning set forth in Section 3(l) hereof.

"Registrable Securities" shall mean any shares of Common Stock issued pursuant to the Plan until the earliest to occur of: (i) the date on which all Registrable Securities have been sold pursuant to a Registration Statement or sold, transferred or otherwise disposed of pursuant to Rule 144; (ii) the date on which all Registrable Securities not held by Affiliates of the Company are eligible for sale without registration under the Securities Act pursuant to subparagraph (k) of Rule 144; or (iii) the third anniversary of the initial effective date of the Initial Shelf Registration.

"Registration Statement" shall mean any registration statement of the Company filed with the SEC pursuant to the provisions of this Agreement, including the Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all documents incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 144" shall mean Rule 144 promulgated under the Securities Act, as such rule may be amended from time to time, or any similar rule (other than Rule 144A) or regulation hereafter adopted by the SEC providing for offers and sales of securities made in compliance therewith resulting in offers and sales by subsequent holders that are not affiliates of an issuer of such securities being free of the registration and prospectus delivery requirements of the Securities Act.

"Rule 144A" shall mean Rule 144A promulgated under the Securities Act, as such rule may be amended from time to time, or any similar rule (other than Rule 144) or regulation hereafter adopted by the SEC.

"Rule 415" shall mean Rule 415 promulgated under the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.

"SEC" shall mean the Securities and Exchange Commission.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Selling Holder" shall mean, on any date, any Holder that has delivered a Notice and Questionnaire to the Company on or prior to such date.

"Shelf Registration" shall have the meaning set forth in Section 2(b) hereof.

"Shelf Registration Statement" shall have the meaning set forth in Section 2(b) hereof.

"Subsequent Shelf Registration" shall have the meaning set forth in Section 2(b) hereof.

"Suspension Event" shall have the meaning set forth in Section 4(b) hereof.

"Suspension Notice" shall have the meaning set forth in Section 4(b) hereof.

"Underwritten Registration" or "Underwritten Offering" shall mean a registration in which securities of the Company are sold to an underwriter for reoffering to the public.

2.      Shelf Registration.

        (a)      Shelf Registration.  The Company shall file with the SEC a "shelf" Registration Statement for an offering to be made on a continuous basis pursuant to Rule 415 covering all of the Registrable Securities (the "Initial Shelf Registration") on or prior to the Filing Date.  The Company shall use its commercially reasonable efforts to cause the Shelf Registration Statement to be declared effective by the SEC not later than the 90th day after the date of the initial filing.

        The Initial Shelf Registration shall be on Form S-1, Form S-3 or another appropriate form permitting registration of such Registrable Securities for resale by Holders in the manner or manners designated by them (including, without limitation, one or more Underwritten Offerings; provided that the lead or managing underwriter in any Underwritten Offerings shall be reasonably acceptable to the Company).  The Company may permit securities other than the Registrable Securities to be included in the Initial Shelf Registration or any Subsequent Shelf Registration.  To the extent that any securities may not be included on any such registration for any reason, no securities other than Note Securities shall be included therein

-4-

unless all Note Securities requested to be included therein are so included. To the extent that any securities are excluded from any Shelf Registration for any reason, those Holders who have requested to have Registrable Securities included in such Registration Statement shall be entitled to participate on a pro rata basis in accordance with the number of shares of Registrable Securities requested to be included to the extent that their inclusion would (i) not materially adversely affect such offering or (ii) exceed any limitation on the number of shares to be included as determined by the lead or managing underwriter in any Underwritten Offerings.

The Company shall use its commercially reasonable efforts to cause the Initial Shelf Registration to be declared effective under the Securities Act on or prior to the Effectiveness Date and to keep such Initial Shelf Registration continuously effective under the Securities Act until the date that is three (3) years after the Effectiveness Date, provided such period shall automatically be extended to the extent required to permit brokers and dealers to comply with Rule 174 under the Securities Act, as provided in Section 4 hereof or as otherwise provided herein (such period, as it may be extended or shortened pursuant to this Agreement, the "Effectiveness Period"), or such shorter period ending when no Registrable Securities continue to be outstanding.

(b)     Subsequent Shelf Registrations. If the Initial Shelf Registration or any Subsequent Shelf Registration ceases to be effective for any reason at any time during the Effectiveness Period (other than because of the sale of all of the securities registered thereunder), the Company shall use its commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness thereof, and in any event shall within forty-five (45) days of such cessation of effectiveness amend the Initial Shelf Registration in a manner to obtain the withdrawal of the order suspending the effectiveness thereof, or file an additional "shelf" Registration Statement pursuant to Rule 415 covering all of the Registrable Securities (a "Subsequent Shelf Registration"). If a Subsequent Shelf Registration is filed, the Company shall use its commercially reasonable efforts to cause the Subsequent Shelf Registration to be declared effective under the Securities Act as soon as practicable after such filing and to keep such Registration Statement continuously effective for a period equal to the number of days in the Effectiveness Period less the aggregate number of days during which the Initial Shelf Registration or any Subsequent Shelf Registration was previously continuously effective. As used herein, the term "Shelf Registration" means the Initial Shelf Registration and any Subsequent Shelf Registration and the term "Shelf Registration Statement" means any Registration Statement filed in connection with a Shelf Registration.

(c)     Supplements and Amendments. The Company shall promptly supplement and amend the Shelf Registration if required by the rules, regulations or instructions applicable to the registration form used for such Shelf Registration, if required by the Securities Act, or, in the reasonable discretion of the Company, if reasonably requested by the Holders of the majority of Registrable Securities covered by such Registration Statement or by any underwriter of such Registrable Securities; provided, however, that the Company shall not be required to supplement or amend the Shelf Registration Statement during the occurrence of any of the events described in Section 4(a)(i) or (ii).

(d)     Notice and Questionnaire. Each Holder agrees that if such Holder wishes to sell Registrable Securities pursuant to a Shelf Registration Statement and related Prospectus, it

will do so only in accordance with this Section 2(d) and Section 3 hereof. Each Holder wishing to sell Registrable Securities pursuant to a Shelf Registration Statement and related Prospectus agrees to deliver a Notice and Questionnaire to the Company at least five (5) Business Days prior to any intended distribution of Registrable Securities under the Shelf Registration Statement. From and after the date the Initial Shelf Registration Statement is declared effective, the Company shall, as promptly as practicable after the date a Notice and Questionnaire is delivered, and in any event upon five (5) Business Days after such date:

(i)     if required by applicable law, file with the SEC a post-effective amendment to the Shelf Registration Statement or prepare and, if required by applicable law, file a supplement to the related Prospectus or a supplement or amendment to any document incorporated therein by reference or file any other required document so that the Holder delivering such Notice and Questionnaire is named as a selling securityholder in the Shelf Registration Statement and the related Prospectus in such a manner as to permit such Holder to deliver such Prospectus to purchasers of the Registrable Securities in accordance with applicable law and, if the Company shall file a post-effective amendment to the Shelf Registration Statement, use its commercially reasonable efforts to cause such post-effective amendment to be declared effective under the Securities Act as promptly as is practicable, but in any event by the date (the "Amendment Effectiveness Deadline Date") that is forty-five (45) days after the date such post-effective amendment is required by this clause to be filed; provided, however, that such period shall be tolled for so long as information provided by or requested to be provided by any such Holder is reasonably likely to prevent the effectiveness of any such post-effective amendment or supplement;

(ii)     provide such Holder copies of any documents filed pursuant to Section 2(d)(i); and

(iii)     notify such Holder as promptly as practicable after the effectiveness under the Securities Act of any post-effective amendment filed pursuant to Section 2(d)(i). Notwithstanding anything contained herein to the contrary, the Company shall be under no obligation to name any Holder that has not delivered a complete Notice and Questionnaire in accordance with this Section 2(d) and such other information to the Company as required by Section 4(p) hereof.

3.     Registration Procedures.

In connection with the filing of any Registration Statement pursuant to Section 2 hereof, the Company shall effect such registrations to permit the sale of the securities covered thereby in accordance with the intended method or methods of disposition thereof, and pursuant thereto and in connection with any Registration Statement filed by the Company hereunder the Company shall:

(a)     Prepare and file with the SEC, on or prior to the Filing Date, a Registration Statement or Registration Statements as prescribed by Section 2 hereof, and use its

commercially reasonable efforts to cause each such Registration Statement to become effective and remain effective as provided herein; provided, however, that before filing any Registration Statement or Prospectus or any amendments or supplements thereto, the Company shall furnish to and afford the Holders of the Registrable Securities covered by such Registration Statement and the managing underwriter or underwriters, if any, a reasonable opportunity to review copies of all such documents proposed to be filed (in each case, where possible, at least three (3) Business Days prior to such filing, or such later date as is reasonable under the circumstances). The Company shall not file any Registration Statement or Prospectus or any amendments or supplements thereto if the Holders of a majority of Registrable Securities covered by such Registration Statement or the managing underwriter or underwriters, if any, shall reasonably object in writing within such period.

(b)     Prepare and file with the SEC such amendments and post-effective amendments to each Shelf Registration, as may be necessary to keep such Registration Statement continuously effective for the Effectiveness Period; cause the related Prospectus to be supplemented by any Prospectus supplement required by applicable law, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; and comply with the provisions of the Securities Act and the Exchange Act applicable to it with respect to the disposition of all Registrable Securities covered by such Registration Statement as so amended or in such Prospectus as so supplemented.

(c)     Notify the Selling Holders, Designated Counsel, if any, and the managing underwriter or underwriters, if any, promptly (but in any event within two (2) Business Days), (i) when a Prospectus or any prospectus supplement or post-effective amendment has been filed, and, with respect to a Registration Statement or any post-effective amendment, when the same has become effective under the Securities Act (including in such notice a written statement that any Holder may, upon request, obtain, at the sole expense of the Company, conformed copies of such Registration Statement or post-effective amendment including financial statements and schedules, documents incorporated or deemed to be incorporated by reference and exhibits), (ii) of the issuance by the SEC of any stop order suspending the effectiveness of a Registration Statement or of any order preventing or suspending the use of any preliminary prospectus or the initiation of any proceedings for that purpose, (iii) of the happening of any event, the existence of any condition or any information becoming known that makes any statement made in such Registration Statement or related Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires the making of any changes in or amendments or supplements to such Registration Statement, Prospectus or documents so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the Prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (iv) of the Company's determination that a post-effective amendment to a Registration Statement would be appropriate.

(d)     Use its commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of a Registration Statement or of any order preventing or suspending the use of a Prospectus and, if any such order is issued, to use its commercially

reasonable efforts to obtain the withdrawal of any such order at the earliest possible moment, and provide prompt notice to the Selling Holders, Designated Counsel, if any, and the managing underwriter or underwriters, if any, of the withdrawal of any such order.

(e) If requested by the managing underwriter or underwriters, if any, or the Holders of a majority of Registrable Securities being sold in connection with an underwritten offering and reasonably acceptable to the Company (i) promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or underwriters, if any, or such Holders reasonably determine, in consultation with the Company, is necessary to be included therein, (ii) make all required filings of such prospectus supplement or such post-effective amendment as soon as reasonably practicable after the Company has received notification of the matters to be incorporated in such prospectus supplement or post-effective amendment and (iii) supplement or make amendments to such Registration Statement.

(f) Furnish to each Selling Holder, Designated Counsel, if any, and the managing underwriter or underwriters, if any, at the sole expense of the Company, conformed copies of the Registration Statement or Registration Statements and each post-effective amendment thereto, including financial statements and schedules, and, if requested, all documents incorporated or deemed to be incorporated therein by reference and all exhibits.

(g) Deliver to each Selling Holder, Designated Counsel, if any, and the managing underwriter or underwriters, if any, at the sole expense of the Company, as many copies of the Prospectus (including each form of preliminary prospectus) and each amendment or supplement thereto and any documents incorporated by reference therein as such Persons may reasonably request; and the Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the Selling Holders of Registrable Securities, the managing underwriter or underwriters, if any, and dealers, if any, in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(h) The Company agrees to cause the Company's counsel to perform blue sky investigations and file registrations and qualifications required to be filed in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities or offer and sale under the securities or blue sky laws of such jurisdictions within the United States as any Selling Holder or the managing underwriter or underwriters, if any, reasonably request, keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective and do any and all other acts or things reasonably necessary or advisable under blue sky laws to enable the disposition in such jurisdictions of the Registrable Securities covered by the applicable Registration Statement; provided, however, that the Company shall not be required to (i) qualify generally to do business in any jurisdiction where it is not then so qualified, or (ii) subject itself to taxation in any such jurisdiction where it is not then so subject.

(i) Cooperate with the Selling Holders, the managing underwriter or underwriters, if any, and their respective counsel to facilitate the timely preparation and delivery of certificates representing shares of Registrable Securities to be sold, which certificates shall not bear any restrictive legends; and enable such shares of Registrable Securities to be in such

-8-

denominations and registered in such names as the managing underwriter or underwriters, if any, or Holders may reasonably request.

(j)     Upon the occurrence of any event contemplated by Section 3(c)(ii), 3(c)(iii) or 3(c)(iv) hereof, as promptly as practicable prepare and (subject to Section 3(a) hereof) file with the SEC, at the sole expense of the Company, a supplement or post-effective amendment to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, any such Prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(k)     In connection with any underwritten offering of Registrable Securities pursuant to a Shelf Registration, enter into an underwriting agreement, reasonably satisfactory in form and substance to the Company, as is customary in underwritten offerings of securities similar to the Registrable Securities and take all such other actions as are reasonably requested by the managing underwriter or underwriters in order to expedite or facilitate the registration or the disposition of such Registrable Securities and, in such connection, (i) make such representations and warranties to, and covenants with, the managing underwriter or underwriters with respect to the business of the Company and its subsidiaries (including any acquired business, properties or entity, if applicable) and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, as are customarily made by issuers to underwriters in underwritten offerings of securities similar to the Registrable Securities and confirm the same in writing if and when requested; (ii) obtain the written opinion of counsel to the Company and written updates thereof in form, scope and substance reasonably satisfactory to the managing underwriter or underwriters, addressed to the managing underwriter or underwriters covering the matters customarily covered in opinions requested in underwritten offerings of securities similar to the Registrable Securities and such other matters as may be reasonably requested by the managing underwriter or underwriters; (iii) obtain "cold comfort" letters and updates thereof in form, scope and substance reasonably satisfactory to the managing underwriter or underwriters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included or incorporated by reference in the Registration Statement), addressed to each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings of securities similar to the Registrable Securities and such other matters as reasonably requested by the managing underwriter or underwriters; and (iv) if an underwriting agreement is entered into, cause the same to contain indemnification provisions and procedures no less favorable to the sellers and underwriters, if any, than those set forth in Section 5 hereof (or such other provisions and procedures acceptable to Holders of a majority in aggregate principal amount of Registrable Securities covered by such Registration Statement and the managing underwriter or underwriters or agents, if any).  The above shall be done as and to the extent required by such underwriting agreement.

(l)     Make available at reasonable times for inspection by one or more representatives of the Selling Holders, designated in writing by Holders of a majority of Registrable Securities to be included in such Registration Statement of such Registrable Securities being sold, any managing underwriter or underwriters participating in any such disposition of Registrable Securities, if any, and any attorney, accountant or other agent retained by any such Selling Holder or underwriter (collectively, the "Inspectors"), at the offices where normally kept, during reasonable business hours at such time or times as shall be mutually convenient for the Company and the Inspectors as a group, all financial and other records, pertinent corporate documents and instruments of the Company and its subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise any applicable due diligence responsibilities, and cause the officers, directors and employees of the Company and its subsidiaries to supply all information reasonably requested by any such Inspector in connection with such Registration Statement.  Records that the Company determines, in good faith, to be confidential and any Records that it notifies the Inspectors are confidential shall not be disclosed by any Inspector unless (i) the disclosure of such Records is necessary to avoid or correct a material misstatement or material omission in such Registration Statement, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, (iii) disclosure of such information is, in the opinion of counsel for any Inspector, necessary or advisable in connection with any action, claim, suit or proceeding, directly involving or potentially involving such Inspector and arising out of, based upon, relating to, or involving this Agreement or any transactions contemplated hereby or arising hereunder or (iv) the information in such Records has been made generally available to the public other than through the acts of such Inspector; provided, however, that prior notice shall be provided as soon as practicable to the Company of the potential disclosure of any information by such Inspector pursuant to clauses (ii) or (iii) of this sentence to permit the Company to obtain a protective order (or waive the provisions of this paragraph (l)).  Each Inspector shall take such actions as are reasonably necessary to protect the confidentiality of such information (if practicable) to the extent such actions are otherwise not inconsistent with, an impairment of or in derogation of the rights and interests of the Holder or any Inspector, unless and until such information in such Records has been made generally available to the public other than as a result of a breach of this Agreement.

(m)     Provide (i) the Holders of the Registrable Securities to be included in such Registration Statement and Designated Counsel, if any, (ii) the underwriters (which term, for purposes of this Registration Rights Agreement, shall include a Person deemed to be an underwriter within the meaning of Section 2(11) of the Securities Act), if any, thereof, (iii) the sales or placement agent, if any, thereof, and (iv) one counsel for such underwriters or agents, reasonable opportunity to participate in the preparation of such Registration Statement, each prospectus included therein or filed with the SEC, and each amendment or supplement thereto.

(n)     Comply with all applicable rules and regulations of the SEC and make generally available to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any similar rule promulgated under the Securities Act) no later than forty-five (45) days after the end of any twelve (12)-month period (or ninety (90) days after the end of any twelve (12)-month period if such period is a fiscal year) (i) commencing at the end of any fiscal quarter in which Registrable Securities are sold to underwriters in a firm commitment or commercially reasonable efforts underwritten offering and

(ii) if not sold to underwriters in such an offering, commencing on the first day of the first fiscal quarter of the Company after the Effectiveness Date of a Registration Statement, which statements shall cover said twelve (12)-month periods.

(o)     Cooperate with each Selling Holder of Registrable Securities covered by any Registration Statement and the managing underwriter or underwriters, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the NASD, Inc. (the "NASD"), including, if the Conduct Rules of the NASD or any successor thereto as amended from time to time so require, engaging a "qualified independent underwriter" ("QIU") as contemplated therein and making Records available to such QIU as though it were a participating underwriter for the purposes of Section 4(l) and otherwise applying the provisions of this Agreement to such QIU (including indemnification) as though it were a participating underwriter.

(p)     Use its commercially reasonable efforts to take all other steps necessary or advisable to effect the registration of the Registrable Securities covered by a Registration Statement contemplated hereby.

(q)     Prior to the effective date of the first Registration Statement relating to the Registrable Securities, provide CUSIP numbers for the Registrable Securities.

Each Holder agrees, by acquisition of the Registrable Securities, that no Holder shall be entitled to sell any of such Registrable Securities pursuant to a Registration Statement or to receive a Prospectus relating thereto, unless such Holder has furnished the Company with a Notice and Questionnaire as required pursuant to Section 2(d) hereof (including the information required to be included in such Notice and Questionnaire) and the information set forth in the next sentence.  Each Selling Holder agrees promptly to furnish to the Company all information required to be disclosed in order to make the information previously furnished to the Company by such Selling Holder not misleading and any other information regarding such Selling Holder and the distribution of such Registrable Securities as the Company may from time to time reasonably request.  Any sale of any Registrable Securities by any Holder shall constitute a representation and warranty by such Holder that the information relating to such Holder and its plan of distribution is as set forth in the Prospectus delivered by such Holder in connection with such disposition, that such Prospectus does not as of the time of such sale contain any untrue statement of a material fact relating to or provided by such Holder or its plan of distribution and that such Prospectus does not as of the time of such sale omit to state any material fact relating to or provided by such Holder or its plan of distribution necessary to make the statements in such Prospectus, in the light of the circumstances under which they were made, not misleading.

The Company may require each Selling Holder of Registrable Securities as to which any registration is being effected to furnish to the Company such additional information regarding such Holder and the distribution of such Registrable Securities as the Company may, from time to time, reasonably request to the extent necessary or advisable to comply with the Securities Act.  The Company may exclude from such registration the Registrable Securities of any Selling Holder if such Holder fails to furnish such additional information within twenty (20) Business Days after receiving such request.  Each Selling Holder as to which any Shelf Registration is being effected agrees to furnish promptly to the Company all information

required to be disclosed so that the information previously furnished to the Company by such Holder is not materially misleading and does not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made.

Each Holder of Registrable Securities agrees by acquisition of such Registrable Securities that upon the happening of any event of the kind described in Section 3(c)(ii), 3(c)(iii) or 3(c)(iv) hereof, such Holder will forthwith discontinue disposition of such Registrable Securities covered by such Registration Statement or Prospectus until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by Section 3(j) hereof, or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amendments or supplements thereto.

4.      Black-Out and Suspension.

(a)      Black-Out Period.  Subject to the provisions of this Section 4 and a good faith determination by a majority of the members of the Board of Directors of the Company that it is in the best interests of the Company to suspend the use of the Registration Statement, following the effectiveness of a Registration Statement (and the filings with any international, federal or state securities commissions), the Company, by written notice to the Holders, may direct the Holders to suspend sales of the Registrable Securities pursuant to a Registration Statement for such times as the Company reasonably may determine is necessary and advisable (but in no event for more than an aggregate of sixty (60) days in any rolling twelve (12)-month period commencing on the Closing Date, or thirty (30) days in any rolling ninety (90)-day period, and no more than two (2) separate times in any rolling twelve (12)-month period) if any of the following events shall occur: (i) a primary Underwritten Offering by the Company where the Company is advised by the representative of the managing underwriters for such Underwritten Offering that the sale of Registrable Securities pursuant to the Registration Statement would have a material adverse effect on the Company's Underwritten Offering; (ii) a majority of the members of the Board of Directors of the Company in good faith determine that (A) the offer or sale of any Registrable Securities would materially impede, delay or interfere with any material proposed acquisition, merger, tender offer, business combination, corporate reorganization, consolidation or other similar material transaction involving the Company, (B) after the advice of counsel, sale of Registrable Securities pursuant to the Registration Statement would require disclosure of non-public material information not otherwise required to be disclosed under applicable law, and (C) disclosure could have a material adverse effect on the Company or the Company's ability to consummate such transaction in each case under circumstances that would make it impracticable or inadvisable to cause the Registration Statement (or such filings) to become effective or to promptly amend or supplement the Registration Statement on a post-effective basis, as applicable; or (iii) a majority of the members of the Board of Directors of the Company shall have determined in good faith, after the advice of counsel, that it is required by law, rule or regulation to supplement the Registration Statement or file a post-effective amendment to the Registration Statement in order to incorporate information into the Registration Statement for the purpose of (A) including in the Registration Statement any Prospectus required under Section 10(a)(3) of the Securities Act, (B) reflecting in the Prospectus included in the Registration Statement any facts or events arising after the effective date of the Registration Statement (or of the most-recent post-effective amendment) that,

individually or in the aggregate, represents a fundamental change in the information set forth therein, or (C) including in the Prospectus included in the Registration Statement any material information with respect to the plan of distribution not disclosed in the Registration Statement or any material change to such information. Upon the occurrence of any such suspension, the Company shall use its commercially reasonable efforts to cause the Registration Statement to become effective or to promptly amend or supplement the Registration Statement on a post-effective basis or to take such action as is necessary to permit resumed use of the Registration Statement as soon as possible.

(b)     In the case of an event that causes the Company to suspend the use of a Registration Statement (a "Suspension Event"), the Company shall give written notice (a "Suspension Notice") to the Holders to suspend sales of the Registrable Securities and such notice shall state generally the basis for the notice and certify, by an officer of the Company, that such suspension shall continue only for so long as the Suspension Event or its effect is continuing and the Company is taking all reasonable steps to terminate suspension of the use of the Registration Statement as promptly as possible. The Holders shall not effect any sales of the Registrable Securities pursuant to such Registration Statement (or such filings) at any time after receiving a Suspension Notice from the Company and prior to receipt of an End of Suspension Notice (as defined below). If so directed by the Company, each Holder will deliver to the Company (at the expense of the Company) all copies other than permanent file copies then in such Holder's possession of the Prospectus covering the Registrable Securities at the time of receipt of the Suspension Notice. The Holders may recommence effecting sales of the Registrable Securities pursuant to the Registration Statement (or such filings) following further notice to such effect (an "End of Suspension Notice") from the Company, which End of Suspension Notice shall be given by the Company to the Holders in the manner described above promptly following the conclusion of any Suspension Event and its effect.

(c)     Notwithstanding any provision herein to the contrary, if the Company shall give a Suspension Notice pursuant to this Section 4 with respect to any Registration Statement, the Company agrees that it shall extend the period of time during which such Registration Statement shall be maintained effective pursuant to this Agreement by the number of days during the period from the date of the giving of a Suspension Notice to and including the date when Holders shall have received an End of Suspension Notice and copies of the supplemented or amended Prospectus necessary to resume sales, with respect to each Suspension Event; provided such period of time shall not be extended beyond the date that Underlying Shares are not Registrable Securities.

5.     Indemnification.

The Company agrees to indemnify and hold harmless (i) each Holder, (ii) each Person, if any, who controls (within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act) any Holder (any of the Persons referred to in this clause (ii) being hereinafter referred to as a "Controlling Person"), (iii) the respective officers, directors, partners, members, employees, representatives and agents of any Holder (including any predecessor holder) or any controlling person (any person referred to in clause (i), (ii) or (iii) may hereinafter be referred to as an "Indemnified Holder") against any losses, claims, damages, liabilities or expenses to which such Indemnified Holder may become subject under the

-13-

PDFfile.doc

Securities Act or otherwise, (A) insofar as such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus, (B) insofar as such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in the light of the circumstances in which they were made, (C) to the extent of the aggregate amount paid in settlement of any litigation, or any investigation or proceeding by any court or governmental agency or body, commenced or threatened, or of any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission, or (D) insofar as such losses, claims, damages, liabilities or expenses arise out investigating, preparing or defending against any litigation, or any investigation or proceeding by any court or governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission; provided, however, that the Company will not be liable under this paragraph, to the extent that (i) any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement, or omission or alleged omission made in any such Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus in reliance upon and in conformity with written information relating to any Holder furnished to the Company or any underwriter by or on behalf of such Holder specifically for use in therein or (ii) any untrue statement contained in or omission from a preliminary Prospectus if a copy of the Prospectus (as then amended or supplemented, if the Company shall have furnished to or on behalf of the Holder participating in the distribution relating to the relevant Registration Statement any amendments or supplements thereto) was not sent or given by or on behalf of such Holder to the Person asserting any such liabilities who purchased Underlying Shares, if such Prospectus (or Prospectus as amended or supplemented) is required by law to be sent or given at or prior to the written confirmation of the sale of such Underlying Shares to such Person and the untrue statement contained in or omission from such preliminary Prospectus was corrected in the Prospectus (or the Prospectus as amended or supplemented if the Company shall have furnished any amendments or supplements thereto). The indemnity provided for herein shall remain in full force and effect regardless of any investigation made by or on behalf of any such Holder.  The Company shall notify such Indemnified Holder promptly of the institution, threat or assertion of any claim, proceeding (including any governmental investigation) or litigation in connection with the matters addressed by this Agreement which involves the Company or such Indemnified Holder.

The Company agrees to reimburse each Indemnified Holder upon demand for any legal or other expenses reasonably incurred by such Indemnified Holder in connection with investigating or defending any such loss, claim, damage or liability, action or proceeding or in responding to a subpoena or governmental inquiry related to the offering of the Registrable Securities, whether or not such Indemnified Holder is a party to any action or proceeding.  In the event that it is finally judicially determined that an Indemnified Holder was not entitled to receive payments for legal and other expenses pursuant to this paragraph, such Indemnified Holder will promptly return all sums that had been advanced pursuant hereto.

-14-

Each Holder agrees, severally and not jointly, to indemnify and hold harmless the Company, its directors and officers and each Person who controls the Company (within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as the indemnity provided in the first paragraph of this Section 5 from the Company to each Holder, but only with reference to such losses, claims, damages, liabilities or expenses which are caused by any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information relating to a Holder furnished to the Company or any underwriter in writing by such Holder expressly for use in any Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus.  The liability of any Holder under this paragraph shall in no event exceed the net proceeds received by such Holder from sales of Registrable Securities giving rise to such obligation.

In case any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any Person in respect of which indemnity may be sought pursuant to either of the first and third paragraphs of this Section 5, such Person (the "Indemnified Person") shall promptly notify the Person or Persons against whom such indemnity may be sought (each an "Indemnifying Person") in writing.  No indemnification provided for in the first or third paragraphs of this Section 5 shall be available to any Person who shall have failed to give notice as provided in this paragraph if the party to whom notice was not given was unaware of the proceeding to which such notice would have related and was materially prejudiced by the failure to give such notice, but the failure to give such notice shall not relieve the Indemnifying Person or Persons from any liability which it or they may have to the Indemnified Person for contribution or otherwise than on account of the provisions of the first and third paragraphs of this Section 5.  In case any such proceeding shall be brought against any Indemnified Person and it shall notify the Indemnifying Person of the commencement thereof, the Indemnifying Person shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other Indemnifying Person similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person and shall pay as incurred (or within 30 days of presentation) the fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any Indemnified Person shall have the right to retain its own counsel at its own expense.  Notwithstanding the foregoing, the Indemnifying Person shall pay as incurred (or within 30 days of presentation) the fees and expenses of the counsel retained by the Indemnified Person in the event (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the retention of such counsel, (ii) the named parties to any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them or (iii) the Indemnifying Person shall have failed to assume the defense and employ counsel reasonably acceptable to the Indemnified Person within a reasonable period of time after notice of commencement of the action.  It is understood that the Indemnifying Person shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such Indemnified Persons.  Such firm shall be designated in writing by a majority of Holders of Registrable Securities in the case of parties indemnified pursuant to the first paragraph of this Section 5 and by the Company in the case of parties indemnified pursuant to the third paragraph of this Section 5.  The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its

-15-

written consent but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify the Indemnified Person from and against any loss or liability by reason of such settlement or judgment. In addition, the Indemnifying Person will not, without the prior written consent of the Indemnified Person, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding of which indemnification may be sought hereunder (whether or not any Indemnified Person is an actual or potential party to such claim, action or proceeding) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action or proceeding.

To the extent the indemnification provided for in this Section 5 is unavailable to or sufficient to hold harmless an Indemnified Person under the first or third paragraph of this Section 5 in respect of any losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) referred to therein, except by reason of the exceptions set forth in the first or third paragraphs of this Section 5 or the failure of the Indemnified Person to give notice as required in the fourth paragraph of this Section 5, then each Indemnifying Person shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Indemnifying Person on the one hand and the Indemnified Person on the other hand from the Registrable Securities pursuant to any Shelf Registration. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law then each Indemnifying Person shall contribute to such amount paid or payable by such Indemnified Person in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Indemnifying Person on the one hand and the Indemnified Person on the other in connection with the statements or omissions which resulted in such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof), as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or such Indemnified Holder on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Holders agree that it would not be just and equitable if contributions pursuant to the immediately preceding paragraph of this Section 5 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) referred to in the immediately preceding paragraph shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Person in connection with investigating or defending any such action or claim or enforcing any rights hereunder. Notwithstanding the provisions of this paragraph and the immediately preceding paragraph of this Section 5, (i) in no event shall any Holder be required to contribute any amount in excess of the amount by which the net proceeds received by such Holder from the offering or sale of the Registrable Securities pursuant to a Shelf Registration Statement exceeds the amount of damages which such Holder would have otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged

omission and (ii) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Except as otherwise provided in this Section 5, any losses, claims, damages, liabilities or expenses for which an Indemnified Person is entitled to indemnification or contribution under this Section 5 shall be paid by the Indemnifying Person to the Indemnified Person as such losses, claims, damages, liabilities or expenses are incurred (or within thirty (30) days of presentation).

The remedies provided for in this Section 5 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any indemnified party at law or in equity.

The indemnity and contribution agreements contained in this Section 5 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Holder or any Person controlling any Holder or by or on behalf of the Company, its officers or directors or any other Person controlling any of the Company and (iii) acceptance of and payment for any of the Registrable Securities.

6.     Underwritten Registrations.

If any of the Registrable Securities covered by any Shelf Registration are to be sold in an underwritten offering, the investment banker or investment bankers and manager or managers that will manage the offering will be selected by, and the underwriting arrangements with respect thereto will be approved by, the Company.

No Holder of Registrable Securities may participate in any underwritten registration hereunder unless such Holder (a) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Company and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.

7.     Rule 144

The Company covenants that it will file the reports required to be filed by it under the Indenture, the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder in a timely manner, other than the filing by the Company of its annual report on Form 10-K for the year ended December 31, 2004 by [_____], in accordance with the requirements of the Securities Act and the Exchange Act and, for so long as any Registrable Securities remain outstanding, if at any time the Company is not required to file such reports, it will (a) make publicly available such information as is necessary to permit sales pursuant to Rule 144 and (b) take such further action, if any, that is reasonable in the circumstances, in each case, to the extent required from time to time to enable such Holder to sell its Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 or (ii) any similar rules or regulations hereafter adopted by the SEC.  Upon the request of any Holder

-17-

of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements.

8.     Miscellaneous.

     (a)     No Inconsistent Agreements.  The Company and the Holders acknowledge that the Company has entered into the Note Purchase Agreement and Notes Registration Rights Agreement.  Notwithstanding the foregoing, the Company has not, as of the date hereof, and the Company shall not, after the date of this Agreement, enter into any agreement, with respect to any of its securities, that is inconsistent with the rights granted to the Holders of Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof.

     (b)     Adjustments Affecting Registrable Securities.  The Company shall not, directly or indirectly, take any action with respect to the Registrable Securities as a class that would materially and adversely affect the ability of the Holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement.

     (c)     Amendments and Waivers.  The provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, otherwise than with the prior written consent of the Company and the Holders of not less than a majority of Registrable Securities then outstanding; provided, however, that Section 5 and this Section 7(c) may not be amended, modified or supplemented without the prior written consent of the Company and each Holder (including, in the case of an amendment, modification or supplement of Section 5, any Person who was a Holder of Registrable Securities disposed of pursuant to any Registration Statement).  Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of Holders of Registrable Securities whose securities are being sold pursuant to a Registration Statement and that does not directly or indirectly affect, impair, limit or compromise the rights of other Holders of Registrable Securities may be given by Holders of at least a majority of the Registrable Securities being sold by such Holders pursuant to such Registration Statement.

     (d)     Notices.  All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, registered first-class mail, next-day air courier or facsimile:

     (1)     if to a Holder, at the most current address of such Holder set forth on the stock ledger of the Company unless any Holder shall have provided notice information in a Notice and Questionnaire or any amendment thereto, in which case such information shall control.

     (2)     if to the Company:

     RCN Corporation
     105 Carnegie Center
     Princeton, New Jersey 08540
     Facsimile No.:  (609) 734-3701
     Attention:  Deborah M. Royster, Esq.

-18-

with copies to (which shall not constitute notice):

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Facsimile No.: (212) 735-2000
> Attention: Alan G. Straus, Esq.

All such notices and communications shall be deemed to have been duly given, when delivered by hand, if personally delivered, five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; one Business Day after being timely delivered to a next-day air courier; and when the addressor receives facsimile confirmation, if sent by facsimile during normal business hours, and otherwise on the next Business Day during normal business hours.

(e)    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto, <u>including</u>, <u>without limitation</u>, the Holders and, without the need for an express assignment, subsequent Holders.  If any transferee of any Holder shall acquire the Registrable Securities, in any manner, whether by operation of law or otherwise, such Registrable Securities shall be held subject to all of the terms of this Agreement, and by taking and holding such Registrable Securities, such Person shall be conclusively deemed to have agreed to be bound by and to perform all of the terms and provisions of this Agreement and such Person shall be entitled to receive the benefits hereof.

(f)    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(g)    <u>Headings</u>.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(h)    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH

RESPECT TO THIS AGREEMENT AND REPRESENTS THAT COUNSEL HAS BEEN CONSULTED SPECIFICALLY AS TO THIS WAIVER.

(i)     <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.  It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(j)     <u>Securities Held by the Company or Its Affiliates</u>.  Whenever the consent or approval of Holders of a majority is required hereunder, Registrable Securities held by the Company or its affiliates (as such term is defined in Rule 405 under the Securities Act) shall not be counted in determining whether such consent or approval was given by the Holders of such required majority.

(k)     <u>Third-Party Beneficiaries</u>.  Holders of Registrable Securities are intended third-party beneficiaries of this Agreement and the Company and each Holder shall have the right to enforce this Agreement directly to the extent it deems such enforcement necessary or advisable to protect its rights or the rights of Holders hereunder.

(l)     <u>Entire Agreement</u>.  This Agreement, together with the Plan of Reorganization, Note Purchase Agreement and Notes Registration Rights Agreement, is intended by the parties as a final and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein and any and all prior oral or written agreements, representations, or warranties, contracts, understandings, correspondence, conversations and memoranda between the Holders on the one hand and the Company on the other, or between or among any agents, representatives, parents, subsidiaries, affiliates, predecessors in interest or successors in interest with respect to the subject matter hereof and thereof are merged herein and replaced hereby.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

RCN CORPORATION

By: _____
      Name:
      Title:

[STOCKHOLDER]

By: _____
      Name:
      Title:

[STOCKHOLDER]

By: _____
      Name:
      Title:

[STOCKHOLDER]

By: _____
      Name:
      Title:

[STOCKHOLDER]

By: _____
      Name:
      Title:

[STOCKHOLDER]

By: _____
      Name:
      Title:

[Signature Page to Registration Rights Agreement]

# APPENDIX A

## _Notice and Questionnaire_

# FORM OF SELLING SECURITYHOLDER NOTICE AND QUESTIONNAIRE

The undersigned beneficial holder of 7 3/8% Convertible Second-Lien Notes due 2012 (the "Notes") of RCN Corporation, a Delaware corporation (the "Company"), or common stock, par value $0.01 per share (the "Common Stock" and, together with the Notes, the "Registrable Securities"), of the Company understands that the Company has filed or intends to file with the Securities and Exchange Commission a registration statement (the "Shelf Registration Statement") for the registration and resale of the Registrable Securities in accordance with the terms of the Registration Rights Agreement, dated as of [_____], 2004 (the "Registration Rights Agreement"), by and among the Company and the purchasers named therein. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below.

Each beneficial owner of Registrable Securities is entitled to the benefits of the Registration Rights Agreement. In order to sell or otherwise dispose of any Registrable Securities pursuant to the Shelf Registration Statement, a beneficial owner of Registrable Securities generally will be required to be named as a selling securityholder in the related prospectus, deliver a prospectus to each purchaser of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such beneficial owner (including certain indemnification provisions, as described below). Beneficial owners are encouraged to complete and deliver this Selling Securityholder Notice and Questionnaire prior to the effectiveness of the Shelf Registration Statement so that such beneficial owners may be named as selling securityholders in the related prospectus at the time of effectiveness. Any beneficial owner of Notes wishing to include its Registrable Securities must deliver to the Company a properly completed and signed Selling Securityholder Notice and Questionnaire.

Certain legal consequences arise from being named as a selling securityholder in the Shelf Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling securityholder in the Shelf Registration Statement and the related prospectus.

## Notice

The undersigned beneficial owner (the "Selling Securityholder") of Registrable Securities hereby gives notice to the Company of its intention to sell or otherwise dispose of Registrable Securities beneficially owned by it and listed below in Item 3 (unless otherwise specified under Item 3) pursuant to the Shelf Registration Statement. The undersigned, by signing and returning this Selling Securityholder Notice and Questionnaire, understands that it will be bound by the terms and conditions of this Selling Securityholder Notice and Questionnaire and the Registration Rights Agreement.

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate and complete as of the date below:

**Questionnaire**

1.     (a)     Full Legal Name of Selling Securityholder:

          _____

     (b)     Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities listed in (3) below are held:

          _____

     (c)     Full Legal Name of DTC Participant (if applicable and if not the same as (b) above) through which Registrable Securities listed in (3) below are held:

          _____

2.     Address for Notices to Selling Securityholder:

     _____

     _____

     Telephone: _____

     Fax: _____

     Contact Person: _____

3.     Beneficial Ownership of Registrable Securities:

     (a)     Type and Principal Amount of Registrable Securities beneficially owned:

          _____

          _____

     (b)     CUSIP No(s). of Registrable Securities beneficially owned:

          _____

          _____

4.     If other than a natural person, please indicate the form or organization of the Selling Securityholder (e.g., corporation, limited liability company, limited partnership, general partnership, trust, estate, etc.):

     _____

5.     If the Selling Securityholder is not a natural person, and is not a publicly traded entity, please identify the individuals who beneficially own the shares or interests of the Selling

Securityholder (including any intermediate entities through which such beneficial ownership is held) and the amounts and percentages of such ownership:

_____

_____

6.  Please indicate whether the Selling Securityholder is a "broker" or a "dealer" (as such terms are defined in Section 3 of the Securities Exchange Act of 1934, as amended) or an affiliate of any broker or dealer.

_____

_____

7.  If the Selling Securityholder is an affiliate of any broker or dealer, please indicate by checking the appropriate box whether the answer to the following questions is "True" or "False."

    (a)  The Selling Securityholder purchased the Registrable Securities in the ordinary course of business.

    ___ True        ___ False

    (b)  At the time of the purchase of the Registrable Securities to be resold, the Selling Securityholder had no agreements or understandings, directly or indirectly, with any person to distribute them.

    ___ True        ___ False

8.  Beneficial Ownership of the Company's securities owned by the Selling Securityholder:

    Except as set forth below in this Item (4), the undersigned is not the beneficial or registered owner of any "Other Securities," defined as securities of the Company other than the Registrable Securities listed above in Item (3).

    (a)  Type and Amount of Other Securities beneficially owned by the Selling Securityholder:

    _____

    _____

    (b)  CUSIP No(s). of such Other Securities beneficially owned:

    _____

    _____

PDFfile.doc

9.      Relationship with the Company:

Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equityholders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.

State any exceptions here:

_____

_____

_____

_____

10.     Plan of Distribution:

Except as set forth below, the undersigned (including its donees or pledgees) intends to distribute the Registrable Securities listed above in Item (3) pursuant to the Shelf Registration Statement only as follows (if at all): Such Registrable Securities may be sold from time to time directly by the undersigned or alternatively, through underwriters, broker-dealers or agents (with the prior agreement of the Company). If the Registrable Securities are sold through underwriters or broker-dealers, the Selling Securityholder will be responsible for underwriting discounts or commissions or agent's commissions. Such Registrable Securities may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale or at negotiated prices. Such sales may be effected in transactions (which may involve block transactions) (i) on any national securities exchange or quotation service on which the Registrable Securities may be listed or quoted at the time of sale, (ii) in the over-the-counter market, (iii) in transactions otherwise than on such exchanges or services or in the over-the-counter market or (iv) through the writing of options. In connection with sales of the Registrable Securities or otherwise, the undersigned may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the Registrable Securities and deliver Registrable Securities to close out such short positions, or loan or pledge Registrable Securities to broker-dealers that in turn may sell such securities.

State any exceptions here:

_____

_____

_____

_____

The undersigned acknowledges that it understands its obligation to comply with the provisions of the Securities Exchange Act of 1934, as amended, and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or

regulations), in connection with any offering of Registrable Securities pursuant to the Shelf Registration Statement. The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

The Selling Securityholder hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons as set forth therein.

Pursuant to the Registration Rights Agreement, the Company has agreed under certain circumstances to indemnify the Selling Securityholder against certain liabilities.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law for inclusion in the Shelf Registration Statement, the undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Shelf Registration Statement remains effective. All notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing at the address set forth below.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to items (1) through (10) above and the inclusion of such information in the Shelf Registration Statement and the related prospectus. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Shelf Registration Statement and the related prospectus.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Selling Securityholder Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:                                   Beneficial Owner


By:_____
        Name:
        Title:


**PLEASE RETURN THE COMPLETED AND EXECUTED SELLING SECURITYHOLDER NOTICE AND QUESTIONNAIRE TO:**

**RCN Corporation**
**[General Counsel's Office]**
**105 Carnegie Center**
**Princeton, New Jersey 08540**
**Telephone:  (     )**
**Facsimile:  (609) 734-3701**

**EXHIBIT C**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**CONVERTIBLE SECOND-LIEN NOTES REGISTRATION RIGHTS AGREEMENT**

REGISTRATION RIGHTS AGREEMENT

Dated as of [_____], 2004

by and among

RCN CORPORATION
as the Company,

and

the Purchasers,

as defined herein.

7 3/8% Convertible Second-Lien Notes Due 2012

# TABLE OF CONTENTS

1.   Definitions...........................................................................................................................1

2.   Shelf Registration .............................................................................................................5

3.   Additional Interest..........................................................................................................7

4.   Registration Procedures. ................................................................................................8

5.   Registration Expenses.....................................................................................................14

6.   Black-Out Period............................................................................................................15

7.   Indemnification. ..............................................................................................................16

8.   Rules 144 and 144A. .......................................................................................................20

9.   Underwritten Registrations. .........................................................................................20

10.   Miscellaneous..................................................................................................................21

# REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is dated as of [_____], 2004, and entered into by and among RCN Corporation, a Delaware corporation (the "Company"), and the institutional investors whose names and addresses are listed on Schedule I hereto (each a "Purchaser" and collectively, the "Purchasers").

This Agreement is entered into in connection with that certain Note Purchase Agreement, dated as of [_____], 2004 (the "Purchase Agreement"), by and among the Company, certain subsidiaries of the Company that are required to be guarantors under the Indenture (as defined below) (the "Guarantors"), and the Purchasers, which provides for the sale by the Company to the Purchasers of $[150],000,000 aggregate principal amount of the Company's 7 3/8% Convertible Second-Lien Notes Due 2012 (the "Notes"), which are convertible into common stock of the Company, par value $0.[01] per share (the "Underlying Shares"). The Notes are being issued pursuant to an Indenture, dated as of the date hereof (the "Indenture"), by and among the Company, the Guarantors and [_____], as trustee.

In order to induce each Purchaser to enter into the Purchase Agreement, the Company has agreed to provide the registration rights set forth in this Agreement for the benefit of the Purchasers and certain subsequent holder or holders of the Notes or Underlying Shares as provided herein. The execution and delivery of this Agreement is a condition to the Purchasers' obligation to purchase the Notes under the Purchase Agreement.

The parties hereby agree as follows:

1.      Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Additional Interest" shall have the meaning set forth in Section 3(a) hereto.

"Agreement" shall have the meaning set forth in the first introductory paragraph hereto.

"Amendment Effectiveness Deadline Date" shall have the meaning set forth in Section 2(d)(i) hereto.

"Amount of Registrable Securities" shall mean (a) with respect to Notes constituting Registrable Securities, the aggregate principal amount of all such Notes outstanding, (b) with respect to Underlying Shares constituting Registrable Securities, the aggregate number of such Underlying Shares outstanding multiplied by the Conversion Price (as defined in the Indenture relating to the Notes upon the conversion of which such Underlying Shares were issued) in effect at the time of computing the Amount of Registrable Securities or, if no such Notes are then outstanding, the last Conversion Price that was in effect under such Indenture when any such Notes were last outstanding, and (c) with respect to combinations thereof, the sum of (a) and (b) for the relevant Registrable Securities.

"Business Day"  shall mean any day that is not a Saturday, Sunday or a day on which banking institutions in New York City are authorized or required by law to be closed.

"Closing Date" shall mean [_____], 2004.

"Company" shall have the meaning set forth in the first introductory paragraph hereto and includes the Company's successors and assigns.

"Controlling Person" shall have the meaning set forth in Section 7 hereof.

"Damages Payment Date" shall have the meaning set forth in Section 3(b) hereof.

"Depositary" shall mean The Depository Trust Company or any successor that is appointed by the Company; provided, however, that such depositary must have an address in the Borough of Manhattan, in The City of New York.

"Designated Counsel" shall mean one firm of counsel chosen by the Holders of a majority in Amount of Registrable Securities to be included in a Registration Statement for a Shelf Registration and identified to the Company in writing prior to the filing of such Registration Statement.

"Effectiveness Date" shall mean the date that is the 90th day after the date the Initial Shelf Registration is filed with the SEC.

"Effectiveness Period" shall have the meaning set forth in Section 2(a) hereof.

"End of Suspension Notice" shall have the meaning set forth in Section 6(b) hereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Filing Date" shall mean the date that is the 60th day after the date on which the Company files its Annual Report on Form 10-K for the fiscal year ended December 31, 2004.

"Guarantors" shall have the meaning set forth in the second introductory paragraph hereto.

"Holder" shall mean any holder of Registrable Securities.

"Indemnified Holder" shall have the meaning set forth in Section 7 hereof.

"Indemnified Person" shall have the meaning set forth in Section 7 hereof.

"Indemnifying Person" shall have the meaning set forth in Section 7 hereof.

"Indenture" shall have the meaning set forth in the second introductory paragraph hereto.

"Initial Shelf Registration" shall have the meaning set forth in Section 2(a) hereof.

"Inspectors" shall have the meaning set forth in Section 4(m) hereof.

"<u>NASD</u>" shall have the meaning set forth in Section 4(p) hereof.

"<u>Notes</u>" shall have the meaning set forth in the second introductory paragraph hereto.

"<u>Notice and Questionnaire</u>" shall mean a written notice delivered to the Company containing substantially the information called for by the Form of Selling Securityholder Notice and Questionnaire attached hereto as <u>Appendix A</u>.

"<u>Outside Date</u>" shall mean September 30, 2005.

"<u>Person</u>" shall mean an individual, partnership, corporation, limited liability company, unincorporated association, trust or joint venture, or a governmental agency or political subdivision thereof.

"<u>Prospectus</u>" shall mean the prospectus included in any Registration Statement (<u>including</u>, <u>without limitation</u>, any prospectus subject to completion and a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"<u>Purchase Agreement</u>" shall have the meaning set forth in the second introductory paragraph hereto.

"<u>Purchasers</u>" shall have the meaning set forth in the first introductory paragraph hereto.

"<u>QIU</u>" shall have the meaning set forth in Section 4(p) hereof.

"<u>Records</u>" shall have the meaning set forth in Section 4(m) hereof.

"<u>Registrable Securities</u>" shall mean all Notes and all Underlying Shares upon original issuance thereof and at all times subsequent thereto until the earliest to occur of (i) a Registration Statement covering such Notes and Underlying Shares having been declared effective by the SEC and such Notes and Underlying Shares having been disposed of in accordance with such effective Registration Statement, (ii) such Notes and Underlying Shares having been sold in compliance with Rule 144 (without giving any effect to Rule 144(k)), (iii) such Notes and any Underlying Shares ceasing to be outstanding or (iv) the third anniversary after the initial effective date of such Registration Statement (subject to extension as provided in Section 2 hereof).

"<u>Registration Default</u>" shall have the meaning set forth in Section 3(a) hereof.

"<u>Registration Statement</u>" shall mean any registration statement of the Company filed with the SEC pursuant to the provisions of this Agreement, including the Prospectus, amendments and supplements to such registration statement, including post-effective

amendments, all exhibits and all documents incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 144" shall mean Rule 144 promulgated under the Securities Act, as such rule may be amended from time to time, or any similar rule (other than Rule 144A) or regulation hereafter adopted by the SEC providing for offers and sales of securities made in compliance therewith resulting in offers and sales by subsequent holders that are not affiliates of an issuer of such securities being free of the registration and prospectus delivery requirements of the Securities Act.

"Rule 144A" shall mean Rule 144A promulgated under the Securities Act, as such rule may be amended from time to time, or any similar rule (other than Rule 144) or regulation hereafter adopted by the SEC.

"Rule 415" shall mean Rule 415 promulgated under the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC.

"SEC" shall mean the Securities and Exchange Commission.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Selling Holder" shall mean, on any date, any Holder that has delivered a Notice and Questionnaire to the Company on or prior to such date.

"Shelf Registration" shall have the meaning set forth in Section 2(b) hereof.

"Shelf Registration Statement" shall have the meaning set forth in Section 2(b) hereof.

"Subsequent Shelf Registration" shall have the meaning set forth in Section 2(b) hereof.

"Suspension Event" shall have the meaning set forth in Section 6(b) hereof.

"Suspension Notice" shall have the meaning set forth in Section 6(b) hereof.

"TIA" shall mean the Trust Indenture Act of 1939, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Trustee" shall mean the Trustee under the Indenture.

"Underlying Shares" shall have the meaning set forth in the second introductory paragraph hereto.

"Underwritten Registration" or "Underwritten Offering" shall mean a registration in which securities of the Company are sold to an underwriter for reoffering to the public.

2.     Shelf Registration.

(a)     Shelf Registration.  The Company shall file with the SEC a "shelf" Registration Statement for an offering to be made on a continuous basis pursuant to Rule 415 covering all of the Registrable Securities (the "Initial Shelf Registration") on or prior to the Filing Date.

The Initial Shelf Registration shall be on Form S-1, Form S-3 or another appropriate form permitting registration of such Registrable Securities for resale by Holders in the manner or manners designated by them (including, without limitation, one or more Underwritten Offerings; provided, that  the lead or managing underwriter in any Underwritten Offerings shall be reasonably acceptable to the Company).  The Company may permit securities other than the Registrable Securities to be included in the Initial Shelf Registration or any Subsequent Shelf Registration; provided, however, that to the extent that any securities may not be included on any such registration for any reason, no securities other than Registrable Securities shall be included therein unless all Registered Securities requested to be included therein are so included.

The Company shall use its commercially reasonable efforts to cause the Initial Shelf Registration to be declared effective under the Securities Act on or prior to the Effectiveness Date and to keep such Initial Shelf Registration continuously effective under the Securities Act until the date that is three (3) years after the Effectiveness Date, provided such period shall automatically be extended to the extent required to permit brokers and dealers to comply with Rule 174 under the Securities Act, as provided in Section 6 hereof or as otherwise provided herein (such period, as it may be extended or shortened pursuant to this Agreement, the "Effectiveness Period"), or such shorter period ending when no Registrable Securities continue to be outstanding.

(b)     Subsequent Shelf Registrations.  If the Initial Shelf Registration or any Subsequent Shelf Registration ceases to be effective for any reason at any time during the Effectiveness Period (other than because of the sale of all of the securities registered thereunder), the Company shall use its commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness thereof, and in any event shall within forty-five (45) days of such cessation of effectiveness amend the Initial Shelf Registration in a manner to obtain the withdrawal of the order suspending the effectiveness thereof, or file an additional "shelf" Registration Statement pursuant to Rule 415 covering all of the Registrable Securities (a "Subsequent Shelf Registration").  If a Subsequent Shelf Registration is filed, the Company shall use its commercially reasonable efforts to cause the Subsequent Shelf Registration to be declared effective under the Securities Act as soon as practicable after such filing and to keep such Registration Statement continuously effective for a period equal to the number of days in the Effectiveness Period less the aggregate number of days during which the Initial Shelf Registration or any Subsequent Shelf Registration was previously continuously effective.  As used herein, the term "Shelf Registration" means the Initial Shelf Registration and any Subsequent Shelf Registration and the term "Shelf Registration Statement" means any Registration Statement filed in connection with a Shelf Registration.

(c)     Supplements and Amendments.  The Company shall promptly supplement and amend the Shelf Registration if required by the rules, regulations or instructions applicable to the registration form used for such Shelf Registration, if required by the Securities Act, or, in the reasonable discretion of the Company, if reasonably requested by the Holders of the majority in Amount of Registrable Securities covered by such Registration Statement or by any underwriter of such Registrable Securities; provided, however, that the Company shall not be required to supplement or amend the Shelf Registration Statement during the occurrence of any of the events described in Section 6(a)(i) or (ii).

(d)     Notice and Questionnaire.  Each Holder agrees that if such Holder wishes to sell Registrable Securities pursuant to a Shelf Registration Statement and related Prospectus, it will do so only in accordance with this Section 2(d) and Section 4 hereof.  Each Holder wishing to sell Registrable Securities pursuant to a Shelf Registration Statement and related Prospectus agrees to deliver a Notice and Questionnaire to the Company at least five (5) Business Days prior to any intended distribution of Registrable Securities under the Shelf Registration Statement. From and after the date the Initial Shelf Registration Statement is declared effective, the Company shall, as promptly as practicable after the date a Notice and Questionnaire is delivered, and in any event upon five (5) Business Days after such date:

(i)     if required by applicable law, file with the SEC a post-effective amendment to the Shelf Registration Statement or prepare and, if required by applicable law, file a supplement to the related Prospectus or a supplement or amendment to any document incorporated therein by reference or file any other required document so that the Holder delivering such Notice and Questionnaire is named as a selling securityholder in the Shelf Registration Statement and the related Prospectus in such a manner as to permit such Holder to deliver such Prospectus to purchasers of the Registrable Securities in accordance with applicable law and, if the Company shall file a post-effective amendment to the Shelf Registration Statement, use its commercially reasonable efforts to cause such post-effective amendment to be declared effective under the Securities Act as promptly as is practicable, but in any event by the date (the "Amendment Effectiveness Deadline Date") that is forty-five (45) days after the date such post-effective amendment is required by this clause to be filed; provided, however, that such period shall be tolled for so long as information provided by or requested to be provided by any such Holder is reasonably likely to prevent the effectiveness of any such post-effective amendment or supplement;

(ii)     provide such Holder copies of any documents filed pursuant to Section 2(d)(i); and

(iii)     notify such Holder as promptly as practicable after the effectiveness under the Securities Act of any post-effective amendment filed pursuant to Section 2(d)(i).  Notwithstanding anything contained herein to the contrary, the Company shall be under no obligation to name any Holder that has not delivered a complete Notice and Questionnaire in accordance with this Section 2(d) and such other information to the Company as required by Section 4(r) hereof.

3.      Additional Interest.

(a)      The Company and the Purchasers agree that the Holders will suffer damages if the Company fails to fulfill certain of its obligations under Section 2 hereof or otherwise permits certain circumstances to exist and that it would not be feasible to ascertain the extent of such damages with precision.  Accordingly, the Company agrees to pay additional interest on the Notes ("Additional Interest") under the circumstances and to the extent set forth below (each of which shall be given independent effect; each a "Registration Default"):

(i)      if the Initial Shelf Registration is not filed on or prior to the Filing Date, then commencing on the day after the Filing Date, the interest rate on the Notes shall automatically increase by an amount equal to 0.25% per annum of the principal amount of the Notes and thereafter the interest rate on the Notes shall automatically increase by an additional amount equal to 0.25% per annum each subsequent ninety (90)-day period until all Registration Defaults have been cured, subject to a maximum increase in the interest rate pursuant to this Section 3 of 2.0%;

(ii)      if the Initial Shelf Registration or Subsequent Shelf Registration is not declared effective by the SEC on or prior to the Effectiveness Date, then commencing on the day after the Effectiveness Date, the interest rate on the Notes shall automatically increase by an amount equal to 0.25% per annum of the principal amount of the Notes and thereafter the interest rate on the Notes shall automatically increase by an additional amount equal to 0.25% per annum each subsequent ninety (90)-day period until all Registration Defaults have been cured, subject to a maximum increase in the interest rate pursuant to this Section 3 of 2.0%;

(iii)      if the Initial Shelf Registration or Subsequent Shelf Registration is not declared effective by the SEC on or prior to the Outside Date, then commencing on the day after the Outside Date, the interest rate on the Notes shall automatically increase by an amount equal to 0.25% per annum of the principal amount of the Notes and thereafter the interest rate on the Notes shall automatically increase by an additional amount equal to 0.25% per annum each subsequent ninety (90)-day period until all Registration Defaults have been cured, subject to a maximum increase in the interest rate pursuant to this Section 3 of 2.0%; and

(iv)      if a Shelf Registration has been declared effective and such Shelf Registration ceases to be effective at any time during the Effectiveness Period, then commencing on the day after the date such Shelf Registration ceases to be effective, the interest rate on the Notes shall automatically increase by an amount equal to 0.25% per annum of the principal amount of the Notes and thereafter the interest rate on the Notes shall automatically increase by an additional amount equal to 0.25% per annum each subsequent ninety (90)-day period until all Registration Defaults have been cured, subject to a maximum increase in the interest rate pursuant to this Section 3 of 2.0%;

provided, however, that Additional Interest on the Notes may not accrue under more than one of the foregoing clauses (i), (ii), (iii) and (iv) at any one time; and provided further, however, that (1) upon the filing of the Initial Shelf Registration as required hereunder (in the case of clause (a)(i) of this Section 3), (2) upon the effectiveness of the Initial Shelf Registration or Subsequent Shelf Registration as required hereunder (in the case of clause (a)(ii) and (a)(iii) of this Section 3), or (3) upon the effectiveness of a Shelf Registration which had ceased to remain effective (in the case of (a)(iv) of this Section 3), Additional Interest on the Notes as a result of such clause shall cease to accrue and the interest rate on the Notes will revert to the original interest rate of the Notes if no other Registration Default has occurred and is continuing; provided, however, any Additional Interest that has accrued and remains unpaid prior to the date on which the Company's obligation to pay Additional Interest ceases, shall be payable to the Holders of the Notes; provided further, that if additional interest on the Notes is owed pursuant to the Purchase Agreement or default interest is owed on the Notes pursuant to the terms of the Indenture, then on the date on which the Registration Default is cured, the interest rate on the Notes will revert to the then applicable rate on the Notes. Additional interest shall be computed based on the actual number of days elapsed during which any such Registration Default exists. Notwithstanding the foregoing, the maximum increase in the interest rate on the Notes pursuant to Section 4(k) of the Purchase Agreement and this Section 3 shall not in the aggregate exceed 2.0% per annum.

(b)     So long as Registrable Securities remain outstanding, the Company shall notify the Trustee within five (5) Business Days after each and every date on which an event occurs in respect of which Additional Interest is required to be paid. Any amounts of Additional Interest due pursuant to clause (a)(i), (a)(ii), (a)(iii) or (a)(iv) of this Section 3 will be payable in cash semi-annually on each January 15 and July 15 (each, a "Damages Payment Date"), commencing with the first such date occurring after any such Additional Interest commences to accrue, to Holders to whom regular interest on the Notes is payable on such Damages Payment Date.

4.     Registration Procedures.

In connection with the filing of any Registration Statement pursuant to Section 2 hereof, the Company shall effect such registrations to permit the sale of the securities covered thereby in accordance with the intended method or methods of disposition thereof, and pursuant thereto and in connection with any Registration Statement filed by the Company hereunder the Company shall:

(a)     Prepare and file with the SEC, on or prior to the Filing Date, a Registration Statement or Registration Statements as prescribed by Section 2 hereof, and use its commercially reasonable efforts to cause each such Registration Statement to become effective and remain effective as provided herein; provided, however, that before filing any Registration Statement or Prospectus or any amendments or supplements thereto, the Company shall furnish to and afford the Holders of the Registrable Securities covered by such Registration Statement and the managing underwriter or underwriters, if any, a reasonable opportunity to review copies of all such documents proposed to be filed (in each case, where possible, at least three (3) Business Days prior to such filing, or such later date as is reasonable under the circumstances). The Company shall not file any Registration Statement or Prospectus or any amendments or supplements thereto if the Holders of a majority in Amount of Registrable Securities covered by

such Registration Statement or the managing underwriter or underwriters, if any, shall reasonably object in writing within such period.

(b)     Prepare and file with the SEC such amendments and post-effective amendments to each Shelf Registration, as may be necessary to keep such Registration Statement continuously effective for the Effectiveness Period; cause the related Prospectus to be supplemented by any Prospectus supplement required by applicable law, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; and comply with the provisions of the Securities Act and the Exchange Act applicable to it with respect to the disposition of all Registrable Securities covered by such Registration Statement as so amended or in such Prospectus as so supplemented.

(c)     Notify the Selling Holders, Designated Counsel, if any, and the managing underwriter or underwriters, if any, promptly (but in any event within two (2) Business Days), (i) when a Prospectus or any prospectus supplement or post-effective amendment has been filed, and, with respect to a Registration Statement or any post-effective amendment, when the same has become effective under the Securities Act (including in such notice a written statement that any Holder may, upon request, obtain, at the sole expense of the Company, conformed copies of such Registration Statement or post-effective amendment including financial statements and schedules, documents incorporated or deemed to be incorporated by reference and exhibits), (ii) of the issuance by the SEC of any stop order suspending the effectiveness of a Registration Statement or of any order preventing or suspending the use of any preliminary prospectus or the initiation of any proceedings for that purpose, (iii) of the happening of any event, the existence of any condition or any information becoming known that makes any statement made in such Registration Statement or related Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires the making of any changes in or amendments or supplements to such Registration Statement, Prospectus or documents so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the Prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (iv) of the Company's determination that a post-effective amendment to a Registration Statement would be appropriate.

(d)     Use its commercially reasonable efforts to prevent the issuance of any order suspending the effectiveness of a Registration Statement or of any order preventing or suspending the use of a Prospectus and, if any such order is issued, to use its commercially reasonable efforts to obtain the withdrawal of any such order at the earliest possible moment, and provide prompt notice to the Selling Holders, Designated Counsel, if any, and the managing underwriter or underwriters, if any, of the withdrawal of any such order.

(e)     If requested by the managing underwriter or underwriters, if any, or the Holders of the majority in Amount of Registrable Securities being sold in connection with an underwritten offering and reasonably acceptable to the Company (i) promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or underwriters, if any, or such Holders reasonably determine, in consultation with

the Company, is necessary to be included therein, (ii) make all required filings of such prospectus supplement or such post-effective amendment as soon as reasonably practicable after the Company has received notification of the matters to be incorporated in such prospectus supplement or post-effective amendment and (iii) supplement or make amendments to such Registration Statement.

(f)     Furnish to each Selling Holder, Designated Counsel, if any, and the managing underwriter or underwriters, if any, at the sole expense of the Company, conformed copies of the Registration Statement or Registration Statements and each post-effective amendment thereto, including financial statements and schedules, and, if requested, all documents incorporated or deemed to be incorporated therein by reference and all exhibits.

(g)     Deliver to each Selling Holder, Designated Counsel, if any, and the managing underwriter or underwriters, if any, at the sole expense of the Company, as many copies of the Prospectus (including each form of preliminary prospectus) and each amendment or supplement thereto and any documents incorporated by reference therein as such Persons may reasonably request; and the Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the Selling Holders of Registrable Securities, the managing underwriter or underwriters, if any, and dealers, if any, in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(h)     The Company agrees to cause the Company's counsel to perform blue sky investigations and file registrations and qualifications required to be filed in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities or offer and sale under the securities or blue sky laws of such jurisdictions within the United States as any Selling Holder or the managing underwriter or underwriters, if any, reasonably request, keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective and do any and all other acts or things reasonably necessary or advisable under blue sky laws to enable the disposition in such jurisdictions of the Registrable Securities covered by the applicable Registration Statement; provided, however, that the Company shall not be required to (A) qualify generally to do business in any jurisdiction where it is not then so qualified, or (B) subject itself to taxation in any such jurisdiction where it is not then so subject.

(i)     Cooperate with the Selling Holders, the managing underwriter or underwriters, if any, and their respective counsel to facilitate the timely preparation and delivery of certificates representing shares of Registrable Securities to be sold, which certificates shall not bear any restrictive legends and shall be in a form eligible for deposit with the Depositary; and enable such shares of Registrable Securities to be in such denominations and registered in such names as the managing underwriter or underwriters, if any, or Holders may reasonably request.

(j)     Upon the occurrence of any event contemplated by Section 4(c)(ii), 4(c)(iii) or 4(c)(iv) hereof, as promptly as practicable prepare and (subject to Section 4(a) hereof) file with the SEC, at the sole expense of the Company, a supplement or post-effective amendment to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, or file any other

required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, any such Prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(k)     Prior to the effective date of the first Registration Statement relating to the Registrable Securities, (i) provide the Trustee with certificates for the Registrable Securities in a form eligible for deposit with the Depositary and (ii) provide CUSIP numbers for the Registrable Securities.

(l)     In connection with any underwritten offering of Registrable Securities pursuant to a Shelf Registration, enter into an underwriting agreement, reasonably satisfactory in form and substance to the Company, as is customary in underwritten offerings of securities similar to the Registrable Securities and take all such other actions as are reasonably requested by the managing underwriter or underwriters in order to expedite or facilitate the registration or the disposition of such Registrable Securities and, in such connection, (i) make such representations and warranties to, and covenants with, the managing underwriter or underwriters with respect to the business of the Company and its subsidiaries (including any acquired business, properties or entity, if applicable) and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, as are customarily made by issuers to underwriters in underwritten offerings of securities similar to the Registrable Securities and confirm the same in writing if and when requested; (ii) obtain the written opinion of counsel to the Company and written updates thereof in form, scope and substance reasonably satisfactory to the managing underwriter or underwriters, addressed to the managing underwriter or underwriters covering the matters customarily covered in opinions requested in underwritten offerings of securities similar to the Registrable Securities and such other matters as may be reasonably requested by the managing underwriter or underwriters; (iii) obtain "cold comfort" letters and updates thereof in form, scope and substance reasonably satisfactory to the managing underwriter or underwriters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included or incorporated by reference in the Registration Statement), addressed to each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings of securities similar to the Registrable Securities and such other matters as reasonably requested by the managing underwriter or underwriters; and (iv) if an underwriting agreement is entered into, cause the same to contain indemnification provisions and procedures no less favorable to the sellers and underwriters, if any, than those set forth in Section 7 hereof (or such other provisions and procedures acceptable to Holders of a majority in aggregate principal amount of Registrable Securities covered by such Registration Statement and the managing underwriter or underwriters or agents, if any).  The above shall be done as and to the extent required by such underwriting agreement.

(m)     Make available at reasonable times for inspection by one or more representatives of the Selling Holders, designated in writing by Holders of a majority in Amount of Registrable Securities to be included in such Registration Statement of such Registrable Securities being sold, any managing underwriter or underwriters participating in any such

disposition of Registrable Securities, if any, and any attorney, accountant or other agent retained by any such Selling Holder or underwriter (collectively, the "Inspectors"), at the offices where normally kept, during reasonable business hours at such time or times as shall be mutually convenient for the Company and the Inspectors as a group, all financial and other records, pertinent corporate documents and instruments of the Company and its subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise any applicable due diligence responsibilities, and cause the officers, directors and employees of the Company and its subsidiaries to supply all information reasonably requested by any such Inspector in connection with such Registration Statement. Records that the Company determines, in good faith, to be confidential and any Records that it notifies the Inspectors are confidential shall not be disclosed by any Inspector unless (i) the disclosure of such Records is necessary to avoid or correct a material misstatement or material omission in such Registration Statement, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, (iii) disclosure of such information is, in the opinion of counsel for any Inspector, necessary or advisable in connection with any action, claim, suit or proceeding, directly involving or potentially involving such Inspector and arising out of, based upon, relating to, or involving this Agreement or any transactions contemplated hereby or arising hereunder or (iv) the information in such Records has been made generally available to the public other than through the acts of such Inspector; provided, however, that prior notice shall be provided as soon as practicable to the Company of the potential disclosure of any information by such Inspector pursuant to clauses (ii) or (iii) of this sentence to permit the Company to obtain a protective order (or waive the provisions of this paragraph (m)). Each Inspector shall take such actions as are reasonably necessary to protect the confidentiality of such information (if practicable) to the extent such actions are otherwise not inconsistent with, an impairment of or in derogation of the rights and interests of the Holder or any Inspector, unless and until such information in such Records has been made generally available to the public other than as a result of a breach of this Agreement.

(n)     Provide (i) the Holders of the Registrable Securities to be included in such Registration Statement and Designated Counsel, if any, (ii) the underwriters (which term, for purposes of this Registration Rights Agreement, shall include a Person deemed to be an underwriter within the meaning of Section 2(11) of the Securities Act), if any, thereof, (iii) the sales or placement agent, if any, thereof, and (iv) one counsel for such underwriters or agents, reasonable opportunity to participate in the preparation of such Registration Statement, each prospectus included therein or filed with the SEC, and each amendment or supplement thereto.

(o)     Comply with all applicable rules and regulations of the SEC and make generally available to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any similar rule promulgated under the Securities Act) no later than forty-five (45) days after the end of any twelve (12)-month period (or ninety (90) days after the end of any twelve (12)-month period if such period is a fiscal year) (i) commencing at the end of any fiscal quarter in which Registrable Securities are sold to underwriters in a firm commitment or commercially reasonable efforts underwritten offering and (ii) if not sold to underwriters in such an offering, commencing on the first day of the first fiscal quarter of the Company after the effective date of a Registration Statement, which statements shall cover said twelve (12)-month periods.

PDFfile.doc

(p)     Cooperate with each Selling Holder of Registrable Securities covered by any Registration Statement and the managing underwriter or underwriters, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the NASD, Inc. (the "NASD"), including, if the Conduct Rules of the NASD or any successor thereto as amended from time to time so require, engaging a "qualified independent underwriter" ("QIU") as contemplated therein and making Records available to such QIU as though it were a participating underwriter for the purposes of Section 4(m) and otherwise applying the provisions of this Agreement to such QIU (including indemnification) as though it were a participating underwriter.

(q)     Cause the Indenture to be qualified under the TIA and in connection therewith, cooperate with the Trustee and the Holders of the Registrable Securities and their respective counsel to effect such changes to the Indenture as may be required for the Indenture to be so qualified in accordance with the terms of the TIA; and execute, and use its commercially reasonable efforts to cause the Trustee to execute, all documents as may be required to effect such changes and all other forms and documents required to be filed with the SEC to enable the Indenture to be so qualified in a timely manner.

(r)     Use its commercially reasonable efforts to take all other steps necessary or advisable to effect the registration of the Registrable Securities covered by a Registration Statement contemplated hereby.

Each Holder agrees, by acquisition of the Registrable Securities, that no Holder shall be entitled to sell any of such Registrable Securities pursuant to a Registration Statement or to receive a Prospectus relating thereto, unless such Holder has furnished the Company with a Notice and Questionnaire as required pursuant to Section 2(d) hereof (including the information required to be included in such Notice and Questionnaire) and the information set forth in the next sentence.  Each Selling Holder agrees promptly to furnish to the Company all information required to be disclosed in order to make the information previously furnished to the Company by such Selling Holder not misleading and any other information regarding such Selling Holder and the distribution of such Registrable Securities as the Company may from time to time reasonably request.  Any sale of any Registrable Securities by any Holder shall constitute a representation and warranty by such Holder that the information relating to such Holder and its plan of distribution is as set forth in the Prospectus delivered by such Holder in connection with such disposition, that such Prospectus does not as of the time of such sale contain any untrue statement of a material fact relating to or provided by such Holder or its plan of distribution and that such Prospectus does not as of the time of such sale omit to state any material fact relating to or provided by such Holder or its plan of distribution necessary to make the statements in such Prospectus, in the light of the circumstances under which they were made, not misleading.

The Company may require each Selling Holder of Registrable Securities as to which any registration is being effected to furnish to the Company such additional information regarding such Holder and the distribution of such Registrable Securities as the Company may, from time to time, reasonably request to the extent necessary or advisable to comply with the Securities Act.  The Company may exclude from such registration the Registrable Securities of any Selling Holder if such Holder fails to furnish such additional information within twenty (20) Business Days after receiving such request.  Each Selling Holder as to which any Shelf

Registration is being effected agrees to furnish promptly to the Company all information required to be disclosed so that the information previously furnished to the Company by such Holder is not materially misleading and does not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made.

Each Holder of Registrable Securities agrees by acquisition of such Registrable Securities that upon the happening of any event of the kind described in Section 4(c)(ii), 4(c)(iii) or 4(c)(iv) hereof, such Holder will forthwith discontinue disposition of such Registrable Securities covered by such Registration Statement or Prospectus until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by Section 4(j) hereof, or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amendments or supplements thereto.

5.      Registration Expenses.

(a)      All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company, including, without limitation, (i) all registration and filing fees (including, without limitation, (A) fees with respect to filings required to be made with the NASD in connection with an underwritten offering and (B) fees and expenses of compliance with state securities or blue sky laws, including, without limitation, reasonable fees and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as provided in Section 4(h) hereof), (ii) printing expenses, including, without limitation, expenses of printing certificates for Registrable Securities in a form eligible for deposit with the Depositary and of printing prospectuses if the printing of prospectuses is requested by the managing underwriter or underwriters, if any, or by the Holders of the majority in Amount of Registrable Securities included in any Registration Statement, (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) fees and disbursements of all independent certified public accountants referred to in Section 4(l)(iii) hereof (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to such performance), (vi) Securities Act liability insurance, if the Company desires such insurance, (vii) fees and expenses of all other Persons retained by the Company, (viii) internal expenses of the Company (including, without limitation, all salaries and expenses of officers and employees of the Company performing legal or accounting duties), (ix) the expense of any annual audit, (x) the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange, if applicable, and (xi) the expenses relating to printing, word processing and distributing all Registration Statements, underwriting agreements, securities sales agreements and any other documents necessary in order to comply with this Agreement.  Notwithstanding anything in this Agreement to the contrary, each Holder shall pay all underwriting discounts and brokerage commissions with respect to any Registrable Securities sold by it and, except as set forth in Section 5(b) below the Company shall not be responsible for the fees and expenses of any counsel for the Holders.

(b)    The Company shall reimburse the Holders of the Registrable Securities being registered in a Shelf Registration for the reasonable fees and disbursements, not to exceed $75,000, of Designated Counsel.

(c)    <u>Black-Out Period</u>.Subject to the provisions of this Section 6 and a good faith determination by a majority of the members of the Board of Directors of the Company that it is in the best interests of the Company to suspend the use of the Registration Statement, following the effectiveness of a Registration Statement (and the filings with any international, federal or state securities commissions), the Company, by written notice to the Holders, may direct the Holders to suspend sales of the Registrable Securities pursuant to a Registration Statement for such times as the Company reasonably may determine is necessary and advisable (but in no event for more than an aggregate of sixty (60)-days in any rolling twelve (12)-month period commencing on the Closing Date, or thirty (30)-days in any rolling ninety (90)-day period, and no more than two (2) separate times in any rolling 12 month period) if any of the following events shall occur: (i) a primary Underwritten Offering by the Company where the Company is advised by the representative of the managing underwriters for such Underwritten Offering that the sale of Registrable Securities pursuant to the Registration Statement would have a material adverse effect on the Company's Underwritten Offering; (ii) a majority of the members of the Board of Directors of the Company in good faith determine that (A) the offer or sale of any Registrable Securities would materially impede, delay or interfere with any material proposed acquisition, merger, tender offer, business combination, corporate reorganization, consolidation or other similar material transaction involving the Company, (B) after the advice of counsel, sale of Registrable Securities pursuant to the Registration Statement would require disclosure of non-public material information not otherwise required to be disclosed under applicable law, and (C) disclosure could have a material adverse effect on the Company or the Company's ability to consummate such transaction in each case under circumstances that would make it impracticable or inadvisable to cause the Registration Statement (or such filings) to become effective or to promptly amend or supplement the Registration Statement on a post-effective basis, as applicable; or (iii) a majority of the members of the Board of Directors of the Company shall have determined in good faith, after the advice of counsel, that it is required by law, rule or regulation to supplement the Registration Statement or file a post-effective amendment to the Registration Statement in order to incorporate information into the Registration Statement for the purpose of (A) including in the Registration Statement any Prospectus required under Section 10(a)(3) of the Securities Act; (B) reflecting in the Prospectus included in the Registration Statement any facts or events arising after the effective date of the Registration Statement (or of the most-recent post-effective amendment) that, individually or in the aggregate, represents a fundamental change in the information set forth therein; or (C) including in the Prospectus included in the Registration Statement any material information with respect to the plan of distribution not disclosed in the Registration Statement or any material change to such information. Upon the occurrence of any such suspension, the Company shall use its commercially reasonable efforts to cause the Registration Statement to become effective or to promptly amend or supplement the Registration Statement on a post-effective basis or to take such action as is necessary to permit resumed use of the Registration Statement as soon as possible.

(d)    In the case of an event that causes the Company to suspend the use of a Registration Statement (a "<u>Suspension Event</u>"), the Company shall give written notice (a

"Suspension Notice") to the Holders to suspend sales of the Registrable Securities and such notice shall state generally the basis for the notice and certify, by an officer of the Company, that such suspension shall continue only for so long as the Suspension Event or its effect is continuing and the Company is taking all reasonable steps to terminate suspension of the use of the Registration Statement as promptly as possible. The Holders shall not effect any sales of the Registrable Securities pursuant to such Registration Statement (or such filings) at any time after receiving a Suspension Notice from the Company and prior to receipt of an End of Suspension Notice (as defined below). If so directed by the Company, each Holder will deliver to the Company (at the expense of the Company) all copies other than permanent file copies then in such Holder's possession of the Prospectus covering the Registrable Securities at the time of receipt of the Suspension Notice. The Holders may recommence effecting sales of the Registrable Securities pursuant to the Registration Statement (or such filings) following further notice to such effect (an "End of Suspension Notice") from the Company, which End of Suspension Notice shall be given by the Company to the Holders in the manner described above promptly following the conclusion of any Suspension Event and its effect.

(e)     Notwithstanding any provision herein to the contrary, if the Company shall give a Suspension Notice pursuant to this Section 6 with respect to any Registration Statement, the Company agrees that it shall extend the period of time during which such Registration Statement shall be maintained effective pursuant to this Agreement by the number of days during the period from the date of the giving of a Suspension Notice to and including the date when Holders shall have received an End of Suspension Notice and copies of the supplemented or amended Prospectus necessary to resume sales, with respect to each Suspension Event; provided such period of time shall not be extended beyond the date that Underlying Shares are not Registrable Securities.

6.     Indemnification.

The Company agrees to indemnify and hold harmless (i) each Holder (which, for the absence of doubt, for purposes of this Section 7 shall include the Purchasers), (ii) each Person, if any, who controls (within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act) any Holder (any of the Persons referred to in this clause (ii) being hereinafter referred to as a "Controlling Person"), (iii) the respective officers, directors, partners, members, employees, representatives and agents of any Holder (including any predecessor holder) or any controlling person (any person referred to in clause (i), (ii) or (iii) may hereinafter be referred to as an "Indemnified Holder"), against any losses, claims, damages, liabilities or expenses to which such Indemnified Holder may become subject under the Securities Act or otherwise, (A) insofar as such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus, (B) insofar as such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in the light of the circumstances in which they were made, (C) to the extent of the aggregate amount paid in settlement of any litigation, or any investigation or proceeding by any court or governmental agency or body, commenced or threatened, or of any claim whatsoever

based upon any such untrue statement or omission, or any such alleged untrue statement or omission, or (D) insofar as such losses, claims, damages, liabilities or expenses arise out investigating, preparing or defending against any litigation, or any investigation or proceeding by any court or governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission; provided, however, that the Company will not be liable under this paragraph, to the extent that (i) any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement, or omission or alleged omission made in any such Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus in reliance upon and in conformity with written information relating to any Holder furnished to the Company or any underwriter by or on behalf of such Holder specifically for use in therein or (ii) any untrue statement contained in or omission from a preliminary Prospectus if a copy of the Prospectus (as then amended or supplemented, if the Company shall have furnished to or on behalf of the Holder participating in the distribution relating to the relevant Registration Statement any amendments or supplements thereto) was not sent or given by or on behalf of such Holder to the Person asserting any such liabilities who purchased Underlying Shares, if such Prospectus (or Prospectus as amended or supplemented) is required by law to be sent or given at or prior to the written confirmation of the sale of such Underlying Shares to such Person and the untrue statement contained in or omission from such preliminary Prospectus was corrected in the Prospectus (or the Prospectus as amended or supplemented if the Company shall have furnished any amendments or supplements thereto). The indemnity provided for herein shall remain in full force and effect regardless of any investigation made by or on behalf of any such Holder. The Company shall notify such Indemnified Holder promptly of the institution, threat or assertion of any claim, proceeding (including any governmental investigation) or litigation in connection with the matters addressed by this Agreement which involves the Company or such Indemnified Holder.

The Company agrees to reimburse each Indemnified Holder upon demand for any legal or other expenses reasonably incurred by such Indemnified Holder in connection with investigating or defending any such loss, claim, damage or liability, action or proceeding or in responding to a subpoena or governmental inquiry related to the offering of the Registrable Securities, whether or not such Indemnified Holder is a party to any action or proceeding. In the event that it is finally judicially determined that an Indemnified Holder was not entitled to receive payments for legal and other expenses pursuant to this paragraph, such Indemnified Holder will promptly return all sums that had been advanced pursuant hereto.

Each Holder agrees, severally and not jointly, to indemnify and hold harmless the Company, its directors and officers and each Person who controls the Company (within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act) to the same extent as the indemnity provided in the first paragraph of this Section 7 from the Company to each Holder, but only with reference to such losses, claims, damages, liabilities or expenses which are caused by any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information relating to a Holder furnished to the Company or any underwriter in writing by such Holder expressly for use in any Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus. The liability of any Holder under this paragraph shall in no event exceed the net

proceeds received by such Holder from sales of Registrable Securities giving rise to such obligation.

In case any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any Person in respect of which indemnity may be sought pursuant to either of the first and third paragraphs of this Section 7, such Person (the "Indemnified Person") shall promptly notify the Person or Persons against whom such indemnity may be sought (each an "Indemnifying Person") in writing. No indemnification provided for in the first or third paragraphs of this Section 7 shall be available to any Person who shall have failed to give notice as provided in this paragraph if the party to whom notice was not given was unaware of the proceeding to which such notice would have related and was materially prejudiced by the failure to give such notice, but the failure to give such notice shall not relieve the Indemnifying Person or Persons from any liability which it or they may have to the Indemnified Person for contribution or otherwise than on account of the provisions of the first and third paragraphs of this Section 7. In case any such proceeding shall be brought against any Indemnified Person and it shall notify the Indemnifying Person of the commencement thereof, the Indemnifying Person shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other Indemnifying Person similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person and shall pay as incurred (or within 30 days of presentation) the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Indemnified Person shall have the right to retain its own counsel at its own expense. Notwithstanding the foregoing, the Indemnifying Person shall pay as incurred (or within 30 days of presentation) the fees and expenses of the counsel retained by the Indemnified Person in the event (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the retention of such counsel, (ii) the named parties to any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them or (iii) the Indemnifying Person shall have failed to assume the defense and employ counsel reasonably acceptable to the Indemnified Person within a reasonable period of time after notice of commencement of the action. It is understood that the Indemnifying Person shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such Indemnified Persons. Such firm shall be designated in writing by a majority in Amount of Registrable Securities in the case of parties indemnified pursuant to the first paragraph of this Section 7 and by the Company in the case of parties indemnified pursuant to the third paragraph of this Section 7. The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify the Indemnified Person from and against any loss or liability by reason of such settlement or judgment. In addition, the Indemnifying Person will not, without the prior written consent of the Indemnified Person, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding of which indemnification may be sought hereunder (whether or not any Indemnified Person is an actual or potential party to such claim, action or proceeding) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action or proceeding.

To the extent the indemnification provided for in this Section 7 is unavailable to or sufficient to hold harmless an Indemnified Person under the first or third paragraph of this Section 7 in respect of any losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) referred to therein, except by reason of the exceptions set forth in the first or third paragraphs of this Section 7 or the failure of the Indemnified Person to give notice as required in the fourth paragraph of this Section 7, then each Indemnifying Person shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Indemnifying Person on the one hand and the Indemnified Person on the other hand from the offering of the Notes pursuant to the Purchase Agreement and the Registrable Securities pursuant to any Shelf Registration. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law then each Indemnifying Person shall contribute to such amount paid or payable by such Indemnified Person in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Indemnifying Person on the one hand and the Indemnified Person on the other in connection with the statements or omissions which resulted in such losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and any Indemnified Holder on the other shall be deemed to be in the same proportion as the total net proceeds (before deducting expenses) received by the Company from the offering and sale of the Notes bear to the total net proceeds received by such Indemnified Holder from sales of Registrable Securities giving rise to such obligations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or such Indemnified Holder on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Purchasers agree that it would not be just and equitable if contributions pursuant to the immediately preceding paragraph of this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages, liabilities or expenses (or actions or proceedings in respect thereof) referred to in the immediately preceding paragraph shall be deemed to include any legal or other expenses reasonably incurred by such Indemnified Person in connection with investigating or defending any such action or claim or enforcing any rights hereunder. Notwithstanding the provisions of this paragraph and the immediately preceding paragraph of this Section 7, (i) in no event shall any Holder be required to contribute any amount in excess of the amount by which the net proceeds received by such Holder from the offering or sale of the Registrable Securities pursuant to a Shelf Registration Statement exceeds the amount of damages which such Holder would have otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission and (ii) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Except as otherwise provided in this Section 7, any losses, claims, damages, liabilities or expenses for which an Indemnified Person is entitled to indemnification or contribution under this Section 7 shall be paid by the Indemnifying Person to the Indemnified Person as such losses, claims, damages, liabilities or expenses are incurred (or within thirty (30) days of presentation).

The remedies provided for in this Section 7 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any indemnified party at law or in equity.

The indemnity and contribution agreements contained in this Section 7 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Holder or any Person controlling any Holder or by or on behalf of the Company, its officers or directors or any other Person controlling any of the Company and (iii) acceptance of and payment for any of the Registrable Securities.

7.   <u>Rules 144 and 144A</u>.

The Company covenants that it will file the reports required to be filed by it under the Indenture, the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder in a timely manner, other than the filing by the Company of its annual report on Form 10-K for the year ended December 31, 2004 by [_____] **[DATE TO BE AGREED TO BY COMPANY AND PURCHASERS]**, in accordance with the requirements of the Indenture, the Securities Act and the Exchange Act and, for so long as any Registrable Securities remain outstanding, if at any time the Company is not required to file such reports, it will (a) make publicly available such information as is necessary to permit sales pursuant to Rule 144, (b) deliver such information to a prospective purchaser as is necessary to permit sales pursuant to Rule 144A and it will take such further action as any Holder of Registrable Securities may reasonably request, and (c) take such further action, if any, that is reasonable in the circumstances, in each case, to the extent required from time to time to enable such Holder to sell its Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144, (ii) Rule 144A or (iii) any similar rules or regulations hereafter adopted by the SEC.  Upon the request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements.

8.   <u>Underwritten Registrations</u>.

If any of the Registrable Securities covered by any Shelf Registration are to be sold in an underwritten offering, the investment banker or investment bankers and manager or managers that will manage the offering will be selected by, and the underwriting arrangements with respect thereto will be approved by the majority in Amount of Registrable Securities to be included in such offering in consultation with the Company; <u>provided</u>, that no managing investment banker or underwriter shall be chosen to which the Company shall reasonably object.

No Holder of Registrable Securities may participate in any underwritten registration hereunder unless such Holder (a) agrees to sell such Holder's Registrable Securities

on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.

9.    Miscellaneous.

(a)    No Inconsistent Agreements.  The Company has not, as of the date hereof, and the Company shall not, after the date of this Agreement, enter into any agreement with respect to any of its securities that is inconsistent with the rights granted to the Holders of Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof.

(b)    Adjustments Affecting Registrable Securities.  The Company shall not, directly or indirectly, take any action with respect to the Registrable Securities as a class that would materially and adversely affect the ability of the Holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement.

(c)    Amendments and Waivers.  The provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, otherwise than with the prior written consent of the Company and the Holders of not less than the majority in Amount of Registrable Securities then outstanding; provided, however, that Section 7 and this Section 10(c) may not be amended, modified or supplemented without the prior written consent of the Company and each Holder (including, in the case of an amendment, modification or supplement of Section 7, any Person who was a Holder of Registrable Securities disposed of pursuant to any Registration Statement). Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of Holders of Registrable Securities whose securities are being sold pursuant to a Registration Statement and that does not directly or indirectly affect, impair, limit or compromise the rights of other Holders of Registrable Securities may be given by Holders of at least a majority in principal amount of the Registrable Securities being sold by such Holders pursuant to such Registration Statement.

(d)    Notices.  All notices and other communications (including without limitation any notices or other communications to the Trustee) provided for or permitted hereunder shall be made in writing by hand-delivery, registered first-class mail, next-day air courier or facsimile:

(1)     if to a Holder, at the most current address of such Holder set forth on the records of the registrar under the Indenture, in the case of Holders of Notes, and the stock ledger of the Company, in the case of Holders of common stock of the Company, unless, in either such case, any Holder shall have provided notice information in a Notice and Questionnaire or any amendment thereto, in which case such information shall control.

(2)     if to the Company:

RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Facsimile No.:  (609) 734-3701
Attention:  Deborah M. Royster, Esq.

with copies to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile No.:  (212) 735-2000
Attention:  Alan G. Straus, Esq.

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; one Business Day after being timely delivered to a next-day air courier; and when the addressor receives facsimile confirmation, if sent by facsimile during normal business hours, and otherwise on the next Business Day during normal business hours.

(e)     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto, including, without limitation, the Holders and without the need for an express assignment, subsequent Holders.  If any transferee of any Holder shall acquire the Registrable Securities, in any manner, whether by operation of law or otherwise, such Registrable Securities shall be held subject to all of the terms of this Agreement, and by taking and holding such Registrable Securities, such Person shall be conclusively deemed to have agreed to be bound by and to perform all of the terms and provisions of this Agreement and such Person shall be entitled to receive the benefits hereof.

(f)     Counterparts.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(g)     Headings.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(h)     Governing Law; Jurisdiction; Waiver of Jury Trial.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of

law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH RESPECT TO THIS AGREEMENT AND REPRESENTS THAT COUNSEL HAS BEEN CONSULTED SPECIFICALLY AS TO THIS WAIVER.

(i)     Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.  It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(j)     Securities Held by the Company or Its Affiliates.  Whenever the consent or approval of Holders of a specified percentage in Amount of Registrable Securities is required hereunder, Registrable Securities held by the Company or its affiliates (as such term is defined in Rule 405 under the Securities Act) shall not be counted in determining whether such consent or approval was given by the Holders of such required percentage.

(k)     Third-Party Beneficiaries.  Holders of Registrable Securities are intended third party beneficiaries of this Agreement and the Company and each Holder shall have the right to enforce this Agreement directly to the extent it deems such enforcement necessary or advisable to protect its rights or the rights of Holders hereunder.

(l)     Entire Agreement.  This Agreement, together with the Purchase Agreement, the Indenture and the Note, is intended by the parties as a final and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein and any and all prior oral or written agreements, representations, or warranties, contracts, understandings, correspondence, conversations and memoranda between the Purchasers on the one hand and the Company on the other, or between or among any agents, representatives, parents, subsidiaries, affiliates, predecessors in interest or successors in interest with respect to the subject matter hereof and thereof are merged herein and replaced hereby.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

RCN CORPORATION

By: _____
    Name:
    Title:

D.E. SHAW LAMINAR LENDING 2, INC.

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

RCN CORPORATION

By: _____
    Name:
    Title:

[_____]

By: _____
    Name:
    Title:

# SCHEDULE I

## *Purchasers*

**Name and Address**

D.E. Shaw Laminar Lending 2, Inc.
120 West 45th Street
New York, NY 10036
Facsimile: (212) 845-0100
Attention: Max Holmes (with a copy of the same to attn: General Counsel)

with copies to (which shall not constitute notice):
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Facsimile No.:  (212) 728-9512
Attention:  Holly K. Youngwood, Esq.


[_____]
[_____]
Facsimile: (    )
Attention:

with copies to (which shall not constitute notice):
[_____]
[_____]
Facsimile: (    )
Attention:


[_____]
[_____]
Facsimile: (    )
Attention:

with copies to  (which shall not constitute notice):
[_____]
[_____]
Facsimile: (    )
Attention:


[_____]
[_____]
Facsimile: (    )
Attention:

with copies to (which shall not constitute notice):
[_____]
[_____]
Facsimile: (    )
Attention:

# APPENDIX A

## _Notice and Questionnaire_

# FORM OF SELLING SECURITYHOLDER NOTICE AND QUESTIONNAIRE

The undersigned beneficial holder of 7 3/8% Convertible Second-Lien Notes due 2012 (the "Notes") of RCN Corporation, a Delaware corporation (the "Company"), or common stock, par value $[0.01] per share (the "Common Stock" and together with the Notes, the "Registrable Securities"), of the Company understands that the Company has filed or intends to file with the Securities and Exchange Commission a registration statement (the "Shelf Registration Statement") for the registration and resale of the Registrable Securities in accordance with the terms of the Registration Rights Agreement, dated as of [_____], 2004 (the "Registration Rights Agreement"), by and among the Company and the purchasers named therein. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below.

Each beneficial owner of Registrable Securities is entitled to the benefits of the Registration Rights Agreement. In order to sell or otherwise dispose of any Registrable Securities pursuant to the Shelf Registration Statement, a beneficial owner of Registrable Securities generally will be required to be named as a selling securityholder in the related prospectus, deliver a prospectus to each purchaser of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such beneficial owner (including certain indemnification provisions, as described below). Beneficial owners are encouraged to complete and deliver this Selling Securityholder Notice and Questionnaire prior to the effectiveness of the Shelf Registration Statement so that such beneficial owners may be named as selling securityholders in the related prospectus at the time of effectiveness. Any beneficial owner of Notes wishing to include its Registrable Securities must deliver to the Company a properly completed and signed Selling Securityholder Notice and Questionnaire.

Certain legal consequences arise from being named as a selling securityholder in the Shelf Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling securityholder in the Shelf Registration Statement and the related prospectus.

**Notice**

The undersigned beneficial owner (the "Selling Securityholder") of Registrable Securities hereby gives notice to the Company of its intention to sell or otherwise dispose of Registrable Securities beneficially owned by it and listed below in Item 3 (unless otherwise specified under Item 3) pursuant to the Shelf Registration Statement. The undersigned, by signing and returning this Selling Securityholder Notice and Questionnaire, understands that it will be bound by the terms and conditions of this Selling Securityholder Notice and Questionnaire and the Registration Rights Agreement.

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate and complete as of the date below:

**Questionnaire**

1.      (a)      Full Legal Name of Selling Securityholder:

_____

(b)      Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities listed in (3) below are held:

_____

(c)      Full Legal Name of DTC Participant (if applicable and if not the same as (b) above) through which Registrable Securities listed in (3) below are held:

_____

2.      Address for Notices to Selling Securityholder:

_____

_____

Telephone: _____

Fax: _____

Contact Person: _____

3.      Beneficial Ownership of Registrable Securities:

(a)      Type and Principal Amount of Registrable Securities beneficially owned:

_____

_____

(b)      CUSIP No(s). of Registrable Securities beneficially owned:

_____

_____

4.      If other than a natural person, please indicate the form or organization of the Selling Securityholder (e.g. corporation, limited liability company, limited partnership, general partnership, trust, estate, etc.):

_____

5.      If the Selling Securityholder is not a natural person, and is not a publicly traded entity, please identify the individuals who beneficially own the shares or interests of the Selling

Securityholder (including any intermediate entities through which such beneficial ownership is held) and the amounts and percentages of such ownership:

_____

_____

6. Please indicate whether the Selling Securityholder is a "broker" or a "dealer" (as such terms are defined in Section 3 of the Securities Exchange Act of 1934, as amended) or an affiliate of any broker or dealer.

_____

_____

7. If the Selling Securityholder is an affiliate of any broker or dealer, please indicate by checking the appropriate box whether the answer to the following questions is "True" or "False."

(a) The Selling Securityholder purchased the Registrable Securities in the ordinary course of business.

___ True        ___ False

(b) At the time of the purchase of the Registrable Securities to be resold, the Selling Securityholder had no agreements or understandings, directly or indirectly, with any person to distribute them.

___ True        ___ False

8. Beneficial Ownership of the Company's securities owned by the Selling Securityholder:

Except as set forth below in this Item (4), the undersigned is not the beneficial or registered owner of any "Other Securities," defined as securities of the Company other than the Registrable Securities listed above in Item (3).

(a) Type and Amount of Other Securities beneficially owned by the Selling Securityholder:

_____

_____

(b) CUSIP No(s). of such Other Securities beneficially owned:

_____

_____

PDFfile.doc

9.      Relationship with the Company:

Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equityholders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.

State any exceptions here:

_____

_____

_____

_____

10.     Plan of Distribution:

Except as set forth below, the undersigned (including its donees or pledgees) intends to distribute the Registrable Securities listed above in Item (3) pursuant to the Shelf Registration Statement only as follows (if at all):  Such Registrable Securities may be sold from time to time directly by the undersigned or alternatively, through underwriters, broker-dealers or agents (with the prior agreement of the Company).  If the Registrable Securities are sold through underwriters or broker-dealers, the Selling Securityholder will be responsible for underwriting discounts or commissions or agent's commissions.  Such Registrable Securities may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale, or at negotiated prices.  Such sales may be effected in transactions (which may involve block transactions) (i) on any national securities exchange or quotation service on which the Registrable Securities may be listed or quoted at the time of sale, (ii) in the over-the-counter market, (iii) in transactions otherwise than on such exchanges or services or in the over-the-counter market, or (iv) through the writing of options.  In connection with sales of the Registrable Securities or otherwise, the undersigned may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the Registrable Securities and deliver Registrable Securities to close out such short positions, or loan or pledge Registrable Securities to broker-dealers that in turn may sell such securities.

State any exceptions here:

_____

_____

_____

_____

The undersigned acknowledges that it understands its obligation to comply with the provisions of the Securities Exchange Act of 1934, as amended, and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or

PDFfile.doc

regulations), in connection with any offering of Registrable Securities pursuant to the Shelf Registration Statement.  The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

The Selling Securityholder hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons as set forth therein.

Pursuant to the Registration Rights Agreement, the Company has agreed under certain circumstances to indemnify the Selling Securityholder against certain liabilities.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law for inclusion in the Shelf Registration Statement, the undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Shelf Registration Statement remains effective.  All notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing at the address set forth below.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to items (1) through (10) above and the inclusion of such information in the Shelf Registration Statement and the related prospectus.  The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Shelf Registration Statement and the related prospectus.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Selling Securityholder Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:                                        Beneficial Owner


By:_____
        Name:
        Title:


**PLEASE RETURN THE COMPLETED AND EXECUTED SELLING SECURITYHOLDER NOTICE AND QUESTIONNAIRE TO:**

**RCN Corporation**
**[General Counsel's Office]**
**105 Carnegie Center**
**Princeton, New Jersey 08540**
**Telephone:  (     )**
**Facsimile:  (     )**

PDFfile.doc

**EXHIBIT D**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF
RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**WARRANT AGREEMENT**

WARRANT AGREEMENT

Dated as of _____, 2004

by and between

RCN CORPORATION

and

[       ]

as Warrant Agent

# WARRANT AGREEMENT

## TABLE OF CONTENTS[1]

Page

SECTION 1.     Appointment of Warrant Agent ........................................................1

SECTION 2.     Warrant Certificates...................................................................2

SECTION 3.     Issuance of Warrants .................................................................2

SECTION 4.     Execution of Warrant Certificates......................................................2

SECTION 5.     Registration and Countersignature ....................................................2

SECTION 6.     Registration of Transfers and Exchanges ............................................3

SECTION 7.     Terms of Warrants; Exercise of Warrants .............................................3

SECTION 8.     Payment of Taxes .......................................................................5

SECTION 9.     Mutilated or Missing Warrant Certificates ...........................................6

SECTION 10.    Reservation of Shares of the New Common Stock ...........................6

SECTION 11.    Obtaining Stock Exchange Listings ....................................................7

SECTION 12.    Adjustment of Exercise Price and Number of Shares of the New
Common Stock Issuable   7

         (a)     Adjustment for Change in Capital Stock................................7

         (b)     Adjustment for Rights Issue. ...............................................8

         (c)     Adjustment for Other Distributions. .....................................9

         (d)     Current Market Price........................................................10

         (e)     When De Minimis Adjustment May Be Deferred.................10

         (f)     When No Adjustment Required............................................10

         (g)     Notice of Adjustment. .......................................................11

         (h)     Consolidation, Merger, Sale, Recapitalization or
                 Reorganization of the Company. ...........................................11

         (i)     The Company Determination Final. .....................................12

         (j)     Warrant Agent's Disclaimer. ...............................................12

         (k)     When Issuance or Payment May Be Deferred.......................12

         (l)     Adjustment in Number of Shares........................................13

         (m)     Form of Warrants..............................................................13

SECTION 13.    Priority Adjustments, Further Actions................................................13

SECTION 14.    Fractional Interests ........................................................................14

---

[1]     This Table of Contents does not constitute a part of this Warrant Agreement or have any bearing upon the interpretation of any of its terms or provisions.

SECTION 15.     Notices to Warrant Holders ...................................................... 14

SECTION 16.     Merger, Consolidation or Change of Name of Warrant Agent ........... 16

SECTION 17.     Warrant Agent ...................................................................... 16

SECTION 18.     Expenses ............................................................................. 18

SECTION 19.     Change of Warrant Agent ....................................................... 18

SECTION 20.     Notices to the Company and Warrant Agent ................................. 19

SECTION 21.     Supplements and Amendments ................................................... 19

SECTION 22.     Successors ........................................................................... 20

SECTION 23.     Termination ......................................................................... 20

SECTION 24.     Governing Law; Jurisdiction .................................................... 20

SECTION 25.     Benefits of this Warrant Agreement ........................................... 20

SECTION 26.     Counterparts ........................................................................ 20

SECTION 27.     Further Assurances ............................................................... 20

SECTION 28.     Entire Agreement .................................................................. 21


EXHIBIT A - Form of Warrant Certificate ................................................. A-1

WARRANT AGREEMENT (this "Warrant Agreement") dated as of [    ] [  ], 2004, between RCN CORPORATION, a Delaware corporation (the "Company"), and [    ], a [    ] banking corporation, as Warrant Agent (the "Warrant Agent").

WHEREAS, pursuant to the terms and conditions of the Joint Reorganization Plan of RCN Corporation and Certain Subsidiaries, dated October 12, 2004, as may be amended and restated from time to time (the "Plan") relating to the reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") of RCN Corporation, a Delaware corporation ("Old RCN") and certain of its subsidiaries, the holders of (i) the Series A Preferred Stock and the Series B Preferred Stock (collectively, the "Old Preferred Stock") issued by Old RCN and (ii) the common stock issued by Old RCN (the "Old Common Stock") will receive warrants (the "Warrants") that are exercisable, within the two-year period beginning on the date of consummation of the Plan (the "Plan Effective Date"), into a number of shares of common stock, par value $0.01 per share, of the Company (the "New Common Stock"), representing, in the aggregate, two percent (2%) of the New Common Stock of the Company that will be outstanding at the Plan Effective Date or issuable upon the exercise of options, warrants or convertible securities to be outstanding at the Plan Effective Date (other than shares or options issuable pursuant to the Management Incentive Plan and Convertible Second-Lien Notes) at the Exercise Price (as defined herein);

WHEREAS, the Warrants are being offered pursuant to, and upon the terms and conditions set forth in, the Plan in an offering in reliance on the exemption afforded by section 1145 of the Bankruptcy Code from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and of any applicable state securities or "blue sky" laws;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing so to act, in connection with the issuance of Warrant certificates and other matters as provided herein; and

WHEREAS, for purposes of this Warrant Agreement, "person" shall be interpreted broadly to include an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, trustee, estate, unincorporated organization, government, governmental unit, agency, or political subdivision thereof, or other entity.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.    Appointment of Warrant Agent.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth hereinafter in this Warrant Agreement, and the Warrant Agent hereby accepts such appointment

SECTION 2. <u>Warrant Certificates</u>. The certificates evidencing the Warrants to be delivered pursuant to this Warrant Agreement shall be in registered form only and shall be substantially in the form set forth in Exhibit A attached hereto ("Warrant Certificates") and may have such letters, numbers, or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (with execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Warrant Agreement, or as may be required to comply with any applicable law or with any rule or regulation made pursuant thereto or with any rule or regulation of any exchange, inter-dealer quotation system or regulated quotation service on which the Warrants may be listed or quoted, as the case may be.

SECTION 3. <u>Issuance of Warrants</u>. Upon issuance in accordance with Section 5, each Warrant Certificate shall evidence one or more Warrants. Each Warrant evidenced thereby entitles the holder, upon proper exercise to receive from the Company, as adjusted as provided herein, one share of the New Common Stock at the Exercise Price.

SECTION 4. <u>Execution of Warrant Certificates</u>. Warrant Certificates shall be signed on behalf of the Company by its Chairman of the Board, Chief Executive Officer, President or any Vice President and by the Secretary or any Assistant Secretary under its corporate seal. The seal of the Company may be in the form of a facsimile thereof and may be impressed, affixed, imprinted or otherwise reproduced on the Warrant Certificates. Each such signature upon any Warrant Certificate may be in the form of a facsimile signature of the present or any future Chairman of the Board, Chief Executive Officer, President, Vice President, Secretary or Assistant Secretary and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any person who shall have been Chairman of the Board, Chief Executive Officer, President, Vice President, Secretary or Assistant Secretary at the time of entering into this Warrant Agreement, notwithstanding the fact that at the time any Warrant Certificate shall be countersigned by the Warrant Agent and delivered or disposed of by the Company he shall have ceased to hold such office, so long as, and the Company hereby represents that, under the Company's charter and by-laws, any Warrants or shares of the New Common Stock so issued would be validly issued. Any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper officer of the Company to sign such Warrant Certificate, although at the date of the execution of this Warrant Agreement any such person was not such officer, so long as, and the Company hereby represents that, under the Company's charter and by-laws, any Warrants or shares of the New Common Stock so issued would be validly issued.

Warrant Certificates shall be dated the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

SECTION 5. <u>Registration and Countersignature</u>. The Warrant Agent, on behalf of the Company, shall number and register the Warrant Certificates in a register as they are issued by the Company.

Warrant Certificates shall be manually countersigned by the Warrant Agent and shall not be valid for any purpose unless so countersigned. The Warrant Agent shall, upon written instructions of the Chairman of the Board, Chief Executive Officer, President, Vice President, Secretary or Assistant Secretary of the Company, initially countersign and deliver Warrants entitling the holders thereof to purchase not more, nor less, than the number of shares of the New Common Stock referred to above in the second recital hereof (but subject to adjustment as hereinafter provided) and shall countersign and deliver Warrants as otherwise provided in this Warrant Agreement.

The Company and the Warrant Agent may deem and treat the registered holder(s) of the Warrant Certificates as the absolute owner(s) thereof (notwithstanding any notation of ownership or other writing thereon made by anyone), for all purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

SECTION 6.    Registration of Transfers and Exchanges.  The Warrant Agent shall from time to time register the transfer of any outstanding Warrant Certificates upon the records to be maintained by it for that purpose, upon surrender thereof accompanied by a written instrument or instruments of transfer in form satisfactory to the Warrant Agent, duly executed by the registered holder or holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney.  Upon any such registration of transfer, a new Warrant Certificate shall be issued to the transferee(s) and the surrendered Warrant Certificate shall be cancelled by the Warrant Agent.  Cancelled Warrant Certificates shall thereafter be disposed of by or at the direction of the Company in accordance with applicable law.

Warrant Certificates may be exchanged at the option of the registered holder(s) thereof, when surrendered to the Warrant Agent at its office during normal business hours for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like number of Warrants.  Warrant Certificates surrendered for exchange shall be cancelled by the Warrant Agent.  Such cancelled Warrant Certificates shall then be disposed of by or at the direction of the Company in accordance with applicable law.

The Warrant Agent is hereby authorized to countersign, in accordance with the provisions of this Section 6, the new Warrant Certificates issued pursuant to the provisions of this Section 6.

SECTION 7.    Terms of Warrants; Exercise of Warrants.  Subject to the terms of this Warrant Agreement, each Warrant holder shall have the right, which may be exercised from the date of original issuance of the Warrant Certificates pursuant to the terms of this Warrant Agreement and prior to 5:00 p.m. New York City Time, on [   ][2] (the "Expiration Date"), to exercise each Warrant and receive from the Company the number of fully paid and nonassessable shares of the New Common Stock which the

---

[2]    Such date shall be the second anniversary of the date of consummation of the Plan.

holder may at the time be entitled to receive on exercise of such Warrants and payment of the aggregate Exercise Price then in effect for such shares of the New Common Stock. In addition, prior to the delivery of any shares of the New Common Stock that the Company shall be obligated to deliver upon proper exercise of the Warrants, the Company shall comply with all applicable federal and state laws, rules and regulations which require action to be taken by the Company. Each Warrant, when exercised, will entitle the holder thereof to purchase one share of the New Common Stock at the Exercise Price. Each Warrant not exercised prior to the Expiration Date shall become void and all rights thereunder and all rights in respect thereof under this Warrant Agreement shall cease as of such time.

A Warrant may be exercised upon surrender to the Company at the principal corporate trust office of the Warrant Agent referred to in Section 20 (the "Warrant Agent Office") of the Warrant Certificate or Warrant Certificates evidencing the Warrants to be exercised with the form of election to purchase on the reverse thereof (the "Exercise Notice") duly completed and signed, which signature shall be guaranteed by an "Eligible Guarantor Institution" as defined in Rule 17Ad-15(2) promulgated under the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and upon payment to the Warrant Agent for the account of the Company of the exercise price of $34.16 (the "Exercise Price"), as adjusted from time to time as herein provided, for each Warrant Share then exercised. Payment of the aggregate Exercise Price for all shares of the New Common Stock being exercised in respect of a Warrant shall be made (a) in United States Dollars or (b) by certified or official bank check for United States Dollars made payable to the order of "RCN Corporation". In lieu of payment of the aggregate Exercise Price as aforesaid and subject to applicable law, the holder of a Warrant may elect to receive from the Company a number of shares of the New Common Stock equal to the "Spread" by indicating such election in the Exercise Notice delivered by such Warrant holder. The "Spread" shall, subject to Section 14, be paid by the Company by delivering to such Warrant holder a number of shares of the New Common Stock equal to [(a)(i) the product of (x) the current market price per share of the New Common Stock (as if the date of receipt of the Exercise Notice to the Company) multiplied by (y) the number of shares of the New Common Stock underlying the Warrants being exercised, minus (ii) the product of (x) the Exercise Price, multiplied by (y) the number of shares of the New Common Stock underlying the Warrants being exercised, divided by (b) the current market price per share of the New Common Stock (as of the date of receipt of the Exercise Notice to the Company)].

Subject to the provisions of Section 8, upon such surrender of Warrants and payment of the aggregate Exercise Price, the Company shall issue and cause to be delivered promptly to or upon the written order of the Warrant holder and in such name or names, as the Warrant holder may designate, a certificate or certificates for the number of full shares of the New Common Stock issuable upon the exercise of such Warrants together with cash as provided in Section 14; provided, however, that if any Fundamental Transaction (as defined in Section 12(h)) is proposed to be effected by the Company or there is pending any tender offer or an exchange offer for shares of the New Common Stock, upon such surrender of Warrants and payment of the Exercise Price as aforesaid, the Company shall, as soon as possible, but in any event not later than two business days

thereafter, issue and cause to be delivered the full number of shares of the New Common Stock issuable upon the exercise of such Warrants in the manner described in this sentence together with any cash as provided in Section 14. Such certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become a holder of record of such shares of the New Common Stock as of the close of business on the date of the surrender of such Warrants and payment of the aggregate Exercise Price. No fractional shares shall be issued upon exercise of any Warrants in accordance with Section 14.

The Warrants shall be exercisable, at the election of the holders thereof, either in full or from time to time in part (in whole shares of the New Common Stock) and, in the event that a Certificate evidencing Warrants is exercised in respect of fewer than all of the shares of the New Common Stock issuable on such exercise at any time prior to the Expiration Date, a new Certificate evidencing the remaining Warrant or Warrants will be promptly issued, and the Warrant Agent is hereby irrevocably authorized to countersign and to deliver the required new Warrant Certificate or Certificates pursuant to the provisions of this Section 7 and of Section 5, and the Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Warrant Certificates duly executed on behalf of the Company for such purpose.

All Warrant Certificates surrendered upon exercise of Warrants shall be cancelled by the Warrant Agent. Such cancelled Warrant Certificates shall then be disposed of by or at the direction of the Company in accordance with applicable law. The Warrant Agent shall (x) advise an authorized representative of the Company as directed by the Company at the end of each day on which Warrants were exercised (i) the number of shares of the New Common Stock issued upon exercise of a Warrant, (ii) delivery of Warrant Certificates evidencing the balance, if any, of the shares of the New Common Stock issuable after such exercise of the Warrant and (iii) such other information as the Company shall reasonably require and (y) concurrently pay to the Company all funds received by it in payment of the aggregate Exercise Price. The Warrant Agent shall promptly confirm such information to the Company in writing.

The Warrant Agent shall keep copies of this Warrant Agreement and any notices given or received hereunder available for inspection by the holders of the Warrants during normal business hours at its office. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Warrant Agreement as the Warrant Agent may request.

SECTION 8.    Payment of Taxes. No service charge shall be made to any holder of a Warrant for any exercise, exchange or registration of transfer of Warrant Certificates, and the Company will pay all documentary stamp taxes attributable to the initial issuance of shares of the New Common Stock upon the exercise of Warrants; provided, however, that the Company shall not be required to pay any tax or taxes which may be payable in respect of any transfer involved in the issue of any Warrant Certificates or any certificates for shares of the New Common Stock in a name other than that of the registered holder of a Warrant Certificate surrendered upon the exercise of a Warrant, and the Company shall not be required to issue or deliver such Warrant

Certificates or the certificates representing the shares of the New Common Stock unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

SECTION 9.    Mutilated or Missing Warrant Certificates.  If any of the Warrant Certificates shall be mutilated, lost, stolen or destroyed, the Company shall issue and the Warrant Agent shall countersign, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence satisfactory to the Company and the Warrant Agent of such loss, theft or destruction of such Warrant Certificate and such indemnity and security therefor as is customary and reasonably satisfactory to the Company and the Warrant Agent, if requested.  Applicants for such substitute Warrant shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe.

SECTION 10.    Reservation of Shares of the New Common Stock.  The Company will at all times reserve and keep available, free from preemptive rights, out of the aggregate of its authorized but unissued shares of the New Common Stock, for the purpose of enabling it to satisfy any obligation to issue shares of the New Common Stock upon exercise of Warrants, the maximum number of shares of the New Common Stock which may then be deliverable upon the exercise of all outstanding Warrants.

The Company or the transfer agent for the New Common Stock and every subsequent transfer agent for any shares of the Company's capital stock issuable upon the exercise of any of the rights of purchase represented by the Warrants as aforesaid (the "Transfer Agent") will be irrevocably authorized and directed at all times to reserve such number of authorized shares as shall be required for such purpose.  The Company will keep a copy of this Warrant Agreement on file with the Transfer Agent for any shares of the Company's capital stock issuable upon the exercise of the rights of purchase represented by the Warrants.  The Warrant Agent is hereby irrevocably authorized to requisition from time to time from such Transfer Agent the stock certificates required to honor outstanding Warrants upon exercise thereof in accordance with the terms of this Warrant Agreement.  The Company will supply such Transfer Agent with duly executed certificates for such purposes and will, upon request, provide or otherwise make available any cash which may be payable as provided in Section 14.  The Company will furnish such Transfer Agent a copy of all notices of adjustments and certificates related thereto, transmitted to each holder pursuant to Section 15.

Before taking any action which would cause an adjustment pursuant to Section 12 to reduce the Exercise Price below the then par value per share (if any) of a share of the New Common Stock, the Company will take all corporate action necessary, in the opinion of its counsel (which may be counsel employed by the Company), in order that the Company may validly and legally issue fully paid and nonassessable shares of the New Common Stock at the Exercise Price as so adjusted.

The Company covenants that all shares of the New Common Stock which may be issued upon exercise of Warrants will be, upon payment of the aggregate Exercise Price and issuance thereof, fully paid, nonassessable, free of preemptive rights and free from all taxes, liens, charges and security interests with respect to the issue thereof (other than any liens, charges and security interests created by the Warrant holder or the person to which the shares of the New Common Stock are to be issued).

SECTION 11.    Obtaining Stock Exchange Listings.  The Company shall also from time to time take all action reasonably necessary so that the shares of the New Common Stock, immediately upon their issuance upon the exercise of Warrants, will be listed or quoted, as the case may be, on the primary exchange, inter-dealer quotation system or regulated quotation service, if any, on which shares of the New Common Stock are then listed or quoted, subject to the rules and regulations thereof.  If the shares of the New Common Stock are not so listed or quoted, the Company shall not be obligated to obtain or maintain a listing or quotation, as the case may be, of the shares of the New Common Stock or shares of the New Common Stock issuable upon the exercise of Warrants on any exchange, inter-dealer quotation system or regulated quotation service.

SECTION 12.    Adjustment of Exercise Price and Number of Shares of the New Common Stock Issuable.  The Exercise Price and the number of shares of the New Common Stock issuable upon the exercise of each Warrant are subject to adjustment from time to time upon the occurrence of the events enumerated in this Section 12.  For purposes of this Section 12, "the New Common Stock" means the New Common Stock and any other stock of the Company, however designated, for which the Warrants may be exercisable from time to time.

(a)    Adjustment for Change in Capital Stock.

If on or after the date of this Warrant Agreement and prior to the Expiration Date, the Company:

(1)    pays a dividend or makes a distribution on its the New Common Stock in shares of its the New Common Stock;

(2)    subdivides its outstanding shares of the New Common Stock into a greater number of shares;

(3)    combines its outstanding shares of the New Common Stock into a smaller number of shares;

(4)    makes a distribution on its the New Common Stock in shares of its capital stock other than the New Common Stock; or

(5)    issues by reclassification of its the New Common Stock any shares of its capital stock,

7

then the Exercise Price and the number and kind of shares of capital stock of the Company issuable upon the exercise of a Warrant shall be proportionately adjusted so that the holder of any Warrant thereafter exercised may receive the aggregate number and kind of shares of capital stock of the Company which he would have owned immediately following such action if such Warrant had been exercised immediately prior to such action.

The adjustment shall become effective immediately after the record date in the case of a dividend or distribution and immediately after the effective date in the case of a subdivision, combination or reclassification.

If after an adjustment a holder of a Warrant upon exercise may receive shares of two or more classes or series of capital stock of the Company, the Company shall determine the allocation of the adjusted Exercise Price between the classes or series of capital stock based on the relative fair market values (determined by the Board of Directors of the Company) of such class or classes of capital stock. After such allocation, the exercise privilege and the Exercise Price of each class or series of capital stock shall thereafter again be subject to adjustment on the terms applicable to the New Common Stock in this Section 12.

Such adjustment shall be made successively whenever any event listed above shall occur.

(b)    Adjustment for Rights Issue.

If on or after the date of this Warrant Agreement and prior to the Expiration Date, the Company distributes any options, warrants or other rights (however classified, except pursuant to any stockholder rights plan now existing or hereafter adopted) to all holders of its the New Common Stock entitling them for a period expiring within 45 days after the record date mentioned below to purchase shares of the New Common Stock or securities convertible into, or exchangeable or exercisable for, the New Common Stock at a price per share (or with an initial conversion, exchange or exercise price) less than the current market price per share on that record date, the Exercise Price shall be adjusted in accordance with the following formula:

$$E' = E \ \text{x} \ \frac{O + \dfrac{N \ \text{x} \ P}{M}}{O + N}$$

where:

E'    =    the adjusted Exercise Price.

E    =    the current Exercise Price.

O    =    the number of shares of the New Common Stock outstanding on the record date.

N = the number of additional shares of the New Common Stock offered.

P = the offering price per share of the additional shares.

M = the current market price per share of the New Common Stock on the record date.

The adjustment shall be made successively whenever any such options, warrants or other rights (however classified) are issued and shall become effective immediately after the record date for the determination of stockholders entitled to receive the options, warrants or other rights (however classified). If at the end of the period during which such rights, options or warrants are exercisable, not all options, warrants or other rights (however classified) shall have been exercised, the Exercise Price shall be immediately readjusted to what it would have been if "N" in the above formula had been the number of shares actually issued.

(c) Adjustment for Other Distributions.

If on or after the date of this Warrant Agreement and prior to the Expiration Date, the Company distributes to all holders of its the New Common Stock any of its assets (other than cash dividends or distributions), debt securities, preferred stock or any options, warrants or other rights to purchase debt securities, assets or other securities of the Company, the Exercise Price shall be adjusted in accordance with the following formula:

$$E' = E \ \text{x} \ \frac{M - F}{M}$$

where:

E' = the adjusted Exercise Price.

E = the current Exercise Price.

M = the current market price per share of the New Common Stock on the record date mentioned below.

F = the fair market value on the record date of the assets, securities, rights or warrants to be distributed in respect of one share of the New Common Stock. The Board of Directors of the Company shall determine the fair market value.

9

The adjustment shall be made successively whenever any such record date is fixed and shall become effective immediately after the record date for the determination of stockholders entitled to receive the distribution.

This Section 12(c) does not apply to: (i) options, warrants or other rights referred to in Section 12(b); or (ii) a dividend payable in shares of Common Stock referred to in Section 12(a).

(d)     Current Market Price.

All references in Section 12(b) or Section 12(c) and in Section 7 and Section 14 to "the current market price per share of the New Common Stock" on any date shall mean the last reported sale price for such security on the principal exchange or quotation system on which such security is listed or traded.  If the security is not admitted for trading on any securities exchange or the Nasdaq National or SmallCap Market, "current market price per share of the New Common Stock" shall mean the average of the last reported closing bid and asked prices reported by the Nasdaq Stock Market, Inc., the electronic securities market regulated by the National Association of Securities Dealers, Inc., as furnished by any member in good standing of the National Association of Securities Dealers, Inc., selected from time to time by the Company for that purpose or as quoted by the National Quotation Bureau Incorporated.  In the event that no such quotation is available for such day, the "current market price per share of the New Common Stock" shall be the average of the quotations for the last five trading days for which a quotation is available within the last 30 trading days prior to such day.  In the event that five such quotations are not available within such 30-trading day period, the Board of Directors of the Company shall be entitled to determine the "current market price per share of the New Common Stock" on the basis of such quotations or other information as it in good faith considers appropriate (without regard to any illiquidity or minority discounts).

(e)     When De Minimis Adjustment May Be Deferred.

No adjustment in the Exercise Price need be made unless the adjustment would require an increase or decrease of at least one percent (l%) in the Exercise Price on the date an adjustment would otherwise be required to be made.  Any adjustments that are not made shall be carried forward and taken into account in any subsequent adjustment.

All calculations under this Section 12 shall be made to the nearest cent or to the nearest 1/100th of a share, as the case may be.

(f)     When No Adjustment Required.

No adjustment need be made for a transaction referred to in Section 12(a), Section 12(b) or Section 12(c) if all Warrant holders participate in such transaction on a basis and with notice that the Board of Directors of the Company determines to be fair and appropriate in light of the basis and notice on which holders of the New Common Stock participate in the transaction.

No adjustment need be made for rights to purchase the New Common Stock purchased at the fair market value thereof (determined by the Board of Directors of the Company) pursuant to any of the Company's plans for reinvestment of dividends or interest.

No adjustment need be made for a change in the par value, or from par value to no par value, or from no par value to par value, of the Common Stock.

Notwithstanding any other provision of this Section 12, no adjustment to the Exercise Price shall result in zero or in a negative number or shall reduce the Exercise Price below the then par value per share of the New Common Stock, and any such purported adjustment shall instead reduce the Exercise Price to such par value (unless the New Common Stock then has no par value in which case such purported adjustment shall instead reduce the Exercise Price to $0.001 per share).

To the extent the Warrants become convertible into cash, no adjustment need be made thereafter as to the cash. Interest will not accrue on the cash.

(g)    Notice of Adjustment.

Whenever the Exercise Price is adjusted, the Company shall provide the notices required by Section 15.

(h)    Consolidation, Merger, Sale, Recapitalization or Reorganization of the Company.

In case of any consolidation of the Company with, or merger of the Company into, another person (other than a consolidation, amalgamation or merger which does not result in any reclassification or exchange of the New Common Stock), or in case of any sale or conveyance to another person of the property of the Company as an entirety or substantially as an entirety (each a "Fundamental Transaction"), the person formed by or surviving such Fundamental Transaction or the persons which shall have acquired such assets, as the case may be, shall execute and deliver to the Warrant Agent a supplemental warrant agreement providing that each holder of a Warrant then outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, solely the kind and amount of capital stock, shares and other securities and property (or cash) receivable upon such Fundamental Transaction for which such Warrant might have been exercised immediately prior to such Fundamental Transaction, provided that (i) if the holders of shares of the New Common Stock were entitled to exercise a right of election as to the kind or amount of securities, cash or other assets receivable upon such Fundamental Transaction, then the kind and amount of securities, cash or other assets for which each Warrant shall become exercisable shall be deemed to be the kind and amount so receivable per share by a plurality of the holders of shares of the New Common Stock in such Fundamental Transaction, and (ii) if a tender or exchange offer shall have been made to and accepted by the holders of shares of the New Common Stock under circumstances in which, upon completion of such tender or exchange offer, the maker thereof, together with members

11

of any group (within the meaning of Rule 13d-5(b)(1) under the Securities and Exchange Act of 1934, as amended (the "Exchange Act")) of which such maker is a part, and together with any affiliate or associate of such maker (within the meaning of Rule 12b-2 under the Exchange Act) and any members of any such group of which any such affiliate or associate is a part, own beneficially (within the meaning of Rule 13d-3 under the Exchange Act) more than 50% of the outstanding shares of the New Common Stock, each Warrant shall become exercisable for the highest amount of cash, securities or other property to which such Warrant holder would actually have been entitled as a shareholder if such Warrant holder had exercised the Warrant prior to the expiration of such tender or exchange offer, accepted such offer and all of the shares of the New Common Stock issuable to such Warrant holder upon such exercise had been purchased pursuant to such tender or exchange offer, subject to adjustments (from and after the consummation of such tender or exchange offer). Such supplemental warrant agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided in this Section 12. The above provision of this Section 12(h) shall similarly apply to successive consolidations, amalgamations, mergers, sales or transfers. The Warrant Agent shall not be under any responsibility to determine the correctness of any provision contained in any such supplemental warrant agreement relating to either the kind or amount of capital stock, shares or securities or property (or cash) purchasable by Warrant holders upon the exercise of their Warrants after any such Fundamental Transaction, but subject to the provisions of Section 17 hereof, may accept as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, a certificate of a firm of independent certified public accountants (who may be the accountants regularly employed by the Company) with respect thereto.

(i)     The Company Determination Final.

Any determination that the Company or the Board of Directors of the Company must make pursuant to this Section 12 is (absent manifest error) conclusive if such determination is made in good faith.

(j)     Warrant Agent's Disclaimer.

The Warrant Agent has no duty to determine when an adjustment under this Section 12 should be made (if at all), how it should be made or what it should be. The Warrant Agent has no duty to determine whether any provisions of a supplemental Warrant Agreement under Section 12(h) are correct. The Warrant Agent makes no representation as to the validity or value of any securities or assets issued upon exercise of Warrants. The Warrant Agent shall not be responsible for the Company's failure to comply with this Section 12.

(k)     When Issuance or Payment May Be Deferred.

In any case in which this Section 12 shall require that an adjustment in the Exercise Price be made effective as of a record date for a specified event, the Company may elect to defer until the occurrence of such event (i) issuing to the holder of any Warrant exercised after such record date the shares of the New Common Stock and other

capital stock of the Company, if any, issuable upon such exercise over and above the shares of the New Common Stock and other capital stock of the Company, if any, issuable upon such exercise on the basis of the Exercise Price and (ii) paying to such holder any amount in cash in lieu of a fractional share pursuant to Section 14; provided, however, that the Company shall deliver to such holder a due bill or other appropriate instrument evidencing such holder's right to receive such additional shares of the New Common Stock, other capital stock and cash (if any) upon the occurrence of the event requiring such adjustment.

      (l)    Adjustment in Number of Shares.

Upon each adjustment of the Exercise Price pursuant to this Section 12, each Warrant outstanding prior to the making of the adjustment in the Exercise Price shall thereafter evidence the right to receive upon payment of the adjusted aggregate Exercise Price that number of shares of the New Common Stock (calculated to the nearest hundredth) obtained from the following formula:

$$N' \ = \ N \ \text{x} \ \frac{E}{E'}$$

where:

| | | |
|---|---|---|
| N' | = | the adjusted number of shares of the New Common Stock issuable upon exercise of a Warrant by payment of the adjusted aggregate Exercise Price. |
| N | = | the number of shares of the New Common Stock previously issuable upon exercise of a Warrant by payment of the aggregate Exercise Price prior to adjustment. |
| E' | = | the adjusted Exercise Price. |
| E | = | the Exercise Price prior to adjustment. |

      (m)    Form of Warrants.

The Company may, but shall not be required to, issue new certificates or make a notation on any outstanding certificates to reflect any adjustment under this Section 12. Irrespective of any adjustments in the Exercise Price or the number or kind of shares purchasable upon the exercise of the Warrants, Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in the Warrants initially issuable pursuant to this Warrant Agreement.

SECTION 13.    Priority Adjustments, Further Actions. (a) If any single action would require adjustment of the Exercise Price pursuant to more than one

subsection of Section 12, only one adjustment shall be made and such adjustment shall be the amount of adjustment that has the highest absolute value.

(b) The Company will not, by amendment of its charter or through any consolidation, merger, reorganization, transfer of assets, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of the Warrants, but will at all times in good faith assist in the carrying out of all such terms. Without limiting the generality of the foregoing, the Company (i) will take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of the New Common Stock on the exercise of the Warrants from time to time outstanding and (ii) will not take any action which results in any adjustment of the Exercise Price if the total number of shares of the New Common Stock issuable after the action upon the exercise of all of the Warrants would exceed the total number of shares of the New Common Stock then authorized by the Company's charter and available for the purposes of issue upon such exercise. A consolidation, merger, reorganization or transfer of assets involving the Company covered by Section 12(h) shall not be prohibited by or require any adjustment under this Section 13.

SECTION 14.    Fractional Interests.  The Company shall not be required to issue fractional shares of the New Common Stock on the exercise of Warrants. If more than one Warrant shall be presented for exercise in full at the same time by the same holder, the number of full shares of the New Common Stock which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of shares of the New Common Stock purchasable on exercise of all of the Warrants so presented. If any fraction of a share of the New Common Stock would, except for the provisions of this Section 14, be issuable on the exercise of any Warrants (or specified portion thereof), the Company shall notify the Warrant Agent in writing of the amount to be paid in lieu of the fraction of a share of the New Common Stock and concurrently pay or provide to the Warrant Agent for repayment to the Warrant holder an amount in cash equal to the product of (i) such fraction of a Warrant Share and (ii) the excess of the current market price of a share of the New Common Stock for the day the Warrant was presented for exercise over the Exercise Price.

SECTION 15.    Notices to Warrant Holders.  Upon any adjustment of the Exercise Price pursuant to Section 12, the Company shall within 25 days thereafter (i) cause to be delivered to the Warrant Agent a certificate of a firm of independent public accountants selected by the Board of Directors of the Company or other knowledgeable expert selected by the Board of Directors of the Company setting forth the Exercise Price after such adjustment and setting forth in reasonable detail the method of calculation and the facts upon which such calculations are based and setting forth the number of shares of the New Common Stock (or portion thereof) issuable after such adjustment in the Exercise Price, upon exercise of a Warrant and payment of the adjusted aggregate Exercise Price, which certificate shall be conclusive evidence of the correctness of the matters set forth therein and (ii) cause to be given to each of the registered holders of the Warrant Certificates at such registered holder's address appearing on the Warrant register

14

written notice of such adjustments by first-class mail, postage prepaid. Where appropriate, such notice may be given in advance and included as a part of the notice required to be mailed under the other provisions of this Section 15.

In case:

(a) the Company shall authorize the issuance to all holders of shares of the New Common Stock of options, warrants or other rights (howsoever classified) to subscribe for or purchase shares of the New Common Stock or of any other subscription rights or warrants; or

(b) the Company shall authorize the distribution to all holders of shares of the New Common Stock of evidences of its indebtedness or assets (other than cash dividends or cash distributions payable out of consolidated earnings or earned surplus or dividends payable in shares of the New Common Stock or distributions referred to in Section 12(a)); or

(c) of any Fundamental Transaction or a tender offer or exchange offer for shares of the New Common Stock; or

(d) of the voluntary or involuntary dissolution, liquidation or winding up of the Company; or

(e) the Company proposes to take any action (other than actions of the character described in Section 12(a)) which would require an adjustment of the Exercise Price pursuant to Section 12;

then, in each case, the Company shall cause to be delivered to the Warrant Agent and shall cause to be given to each of the registered holders of the Warrant Certificates at his address appearing on the Warrant register, at least 20 days (or 10 days in any case specified in clauses (a) or (b) above) prior to the applicable record date hereinafter specified, or promptly in the case of events for which there is no record date, by first-class mail, postage prepaid, a written notice stating (i) the date as of which the holders of record of shares of the New Common Stock to be entitled to receive any such rights, options, warrants or distribution are to be determined or (ii) the initial expiration date set forth in any tender offer or exchange offer for shares of the New Common Stock or (iii) the date on which any such consolidation, merger, conveyance, transfer, dissolution, liquidation or winding up is expected to become effective or consummated, and the date as of which it is expected that holders of record of shares of the New Common Stock shall be entitled to exchange such shares for securities or other property, if any, deliverable upon such reclassification, consolidation, merger, conveyance, transfer, dissolution, liquidation or winding up. The failure to give the notice required by this Section 15 or any defect therein shall not affect the legality or validity of any distribution, right, option, warrant, consolidation, merger, conveyance, transfer, lease, dissolution, liquidation or winding up, or the vote upon any action.

Nothing contained in this Warrant Agreement or in any of the Warrant Certificates shall be construed as conferring upon the holders thereof the right to vote or

to consent or to receive notice as stockholders in respect of the meetings of stockholders or the election of Directors of the Company or any other matter, or any rights whatsoever as stockholders of the Company.

SECTION 16.     Merger, Consolidation or Change of Name of Warrant Agent.  Any person into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor to the Warrant Agent hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto.  If, at the time such successor to the Warrant Agent by merger or consolidation succeeds to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if, at that time any of the Warrant Certificates shall not have been countersigned, any such successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor to the Warrant Agent; and in all such cases such Warrant Certificates shall have the full force and effect provided in the Warrant Certificates in this Warrant Agreement.

SECTION 17.     Warrant Agent.  The Warrant Agent undertakes the duties and obligations imposed by this Warrant Agreement upon the following terms and conditions, by all of which the Company and the holders of Warrants, by their acceptance thereof, shall be bound:

(a)     The statements contained herein and in the Warrant Certificates shall be taken as statements of the Company.  The Warrant Agent assumes no responsibility for the correctness of any of the same except such as describe the Warrant Agent or action taken or to be taken by it.  The Warrant Agent assumes no responsibility with respect to the distribution of the Warrant Certificates except as herein otherwise provided.

(b)     The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Warrant Agreement or in the Warrant Certificates to be complied with by the Company.

(c)     The Warrant Agent may consult at any time with counsel satisfactory to it (who may be counsel for the Company) and the Warrant Agent shall incur no liability or responsibility to the Company or to any holder of any Warrant Certificate in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the opinion or the advice of such counsel.

(d)     The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of any Warrant Certificate for any action taken in reliance on any Warrant Certificate, certificate of shares, notice, resolution,

waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent shall not be bound by any notice or demand, or any waiver, modification, termination or revision of this Warrant Agreement or any of the terms hereof, unless evidenced by a writing between the Company and the Warrant Agent.

(e)     The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent in the execution of this Warrant Agreement, to reimburse the Warrant Agent for all expenses (including reasonable counsel fees), taxes (including withholding taxes) and governmental charges and other charges of any kind and nature actually incurred by the Warrant Agent in the execution, delivery and performance of its responsibilities under this Warrant Agreement and to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and counsel fees, for anything done or omitted by the Warrant Agent in the execution, delivery and performance of its responsibilities under this Warrant Agreement except as a result of its gross negligence, bad faith or willful misconduct.

(f)     The Warrant Agent, shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more registered holders of Warrant Certificates shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as it may consider proper, whether with or without any such security or indemnity. All rights of action under this Warrant Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrant Certificates or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent and any recovery of judgment shall be for the ratable benefit of the registered holders of the Warrants, as their respective rights or interests may appear.

(g)     Except as otherwise prohibited by applicable law, the Warrant Agent, and any stockholder, director, officer or employee of the Warrant Agent, may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(h)     The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof. The Warrant Agent shall not be liable for anything which it may do or

refrain from doing in connection with this Warrant Agreement, except for its own gross negligence, bad faith or willful misconduct; provided that in no event shall the Warrant Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The Warrant Agent shall not at any time be under any duty or responsibility to any holder of any Warrant Certificate to make or cause to be made any adjustment of the Exercise Price or number of the shares of the New Common Stock or other securities or property deliverable as provided in this Warrant Agreement, or to determine whether any facts exist which may require any of such adjustments, or with respect to the nature or extent of any such adjustments, when made, or with respect to the method employed in making the same. The Warrant Agent shall not be accountable with respect to the validity or value or the kind or amount of any shares of the New Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or with respect to whether any such shares of the New Common Stock or other securities will when issued be validly issued and fully paid and nonassessable, and makes no representation with respect thereto.

SECTION 18.     Expenses.  All expenses incident to the Company's performance of or compliance with this Warrant Agreement will be borne by the Company, including without limitation: (i) all expenses of printing Warrant Certificates; (ii) messenger and delivery services and telephone calls; (iii) all fees and disbursements of counsel for the Company; (iv) all fees and disbursements of independent certified public accountants or knowledgeable experts selected by the Company; and (v) the Company's internal expenses (including, without limitation, all salaries and expenses of their officers and employees performing legal or accounting duties).

SECTION 19.     Change of Warrant Agent.  If the Warrant Agent shall become incapable of acting as Warrant Agent or shall resign as provided below, the Company shall appoint a successor to such Warrant Agent.  If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation or incapacity by the Warrant Agent, then the registered holder of any Warrant Certificate may apply to any court of competent jurisdiction for the appointment of a successor to the Warrant Agent.  Pending appointment of a successor to such Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  The registered holders of a majority of the unexercised Warrants shall be entitled at any time to remove the Warrant Agent for cause and appoint a successor to such Warrant Agent; provided that the Warrant Agent so appointed shall be acceptable to the Company.  After appointment, the successor to the Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed; but the former Warrant Agent shall deliver and transfer to the successor to the Warrant Agent any property at the time held by it hereunder and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose.  Failure to give any notice

provided for in this Section 19, however, or any defect therein, shall not affect the legality or validity of the appointment of a successor to the Warrant Agent.

The Warrant Agent may resign at any time and be discharged from the obligations hereby created by so notifying the Company in writing at least 30 days in advance of the proposed effective date of its resignation. If no successor Warrant Agent accepts the engagement hereunder by such time, the Company shall act as Warrant Agent.

SECTION 20.    <u>Notices to the Company and Warrant Agent</u>.  Any notice or demand authorized or permitted by this Warrant Agreement to be given or made by the Warrant Agent or by the registered holder of any Warrant Certificate to or on the Company shall be sufficiently given or made when and if deposited in the mail, first class or registered, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

> RCN Corporation
> 105 Carnegie Center
> Princeton, New Jersey 08540
> Telephone No.: (609) 734-3700
> Facsimile No.: (609) 734-3701
> Attention:  General Counsel

with a copy to (which shall not constitute notice to the Company):

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, New York 10036
> Telephone No.: (212) 735-3000
> Facsimile No.: (212) 735-2000
> Attention:  Howard L. Ellin, Esq.

Any notice pursuant to this Warrant Agreement to be given by the Company or by the registered holder(s) of any Warrant Certificate to the Warrant Agent shall be sufficiently given when and if deposited in the mail, first-class or registered, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company) to the Warrant Agent at the Warrant Agent Office as follows:

> [    ]
> [    ]
> Attention:

SECTION 21.    <u>Supplements and Amendments</u>.  The Company and the Warrant Agent may from time to time supplement or amend this Warrant Agreement without the approval of any holders of Warrant Certificates in order to cure any ambiguity or to correct or supplement any provision contained herein which may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder which the Company and the Warrant Agent may deem necessary or desirable and which shall not in any way adversely affect

the interests of the holders of Warrant Certificates. Any amendment or supplement to this Warrant Agreement that has an adverse effect on the interests of holders shall require the written consent of registered holders of a majority of the then outstanding Warrants (excluding Warrants held by the Company or any of its controlled affiliates). The consent of each holder of a Warrant affected shall be required for any amendment of this Warrant Agreement pursuant to which the Exercise Price would be increased or the number of shares of the New Common Stock purchasable upon exercise of Warrants would be decreased.

SECTION 22. Successors. All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

SECTION 23. Termination. This Warrant Agreement shall terminate at 5:00 p.m., New York City time, on the Expiration Date. Notwithstanding the foregoing, this Warrant Agreement will terminate on such earlier date on which all outstanding Warrants have been exercised. The provisions of Section 17 shall survive such termination.

SECTION 24. Governing Law; Jurisdiction. This Warrant Agreement and each Warrant Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of New York and for all purposes shall be governed by and construed in accordance with the internal laws of said State. The parties hereto irrevocably consent to the jurisdiction of the courts of the State of New York and any federal court located in such state in connection with any action, suit or proceeding arising out of or relating to this Warrant Agreement.

SECTION 25. Benefits of this Warrant Agreement. Nothing in this Warrant Agreement shall be construed to give to any person other than the Company, the Warrant Agent and the registered holders of the Warrant Certificates any legal or equitable right, remedy or claim under this Warrant Agreement; but this Warrant Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered holders of the Warrant Certificates.

SECTION 26. Counterparts. This Warrant Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

SECTION 27. Further Assurances. From time to time on and after the date hereof, the Company shall deliver or cause to be delivered to the Warrant Agent such further documents and instruments and shall do and cause to be done such further acts as the Warrant Agent shall reasonably request (it being understood that the Warrant Agent shall have no obligation to make such request) to carry out more effectively the provisions and purposes of this Warrant Agreement, to evidence compliance herewith or to assure itself that it is protected hereunder.

SECTION 28.     Entire Agreement.  This Warrant Agreement and the Warrant Certificate constitute the entire agreement of the Company, the Warrant Agent and the registered holders of the Warrant Certificates with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the registered holders of the Warrant Certificates with respect to the subject matter hereof.

915159.07-New York Server 7A - MSW

IN WITNESS WHEREOF, the parties hereto have caused this Warrant Agreement to be duly executed, as of the day and year first above written.

RCN CORPORATION, as the Company

By:_____
   Name:
   Title:

[   ], as Warrant Agent

By:_____
   Name:
   Title:

915159.07-New York Server 7A - MSW

Form of Warrant Certificate
[Face of Warrant Certificate]

**EXERCISABLE ON OR AFTER THE DATE OF THIS CERTIFICATE AND
PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON [DATE]³, 2006 AND
ONLY IF COUNTERSIGNED BY THE WARRANT AGENT**

**RCN CORPORATION**
INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

No. NIW _____          CUSIP No. [     ]                          _____ Warrants

**WARRANTS**

    This certifies that _____, or registered assigns, is the registered holder of _____ warrants (the "Warrants"), to purchase shares of common stock, par value $0.01 per share (the "Common Stock"), of RCN Corporation, a Delaware corporation (the "Company"). Each Warrant entitles the holder upon exercise at any time on or after the date of this Warrant Certificate and prior to 5:00 p.m., New York City Time, on [Date], 2006 to receive from the Company its pro rata portion, as determined pursuant to the Warrant Agreement (as defined below), of fully paid and nonassessable shares of Common Stock for each Warrant at the initial exercise price (the "Exercise Price") of $[   ] per share payable (i) in United States dollars or (ii) by certified or official bank check for United States Dollars made payable to the order of "RCN Corporation." In lieu of payment of the aggregate Exercise Price as aforesaid and subject to applicable law, the holder of a Warrant may request the payment by the Company of the "Spread", which shall, subject to Section 14 of the Warrant Agreement, dated as of [   ], 2004, by and between the Company and [   ], as Warrant Agent (the "Warrant Agreement"), be delivered by the Company by delivering to such Warrant holder a number of shares of Common Stock equal to [(a)(i) the product of (x) the current market price per share of Common Stock (as of the date of receipt of the request to the Company), multiplied by (y) the number of shares of Common Stock underlying the Warrants being exercised, minus (ii) the product of (x) the Exercise Price, multiplied by (y) the number of shares of Common Stock underlying the Warrants being exercised, divided by (b) the current market price per share of Common Stock (as of the date of receipt of the request to the Company).] The Exercise Price and number of shares of Common Stock issuable upon exercise of the Warrants are subject to adjustment upon the occurrence of certain events set forth in the Warrant Agreement. No Warrant may be exercised after 5:00 p.m., New York City Time, on [   ], 2006, and to the extent not exercised by such time such Warrants shall become void. This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent, as such term is used in the Warrant Agreement. Reference is made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as though fully set forth at this place. This Warrant Certificate shall be governed and construed in accordance with the internal laws of the State of New York.

---

³    Second anniversary of the date of consummation of the Plan.

IN WITNESS WHEREOF, RCN Corporation has caused this Warrant Certificate to be signed by the undersigned President and the undersigned Secretary of the Company and has caused its corporate seal to be imprinted hereon.

Dated:

**RCN CORPORATION**
[Corporate Seal]

By:

_____       _____
President                                                    Secretary

Countersigned:                                                              (seal)

[      ]
[      ]
TRANSFER AGENT AND REGISTRAR

By:_____
Authorized Officer

[Reverse of Warrant Certificate]

# RCN CORPORATION (WARRANT)

By accepting a Warrant Certificate, each holder shall be bound by all of the terms and provisions of the Warrant Agreement (a copy of which is available on request to the Secretary of the Company) and any amendments thereto as fully and effectively as if such holder had signed the same.

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants by the Company expiring at 5:00 p.m., New York City Time, on [    ], 2006, entitling the holder upon proper exercise to receive shares of Common Stock and are issued or to be issued pursuant to the Warrant Agreement, which Warrant Agreement is hereby incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants.

The holder of the Warrants evidenced by this Warrant Certificate may exercise them by surrendering this Warrant Certificate, with the form of election to purchase set forth below on this Warrant Certificate properly completed and executed, together with payment of the aggregate Exercise Price in accordance with the provisions set forth on the face of this Warrant Certificate.  In the event that upon any exercise of Warrants evidenced hereby the number of Warrants exercised shall be less than the total number of Warrants evidenced hereby, there shall be issued to the holder hereof or his assignee a new Warrant Certificate evidencing the number of Warrants not exercised.

The Warrant Agreement provides that upon the occurrence of certain events the Exercise Price and the number of shares of Common Stock issuable upon exercise of this Warrant, in each case, set forth on the face hereof may, subject to certain conditions, be adjusted.  If the Exercise Price is adjusted, the Warrant Agreement provides that the number of shares of Common Stock issuable upon the exercise of each Warrant may be adjusted.  No fractions of a share of Common Stock will be issued upon the exercise of any Warrant, but the Company will pay the cash value in lieu thereof determined as provided in the Warrant Agreement.

Warrant Certificates, when surrendered at the principal corporate trust office of the Warrant Agent by the registered holder thereof in person or by legal representative or attorney duly authorized in writing, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing in the aggregate a like number of Warrants.

Upon due presentation for registration of transfer of this Warrant Certificate at the principal corporate trust office of the Warrant Agent a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like

number of Warrants shall be issued to the transferee(s) in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any tax or other governmental charge imposed in connection therewith.

The Company and the Warrant Agent may deem and treat the registered holder(s) hereof as the absolute owner(s) of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone), for the purpose of any exercise hereof, of any distribution to the holder(s) hereof, and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary. Neither the Warrants nor this Warrant Certificate entitles any holder hereof to any rights of a stockholder of the Company.

The Warrant Agreement permits, with certain exceptions therein provided, the supplementing or amendment thereof at any time by the Company and the Warrant Agent with the written consent of registered holders of a majority of the then outstanding Warrants (excluding Warrants held by the Company or any of its controlled affiliates). Any such consent by or on behalf of a holder of a Warrant shall be conclusive and binding upon such holder and upon all future holders of this Warrant and any Warrant issued upon the registration of transfer thereof or in exchange thereof whether or not notation of such consent is made upon such Warrant or any other Warrant.

A-4

Form of Assignment

[Form of Assignment to be Executed if Holder
Desires to Transfer Warrants Evidenced Hereby]

## ASSIGNMENT
### (To Be Executed by the Registered Holder in Order to Assign Warrants)

FOR VALUE RECEIVED the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPE NAME AND ADDRESS, INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

of the Warrants represented by this Warrant Certificate, and hereby irrevocably
constitutes and appoints

_____ Attorney
to transfer this Warrant Certificate on the books of the Company, with full power of
substitution in the premises.


Dated:_____, _____      _____

                                          Signature(s)*


                              _____


                              _____

                              (Social Security or Taxpayer Identification Number)




_____
    Signature(s) Guaranteed*

Form of Election to Purchase
[To Be Executed Upon Exercise Of Warrant]

## NOTICE OF EXERCISE
### (To Be Executed by the Registered Holder in Order to Exercise Warrants)

The undersigned hereby irrevocably elects to exercise the right, represented by this Warrant Certificate, to receive shares of the New Common Stock and herewith tenders payment for such shares to the order of RCN Corporation in the amount of $[   ] per share of the New Common Stock (subject to adjustment) in accordance with the terms of the Warrant Agreement, in cash or by certified or official bank check made payable to the order of the Company.

---

### REQUEST FOR PAYMENT OF SPREAD

ﻕ    Please check if the undersigned, in lieu of tendering the cash payment, as aforesaid, hereby requests the payment of the "Spread" within the meaning of Section 7 of the Warrant Agreement.

---

The undersigned requests that a certificate for such shares be registered in the name of:

_____
PLEASE INSERT SOCIAL SECURITY<br>OR OTHER IDENTIFYING NUMBER

and be delivered to: _____
(PLEASE PRINT OR TYPE NAME AND ADDRESS, INCLUDING POSTAL ZIP CODE)

_____

and, if such number of Warrants shall not be all the Warrants evidenced by this Warrant Certificate, that a new Warrant Certificate for the balance of such Warrants be registered in the name of, and delivered to, the Registered Holder at the address stated below:

_____
(PLEASE PRINT OR TYPE ADDRESS)

Dated:_____, _____    _____
Signature(s)*

                        _____

(Social Security or Taxpayer Identification Number)

_____
Signature(s) Guaranteed*

*    THE SIGNATURE TO THE ASSIGNMENT OR THE SUBSCRIPTION FORM MUST CORRESPOND TO THE NAME AS WRITTEN UPON THE FACE OF THIS WARRANT CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER, AND MUST BEAR A SIGNATURE GUARANTEED BY AN "ELIGIBLE GUARANTOR INSTITUTION" AS DEFINED IN RULE 17Ad-15(2) PROMULGATED UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.

A-6

**EXHIBIT E**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF
RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**NEW EVERGREEN CREDIT AGREEMENT**

**AMENDED AND RESTATED
TERM LOAN AND CREDIT AGREEMENT**


**Dated as of December [  ], 2004**


**among**


**RCN CORPORATION**


**The Lenders Party hereto**


**and**


**HSBC Bank USA,
as Agent**

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ..................................................................................2
    1.01    Defined Terms ........................................................................... 2
    1.02    [Reserved] ................................................................................30
    1.03    Terms Generally ......................................................................30
    1.04    Accounting Terms ....................................................................30
ARTICLE II       THE CREDITS ................................................................................31
    2.01    Outstanding Term Loans ........................................................31
    2.02    [Reserved] ................................................................................31
    2.03    [Reserved] ................................................................................31
    2.04    [Reserved] ................................................................................31
    2.05    [Reserved] ................................................................................31
    2.06    [Reserved] ................................................................................31
    2.07    [Reserved] ................................................................................31
    2.08    Repayment of Term Loans; Evidence of Debt ....................31
    2.09    Repayment of Term Loans .....................................................32
    2.10    Prepayment of Term Loans ....................................................32
    2.11    [Reserved] ................................................................................33
    2.12    Fees ...........................................................................................33
    2.13    Interest ......................................................................................33
    2.14    [Reserved] ................................................................................34
    2.15    Increased Costs ........................................................................34
    2.16    [Reserved] ................................................................................35
    2.17    Taxes .........................................................................................35
    2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ........................37
    2.19    Mitigation Obligations; Replacement of Lenders ................38
ARTICLE III      REPRESENTATIONS AND WARRANTIES ...........................39
    3.01    Organizational Status ..............................................................39
    3.02    Power and Authority ................................................................39
    3.03    No Violation .............................................................................39
    3.04    Approvals ..................................................................................40

| | | | |
|---|---|---|---|
| | 3.05 | Financial Statements; Financial Condition; Undisclosed Liabilities; Projections | 40 |
| | 3.06 | Litigation | 41 |
| | 3.07 | True and Complete Disclosure | 41 |
| | 3.08 | Use of Proceeds | 42 |
| | 3.09 | Tax Returns and Payments | 42 |
| | 3.10 | Compliance with ERISA | 42 |
| | 3.11 | The Security Documents | 43 |
| | 3.12 | Properties | 44 |
| | 3.13 | Capitalization | 44 |
| | 3.14 | Subsidiaries | 44 |
| | 3.15 | Compliance with Statutes | 44 |
| | 3.16 | Investment Company Act | 44 |
| | 3.17 | Public Utility Holdings Company Act | 44 |
| | 3.18 | Environmental Matters | 45 |
| | 3.19 | Labor Relations | 45 |
| | 3.20 | Intellectual Property, etc | 46 |
| | 3.21 | Indebtedness | 46 |
| | 3.22 | Insurance | 46 |
| | 3.23 | Representations and Warranties in Other Documents | 46 |
| | 3.24 | FCC Licenses and Other Governmental Authorizations | 46 |
| | 3.25 | Intercreditor Agreement | 48 |
| | 3.26 | Certain Agreements | 48 |
| | 3.27 | Event of Default | 48 |
| ARTICLE IV | | CONDITIONS | 48 |
| | 4.01 | Effective Date | 48 |
| ARTICLE V | | AFFIRMATIVE COVENANTS | 53 |
| | 5.01 | Information Covenants | 53 |
| | 5.02 | Corporate Existence | 55 |
| | 5.03 | Payment of Taxes and Other Claims | 55 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.04 | Maintenance of Properties | 56 |
| 5.05 | Insurance | 56 |
| 5.06 | Books and Records | 56 |
| 5.07 | Payment of Principal and Interest | 56 |
| 5.08 | Collateral Trigger Date; Additional Subsidiaries | 57 |
| 5.09 | Future Amendments | 58 |
| ARTICLE VI | NEGATIVE COVENANTS | 58 |
| 6.01 | Limitation on Additional Indebtedness | 58 |
| 6.02 | Limitation on Liens | 59 |
| 6.03 | Fundamental Changes | 59 |
| 6.04 | Disposition of Proceeds of Asset Sales | 60 |
| 6.05 | Limitation on Restricted Payments | 61 |
| 6.06 | Limitation on Transactions with Affiliates | 63 |
| 6.07 | Limitation on Issuances and Sales of Preferred Stock by Restricted Subsidiaries | 64 |
| 6.08 | Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries | 64 |
| 6.09 | Designation of Unrestricted Subsidiaries | 65 |
| 6.10 | Limitations on Layering | 66 |
| 6.11 | Collateral Trigger Date | 66 |
| ARTICLE VII | EVENTS OF DEFAULT; LIMITATION ON REMEDIES | 66 |
| 7.01 | Events of Default | 66 |
| ARTICLE VIII | THE AGENT | 68 |
| ARTICLE IX | MISCELLANEOUS | 70 |
| 9.01 | Notices | 70 |
| 9.02 | Waivers; Amendments | 71 |
| 9.03 | Expenses; Indemnity; Damage Waiver | 72 |
| 9.04 | Successors and Assigns | 73 |
| 9.05 | Survival | 75 |
| 9.06 | Counterparts; Integration; Effectiveness | 76 |
| 9.07 | Severability | 76 |

**TABLE OF CONTENTS**
(continued)

**Page**

9.08   Right of Setoff .................................................................................76

9.09   Governing Law; Jurisdiction; Consent to Service of Process ............................76

9.10   WAIVER OF JURY TRIAL ................................................................77

9.11   Headings .......................................................................................77

9.12   Confidentiality ................................................................................77

9.13   Interest Rate Limitation.....................................................................78

9.14   Release of Subsidiaries; Collateral ....................................................78

9.15   Intercreditor Agreement Controls ....................................................79

SCHEDULES:



EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | -- | Form of Assignment and Acceptance |
| Exhibit C-1 | -- | Form of Opinion of Skadden, Arps, Slate, Meagher & Flom LLP |
| Exhibit C-2 | -- | Form of Opinion of General Counsel to the Company |
| Exhibit D | -- | Form of Pledge Agreement |
| Exhibit E | -- | Form of Security Agreement |
| Exhibit F | -- | Form of Term Note |
| Exhibit G | -- | Form of Officer's Certificate |
| Exhibit H | -- | Form of Intercreditor Agreement |
| Exhibit I | -- | Form of Solvency Opinion |

ANNEXES

| | | |
|---|---|---|
| Annex I | -- | Financial Covenants |

# AMENDED AND RESTATED TERM LOAN AND CREDIT AGREEMENT

AMENDED AND RESTATED TERM LOAN AND CREDIT AGREEMENT dated as of December [  ], 2004, among RCN CORPORATION, a Delaware corporation (the "Company"), the LENDERS party hereto, and HSBC Bank USA, as Agent and Collateral Agent.

WHEREAS, the Company has filed a case under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Company plans to emerge from the Bankruptcy Case pursuant to the Company's Plan of Reorganization dated August 20, 2004 under Chapter 11 of the Bankruptcy Code (as amended from time to time, the "Plan of Reorganization") and, pursuant thereto, to consummate certain financings on the Effective Date as defined under the Plan of Reorganization; and

WHEREAS, the Lenders have previously extended credit to the Company pursuant to that certain Commercial Term Loan and Credit Agreement, dated as of June 6, 2003, among the Company, the Lenders party thereto and HSBC Bank USA, as Agent and Collateral Agent (as amended through the date hereof, the "Original Credit Agreement"); and

WHEREAS, immediately before the occurrence of the Effective Date, $[       ] of Obligations remain outstanding under the Original Credit Agreement (the "Outstanding Indebtedness"); and

WHEREAS, the Company, the Lenders, the Agent and the Collateral Agent desire to (i) recast the Outstanding Indebtedness as the Term Loans (as such term is hereinafter defined) under this Agreement and (ii) to otherwise amend, modify and restate the Original Credit Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained and intending to be legally bound hereby, the parties hereto hereby agree that the Original Credit Agreement is amended, modified and restated in its entirety as follows:

## ARTICLE I

### Definitions

1.01  <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>Acquired Entity or Business</u>" shall mean either (x) the assets constituting a business, division or product line of any Person not already a Restricted Subsidiary of the Company or (y) 100% of the Capital Stock of any such Person, which Person shall, as a result of the respective Permitted Acquisition, become a Wholly-Owned Domestic Restriced Subsidiary of the Company (or shall be merged with and into the Company or a Restricted Subsidiary, with the Company or such Restricted Subsidiary being the surviving Person).

"<u>Acquired Indebtedness</u>" means Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or assumed in connection with an Asset

Acquisition by such person and not incurred in connection with, or in anticipation of, such person becoming a Restricted Subsidiary or such Asset Acquisition; provided that Indebtedness of such person which is redeemed, defeased, retired or otherwise repaid at the time of or immediately upon consummation of the transactions by which such person becomes a Restricted Subsidiary or such Asset Acquisition shall not constitute Acquired Indebtedness.

"Adjusted Consolidated Indebtedness" shall mean, at any time, the amount of Consolidated Indebtedness at such time less any amounts reflected therein constituting Indebtedness incurred pursuant to the First-Lien Credit Documents and the Second-Lien Note Documents.

"Adjusted Consolidated Net Income" shall mean, for any period, Consolidated Net Income for such period plus the sum of the amount of all net non-cash charges (including, without limitation, depreciation, amortization, deferred tax expense and non-cash interest expense) and net non-cash losses which were included in arriving at Consolidated Net Income for such period, less the amount of all net non-cash gains and non-cash credits which were included in arriving at Consolidated Net Income for such period.

"Adjusted Consolidated Working Capital" shall mean, at any time, Consolidated Current Assets (but excluding therefrom all cash and Cash Equivalents) less Consolidated Current Liabilities at such time.

"Adjusted Leverage Ratio" shall mean, at any time, the ratio of Adjusted Consolidated Indebtedness at such time to Consolidated EBITDA for the Test Period then most recently ended.

"Adjusted Senior financial covenant" shall have the meaning set forth in Section 5.09.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliate Transaction" shall have the meaning set forth in Section 6.06.

"Agent" means HSBC Bank USA, in its capacity as administrative agent and collateral agent for the Lenders hereunder.

"Agreement" means this Amended and Restated Term Loan and Credit Agreement, together with any and all addenda, exhibits, annexes and schedules hereto, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or revised from time to time.

"Annex I financial covenant" shall have the meaning set forth in Section 5.09.

"Asset Acquisition" means (i) any capital contribution (by means of transfers of cash or other property to others or payments for property or services for the account or use of others, or otherwise) by the Company or any Restricted Subsidiary to any other person, or any

acquisition or purchase of Capital Stock of any other person by the Company or any Restricted Subsidiary, in either case pursuant to which such person shall (a) become a Restricted Subsidiary or (b) shall be merged with or into the Company or any Restricted Subsidiary or (ii) any acquisition by the Company or any Restricted Subsidiary of the assets of any person which constitute substantially all of an operating unit or line of business of such person or which is otherwise outside of the ordinary course of business.

"Asset Sale" means any direct or indirect sale, conveyance, transfer or lease (that has the effect of a disposition and is not for security purposes) or other disposition (that is not for security purposes) to any person other than the Company or a Restricted Subsidiary, in one transaction or a series of related transactions, of (i) any Capital Stock of any Restricted Subsidiary (other than customary stock option programs), (ii) any assets of the Company or any Restricted Subsidiary which constitute substantially all of an operating unit or line of business of the Company and the Restricted Subsidiaries or (iii) any other property or asset of the Company or any Restricted Subsidiary outside of the ordinary course of business.  For the purposes of this definition, the term "Asset Sale" shall not include (i) any disposition of properties and assets of the Company and/or the Restricted Subsidiaries that is governed under Section 6.03(a), (ii) sales of property or equipment that have become worn out, obsolete or damaged or otherwise unsuitable for use in connection with the business of the Company or any Restricted Subsidiary, as the case may be, and (iii) for purposes of Section 6.04 any sale, conveyance, transfer, lease or other disposition of any property or asset, whether in one transaction or a series of related transactions occurring within one year, either (x) involving assets with a Fair Market Value not in excess of $5,000,000 or (y) which constitutes the incurrence of a Capitalized Lease Obligation.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04) in the form of Exhibit A or any other form approved by the Agent.

"Assumed Indebtedness" has the meaning set forth in Section 4.01(k).

"Average Life to Stated Maturity" means, with respect to any Indebtedness, as at any date of determination, the quotient obtained by dividing (i) the sum of the products of (a) the number of years from such date to the date or dates of each successive scheduled principal payment (including, without limitation, any sinking fund requirements) of such Indebtedness multiplied by (b) the amount of each such principal payment by (ii) the sum of all such principal payments; provided that, in the case of any Capitalized Lease Obligation, all calculations hereunder shall give effect to any applicable options to renew in favor of the Company or any Restricted Subsidiary.

"Bankruptcy Case" has the meaning assigned to such term in the preamble to this Agreement.

"Bankruptcy Court" has the meaning assigned to such term in the preamble to this Agreement.

"Board of Directors" or "Board" shall mean the Board of Directors of the Company or a committee of such Board of Directors duly authorized to act for it hereunder (to the extent permitted by applicable law).

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Agent.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Business Intellectual Property" has the meaning assigned to such term in Section 3.20.

"Calculation Period" shall mean, in the case of any Permitted Acquisition, the Test Period most recently ended prior to the date of any such Permitted Acquisition for which financial statements are available.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with generally accepted accounting principles and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"Capital Stock" means, with respect to any person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting and/or non-voting) of, such person's capital stock, whether outstanding on the Effective Date or issued after the Effective Date, and any and all rights (other than any evidence of Indebtedness), warrants or options exchangeable for or convertible into such capital stock.

"Capitalized Lease Obligation" means any obligation to pay rent or other amounts under a lease of (or other agreement conveying the right to use) any property (whether real, personal or mixed, immovable or movable) that is required to be classified and accounted for as a capitalized lease obligation under GAAP, and, for the purpose of this Agreement, the amount of such obligation at any date shall be the capitalized amount thereof at such date, determined in accordance with GAAP.

"Cash Equivalents" means (i) shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv)

repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, and (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"Change of Control" means  the occurrence of any of the following events:

(a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act),  is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person shall be deemed to have "beneficial ownership" of all securities that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 40% of the total Voting Stock of the Company; or

(b) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of the Company to any Person or group of related Persons for purposes of Section 13(d) of the Exchange Act; or

(c) during any consecutive two-year period, individuals who at the beginning of such period constituted the Board (together with any new directors whose election by the Board or whose nomination for election by the stockholders of the Company was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason  to constitute a majority of the Board then in office.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Charges" has the meaning assigned to such term in Section 9.13.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all "Collateral", as defined in any applicable Security Document.

"Collateral Agent" means the Agent acting as collateral agent for the Lenders hereunder.

"Collateral Trigger Date" means the date that is ninety five (95) days after the date on which there has occurred both a Discharge of First-Lien Obligations and a Discharge of Second-Lien Obligations.

"Common Stock" means the common stock of the Company.

"Communications Act" means the Communications Act of 1934, as amended.

"Company" means RCN Corporation, a Delaware corporation.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan of Reorganization, which order shall be a Final Order.

"Consolidated Current Assets" shall mean, at any time, the consolidated current assets of the Company and its Subsidiaries at such time.

"Consolidated Current Liabilities" shall mean, at any time, the consolidated current liabilities of the Company and its Subsidiaries at such time, but excluding the current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein.

"Consolidated EBITDA" shall be computed in accordance with GAAP and shall mean, for any period, Consolidated Net Income for such period, without giving effect (x) to any extraordinary gains or any extraordinary non-cash losses (except to the extent that any such extraordinary non-cash losses will require a cash payment in a future period) and (y) to any gains or losses from sales of assets other than from sales of inventory in the ordinary course of business, adjusted by (1) adding thereto (i) the consolidated interest expense of the Company and its [Restricted] Subsidiaries for such period (to the extent that such consolidated interest expense was deducted in arriving at Consolidated Net Income for such period), (ii) provisions for taxes based on income that were deducted in arriving at Consolidated Net Income for such period, (iii) the amount of all amortization of intangibles and depreciation that were deducted in arriving at Consolidated Net Income for such period, (iv) the amount of all expenses incurred in connection with the Transaction for such period to the extent that same were deducted in arriving at Consolidated Net Income for such period, (v) the amount of all non-cash deferred compensation expense for such period to the extent that same was deducted in arriving at the Consolidated Net Income for such period and (vi) any non-cash, non-recurring charges and any non-cash charges associated with stock-based compensation, provided that if any cash amounts are paid in any subsequent period with respect to amounts described above in this clause (vi), the amounts so paid in any subsequent period shall be subtracted in determining Consolidated EBITDA for such subsequent period as provided in clause 2(i) below, and (2) deducting therefrom (i) the amount of all cash payments during such period that are associated with any non-cash loss, change (including, without limitation, as described in preceding clause (1)(vi)) or expense that was added back to Consolidated Net Income in a previous period and (ii) the amount of all consolidated interest income of the Company and its Restricted Subsidiaries to the extent same increased Consolidated Net Income for such period.

"Consolidated Indebtedness" shall mean, at any time, the sum of (without duplication) (i) all Indebtedness of the Company and its Subsidiaries (on a consolidated basis) as

- 7 -

would be required to be reflected as debt or Capital Lease Obligations on the liability side of a consolidated balance sheet of the Company and its Subsidiaries in accordance with GAAP, (ii) all Indebtedness of the Company and its Subsidiaries of the type described in clauses (ii) and (viii) of the definition of Indebtedness and (iii) all Contingent Obligations of the Company and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) and (ii); provided that the sum of the aggregate amount available to be drawn (i.e., unfunded amounts) under all letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar obligations issued for the account of the Company or any of its Subsidiaries (but excluding, for avoidance of doubt, all unpaid drawings or other matured monetary obligations owing in respect of such letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar obligations) shall not be included in any determination of "Consolidated Indebtedness".

"Consolidated Interest Coverage Ratio" shall mean, for any period, the ratio of Consolidated EBITDA to Consolidated Interest Expense for such period, computed on a Pro Forma Basis.

"Consolidated Interest Expense" shall mean, for any period, the sum of the total consolidated interest expense of the Company and its [Restricted] Subsidiaries for such period (calculated without regard to any limitations on the payment thereof) plus, without duplication, that portion of Capitalized Lease Obligations of the Company and its [Restricted] Subsidiaries representing the interest factor for such period[; provided that the amortization of deferred financing, legal and accounting costs with respect to this Agreement, the First-Lien Credit Agreement and the Second-Lien Note Indenture in each case shall be excluded from Consolidated Interest Expense to the extent same would otherwise have been included therein].

"Consolidated Net Income" shall mean, for any period, the net income (or loss) of the Company and its [Restricted] Subsidiaries for such period, determined on a consolidated basis (after any deduction for minority interests), provided that (i) in determining Consolidated Net Income, the net income of any other Person which is not a [Restricted] Subsidiary of the Company or is accounted for by the Company by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Company or a [Restricted] Subsidiary thereof during such period, (ii) the net income of any [Restricted] Subsidiary of the Company (other than the Company) shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that [Restricted] Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such [Restricted] Subsidiary and (iii) the net income (or loss) of any other Person acquired by the Company or a [Restricted] Subsidiary of the Company in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded.

"Consolidation" means, with respect to the Company, the consolidation of the accounts of the Restricted Subsidiaries with those of the Company all in accordance with GAAP; provided that "consolidation" will not include consolidation of the accounts of any Unrestricted Subsidiary with the accounts of the Company. The term "consolidated" has a correlative meaning to the foregoing.

- 8 -

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covenant Triggering Event" means the date that is ninety-five (95) days after the date on which there has occurred a Discharge of First-Lien Obligations and a Discharge of Second-Lien Obligations.

"Credit Documents" means this Agreement, the Term Notes and the Security Documents.

"Credit Party" means the Company and any Subsidiary Credit Party.

"DBCI" means Deutsche Bank AG Cayman Islands Branch, as Administrative Agent under the First Lien Credit Agreement.

"Debtors-In-Possession" shall mean the Company and each of its Restricted Subsidiaries which, on the Effective Date, is a debtor-in-possession pursuant to the Bankruptcy Code [to be reviewed].

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Designation" has the meaning assigned to such term in Section 6.09.

"Designation Amount" has the meaning assigned to such term in Section 6.09.

"Discharge of First-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"Discharge of Second-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"Disclosure Statement" shall mean the Disclosure Statement, dated August 20, 2004, pursuant to Section 1125 of the Bankruptcy Code relating to the Plan of Reorganization, as approved by the Bankruptcy Court, and as the same may be amended, modified or supplemented from time in accordance with the terms hereof and thereof.

"Disinterested Director" means, with respect to any transaction or series of related transactions, a member of the Board of the Company other than a director who (i) has any material direct or indirect financial interest in or with respect to such transaction or series of related transactions or (ii) is an employee or officer of the Company or an Affiliate that is itself a party to such transaction or series of transactions or an Affiliate of a party to such transaction or series of related transactions.

"Disqualified Stock" means, with respect to any person, any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or becomes mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or becomes exchangeable for Indebtedness at the option of the holder thereof, or becomes redeemable at the option of the holder thereof, in whole or in part, on or prior to the Maturity Date; provided such Capital Stock shall only constitute Disqualified Stock to the extent it so matures or becomes so redeemable or exchangeable on or prior to the Maturity Date; provided, further, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the Maturity Date shall not constitute Disqualified Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock specifically provides that such person will not repurchase or redeem any such stock pursuant to such provision prior to the Company's payment of the Term Loans pursuant to Section 2.10 or the waiver of the Event of Default under Section 7.01(j) by the Required Lenders and at all times subject to 6.05 hereof.

"Documents" shall mean the Credit Documents, the First-Lien Credit Documents, the Second-Lien Note Documents and the Plan Documents.

"dollars" or "$" refers to lawful money of the United States of America.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or written, binding notices or agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the

environment, preservation or reclamation of natural resources, the management, exposure to, or release or threatened release of any Hazardous Material.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the Effective Date and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Company, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Evergreen Investments" shall mean Evergreen Investment Management Company, LLC.

"Excess Cash Flow" shall mean, for any period, the remainder of (a) the sum of, without duplication, (i) Adjusted Consolidated Net Income for such period and (ii) the decrease, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period, minus (b) the sum of, without duplication, (i) the aggregate amount of all Capital Expenditures made by the Company and its Subsidiaries during such period (other than Capital Expenditures to the extent financed with equity proceeds, Asset Sale proceeds, insurance proceeds or Indebtedness), (ii) the aggregate amount of all payments made in respect of all Permitted Acquisitions consummated by the Company and its Subsidiaries during such period (other than any such payments to the extent financed with equity proceeds, Asset Sale proceeds, insurance proceeds or Indebtedness), (iii) the aggregate amount of permanent principal payments of Indebtedness for borrowed money of the Company and its Subsidiaries during such period (other than (A) repayments to the extent made with Asset Sale proceeds, equity proceeds, insurance proceeds or Indebtedness and (B) repayments of Term Loans, provided that repayments of Term Loans shall be deducted in determining Excess Cash Flow to the extent such repayments were (x) required as a result of a mandatory prepayment under Section 2.10 or (y) made as a voluntary prepayment with internally generated funds), and (iv) the increase, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period.

"Excess Proceeds" has the meaning assigned to it in Section 6.04 of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, as amended from time to time.

"Excluded Taxes" means, with respect to the Agent, any Lender, a Participant or any other recipient of any payment to be made by or on account of any obligation of the Company hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by any jurisdiction under the laws of which such recipient is authorized to do business or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above, (c) taxes imposed by reason of the Agent, any Lender or any other recipient of any payment described herein doing business in the jurisdiction imposing such tax, other than solely as a result of the Credit Documents or any transaction contemplated hereby and (d) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Company under Section 2.19(b)) or a Participant that would be a Foreign Lender if it were a Lender, any withholding tax that (i) is in effect and would apply to amounts payable to such Foreign Lender or Participant at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or such Participant becomes a Participant, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Company with respect to any withholding tax pursuant to Section 2.17(a), or (ii) is attributable to such Foreign Lender's failure to comply with Section 2.17(e) or such Participant's failure to comply with Section 9.04(f).

"Existing Indebtedness" has the meaning assigned to it in Section 3.21.

"Fair Market Value" means, with respect to any asset or property, the price that could be negotiated in an arms-length free market transaction, for cash, between a willing seller and a willing buyer, neither of whom is under pressure or compulsion to complete the transaction. [Still relevant? -- Any Asset Sale pursuant to the terms of the deadlock event "buy-sell" arrangements in Section 7.15 of the Amended and Restated Operating Agreement of Starpower Communications, LLC, as in effect on the Effective Date, shall be deemed to have been made for Fair Market Value.] Unless otherwise specified in this Agreement, Fair Market Value shall be determined by the Board acting in good faith and shall be evidenced by a Board Resolution.

"FCC" shall mean the U.S. Federal Communications Commission, or any successor thereto.

"FCC Licenses" shall have the meaning provided in Section 3.24(a) of this Agreement.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions.

- 12 -

"First-Lien Administrative Agent" has the meaning given to it in the Intercreditor Agreement.

"First-Lien Collateral Agent" has the meaning given to it in the Intercreditor Agreement

"First Lien Credit Agreement" means that certain Credit Agreement, dated as of the date hereof, among the Company, the subsidiaries of the Company that are guarantors thereto, DBCI and the lenders named therein, as such agreement may be modified, supplemented, amended, restated (including any amendment and restatement thereof), extended or revised from time to time.

"First-Lien Credit Documents" has the meaning given to it in the Intercreditor Agreement.

"First-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"Fixed Rate" when used in reference to any Term Loan, refers to whether such Term Loans are bearing interest at the FX Rate.

"Foreign Lender" means any Lender that is a Foreign Person.

"Foreign Pension Plan" shall mean each employee benefit plan, employment, bonus, incentive, stock purchase and stock option plan, program, agreement or arrangement; and each severance, termination pay, salary continuation, retention, accrued leave, vacation, sick pay, sick leave, medical, life insurance, disability, accident, profit-sharing, fringe benefit, pension, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the fifty states of the United States of America, by the Company or any of its Subsidiaries, including, without limitation, any such plan, fund, program, agreement or arrangement sponsored by a government or governmental entity.

"Foreign Person" means any Person that is not a "United States person" as defined in section 7701(a)(30) of the Code.

"Foreign Subsidiary" means any (a) Subsidiary that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia or (b) any Subsidiary that is organized under the laws of the United States of America or any State thereof or the District of Columbia and whose assets (directly or indirectly) consist solely of Capital Stock of one or more Subsidiaries that are Foreign Subsidiaries (which constitute controlled foreign corporations as defined in Section 957 of the Code) within the meaning of clause (a) of this definition.

"FX Rate" means: (i) a rate per annum equal to 12.5% from the Effective Date through and including March 31, 2006; and (ii) thereafter, a rate per annum equal to 13.2%; provided, however, if the Company elects to pay the full amount of the interest accrued for any

Interest Payment Date in cash, the FX Rate shall be deemed to be a rate per annum equal to 12.5% for such interest period.

"GAAP" means, at any date of determination, generally accepted accounting principles in effect in the United States and which are applicable as of the date of determination and which are consistently applied for all applicable periods.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorizations" shall have the meaning set forth in Section 3.24(b) of this Agreement.

"Guarantee" means, as applied to any obligation, (i) a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner, of any part or all of such obligation and (ii) an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to assure in any way the payment or performance (or payment of damages in the event of non-performance) of all or any part of such obligation, including, without limiting the foregoing, the payment of amounts drawn down by letters of credit.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic materials, substances, wastes or other pollutants or contaminants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, in each case, which are regulated pursuant to any Environmental Law.

"Indebtedness" means, with respect to any Person, without duplication, (i) any liability, contingent or otherwise, of such person (A) for borrowed money (whether or not the recourse of the lender is to the whole of the assets of such person or only to a portion thereof) or (B) evidenced by a note, debenture or similar instrument or letter of credit (including a purchase money obligation) or (C) for the payment of money relating to a Capitalized Lease Obligation or other obligation relating to the deferred purchase price of property or (D) in respect of an Interest Rate Obligation or currency agreement; or (ii) any liability of others of the kind described in the preceding clause (i) which the person has guaranteed or which is otherwise its legal liability; or (iii) any obligation secured by a Lien (other than Liens on Capital Stock or Indebtedness of any Unrestricted Subsidiary) to which the property or assets of such person are subject, whether or not the obligations secured thereby shall have been assumed by or shall otherwise be such person's legal liability (the amount of such obligation being deemed to be the lesser of the value of such property or asset or the amount of the obligation so secured); (iv) all Disqualified Stock valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued and unpaid dividends; and (v) any and all deferrals, renewals, extensions and refundings of, or amendments, modifications or supplements to, any liability of the kind described in any of the preceding clauses (i), (ii), (iii) or (iv). In no event shall "Indebtedness" include trade

payables and accrued liabilities that are current liabilities incurred in the ordinary course of business, excluding the current maturity of any obligation which would otherwise constitute Indebtedness. For purposes of Section 6.01 and Section 6.04 hereof and the definition of "Events of Default," in determining the principal amount of any Indebtedness to be incurred by the Company or a Restricted Subsidiary or which is outstanding at any date, the principal amount of any Indebtedness which provides that an amount less than the principal amount at maturity thereof shall be due upon any declaration of acceleration thereof shall be the accreted value thereof at the date of determination. Indebtedness of any person that becomes a Restricted Subsidiary shall be deemed incurred at the time that such a person becomes a Restricted Subsidiary.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03.

"Independent Financial Advisor" means a United States investment banking, consulting or accounting firm of national standing in the United States (i) which does not, and whose directors, officers and employees or Affiliates do not, have a material direct or indirect financial interest in the Company or any of its Subsidiaries or Affiliates and (ii) which, in the judgment of the Board, is otherwise independent and qualified to perform the task for which it is to be engaged.

"Intercompany Loans" shall have the meaning given to it in clause (vii) of the definition of Permitted Indebtedness.

"Intercompany Note" means a promissory note evidencing Intercompany Loans.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the date hereof, among the Company, certain Subsidiaries of the Company named therein, the Agent, the First-Lien Administrative Agent the Second-Lien Administrative Agent, the Collateral Agent, the First-Lien Collateral Agent and the Second-Lien Collateral Agent, as such agreement may from time to time be amended, modified or supplemented in accordance with its terms.

"Interest Payment Date" means the last day of each March, June, September and December, commencing December 31, 2004.

"Interest Rate Obligations" means the obligations of any person pursuant to any arrangement with any other person whereby, directly or indirectly, such person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount and shall include without limitation, interest rate swaps, caps, floors, collars, forward interest rate agreements and similar agreements.

"Intertainer" means Intertainer Inc., a Delaware corporation.

"Investment" means, with respect to any person, any advance, loan, account receivable (other than an account receivable arising in the ordinary course of business), or other extension of credit (including, without limitation, by means of any guarantee) or any capital

contribution to (by means of transfers of property to others, payments for property or services for the account or use of others, or otherwise), or any purchase or ownership of any stocks, bonds, notes, debentures or other securities of, any other person. Notwithstanding the foregoing, in no event shall any issuance of Capital Stock (other than Disqualified Stock) of the Company in exchange for Capital Stock, property or assets of another person constitute an Investment by the Company in such other person.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"License" means any license issued by the Federal Communications Commission to the Company or any Subsidiary under the Communications Act.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), security interest, hypothecation, assignment for security, claim, or preference or priority or other encumbrance upon or with respect to any property of any kind. A person shall be deemed to own subject to a Lien any property which such person has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement.

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" means (i) a material adverse effect on the business, operations, properties, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its Restricted Subsidiaries taken as a whole since December 31, 2003 (other than the commencement of the bankruptcy cases with respect to the Debtors-In-Possession) or (ii) a material adverse effect (x) on the rights or remedies of the Lenders or the Agent or Collateral Agent hereunder or under any other Credit Document or (y) on the ability of the Company to perform its obligations to the Lenders or the Agent or any Collateral Agent under any other Credit Documents.

"Material Asset Sale" shall mean any Asset Sale where the gross proceeds received by the Company and its Restricted Subsidiaries (taking the amount of cash and Cash Equivalents received, the principal amount of Indebtedness received and the fair market value of all other consideration) is in excess of [$5,000,000].

"Maturity Date" means [_____], 2012. [Note: To be 7¾ years following the Effective Date.]

"Maximum First-Lien Credit Documents Principal Amount" shall have the meaning given to it in the Intercreditor Agreement.

"Maximum Second-Lien Principal Amount" shall have the meaning given to it in the Intercreditor Agreement.

"Maximum Rate" has the meaning assigned to such term in Section 9.13.

"Megacable" means collectively, Mega Cable, S.A. de C.V., MCM Holding, S.A. de C.V. and Megacable Telecomunicaciones, S.A. de C.V., each a sociedad anonima de capital variable organized under the laws of the United Mexican States.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument which shall be, prior the date of Discharge of First-Lien Obligations, in substantially the same form delivered under the First-Lien Credit Agreement, and, thereafter, in a form reasonably acceptable to the trustee under the Second-Lien Note Indenture.

"Mortgage Policy" shall mean a mortgage title insurance policy or a binding commitment with respect thereto.

"Mortgaged Property" shall mean any Real Property owned or leased by the Company or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Company or any ERISA Affiliate has any actual or contingent liability.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds thereof in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary or any Restricted Affiliate) net of (i) brokerage commissions and other fees and expenses (including fees and expenses of legal counsel, accountants, consultants and investment bankers) related to such Asset Sale, (ii) provisions for all taxes payable as a result of such Asset Sale, (iii) amounts required to be paid to any person (other than the Company or any Restricted Subsidiary or any Restricted Affiliate) owning a beneficial interest in or having a Permitted Lien on the assets subject to the Asset Sale and (iv) appropriate amounts to be provided by the Company or any Restricted Subsidiary or any Restricted Affiliate, as the case may be, as a reserve required in accordance with GAAP against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary or any Restricted Affiliate, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officers' Certificate delivered to the Agent.

"Non-Wholly Owned Subsidiary" shall mean any Subsidiary of the Company that is not a Wholly-Owned Subsidiary of the Company.

"Notice of Plan Effective Date" shall mean the notice from the Company certifying that the effective date for the Plan of Reorganization has occurred.

"Obligations" has the meaning assigned to such term in the Security Agreement.

"Original Credit Agreement" has the meaning assigned to such term in the preamble to this Agreement.

"Original Credit Documents" means the Original Credit Agreement, any Notes, the other Security Documents and all filings and other agreements, instruments, documents and certificates delivered to the Agent, the Collateral Agent or any Lenders in connection with the Original Credit Agreement.

"Other Senior Debt Pro Rata Share" means the amount of the applicable Excess Proceeds obtained by multiplying the amount of such Excess Proceeds by a fraction, (i) the numerator of which is the aggregate accreted value and/or principal amount, as the case may be, of all Indebtedness (other than Subordinated Indebtedness) of the Company outstanding at the time of the applicable Asset Sale with respect to which the Company is required to use Excess Proceeds to repay or make an offer to purchase or repay and (ii) the denominator of which is the sum of (a) the aggregate principal amount of all Term Loans outstanding at the time of the offer to purchase or repay with respect to the applicable Asset Sale and (b) the aggregate principal amount or the aggregate accreted value, as the case may be, of all other Indebtedness (other than Subordinated Indebtedness) of the Company outstanding at the time of the applicable prepayment date with respect to which the Company is required to use the applicable Excess Proceeds to offer to repay or make an offer to purchase or repay.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar taxes, charges or levies arising from any payment made under any Credit Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Credit Document.

"Outstanding Indebtedness" has the meaning assigned to it in the preamble to this Agreement.

"Participant" has the meaning assigned to it in Section 9.04.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisition" shall mean the acquisition by the Company or a Wholly-Owned Domestic Restricted Subsidiary of the Company [of an Acquired Entity or Business] (including by way of merger of such Acquired Entity or Business with and into the Company (so long as the Company is the surviving corporation) or a Wholly-Owned Domestic Restricted Subsidiary of the Company (so long as the Restricted Subsidiary is the surviving corporation)), provided that (in each case) (A) the consideration paid or to be paid by the Company or such Wholly-Owned Domestic Restricted Subsidiary consists solely of cash, the issuance or incurrence of Indebtedness otherwise permitted by Section 6.01 and the assumption/acquisition of any Indebtedness (calculated at face value) which is permitted to remain outstanding in accordance with the requirements of Section 6.01, (B) in the case of the acquisition of 100% of the capital stock or other Capital Stock of any Person (including way of merger), such Person shall own no capital stock or other Capital Stock of any other Person (excluding *de minimis* amounts) unless such Person owns 100% of the capital stock or other Capital Stock of such other

Person, (C) all of the business, division or product line acquired pursuant to the respective Permitted Acquisition, or the business of the Person acquired pursuant to the respective Permitted Acquisition and its Subsidiaries taken as a whole, is in the United States, (D) the Acquired Entity or Business acquired pursuant to the respective Permitted Acquisition is in a business permitted by Section 6.03(b) and (E) all applicable requirements of the First Lien Credit Agreement.

"Permitted Business" means [to be defined].

"Permitted Credit Facility" means (i) any term loan and/or revolving credit facility (including any letter of credit facility) entered into principally with commercial banks and/or other financial institutions and lenders typically party to loan agreements and (ii) any senior credit facility entered into with any vendor or supplier (or any financial institution acting on behalf of or for the purpose of directly financing purchases from such vendor or supplier) to the extent the Indebtedness thereunder is incurred for the purpose of financing the cost (including the cost of design, development, construction, manufacture or acquisition) of property or assets used or to be used in a business in which the Company and its Restricted Subsidiaries are permitted to engage under Section 6.03(b).

"Permitted Indebtedness" means the following Indebtedness (each of which shall be given independent effect): [Subject to change depending upon terms of the DB Credit Agreement with certain specific dollar baskets being looser than those in the DB Credit Agreement and the Second-Lien Note Indenture.]

(a)    Indebtedness under this Agreement and the other Credit Documents;

(b)    Indebtedness of the Company and/or any Restricted Subsidiary outstanding on the Effective Date and set forth on Schedule 6.01 (which shall not include the Indebtedness under clause (h) below);

(c)    (i) Indebtedness of any Restricted Subsidiary owed to and held by the Company or a Restricted Subsidiary and (ii) Indebtedness of the Company, not secured by any Lien, owed to and held by any Restricted Subsidiary; provided that an incurrence of Indebtedness shall be deemed to have occurred upon (x) any sale or other disposition (excluding assignments as security to financial institutions) of any Indebtedness of the Company or a Restricted Subsidiary referred to in this clause (c) to a person (other than the Company or a Restricted Subsidiary) or (y) any sale or other disposition by the Company or any Restricted Subsidiary of Capital Stock of a Restricted Subsidiary, or Designation of an Unrestricted Subsidiary, which holds Indebtedness of the Company or Restricted Subsidiary such that such Restricted Subsidiary, in any such case, ceases to be a Restricted Subsidiary;

(d)    Interest Rate Obligations of the Company and/or any Restricted Subsidiary relating to Indebtedness of the Company and/or such Restricted Subsidiary, as the case may be so long as the entering into of such Interest Rate Obligations are bona fide hedging activities and are not for speculative purposes;

(e)     Indebtedness of the Company and/or any Restricted Subsidiary in respect of performance bonds of the Company or any Restricted Subsidiary or surety bonds provided by the Company or any Restricted Subsidiary incurred in the ordinary course of business;

(f)     Indebtedness of the Company and its Restricted Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness described in clause (vii) of the definition of Permitted Liens, provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (iii) exceed $_____ at any time outstanding;

(g)     Indebtedness of a Restricted Subsidiary of the Company acquired pursuant to a Permitted Acquisition (or Indebtedness assumed at the time of a Permitted Acquisition of an asset securing such Indebtedness), provided that (x) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition, (y) such Indebtedness does not constitute debt for borrowed money, it being understood and agreed that Capitalized Lease Obligations and purchase money Indebtedness shall not constitute debt for borrowed money for purposes of this clause (g) and (z) the aggregate principal amount of all Indebtedness permitted by this clause (g) shall not exceed $_____ at any one time outstanding;

(h)     Indebtedness of the Company, and guarantees thereof by the Subsidiaries of the Company under the Second-Lien Note Indenture and the other Second-Lien Note Documents in an aggregate principal amount not to exceed $_____ (less the amount of any repayments of principal thereof made after the Effective Date);

(i)     Indebtedness of the Company and/or any Restricted Subsidiary to the extent it represents a replacement, renewal, refinancing or extension (a "Refinancing") of outstanding Indebtedness of the Company and/or any Restricted Subsidiary incurred or outstanding pursuant to clause (a), or (b), of this definition or the proviso of Section 6.01 hereof, provided that (1) Indebtedness of the Company may not be Refinanced to such extent under this clause (i) with Indebtedness of any Restricted Subsidiary, and (2) any such Refinancing shall only be permitted under this clause (i) to the extent that (x) it does not result in a lower Average Life to Stated Maturity of such Indebtedness as compared with the Indebtedness being Refinanced and (y) it does not exceed the sum of the principal amount (or, if such Indebtedness provides for a lesser amount to be due and payable upon a declaration of acceleration thereof, an amount no greater than such lesser amount) of the Indebtedness being Refinanced plus the amount of accrued interest thereon and the amount of any reasonably determined prepayment premium necessary to accomplish such Refinancing and such reasonable fees and expenses incurred in connection therewith;

(j)     Indebtedness of the Company and/or any Restricted Subsidiary incurred under one or more Permitted Credit Facilities, and any Refinancings of the foregoing, such that the aggregate principal amount of such Indebtedness of the Company and the Restricted Subsidiaries does not exceed, at the time of the incurrence of such Indebtedness, the Maximum First-Lien Credit Documents Principal Amount then in effect;

(k)    guarantees by the Company of Indebtedness or operating lease payment obligations of any Wholly Owned Domestic Restricted Subsidiary and by any Wholly Owned Domestic Restricted Subsidiary of Indebtedness or operating lease payment obligations of any other Wholly Owned Domestic Restricted Subsidiary, in each case so long as the respective underlying guaranteed Indebtedness or operating lease payment obligations are otherwise permitted in accordance with the relevant terms of this Agreement (other than this clause (k)); and

(l)    in addition to the items referred to in clauses (a) through (k) above, Indebtedness of the Company and/or the Restricted Subsidiaries having an aggregate principal amount not to exceed $_____ at any time outstanding.

"Permitted Investments" means Investments consisting of:

(i)    accounts receivables owing to the Company or any Restricted Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Company or such Restricted Subsidiary;

(ii)    cash and Cash Equivalents;

(iii)    Investments held by the Company or any Restricted Subsidiary on the Effective Date and described on Schedule 1.01B, provided that any additional Investments made with respect thereto shall constitute Permitted Investments only if permitted under the other provisions of this definition;

(iv)    Investments acquired by the Company or any Restricted Subsidiary (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)    loans and advances by the Company or any Restricted Subsidiary to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $_____ at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)    Interest Rate Obligations of counterparties under agreements permitted under clause (d) of the definition of "Permitted Indebtedness";

(vii)    intercompany loans and advances between and among the Company and the Wholly-Owned Domestic Restricted Subsidiaries of the Company (collectively, "Intercompany Loans"), provided that each such Intercompany Loan shall be evidenced by an Intercompany Note (which Intercompany Note shall include the subordination provisions attached as Annex A to the form of Intercompany Note attached to the First-Lien Credit Agreement) which shall be pledged to the Collateral Agent pursuant to, and to the extent required by, the Pledge Agreement but subject to the Intercreditor Agreement;

(viii)     [Permitted Acquisitions] and the Starpower Acquisition;

(ix)     Investments by the Company and its Restricted Subsidiaries in Capital Stock of Subsidiaries that are Wholly-Owned Domestic Restricted Subsidiary both before and after such investments; provided that any such Capital Stock held by the Company shall be pledged pursuant to the Pledge Agreement;

(x)     loans by the Company to the Employee Stock Ownership Plan of the Company, 100% of the gross proceeds of which (without reduction for costs, fees and expenses or other items) are immediately thereafter utilized by such Employee Stock Ownership Plan to purchase from the Company not more than [2,000,000] shares of the Company's common stock (such number of shares to be adjusted to reflect stock splits, stock dividends, stock combinations and similar events); and

(xi)     other investments in an aggregate amount not to exceed $[_____] (net of any return of capital or Net Cash Proceeds in respect of any such investment and valued at the time of the making thereof).

"Permitted Encumbrance" means, with respect to any Mortgaged Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, which exceptions prior to the date of Discharge of First-Lien Obligations must be acceptable to the Administrative Agent under the First-Lien Credit Agreement in its reasonable discretion.

"Permitted Liens" means:

(i)     inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with generally accepted accounting principles;

(ii)     Liens in respect of property or assets of the Company or any of its Restricted Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Company's or such Restricted Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Company or such Restricted Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)     Liens in existence on the Effective Date which are listed, and the property subject thereto described, in Schedule 1.01, but only to the respective date, if any, set forth in such Schedule 1.01 for the removal, replacement and termination of any such Liens, plus renewals, replacements and extensions of such Liens to the extent set forth on such Schedule 1.01, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such

renewal, replacement or extension does not encumber any additional assets or properties of the Company or any of its Restricted Subsidiaries;

(iv)        Liens created by or pursuant to (x) the First-Lien Credit Documents and (y) the Second-Lien Note Documents;

(v)        licenses, sublicenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Company or any of its Restricted Subsidiaries;

(vi)        Liens upon assets of the Company or any of its Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by clause (f) of the definition of "Permitted Indebtedness", provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of the Company or any other asset of the Company or any Restricted Subsidiary of the Company;

(vii)        Liens placed upon equipment or machinery acquired after the Effective Date and used in the ordinary course of business of the Company or any of its Restricted Subsidiaries and placed at the time of the acquisition thereof by the Company or such Restricted Subsidiary or within 180 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by clause (f) of the definition of "Permitted Indebtedness" and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any asset of the Company or any other asset of the Company or such Restricted Subsidiary;

(viii)        easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Company or any of its Restricted Subsidiaries;

(ix)        Liens arising from precautionary Uniform Commercial Code financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)        Liens arising out of the existence of judgments or awards in respect of which the Company or any of its Restricted Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings, provided that the aggregate amount of all cash (including the stated amount of all letters of credit) and the fair market value of all other property subject to such Liens does not exceed [$5,000,000] at any time outstanding;

(xi)	statutory and common law landlords' liens under leases to which the Company or any of its Restricted Subsidiaries is a party;

(xii)	Liens (other than Liens imposed under ERISA), including deposits, incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice (exclusive of obligations in respect of the payment for borrowed money), provided that the aggregate amount of all cash and the fair market value of all other property subject to all Liens permitted by this clause (xii) shall not at any time exceed [$5,000,000];

(xiii)	Permitted Encumbrances;

(xiv)	Liens on property or assets acquired pursuant to a Permitted Acquisition, or on property or assets of a Restricted Subsidiary of the Company in existence at the time such Restricted Subsidiary is acquired pursuant to such an acquisition, provided that (x) any Indebtedness that is secured by such Liens is permitted to exist under clause (g) of the definition of "Permitted Indebtedness", and (y) such Liens are not incurred in connection with, or in contemplation or anticipation of, such acquisition and do not attach to any asset of the Company or any other asset of the Company or any of its Restricted Subsidiaries;

(xv)	restrictions on the transfer or pledge of assets contained in any FCC License or imposed by the Communications Act, comparable state or local legislation, regulations or ordinances or the terms of cable TV franchises;

(xvi)	Liens consisting of customary options, calls, puts or restrictions on transfer relating to Capital Stock of Non-Wholly Owned Subsidiaries and arising under joint venture arrangements with other holders (other than the Company and its Affiliates) of such Capital Stock; and

(xvii)	other Liens, so long as neither the aggregate fair market value of all assets subject thereto, nor the aggregate amount of Indebtedness or other obligations secured thereby, exceeds $_____.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PIK Amount" has the meaning assigned to such term in Section 2.13(b)(i) of this Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Company or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA.

- 24 -

"<u>Plan Documents</u>" shall have the meaning provided in the Plan of Reorganization.

"<u>Plan of Reorganization</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Pledge Agreement</u>" means the Pledge Agreement, substantially in the form of Exhibit D, between the Company and the Agent as collateral agent for the benefit of the Secured Creditors.

"<u>Pledge Agreement Collateral</u>" shall mean all "Collateral" as defined in the Pledge Agreement.

"<u>Pro Forma Basis</u>" shall mean, in connection with any calculation of compliance with any financial covenant or financial term, the calculation thereof after giving effect on a <u>pro forma</u> basis to (x) the incurrence of any Indebtedness (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness or to finance a Permitted Acquisition) after the first day of the relevant Calculation Period as if such Indebtedness had been incurred (and the proceeds thereof applied) on the first day of the relevant Calculation Period, (y) the permanent repayment of any Indebtedness (other than revolving Indebtedness except to the extent accompanied by a corresponding permanent commitment reduction) after the first day of the relevant Calculation Period as if such Indebtedness had been retired or redeemed on the first day of the relevant Calculation Period and/or (z) the Permitted Acquisition, if any, then being consummated as well as any other Permitted Acquisition or Material Asset Sale consummated after the first day of the relevant Calculation Period and on or prior to the date of the respective Permitted Acquisition then being effected, as the case may be, with the following rules to apply in connection therewith:

(i) all Indebtedness (x) (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness or to finance a Permitted Acquisition) incurred or issued after the first day of the relevant Calculation Period (whether incurred to finance a Permitted Acquisition, to refinance Indebtedness or otherwise) shall be deemed to have been incurred or issued (and the proceeds thereof applied) on the first day of the respective Calculation Period and remain outstanding through the date of determination and (y) (other than revolving Indebtedness except to the extent accompanied by a corresponding permanent commitment reduction) permanently retired or redeemed after the first day of the relevant Calculation Period shall be deemed to have been retired or redeemed on the first day of the respective Calculation Period and remain retired through the date of determination;

(ii) all Indebtedness assumed to be outstanding pursuant to preceding clause (i) shall be deemed to have borne interest at (x) the rate applicable thereto, in the case of fixed rate indebtedness, or (y) at the rate which would have been applicable thereto on the last day of the respective Calculation Period, in the case of floating rate Indebtedness (although interest expense with respect to any Indebtedness for periods while same was actually outstanding during the respective period shall be calculated using the actual rates applicable thereto while same was actually outstanding); and

(iii)     in making any determination of Consolidated EBITDA, pro forma effect shall be given to any Permitted Acquisition or Material Asset Sale consummated during the periods described above, with such Consolidated EBITDA to be determined as if such Permitted Acquisition or Material Asset Sale was consummated on the first day of the relevant Calculation Period, taking into account, for any portion of the relevant period being tested occurring prior to the consummation of any Permitted Acquisition or Material Asset Sale, demonstrable cost savings actually achieved simultaneously with, or to be achieved within a 1-year period following, the closing of the respective Permitted Acquisition or Material Asset Sales, which cost savings would be permitted to be recognized in pro forma financial statements prepared in accordance with Regulation S-X under the Securities Act, as if such cost-savings were realized on the first day of the relevant period.

"Refinancing" has the meaning set forth in clause (i) of the definition of "Permitted Indebtedness."

"Register" has the meaning set forth in Section 9.04 of this Agreement.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, members, stockholders, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Related Fund" means with respect to any Lender that is a fund that invests in bank loans in the ordinary course of business, any other fund that invests in bank loans in the ordinary course of business and is advised or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Replacement Assets" has the meaning given to it in Section 6.04 of this Agreement.

"Required Lenders" means, at any time, Lenders having Term Loans representing more than 50% of the sum of the total principal amount of outstanding Term Loans at such time.

"Restricted" shall mean, when referring to cash or Cash Equivalents of the Company or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Company or of any such Subsidiary, (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors or (iii) are not otherwise generally available for use by the Company or any of its Subsidiaries.

"Restricted Payment" means any of the following: (i) the declaration or payment of any dividend or any other distribution on Capital Stock of the Company or any payment made to the direct or indirect holders (in their capacities as such) of Capital Stock of the Company other than dividends or distributions payable solely in Capital Stock (other than Disqualified Stock) of the Company or in options, warrants or other rights to purchase Capital Stock (other than Disqualified Stock) of the Company; (ii) the purchase, redemption or other acquisition or retirement for value of any Capital Stock of the Company (other than any such Capital Stock owned by the Company or a Wholly Owned Restricted Subsidiary); (iii) the purchase,

redemption, defeasance or other acquisition or retirement for value prior to any scheduled repayment, sinking fund or maturity of any Subordinated Indebtedness (other than any Subordinated Indebtedness held by the Company or a Wholly Owned Restricted Subsidiary); or (iv) the making by the Company or any Restricted Subsidiary of any Investment (other than a Permitted Investment) in any person.

"Restricted Subsidiary" means any Subsidiary of the Company that has not been designated by the Board, by a Board Resolution delivered to the Agent, as an Unrestricted Subsidiary pursuant to and in compliance with Section 6.09 hereof. Any such designation may be revoked by a Board Resolution delivered to the Agent, subject to the provisions of such covenant.

"Restricted Subsidiary Indebtedness" means Indebtedness of any Restricted Subsidiary (i) which is not subordinated to any other Indebtedness of such Restricted Subsidiary and (ii) in respect of which the Company is not also obligated (by means of a guarantee or otherwise) other than, in the case of this clause (ii), Indebtedness under any Permitted Credit Facilities.

"Returns" shall have the meaning given to it in Section 3.09.

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies.

"SEC" shall have the meaning given to it in Section 5.01.

"Second-Lien Administrative Agent" shall mean the "Trustee" (including in its capacity as collateral agent under the Second-Line Note Documents) under and as defined in the Second-Lien Note Indenture.

"Second-Lien Collateral Agent" shall mean the "Trustee" under and as defined in the Second-Lien Note Documents.

"Second-Lien Note Documents" has the meaning given to it in the Intercreditor Agreement.

"Second-Lien Note Indenture" means that certain Indenture, dated as of the date hereof, as amended from time to time, by and among the Company, as Issuer, and [          ], as Trustee.

"Second-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"Second Priority Lien" shall mean the Liens that secure obligations under any other agreements evidencing indebtedness secured by a second priority Lien on any assets or properties of the Company.

"Secured Creditors" has the meaning assigned to such term in the Security Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" means the Security Agreement, substantially in the form of Exhibit E, between the Company and the Agent for the benefit of the Secured Creditors.

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement.

"Security Documents" means, collectively, the Security Agreement, the Pledge Agreement, the Intercreditor Agreement and all other security agreements, pledges, collateral assignments or other instruments evidencing or creating any Security Interests in favor of the Collateral Agent, for the benefit of the Agent and the Lenders, in all or any portion of the Collateral, in each case, as amended, modified, restated, supplemented or replaced from time to time.

"Security Interests" means the Liens on the Collateral created by the Security Documents in favor of the Collateral Agent for the benefit of the Lenders.

"Senior Credit Agreements" means, together, the First Lien Credit Agreement and the Second Lien Note Indenture.

"Senior financial covenant" shall have the meaning given to it in Section 5.09.

"Senior Lenders" means the lenders under the First Lien Credit Agreement and the Second Lien Note Indenture.

"Senior Liens" means the Liens on the Collateral granted by the Company or the Subsidiaries of the Company to secure the payment of any First-Lien Obligations or any Second-Lien Obligations, and all replacements, renewals and other modifications of such Liens.

"Significant Restricted Subsidiary" means any Restricted Subsidiary (or group of Restricted Subsidiaries) that would constitute a Significant Restricted Subsidiary, as defined under Regulation S-X (or any successor regulation) under the Securities Act of 1933, as amended, but substituting therein 5% for each reference to 10%.

"Special Default" means (a) a Default under Section 7.01(a), (b) or, to the extent constituting a failure to make a payment, 7.01(c) or (b) any other Event of Default.

["Starpower" means Starpower Communications, LLC, a Delaware limited liability company.

"Starpower Acquisition" means the acquisition by the Company of the 50% of the Capital Stock in Starpower not owned by the Company for aggregate consideration not exceeding $[32,000,000].

"Starpower Group" means Starpower and its subsidiaries.]

"Subordinated Indebtedness" means any Indebtedness of the Company or any Subsidiary of the Company which is expressly subordinated in right of payment to any other Indebtedness of the Company or such Subsidiary of the Company.

"Subsidiary" means, with respect to any person, (i) any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors shall at the time be owned, directly or indirectly, by such person, or (ii) any other person of which at least a majority of voting interest is at the time, directly or indirectly, owned by such person. For the purposes of this definition, "voting stock" means stock which ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of stock has such voting power by reason of any contingency.

"Subsidiary Credit Party" means, following a Collateral Trigger Date, any Wholly Owned Restricted Subsidiary that is a Significant Restricted Subsidiary and is not a Foreign Subsidiary and that is (as of such date) a "non-restricted Subsidiary" as such term is defined in the definition of "Collateral Trigger Date."

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Loans" means the loans made by the Lenders to the Company pursuant to this Agreement.

"Test Period" shall mean (i) for the period ended March 31, 2005, the fiscal quarter of the Company then ended, (ii) for the period ended June 30, 2005, the two consecutive fiscal quarters (taken as one accounting period) of the Company then ended, (iii) for the period ended September 30, 2005, the three consecutive fiscal quarters (taken as one accounting period) of the Company then ended and (iv) thereafter, each period of four consecutive fiscal quarters of the Company then last ended (in each case taken as one accounting period).

"Total Leverage Ratio" shall mean, at any time, the ratio of Consolidated Indebtedness at such time to Consolidated EBITDA for the Test Period then most recently ended.

"Transaction" shall mean, collectively, (i) the consummation of the Plan of Reorganization, (ii) the entering into of the First-Lien Credit Documents and the occurrence of the Credit Events thereunder on the Effective Date, (iii) the entering into of the Second-Lien Note Documents and the issuance of all Second-Lien Notes thereunder on the Effective Date, (iv) the entering into of the Credit Documents and (v) the payment of all fees and expenses in connection with the foregoing.

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of the Company or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"Unrestricted Subsidiary" means any Subsidiary of the Company designated as such pursuant to and in compliance with Section 6.09 hereof. Any such designation may be revoked by a Board Resolution delivered to the Agent, subject to the provisions of such covenant.

"Voting Stock" means, with respect to any Person, the Capital Stock of any class or kind ordinarily having the power to vote for the election of directors or other members of the governing body of such person.

"Wholly Owned Domestic Restricted Subsidiary" shall mean, as to any Person, any Wholly Owned Subsidiary of such Person which is a Restricted Subsidiary and is incorporated or organized in the United States or any State thereof.

"Wholly Owned Restricted Subsidiary" means any Restricted Subsidiary of which all of the outstanding Capital Stock is owned by the Company or another Wholly Owned Restricted Subsidiary. For the purposes of this definition, any directors' qualifying shares or investments by foreign nationals mandated by applicable law shall be disregarded in determining the ownership of a Restricted Subsidiary.

"Wholly Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.02    [Reserved].

1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.04    Accounting Terms.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP as in effect from time to time; provided that, if the Company notifies the Agent that the Company

requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if (based on a request from the Required Lenders) the Agent notifies the Company that the Required Lenders have requested an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

ARTICLE II

The Credits

2.01  <u>Outstanding Term Loans</u>.  On the terms and subject to the conditions hereof, each Lender agrees, on a several but not joint basis, to make a Term Loan to the Company, in the amounts set forth on Schedule 2.01 hereto, on the Effective Date.

2.02  [Reserved].

2.03  [Reserved].

2.04  [Reserved].

2.05  [Reserved].

2.06  [Reserved].

2.07  [Reserved].

2.08  <u>Repayment of Term Loans; Evidence of Debt</u>.

(a)  The Company hereby unconditionally promises to pay to the Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.09.

(b)  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Company to such Lender resulting from each Term Loan made by Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)  The Agent shall maintain accounts in which it shall record (i) the amount of each Term Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Company to each Lender hereunder and (iii) the amount of any sum received by the Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)  The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall conclusively establish the existence and amounts of the obligations

- 31 -

recorded therein, absent manifest error; _provided_ that the failure of any Lender or the Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Company to repay the Term Loans in accordance with the terms of this Agreement.

(e)     Any Lender may request that Term Loans made by it be evidenced by a promissory note.  In such event, the Company shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender or its registered assigns) and in the form of Exhibit F hereto.  Thereafter, the Term Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

2.09     _Repayment of Term Loans_.  The Company shall repay the outstanding principal balance of the Term Loans plus all accrued and unpaid interest thereon, on the Maturity Date.

2.10     _Prepayment of Term Loans_.

(a)     The Company may prepay any of the Term Loans under this Section 2.10(a), in whole or in part, to the extent permitted by the Senior Credit Agreements and subject to the requirements of this Section, provided that the Company shall at the time of such prepayment pay to the Agent, for the pro rata account of each Lender, the following amounts:

(i)     if such prepayment is made after the Effective Date but before the second anniversary thereof, 100% of the then principal amount of the Term Loan, plus all accrued and unpaid interest;

(ii)     if such prepayment is made on or after the second anniversary of the Effective Date but before the third anniversary thereof, 103% of the then principal amount of the Term Loan, plus all accrued and unpaid interest;

(iii)     if such prepayment is made on or after the third anniversary of the Effective Date but before the fourth anniversary thereof, 102% of the then principal amount of the Term Loan, plus all accrued and unpaid interest;

(iv)     if such prepayment is made on or after the fourth anniversary of the Effective Date but before the fifth anniversary thereof, 101% of the principal amount of the Term Loan, plus all accrued and unpaid interest; or

(v)     if such prepayment is made on or after the fifth anniversary of the Effective Date but before the Maturity Date, 100% of the then principal amount of the Term Loan, plus all accrued and unpaid interest.

(b)     Following the end of each fiscal year of the Company, commencing at the end of the fiscal year in which all amounts outstanding under the Senior Credit Agreements have been paid in full, the Company shall prepay Term Loans in an aggregate amount equal to 50% of Excess Cash Flow for such fiscal year; _provided_ that any Lender may waive the right to receive

the amount of such mandatory prepayment and such amount shall be applied to the other Term Loans being repaid pro rata. Each prepayment pursuant to this paragraph shall be made without any premium or penalty of any kind and shall be made on or before the date on which financial statements are delivered pursuant to Section 5.01 with respect to the fiscal year for which Excess Cash Flow is being calculated (and in any event within 90 days after the end of such fiscal year).

(c)     In the event of the receipt by the Company of Excess Proceeds that are not used to repay the First-Lien Obligations and/or the Second-Lien Obligations, the Company shall prepay the Term Loans on the next Business Day in an amount equal to such proceeds not so used, to the extent permitted by the Senior Credit Agreements and subject to the requirements of this Section.

(d)     Prior to any optional or mandatory prepayment of Term Loans pursuant to this Section, the Company shall select the Term Loans to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (e) of this Section provided that all Term Loans shall be paid pro rata.

(e)     The Company shall notify the Agent in writing of any prepayment hereunder not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of the Term Loans or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Agent shall advise the Lenders of the contents thereof. Each prepayment of the Term Loans shall be applied ratably to the Term Loans. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13 and provided further that no prepayment of Term Loans need be made under this paragraph (e) until the aggregate amount of Net Cash Proceeds received in respect of which prepayments are otherwise required to be made equals or exceeds $5,000,000, at which time a prepayment shall be made in an aggregate amount equal to all such Net Cash Proceeds in respect of which no such prepayment has yet been made.

2.11     [Reserved].

2.12     Fees.

(a)     The Company agrees to pay to the Agent and each Lender, in each case for such Person's own account, fees and other consideration payable in the amounts and at the times separately agreed upon between the Company and the Agent or such Lender, respectively.

(b)     Except as set forth in any agreement referred to in clause (a) above, all fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Agent for distribution, in the case of participation fees, to the Lenders entitled thereto. Fees paid shall not be refundable under any circumstances unless paid in the absence of an obligation to pay such fee.

2.13     Interest.

(a)     The Term Loans shall accrue interest at the FX Rate.

(b)     (i) From the Effective Date through and including March 31, 2006, the interest accrued to any Interest Payment Date shall be capitalized and added to the principal amount of the Term Loans (such accrued interest, the "PIK Amount") and no interest for such period shall be paid in cash.  From and after each Interest Payment Date, the principal amount of Term Loan shall, without further action on the part of the Company or the Lenders, be deemed to be increased by the PIK Amount so capitalized and added to the principal in accordance with the provisions hereof.

(ii) From and after April 1, 2006 through the Maturity Date, accrued interest shall be payable on each Interest Payment Date as follows: (i) interest at a rate of 6.25% per annum shall be paid in cash, and (ii) interest at a rate of 6.95% per annum shall be capitalized as a PIK Amount and the principal amount of the Term Loan shall, without further action on the part of the Company or the Lenders, be deemed to be increased by the PIK Amount so capitalized and added to the principal in accordance with the provisions hereof; provided, that, for any Interest Payment Date, the Company may elect to pay in cash the full amount of the interest accrued for that interest period, in which case interest shall be deemed to have accrued at a rate per annum of 12.5% for such period.

(c)     Notwithstanding the foregoing, if any principal of or interest on any Term Loan or any fee or other amount payable by the Company hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the applicable FX Rate.

(d)     Accrued interest on each Term Loan shall be payable in arrears on each Interest Payment Date for such Term Loan; provided that, (i) in accordance with Section 2.13(b)(i), the Term Loans will not accrue cash interest prior to April 1, 2006, (ii) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, and (iii) in the event of any repayment or prepayment of any Term Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

2.14     [Reserved].

2.15     Increased Costs.

(a)     If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, as a consequence of this Agreement or the Term Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Company will pay to such Lender such additional amount

or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(b)     A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) of this Section and the determination thereof shall be delivered to the Company and shall be conclusive absent demonstrable error.  The Company shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(c)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Company shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; <u>provided</u> <u>further</u> that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.16     [Reserved].

2.17     <u>Taxes</u>.

(a)     Any and all payments by or on account of any obligation of the Company or any Subsidiary hereunder or under any other Credit Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; <u>provided</u> that if the Company or any Subsidiary shall be required by law or regulation to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent or Lender(as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Company or such Subsidiary shall make such deductions and (iii) the Company or any Subsidiary, as the case may be, shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Company and any Subsidiary shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Company and any Subsidiary Credit Party shall, jointly and severally, indemnify the Agent and each Lender within 15 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes required to be paid by the Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Company or any Subsidiary hereunder or under any other Credit Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section), and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  After the Agent or such Lender

learns of the imposition of such Indemnified Taxes or Other Taxes, such party will act in good faith to promptly notify the Company of its obligations thereunder. A certificate setting forth in reasonable detail the amount of such payment or liability and the determination thereof delivered to the Company by a Lender or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent demonstrable error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Company or any Subsidiary to a Governmental Authority, the Company shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     Each Lender that is a Foreign Person and that is entitled to an exemption from or reduction of withholding tax with respect to payments under any Credit Document shall deliver to the Company (with a copy to the Agent, as applicable), at the time(s) prescribed by applicable law or reasonably requested by the Company (or the Agent, as applicable), such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Company as will permit such payments to be made without withholding or at a reduced rate of withholding. Each Lender and Agent that is a United States person, as defined in section 7701(a)(30) of the Code (other than a Person that the Company may treat as an "exempt recipient" pursuant to Treasury Regulations section 1.6049-4(c)), shall deliver at the time(s) and in the manner(s) prescribed by applicable law or reasonably requested by the Company (or the Agent, as applicable), properly completed and duly executed United States Internal Revenue Form W-9 or any successor form, certifying that such Person is exempt from United States backup withholding tax on payments made under the Credit Documents. Notwithstanding any other provision of this Section 2.17(e), each such Lender shall not be required to deliver any form pursuant to this Section 2.17(e) that such Lender is not legally able to deliver (i) at the time such Lender becomes a party to this Agreement or (ii) to the extent that such failure is due to a change in treaty, law, regulation or any action by the Company occurring subsequent to the date on which such form originally was required to be provided pursuant to this Section 2.17(e).

(f)     If any Foreign Lender or Participant receives a refund of any Taxes or Other Taxes as to which it has been indemnified by the Company or with respect to which the Company has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Company (but only to the extent of indemnity payments made, or additional amounts paid, by the Company under this Section 2.17 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Foreign Lender without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, however, that the Company, upon the request of such Foreign Lender, agrees to repay the amount paid over to the Company pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Foreign Lender in the event such Foreign Lender is required to repay such refund to such Governmental Authority. Nothing contained in this Section 2.17(f) shall require any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Company or any other Person.

2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Company shall make each payment required to be made by it hereunder or under any other Credit Document (whether of principal, interest, or fees, or of amounts payable under Section 2.15 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Credit Document for such payment (or, if no such time is expressly required, prior to 1:00 p.m., New York City time), on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date shall be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Agent, except that payments pursuant to Sections 2.15, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Credit Documents shall be made to the Persons specified therein.  The Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Notwithstanding the foregoing, in no event shall the issuance of any warrants or other right to acquire any such Capital Stock of the Company to any Lender or any payment or proceeds resulting from such issuance constitute a payment which shall be subject to distribution amongst any other Lenders pursuant to this Section 2.18(a).  If any payment under any Credit Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Credit Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Company pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans to any assignee or participant, other than to the Company or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Company consents to the foregoing and agrees, to the extent they may effectively do so under applicable law, that any Lender acquiring a participation

pursuant to the foregoing arrangements may exercise against the Company's rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Company in the amount of such participation.

(d)     Unless the Agent shall have received written notice from the Company prior to the date on which any payment is due to the Agent for the account of the Lenders hereunder that the Company will not make such payment, the Agent may assume that the Company has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Company has not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the Federal Funds Effective Rate.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.18(d) or 9.03(c), then the Agent shall (notwithstanding any contrary provision hereof) apply any amounts thereafter received by the Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

2.19    <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)     If any Lender requests compensation under Section 2.15, or if the Company is required to pay any additional amount to (or for the benefit of) any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Company hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.15, or if the Company is required to pay any additional amount to (or for the benefit of) any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then the Company may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder or pursuant to any other Credit Document, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts).  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by

such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

ARTICLE III

Representations and Warranties

In order to induce the Lenders to enter into this Agreement and to make the Term Loans, the Company makes the following representations, warranties and agreements, in each case after giving effect to the Transaction, all of which shall survive the execution and delivery of this Agreement and the Term Notes and the making of the Term Loans on or after the Effective Date being deemed to constitute a representation and warranty that the matters specified in this Article III are true and correct in all material respects on and as of the Effective Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

3.01    Organizational Status.  The Company and each of its Subsidiaries (i) is a duly organized and validly existing corporation, partnership or limited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the corporate, partnership or limited liability company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.02    Power and Authority.  The Company has the corporate power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents and has taken all necessary corporate action to authorize the execution, delivery and performance by it of each of such Credit Documents.  The Company has duly executed and delivered each of the Credit Documents, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

3.03    No Violation.  Neither the execution, delivery or performance by the Company of the Credit Documents, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality or the terms of any FCC License or other Governmental Authorization, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents, the First-Lien Credit Documents and the Second-Lien Note Documents) upon any of the property or assets of the Company or any of its Subsidiaries pursuant to the

- 39 -

terms of any indenture, mortgage, deed of trust or credit agreement, or any other material agreement, contract or instrument, in each case to which the Company or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject, except for such conflicts, breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of the Company or any of its Subsidiaries.

3.04    Approvals.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (w) those that have otherwise been obtained or made on or prior to the Effective Date and which remain in full force and effect on the Effective Date, (x) filings which are necessary to perfect the security interests created under the Security Documents, which filings shall have been made (or will be made within ten (10) days of the Effective Date), (y) filings which are necessary to perfect the security interests created under the First Lien Credit Documents, which filings will be made prior to the filings described in clause (x) and (z) and within ten (10) days following the Effective Date, and (z) filings which are necessary to perfect the security interests created under the Second-Lien Security Documents, which filings will be made prior to the filings described in clause (x) and within ten (10) days following the Effective Date, or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, the Company to authorize, or is required to be obtained or made by, or on behalf of, the Company in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document.

3.05    Financial Statements; Financial Condition; Undisclosed Liabilities; Projections.

(a)    (i) The consolidated balance sheets of the Company and its Subsidiaries as at [December 31, 2001, December 31, 2002, December 31, 2003, March 31, 2004, June 30, 2004 and September 30, 2004], and the related consolidated statements of income, cash flows and retained earnings of the Company for the fiscal years ended December 31, 2001, 2002 and 2003 and the six and nine-month periods ended June 30, 2004 and September 30, 2004, copies of which have been furnished to the Lenders prior to the Effective Date, present fairly in all material respects the consolidated financial position of the Company at the dates of such balance sheets and the consolidated results of the operations of the Company for the periods covered thereby.  All interim monthly or quarterly financial statements furnished to the Agent and the Lenders prior to the Effective Date, as the case may be, present fairly in all material respects in accordance with GAAP the consolidated results of the operations of the Company and its Subsidiaries, for the periods covered thereby (except, in the case of the aforementioned quarterly or monthly financial statements, for normal year-end audit adjustments and the absence of footnotes).  All of the foregoing historical financial statements have been prepared in accordance with generally accepted accounting principles consistently applied (except, in the case of the aforementioned quarterly or monthly financial statements, for normal year-end audit adjustments and the absence of footnotes).

NY55/412464.6

(ii) The Pro Forma Financials, copies of which have been furnished to the Lenders prior to the Effective Date, present in all material respects the pro forma consolidated financial position and results of operations of the Company and its Subsidiaries (after giving effect to the Transaction) as at the dates and for the periods covered thereby.

(b)     Except as fully disclosed in the financial statements delivered pursuant to Section 3.05(a) there were as of the Effective Date no liabilities or obligations with respect to the Company or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be material to the Company or any of its Subsidiaries.  As of the Effective Date, the Company knows of no basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements delivered pursuant to Section 3.05(a) or referred to in the immediately preceding sentence which, either individually or in the aggregate, could reasonably be expected to be material to the Company or any of its Subsidiaries.

(c)     The Projections delivered to the Agent and the Lenders on or prior to the Effective Date, as the case may be, have been prepared in good faith and are based on reasonable assumptions, and there are no statements or conclusions in the Projections which are based upon or include information known to the Company to be misleading in any material respect or which fail to take into account material information known to the Company regarding the matters reported therein.  On the Effective Date, as applicable, the Company believes that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results and such differences may be material.

(d)     Since December 31, 2003, there has been no changes, events and/or occurrences that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.06     Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of the Company, threatened (i) with respect to the Transaction or any Credit Document or (ii) that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

3.07     True and Complete Disclosure.  All factual information (taken as a whole) furnished by or on behalf of the Company in writing to the Agent or any Lender (including, without limitation, all information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Company in writing to the Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

- 41 -

3.08    Use of Proceeds.

(a)    All proceeds of the Term Loans will be used by the Company to finance, in part, the Transaction and to pay the fees and expenses relating to the Transaction.

(b)    No part of the proceeds of any Term Loan will be used to purchase or carry any Margin Stock.  Neither the making of any Term Loan, nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

3.09    Tax Returns and Payments.  The Company and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all federal income tax and other material returns, statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of, the Company and/or any of its Subsidiaries.  The Returns accurately reflect in all material respects all liability for taxes of the Company and its Subsidiaries for the periods covered thereby.  The Company and each of its Subsidiaries has paid all taxes and assessments payable by it which have become due, other than (i) those that are immaterial, (ii) those being contested in good faith and adequately disclosed and fully provided for on the financial statements of the Company and its Subsidiaries in accordance with GAAP, (iii) those discharged pursuant to the Plan of Reorganization [and (iv) those payable over time pursuant to the Plan of Reorganization (which taxes and assessments, in the case of this clause (iv) and to the extent due in accordance with the Plan of Reorganization, have been paid in all material respects in accordance with the terms of the Plan of Reorganization)].  There is no action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of the Company, threatened by any authority regarding any material taxes relating to the Company or any of its Subsidiaries.  [Except as provided on Schedule 3.09,] as of the Effective Date, neither the Company nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of the Company or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Company or any of its Subsidiaries not to be subject to the normally applicable statute of limitations.  [Except as provided on Schedule 3.09,] neither the Company nor any of its Subsidiaries has incurred, nor will any of them incur, any material tax liability in connection with the Transaction or any other transactions contemplated hereby (it being understood that the representation contained in this sentence does not cover any future tax liabilities of the Company or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business).

3.10    Compliance with ERISA.  Schedule 3.10 sets forth, as of the Effective Date, the name of each Plan.  Each Plan (and each related trust) is in substantial compliance with its terms and with all applicable laws, including, without limitation, ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received or timely applied for a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code within the preceding six years; neither the Company nor any of its Subsidiaries or ERISA Affiliates has ever maintained or contributed to, or had any obligation to maintain or contribute to (or borne any liability with respect to) any "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, that is a "multiemployer plan," within the meaning of Section 3(37) of ERISA,

or that is subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA or subject to Title IV of ERISA; neither the Company nor any of its Subsidiaries or ERISA Affiliates has any obligation to maintain or contribute to (or borne any liability with respect to) any Foreign Pension Plan; all contributions required to be made with respect to a Plan have been timely made; neither the Company nor any Restricted Subsidiary of the Company nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4204 or 4212 of ERISA or Section 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a material risk to the Company or any Restricted Subsidiary of the Company or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or, to the knowledge of the Company, threatened; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Company, any Restricted Subsidiary of the Company, or any ERISA Affiliate has at all times been operated in compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code, except to the extent that any failure to comply could not reasonably be expected to result in a material liability to the Company or any of its Subsidiaries; each group health plan (as defined in 45 Code of Federal Regulations Section 160.103) which covers or has covered employees or former employees of the Company, any Restricted Subsidiary of the Company, or any ERISA Affiliate has at all times been operated in compliance with the provisions of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder, except to the extent that any failure to comply could not reasonably be expected to result in a material liability to the Company or any of its Subsidiaries; no lien imposed under the Code or ERISA on the assets of the Company or any Restricted Subsidiary of the Company or any ERISA Affiliate exists or is likely to arise on account of any Plan; and the Company and its Subsidiaries may cease contributions to or terminate any employee benefit plan maintained by any of them without incurring any material liability.

3.11    The Security Documents.

(a)    The provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors, a legal, valid and enforceable security interest in all right, title and interest of the Company in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has (or will have within ten (10) days of the Effective Date) a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral described therein, subject to no other Liens other than Permitted Liens.

(b)    The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person (other than the Senior Lenders). No filings or recordings are required in order to perfect (or maintain the perfection or priority of) the security interests created in the Pledge Agreement Collateral under the Pledge Agreement other than with

respect to that portion of the Pledge Agreement Collateral constituting a "general intangible" under the UCC.

        3.12    <u>Properties</u>.  All Real Property [having a [book/fair market] value in excess of $_____ that is] owned [or leased] by the Company or any of its Subsidiaries as of the Effective Date, and the nature of the interest therein, is correctly set forth in Schedule [3.12]. Each of the Company and each of its Subsidiaries has good and indefeasible title to all material properties owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 3.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

        3.13    <u>Capitalization</u>.  On the Effective Date, the authorized capital stock of the Company consists of [____] shares of common stock, [___] par value, of which [___] shares are issued and outstanding.  All outstanding shares of capital stock of the Company have been duly and validly issued and are fully paid and non-assessable.

        3.14    <u>Subsidiaries</u>.  On and as of the Effective Date and after giving effect to the Transaction, the Company has no Subsidiaries other than those Subsidiaries listed on Schedule 3.14.  Schedule 3.14 correctly sets forth, as of the Effective Date and after giving effect to the Transaction, (i) the percentage ownership (direct and indirect) of the Company in each class of capital stock or other Capital Stock of each of its Subsidiaries and also identifies the direct owner thereof and (ii) the jurisdiction of organization of each such Subsidiary.  All outstanding shares of capital stock or other Capital Stock of each Subsidiary have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  On the Effective Date and after giving effect to the Transaction, except as set forth on Schedule 3.14, no Subsidiary of the Company has outstanding any securities convertible into or exchangeable for its capital stock or other Capital Stock or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its capital stock or other Capital Stock or any stock appreciation or similar rights.

        3.15    <u>Compliance with Statutes</u>.  The Company and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business, the holding of the FCC Licenses and the other Governmental Authorizations and the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

        3.16    <u>Investment Company Act</u>.  Neither the Company nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

        3.17    <u>Public Utility Holdings Company Act</u>.  Neither the Company nor any of its Subsidiaries is a "holding company," or a "subsidiary company" of a "holding company," or

an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holdings Company Act of 1935, as amended.

3.18    Environmental Matters.  The Company and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws.  There are no pending or, to the knowledge of the Company, threatened Environmental Claims against the Company or any of its Subsidiaries or any Real Property owned, leased or operated by the Company or any of its Subsidiaries (including, to the Company's knowledge, any such claim arising out of the ownership, lease or operation by the Company or any of its Subsidiaries of any Real Property formerly owned, leased or operated by the Company or any of its Subsidiaries but no longer owned, leased or operated by the Company or any of its Subsidiaries).  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Company or any of its Subsidiaries, or any Real Property owned, leased or operated by the Company or any of its Subsidiaries (including, to the Company's knowledge, any Real Property formerly owned, leased or operated by the Company or any of its Subsidiaries but no longer owned, leased or operated by the Company or any of its Subsidiaries) or, to the knowledge of the Company, any property adjoining or adjacent to any such Real Property that could be reasonably expected (i) to form the basis of an Environmental Claim against the Company or any of its Subsidiaries or any Real Property owned, leased or operated by the Company or any of its Subsidiaries or (ii) to cause any Real Property owned, leased or operated by the Company or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such Real Property by the Company or any of its Subsidiaries under any applicable Environmental Law.

(b)    Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Real Property owned, leased or operated by the Company or any of its Subsidiaries or, to the knowledge of the Company, any property adjoining or adjacent to any Real Property, where such generation, use, treatment, storage, transportation or Release has violated or could be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim.

(c)    Notwithstanding anything to the contrary in this Section 3.18, the representations and warranties made in this Section 3.18 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliances of the types described above could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.19    Labor Relations.  Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against the Company or any of its Subsidiaries or, to the knowledge of the Company, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Company or any of its Subsidiaries or, to the knowledge of the Company, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Company or any of its Subsidiaries or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries and (iii) no union representation question exists with respect

- 45 -

to the employees of the Company or any of its Subsidiaries, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

3.20    Intellectual Property, etc.  The Company and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, necessary for the conduct of its business (the "Business Intellectual Property") without any known conflict with the rights of others arising from the Company's or its Subsidiaries' use of the Business Intellectual Property which, or the failure to obtain which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

3.21    Indebtedness.  Schedule 3.21 sets forth a true and complete list of all Indebtedness (including Contingent Obligations) of the Company and its Subsidiaries as of the Effective Date (excluding the Term Loans and the Indebtedness incurred pursuant to the First-Lien Credit Agreement and the Second-Lien Note Indenture) (the "Existing Indebtedness") which is to remain outstanding after giving effect to the Transaction, in each case showing the aggregate principal amount thereof and the name of the respective Company or any of its Subsidiaries which directly or indirectly guarantees such debt.

3.22    Insurance.  Schedule 3.22 sets forth a true and complete listing of all insurance maintained by the Company and its Subsidiaries as of the Effective Date, with the amounts insured (and any deductibles) set forth therein.

3.23    Representations and Warranties in Other Documents.  All representations and warranties set forth in the other Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Effective Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

3.24    FCC Licenses and Other Governmental Authorizations.

(a)    The Company and its Subsidiaries hold all FCC licenses, registrations and authorizations as are necessary to the Company's and its Subsidiaries' businesses (collectively, the "FCC Licenses").  Each of the FCC Licenses that is material to the business of the Company or any of its Subsidiaries has been validly issued and is in full force and effect.  All FCC Licenses in effect on the Effective Date and their respective expiration dates are listed and described on Schedule 3.24 and true copies of such FCC Licenses, with any and all modifications, amendments, and pending applications therefor or relating thereto, as of the Effective Date have been furnished to the Agent.  The Company has no knowledge of any condition imposed by the FCC as part of any FCC License which is neither set forth on the face thereof as issued by the FCC nor contained in the policies, rules and regulations of the FCC applicable generally to business of the type, nature, class or location of the Company and its

- 46 -

Subsidiaries. The Company and its Subsidiaries are in compliance in all material respects with the terms and conditions of the FCC Licenses applicable to it and with the policies, rules and regulations of the FCC and the Communications Act. No proceedings are pending or are, to the knowledge of the Company, threatened which may reasonably be expected to result in the revocation, rescission, modification, non-renewal or suspension of any FCC License that is material to the business of the Company or any of its Subsidiaries, the denial of any pending applications, the issuance of any cease and desist order or the imposition of any fines, forfeitures or other administrative actions by the FCC with respect to the Company or any of its Subsidiaries. All reports, applications, tariffs and other documents required to be filed by the Company or any of its Subsidiaries, as appropriate, with the FCC have in all material respects been timely filed and all such reports, applications, tariffs and documents are true, correct and complete in all material respects. To the knowledge of the Company, there are no unsatisfied or otherwise outstanding citations, complaint proceedings, notices of liability or notices of forfeiture issued by the FCC and received by the Company or a Restricted Subsidiary thereof with respect to the Company or any of its Subsidiaries or any of their respective operations.

(b)    In addition to the FCC Licenses issued by the FCC, the Company and its Subsidiaries hold all material licenses, certificates, registrations and authorizations issued by any other governmental entity (domestic and foreign) necessary to operate their respective businesses for each line of business of the Company or any of its Subsidiaries requiring such authorization and in each jurisdiction in which Company or any of its Subsidiaries may be deemed to be conducting their respective businesses under applicable law (collectively, the "Governmental Authorizations"). Each of the Governmental Authorizations has been validly issued and is in full force and effect. The Governmental Authorizations as of the Effective Date are listed on Schedule 3.24, with any expiration date for any such authorization identified on Schedule 3.24, with authorizations issued by state public service or utility commissions (or analogous state authorities) listed on Schedule 3.24 and other Governmental Authorizations listed on Schedule 3.24. None of the Governmental Authorizations contain any conditions or limitations outside the normal course that would materially and adversely restrict the operations of the Company or any of its Subsidiaries. The Company and its Subsidiaries have been and are in compliance in all material respects with the terms and conditions of the Governmental Authorizations applicable to them. Other than the proceedings of a general nature, no proceedings are pending or are, to the knowledge of the Company, threatened, and, to the Company's knowledge, no event has occurred, which may reasonably be expected to result in the revocation, rescission, adverse modification, non-renewal or suspension of any Governmental Authorization that is material to the business of the Company or any of its Subsidiaries, the denial of any pending applications therefor, the issuance of any cease and desist order, or the imposition of any material fines, forfeitures, or other administrative actions by a governmental entity. All reports, applications, tariffs and other documents required to be filed by the Company or any of its Subsidiaries, as appropriate, with the governmental entity issuing a Government Authorization have in all material respects been timely filed, and all such reports, applications, tariffs and documents are true, correct and complete in all material respects. To the knowledge of the Company, there are no material unsatisfied or otherwise outstanding citations issued by any governmental entity and received by the Company or a Restricted Subsidiary thereof with respect to the Company or any of its Subsidiaries. Schedule 3.24 separately lists all pending applications for certificates or other authorizations from any state public service or utility commission (or analogous state authority).

(c)     The transactions contemplated herein, under applicable law (including the Communications Act) and the applicable policies, rules, regulations and practices of the FCC and other governmental entities, would not disqualify the Company or any of its Subsidiaries as an assignee or transferee of the FCC Licenses or the Governmental Authorizations or result in the imposition of any materially adverse condition on or modification of the FCC Licenses or the Governmental Authorizations.

3.25    Intercreditor Agreement.  The Intercreditor Agreement is enforceable against the Company.

3.26    Certain Agreements.

(a)     Neither the Company nor any of its Subsidiaries is a party to any agreement or instrument or subject to any corporate, partnership or limited liability company restriction, as the case may be, that, either individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)     Neither the Company nor any of its Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, if such default, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

3.27    Event of Default.  No event has occurred or is continuing which constitutes, or with notice or lapse of time could constitute, an Event of Default.

ARTICLE IV

Conditions

4.01    Effective Date.  On the Effective Date, the following conditions shall have been satisfied (or waived in accordance with Section 9.02):

(a)     Term Notes.  On or prior to the Effective Date; (i) Evergreen Investments (or its counsel) shall have received from each party hereto either a (y) counterpart of this Agreement signed on behalf of such party or (z) written evidence satisfactory to the Lenders (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement; and (ii) there shall have been delivered to the Agent for the account of each of the Lenders that has requested same the appropriate Term Note executed by the Company in the amount, maturity and as otherwise provided herein.

(b)     Officer's Certificate.  On the Effective Date, the Agent shall have received from the Company a certificate, dated such date and signed on behalf of the Company by an authorized representative of the Company, certifying on behalf of the Company that all of the conditions in each of Sections 4.01(f), (g), (h), (j) and (o), have been satisfied on such date.

(c)     Opinions of Counsel.  On the Effective Date, the Agent shall have received from (i) Skadden, Arps, Slate, Meagher & Flom LLP, counsel to the Company, an

- 48 -

opinion addressed to the Agent and the Lenders and dated the Effective Date substantially in the form of Exhibit C-1 and (ii) Deborah M. Royster, general counsel to the Company, an opinion addressed to each Agent and the Lenders and dated the Effective Date substantially in the form of Exhibit C-2.

(d)     First-Lien Credit Agreement.  On the Effective Date, the First-Lien Credit Agreement shall have been executed and delivered by the parties thereto and shall be in full force and effect.  The Agent shall have received true and correct copies of all First-Lien Credit Documents, certified as such by an Authorized Representative of the Company, the First-Lien Credit Documents and all terms and conditions thereof (including, without limitation, amortization, maturities, interest rates, covenants, defaults, remedies, guaranties and guarantors) shall be in form and substance satisfactory to the Agent and the Required Lenders, and all conditions precedent to the First-Lien Credit Documents shall have been satisfied, and not waived unless consented to by the Agent and the Required Lenders, to the satisfaction of the Agent and the Required Lenders.

(e)     Second-Lien Note Indenture.  On the Effective Date, the Second-Lien Note Indenture shall have been executed and delivered by the parties thereto and shall be in full force and effect, and the Company shall have received gross cash proceeds of at least [$125,000,000] from the issuance of Second-Lien Notes thereunder, the full amount of which proceeds the Company shall utilize to make payments owing in connection with the Transaction contemporaneously with the utilization by the Company of any proceeds of Term Loans for such purpose.  The Agent shall have received true and correct copies of all Second-Lien Note Documents, certified as such by an Authorized Representative of the Company, the Second-Lien Note Documents and all terms and conditions thereof (including, without limitation, amortization, maturities, interest rates, covenants, defaults, remedies, guaranties and guarantors) shall be in form and substance satisfactory to the Agent and the Required Lenders, and all conditions precedent under the Second-Lien Note Documents shall have been satisfied, and not waived unless consented to by the Agent and the Required Lenders, to the satisfaction of the Agent and the Required Lenders.

(f)     Adverse Change.  On the Effective Date, there shall not have occurred (and neither the Agent nor the Required Lenders shall have become aware of any facts or conditions not previously known) which the Agent or the Required Lenders shall determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(g)     Litigation.  On the Effective Date, no litigation by any entity (private or governmental) shall be pending or, to the knowledge of the Company, threatened with respect to (i) the Transaction or any documentation executed in connection therewith (including any Credit Document) or the transactions contemplated thereby or (ii) which is, or could reasonably be expected to have, a Material Adverse Effect.

(h)     Fees, etc.  On the Effective Date, the Company shall have paid to the Agents and the Lenders all costs, fees and expenses (including, without limitation, legal fees and expenses of the Agents and their affiliates incurred prior to the Effective Date) payable to the Agents and the Lenders or otherwise payable in respect of the Transaction to the extent then due.

(i)    Corporate Documents; Proceedings; etc.  (i) On the Effective Date, the Agent shall have received a certificate, dated the Effective Date, signed by an authorized officer of the Company and attested to by the Secretary or any Assistant Secretary of the Company, substantially in the form of Exhibit G with appropriate insertions, together with copies of the certificate of incorporation, by-laws or equivalent organizational documents of the Company, and the resolutions of the Company authorizing the transactions referred to herein and occurring on or prior to the Effective Date.

(ii)    All corporate and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be in form and substance reasonably satisfactory to the Agent, and the Agent shall have received all information and copies of all documents and papers, including records of corporate proceedings, governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper corporate or governmental authorities.

(j)    The Transaction, etc.  (i)  On or prior to the Effective Date, (i) there shall have been delivered to the Agent true and correct copies of the Confirmation Order (which shall be a Final Order), the Plan of Reorganization, the Disclosure Statement and the other Plan Documents, which Confirmation Order, Plan of Reorganization, Disclosure Statement and other Plan Documents shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders and shall be in full force and effect on the Effective Date (and with the Confirmation Order, the Plan of Reorganization and the Disclosure Statement also to be certified by the Bankruptcy Court), (ii) there shall have been delivered to the Agent a true and correct copy of the Notice of Plan Effective Date, which Notice of Plan Effective Date shall be in form and substance reasonably satisfactory to the Agent, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not be subject to any stay, (iii) all conditions precedent to the effective date of the Plan of Reorganization shall have been satisfied (and not waived without the consent of the Agent and the Required Lenders) to the reasonable satisfaction of the Agent, (iv) the effective date of the Plan of Reorganization shall have occurred and the Plan of Reorganization shall have been substantially consummated, and (v) no request to revoke the Confirmation Order shall be pending before the Bankruptcy Court.

(ii)  On the Effective Date and prior to or concurrently with the incurrence of the Term Loans hereunder, each element of the Transaction shall have been consummated in accordance with the Plan of Reorganization, the other applicable Plan Documents and all applicable laws.

(iii)  On the Effective Date, (x) the aggregate amount of proceeds received by the Company from the term loans incurred under the First-Lien Credit Agreement on the Effective Date when added to the net cash proceeds received by the Company from the issuance of the Second-Lien Notes, shall be sufficient to make all cash payments required to be made pursuant to the Plan of Reorganization, (y) the Company shall have at least $115,000,000 of unrestricted cash and/or Cash Equivalents on hand after making all cash payments required to be made pursuant to the Plan of Reorganization and (z) the Agent shall have received evidence, in

- 50 -

form, scope and substance reasonably satisfactory to it, that the matters set forth above in this Section 4.01(j)(iii) have been satisfied on such date.

(k)     Existing Indebtedness and Preferred Equity.  On the Effective Date and after giving effect to the consummation of the Transaction, the Company and its Subsidiaries shall have no outstanding preferred equity or Indebtedness, except for (i) Indebtedness pursuant to (or in respect of) the Credit Documents, (ii) Indebtedness pursuant to (or in respect of) the First-Lien Credit Documents (iii) Indebtedness pursuant to (or in respect of) the Second-Lien Note Documents, and (iv) such other Indebtedness assumed by the Company and its Subsidiaries pursuant to the Plan of Reorganization (the "Assumed Indebtedness"), if any, as shall be permitted by the Agent and the Required Lenders to remain outstanding (all of which Indebtedness described in this clause (iv) shall be specifically listed as Assumed Indebtedness on Schedule 4.01(k)), provided that such Assumed Indebtedness shall not exceed [$15,000,000] in the aggregate.  On and as of the Effective Date, all Indebtedness to remain outstanding as described in the immediately preceding sentence shall remain outstanding after giving effect to the Transaction and the other transactions contemplated hereby without any breach, required repayment, required offer to purchase, default, event of default or termination rights existing thereunder or arising as a result of the Transaction and the other transactions contemplated hereby and there shall not be any amendments or modifications to the documents governing any Existing Indebtedness that are adverse to the interests of the Lenders (other than as requested or approved by the Agent).  On and as of the Effective Date, the Agent shall be satisfied with the amount of and the terms and conditions of all Indebtedness described above in this Section 4.01(k).

(l)     Pledge Agreement.  On the Effective Date, the Company shall have duly authorized, executed and delivered the Pledge Agreement in the form of Exhibit D and shall have delivered to the First-Lien Collateral Agent (as defined in the Intercreditor Agreement), as Pledgee thereunder, all of the Pledge Agreement Collateral, if any, referred to therein and then owned by the Company, (i) endorsed in blank in the case of promissory notes constituting Pledge Agreement Collateral and (ii) together with executed and undated endorsements for transfer in the case of Capital Stock constituting certificated Pledge Agreement Collateral, along with evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Pledge Agreement have been taken and the Pledge Agreement shall be in full force and effect.

(m)     Security Agreement.  On the Effective Date, the Company shall have duly authorized, executed and delivered the Security Agreement in the form of Exhibit E covering all of the Company's Security Agreement Collateral, together with:

(i)     proper financing statements (Form UCC-1 or the equivalent) fully executed for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Security Agreement;

(ii)     certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Company or any of its Subsidiaries as debtor and that are filed in the

- 51 -

jurisdictions referred to in clause (i) above and in such other jurisdictions in which Collateral is located on the Effective Date, together with copies of such other financing statements that name the Company or any of its Subsidiaries as debtor (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Collateral Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(iii)    evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests intended to be created by the Security Agreement; and

(iv)    evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect and protect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect.

(n)    Intercreditor Agreement.  The Company, the Agent and the other parties thereto shall have duly authorized, executed and delivered the Intercreditor Agreement in the form of Exhibit H hereto, and the Intercreditor Agreement shall be in full force and effect.

(o)    Governmental Approvals; etc.  On or prior to the Effective Date, (A) all necessary governmental (domestic (including those of the Bankruptcy Court) and foreign) and third party approvals in connection with the Credit Documents and otherwise referred to herein or therein shall have been obtained and remain in full force and effect and evidence thereof shall have been provided to the Agent, (B) all necessary material governmental (domestic and foreign) and third party approvals in connection with any Existing Indebtedness which is to remain outstanding after the Effective Date and the consummation of the Transaction shall have been obtained and remain in full force and effect and evidence thereof shall have been provided to the Agent and (C) all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the Transaction, the making of the loans and the transactions contemplated by the Documents or otherwise referred to herein or therein.  Additionally, there shall not exist any judgment, order, injunction or other restraint issued or filed by any Governmental Authority or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon, or materially delaying, or making economically unfeasible, the consummation of the Transaction or the making of the loans or the transactions contemplated by the Documents.

(p)    Financial Statements; etc.  (i)  On or prior to the Effective Date, the Agent and the Lenders shall have received (x) true and correct copies of the historical financial statements, the pro forma financial statements and the Projections referred to in Sections 3.05(a) and (d), which historical financial statements, pro forma financial statements and Projections shall be in form and substance reasonably satisfactory to the Agent and the Required Lenders and, (y) a certificate from the chief financial officer of the Company (together with appropriate calculations provided as an attachment to such certificate), demonstrating to the Agents'

reasonable satisfaction, that (1) Consolidated EBITDA for the twelve months ended for which financial statements are required to be furnished pursuant to the following clause (ii) is at least $[_____], and (2) the other covenants described herein shall been satisfied on the Effective Date and will be satisfied on a pro forma basis after giving effect to the Transaction.

(ii)  On or prior to the Effective Date, the Agents and the Lenders shall have received (x) interim quarterly (and year to date) consolidated financial statements of the Company and its Subsidiaries for each fiscal quarter ended (1) after the date of the last financial statements for such Persons previously furnished to the Agents and the Lenders pursuant to Section 7.05(a), and (2) at least 45 days prior to the Effective Date and (y) interim monthly consolidated financial statements of the Company and its Subsidiaries for any calendar month ended after the date of the last quarterly financial statements furnished pursuant to preceding clause (x) and at least [___] days prior to the Effective Date.

(q)    Solvency Opinion; Insurance Certificates.  On the Effective Date, the Agent shall have received:

(i)    a solvency opinion from the chief financial officer of the Company in the form of Exhibit I; and

(ii)    certificates of insurance complying with the requirements of Section 5.05 for the business and properties of the Company and its Subsidiaries, in form and substance reasonably satisfactory to the Agent.

Upon the occurrence of the Effective Date, the Agent shall give each Lender and the Company notice that the Effective Date has occurred (although the failure to give any such notice shall not affect any Lender's or the Company's obligations under this Agreement).

ARTICLE V

Affirmative Covenants

Until the principal of and interest on each Term Loan and all fees payable hereunder shall have been paid in full the Company covenants and agrees with the Lenders that:

5.01    Information Covenants.  The Company will furnish to each Lender:

(a)    Reserved.

(b)    Quarterly Financial Statements.  Within 45 days in the case of the first quarterly accounting period of the Company in the fiscal year 2005 (or __ days in the case of the second quarterly accounting period of the Company in the fiscal year 2005) after the close of each of the first three quarterly accounting periods in each fiscal year of the Company (i) the consolidated balance sheet of the Company and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all

of which shall be certified by Authorized Representative of the Company that they fairly present in all material respects in accordance with generally accepted accounting principles the financial condition of the Company and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period, in each case without any material qualifications with respect thereto.

(c)     Annual Financial Statements.  Within 90 days after the close of each fiscal year of the Company (or by _____ _____, 2005 in the case of the fiscal year of the Company ending December 31, 2004), (i) the consolidated balance sheet of the Company and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal year setting forth (commencing with the Company's fiscal year ended closest to December 31, 2005) comparative figures for the preceding fiscal year and certified by Friedman LLP or other independent certified public accountants of recognized national standing reasonably acceptable to the Agent, together with a report of such accounting firm stating that in the course of its regular audit of the financial statements of the Company and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or an Event of Default relating to financial or accounting matters which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or an Event of Default has occurred and is continuing, a statement as to the nature thereof, and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year.

(d)     Management Letters.  Promptly after the Company's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(e)     Reserved.

(f)     Officer's Certificates.  At the time of the delivery of the financial statements provided for in Sections 5.01(b) and (c), a certificate from the chief financial officer of the Company certifying on behalf of the Company that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, and (iii) certify that there have been no changes to [Annexes C through F, and Annexes I through K], in each case of the Security Agreement and [Annexes A through F] of the Pledge Agreement, in each case since the Effective Date or, if later, since the date of the most recent certificate delivered pursuant to this Section 5.01(f), or if there have been any such changes, a list in reasonable detail of such changes, and whether the Company has otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

(g)     Notice of Default, Litigation and Material Adverse Effect.  Promptly, and in any event within three Business Days after any officer of the Company or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which

constitutes a Default or an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against the Company or any of its Subsidiaries (x) which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (y) with respect to any Document, or (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect.

(h)     Other Reports and Filings.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials and reports, if any, which the Company or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "SEC") or deliver to holders (or any trustee, agent or other representative therefor) of its material Indebtedness (including the First-Lien Credit Agreement and the Second-Lien Note Indenture) pursuant to the terms of the documentation governing such Indebtedness. The Company shall deliver an opinion of counsel covering the security interests granted pursuant to the Security Documents contemporaneously with the delivery of any similar opinion to the trustee under the Second-Lien Note Indenture pursuant to Section 4.4 thereof so long as such an opinion  is required to be delivered pursuant to the Second-Lien Note Indenture or any similar document.

(i)     Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to the Company or any of its Subsidiaries as the Agent or any Lender (through the Agent) may reasonably request.

5.02     Corporate Existence.  Subject to Section 6.03, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect the corporate existence, rights (charter and statutory), licenses, permits, franchises, patents, copyrights and trademarks of the Company and each of the Subsidiaries; provided, however, that the Company will not be required to preserve the existence (in the case of any Subsidiary) or any such right, license, permit, franchise, patent, copyright or trademark (in the case of the Company or any Subsidiary) if the Board shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and the Subsidiaries as a whole or that the loss thereof would not be reasonably likely to result in a Material Adverse Effect; provided, further, that the foregoing will not prohibit a sale, transfer or conveyance of a Subsidiary of the Company or any of its assets in compliance with the terms of this Agreement.

5.03     Payment of Taxes and Other Claims.  The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material Taxes, assessments and governmental charges levied or imposed (i) upon the Company or any of its Subsidiaries or (ii) upon the income, profits or property of the Company or any of the Subsidiaries and (b) all material lawful claims for labor, materials and supplies, which, if unpaid, could reasonably be expected to become a Lien upon the property of the Company or any of the Subsidiaries; provided, however, that the Company will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim (x) whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted or (y) if the failure to so pay, discharge or cause to be paid or discharged would not reasonably be expected to have a Material Adverse Effect.

5.04    Maintenance of Properties.  The Company will, and will cause each of its Subsidiaries to, keep all property necessary to the business of the Company and its Subsidiaries taken as a whole in good working order and condition, ordinary wear and tear excepted; provided that the foregoing covenant shall not be violated by reason of any failures which, individually and in the aggregate would not be reasonably likely to have a Material Adverse Affect.

5.05    Insurance.  (a)  The Company will, and will cause each of its Subsidiaries to maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Company and its Subsidiaries, and furnish to the Agent, upon its request therefor, full information as to the insurance carried.  The provisions of this Section 5.05 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)    From and after the date of the Discharge of First-Lien Obligations and the Second-Lien Obligations, the Company will, and will cause each of its Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Company and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 30 days' prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Parties, and (iv) shall be deposited with the Collateral Agent.

(c)    From and after the date of the Discharge of First-Lien Obligations and the Second-Lien Obligations, if the Company or any of its Restricted Subsidiaries shall fail to maintain insurance in accordance with this Section 5.05, or if the Company or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Agent shall have the right (but shall be under no obligation) to procure such insurance and the Company agrees to reimburse the Agent for all reasonable costs and expenses of procuring such insurance.

(d)    The rights under this Section 5.05 are subject to the provisions of the Intercreditor Agreement (including, without limitation, Section 5.2 thereof).

5.06    Books and Records.  The Company shall keep proper books of record and account, in which full and correct entries will be made of all material financial transactions and the assets and business of the Company and each Subsidiary of the Company in material compliance with GAAP.

5.07    Payment of Principal and Interest.  The Company shall duly and punctually pay the principal of and interest on the Term Loans in accordance with the terms of this Agreement.

5.08    Collateral Trigger Date; Additional Subsidiaries.

(a)    Within 10 Business Days after any Collateral Trigger Date, the Company shall cause each Subsidiary that is a Subsidiary Credit Party (i) to execute a guarantee substantially similar to the guarantee executed by the Subsidiary Credit Parties in connection with the Senior Credit Agreements pursuant to which it shall guarantee the obligations of the Company hereunder (solely to the extent such Subsidiary has entered into a Guarantee with respect to the Senior Credit Agreements or is a co-borrower under the Senior Credit Agreements (in each case to the extent the Senior Credit Agreements remain outstanding at such time)), (ii) to become a party to the Security Documents and other Credit Documents and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Agent or the Required Lenders shall reasonably request (but solely to the extent such Subsidiary has granted a Lien on its assets to secure the Senior Credit Agreements (to the extent the Senior Credit Agreements remain outstanding at such time)), (iii) if any Capital Stock in or Indebtedness of such Subsidiary is owned by or on behalf of any Credit Party, the Company and the Subsidiary Credit Parties will cause such Capital Stock and promissory notes evidencing such Indebtedness to be pledged pursuant to the Security Documents (except that, if such Subsidiary is a Foreign Subsidiary, shares of voting stock of such Subsidiary to be pledged pursuant to the Pledge Agreement may be limited to 65% of the outstanding shares of voting stock of such Subsidiary and further limited solely to the extent such Subsidiary has granted a Lien on such Capital Stock and promissory notes to secure the Senior Credit Agreements (to the extent the Senior Credit Agreements remain outstanding at such time)) and (iv) deliver legal opinions, with respect to similar matters covered in Exhibit C-1, to the addresses contained in Exhibit C-1, including those related to the guarantees and pledges of the Subsidiary Credit Parties in form and substance reasonably satisfactory to the Agent.  Upon the occurrence of a Collateral Trigger Date, the Credit Documents shall be amended to incorporate and reference the Subsidiary Credit Parties throughout the Credit Documents, including the covenants, in each place where the Senior Credit Agreements as of the date hereof references the Borrowers, Subsidiary Credit Parties or Credit Parties, as applicable, and the Company and each of the Lenders hereby authorizes and directs the Agent on its behalf to enter into such amendment.  The Company hereby agrees to cause the Subsidiary Credit Parties to execute such Credit Documents and become parties hereto and thereto.

(b)    If any additional Significant Restricted Subsidiary is formed or acquired after the Effective Date but prior to the Collateral Trigger Date, and the Capital Stock in or Indebtedness of such Subsidiary is owned directly by the Company and is pledged to secure the First-Lien Obligations and the Second-Lien Obligations, the Company will notify the Agent and the Lenders thereof in writing and will cause such Capital Stock and promissory notes evidencing such Indebtedness to be pledged pursuant to the Security Documents when such Capital Stock is pledged to secure the First-Lien Obligations and the Second-Lien Obligations (except that, if such Subsidiary is a Foreign Subsidiary, shares of voting stock of such Subsidiary to be pledged pursuant to the Pledge Agreement may be limited to 65% of the outstanding shares of voting stock of such Subsidiary).

(c)    If any additional Significant Restricted Subsidiary is formed or acquired after the Collateral Trigger Date, the Company will notify the Agent and the Lenders thereof in writing and (a) if such Subsidiary is a Subsidiary Credit Party, the Company will cause such

Subsidiary to become a party to the Security Documents within ten Business Days after such Restricted Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Agent or the Required Lenders shall reasonably request and (b) if any Capital Stock in or Indebtedness of such Subsidiary is owned by or on behalf of any Credit Party, the Company will cause such Capital Stock and promissory notes evidencing such Indebtedness to be pledged pursuant to the Security Documents within 10 Business Days after such Subsidiary is formed or acquired (except that, if such Subsidiary is a Foreign Subsidiary, shares of voting stock of such Subsidiary to be pledged pursuant to the Pledge Agreement may be limited to 65% of the outstanding shares of voting stock of such Subsidiary).

      5.09   <u>Future Amendments</u>.  Upon the occurrence of the Covenant Triggering Event, this Agreement shall be amended automatically without any further action on the part of any Person so that each of the financial covenants listed on Annex I hereto shall become a part of Article VI of this Agreement and the event of default listed on Annex I hereto shall become a part of Section 7.01 of this Agreement; <u>provided</u> that if at the time the Covenant Triggering Event occurs, the Senior Credit Agreements contain a financial covenant (such covenant, the "Senior financial covenant") that measures the same financial information as one of the financial covenants listed on Annex I (such covenant, the "Annex I financial covenant") and the Annex I financial covenant is more restrictive to the Company than the Senior financial covenant as adjusted to be more favorable to the Company by __% (such covenant, the "Adjusted Senior financial covenant"), then the Annex I financial covenant shall be amended so that it is equal to the Adjusted Senior financial covenant.

ARTICLE VI

<u>Negative Covenants</u>

      Until the principal of and interest on each Term Loan and all fees payable hereunder have been paid in full the Company covenants and agrees with the Lenders that:

      6.01   <u>Limitation on Additional Indebtedness</u>.  The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume, issue, guarantee or in any manner become directly or indirectly liable for or with respect to, contingently or otherwise, the payment of (collectively to "incur") any Indebtedness (including any Acquired Indebtedness), except for Permitted Indebtedness; provided, that the Company will be permitted to incur Indebtedness (including Acquired Indebtedness) if, immediately after giving pro forma effect to such incurrence (including the application of the net cash proceeds therefrom), the Consolidated Interest Coverage Ratio for the most recent four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred would be at least [___ to 1.00] determined on a pro forma basis (including a pro forma application of the net cash proceeds therefrom), as if the additional Indebtedness had been issued and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

      For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness meets the criteria of more than one of the types of Indebtedness

permitted in the definition of Permitted Indebtedness permitted by this covenant, the Company in its sole discretion shall classify (and may reclassify) such item of Indebtedness and only be required to include the amount of such Indebtedness as one of such types. Acquired Indebtedness shall be deemed to have been incurred at the time of the acquisition (by merger or otherwise) of the Person or asset subject to such Acquired Indebtedness.

6.02 <u>Limitation on Liens</u>. The Company shall not, and shall not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any Liens of any kind against or upon any property or assets of the Company or any Restricted Subsidiary, whether now owned or hereafter acquired, or any proceeds therefrom, other than Permitted Liens.

6.03 <u>Fundamental Changes</u>.

(a) The Company shall not, directly or indirectly, consolidate with or merge with or into any other Person or sell, lease, convey or transfer all or substantially all its assets, whether in a single transaction or a series of related transactions, to any Person or group of affiliated Persons (other than any of the foregoing involving solely the Company and a Restricted Subsidiary in which the Company is the survivor or the purchaser) unless:

(i) either (i) the Company is the surviving entity or (ii) in case the Company shall consolidate with or merge into another Person or sell, lease, convey or transfer all or substantially all of its properties and assets, whether in a single transaction or a series of related transactions, to any Person, the Person formed by such consolidation or into which the Company is merged, or the Person which acquires by sale, conveyance or transfer, or which leases the properties and assets of the Company substantially as an entirety, shall be a corporation, limited liability company, partnership or trust, shall be organized and validly existing under the laws of the United States of America, any state thereof or the District of Columbia and shall expressly assume the due and punctual payment of the principal and interest on all of the Term Loans, as applicable, and the performance or observance of every covenant of this Agreement and the Security Documents on the part of the Company to be performed or observed;

(ii) immediately after giving effect to such transaction on a pro forma basis (including, without limitation, any Indebtedness incurred or anticipated to be incurred in connection with or in respect of such transaction immediately after giving effect to such transaction) no Default or Event of Default shall have happened and be continuing; and

(iii) immediately after giving effect to such transaction on a pro forma basis (including, without limitation, any Indebtedness incurred or anticipated to be incurred in connection with or in respect of such transaction), the Company or the surviving entity (assuming such surviving entity's assumption of the Company's obligations under the Term Loans and this Agreement), as the case may be, would be able to incur $1.00 of Indebtedness (other than Permitted Indebtedness) under Section 6.01.

(b)     The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than the businesses [primarily] engaged in by the Company and its Restricted Subsidiaries as of the Effective Date and reasonable extensions thereof and businesses ancillary or complementary thereto.

6.04    Disposition of Proceeds of Asset Sales.  The Company shall not, and shall not permit any Restricted Subsidiary to, make any Asset Sale unless (a) the Company or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the shares or assets sold or otherwise disposed of and (b) at least 75% of such consideration consists of cash or Cash Equivalents; provided that the amount of any liabilities (other than Subordinated Indebtedness or Indebtedness of a Restricted Subsidiary that would not constitute Restricted Subsidiary Indebtedness) that are assumed by the transferee of any such assets pursuant to an agreement that unconditionally releases the Company or such Restricted Subsidiary, as the case may be, from further liability shall be treated as cash for purposes of this Section 6.04.  The Company or the applicable Restricted Subsidiary, as the case may be, may (i) apply the Net Cash Proceeds from any such Asset Sale by the Company or a Restricted Subsidiary within 365 days of the receipt thereof (x) to repay an amount of Indebtedness (other than Subordinated Indebtedness, First-Lien Obligations and Second Lien Obligations) of the Company in an amount not exceeding the Other Senior Debt Pro Rata Share and elect to permanently reduce the amount of the commitments thereunder by the amount of the Indebtedness so repaid or (y) to repay First-Lien Obligations and/or the Second-Lien Obligations, (ii) apply the Net Cash Proceeds from such Asset Sale by the Company or a Restricted Subsidiary to repay any Restricted Subsidiary Indebtedness and elect to permanently reduce the commitments thereunder by the amount of the Indebtedness so repaid or (iii) apply the Net Cash Proceeds from any Asset Sale by the Company or a Restricted Subsidiary within 365 days thereof, to an investment in properties and assets that will be used in a Permitted Business (or in Capital Stock and other securities of any person that will become a Restricted Subsidiary as a result of such investment to the extent such person owns properties and assets that will be used in a Permitted Business) of the Company or any Restricted Subsidiary ("Replacement Assets").  Any Net Cash Proceeds from any Asset Sale that are neither used as described in clause (i)(x) of the preceding sentence or to repay, and permanently reduce the commitments under, any Restricted Subsidiary Indebtedness as set forth in clause (ii) of the preceding sentence or invested in Replacement Assets within the 365-day period as set forth in clause (iii) shall constitute "Excess Proceeds."  Any Excess Proceeds not used as set forth in clause (i)(y) of the second proceeding sentence shall be subject to disposition as provided in Section 2.10(c).

Notwithstanding the immediately preceding paragraph, the Company and the Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such paragraph to the extent (i) at least 75% of the consideration of such Asset Sale constitutes Replacement Assets, cash or Cash Equivalents (including obligations deemed to be cash under this covenant) and (ii) such Asset Sale is for Fair Market Value; provided that any consideration constituting (or deemed to constitute) cash or Cash Equivalents received by the Company or any of the Restricted Subsidiaries in connection with any Asset Sale permitted to be consummated under this paragraph shall constitute Net Cash Proceeds subject to the provisions of the preceding paragraph.

NY55/412464.6

6.05    Limitation on Restricted Payments.  The Company shall not, and shall not permit any of the Restricted Subsidiaries to, make, directly or indirectly, any Restricted Payment unless:

(i)       no Default shall have occurred and be continuing at the time of or upon giving effect to such Restricted Payment;

(ii)      immediately after giving effect to such Restricted Payment, the Company would be able to incur $1.00 of Indebtedness (other than Permitted Indebtedness) under Section 6.01 hereof; and

(iii)     immediately after giving effect to such Restricted Payment, the aggregate amount of all Restricted Payments declared or made on or after the Effective Date and all Designation Amounts does not exceed an amount equal to the sum of, without duplication, (a) 50% of the cumulative Consolidated Net Income accrued on a cumulative basis during the period beginning on the first day of the first fiscal quarter commencing after the Effective Date (being January 1, 2005)  and ending on the last day of the fiscal quarter of the Company immediately preceding the date of such proposed Restricted Payment (or, if such cumulative Consolidated Net Income for such period is a deficit, minus 100% of such deficit), plus (b) the aggregate net cash proceeds received by the Company from the issue or sale (other than to a Restricted Subsidiary of the Company) of its Capital Stock (other than Disqualified Stock) after the Effective Date (including, without duplication, upon exercise of warrants, options or rights), plus (c) the aggregate net cash proceeds received by the Company from the issuance (other than to a Restricted Subsidiary of the Company) after the Effective Date of its Capital Stock (other than Disqualified Stock) upon the conversion of, or exchange for, Indebtedness of the Company or a Restricted Subsidiary, plus (d) in the case of the disposition or repayment of any Investment constituting a Restricted Payment (other than an Investment made pursuant to clause (d), (e) or (f) of the following paragraph) made after the Effective Date, an amount equal to the lesser of the return of capital with respect to such Investment and the cost of such Investment, in either case, less the cost of the disposition of such Investment to the extent such cost is in excess of any gain in respect of the disposition, plus (e) in the case of any Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary, an amount equal to the consolidated net Investment in such Subsidiary on the date of Revocation but not in an amount exceeding the net amount of any Investments constituting Restricted Payments made (or deemed made) in such Subsidiary after the Effective Date.  For purposes of the preceding clauses (b) and (c) and without duplication, the value of the aggregate net cash proceeds received by the Company upon the issuance of Capital Stock either upon the conversion of convertible Indebtedness or in exchange for outstanding Indebtedness or upon the exercise of options, warrants or rights will be the net cash proceeds received upon the issuance of such Indebtedness, options, warrants or rights plus the incremental amount received by the Company upon the conversion, exchange or exercise thereof.

For purposes of determining the amount expended for Restricted Payments, cash distributed shall be valued at the face amount thereof and property other than cash shall be valued at its Fair Market Value.

NY55/412464.6

The provisions of this Section 6.05 shall not prohibit (each of which shall be given independent effect):

(a)     the payment of any dividend or other distribution within 60 days after the date of declaration thereof, if at such date of declaration such payment would comply with the provisions of this Agreement;

(b)     so long as no Default shall have occurred and be continuing, the purchase, redemption, retirement or other acquisition of any shares of Capital Stock of the Company (A) in exchange for or conversion into or (B) out of the net cash proceeds of the substantially concurrent issue and sale (other than to a Restricted Subsidiary) of shares of Capital Stock of the Company (other than Disqualified Stock); provided that any such net cash proceeds pursuant to the immediately preceding subclause (B) are excluded from clause (iii)(b) of the preceding paragraph;

(c)     so long as no Default shall have occurred and be continuing, the purchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Indebtedness made by exchange for (including any such exchange pursuant to the exercise of a conversion right or privilege in which cash is paid in lieu of fractional shares or scrip), or out of the net cash proceeds of, a substantially concurrent issue or sale (other than to a Restricted Subsidiary) of (A) Capital Stock (other than Disqualified Stock) of the Company; provided that any such net cash proceeds, to the extent so used, are excluded from clause (iii)(b) of the preceding paragraph, and/or (B) other Subordinated Indebtedness, having an Average Life to Stated Maturity that is equal to or greater than the Average Life to Stated Maturity of the Subordinated Indebtedness being purchased, redeemed, defeased or otherwise acquired or retired;

(d)     so long as no Special Default shall have occurred and be continuing, Investments constituting a Restricted Payment made by the Company or any Restricted Subsidiary in any person (including any Unrestricted Subsidiary) in an amount not to exceed [$___ million][Note:  will be looser than basket in the DB Credit Agreement and the Second-Lien Note Indenture and will include a subbasket for Megacable if included in the DB Credit Agreement] in the aggregate at any time outstanding;

(e)     so long as no Default shall have occurred and be continuing, the making of a direct or indirect Investment constituting a Restricted Payment out of the proceeds of the issue or sale (other than to a Subsidiary) of Capital Stock (other than Disqualified Stock) of the Company; provided that any such net cash proceeds are excluded from clause (iii)(b) of the preceding paragraph; or

(f)     so long as no Default or Event of Default exists at the time of the respective Restricted Payment or would exist immediately after giving effect thereto, Restricted Payments by the Company consisting of a redemption or repurchase of Capital Stock of the Company from officers, employees and directors of the Company or its Subsidiaries (or their estates) after the death, disability, retirement or termination of employment or service as a director of any such Person, or otherwise in accordance with any stock option plan or any employee stock ownership plan that has been approved by the Board of Directors of the Company; provided that the aggregate amount of Restricted Payments made by the Company

pursuant to this clause (f), and the aggregate amount paid shall not (net of any proceeds received by the Company from issuances of its Capital Stock and contributed to the Company in connection with such redemption or repurchase) exceed either (x) during any fiscal year of the Company, [$_____] or (y) for all periods after the Effective Date (taken as a single period), [$_____].

Restricted Payments of the type set forth in the preceding clause (d) and (f) shall be included in making the determination of available amounts under clause (iii) of the preceding paragraph to the extent they are outstanding.

In no event shall a Restricted Payment made on the basis of consolidated financial statements prepared in good faith in accordance with GAAP be subject to rescission or constitute a Default by reason of any requisite subsequent restatement of such financial statements which would have made such Restricted Payment prohibited at the time that it was made.

6.06    Limitation on Transactions with Affiliates.  The Company shall not, and shall not permit, cause or suffer any Restricted Subsidiary to, conduct any business or enter into any transaction (or series of related transactions which are similar or part of a common plan) with or for the benefit of any of their respective Affiliates or any beneficial holder of 10% or more of the Common Stock of the Company or any officer or director of the Company (each, an "Affiliate Transaction"), unless the terms of the Affiliate Transaction are set forth in writing, and are fair and reasonable to the Company or such Restricted Subsidiary, as the case may be.  Each Affiliate Transaction involving aggregate payments or other Fair Market Value in excess of [$5,000,000] be approved by a majority of the Disinterested Directors or by Board, such approval to be evidenced by a Board Resolution stating that the Board has determined that such transaction or transactions comply with the foregoing provisions provided that, in lieu of such approval by the Disinterested Directors, the Company may obtain a written opinion from an Independent Financial Advisor stating that the terms of such Affiliate Transaction to the Company or the Restricted Subsidiary, as the case may be, are fair from a financial point of view.  In addition to the foregoing, the Company shall obtain, with respect to each Affiliate Transaction involving aggregate consideration of [$25,000,000] a written opinion from an Independent Financial Advisor stating that the terms of such Affiliate Transaction to the Company or the Restricted Subsidiary, as the case may be, are fair from a financial point of view.  For purposes of this covenant but without limiting the requirements of the two preceding sentences, when any Affiliate Transaction approved by a majority of the Disinterested Directors or as to which a written opinion has been obtained from an Independent Financial Advisor, on the basis set forth in the preceding sentences, such Affiliate Transaction shall be deemed to be on terms that are fair and reasonable to the Company and the Restricted Subsidiaries, as the case may be, and therefore shall be permitted under this covenant.

Notwithstanding the foregoing, the restrictions set forth in this covenant shall not apply to (i) transactions with or among, or solely for the benefit of, the Company and/or any of the Restricted Subsidiaries, (ii) transactions pursuant to agreements and arrangements existing on the Effective Date, (iii) transactions under the First-Lien Credit Documents (as defined in the Intercreditor Agreement) or the Second-Lien Note Documents (as defined in the Intercreditor Agreement), (iv) dividends paid by the Company pursuant to and in compliance with this Section 6.06, (v) customary directors' fees, indemnification and similar arrangements, consulting fees,

employee salaries bonuses, employment agreements and arrangements, compensation or employee benefit arrangements or legal fees, (vi) grants of customary registration rights with respect to securities of the Company, (vii) Restricted Payments permitted under Section 6.04 provided that any Investments and purchases constituting Restricted Payments must be fair and reasonable to the Company or such Restricted Subsidiary, as the case may be.

      6.07   <u>Limitation on Issuances and Sales of Preferred Stock by Restricted Subsidiaries</u>.  The Company (i) shall not permit any Restricted Subsidiary to issue any Preferred Stock (other than to the Company or a Restricted Subsidiary) and (ii) shall not permit any person (other than the Company or a Restricted Subsidiary) to own any Preferred Stock of any Restricted Subsidiary.

      6.08   <u>Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries</u>.  The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise enter into or cause to become effective any consensual encumbrance or consensual restriction of any kind on the ability of any Restricted Subsidiary to (a) pay dividends, in cash or otherwise, or make any other distributions on its Capital Stock or any other interest or participation in, or measured by, its profits to the extent owned by the Company or any Restricted Subsidiary, (b) pay any Indebtedness owed to the Company or any Restricted Subsidiary, (c) make any Investment in the Company or any other Restricted Subsidiary or (d) transfer any of its properties or assets to the Company or to any Restricted Subsidiary, except for (i) any encumbrance or restriction in existence on the Effective Date and set forth on Schedule 6.08, (ii) any encumbrance or restriction set forth in any First-Lien Credit Document and any other Indebtedness of the type described in clauses (i)(A), (i)(B) or (i)(D) of the definition of the term "Indebtedness" so long as such encumbrances and restrictions are not materially less favorable to the Holders than those under the First-Lien Credit Documents, (iii) customary non-assignment provisions, (iv) any encumbrance or restriction pertaining to an asset subject to a Lien to the extent set forth in the security documentation governing such Lien, (v) any encumbrance or restriction applicable to a Restricted Subsidiary at the time that it becomes a Restricted Subsidiary that is not created in contemplation thereof, (vi) any encumbrance or restriction existing under any agreement that refinances or replaces an agreement containing a restriction permitted by clause (iv) above; provided that the terms and conditions of any such encumbrance or restriction are not materially less favorable to the Holders than those under or pursuant to the agreement being replaced or the agreement evidencing the Indebtedness refinanced, (vi) any encumbrance or restriction imposed upon a Restricted Subsidiary pursuant to an agreement which has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary or any Asset Sale to the extent limited to the Capital Stock or assets in question, and (vii) any customary encumbrance or restriction applicable to a Restricted Subsidiary that is contained in an agreement or instrument governing or relating to Indebtedness contained in any Permitted Credit Facility; provided that (subject to customary net worth, leverage, invested capital and other financial covenants) the provisions of such agreement permit the payment of interest and principal and mandatory repurchases pursuant to the terms of this Agreement and other indebtedness that is solely an obligation of the Company; provided further that such agreement may contain customary covenants regarding the merger of or sale of all or any substantial part of the assets of the Company or any Restricted Subsidiary, customary restrictions on transactions

with affiliates, and customary subordination provisions governing indebtedness owed to the Company or any Restricted Subsidiary.

6.09    Designation of Unrestricted Subsidiaries.  The Company shall not designate any Subsidiary of the Company (other than a newly created Subsidiary in which no Investment has previously been made) as an "Unrestricted Subsidiary" under this Agreement (a "Designation") unless:

(a)    no Default shall have occurred and be continuing at the time of or after giving effect to such Designation;

(b)    the Company would be able to incur $1.00 of Indebtedness (other than Permitted Indebtedness) under Section 6.01; and

(c)    the Company would not be prohibited under this Agreement from making an Investment at the time of Designation (assuming the effectiveness of such Designation) in an amount (the "Designation Amount") equal to the Fair Market Value of the net Investment of the Company or any other Restricted Subsidiary in such Restricted Subsidiary on such date.

In the event of any such Designation, the Company shall be deemed to have made an Investment constituting a Restricted Payment pursuant to Section 6.05 hereof for all purposes of this Agreement in the Designation Amount.  Neither the Company nor any Restricted Subsidiary shall at any time (x) provide a guarantee of, or similar credit support to, any Indebtedness of any Unrestricted Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness); provided that the Company may pledge Capital Stock or Indebtedness of any Unrestricted Subsidiary on a nonrecourse basis such that the pledgee has no claim whatsoever against the Company other than to obtain such pledged property, (y) be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary or (z) be directly or indirectly liable for any other Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon (or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity) upon the occurrence of a default with respect to any other Indebtedness that is Indebtedness of an Unrestricted Subsidiary, including any corresponding right to take enforcement action against such Unrestricted Subsidiary, except in the case of clause (x) or (y) to the extent permitted under Section 6.05 and Section 6.06 hereof.

The Company will not revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") unless:

(a)    no Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(b)    all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if incurred at such time, have been permitted to be incurred for all purposes of this Agreement.

All Designations and Revocations must be evidenced by Board Resolutions delivered to the Agent certifying compliance with the foregoing provisions.

6.10    Limitations on Layering.  Notwithstanding the provisions of Section 6.01, the Company shall not incur any Indebtedness that is subordinate or junior in lien priority to the Indebtedness evidenced by the Senior Credit Agreements and senior in lien priority to any Indebtedness arising under this Agreement.

6.11    Collateral Trigger Date.  The Company shall not enter into any agreement, or amend or modify any existing agreement that would cause a Collateral Trigger Event to occur later than it otherwise would have occurred prior to the effectiveness of such agreement, amendment, or modification; provided that this Section 6.11 shall not apply to any amendment, supplement or modification of the Senior Credit Agreements.

ARTICLE VII

Events of Default; Limitation on Remedies

7.01    Events of Default.  "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    Default in the payment of interest on any Term Loan when it becomes due and payable and continuance of such Default for a period of fifteen (15) Business Days or more; or

(b)    Default in the payment of the principal of any Term Loan when due; or

(c)    Default in the performance, or breach, of any covenant described under Section 6.03 or Section 6.04; or

(d)    Default in the performance, or breach, of any covenant in this Agreement (other than Defaults specified elsewhere in this Section 7.01) or the other Credit Documents, and continuance of such default or breach for a period of forty-five (45) days or more after written notice to the Company by the Agent at the discretion of the Required Lenders; or

(e)    failure to perform any term, covenant, condition or provision of one or more classes or issues of Indebtedness in an aggregate principal amount outstanding of $25,000,000 or more under which the Company or a Significant Restricted Subsidiary is obligated, and either (a) such Indebtedness is already due and payable in full or (b) such failure results in the acceleration of the maturity of such Indebtedness; or

(f)    one or more non-appealable judgments, orders or decrees for the payment of money of $25,000,000 or more, either individually or in the aggregate, shall be entered into against the Company or any Significant Restricted Subsidiary or any of their respective properties that is not paid or fully covered by a reputable and solvent insurance company and shall not be discharged and there shall have been a period of sixty (60) days or more during which a stay of enforcement of such judgment or order, by reason of pending appeal or otherwise, shall not be in effect; or

NY55/412464.6

(g)     the Company or any of its Significant Restricted Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the Bankruptcy Code; or an involuntary case is commenced against the Company or any of its Significant Restricted Subsidiaries, and the petition is not controverted within ten (10) days, or is not dismissed within sixty (60) days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Company or any of its Significant Restricted Subsidiaries, or the Company or any of its Significant Restricted Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Company or any of its Significant Restricted Subsidiaries, or there is commenced against the Company or any of its Significant Restricted Subsidiaries any such proceeding which remains undismissed for a period of sixty (60) days, or the Company or any of its Significant Restricted Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Company or any of its Significant Restricted Subsidiaries suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of sixty (60) days; or the Company or any of its Significant Restricted Subsidiaries makes a general assignment for the benefit of creditors; or any corporate, limited liability company or similar action is taken by the Company or any of its Significant Restricted Subsidiaries for the purpose of effecting any of the foregoing;

(h)     the representations or warranties made by the Company herein or in the Credit Documents shall be false or misleading in any material respect at the time made and the same shall be reasonably likely to adversely affect either (i) the ability of the Company to make payments required hereunder or the other Credit Documents when due or (ii) the validity or enforceability of any Credit Document or the rights or remedies of the Lenders or the Agent or Collateral Agent hereunder or under any other Credit Document; or

(i)     unless all the Collateral has been released from the Third Priority Liens in accordance with the provisions of the Security Documents, default by the Company or any Credit Party in the performance of the Security Documents, or the occurrence of any event, which adversely affects the enforceability, validity, perfection or priority of the Third Priority Liens on a material portion of the Collateral granted to the Collateral Agent for the benefit of the Agent and the Lenders, the repudiation or disaffirmation by the Company or any Credit Party of any of its material obligations under the Security Documents or the determination in a judicial proceeding that the Security Documents are unenforceable or invalid against the Company or any Credit Party for any reason with respect to a material portion of the Collateral (which default, repudiation, disaffirmation or determination is not rescinded, stayed or waived by the Persons having such authority pursuant to the Security Documents or otherwise cured within thirty (30) days or more after written notice to the Company by the Agent at the discretion of the Required Lenders, when such notice is deemed received in accordance with this Agreement;

(j)     a Change of Control shall occur;

then, and in each and every such case (other than an Event of Default specified in Section 7.01(g) with respect to the Company), so long as the respective Event of Default has occurred and is continuing, unless the principal of all of the Term Loans shall have already become due

and payable, and unless the Event of Default shall have been waived in writing in accordance with the provisions of Section 9.02, the Agent shall, at the discretion of the Required Lenders, by notice in writing to the Company, may declare the principal of all the Term Loans and the interest accrued thereon to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Agreement or in the Notes contained to the contrary notwithstanding. If an Event of Default specified in Section 7.01(g) occurs and is continuing with respect to the Company, the principal of all the Term Loans and the interest accrued thereon shall be immediately due and payable. Notwithstanding the foregoing if, at any time after the principal of the Term Loans shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Agent a sum sufficient to pay all matured installments of interest upon all Term Loans and the principal of any and all Term Loans which shall have become due otherwise than by acceleration (with interest on overdue installments of interest (to the extent that payment of such interest is enforceable under applicable law) and on such principal at the rate borne by the Term Loans, to the date of such payment or deposit), and if any and all Defaults under this Agreement, other than the nonpayment of principal and accrued interest on Term Loans which shall have become due by acceleration, shall have been cured or waived pursuant to Section 9.02, then and in every such case the Required Lenders, by written notice to the Company and to the Agent, may waive all Defaults or Events of Default and rescind and annul such acceleration and its consequences; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon.

In case the Agent shall have proceeded to enforce any right under this Agreement and such proceedings shall have been discontinued or abandoned because of such waiver or rescission and annulment or for any other reason or shall have been determined adversely to the Agent, then and in every such case the Company, the Lenders, and the Agent shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Lenders, and the Agent shall continue as though no such proceeding had been instituted.

## ARTICLE VIII

### The Agent

Each of the Lenders hereby irrevocably appoints the Agent as its administrative agent and collateral agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Credit Documents, together with such actions and powers as are reasonably incidental thereto. All references to the Agent in this Article VIII shall be deemed to include both the Agent and the Collateral Agent, as the context so requires.

The financial institution serving as the Agent hereunder and under the other Credit Documents shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such financial institution and its Affiliates may accept deposits from, lend money to and generally engage in any kind of

business with the Company or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Credit Documents. Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Credit Documents that the Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Credit Documents, the Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of the Subsidiaries that is communicated to or obtained by the financial institution serving as Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or wilful misconduct. The Agent shall not be deemed to have knowledge of any Default unless and until written notice thereof is given to the Agent by the Company or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Credit Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Credit Document, (iv) the validity, enforceability, effectiveness or genuineness of any Credit Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Credit Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, direction, certificate, consent, statement, instrument, document, opinion, report, order or other writing believed by it to be genuine and to have been signed or sent by the proper Person; and the Agent shall not be bound to make any investigation into the facts or matters stated in any such document, but the Agent, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. Whenever in the administration of this Agreement the Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Agent (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an officer's certificate relating thereto. The Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity satisfactory to it against any loss, liability or expense. The Agent shall not be liable for any error of judgment made in good faith by an officer thereof, unless it is proved that the Agent was negligent in ascertaining the pertinent facts.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Company in writing. Upon any such resignation, the Required Lenders shall have the right, with the consent of the Company (which consent shall not be unreasonably withheld or delayed and shall not be required if a Default or an Event of Default shall have occurred and be continuing) in consultation with the Company, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent approved by the Company (which approval shall not be unreasonably withheld or delayed and shall not be required if a Default or an Event of Default shall have occurred and be continuing) which shall be a financial institution with an office in New York, New York, or an Affiliate of any such financial institution. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Company to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent. Any successor to the Agent must be a "United States person," as defined in section 7701(a)(30) of the Code.

Each Lender (other than Evergreen Investments solely with respect to the Company) acknowledges that it has, independently and without reliance upon the Company, the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender (other than Evergreen Investments solely with respect to the Company) also acknowledges that it will, independently and without reliance upon the Company, the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or related agreement or any document furnished hereunder or thereunder.

ARTICLE IX

Miscellaneous

9.01    Notices. Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for

herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)     if to the Company at RCN Corporation, 105 Carnegie Center, Princeton, New Jersey 08540, telecopy:  (609) 734-3823, Attention of Chief Financial Officer;

(b)     if to the Agent to HSBC Bank USA, Issuer Services, 452 Fifth Avenue, New York, New York 10018 (delivery address:  10 East 40th Street, 14th Floor, New York, New York 10016, Attention:  Frank J. Godino, Telephone No. (212)525-1316), Facsimile No. (212)525-1300;

(c)     if to any other Lender, to it at its address (or telecopy number) set forth on the signature pages hereto or in the applicable Assignment and Acceptance.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of delivery.  Each Company hereby irrevocably authorizes and appoints the Company as its agent to give and receive any notices on its behalf under this Agreement and each other Credit Document, and any such notice given or received by the Company on behalf of any Company shall be fully effective as if given or received by such Company at such time, regardless of such Company's actual knowledge thereof.

9.02   Waivers; Amendments.

(a)     No failure or delay by the Agent or any Lender in exercising any right or power hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agent and the Lenders hereunder and under the other Credit Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Credit Document or consent to any departure by the Company therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Term Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Credit Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Company and the Required Lenders or, in the case of any other Credit Document, pursuant to an agreement or agreements in writing entered into by the Agent and the Company, in each case with the consent of the Required Lenders; provided that no such agreement shall (i) reduce the principal amount of any Term Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (ii) postpone the maturity of any

Term Loan, or any scheduled date of payment of the principal amount of any Term Loan under Section 2.09, or any date for the payment of any interest or fees payable hereunder, without the written consent of each Lender affected thereby, (iv) change Section 2.18(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Credit Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (vi) release any Credit Party from any of its obligations under any Credit Document or limit its liability thereunder or release all or substantially all of the Collateral from the Liens of the Security Documents (in each case other than to the extent such Credit Party or Collateral has been released under the Senior Credit Agreements), without the written consent of each Lender or (vii) amend or modify Section 2.10(a); provided, further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent without the prior written consent of the Agent, (B) no such agreement shall amend, modify or otherwise affect the terms and provisions of Section 9.13(b) of this Agreement without the prior written consent of DBCI (or any successor agent), in its capacity as agent for the lenders under the First Lien Credit Agreement, (C) this Agreement may be amended pursuant to Section 2.01(b) to add Lenders as provided therein with the consent of the Company and the relevant Lenders provided that such amendment does not have an adverse effect on the existing Lenders, (D) no such agreement shall amend or consent to any assignment by the Company pursuant to Section 9.04 hereof without each Lender's consent and (E) this Agreement may be amended pursuant to 5.12(a) to incorporate the Subsidiary Credit Parties with the consent of the Agent. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Company, the Required Lenders and the Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Term Loan made by it and all other amounts owing to it or accrued for its account under this Agreement, in each case in accordance with the terms hereof.

9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Company shall pay (i) all reasonable out-of-pocket expenses incurred by the Agent, the Lenders and their Affiliates, including the reasonable out-of-pocket fees, charges and disbursements of counsel and financial advisors for the Agent and the Lenders, in connection with any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) upon the occurrence and during the continuation of an Event of Default, all out-of-pocket expenses incurred by the Agent or any Lender, including the fees, charges and disbursements of any counsel for the Agent or any Lender, in connection with the enforcement or protection of its rights in connection with the Credit Documents, including its rights under this Section, or in connection with the Term Loans made hereunder, including all such out-of-pocket expenses incurred during  any workout, restructuring or negotiations in respect of such Term Loans.

(b)    The Company shall indemnify the Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any

Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of any actual or prospective claim, litigation, investigation or proceeding relating to (i) the execution or delivery of any Credit Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Credit Documents of their respective obligations thereunder or the consummation of the Transaction or any other transactions contemplated hereby, (ii) any Term Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Company or any of its Subsidiaries, or any Environmental Liability related in any way to the Company or any of its Subsidiaries, whether such claim, litigation, investigation or proceeding is based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or wilful misconduct of such Indemnitee.

(c)     To the extent that the Company fails to pay any amount required to be paid by it to the Agent under paragraph (a) or (b) of this Section each Lender severally agrees to pay to the Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such and the Agent shall be entitled to deduct amounts owing to it under Sections 9.03(a) and (b) from all property and funds held or collected by the Agent as such, prior to making payments to the Lenders thereon (and the Lenders agree that the Agent shall be entitled to receipt of any such amounts prior to payment to the Lenders of amounts owed to them).  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Term Loans at the time.

(d)     To the extent permitted by applicable law, the Company shall not assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Term Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable promptly after written demand therefor.

9.04     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Company may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Company without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lenders) any legal or

equitable right, remedy or claim under or by reason of this Agreement.  If the Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Agent.

(b)     Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Term Loans at the time owing to it); provided that (i) except in the case of an assignment to an existing Lender, the Company must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed); provided that the consent of the Company shall not be required for any assignment that occurs at any time when an Event of Default pursuant to paragraphs (h) and (i) of Article VII hereof shall have occurred and be continuing, (ii) except in the case of an assignment to an existing Lender or an assignment of the entire remaining amount of the assigning Lender's Term Loans, the amount of the Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 unless the Company otherwise consents, (iii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement and (iv) the parties to each assignment shall execute and deliver to the Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500.  Subject to acceptance and recording thereof pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.17 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (e) of this Section.

(c)     The Agent, acting for this purpose as an agent of the Company, shall maintain at its Issuer Services office in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amount of, and stated interest on, the Term Loans of each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Company, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Company and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by

paragraph (b) of this Section, the Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)   Any Lender may, without the consent of the Company or the Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Term Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Company, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Credit Documents and to approve any amendment, modification or waiver of any provision of the Credit Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to paragraph (f) of this Section, the Company agrees that each Participant shall be entitled to the benefits of Sections 2.15 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(f)   A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Company's prior written consent referring to Section 2.17. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless the Company is notified of the participation sold to such Participant and such Participant complies, for the benefit of the Company, with Section 2.17(e) as though it were a Lender.

(g)   Without notice to or consent from the Agent or the Company, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

9.05   Survival.  All covenants, agreements, representations and warranties made by the Company in the Credit Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Credit Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Credit Documents and the making of any Term Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the

time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Sections 2.15, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Term Loans or the termination of this Agreement or any provision hereof.

9.06    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Credit Documents and any separate letter agreements with respect to fees payable to the Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by all parties hereto and when the Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

9.07    Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

9.08    Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Company against any of and all the obligations of the Company now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such deposits may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    The Company hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of

or relating to any Credit Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Credit Document shall affect any right that the Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Credit Document against the Company or its properties in the courts of any jurisdiction.

(c)     The Company hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Credit Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process by registered or certified mail, return receipt requested. Nothing in this Agreement or any other Credit Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.10     <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.11     <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

9.12     <u>Confidentiality</u>. Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and its Related Funds' directors, officers, employees and agents, including accountants, legal counsel and other advisors (other than securities analysts) or to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisors (so long as such contractual counterparty or professional advisor to such

contractual counterparty agrees in writing to be bound by the provisions of this Section 9.12) (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) provided that such assignee or Participant, or such prospective assignee or Participant agrees in writing to be bound by the confidentiality provisions of this Section 9.12, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Company or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Agent or any Lender on a nonconfidential basis from a source other than the Company. For the purposes of this Section, "Information" means all information received from the Company or relating to the Company or their business, other than any such information that is available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Company or; provided that, in the case of information received from the Company after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Notwithstanding the foregoing, the parties (and each Related Party, representative, or other agent of the parties) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction, provided, however, that this sentence shall not permit any party (or any Related Party, representative, or other agent thereof) to disclose any information that is not necessary to understanding the tax treatment and tax structure of the transaction (including the identity of the parties, any information that could lead another to determine the identity of the parties, or any other information to the extent that such disclosure could result in a violation of any federal or state securities law).

9.13    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Term Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Term Loan in accordance with applicable law, the rate of interest payable in respect of such Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Term Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Term Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

9.14    Release of Subsidiaries; Collateral.

(a)     If (i) the Agent receives a certificate from the chief executive officer, the chief financial officer or treasurer of the Company certifying as of the date of that certificate that, after the consummation of the transaction or series of transactions described in reasonable detail satisfactory to the Agent in such certificate on such date, the Subsidiary Credit Party identified in such certificate will no longer be a Subsidiary of the Company and (ii) such transactions are consummated on such date in accordance with and without violating the provisions of this Agreement or any other Credit Document, then such Subsidiary's guarantee of the Company's obligations under this Agreement shall automatically terminate and such Subsidiary shall cease to be a party to any Credit Document.

(b)     If (i) any Subsidiary Credit Party is released from its guarantee with respect to the Senior Credit Agreements or (ii) any collateral is released from the Lien securing the Senior Credit Agreements, then, to the extent such Subsidiary Credit Party has guaranteed the Company's obligations hereunder, or such collateral has been pledged to secure the Company's obligations hereunder or under any guarantee executed by a Subsidiary Credit Party with respect hereto, then such Subsidiary's guarantee of the Company's or a Subsidiary Credit Party's obligations under this Agreement shall automatically terminate and such Subsidiary shall cease to be a party to any Credit Document and/or such collateral shall automatically be released from the Liens in favor of the Agent hereunder, in each case without any further action on the part of any Person.

(c)     No such termination or cessation shall release, reduce, or otherwise adversely affect the obligations of any other Credit Party under this Agreement or any other Credit Document, all of which obligations continue to remain in full force and effect.

9.15    Intercreditor Agreement Controls.  Notwithstanding anything herein to the contrary, (x) the Lien and security interest granted to the Agent pursuant to this Agreement or any other Document and the exercise of any right or remedy by the Agent hereunder or thereunder are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement or any other Document, the terms of the Intercreditor Agreement will govern and (y) the Lenders are subject to the agreements made by the Agent on their behalf in the Intercreditor Agreement but no such agreement shall obligate any Lender to make additional Term Loans.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

RCN CORPORATION

By: _____
      Name:
      Title:


HSBC BANK USA,
as Agent

By: _____
      Name:
      Title:

Evergreen High Yield Bond Fund,
as a Lender

By: _____
      Name:
      Title:

Address:


Evergreen VA Strategic Income Fund,
as a Lender

By: _____
      Name:
      Title:

Address:


Evergreen Strategic Income Fund,
as a Lender

By: _____
      Name:
      Title:

Address:


Evergreen VA High Income Fund,
as a Lender

By: _____
      Name:
      Title:

Address:

Evergreen Income Advantage Fund,
as a Lender

By: _____
     Name:
     Title:

<u>Address</u>:


Evergreen Utility and
Telecommunications Fund,
as a Lender

By: _____
     Name:
     Title:

<u>Address</u>:


Sentinel Capital Markets Income Fund,
as a Lender

By: _____
     Name:
     Title:

<u>Address</u>:


Sentinel High Yield Bond Fund,
as a Lender

By: _____
     Name:
     Title:

<u>Address</u>:

FORM OF PLEDGE AGREEMENT

PLEDGE AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of December __, 2004, between RCN Corporation (the "Pledgor") and HSBC Bank USA, as collateral agent (the "Third-Lien Collateral Agent" and together with any successor collateral agent, the "Pledgee"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Third-Lien Credit Agreement (as defined below) shall be used herein as therein defined.

W I T N E S S E T H :

WHEREAS, the Pledgor, the lenders from time to time party thereto (the "Lenders"), HSBC Bank USA, as agent (together with any successor agent, the "Administrative Agent"), have entered into an Amended and Restated Term Loan and Credit Agreement, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Third-Lien Credit Agreement"), providing for the making of Third-Lien Loans to the Pledgor, all as contemplated therein (the Lenders, the Administrative Agent, the Collateral Agent and the Pledgee are herein called the "Secured Creditors");

WHEREAS, it is a condition precedent to the making of Third-Lien Loans to the Pledgor under the Third-Lien Credit Agreement that the Pledgor shall have executed and delivered to the Pledgee this Agreement; and

WHEREAS, the Pledgor, various financial institutions from time to time party thereto and Deutsche Bank AG Cayman Islands Branch, as administrative agent and collateral agent (in such capacity, the "First-Lien Collateral Agent"), have entered into a credit agreement, dated as of the date hereof (as amended, restated, modified, extended, renewed, replaced, supplemented, restructured and/or refinanced from time to time, the "First-Lien Credit Agreement");

WHEREAS, the Pledgor desires to execute this Agreement in order to satisfy the condition described in the second preceding paragraph and to induce the Lenders to make Third-Lien Loans to the Borrower; and

WHEREAS, in order to secure the obligations under the First-Lien Credit Agreement, the Pledgor is concurrently granting to the First-Lien Collateral Agent, for the benefit of the holders of obligations under the First-Lien Credit Agreement, a first priority security interest in the Collateral (it being understood that the relative rights and priorities of the grantees in respect of the Collateral are governed by the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among the Pledgor, the First-Lien Collateral Agent, the Collateral Agent and certain other persons party or that may become party thereto from time to time);

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to the Pledgor, the receipt and sufficiency of which are hereby acknowledged, the Pledgor

hereby makes the following representations and warranties to the Pledgee for the benefit of the Secured Creditors and hereby covenants and agrees with the Pledgee for the benefit of the Secured Creditors as follows:

1. SECURITY FOR OBLIGATIONS. This Agreement is made by the Pledgor for the benefit of the Secured Creditors to secure:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of the Pledgor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), fees, costs and indemnities) of the Pledgor owing to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Third-Lien Credit Agreement and the other Credit Documents to which the Pledgor is a party and the due performance and compliance by the Pledgor with all of the terms, conditions and agreements contained in the Third-Lien Credit Agreement and in such other Credit Documents (all such obligations, liabilities and indebtedness under this clause (i), entitled to the benefits of this Agreement being herein collectively called the "Credit Document Obligations");

(ii) any and all sums advanced by the Pledgee in order to preserve the Collateral (as hereinafter defined) or preserve its security interest in the Collateral;

(iii) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of the Pledgor referred to in clause (i) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Pledgee of its rights hereunder, together with reasonable attorneys' fees and court costs;

(iv) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 11 of this Agreement; and

(v) all amounts owing to any Agent or any of its affiliates pursuant to any of the Credit Documents in its capacity as such;

all such obligations, liabilities, indebtedness, sums and expenses set forth in clauses (i) through (v) of this Section 1 being herein collectively called the "Obligations", it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

2. DEFINITIONS. (a) Unless otherwise defined herein, all capitalized terms used herein and defined in the Third-Lien Credit Agreement shall be used herein as therein defined. Reference to singular terms shall include the plural and vice versa.

(b) The following capitalized terms used herein shall have the definitions specified below:

"Administrative Agent" shall have the meaning set forth in the recitals hereto.

"Adverse Claim" shall have the meaning given such term in Section 8-102(a)(1) of the UCC.

"Agreement" shall have the meaning set forth in the first paragraph hereof.

"Certificated Security" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"Clearing Corporation" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"Collateral" shall have the meaning set forth in Section 3.1 hereof.

"Collateral Accounts" shall mean any and all accounts established and maintained by the Pledgee in the name of the Pledgor to which Collateral may be credited.

"Credit Document Obligations" shall have the meaning set forth in Section 1(i) hereof.

"Domestic Corporation" shall mean any corporation or similar entity organized under the laws of the United States or any State or territory thereof or the District of Columbia.

"Event of Default" shall mean any Event of Default under, and as defined in, the Third-Lien Credit Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"Exempted Foreign Entity" shall mean any Foreign Corporation and any limited liability company organized under the laws of a jurisdiction other than the United States or any State or Territory thereof that, in any such case, is treated as a corporation or an association taxable as a corporation for U.S. Federal income tax purposes.

"Financial Asset" shall have the meaning given such term in Section 8-102(a)(9) of the UCC.

"First-Lien Collateral Agent" has the meaning given such term in the Recitals hereto.

"Foreign Corporation" shall mean any corporation or similar entity organized under the laws of any jurisdiction other than the United States or any State or territory thereof or the District of Columbia.

"Holdings" shall have the meaning set forth in the recitals hereto.

"Indemnitees" shall have the meaning set forth in Section 11 hereof.

"<u>Instrument</u>" shall have the meaning given such term in Section 9-102(a)(47) of the UCC.

"<u>Intercreditor Agreement</u>" has the meaning given such term in the Recitals hereto.

"<u>Investment Property</u>" shall have the meaning given such term in Section 9-102(a)(49) of the UCC.

"<u>Secured Creditors</u>" shall have the meaning set forth in the recitals hereto.

"<u>Lenders</u>" shall have the meaning set forth in the recitals hereto.

"<u>Limited Liability Company Assets</u>" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all limited liability company capital and interest in other limited liability companies), at any time owned by the Pledgor or represented by any Limited Liability Company Interest.

"<u>Limited Liability Company Interests</u>" shall mean the entire limited liability company membership interest at any time owned by the Pledgor in any limited liability company.

"<u>Location</u>" of the Pledgor has the meaning given such term in Section 9-307 of the UCC.

"<u>Non-Voting Equity Interests</u>" shall mean all Equity Interests of any Person which are not Voting Equity Interests.

"<u>Notes</u>" shall mean all promissory notes, including all intercompany notes at any time issued to the Pledgor.

"<u>Obligations</u>" shall have the meaning set forth in Section 1 hereof.

"<u>Partnership Assets</u>" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all partnership capital and interest in other partnerships), at any time owned by the Pledgor or represented by any Partnership Interest.

"<u>Partnership Interest</u>" shall mean the entire general partnership interest or limited partnership interest at any time owned by the Pledgor in any general partnership or limited partnership.

"<u>Pledged Notes</u>" shall mean all Notes at any time pledged or required to be pledged hereunder.

"<u>Pledgee</u>" shall have the meaning set forth in the first paragraph hereof.

"<u>Pledgor</u>" shall have the meaning set forth in the first paragraph hereof.

"<u>Proceeds</u>" shall have the meaning given such term in Section 9-102(a)(64) of the UCC.

"<u>Registered Organization</u>" shall have the meaning given such term in Section 9-102(a)(70) of the UCC.

"<u>Required Lenders</u>" shall have the meaning given such term in the Third-Lien Credit Agreement.

"<u>Required Secured Creditors</u>" shall have the meaning provided in the Security Agreement.

"<u>Third-Lien Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>Secured Creditors</u>" shall have the meaning set forth in the recitals hereto.

"<u>Secured Debt Agreements</u>" shall mean and includes this Agreement and the other Credit Documents.

"<u>Securities Account</u>" shall have the meaning given such term in Section 8-501(a) of the UCC.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended, as in effect from time to time.

"<u>Securities Intermediary</u>" shall have the meaning given such term in Section 8-102(14) of the UCC.

"<u>Security</u>" and "<u>Securities</u>" shall have the meaning given such term in Section 8-102(a)(15) of the UCC and shall in any event also include all Stock and all Notes.

"<u>Security Entitlement</u>" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

"<u>Specified Default</u>" shall have the meaning set forth in Section 5 hereof.

"<u>Stock</u>" shall mean all of the issued and outstanding shares of capital stock or similar equity interests of any Domestic Corporation or Foreign Corporation at any time owned by the Pledgor.

"<u>Termination Date</u>" shall have the meaning set forth in Section 20 hereof.

"<u>Transmitting Utility</u>" has the meaning given such term in Section 9-102(a)(80) of the UCC.

"<u>UCC</u>" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; <u>provided</u> that all references herein to specific Sections or

subsections of the UCC are references to such Sections or subsections, as the case may be, of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

"Voting Equity Interests" of any Person shall mean all classes of Equity Interests of such Person entitled to vote.

## 3. PLEDGE OF SECURITIES, ETC.

3.1 Pledge. To secure the Obligations now or hereafter owed or to be performed by the Pledgor (but the rights and remedies between the First-Lien Collateral Agent and the Second-Lien Collateral Agent are subject to the terms of the Intercreditor Agreement), the Pledgor does hereby grant, pledge and assign to the Pledgee for the benefit of the Secured Creditors, and does hereby create a continuing security interest (subject to those Liens permitted to exist with respect to the Collateral pursuant to the terms of all Secured Debt Agreements then in effect) in favor of the Pledgee for the benefit of the Secured Creditors in, all of its right, title and interest in and to the following, whether now existing or hereafter from time to time acquired (collectively, the "Collateral"):

(a) each of the Collateral Accounts (to the extent a security interest therein is not created pursuant to the Security Agreement), including any and all assets of whatever type or kind deposited by the Pledgor in any such Collateral Account, whether now owned or hereafter acquired, existing or arising, including, without limitation, all Financial Assets, Investment Property, monies, checks, drafts, Instruments, Securities or interests therein of any type or nature deposited or required by the Third-Lien Credit Agreement or any other Secured Debt Agreement to be deposited in such Collateral Account, and all investments and all certificates and other Instruments (including depository receipts, if any) from time to time representing or evidencing the same, and all dividends, interest, distributions, cash and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing;

(b) all Securities owned or held by the Pledgor from time to time and all options and warrants owned by the Pledgor from time to time to purchase Securities;

(c) all Limited Liability Company Interests owned by the Pledgor from time to time and all of its right, title and interest in each limited liability company to which each such Limited Liability Company Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Limited Liability Company Interests and applicable law:

(A) all its capital therein and its interest in all profits, income, surpluses, losses, Limited Liability Company Assets and other distributions to which the Pledgor shall at any time be entitled in respect of such Limited Liability Company Interests;

(B)     all other payments due or to become due to the Pledgor in respect of Limited Liability Company Interests, whether under any limited liability company agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any limited liability company agreement or operating agreement, or at law or otherwise in respect of such Limited Liability Company Interests;

(D)     all present and future claims, if any, of the Pledgor against any such limited liability company for monies loaned or advanced, for services rendered or otherwise;

(E)     all of the Pledgor's rights under any limited liability company agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of the Pledgor relating to such Limited Liability Company Interests, including any power to terminate, cancel or modify any such limited liability company agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of the Pledgor in respect of such Limited Liability Company Interests and any such limited liability company, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Limited Liability Company Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(d) all Partnership Interests owned by the Pledgor from time to time and all of its right, title and interest in each partnership to which each such Partnership Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Partnership Interests and applicable law:

(A)     all its capital therein and its interest in all profits, income, surpluses, losses, Partnership Assets and other distributions to which the Pledgor shall at any time be entitled in respect of such Partnership Interests;

(B)     all other payments due or to become due to the Pledgor in respect of Partnership Interests, whether under any partnership agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any partnership agreement or operating agreement, or at law or otherwise in respect of such Partnership Interests;

(D)     all present and future claims, if any, of the Pledgor against any such partnership for monies loaned or advanced, for services rendered or otherwise;

(E)     all of the Pledgor's rights under any partnership agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of the Pledgor relating to such Partnership Interests, including any power to terminate, cancel or modify any partnership agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of the Pledgor in respect of such Partnership Interests and any such partnership, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Partnership Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(e) all Financial Assets and Investment Property owned by the Pledgor from time to time;

(f) all Security Entitlements owned by the Pledgor from time to time in any and all of the foregoing; and

(g) all Proceeds of any and all of the foregoing.

Notwithstanding anything to the contrary contained herein, the Pledgor shall not be required at any time to pledge hereunder (x) any equity interests of Megacable, S.A. de C.V., MCM Holdings, S.A. de C.V. and Megacable Telecommunicaciones, S.A. de C.V. for so long as the organizational documents of such entities prohibits the granting of a security interest in such equity interests; provided that such security interest shall attach immediately when such prohibition is no longer in effect or (y) more than 65% of the Voting Equity Interest of any Foreign Corporation; provided that the Pledgor shall be required to pledge hereunder 100% of

any Non-Voting Equity Interest at any time and from time to time acquired by the Pledgor of any Foreign Corporation.

3.2 <u>Procedures</u>. (a) To the extent that the Pledgor at any time or from time to time owns, acquires or obtains any right, title or interest in any Collateral, such Collateral shall automatically (and without the taking of any action by the Pledgor) be pledged pursuant to Section 3.1 of this Agreement and, in addition thereto (but subject to the terms of the Intercreditor Agreement), the Pledgor shall (to the extent provided below and not inconsistent with the terms of the Intercreditor Agreement) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) for the benefit of the Pledgee and the other Secured Creditors:

(i) with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), the Pledgor shall physically deliver such Certificated Security to the Pledgee, endorsed to the Pledgee or endorsed in blank;

(ii) with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), the Pledgor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Pledgee, an agreement for the benefit of the Pledgee and the other Secured Creditors substantially in the form of Annex H hereto (appropriately completed to the satisfaction of the Pledgee and with such modifications, if any, as shall be satisfactory to the Pledgee) pursuant to which such issuer agrees to comply with any and all instructions originated by the Pledgee in accordance with this Agreement without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

(iii) with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), the Pledgor shall promptly notify the Pledgee thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Pledgee under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Pledgee deems necessary or desirable to effect the foregoing;

(iv) with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, the procedure set forth in Section 3.2(a)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not

represented by a certificate or is not a Security for purposes of the UCC, the procedure set forth in Section 3.2(a)(ii) hereof;

(v)     with respect to any Note, physical delivery of such Note to the Pledgee, endorsed in blank, or, at the request of the Pledgee, endorsed to the Pledgee; and

(vi)     with respect to cash proceeds from any of the Collateral described in Section 3.1 hereof, (i) establishment by the Pledgee of a cash account in the name of the Pledgor over which the Pledgee shall have "control" within the meaning of the UCC and at any time any Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Pledgee and (ii) deposit of such cash in such cash account.

(b)   In addition to the actions required to be taken pursuant to Section 3.2(a) hereof, the Pledgor shall take the following additional actions with respect to the Collateral:

(i)     with respect to all Collateral of the Pledgor whereby or with respect to which the Pledgee may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), the Pledgor shall take all actions as may be requested from time to time by the Pledgee (to the extent not inconsistent with the Intercreditor Agreement) so that "control" of such Collateral is obtained and at all times held by the Pledgee; and

(ii)     the Pledgor shall from time to time cause appropriate financing statements (on appropriate forms) under the Uniform Commercial Code as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Pledgee), to be filed in the relevant filing offices so that at all times the Pledgee's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

3.3   Subsequently Acquired Collateral.  If the Pledgor shall acquire (by purchase, stock dividend, distribution or otherwise) any additional Collateral at any time or from time to time after the date hereof, (i) such Collateral shall automatically (and without any further action being required to be taken) be subject to the pledge and security interests created pursuant to Section 3.1 hereof and, furthermore, the Pledgor will, to the extent not inconsistent with the Intercreditor Agreement, thereafter take (or cause to be taken) all action (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) with respect to such Collateral in accordance with the procedures set forth in Section 3.2 hereof and the Intercreditor Agreement, and will, to the extent not inconsistent with the Intercreditor Agreement, promptly thereafter deliver to the Pledgee (i) a certificate executed by an authorized officer of the Pledgor describing such Collateral and certifying that the same has been duly pledged in favor of the Pledgee (for the benefit of the Secured Creditors) hereunder and (ii) supplements to Annexes A through G hereto as are necessary to cause such Annexes to be complete and accurate at such

time.  Notwithstanding the foregoing, the Pledgor shall not be required to pledge hereunder the equity interests of any Exempted Foreign Entity.

       3.4  <u>Transfer Taxes</u>.  Each pledge of Collateral under Section 3.1 or Section 3.3 hereof shall be accompanied by any transfer tax stamps required in connection with the pledge of such Collateral.

       3.5  <u>Certain Representations and Warranties Regarding the Collateral</u>.  The Pledgor represents and warrants that on the date hereof: (i) each Subsidiary of the Pledgor, and the direct ownership thereof, is listed in Annex B hereto; (ii) the Stock (and any warrants or options to purchase Stock) held by the Pledgor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex C hereto; (iii) such Stock referenced in clause (ii) of this paragraph constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex C hereto; (iv) the Notes held by the Pledgor consist of the promissory notes described in Annex D hereto where the Pledgor is listed as the lender; (v) the Limited Liability Company Interests held by the Pledgor consist of the number and type of interests of the Persons described in Annex E hereto; (vi) each such Limited Liability Company Interest referenced in clause (v) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex E hereto; (vii) the Partnership Interests held by the Pledgor consist of the number and type of interests of the Persons described in Annex F hereto; (viii) each such Partnership Interest referenced in clause (viii) of this paragraph constitutes that percentage or portion of the entire partnership interest of the Partnership as set forth in Annex F hereto; (ix) the exact address of each chief executive office of the Pledgor is listed on Annex G hereto; (x) the Pledgor has complied with the respective procedure set forth in Section 3.2(a) hereof with respect to each item of Collateral described in Annexes C through F hereto; and (xi) on the date hereof, the Pledgor owns no other Securities, Stock, Notes, Limited Liability Company Interests or Partnership Interests.

       4.  APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.  Subject to the terms of the Intercreditor Agreement, the Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of the Collateral, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or in favor of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee.

       5.  VOTING, ETC., WHILE NO EVENT OF DEFAULT OR SPECIFIED DEFAULT.  Unless and until there shall have occurred and be continuing any Event of Default under the Third-Lien Credit Agreement or a Default under Section [__] or [__] of the Third-Lien Credit Agreement (each such Default, a "<u>Specified Default</u>"), the Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral owned by it, and to give consents, waivers or ratifications in respect thereof; <u>provided</u> that, in each case, no vote shall be cast or any consent, waiver or ratification given or any action taken or omitted to be taken which would violate, result in a breach of any covenant contained in, or be inconsistent with any of the terms of any Secured Debt Agreement, or which could reasonably be expected to have the effect of impairing the value of the Collateral or any part thereof or the position or interests of the Pledgee or any other Secured Creditor in the Collateral, unless expressly

permitted by the terms of the Secured Debt Agreements. All such rights of the Pledgor to vote and to give consents, waivers and ratifications shall cease in case an Event of Default has occurred and is continuing, and Section 7 hereof shall become applicable.

6. DIVIDENDS AND OTHER DISTRIBUTIONS. Subject to the terms of the Intercreditor Agreement, unless and until there shall have occurred and be continuing an Event of Default, all cash dividends, cash distributions, cash Proceeds and other cash amounts payable in respect of the Collateral shall be paid to the Pledgor. The Pledgee shall be entitled to receive directly, and to retain as part of the Collateral:

(i) all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash dividends other than as set forth above) paid or distributed by way of dividend or otherwise in respect of the Collateral;

(ii) all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash (although such cash may be paid directly to the Pledgor so long as no Event of Default then exists)) paid or distributed in respect of the Collateral by way of stock-split, spin-off, split-up, reclassification, combination of shares or similar rearrangement; and

(iii) all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) which may be paid in respect of the Collateral by reason of any consolidation, merger, exchange of stock, conveyance of assets, liquidation or similar corporate or other reorganization.

Except as otherwise provided in the Intercreditor Agreement, nothing contained in this Section 6 shall limit or restrict in any way the Pledgee's right to receive the proceeds of the Collateral in any form in accordance with Section 3 of this Agreement. To the extent not inconsistent with the terms of the Intercreditor Agreement, all dividends, distributions or other payments which are received by the Pledgor contrary to the provisions of this Section 6 or Section 7 hereof shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of the Pledgor and shall be forthwith paid over to the Pledgee as Collateral in the same form as so received (with any necessary endorsement).

7. REMEDIES IN CASE OF AN EVENT OF DEFAULT OR A SPECIFIED DEFAULT. (a) If there shall have occurred and be continuing an Event of Default, then and in every such case, to the extent not inconsistent with the terms of the Intercreditor Agreement, the Pledgee shall be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any other Secured Debt Agreement or by law) for the protection and enforce- ment of its rights in respect of the Collateral, and the Pledgee shall be entitled to exercise all the rights and remedies of a secured party under the UCC as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights, which the Pledgor hereby agrees to be commercially reasonable:

(i)  to receive all amounts payable in respect of the Collateral otherwise payable under Section 6 hereof to the Pledgor;

(ii)  to transfer all or any part of the Collateral into the Pledgee's name or the name of its nominee or nominees;

(iii)  to accelerate any Pledged Note which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Pledged Note (including, without limitation, to make any demand for payment thereon);

(iv)  to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (the Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of the Pledgor, with full power of substitution to do so);

(v)  at any time and from time to time to sell, assign and deliver, or grant options to purchase, all or any part of the Collateral, or any interest therein, at any public or private sale, without demand of performance, advertisement or, notice of intention to sell or of the time or place of sale or adjournment thereof or to redeem or otherwise purchase or dispose (all of which are hereby waived by the Pledgor), for cash, on credit or for other property, for immediate or future delivery without any assumption of credit risk, and for such price or prices and on such terms as the Pledgee in its absolute discretion may determine, provided at least 10 days' written notice of the time and place of any such sale shall be given to the Pledgor. The Pledgee shall not be obligated to make any such sale of Collateral regardless of whether any such notice of sale has theretofore been given. The Pledgor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security or the Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Pledgee on behalf of the Secured Creditors may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Pledgee nor any other Secured Creditor shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall any of them be under any obligation to take any action whatsoever with regard thereto; and

(vi)  to set off any and all Collateral against any and all Obligations, and to withdraw any and all cash or other Collateral from any and all Collateral Accounts and to apply such cash and other Collateral to the payment of any and all Obligations.

(b)  If there shall have occurred and be continuing a Specified Default, then and in every such case but subject to the terms of the Intercreditor Agreement, the Pledgee shall be entitled to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (the Pledgor hereby irrevocably constituting and

appointing the Pledgee the proxy and attorney-in-fact of the Pledgor, with full power of substitution to do so).

8. REMEDIES, CUMULATIVE, ETC. Each and every right, power and remedy of the Pledgee provided for in this Agreement or in any other Secured Debt Agreement (including, without limitation, the Intercreditor Agreement), or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by the Pledgee or any other Secured Creditor of any one or more of the rights, powers or remedies provided for in this Agreement or any other Secured Debt Agreement (including, without limitation, the Intercreditor Agreement) or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the Pledgee or any other Secured Creditor of all such other rights, powers or remedies, and no failure or delay on the part of the Pledgee or any other Secured Creditor to exercise any such right, power or remedy shall operate as a waiver thereof. Notice to or demand on the Pledgor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Pledgee or any other Secured Creditor to any other or further action in any circumstances without notice or demand. The Secured Creditors agree that this Agreement may be enforced only by the action of the Pledgee, in each case, acting upon the instructions of the Required Secured Creditors, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Pledgee for the benefit of the Secured Creditors upon the terms of this Agreement and the Security Agreement.

9. APPLICATION OF PROCEEDS. (a) All monies collected by the Pledgee upon any sale or other disposition of the Collateral pursuant to the terms of this Agreement, together with all other monies received by the Pledgee hereunder, shall be applied in the manner provided in the Security Agreement.

(b) It is understood and agreed that the Pledgor shall remain liable with respect to its Obligations to the extent of any deficiency between the amount of the proceeds of the Collateral pledged by it hereunder and the aggregate amount of such Obligations.

10. PURCHASERS OF COLLATERAL. Upon any sale of the Collateral by the Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the Pledgee or the officer making such sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Pledgee or such officer or be answerable in any way for the misapplication or nonapplication thereof.

11. INDEMNITY. The Pledgor agrees (i) to indemnify, reimburse and hold harmless the Pledgee and each other Secured Creditor and their respective successors, assigns, employees, agents and affiliates (individually an "Indemnitee", and collectively, the "Indemnitees") from and against any and all obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties)

of whatsoever kind or nature, and (ii) to reimburse each Indemnitee for all reasonable costs, expenses and disbursements, including reasonable attorneys' fees and expenses, in each case arising out of or resulting from this Agreement or the exercise by any Indemnitee of any right or remedy granted to it hereunder or under any other Secured Debt Agreement (but excluding any obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) or expenses of whatsoever kind or nature to the extent incurred or arising by reason of gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  In no event shall the Pledgee hereunder be liable, in the absence of gross negligence or willful misconduct on its part (as determined by a court of competent jurisdiction in a final and non-appealable decision), for any matter or thing in connection with this Agreement other than to account for monies or other property actually received by it in accordance with the terms hereof.  If and to the extent that the obligations of the Pledgor under this Section 11 are unenforceable for any reason, the Pledgor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law. The indemnity obligations of the Pledgor contained in this Section 11 shall continue in full force and effect notwithstanding the full payment of all the Third-Lien Notes issued under the Third-Lien Credit Agreement and the payment of all other Obligations and notwithstanding the discharge thereof.

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER.  (a)  Nothing herein shall be construed to make the Pledgee or any other Secured Creditor liable as a member of any limited liability company or as a partner of any partnership and neither the Pledgee nor any other Secured Creditor by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership.  The parties hereto expressly agree that, unless the Pledgee shall become the absolute owner of Collateral consisting of a Limited Liability Company Interest or a Partnership Interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Pledgee, any other Secured Creditor, the Pledgor and/or any other Person.

(b)     Except as provided in the last sentence of paragraph (a) of this Section 12, the Pledgee, by accepting this Agreement, did not intend to become a member of any limited liability company or a partner of any partnership or otherwise be deemed to be a co-venturer with respect to the Pledgor, any limited liability company, partnership and/or any other Person either before or after an Event of Default shall have occurred.  The Pledgee shall have only those powers set forth herein and the Secured Creditors shall assume none of the duties, obligations or liabilities of a member of any limited liability company or as a partner of any partnership or the Pledgor except as provided in the last sentence of paragraph (a) of this Section 12.

(c)     The Pledgee and the other Secured Creditors shall not be obligated to perform or discharge any obligation of the Pledgor as a result of the pledge hereby effected.

(d)     The acceptance by the Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate the Pledgee or any other Secured Creditor to appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or to take any action hereunder or thereunder, or to

expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY. (a) The Pledgor agrees that it will join with the Pledgee in executing and, at the Pledgor's own expense, file and refile under the UCC or other applicable law such financing statements, continuation statements and other documents, in form reasonably acceptable to the Pledgee, in such filing offices as the Pledgee (acting on its own or on the instructions of the Required Secured Creditors) may reasonably deem necessary or appropriate (to the extent not inconsistent with the Intercreditor Agreement) and wherever required or permitted by law in order to perfect and preserve the Pledgee's security interest in the Collateral hereunder and hereby authorizes the Pledgee to file financing statements and amendments thereto relative to all or any part of the Collateral (including, without limitation, (x) financing statements which list the Collateral specifically and/or "all assets" as collateral and (y) "in lieu of" financing statements) without the signature of the Pledgor where permitted by law, and agrees to do such further acts and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee its rights, powers and remedies hereunder or thereunder.

(b) The Pledgor hereby constitutes and appoints the Pledgee its true and lawful attorney-in-fact, irrevocably, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time after the occurrence and during the continuance of an Event of Default, in the Pledgee's discretion, to act, require, demand, receive and give acquittance for any and all monies and claims for monies due or to become due to the Pledgor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings and to execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, which appointment as attorney is coupled with an interest.

14. THE PLEDGEE AS THIRD-LIEN COLLATERAL AGENT. Subject to the terms of the Intercreditor Agreement, the Pledgee will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement. It is expressly understood, acknowledged and agreed by each Secured Creditor that by accepting the benefits of this Agreement each such Secured Creditor acknowledges and agrees that the obligations of the Pledgee as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section [__] of the Third-Lien Credit Agreement. The Pledgee shall act hereunder on the terms and conditions set forth herein and in Section [__] of the Third-Lien Credit Agreement.

15. TRANSFER BY THE PLEDGORS. Except as permitted (i) prior to the date all Credit Document Obligations have been paid in full and all Commitments under the Third-Lien Credit Agreement have been terminated, pursuant to the Third-Lien Credit Agreement, and (ii) thereafter, pursuant to the other Secured Debt Agreements, the Pledgor will not sell or otherwise dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral or any interest therein.

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS. (a) The Pledgor represents, warrants and covenants as to itself and each of its Subsidiaries that:

(i)     it is the legal, beneficial and record owner of, and has good and marketable title to, all of its Collateral consisting of one or more Securities, Partnership Interests and Limited Liability Company Interests and that it has sufficient interest in all of its Collateral in which a security interest is purported to be created hereunder for such security interest to attach (subject, in each case, to no pledge, lien, mortgage, hypothe-cation, security interest, charge, option, Adverse Claim or other encumbrance whatsoever, except the liens and security interests created by this Agreement or permitted under the Secured Debt Agreements);

(ii)     it has full power, authority and legal right to pledge all the Collateral pledged by it pursuant to this Agreement;

(iii)     this Agreement has been duly authorized, executed and delivered by the Pledgor and constitutes a legal, valid and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms, except to the extent that the enforce-ability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(iv)     except to the extent already obtained or made, no consent of any other party (including, without limitation, any stockholder, partner, member or creditor of the Pledgor or any of its Subsidiaries) and no consent, license, permit, approval or authoriza-tion of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required to be obtained by the Pledgor in connection with (a) the execution, delivery or performance of this Agreement by the Pledgor, (b) the validity or enforceability of this Agreement against the Pledgor (except as set forth in clause (iii) above), (c) the perfection or enforceability of the Pledgee's security interest in the Pledgor's Collateral or (d) except for compliance with or as may be required by applicable securities laws, the exercise by the Pledgee of any of its rights or remedies provided herein;

(v)     neither the execution, delivery or performance by the Pledgor of this Agreement, or any other Secured Debt Agreement to which it is a party, nor compliance by it with the terms and provisions hereof and thereof nor the consummation of the transactions contemplated therein:  (i) will contravene any provision of any applicable law, statute, rule or regulation, or any applicable order, writ, injunction or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to the Pledgor; (ii) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the properties or assets of the Pledgor or any of its Subsidiaries pursuant to the terms of any indenture, material lease, material mortgage, material deed of trust, credit agreement, loan agreement or any other material agreement,

contract or other instrument to which the Pledgor or any of its Subsidiaries is a party or is otherwise bound, or by which it or any of its properties or assets is bound or to which it may be subject; or (iii) will violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation or limited liability company agreement (or equivalent organizational documents), as the case may be, of the Pledgor or any of its Subsidiaries;

(vi)     all of the Pledgor's Collateral (consisting of Securities, Limited Liability Company Interests and Partnership Interests) has been duly and validly issued, is fully paid and non-assessable and is subject to no options to purchase or similar rights;

(vii)     each of the Pledgor's Pledged Notes constitutes, or when executed by the obligor thereof will constitute, the legal, valid and binding obligation of such obligor, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(viii)     the pledge, collateral assignment and delivery to the Pledgee of the Pledgor's Collateral consisting of Certificated Securities and Pledged Notes pursuant to this Agreement creates a valid and perfected third priority security interest in such Certificated Securities and Pledged Notes (subject in priority to the Lien of the First-Lien Collateral Agent and the Second-Lien Collateral Agent in accordance with the terms of the Intercreditor Agreement), and the proceeds thereof, subject to no prior Lien or encumbrance or to any agreement purporting to grant to any third party a Lien or encumbrance on the property or assets of the Pledgor which would include the Securities (other than the liens and security interests permitted under the Secured Debt Agreements then in effect) and the Pledgee is entitled to all the rights, priorities and benefits afforded by the UCC or other relevant law as enacted in any relevant jurisdiction to perfect security interests in respect of such Collateral; and

(ix)     "control" (as defined in Section 8-106 of the UCC) has been obtained by the Pledgee over all of the Pledgor's Collateral consisting of Securities (including, without limitation, Notes which are Securities) with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC, except to the extent that the obligation of the applicable Pledgor to provide the Pledgee with "control" of such Collateral has not yet arisen under this Agreement; provided that in the case of the Pledgee obtaining "control" over Collateral consisting of a Security Entitlement, the Pledgor shall have taken all steps in its control so that the Pledgee obtains "control" over such Security Entitlement.

(b)     The Pledgor covenants and agrees that it will defend the Pledgee's right, title and security interest in and to the Pledgor's Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and the Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee by the Pledgor as Collateral hereunder and will likewise defend the right thereto and security interest therein of the Pledgee and the other Secured Creditors.

(c)     The Pledgor covenants and agrees that it will take no action which would violate any of the terms of any Secured Debt Agreement.

(d)     The Pledgor hereby authorizes the Third-Lien Collateral Agent to make duplicate filings as if the Pledgor is a Transmitting Utility, or alternatively, as if the Pledgor is a Person which is not a Transmitting Utility.

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZATION; LOCATION; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO; ETC.   The exact legal name of the Pledgor, the type of organization of the Pledgor, whether or not the Pledgor is a Registered Organization, the jurisdiction of organization of the Pledgor, the Pledgor's Location, the organizational identification number (if any) of the Pledgor is listed on Annex A hereto for the Pledgor.   The Pledgor shall not change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) the Pledgor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex A (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex A which shall correct all information contained therein for the Pledgor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.   In addition, to the extent that the Pledgor does not have an organizational identification number on the date hereof and later obtains one, the Pledgor shall promptly thereafter deliver a notification of the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

18. PLEDGORS' OBLIGATIONS ABSOLUTE, ETC.   The obligations of the Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever (other than termination of this Agreement pursuant to Section 20 hereof), including, without limitation:

(i)     any renewal, extension, amendment or modification of, or addition or supplement to or deletion from any Secured Debt Agreement (other than this Agreement in accordance with its terms), or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof;

(ii)     any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument including, without limitation, this Agreement (other than a waiver, consent or extension with respect to this Agreement in accordance with its terms);

(iii)    any furnishing of any additional security to the Pledgee or its assignee or any acceptance thereof or any release of any security by the Pledgee or its assignee;

(iv)    any limitation on any party's liability or obligations under any such instrument or agreement or any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof; or

(v)     any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Pledgor or any Subsidiary of the Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not the Pledgor shall have notice or knowledge of any of the foregoing.

19. SALE OF COLLATERAL WITHOUT REGISTRATION.  Subject to the terms of the Intercreditor Agreement:

(a)     If an Event of Default shall have occurred and be continuing and the Pledgor shall have received from the Pledgee a written request or requests that the Pledgor cause any registration, qualification or compliance under any federal or state securities law or laws to be effected with respect to all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests, the Pledgor as soon as practicable and at its expense will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with any other governmental requirements; provided, that the Pledgee shall furnish to the Pledgor such information regarding the Pledgee as the Pledgor may request in writing and as shall be required in connection with any such registration, qualification or compliance.  The Pledgor will cause the Pledgee to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to the Pledgee such number of prospectuses, offering circulars and other documents incident thereto as the Pledgee from time to time may reasonably request, and will indemnify, to the extent permitted by law, the Pledgee and all other Secured Creditors participating in the distribution of such Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue

statement or omission based upon information furnished in writing to the Pledgor by the Pledgee or such other Secured Creditor expressly for use therein.

(b)     If at any time when the Pledgee shall determine to exercise its right to sell all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests pursuant to Section 7 hereof, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, the Pledgee may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale in such manner and under such circumstances as the Pledgee may deem necessary or advisable in order that such sale may legally be effected without such registration. Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion (i) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, the Pledgee shall incur no responsibility or liability for selling all or any part of the Collateral at a price which the Pledgee, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until the registration as aforesaid.

20. TERMINATION; RELEASE.     (a)     On the Termination Date (as defined below), this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation, in Section 11 hereof shall survive any such termination) and the Pledgee, at the request and expense of the Pledgor, will execute and deliver to the Pledgor a proper instrument or instruments (including UCC termination statements) acknowledging the satisfaction and termination of this Agreement (including, without limitation, UCC termination statements and instruments of satisfaction, discharge and/or reconveyance), and will duly release from the security interest created hereby and assign, transfer and deliver to the Pledgor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Pledgee and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, together with any moneys at the time held by the Pledgee or any of its sub-agents hereunder and, with respect to any Collateral consisting of an Uncertificated Security, a Partnership Interest or a Limited Liability Company Interest (other than an Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), a termination of the agreement relating thereto executed and delivered by the issuer of such Uncertificated Security pursuant to Section 3.2(a)(ii) or by the respective partnership or limited liability company pursuant to Section 3.2(a)(iv)(2). As used in this Agreement, "Termination Date" shall mean the date upon which all Loans under the Third-Lien Credit Agreement have been repaid in full and all other Obligations (other than indemnities described in Section 11 hereof and described in Section [__] of the Third-Lien Credit Agreement, and any other indemnities set forth in any other Security Documents, in each case which are not then due and payable) then due and payable have been paid in full.

(b)     In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (x) at any time prior to the time at which all Credit Document Obligations have been paid in full, in connection with a sale or disposition permitted by the Third-Lien Credit Agreement or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section [__] of the Third-Lien Credit Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Third-Lien Credit Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, the Pledgee, at the request and expense of the Pledgor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to the Pledgor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or released and as may be in the possession of the Pledgee (or, in the case of Collateral held by any sub-agent designated pursuant to Section 4 hereto, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(c)     At any time that the Pledgor desires that Collateral be released as provided in the foregoing Section 20(a) or (b), it shall deliver to the Pledgee (and the relevant sub-agent, if any, designated pursuant to Section 4 hereof) a certificate signed by an authorized officer of the Pledgor stating that the release of the respective Collateral is permitted pursuant to Section 20(a) or (b) hereof.  If reasonably requested by the Pledgee (although the Pledgee shall have no obligation to make any such request), the relevant Pledgor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.

(d)     The Pledgee shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Collateral Agent in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 20.

21.  NOTICES, ETC.  Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Pledgor shall not be effective until received by the Pledgee or the Pledgor, as the case may be.  All notices and other communications shall be in writing and addressed as follows:

(a)     if to the Pledgor, at its address set forth opposite its signature below;

(b)     if to the Pledgee, at:

HSBC Bank USA
Issuer Services
452 Fifth Avenue
New York, New York 10018
Attention:  Frank J. Godino
Telephone No.:  (212) 525-1316
Telecopier No.:  (212) 525-1300

(c)　　if to any Secured Creditor, either (x) to the Administrative Agent, at the address of the Administrative Agent specified in the Third-Lien Credit Agreement, or (y) at such address as such Secured Creditor shall have specified in the Third-Lien Credit Agreement;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

22. WAIVER; AMENDMENT.  Except as contemplated by the Intercreditor Agreement and as provided in Sections 30 and 32 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in accordance with the requirements specified in the Security Agreement.

23. SUCCESSORS AND ASSIGNS.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 20, (ii) be binding upon the Pledgor, its successors and assigns; provided, however, that the Pledgor shall not assign any of its rights or obligations hereunder without the prior written consent of the Pledgee (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Pledgee hereunder, to the benefit of the Pledgee, the other Secured Creditors and their respective successors, transferees and assigns.  All agreements, statements, representations and warranties made by the Pledgor herein or in any certificate or other instrument delivered by the Pledgor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

24. HEADINGS DESCRIPTIVE.  The headings of the several Sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. (a)  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE

COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PLEDGOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PLEDGOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PLEDGOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS PERSONAL JURISDICTION OVER SUCH PLEDGOR. EACH PLEDGOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH PLEDGOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 21 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PLEDGEE UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY PLEDGOR IN ANY OTHER JURISDICTION.

(b) EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

26. PLEDGOR'S DUTIES. It is expressly agreed, anything herein contained to the contrary notwithstanding, that the Pledgor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Pledgee shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, except for the safekeeping of Collateral actually in Pledgor's possession, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of the Pledgor under or with respect to any Collateral.

27. COUNTERPARTS. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Pledgor and the Pledgee.

28. SEVERABILITY. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

29. RECOURSE. This Agreement is made with full recourse to the Pledgor and pursuant to and upon all the representations, warranties, covenants and agreements on the part of the Pledgor contained herein and in the other Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

30. LIMITED OBLIGATIONS. It is the desire and intent of the Pledgor and the Secured Creditors that this Agreement shall be enforced against the Pledgor to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought.

31. COMPLIANCE WITH LAWS. The Pledgor agrees to use commercially reasonable efforts, including taking any action which the Pledgee and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the Federal Communications Commission (the "FCC") or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Pledgee and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

The Pledgor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to Pledgee and the Secured Creditors as permitted by applicable law.

32. CONFLICTS; INTERCREDITOR AGREEMENT. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

* * * *

IN WITNESS WHEREOF, the Pledgor and the Pledgee have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.


Address:                                      RCN CORPORATION, as a Pledgor

105 Carnegie Center
Princeton, NJ 08540                           By: _____
Tel: (609) 734-3700                              Name:
Fax: (609) 734-3830                              Title:

Accepted and Agreed to:

HSBC BANK USA, as Collateral Agent and
    Pledgee

By:_____
    Name:
    Title:

Address:

452 Fifth Avenue
New York, New York 10018
Tel: (212) 525-1316
Fax: (212) 525-1300

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION(AND WHETHER A REGISTERED ORGANIZATION, JURISDICTION OF ORGANIZATION, LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

| Exact Legal Name of the Pledgor | Registered Organization? (Yes/No) | Jurisdiction of Organization | Pledgor's Location (for purposes of NY UCC § 9-307) | Pledgor's Organization Identification Number (or, if it has none, so indicate) |
|---|---|---|---|---|
| | | | | |

SCHEDULE OF SUBSIDIARIES

| Entity | Ownership | Jurisdiction of Organization |
|---|---|---|

SCHEDULE OF STOCK

RCN CORPORATION

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No.[1] | Percentage Owned[2] | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|

_____

[1] Specify if uncertificated.

[2] Specify for each Foreign Subsidiary the percentage owned of (x) Voting Equity Interests and (y) Non-Voting Equity Interests.

<u>SCHEDULE OF NOTES</u>

RCN CORPORATION

| <u>Amount</u> | <u>Maturity Date</u> | <u>Obligor</u> | Sub-clause of<br>Section 3.2(a)<br><u>of Pledge Agreement</u> |
|---|---|---|---|

SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

RCN CORPORATION

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

<u>SCHEDULE OF PARTNERSHIP INTERESTS</u>

RCN CORPORATION

| Name of <br> <u>Issuing Partnership</u> | Type of <br> <u>Interest</u> | <u>Percentage</u> <br> <u>Owned</u> | Sub-clause of <br> Section 3.2(a) <br> <u>of Pledge Agreement</u> |
|---|---|---|---|

SCHEDULE OF CHIEF EXECUTIVE OFFICES

Name of Pledgor                    Address(es) of Chief Executive Office[1]

---

[1]   For the Pledgor, list the address of its chief executive office on the date of the Security Agreement and each other location (if any) of its chief executive office in the four calendar months preceding said date.

Form of Agreement Regarding Uncertificated Securities, Limited Liability
Company Interests and Partnership Interests

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, 2004], among the undersigned pledgor (the "Pledgor"), Deutsche Bank AG Cayman Islands Branch, not in its individual capacity but solely as Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Uncertificated Securities, Limited Liability Company Interests and/or Partnership Interests (each as defined below) (the "Issuer").

W I T N E S S E T H :

WHEREAS, the Pledgor, certain of its affiliates and the Pledgee have entered into a Pledge Agreement, dated as of [_____ __, 2004] (as amended, modified, restated and/or supplemented from time to time, the "Pledge Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Pledge Agreement), the Pledgor has or will pledge to the Pledgee for the benefit of the Secured Creditors (as defined in the Pledge Agreement), and grant a security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all ["uncertificated securities" (as defined in Section 8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York) ("Uncertificated Securities")] [Partnership Interests (as defined in the Pledge Agreement)] [Limited Liability Company Interests (as defined in the Pledge Agreement)], from time to time by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "Issuer Pledged Interests"); and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interest of the Pledgee under the Pledge Agreement in the Issuer Pledged Interests, to vest in the Pledgee control of the Issuer Pledge Interests and to provide for the rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Subject to the terms of the Intercreditor Agreement, the Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any

person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.  The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.  The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.  All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> HSBC Bank USA
> 452 Fifth Avenue
> New York, New York 10018
> Attention:  Frank J. Godino
> Telephone No.:  (212) 525-1316
> Telecopier No.:  (212) 525-1300

5.  Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.  Except as expressly provided otherwise in Sections 4 and 5, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

> (a)      if to the Pledgor, at:
>
> RCN Corporation
> 105 Carnegie Center
> Princeton, New Jersey 08540
> Attention:  _____

Telephone No.:  (609) 734-3700
Telecopier No.:  (609) 734-3830

(b)     if to the Pledgee, at the address given in Section 4 hereof;

(c)     if to the Issuer, at:

c/o RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Attention: _____
Telephone No.:  (609) 734-3700
Telecopier No.:  (609) 734-3830

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 6, "Business Day" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

7.   This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

8.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

RCN CORPORATION,
    as Pledgor


By_____
    Name:
    Title:


HSBC BANK USA, not in its individual capacity
    but solely as Collateral Agent and Pledgee
By_____
    Name:
    Title:


[_____],
    as the Issuer


By_____
    Name:
    Title:

# Table of Contents

Page

1. SECURITY FOR OBLIGATIONS ...........................................................................2

2. DEFINITIONS ....................................................................................................2

3. PLEDGE OF SECURITIES, ETC ..........................................................................6

    3.1 Pledge ....................................................................................................6
    3.2 Procedures ............................................................................................9
    3.3 Subsequently Acquired Collateral .....................................................10
    3.4 Transfer Taxes ....................................................................................11
    3.5 Certain Representations and Warranties Regarding the Collateral ...........................11

4. APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC ..........................11

5. VOTING, ETC., WHILE NO EVENT OF DEFAULT OR SPECIFIED DEFAULT ............11

6. DIVIDENDS AND OTHER DISTRIBUTIONS ...................................................12

7. REMEDIES IN CASE OF AN EVENT OF DEFAULT OR A SPECIFIED DEFAULT ........12

8. REMEDIES, CUMULATIVE, ETC .....................................................................14

9. APPLICATION OF PROCEEDS .........................................................................14

10. PURCHASERS OF COLLATERAL ...................................................................14

11. INDEMNITY ...................................................................................................14

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER ...........15

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY ....................................16

14. THE PLEDGEE AS SECOND-LIEN COLLATERAL AGENT ..........................16

15. TRANSFER BY THE PLEDGORS ...................................................................16

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS ........17

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED
    ORGANIZATION); JURISDICTION OF ORGANIZATION; LOCATION;
    ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO;
    ETC ..................................................................................................19

18. PLEDGORS' OBLIGATIONS ABSOLUTE, ETC ...............................................19

i

19. SALE OF COLLATERAL WITHOUT REGISTRATION ................................... 20

20. TERMINATION; RELEASE ............................................................................. 21

21. NOTICES, ETC ............................................................................................... 22

22. WAIVER; AMENDMENT .............................................................................. 23

23. SUCCESSORS AND ASSIGNS ...................................................................... 23

24. HEADINGS DESCRIPTIVE............................................................................ 23

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF
       JURY TRIAL ................................................................................................ 23

26. PLEDGOR'S DUTIES .................................................................................... 24

27. COUNTERPARTS ........................................................................................... 25

28. SEVERABILITY ............................................................................................. 25

29. RECOURSE ..................................................................................................... 25

30. LIMITED OBLIGATIONS .............................................................................. 25

31. COMPLIANCE WITH LAWS ........................................................................ 25

32. CONFLICTS; INTERCREDITOR AGREEMENT ........................................... 25

ANNEX A    -    SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION,
                          JURISDICTION OF ORGANIZATION, LOCATION AND
                          ORGANIZATIONAL IDENTIFICATION NUMBERS
ANNEX B    -    SCHEDULE OF SUBSIDIARIES
ANNEX C    -    SCHEDULE OF STOCK
ANNEX D    -    SCHEDULE OF NOTES
ANNEX E    -    SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS
ANNEX F    -    SCHEDULE OF PARTNERSHIP INTERESTS
ANNEX G    -    SCHEDULE OF CHIEF EXECUTIVE OFFICES
ANNEX H    -    FORM OF AGREEMENT REGARDING UNCERTIFICATED
                          SECURITIES, LIMITED LIABILITY COMPANY INTERESTS AND
                          PARTNERSHIP INTERESTS

NEWYORK 4469186 (2K)

FORM OF SECURITY AGREEMENT

between

RCN CORPORATION

and

HSBC BANK USA,
as THIRD-LIEN COLLATERAL AGENT

_____

Dated as of December __, 2004
_____

# SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of December __, 2004, made by RCN Corporation (the "Assignor") in favor of HSBC BANK USA, as collateral agent (together with any successor collateral agent, the "Third-Lien Collateral Agent"), for the benefit of the Secured Creditors (as defined below).  Certain capitalized terms as used herein are defined in Article IX hereof.  Except as otherwise defined herein, all capitalized terms used herein and defined in the Third-Lien Credit Agreement (as defined below) shall be used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, the Assignor, the lenders from time to time party thereto (the "Lenders") and HSBC Bank USA, as agent (together with any successor Agent, the "Administrative Agent"), have entered into an Amended and Restated Term Loan and Credit Agreement, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Third-Lien Credit Agreement"), providing for the making of Loans to the Assignor, all as contemplated therein (the Lenders, the Administrative Agent and the Third-Lien Collateral Agent are herein called the "Secured Creditors");

WHEREAS, it is a condition precedent to the making of Loans to the Assignor under the Third-Lien Credit Agreement that the Assignor shall have executed and delivered to the Third-Lien Collateral Agent this Agreement;

WHEREAS, the Assignor, various financial institutions from time to time party thereto and Deutsche Bank AG Cayman Islands Branch, as administrative agent and collateral agent (in such capacity, the "First-Lien Collateral Agent"), have entered into a Credit Agreement, dated as of the date hereof (as amended, restated, modified, extended, renewed, replaced, supplemented, restructured and/or refinanced from time to time, the "First-Lien Credit Agreement");

WHEREAS, the Assignor desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make Loans to the Assignor; and

WHEREAS, in order to secure the obligations under the Third-Lien Credit Agreement, each Pledgor is concurrently granting to the First-Lien Collateral Agent, for the benefit of the holders of obligations under the First-Lien Credit Agreement, a first priority security interest in the Collateral (it being understood that the relative rights and priorities of the grantees in respect of the Collateral are governed by the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among the Assignor, the First-Lien Collateral Agent, the Third-Lien Collateral Agent and certain other persons party or that may become party thereto from time to time);

NOW, THEREFORE, in consideration of the benefits accruing to the Assignor, the receipt and sufficiency of which are hereby acknowledged, the Assignor hereby makes the

following representations and warranties to the Third-Lien Collateral Agent for the benefit of the Secured Creditors and hereby covenants and agrees with the Third-Lien Collateral Agent for the benefit of the Secured Creditors as follows:

# ARTICLE I

# SECURITY INTERESTS

1.1 <u>Grant of Security Interests</u>. (a) Subject to the terms of the Intercreditor Agreement with respect to rights and remedies between the First-Lien Collateral Agent and the Second-Lien Collateral Agent, as security for the prompt and complete payment and performance when due of all of its Obligations, the Assignor does hereby assign and transfer unto the Third-Lien Collateral Agent, and does hereby pledge and grant to the Third-Lien Collateral Agent, for the benefit of the Secured Creditors, a continuing security interest in all of the right, title and interest of the Assignor in, to and under all of the following personal property and fixtures (and all rights therein) of the Assignor, or in which or to which the Assignor has any rights, in each case whether now existing or hereafter from time to time acquired:

(i) each and every Account;

(ii) all cash and Cash Equivalents;

(iii) the Cash Collateral Account and all monies, securities, Instruments and other investments deposited or required to be deposited in the Cash Collateral Account;

(iv) all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(v) all Commercial Tort Claims;

(vi) all computer programs of the Assignor and all intellectual property rights therein and all other proprietary information of the Assignor, including but not limited to all Software, and all Software licensing rights, all writings, plans, specifications and schematics, all engineering drawings, customer lists, goodwill and licenses, and all recorded data of any kind or nature, regardless of the medium of recording;

(vii) all Domain Names;

(viii) all Trade Secret Rights;

(ix) Contracts, together with all Contract Rights arising thereunder;

(x) all Copyrights;

(xi) all Equipment;

(xii)    all Deposit Accounts and all other demand, deposit, time, savings, cash management and passbook accounts maintained by the Assignor with any Person and all monies, securities, Instruments and other investments deposited in any of the foregoing;

(xiii)   all Documents;

(xiv)    all General Intangibles;

(xv)     all Goods;

(xvi)    all Instruments;

(xvii)   all Inventory;

(xviii)  all Investment Property;

(xix)    all Letter-of-Credit Rights (whether or not the respective letter of credit is evidenced by a writing);

(xx)     all Marks;

(xxi)    all Patents;

(xxii)   all Permits;

(xxiii)  all Supporting Obligations; and

(xxiv)   all Proceeds and products of any and all of the foregoing and any item excluded pursuant to the next succeeding sentence (except to the extent such proceeds would independently be excluded pursuant to said sentence) (all of the above, the "Collateral").

Notwithstanding anything to the contrary contained above, in no event shall the Collateral include, and no Assignor shall be deemed to have granted a security interest (unless and until as further provided below) in (a) any lease, license, contract, property rights or agreement to which the Assignor is a party or any of its rights or interests thereunder or property subject thereto if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of same or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term in the case of preceding clause (i) or (ii) , as applicable) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC  (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity), provided, however, that (x) the security interests hereunder, shall attach immediately to any portion of such lease, license, contact, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) and (y) to any property or assets described above in this clause (a) on the first date upon which the circumstances described in preceding clauses (i) and/or (ii) (as relevant) no longer

exist with respect thereto, or (b) the equity interests of (x) Megacable, S.A. de C.V., MCM Holdings, S.A. de C.V. and Megacable Telecommunicaciones, S.A. de C.V. for so long as the organizational documents of such entities prohibit the granting of a security interest in such equity interests; <u>provided</u> that such security interest shall attach immediately when such prohibition is no longer in effect or (y) more than 65% of the Voting Equity Interests of any Foreign Corporation; <u>provided</u> that each Pledgor shall be required to pledge hereunder 100% of any Non-Voting Equity Interests at any time and from time to time acquired by such Pledgor of any Foreign Corporation.

(b)     The security interest of the Third-Lien Collateral Agent under this Agreement extends to all Collateral which the Assignor may acquire, or with respect to which the Assignor may obtain rights, at any time during the term of this Agreement.

(c)     Notwithstanding anything herein to the contrary, the relative rights and remedies of Third-Lien Collateral Agent shall be subject to and governed by the terms of the Intercreditor Agreement at any time the Intercreditor Agreement is in effect. In the event of any inconsistency between the terms hereof and the Intercreditor Agreement, the Intercreditor Agreement shall control at any time the Intercreditor Agreement is in effect.

1.2 <u>Power of Attorney</u>.  Subject to the terms of the Intercreditor Agreement, the Assignor hereby constitutes and appoints the Third-Lien Collateral Agent its true and lawful attorney, irrevocably, with full power after the occurrence of and during the continuance of an Event of Default (in the name of the Assignor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to the Assignor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Third-Lien Collateral Agent may deem to be necessary or advisable to protect the interests of the Secured Creditors, which appointment as attorney is coupled with an interest.

## ARTICLE II

## GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS

The Assignor represents, warrants and covenants, which representations, warranties and covenants shall survive execution and delivery of this Agreement, as follows:

2.1 <u>Necessary Filings</u>.  All filings, registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted by the Assignor to the Third-Lien Collateral Agent hereby in respect of the Collateral have been accomplished (or will be accomplished within 5 days after the date of this Agreement or, with respect to Marks, Patents and Copyrights, within 30 days of the date of this Agreement) and the security interest granted to the Third-Lien Collateral Agent pursuant to this Agreement in and to the Collateral creates a valid and, together with all such filings, registrations, recordings and other actions, a perfected security interest therein prior to the rights of all other Persons therein and subject to no other Liens (other than Permitted Liens) and is entitled to all the rights, priorities and benefits afforded by the Uniform Commercial Code or other relevant law as

enacted in any relevant jurisdiction to perfected security interests, in each case to the extent that the Collateral consists of the type of property in which a security interest may be perfected by possession or control (within the meaning of the UCC as in effect on the date hereof in the State of New York), by filing a financing statement under the Uniform Commercial Code as enacted in any relevant jurisdiction or by a filing of a Grant of Security Interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office. The Assignor hereby authorizes the Third-Lien Collateral Agent to make duplicate filings as if the Assignor is a Transmitting Utility, or alternatively, as if the Assignor is a Person which is not a Transmitting Utility.

2.2 <u>No Liens</u>. The Assignor is, and as to all Collateral acquired by it from time to time after the date hereof the Assignor will be, the owner of all Collateral free from any Lien, security interest, encumbrance or other right, title or interest of any Person (other than Permitted Liens), and the Assignor shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the Third-Lien Collateral Agent.

2.3 <u>Other Financing Statements</u>. As of the date hereof, there is no financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Collateral (other than financing statements filed in respect of Permitted Liens), and so long as the Termination Date has not occurred, the Assignor will not execute or authorize to be filed in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) or statements relating to the Collateral, except financing statements filed or to be filed in respect of and covering the security interests granted hereby by the Assignor or in connection with Permitted Liens.

2.4 <u>Chief Executive Office, Record Locations</u>. The chief executive office of the Assignor is, on the date of this Agreement, located at the address indicated on Annex A hereto for the Assignor. During the period of the four calendar months preceding the date of this Agreement, the chief executive office of the Assignor has not been located at any address other than that indicated on Annex A in accordance with the immediately preceding sentence, in each case unless each such other address is also indicated on Annex A hereto for the Assignor.

2.5 <u>Location of Inventory and Equipment</u>. All Inventory and Equipment held on the date hereof, or held at any time during the four calendar months prior to the date hereof, by the Assignor is located at one of the locations shown on Annex B hereto for the Assignor.

2.6 <u>Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; Location; Organizational Identification Numbers; Changes Thereto; etc.</u> The exact legal name of the Assignor, the type of organization of the Assignor, whether or not the Assignor is a Registered Organization, the jurisdiction of organization of the Assignor, the Assignor's Location, the organizational identification number (if any) of the Assignor is listed on Annex C hereto for the Assignor. The Assignor shall not change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its jurisdiction of organization, its Location, or its organizational identification number (if any) from that used on Annex C hereto, except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt

Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) the Assignor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Third-Lien Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex C (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex C which shall correct all information contained therein for the Assignor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Third-Lien Collateral Agent to maintain the security interests of the Third-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect. In addition, to the extent that the Assignor does not have an organizational identification number on the date hereof and later obtains one, the Assignor shall promptly thereafter notify the Third-Lien Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Third-Lien Collateral Agent to the extent necessary to maintain the security interest of the Third-Lien Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

2.7 <u>Trade Names; Etc.</u> The Assignor has or operates in any jurisdiction under, or in the preceding five years has had or has operated in any jurisdiction under, no trade names, fictitious names or other names except its legal name as specified in Annex C and such other trade or fictitious names as are listed on Annex D hereto for the Assignor. The Assignor shall not assume or operate in any jurisdiction under any new trade, fictitious or other name until (i) it shall have given to the Third-Lien Collateral Agent not less than 15 days' written notice of its intention so to do, clearly describing such new name and the jurisdictions in which such new name will be used and providing such other information in connection therewith as the Third-Lien Collateral Agent may reasonably request and (ii) with respect to such new name, it shall have taken all action reasonably requested by the Third-Lien Collateral Agent to maintain the security interest of the Third-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.

2.8 <u>Certain Significant Transactions.</u> During the one year period preceding the date of this Agreement, no Person shall have merged or consolidated with or into the Assignor, and no Person shall have liquidated into, or transferred all or substantially all of its assets to, the Assignor, in each case except as described in Annex E hereto. With respect to any transactions so described in Annex E hereto, the respective Assignor shall have furnished such information with respect to the Person (and the assets of the Person and locations thereof) which merged with or into or consolidated with the Assignor, or was liquidated into or transferred all or substantially all of its assets to the Assignor, and shall have furnished to the Third-Lien Collateral Agent such UCC lien searches as may have been requested with respect to such Person and its assets, to establish that no security interest (excluding Permitted Liens) continues perfected on the date hereof with respect to any Person described above (or the assets transferred to the respective Assignor by such Person), including without limitation pursuant to Section 9-316(a)(3) of the UCC.

2.9 <u>Non-UCC Property.</u> The aggregate fair market value (as determined by the Assignor in good faith) of all property of the Assignor of the types described in clauses (1), (2)

and (3) of Section 9-311(a) of the UCC does not exceed $_____. If the aggregate value of all such property at any time owned by the Assignor exceeds $_____, the Assignor shall provide prompt written notice thereof to the Third-Lien Collateral Agent and, upon the reasonable request of the Third-Lien Collateral Agent, the Assignor shall promptly (and in any event within 30 days) (or such longer period as the Third-Lien Collateral Agent may agree to in writing) take such actions (at their own cost and expense) as may be required under the respective United States, State or other laws referenced in Section 9-311(a) of the UCC to perfect the security interests granted herein in any Collateral where the filing of a financing statement does not perfect the security interest in such property in accordance with the provisions of Section 9-311(a) of the UCC.

2.10 <u>As-Extracted Collateral; Timber-to-be-Cut</u>.  On the date hereof, the Assignor does not own, or expect to acquire, any property which constitutes, or would constitute, As-Extracted Collateral or Timber-to-be-Cut.  If at any time after the date of this Agreement the Assignor owns, acquires or obtains rights to any As-Extracted Collateral or Timber-to-be-Cut, the Assignor shall furnish the Third-Lien Collateral Agent with prompt written notice thereof (which notice shall describe in reasonable detail the As-Extracted Collateral and/or Timber-to-be-Cut and the locations thereof) and shall take all actions as may be deemed reasonably necessary or desirable by the Third-Lien Collateral Agent to perfect the security interest of the Third-Lien Collateral Agent therein.

2.11 <u>Collateral in the Possession of a Bailee</u>.  If any Inventory or other Goods are at any time in the possession of a bailee (other than the First-Lien Collateral Agent), the Assignor shall promptly notify the Third-Lien Collateral Agent thereof and, if requested by the Third-Lien Collateral Agent, shall use its commercially reasonable efforts to promptly obtain an acknowledgment from such bailee, in form and substance reasonably satisfactory to the Third-Lien Collateral Agent, that the bailee holds such Collateral for the benefit of the Third-Lien Collateral Agent and shall act upon the instructions of the Third-Lien Collateral Agent, without the further consent of the Assignor. The Third-Lien Collateral Agent agrees with the Assignor that the Third-Lien Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the respective Assignor with respect to any such bailee.

2.12 <u>Recourse</u>.  This Agreement is made with full recourse to the Assignor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of the Assignor contained herein, in the Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

ARTICLE III

SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER COLLATERAL

3.1 <u>Additional Representations and Warranties</u>.  As of the time when each of its Accounts arises, the Assignor shall be deemed to have represented and warranted that each such Account, and all records, papers and documents relating thereto (if any) are genuine and what they purport to be, and that all papers and documents (if any) relating thereto (i) will, to the knowledge of the Assignor, represent the genuine, legal, valid and binding obligation of the

account debtor evidencing indebtedness unpaid and owed by the respective account debtor arising out of the performance of labor or services or the sale or lease and delivery of the merchandise listed therein, or both, (ii) will be the only original writings evidencing and embodying such obligation of the account debtor named therein (other than copies created for general accounting purposes), (iii) will, to the knowledge of the Assignor, evidence true and valid obligations, enforceable in accordance with their respective terms, and (iv) will be in compliance and will conform in all material respects with all applicable federal, state and local laws and applicable laws of any relevant foreign jurisdiction.

3.2 <u>Maintenance of Records</u>. The Assignor will keep and maintain at its own cost and expense accurate records of its Accounts and Contracts, including, but not limited to, originals of all documentation (including each Contract) with respect thereto, records of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and the Assignor will make the same available on the Assignor's premises to the Third-Lien Collateral Agent for inspection, at the Assignor's own cost and expense, at any and all reasonable times upon prior notice to the Assignor and otherwise in accordance with the Third-Lien Credit Agreement. Upon the occurrence and during the continuance of an Event of Default and at the request of the Third-Lien Collateral Agent, the Assignor shall, at its own cost and expense, deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the Third-Lien Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by the Assignor). Upon the occurrence and during the continuance of an Event of Default and if the Third-Lien Collateral Agent so directs, the Assignor shall legend, in form and manner satisfactory to the Third-Lien Collateral Agent, the Accounts and the Contracts, as well as books, records and documents (if any) of the Assignor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Third-Lien Collateral Agent and that the Third-Lien Collateral Agent has a security interest therein.

3.3 <u>Direction to Account Debtors; Contracting Parties; etc.</u> Upon the occurrence and during the continuance of an Event of Default, if the Third-Lien Collateral Agent so directs the Assignor, the Assignor agrees (x) to cause all payments on account of the Accounts and Contracts to be made directly to the Cash Collateral Account, (y) that the Third-Lien Collateral Agent may, at its option, directly notify the obligors with respect to any Accounts and/or under any Contracts to make payments with respect thereto as provided in the preceding clause (x), and (z) that the Third-Lien Collateral Agent may enforce collection of any such Accounts and Contracts and may adjust, settle or compromise the amount of payment thereof, in the same manner and to the same extent as the Assignor. Without notice to or assent by the Assignor, the Third-Lien Collateral Agent may, upon the occurrence and during the continuance of an Event of Default, apply any or all amounts then in, or thereafter deposited in, the Cash Collateral Account toward the payment of the Obligations in the manner provided in Section 7.4 of this Agreement. The reasonable costs and expenses of collection (including reasonable attorneys' fees), whether incurred by an Assignor or the Third-Lien Collateral Agent, shall be borne by the Assignor. The Third-Lien Collateral Agent shall deliver a copy of each notice referred to in the preceding clause (y) to the Assignor, <u>provided</u> that (x) the failure by the Third-Lien Collateral Agent to so notify the Assignor shall not affect the effectiveness of such notice or the other rights of the Third-Lien Collateral Agent created by this Section 3.3 and (y) no such notice shall be required

if an Event of Default of the type described in Section [___] of the Third-Lien Credit Agreement has occurred and is continuing.

3.4 <u>Modification of Terms; etc.</u> Except in accordance with the Assignor's ordinary course of business and consistent with reasonable business judgment or as permitted by Section 3.5, no Assignor shall rescind or cancel any indebtedness evidenced by any Account or under any Contract, or modify any material term thereof or make any material adjustment with respect thereto, or extend or renew the same, or compromise or settle any material dispute, claim, suit or legal proceeding relating thereto, or sell any Account or Contract, or interest therein, without the prior written consent of the Third-Lien Collateral Agent. No Assignor will do anything to impair the rights of the Third-Lien Collateral Agent in the Accounts or Contracts.

3.5 <u>Collection</u>. The Assignor shall endeavor in accordance with reasonable business practices to cause to be collected from the account debtor named in each of its Accounts or obligor under any Contract, as and when due (including, without limitation, amounts which are delinquent, such amounts to be collected in accordance with generally accepted lawful collection procedures) any and all amounts owing under or on account of such Account or Contract, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or under such Contract. Except as otherwise directed by the Third-Lien Collateral Agent after the occurrence and during the continuation of an Event of Default, the Assignor may allow in the ordinary course of business as adjustments to amounts owing under its Accounts and Contracts (i) an extension or renewal of the time or times of payment, or settlement for less than the total unpaid balance, which the Assignor finds appropriate in accordance with reasonable business judgment and (ii) a refund or credit due as a result of returned or damaged merchandise or improperly performed services or for other reasons which the Assignor finds appropriate in accordance with reasonable business judgment. The reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) of collection, whether incurred by an Assignor or the Third-Lien Collateral Agent, shall be borne by the Assignor.

3.6 <u>Instruments</u>. If the Assignor owns or acquires any Instrument in excess of $[____] constituting Collateral (other than checks and other payment instruments received and collected in the ordinary course of business), the Assignor will within 10 Business Days notify the Third-Lien Collateral Agent thereof, and upon request by the Third-Lien Collateral Agent will promptly deliver such Instrument to the Third-Lien Collateral Agent appropriately endorsed to the order of the Third-Lien Collateral Agent.

3.7 <u>Assignor Remains Liable Under Accounts</u>. Anything herein to the contrary notwithstanding, the Assignor shall remain liable under each of the Accounts to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts. Neither the Third-Lien Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Third-Lien Collateral Agent or any other Secured Creditor of any payment relating to such Account pursuant hereto, nor shall the Third-Lien Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of the Assignor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment,

to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.8 <u>Assignor Remains Liable Under Contracts</u>. Anything herein to the contrary notwithstanding, the Assignor shall remain liable under each of the Contracts to observe and perform all of the conditions and obligations to be observed and performed by them thereunder, all in accordance with and pursuant to the terms and provisions of each Contract. Neither the Third-Lien Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Contract by reason of or arising out of this Agreement or the receipt by the Third-Lien Collateral Agent or any other Secured Creditor of any payment relating to such Contract pursuant hereto, nor shall the Third-Lien Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of the Assignor under or pursuant to any Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any performance by any party under any Contract, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.9 <u>Deposit Accounts; Etc.</u> (a) No Assignor maintains, or at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for such accounts maintained with a bank (as defined in Section 9-102 of the UCC) whose jurisdiction (determined in accordance with Section 9-304 of the UCC) is within a State of the United States. Annex F hereto accurately sets forth, as of the date of this Agreement, for the Assignor, each Deposit Account maintained by the Assignor (including a description thereof and the respective account number), the name of the respective bank with which such Deposit Account is maintained, and the jurisdiction of the respective bank with respect to such Deposit Account. For each Deposit Account (other than the Cash Collateral Account or any other Deposit Account maintained with the Third-Lien Collateral Agent), the respective Assignor shall cause the bank with which the Deposit Account is maintained to execute and deliver to the Third-Lien Collateral Agent, within 30 days after the date of this Agreement (as such date may be extended by the Third-Lien Collateral Agent) or, if later, at the time of the establishment of the respective Deposit Account, a "control agreement" in the form of Annex G hereto (appropriately completed), with such changes thereto as may be acceptable to the Third-Lien Collateral Agent. If any bank with which a Deposit Account is maintained refuses to, or does not, enter into such a "control agreement", then the respective Assignor shall promptly (and in any event within 30 days after the date of this Agreement or, if later, 30 days after the establishment of such account) close the respective Deposit Account and transfer all balances therein to the Cash Collateral Account or another Deposit Account meeting the requirements of this Section 3.9. If any bank with which a Deposit Account is maintained refuses to subordinate all its claims, subject to customary exceptions, with respect to such Deposit Account to the Third-Lien Collateral Agent's security interest therein on terms satisfactory to the Third-Lien Collateral Agent, then the Third-Lien Collateral Agent, at its option, may (x) require that such Deposit Account be terminated in accordance with the immediately preceding sentence or (y) agree to a "control agreement" without such subordination, provided that in such event the Third-Lien Collateral Agent may at any time, at its

option, subsequently require that such Deposit Account be terminated (within 30 days after notice from the Third-Lien Collateral Agent) (as such date may be extended by the Third-Lien Collateral Agent) in accordance with the requirements of the immediately preceding sentence.

(b)     After the date of this Agreement, no Assignor shall establish any new demand, time, savings, passbook or similar account, except for Deposit Accounts established and maintained with banks and meeting the requirements of preceding clause (a). At the time any such Deposit Account is established, the appropriate "control agreement" shall be entered into in accordance with the requirements of preceding clause (a) and the respective Assignor shall furnish to the Third-Lien Collateral Agent a supplement to Annex F hereto containing the relevant information with respect to the respective Deposit Account and the bank with which same is established.

3.10 <u>Letter-of-Credit Rights</u>. If the Assignor is at any time a beneficiary under a letter of credit with a stated amount of $1,000,000 or more, the Assignor shall promptly notify the Third-Lien Collateral Agent thereof and, at the request of the Third-Lien Collateral Agent, the Assignor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Third-Lien Collateral Agent, use its reasonable best efforts to (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Third-Lien Collateral Agent of the proceeds of any drawing under such letter of credit or (ii) arrange for the Third-Lien Collateral Agent to become the transferee beneficiary of such letter of credit, with the Third-Lien Collateral Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are (subject to the terms of the Intercreditor Agreement) to be applied as provided in this Agreement after the occurrence and during the continuance of an Event of Default.

3.11 <u>Commercial Tort Claims</u>. All Commercial Tort Claims of the Assignor in existence on the date of this Agreement are described in Annex H hereto. If the Assignor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $1,000,000 or more, the Assignor shall promptly notify the Third-Lien Collateral Agent thereof in a writing signed by the Assignor and describing the details thereof and shall grant to the Third-Lien Collateral Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Third-Lien Collateral Agent.

3.12 <u>Chattel Paper</u>. Upon the request of the Third-Lien Collateral Agent made at any time or from time to time, the Assignor shall promptly furnish to the Third-Lien Collateral Agent a list of all Electronic Chattel Paper held or owned by the Assignor. Furthermore, if requested by the Third-Lien Collateral Agent, the Assignor shall promptly take all actions which are reasonably practicable so that the Third-Lien Collateral Agent has "control" of all Electronic Chattel Paper in accordance with the requirements of Section 9-105 of the UCC. The Assignor will promptly (and in any event within 10 days) following any request by the Third-Lien Collateral Agent, deliver all of its Tangible Chattel Paper to the Third-Lien Collateral Agent.

3.13 <u>Further Actions</u>. The Assignor will, at its own expense, make, execute, endorse, acknowledge, file and/or deliver to the Third-Lien Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing

statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps, including any and all actions as may be necessary or required under the Federal Assignment of Claims Act, relating to its Accounts, Contracts, Instruments and other property or rights covered by the security interest hereby granted, as the Third-Lien Collateral Agent may reasonably require.

ARTICLE IV

SPECIAL PROVISIONS CONCERNING TRADEMARKS AND DOMAIN NAMES

4.1 <u>Additional Representations and Warranties</u>. The Assignor represents and warrants that it is the true and lawful owner of all right, title and interest in and to the registered Marks and Domain Names listed in Annex I hereto for the Assignor and that said listed Marks and Domain Names include all United States marks and applications for United States marks owned or purported to be owned by the Assignor registered in the United States Patent and Trademark Office, as well as all Domain Names that the Assignor owns or purports to own as of the date hereof. The Assignor represents and warrants that it owns, is licensed to use or otherwise has the right to use any trademarks, service marks or other indicia of origin, including trade dress, and any Internet domain names, that it uses. The Assignor further warrants that it has no knowledge of any third party claim received by it that any aspect of the Assignor's present or contemplated business operations infringes or will infringe any trademark, service mark or trade name of any other Person other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Assignor represents and warrants that the registrations of Marks listed in Annex I hereto are valid, subsisting, have not been canceled and that the Assignor is not aware of any third-party claim that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said applications will not mature into registrations, other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Assignor hereby grants to the Third-Lien Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the United States Patent and Trademark Office or similar registrar in order to effect an absolute assignment of all right, title and interest in each Mark and/or Domain Name, and record the same.

4.2 <u>Licenses and Assignments</u>. Except as otherwise permitted by the Secured Debt Agreements, the Assignor hereby agrees not to divest itself of any right under any Mark or Domain Name absent prior written approval of the Third-Lien Collateral Agent.

4.3 <u>Infringements</u>. The Assignor agrees, promptly upon learning thereof, to notify the Third-Lien Collateral Agent in writing of the name and address of, and to furnish such pertinent information that is likely to be available with respect to, any party who the Assignor believes is, or may be, infringing or diluting or otherwise violating any of the Assignor's rights in and to any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect, or with respect to any party claiming that the Assignor's use of any Mark or Domain Name material to the Assignor's business violates in any material respect any property right of that party. The Assignor further agrees to prosecute diligently in accordance

with reasonable business practices any Person infringing any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect.

4.4 <u>Preservation of Marks and Domain Names</u>.  The Assignor agrees to use its Marks and Domain Names which are material to the Assignor's business in interstate commerce during the time in which this Agreement is in effect and to take all such other actions as are reasonably necessary to preserve such Marks as trademarks or service marks under the laws of the United States (other than any such Marks which Assignor reasonably determines are no longer used or useful in its business or operations).

4.5 <u>Maintenance of Registration</u>.  The Assignor shall, at its own expense, diligently process all documents reasonably required to maintain all Mark and/or Domain Name registrations, including but not limited to affidavits of use and applications for renewals of registration in the United States Patent and Trademark Office for all of its material registered Marks, and shall pay all fees and disbursements in connection therewith and shall not abandon any such filing of affidavit of use or any such application of renewal prior to the exhaustion of all administrative and judicial remedies without prior written consent of the Third-Lien Collateral Agent (other than with respect to registrations and applications deemed by the Assignor in its reasonable business judgment to be no longer prudent to pursue).

4.6 <u>Future Registered Marks and Domain Names</u>.  If any Mark registration is issued hereafter to the Assignor as a result of any application now or hereafter pending before the United States Patent and Trademark Office or any Domain Name is registered by Assignor, within 60 days of receipt of such certificate or similar indicia of ownership, the Assignor shall deliver to the Third-Lien Collateral Agent a copy of such registration certificate or similar indicia of ownership, and a grant of a security interest in such Mark and/or Domain Name, to the Third-Lien Collateral Agent and at the expense of the Assignor, confirming the grant of a security interest in such Mark and/or Domain Name to the Third-Lien Collateral Agent hereunder, the form of such security to be substantially in the form of Annex L hereto or in such other form as may be reasonably satisfactory to the Third-Lien Collateral Agent.

4.7 <u>Remedies</u>.  Subject to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing, the Third-Lien Collateral Agent may, by written notice to the Assignor, take any or all of the following actions:  (i) declare the entire right, title and interest of the Assignor in and to each of the Marks and Domain Names, together with all trademark rights and rights of protection to the same, vested in the Third-Lien Collateral Agent for the benefit of the Secured Creditors, in which event such rights, title and interest shall immediately vest, in the Third-Lien Collateral Agent for the benefit of the Secured Creditors, and the Third-Lien Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 4.1 hereof to execute, cause to be acknowledged and notarized and record said absolute assignment with the applicable agency or registrar; (ii) take and use or sell the Marks or Domain Names and the goodwill of the Assignor's business symbolized by the Marks or Domain Names and the right to carry on the business and use the assets of the Assignor in connection with which the Marks or Domain Names have been used; and (iii) direct the Assignor to refrain, in which event the Assignor shall refrain, from using the Marks or Domain Names in any manner whatsoever, directly or indirectly, and the Assignor shall execute such further documents that the Third-Lien Collateral Agent may reasonably request to further confirm this and to transfer ownership of the

Marks or Domain Names and registrations and any pending trademark applications in the United States Patent and Trademark Office or applicable Domain Name registrar to the Third-Lien Collateral Agent.

## ARTICLE V

SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND TRADE SECRETS

5.1 <u>Additional Representations and Warranties</u>.  The Assignor represents and warrants that it is the true and lawful owner of all rights in (i) the Trade Secret Rights, (ii) all right, title and interest in and to the Patents listed in Annex J hereto for the Assignor and that said Patents include all the United States patents and applications for United States patents that the Assignor owns as of the date hereof and (iii) all right, title and interest in and to the registered Copyrights listed in Annex K hereto for the Assignor and that said Copyrights include all the United States copyrights registered with the United States Copyright Office and applications to United States copyrights that the Assignor owns as of the date hereof.  The Assignor further warrants that it has no knowledge of any third party claim that any aspect of the Assignor's present or contemplated business operations infringes or will infringe any patent of any other Person or the Assignor has misappropriated any trade secret or proprietary information which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  The Assignor represents and warrants that the Patents listed in Annex J hereto are valid, subsisting, have not been canceled and that the Assignor is not aware of any third-party claim that any of said Patents are invalid or unenforceable, and is not aware that there is any reason that any of said Patents are invalid or unenforceable, and is not aware that there is any reason that any of said Patent applications will not mature into issued Patents.  The Assignor hereby grants to the Third-Lien Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Patent and Trademark Office or the United States Copyright Office in order to effect an absolute assignment of all right, title and interest in each Patent or Copyright, and to record the same.

5.2 <u>Licenses and Assignments</u>.  Except as otherwise permitted by the Secured Debt Agreements, the Assignor hereby agrees not to divest itself of any right under any Patent or Copyright absent prior written approval of the Third-Lien Collateral Agent.

5.3 <u>Infringements</u>.  The Assignor agrees, promptly upon learning thereof, to furnish the Third-Lien Collateral Agent in writing with all pertinent information available to the Assignor with respect to any infringement, contributing infringement or active inducement to infringe or other violation of the Assignor's rights in any Patent or Copyright or to any claim that the practice of any Patent or use of any Copyright violates any property right of a third party, or with respect to any misappropriation of any Trade Secret Right or any claim that practice of any Trade Secret Right violates any property right of a third party, in each case, in any manner which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  The Assignor further agrees, absent direction of the Third-Lien Collateral Agent to the contrary, to diligently prosecute, in accordance with its reasonable business judgment, any Person infringing any Patent or Copyright or any Person misappropriating any Trade Secret

Right, in each case to the extent that such infringement or misappropriation, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.4 <u>Maintenance of Patents or Copyrights</u>. At its own expense, the Assignor shall make timely payment of all post-issuance fees required to maintain in force its rights under each Patent or Copyright, absent prior written consent of the Third-Lien Collateral Agent (other than any such Patents or Copyrights which are no longer used or are deemed by the Assignor in its reasonable business judgment to no longer be useful in its business or operations).

5.5 <u>Prosecution of Patent Applications</u>. At its own expense, the Assignor shall diligently prosecute all material applications for the United States Patents listed in Annex J hereto, in each case for the Assignor and shall not abandon any such application prior to exhaustion of all administrative and judicial remedies (other than applications that are deemed by the Assignor in its reasonable business judgment to no longer be necessary in the conduct of the Assignor's business), absent written consent of the Third-Lien Collateral Agent.

5.6 <u>Other Patents and Copyrights</u>. Within 30 days of the acquisition or issuance of a United States Patent, registration of a Copyright, or acquisition of a registered Copyright, or of filing of an application for a United States Patent or Copyright, the Assignor shall deliver to the Third-Lien Collateral Agent a copy of said Copyright or Patent, or certificate or registration of, or application therefor, as the case may be, with a grant of a security interest as to such Patent or Copyright, as the case may be, to the Third-Lien Collateral Agent and at the expense of the Assignor, confirming the grant of a security interest, the form of such grant of a security interest to be substantially in the form of Annex M or N hereto, as appropriate, or in such other form as may be reasonably satisfactory to the Third-Lien Collateral Agent.

5.7 <u>Remedies</u>. Subject to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing, the Third-Lien Collateral Agent may, by written notice to the Assignor, take any or all of the following actions: (i) declare the entire right, title, and interest of the Assignor in each of the Patents and Copyrights vested in the Third-Lien Collateral Agent for the benefit of the Secured Creditors, in which event such right, title, and interest shall immediately vest in the Third-Lien Collateral Agent for the benefit of the Secured Creditors, in which case the Third-Lien Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 5.1 hereof to execute, cause to be acknowledged and notarized and to record said absolute assignment with the applicable agency; (ii) take and practice or sell the Patents and Copyrights; and (iii) direct the Assignor to refrain, in which event the Assignor shall refrain, from practicing the Patents and using the Copyrights directly or indirectly, and the Assignor shall execute such further documents as the Third-Lien Collateral Agent may reasonably request further to confirm this and to transfer ownership of the Patents and Copyrights to the Third-Lien Collateral Agent for the benefit of the Secured Creditors.

ARTICLE VI

PROVISIONS CONCERNING ALL COLLATERAL

6.1 <u>Protection of Third-Lien Collateral Agent's Security</u>. Except as otherwise permitted by the Secured Debt Agreements and the Intercreditor Agreement, the Assignor will

do nothing to impair the rights of the Third-Lien Collateral Agent in the Collateral. The Assignor will at all times maintain insurance, at the Assignor's own expense to the extent and in the manner provided in the Secured Debt Agreements. Except to the extent otherwise permitted to be retained by the Assignor or applied by the Assignor pursuant to the terms of the Secured Debt Agreements, the Third-Lien Collateral Agent shall, at the time any proceeds of such insurance are distributed to the Secured Creditors, apply such proceeds in accordance with Section 7.4 hereof. The Assignor assumes all liability and responsibility in connection with the Collateral acquired by it and the liability of the Assignor to pay the Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to the Assignor.

6.2 <u>Warehouse Receipts Non-Negotiable</u>. To the extent practicable, the Assignor agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued with respect to any of its Inventory, the Assignor shall request that such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7-104 of the Uniform Commercial Code as in effect in any relevant jurisdiction or under other relevant law).

6.3 <u>Additional Information.</u> The Assignor will, at its own expense, from time to time upon the reasonable request of the Third-Lien Collateral Agent, promptly (and in any event within 10 days after its receipt of the respective request) furnish to the Third-Lien Collateral Agent such information with respect to the Collateral (including the identity of the Collateral or such components thereof as may have been requested by the Third-Lien Collateral Agent, the value and location of such Collateral, etc.) as may be requested by the Third-Lien Collateral Agent. Without limiting the forgoing, the Assignor agrees that it shall promptly (and in any event within 10 days after its receipt of the respective request) furnish to the Third-Lien Collateral Agent such updated Annexes hereto as may from time to time be reasonably requested by the Third-Lien Collateral Agent.

6.4 <u>Further Actions</u>. Subject to the terms of the Intercreditor Agreement, the Assignor will, at its own expense and upon the reasonable request of the Third-Lien Collateral Agent, make, execute, endorse, acknowledge, file and/or deliver to the Third-Lien Collateral Agent from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps relating to the Collateral and other property or rights covered by the security interest hereby granted, which the Third-Lien Collateral Agent deems reasonably appropriate or advisable to perfect, preserve or protect its security interest in the Collateral.

6.5 <u>Financing Statements</u>. The Assignor agrees to execute and deliver to the Third-Lien Collateral Agent such financing statements, in form reasonably acceptable to the Third-Lien Collateral Agent, as the Third-Lien Collateral Agent may from time to time reasonably request or as are reasonably necessary or desirable in the opinion of the Third-Lien Collateral Agent to establish and maintain a valid, enforceable, third-priority perfected security interest in the Collateral (subject to the first-priority lien of the First-Lien Collateral Agent and the second-priority lien of the Second-Lien Collateral Agent in and in accordance with the terms of the Intercreditor Agreement) as provided herein and the other rights and security contemplated

hereby.  The Assignor will pay any applicable filing fees, recordation taxes and related expenses relating to its Collateral.  The Assignor hereby authorizes the Third-Lien Collateral Agent to file any such financing statements without the signature of the Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets" of the Assignor).

ARTICLE VII

REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

7.1  <u>Remedies; Obtaining the Collateral Upon Default</u>.  The Assignor agrees that, to the extent not inconsistent with the Intercreditor Agreement, if any Event of Default shall have occurred and be continuing, then and in every such case, the Third-Lien Collateral Agent, in addition to any rights now or hereafter existing under applicable law and under the other provisions of this Agreement, shall have all rights as a secured creditor under any UCC, and such additional rights and remedies to which a secured creditor is entitled under the laws in effect in all relevant jurisdictions and may:

(i)  personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from the Assignor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon the Assignor's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of the Assignor;

(ii)  instruct the obligor or obligors on any agreement, instrument or other obligation (including, without limitation, the Accounts and the Contracts) constituting the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Third-Lien Collateral Agent and may exercise any and all remedies of the Assignor in respect of such Collateral;

(iii)  instruct all banks which have entered into a control agreement with the Third-Lien Collateral Agent to transfer all monies, securities and instruments held by such depositary bank to the Cash Collateral Account;

(iv)  sell, assign or otherwise liquidate any or all of the Collateral or any part thereof in accordance with Section 7.2 hereof, or direct the Assignor to sell, assign or otherwise liquidate any or all of the Collateral or any part thereof, and, in each case, take possession of the proceeds of any such sale or liquidation;

(v)  take possession of the Collateral or any part thereof, by directing the Assignor in writing to deliver the same to the Third-Lien Collateral Agent at any reasonable place or places designated by the Third-Lien Collateral Agent, in which event the Assignor shall at its own expense:

(x)  forthwith cause the same to be moved to the place or places so designated by the Third-Lien Collateral Agent and there delivered to the Third-Lien Collateral Agent;

(y)     store and keep any Collateral so delivered to the Third-Lien Collateral Agent at such place or places pending further action by the Third-Lien Collateral Agent as provided in Section 7.2 hereof; and

(z)     while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be reasonably necessary to protect the same and to preserve and maintain it in good condition;

(vi)     subject to any exclusive license issued prior to the Event of Default, license or sublicense, whether on an exclusive or nonexclusive basis, any Marks, Domain Names, Patents or Copyrights included in the Collateral for such term and on such conditions and in such manner as the Third-Lien Collateral Agent shall in its sole judgment determine; provided in the case of Marks to the maintenance of quality standards, not less than comparable to the standards in place at the time of the Event of Default;

(vii)     apply any monies constituting Collateral or proceeds thereof in accordance with the provisions of Section 7.4; and

(viii)     take any other action as specified in clauses (1) through (5), inclusive, of Section 9-607 of the UCC;

it being understood that the Assignor's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the Third-Lien Collateral Agent shall be entitled to a decree requiring specific performance by the Assignor of said obligation. By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors expressly acknowledge and agree that this Agreement and each other Security Document may be enforced only by the action of the Third-Lien Collateral Agent acting upon the instructions of the Required Secured Creditors and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Third-Lien Collateral Agent or the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Agreement and the other Security Documents. Furthermore, the Assignor agrees to upon the occurrence and continuance of an Event of Default, use its commercially reasonable efforts to assist the Third-Lien Collateral Agent in obtaining any approvals or assignments or licenses from any relevant Governmental Authority that may be necessary for the exercise of the rights and remedies of the Third-Lien Collateral Agent with respect to the Collateral.

7.2     Remedies; Disposition of the Collateral.     Subject to the terms of the Intercreditor Agreement, if any Event of Default shall have occurred and be continuing, then any Collateral repossessed by the Third-Lien Collateral Agent under or pursuant to Section 7.1 hereof and any other Collateral whether or not so repossessed by the Third-Lien Collateral Agent, may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as the

Third-Lien Collateral Agent may, in compliance with any mandatory requirements of applicable law, determine to be commercially reasonable. Any of the Collateral may be sold, leased or otherwise disposed of, in the condition in which the same existed when taken by the Third-Lien Collateral Agent or after any overhaul or repair at the expense of the Assignor which the Third-Lien Collateral Agent shall determine to be commercially reasonable. Any such sale, lease or other disposition may be effected by means of a public disposition or private disposition, effected in accordance with the applicable requirements (in each case if and to the extent applicable) of Sections 9-610 through 9-613 of the UCC and/or such other mandatory requirements of applicable law as may apply to the respective disposition. The Third-Lien Collateral Agent may, without notice or publication, adjourn any public or private disposition or cause the same to be adjourned from time to time by announcement at the time and place fixed for the disposition, and such disposition may be made at any time or place to which the disposition may be so adjourned. To the extent permitted by any such requirement of law, the Third-Lien Collateral Agent may bid for and become the purchaser (and may pay all or any portion of the purchase price by crediting Obligations against the purchase price) of the Collateral or any item thereof, offered for disposition in accordance with this Section 7.2 without accountability to the Assignor. If, under applicable law, the Third-Lien Collateral Agent shall be permitted to make disposition of the Collateral within a period of time which does not permit the giving of notice to the Assignor as hereinabove specified, the Third-Lien Collateral Agent need give the Assignor only such notice of disposition as shall be required by such applicable law. The Assignor agrees to do or cause to be done all such other acts and things as may be reasonably necessary to make such disposition or dispositions of all or any portion of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at the Assignor's expense.

      7.3 <u>Waiver of Claims</u>. Except as otherwise provided in this Agreement, EACH ASSIGNOR HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE FIRST-LIEN COLLATERAL AGENT'S TAKING POSSESSION OR THE FIRST-LIEN COLLATERAL AGENT'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES, and the Assignor hereby further waives, to the extent permitted by law:

      (i) all damages occasioned by such taking of possession or any such disposition except any damages which are the direct result of the Third-Lien Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision);

      (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Third-Lien Collateral Agent's rights hereunder; and

      (iii) all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any applicable law in order to prevent or

delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and the Assignor, for itself and all who may claim under it, insofar as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws.

Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the Assignor therein and thereto, and shall be a perpetual bar both at law and in equity against the Assignor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through and under the Assignor.

7.4 <u>Application of Proceeds</u>. (a) Subject to the terms of the Intercreditor Agreement, all moneys collected by the Third-Lien Collateral Agent (or, to the extent the Pledge Agreement or any other Security Document requires proceeds of collateral under such other Security Document to be applied in accordance with the provisions of this Agreement, the Pledgee or Third-Lien Collateral Agent under such other Security Document) upon any sale or other disposition of the Collateral, together with all other moneys received by the Third-Lien Collateral Agent hereunder, shall be applied as follows:

(i) <u>first</u>, to the payment of all amounts owing the Third-Lien Collateral Agent of the type described in clauses (iii), (iv) and (v) of the definition of "Obligations";

(ii) <u>second</u>, to the extent proceeds remain after the application pursuant to the preceding clause (i), to the payment of all amounts owing to any Agent of the type described in clauses (v) and (vi) of the definition of "Obligations";

(iii) <u>third</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) and (ii), an amount equal to the outstanding Primary Obligations shall be paid to the Secured Creditors as provided in Section 7.4(e) hereof, with each Secured Creditor receiving an amount equal to its outstanding Primary Obligations or, if the proceeds are insufficient to pay in full all such Primary Obligations, its Pro Rata Share of the amount remaining to be distributed;

(iv) <u>fourth</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) through (iii), inclusive, an amount equal to the outstanding Secondary Obligations shall be paid to the Secured Creditors as provided in Section 7.4(e) hereof, with each Secured Creditor receiving an amount equal to its outstanding Secondary Obligations or, if the proceeds are insufficient to pay in full all such Secondary Obligations, its Pro Rata Share of the amount remaining to be distributed; and

(v) <u>fifth</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) through (iv), inclusive, and following the termination of this Agreement pursuant to Section 10.8(a) hereof, to the Assignor or to whomever may be lawfully entitled to receive such surplus.

(b) For purposes of this Agreement, (x) "<u>Pro Rata Share</u>" shall mean, when calculating a Secured Creditor's portion of any distribution or amount, that amount (expressed as a percentage) equal to a fraction the numerator of which is the then unpaid amount of such Secured Creditor's Primary Obligations or Secondary Obligations, as the case may be, and the

denominator of which is the then outstanding amount of all Primary Obligations or Secondary Obligations, as the case may be, (y) "Primary Obligations" shall mean all principal of, premium, fees and interest on, all Third-Lien Loans and all Fees and (z) "Secondary Obligations" shall mean all Obligations other than Primary Obligations.

(c)     When payments to Secured Creditors are based upon their respective Pro Rata Shares, the amounts received by such Secured Creditors hereunder shall be applied (for purposes of making determinations under this Section 7.4 only) (i) first, to their Primary Obligations and (ii) second, to their Secondary Obligations. If any payment to any Secured Creditor of its Pro Rata Share of any distribution would result in overpayment to such Secured Creditor, such excess amount shall instead be distributed in respect of the unpaid Primary Obligations or Secondary Obligations, as the case may be, of the other Secured Creditors, with each Secured Creditor whose Primary Obligations or Secondary Obligations, as the case may be, have not been paid in full to receive an amount equal to such excess amount multiplied by a fraction the numerator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of such Secured Creditor and the denominator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of all Secured Creditors entitled to such distribution.

(d)     Subject to the terms of the Intercreditor Agreement, all payments required to be made hereunder shall be made to the Administrative Agent for the account of the Secured Parties.

(e)     For purposes of applying payments received in accordance with this Section 7.4, the Third-Lien Collateral Agent shall be entitled to rely upon the Administrative Agent for a determination (which the Administrative Agent agrees (or shall agree) to provide upon request of the Third-Lien Collateral Agent) of the outstanding Primary Obligations and Secondary Obligations owed to the Secured Creditors. Unless it has received written notice from a Secured Creditor to the contrary, the Administrative Agent and each Representative, in furnishing information pursuant to the preceding sentence, and the Third-Lien Collateral Agent, in acting hereunder, shall be entitled to assume that no Secondary Obligations are outstanding.

(f)     It is understood that the Assignor shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

7.5 Remedies Cumulative.  Subject to the terms of (and to the extent not inconsistent with) the Intercreditor Agreement, each and every right, power and remedy hereby specifically given to the Third-Lien Collateral Agent shall be in addition to every other right, power and remedy specifically given to the Third-Lien Collateral Agent under this Agreement, the other Secured Debt Agreements or now or hereafter existing at law, in equity or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Third-Lien Collateral Agent.  All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others.  No delay or omission of the Third-Lien Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be

construed to be a waiver of any Default or Event of Default or an acquiescence thereof. No notice to or demand on the Assignor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Third-Lien Collateral Agent to any other or further action in any circumstances without notice or demand. In the event that the Third-Lien Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Third-Lien Collateral Agent may recover reasonable expenses, including reasonable attorneys' fees, and the amounts thereof shall be included in such judgment.

7.6 Discontinuance of Proceedings. In case the Third-Lien Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Third-Lien Collateral Agent, then and in every such case the Assignor, the Third-Lien Collateral Agent and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Agreement, and all rights, remedies and powers of the Third-Lien Collateral Agent shall continue as if no such proceeding had been instituted.

ARTICLE VIII

INDEMNITY

8.1 Indemnity. (a) The Assignor agrees to indemnify, reimburse and hold the Third-Lien Collateral Agent, each other Secured Creditor and their respective successors, assigns, employees, affiliates and agents (hereinafter in this Section 8.1 referred to individually as "Indemnitee," and collectively as "Indemnitees") harmless from any and all liabilities, obligations, damages, injuries, penalties, claims, demands, actions, suits, judgments and any and all costs, expenses or disbursements (including reasonable attorneys' fees and expenses) (for the purposes of this Section 8.1 the foregoing are collectively called "expenses") of whatsoever kind and nature imposed on, asserted against or incurred by any of the Indemnitees in any way relating to or arising out of this Agreement, any other Secured Debt Agreement or any other document executed in connection herewith or therewith or in any other way connected with the administration of the transactions contemplated hereby or thereby or the enforcement of any of the terms of, or the preservation of any rights under any thereof, or in any way relating to or arising out of the manufacture, ownership, ordering, purchase, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition, or use of the Collateral (including, without limitation, latent or other defects, whether or not discoverable), the violation of the laws of any country, state or other governmental body or unit, any tort (including, without limitation, claims arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any Person (including any Indemnitee), or property damage), or contract claim; provided that no Indemnitee shall be indemnified pursuant to this Section 8.1(a) for losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision). The Assignor agrees that upon written notice by any Indemnitee of the assertion of such a liability, obligation, damage, injury, penalty, claim, demand, action, suit or judgment, the Assignor shall assume full responsibility for the defense

thereof. Each Indemnitee agrees to use its best efforts to promptly notify the Assignor of any such assertion of which such Indemnitee has knowledge.

(b)     Without limiting the application of Section 8.1(a) hereof, the Assignor agrees to pay or reimburse the Third-Lien Collateral Agent for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the Third-Lien Collateral Agent's Liens on, and security interest in, the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, payment or discharge of any taxes or Liens upon or in respect of the Collateral, premiums for insurance with respect to the Collateral and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the Third-Lien Collateral Agent's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

(c)     Without limiting the application of Section 8.1(a) or (b) hereof, the Assignor agrees to pay, indemnify and hold each Indemnitee harmless from and against any loss, costs, damages and expenses which such Indemnitee may suffer, expend or incur in consequence of or growing out of any misrepresentation by the Assignor in this Agreement, any other Secured Debt Agreement or in any writing contemplated by or made or delivered pursuant to or in connection with this Agreement or any other Secured Debt Agreement.

(d)     If and to the extent that the obligations of the Assignor under this Section 8.1 are unenforceable for any reason, the Assignor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law.

8.2     <u>Indemnity Obligations Secured by Collateral; Survival</u>.  Any amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement shall constitute Obligations secured by the Collateral.  The indemnity obligations of the Assignor contained in this Article VIII shall continue in full force and effect notwithstanding the full payment of all of the other Obligations and notwithstanding the full payment of all the Notes issued, and Loans made, under the Third-Lien Credit Agreement and the payment of all other Obligations and notwithstanding the discharge thereof and the occurrence of the Termination Date.

ARTICLE IX

DEFINITIONS

The following terms shall have the meanings herein specified.  Such definitions shall be equally applicable to the singular and plural forms of the terms defined.

"<u>Account</u>" shall mean any "account" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event shall include but shall not be limited to, all rights to payment of any monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of

insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. Without limiting the foregoing, the term "account" shall include all Health-Care-Insurance Receivables.

"Administrative Agent" shall have the meaning provided in the recitals of this Agreement.

"Agreement" shall mean this Security Agreement as the same may be amended, modified, restated and/or supplemented from time to time in accordance with its terms.

"As-Extracted Collateral" shall mean "as-extracted collateral" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Assignor" shall have the meaning provided in the recitals of this Agreement.

"Cash Collateral Account" shall mean a non-interest bearing cash collateral account maintained with, and in the sole dominion and control of, the Third-Lien Collateral Agent for the benefit of the Secured Creditors.

"Chattel Paper" shall mean "chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York. Without limiting the foregoing, the term "Chattel Paper" shall in any event include all Tangible Chattel Paper and all Electronic Chattel Paper.

"Collateral" shall have the meaning provided in Section 1.1(a) of this Agreement.

"Commercial Tort Claims" shall mean "commercial tort claims" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Contract Rights" shall mean all rights of the Assignor under each Contract, including, without limitation, (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"Contracts" shall mean all contracts between the Assignor and one or more additional parties (including, without limitation, any interest rate protection agreements, hedging agreements, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"Copyrights" shall mean any United States or foreign copyright now or hereafter owned by the Assignor, including any registrations of any copyrights, in the United States

Copyright Office or any foreign equivalent office, as well as any application for a copyright registration now or hereafter made with the United States Copyright Office or any foreign equivalent office by the Assignor.

"Credit Document Obligations" shall have the meaning provided in the definition of "Obligations" in this Article IX.

"Deposit Accounts" shall mean all "deposit accounts" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Documents" shall mean "documents" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Domain Names" shall mean all Internet domain names and associated URL addresses in or to which the Assignor now or hereafter has any right, title or interest.

"Electronic Chattel Paper" shall mean "electronic chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Equipment" shall mean any "equipment" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, fixtures and vehicles now or hereafter owned by the Assignor and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Event of Default" shall mean any Event of Default under, and as defined in, the Third-Lien Credit Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"First-Lien Collateral Agent" shall have the meaning provided in the recitals to this Agreement.

"First-Lien Credit Agreement" shall have the meaning provided in the recitals to this Agreement.

"General Intangibles" shall mean "general intangibles" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Goods" shall mean "goods" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Health-Care-Insurance Receivable" shall mean any "health-care-insurance receivable" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Indemnitee" shall have the meaning provided in Section 8.1(a) of this Agreement.

"Instrument" shall mean "instruments" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Intercreditor Agreement" shall have the meaning provided in the recitals to this Agreement.

"Inventory" shall mean merchandise, inventory and goods, and all additions, substitutions and replacements thereof and all accessions thereto, wherever located, together with all goods, supplies, incidentals, packaging materials, labels, materials and any other items used or to be used in manufacturing, processing, packaging or shipping same, in all stages of production from raw materials through work in process to finished goods, and all products and proceeds of whatever sort and wherever located any portion thereof which may be returned, rejected, reclaimed or repossessed by the Third-Lien Collateral Agent from the Assignor's customers, and shall specifically include all "inventory" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Investment Property" shall mean "investment property" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Lenders" shall have the meaning provided in the recitals of this Agreement.

"Letter-of-Credit Rights" shall mean "letter-of-credit rights" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Location" of the Assignor, shall mean the Assignor's "location" as determined pursuant to Section 9-307 of the UCC.

"Marks" shall mean all right, title and interest in and to any trademarks, service marks, trade names, trade dress, logos, fictitious business names, and other business identifiers, including the goodwill of the business of the Assignor associated with each of the foregoing, now held or hereafter acquired by the Assignor, the right to sue for past or future infringement thereof and including any registration or application for registration or renewals thereof of any trademarks and service marks now held or hereafter acquired by the Assignor, which are registered or filed in the United States Patent and Trademark Office or the equivalent thereof in any state of the United States or any equivalent foreign office or agency.

"Material Adverse Effect" shall mean a material adverse effect on the business, property, assets, liabilities (actual or contingent), operations or condition (financial or otherwise) of the Assignor and its Subsidiaries taken as a whole.

"Obligations" shall mean and include, as to the Assignor, all of the following:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, with-

out limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of the Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), fees, costs and indemnities) of the Assignor to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Third-Lien Credit Agreement and the other Credit Documents to which the Assignor is a party (including, without limitation, in the event the Assignor is a Guarantor, all such obligations, liabilities and indebtedness of the Assignor under its Guaranty) and the due performance and compliance by the Assignor with all of the terms, conditions and agreements contained in the Third-Lien Credit Agreement and in such other Credit Documents (all such obligations, liabilities and indebtedness under this clause (i), being herein collectively called the "Credit Document Obligations");

(ii) any and all sums advanced by the Third-Lien Collateral Agent in order to preserve the Collateral or preserve its security interest in the Collateral;

(iii) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities of the Assignor referred to in clause (i) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Third-Lien Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs;

(iv) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 8.1 of this Agreement; and

(v) all amounts owing to any Agent pursuant to any of the Credit Documents in its capacity as such;

it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

"Patents" shall mean any patent in or to which the Assignor now or hereafter has any right, title or interest therein, and any divisions, continuations (including, but not limited to, continuations-in-parts) and improvements thereof, including the right to sue for past or future infringement thereof, as well as any application for a patent now or hereafter made by the Assignor.

"Permits" shall mean, to the extent permitted to be assigned by the terms thereof or by applicable law, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any governmental authority or agency.

"Primary Obligations" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Pro Rata Share" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Proceeds" shall mean all "proceeds" as such term is defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Third-Lien Collateral Agent or the Assignor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to the Assignor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Registered Organization" shall have the meaning provided in the Uniform Commercial Code as in effect in the State of New York.

"Secondary Obligations" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Secured Creditors" shall have the meaning provided in the recitals of this Agreement.

"Secured Debt Agreements" shall mean and include this Agreement and the other Third-Lien Credit Documents.

"Software" shall mean "software" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Supporting Obligations" shall mean any "supporting obligation" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, now or hereafter owned by the Assignor, or in which the Assignor has any rights, and, in any event, shall include, but shall not be limited to all of the Assignor's rights in any Letter-of-Credit Right or secondary obligation that supports the payment or performance of, and all security for, any Account, Chattel Paper, Document, General Intangible, Instrument or Investment Property.

"Tangible Chattel Paper" shall mean "tangible chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Termination Date" shall have the meaning provided in Section 10.8(a) of this Agreement.

"Third-Lien Collateral Agent" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Third-Lien Credit Agreement</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Timber-to-be-Cut</u>" shall mean "timber-to-be-cut" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Trade Secrets</u>" shall mean any secretly held existing engineering or other data, information, production procedures and other know-how relating to the design manufacture, assembly, installation, use, operation, marketing, sale and/or servicing of any products or business of an Assignor worldwide whether written or not.

"<u>Trade Secret Rights</u>" shall mean the rights of an Assignor in any Trade Secret it holds.

"<u>Transmitting Utility</u>" shall have the meaning given such term in Section 9-102(a)(80) of the UCC.

"<u>UCC</u>" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

## ARTICLE X

## MISCELLANEOUS

10.1 <u>Notices</u>.   Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Third-Lien Collateral Agent or the Assignor shall not be effective until received by the Third-Lien Collateral Agent or the Assignor, as the case may be. All notices and other communications shall be in writing and addressed as follows:

(a)      if to the Assignor, c/o:

c/o RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Attention:  General Counsel
Telephone No.:  (609) 734-3811
Telecopier No.:  (609) 734-3830

(b)      if to the Third-Lien Collateral Agent, at:

HSBC Bank USA
Issuer Services
452 Fifth Avenue
New York, New York 10018
Attention: Frank J. Godino
Telephone No.: (212) 525-1316
Telecopier No.: (212) 525-1300

(c)      if to any Secured Creditor (other than the Third-Lien Collateral Agent), at such address as such Secured Creditor shall have specified in the Third-Lien Credit Agreement;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

10.2  <u>Waiver; Amendment</u>. Except as provided in Sections 10.8 and 10.12, subject to the terms of the Intercreditor Agreement (including, without limitation, Section 5.3 thereof), none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by the Assignor directly affected thereby (it being understood that the addition or release of the Assignor hereunder shall not constitute a change, waiver, discharge or termination affecting the Assignor other than the Assignor so added or released) and the Third-Lien Collateral Agent (with the written consent of the Required Secured Creditors).

10.3  <u>Obligations Absolute</u>. Subject to the terms of the Intercreditor Agreement, the obligations of the Assignor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of the Assignor; (b) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Agreement or any other Secured Debt Agreement; or (c) any amendment to or modification of any Secured Debt Agreement or any security for any of the Obligations; whether or not the Assignor shall have notice or knowledge of any of the foregoing.

10.4  <u>Successors and Assigns</u>. This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 10.8, (ii) be binding upon the Assignor, its successors and assigns; <u>provided</u>, <u>however</u>, that no Assignor shall assign any of its rights or obligations hereunder without the prior written consent of the Third-Lien Collateral Agent (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Third-Lien Collateral Agent hereunder, to the benefit of the Third-Lien Collateral Agent, the other Secured Creditors and their respective successors, transferees and assigns. All agreements, statements, representations and warranties made by the Assignor herein or in any certificate or other instrument delivered by the Assignor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

10.5 <u>Headings Descriptive</u>.   The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

10.6 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.</u>    (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH ASSIGNOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH ASSIGNOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK JURISDICTION OVER SUCH ASSIGNOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS JURISDICTION OVER SUCH ASSIGNOR.  EACH ASSIGNOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH ASSIGNOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 10.1 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.    EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE FIRST-LIEN COLLATERAL AGENT UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY ASSIGNOR IN ANY OTHER JURISDICTION.

(b)    EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION,

PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.7 <u>Assignor's Duties</u>. It is expressly agreed, anything herein contained to the contrary notwithstanding, that the Assignor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Third-Lien Collateral Agent shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, nor shall the Third-Lien Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of the Assignor under or with respect to any Collateral.

10.8 <u>Termination; Release</u>. (a) After the Termination Date, this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation in Section 8.1 hereof, shall survive such termination) and the Third-Lien Collateral Agent, at the request and expense of the respective Assignor, will promptly execute and deliver to the Assignor a proper instrument or instruments (including Uniform Commercial Code termination statements on form UCC-3) acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to the Assignor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Third-Lien Collateral Agent and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement. As used in this Agreement, "<u>Termination Date</u>" shall mean the date upon which the Total Commitment under the Third-Lien Credit Agreement has been terminated, no Third-Lien Note under the Third-Lien Credit Agreement is outstanding and all Loans thereunder have been repaid in full and all Obligations then due and payable have been paid in full.

(b) Subject to the terms of the Intercreditor Agreement, in the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (x) at any time prior to the time at which all Credit Document Obligations have been paid in full in connection with a sale or disposition permitted by Section [__] of the Third-Lien Credit Agreement or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section [__] of the Third-Lien Credit Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Third-Lien Credit Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, the Third-Lien Collateral Agent, at the request and expense of the Assignor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to the Assignor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or otherwise disposed of, or released, and as may be in the possession of the Third-Lien Collateral Agent and has not theretofore been released pursuant to this Agreement. Furthermore, upon the release of any Subsidiary Guarantor from the Subsidiaries Guaranty in accordance with the provisions thereof, the Assignor (and the Collateral at such time assigned by the respective Assignor pursuant hereto) shall be released from this Agreement.

(c) At any time that an Assignor desires that the Third-Lien Collateral Agent take any action to acknowledge or give effect to any release of Collateral pursuant to the

foregoing Section 10.8(a) or (b), the Assignor shall deliver to the Third-Lien Collateral Agent a certificate signed by a principal executive officer of the Assignor stating that the release of the respective Collateral is permitted pursuant to such Section 10.8(a) or (b). If reasonably requested by the Third-Lien Collateral Agent (although the Third-Lien Collateral Agent shall have not obligation to make such request), the Assignor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Third-Lien Collateral Agent) to the effect set forth in this Section 10.8(c).

(d)     The Third-Lien Collateral Agent shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Third-Lien Collateral Agent in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 10.8.

10.9 <u>Counterparts</u>. This Agreement may be executed in any number of counter-parts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Assignor and the Third-Lien Collateral Agent.

10.10 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11 <u>The Third-Lien Collateral Agent and the other Secured Creditors</u>. Subject to the terms of the Intercreditor Agreement, the Third-Lien Collateral Agent will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement. It is expressly understood and agreed that the obligations of the Third-Lien Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section [__] of the Third-Lien Credit Agreement. The Third-Lien Collateral Agent shall act hereunder on the terms and conditions set forth herein and in Section 12 of the Third-Lien Credit Agreement.

10.12 <u>Compliance with Laws</u>.  The Assignor agrees to use commercially reasonable efforts, including taking any action which the Third-Lien Collateral Agent and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the Federal Communications Commission (the "<u>FCC</u>") or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Third-Lien Collateral Agent and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

The Assignor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to Third-Lien Collateral Agent and the Secured Creditors as permitted by applicable law.

10.13 <u>Conflicts; Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

RCN CORPORATION, as an Assignor

By: _____
    Name:
    Title:

Accepted and Agreed to:

HSBC BANK USA,
  as Third-Lien Collateral Agent


By: _____
    Name:
    Title:

SCHEDULE OF CHIEF EXECUTIVE OFFICES

<u>Name of Assignor</u>                    <u>Address(es) of Chief Executive Office</u>[1]

---

[1]    List the address of its chief executive office on the date of the Security Agreement and each other location (if any) of its chief executive office in the four calendar months preceding said date.

SCHEDULE OF INVENTORY AND EQUIPMENT LOCATIONS

Assignor                          Location[1]

---

[1]  List each location at which any Inventory or Equipment was located on the date of the Security Agreement or at any time during the preceding four calendar months.

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION),
JURISDICTION OF ORGANIZATION,
LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

| Exact Legal Name of the Assignor | Type of Organization (or, if the Assignor is an Individual, so indicate) | Registered Organization? (Yes/No) | Jurisdiction of Organization | Assignor's Location (for purposes of NY UCC § 9-307) | Assignor's Organization Identification Number (or, if it has none, so indicate) |
|---|---|---|---|---|---|

SCHEDULE OF TRADE AND FICTITIOUS NAMES

Name of                                        Trade and/or
Assignor                                       Fictitious Names

DESCRIPTION OF CERTAIN SIGNIFICANT TRANSACTIONS OCCURRING WITHIN
ONE YEAR PRIOR TO THE DATE OF THE SECURITY AGREEMENT

Name of Assignor

Description of any Transactions as required
by Section 2.8 of the Security Agreement

Schedule of Deposit Accounts

| Name of Assignor | Description of Deposit Account | Account Number | Name of Bank, Address and Contact Information | Jurisdiction of Bank (determined in accordance with UCC § 9-304) |
|---|---|---|---|---|

Form of Control Agreement Regarding Deposit Accounts

       AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, ____], among the undersigned assignor (the "Assignor"), Deutsche Bank AG Cayman Islands Branch, not in its individual capacity but solely as First-Lien Collateral Agent under the First-Lien Security Agreement referred to below (in such capacity, the "First-Lien Collateral Agent"), _____, not in its individual capacity but solely as Second-Lien Collateral Agent under the Second-Lien Security Agreement referred to below (in such capacity, the "Second-Lien Collateral Agent"), HSBC Bank USA, not in its individual capacity but solely as Third-Lien Collateral Agent under the Third-Lien Security Agreement referred to below (in such capacity, the "Third-Lien Collateral Agent"),][1] and [_____] (the "Deposit Account Bank"), as the bank (as defined in Section 9-102 of the UCC as in effect on the date hereof in the State of New York (the "UCC")) with which one or more deposit accounts (as defined in Section 9-102 of the UCC) are maintained by the Assignor (with all such deposit accounts now or at any time in the future maintained by the Assignor with the Deposit Account Bank being herein called the "Deposit Accounts").

W I T N E S S E T H :

       WHEREAS, the Assignor, various other assignors and the First-Lien Collateral Agent have entered into a First-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "First-Lien Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the First-Lien Security Agreement), the Assignor has granted a security interest to the First-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the First-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "First-Lien Collateral");

       WHEREAS, the Assignor, various other assignors and the Second-Lien Collateral Agent have entered into a Second-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Second-Lien Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Second-Lien Security Agreement), the Assignor has granted a

---

[1] Include references to the Third-Lien Collateral Agent and the Third-Lien Security Documents if and only if the Assignor is RCN Corporation.

security interest to the Second-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the Second-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "Second-Lien Collateral");

WHEREAS, the Assignor and the Third-Lien Collateral Agent have entered into a Third-Lien Security Agreement, dated as of December __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Third-Lien Security Agreement" and, together with the First-Lien Security Agreement and the Second-Lien Security Agreement, the "Security Agreements"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Third-Lien Security Agreement), the Assignor has granted a security interest to the Third-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the Third-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "Third-Lien Collateral", and together with the First-Lien Collateral and the Second-Lien Collateral, the "Collateral");

WHEREAS, [RCN Corporation] [the Assignor], the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent have entered into an Intercreditor Agreement, dated as of December __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Intercreditor Agreement"), governing the relative rights and priorities of the Secured Creditors (as defined in each Security Agreement) in respect of the Collateral; and

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Assignor's Dealings with Deposit Accounts; Notice of Exclusive Control. Until the Deposit Account Bank shall have received from the First-Lien Collateral Agent and/or the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent a Notice of Exclusive Control (as defined below), the Assignor shall be entitled to present items drawn on and otherwise to withdraw or direct the disposition of funds from the Deposit Accounts and give instructions in respect of the Deposit Accounts; provided, however, that the Assignor may not, and the Deposit Account Bank agrees that it shall not permit the Assignor to, close any Deposit Account, in any case without the prior written consent of each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent. If the First-Lien Collateral Agent or the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall give to the Deposit Account Bank a notice of the First-Lien Collateral Agent's or the Second-Lien Collateral Agent's or the Third-Lien Collateral Agent's exclusive control of the Deposit Accounts, which notice states that it is a "Notice of Exclusive Control" (a "Notice of Exclusive Control"), only the First-Lien Collateral Agent or the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, shall be entitled to withdraw funds from the Deposit

Accounts, to give any instructions in respect of the Deposit Accounts and any funds held therein or credited thereto or otherwise to deal with the Deposit Accounts.

2.    First-Lien Collateral Agent's, Second-Lien Collateral Agent's and Third-Lien Collateral Agent's Rights to Give Instructions as to Deposit Accounts. (a) Notwithstanding the foregoing or any separate agreement that the Assignor may have with the Deposit Account Bank, each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent shall be entitled, for purposes of this Agreement, at any time to give the Deposit Account Bank instructions as to the withdrawal or disposition of any funds from time to time credited to any Deposit Account, or as to any other matters relating to any Deposit Account or any other Collateral, without further consent from the Assignor or any other Person.  The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank, and the Deposit Account Bank hereby agrees, to comply with any such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent without any further consent from the Assignor or any other Person.  Such instructions may include the giving of stop payment orders for any items being presented to any Deposit Account for payment.  The Deposit Account Bank shall be fully entitled to rely on, and shall comply with, such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent even if such instructions are contrary to any instructions or demands that the Assignor may give to the Deposit Account Bank.  In case of any conflict between instructions received by the Deposit Account Bank from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, on the one hand, and the Assignor, on the other hand, the instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, shall prevail.  In case of any conflict between instructions received by the Deposit Account Bank from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent, the instructions from the First-Lien Collateral Agent shall prevail.

(b)    It is understood and agreed that the Deposit Account Bank's duty to comply with instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent regarding the Deposit Accounts is absolute, and the Deposit Account Bank shall be under no duty or obligation, nor shall it have the authority, to inquire or determine whether or not such instructions are in accordance with the Security Agreements, the Intercreditor Agreement or any other Credit Document (as defined in each of the Security Agreements), nor seek confirmation thereof from the Assignor or any other Person.

3.    Assignor's Exculpation and Indemnification of Depository Bank.    The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank to follow instructions from each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent regarding the Deposit Accounts even if the result of following such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent is that the Deposit Account Bank dishonors items presented for payment from any Deposit Account.  The Assignor further confirms that the Deposit Account Bank shall have no liability to the Assignor for wrongful dishonor of such items in following such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent.  The Deposit Account Bank shall have no duty to inquire or

determine whether the Assignor's obligations to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent are in default or whether the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent is entitled, under any separate agreement between the Assignor and the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, to give any such instructions. The Assignor further agrees to be responsible for the Deposit Account Bank's customary charges and to indemnify the Deposit Account Bank from and to hold the Deposit Account Bank harmless against any loss, cost or expense that the Deposit Account Bank may sustain or incur in acting upon instructions which the Deposit Account Bank believes in good faith to be instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent.

4.    Subordination of Security Interests; Deposit Account Bank's Recourse to Deposit Accounts. The Deposit Account Bank hereby subordinates any claims and security interests it may have against, or with respect to, any Deposit Account at any time established or maintained with it by the Assignor (including any amounts, investments, instruments or other Collateral from time to time on deposit therein) to the security interests of the First-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the First-Lien Security Agreement), the Second-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Second-Lien Security Agreement) and the Third-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Third-Lien Security Agreement), and agrees that no amounts shall be charged by it to, or withheld or set-off or otherwise recouped by it from, any Deposit Account of the Assignor or any amounts, investments, instruments or other Collateral from time to time on deposit therein; provided that the Deposit Account Bank may, however, from time to time debit the Deposit Accounts for any of its customary charges in maintaining the Deposit Accounts or for reimbursement for the reversal of any provisional credits granted by the Deposit Account Bank to any Deposit Account, to the extent, in each case, that the Assignor has not separately paid or reimbursed the Deposit Account Bank therefor.

5.    Representations, Warranties and Covenants of Deposit Account Bank. The Deposit Account Bank represents and warrants to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the and the Second-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Second-Lien Security Agreement) and hereby agrees that:

(a)    The Deposit Account Bank constitutes a "bank" (as defined in Section 9-102 of the UCC), that the jurisdiction (determined in accordance with Section 9-304 of the UCC) of the Deposit Account Bank for purposes of each Deposit Account maintained by the Assignor with the Deposit Account Bank is _____.

(b)    The Deposit Account Bank shall not permit the Assignor to establish any demand, time, savings, passbook or other account with it which does not constitute a "deposit account" (as defined in Section 9-102 of the UCC).

(c)     The Deposit Account Bank will not, without the prior written consent of each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent, amend any account agreement between it and the Assignor governing any Deposit Account so that the Deposit Account Bank's jurisdiction for purposes of Section 9-304 of the UCC is other than the jurisdiction specified in the preceding clause (a).  All account agreements in respect of each Deposit Account in existence on the date hereof are listed on Annex F hereto and copies of all such account agreements have been furnished to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent.  The Deposit Account Bank will promptly furnish to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent a copy of the account agreement for each Deposit Account hereafter established by the Deposit Account Bank for the Assignor.

(d)     The Deposit Account Bank has not entered and will not enter, into any agreement with any other Person by which the Deposit Account Bank is obligated to comply with instructions from such other Person as to the disposition of funds from any Deposit Account or other dealings with any Deposit Account or other of the Collateral.

(e)     On the date hereof, the Deposit Account Bank maintains no Deposit Accounts for the Assignor other than the Deposit Accounts specifically identified in Annex F hereto.

(f)     Any items or funds received by the Deposit Account Bank for the Assignor's account will be credited to said Deposit Accounts specified in paragraph (e) above or to any other Deposit Accounts hereafter established by the Deposit Account Bank for the Assignor in accordance with this Agreement.

(g)     The Deposit Account Bank will promptly notify the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent of each Deposit Account hereafter established by the Deposit Account Bank for the Assignor (which notice shall specify the account number of such Deposit Account and the location at which the Deposit Account is maintained), and each such new Deposit Account shall be subject to the terms of this Agreement in all respects.

6.     Deposit Account Statements and Information.  The Deposit Account Bank agrees, and is hereby authorized and instructed by the Assignor, to furnish to each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent, and the Third-Lien Collateral Agent, at its address indicated below, copies of all account statements and other information relating to each Deposit Account that the Deposit Account Bank sends to the Assignor and to disclose to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent all information requested by the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, regarding any Deposit Account.

7.     Conflicting Agreements.  This Agreement shall have control over any conflicting agreement between the Deposit Account Bank and the Assignor.

8.     <u>Merger or Consolidation of Deposit Account Bank</u>.  Without the execution or filing of any paper or any further act on the part of any of the parties hereto, any bank into which the Deposit Account Bank may be merged or with which it may be consolidated, or any bank resulting from any merger to which the Deposit Account Bank shall be a party, shall be the successor of the Deposit Account Bank hereunder and shall be bound by all provisions hereof which are binding upon the Deposit Account Bank and shall be deemed to affirm as to itself all representations and warranties of the Deposit Account Bank contained herein.

9.     <u>Notices</u>.  (a) All notices and other communications provided for in this Agreement shall be in writing (including facsimile) and sent to the intended recipient at its address or telex or facsimile number set forth below:

<u>If to the First-Lien Collateral Agent, at</u>:

60 Wall Street
New York, New York 10005
Attention: _____
Telephone: _____
Facsimile: _____

<u>If to the Second-Lien Collateral Agent, at</u>:

_____
_____
Attention: _____
Telephone: _____
Facsimile: _____

<u>If to the Third-Lien Collateral Agent, at</u>:

HSBC Bank USA
Issuer Services
452 Fifth Avenue
New York, New York 10018
Attention:  Frank J. Godino
Telephone:  (212) 525-1316
Facsimile.:  (212) 525-1300

<u>If to the Assignor, at</u>:

C/o RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Attention: General Counsel
Telephone: (609) 734-3811
Facsimile: (609) 734-3830

If to the Deposit Account Bank, at:

_____

_____

_____

or, as to any party, to such other address or telex or facsimile number as such party may designate from time to time by notice to the other parties.

(b)     Except as otherwise provided herein, all notices and other communications hereunder shall be delivered by hand or by commercial overnight courier (delivery charges prepaid), or mailed, postage prepaid, or telexed or faxed, addressed as aforesaid, and shall be effective (i) three business days after being deposited in the mail (if mailed), (ii) when delivered (if delivered by hand or courier) and (iii) or when transmitted with receipt confirmed (if telexed or faxed); provided that notices to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall not be effective until actually received by it.

10.     Amendment.     This Agreement may not be amended, modified or supplemented except in writing executed and delivered by all the parties hereto.

11.     Binding Agreement.     This Agreement shall bind the parties hereto and their successors and assign and shall inure to the benefit of the parties hereto and their successors and assigns.  Without limiting the provisions of the immediately preceding sentence, the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent may at any time or from time to time designate in writing to the Deposit Account Bank a successor First-Lien Collateral Agent, Second-Lien Collateral Agent or Third-Lien Collateral Agent, as the case may be (at such time, if any, as such entity becomes the "First-Lien Collateral Agent" under the First-Lien Security Agreement, the "Second-Lien Collateral Agent" under the Second-Lien Security Agreement or the "Third-Lien Collateral Agent" under the Third-Lien Security Agreement, or at any time thereafter), and such successor shall thereafter succeed to the rights of the existing First-Lien Collateral Agent, Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be,  hereunder and shall be entitled to all of the rights and benefits provided hereunder.

12.     Continuing Obligations.     The rights and powers granted herein to each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent have been granted in order to protect and further perfect its security interests in the Deposit Accounts and other relevant Collateral and are powers coupled with an interest and will be affected neither by any purported revocation by the Assignor of this Agreement or the rights granted to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent hereunder or by the bankruptcy, insolvency, conservatorship or receivership of the Assignor, the Deposit Account Bank, the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent or by the lapse of time.  The rights of the First-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other First-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the First-Lien Collateral Agent in the Deposit

Accounts and such other First-Lien Collateral have been terminated and the First-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing. The rights of the Second-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other Second-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the Second-Lien Collateral Agent in the Deposit Accounts and such other Second-Lien Collateral have been terminated and the Second-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing. The rights of the Third-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other Third-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the Third-Lien Collateral Agent in the Deposit Accounts and such other Third-Lien Collateral have been terminated and the Third-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing.

13. <u>Compliance with Intercreditor Agreement</u>. The First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent hereby acknowledge and agree as between themselves that, notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Second-Lien Collateral Agent or the Third-Lien Collateral Agent hereunder (including, without limitation, its right to deliver a Notice of Exclusive Control or any other instruction to the Deposit Account Bank and to withdraw funds from a Deposit Account) is subject to the provisions of the Intercreditor Agreement.

14 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

15. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

Assignor:

[NAME OF ASSIGNOR]


By:_____
    Name:
    Title:


First-Lien Collateral Agent:

DEUTSCHE BANK AG CAYMAN ISLANDS
    BRANCH


By:_____
    Name:
    Title:


Second-Lien Collateral Agent:

[_____]


By:_____
    Name:
    Title: Authorized Officer


Third-Lien Collateral Agent:

HSBC BANK USA


By:_____
    Name:
    Title:


Deposit Account Bank:

[NAME OF DEPOSIT ACCOUNT BANK]


By:_____
    Name:
    Title:

DESCRIPTION OF COMMERCIAL TORT CLAIMS

Name of Assignor                    Description of Commercial Tort Claims

SCHEDULE OF MARKS AND APPLICATIONS;
INTERNET DOMAIN NAME REGISTRATIONS

**1.     Marks and Applications:**

| Marks | Country | Registration No. |
|-------|---------|------------------|

**2.     Internet Domain Name Registrations:**

| Internet Domain Names | Country | Registration No. (or other applicable identifier) |
|-----------------------|---------|--------------------------------------------------|

<u>SCHEDULE OF PATENTS</u>

SCHEDULE OF COPYRIGHTS

| NUMBERS REGISTRATION | PUBLICATION DATE | COPYRIGHT TITLE |
|---|---|---|

GRANT OF SECURITY INTEREST
IN UNITED STATES TRADEMARKS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, RCN Corporation, a Delaware corporation (the "Grantor") with principal offices at 105 Carnegie Center, Princeton, New Jersey 08540, hereby grants to HSBC Bank USA, as Third-Lien Collateral Agent, with principal offices at 452 Fifth Avenue, New York, New York 10018, (the "Grantee"), a security interest in (i) all of the Grantor's right, title and interest in and to the United States trademarks, trademark registrations and trademark applications (the "Marks") set forth on Schedule A attached hereto, (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Marks, (iii) the goodwill of the businesses with which the Marks are associated and (iv) all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Marks acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this

Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the ____ day of _____, 2004.

RCN CORPORATION, Grantor

By_____
   Name:
   Title:

HSBC BANK USA, as Third-Lien Collateral Agent and Grantee

By_____
   Name:
   Title:

STATE OF _____ )
                                 ) ss.:
COUNTY OF _____ )

On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows: that [s]he is _____ of RCN Corporation, that [s]he is authorized to execute the foregoing Grant on behalf of said corporation and that [s]he did so by authority of the [Board of Directors] of said corporation.

_____
Notary Public

STATE OF NEW YORK    )
                              ) ss:
COUNTY OF NEW YORK  )


        On this _____ day of _____, 2004, before me personally came _____

_____ who, being by me duly sworn, did state as follows: that [s]he is

_____ of HSBC Bank USA, that [s]he is authorized to execute the foregoing

Grant on behalf of said banking corporation and that [s]he did so by authority of the Board of

Directors of said banking corporation.


                                              _____
                                                 Notary Public

| MARK | REG. NO. | REG. DATE |
| --- | --- | --- |

GRANT OF SECURITY INTEREST
IN UNITED STATES PATENTS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, RCN Corporation, a Delaware corporation (the "Grantor") with principal offices at 105 Carnegie Center, Princeton, New Jersey 08540, hereby grants to HSBC Bank USA, as Third-Lien Collateral Agent, with principal offices at 452 Fifth Avenue, New York, New York 10018, (the "Grantee"), a security interest in (i) all of the Grantor's rights, title and interest in and to the United States patents (the "Patents") set forth on Schedule A attached hereto, in each case together with (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Patents, and (iii) all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Patents acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement.  The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference.  In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the ____ day of _____, 2004.

RCN CORPORATION, Grantor


By_____
   Name:
   Title:


HSBC BANK USA, as Third-Lien Collateral Agent
  and Grantee


By_____
   Name:
   Title:

STATE OF _____ )

                          ) ss:

COUNTY OF_____)


        On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows: that [s]he is _____ of RCN Corporation, that [s]he is authorized to execute the foregoing Grant on behalf of said corporation and that [s]he did so by authority of the Board of Directors of said corporation.


                                      _____

                                          Notary Public

STATE OF NEW YORK )
                            ) ss:
COUNTY OF NEW YORK )

        On this _____ day of _____, 2004, before me personally came _____

_____ who, being by me duly sworn, did state as follows:  that [s]he is

_____ of HSBC Bank USA, that [s]he is authorized to execute the foregoing

Grant on behalf of said banking corporation.

                                          _____
                                                    Notary Public

| PATENT | PATENT NO. | ISSUE DATE |
| --- | --- | --- |

GRANT OF SECURITY INTEREST
IN UNITED STATES COPYRIGHTS


WHEREAS, RCN Corporation, a Delaware corporation (the "Grantor"), having its chief executive office at 105 Carnegie Center, Princeton, New Jersey 08540, is the owner of all right, title and interest in and to the United States copyrights and associated United States copyright registrations and applications for registration set forth in Schedule A attached hereto;

WHEREAS, HSBC Bank USA, as Third-Lien Collateral Agent, having its principal offices at 452 Fifth Avenue, New York, New York 10018 (the "Grantee"), desires to acquire a security interest in said copyrights and copyright registrations and applications therefor; and

WHEREAS, the Grantor is willing to grant to the Grantee a security interest in and lien upon the copyrights and copyright registrations and applications therefor described above.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions of the Security Agreement, dated as of December __, 2004, made by the Grantor, the other assignors from time to time party thereto and the Grantee (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"), the Grantor hereby assigns to the Grantee as collateral security, and grants to the Grantee a security interest in, the copyrights and copyright registrations and applications therefor set forth in Schedule A attached hereto.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the

\_\_\_\_ day of _____, 2004.

RCN CORPORATION, Grantor


By_____
  Name:
  Title:


HSBC BANK USA, as Third-Lien Collateral Agent
  and Grantee


By_____
  Name:
  Title:

STATE OF                  )

                                      ) ss:

COUNTY OF             )

On this __ day of _____, ____, before me personally came _____

_____, who being duly sworn, did depose and say that [s]he is

_____ of RCN Corporation, that [s]he is authorized to execute the foregoing

Grant on behalf of said corporation and that [s]he did so by authority of the Board of Directors of

said corporation.


_____
Notary Public

STATE OF NEW YORK     )
                          ) ss.:
COUNTY OF NEW YORK  )

        On this ____ day of _____, 2004, before me personally came _____

_____ who, being by me duly sworn, did state as follows:  that [s]he is

_____ of HSBC Bank USA, that [s]he is authorized to execute the foregoing

Grant on behalf of said banking corporation.

                                  _____
                                       Notary Public

# TABLE OF CONTENTS

ARTICLE I SECURITY INTERESTS ........................................................................2

    1.1 Grant of Security Interests ........................................................................2
    1.2 Power of Attorney..................................................................................4

ARTICLE II GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS ..........4

    2.1 Necessary Filings...................................................................................4
    2.2 No Liens...............................................................................................5
    2.3 Other Financing Statements ....................................................................5
    2.4 Chief Executive Office, Record Locations .................................................5
    2.5 Location of Inventory and Equipment .......................................................5
    2.6 Legal Names; Type of Organization (and Whether a Registered Organization);
        Jurisdiction of Organization; Location; Organizational Identification
        Numbers; Changes Thereto; etc................................................................5
    2.7 Trade Names; Etc. ..................................................................................6
    2.8 Certain Significant Transactions. ..............................................................6
    2.9 Non-UCC Property ................................................................................6
    2.10 As-Extracted Collateral; Timber-to-be-Cut ..............................................7
    2.11 Collateral in the Possession of a Bailee ...................................................7
    2.12 Recourse .............................................................................................7

ARTICLE III SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT
    RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER
    COLLATERAL.................................................................................................7

    3.1 Additional Representations and Warranties.................................................7
    3.2 Maintenance of Records..........................................................................8
    3.3 Direction to Account Debtors; Contracting Parties; etc. ...............................8
    3.4 Modification of Terms; etc.......................................................................9
    3.5 Collection .............................................................................................9
    3.6 Instruments ...........................................................................................9
    3.7 Assignor Remains Liable Under Accounts .................................................9
    3.8 Assignor Remains Liable Under Contracts................................................10
    3.9 Deposit Accounts; Etc. .........................................................................10
    3.10 Letter-of-Credit Rights........................................................................11
    3.11 Commercial Tort Claims ......................................................................11
    3.12 Chattel Paper .....................................................................................11
    3.13 Further Actions ...................................................................................11

ARTICLE IV SPECIAL PROVISIONS CONCERNING TRADEMARKS AND
    DOMAIN NAMES.........................................................................................12

    4.1 Additional Representations and Warranties...............................................12

4.2 Licenses and Assignments .................................................................................12
4.3 Infringements.................................................................................................12
4.4 Preservation of Marks and Domain Names .......................................................13
4.5 Maintenance of Registration ..........................................................................13
4.6 Future Registered Marks and Domain Names ..................................................13
4.7 Remedies ......................................................................................................13

ARTICLE V SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND
TRADE SECRETS.......................................................................................................14
5.1 Additional Representations and Warranties......................................................14
5.2 Licenses and Assignments .............................................................................14
5.3 Infringements.................................................................................................14
5.4 Maintenance of Patents or Copyrights.............................................................15
5.5 Prosecution of Patent Applications..................................................................15
5.6 Other Patents and Copyrights.........................................................................15
5.7 Remedies ......................................................................................................15

ARTICLE VI PROVISIONS CONCERNING ALL COLLATERAL......................................15
6.1 Protection of Third-Lien Collateral Agent's Security ........................................15
6.2 Warehouse Receipts Non-Negotiable ..............................................................16
6.3 Additional Information. ...................................................................................16
6.4 Further Actions ..............................................................................................16
6.5 Financing Statements .....................................................................................16

ARTICLE VII REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT ..............17
7.1 Remedies; Obtaining the Collateral Upon Default............................................17
7.2 Remedies; Disposition of the Collateral ..........................................................18
7.3 Waiver of Claims............................................................................................19
7.4 Application of Proceeds...................................................................................20
7.5 Remedies Cumulative .....................................................................................21
7.6 Discontinuance of Proceedings .......................................................................22

ARTICLE VIII INDEMNITY ........................................................................................22
8.1 Indemnity ......................................................................................................22
8.2 Indemnity Obligations Secured by Collateral; Survival ....................................23

ARTICLE IX DEFINITIONS ........................................................................................23

ARTICLE X MISCELLANEOUS ..................................................................................29
10.1 Notices ........................................................................................................29
10.2 Waiver; Amendment......................................................................................30
10.3 Obligations Absolute .....................................................................................30
10.4 Successors and Assigns..................................................................................30
10.5 Headings Descriptive ....................................................................................31

10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
        WAIVER OF JURY TRIAL. .............................................................31
10.7 Assignor's Duties..........................................................................32
10.8 Termination; Release .....................................................................32
10.9 Counterparts .................................................................................33
10.10 Severability..................................................................................33
10.11 The Third-Lien Collateral Agent and the other Secured Creditors .......................33
10.12 Compliance with Laws..................................................................34
10.13 Conflicts; Intercreditor Agreement ...............................................34

| | |
|---|---|
| ANNEX A | Schedule of Chief Executive Offices Address(es) of Chief Executive Office |
| ANNEX B | Schedule of Inventory and Equipment Locations |
| ANNEX C | Schedule of Legal Names, Type of Organization (and Whether a Registered Organization), Jurisdiction of Organization, Location and Organizational Identification Numbers |
| ANNEX D | Schedule of Trade and Fictitious Names |
| ANNEX E | Description of Certain Significant Transactions Occurring Within One Year Prior to the Date of the Security Agreement |
| ANNEX F | Schedule of Deposit Accounts |
| ANNEX G | Form of Control Agreement Regarding Deposit Accounts |
| ANNEX H | Schedule of Commercial Tort Claims |
| ANNEX I | Schedule of Marks and Applications; Internet Domain Name Registrations |
| ANNEX J | Schedule of Patents |
| ANNEX K | Schedule of Copyrights |
| ANNEX L | Grant of Security Interest in United States Trademarks |
| ANNEX M | Grant of Security Interest in United States Patents |
| ANNEX N | Grant of Security Interest in United States Copyrights |

**[Remainder of this page intentionally left blank]**

## I.    Financial Covenants

(a)    <u>Maximum Capital Expenditures</u>.  The Company will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures, except that during any fiscal year of the Company set forth below (taken as one accounting period) (it being understood and agreed that for purposes of this clause (c) only, the period from the Effective Date through December 31, 2004 shall be deemed to be part of the fiscal year ending on December 31, 2005), the Company and its Subsidiaries may make Capital Expenditures so long as the aggregate amount of all such Capital Expenditures does not exceed in any fiscal year of the Company set forth below the amount set forth opposite such fiscal year below:

| Fiscal Year Ending On | Amount |
|---|---|
| December 31, 2005 | $[_____] |
| December 31, 2006 | $[_____] |
| December 31, 2007 and thereafter | $[_____] |

      (i)    In addition to the foregoing, the Company and its Subsidiaries may make Capital Expenditures with the amount of Excess Proceeds received by the Company or any of its Subsidiaries from any Asset Sale so long as such Excess Proceeds are reinvested within 365 days following the date of such Asset Sale, but only to the extent that such Excess Proceeds are not otherwise required to be applied to repay Term Loans pursuant to Section 2.10(c).

      (ii)    In addition to the foregoing, the Company and its Wholly-Owned Domestic Restricted Subsidiaries may consummate (x) Permitted Acquisitions in accordance with the requirements of [Section 8.17] and (y) the Starpower Acquisition in accordance with the provisions of [Section 9.02(xv)].

(b)    <u>Consolidated Interest Coverage Ratio</u>.  The Company will not permit the Consolidated Interest Coverage Ratio for any Test Period ending on the last day of a fiscal quarter of the Company set forth below to be less than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2005 | ___:1.00 |
| June 30, 2005 | ___:1.00 |
| September 30, 2005 | ___:1.00 |
| December 31, 2005 | ___:1.00 |
| March 31, 2006 | ___:1.00 |
| June 30, 2006 | ___:1.00 |
| September 30, 2006 | ___:1.00 |

| Fiscal Quarter Ended | Ratio |
|---|---|
| December 31, 2006 | ___:1.00 |
| | |
| March 31, 2007 | ___:1.00 |
| June 30, 2007 | ___:1.00 |
| September 30, 2007 | ___:1.00 |
| December 31, 2007 and thereafter | ___:1.00] |

(c)     Minimum Consolidated EBITDA.  The Company will not permit Consolidated EBITDA for any Test Period ending on the last day of a fiscal quarter of the Company set forth below to be less than the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter Ended | Amount |
|---|---|
| March 31, 2005 | $[_____] |
| June 30, 2005 | $[_____] |
| September 30, 2005 | $[_____] |
| December 31, 2005 | $[_____] |
| | |
| March 31, 2006 | $[_____] |
| June 30, 2006 | $[_____] |
| September 30, 2006 | $[_____] |
| December 31, 2006 | $[_____] |
| | |
| March 31, 2007 | $[_____] |
| June 30, 2007 | $[_____] |
| September 30, 2007 | $[_____] |
| December 31, 2007 | $[_____] |
| | |
| March 31, 2008 | $[_____] |
| June 30, 2008 | $[_____] |
| September 30, 2008 | $[_____] |
| December 31, 2008 | $[_____] |
| | |
| March 31, 2009 | $[_____] |
| June 30, 2009 | $[_____] |
| September 30, 2009 | $[_____] |
| December 31, 2009 | $[_____] |
| | |
| March 31, 2010 | $[_____] |
| June 30, 2010 | $[_____] |
| September 30, 2010 | $[_____] |
| December 31, 2010 | $[_____] |
| | |
| March 31, 2011 | $[_____] |
| June 30, 2011 | $[_____] |
| September 30, 2011 | $[_____] |

| Fiscal Quarter Ended | Amount |
|---|---|
| December 31, 2011 | $[_____] |

(d)　　Total Leverage Ratio.  The Company will not permit the Total Leverage Ratio at any time during a period set forth below to be greater than the ratio set forth opposite such period below:

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2005 | ___:1.00 |
| June 30, 2005 | ___:1.00 |
| September 30, 2005 | ___:1.00 |
| December 31, 2005 | ___:1.00 |
| March 31, 2006 | ___:1.00 |
| June 30, 2006 | ___:1.00 |
| September 30, 2006 | ___:1.00 |
| December 31, 2006 | ___:1.00 |
| March 31, 2007 | ___:1.00 |
| June 30, 2007 | ___:1.00 |
| September 30, 2007 | ___:1.00 |
| December 31, 2007 | ___:1.00 |
| March 31, 2008 | ___:1.00 |
| June 30, 2008 | ___:1.00 |
| September 30, 2008 | ___:1.00 |
| December 31, 2008 | ___:1.00 |
| March 31, 2009 | ___:1.00 |
| June 30, 2009 | ___:1.00 |
| September 30, 2009 | ___:1.00 |
| December 31, 2009 and thereafter | ___1.00 |

(e)　　Adjusted Leverage Ratio.  The Company will not permit the Adjusted Leverage Ratio at any time during a period set forth below to be greater than the ratio set forth opposite such period below:

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2005 | ___:1.00 |
| June 30, 2005 | ___:1.00 |
| September 30, 2005 | ___:1.00 |
| December 31, 2005 | ___:1.00 |
| March 31, 2006 | ___:1.00 |
| June 30, 2006 | ___:1.00 |

| Fiscal Quarter Ended | Ratio |
|---|---|
| September 30, 2006 | ___:1.00 |
| December 31, 2006 | ___:1.00 |
| | |
| March 31, 2007 | ___:1.00 |
| June 30, 2007 | ___:1.00 |
| September 30, 2007 | ___:1.00 |
| December 31, 2007 | ___:1.00 |
| | |
| March 31, 2008 | ___:1.00 |
| June 30, 2008 | ___:1.00 |
| September 30, 2008 | ___:1.00 |
| December 31, 2008 | ___:1.00 |
| | |
| March 31, 2009 | ___:1.00 |
| June 30, 2009 | ___:1.00 |
| September 30, 2009 | ___:1.00 |
| December 31, 2009 and thereafter | ___:1.00 |

(f)     Minimum Cash on Hand.  The Company will not permit Unrestricted cash and Cash Equivalents on hand at any time [during a period set forth below] to be less than [$[_____.]/the amount set forth opposite such period below:]

II.     Events of Default

(a)     [(i) The Company or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required but determined only after giving effect to any applicable grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of the Company or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or an Event of Default under this section unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least $_____.]

**EXHIBIT F**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**DEUTSCHE BANK EXIT FACILITY**



FIRST-LIEN CREDIT AGREEMENT

among

RCN CORPORATION,

VARIOUS LENDERS

and

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH,
as ADMINISTRATIVE AGENT

_____

Dated as of _____ __, 2004
_____

DEUTSCHE BANK SECURITIES INC.,
as SOLE LEAD ARRANGER and SOLE BOOK MANAGER,

[                    ], as Syndication Agent

and

[                    ], as Documentation Agent

 Deutsche Bank

FIRST-LIEN CREDIT AGREEMENT, dated as of _____ __, 2004, among RCN CORPORATION, a Delaware corporation (the "Borrower"), the Lenders party hereto from time to time, and DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH, as Administrative Agent (in such capacity, the "Administrative Agent"). All capitalized terms used herein and defined in Section 11 are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the respective credit facilities provided for herein;

NOW, THEREFORE, IT IS AGREED:

SECTION 1.   Amount and Terms of Credit.

1.01   The Commitments.  Subject to and upon the terms and conditions set forth herein, each Lender with a Term Loan Commitment severally agrees to make a term loan or term loans (each a "Term Loan" and, collectively, the "Term Loans") to the Borrower in an amount equal to such Lender's Term Loan Percentage, which Term Loans (i) shall be incurred pursuant to a single drawing on the Initial Borrowing Date, (ii) shall be denominated in Dollars, (iii) except as hereinafter provided, shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or Eurodollar Loans, provided that (A) except as otherwise specifically provided in Section 1.10(b), all Term Loans comprising the same Borrowing shall at all times be of the same Type, and (B) unless either the Administrative Agent otherwise agrees in its sole discretion or has determined that the Syndication Date has occurred (at which time this clause (B) shall no longer be applicable), prior to the 90th day following the Initial Borrowing Date, Term Loans may only be incurred and maintained as, and/or converted into, Eurodollar Loans so long as all such outstanding Eurodollar Loans are subject to an Interest Period of one month which begins and ends on the same day with the first such Interest Period to begin no sooner than three Business Days after the Initial Borrowing Date, and (iv) shall be made by each such Lender in that aggregate principal amount which does not exceed the Term Loan Commitment of such Lender on the Initial Borrowing Date.  Once repaid, Term Loans incurred hereunder may not be reborrowed.

1.02   Minimum Amount of Borrowing.  The aggregate principal amount of each Borrowing of Term Loans shall not be less than the Minimum Borrowing Amount.  More than one Borrowing may occur on the same date, but at no time shall there be outstanding more than ten Borrowings of Eurodollar Loans.

1.03   Notice of Borrowing.  (a) Whenever the Borrower desires to incur (x) Eurodollar Loans hereunder, it shall give the Administrative Agent at the Notice Office at least three Business Days' prior notice of each Eurodollar Loan to be incurred hereunder and (y) Base Rate Loans hereunder, it shall give the Administrative Agent at the Notice Office at least one Business Day's prior notice of each Base Rate Loan to be incurred hereunder, provided that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 12:00 Noon (New York time) on such day.  Each such notice (each a "Notice of Borrow-

ing"), except as otherwise expressly provided in Section 1.10, shall be irrevocable and shall be in writing, or by telephone promptly confirmed in writing, in the form of Exhibit A-1, appropriately completed to specify: (i) the aggregate principal amount of the Term Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), and (iii) whether the Term Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Eurodollar Loans and, if Eurodollar Loans, the initial Interest Period to be applicable thereto. The Administrative Agent shall promptly give each Lender which is required to make Term Loans notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b)     Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice of any Borrowing or prepayment of Term Loans, the Administrative Agent may act without liability upon the basis of telephonic notice of such Borrowing or prepayment, as the case may be, believed by the Administrative Agent in good faith to be from an Authorized Representative of the Borrower. In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such tele-phonic notice of such Borrowing or prepayment of Term Loans, as the case may be, absent manifest error.

1.04     Disbursement of Funds. On the Initial Borrowing Date, each Lender with a Term Loan Commitment will make available its pro rata portion (determined in accordance with Section 1.07) of the Total Term Loan Commitment. All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the Borrower at the Payment Office the aggregate of the amounts so made available by the Lenders. Unless the Administrative Agent shall have been notified by any Lender prior to the Initial Borrowing Date that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on the Initial Borrowing Date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on the Initial Borrowing Date and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Term Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 1.08. Nothing in this Section 1.04 shall be deemed to relieve any Lender from its obligation to make Term Loans hereunder or to prejudice any rights which the

Borrower may have against any Lender as a result of any failure by such Lender to make Term Loans hereunder.

               1.05    Term Notes.  (a)  The Borrower's obligation to pay the principal of, and interest on, the Term Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 13.15 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity here-with (each a "Term Note" and, collectively, the "Term Notes").

               (b)     The Term Note issued to each Lender that has a Term Loan Commitment or outstanding Term Loans shall (i) be executed by the Borrower, (ii) be payable to such Lender or its registered assigns and be dated the Initial Borrowing Date (or, if issued after the Initial Borrowing Date, be dated the date of issuance thereof), (iii) be in a stated principal amount equal to the Term Loans made by such Lender on the Initial Borrowing Date (or, if issued after the Initial Borrowing Date, be in a stated principal amount equal to the outstanding Term Loans of such Lender at such time) and be payable in the outstanding principal amount of Term Loans evidenced thereby, (iv) mature on the Final Maturity Date, (v) bear interest as provided in the appropriate clause of Section 1.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 4.01, and mandatory repayment as provided in Section 4.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

               (c)     Each Lender will note on its internal records the amount of each Term Loan made by it and each payment in respect thereof and prior to any transfer of any of its Term Notes will endorse on the reverse side thereof the outstanding principal amount of Term Loans evidenced thereby.  Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Term Loans.

               (d)     Notwithstanding anything to the contrary contained above in this Section 1.05 or elsewhere in this Agreement, Term Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Term Notes.  No failure of any Lender to request or obtain a Term Note evidencing its Term Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Term Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Term Note evidencing its outstanding Term Loans shall in no event be required to make the notations otherwise described in preceding clause (e).  At any time when any Lender requests the delivery of a Term Note to evidence any of its Term Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Term Note in the appropriate amount or amounts to evidence such Term Loans.

               1.06    Conversions.  The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Term Loans into a Borrowing of another Type of Term Loan, provided that, (i) except as otherwise provided in Section 1.10(b), Eurodollar Loans may be converted into

Base Rate Loans only on the last day of an Interest Period applicable to the Term Loans being converted and no such partial conversion of Eurodollar Loans shall reduce the outstanding principal amount of such Eurodollar Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into Eurodollar Loans if no Default or Event of Default is in existence on the date of the conversion, (iii) unless the Administrative Agent otherwise agrees in its sole discretion or has determined that the Syndication Date has occurred (at which time this clause (iii) shall no longer be applicable), prior to the 90th day following the Initial Borrowing Date, conversions of Base Rate Loans into Eurodollar Loans shall be subject to the provisions of clause (B) of the proviso in Section 1.01(iii), and (iv) no conversion pursuant to this Section 1.06 shall result in a greater number of Borrowings of Eurodollar Loans than is permitted under Section 1.02. Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 12:00 Noon (New York time) at least three Business Days' prior notice (each a "Notice of Conversion/Continuation") in the form of Exhibit A-2, appropriately completed to specify the Term Loans to be so converted, the Borrowing or Borrowings pursuant to which such Term Loans were incurred and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Term Loans. Upon any such conversion the proceeds thereof will be deemed to be applied directly on the day of such conversion to prepay the outstanding principal amount of the Term Loans being converted.

1.07    Pro Rata Borrowings. All Borrowings of Term Loans under this Agreement shall be incurred from the Lenders pro rata on the basis of their Term Loan Commitments. It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Term Loans hereunder and that each Lender shall be obligated to make the Term Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Term Loans hereunder.

1.08    Interest. (a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to Section 1.06 or 1.09, as applicable, at a rate per annum which shall be equal to the sum of the Applicable Margin plus the Base Rate each as in effect from time to time.

(b)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Eurodollar Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to Section 1.06, 1.09 or 1.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Applicable Margin as in effect from time to time during such Interest Period plus the Eurodollar Rate for such Interest Period.

(c)    Overdue principal and, to the extent permitted by law, overdue interest in respect of each Term Loan shall, in each case, bear interest at a rate per annum equal to the greater of (x) the rate which is 2% in excess of the rate then borne by such Term Loans and (y)

the rate which is 2% in excess of the rate otherwise applicable to Term Loans that are maintained at Base Rate Loans from time to time, and all other overdue amounts payable hereunder and under any other Credit Document shall bear interest at a rate per annum equal to the rate which is 2% in excess of the rate otherwise applicable to Term Loans that are maintained as Base Rate Loans from time to time.  Interest that accrues under this Section 1.08(c) shall be payable on demand.

(d)     Accrued (and theretofore unpaid) interest shall be payable (i) in respect of each Base Rate Loan, (x) quarterly in arrears on each Quarterly Payment Date, (y) on the date of any repayment or prepayment in full of all outstanding Base Rate Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand, and (ii) in respect of each Eurodollar Loan, (x) on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, and (y) on the date of any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)     Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the respective Eurodollar Loans and shall promptly notify the Borrower and the Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

1.09     Interest Periods for Eurodollar Loans.  At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Eurodollar Loan (in the case of the initial Interest Period applicable thereto) or prior to 12:00 Noon (New York time) on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loan (in the case of any subsequent Interest Period), the Borrower shall have the right to elect the interest period (each an "Interest Period") applicable to such Eurodollar Loan, which Interest Period shall, at the option of the Borrower (but otherwise subject to the provisions of clause (B) of the proviso in Section 1.01(iii), be a one, two, three or six month period or, to the extent agreed by all Lenders with Term Loans, a nine or twelve month period, provided that (in each case):

(i)     all Eurodollar Loans comprising a Borrowing shall at all times have the same Interest Period;

(ii)     the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(iii)     if any Interest Period for a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv)     if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(v)     unless the Required Lenders otherwise agree, no Interest Period may be selected at any time when a Default or an Event of Default is then in existence;

(vi)     no Interest Period shall be selected which extends beyond the Final Maturity Date; and

(vii)     no Interest Period in respect of any Borrowing of Term Loans shall be selected which extends beyond any date upon which a mandatory repayment of such Term Loans will be required to be made under Section 4.02(b) if the aggregate principal amount of such Term Loans which have Interest Periods which will expire after such date will be in excess of the aggregate principal amount of such Term Loans then outstanding less the aggregate amount of such required repayment.

If by 12:00 Noon (New York time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Eurodollar Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such Eurodollar Loans as provided above, the Borrower shall be deemed to have elected to convert such Eurodollar Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

1.10     Increased Costs, Illegality, etc. (a) In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)     on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of Eurodollar Rate; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loan because of (x) any change since the Effective Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to: (A) a change in the basis of taxation of payment to any Lender of the principal of or interest on the Term Loans or the Term Notes or any other amounts payable hereunder (except for changes in the rate of tax on, or determined by reference to, the net income or net profits or capital or franchise taxes imposed in lieu thereof of such Lender or, in the

case of a Lender that is a flow-through entity for tax purposes, a member or a partner of such Lender, pursuant to the laws of the country or national jurisdiction (or any political subdivision thereof) in which it is organized or in which its principal office or applicable lending office is located) (the preceding sentence shall not apply to increased costs with respect to Taxes which are addressed in Section 4.04) or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances arising since the Effective Date affecting such Lender, the interbank Eurodollar market or the position of such Lender in such market; or

(iii)    at any time, that the making or continuance of any Eurodollar Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Effective Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone promptly confirmed in writing) to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Borrower with respect to Eurodollar Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, but subject to Section 13.17, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for and the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 1.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)    At any time that any Eurodollar Loan is affected by the circumstances described in Section 1.10(a)(ii), the Borrower may, and in the case of a Eurodollar Loan affected by the circumstances described in Section 1.10(a)(iii), the Borrower shall, either (x) if the affected Eurodollar Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 1.10(a)(ii) or (iii) or (y) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Loan into a Base Rate Loan, provided that, if more

than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 1.10(b).

(c) If any Lender determines that after the Effective Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any governmental authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, but subject to the provisions of Section 13.17 (to the extent applicable), such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 1.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 1.10(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

1.11 Compensation. Subject to Section 13.17, the Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, Eurodollar Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 1.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 4.01, Section 4.02 or as a result of an acceleration of the Term Loans pursuant to Section 10) or conversion of any of its Eurodollar Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its Eurodollar Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Eurodollar Loans when required by the terms of this Agreement or any Term Note held by such Lender or (y) any election made pursuant to Section 1.10(b).

1.12 Change of Lending Office. Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 1.10(a)(ii) or (iii), Section 1.10(c), Section 2.06 or Section 4.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Term Loans or Letters of Credit affected by such event with the object of avoiding the consequence of the event giving rise to the operation of such Section, provided that such designation is made on such terms that such Lender and its lending office suffer no economic,

legal or regulatory disadvantage.  Nothing in this Section 1.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 1.10, 2.06 and 4.04.

1.13    Replacement of Lenders.  (x)  If any Lender becomes a Defaulting Lender or otherwise defaults in its obligations to make Term Loans, (y) upon the occurrence of an event giving rise to the operation of Section 1.10(a)(ii) or (iii), Section 1.10(c), Section 2.06 or Section 4.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs or requires the Borrower to pay any amounts under Section 4.04, in each case in excess of those being generally charged by the other Lenders or (z) in the case of a refusal by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower shall have the right, if no Default or Event of Default then exists (or, in the case of preceding clause (z), will exist immediately after giving effect to such replacement), to replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") and each of whom shall be required to be reasonably acceptable to the Administrative Agent (or, at the option of the Borrower, if the circumstances described above in this Section 1.13, or the consents required of the respective Lender as described above, relate to only a single Tranche hereunder, to replace only the Commitments and related outstandings and/or participations of the respective Tranche of the Replaced Lender with a Replacement Lender as described herein), provided that (i) at the time of any replacement pursuant to this Section 1.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Term Loans of, and in each case participations in Letters of Credit by, the Replaced Lender (or all of the foregoing relating to the Tranche of the Replaced Lender being replaced, in the event that the replacement  is not in respect of all Tranches) and, in connection therewith, shall pay to (x) the Replaced Lender in respect thereof an amount equal to the sum of (I) an amount equal to the principal of, and all accrued interest on, all outstanding Term Loans of the Replaced Lender (unless the Replaced Lender is not being replaced with respect to such Tranche), (II) an amount equal to all Unpaid Drawings that have been funded by (and not reimbursed to) such Replaced Lender, together with all then unpaid interest with respect thereto at such time (unless the Replaced Lender is not being replaced with respect to such Tranche) and (III) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 3.01 (except to the extent that such Fees relate to a Tranche with respect to which the Replaced Lender is not being replaced) and (y) unless the Replaced Lender is not being replaced with respect the L/C Commitment, each Issuing Lender an amount equal to such Replaced Lender's L/C Percentage of any Unpaid Drawing (which at such time remains an Unpaid Drawing) to the extent such amount was not theretofore funded by such Replaced Lender to such Issuing Lender and (ii) all obligations of the Borrower due and owing to the Replaced Lender at such time (other than (x) those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid and (y) those relating to a Tranche where the respective Replaced Lender is not being replaced) shall be paid in full to such Replaced Lender concurrently with such replacement.  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in

clauses (i) and (ii) above and, if so requested by the Replacement Lender (if it is acquiring Term Loans or any Term Loan Commitment pursuant to the respective replacement), delivery to the Replacement Lender of the appropriate Term Note or Term Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder (with respect to any Tranche or Tranches with respect to which it is being replaced), except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 1.10, 1.11, 2.06, 4.04, 12.06 and 13.01), which shall survive as to such Replaced Lender.

SECTION 2.  Letters of Credit.

2.01  Letters of Credit.  (a)  Subject to and upon the terms and conditions set forth herein, the Borrower may request that an Issuing Lender issue, at any time and from time to time on and after the Initial Borrowing Date and prior to the 60th day prior to the Final Maturity Date, for the account of the Borrower and for the benefit of (x) any holder (or any trustee, agent or other similar representative for any such holders) of L/C Supportable Obligations, an irrevocable standby letter of credit, in a form customarily used by such Issuing Lender or in such other form as is reasonably acceptable to such Issuing Lender, and (y) sellers of goods to the Borrower or any of its Subsidiaries, an irrevocable trade letter of credit, in a form customarily used by such Issuing Lender or in such other form as has been approved by such Issuing Lender (each such letter of credit, a "Letter of Credit" and, collectively, the "Letters of Credit").  All Letters of Credit shall be denominated in Dollars and shall be issued on a sight basis only.

(b)  Subject to and upon the terms and conditions set forth herein, each Issuing Lender agrees that it will, at any time and from time to time on and after the Initial Borrowing Date and prior to the 60th day prior to the Final Maturity Date, following its receipt of the respective Letter of Credit Request, issue for account of the Borrower, one or more Letters of Credit as are permitted to remain outstanding hereunder without giving rise to a Default or an Event of Default, provided that no Issuing Lender shall be under any obligation to issue any Letter of Credit of the types described above if at the time of such issuance:

(i)  any order, judgment or decree of any governmental authority or arbitrator shall purport by its terms to enjoin or restrain such Issuing Lender from issuing such Letter of Credit or any requirement of law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over such Issuing Lender shall prohibit, or request that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction or reserve or capital requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect with respect to such Issuing Lender on the date hereof, or any unreimbursed loss, cost or expense which was not applicable or in effect with respect to such Issuing Lender as of the date hereof and which such Issuing Lender reasonably and in good faith deems material to it; or

(ii)  such Issuing Lender shall have received from the Borrower, any other Credit Party or the Required Lenders prior to the issuance of such Letter of Credit notice of the type described in the second sentence of Section 2.03(b).

2.02 <u>Maximum Letter of Credit Outstandings; Final Maturities</u>. Notwithstanding anything to the contrary contained in this Agreement, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid on the date of, and prior to the issuance of, the respective Letter of Credit) at such time would exceed the Total L/C Commitment at such time, and (ii) each Letter of Credit shall by its terms terminate (x) in the case of standby Letters of Credit, on or before the earlier of (A) the date which occurs 12 months after the date of the issuance thereof (although any such standby Letter of Credit shall be extendible for successive periods of up to 12 months, but, in each case, not beyond the tenth Business Day prior to the Final Maturity Date, on terms acceptable to the respective Issuing Lender) and (B) ten Business Days prior to the Final Maturity Date, and (y) in the case of trade Letters of Credit, on or before the earlier of (A) the date which occurs 180 days after the date of issuance thereof and (B) 30 days prior to the Final Maturity Date.

2.03 <u>Letter of Credit Requests; Minimum Stated Amount</u>. (a) Whenever the Borrower desires that a Letter of Credit be issued for its account, the Borrower shall give the Administrative Agent and the respective Issuing Lender at least five Business Days' (or such shorter period as is acceptable to such Issuing Lender) written notice thereof (including by way of facsimile). Each notice shall be in the form of Exhibit C, appropriately completed (each a "<u>Letter of Credit Request</u>").

(b) The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower to the Lenders that such Letter of Credit may be issued in accordance with, and will not violate the requirements of, Section 2.02. Unless the respective Issuing Lender has received notice from the Borrower, any other Credit Party or the Required Lenders before it issues a Letter of Credit that one or more of the conditions specified in Section 5 or 6 are not then satisfied, or that the issuance of such Letter of Credit would violate Section 2.02, then such Issuing Lender shall, subject to the terms and conditions of this Agreement, issue the requested Letter of Credit for the account of the Borrower in accordance with such Issuing Lender's usual and customary practices. Upon the issuance of or modification or amendment to any standby Letter of Credit, each Issuing Lender shall promptly notify the Borrower and the Administrative Agent, in writing of such issuance, modification or amendment and such notice shall be accompanied by a copy of such Letter of Credit or the respective modification or amendment thereto, as the case may be. Promptly after receipt of such notice the Administrative Agent shall notify the Participants, in writing, of such issuance, modification or amendment. On the first Business Day of each week, each Issuing Lender shall furnish the Administrative Agent with a written (including via facsimile) report of the daily aggregate outstandings of trade Letters of Credit issued by such Issuing Lender for the immediately preceding week. Notwithstanding anything to the contrary contained in this Agreement, in the event that a Lender Default exists with respect to an L/C Lender, no Issuing Lender shall be required to issue any Letter of Credit unless such Issuing Lender has entered into arrangements satisfactory to it and the Borrower to eliminate such Issuing Lender's risk with respect to the participation in Letters of Credit by the Defaulting Lender or Lenders, including by cash collateralizing such Defaulting Lender's or Lenders' L/C Percentage of the Letter of Credit Outstandings.

(c)     The initial Stated Amount of each Letter of Credit shall not be less than $100,000 or such lesser amount as is acceptable to the respective Issuing Lender.

2.04    Letter of Credit Participations. (a)  Immediately upon the issuance by an Issuing Lender of any Letter of Credit, such Issuing Lender shall be deemed to have sold and transferred to each L/C Lender, and each such L/C Lender (in its capacity under this Section 2.04, a "Participant") shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Lender, without recourse or warranty, an undivided interest and participation, to the extent of such Participant's L/C Percentage, in such Letter of Credit, each drawing or payment made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.  Upon any change in the L/C Commitments or L/C Percentages of the Lenders pursuant to Section 1.13 or 13.04(b), it is hereby agreed that, with respect to all outstanding Letters of Credit and Unpaid Drawings relating thereto, there shall be an automatic adjustment to the participations pursuant to this Section 2.04 to reflect the new L/C Percentages of the assignor and assignee Lender, as the case may be.

(b)     In determining whether to pay under any Letter of Credit, no Issuing Lender shall have any obligation relative to the other Lenders other than to confirm that any documents required to be delivered under such Letter of Credit appear to have been delivered and that they appear to substantially comply on their face with the requirements of such Letter of Credit.  Any action taken or omitted to be taken by an Issuing Lender under or in connection with any Letter of Credit issued by it shall not create for such Issuing Lender any resulting liability to the Borrower, any other Credit Party, any Lender or any other Person unless such action is taken or omitted to be taken with gross negligence or willful misconduct on the part of such Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(c)     In the event that an Issuing Lender makes any payment under any Letter of Credit issued by it and the Borrower shall not have reimbursed such amount in full to such Issuing Lender pursuant to Section 2.05(a), such Issuing Lender shall promptly notify the Administrative Agent, which shall promptly notify each Participant of such failure, and each Participant shall promptly and unconditionally pay to such Issuing Lender the amount of such Participant's L/C Percentage of such unreimbursed payment in Dollars and in same day funds.  If the Administrative Agent so notifies, prior to 12:00 Noon (New York time) on any Business Day, any Participant required to fund a payment under a Letter of Credit, such Participant shall make available to the respective Issuing Lender in Dollars such Participant's L/C Percentage of the amount of such payment on such Business Day in same day funds.  If and to the extent such Participant shall not have so made its L/C Percentage of the amount of such payment available to the respective Issuing Lender, such Participant agrees to pay to such Issuing Lender, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to such Issuing Lender at the overnight Federal Funds Rate for the first three days and at the interest rate applicable to Term Loans that are maintained as Base Rate Loans for each day thereafter.  The failure of any Participant to make available to an Issuing Lender its L/C Percentage of any payment under any Letter of Credit issued by such Issuing Lender shall not relieve any other Participant of its obligation hereunder to make available to such Issuing Lender its L/C Percentage of any payment under any Letter of Credit on the date required, as specified

above, but no Participant shall be responsible for the failure of any other Participant to make available to such Issuing Lender such other Participant's L/C Percentage of any such payment.

(d)     Whenever an Issuing Lender receives a payment of a reimbursement obligation as to which it has received any payments from the respective Participants pursuant to clause (c) above, such Issuing Lender shall pay to each such Participant which has paid its L/C Percentage thereof, in Dollars and in same day funds, an amount equal to such Participant's share (based upon the proportionate aggregate amount originally funded by such Participant to the aggregate amount funded by all Participants) of the principal amount of such reimbursement obligation and interest thereon accruing after the purchase of the respective participations.

(e)     Upon the request of any Participant, each Issuing Lender shall furnish to such Participant copies of any standby Letter of Credit issued by it and such other documentation as may reasonably be requested by such Participant.

(f)     The obligations of the Participants to make payments to each Issuing Lender with respect to Letters of Credit shall be irrevocable and not subject to any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii)     the existence of any claim, setoff, defense or other right which the Borrower or any of its Subsidiaries may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Participant, or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower or any Subsidiary of the Borrower and the beneficiary named in any such Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents; or

(v)     the occurrence of any Default or Event of Default.

2.05     Agreement to Repay Letter of Credit Drawings. (a) The Borrower agrees to reimburse each Issuing Lender, by making payment to the Administrative Agent in immediately available funds at the Payment Office, for any payment or disbursement made by such Issuing Lender under any Letter of Credit issued by it (each such amount, so paid until reimbursed, an "Unpaid Drawing"), not later than one Business Day following receipt by the Borrower of notice of such payment or disbursement (provided that no such notice shall be

required to be given if a Default or an Event of Default under Section 10.05 shall have occurred and be continuing, in which case the Unpaid Drawing shall be due and payable immediately without presentment, demand, protest or notice of any kind (all of which are hereby waived by the Borrower)), with interest on the amount so paid or disbursed by such Issuing Lender, to the extent not reimbursed prior to 12:00 Noon (New York time) on the date of such payment or disbursement, from and including the date paid or disbursed to but excluding the date such Issuing Lender was reimbursed by the Borrower therefor at a rate per annum equal to the Base Rate in effect from time to time plus the Applicable Margin as in effect from time to time for Term Loans that are maintained as Base Rate Loans; provided, however, to the extent such amounts are not reimbursed prior to 12:00 Noon (New York time) on the third Business Day following the receipt by the Borrower of notice of such payment or disbursement or following the occurrence of a Default or an Event of Default under Section 10.05, interest shall thereafter accrue on the amounts so paid or disbursed by such Issuing Lender (and until reimbursed by the Borrower) at a rate per annum equal to the Base Rate in effect from time to time plus the Applicable Margin for Term Loans that are maintained as Base Rate Loans as in effect from time to time plus 2%, with such interest to be payable on demand. Each Issuing Lender shall give the Borrower prompt written notice of each Drawing under any Letter of Credit issued by it, provided that the failure to give any such notice shall in no way affect, impair or diminish the Borrower's obligations hereunder.

(b)     The obligations of the Borrower under this Section 2.05 to reimburse each Issuing Lender with respect to drafts, demands and other presentations for payment under Letters of Credit issued by it (each a "Drawing") (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower or any Subsidiary of the Borrower may have or have had against any Lender (including in its capacity as an Issuing Lender or as a Participant), including, without limitation, any defense based upon the failure of any drawing under a Letter of Credit to conform to the terms of the Letter of Credit or any nonapplication or misapplication by the beneficiary of the proceeds of such Drawing; provided, however, that the Borrower shall not be obligated to reimburse any Issuing Lender for any wrongful payment made by such Issuing Lender under a Letter of Credit issued by it as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Issuing Lender (as determined by a court of competent jurisdiction in a final and non-appealable decision).

2.06     Increased Costs. If at any time after the Effective Date, the introduction of or any change in any applicable law, rule, regulation, order, guideline or request or in the interpretation or administration thereof by the NAIC or any governmental authority charged with the interpretation or administration thereof, or compliance by any Issuing Lender or any Participant with any request or directive by the NAIC or by any such governmental authority (whether or not having the force of law), shall either (i) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against letters of credit issued by any Issuing Lender or participated in by any Participant, or (ii) impose on any Issuing Lender or any Participant any other conditions relating, directly or indirectly, to this Agreement or any Letter of Credit; and the result of any of the foregoing is to increase the cost to any Issuing Lender or any Participant of issuing, maintaining or participating in any Letter of Credit, or reduce the amount of any sum received or receivable by any Issuing Lender or any Participant hereunder or reduce the rate of return on its capital with respect to Letters of Credit (except for changes in the rate of tax on, or

determined by reference to, the net income or profits or capital or franchise taxes imposed in lieu thereof of such Issuing Lender or such Participant or, in the case of an Issuing Lender or Participant that is a flow-through entity for tax purposes, a member or a partner of such Issuing Lender or Participant, pursuant to the laws of the country or national jurisdiction (or any political subdivision thereof) in which it is organized or in which its principal office or applicable lending office is located), then, upon the delivery of the certificate referred to below to the Borrower by any Issuing Lender or any Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), the Borrower agrees, subject to the provisions of Section 13.17, to pay to such Issuing Lender or such Participant such additional amount or amounts as will compensate such Issuing Lender or such Participant for such increased cost or reduction in the amount receivable or reduction on the rate of return on its capital, it being agreed that this Section 2.06 shall not apply to Taxes which are the subject of and not excluded under Section 4.04(a). Any Issuing Lender or any Participant, upon determining that any additional amounts will be payable pursuant to this Section 2.06, will give prompt written notice thereof to the Borrower, which notice shall include a certificate submitted to the Borrower by such Issuing Lender or such Participant (a copy of which certificate shall be sent by the Issuing Lender or such Participant to the Administrative Agent), setting forth in reasonable detail the basis for and the calculation of such additional amount or amounts necessary to compensate such Issuing Lender or such Participant. The certificate required to be delivered pursuant to this Section 2.06 shall, absent manifest error, be final and conclusive and binding on the Borrower.

SECTION 3. <u>L/C Commitment Commission; Fees; Reductions of Commitment.</u>

3.01 <u>Fees</u>. (a) The Borrower agrees to pay to the Administrative Agent for distribution to each L/C Lender which is a Non-Defaulting Lender a commitment commission (the "<u>L/C Commitment Commission</u>") for the period from and including the Effective Date to and including the Final Maturity Date (or such earlier date on which the Total L/C Commitment has been terminated) computed at a rate per annum equal to ½ of 1% of the Unutilized L/C Commitment of such L/C Lender as in effect from time to time. Accrued L/C Commitment Commission shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the date upon which the Total L/C Commitment is terminated.

(b) The Borrower agrees to pay to the Administrative Agent for distribution to each L/C Lender (based on each such Lender's respective L/C Percentage) a fee in respect of each Letter of Credit (the "<u>Letter of Credit Fee</u>") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to 4.00% of the daily Stated Amount of each such Letter of Credit. Accrued Letter of Credit Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the first day on or after the termination of the Total L/C Commitment upon which no Letter of Credit remains outstanding.

(c) The Borrower agrees to pay to each Issuing Lender, for its own account, a facing fee in respect of each Letter of Credit issued by it (the "<u>Facing Fee</u>") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to 1/4 of 1% on the daily Stated Amount of such Letter of Credit, <u>provided</u> that in any event the minimum

amount of Facing Fees payable in any twelve-month period for each Letter of Credit shall be not less than $500; it being agreed that, on the day of issuance of any Letter of Credit and on each anniversary thereof prior to the termination or expiration of such Letter of Credit, if $500 will exceed the amount of Facing Fees that will accrue with respect to such Letter of Credit for the immediately succeeding twelve-month period, the full $500 shall be payable on the date of issuance of such Letter of Credit and on each such anniversary thereof. Except as otherwise provided in the proviso to the immediately preceding sentence, accrued Facing Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and upon the first day on or after the termination of the Total L/C Commitment upon which no Letter of Credit remains outstanding.

(d)  The Borrower agrees to pay to each Issuing Lender, for its own account, upon each payment under, issuance of, or amendment to, any Letter of Credit issued by it, such amount as shall at the time of such event be the administrative charge and the reasonable expenses which such Issuing Lender is generally imposing in connection with such occurrence with respect to letters of credit.

(e)  The Borrower agrees to pay to the Administrative Agent such fees as may be agreed to in writing from time to time by the Borrower or any of its Subsidiaries and the Administrative Agent.

3.02  <u>Voluntary Termination of Unutilized L/C Commitments</u>.  (a)  Upon at least three Business Days' prior notice from an Authorized Representative of the Borrower to the Administrative Agent at its Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, at any time or from time to time, without premium or penalty, to terminate the Total Unutilized L/C Commitment at such time, in whole or in part, in integral multiples of $1,000,000 in the case of partial reductions of the Total L/C Commitment. Each reduction to the Total Unutilized L/C Commitment pursuant to this Section 3.02 shall apply to proportionately and permanently reduce the L/C Commitment of each Lender (based on their respective L/C Percentages).

(b)  In the event of a refusal by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower may, subject to its compliance with the requirements of Section 13.12(b), upon five Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders) terminate all of the L/C Commitment and/or the Term Loan Commitment of such Lender, so long as all Term Loans, together with accrued and unpaid interest, Fees and all other amounts, owing to such Lender (other than any such amounts owing in respect of any Tranche maintained by such Lender which are not being repaid pursuant to Section 13.12(b)) are repaid concurrently with the effectiveness of such termination pursuant to Section 4.01(b) (at which time Schedule I shall be deemed modified to reflect such changed amounts) and such Lender's L/C Percentage of all outstanding Letters of Credit is cash collateralized in a manner satisfactory to the Administrative Agent and the respective Issuing Lenders (unless the respective Lender is not being repaid with respect to its L/C Commitment pursuant to Section 13.12(b)), and at such time, unless the respective Lender continues to have outstanding Term Loans or Commitments of one or more

Tranches hereunder, such Lender shall no longer constitute a "Lender" for purposes of this Agreement, except with respect to indemnifications under this Agreement (including, without limitation, Sections 1.10, 1.11, 2.06, 4.04, 12.06 and 13.01), which shall survive as to such repaid Lender.

3.03    Mandatory Reduction of Commitments.  (a)  The Total Commitment (and the Commitment of each Lender) shall terminate in its entirety on December 31, 2004, unless the Initial Borrowing Date has occurred on or prior to such date.

(b)    In addition to any other mandatory commitment reductions pursuant to this Section 3.03, the Total Term Loan Commitment (and the Term Loan Commitment of each Lender) shall terminate in its entirety on the Initial Borrowing Date (after giving effect to the incurrence of Term Loans on such date pursuant to Section 1.01).

(c)    In addition to any other mandatory commitment reductions pursuant to this Section 3.03, the Total L/C Commitment shall terminate in its entirety upon the earlier of (x) the Final Maturity Date and (y) unless the Required Lenders otherwise agree in writing, the date on which a Change of Control occurs.

(d)    In addition to any other mandatory commitment reductions pursuant to this Section 3.03, on each date upon which a mandatory repayment of Term Loans pursuant to Section 4.02(c), (d), (e), (f) or (g) is required (and exceeds in amount the aggregate principal amount of Term Loans then outstanding) or would be required if Term Loans were then outstanding, the Total L/C Commitment shall be permanently reduced by the amount, if any, by which the amount required to be applied pursuant to said Sections (determined as if an unlimited amount of Term Loans were actually outstanding) exceeds the aggregate principal amount of Term Loans then outstanding.

(e)    Each reduction to, or termination of, the Total L/C Commitment shall be applied to proportionately reduce or terminate, as the case may be, the L/C Commitment of each Lender with a L/C Commitment.

SECTION 4.   Prepayments; Payments; Taxes.

4.01    Voluntary Prepayments.  (a)  The Borrower shall have the right to prepay Term Loans, without premium or penalty, in whole or in part at any time and from time to time on the following terms and conditions:  (i) the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York time) at the Notice Office (x) at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Base Rate Loans and (y) at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Eurodollar Loans, which notice (in each case) shall specify the amount of such prepayment and the Types of Term Loans to be prepaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; (ii) each partial prepayment of Term Loans pursuant to this Section 4.01(a) shall be in an aggregate principal amount of at least $[1,000,000] (or such lesser amount as is acceptable to the Administrative Agent), provided that if any partial prepayment of

Eurodollar Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of Eurodollar Loans (and same shall automatically be converted into a Borrowing of Base Rate Loans) and any election of an Interest Period with respect thereto given by the Borrower shall have no force or effect; and (iii) each voluntary prepayment of Term Loans pursuant to this Section 4.01(a) shall be applied to reduce the then remaining Scheduled Repayments of the Term Loans on a pro rata basis (based upon the then remaining unpaid principal amounts of such Scheduled Repayments after giving effect to all prior reductions thereto).

(b)     In the event of a refusal by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower may, upon five Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders) repay all Term Loans, together with accrued and unpaid interest, Fees, and other amounts owing to such Lender (or owing to such Lender in respect of the Tranche being repaid in the event such Lender is being repaid with respect to a single Tranche only) in accordance with, and subject to the requirements of, said Section 13.12(b) so long as (I) all Commitments of such Lender (other than Commitments relating to any Tranche with respect to which such Lender is not being replaced or terminated) are terminated concurrently with such repayment pursuant to Section 3.02(b) (at which time Schedule I shall be deemed modified to reflect the changed Commitments), (II) unless such Lender is an L/C Lender that is not being repaid or replaced with respect to its L/C Commitment, such Lender's L/C Percentage of all outstanding Letters of Credit is cash collateralized in a manner satisfactory to the Administrative Agent and the respective Issuing Lenders and (III) the consents, if any, required under Section 13.12(b) in connection with the repayment pursuant to this clause (b) have been obtained. Each prepayment of any Term Loans pursuant to this Section 4.01(b) shall be applied to reduce the then remaining Scheduled Repayments of the Term Loans on a pro rata basis (based upon the then remaining unpaid principal amounts of such Scheduled Repayments after giving effect to all prior reductions thereto).

4.02     Mandatory Repayments.  (a)  If the aggregate amount of the Letter of Credit Outstandings exceeds the Total L/C Commitment on any day, the Borrower shall pay to the Administrative Agent at the Payment Office on such day an amount of cash and/or Cash Equivalents equal to the amount of such excess (up to a maximum amount equal to the Letter of Credit Outstandings at such time), such cash and/or Cash Equivalents to be held as security for all obligations of the Borrower to the Issuing Lenders and the Lenders hereunder in a cash collateral account to be established by the Administrative Agent.

(b)     In addition to any other mandatory repayments pursuant to this Section 4.02, on each date set forth below (each, a "Scheduled Repayment Date"), the Borrower shall be required to repay that principal amount of Term Loans, to the extent then outstanding, as is set forth opposite each such date below (each such repayment, as the same may be reduced as provided in Section 4.01(a), 4.01(b) or 4.02(h), a "Scheduled Repayment"):

| Scheduled Repayment Date | Amount |
|---|---|
| March 31, 2005 | $825,000 |
| June 30, 2005 | $825,000 |
| September 30, 2005 | $825,000 |
| December 31, 2005 | $825,000 |
| | |
| March 31, 2006 | $825,000 |
| June 30, 2006 | $825,000 |
| September 30, 2006 | $825,000 |
| December 31, 2006 | $825,000 |
| | |
| March 31, 2007 | $825,000 |
| June 30, 2007 | $825,000 |
| September 30, 2007 | $825,000 |
| December 31, 2007 | $825,000 |
| | |
| March 31, 2008 | $825,000 |
| June 30, 2008 | $825,000 |
| September 30, 2008 | $825,000 |
| December 31, 2008 | $825,000 |
| | |
| March 31, 2009 | $825,000 |
| June 30, 2009 | $825,000 |
| September 30, 2009 | $825,000 |
| December 31, 2009 | $825,000 |
| | |
| March 31, 2010 | $825,000 |
| June 30, 2010 | $825,000 |
| September 30, 2010 | $825,000 |
| December 31, 2010 | $825,000 |
| | |
| March 31, 2011 | $77,550,000 |
| June 30, 2011 | $77,550,000 |
| September 30, 2011 | $77,550,000 |
| Final Maturity Date | $77,550,000 |

(c)     In addition to any other mandatory repayments pursuant to this Section 4.02, on each date on or after the Initial Borrowing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any capital contribution or any sale or issuance of its Equity Interests (other than cash proceeds from the issuance of Equity Interests to members of management or employees of the Borrower in an amount not to exceed $[_____] in any fiscal year of the Borrower), an amount equal to 100% of the Net Equity Proceeds of such capital contribution or sale or issuance of equity shall be applied on such date as a mandatory repayment of principal of outstanding Term Loans in accordance with the requirements of Sections 4.02(h) and (i); provided, however, that with respect to no more than $[_____] in the aggregate of

cash proceeds from any sale or issuance of Qualified Capital Stock in any fiscal year of the Borrower, the Net Equity Proceeds therefrom shall not be required to be so applied on such date so long as no Default and no Event of Default then exists and such Net Equity Proceeds shall be used to make a Permitted Acquisition pursuant to Section 8.17 within 90 days following the date of the issuance of such Qualified Capital Stock, and provided further, that if all or any portion of such Net Equity Proceeds not required to be so applied as provided above in this Section 4.02(c) are not so used within such 90-day period (or such earlier date, if any, as the Borrower or the relevant Subsidiary determines not to use the Net Equity Proceeds as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 4.02(c) without regard to the preceding proviso.

(d)     In addition to any other mandatory repayments pursuant to this Section 4.02, on each date on or after the Initial Borrowing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any issuance or incurrence by the Borrower or any of its Subsidiaries of Indebtedness for borrowed money (other than Indebtedness for borrowed money permitted to be incurred pursuant to Section 9.04 as in effect on the Effective Date), an amount equal to 100% of the Net Debt Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment of principal of outstanding Term Loans in accordance with the requirements of Sections 4.02(h) and (i).

(e)     In addition to any other mandatory repayments pursuant to this Section 4.02, on each date on or after the Initial Borrowing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such date as a mandatory repayment of principal of outstanding Term Loans in accordance with the requirements of Sections 4.02(h); and (i) provided, however, that with respect to no more than $[1,000,000] in the aggregate of cash proceeds from Asset Sales (other than Asset Sales made pursuant to any of clauses (xi), (xii), (xiii) and (xiv) of Section 9.02, the proceeds of which must be applied as provided above without regard to this proviso) in any fiscal year of the Borrower, the Net Sale Proceeds therefrom shall not be required to be so applied on such date so long as no Default and no Event of Default then exists and such Net Sale Proceeds shall be used to purchase assets (other than working capital) used or to be used in the businesses permitted pursuant to Section 9.16 within 365 days following the date of such Asset Sale, and provided further, that if all or any portion of such Net Sale Proceeds not required to be so applied as provided above in this Section 4.02(e) are not so reinvested within such 365-day period (or such earlier date, if any, as the Borrower or the relevant Subsidiary determines not to reinvest the Net Sale Proceeds from such Asset Sale as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 4.02(e) without regard to the preceding proviso.

(f)     In addition to any other mandatory repayments pursuant to this Section 4.02, on each Excess Cash Payment Date, an amount equal to the Applicable ECF Percentage of the Excess Cash Flow for the related Excess Cash Payment Period shall be applied as a mandatory repayment of principal of outstanding Term Loans in accordance with the requirements of Sections 4.02(h) and (i).

(g)     In addition to any other mandatory repayments pursuant to this Section 4.02, within 10 days following each date on or after the Initial Borrowing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any Recovery Event (other than Recovery Events where the Net Insurance Proceeds therefrom do not exceed $50,000), an amount equal to 100% of the Net Insurance Proceeds from such Recovery Event shall be applied within such ten day period in accordance with the requirements of Sections 4.02(h) and (i); provided, however, that (i) so long as no Default or Event of Default then exists and such Net Insurance Proceeds do not exceed $1,000,000, an amount equal to such Net Insurance Proceeds shall not be required to be so applied within such ten day period to the extent that the Borrower has delivered a certificate to the Administrative Agent within such ten day period stating that such Net Insurance Proceeds shall be used to replace or restore properties or assets in respect of which such Net Insurance Proceeds were paid within 365 days following the date of the receipt of such Net Insurance Proceeds (which certificate shall set forth the estimates of the Net Insurance Proceeds to be so expended), and (ii) if the amount of such Net Insurance Proceeds exceeds $1,000,000, then an amount equal to the entire amount of such Net Insurance Proceeds (and not just the portion thereof in excess of $1,000,000) shall be applied as provided above in this Section 4.02(g) without regard to preceding clause (i) of this proviso, and provided further, that if all or any portion of such Net Insurance Proceeds not required to be so applied pursuant to the preceding proviso are not so used within 365 days after the date of the receipt of such Net Insurance Proceeds (or such earlier date, if any, as the Borrower or the relevant Subsidiary determines not to reinvest the Net Insurance Proceeds relating to such Recovery Event as set forth above), an amount equal to such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 4.02(g) without regard to the preceding proviso.

(h)     Each amount required to be applied pursuant to Sections 4.02(c), (d), (e), (f) and (g) in accordance with this Section 4.02(h) shall be applied (i) first, as a mandatory repayment of principal of outstanding Term Loans, and (ii) second, to the extent in excess of the amounts required to be applied pursuant to preceding clause (i), as a mandatory and permanent reduction to the Total L/C Commitment.  The amount of each principal repayment of outstanding Term Loans made as required by this Sections 4.02(h) shall be applied to reduce the then remaining Scheduled Repayments on a pro rata basis (based upon the then remaining unpaid principal amounts of such Scheduled Repayments after giving effect to all prior reductions thereto).

(i)     With respect to each repayment of Term Loans required by this Section 4.02, the Borrower may designate the Types of Term Loans which are to be repaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings to which such Eurodollar Loans were made, provided that:  (i) repayments of Eurodollar Loans pursuant to this Section 4.02 may only be made on the last day of an Interest Period applicable thereto unless all Eurodollar Loans with Interest Periods ending on such date of required repayment and all Base Rate Loans have been paid in full; (ii) if any repayment of Eurodollar Loans made pursuant to a single Borrowing shall reduce the outstanding Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, such Borrowing shall be automatically converted into a Borrowing of Base Rate Loans; and (iii) each repayment of any Term Loans made pursuant to a Borrowing shall be applied pro rata among such Term Loans.  In

the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion.

(j)     In addition to any other mandatory repayments pursuant to this Section 4.02, (i) all then outstanding Term Loans shall be repaid in full on the Final Maturity Date and (ii) unless the Required Lenders otherwise agree in writing, all then outstanding Term Loans shall be repaid in full on the date on which a Change of Control occurs.

4.03    Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement and under any Term Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Whenever any payment to be made hereunder or under any Term Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

4.04    Net Payments.  (a)  All payments made by the Borrower hereunder and under any Term Note will be made without setoff, counterclaim or other defense.  Except as provided in Section 4.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, except as provided in the second succeeding sentence, any tax imposed on or measured by the net income, net profits or capital or franchise taxes imposed in lieu thereof of a Lender or, in the case of a Lender or Administrative Agent that is a flow-through entity for tax purposes, a member or a partner of such Lender or Administrative Agent, pursuant to the laws of the country or national jurisdiction (or any political subdivision thereof) in which it is organized or the country or national jurisdiction (or any political subdivision thereof) in which the principal office or applicable lending office of such Lender is located) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes").  If any Taxes are so levied or imposed on payments made by the Borrower hereunder and under the Term Note, the Borrower agrees to pay the full amount of such Taxes to the appropriate taxing authority, and shall pay to the applicable Lender or, in the case of a Lender or Administrative Agent that is a flow-through entity for tax purposes, a member or a partner of such Lender or Administrative Agent, such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Term Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Term Note.  If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Borrower agrees to reimburse each Lender, upon the written request of such Lender, for taxes imposed on or measured by the net income or net profits of such Lender pursuant to the laws of the jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located and for any withholding of taxes as such Lender shall

determine are payable by, or withheld from, such Lender, in respect of such amounts so paid to or on behalf of such Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of such Lender pursuant to this sentence. The Borrower will furnish to the Administrative Agent within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts or other evidence reasonably satidfactory to the Administrative Agent evidencing such payment by such Borrower. The Borrower agrees to indemnify and hold harmless each Lender or, in the case of a Lender or Administrative Agent that is a flow-through entity for tax purposes, a member or a partner of such Lender or Administrative Agent, and reimburse such Lender or, in the case of a Lender or Administrative Agent that is a flow-through entity for tax purposes, a member or a partner of such Lender or Administrative Agent, upon its written request, for the amount of any Taxes so levied or imposed and paid by such Lender or, in the case of a Lender or Administrative Agent that is a flow-through entity for tax purposes, a member or a partner of such Lender or Administrative Agent,.

        (b)    The Administrative Agent and each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes agrees to deliver to the Borrower and the Administrative Agent on or prior to the Effective Date or, in the case of a Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 1.13 or 13.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement and under any Term Note, (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit D (any such certificate, a "Section 4.04(b)(ii) Certificate") and (y) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Term Note , or (iii) if a Lender or the Administrative Agent is a foreign intermediary or flow-through entity for U.S. federal income tax purposes, two accurate and complete signed copies of Internal Revenue Service Form W-8IMY (and all necessary attachments) establishing a complete exemption from United States withholding tax with respect to payments made under this Agreement and under any Term Note. In addition, each Lender and the Administrative Agent agree that from time to time after the Effective Date, when a lapse in time or change in circumstances  or law renders the previous certification obsolete, invalid or inaccurate in any material respect, it will deliver to the Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN (with respect to the portfolio interest exemption) and a Section 4.04(b)(ii) Certificate or Form W-8IMY (with respect to foreign intermediary or flow through entity), as the case may be, and such other forms and necessary attachments as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United

States withholding tax with respect to payments under this Agreement and any Term Note, or such Lender shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this Section 4.04(b). Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income taxes (other than a Lender that may be treated as an exempt recipient based on the indicators described in U.S. Treasury Regulation Section 1.6049-4(c)(1)(ii) except to the extent required by Treasury Regulation Section 1.1441-(1)(d)(4) (and any successor provision)) agrees to deliver to the Borrower and the Administrative Agent on or prior to the Effective Date or, in the case of such a Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 1.13 or 13.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender and at the other times described above with respect to Lenders that are not United States persons, two accurate and complete original signed copies of U.S. Internal Revenue Service Form W-9 (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States backup withholding tax with respect to payments to be made under this Agreement and under any other Credit Document. Notwithstanding anything to the contrary contained in Section 4.04(a), but subject to Section 13.04(b) and the immediately succeeding sentence, (x) the Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar taxes imposed by the United States (or any political subdivision or taxing authority thereof or therein) from interest, Fees or other amounts payable hereunder to the extent that such Lender has not provided to the Borrower U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding and (y) the Borrower shall not be obligated pursuant to Section 4.04(a) to gross-up payments to be made to a Lender in respect of withholdings, income or similar taxes imposed by the United States if (I) such Lender has not provided to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to this Section 4.04(b) or (II) in the case of a payment, other than interest, to a Lender described in clause (ii) above, to the extent that such forms do not establish a complete exemption from with-holding of such taxes. Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 4.04 and except as set forth in Section 13.04(b), the Borrower agrees to pay any additional amounts and to indemnify each Lender in the manner set forth in Section 4.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes that are effective after the Effective Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such Taxes.

(c)     If the Borrower pays any additional amount under this Section 4.04 to a Lender and such Lender determines in its sole discretion that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Lender shall pay to the Borrower an amount that the Lender shall, in its sole discretion, determine is equal to the net benefit, after tax, which was obtained by the Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) any Lender may determine, in its sole discretion consistent with the policies of such Lender, whether to seek a Tax Benefit; (ii) any Taxes that are imposed on a Lender as a result of a disallowance or reduction (including

through the expiration of any tax credit carryover or carryback of such Lender that otherwise would not have expired) of any Tax Benefit with respect to which such Lender has made a payment to the Borrower pursuant to this Section 4.04(c) shall be treated as a Tax for which the Borrower is obligated to indemnify such Lender pursuant to this Section 4.04 without any exclusions or defenses; (iii) subject to Section 13.16, nothing in this Section 4.04(c) shall require the Lender to disclose any confidential information to the Borrower (including, without limitation, its tax returns); and (iv) no Lender shall be required to pay any amounts pursuant to this Section 4.04(c) at any time which a Default or Event of Default exists.

SECTION 5.

5.01 <u>Conditions Precedent to Credit Events on the Initial Borrowing Date</u>. The obligation of each Lender with a Term Loan Commitment to make Loans, and the obligation of each Issuing Lender to Issue Letters of Credit, on the Initial Borrowing Date, are subject at the time of the making of such Loans or the issuance of such Letters of Credit to the satisfaction of the following conditions:

(a) <u>Effective Date; Term Notes</u>. On or prior to the Initial Borrowing Date, (i) the Effective Date shall have occurred and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same the appropriate Term Note executed by the Borrower in the amount, maturity and as otherwise provided herein.

(b) <u>Officer's Certificate</u>. On the Initial Borrowing Date, the Administrative Agent shall have received from the Borrower a certificate, dated such date and signed on behalf of the Borrower by an Authorized Representative of the Borrower, certifying on behalf of the Borrower that all of the conditions in each of Sections 5.01(f), (g), (h), (i), (j), (m) and (t) and 6, have been satisfied on such date.

(c) <u>Opinions of Counsel</u>. On the Initial Borrowing Date, the Administrative Agent shall have received from (i) Skadden, Arps, Slate, Meagher & Flom LLP, counsel to the Credit Parties, an opinion addressed to each Agent and the Lenders and dated the Initial Borrowing Date substantially in the form of Exhibit E-1 (ii) Deborah M. Royster, general counsel to the Credit Parties, an opinion addressed to each Agent and the Lenders and dated the Initial Borrowing Date substantially in the form of Exhibit E-2 and (iii) from local counsel to the Credit Parties reasonably satisfactory to the Administrative Agent practicing in those jurisdictions in which Mortgaged Properties are located and/or Credit Parties are organized (if organized other than under the laws of Delaware or New York), which opinions shall be addressed to the Administrative Agent and each of the Lenders and dated the Initial Borrowing Date and shall cover the perfection of the security interests and/or liens granted pursuant to the relevant Security Documents (and matters relating to the organization, good standing and due authorization, execution and delivery of the various Credit Documents in the case of any Credit Party organized in that jurisdiction) and such other opinions as the Administrative Agent may reasonably request and shall be in form and substance reasonably satisfactory to the Administrative Agent.

(d)    Second-Lien Note Indenture.  On the Initial Borrowing Date, the Second-Lien Note Indenture shall have been executed and delivered by the parties thereto and shall be in full force and effect, and the Borrower shall have received gross cash proceeds of $[125],000,000 from the issuance of Second-Lien Notes thereunder, the full amount of which proceeds the Borrower shall utilize to make payments owing in connection with the Transaction contemporaneously with the utilization by the Borrower of any proceeds of Term Loans for such purpose.  The Administrative Agent shall have received true and correct copies of all Second-Lien Note Documents, certified as such by an Authorized Representative of the Borrower, the Second-Lien Note Documents and all terms and conditions thereof (including, without limitation, amortization, maturities, interest rates, covenants, defaults, remedies, guaranties and guarantors) shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders, and all conditions precedent under the Second-Lien Note Documents shall have been satisfied, and not waived unless consented to by the Administrative Agent and the Required Lenders, to the satisfaction of the Administrative Agent and the Required Lenders.

(e)    Third-Lien Credit Agreement.  On the Initial Borrowing Date, the Third-Lien Credit Agreement shall have been executed and delivered by the parties thereto and shall be in full force and effect.  The Administrative Agent shall have received true and correct copies of all Third-Lien Credit Documents, certified as such by an Authorized Representative of the Borrower, the Third-Lien Credit Documents and all terms and conditions thereof (including, without limitation, amortization, maturities, interest rates, covenants, defaults, remedies, guaranties and guarantors) shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders, and all conditions precedent to the Third-Lien Credit Documents shall have been satisfied, and not waived unless consented to by the Administrative Agent and the Required Lenders, to the satisfaction of the Administrative Agent and the Required Lenders.  [Note: all security interests and related filings for predecessor agreement must be terminated, with new filings relating to security granted by the Borrower to be sequenced as provided in the Intercreditor Agreement.]

(f)    Adverse Change.  On the Initial Borrowing Date, there shall not have occurred (and neither the Administrative Agent nor the Required Lenders shall have become aware of any facts or conditions not previously known) which the Administrative Agent or the Required Lenders shall determine has had, or could reasonably be expected to have, a Material Adverse Effect.

(g)    Litigation.  On the Initial Borrowing Date, no litigation by any entity (private or governmental) shall be pending or, to the knowledge of the Borrower, threatened with respect to (i) the Transaction or any documentation executed in connection therewith (including any Credit Document) or the transactions contemplated thereby or (ii) which is, or could reasonably be expected to have, a Material Adverse Effect.

(h)    Governmental Approvals; etc.  On or prior to the Initial Borrowing Date, (A) all necessary governmental (domestic (including those of the Bankruptcy Court) and foreign) and third party approvals in connection with the Credit Documents and otherwise referred to herein or therein shall have been obtained and remain in full force and effect and evidence thereof shall have been provided to the Administrative Agent, (B) all necessary material governmental (domestic and foreign) and third party approvals in connection with any Existing

Indebtedness which is to remain outstanding after the Initial Borrowing Date and the consummation of the Transaction shall have been obtained and remain in full force and effect and evidence thereof shall have been provided to the Administrative Agent and (C) all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the Transaction, the making of the loans and the transactions contemplated by the Documents or otherwise referred to herein or therein. Additionally, there shall not exist any judgment, order, injunction or other restraint issued or filed by any governmental authority or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon, or materially delaying, or making economically unfeasible, the consummation of the Transaction or the making of the loans, the issuance of Letters of Credit or the transactions contemplated by the Documents.

(i)     Fees, etc.  On the Initial Borrowing Date, the Borrower shall have paid to the Agents and the Lenders all costs, fees and expenses (including, without limitation, legal fees and expenses of the Agents and their affiliates incurred prior to the Initial Borrowing Date) payable to the Agents and the Lenders or otherwise payable in respect of the Transaction to the extent then due.

(j)     Operating in Ordinary Course.  During the period from May 24, 2004 through the Initial Borrowing Date, the Borrower and its subsidiaries shall have been operated in the ordinary course (recognizing that certain changes in the way the Borrower and its subsidiaries operate may be required as a result of operating in a Chapter 11 proceeding) and there shall not have been sold any material assets of the Borrower and its subsidiaries other than in the ordinary course and consistent with past practice or as otherwise approved by the Administrative Agent and the Required Lenders.

(k)     Management.  On the Initial Borrowing Date, the Administrative Agent and the Required Lenders shall be satisfied with the management of the Borrower and its Subsidiaries.

(l)     Corporate Documents; Proceedings; etc.  (i) On the Initial Borrowing Date, the Administrative Agent shall have received a certificate, dated the Initial Borrowing Date, signed by an authorized officer of each Credit Party and attested to by the Secretary or any Assistant Secretary of such Credit Party, substantially in the form of Exhibit F with appropriate insertions, together with copies of the certificate of incorporation, by-laws or equivalent organizational documents of such Credit Party, and the resolutions of such Credit Party authorizing the transactions referred to herein and occurring on or prior to the Initial Borrowing Date.

(ii)     All corporate, partnership, limited liability company and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Documents shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of corporate proceedings, governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the

Administrative Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper corporate or governmental authorities.

      (m)   <u>The Transaction, etc</u>.  (i)  On or prior to the Initial Borrowing Date, (i) there shall have been delivered to the Administrative Agent true and correct copies of the Confirmation Order (which shall be a Final Order), the Plan of Reorganization, the Disclosure Statement and the other Plan Documents, which Confirmation Order, Plan of Reorganization, Disclosure Statement and other Plan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and shall be in full force and effect on the Initial Borrowing Date (and with the Confirmation Order, the Plan of Reorganization and the Disclosure Statement also to be certified by the Bankruptcy Court), (ii) there shall have been delivered to the Administrative Agent a true and correct copy of the Notice of Plan Effective Date, which Notice of Plan Effective Date shall be in form and substance reasonably satisfactory to the Administrative Agent, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not be subject to any stay, (iii) all conditions precedent to the effective date of the Plan of Reorganization shall have been satisfied (and not waived without the consent of the Administrative Agent and the Required Lenders) to the reasonable satisfaction of the Administrative Agent, (iv) the effective date of the Plan of Reorganization shall have occurred and the Plan of Reorganization shall have been substantially consummated, and (v) no request to revoke the Confirmation Order shall be pending before the Bankruptcy Court.

      (ii)  On the Initial Borrowing Date and prior to or concurrently with the incurrence of the Term Loans hereunder, each element of the Transaction shall have been consummated in accordance with the Plan of Reorganization, the other applicable Plan Documents and all applicable laws.

      (iii)  On the Initial Borrowing Date, (x) the aggregate amount of proceeds received by the Borrower from the Term Loans incurred on the Initial Borrowing Date when added to the net cash proceeds received by the Borrower from the issuance of the Second-Lien Notes, shall be sufficient to make all cash payments required to be made pursuant to the Plan of Reorganization, (y) the Borrower shall have at least $115,000,000 of unrestricted cash and/or Cash Equivalents on hand after making all cash payments required to be made pursuant to the Plan of Reorganization and (z) the Administrative Agent shall have received evidence, in form, scope and substance reasonably satisfactory to it, that the matters set forth above in this Section 5.01(m)(iii) have been satisfied on such date.

      (n)   <u>Existing Indebtedness and Preferred Equity</u>.  On the Initial Borrowing Date and after giving effect to the consummation of the Transaction, the Borrower and its Subsidiaries shall have no outstanding preferred equity or Indebtedness, except for (i) Indebtedness pursuant to (or in respect of) the Credit Documents, (ii) Indebtedness pursuant to (or in respect of) the Second-Lien Note Documents, (iii) Indebtedness (not to exceed $35,000,000 in original aggregate principal amount) pursuant to (or in respect of) the Third-Lien Credit Documents and (iv) such other Indebtedness assumed by the Borrower and its Subsidiaries pursuant to the Plan of Reorganization (the "Assumed Indebtedness"), if any, as shall be permitted by the Administrative Agent and the Required Lenders to remain outstanding (all of which Indebtedness described in this clause (iv) shall be specifically listed as Assumed Indebtedness on

Schedule VI), provided that such Assumed Indebtedness shall not exceed $[15],000,000 in the aggregate. On and as of the Initial Borrowing Date, all Indebtedness to remain outstanding as described in the immediately preceding sentence shall remain outstanding after giving effect to the Transaction and the other transactions contemplated hereby without any breach, required repayment, required offer to purchase, default, event of default or termination rights existing thereunder or arising as a result of the Transaction and the other transactions contemplated hereby and there shall not be any amendments or modifications to the documents governing any Existing Indebtedness that are adverse to the interests of the Lenders (other than as requested or approved by the Administrative Agent). On and as of the Initial Borrowing Date, the Administrative Agent shall be satisfied with the amount of and the terms and conditions of all Indebtedness described above in this Section 5.01(n).

(o)    Subsidiaries Guaranties. On the Initial Borrowing Date, each Subsidiary Guarantor shall have duly authorized, executed and delivered the Subsidiaries Guaranty substantially in the form of Exhibit M (as amended, modified, restated and/or supplemented from time to time, the "Subsidiaries Guaranty"), guaranteeing all of the obligations of the Borrower as more fully provided therein, and the Subsidiaries Guaranty shall be in full force and effect.

(p)    Pledge Agreement. On the Initial Borrowing Date, each Credit Party shall have duly authorized, executed and delivered the Pledge Agreement in the form of Exhibit G (as amended, modified or supplemented from time to time, the "Pledge Agreement") and shall have delivered to the Collateral Agent, as Pledgee thereunder, all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, (i) endorsed in blank in the case of promissory notes constituting Pledge Agreement Collateral and (ii) together with executed and undated endorsements for transfer in the case of equity interests constituting certificated Pledge Agreement Collateral, along with evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Pledge Agreement have been taken and the Pledge Agreement shall be in full force and effect.

(q)    Security Agreement. On the Initial Borrowing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement in the form of Exhibit H (as amended, modified or supplemented from time to time, the "Security Agreement") covering all of such Credit Party's Security Agreement Collateral, together with:

(i)    proper financing statements (Form UCC-1 or the equivalent) fully executed for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Security Agreement, with arrangements having been made by the Borrower which are satisfactory to the Administrative Agent to ensure that such financing statements are filed before any financing statements are filed in connection with the Second-Lien Note Documents or the Third-Lien Credit Documents;

(ii)    certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Borrower or any of its Subsidiaries as debtor and that are filed in the jurisdictions referred to in clause (i) above and in such other jurisdictions in which Collateral is located on the Initial

Borrowing Date, together with copies of such other financing statements that name the Borrower or any of its Subsidiaries as debtor (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Collateral Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(iii)    evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests intended to be created by the Security Agreement; and

(iv)    evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect and protect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect.

(r)    <u>Mortgages; Title Insurance; Surveys; etc</u>.  On the Initial Borrowing Date, the Collateral Agent shall have received:

(i)    fully executed counterparts of a Mortgage, in form and substance reasonably satisfactory to the Administrative Agent, which Mortgage shall cover the Real Property owned or leased by the Borrower or a Subsidiary Guarantor and designated as a "Mortgaged Property" on Schedule III, together with evidence that counterparts of such Mortgage have been delivered to the title insurance company insuring the Lien of such Mortgage for recording in all places to the extent necessary or, in the reasonable opinion of the Collateral Agent desirable, to effectively create a valid and enforceable first priority mortgage lien, subject only to Permitted Encumbrances, on the Mortgaged Property described therein in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors;

(ii)    such consents, approvals, amendments, supplements, estoppels, tenant subordination agreements or other instruments as shall be reasonably deemed necessary by the Administrative Agent in order for the owner or holder of the fee interest constituting such Mortgaged Property to grant the Lien contemplated by the Mortgage with respect to such Mortgaged Property;

(iii)    a Mortgage Policy relating to the Mortgage on each Mortgaged Property referred to above issued by a title insurer reasonably satisfactory to the Collateral Agent and in amounts satisfactory to the Collateral Agent and assuring the Collateral Agent that the Mortgage on such Mortgaged Property is a valid and enforceable first priority mortgage lien on such Mortgaged Property, free and clear of all defects and encumbrances except Permitted Encumbrances, and such Mortgage Policy shall otherwise be in form and substance reasonably satisfactory to the Collateral Agent and shall include, as appropriate, an endorsement for future advances under this Agreement and the Term Notes and for any other matter that the Collateral Agent in its discretion may reasonably request, shall not include a survey exception or an exception for mechanics' liens, and shall provide for affirmative insurance and such reinsurance as the Collateral Agent in its discretion may reasonably request;

(iv)    such affidavits, certificates, information (including financial data) and instruments of indemnification (including, without limitation, a so-called "gap" indemnification) as shall be required to induce the title company to issue the Mortgage Policies referred to in subsection (iii) above;

(v)    evidence reasonably acceptable to the Collateral Agent of payment by the Borrower of all Mortgage Policy premiums in respect of such Mortgage Property, search and examination charges, and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of such Mortgage Policies;

(vi)    a copy of a recent survey of each Mortgaged Property;

(vii)    to the extent obtainable on or prior to the Initial Borrowing Date, fully executed landlord waivers in respect of those Leaseholds of the Borrower designated as "Leaseholds Subject to Landlord Waivers" on Schedule III, each of which landlord waivers shall be in form and substance reasonably satisfactory to the Collateral Agent;

(viii)    to the extent requested by the Collateral Agent, copies of all leases in which the Borrower holds the lessor's interest or other agreements relating to possessory interests, if any; provided that, to the extent any of the foregoing affect such Mortgaged Property, such agreements shall be subordinate to the Liens of the Mortgage to be recorded against such Mortgaged Property, either expressly by its terms or pursuant to a subordination, non-disturbance and attornment agreement (with any such agreement being reasonably acceptable to the Administrative Agent); and

(ix)    flood certificates covering such Mortgaged Property in form and substance acceptable to the Administrative Agent, and certifying whether or not each such Mortgaged Property is located in a flood hazard area, as determined by reference to the applicable FEMA map.

(s)    Intercreditor Agreement.  Each Credit Party, the Administrative Agent, the Second-Lien Administrative Agent, the Third-Lien Administrative Agent, the Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent shall have duly authorized, executed and delivered the Intercreditor Agreement in the form of Exhibit I hereto (as amended, modified, restated and/or supplemented from time to time, the "Intercreditor Agreement"), and the Intercreditor Agreement shall be in full force and effect.

(t)    Financial Statements; etc.  (i)  On or prior to the Initial Borrowing Date, the Administrative Agent and the Lenders shall have received (x) true and correct copies of the historical financial statements, the pro forma financial statements and the Projections referred to in Sections 7.05(a) and (d), which historical financial statements, pro forma financial statements and Projections shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and, (y) a certificate from the chief financial officer of the Borrower (together with appropriate calculations provided as an attachment to such certificate), demonstrating to the Agents' reasonable satisfaction, that (1) Consolidated EBITDA for the twelve months ended for which financial statements are required to be furnished pursuant to the following clause (ii) is at least $[_____], and (2) the other covenants described herein

shall been satisfied on the Initial Borrowing Date and will be satisfied on a pro forma basis after giving effect to the Transaction.

(ii)  On or prior to the Initial Borrowing Date, the Agents and the Lenders shall have received (x) interim quarterly (and year to date) consolidated financial statements of the Borrower and its Subsidiaries for each fiscal quarter ended (1) after the date of the last financial statements for such Persons previously furnished to the Agents and the Lenders pursuant to Section 7.05(a), and (2) at least 45 days prior to the Initial Borrowing Date and (y) interim monthly consolidated financial statements of the Borrower and its Subsidiaries for any calendar month ended after the date of the last quarterly financial statements furnished pursuant to preceding clause (x) and at least [___] days prior to the Initial Borrowing Date.

(u)  Solvency Opinion; Insurance Certificates.  On the Initial Borrowing Date, the Administrative Agent shall have received:

(i)  a solvency opinion from the chief financial officer of the Borrower in the form of Exhibit J; and

(ii)  certificates of insurance complying with the requirements of Section 8.03 for the business and properties of the Borrower and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent.

Upon the occurrence of the Initial Borrowing Date, the Administrative Agent shall give each Lender and the Borrower notice that the Initial Borrowing Date has occurred (although the failure to give any such notice shall not affect any Lender's or the Borrower's obligations under this Agreement).

SECTION 6.  Conditions Precedent to All Credit Events.  The obligation of each Lender to make Term Loans (including Term Loans made on the Initial Borrowing Date, but excluding conversions or continuations made in accordance with Sections 1.06 and/or 1.09) and the obligation of an Issuing Lender to issue any Letter of Credit is subject, at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction of the following conditions:

6.01  No Default; Representations and Warranties  At the time of each such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein or in any other Credit Document shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of the making of such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

6.02  Notice of Borrowings; Letter of Credit Request.  Prior to the making of each Loan, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 1.03(a).  Prior to the issuance of each Letter of Credit, the Administrative Agent and the respective Issuing Lender shall have received a Letter of Credit Request meeting the requirements of Section 2.03(a).

The acceptance of the benefits or proceeds of each Credit Event, in each case, shall constitute a representation and warranty by the Borrower to the Administrative Agent and each of the Lenders that all the conditions specified in Section 5 (with respect to Credit Events occurring on the Initial Borrowing Date) and in this Section 6 (with respect to Credit Events occurring on or after the Initial Borrowing Date) and applicable to such Credit Event exist as of that time. All of the Term Notes, certificates, legal opinions and other documents and papers referred to in Section 5 and in this Section 6, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Term Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 7. <u>Representations, Warranties and Agreements</u>. In order to induce the Lenders to enter into this Agreement and to make the Term Loans, and issue (or participate in) the Letters of Credit as provided herein, the Borrower makes the following representations, warranties and agreements, in each case after giving effect to the Transaction, all of which shall survive the execution and delivery of this Agreement and the Term Notes and the making of the Term Loans and the issuance of the Letters of Credit, with the occurrence of each Credit Event on or after the Initial Borrowing Date being deemed to constitute a representation and warranty that the matters specified in this Section 7 are true and correct in all material respects on and as of the Initial Borrowing Date and on the date of each such other Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

7.01 <u>Organizational Status</u>. Each of the Borrower and each of its Subsidiaries (i) is a duly organized and validly existing corporation, partnership or limited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the corporate, partnership or limited liability company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

7.02 <u>Power and Authority</u>. Each Credit Party has the corporate, partnership or limited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of each of the Documents to which it is party and has taken all necessary corporate, partnership or limited liability company action, as the case may be, to authorize the execution, delivery and performance by it of each of such Documents. Each Credit Party has duly executed and delivered each of the Documents to which it is party, and each of such Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

7.03    No Violation.   Neither the execution, delivery or performance by any Credit Party of the Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality or the terms of any FCC License or other Governmental Authorization, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents, the Second-Lien Security Documents and the Third-Lien Credit Documents) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or Term Loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject, or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries.

7.04    Approvals.    No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (w) those that have otherwise been obtained or made on or prior to the Initial Borrowing Date and which remain in full force and effect on the Initial Borrowing Date, (y) filings which are necessary to perfect the security interests created under the Security Documents, which filings shall have been made (or will be made within ten days of the Initial Borrowing Date), (y) filings which are necessary to perfect the security interests created under the Second-Lien Security Documents, which filings will be made after the filings described in clause (x) and within ten days following the Initial Borrowing Date and (z) filings which are necessary to perfect the security interests created under the Third-Lien Credit Documents, which filings will be made after the filings described in clauses (x) and (y) and within ten days of the Initial Borrowing Date), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (i) the execution, delivery and performance of any Document or (ii) the legality, validity, binding effect or enforceability of any such Document.

7.05    Financial Statements; Financial Condition; Undisclosed Liabilities; Projections.  (a) (i) The consolidated balance sheets of the Borrower and its subsidiaries as at December 31, 2001, December 31, 2002, December 31, 2003, March 31, 2004, June 30, 2004 and September 30, 2004, and the related consolidated statements of income, cash flows and retained earnings of the Borrower for the fiscal years ended December 31, 2001, 2002 and 2003 and the six- and nine-month periods ended June 30, 2004 and September 30, 2004, copies of which have been furnished to the Lenders prior to the Initial Borrowing Date, present fairly in all material respects the consolidated financial position of the Borrower at the dates of such balance sheets and the consolidated results of the operations of the Borrower for the periods covered thereby.  All interim monthly or quarterly financial statements furnished to the Administrative Agent and the Lenders prior to the Initial Borrowing Date, as the case may be, present fairly in all material respects in accordance with GAAP the consolidated results of the operations of the Borrower and its Subsidiaries, for the periods covered thereby  (except, in the case of the aforementioned quarterly or monthly financial statements, for normal year-end audit adjustments

and the absence of footnotes). All of the foregoing historical financial statements have been prepared in accordance with generally accepted accounting principles consistently applied (except, in the case of the aforementioned quarterly or monthly financial statements, for normal year-end audit adjustments and the absence of footnotes).

(ii) The Pro Forma Financials, copies of which have been furnished to the Lenders prior to the Initial Borrowing Date, present in all material respects the pro forma consolidated financial position and results of operations of the Borrower and its Subsidiaries (after giving effect to the Transaction) as at the dates and for the periods covered thereby.

(b) On and as of the Initial Borrowing Date and after giving effect to the Transaction and to all Indebtedness (including the Term Loans and Indebtedness incurred pursuant to the Second-Lien Note Indenture and the Third-Lien Credit Agreement) being incurred or assumed and Liens created by the Credit Parties in connection therewith (i) the sum of the assets, at a fair valuation, of the Borrower on a stand-alone basis and of the Borrower and its Subsidiaries taken as a whole will exceed their respective debts, (ii) each of the Borrower on a stand-alone basis and the Borrower and its Subsidiaries taken as a whole have not incurred and do not intend to incur, and do not believe that they will incur, debts beyond their respective ability to pay such debts as such debts mature, and (iii) the Borrower on a stand-alone basis and the Borrower and its Subsidiaries taken as a whole will have sufficient capital with which to conduct their respective businesses. For purposes of this Section 7.05(b), "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(c) Except as fully disclosed in the financial statements delivered pursuant to Section 7.05(a) there were as of the Initial Borrowing Date no liabilities or obligations with respect to the Borrower or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be material to the Borrower or any of its Subsidiaries. As of the Initial Borrowing Date, the Borrower knows of no basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements delivered pursuant to Section 7.05(a) or referred to in the immediately preceding sentence which, either individually or in the aggregate, could reasonably be expected to be material to the Borrower or any of its Subsidiaries.

(d) The Projections delivered to the Administrative Agent and the Lenders on or prior to the Initial Borrowing Date, as the case may be, have been prepared in good faith and are based on reasonable assumptions, and there are no statements or conclusions in the Projections which are based upon or include information known to the Borrower to be misleading in any material respect or which fail to take into account material information known to the Borrower regarding the matters reported therein. On the Initial Borrowing Date, the

Borrower believes that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results and such differences may be material.

(e)     Since December 31, 2003, there has been no changes, events and/or occurrences that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

7.06    <u>Litigation</u>.  There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened (i) with respect to the Transaction or any Document or (ii) that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

7.07    <u>True and Complete Disclosure</u>.  All factual information (taken as a whole) furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

7.08    <u>Use of Proceeds; Margin Regulations</u>.  (a)   All proceeds of the Term Loans will be used by the Borrower to finance, in part, the Transaction and to pay the fees and expenses relating to the Transaction.

(b)     All proceeds of any Letters of Credit will be used for the purposes described in Section 2.01(a).

(c)     No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Term Loan or the issuance of any Letter of Credit, nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

7.09    <u>Tax Returns and Payments</u>.  Each of the Borrower and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all federal income tax and other material returns, statements, forms and reports for taxes (the "<u>Returns</u>") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Subsidiaries.  The Returns accurately reflect in all material respects all liability for taxes of the Borrower and its Subsidiaries for the periods covered thereby.  Each of the Borrower and each of its Subsidiaries has paid all taxes and assessments payable by it which have become due, other than (i) those that are immaterial, (ii) those being contested in

good faith and adequately disclosed and fully provided for on the financial statements of the Borrower and its Subsidiaries in accordance with generally accepted accounting principles, (iii) those discharged pursuant to the Plan of Reorganization [and (iv) those payable over time pursuant to the Plan of Reorganization (which taxes and assessments, in the case of this clause (iv) and to the extent due in accordance with the Plan of Reorganization, have been paid in all material respects in accordance with the terms of the Plan of Reorganization)]. There is no action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of the Borrower, threatened by any authority regarding any material taxes relating to the Borrower or any of its Subsidiaries. [Except as provided in Schedule__,] as of the Initial Borrowing Date, neither the Borrower nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of the Borrower or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Borrower or any of its Subsidiaries not to be subject to the normally applicable statute of limitations. [Except as provided on Schedule __,] neither the Borrower nor any of its Subsidiaries has incurred, nor will any of them incur, any material tax liability in connection with the Transaction or any other transactions contemplated hereby (it being understood that the representation contained in this sentence does not cover any future tax liabilities of the Borrower or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business).

7.10    Compliance with ERISA.  Schedule IV sets forth, as of the Initial Borrowing Date, the name of each Plan.  Each Plan (and each related trust) is in substantial compliance with its terms and with all applicable laws, including, without limitation, ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received or timely applied for a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code within the preceding six years; neither the Borrower nor any of its Subsidiaries or ERISA Affiliates has ever maintained or contributed to, or had any obligation to maintain or contribute to (or borne any liability with respect to) any "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, that is a "multiemployer plan," within the meaning of Section 3(37) of ERISA, or that is subject to the minimum funding standards of Section 412 of the Code or Section 302 of  ERISA or subject to Title IV of ERISA; neither the Borrower nor any of its Subsidiaries or ERISA Affiliates has any obligation to maintain or contribute to (or borne any liability with respect to) any Foreign Pension Plan; all contributions required to be made with respect to a Plan have been timely made; neither the Borrower nor any Subsidiary of the Borrower nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4204 or 4212 of ERISA or Section 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a material risk to the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or, to the knowledge of the Borrower, threatened; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Borrower, any Subsidiary of the Borrower, or any ERISA Affiliate has at all times been operated in compliance with the

provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code, except to the extent that any failure to comply could not reasonably be expected to result in a material liability to the Borrower or any Subsidiary of the Borrower; each group health plan (as defined in 45 Code of Federal Regulations Section 160.103) which covers or has covered employees or former employees of the Borrower, any Subsidiary of the Borrower, or any ERISA Affiliate has at all times been operated in compliance with the provisions of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder, except to the extent that any failure to comply could not reasonably be expected to result in a material liability to the Borrower or any Subsidiary of the Borrower; no lien imposed under the Code or ERISA on the assets of the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate exists or is likely to arise on account of any Plan; and the Borrower and its Subsidiaries may cease contributions to or terminate any employee benefit plan maintained by any of them without incurring any material liability.

        7.11   <u>The Security Documents</u>. (a) The provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has (or will have within ten days of the Initial Borrowing Date) a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral described therein, subject to no other Liens other than Permitted Liens. Following the recordation of (x) the Grant of Security Interest in U.S. Patents, if applicable, and (y) the Grant of Security Interest in U.S. Trademarks, if applicable, in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, the Collateral Agent for the benefit of the Secured Creditors will have, as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Security Agreement, and following the recordation of the Grant of Security Interest in U.S. Copyrights, if applicable, in the form attached to the Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, the Collateral Agent for the benefit of the Secured Creditors will have, as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Security Agreement.

        (b)   The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person. No filings or recordings are required in order to perfect (or maintain the perfection or priority of) the security interests created in the Pledge Agreement Collateral under the Pledge Agreement other than with respect to that portion of the Pledge Agreement Collateral constituting a "general intangible" under the UCC.

        (c)   Each Mortgage creates, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest and mortgage lien created on such

Mortgaged Property may be subject to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Liens related thereto).

7.12    Properties.  All Real Property [having a [book/fair market] value in excess of $_____ that is] owned [or leased] by the Borrower or any of its Subsidiaries as of the Initial Borrowing Date, and the nature of the interest therein, is correctly set forth in Schedule III.  Each of the Borrower and each of its Subsidiaries has good and indefeasible title to all material properties owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 7.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

7.13    Capitalization.  On the Initial Borrowing Date, the authorized capital stock of the Borrower consists of [____] shares of common stock, [___] par value, of which [___] shares are issued and outstanding.  All outstanding shares of capital stock of the Borrower have been duly and validly issued and are fully paid and non-assessable.

7.14    Subsidiaries.  On and as of the Initial Borrowing Date and after giving effect to the Transaction, the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule V.  Schedule V correctly sets forth, as of the Initial Borrowing Date and after giving effect to the Transaction, (i) the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof and (ii) the jurisdiction of organization of each such Subsidiary.  All outstanding shares of capital stock or other Equity Interests of each Subsidiary have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  On the Initial Borrowing Date and after giving effect to the Transaction, except as set forth on Schedule V, no Subsidiary of the Borrower has outstanding any securities convertible into or exchangeable for its capital stock or other Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its capital stock or other Equity Interests or any stock appreciation or similar rights.

7.15    Compliance with Statutes, etc.  Each of the Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business, the holding of the FCC Licenses and the other Governmental Authorizations and the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.16    Investment Company Act.  Neither the Borrower nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

7.17    Public Utility Holdings Company Act.  Neither the Borrower nor any of its Subsidiaries is a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holdings Company Act of 1935, as amended.

7.18    Environmental Matters.  (a)    Each of the Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws.  There are no pending or, to the knowledge of the Borrower, threatened Environmental Claims against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries (including, to the Borrower's knowledge, any such claim arising out of the ownership, lease or operation by the Borrower or any of its Subsidiaries of any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries but no longer owned, leased or operated by the Borrower or any of its Subsidiaries).  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Borrower or any of its Subsidiaries, or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries (including, to the Borrower's knowledge, any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries but no longer owned, leased or operated by the Borrower or any of its Subsidiaries) or, to the knowledge of the Borrower, any property adjoining or adjacent to any such Real Property that could be reasonably expected (i) to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or (ii) to cause any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or trans-ferability of such Real Property by the Borrower or any of its Subsidiaries under any applicable Environmental Law.

(b)    Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, any property adjoining or adjacent to any Real Property, where such generation, use, treatment, storage, transportation or Release has violated or could be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim.

(c)    Notwithstanding anything to the contrary in this Section 7.18, the representations and warranties made in this Section 7.18 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliances of the types described above could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.19    Labor Relations.  Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened

against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries and (iii) no union representation question exists with respect to the employees of the Borrower or any of its Subsidiaries, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

        7.20   <u>Intellectual Property, etc.</u>  Each of the Borrower and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, necessary for the conduct of its business (the "<u>Business Intellectual Property</u>") without any known conflict with the rights of others arising from the Borrower's or its Subsidiaries' use of the Business Intellectual Property which, or the failure to obtain which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

        7.21   <u>Indebtedness</u>.  Schedule VI sets forth a true and complete list of all Indebtedness (including Contingent Obligations) of the Borrower and its Subsidiaries as of the Initial Borrowing Date (excluding the Term Loans, the Letters of Credit and the Indebtedness incurred pursuant to the Second-Lien Note Indenture and the Third-Lien Credit Agreement) (the "<u>Existing Indebtedness</u>") which is to remain outstanding after giving effect to the Transaction, in each case showing the aggregate principal amount thereof and the name of the respective borrower and any Credit Party or any of its Subsidiaries which directly or indirectly guarantees such debt.

        7.22   <u>Insurance</u>.  Schedule VII sets forth a true and complete listing of all insurance maintained by the Borrower and its Subsidiaries as of the Initial Borrowing Date, with the amounts insured (and any deductibles) set forth therein.

        7.23   <u>Representations and Warranties in Other Documents</u>.  All representations and warranties set forth in the other Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Initial Borrowing Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

        7.24   <u>FCC Licenses and Other Governmental Authorizations</u>.  (a)  The Borrower and its Subsidiaries hold all FCC licenses, registrations and authorizations as are necessary to the Borrower's and its Subsidiaries' businesses (collectively, the "<u>FCC Licenses</u>"). Each of the FCC Licenses that is material to the business of the Borrower or any of its Subsidiaries has been validly issued and is in full force and effect. All FCC Licenses in effect on the Initial Borrowing Date and their respective expiration dates are listed and described on Schedule X and true copies of such FCC Licenses, with any and all modifications, amendments, and pending applications therefor or relating thereto, as of the Initial Borrowing Date have been

furnished to the Administrative Agent. The Borrower has no knowledge of any condition imposed by the FCC as part of any FCC License which is neither set forth on the face thereof as issued by the FCC nor contained in the policies, rules and regulations of the FCC applicable generally to business of the type, nature, class or location of the Borrower and its Subsidiaries. The Borrower and its Subsidiaries are in compliance in all material respects with the terms and conditions of the FCC Licenses applicable to it and with the policies, rules and regulations of the FCC and the Communications Act of 1934, as amended (the "Communications Act"). No proceedings are pending or are, to the knowledge of the Borrower, threatened which may reasonably be expected to result in the revocation, rescission, modification, non-renewal or suspension of any FCC License that is material to the business of the Borrower or any of its Subsidiaries, the denial of any pending applications, the issuance of any cease and desist order or the imposition of any fines, forfeitures or other administrative actions by the FCC with respect to the Borrower or any of its Subsidiaries. All reports, applications, tariffs and other documents required to be filed by the Borrower or any of its Subsidiaries, as appropriate, with the FCC have in all material respects been timely filed and all such reports, applications, tariffs and documents are true, correct and complete in all material respects. To the knowledge of the Borrower, there are no unsatisfied or otherwise outstanding citations, complaint proceedings, notices of liability or notices of forfeiture issued by the FCC and received by the Borrower or a Subsidiary thereof with respect to the Borrower or any of its Subsidiaries or any of their respective operations.

(b)     In addition to the FCC Licenses issued by the FCC, the Borrower and its Subsidiaries hold all material licenses, certificates, registrations and authorizations issued by any other governmental entity (domestic and foreign) necessary to operate their respective businesses for each line of business of the Borrower or any of its Subsidiaries requiring such authorization and in each jurisdiction in which Borrower or any of its Subsidiaries may be deemed to be conducting their respective businesses under applicable law (collectively, the "Governmental Authorizations"). Each of the Governmental Authorizations has been validly issued and is in full force and effect. The Governmental Authorizations as of the Initial Borrowing Date are listed on Schedule XI, with any expiration date for any such authorization identified on Schedule XI, with authorizations issued by state public service or utility commissions (or analogous state authorities) listed in Part A of Schedule XI and other Governmental Authorizations listed in Part B of Schedule XI. None of the Governmental Authorizations contain any conditions or limitations outside the normal course that would materially and adversely restrict the operations of the Borrower or any of its Subsidiaries. The Borrower and its Subsidiaries have been and are in compliance in all material respects with the terms and conditions of the Governmental Authorizations applicable to them. Other than the proceedings of a general nature, no proceedings are pending or are, to the knowledge of the Borrower, threatened, and, to the Borrower's knowledge, no event has occurred, which may reasonably be expected to result in the revocation, rescission, adverse modification, non-renewal or suspension of any Governmental Authorization that is material to the business of the Borrower or any of its Subsidiaries, the denial of any pending applications therefor, the issuance of any cease and desist order, or the imposition of any material fines, forfeitures, or other administrative actions by a governmental entity. All reports, applications, tariffs and other documents required to be filed by the Borrower or any of its Subsidiaries, as appropriate, with the governmental entity issuing a Government Authorization have in all material respects been timely filed, and all such reports, applications, tariffs and documents are true, correct and complete in all material respects. To the knowledge of the Borrower, there are no material unsatisfied or otherwise outstanding citations issued by

any governmental entity and received by the Borrower or a Subsidiary thereof with respect to the Borrower or any of its Subsidiaries. Schedule XI separately lists all pending applications for certificates or other authorizations from any state public service or utility commission (or analogous state authority).

(c)     The transactions contemplated herein, under applicable law (including the Communications Act) and the applicable policies, rules, regulations and practices of the FCC and other governmental entities, would not disqualify the Borrower or any of its Subsidiaries as an assignee or transferee of the FCC Licenses or the Governmental Authorizations or result in the imposition of any materially adverse condition on or modification of the FCC Licenses or the Governmental Authorizations. [Note: License Subsidiary to be discussed]

7.25     Intercreditor Agreement.  The Intercreditor Agreement is enforceable against the parties thereto (and the Creditors as defined therein) in accordance with its terms.

7.26     Certain Agreements.  (a)  Neither the Borrower nor any of its Subsidiaries is a party to any agreement or instrument or subject to any corporate, partnership or limited liability company restriction, as the case may be, that, either individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)     Neither the Borrower nor any of its Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, if such default, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

7.27     RCN International.  RCN International is a Delaware corporation which has no significant assets or material liabilities except as permitted in accordance with the relevant provisions of Section 9.16(b).

SECTION 8.     Affirmative Covenants.  The Borrower hereby covenants and agrees that on and after the Effective Date and until the Total Commitment and all Letters of Credit have terminated and the Term Loans, Term Notes and Unpaid Drawings (in each case together with interest thereon), Fees and all other Obligations (other than indemnities described in Section 13.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

8.01     Information Covenants.  The Borrower will furnish to each Lender:

(a)     Monthly Reports.  Within 30 days after the end of each fiscal month of the Borrower (commencing with its fiscal month ending on January 31, 2005), the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal month and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year and comparable budgeted figures for such fiscal month as set forth in the respective budget delivered pursuant to Section 8.01(e), all of which shall be certified by an Authorized Representative of the Borrower that they fairly present in all material respects in

accordance with generally accepted accounting principles the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b) <u>Quarterly Financial Statements</u>. Within 45 days (or ___ days in the case of the first quarterly accounting period of the Borrower in the fiscal year 2005 and ___ days in the case of the second quarterly accounting period of the Borrower in the fiscal year 2005) after the close of each of the first three quarterly accounting periods in each fiscal year of the Borrower (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year and comparable budgeted figures for such quarterly accounting period as set forth in the respective budget delivered pursuant to Section 8.01(e), all of which shall be certified by Authorized Representative of the Borrower that they fairly present in all material respects in accordance with generally accepted accounting principles the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period, in each case without any material qualifications with respect thereto.

(c) <u>Annual Financial Statements</u>. Within 90 days after the close of each fiscal year of the Borrower (or by _____ ____, 2005 in the case of the fiscal year of the Borrower ending December 31, 2004), (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal year setting forth (commencing with the Borrower's fiscal year ended closest to December 31, 2005) comparative figures for the preceding fiscal year and certified (without any "going concern" or other qualification or exception) by [Friedman LLP] or other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent, together with a report of such accounting firm stating that in the course of its regular audit of the financial statements of the Borrower and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or an Event of Default relating to financial or accounting matters which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or an Event of Default has occurred and is continuing, a statement as to the nature thereof, and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year.

(d) <u>Management Letters</u>. Promptly after the Borrower's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(e) <u>Budgets</u>. Commencing with the fiscal year of the Borrower ending December 31, 2005, no later than 30 days following the first day of each fiscal year of the Borrower, a budget in form reasonably satisfactory to the Administrative Agent (including bud-

geted statements of income, cash flow statements and balance sheets for the Borrower and its Subsidiaries on a consolidated basis) (i) for each of the twelve months of such fiscal year prepared in detail and (ii) for the two immediately succeeding fiscal years prepared in summary form, in each case setting forth, with appropriate discussion, the principal assumptions upon which such budget is based.

        (f)    <u>Officer's Certificates</u>.   At the time of the delivery of the financial statements provided for in Sections 8.01(b) and (c), a compliance certificate from the chief financial officer of the Borrower in the form of Exhibit K certifying on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall (i) set forth in reasonable detail the calculations required to establish whether the Borrower and its Subsidiaries were in compliance with the provisions of Sections [4.02(e), 4.02(g), 9.01(x), 9.01(xii), 9.02(iv), 9.03, 9.04(iii), 9.04(v), 9.05(v) and 9.07 through 9.11], inclusive, at the end of such fiscal quarter or year, as the case may be, (ii) if delivered with the financial statements required by Section 8.01(c), set forth in reasonable detail (and the calculations required to establish) the amount of Excess Cash Flow and the Applicable ECF Percentage for the respective Excess Cash Payment Period, and (iii) certify that there have been no changes to Annexes C through F, and Annexes I through K, in each case of the Security Agreement and Annexes A through F of the Pledge Agreement, in each case since the Initial Borrowing Date or, if later, since the date of the most recent certificate delivered pursuant to this Section 8.01(f), or if there have been any such changes, a list in reasonable detail of such changes, and whether the Borrower and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

        (g)    <u>Notice of Default, Litigation and Material Adverse Effect</u>.  Promptly, and in any event within three Business Days after any officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries (x) which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (y) with respect to any Document, or (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect.

        (h)    <u>Other Reports and Filings</u>.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials and reports, if any, which the Borrower or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "<u>SEC</u>") or deliver to holders (or any trustee, agent or other representative therefor) of its material Indebtedness (including the Second-Lien Note Indenture and the Third-Lien Credit Agreement) pursuant to the terms of the documentation governing such Indebtedness.  The Borrower shall deliver an opinion of counsel covering the security interests granted pursuant to the Security Documents (in substantially the same form, and from the same counsel, required by the Second-Lien Note Indenture, but covering the Security Documents and the security interests created pursuant thereto rather than the security documents constituting Second-Lien Note Documents) contemporaneously with the delivery of any similar opinion to the trustee under the Second-Lien Note Indenture pursuant to Section 4.4 thereof so long as such

an opinion is required to be delivered pursuant to the Second-Lien Note Indenture or any related document.

(i) _Environmental Matters_. Promptly after any officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i) any pending or threatened Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries;

(ii) any condition or occurrence on or arising from any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that (a) results in noncompliance by the Borrower or any of its Subsidiaries with any applicable Environmental Law or (b) could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any such Real Property;

(iii) any condition or occurrence on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Real Property under any Environmental Law; and

(iv) the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; _provided_ that in any event the Borrower shall deliver to each Lender all notices received by the Borrower or any of its Subsidiaries from any government or governmental agency under, or pursuant to, CERCLA which identify the Borrower or any of its Subsidiaries as potentially responsible parties for remediation costs or which otherwise notify the Borrower or any of its Subsidiaries of potential liability under CERCLA.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Subsidiary's response thereto.

(j) _Other Information_. From time to time, such other information or documents (financial or otherwise) with respect to the Borrower or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

8.02 _Books, Records and Inspections; Annual Meetings_. (a) The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity with generally accepted accounting principles and all requirements of law shall be made of all dealings and transactions in relation to its

business and activities.  The Borrower will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent or any Lender to visit and inspect, under guidance of officers of the Borrower or such Subsidiary, any of the properties of the Borrower or such Subsidiary, and to examine the books of account of the Borrower or such Subsidiary and discuss the affairs, finances and accounts of the Borrower or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or any such Lender may reasonably request; provided, that unless an Event of Default shall have occurred and be continuing, such visit and inspection by any Lender shall occur no more than one time per year.

(b)     At a date to be mutually agreed upon between the Administrative Agent and the Borrower occurring on or prior to the 120th day after the close of each fiscal year of the Borrower, the Borrower will, at the request of the Administrative Agent, hold a meeting with all of the Lenders at which meeting will be reviewed the financial results of the Borrower and its Subsidiaries for the previous fiscal year and the budgets presented for the current fiscal year of the Borrower.

8.03    Maintenance of Property; Insurance.  (a)  The Borrower will, and will cause each of its Subsidiaries to, (i) keep all property necessary to the business of the Borrower and its Subsidiaries in good working order and condition, ordinary wear and tear excepted, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and its Subsidiaries, and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.  In addition to the requirements of the immediately preceding sentence, the Borrower will at all times cause insurance of the types described in Schedule VII to be maintained (with the same scope of coverage as that described in Schedule VII) at levels which are consistent with their practices immediately before the Initial Borrowing Date.  Such insurance shall include physical damage insurance on all real and personal property (whether now owned or hereafter acquired) on an all risk basis and business interruption insurance.  The provisions of this Section 8.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.  [In addition to the foregoing, the Borrower acknowledge and agree that (x) the Administrative Agent has the right, on an annual basis, to review the insurance then being maintained by the Borrower and its Subsidiaries and to require the Borrower and its Subsidiaries to increase their levels of coverage from that which then exists to the extent that the Administrative Agent has a reasonable basis to require same and (y) they will, within 30 days following such a request by the Administrative Agent, obtain such increased insurance coverage.]

(b)     The Borrower will, and will cause each of its Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Borrower and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall

not be canceled without at least 30 days' prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors, and (iv) shall be deposited with the Collateral Agent.

(c)     If the Borrower or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 8.03, or if the Borrower or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

8.04    Existence; Franchises.   The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits, copyrights, trademarks and patents; provided, however, that nothing in this Section 8.04 shall prevent (i) sales of assets and other transactions by the Borrower or any of its Subsidiaries in accordance with Section 9.02 or (ii) the withdrawal by the Borrower or any of its Subsidiaries of its qualification as a foreign corporation, partnership or limited liability company, as the case may be, in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.05    Compliance with Statutes, etc.   The Borrower will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.06    Compliance with Environmental Laws.   (a)  The Borrower will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, except such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws. Neither the Borrower nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at any such Real Properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of the Borrower or any of its Subsidiaries.

(b)    (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in Section 8.01(i), (ii) at any time that the Borrower or any of its Subsidiaries are not in compliance with Section 8.06(a) or (iii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to the last paragraph of Section 10, the Borrower will (in each case) provide, at the sole expense of the Borrower and at the request of the Administrative Agent, an environmental site assessment report concerning any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action in connection with such Hazardous Materials on such Real Property.  If the Borrower fails to provide the same within 30 days after such request was made, the Administrative Agent may order the same, the cost of which shall be borne by the Borrower, and the Borrower shall grant, and hereby grants, to the Administrative Agent and the Lenders and their respective agents access to such Real Property and specifically grants the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Borrower, all at the sole expense of the Borrower.

8.07    ERISA.  As soon as possible and, in any event, within ten (10) days after the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Borrower will deliver to each of the Lenders a certificate of the chief financial officer or the vice president-finance of the Borrower setting forth the full details as to such occurrence and the action, if any, that the Borrower, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by the Borrower, such Subsidiary, the Plan administrator or such ERISA Affiliate to or with the PBGC or any other governmental agency, or a Plan participant and any notices received by the Borrower, such Subsidiary or such ERISA Affiliate from the PBGC or any other government agency, or a Plan participant with respect thereto:  that a Reportable Event has occurred (except to the extent that the Borrower has previously delivered to the Lenders a certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65 (unless notice is waived under .65), .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that an accumulated funding deficiency, within the meaning of Section 412 of the Code or Section 302 of ERISA, has been incurred or an application may be or has been made for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code or Section 303 or 304 of ERISA with respect to a Plan; that any contribution required to be made with respect to a Plan or Foreign Pension Plan has not been timely made; that a Plan has been or may be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA; that a Plan has an Unfunded Current Liability; that proceedings may be or have been instituted to terminate or appoint a trustee to administer a Plan which is subject to Title IV of ERISA; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate will or may incur any liability (including any indirect, contingent, or secondary

liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409, 502(i) or 502(l) of ERISA; that the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate will or could reasonably be expected to incur any material liability with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; or that the Borrower or any Subsidiary of the Borrower is reasonably expected to incur material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan or any Foreign Pension Plan. The Borrower will deliver to each of the Lenders copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA. The Borrower will also deliver to each of the Lenders a complete copy of the annual report (on Internal Revenue Service Form 5500-series) of each Plan (including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to be filed with the Internal Revenue Service. In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of annual reports and any records, documents or other information required to be furnished to the PBGC or any other governmental agency, and any material notices received by the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate with respect to any Plan or Foreign Pension Plan or received from any governmental agency or plan administrator or sponsor or trustee with respect to any multiemployer plan (as defined in Section 4001(a)(3) of ERISA), shall be delivered to the Lenders no later than ten (10) days after the date such annual report has been filed with the Internal Revenue Service or such records, documents and/or information has been furnished to the PBGC or any other governmental agency or such notice has been received by the Borrower, the respective Subsidiary or the ERISA Affiliate, as applicable. The Borrower will ensure, and cause each of its applicable Subsidiaries to ensure, that all Foreign Pension Plans administered by it or into which it makes payments obtains or retains (as applicable) registered status under and as required by applicable law and is administered in a timely manner in all respects in compliance with all applicable laws except where the failure to do any of the foregoing could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. If, at any time after the Initial Borrowing Date, the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate maintains, or contributes to (or incurs an obligation to contribute to), a pension plan as defined in Section 3(2) of ERISA which is not set forth in Schedule IV, as may be updated from time to time, then the Borrower shall deliver to the Lenders an updated Schedule IV as soon as possible and, in any event, within ten (10) days after the Borrower, such Subsidiary or such ERISA Affiliate maintains, or contributes to (or incurs an obligation to contribute to), such pension plan. Such updated Schedule IV shall supersede and replaced the existing Schedule IV.

   8.08 <u>End of Fiscal Years; Fiscal Quarters</u>. The Borrower will cause (i) each of its, and each of its Subsidiaries', fiscal years to end on December 31 of each year and (ii) each of its, and each of its Subsidiaries', fiscal quarters to end on dates which are consistent with a fiscal year end as described above.

   8.09 <u>Performance of Obligations</u>. The Borrower will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture,

security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except such non-performances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.10    Payment of Taxes.  The Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, would or would reasonably be expected to, become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries not otherwise permitted under Section 9.01(i); provided that neither the Borrower nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with generally accepted accounting principles.

8.11    Use of Proceeds.  The Borrower will use the proceeds of the Term Loans only as provided in Section 7.08.

8.12    Additional Security; Further Assurances; etc.  (a)  The Borrower will, and will cause each of the other Credit Parties that are Subsidiaries of the Borrower to, grant to the Collateral Agent for the benefit of the Secured Creditors Security Interests and Mortgages in such assets, properties [and owned real properties having a [book/fair market] value in excess of $_____] of the Borrower and such other Credit Parties that are Subsidiaries of the Borrower as are not covered by the original Security Documents and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "Additional Security Documents"); provided that the Credit Parties shall not be required to grant Liens on assets that are subject to express exclusions in the Security Documents until (and then to the extent) such exclusions are no longer applicable.  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and shall constitute valid and enforceable perfected security interests and Mortgages superior to and prior to the rights of all third Persons and subject to no other Liens except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.  The Borrower shall make arrangements to ensure that all such recordations and filings made pursuant to this Section 8.12 or any of the Security Documents or Additional Security Documents are made at least one Business Day before any equivalent recordations or filings are made pursuant to the Second-Lien Note Documents or the Third-Lien Credit Documents.

(b)    The Borrower will, and will cause each of the other Credit Parties that are Subsidiaries of the Borrower to, at the expense of the Borrower and the Credit Parties, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, landlord waivers, bailee agreements, control agreements and other assurances or instruments and take

such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require. Furthermore, the Borrower will, and will cause the other Credit Parties that are Subsidiaries of the Borrower to, deliver to the Collateral Agent such opinions of counsel, title insurance and other related documents as may be reasonably requested by the Administrative Agent to assure itself that this Section 8.12 has been complied with.

(c)     If the Administrative Agent or the Required Lenders reasonably determine that they are required by law or regulation to have appraisals prepared in respect of any Real Property of the Borrower and its Subsidiaries constituting Collateral, the Borrower and the Borrower will, at their own expense, provide to the Administrative Agent appraisals which satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Financial Institution Reform, Recovery and Enforcement Act of 1989, as amended, and which shall otherwise be in form and substance reasonably satisfactory to the Administrative Agent.

(d)     The Borrower and the Borrower agree that each action required by clauses (a) through (c) of this Section 8.12 shall be completed as soon as possible, but in no event later than 60 days after such action is requested to be taken by the Administrative Agent or the Required Lenders; provided that, in no event will the Borrower or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 8.12.

8.13   <u>Ownership of Subsidiaries; etc.</u>  The Borrower will, and will cause each of its Subsidiaries to, own 100% of the capital stock and other Equity Interests of each of their Subsidiaries (other than directors' qualifying shares to the extent required by applicable law); provided that the foregoing shall not prohibit (x) Starpower from being a Non-Wholly-Owned Subsidiary prior to the consummation of the Starpower Acquisition as required by following Section 8.15 or (y) the Borrower and/or its Wholly-Owned Subsidiaries owning Equity Interests in any Non-Wholly-Owned Subsidiary acquired after the Initial Borrowing Date so long as all Investments therein made by the Borrower and its Subsidiaries are justified pursuant to clause (xi) of Section 9.05.

8.14   <u>Corporate Separateness.</u>  The Borrower will, and will cause each of its Subsidiaries to, satisfy customary corporate formalities, including, as applicable, the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting and the maintenance of corporate offices and records. Neither the Borrower nor any of its Subsidiaries shall take any action, or conduct its affairs in a manner, which is likely to result in the corporate existence of the Borrower or any of its Subsidiaries being ignored, or in the assets and liabilities of the Borrower or any of its Subsidiaries being substantively consolidated with those of any other such Person in a bankruptcy, reorganization or other insolvency proceeding.

8.15   <u>Starpower Acquisition.</u>  The Borrower shall consummate the Starpower Acquisition within 2 Business Days of the Initial Borrowing Date. Concurrently with consummation of the Starpower Acquisition, Starpower shall become a Subsidiary Guarantor and shall execute and deliver such Security Documents and take such other actions, as it would have taken on the Initial Borrowing Date had it been a Wholly-Owned Domestic Subsidiary

which was at such time a Credit Party, all to the reasonable satisfaction of the Administrative Agent.

8.16    Third-Lien Credit Agreement.  The Borrower shall pay interest under the Third-Lien Credit Agreement in-kind (or through the capitalization of interest in accordance with the terms of the Third-Lien Credit Agreement) and not in cash to the maximum extent permitted under the Third-Lien Credit Agreement.  The Borrower shall cause the outstanding Indebtedness under the Third-Lien Credit Agreement to not exceed at any time an amount equal to $[35],000,000 plus any increase in the principal amount thereof resulting from the payment-in-kind, or capitalization, of interest thereon as contemplated above.

8.17    Permitted Acquisitions.  (a)  Subject to the provisions of this Section 8.15 and the requirements contained in the definition of Permitted Acquisition, the Borrower and each Wholly-Owned Domestic Subsidiary of the Borrower which is a Subsidiary Guarantor may from time to time after [January 1, 2005] effect Permitted Acquisitions, so long as (in each case except to the extent the Required Lenders otherwise specifically agree in writing in the case of a specific Permitted Acquisition):  (i) no Default or Event of Default shall have occurred and be continuing at the time of the consummation of the proposed Permitted Acquisition or immediately after giving effect thereto;  (ii) the Borrower shall have given to the Administrative Agent and the Lenders at least 10 Business Days' prior written notice of any Permitted Acquisition (or such shorter period of time as may be reasonably acceptable to the Administrative Agent), which notice shall describe in reasonable detail the principal terms and conditions of such Permitted Acquisition;  (iii) calculations are made by the Borrower with respect to the financial covenants contained in Sections 9.08 through 9.11, inclusive, for the respective Calculation Period on a Pro Forma Basis as if the respective Permitted Acquisition (as well as all other Permitted Acquisitions and Material Asset Sales theretofore consummated after the first day of such Calculation Period) had occurred on the first day of such Calculation Period, and such calculations shall show that such financial covenants would have been complied with if the Permitted Acquisition had occurred on the first day of such Calculation Period;  (iv) based on good faith projections prepared by the Borrower for the period from the date of the consummation of the respective Permitted Acquisition to the date which is one year thereafter, the level of financial performance measured by the financial covenants set forth in Sections 9.08 through 9.11, inclusive, shall be better than or equal to such level as would be required to provide that no Default or Event of Default would exist under the financial covenants contained in such Sections 9.08 through 9.11, inclusive, as compliance with such financial covenants would be required through the date which is one year from the date of the consummation of the respective Permitted Acquisition;  (v) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Permitted Acquisition (both before and after giving effect thereto), unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date;  (vi) the aggregate consideration (including, without limitation, (I) the aggregate principal amount of any Indebtedness assumed, refinanced, incurred or issued in connection therewith and (II) the aggregate amount paid and reasonably expected to be paid (based on good faith projections prepared by the Borrower) pursuant to any non-compete, consulting or purchase price adjustments) payable for the proposed Permitted Acquisition, when added to the aggregate consideration paid or payable for all other Permitted

Acquisitions (x) effected during such fiscal year, does not exceed $5,000,000, or (y) effected after ____, does not exceed $____; (vii) the aggregate amount of deferred compensation or other deferred purchase price (including any earn-outs) paid in any fiscal year of the Borrower in respect of all Permitted Acquisitions (whether or not such Permitted Acquisitions were consummated during such fiscal year) shall not exceed $[_____] (it being understood and agreed, <u>however</u>, that any such deferred compensation or other deferred purchase price (including any earn-outs) shall be structured as a multiple of the excess of the cash flow of the Acquired Entity or Business that is the subject of the respective Permitted Acquisition for the most recently ended 12-month period above the cash flow for such Acquired Entity or Business for such 12-month period selected to determine the purchase price for such Permitted Acquisition); and (viii) the Borrower shall have delivered to the Administrative Agent and each Lender a certificate executed by its chief financial officer, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) through (vii), inclusive, and containing the calculations (in reasonable detail) required by preceding clauses (iii), (iv), (vi) and (vii).

(b)    At the time of each Permitted Acquisition involving the creation or acquisition of a Subsidiary, or the acquisition of capital stock or other Equity Interest of any Person, the capital stock or other Equity Interests thereof created or acquired in connection with such Permitted Acquisition shall be pledged for the benefit of the Secured Creditors pursuant to (and to the extent required by) the Pledge Agreement.

(c)    The Borrower will cause each Subsidiary which is formed to effect, or is acquired pursuant to, a Permitted Acquisition to comply with, and to execute and deliver all of the documentation as and to the extent required by, Sections 8.12 and 9.19, to the reasonable satisfaction of the Administrative Agent.

(d)    The consummation of each Permitted Acquisition shall be deemed to be a representation and warranty by each of the Borrower and the Borrower that the certifications pursuant to this Section 8.15 are true and correct and that all conditions thereto have been satisfied and that same is permitted in accordance with the terms of this Agreement, which representation and warranty shall be deemed to be a representation and warranty for all purposes hereunder, including, without limitation, Sections 7 and 10.

8.18    <u>Ratings</u>.    The Borrower shall at all times maintain a senior secured financing rating (of any level) from Moody's with respect to the Loans.

8.19    <u>RCN International/Megacable Entities</u>.    The Borrower shall at all times cause all of the Equity Interests of the Megacable Entities which are owned by the Borrower or any of its Subsidiaries to be directly owned by RCN International.

SECTION 9.    <u>Negative Covenants</u>.    The Borrower hereby covenants and agrees that on and after the Effective Date and until the Total Commitment and all Letters of Credit have terminated and the Term Loans, Term Notes and Unpaid Drawings (in each case, together with interest thereon), Fees and all other Obligations (other than any indemnities described in Section 13.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

9.01    Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to the Borrower or any of its Subsidiaries), or assign any right to receive income or consent to the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute; provided that the provisions of this Section 9.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "Permitted Liens"):

(i)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with generally accepted accounting principles;

(ii)    Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Borrower's or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)    Liens in existence on the Initial Borrowing Date which are listed, and the property subject thereto described, in Schedule VIII, but only to the respective date, if any, set forth in such Schedule VIII for the removal, replacement and termination of any such Liens, plus renewals, replacements and extensions of such Liens to the extent set forth on such Schedule VIII, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of the Borrower or any of its Subsidiaries;

(iv)    Liens created by or pursuant to (x) this Agreement and the Security Documents, (y) the Second-Lien Note Documents and the Third-Lien Credit Documents, so long as the Liens created pursuant to the Second-Lien Note Documents and the Third-Lien Credit Documents are limited to assets constituting Collateral (or in the case of the Third-Lien Credit Documents, Collateral of the Borrower) pursuant to the Security Documents and are at all times subordinated to the Liens pursuant to the Security Documents on the terms provided in the Intercreditor Agreement;

(v)    licenses, sublicenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(vi)    Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 9.04(iii), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of the Borrower or any other asset of the Borrower or any Subsidiary of the Borrower;

(vii)    Liens placed upon equipment or machinery acquired after the Initial Borrowing Date and used in the ordinary course of business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 180 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 9.04(iii) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any asset of the Borrower or any other asset of the Borrower or such Subsidiary;

(viii)    easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(ix)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)    Liens arising out of the existence of judgments or awards in respect of which the Borrower or any of its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings, provided that the aggregate amount of all cash (including the stated amount of all letters of credit) and the fair market value of all other property subject to such Liens does not exceed $500,000 at any time outstanding;

(xi)    statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(xii)    Liens (other than Liens imposed under ERISA), including deposits, incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice (exclusive of obligations in respect of the payment for borrowed money), provided that

the aggregate amount of all cash and the fair market value of all other property subject to all Liens permitted by this clause (xii) shall not at any time exceed $1,000,000;

(xiii)   Permitted Encumbrances;

(xiv)   Liens on property or assets acquired pursuant to a Permitted Acquisition, or on property or assets of a Subsidiary of the Borrower in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition, provided that (x) any Indebtedness that is secured by such Liens is permitted to exist under Section 9.04(v), and (y) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition and do not attach to any asset of the Borrower or any other asset of the Borrower or any of its Subsidiaries;

(xv)   restrictions on the transfer or pledge of assets contained in any FCC License or imposed by the Communications Act, comparable state or local legislation, regulations or ordinances or the terms of cable TV franchises;

(xvi)   Liens consisting of customary options, calls, puts or restrictions on transfer relating to Equity Interests of Non-Wholly Owned Subsidiaries and arising under joint venture arrangements with other holders (other than the Borrower and its Affiliates) of such Equity Interests; and

(xvii)   other Liens, so long as neither the aggregate fair market value of all assets subject thereto, nor the aggregate amount of Indebtedness or other obligations secured thereby, exceeds $_____.

In connection with the granting of Liens of the type described in clauses (vi), (vii), (xiv) and (xvii) of this Section 9.01 by the Borrower of any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens; provided the Collateral Agent may require that appropriate similar lien releases and/or subordination agreements be executed with respect to the Second-Lien Note Documents and the Third-Lien Credit Documents).

9.02   Consolidation, Merger, Purchase or Sale of Assets, etc.   The Borrower will not, and will not permit any of its Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets, or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions) any part of the property or assets (other than purchases or other acquisitions of

inventory, materials and equipment in the ordinary course of business) of any Person (or agree to do any of the foregoing at any future time), except that:[1]

(i)     Capital Expenditures by the Borrower and its Subsidiaries shall be permitted to the extent not in violation of Section 9.07;

(ii)     each of the Borrower and its Subsidiaries may make sales of inventory in the ordinary course of business or sales of goods that have become worn-out, obsolete or damaged and as a result are unsuitable for use in connection with the business of the Borrower and its Subsidiaries;

(iii)     Investments may be made to the extent permitted by Section 9.05;

(iv)     the Borrower and its Subsidiaries may sell assets (other than the capital stock or other Equity Interests of any Subsidiary that is less than all of the Equity Interests in such Subsidiary that are owned by the Borrower and its Subsidiaries), so long as (v) no Default or Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least fair market value (as determined in good faith by the Borrower or such Subsidiary, as the case may be), (x) at least 90% of the Total Consideration received by the Borrower or such Subsidiary consists of cash and is paid at the time of the closing of such sale, (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 4.02(e) and (z) the aggregate amount of the proceeds received from all assets sold pursuant to this clause (iv) shall not exceed $5,000,000 in any fiscal year of the Borrower;

(v)     each of the Borrower and its Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 9.04(iii));

(vi)     each of the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(vii)     each of the Borrower and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto;

(viii)     any Subsidiary of the Borrower may merge with and into, or be dissolved or liquidated into, the Borrower or any Wholly-Owned Domestic Subsidiary of the

---

[1] Sale of New York microwave client to be discussed.

Borrower which is a Subsidiary Guarantor so long as (i) in the case of any such merger, dissolution or liquidation involving the Borrower, the Borrower is the surviving corporation of any such merger, dissolution or liquidation, (ii) in all other cases, the Wholly-Owned Domestic Subsidiary which is a Subsidiary Guarantor is the surviving corporation of any such merger, dissolution or liquidation, and (iii) in all cases, the security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of such Subsidiary shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, dissolution or liquidation);

(ix)     Permitted Acquisitions may be made to the extent permitted by Section 8.17;

(x)     sales, transfers and dispositions by the Borrower or any Wholly-Owned Domestic Subsidiary Guarantor (other than RCN International) to the Borrower or a Wholly-Owned Domestic Subsidiary Guarantor (other than RCN International) shall be permitted;

(xi)     sales, transfers and other dispositions of the Equity Interests of Intertainer shall be permitted so long as (w) no Default or Event of Default then exists or would result therefrom, (x) each such sale is in an arm's-length transaction and the Borrower or the respective  Subsidiary receives at least Fair Market Value, (y) at least 90% of the Total Consideration received by the Borrower and its Subsidiaries consists of cash paid at the time of the closing of such sale or disposition and (z) the Net Sale Proceeds therefrom are applied to prepay Loans pursuant to Section 4.02(e);

(xii)     the sale, transfer or other disposition of all or substantially all the Los Angeles Assets in a single transaction or series of related transactions shall be permitted, so long as (w) no Default or Event of Default then exists or would result therefrom, (x) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (y) at least 90% of the Total Consideration received by the Borrower and its Subsidiaries consists of cash paid at the time of the closing of such sale or disposition and (z) the Net Sale Proceeds therefrom are applied to prepay Loans pursuant to Section 4.02(e);

(xiii)     the sale, transfer or other disposition of all or substantially all the San Francisco Assets in a single transaction or series of related transactions shall be permitted, so long as (w) no Default or Event of Default then exists or would result therefrom, (x) each such sale is in an arm's-length transaction and the Borrower or the respective  Subsidiary receives at least Fair Market Value, (y) at least 90% of the Total Consideration received by the Borrower and its Subsidiaries consists of cash paid at the time of the closing of such sale or disposition and (z) the Net Sale Proceeds therefrom are applied to prepay Loans pursuant to Section 4.02(e);

(xiv)     the sale, transfer or other disposition of all or substantially all the Chicago Assets in a single transaction or series of related transactions shall be permitted, so long as (w) no Default or Event of Default then exists or would result therefrom, (x) each such

sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (y) at least 90% of the Total Consideration received by the Borrower and its Subsidiaries consists of cash paid at the time of the closing of such sale or disposition and (z) the Net Sale Proceeds therefrom are applied to prepay Loans pursuant to Section 4.02(e);

(xv) the Borrower may consummate the Starpower Acquisition; and

(xvi) the Borrower and its Subsidiaries may make a sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 270 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose as the sold property; provided that (i) the sum of the aggregate amount of Attributable Debt in respect of all such sale and leaseback transactions of the Borrower and its Subsidiaries other than the Starpower Group shall not exceed $[_____] at any time outstanding and (ii) the sum of the aggregate amount of Attributable Debt in respect of all such sale and leaseback transactions of the Starpower Group shall not exceed $[_____] at any time outstanding.

To the extent the Required Lenders waive the provisions of this Section 9.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 9.02 (other than to the Borrower or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents (so long as also sold free and clear of the Liens created by the Second-Lien Security Documents and the Third-Lien Credit Documents), and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

9.03   Dividends.   The Borrower will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to the Borrower or any of its Subsidiaries, except that:

(i) any Subsidiary of the Borrower may pay Dividends or return capital or make distributions and other similar payments with regard to its Equity Interests to the Borrower or to a Wholly-Owned Subsidiary of the Borrower which owns equity therein;

(ii) any Non-Wholly-Owned Subsidiary of the Borrower may declare and pay cash Dividends to its shareholders generally so long as the Borrower or its respective Subsidiary which owns the Equity Interests in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based upon its relative holding of the Equity Interests in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary); and

(iii) so long as no Default or Event of Default exists at the time of the respective Dividend, redemption or repurchase or would exist immediately after giving effect thereto, the Borrower may redeem or repurchase Equity Interests of the Borrower

from officers, employees and directors of the Borrower or its Subsidiaries (or their estates) after the death, disability, retirement or termination of employment or service as a director of any such Person, or otherwise in accordance with any stock option plan or any employee stock ownership plan that has been approved by the Board of Directors of the Borrower provided that the aggregate amount of Dividends made by the Borrower pursuant to this clause (iii), and the aggregate amount paid shall not (net of any proceeds received by the Borrower from issuances of its Equity Interests and contributed to the Borrower in connection with such redemption or repurchase) exceed either (x) during any fiscal year of the Borrower, $500,000 or (y) for all periods after the Initial Borrowing Date (taken as a single period), $2,500,000.

9.04    Indebtedness.    The Borrower will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)    Indebtedness of the Credit Parties incurred pursuant to this Agreement and the other Credit Documents;

(ii)    Indebtedness of the Borrower and its Subsidiaries under Interest Rate Protection Agreements entered into with respect to other Indebtedness permitted under this Section 9.04, in each case so long as the entering into of such Interest Rate Protection Agreements are bona fide hedging activities and are not for speculative purposes;

(iii)    Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations (to the extent permitted pursuant to Section 9.07) and purchase money Indebtedness described in Section 9.01(vii), provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (iii) exceed $15,000,000 at any time outstanding;

(iv)    Indebtedness of the Borrower, and guarantees thereof by the Subsidiary Guarantors (provided that any guarantee by RCN International shall be subordinated in right of payment as required by the Intercreditor Agreement) under the Second-Lien Note Indenture and the other Second-Lien Note Documents in an aggregate principal amount not to exceed $[125],000,000 (less the amount of any repayments of principal thereof made after the Initial Borrowing Date);

(v)    Indebtedness of a Subsidiary of the Borrower acquired pursuant to a Permitted Acquisition (or Indebtedness assumed at the time of a Permitted Acquisition of an asset securing such Indebtedness), provided that (x) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition, (y) such Indebtedness does not constitute debt for borrowed money, it being understood and agreed that Capitalized Lease Obligations and purchase money Indebtedness shall not constitute debt for borrowed money for purposes of this clause (y) and (z) the aggregate principal amount of all Indebtedness permitted by this clause (vi) shall not exceed $7,500,000 at any one time outstanding;

(vi)     intercompany Indebtedness among the Borrower and the Subsidiary Guarantors to the extent permitted by Section 9.05(vii);

(vii)    Existing Indebtedness outstanding on the Initial Borrowing Date and listed on Schedule VI (as reduced by any permanent repayments of principal thereof), without giving effect to any subsequent extension, renewal or refinancing thereof except to the extent set forth on Schedule VI, provided that the aggregate principal amount of the Indebtedness to be extended, renewed or refinanced does not increase from that amount outstanding at the time of any such extension, renewal or refinancing;

(viii)   Indebtedness of the Borrower (which Indebtedness may in no event be guaranteed by, or secured by the assets of, any Subsidiary of the Borrower) under the Third-Lien Credit Agreement the other Third-Lien Credit Documents in an aggregate amount not to exceed $[35],000,000 plus any increase in the principal amount thereof resulting from the payment-in-kind or capitalization, of interest accruing thereon after the Initial Borrowing Date as contemplated by Section 8.16;

(ix)     guarantees by the Borrower of Indebtedness or operating lease payment obligations of any Wholly-Owned Domestic Subsidiary Guarantor and by any Wholly-Owned Domestic Subsidiary Guarantor of Indebtedness or operating lease payment obligations of any other Wholly-Owned Domestic Subsidiary Guarantor, in each case so long as the respective underlying guaranteed Indebtedness or operating lease payment obligations are otherwise permitted in accordance with the relevant terms of this Agreement (other than this clause (ix)); provided that this clause (iv) shall not permit any guarantees of Indebtedness described in any of clauses (iv), (v), (vii) and (viii); and

(x)      [      other Indebtedness of the Borrower or any Subsidiary not in excess of $[7,500,000] at any time outstanding.]

9.05    Advances, Investments and Loans.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or hold any cash or Cash Equivalents (each of the foregoing an "Investment" and, collectively, "Investments"), except that the following shall be permitted:

(i)      the Borrower and its Subsidiaries may acquire and hold accounts receivables owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(ii)     the Borrower and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(iii)    the Borrower and its Subsidiaries may hold the Investments held by them on the Initial Borrowing Date and described on Schedule IX, provided that any additional

Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 9.05;

(iv)    the Borrower and its Subsidiaries may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)    the Borrower and its Subsidiaries may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $500,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)    the Borrower may enter into Interest Rate Protection Agreements to the extent permitted by Section 9.04(ii);

(vii)    the Borrower and the Domestic Wholly-Owned Subsidiary Guarantors may make intercompany loans and advances between and among one another (collectively, "Intercompany Loans"), provided that each such Intercompany Loan shall be evidenced by an Intercompany Note (which Intercompany Note shall include the subordination provisions attached as Annex A to the form of Intercompany Note) which shall be pledged to the Collateral Agent pursuant to, and to the extent required by, the Pledge Agreement;

(viii)    Permitted Acquisitions shall be permitted in accordance with Section 8.17, and the Starpower Acquisition may be consummated in accordance with Section 9.02(xv) and the definition thereof contained therein;

(ix)    investments by the Borrower and its Subsidiaries in Equity Interests in Subsidiaries that are Wholly-Owned Domestic Subsidiary Guarantors both before and after such investments; provided that any such Equity Interests held by a Credit Party shall be pledged pursuant to the Pledge Agreement;

(x)    loans by the Borrower to the Employee Stock Ownership Plan of the Borrower, 100% of the gross proceeds of which (without reduction for costs, fees and expenses or other items) are immediately thereafter utilized by such Employee Stock Ownership Plan to purchase from the Borrower not more than [2,000,000] shares of the Borrower's common stock (such number of shares to be adjusted to reflect stock splits, stock dividends, stock combinations and similar events); and

(xi)    other investments in an aggregate amount not to exceed $[_____] (net of any return of capital or Net Sale Proceeds in respect of any such investment and valued at the time of the making thereof).

9.06    Transactions with Affiliates.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of its Subsidiaries, other than in the ordinary course of business

and on terms and conditions substantially as favorable to the Borrower or such Subsidiary as would reasonably be obtained by the Borrower or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except:

(i)     Dividends may be paid to the extent provided in Section 9.03;

(ii)    customary fees and indemnifications may be paid to non-officer directors of the Borrower and its Subsidiaries;

(iii)   loans may be made and other transactions maybe entered into by the Borrower with its Subsidiaries, or between Subsidiaries of the Borrower, to the extent permitted by Sections 9.01, 9.02, 9.04 and 9.05;

(iv)    the Borrower and its Subsidiaries may enter into, and make payments under, employment agreements, employee benefit plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of the Borrower and its Subsidiaries in the ordinary course of business;

(v)     the Plan of Reorganization (and transactions effected pursuant thereto) shall be permitted; and

[(vi)   transactions required to be effected pursuant to, and on terms provided for in, existing agreements (as in effect on the Initial Borrowing Date) listed in Schedule 9.06 attached hereto.]

9.07   Capital Expenditures.  (a)  The Borrower will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures, except that during any fiscal year of the Borrower set forth below (taken as one accounting period) (it being understood and agreed that for purposes of this Section 9.07 only, the period from the Initial Borrowing Date through December 31, 2004 shall be deemed to be part of the fiscal year ending on December 31, 2005), the Borrower and its Subsidiaries may make Capital Expenditures so long as the aggregate amount of all such Capital Expenditures does not exceed in any fiscal year of the Borrower set forth below the amount set forth opposite such fiscal year below:

| Fiscal Year Ending On | Amount |
| --- | --- |
| December 31, 2005 | $[_____] |
| December 31, 2006 | $[75,000,000] |
| December 31, 2007 and thereafter | $[55,000,000] |

(b)     In addition to the foregoing, the Borrower and its Subsidiaries may make Capital Expenditures with the amount of Net Sale Proceeds received by the Borrower or any of

its Subsidiaries from any Asset Sale so long as such Net Sale Proceeds are reinvested within 365 days following the date of such Asset Sale, but only to the extent that such Net Sale Proceeds are not otherwise required to be applied to repay Term Loans pursuant to Section 4.02(e) or reduce the Total L/C Commitment pursuant to Section 3.03(d).

(c)    In addition to the foregoing, the Borrower or any of its Subsidiaries may make Capital Expenditures with the amount of Net Insurance Proceeds received by the Borrower or any of its Subsidiaries from any Recovery Event so long as such Net Insurance Proceeds are used to replace or restore any properties or assets in respect of which such Net Insurance Proceeds were paid within 365 days following the date of receipt of such Net Insurance Proceeds from such Recovery Event, but only to the extent that such Net Insurance Proceeds are not otherwise required to be applied to repay Term Loans pursuant to Section 4.02(g) or reduce the Total L/C Commitment pursuant to Section 3.03(d).

(d)    In addition to the foregoing, the Borrower and its Wholly-Owned Domestic Subsidiaries that are Subsidiary Guarantors may consummate (x) Permitted Acquisitions in accordance with the requirements of Section 8.17 and (y) the Starpower Acquisition in accordance with the provisions of Section 9.02(xv).

9.08    Consolidated Interest Coverage Ratio.  The Borrower will not permit the Consolidated Interest Coverage Ratio for any Test Period ending on the last day of a fiscal quarter of the Borrower set forth below to be less than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2005 | [2.00:1.00 |
| June 30, 2005 | 2.00:1.00 |
| September 30, 2005 | 2.00:1.00 |
| December 31, 2005 | 2.00:1.00 |
| | |
| March 31, 2006 | 2.00:1.00 |
| June 30, 2006 | 2.00:1.00 |
| September 30, 2006 | 2.00:1.00 |
| December 31, 2006 | 2.25:1.00 |
| | |
| March 31, 2007 | 2.25:1.00 |
| June 30, 2007 | 2.50:1.00 |
| September 30, 2007 | 2.50:1.00 |
| December 31, 2007 and thereafter | 2.50:1.00] |

9.09    Minimum Consolidated EBITDA.  The Borrower will not permit Consolidated EBITDA for any Test Period ending on the last day of a fiscal quarter of the Borrower set forth below to be less than the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter Ended | Amount |
|---|---|

| Fiscal Quarter Ended | Amount |
|---|---|
| March 31, 2005 | [$30,000,000 |
| June 30, 2005 | $47,500,000 |
| September 30, 2005 | $65,000,000 |
| December 31, 2005 | $70,000,000 |
| March 31, 2006 | $77,500,000 |
| June 30, 2006 | $85,000,000 |
| September 30, 2006 | $92,500,000 |
| December 31, 2006 | $100,000,000 |
| March 31, 2007 | $105,000,000 |
| June 30, 2007 | $112,500,000 |
| September 30, 2007 | $120,000,000 |
| December 31, 2007 | $127,500,000 |
| March 31, 2008 | $132,500,000 |
| June 30, 2008 | $137,500,000 |
| September 30, 2008 | $142,500,000 |
| December 31, 2008 | $147,500,000 |
| March 31, 2009 | $152,500,000 |
| June 30, 2009 | $155,000,000 |
| September 30, 2009 | $160,000,000 |
| December 31, 2009 | $165,000,000 |
| March 31, 2010 | $167,500,000 |
| June 30, 2010 | $170,000,000 |
| September 30, 2010 | $172,500,000 |
| December 31, 2010 | $175,000,000 |
| March 31, 2011 | $177,500,000 |
| June 30, 2011 | $180,000,000 |
| September 30, 2011 | $182,500,000 |
| December 31, 2011 | $185,000,000] |

9.10    Total Leverage Ratio.  The Borrower will not permit the Total Leverage Ratio at any time during a period set forth below to be greater than the ratio set forth opposite such period below:

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2005 | 8.00:1.00 |
| June 30, 2005 | 7.50:1.00 |
| September 30, 2005 | 7.25:1.00 |
| December 31, 2005 | 6.75:1.00 |

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2006 | 6.00:1.00 |
| June 30, 2006 | 5.50:1.00 |
| September 30, 2006 | 5.00:1.00 |
| December 31, 2006 | 4.75:1.00 |
| | |
| March 31, 2007 | 4.25:1.00 |
| June 30, 2007 | 4.00:1.00 |
| September 30, 2007 | 3.75:1.00 |
| December 31, 2007 | 3.50:1.00 |
| | |
| March 31, 2008 | 3.25:1.00 |
| June 30, 2008 | 3.00:1.00 |
| September 30, 2008 | 2.75:1.00 |
| December 31, 2008 | 2.50:1.00 |
| | |
| March 31, 2009 | 2.50:1.00 |
| June 30, 2009 | 2.00:1.00 |
| September 30, 2009 | 2.00:1.00 |
| December 31, 2009 and thereafter | 2.00:1.00 |

9.11    <u>Adjusted Leverage Ratio</u>.  The Borrower will not permit the Adjusted Leverage Ratio at any time during a period set forth below to be greater than the ratio set forth opposite such period below:

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2005 | 5.00:1.00 |
| June 30, 2005 | 5.00:1.00 |
| September 30, 2005 | 4.50:1.00 |
| December 31, 2005 | 4.25:1.00 |
| | |
| March 31, 2006 | 3.75:1.00 |
| June 30, 2006 | 3.50:1.00 |
| September 30, 2006 | 3.25:1.00 |
| December 31, 2006 | 3.00:1.00 |
| | |
| March 31, 2007 | 2.75:1.00 |
| June 30, 2007 | 2.50:1.00 |
| September 30, 2007 | 2.25:1.00 |
| December 31, 2007 | 2.00:1.00 |
| | |
| March 31, 2008 | 2.00:1.00 |
| June 30, 2008 | 1.50:1.00 |
| September 30, 2008 | 1.50:1.00 |
| December 31, 2008 | 1.50:1.00 |

| Fiscal Quarter Ended | Ratio |
|---|---|
| March 31, 2009 | 1.50:1.00 |
| June 30, 2009 | 1.00:1.00 |
| September 30, 2009 | 1.00:1.00 |
| December 31, 2009 and thereafter | 1.00:1.00 |

[9.12  <u>Minimum Cash on Hand</u>.  The Borrower will not permit Unrestricted cash and Cash Equivalents on hand at any time [during a period set forth below] to be less than [$[_____].]/the amount set forth opposite such period below:]

9.13  <u>Limitations on Payments of the Second-Lien Note Indenture and Third-Lien Credit Agreement; Modifications of Second-Lien Note Documents, Third-Lien Credit Documents, Certificate of Incorporation, By-Laws and Certain Other Agreements, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to:

(i)  make (or give any notice in respect of) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due), any Indebtedness pursuant to the Second-Lien Note Documents or the Third-Lien Credit Documents;

(ii)  except as specifically provided in the Intercreditor Agreement, amend or modify, or permit the amendment or modification of any provision of, any Second-Lien Credit Document or any Third-Lien Credit Document;

(iii)  amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests (including any Shareholders' Agreement), or enter into any new agreement with respect to its capital stock or other Equity Interests, unless such amendment, modification, change or other action contemplated by this clause (iii) could not reasonably be expected to be adverse to the interests of the Lenders; or

(iv)  amend, modify or change any provision of (x) any Management Agreement unless such amendment, modification or change could not reasonably be expected to be adverse to the interests of the Lenders (although no amendment, modification or change may be made to any monetary term thereof) or (y) any Tax Allocation Agreement or enter into any new tax sharing agreement, tax allocation agreement or similar agreement without the prior written consent of the Administrative Agent.

9.14  <u>Limitation on Certain Restrictions on Subsidiaries</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such

Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any of its Subsidiaries, or pay any Indebtedness owed to the Borrower or any of its Subsidiaries, (b) make loans or advances to the Borrower or any of its Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) the Second-Lien Note Documents, (iv) the Third-Lien Credit Documents, (v) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Borrower or any of its Subsidiaries, (vi) customary provisions restricting assignment of any licensing agreement (in which the Borrower or any of its Subsidiaries is the licensee) or other contract entered into by the Borrower or any of its Subsidiaries in the ordinary course of business, (vii) restrictions on the transfer of any asset pending the close of the sale of such asset, and (viii) restrictions on the transfer of any asset subject to a Lien permitted by Section 9.01(iii), (vi), (vii) or (xiv).

9.15    <u>Limitation on Issuance of Capital Stock</u>.  (a)  The Borrower will not issue (i) any preferred stock or other preferred equity interests or (ii) any redeemable common stock or other redeemable common equity interests other than common stock or other redeemable common equity interests that is redeemable at the sole option of the Borrower, in each case, other than Qualified Capital Stock issued pursuant to clause (c) below .

(b)    The Borrower will not permit any of its Subsidiaries to issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other equity interests, (ii) for stock splits, stock dividends and issuances which do not decrease the percentage ownership of the Borrower or any of its Subsidiaries in any class of the capital stock or other equity interests of such Subsidiary, (iii) to qualify directors to the extent required by applicable law or (iv) for issuances by Subsidiaries of the Borrower which are newly created or acquired in accordance with the terms of this Agreement.

(c)    The Borrower may issue Qualified Capital Stock so long as (x) no Default or Event of Default shall exist at the time of any such issuance or immediately after giving effect thereto, and (y) with respect to each issue of Qualified Capital Stock, the gross cash proceeds therefrom (or in the case of Qualified Capital Stock directly issued as consideration for a Permitted Acquisition, the Fair Market Value thereof of the assets received therefor) shall be at least equal to 100% of the liquidation preference thereof at the time of issuance.

9.16    <u>Business, etc.</u> (a)    The Borrower will not, and will not permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by the Borrower and its Subsidiaries  as of the Initial Borrowing Date and reasonable extensions thereof and businesses ancillary or complementary thereto.

(b)    Notwithstanding the foregoing or anything else in this Agreement to the contrary, RCN International shall not incur or suffer to exist any Indebtedness (other than its guarantees of the Obligations hereunder pursuant to the Subsidiaries Guaranty and its guarantee (which shall be subordinated in right of payment as required by the Intercreditor Agreement) of

the Second-Lien Note Documents and obligations pursuant thereto) and shall not engage in any business or own any significant assets or have any material liabilities other than its ownership of all Equity Interests in the Megacable Entities that are owned (directly or indirectly) by the Borrower or any of its Subsidiaries; provided that RCN International may engage in those activities that are incidental to (x) the maintenance of its existence in compliance with applicable law and (y) legal, tax and accounting matters in connection with any of the foregoing activities.

9.17 <u>Limitation on Creation of Subsidiaries</u>. The Borrower will not, and will not permit any of its Subsidiaries to, establish, create or acquire after the Initial Borrowing Date any Subsidiary, provided that the Borrower and its Wholly-Owned Domestic Subsidiaries that are, or are to become, Subsidiary Guarantors may create and/or acquire Wholly-Owned Domestic Subsidiaries (subject to compliance with the other applicable provisions of Section 8 and this Section 9) so long as (i) all of the capital stock and other Equity Interests of such new Subsidiary are pledged to the Collateral Agent pursuant to the terms and conditions of the Pledge Agreement, (ii) such new Subsidiary enters into the Subsidiaries Guaranty and executes and delivers to the Collateral Agent counterparts of the Security Agreement, the Pledge Agreement and the Intercreditor Agreement, (iii) such new Subsidiary enters into such Additional Security Documents as the Administrative Agent or the Required Lenders may require pursuant to Section 8.12 and (iv) such new Subsidiary executes and delivers all other relevant documentation (including opinions of counsel) of the type described in Section 5 as such new Subsidiary would have had to deliver if it were a Credit Party on the Initial Borrowing Date.

SECTION 10. <u>Events of Default</u>. Upon the occurrence of any of the following specified events (each an "<u>Event of Default</u>"):

10.01 <u>Payments</u>. The Borrower shall (i) default in the payment when due of any principal of any Term Loan or any Term Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Term Loan or Term Note, any Unpaid Drawing or any Fees or any other amounts owing hereunder or under any other Credit Document; or

10.02 <u>Representations, etc.</u> Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

10.03 <u>Covenants</u>. The Borrower or any of its Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 8.01(g), 8.08, 8.11, 8.15, 8.16 or 8.19 or Section 9 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or in any other Credit Document (other than those set forth in Sections 10.01 and 10.02) and such default shall continue unremedied for a period of 30 days after written notice thereof to the defaulting party by the Administrative Agent or the Required Lenders; or

10.04 <u>Default Under Other Agreements</u>. (i) The Borrower or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such

Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required but determined only after giving effect to any applicable grace period), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of the Borrower or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, <u>provided</u> that it shall not be a Default or an Event of Default under this Section 10.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least $2,500,000; or

10.05 <u>Bankruptcy, etc.</u> The Borrower or any of its Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "<u>Bankruptcy Code</u>"); or an involuntary case is commenced against the Borrower or any of its Subsidiaries, and the petition is not controverted within 10 days, or is not dismissed within 60 days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any of its Subsidiaries, or the Borrower or any of its Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any of its Subsidiaries, or there is commenced against the Borrower or any of its Subsidiaries any such proceeding which remains undismissed for a period of 60 days, or the Borrower or any of its Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Borrower or any of its Subsidiaries suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 days; or the Borrower or any of its Subsidiaries makes a general assignment for the benefit of creditors; or any corporate, limited liability company or similar action is taken by the Borrower or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

10.06 <u>ERISA.</u> (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA, a Reportable Event shall have occurred, a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in sub-section .62, .63, .64, .65 (unless notice is waived under .65), .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days, any Plan which is subject to Title IV of ERISA shall have had or is likely to have a trustee appointed to administer such Plan, any Plan which is subject to Title IV of ERISA is, shall have been or is likely to be terminated or to be the subject of termination proceedings under ERISA, any Plan shall have an Unfunded Current Liability, a contribution required to be

made with respect to a Plan or a Foreign Pension Plan has not been timely made, the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate has incurred or is likely to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or on account of a group health plan (as defined in Section 607(1) of ERISA, Section 4980B(g)(2) of the Code or 45 Code of Federal Regulation 160.103) under Section 4980B of the Code and/or the Health Insurance Portability and Accountability Act of 1996, or the Borrower or any Subsidiary of the Borrower has incurred or is likely to incur liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans or Foreign Pension Plans, a "default" within the meaning of Section 4219(c)(5) of ERISA shall occur with respect to any Plan, any applicable law, rule or regulation is adopted, changed or interpreted, or the interpretation or administration thereof is changed, in each case after the date hereof, by any governmental authority or agency or by any court (a "Change of Law"), or, as a result of a Change in Law, an event occurs following a Change in Law, with respect to or otherwise affecting any Plan; (b) there shall result from any such event or events the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, either individually and/or in the aggregate, has had, or could reasonably be expected to have, in the opinion of the Required Lenders, a Material Adverse Effect; or

10.07  <u>Security Documents</u>.  Any of the Security Documents shall cease to be in full force and effect, or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 9.01), and subject to no other Liens (except as permitted by Section 9.01), or any Credit Party shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any such Security Document and such default shall continue beyond the period of grace, if any, specifically applicable thereto pursuant to the terms of such Security Document; or

10.08  <u>Subsidiaries Guaranty</u>.  The Subsidiaries Guaranty or any provision thereof shall cease to be in full force or effect as to any Subsidiary Guarantor, or any Subsidiary Guarantor or any Person acting for or on behalf of such Subsidiary Guarantor shall deny or disaffirm such Subsidiary Guarantor's obligations under the Subsidiaries Guaranty or any Subsidiary Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Subsidiaries Guaranty; or

10.09  <u>Judgments</u>.  One or more judgments or decrees shall be entered against the Borrower or any Subsidiary of the Borrower involving in the aggregate for the Borrower and its Subsidiaries a liability (not paid or fully covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $2,500,000; or

10.10  <u>Change of Control</u>.  A Change of Control shall occur; or

10.11  Intercreditor Agreement.  The Intercreditor Agreement or any provision thereof shall cease to be in full force and effect, or any Lien securing or purporting to secure Indebtedness or other obligations owing under the Second-Lien Note Documents or the Third-Lien Credit Documents shall, for any reason, cease to be subordinated to the Lien created under the Security Documents securing the First-Lien Obligations under, and as defined in, and pursuant to, the Intercreditor Agreement;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Term Note to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 10.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice):  (i) declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately and any L/C Commitment Commission shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Term Loans and the Term Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) terminate any Letter of Credit which may be terminated in accordance with its terms; (iv) direct the Borrower to pay (and the Borrower agrees that upon receipt of such notice, or upon the occurrence of an Event of Default specified in Section 10.05 with respect to the Borrower, it will pay) to the Collateral Agent at the Payment Office such additional amount of cash or Cash Equivalents, to be held as security by the Collateral Agent, as is equal to the aggregate Stated Amount of all Letters of Credit issued for the account of the Borrower and then outstanding; (v) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents; and (vi) apply any cash collateral held by the Administrative Agent pursuant to Section 4.02 to the repayment of the Obligations.

SECTION 11. Definitions and Accounting Terms.

11.01  Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acquired Entity or Business" shall mean either (x) the assets constituting a business, division or product line of any Person not already a Subsidiary of the Borrower or (y) 100% of the Equity Interests of any such Person, which Person shall, as a result of the respective Permitted Acquisition, become a Wholly-Owned Domestic Subsidiary of the Borrower (or shall be merged with and into the Borrower or a Subsidiary Guarantor, with the Borrower or such Subsidiary Guarantor being the surviving Person).

"Additional Security Documents" shall have the meaning provided in Section 8.12.

"Adjusted Consolidated Indebtedness" shall mean, at any time, the amount of Consolidated Indebtedness at such time less any amounts reflected therein constituting Indebtedness incurred pursuant to the Second-Lien Credit Documents and the Third-Lien Note Documents.

"Adjusted Consolidated Net Income" shall mean, for any period, Consolidated Net Income for such period plus the sum of the amount of all net non-cash charges (including, without limitation, depreciation, amortization, deferred tax expense and non-cash interest expense) and net non-cash losses which were included in arriving at Consolidated Net Income for such period, less the amount of all net non-cash gains and non-cash credits which were included in arriving at Consolidated Net Income for such period.

"Adjusted Consolidated Working Capital" shall mean, at any time, Consolidated Current Assets (but excluding therefrom all cash and Cash Equivalents) less Consolidated Current Liabilities at such time.

"Adjusted Leverage Ratio" shall mean, at any time, the ratio of Adjusted Consolidated Indebtedness at such time to Consolidated EBITDA for the Test Period then most recently ended.

"Administrative Agent" shall mean DBCI, in its capacity as Administrative Agent for the Lenders hereunder, and shall include any successor to the Administrative Agent appointed pursuant to Section 12.09.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and officers of such Person), controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power (i) to vote 5% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person or (ii) to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that neither the Administrative Agent nor any Lender (nor any Affiliate thereof) shall be considered an Affiliate of the Borrower or any Subsidiary thereof.

"Agents" shall mean, except as otherwise provided in Section 12, any or all of the Syndication Agent, the Administrative Agent, the Collateral Agent, the Documentation Agent and the Lead Arranger and Book Manager.

"Agreement" shall mean this Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Applicable ECF Percentage" shall mean 75%; provided that if on the last day of the respective Excess Cash Payment Period, the Total Leverage Ratio was less than 2.00:1.00, then the Applicable ECF Percentage shall instead be 50%.

"Applicable Margin" shall mean a percentage per annum equal to in the case of Term Loans (A) maintained as Base Rate Loans, 3.00%, and (B) maintained as Eurodollar Loans, 4.00%.

"Asset Sale" shall mean any sale, transfer or other disposition by the Borrower or any of its Subsidiaries to any Person (including by way of redemption by such Person) other than to the Borrower or a Wholly-Owned Subsidiary of the Borrower of any asset (including, without limitation, any capital stock or other securities of, or equity interests in, another Person) other than sales of assets pursuant to Sections 9.02(ii), (vi), (vii), (x) and (xvi).

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit L (appropriately completed).

"Assumed Indebtedness" shall have the meaning provided in Section 5.01(n).

"Attributable Debt" means, on any date, in respect of any lease of the Borrower or any Subsidiary entered into as part of a sale and leaseback transaction subject to Section 9.02, (i) if such lease is a Capitalized Lease Obligation, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (ii) if such lease is not a Capitalized Lease Obligation, the capitalized amount of the remaining lease payments under such lease that would appear on a balance sheet of such Person prepared as of such date in accordance with Adjusted Accounting Principles if such lease were accounted for as a Capitalized Lease Obligation.

"Authorized Representative" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation, Letter of Credit Requests and similar notices, any person or persons that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards on file with the Administrative Agent and each Issuing Lender; (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, any treasurer or other financial officer of the Borrower and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of the Borrower.

"Bankruptcy Code" shall have the meaning provided in Section 10.05.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the jointly administered cases under the Bankruptcy Code commenced by the Borrower on May 27, 2004 and certain of its Subsidiaries on such date and dates thereafter and styled *In re RCN Corporation, et al.*, Case No. 04-13638(RDD) and, to the extent of any reference made under Section 157 of Title 28 of the United States Code, the unit of such District Court having jurisdiction over such cases under Section 151 of Title 28 of the United States Code.

"Base Rate" shall mean the higher of (x) the rate that the Administrative Agent announces from time to time as its prime lending rate, as in effect from time to time, and (y) ½ of 1% in excess of the overnight Federal Funds Rate at such time.

"Base Rate Loan" shall mean each Term Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"Borrower" shall have the meaning set forth in the first paragraph of this Agreement.

"Borrowing" shall mean the borrowing of one Type of Term Loan from all the Lenders having Term Loan Commitments on a given date (or resulting from a conversion or conversions on such date) having in the case of Eurodollar Loans the same Interest Period, provided that Base Rate Loans incurred pursuant to Section 1.10(b) shall be considered part of the related Borrowing of Eurodollar Loans.

"Business Day" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in U.S. dollar deposits in the interbank Eurodollar market.

"Business Intellectual Property" shall have the meaning provided in Section 7.20.

"Calculation Period" shall mean, in the case of any Permitted Acquisition, the Test Period most recently ended prior to the date of any such Permitted Acquisition for which financial statements are available.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with generally accepted accounting principles and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all rental obligations of such Person which, under generally accepted accounting principles, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"Cash Equivalents" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv) repur-

chase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, and (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"Change of Control" shall mean, at any time and for any reason whatsoever, (a) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act) shall be the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act) of Equity Interests having more than 30% of the total voting power of all outstanding Equity Interests of the Borrower in the election of directors, (b) the Board of Directors of the Borrower shall cease to consist of a majority of Continuing Directors or (c) a "change of control" or similar event shall occur as provided in the Second-Lien Note Documents, the Third-Lien Credit Documents or any other credit agreement, indenture or similar agreement in connection with indebtedness in an aggregate principal amount in excess of $1,000,000.

"Change of Law" shall have the meaning provided in Section 10.06.

"Chicago Assets" means the Telecommunications Assets owned by the Borrower and its Subsidiaries that are, on the Initial Borrowing Date, physically located in the Chicago, Illinois metropolitan area and utilized to provide telecommunications services to customers of the Borrower or its Subsidiaries in the Chicago, Illinois metropolitan area plus (i) such additional Telecommunications Assets as are, after the Initial Borrowing Date, acquired for such cable systems and located in the Chicago, Illinois metropolitan area pursuant to Capital Expenditures made in accordance with Section 9.07, (ii) related net working capital and (iii) Equity Interests in Persons that own no assets other than such assets.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code as in effect at the date of this Agreement and any subsequent provisions of the Code amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including, without limitation, all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties and all cash and Cash Equivalents delivered as collateral pursuant to Section 4.02 or 10.

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"Commitment" shall mean any of the commitments of any Lender, i.e., either a Term Loan Commitment or a L/C Commitment.

"Communications Act" shall have the meaning provided in Section 7.24.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan of Reorganization, which order shall be a Final Order.

"Consolidated Current Assets" shall mean, at any time, the consolidated current assets of the Borrower and its Subsidiaries at such time.

"Consolidated Current Liabilities" shall mean, at any time, the consolidated current liabilities of the Borrower and its Subsidiaries at such time, but excluding the current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein.

"Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period, without giving effect (x) to any extraordinary gains or any extraordinary non-cash losses (except to the extent that any such extraordinary non-cash losses will require a cash payment in a future period) and (y) to any gains or losses from sales of assets other than from sales of inventory in the ordinary course of business, adjusted by (1) adding thereto (i) the consolidated interest expense of the Borrower and its Subsidiaries for such period (to the extent that such consolidated interest expense was deducted in arriving at Consolidated Net Income for such period), (ii) provisions for taxes based on income that were deducted in arriving at Consolidated Net Income for such period, (iii) the amount of all amortization of intangibles and depreciation that were deducted in arriving at Consolidated Net Income for such period, (iv) the amount of all expenses incurred in connection with the Transaction for such period to the extent that same were deducted in arriving at Consolidated Net Income for such period, (v) the amount of all non-cash deferred compensation expense for such period to the extent that same was deducted in arriving at the Consolidated Net Income for such period and (vi) any non-cash, non-recurring charges and any non-cash charges associated with stock-based compensation; provided that if any cash amounts are paid in any subsequent period with respect to amounts described above in this clause (vi), the amounts so paid in any subsequent period shall be subtracted in determining Consolidated EBITDA for such subsequent period as provided in clause 2(i) below, and (2) deducting therefrom (i) the amount of all cash payments during such period that are associated with any non-cash loss, change (including, without limitation, as described in preceding clause (1)(vi)) or expense that was added back to Consolidated Net Income in a previous period and (ii) the amount of all consolidated interest income of the Borrower and its Subsidiaries to the extent same increased Consolidated Net Income for such period; it being understood that in determining the Total Leverage Ratio and the Adjusted Leverage Ratio, Consolidated EBITDA for any period shall be calculated on a Pro Forma Basis to give effect to any Acquired Entity or Business acquired during such period pursuant to a Permitted Acquisition, and to any Material Asset Sale effected during such period.

"Consolidated Indebtedness" shall mean, at any time, the sum of (without duplication) (i) all Indebtedness of the Borrower and its Subsidiaries (on a consolidated basis) as would be required to be reflected as debt or Capital Lease Obligations on the liability side of a

consolidated balance sheet of the Borrower and its Subsidiaries in accordance with GAAP, (ii) all Indebtedness of the Borrower and its Subsidiaries of the type described in clauses (ii) and (viii) of the definition of Indebtedness and (iii) all Contingent Obligations of the Borrower and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) and (ii); provided that the sum of the aggregate amount available to be drawn (i.e., unfunded amounts) under all letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar obligations issued for the account of the Borrower or any of its Subsidiaries (but excluding, for avoidance of doubt, all unpaid drawings or other matured monetary obligations owing in respect of such letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar obligations) shall not be included in any determination of "Consolidated Indebtedness".

"Consolidated Interest Coverage Ratio" shall mean, for any period, the ratio of Consolidated EBITDA to Consolidated Interest Expense for such period.

"Consolidated Interest Expense" shall mean, for any period, the sum of the total consolidated interest expense of the Borrower and its Subsidiaries for such period (calculated without regard to any limitations on the payment thereof) plus, without duplication, that portion of Capitalized Lease Obligations of the Borrower and its Subsidiaries representing the interest factor for such period; provided that the amortization of deferred financing, legal and accounting costs with respect to this Agreement, the Second-Lien Note Indenture and the Third-Lien Credit Agreement in each case shall be excluded from Consolidated Interest Expense to the extent same would otherwise have been included therein.

"Consolidated Net Income" shall mean, for any period, the net income (or loss) of the Borrower and its Subsidiaries for such period, determined on a consolidated basis (after deduction for minority interests), provided that (i) in determining Consolidated Net Income, the net income of any other Person which is not a Subsidiary of the Borrower or is accounted for by the Borrower by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Borrower or a Subsidiary thereof during such period, (ii) the net income of any Subsidiary of the Borrower (other than the Borrower) shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary and (iii) the net income (or loss) of any other Person acquired by the Borrower or a Subsidiary of the Borrower in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the

primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Continuing Directors" shall mean the directors of the Borrower on the Effective Date, after giving effect to the Transaction and each other director if, in each case, such other director's nomination for election to the board of directors of the Borrower is recommended by at least a majority of the then Continuing Directors in his or her election by the shareholders of the Borrower.

"Credit Documents" shall mean this Agreement and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Term Note, the Subsidiaries Guaranty, each Security Document, the Intercreditor Agreement and the Securities Account Control Agreement.

"Credit Event" shall mean the making of any Term Loan or the issuance of any Letter of Credit.

"Credit Party" shall mean the Borrower and each Subsidiary Guarantor.

"DBCI" shall mean Deutsche Bank AG Cayman Islands Branch, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"DBSI" shall mean Deutsche Bank Securities Inc., in its individual capacity.

"Debtors-In-Possession" shall mean the Borrower and each of its Subsidiaries which, on the Initial Borrowing Date, is a debtor-in-possession pursuant to the Bankruptcy Code [to be reviewed].

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"Disclosure Statement" shall mean the Disclosure Statement, dated August 20, 2004, pursuant to Section 1125 of the Bankruptcy Code relating to the Plan of Reorganization, as approved by the Bankruptcy Court, and as the same may be amended, modified or supplemented from time in accordance with the terms hereof and thereof.

"Dividend" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of the same type as that in respect of which such dividend or distribution is being made of such Person or rights to acquire Qualified Capital Stock of the same type as that in respect of which such dividend or distribution is being made of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any partnership or membership interests outstanding on or after the Initial Borrowing Date (or any options or warrants issued by such Person with respect to its capital stock or other equity interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any shares of any class of the capital stock or any partnership or membership interests of such Person outstanding on or after the Initial Borrowing Date (or any options or warrants issued by such Person with respect to its capital stock or other equity interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"Documentation Agent" shall mean [____], in its capacity as such hereunder.

"Documents" shall mean the Credit Documents, the Second-Lien Note Documents, the Third-Lien Credit Documents and the Plan Documents.

"Dollars" and the sign "$" shall each mean freely transferable lawful money of the United States.

"Drawing" shall have the meaning provided in Section 2.05(b).

"Effective Date" shall have the meaning provided in Section 13.10.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in Term Loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding the Borrower and its Subsidiaries.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"<u>Environmental Law</u>" shall mean any Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, guideline, policy and rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C § 6901 <u>et seq.</u>; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 <u>et seq.</u>; the Toxic Substances Control Act, 15 U.S.C. § 2601 <u>et seq.</u>; the Clean Air Act, 42 U.S.C. § 7401 <u>et seq.</u>; the Safe Drinking Water Act, 42 U.S.C. § 3803 <u>et seq.</u>; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 <u>et seq.</u>; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 <u>et seq.</u>; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 <u>et seq.</u>; the Occupational Safety and Health Act, 29 U.S.C. § 651 <u>et seq.</u>; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"<u>Equity Interests</u>" shall mean of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"<u>ERISA Affiliate</u>" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or a Subsidiary of the Borrower would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or (ii) as a result of the Borrower or a Subsidiary of the Borrower being or having been a general partner of such person.

"<u>Eurodollar Loan</u>" shall mean each Term Loan designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"<u>Eurodollar Rate</u>" shall mean (a) the offered quotation to first-class banks in the New York interbank Eurodollar market by the Administrative Agent for Dollar deposits of amounts in immediately available funds comparable to the outstanding principal amount of the Eurodollar Loan of the Administrative Agent (in its capacity as a Lender) with maturities comparable to the Interest Period applicable to such Eurodollar Loan commencing two Business Days thereafter as of 10:00 A.M. (New York time) on the applicable Interest Determination Date, divided (and rounded upward to the nearest 1/16 of 1%) by (b) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D).

"<u>Event of Default</u>" shall have the meaning provided in Section 10.

"Excess Cash Flow" shall mean, for any period, the remainder of (a) the sum of, without duplication, (i) Adjusted Consolidated Net Income for such period and (ii) the decrease, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period, minus (b) the sum of, without duplication, (i) the aggregate amount of all Capital Expenditures made by the Borrower and its Subsidiaries during such period (other than Capital Expenditures to the extent financed with equity proceeds, Asset Sale proceeds, insurance proceeds or Indebtedness), (ii) the aggregate amount of all payments made in respect of all Permitted Acquisitions consummated by the Borrower and its Subsidiaries during such period (other than any such payments to the extent financed with equity proceeds, Asset Sale proceeds, insurance proceeds or Indebtedness), (iii) the aggregate amount of permanent principal payments of Indebtedness for borrowed money of the Borrower and its Subsidiaries during such period (other than (A) repayments to the extent made with Asset Sale proceeds, equity proceeds, insurance proceeds or Indebtedness and (B) repayments of Term Loans, provided that repayments of Term Loans shall be deducted in determining Excess Cash Flow to the extent such repayments were (x) required as a result of a Scheduled Repayment under Section 4.02(b) or (y) made as a voluntary prepayment with internally generated funds), and (iv) the increase, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period.

"Excess Cash Payment Date" shall mean [April 15] of each year (commencing on [April 15, 200[6]]).

"Excess Cash Payment Period" shall mean, with respect to the repayment required on each Excess Cash Payment Date, the immediately preceding fiscal year of the Borrower.

"Existing Indebtedness" shall have the meaning provided in Section 7.21.

"FCC" shall mean the U.S. Federal Communications Commission, or any successor thereto.

"FCC Licenses" shall have the meaning provided in Section 7.24(a).

"Facing Fee" shall have the meaning provided in Section 3.01(c).

"Fair Market Value" shall mean, with respect to any asset, the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower selling such asset.

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"Fees" shall mean all amounts payable pursuant to or referred to in Section 3.01.

"Final Maturity Date" shall mean (x) with respect to Term Loans _____ __, 2011, and (y) with respect to Letters of Credit _____ __, 2009.

"Final Order" shall mean an order of the Bankruptcy Court entered by the Bankruptcy Court, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or to move for a new trial has expired and as to which no appeal, writ of certiorari or request for a new trial shall then be pending.

"Foreign Pension Plan" shall mean each employee benefit plan, employment, bonus, incentive, stock purchase and stock option plan, program, agreement or arrangement; and each severance, termination pay, salary continuation, retention, accrued leave, vacation, sick pay, sick leave, medical, life insurance, disability, accident, profit-sharing, fringe benefit, pension, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the fifty states of the United States of America, by the Borrower or any of its Subsidiaries, including, without limitation, any such plan, fund, program, agreement or arrangement sponsored by a government or governmental entity.

"Foreign Person" means any Person that is not a "United States person" as defined in Section 7701(a)(3) of the Code.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time-to-time; provided that determinations in accordance with GAAP for purposes of Sections 4.02, 8.15 and 9, including defined terms as used therein, are subject (to the extent provided therein) to Section 13.07(a).

"Governmental Authorizations" shall have the meaning provided in Section 7.24(b).

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any governmental authority.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money or for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit, bankers' acceptances and similar obligations issued for the account of such Person and all unpaid drawings in respect of such letters of credit, bankers' acceptances and similar obligations, (iii) all Indebtedness of the types described in clause (i), (ii),

(iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such Indebtedness, such Indebtedness shall be deemed to be in an amount equal to the fair market value of the property to which such Lien relates as determined in good faith by such Person), (iv) the aggregate amount of all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person, (vii) all obligations under any Interest Rate Protection Agreement, any Other Hedging Agreement or under any similar type of agreement and (viii) all Off-Balance Sheet Liabilities of such Person. Notwithstanding the foregoing, Indebtedness shall not include trade payables and accrued expenses incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person.

"Initial Borrowing Date" shall mean the date occurring on or after the Effective Date on which the initial Borrowing of Term Loans occurs.

"Intercompany Loan" shall have the meaning provided in Section 9.05(vii).

"Intercompany Note" shall mean a promissory note, in the form of Exhibit N, evidencing Intercompany Loans.

"Intercreditor Agreement" shall have the meaning provided in Section 5.01(s)

"Interest Determination Date" shall mean, with respect to any Eurodollar Loan, the second Business Day prior to the commencement of any Interest Period relating to such Eurodollar Loan.

"Interest Period" shall have the meaning provided in Section 1.09.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"Intertainer" means Intertainer Inc., a Delaware Corporation.

"Investments" shall have the meaning provided in Section 9.05.

"Issuing Lender" shall mean each of DBCI (except as otherwise provided in Section 12.09) and any other Lender reasonably acceptable to the Administrative Agent which agrees to issue Letters of Credit hereunder, provided that until such time as it agrees otherwise, DBCI shall not be an Issuing Lender with respect to any trade Letter of Credit. Any Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by one or more Affiliates of such issuing Lender.

"L/C Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule I directly below the column entitled "L/C Commitment," as the same may be terminated pursuant to Sections 3.03 and/or 10.

"L/C Commitment Commission" shall have the meaning provided in Section 3.01(a).

"L/C Lender" shall mean each Lender which has an L/C Commitment or, after the termination of the L/C Commitments, is a Participant in Letter of Credit Outstandings.

"L/C Percentage" means shall have the meaning provided in Section 2.04(a).

"L/C Percentage" of any Lender at any time shall mean a fraction (expressed as a percentage) the numerator of which is the L/C Commitment of such Lender and the denominator of which is the Total L/C Commitment at such time; provided that if the L/C Percentage of any Lender is to be determined after the Total L/C Commitment has been terminated, then the L/C Percentage of the Lenders shall be determined immediately prior (and without giving effect) to such termination, but adjusted for any assignments of L/C Commitments or related outstandings pursuant to this Agreement by such Lender after the date of such termination.

"L/C Supportable Obligations" shall mean (i) obligations of the Borrower or any of its Subsidiaries with respect to workers compensation, surety bonds and other similar statutory obligations and (ii) such other obligations of the Borrower or any of its Subsidiaries as are reasonably acceptable to the respective Issuing Lender and otherwise permitted to exist pursuant to the terms of this Agreement.

"Lead Arranger and Book Manager" shall mean DBSI, in its capacity as such hereunder.

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" shall mean each financial institution listed on Schedule I, as well as any Person that becomes a "Lender" hereunder pursuant to Section 1.13 or 13.04(b).

"Lender Default" shall mean (i) the refusal (which has not been retracted) or the failure of a Lender to make available its portion of any Borrowing or to fund its portion of any unreimbursed payment under Section 2.04(c) or (ii) a Lender having notified in writing the Borrower and/or the Administrative Agent that such Lender does not intend to comply with its obligations under Section 1.01 or 2.

"Letter of Credit" shall have the meaning provided in Section 2.01(a).

"Letter of Credit Fee" shall have the meaning provided in Section 3.01(b).

"Letter of Credit Outstandings" shall mean, at any time, the sum of (i) the Stated Amount of all outstanding Letters of Credit and (ii) the aggregate amount of all Unpaid Drawings in respect of all Letters of Credit.

"Letter of Credit Request" shall have the meaning provided in Section 2.03(a).

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Los Angeles Assets" means the Telecommunications Assets owned by the Borrower and its Subsidiaries that are, on the Initial Borrowing Date, physically located in the Los Angeles, California metropolitan area and utilized to provide telecommunications services to customers of the Borrower or its Subsidiaries in the Los Angeles, California metropolitan area plus (i) such additional Telecommunications Assets as are, after the Initial Borrowing Date, acquired for such cable systems and located in the Los Angeles, California metropolitan area pursuant to Capital Expenditures made in accordance with Section 9.07, (ii) related net working capital and (iii) Equity Interests in Persons that own no assets other than such assets.

"Management Agreements" shall mean all material agreements entered into by the Borrower or any of its Subsidiaries with respect to the management of the Borrower or any of its Subsidiaries after giving effect to the Transaction (including consulting agreements and other management advisory agreements but excluding employment agreements).

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean (i) a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries taken as a whole since December 31, 2003 (other than the commencement of the bankruptcy cases filed prior to the Initial Borrowing Date with respect to the Debtors-In-Possession) or (ii) a material adverse effect (x) on the rights or remedies of the Lenders or the Administrative Agent hereunder or under any other Credit Document or (y) on the ability of any Credit Party to perform its obligations to the Lenders or Administrative Agent hereunder or under any other Credit Document.

"Material Asset Sale" shall mean any Asset Sale where the gross proceeds received by the Borrower and its Subsidiaries (taking the amount of cash and Cash Equivalents received, the principal amount of Indebtedness received and the fair market value of all other consideration) is in excess of $5,000,000.

"Megacable Entities" shall mean, collectively, Megacable, S.A. de C.V., Megacable Telecommunications, S.A. de C.V. and MCM Holdings, S.A. de C.V.

"Minimum Borrowing Amount" shall mean for Term Loans, $[_____].

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument.

"Mortgage Policy" shall mean a mortgage title insurance policy or a binding commitment with respect thereto.

"Mortgaged Property" shall mean any Real Property owned or leased by the Borrower or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage.

"NAIC" shall mean the National Association of Insurance Commissioners.

"Net Debt Proceeds" shall mean, with respect to any incurrence of Indebtedness for borrowed money, the cash proceeds (net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith) received by the respective Person from the respective incurrence of such Indebtedness for borrowed money.

"Net Equity Proceeds" shall mean, with respect to each issuance or sale of any equity by any Person or any capital contribution to such Person, the cash proceeds (net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith) received by such Person from the respective sale or issuance of its equity or from the respective capital contribution.

"Net Insurance Proceeds" shall mean, with respect to any Recovery Event, the cash proceeds (net of the (x) marginal increase in taxes reasonably expected to be payable with respect to the fiscal year in which such event occurred as a result thereof and reasonable costs and expenses incurred in connection with such Recovery Event and (y) all cash amounts required to be applied as the result of such event to repay Indebtedness (other than Indebtedness hereunder or under the Second-Lien Credit Documents or the Third-Lien Note Documents) of the Borrower or the respective Subsidiary secured by such asset) received by the respective Person in connection with such Recovery Event.

"Net Sale Proceeds" shall mean, for any Asset Sale, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such sale of assets, net of the reasonable costs and expenses of such sale (including fees and commissions, payments of unassumed liabilities relating to the assets sold and required payments of any Indebtedness (other than Indebtedness secured pursuant to the Security Documents) which is secured by the respective assets which were sold), and the marginal increase in taxes reasonably expected to be payable with respect to the fiscal year in which such Asset Sale occurred as a result thereof and the amount of any reserves established by the Borrower and the Subsidiaries to fund contingent liabilities reasonably estimated to be payable within one year of the date of such Asset Sale, and that are directly attributable to such Asset Sale (as determined reasonably and in good faith by the chief financial officer of the Borrower); provided, that (x) the unused portion of any such reserves shall constitute Net Sale Proceeds and be required to be used to prepay Loans in accordance with Section 4.02(e) on the date occurring one year from the respective Asset Sale or (y) if any such reserves are otherwise reversed or released, an amount equal to the amount of such reversal or release shall be deemed to constitute Net Sale Proceeds received at the time of such reversal or release and shall be used to prepay Loans in accordance with Section 4.02(e).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Wholly-Owned Subsidiary" shall mean any Subsidiary of the Borrower that is not a Wholly-Owned Subsidiary of the Borrower.

"Notice of Borrowing" shall have the meaning provided in Section 1.03(a).

"Notice of Conversion/Continuation" shall have the meaning provided in Section 1.06.

"Notice of Plan Effective Date" shall mean the notice from the Borrower certifying that the effective date for the Plan of Reorganization has occurred.

"Notice Office" shall mean (i) for credit notices, the office of the Administrative Agent located at 60 Wall Street, New York, New York 10005, Attention: [_____], Telephone No.: [_____], and Telecopier No.: [_____], and (ii) for operational notices, the office of the Administrative Agent located at [90 Hudson Street, 5th Floor, Jersey City, New Jersey 07302, Attention: [_____], Telephone No.: [_____], and Telecopier No.: [_____]], or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligations" shall mean all amounts owing to the Administrative Agent, the Collateral Agent, any other Agent, any Issuing Lender, or any Lender pursuant to the terms of this Agreement or any other Credit Document.

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Other Hedging Agreements" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values or commodity prices.

"Participant" shall have the meaning provided in Section 2.04(a).

"Payment Office" shall mean the office of the Administrative Agent located at 90 Hudson Street, 5th Floor, Jersey City, New Jersey or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Acquisition" shall mean the acquisition by the Borrower or a Wholly-Owned Domestic Subsidiary of the Borrower which is a Subsidiary Guarantor of an Acquired Entity or Business (including by way of merger of such Acquired Entity or Business with and into the Borrower (so long as the Borrower is the surviving corporation) or a Wholly-Owned Domestic Subsidiary of the Borrower which is a Subsidiary Guarantor (so long as the Subsidiary Guarantor is the surviving corporation)), provided that (in each case) (A) the consideration paid or to be paid by the Borrower or such Wholly-Owned Domestic Subsidiary consists solely of cash, the issuance or incurrence of Indebtedness otherwise permitted by Section 9.04 and the assumption/acquisition of any Indebtedness (calculated at face value) which is permitted to remain outstanding in accordance with the requirements of Section 9.04, (B) in the case of the acquisition of 100% of the capital stock or other Equity Interests of any Person (including way of merger), such Person shall own no capital stock or other equity interests of any other Person (excluding *de minimis* amounts) unless such Person owns 100% of the capital stock or other Equity Interests of such other Person, (C) all of the business, division or product line acquired pursuant to the respective Permitted Acquisition, or the business of the Person acquired pursuant to the respective Permitted Acquisition and its Subsidiaries taken as a whole, is in the United States, (D) the Acquired Entity or Business acquired pursuant to the respective Permitted Acquisition is in a business permitted by Section 9.15 and (E) all applicable requirements of Sections 8.15, 9.02 and 9.19 applicable to Permitted Acquisitions are satisfied. Notwithstanding anything to the contrary contained in the immediately preceding sentence, an acquisition which does not otherwise meet the requirements set forth above in the definition of "Permitted Acquisition" shall constitute a Permitted Acquisition if, and to the extent, the Required Lenders agree in writing, prior to the consummation thereof, that such acquisition shall constitute a Permitted Acquisition for purposes of this Agreement.

"Permitted Encumbrance" shall mean, with respect to any Mortgaged Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, all of which exceptions must be acceptable to the Administrative Agent in its reasonable discretion.

"Permitted Liens" shall have the meaning provided in Section 9.01.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Borrower or a Subsidiary of the Borrower or an ERISA Affiliate, and each such plan for the five year period immediately following the latest date on which the Borrower, a Subsidiary of the Borrower or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"Plan Documents" shall have the meaning provided in the Plan of Reorganization.

"Plan of Reorganization" shall mean the chapter 11 plan of reorganization relating to the Borrower and its Subsidiaries subject thereto, dated August 20, 2004, including the exhibits and schedules thereto, as the same may be amended, modified or supplemented from

time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof and hereof.

"Pledge Agreement" shall have the meaning provided in Section 5.01(p).

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement.

"Pledgee" shall have the meaning provided in the Pledge Agreement.

"Pro Forma Basis" shall mean, in connection with any calculation of compliance with any financial covenant or financial term, the calculation thereof after giving effect on a pro forma basis to (x) the incurrence of any Indebtedness (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness or to finance a Permitted Acquisition) after the first day of the relevant Calculation Period as if such Indebtedness had been incurred (and the proceeds thereof applied) on the first day of the relevant Calculation Period, (y) the permanent repayment of any Indebtedness (other than revolving Indebtedness except to the extent accompanied by a corresponding permanent commitment reduction) after the first day of the relevant Calculation Period as if such Indebtedness had been retired or redeemed on the first day of the relevant Calculation Period and/or (z) the Permitted Acquisition, if any, then being consummated as well as any other Permitted Acquisition or Material Asset Sale consummated after the first day of the relevant Calculation Period and on or prior to the date of the respective Permitted Acquisition then being effected, as the case may be, with the following rules to apply in connection therewith:

(i)     all Indebtedness (x) (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness or to finance a Permitted Acquisition) incurred or issued after the first day of the relevant Calculation Period (whether incurred to finance a Permitted Acquisition, to refinance Indebtedness or otherwise) shall be deemed to have been incurred or issued (and the proceeds thereof applied) on the first day of the respective Calculation Period and remain outstanding through the date of determination and (y) (other than revolving Indebtedness except to the extent accompanied by a corresponding permanent commitment reduction) permanently retired or redeemed after the first day of the relevant Calculation Period shall be deemed to have been retired or redeemed on the first day of the respective Calculation Period and remain retired through the date of determination;

(ii)    all Indebtedness assumed to be outstanding pursuant to preceding clause (i) shall be deemed to have borne interest at (x) the rate applicable thereto, in the case of fixed rate indebtedness, or (y) at the rate which would have been applicable thereto on the last day of the respective Calculation Period, in the case of floating rate Indebtedness (although interest expense with respect to any Indebtedness for periods while same was actually outstanding during the respective period shall be calculated using the actual rates applicable thereto while same was actually outstanding); and

(iii)   in making any determination of Consolidated EBITDA, pro forma effect shall be given to any Permitted Acquisition or Material Asset Sale consummated during

the periods described above, with such Consolidated EBITDA to be determined as if such Permitted Acquisition or Material Asset Sale was consummated on the first day of the relevant Calculation Period, taking into account, for any portion of the relevant period being tested occurring prior to the consummation of any Permitted Acquisition or Material Asset Sale, demonstrable cost savings actually achieved simultaneously with, or to be achieved within a 1-year period following, the closing of the respective Permitted Acquisition or Material Asset Sales, which cost savings would be permitted to be recognized in pro forma financial statements prepared in accordance with Regulation S-X under the Securities Act, as if such cost-savings were realized on the first day of the relevant period.

"Pro Forma Financials" shall mean the pro forma consolidated financial statements of the Borrower and its Subsidiaries (after giving effect to the Transaction and any other significant transactions in the case of said pro forma financial statements), which Pro Forma Financials were delivered to the Agents and the Lenders prior to the Initial Borrowing Date.

"Projections" shall mean the projections that are contained in the Confidential Information Memorandum dated [_____] and that were prepared by or on behalf of the Borrower in connection with the Transaction and delivered to the Administrative Agent and the Lenders prior to the Initial Borrowing Date.

"Qualified Capital Stock" shall mean any Equity Interests of the Borrower, the express terms of which shall provide that dividends thereon shall not be required to be paid at any time (and to the extent) that such payment would be prohibited by the terms of this Agreement or any other agreement of the Borrower or any of its Subsidiaries relating to outstanding indebtedness and which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event (including any change of control event), cannot mature (excluding any maturity as the result of an optional redemption by the issuer thereof) and is not mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, and is not redeemable, or required to be repurchased, at the sole option of the holder thereof (including, without limitation, upon the occurrence of an change of control event), in whole or in part, on or prior to one year following the latest Final Maturity Date then in effect.

"Quarterly Payment Date" shall mean the last Business Day of each September, December, March and June occurring after the Initial Borrowing Date, commencing on [_____ __, ____].

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"RCN International" shall mean RCN International Holdings, Inc., a Delaware corporation.

"Recovery Event" shall mean the receipt by the Borrower or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of

theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 8.03.

"Register" shall have the meaning provided in Section 13.15.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Release" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"Replaced Lender" shall have the meaning provided in Section 1.13.

"Replacement Lender" shall have the meaning provided in Section 1.13.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27, .28 or .32 of PBGC Regulation Section 4043.

"Required Lenders" shall mean Non-Defaulting Lenders the sum of whose outstanding Term Loan Commitments (or after the termination thereof, outstanding principal of Term Loans) and L/C Commitments (or after the termination thereof, the L/C Percentages of Letter of Credit Outstandings) represent at least 50.1% of the sum of (i) all outstanding Term Loan Commitments (or after the termination thereof, outstanding principal of Term Loans) of Non-Defaulting Lenders and (ii) the Total L/C Commitment of all Non-Defaulting Lenders (or after the termination thereof, the aggregate L/C Percentages of all Non-Defaulting Lenders of Letter of Credit Outstandings at such time).

"Restricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Subsidiary, (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for

the benefit of the Secured Creditors or (iii) are not otherwise generally available for use by the Borrower or any of its Subsidiaries.

"Returns" shall have the meaning provided in Section 7.09.

"S&P" shall mean Standard & Poor's Rating Services, a division of McGraw-Hill, Inc., or any successor thereto.

"San Francisco Assets" means the Telecommunications Assets owned by the Borrower and its Subsidiaries that are, on the Initial Borrowing Date, physically located in the San Francisco, California metropolitan area and utilized to provide telecommunications services to customers of the Borrower or its Subsidiaries in the San Francisco, California metropolitan area plus (i) such additional Telecommunications Assets as are, after the Initial Borrowing Date, acquired for such cable systems and located in the San Francisco, California metropolitan area pursuant to Capital Expenditures made in accordance with Section 9.07, (ii) related net working capital and (iii) Equity Interests in Persons that own no assets other than such assets.

"Schedule" shall mean the schedules attached hereto.

"Scheduled Repayment" shall have the meaning provided in Section 4.02(b).

"Scheduled Repayment Date" shall have the meaning provided in Section 4.02(b).

"SEC" shall have the meaning provided in Section 8.01(h).

"Second-Lien Administrative Agent" shall mean the "Trustee" (including in its capacity as collateral agent under the Second-Line Note Documents) under and as defined in the Second-Lien Note Indenture.

"Second-Lien Collateral Agent" shall mean the "Trustee" under and as defined in the Second-Lien Note Documents.

"Second-Lien Note Documents" shall mean the Second-Lien Note Indenture, and the related guarantees, pledge agreements, security agreements, mortgages, notes and other agreements and instruments entered into in connection with the Second-Lien Note Indenture, in each case as the same may be amended, modified and/or supplemented from time to time in accordance with the terms hereof and thereof.

"Second-Lien Note Indenture" shall mean that certain Indenture, dated as of the date hereof, among the Borrower, the Second-Lien Administrative Agent and various lenders from time to time party thereto, as the same may be amended, modified and/or supplemented from time to time in accordance with the terms hereof and thereof.

"Second-Lien Notes" shall mean the 7-3/8% Convertible Second-Lien Notes due 2012 issued by the Borrower on the Initial Borrowing Date pursuant to the Second-Lien Note Indenture.

"Second-Lien Security Documents" shall mean the "Security Documents" under, and as defined in, the Second-Lien Note Indenture.

"Section 4.04(b)(ii) Certificate" shall have the meaning provided in Section 4.04(b)(ii).

"Secured Creditors" shall have the meaning assigned that term in the respective Security Documents.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 5.01(q).

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement.

"Security Document" shall mean and include each of the Security Agreement, the Pledge Agreement, each Mortgage and, after the execution and delivery thereof, each Additional Security Document.

"Securities Exchange Act" the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, as amended from time to time.

"Shareholders' Agreements" shall mean all agreements (including, without limitation, shareholders' agreements, subscription agreements and registration rights agreements) entered into by the Borrower or any of its Subsidiaries governing the terms and relative rights of the capital stock of the entity that is a party to such agreement and any agreements entered into by shareholders relating to any such entity with respect to its capital stock to which such entity is also a party.

"Starpower" means Starpower Communications, LLC, a Delaware limited liability company.

"Starpower Acquisition" means the acquisition by the Borrower of the 50% of the Equity Interests in Starpower not owned by the Borrower for aggregate purchase consideration not exceeding $[30] million.

"Starpower Group" means Starpower and its Subsidiaries.

"Stated Amount" of each Letter of Credit shall mean, at any time, the maximum amount available to be drawn thereunder (in each case determined without regard to whether any conditions to drawing could then be met).

"Subsidiaries Guaranty" shall have the meaning provided in Section 5.01(o).

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a

majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.

"Subsidiary Guarantor" shall mean each Subsidiary of the Borrower which has executed and delivered the Subsidiaries Guaranty, with (x) each Wholly-Owned Domestic Subsidiary of the Borrower on the Initial Borrowing Date and each subsequently acquired Wholly-Owned Domestic Subsidiary (including Starpower upon the consummation of the Starpower Acquisition) being required to be a Subsidiary Guarantor.

"Supermajority Lenders" shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if (x) all outstanding Obligations in respect of the L/C Commitments were repaid in full and the Total L/C Commitment was terminated and (y) the text "at least 50.1%" contained therein were changed to "at least 66-2/3%."

"Syndication Agent" shall mean [____], in its capacity as such hereunder.

"Syndication Date" shall mean that date upon which the Administrative Agent determines in its sole discretion (and notifies the Borrower) that the primary syndication (and resultant addition of Persons as Lenders pursuant to Section 13.04(b)) has been completed.

"Synthetic Lease" means a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Tax Allocation Agreements" shall mean any tax sharing or tax allocation agreements entered into by the Borrower or any of its Subsidiaries.

"Tax Benefit" shall have the meaning provided in Section 4.04(c).

"Taxes" shall have the meaning provided in Section 4.04(a).

"Telecommunications Assets" means properties or assets utilized directly or indirectly for the design, development, construction, installation, operation, integration, management or provision of any telecommunications business, including voice, video and data transmission products, services and systems and any business reasonably related to the foregoing.

"Term Loan" shall have the meaning provided in Section 1.01.

"Term Loan Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule I directly below the column entitled "Term Loan Commitment," as the same may be terminated pursuant to Sections 3.03 and/or 10.

"Term Loan Percentage" of any Term Loan Lender at any time (x) prior to the termination of the Total Term Loan Commitment, a fraction (expressed as a percentage) the numerator of which is the Term Loan Commitment of such Term Loan Lender and the denominator of which is the Total Term Loan Commitment or (y) after the Total Term Loan Commitment has terminated, (i) if the Initial Borrowing Date has occurred, a fraction (expressed as a percentage) the numerator of which is the outstanding principal of Term Loans of such Term Loan Lender and the denominator of which is the aggregate principal amount of all outstanding Term Loans or (ii) if the Initial Borrowing Date has not occurred, the percentage for each Term Loan Lender determined as provided in clause (x) above, based on the Term Loan Commitments of the various Term Loan Lenders as in effect immediately before the termination of the Total Term Loan Commitment.

"Term Note" shall have the meaning provided in Section 1.05(a).

"Test Period" shall mean (i) for the period ended March 31, 2005, the fiscal quarter of the Borrower then ended, (ii) for the period ended June 30, 2005, the two consecutive fiscal quarters (taken as one accounting period) of the Borrower then ended, (iii) for the period ended September 30, 2005, the three consecutive fiscal quarters (taken as one accounting period) of the Borrower then ended and (iv) thereafter, each period of four consecutive fiscal quarters of the Borrower then last ended (in each case taken as one accounting period).

"Third-Lien Administrative Agent" shall mean HSBC Bank USA in its capacity as agent for the secured creditors under the Third-Lien Credit Documents.

"Third-Lien Collateral Agent" shall mean HSBC Bank USA in its capacity as collateral agent for the secured creditors under the Third-Lien Credit Documents.

"Third-Lien Credit Agreement" shall mean the Credit Agreement, dated as of the date hereof, among the Borrower, the lenders party thereto, and HSBC Bank USA, as agent, as the same may be amended, modified, and (or supplemented from time to time in accordance with the terms hereof and thereof.).

"Third-Lien Credit Documents" shall mean the Third-Lien Credit Agreement, and the related guarantees, pledge agreements, security agreements, mortgages, notes and other agreements and instruments entered into in connection with the Third-Lien Credit Agreement, in each case as the same may be amended, modified and/or supplemented from time to time in accordance with the terms hereof and thereof.

"Total Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Total L/C Commitment" shall mean, at any time, the sum of the L/C Commitments of each of the Lenders at such time.

"Total Consideration" shall mean, with respect to any sale or disposition, the aggregate amount of cash and Cash Equivalents, plus the greater of the face amount (if relevant) Fair Market Value of all other consideration, in each case received by the Borrower and its Subsidiaries from the respective sale or disposition.

"<u>Total Leverage Ratio</u>" shall mean, at any time, the ratio of Consolidated Indebtedness at such time to Consolidated EBITDA for the Test Period then most recently ended.

"<u>Total Term Loan Commitment</u>" shall mean, at any time, the sum of the Term Loan Commitments of each of the Lenders at such time.

"<u>Total Unutilized L/C Commitment</u>" shall mean, at any time, an amount equal to the remainder of (x) the Total L/C Commitment then in effect less (y) the sum of the aggregate amount of all Letter of Credit Outstandings at such time.

"<u>Transaction</u>" shall mean, collectively, (i) the consummation of the Plan of Reorganization, (ii) the entering into of the Credit Documents and the occurrence of the Credit Events hereunder on the Initial Borrowing Date, (iii) the entering into of the Second-Lien Note Documents and the issuance of all Second-Lien Notes thereunder on the Initial Borrowing Date, (iv) the entering into of the Third-Lien Credit Documents and (v) the payment of all fees and expenses in connection with the foregoing.

"<u>Type</u>" shall mean the type of Term Loan determined with regard to the interest option applicable thereto, <u>i.e.</u>, whether a Base Rate Loan or a Eurodollar Loan.

"<u>UCC</u>" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"<u>Unfunded Current Liability</u>" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contribution).

"<u>United States</u>" and "<u>U.S.</u>" shall each mean the United States of America.

"<u>Unpaid Drawing</u>" shall have the meaning provided in Section 2.05(a).

"<u>Unrestricted</u>" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"<u>Unutilized L/C Commitments</u>" shall mean, with respect to any Lender at any time, such Lender's L/C Commitment at such time less such Lender's L/C Percentage of the Letter of Credit Outstandings at such time

"<u>Wholly-Owned Domestic Subsidiary</u>" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is incorporated or organized in the United States or any State thereof.

"<u>Wholly-Owned Domestic Subsidiary Guarantor</u>" shall mean any Wholly-Owned Domestic Subsidiary of the Borrower, which is also a Subsidiary Guarantor.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

SECTION 12. The Administrative Agent.

12.01  Appointment.  The Lenders hereby irrevocably designate and appoint DBCI as Administrative Agent (for purposes of this Section 12 and Section 13.01, the term "Administrative Agent" also shall include DBCI in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Term Note by the acceptance of such Term Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

12.02  Nature of Duties.  The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Term Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

12.03  Lack of Reliance on the Administrative Agent.  Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Term Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with the extensions of credit hereunder and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Term Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter.  The Administrative Agent shall not be responsible to any Lender or the holder of any Term Note for any recitals, statements, information, representations or warranties herein or in

any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

12.04  Certain Rights of the Administrative Agent.  If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Term Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.05  Reliance.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

12.06  Indemnification.  To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

12.07  The Administrative Agent in its Individual Capacity.  With respect to its obligation to make Term Loans, or issue or participate in Letters of Credit, under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders," "Supermajority Lenders," "holders of Term Notes" or any similar terms shall, unless the context clearly indicates

otherwise, include the Administrative Agent in its respective individual capacities. The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.08 <u>Holders</u>. The Administrative Agent may deem and treat the payee of any Term Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Term Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Term Note or of any Term Note or Term Notes issued in exchange therefor.

12.09 <u>Resignation by the Administrative Agent</u>. (a) The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 15 Business Days' prior written notice to the Lenders and, unless a Default or an Event of Default under Section 10.05 then exists, the Borrower. Any such resignation by an Administrative Agent hereunder shall also constitute its resignation as an Issuing Lender, in which case the resigning Administrative Agent (x) shall not be required to issue any further Letters of Credit hereunder and (y) shall maintain all of its rights as Issuing Lender, with respect to any Letters of Credit issued by it prior to the date of such resignation. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)     Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if an Event of Default then exists).

(c)     If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed, provided that the Borrower's consent shall not be required if an Event of Default then exists), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)     If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 20th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative

Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e)    Upon a resignation of the Administrative Agent pursuant to this Section 12.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

SECTION 13. <u>Miscellaneous.</u>

13.01  <u>Payment of Expenses, etc.</u>  The Borrower hereby agrees to:  (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, the reasonable fees and disbursements of White & Case LLP and the Administrative Agent's other counsel and consultants) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Administrative Agent in connection with its syndication efforts with respect to this Agreement and of the Administrative Agent and, after the occurrence of an Event of Default, each of the Issuing Lenders and Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of counsel and consultants for the Administrative Agent and, after the occurrence of an Event of Default, counsel for each of the Issuing Lenders and Lenders); (ii) pay and hold the Administrative Agent, each of the Issuing Lenders and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and save the Administrative Agent, each of the Issuing Lenders and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Administrative Agent, such Issuing Lender or such Lender) to pay such taxes; and (iii) indemnify the Administrative Agent, each Issuing Lender and each Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not the Administrative Agent, any Issuing Lender or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the use of any Letter of Credit or the proceeds of any Term Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the

surface or subsurface of any Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by the Borrower or any of its Subsidiaries at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, the non-compliance by the Borrower or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or any Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding liabilities for Taxes which are subject to indemnification under Section 4.04(a) hereof and any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)). To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent, any Issuing Lender or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

13.02  <u>Right of Setoff</u>.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, each Issuing Lender and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent, such Issuing Lender or such Lender (including, without limitation, by branches and agencies of the Administrative Agent, such Issuing Lender or such Lender wherever located) to or for the credit or the account of the Borrower or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent, such Issuing Lender or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 13.06(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent, such Issuing Lender or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

13.03  <u>Notices</u>.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telecopier or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered:  if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; if to any Lender, at its address specified on Schedule II; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  Any party hereto may change

its address or telecopy number for notices and other communications hereunder by written notice to the other parties hereto. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

13.04 <u>Benefit of Agreement; Assignments; Participations</u>. (a) This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided</u>, <u>however</u>, neither the Borrower nor the Borrower may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Lenders and, <u>provided further</u>, that, although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 1.13 and 13.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, <u>provided further</u>, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Term Loan, Term Note or Letter of Credit (unless such Letter of Credit is not extended beyond the Final Maturity Date) in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Term Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) supporting the Term Loans or Letters of Credit hereunder in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b) Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Term Loan Commitments or L/C Commitments have terminated, the related outstanding Obligations) hereunder to (i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by

such other Lender or its parent company (provided that any fund that invests in Term Loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(B)), or (ii) in the case of any Lender that is a fund that invests in Term Loans, any other fund that invests in Term Loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Term Loan Commitments or L/C Commitments have terminated, the related outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in Term Loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) at such time, Schedule I shall be deemed modified to reflect the Commitments and/or outstanding Term Loans, as the case may be, of such new Lender and of the existing Lenders, (ii) upon the surrender of the relevant Term Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Term Note pursuant to a customary indemnification agreement) new Term Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Term Notes to be in conformity with the requirements of Section 1.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Term Loans, as the case may be, (iii) the consent of the Administrative Agent and the Borrower (unless a Default under Section 10.01 or 10.05 or an Event of Default has occurred and is continuing and with such consent of the Borrower not being required in connection with the primary syndication (as determined by the Administrative Agent) of the Term Loans) shall be required in connection with any such assignment pursuant to clause (y) above (which consent shall not be unreasonably withheld or delayed), (iv) the consent of each Issuing Lender shall be required for any assignment of any L/C Commitment or participation in any Letter of Credit Outstandings, (v) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500 and (vi) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15. To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments. At the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms and necessary attachments (and, if applicable, a Section 4.04(b)(ii) Certificate) described in Section 4.04(b). To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 1.13 or this Section 13.04(b) would, at the time of such assignment, result in greater amounts under Section 1.10, 2.06 or 4.04 from the amounts the Borrower is required to pay or increase with respect to the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased amounts (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Term Loans and Term Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Term Loans and Term Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

13.05    No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent, any Issuing Lender or any Lender to any other or further action in any circumstances without notice or demand.

13.06    Payments Pro Rata.  (a)  Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)     Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Term Loans, Unpaid Drawings, L/C Commitment Commission or Letter of Credit Fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)     Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07  Calculations; Computations.  (a)  The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with generally accepted accounting principles in the United States consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders); provided that, (i) except as otherwise specifically provided herein, all computations of Excess Cash Flow, and all computations and all definitions (including accounting terms) used in determining compliance with Sections 8.15 and 9, inclusive, shall utilize generally accepted accounting principles and policies in conformity with those used to prepare the historical financial statements of the Borrower referred to in Section 7.05(a) [adjustments needed?] and (ii) to the extent expressly provided herein, certain calculations shall be made on a Pro Forma Basis.

(b)     All computations of interest, L/C Commitment Commission and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day; except that in the case of Letter of Credit Fees and Facing Fees, the last day shall be included) occurring in the period for which such interest, L/C Commitment Commission or Fees are payable.

13.08  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.  (a)  THIS AGREEMENT AND THE OTHER CREDIT DOCU-MENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN THE MORTGAGES, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENTS BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER.   THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PRO-CEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  THE BORROWER HEREBY IRREVOCABLY WAIVES

ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b) THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJEC-TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVO-CABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.09 Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

13.10 Effectiveness. This Agreement shall become effective on the date (the "Effective Date") on which the Borrower, the Administrative Agent and each of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent at the Notice Office or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it. The Administrative Agent will give the Borrower and each Lender prompt written notice of the occurrence of the Effective Date.

13.11 Headings Descriptive. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12 Amendment or Waiver; etc. (a) Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or termi-nated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may

be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), _provided_ that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly modified in the case of following clause (i)), (i) extend the final scheduled maturity of any Term Loan or Term Note or extend the stated expiration date of any Letter of Credit beyond the Final Maturity Date, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 13.07(a) shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under all the Security Documents, (iii) amend, modify or waive any provision of this Section 13.12 (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Term Loans and the L/C Commitments on the Effective Date), (iv) reduce the percentage specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Term Loans and L/C Commitments are included on the Effective Date) or (v) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement; _provided further_, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the consent of each Issuing Lender, amend, modify or waive any provision of Section 2 or alter its rights or obligations with respect to Letters of Credit, (3) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision as same relates to the rights or obligations of the Administrative Agent, (4) without the consent of Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, or (5) reduce the amount of, or extend the date of, any Scheduled Repayment without the consent of the Supermajority Lenders holding Term Loans, or amend the definition of Supermajority Lenders without the consent of the Supermajority Lenders holding Term Loans (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Supermajority Lenders on substantially the same basis as the extensions of Term Loans and L/C Commitments are included on the Effective Date).

    (b)  If, in connection with any proposed change, waiver, discharge or termination of any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to Section 13.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual con-

sent is required are treated as described in either clauses (A) or (B) below, to either (A) replace each such non-consenting Lender or Lenders (or, at the option of the Borrower if the respective Lender's consent is required with respect to less than all Tranches (or related Commitments), to replace only the respective Tranche or Tranches of Commitments and/or related outstandings of the respective non-consenting Lender which gave rise to the need to obtain such Lender's individual consent) with one or more Replacement Lenders pursuant to Section 1.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination or (B) terminate such non-consenting Lender's Commitments and repay the outstanding Term Loans of such Lender and cash collateralize such Lender's L/C Percentage of all outstanding Letters of Credit (or, if such Lender is being replaced as to a single Tranche only, take such actions with respect to the Tranche for which it is being terminated), all in accordance with Sections 3.02(b) and/or 4.01(b), provided that, unless the Commitments that are terminated, and Term Loans repaid, pursuant to preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of the Commitments and/or outstanding Term Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B) the Required Lenders (determined after giving effect to the proposed action) shall specifically consent thereto, provided further, that in any event the Borrower shall not have the right to replace a Lender, terminate its Commitments or repay its Term Loans solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 13.12(a).

13.13   Survival.  All indemnities set forth herein including, without limitation, in Sections 1.10, 1.11, 2.06, 4.04, 12.06 and 13.01 shall survive the execution, delivery and termination of this Agreement and the Term Notes and the making and repayment of the Obligations.

13.14   Domicile of Term Loans.  Each Lender may transfer and carry its Term Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Term Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Section 1.10, 1.11, 2.06 or 4.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15   Register.  The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.15, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders, the Term Loans made by each of the Lenders and each repayment in respect of the principal amount of the Term Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Term Loans. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Term Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Term Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Term Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any

Commitments and Term Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Term Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Term Note (if any) evidencing such Term Loan, and thereupon one or more new Term Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 13.15.

13.16 <u>Confidentiality</u>. (a) Subject to the provisions of clause (b) of this Section 13.16, each of the Administrative Agent and the Lender agrees that it will use its reasonable efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, <u>provided</u> that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.16(a) by the respective Lender, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent or the Collateral Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.16, and (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Term Notes or Commitments or any interest therein by such Lender, <u>provided</u> that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 13.16.

(b) The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of the Borrower and its Subsidiaries), provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender.

13.17 <u>Limitation on Additional Amounts</u>. Notwithstanding anything to the contrary contained in Section 1.10, 1.11 or 2.06, unless a Lender gives notice to the Borrower

that it is obligated to pay an amount under any such Section within 270 days after the later of (x) the date the Lender incurs the respective increased costs, Taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital or (y) the date such Lender has actual knowledge of its incurrence of the respective increased costs, Taxes, loss, expense or liability, reductions in amounts received or receivable or reduction in return on capital, then such Lender shall only be entitled to be compensated for such amount by the Borrower pursuant to said Section 1.10, 1.11 or 2.06, as the case may be, to the extent the costs, Taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital are incurred or suffered on or after the date which occurs 270 days prior to such Lender giving notice to the Borrower that it is obligated to pay the respective amounts pursuant to said Section 1.10, 1.11 or 2.06.  This Section 13.17 shall have no applicability to any Section of this Agreement other than said Sections 1.10, 1.11 or 2.06.

13.18  <u>The Patriot Act</u>.  Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>") hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the Act.

13.19  <u>OTHER LIENS ON COLLATERAL; TERMS OF INTERCREDITOR AGREEMENT; ETC</u>.    (a)  EACH LENDER PARTY HERETO UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT LIENS SHALL BE CREATED ON THE COLLATERAL PURSUANT TO THE SECOND-LIEN NOTE DOCUMENTS AND ON THE COLLATERAL OF THE BORROWER PURSUANT TO THE THIRD-LIEN CREDIT DOCUMENTS, WHICH LIENS SHALL BE REQUIRED TO BE SUBORDINATED AND JUNIOR TO THE LIENS CREATED PURSUANT TO THE CREDIT DOCUMENTS IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENT. PURSUANT TO THE EXPRESS TERMS OF  SECTION 8.1 OF THE INTERCREDITOR AGREEMENT, IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE INTERCREDITOR AGREEMENT AND ANY OF THE CREDIT DOCUMENTS, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

(b)     EACH LENDER AUTHORIZES AND INSTRUCTS THE COLLATERAL AGENT AND THE ADMINISTRATIVE AGENT TO ENTER INTO THE INTERCREDITOR AGREEMENT ON BEHALF OF THE LENDERS, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY IT IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENT.

(c)     THE PROVISIONS OF THIS SECTION 13.19 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE INTERCREDITOR AGREEMENT, THE FORM OF WHICH IS ATTACHED AS AN EXHIBIT TO THIS AGREEMENT. REFERENCE MUST BE MADE TO THE INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.   EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND

NO AGENT OR ANY OF AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENT. EACH LENDER IS FURTHER AWARE THAT CERTAIN AGENTS ARE ALSO ACTING IN AN AGENCY CAPACITY UNDER, AND AS DEFINED IN, THE SECOND-LIEN NOTE DOCUMENTS, AND EACH LENDER HEREBY IRREVOCABLY WAIVES ANY OBJECTION THERETO OR CAUSE OF ACTION ARISING THEREFROM.

\* \* \*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

Address:

105 Carnegie Center
Princeton, New Jersey 08540
Attention:
Tel. No.:
Fax No.:

RCN CORPORATION

By: _____
    Name:
    Title:

DEUTSCHE BANK AG CAYMAN
    ISLANDS BRANCH, Individually and as
    Administrative Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[Other Lenders]

COMMITMENTS

| Lender | Term Loan Commitment | L/C Commitment | Total Commitment |
|---|---|---|---|
| Deutsche Bank AG Cayman Islands Branch | | | |
| [Other Lenders] | | | |
| TOTAL: | $330,000,000 | $25,000,000 | $355,000,000 |

## LENDER ADDRESSES

| Lender | Address |
| --- | --- |
| Deutsche Bank AG Cayman Islands Branch | 60 Wall Street<br>New York, New York  10005<br>Attention:  [_____]<br>Telephone:  (212) 250-[___]<br>Telecopier No.:  (212) ___-_____ |

[Other Lenders]

REAL PROPERTY

PLANS

SUBSIDIARIES

# EXISTING INDEBTEDNESS AND ASSUMED INDEBTEDNESS

INSURANCE

EXISTING LIENS

EXISTING INVESTMENTS

## FCC LICENSES

GOVERNMENTAL AUTHORIZATIONS

SECTION 1.    Amount and Terms of Credit. ................................................................. 1

   1.01    The Commitments ............................................................. 1
   1.02    Minimum Amount of Borrowing ............................................. 1
   1.03    Notice of Borrowing ......................................................... 1
   1.04    Disbursement of Funds ..................................................... 2
   1.05    Term Notes ................................................................. 3
   1.06    Conversions ................................................................ 3
   1.07    Pro Rata Borrowings ....................................................... 4
   1.08    Interest .................................................................... 4
   1.09    Interest Periods for Eurodollar Loans ..................................... 5
   1.10    Increased Costs, Illegality, etc. ........................................... 6
   1.11    Compensation .............................................................. 8
   1.12    Change of Lending Office ................................................... 8
   1.13    Replacement of Lenders .................................................... 9

SECTION 2.    Letters of Credit. ............................................................. 10

   2.01    Letters of Credit ........................................................... 10
   2.02    Maximum Letter of Credit Outstandings; Final Maturities ................... 11
   2.03    Letter of Credit Requests; Minimum Stated Amount ......................... 11
   2.04    Letter of Credit Participations ............................................. 12
   2.05    Agreement to Repay Letter of Credit Drawings ............................. 13
   2.06    Increased Costs ........................................................... 14

SECTION 3.    L/C Commitment Commission; Fees; Reductions of Commitment. ......... 15

   3.01    Fees ...................................................................... 15
   3.02    Voluntary Termination of Unutilized L/C Commitments ...................... 16
   3.03    Mandatory Reduction of Commitments ..................................... 17

SECTION 4.    Prepayments; Payments; Taxes ........................................... 17

   4.01    Voluntary Prepayments ..................................................... 17
   4.02    Mandatory Repayments ..................................................... 18
   4.03    Method and Place of Payment .............................................. 22
   4.04    Net Payments .............................................................. 22

SECTION 5.    25

   5.01    Conditions Precedent to Credit Events on the Initial Borrowing Date ..... 25

SECTION 6.    Conditions Precedent to All Credit Events ................................. 32

   6.01    No Default; Representations and Warranties ............................... 32
   6.02    Notice of Borrowings; Letter of Credit Request ............................ 32

SECTION 7.    Representations, Warranties and Agreements .......................... 33

    7.01    Organizational Status ........................................................... 33
    7.02    Power and Authority .............................................................. 33
    7.03    No Violation ........................................................................ 34
    7.04    Approvals............................................................................. 34
    7.05    Financial Statements; Financial Condition; Undisclosed Liabilities;
            Projections ......................................................................... 34
    7.06    Litigation ............................................................................ 36
    7.07    True and Complete Disclosure............................................. 36
    7.08    Use of Proceeds; Margin Regulations ................................. 36
    7.09    Tax Returns and Payments .................................................. 36
    7.10    Compliance with ERISA ...................................................... 37
    7.11    The Security Documents ...................................................... 38
    7.12    Properties ............................................................................ 39
    7.13    Capitalization ...................................................................... 39
    7.14    Subsidiaries ......................................................................... 39
    7.15    Compliance with Statutes, etc.............................................. 39
    7.16    Investment Company Act ..................................................... 39
    7.17    Public Utility Holdings Company Act ................................. 40
    7.18    Environmental Matters ........................................................ 40
    7.19    Labor Relations ................................................................... 40
    7.20    Intellectual Property, etc...................................................... 41
    7.21    Indebtedness........................................................................ 41
    7.22    Insurance ............................................................................. 41
    7.23    Representations and Warranties in Other Documents............ 41
    7.24    FCC Licenses and Other Governmental Authorizations ........ 41
    7.25    Intercreditor Agreement ...................................................... 43
    7.26    Certain Agreements............................................................. 43
    7.27    RCN International ................................................................ 43

SECTION 8.    Affirmative Covenants .......................................................... 43

    8.01    Information Covenants ......................................................... 43
    8.02    Books, Records and Inspections; Annual Meetings............... 46
    8.03    Maintenance of Property; Insurance .................................... 47
    8.04    Existence; Franchises .......................................................... 48
    8.05    Compliance with Statutes, etc.............................................. 48
    8.06    Compliance with Environmental Laws ................................. 48
    8.07    ERISA.................................................................................. 49
    8.08    End of Fiscal Years; Fiscal Quarters.................................... 50
    8.09    Performance of Obligations ................................................. 50
    8.10    Payment of Taxes ................................................................ 51
    8.11    Use of Proceeds................................................................... 51
    8.12    Additional Security; Further Assurances; etc. ...................... 51
    8.13    Ownership of Subsidiaries; etc. ........................................... 52
    8.14    Corporate Separateness ....................................................... 52

8.15        Starpower Acquisition ................................................................ 52
8.16        Third-Lien Credit Agreement .................................................... 53
8.17        Permitted Acquisitions .............................................................. 53
8.18        Ratings ....................................................................................... 54
8.19        RCN International/Megacable Entities ..................................... 54

SECTION 9.        Negative Covenants ................................................................... 54

9.01        Liens .......................................................................................... 55
9.02        Consolidation, Merger, Purchase or Sale of Assets, etc. ......... 57
9.03        Dividends ................................................................................... 60
9.04        Indebtedness .............................................................................. 61
9.05        Advances, Investments and Loans ............................................ 62
9.06        Transactions with Affiliates ...................................................... 63
9.07        Capital Expenditures ................................................................. 64
9.08        Consolidated Interest Coverage Ratio ...................................... 65
9.09        Minimum Consolidated EBITDA ............................................. 65
9.10        Total Leverage Ratio ................................................................. 66
9.11        Adjusted Leverage Ratio ........................................................... 67
[9.12   Minimum Cash on Hand .................................................................... 68
9.13        Limitations on Payments of the Second-Lien Note Indenture and Third-
             Lien Credit Agreement; Modifications of Second-Lien Note
             Documents, Third-Lien Credit Documents, Certificate of Incorporation,
             By-Laws and Certain Other Agreements, etc. ............................ 68
9.14        Limitation on Certain Restrictions on Subsidiaries ................. 68
9.15        Limitation on Issuance of Capital Stock .................................. 69
9.16        Business, etc. ............................................................................. 69
9.17        Limitation on Creation of Subsidiaries .................................... 70

SECTION 10.        Events of Default ...................................................................... 70

10.01        Payments .................................................................................... 70
10.02        Representations, etc. .................................................................. 70
10.03        Covenants ................................................................................... 70
10.04        Default Under Other Agreements ............................................. 70
10.05        Bankruptcy, etc. ......................................................................... 71
10.06        ERISA ......................................................................................... 71
10.07        Security Documents ................................................................... 72
10.08        Subsidiaries Guaranty ................................................................ 72
10.09        Judgments ................................................................................... 72
10.10        Change of Control ...................................................................... 72
10.11        Intercreditor Agreement. ........................................................... 73

SECTION 11.        Definitions and Accounting Terms. ......................................... 73

11.01        Defined Terms ............................................................................ 73

SECTION 12.    The Administrative Agent. ..................................................................... 99

    12.01    Appointment ................................................................................ 99
    12.02    Nature of Duties .......................................................................... 99
    12.03    Lack of Reliance on the Administrative Agent ....................................... 99
    12.04    Certain Rights of the Administrative Agent ......................................... 100
    12.05    Reliance ................................................................................... 100
    12.06    Indemnification .......................................................................... 100
    12.07    The Administrative Agent in its Individual Capacity ........................... 100
    12.08    Holders ................................................................................... 101
    12.09    Resignation by the Administrative Agent ........................................... 101

SECTION 13.    Miscellaneous. .................................................................... 102

    13.01    Payment of Expenses, etc. .............................................................. 102
    13.02    Right of Setoff .......................................................................... 103
    13.03    Notices ................................................................................... 103
    13.04    Benefit of Agreement; Assignments; Participations ............................. 104
    13.05    No Waiver; Remedies Cumulative ..................................................... 106
    13.06    Payments Pro Rata ...................................................................... 106
    13.07    Calculations; Computations ............................................................ 107
    13.08    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL ............................................................. 107
    13.09    Counterparts ............................................................................. 108
    13.10    Effectiveness ............................................................................ 108
    13.11    Headings Descriptive ................................................................... 108
    13.12    Amendment or Waiver; etc. ............................................................. 108
    13.13    Survival .................................................................................. 110
    13.14    Domicile of Term Loans ................................................................. 110
    13.15    Register .................................................................................. 110
    13.16    Confidentiality .......................................................................... 111
    13.17    Limitation on Additional Amounts ................................................... 111
    13.18    The Patriot Act .......................................................................... 112
    13.19    OTHER LIENS ON COLLATERAL; TERMS OF INTERCREDITOR AGREEMENT; ETC. ................................................................. 112

SCHEDULE I        Commitments
SCHEDULE II       Lender Addresses
SCHEDULE III      Real Property
SCHEDULE IV       Plans
SCHEDULE V        Subsidiaries
SCHEDULE VI       Existing Indebtedness and Assumed Indebtedness
SCHEDULE VII      Insurance
SCHEDULE VIII     Existing Liens
SCHEDULE IX       Existing Investments
SCHEDULE X        FCC Licenses
SCHEDULE XI       Governmental Authorizations


EXHIBIT A-1       Notice of Borrowing
EXHIBIT A-2       Notice of Conversion/Continuation
EXHIBIT B         Term Note
EXHIBIT C         Letter of Credit Request
EXHIBIT D         Section 4.04(b)(ii) Certificate
EXHIBIT E-1       Opinion of Skadden, Arps, Slate, Meagher& Flom LLP, Counsel to the Credit
                  Parties
EXHIBIT E-2       Opinion of [Deborah M. Royster], General Counsel to the Credit Parties
EXHIBIT F         Officers' Certificate
EXHIBIT G         Pledge Agreement
EXHIBIT H         Security Agreement
EXHIBIT I         Intercreditor Agreement
EXHIBIT J         Solvency Certificate
EXHIBIT K         Compliance Certificate
EXHIBIT L         Assignment and Assumption Agreement
EXHIBIT M         Subsidiaries Guaranty
EXHIBIT N         Intercompany Note

FORM OF NOTICE OF BORROWING

[Date]

Deutsche Bank AG Cayman Islands Branch, as
    Administrative Agent (the "Administrative
    Agent") for the Lenders party to the Credit
    Agreement referred to below
60 Wall Street
New York, New York  10005
Attention:  [_____]

Ladies and Gentlemen:

The undersigned, RCN Corporation (the "Borrower"), refers to the Credit Agreement, dated as of December __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement", the terms defined therein being used herein as therein defined), among the Borrower, the lenders from time to time party thereto (each, a "Lender" and collectively, the "Lenders") and you, as Administrative Agent for such Lenders, and hereby gives you notice, irrevocably, pursuant to Section 1.03(a) of the Credit Agreement, that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 1.03(a) of the Credit Agreement:

(i)    The Business Day of the Proposed Borrowing is _____, __.[1]

(ii)    The aggregate principal amount of the Proposed Borrowing is U.S.$[_____].

(iii)    The Loans to be made pursuant to the Proposed Borrowing shall consist of Term Loans.

(iv)    The Loans to be made pursuant to the Proposed Borrowing shall be initially maintained as [Base Rate Loans] [Eurodollar Loans].[2]

[(v)    The initial Interest Period for the Proposed Borrowing is [one month] [two months] [three months] [six months] [[, subject to the agreement of all Lenders with Term Loans, [nine] [twelve] months].[3]

---

[1]    Shall be a Business Day at least one Business Day in the case of Base Rate Loans and three Business Days in the case of Eurodollar Loans, in each case, after the date hereof.

[2]    Unless the Syndication Date has theretofore occurred, prior to the 90th day after the Initial Borrowing Date (or, if later, the last day of the third month following the initial Borrowing of Eurodollar Loans), Loans to be maintained as Eurodollar Loans may only be incurred on, or within 3 Business Days after, the Initial Borrowing Date and on each one month anniversary of the initial date of Borrowing of such Eurodollar Loans.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(A)     the representations and warranties contained in the Credit Agreement and the other Credit Documents are and will be true and correct in all material respects, before and after giving effect to the Proposed Borrowing and to the application of the proceeds thereof, as though made on such date, unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; and

(B)     no Default or Event of Default has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds thereof.]

Very truly yours,

RCN CORPORATION


By:_____
      Name:
      Title:

---

[3]     To be included for a Proposed Borrowing of Eurodollar Loans.  Unless the Syndication Date has theretofore occurred, prior to the 90th day after the Initial Borrowing Date (or, if later, the last day of the third month following the initial Borrowing of Eurodollar Loans), Loans to be maintained as Eurodollar Loans may not have an Interest Period in excess of one month.

## FORM OF NOTICE OF CONVERSION/CONTINUATION

[Date]


Deutsche Bank AG Cayman Islands Branch,
    as Administrative Agent for the Lenders party
    to the Credit Agreement
    referred to below
60 Wall Street
New York, New York 10005

Attention: [_____]


Ladies and Gentlemen:

       The undersigned, RCN Corporation (the "Borrower"), refers to the Credit Agreement, dated as of [_____ ___, 2004] (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement", the terms defined therein being used herein as therein defined), among the Borrower, the lenders from time to time party thereto (the "Lenders") and you, as Administrative Agent for such Lenders, and hereby give you notice, irrevocably, pursuant to Section [1.06][1.09] of the Credit Agreement, that the undersigned hereby requests to [convert] [continue] the Borrowing of Term Loans referred to below, and in that connection sets forth below the information relating to such [conversion] [continuation] (the "Proposed [Conversion] [Continuation]") as required by Section [1.06][1.09] of the Credit Agreement:

       (i)    The Proposed [Conversion] [Continuation] relates to the Borrowing of Term Loans originally made on _____ __, 20__ (the "Outstanding Borrowing") in the principal amount of U.S.$_____ and currently maintained as a Borrowing of [Base Rate Loans] [Eurodollar Loans with an Interest Period ending on _____ __, ____] [Euro Rate Loans with an Interest Period ending on _____ __, ____].

       (ii)    The Business Day of the Proposed [Conversion] [Continuation] is _____.[1]

       (iii)    The Outstanding Borrowing shall be [continued as a Borrowing of Eurodollar Loans with an Interest Period of _____] converted into a Borrowing of [Base Rate Loans] [Eurodollar Loans with an Interest Period of ___].[2]

---

[1]    Shall be a Business Day at least three Business Days (or one Business Day in the case of a conversion into Base Rate Loans) after the date hereof, provided that such notice shall be deemed to have been given on a certain day only if given before 12:00 Noon (New York City time) on such day.

[The undersigned hereby certifies that no Default or Event of Default has occurred and will be continuing on the date of the Proposed [Conversion] [Continuation] or will have occurred and be continuing on the date of the Proposed [Conversion] [Continuation]].[3]

Very truly yours,

RCN CORPORATION


By: _____
      Name:
      Title:

_____
(...continued)

[2]    In the event that either (x) only a portion of the Outstanding Borrowing is to be so converted or continued or (y) the Outstanding Borrowing is to be divided into separate Borrowings with different Interest Periods, the Borrower should make appropriate modifications to this clause to reflect same.

[3]    In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that the conversion is from a Base Rate Loan to a Eurodollar Loan or in the case of a continuation of a Eurodollar Loan.

<u>FORM OF TERM NOTE</u>

U.S. $_____                                           New York, New York

                                                                  _____ __, ____

        FOR VALUE RECEIVED, RCN Corporation, a Delaware corporation (the "<u>Borrower</u>"), hereby promises to pay to the order of [_____] (the "<u>Lender</u>"), in lawful money of the United States of America in immediately available funds, at the Payment Office (as defined in the Agreement referred to below) initially located at 60 Wall Street, New York, New York 10005 on the Term Loan Maturity Date (as defined in the Agreement) the principal sum of _____ DOLLARS ($_____) or, if less, the unpaid principal amount of all Term Loans (as defined in the Agreement) made by the Lender pursuant to the Agreement, payable at such times and in such amounts as are specified in the Agreement.

        The Borrower promises also to pay interest on the unpaid principal amount of each Term Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 1.08 of the Agreement.

        This Note is one of the Term Notes referred to in the Credit Agreement, dated as of [_____ __, 2004], among the Borrower, the lenders from time to time party thereto (including the Lender) and Deutsche Bank AG Cayman Islands Branch, as Administrative Agent (as amended, restated, modified and/or supplemented from time to time, the "<u>Agreement</u>") and is entitled to the benefits thereof and of the other Credit Documents (as defined in the Agreement). This Note is secured by the Security Documents (as defined in the Agreement) and is entitled to the benefits of the Subsidiaries Guaranty (as defined in the Agreement).  As provided in the Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Term Loan Maturity Date, in whole or in part, and Term Loans may be converted from one Type (as defined in the Agreement) into another Type to the extent provided in the Agreement.

        In case an Event of Default (as defined in the Agreement) shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Agreement.

        The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

        **THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

RCN CORPORATION


By:_____
    Name:
    Title:

<u>FORM OF LETTER OF CREDIT REQUEST</u>

No. _____<sup>(1)</sup>                                   Dated _____<sup>(2)</sup>

Deutsche Bank AG Cayman Islands Branch, [as Letter of
Credit Issuer and] as Administrative Agent, under the Credit
Agreement, dated as of [_____ __, 2004] (as amended,
restated, modified and/or supplemented from time to time,
the "<u>Credit Agreement</u>"), among RCN Corporation (the
"<u>Borrower</u>"), the lenders from time to time party thereto
and Deutsche Bank AG Cayman Islands Branch, as
Administrative Agent

60 Wall Street
New York, New York 10005

[[_____<sup>(3)</sup>_____], as Letter of Credit Issuer
under the Credit Agreement

_____

_____

_____]

Ladies and Gentlemen:

     Pursuant to Section 2.03 of the Credit Agreement, we hereby request that the
Letter of Credit Issuer referred to above issue a [Trade] [Standby] Letter of Credit for the
account of the undersigned on _____<sup>(4)</sup> (the "<u>Date of Issuance</u>") in the aggregate Stated Amount
of _____<sup>(5)</sup>.

     For purposes of this Letter of Credit Request, unless otherwise defined herein, all
capitalized terms used herein which are defined in the Credit Agreement shall have the respec-
tive meaning provided therein.

---

<sup>(1)</sup> Letter of Credit Request Number.

<sup>(2)</sup> Date of Letter of Credit Request.

<sup>(3)</sup> Insert name of Letter of Credit Issuer.

<sup>(4)</sup> Date of Issuance which shall be (x) a Business Day and (y) at least 3 Business Days after the date hereof (or such
earlier date as is acceptable to the respective Letter of Credit Issuer in any given case).

<sup>(5)</sup> Aggregate initial Stated Amount of the Letter of Credit which should not be less than $[100,000] (or such lesser
amount as is acceptable to the respective Letter of Credit Issuer).

Exhibit C
Page 2

The beneficiary of the requested Letter of Credit will be _____(6)_____, and such Letter of Credit will be in support of _____(7)_____ and will have a stated expiration date of _____(8)_____.

We hereby certify that:

(A) the representations and warranties contained in the Credit Agreement and the other Credit Documents are and will be true and correct in all material respects on the Date of Issuance, both before and after giving effect to the issuance of the Letter of Credit requested hereby, unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; and

(B) no Default or Event of Default has occurred and is continuing nor, after giving effect to the issuance of the Letter of Credit requested hereby, would such a Default or Event of Default occur.

Copies of all documentation with respect to the supported transaction are attached hereto.

RCN CORPORATION

By:_____
      Name:
      Title:

---

(6)   Insert name and address of beneficiary.

(7)   Insert a description of L/C Supportable Indebtedness (in the case of Standby Letters of Credit) and insert description of permitted trade obligations of the Borrower or any of its Subsidiaries (in the case of Trade Letters of Credit).

(8)   Insert the last date upon which drafts may be presented which may not be later than (i) in the case of Standby Letters of Credit, the earlier of (x) one year after the Date of Issuance and (y) the 10th Business Day preceding the Final Maturity Date and (ii) in the case of Trade Letters of Credit, the earlier of (x) 180 days after the Date of Issuance and (y) 30 days prior to the Final Maturity Date.

FORM OF SECTION 4.04(b)(ii) CERTIFICATE


Reference is hereby made to the Credit Agreement, dated as of [_____ ___, 2004] among RCN Corporation, the lenders from time to time party thereto and Deutsche Bank AG Cayman Islands Branch, as Administrative Agent (as amended, restated, modified and/or supplemented from time to time, the "Credit Agreement").  Pursuant to the provisions of Section 4.04(b)(ii) of the Credit Agreement, the undersigned hereby certifies that it is not a "bank" as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended.


[NAME OF LENDER]


By:_____
      Name:
      Title:


Date: _____, _____

## FORM OF OFFICERS' CERTIFICATE

I, the undersigned, [Chairman/Vice-Chairman/President/Vice-President] of RCN Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Company"), do hereby certify, solely in my capacity as an officer of the Company and not in my individual capacity, on behalf of the Company, that:

1.      This Certificate is furnished pursuant to the Credit Agreement, dated as of December __, 2004, among RCN Corporation, the lenders from time to time party thereto and Deutsche Bank AG Cayman Islands Branch, as Administrative Agent (such Credit Agreement, as in effect on the date of this Certificate, being herein called the "Credit Agreement").  Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

2.      The following named individuals are elected or appointed officers of the Company, and each holds the office of the Company set forth opposite [his] [her] name.  The signature written opposite the name and title of each such officer is [his] [her] genuine signature.

| Name | Office | Signature |
|------|--------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

3.      Attached hereto as Annex A is a certified copy of the Certificate of Incorporation of the Company, as filed in the office of the Secretary of State of the State of Delaware on _____, ____, together with all amendments thereto adopted through the date hereof.

4.      Attached hereto as Annex B is a true and correct copy of the By-Laws of the Company which were duly adopted, are in full force and effect on the date hereof, and have been in effect since _____, ____, together with all amendments thereto adopted through the date hereof.

5.      Attached hereto as Annex C is a true and correct copy of resolutions which were duly adopted on _____, ____ by unanimous written consent of the Board of Directors of the Company, and said resolutions have not been rescinded, amended or modified.  Except as attached hereto as Exhibit C, no resolutions have been adopted by the Board of Directors of the Company relating to the execution, delivery or performance of any of the Documents to which the Company is a party.

[[6.      On the date hereof, all of the conditions set forth in Sections [5.01(f), (g), (h), (i), (j), (m) and (t) and Section 6] of the Credit Agreement have been satisfied (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders).

7.       Attached hereto as Annex D are true and correct copies of all Existing Indebtedness Agreements of the Borrower and its Subsidiaries required to be delivered to the Administrative Agent pursuant to Section 5.01(n) of the Credit Agreement.

8.       Attached hereto as Annex E are true and correct copies of all Second-Lien Note Documents required to be delivered to the Administrative Agent pursuant to Section 5.01(d).

9.       Attached hereto as Annex F are true and correct copies of all Third-Lien Credit Documents required to be delivered to the Administrative Agent pursuant to Section 5.01(e).

10.       Attached hereto as Annex G are true and correct copies of the Confirmation Order, Plan of Reorganization, Disclosure Statement and the other Plan Documents required to be delivered to the Administrative Agent pursuant to Section 5.01(m) of the Credit Agreement.

11.       Attached hereto as Annex H are true and correct copies of the financial statements referred to in Section 7.05 of the Credit Agreement (including the Pro Forma Balance Sheet) required to be delivered to the Administrative Agent pursuant to Section 5.01(u) of the Credit Agreement.][1]

[6.][12.]  On the date hereof, the representations and warranties contained in the Credit Agreement and in the other Credit Documents are true and correct in all material respects with the same effect as though such representations and warranties had been made on the date hereof, both before and after giving effect to each Credit Event to occur on the date hereof and the application of the proceeds thereof, unless stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

[7.][13.]  On the date hereof, no Default or Event of Default has occurred and is continuing or would result from any Credit Event to occur on the date hereof or from the application of the proceeds thereof.

[8.][14.]  There is no pending proceeding for the dissolution or liquidation of the Company or, to the knowledge of the undersigned, threatening its existence.

---

[1]   Insert bracketed items 6 through [13] only in the Certificate delivered on behalf of the Borrower.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of December, 2004.

RCN CORPORATION

By:_____
    Name:
    Title:

I, the undersigned, [Secretary/Assistant Secretary] of the Company, do hereby certify, solely in my capacity as an officer of the Company and not in my individual capacity, on behalf of the Company that:

1.      [Name of Person making above certifications] is the duly elected and qualified [Chairman/Vice-Chairman/President/Vice-President] of the Company and the signature above is [his] [her] genuine signature.

2.      The certifications made by [name of Person making above certifications] on behalf of the Company in Items 2, 3, 4, 5 and [13] above are true and correct.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of _____, 2004.

RCN CORPORATION


By:_____
        Name:
        Title:

## FORM OF PLEDGE AGREEMENT

PLEDGE AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of December __, 2004, among each of the undersigned pledgors (each, a "Pledgor" and, together with any other entity that becomes a pledgor hereunder pursuant to Section 30 hereof, the "Pledgors") and Deutsche Bank AG Cayman Islands Branch, as collateral agent (together with any successor collateral agent, the "Pledgee"), for the benefit of the Secured Creditors (as defined below). Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

## W I T N E S S E T H :

WHEREAS, RCN Corporation (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc., as Sole Lead Arranger and Sole Book Manager, and Deutsche Bank AG Cayman Islands Branch, as administrative agent (together with any successor administrative agent, the "Administrative Agent"), have entered into a Credit Agreement, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Credit Agreement"), providing for the making of Loans to, and the issuance of, and participation in, Letters of Credit for the account of the Borrower, all as contemplated therein (the Lenders, each Issuing Lender, the Administrative Agent, the Collateral Agent, each other Agent and the Pledgee are herein called the "Lender Creditors");

WHEREAS, the Borrower [and/or one or more of its Subsidiaries] may at any time and from time to time enter into one or more Interest Rate Protection Agreements or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if any, collectively, the "Other Creditors" and, together with the Lender Creditors, the "Secured Creditors");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the making of Loans to the Borrower and the issuance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and to the Other Creditors entering into Interest Rate Protection Agreements and Other Hedging Agreements that each Pledgor shall have executed and delivered to the Pledgee this Agreement; and

WHEREAS, each Pledgor will obtain benefits from the incurrence of Loans by the Borrower and the issuance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and the entering into by the Borrower and/or one or more of its Subsidiaries of Interest Rate Protection Agreements or Other Hedging Agreements and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the

preceding paragraph and to induce the Lenders to make Loans to the Borrower and/or participate in, Letters of Credit for the account of the Borrower and the Other Creditors to enter into Interest Rate Protection Agreements or Other Hedging Agreements with the Borrower and/or one or more of its Subsidiaries;

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby makes the following representations and warranties to the Pledgee for the benefit of the Secured Creditors and hereby covenants and agrees with the Pledgee for the benefit of the Secured Creditors as follows:

1. SECURITY FOR OBLIGATIONS.  This Agreement is made by each Pledgor for the benefit of the Secured Creditors to secure:

(i)     the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor or any Subsidiary thereof at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), reimbursement obligations under Letters of Credit, fees, costs and indemnities) of such Pledgor owing to the Lender Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Credit Agreement and the other Credit Documents to which such Pledgor is a party (including, in the case of each Pledgor that is a Guarantor, all such obligations, liabilities and indebtedness of such Pledgor under its Guaranty) and the due performance and compliance by such Pledgor with all of the terms, conditions and agreements contained in the Credit Agreement and in such other Credit Documents (all such obligations, liabilities and indebtedness under this clause (i), except to the extent consisting of obligations, liabilities or indebtedness with respect to Interest Rate Protection Agreements or Other Hedging Agreements, entitled to the benefits of this Agreement being herein collectively called the "Credit Document Obligations");

(ii)     the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding) owing by such Pledgor to the Other Creditors now existing or hereafter incurred under, arising out of or in connection with any Interest Rate Protection Agreement or Other Hedging Agreement, whether such Interest Rate Protection Agreement or Other Hedging Agreement is now in existence or hereinafter arising (including, in the case of a Pledgor that is a Guarantor, all obligations, liabilities and indebtedness of such Pledgor under its Guaranty in respect of the Interest Rate Protection Agreements and Other Hedging Agreements), and the due performance and compliance by such Pledgor with all of the terms, conditions and agreements contained in each such

Interest Rate Protection Agreement and Other Hedging Agreement (all such obligations, liabilities and indebtedness under this clause (ii) being herein collectively called the "Other Obligations");

(iii)     any and all sums advanced by the Pledgee in order to preserve the Collateral (as hereinafter defined) or preserve its security interest in the Collateral;

(iv)     in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of such Pledgor referred to in clauses (i) and (ii) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Pledgee of its rights hereunder, together with reasonable attorneys' fees and court costs;

(v)     all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 11 of this Agreement; and

(vi)     all amounts owing to any Agent or any of its affiliates pursuant to any of the Credit Documents in its capacity as such;

all such obligations, liabilities, indebtedness, sums and expenses set forth in clauses (i) through (vi) of this Section 1 being herein collectively called the "Obligations", it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

2.  DEFINITIONS.  (a)  Unless otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement shall be used herein as therein defined. Reference to singular terms shall include the plural and vice versa.

(b) The following capitalized terms used herein shall have the definitions specified below:

"Administrative Agent" shall have the meaning set forth in the recitals hereto.

"Adverse Claim" shall have the meaning given such term in Section 8-102(a)(1) of the UCC.

"Agreement" shall have the meaning set forth in the first paragraph hereof.

"Borrower" shall have the meaning set forth in the recitals hereto.

"Certificated Security" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"Clearing Corporation" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"Collateral" shall have the meaning set forth in Section 3.1 hereof.

"Collateral Accounts" shall mean any and all accounts established and maintained by the Pledgee in the name of any Pledgor to which Collateral may be credited.

"Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Credit Document Obligations" shall have the meaning set forth in Section 1(i) hereof.

"Domestic Corporation" shall mean any corporation or similar entity organized under the laws of the United States or any State or territory thereof or the District of Columbia.

"Event of Default" shall mean any Event of Default under, and as defined in, the Credit Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"Exempted Foreign Entity" shall mean any Foreign Corporation and any limited liability company organized under the laws of a jurisdiction other than the United States or any State or Territory thereof that, in any such case, is treated as a corporation or an association taxable as a corporation for U.S. Federal income tax purposes.

"Financial Asset" shall have the meaning given such term in Section 8-102(a)(9) of the UCC.

"Foreign Corporation" shall mean any corporation or similar entity organized under the laws of any jurisdiction other than the United States or any State or territory thereof or the District of Columbia.

"Holdings" shall have the meaning set forth in the recitals hereto.

"Indemnitees" shall have the meaning set forth in Section 11 hereof.

"Instrument" shall have the meaning given such term in Section 9-102(a)(47) of the UCC.

"Investment Property" shall have the meaning given such term in Section 9-102(a)(49) of the UCC.

"Lender Creditors" shall have the meaning set forth in the recitals hereto.

"Lenders" shall have the meaning set forth in the recitals hereto.

"Limited Liability Company Assets" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all limited liability company capital and interest in other limited liability companies), at any time owned by any Pledgor or represented by any Limited Liability Company Interest.

"Limited Liability Company Interests" shall mean the entire limited liability company membership interest at any time owned by any Pledgor in any limited liability company.

"Location" of any Pledgor has the meaning given such term in Section 9-307 of the UCC.

"Non-Voting Equity Interests" shall mean all Equity Interests of any Person which are not Voting Equity Interests.

"Notes" shall mean all promissory notes, including all intercompany notes at any time issued to any Pledgor.

"Obligations" shall have the meaning set forth in Section 1 hereof.

"Other Creditors" shall have the meaning set forth in the recitals hereto.

"Other Obligations" shall have the meaning set forth in Section 1(ii) hereof.

"Partnership Assets" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all partnership capital and interest in other partnerships), at any time owned by any Pledgor or represented by any Partnership Interest.

"Partnership Interest" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Pledgor in any general partnership or limited partnership.

"Pledged Notes" shall mean all Notes at any time pledged or required to be pledged hereunder.

"Pledgee" shall have the meaning set forth in the first paragraph hereof.

"Pledgor" shall have the meaning set forth in the first paragraph hereof.

"Proceeds" shall have the meaning given such term in Section 9-102(a)(64) of the UCC.

"Registered Organization" shall have the meaning given such term in Section 9-102(a)(70) of the UCC.

"Required Lenders" shall have the meaning given such term in the Credit Agreement.

"Required Secured Creditors" shall have the meaning provided in the Security Agreement.

"Secured Creditors" shall have the meaning set forth in the recitals hereto.

"Secured Debt Agreements" shall mean and includes (x) this Agreement, (y) the other Credit Documents and (z) the Interest Rate Protection Agreements and Other Hedging Agreements entered into with any Other Creditors.

"Securities Account" shall have the meaning given such term in Section 8-501(a) of the UCC.

"Securities Act" shall mean the Securities Act of 1933, as amended, as in effect from time to time.

"Securities Intermediary" shall have the meaning given such term in Section 8-102(14) of the UCC.

"Security" and "Securities" shall have the meaning given such term in Section 8-102(a)(15) of the UCC and shall in any event also include all Stock and all Notes.

"Security Entitlement" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

"Specified Default" shall have the meaning set forth in Section 5 hereof.

"Stock" shall mean all of the issued and outstanding shares of capital stock or similar equity interests of any Domestic Corporation or Foreign Corporation at any time owned by any Pledgor.

"Termination Date" shall have the meaning set forth in Section 20 hereof.

"Transmitting Utility" has the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided that all references herein to specific Sections or subsections of the UCC are references to such Sections or subsections, as the case may be, of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

"Voting Equity Interests" of any Person shall mean all classes of Equity Interests of such Person entitled to vote.

3. PLEDGE OF SECURITIES, ETC.

3.1 Pledge. To secure the Obligations now or hereafter owed or to be performed by such Pledgor, each Pledgor does hereby grant, pledge and assign to the Pledgee for the benefit of the Secured Creditors, and does hereby create a continuing security interest (subject to those Liens permitted to exist with respect to the Collateral pursuant to the terms of all Secured Debt Agreements then in effect) in favor of the Pledgee for the benefit of the Secured Creditors in, all

of its right, title and interest in and to the following, whether now existing or hereafter from time to time acquired (collectively, the "Collateral"):

(a) each of the Collateral Accounts (to the extent a security interest therein is not created pursuant to the Security Agreement), including any and all assets of whatever type or kind deposited by such Pledgor in any such Collateral Account, whether now owned or hereafter acquired, existing or arising, including, without limitation, all Financial Assets, Investment Property, monies, checks, drafts, Instruments, Securities or interests therein of any type or nature deposited or required by the Credit Agreement or any other Secured Debt Agreement to be deposited in such Collateral Account, and all investments and all certificates and other Instruments (including depository receipts, if any) from time to time representing or evidencing the same, and all dividends, interest, distributions, cash and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing;

(b) all Securities owned or held by such Pledgor from time to time and all options and warrants owned by such Pledgor from time to time to purchase Securities;

(c) all Limited Liability Company Interests owned by such Pledgor from time to time and all of its right, title and interest in each limited liability company to which each such Limited Liability Company Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Limited Liability Company Interests and applicable law:

(A) all its capital therein and its interest in all profits, income, surpluses, losses, Limited Liability Company Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Limited Liability Company Interests;

(B) all other payments due or to become due to such Pledgor in respect of Limited Liability Company Interests, whether under any limited liability company agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C) all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any limited liability company agreement or operating agreement, or at law or otherwise in respect of such Limited Liability Company Interests;

(D) all present and future claims, if any, of such Pledgor against any such limited liability company for monies loaned or advanced, for services rendered or otherwise;

(E) all of such Pledgor's rights under any limited liability company agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Limited Liability Company Interests, including any power to terminate, cancel or

modify any such limited liability company agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of such Pledgor in respect of such Limited Liability Company Interests and any such limited liability company, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Limited Liability Company Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(d) all Partnership Interests owned by such Pledgor from time to time and all of its right, title and interest in each partnership to which each such Partnership Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Partnership Interests and applicable law:

(A)     all its capital therein and its interest in all profits, income, surpluses, losses, Partnership Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Partnership Interests;

(B)     all other payments due or to become due to such Pledgor in respect of Partnership Interests, whether under any partnership agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any partnership agreement or operating agreement, or at law or otherwise in respect of such Partnership Interests;

(D)     all present and future claims, if any, of such Pledgor against any such partnership for monies loaned or advanced, for services rendered or otherwise;

(E)     all of such Pledgor's rights under any partnership agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Partnership Interests, including any power to terminate, cancel or modify any partnership agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of such Pledgor in respect of such Partnership Interests and any such partnership, to make determinations, to

exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Partnership Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(e) all Financial Assets and Investment Property owned by such Pledgor from time to time;

(f) all Security Entitlements owned by such Pledgor from time to time in any and all of the foregoing; and

(g) all Proceeds of any and all of the foregoing.

Notwithstanding anything to the contrary contained herein, no Pledgor shall be required at any time to pledge hereunder (x) any equity interests of Megacable, S.A. de C.V., MCM Holdings, S.A. de C.V. and Megacable Telecommunicaciones, S.A. de C.V. for so long as the organizational documents of such entities prohibits the granting of a security interest in such equity interests; provided that such security interest shall attach immediately when such prohibition is no longer in effect or (y) more than 65% of the Voting Equity Interest of any Foreign Corporation; provided that each Pledgor shall be required to pledge hereunder 100% of any Non-Voting Equity Interest at any time and from time to time acquired by such Pledgor of any Foreign Corporation.

3.2  Procedures.  (a)  To the extent that any Pledgor at any time or from time to time owns, acquires or obtains any right, title or interest in any Collateral, such Collateral shall automatically (and without the taking of any action by such Pledgor) be pledged pursuant to Section 3.1 of this Agreement and, in addition thereto, such Pledgor shall (to the extent provided below) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) for the benefit of the Pledgee and the other Secured Creditors:

(i)     with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall physically deliver such Certificated Security to the Pledgee, endorsed to the Pledgee or endorsed in blank;

(ii)     with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Pledgee, an agreement for the benefit of the Pledgee and the

other Secured Creditors substantially in the form of Annex H hereto (appropriately completed to the satisfaction of the Pledgee and with such modifications, if any, as shall be satisfactory to the Pledgee) pursuant to which such issuer agrees to comply with any and all instructions originated by the Pledgee in accordance with this Agreement without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

(iii)     with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), such Pledgor shall promptly notify the Pledgee thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Pledgee under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Pledgee deems necessary or desirable to effect the foregoing;

(iv)     with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, the procedure set forth in Section 3.2(a)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, the procedure set forth in Section 3.2(a)(ii) hereof;

(v)     with respect to any Note, physical delivery of such Note to the Pledgee, endorsed in blank, or, at the request of the Pledgee, endorsed to the Pledgee; and

(vi)     with respect to cash proceeds from any of the Collateral described in Section 3.1 hereof, (i) establishment by the Pledgee of a cash account in the name of such Pledgor over which the Pledgee shall have "control" within the meaning of the UCC and at any time any Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Pledgee and (ii) deposit of such cash in such cash account.

(b)   In addition to the actions required to be taken pursuant to Section 3.2(a) hereof, each Pledgor shall take the following additional actions with respect to the Collateral:

(i)     with respect to all Collateral of such Pledgor whereby or with respect to which the Pledgee may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), such Pledgor shall take all actions as may be requested from time to time by

the Pledgee so that "control" of such Collateral is obtained and at all times held by the Pledgee; and

(ii)     each Pledgor shall from time to time cause appropriate financing statements (on appropriate forms) under the Uniform Commercial Code as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Pledgee), to be filed in the relevant filing offices so that at all times the Pledgee's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

3.3  Subsequently Acquired Collateral.  If any Pledgor shall acquire (by purchase, stock dividend, distribution or otherwise) any additional Collateral at any time or from time to time after the date hereof, (i) such Collateral shall automatically (and without any further action being required to be taken) be subject to the pledge and security interests created pursuant to Section 3.1 hereof and, furthermore, such Pledgor will thereafter take (or cause to be taken) all action (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) with respect to such Collateral in accordance with the procedures set forth in Section 3.2 hereof, and will promptly thereafter deliver to the Pledgee (i) a certificate executed by an authorized officer of such Pledgor describing such Collateral and certifying that the same has been duly pledged in favor of the Pledgee (for the benefit of the Secured Creditors) hereunder and (ii) supplements to Annexes A through G hereto as are necessary to cause such Annexes to be complete and accurate at such time.  Notwithstanding the foregoing, no Pledgor shall be required to pledge hereunder the equity interests of any Exempted Foreign Entity.

3.4  Transfer Taxes.  Each pledge of Collateral under Section 3.1 or Section 3.3 hereof shall be accompanied by any transfer tax stamps required in connection with the pledge of such Collateral.

3.5  Certain Representations and Warranties Regarding the Collateral.  Each Pledgor represents and warrants that on the date hereof: (i) each Subsidiary of such Pledgor, and the direct ownership thereof, is listed in Annex B hereto; (ii) the Stock (and any warrants or options to purchase Stock) held by such Pledgor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex C hereto; (iii) such Stock referenced in clause (ii) of this paragraph constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex C hereto; (iv) the Notes held by such Pledgor consist of the promissory notes described in Annex D hereto where such Pledgor is listed as the lender; (v) the Limited Liability Company Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex E hereto; (vi) each such Limited Liability Company Interest referenced in clause (v) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex E hereto; (vii) the Partnership Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex F hereto; (viii) each such Partnership Interest referenced in clause (viii) of this paragraph constitutes that percentage or portion of the entire partnership interest of the Partnership as set forth in Annex F hereto; (ix) the exact address of each chief executive office of such Pledgor is listed on Annex G

hereto; (x) the Pledgor has complied with the respective procedure set forth in Section 3.2(a) hereof with respect to each item of Collateral described in Annexes C through F hereto; and (xi) on the date hereof, such Pledgor owns no other Securities, Stock, Notes, Limited Liability Company Interests or Partnership Interests.

      4.  APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.  The Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of the Collateral, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or in favor of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee.

      5.  VOTING, ETC., WHILE NO EVENT OF DEFAULT OR SPECIFIED DEFAULT.  Unless and until there shall have occurred and be continuing any Event of Default under the Credit Agreement or a Default under Section 10.01 or 10.05 of the Credit Agreement (each such Default, a "Specified Default"), each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral owned by it, and to give consents, waivers or ratifications in respect thereof; provided that, in each case, no vote shall be cast or any consent, waiver or ratification given or any action taken or omitted to be taken which would violate, result in a breach of any covenant contained in, or be inconsistent with any of the terms of any Secured Debt Agreement, or which could reasonably be expected to have the effect of impairing the value of the Collateral or any part thereof or the position or interests of the Pledgee or any other Secured Creditor in the Collateral, unless expressly permitted by the terms of the Secured Debt Agreements.  All such rights of each Pledgor to vote and to give consents, waivers and ratifications shall cease in case an Event of Default has occurred and is continuing, and Section 7 hereof shall become applicable.

      6.  DIVIDENDS AND OTHER DISTRIBUTIONS.  Unless and until there shall have occurred and be continuing an Event of Default, all cash dividends, cash distributions, cash Proceeds and other cash amounts payable in respect of the Collateral shall be paid to the respective Pledgor.  The Pledgee shall be entitled to receive directly, and to retain as part of the Collateral:

      (i)  all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash dividends other than as set forth above) paid or distributed by way of dividend or otherwise in respect of the Collateral;

      (ii)  all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash (although such cash may be paid directly to the respective Pledgor so long as no Event of Default then exists)) paid or distributed in respect of the Collateral by way of stock-split, spin-off, split-up, reclassification, combination of shares or similar rearrangement; and

      (iii)  all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) which may be paid in respect of the Collateral by reason of any

consolidation, merger, exchange of stock, conveyance of assets, liquidation or similar corporate or other reorganization.

Nothing contained in this Section 6 shall limit or restrict in any way the Pledgee's right to receive the proceeds of the Collateral in any form in accordance with Section 3 of this Agreement. All dividends, distributions or other payments which are received by any Pledgor contrary to the provisions of this Section 6 or Section 7 hereof shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to the Pledgee as Collateral in the same form as so received (with any necessary endorsement).

7. REMEDIES IN CASE OF AN EVENT OF DEFAULT OR A SPECIFIED DEFAULT. (a) If there shall have occurred and be continuing an Event of Default, then and in every such case, the Pledgee shall be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any other Secured Debt Agreement or by law) for the protection and enforcement of its rights in respect of the Collateral, and the Pledgee shall be entitled to exercise all the rights and remedies of a secured party under the UCC as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights, which each Pledgor hereby agrees to be commercially reasonable:

(i) to receive all amounts payable in respect of the Collateral otherwise payable under Section 6 hereof to the respective Pledgor;

(ii) to transfer all or any part of the Collateral into the Pledgee's name or the name of its nominee or nominees;

(iii) to accelerate any Pledged Note which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Pledged Note (including, without limitation, to make any demand for payment thereon);

(iv) to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so);

(v) at any time and from time to time to sell, assign and deliver, or grant options to purchase, all or any part of the Collateral, or any interest therein, at any public or private sale, without demand of performance, advertisement or, notice of intention to sell or of the time or place of sale or adjournment thereof or to redeem or otherwise purchase or dispose (all of which are hereby waived by each Pledgor), for cash, on credit or for other property, for immediate or future delivery without any assumption of credit risk, and for such price or prices and on such terms as the Pledgee in its absolute discretion may determine, provided at least 10 days' written notice of the time and place of any such sale shall be given to the respective Pledgor. The Pledgee shall not be obligated to make any such sale of Collateral regardless of whether any such notice of

sale has theretofore been given. Each Pledgor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security or the Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Pledgee on behalf of the Secured Creditors may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Pledgee nor any other Secured Creditor shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall any of them be under any obligation to take any action whatsoever with regard thereto; and

(vi)    to set off any and all Collateral against any and all Obligations, and to withdraw any and all cash or other Collateral from any and all Collateral Accounts and to apply such cash and other Collateral to the payment of any and all Obligations.

(b)    If there shall have occurred and be continuing a Specified Default, then and in every such case, the Pledgee shall be entitled to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so).

8.    REMEDIES, CUMULATIVE, ETC.  Each and every right, power and remedy of the Pledgee provided for in this Agreement or in any other Secured Debt Agreement, or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by the Pledgee or any other Secured Creditor of any one or more of the rights, powers or remedies provided for in this Agreement or any other Secured Debt Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the Pledgee or any other Secured Creditor of all such other rights, powers or remedies, and no failure or delay on the part of the Pledgee or any other Secured Creditor to exercise any such right, power or remedy shall operate as a waiver thereof.  Notice to or demand on any Pledgor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Pledgee or any other Secured Creditor to any other or further action in any circumstances without notice or demand. The Secured Creditors agree that this Agreement may be enforced only by the action of the Pledgee, in each case, acting upon the instructions of the Required Secured Creditors, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Pledgee for the benefit of the Secured Creditors upon the terms of this Agreement and the Security Agreement.

9.    APPLICATION OF PROCEEDS.  (a)  All monies collected by the Pledgee upon any sale or other disposition of the Collateral pursuant to the terms of this Agreement, together with all other monies received by the Pledgee hereunder, shall be applied in the manner provided in the Security Agreement.

(b)     It is understood and agreed that each Pledgor shall remain jointly and severally liable with respect to its Obligations to the extent of any deficiency between the amount of the proceeds of the Collateral pledged by it hereunder and the aggregate amount of such Obligations.

10.  PURCHASERS OF COLLATERAL.  Upon any sale of the Collateral by the Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the Pledgee or the officer making such sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Pledgee or such officer or be answerable in any way for the misapplication or nonapplication thereof.

11.  INDEMNITY.  Each Pledgor jointly and severally agrees (i) to indemnify, reimburse and hold harmless the Pledgee and each other Secured Creditor and their respective successors, assigns, employees, agents and affiliates (individually an "Indemnitee", and collectively, the "Indemnitees") from and against any and all obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) of whatsoever kind or nature, and (ii) to reimburse each Indemnitee for all reasonable costs, expenses and disbursements, including reasonable attorneys' fees and expenses, in each case arising out of or resulting from this Agreement or the exercise by any Indemnitee of any right or remedy granted to it hereunder or under any other Secured Debt Agreement (but excluding any obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) or expenses of whatsoever kind or nature to the extent incurred or arising by reason of gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  In no event shall the Pledgee hereunder be liable, in the absence of gross negligence or willful misconduct on its part (as determined by a court of competent jurisdiction in a final and non-appealable decision), for any matter or thing in connection with this Agreement other than to account for monies or other property actually received by it in accordance with the terms hereof.  If and to the extent that the obligations of any Pledgor under this Section 11 are unenforceable for any reason, such Pledgor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law. The indemnity obligations of each Pledgor contained in this Section 11 shall continue in full force and effect notwithstanding the full payment of all the Notes issued under the Credit Agreement, the termination of all Interest Rate Protection Agreements and Other Hedging Agreements and Letters of Credit, and the payment of all other Obligations and notwithstanding the discharge thereof.

12.  PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER.  (a)  Nothing herein shall be construed to make the Pledgee or any other Secured Creditor liable as a member of any limited liability company or as a partner of any partnership and neither the Pledgee nor any other Secured Creditor by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership.  The parties hereto expressly agree that, unless the Pledgee shall become the absolute owner of Collateral consisting of a Limited Liability Company Interest or a Partnership Interest pursuant

hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Pledgee, any other Secured Creditor, any Pledgor and/or any other Person.

(b)	Except as provided in the last sentence of paragraph (a) of this Section 12, the Pledgee, by accepting this Agreement, did not intend to become a member of any limited liability company or a partner of any partnership or otherwise be deemed to be a co-venturer with respect to any Pledgor, any limited liability company, partnership and/or any other Person either before or after an Event of Default shall have occurred.  The Pledgee shall have only those powers set forth herein and the Secured Creditors shall assume none of the duties, obligations or liabilities of a member of any limited liability company or as a partner of any partnership or any Pledgor except as provided in the last sentence of paragraph (a) of this Section 12.

(c)	The Pledgee and the other Secured Creditors shall not be obligated to perform or discharge any obligation of any Pledgor as a result of the pledge hereby effected.

(d)	The acceptance by the Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate the Pledgee or any other Secured Creditor to appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or to take any action hereunder or thereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY.  (a)  Each Pledgor agrees that it will join with the Pledgee in executing and, at such Pledgor's own expense, file and refile under the UCC or other applicable law such financing statements, continuation statements and other documents, in form reasonably acceptable to the Pledgee, in such filing offices as the Pledgee (acting on its own or on the instructions of the Required Secured Creditors) may reasonably deem necessary or appropriate and wherever required or permitted by law in order to perfect and preserve the Pledgee's security interest in the Collateral hereunder and hereby authorizes the Pledgee to file financing statements and amendments thereto relative to all or any part of the Collateral (including, without limitation, (x) financing statements which list the Collateral specifically and/or "all assets" as collateral and (y) "in lieu of" financing statements) without the signature of such Pledgor where permitted by law, and agrees to do such further acts and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee its rights, powers and remedies hereunder or thereunder.

(b)	Each Pledgor hereby constitutes and appoints the Pledgee its true and lawful attorney-in-fact, irrevocably, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time after the occurrence and during the continuance of an Event of Default, in the Pledgee's discretion, to act, require, demand, receive and give acquittance for any and all monies and claims for monies due or to become due to such Pledgor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings and to execute any instrument which the Pledgee may deem necessary or advisable

to accomplish the purposes of this Agreement, which appointment as attorney is coupled with an interest.

14. THE PLEDGEE AS FIRST-LIEN COLLATERAL AGENT. The Pledgee will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement. It is expressly understood, acknowledged and agreed by each Secured Creditor that by accepting the benefits of this Agreement each such Secured Creditor acknowledges and agrees that the obligations of the Pledgee as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section 12 of the Credit Agreement. The Pledgee shall act hereunder on the terms and conditions set forth herein and in Section 12 of the Credit Agreement.

15. TRANSFER BY THE PLEDGORS. Except as permitted (i) prior to the date all Credit Document Obligations have been paid in full and all Commitments under the Credit Agreement have been terminated, pursuant to the Credit Agreement, and (ii) thereafter, pursuant to the other Secured Debt Agreements, no Pledgor will sell or otherwise dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral or any interest therein.

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS. (a) Each Pledgor represents, warrants and covenants as to itself and each of its Subsidiaries that:

(i) it is the legal, beneficial and record owner of, and has good and marketable title to, all of its Collateral consisting of one or more Securities, Partnership Interests and Limited Liability Company Interests and that it has sufficient interest in all of its Collateral in which a security interest is purported to be created hereunder for such security interest to attach (subject, in each case, to no pledge, lien, mortgage, hypothe-cation, security interest, charge, option, Adverse Claim or other encumbrance whatsoever, except the liens and security interests created by this Agreement or permitted under the Secured Debt Agreements);

(ii) it has full power, authority and legal right to pledge all the Collateral pledged by it pursuant to this Agreement;

(iii) this Agreement has been duly authorized, executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor enforceable against such Pledgor in accordance with its terms, except to the extent that the enforce-ability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(iv) except to the extent already obtained or made, no consent of any other party (including, without limitation, any stockholder, partner, member or creditor of such Pledgor or any of its Subsidiaries) and no consent, license, permit, approval or authoriza-tion of, exemption by, notice or report to, or registration, filing or declaration with, any

governmental authority is required to be obtained by such Pledgor in connection with (a) the execution, delivery or performance of this Agreement by such Pledgor, (b) the validity or enforceability of this Agreement against such Pledgor (except as set forth in clause (iii) above), (c) the perfection or enforceability of the Pledgee's security interest in such Pledgor's Collateral or (d) except for compliance with or as may be required by applicable securities laws, the exercise by the Pledgee of any of its rights or remedies provided herein;

(v)        neither the execution, delivery or performance by such Pledgor of this Agreement, or any other Secured Debt Agreement to which it is a party, nor compliance by it with the terms and provisions hereof and thereof nor the consummation of the transactions contemplated therein:  (i) will contravene any provision of any applicable law, statute, rule or regulation, or any applicable order, writ, injunction or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to such Pledgor; (ii) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the properties or assets of such Pledgor or any of its Subsidiaries pursuant to the terms of any indenture, material lease, material mortgage, material deed of trust, credit agreement, loan agreement or any other material agreement, contract or other instrument to which such Pledgor or any of its Subsidiaries is a party or is otherwise bound, or by which it or any of its properties or assets is bound or to which it may be subject; or (iii) will violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Pledgor or any of its Subsidiaries;

(vi)        all of such Pledgor's Collateral (consisting of Securities, Limited Liability Company Interests and Partnership Interests) has been duly and validly issued, is fully paid and non-assessable and is subject to no options to purchase or similar rights;

(vii)        each of such Pledgor's Pledged Notes constitutes, or when executed by the obligor thereof will constitute, the legal, valid and binding obligation of such obligor, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(viii)        the pledge, collateral assignment and delivery to the Pledgee of such Pledgor's Collateral consisting of Certificated Securities and Pledged Notes pursuant to this Agreement creates a valid and perfected first priority security interest in such Certificated Securities and Pledged Notes, and the proceeds thereof, subject to no prior Lien or encumbrance or to any agreement purporting to grant to any third party a Lien or encumbrance on the property or assets of such Pledgor which would include the Securities (other than the liens and security interests permitted under the Secured Debt Agreements then in effect) and the Pledgee is entitled to all the rights, priorities and

benefits afforded by the UCC or other relevant law as enacted in any relevant jurisdiction to perfect security interests in respect of such Collateral; and

(ix)    "control" (as defined in Section 8-106 of the UCC) has been obtained by the Pledgee over all of such Pledgor's Collateral consisting of Securities (including, without limitation, Notes which are Securities) with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC, except to the extent that the obligation of the applicable Pledgor to provide the Pledgee with "control" of such Collateral has not yet arisen under this Agreement; provided that in the case of the Pledgee obtaining "control" over Collateral consisting of a Security Entitlement, such Pledgor shall have taken all steps in its control so that the Pledgee obtains "control" over such Security Entitlement.

(b)    Each Pledgor covenants and agrees that it will defend the Pledgee's right, title and security interest in and to such Pledgor's Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and each Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee by such Pledgor as Collateral hereunder and will likewise defend the right thereto and security interest therein of the Pledgee and the other Secured Creditors.

(c)    Each Pledgor covenants and agrees that it will take no action which would violate any of the terms of any Secured Debt Agreement.

(d)    Each Pledgor hereby authorizes the First-Lien Collateral Agent to make duplicate filings as if such Pledgor is a Transmitting Utility, or alternatively, as if such Pledgor is a Person which is not a Transmitting Utility.

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZATION; LOCATION; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO; ETC.    The exact legal name of each Pledgor, the type of organization of such Pledgor, whether or not such Pledgor is a Registered Organization, the jurisdiction of organization of such Pledgor, such Pledgor's Location, the organizational identification number (if any) of each Pledgor is listed on Annex A hereto for such Pledgor.  No Pledgor shall change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) any Pledgor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex A (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex A which shall correct all information contained therein for such Pledgor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Collateral Agent to maintain the security interests of the Collateral Agent in the Collateral

intended to be granted hereby at all times fully perfected and in full force and effect. In addition, to the extent that any Pledgor does not have an organizational identification number on the date hereof and later obtains one, such Pledgor shall promptly thereafter deliver a notification of the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interest of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

18. PLEDGORS' OBLIGATIONS ABSOLUTE, ETC. The obligations of each Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever (other than termination of this Agreement pursuant to Section 20 hereof), including, without limitation:

(i) any renewal, extension, amendment or modification of, or addition or supplement to or deletion from any Secured Debt Agreement (other than this Agreement in accordance with its terms), or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof;

(ii) any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument including, without limitation, this Agreement (other than a waiver, consent or extension with respect to this Agreement in accordance with its terms);

(iii) any furnishing of any additional security to the Pledgee or its assignee or any acceptance thereof or any release of any security by the Pledgee or its assignee;

(iv) any limitation on any party's liability or obligations under any such instrument or agreement or any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof; or

(v) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to any Pledgor or any Subsidiary of any Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not such Pledgor shall have notice or knowledge of any of the foregoing.

19. SALE OF COLLATERAL WITHOUT REGISTRATION. (a) If an Event of Default shall have occurred and be continuing and any Pledgor shall have received from the Pledgee a written request or requests that such Pledgor cause any registration, qualification or compliance under any federal or state securities law or laws to be effected with respect to all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests, such Pledgor as soon as practicable and at its expense will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests, including, without

limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with any other governmental requirements; provided, that the Pledgee shall furnish to such Pledgor such information regarding the Pledgee as such Pledgor may request in writing and as shall be required in connection with any such registration, qualification or compliance. Each Pledgor will cause the Pledgee to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to the Pledgee such number of prospectuses, offering circulars and other documents incident thereto as the Pledgee from time to time may reasonably request, and will indemnify, to the extent permitted by law, the Pledgee and all other Secured Creditors participating in the distribution of such Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to such Pledgor by the Pledgee or such other Secured Creditor expressly for use therein.

(b)     If at any time when the Pledgee shall determine to exercise its right to sell all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests pursuant to Section 7 hereof, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, the Pledgee may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale in such manner and under such circumstances as the Pledgee may deem necessary or advisable in order that such sale may legally be effected without such registration. Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion (i) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, the Pledgee shall incur no responsibility or liability for selling all or any part of the Collateral at a price which the Pledgee, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until the registration as aforesaid.

20. TERMINATION; RELEASE.  (a)  On the Termination Date (as defined below), this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation, in Section 11 hereof shall survive any such termination) and the Pledgee, at the request and expense of such Pledgor, will execute and deliver to such Pledgor a proper instrument or instruments (including UCC termination statements) acknowledging the satisfaction and termination of this Agreement (including, without limitation, UCC termination statements and instruments of satisfaction, discharge and/or reconveyance), and will duly release from the security interest created hereby and assign, transfer and deliver to such Pledgor (without

recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Pledgee and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, together with any moneys at the time held by the Pledgee or any of its sub-agents hereunder and, with respect to any Collateral consisting of an Uncertificated Security, a Partnership Interest or a Limited Liability Company Interest (other than an Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), a termination of the agreement relating thereto executed and delivered by the issuer of such Uncertificated Security pursuant to Section 3.2(a)(ii) or by the respective partnership or limited liability company pursuant to Section 3.2(a)(iv)(2). As used in this Agreement, "Termination Date" shall mean the date upon which the Commitments under the Credit Agreement have been terminated and all Interest Rate Protection Agreements and Other Hedging Agreements entitled to the benefits of this Agreement have been terminated, no Letter of Credit or Note (as defined in the Credit Agreement) is outstanding (and all Loans have been paid in full), all Letters of Credit have been terminated, and all other Obligations (other than indemnities described in Section 11 hereof and described in Section 12.06 of the Credit Agreement, and any other indemnities set forth in any other Security Documents, in each case which are not then due and payable) then due and payable have been paid in full.

(b)    In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (x) at any time prior to the time at which all Credit Document Obligations have been paid in full and all Commitments and Letters of Credit under the Credit Agreement have been terminated, in connection with a sale or disposition permitted by Section 9.02 of the Credit Agreement or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section 13.12 of the Credit Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Credit Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, the Pledgee, at the request and expense of such Pledgor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or released and as may be in the possession of the Pledgee (or, in the case of Collateral held by any sub-agent designated pursuant to Section 4 hereto, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(c)    At any time that any Pledgor desires that Collateral be released as provided in the foregoing Section 20(a) or (b), it shall deliver to the Pledgee (and the relevant sub-agent, if any, designated pursuant to Section 4 hereof) a certificate signed by an authorized officer of such Pledgor stating that the release of the respective Collateral is permitted pursuant to Section 20(a) or (b) hereof. If reasonably requested by the Pledgee (although the Pledgee shall have no obligation to make any such request), the relevant Pledgor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.

(d)    The Pledgee shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Collateral Agent in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 20.

21.  NOTICES, ETC.  Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Pledgee or any Pledgor shall not be effective until received by the Pledgee or such Pledgor, as the case may be.  All notices and other communications shall be in writing and addressed as follows:

(a)    if to any Pledgor, at its address set forth opposite its signature below;

(b)    if to the Pledgee, at:

60 Wall Street
New York, New York 10005
Attention:  [_____]
Telephone No.:  [_____]
Telecopier No.:  [_____]

(c)    if to any Lender Creditor, either (x) to the Administrative Agent, at the address of the Administrative Agent specified in the Credit Agreement, or (y) at such address as such Lender Creditor shall have specified in the Credit Agreement;

(d)    if to any Other Creditor, at such address as such Other Creditor shall have specified in writing to the Pledgors and the Pledgee;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

22.  WAIVER; AMENDMENT.  Except as provided in Sections 30 and 32 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in accordance with the requirements specified in the Security Agreement.

23.  SUCCESSORS AND ASSIGNS.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 20, (ii) be binding upon each Pledgor, its successors and assigns; provided, however, that no Pledgor shall assign any of its rights or obligations hereunder without the prior written consent of the Pledgee (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Pledgee hereunder, to the benefit of the Pledgee, the other Secured Creditors and their respective successors, transferees and assigns.  All agreements, statements, representations and warranties

made by each Pledgor herein or in any certificate or other instrument delivered by such Pledgor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

24. HEADINGS DESCRIPTIVE. The headings of the several Sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PLEDGOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PLEDGOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PLEDGOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS PERSONAL JURISDICTION OVER SUCH PLEDGOR. EACH PLEDGOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH PLEDGOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 21 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PLEDGEE UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY PLEDGOR IN ANY OTHER JURISDICTION.

(b) EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJEC-TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT

BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVO-CABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

26. PLEDGOR'S DUTIES.  It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Pledgor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Pledgee shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, except for the safekeeping of Collateral actually in Pledgor's possession, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of any Pledgor under or with respect to any Collateral.

27. COUNTERPARTS.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with each Pledgor and the Pledgee.

28. SEVERABILITY.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

29. RECOURSE.  This Agreement is made with full recourse to each Pledgor and pursuant to and upon all the representations, warranties, covenants and agreements on the part of such Pledgor contained herein and in the other Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

30. ADDITIONAL PLEDGORS.  It is understood and agreed that any Subsidiary of Holdings that is required to become a party to this Agreement after the date hereof pursuant to the requirements of the Credit Agreement or any other Credit Document, shall become a Pledgor hereunder by (x) executing a counterpart hereof and delivering same to the Pledgee, (y) delivering supplements to Annexes A through G, hereto as are necessary to cause such annexes to be complete and accurate with respect to such additional Pledgor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Pledgor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Pledgee and with all documents and actions required above to be taken to the reasonable satisfaction of the Pledgee.

31. LIMITED OBLIGATIONS.  It is the desire and intent of each Pledgor and the Secured Creditors that this Agreement shall be enforced against each Pledgor to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought. Notwithstanding anything to the contrary contained herein, in furtherance of the foregoing, it is noted that the obligations of each Pledgor constituting a Subsidiary Guarantor have been limited as provided in the Subsidiaries Guaranty.

32. RELEASE OF PLEDGORS.  If at any time all of the Equity Interests of any Pledgor owned by the Borrower or any of its Subsidiaries are sold (to a Person other than a Credit Party) in a transaction permitted pursuant to the Credit Agreement (and which does not violate the terms of any other Secured Debt Agreement then in effect), then, such Pledgor shall be released as a Pledgor pursuant to this Agreement without any further action hereunder (it being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in any Pledgor shall be deemed to be a sale of all of the Equity Interests in such Pledgor for purposes of this Section), and the Pledgee is authorized and directed to execute and deliver such instruments of release as are reasonably satisfactory to it.  At any time that the Borrower desires that a Pledgor be released from this Agreement as provided in this Section 32, the Borrower shall deliver to the Pledgee a certificate signed by a principal executive officer of the Borrower stating that the release of such Pledgor is permitted pursuant to this Section 32.  If requested by Pledgee (although the Pledgee shall have no obligation to make any such request), the Borrower shall furnish legal opinions (from counsel acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.  The Pledgee shall have no liability whatsoever to any other Secured Creditor as a result of the release of any Pledgor by it in accordance with, or which it believes to be in accordance with, this Section 32.

33. COMPLIANCE WITH LAWS.  Each Pledgor agrees to use commercially reasonable efforts, including taking any action which the Pledgee and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the Federal Communications Commission (the "FCC") or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Pledgee and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

Each Pledgor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to Pledgee and the Secured Creditors as permitted by applicable law.

* * * *

IN WITNESS WHEREOF, each Pledgor and the Pledgee have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN CORPORATION, as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

BRAINSTORM NETWORKS, INC., as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

HOT SPOTS PRODUCTIONS, INC., as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

ON TV, INC., as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN-BECOCOM, LLC, as a Pledgor

By: RCN Telecom Services of
    Massachusetts, Inc., its managing
    member

By: _____
    Name:
    Title:

Address:                                RCN CABLE TV OF CHICAGO, INC., as a
                                        Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                RCN ENTERTAINMENT, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: [_____]                           Name:
                                            Title:


Address:                                RCN FINANCE, LLC, as a Pledgor

105 Carnegie Center                         By:  RCN Corporation, its managing
Princeton, NJ 08540                              member
Tel: (609) 734-3700
Fax: (609) 734-3830                     By: _____
                                            Name:
                                            Title:


Address:                                RCN FINANCIAL MANAGEMENT, INC., as
                                        a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                RCN INTERNATIONAL HOLDINGS, INC.,
                                        as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN INTERNET SERVICES, INC., as a
Pledgor


By: _____
    Name:
    Title:


Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES, INC., as a
Pledgor


By: _____
    Name:
    Title:


Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES OF ILLINOIS,
LLC, as a Pledgor

    By: RCN CORPORATION, its managing
        member

By: _____
    Name:
    Title:


Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES OF
MASSACHUSETTS, INC., as a Pledgor


By: _____
    Name:
    Title:


Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES OF
PHILADELPHIA, INC., as a Pledgor


By: _____
    Name:
    Title:

Address:                                        RCN TELECOM SERVICES OF VIRGINIA,
                                                INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                             By: _____
Fax: (609) 734-3830                                 Name:
                                                    Title:


Address:                                        RCN TELECOM SERVICES OF
                                                WASHINGTON, D.C., INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                             By: _____
Fax: (609) 734-3830                                 Name:
                                                    Title:


Address:                                        RFM 2, LLC, as a Pledgor

105 Carnegie Center                                 By:  RCN Corporation, its managing
Princeton, NJ 08540                                      member
Tel: (609) 734-3700
Fax: (609) 734-3830                             By: _____
                                                    Name:
                                                    Title:


Address:                                        RLH PROPERTY CORPORATION, as a
                                                Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                             By: _____
Fax: (609) 734-3830                                 Name:
                                                    Title:


Address:                                        STARPOWER COMMUNICATIONS, LLC,
                                                as a Pledgor

105 Carnegie Center
Princeton, NJ 08540                                 By:  RCN Telecom Services of
Tel: (609) 734-3700                                      Washington, D.C., Inc., its managing
Fax: (609) 734-3830                                      member

                                                By: _____
                                                    Name:
                                                    Title:

Address:                                          TEC AIR, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                               By: _____
Fax: (609) 734-3830                                   Name:
                                                      Title:

Address:                                          21ST CENTURY TELECOM SERVICES,
                                                  INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                               By: _____
Fax: (609) 734-3830                                   Name:
                                                      Title:

Address:                                          UNET HOLDING, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540                               By: _____
Tel: (609) 734-3700                                   Name:
Fax: (609) 734-3830                                   Title:

Accepted and Agreed to:

DEUTSCHE BANK AG CAYMAN
    ISLANDS BRANCH, as Collateral Agent
    and Pledgee

By:_____
    Name:
    Title:

Address:

60 Wall Street
New York, New York 10005
Tel: [_____]
Fax: [_____]

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION), JURISDICTION OF ORGANIZATION,
LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

| Exact Legal Name of Each Pledgor | Registered Organization? (Yes/No) | Jurisdiction of Organization | Pledgor's Location (for purposes of NY UCC § 9-307) | Pledgor's Organization Identification Number (or, if it has none, so indicate) |
|---|---|---|---|---|
| | | | | |

## SCHEDULE OF SUBSIDIARIES

| Entity | Ownership | Jurisdiction of Organization |
|--------|-----------|------------------------------|

## SCHEDULE OF STOCK

1.      [PLEDGOR]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No.[1] | Percentage Owned[2] | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

2.      [ADDITIONAL PLEDGOR(S)]

| Name of Issuing Corporation | Type of Shares | Number of Shares | Certificate No.[16] | Percentage Owned[17] | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|---|---|
| | | | | | |

---

[1]     Specify if uncertificated.

[2]     Specify for each Foreign Subsidiary the percentage owned of (x) Voting Equity Interests and (y) Non-Voting Equity Interests.

SCHEDULE OF NOTES

1.    RCN CORPORATION

|  |  |  | Sub-clause of |
| Amount | Maturity Date | Obligor | Section 3.2(a) |
|  |  |  | of Pledge Agreement |

2.    [ADDITIONAL PLEDGOR(S)]

|  |  |  | Sub-clause of |
| Amount | Maturity Date | Obligor | Section 3.2(a) |
|  |  |  | of Pledge Agreement |

## SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

1.    RCN CORPORATION

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|
|  |  |  |  |

2.    [ADDITIONAL PLEDGOR(S)]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|
|  |  |  |  |

## SCHEDULE OF PARTNERSHIP INTERESTS

1.     RCN CORPORATION

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|
| | | | |

2.     [ADDITIONAL PLEDGOR(S)]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|
| | | | |

## SCHEDULE OF CHIEF EXECUTIVE OFFICES

Name of Pledgor     Address(es) of Chief Executive Office[1]

---

[1]   For each Pledgor, list the address of its chief executive office on the date of the Security Agreement and each other location (if any) of its chief executive office in the four calendar months preceding said date.

Form of Agreement Regarding Uncertificated Securities, Limited Liability
Company Interests and Partnership Interests

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, 2004], among the undersigned pledgor (the "Pledgor"), Deutsche Bank AG Cayman Islands Branch, not in its individual capacity but solely as Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Uncertificated Securities, Limited Liability Company Interests and/or Partnership Interests (each as defined below) (the "Issuer").

W I T N E S S E T H :

WHEREAS, the Pledgor, certain of its affiliates and the Pledgee have entered into a Pledge Agreement, dated as of [_____ __, 2004] (as amended, modified, restated and/or supplemented from time to time, the "Pledge Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Pledge Agreement), the Pledgor has or will pledge to the Pledgee for the benefit of the Secured Creditors (as defined in the Pledge Agreement), and grant a security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all ["uncertificated securities" (as defined in Section 8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York) ("Uncertificated Securities")] [Partnership Interests (as defined in the Pledge Agreement)] [Limited Liability Company Interests (as defined in the Pledge Agreement)], from time to time by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "Issuer Pledged Interests"); and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interest of the Pledgee under the Pledge Agreement in the Issuer Pledged Interests, to vest in the Pledgee control of the Issuer Pledge Interests and to provide for the rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. The Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.  The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.  The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.  All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> 60 Wall Street
> New York, New York 10005
> Attention: [_____]
> Telephone No.: [_____]
> Telecopier No.: [_____]

5.  Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.  Except as expressly provided otherwise in Sections 4 and 5, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received. All notices and other communications shall be in writing and addressed as follows:

(a)     if to the Pledgor, at:

> _____
> _____
> _____
> _____
> Attention: _____
> Telephone No.:
> Fax No.:

(b)     if to the Pledgee, at the address given in Section 4 hereof;

(c)     if to the Issuer, at:

_____
_____
_____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 6, "<u>Business Day</u>" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

7.   This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

8.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____],
    as Pledgor


By_____
    Name:
    Title:


DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH, not in its individual capacity but solely as Collateral Agent and Pledgee

By_____
    Name:
    Title:


[_____],
    as the Issuer


By_____
    Name:
    Title:

# Table of Contents

Page

1. SECURITY FOR OBLIGATIONS.........................................................................................2

2. DEFINITIONS.....................................................................................................................3

3. PLEDGE OF SECURITIES, ETC. .....................................................................................6

   3.1 Pledge .........................................................................................................................6

   3.2 Procedures...................................................................................................................9

   3.3 Subsequently Acquired Collateral...........................................................................11

   3.4 Transfer Taxes...........................................................................................................11

   3.5 Certain Representations and Warranties Regarding the Collateral ...............................11

4. APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.......................................12

5. VOTING, ETC., WHILE NO EVENT OF DEFAULT OR SPECIFIED DEFAULT ...........12

6. DIVIDENDS AND OTHER DISTRIBUTIONS..................................................................12

7. REMEDIES IN CASE OF AN EVENT OF DEFAULT OR A SPECIFIED DEFAULT.......13

8. REMEDIES, CUMULATIVE, ETC..................................................................................14

9. APPLICATION OF PROCEEDS .......................................................................................14

10. PURCHASERS OF COLLATERAL .................................................................................15

11. INDEMNITY...................................................................................................................15

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER..........15

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY...................................................16

14. THE PLEDGEE AS FIRST-LIEN COLLATERAL AGENT.............................................17

15. TRANSFER BY THE PLEDGORS ..................................................................................17

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS .......17

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION AND/OR A TRANSMITTING UTILITY); JURISDICTION OF ORGANIZATION; LOCATION; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO; ETC. ............................................................... 19

18. PLEDGORS' OBLIGATIONS ABSOLUTE, ETC. ........................................... 20

19. SALE OF COLLATERAL WITHOUT REGISTRATION ................................. 20

20. TERMINATION; RELEASE ......................................................................... 21

21. NOTICES, ETC. ........................................................................................... 23

22. WAIVER; AMENDMENT ............................................................................ 23

23. SUCCESSORS AND ASSIGNS .................................................................... 23

24. HEADINGS DESCRIPTIVE .......................................................................... 24

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL ............................................................................................... 24

26. PLEDGOR'S DUTIES ................................................................................... 25

27. COUNTERPARTS .......................................................................................... 25

28. SEVERABILITY ............................................................................................ 25

29. RECOURSE ................................................................................................... 25

30. ADDITIONAL PLEDGORS ........................................................................... 25

31. LIMITED OBLIGATIONS ............................................................................. 26

32. RELEASE OF PLEDGORS ............................................................................ 26

33. COMPLIANCE WITH LAWS ........................................................................ 26

ANNEX A  -  SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION, LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS
ANNEX B  -  SCHEDULE OF SUBSIDIARIES
ANNEX C  -  SCHEDULE OF STOCK
ANNEX D  -  SCHEDULE OF NOTES

# Table of Contents

ANNEX E    -    SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS
ANNEX F    -    SCHEDULE OF PARTNERSHIP INTERESTS
ANNEX G    -    SCHEDULE OF CHIEF EXECUTIVE OFFICES
ANNEX H    -    FORM OF AGREEMENT REGARDING UNCERTIFICATED
                SECURITIES, LIMITED LIABILITY COMPANY INTERESTS AND
                PARTNERSHIP INTERESTS

FORM OF SECURITY AGREEMENT

among

RCN CORPORATION,

CERTAIN SUBSIDIARIES OF RCN CORPORATION

and

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH,
as FIRST-LIEN COLLATERAL AGENT

_____

Dated as of _____, 2004
_____

# TABLE OF CONTENTS

ARTICLE I SECURITY INTERESTS ..................................................................2

    1.1 Grant of Security Interests ...............................................................2
    1.2 Power of Attorney..........................................................................4

ARTICLE II GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS ..........4

    2.1 Necessary Filings..........................................................................4
    2.2 No Liens....................................................................................5
    2.3 Other Financing Statements ..............................................................5
    2.4 Chief Executive Office, Record Locations ..............................................5
    2.5 Location of Inventory and Equipment ..................................................5
    2.6 Legal Names; Type of Organization (and Whether a Registered Organization);
        Jurisdiction of Organization; Location; Organizational Identification
        Numbers; Changes Thereto; etc................................................5
    2.7 Trade Names; Etc. .........................................................................6
    2.8 Certain Significant Transactions. .......................................................6
    2.9 Non-UCC Property ........................................................................7
    2.10 As-Extracted Collateral; Timber-to-be-Cut ..........................................7
    2.11 Collateral in the Possession of a Bailee ...............................................7
    2.12 Recourse ..................................................................................7

ARTICLE III SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT
    RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER
    COLLATERAL....................................................................................8

    3.1 Additional Representations and Warranties.............................................8
    3.2 Maintenance of Records...................................................................8
    3.3 Direction to Account Debtors; Contracting Parties; etc. ..............................8
    3.4 Modification of Terms; etc................................................................9
    3.5 Collection ..................................................................................9
    3.6 Instruments ................................................................................9
    3.7 Assignors Remain Liable Under Accounts...............................................9
    3.8 Assignors Remain Liable Under Contracts.............................................10
    3.9 Deposit Accounts; Etc...................................................................10
    3.10 Letter-of-Credit Rights.................................................................11
    3.11 Commercial Tort Claims ...............................................................11
    3.12 Chattel Paper ...........................................................................11
    3.13 Further Actions .........................................................................12

ARTICLE IV SPECIAL PROVISIONS CONCERNING TRADEMARKS AND
    DOMAIN NAMES...............................................................................13

    4.1 Additional Representations and Warranties............................................13

4.2 Licenses and Assignments ...................................................................13
4.3 Infringements..................................................................................13
4.4 Preservation of Marks and Domain Names .......................................13
4.5 Maintenance of Registration ...........................................................14
4.6 Future Registered Marks and Domain Names ...................................14
4.7 Remedies .....................................................................................14

ARTICLE V SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND TRADE SECRETS....................................................................15

5.1 Additional Representations and Warranties.......................................15
5.2 Licenses and Assignments .............................................................15
5.3 Infringements..................................................................................15
5.4 Maintenance of Patents or Copyrights.............................................15
5.5 Prosecution of Patent Applications..................................................16
5.6 Other Patents and Copyrights.........................................................16
5.7 Remedies .....................................................................................16

ARTICLE VI PROVISIONS CONCERNING ALL COLLATERAL.......................16

6.1 Protection of First-Lien Collateral Agent's Security...........................16
6.2 Warehouse Receipts Non-Negotiable ..............................................17
6.3 Additional Information. ....................................................................17
6.4 Further Actions ..............................................................................17
6.5 Financing Statements ....................................................................17

ARTICLE VII REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT .............18

7.1 Remedies; Obtaining the Collateral Upon Default.............................18
7.2 Remedies; Disposition of the Collateral ...........................................19
7.3 Waiver of Claims............................................................................20
7.4 Application of Proceeds..................................................................21
7.5 Remedies Cumulative ....................................................................23
7.6 Discontinuance of Proceedings ......................................................23

ARTICLE VIII INDEMNITY .........................................................................23

8.1 Indemnity ......................................................................................23
8.2 Indemnity Obligations Secured by Collateral; Survival ......................25

ARTICLE IX DEFINITIONS .........................................................................25

ARTICLE X MISCELLANEOUS ...................................................................32

10.1 Notices .......................................................................................32
10.2 Waiver; Amendment .....................................................................32
10.3 Obligations Absolute ....................................................................33
10.4 Successors and Assigns................................................................33
10.5 Headings Descriptive ...................................................................33

10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
  WAIVER OF JURY TRIAL. ............................................................33
10.7 Assignor's Duties..........................................................................34
10.8 Termination; Release .....................................................................34
10.9 Counterparts ...............................................................................36
10.10 Severability................................................................................36
10.11 The First-Lien Collateral Agent and the other Secured Creditors.........36
10.12 Additional Assignors.....................................................................36
10.13 Compliance with Laws..................................................................36


ANNEX A      Schedule of Chief Executive Offices Address(es) of Chief Executive Office
ANNEX B      Schedule of Inventory and Equipment Locations
ANNEX C      Schedule of Legal Names, Type of Organization (and Whether a Registered
             Organization), Jurisdiction of Organization, Location and Organizational
             Identification Numbers
ANNEX D      Schedule of Trade and Fictitious Names
ANNEX E      Description of Certain Significant Transactions Occurring Within One Year
             Prior to the Date of the Security Agreement
ANNEX F      Schedule of Deposit Accounts
ANNEX G      Form of Control Agreement Regarding Deposit Accounts
ANNEX H      Schedule of Commercial Tort Claims
ANNEX I      Schedule of Marks and Applications; Internet Domain Name Registrations
ANNEX J      Schedule of Patents
ANNEX K      Schedule of Copyrights
ANNEX L      Grant of Security Interest in United States Trademarks
ANNEX M      Grant of Security Interest in United States Patents
ANNEX N      Grant of Security Interest in United States Copyrights

**[Remainder of this page intentionally left blank]**

# SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of _____, 2004, made by each of the undersigned assignors (each, an "Assignor" and, together with any other entity that becomes an assignor hereunder pursuant to Section 10.12 hereof, the "Assignors") in favor of Deutsche Bank AG Cayman Islands Branch, as First-Lien Collateral Agent (together with any successor First-Lien Collateral Agent, the "First-Lien Collateral Agent"), for the benefit of the Secured Creditors (as defined below).  Certain capitalized terms as used herein are defined in Article IX hereof. Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, RCN Corporation (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), Deutsche Bank Securities Inc., as Sole Lead Arranger and Sole Book Manager, and Deutsche Bank AG Cayman Islands Branch, as administrative agent (together with any successor Administrative Agent, the "Administrative Agent"), [_____], as syndication agent, and [_____] as documentation agent, have entered into a Credit Agreement, dated as of _____, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Credit Agreement"), providing for the making of Loans to, and the issuance of, and participation in, Letters of Credit for the account of the Borrower, all as contemplated therein (the Lenders, each Issuing Lender, the Administrative Agent, the First-Lien Collateral Agent and each other Agent are herein called the "Lender Creditors");

WHEREAS, the Borrower [and/or one or more of its Subsidiaries] may at any time and from time to time enter into one or more Interest Rate Protection Agreements or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if any, collectively, the "Other Creditors" and, together with the Lender Creditors, the "Secured Creditors");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the making of Loans to the Borrower and the issuance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and to the Other Creditors entering into Interest Rate Protection Agreements and Other Hedging Agreements that each Assignor shall have executed and delivered to the First-Lien Collateral Agent this Agreement; and

WHEREAS, each Assignor will obtain benefits from the incurrence of Loans by the Borrower and the issuance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and the entering into by the Borrower and/or one or more of its Subsidiaries of Interest Rate Protection Agreements or Other Hedging Agreements and,

accordingly, desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make Loans to the Borrower and issue, and/or participate in, Letters of Credit for the account of the Borrower and the Other Creditors to enter into Interest Rate Protection Agreements or Other Hedging Agreements with the Borrower and/or one or more of its Subsidiaries;

NOW, THEREFORE, in consideration of the benefits accruing to each Assignor, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby makes the following representations and warranties to the First-Lien Collateral Agent for the benefit of the Secured Creditors and hereby covenants and agrees with the First-Lien Collateral Agent for the benefit of the Secured Creditors as follows:

ARTICLE I

SECURITY INTERESTS

1.1 <u>Grant of Security Interests</u>. (a) As security for the prompt and complete payment and performance when due of all of its Obligations, each Assignor does hereby assign and transfer unto the First-Lien Collateral Agent, and does hereby pledge and grant to the First-Lien Collateral Agent, for the benefit of the Secured Creditors, a continuing security interest in all of the right, title and interest of such Assignor in, to and under all of the following personal property and fixtures (and all rights therein) of such Assignor, or in which or to which such Assignor has any rights, in each case whether now existing or hereafter from time to time acquired:

(i)     each and every Account;

(ii)    all cash and Cash Equivalents;

(iii)   the Cash Collateral Account and all monies, securities, Instruments and other investments deposited or required to be deposited in the Cash Collateral Account;

(iv)    all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(v)     all Commercial Tort Claims;

(vi)    all computer programs of such Assignor and all intellectual property rights therein and all other proprietary information of such Assignor, including but not limited to all Software, and all Software licensing rights, all writings, plans, specifications and schematics, all engineering drawings, customer lists, goodwill and licenses, and all recorded data of any kind or nature, regardless of the medium of recording;

(vii)   all Domain Names;

(viii)  all Trade Secret Rights;

(ix)    Contracts, together with all Contract Rights arising thereunder;

(x)    all Copyrights;

(xi)    all Equipment;

(xii)    all Deposit Accounts and all other demand, deposit, time, savings, cash management and passbook accounts maintained by such Assignor with any Person and all monies, securities, Instruments and other investments deposited in any of the foregoing;

(xiii)    all Documents;

(xiv)    all General Intangibles;

(xv)    all Goods;

(xvi)    all Instruments;

(xvii)    all Inventory;

(xviii)    all Investment Property;

(xix)    all Letter-of-Credit Rights (whether or not the respective letter of credit is evidenced by a writing);

(xx)    all Marks;

(xxi)    all Patents;

(xxii)    all Permits;

(xxiii)    all Supporting Obligations; and

(xxiv)    all Proceeds and products of any and all of the foregoing and any item excluded pursuant to the next succeeding sentence (except to the extent such proceeds would independently be excluded pursuant to said sentence) (all of the above, the "Collateral").

Notwithstanding anything to the contrary contained above, in no event shall the Collateral include, and no Assignor shall be deemed to have granted a security interest (unless and until as further provided below) in (a) any lease, license, contract, property rights or agreement to which any Assignor is a party or any of its rights or interests thereunder or property subject thereto if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of same or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term in the case of preceding clause (i) or (ii) , as applicable) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of

the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity), provided, however, that (x) the security interests hereunder, shall attach immediately to any portion of such lease, license, contact, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) and (y) to any property or assets described above in this clause (a) on the first date upon which the circumstances described in preceding clauses (i) and/or (ii) (as relevant) no longer exist with respect thereto, or (b) the equity interests of (x) Megacable, S.A. de C.V., MCM Holdings, S.A. de C.V. and Megacable Telecommunicaciones, S.A. de C.V. for so long as the organizational documents of such entities prohibits the granting of a security interest in such equity interests; provided that such security interest shall attach immediately when such prohibition is no longer in effect or (y) more than 65% of the Voting Equity Interests of any Foreign Corporation; provided that each Pledgor shall be required to pledge hereunder 100% of any Non-Voting Equity Interests at any time and from time to time acquired by such Pledgor of any Foreign Corporation.

(b)    The security interest of the First-Lien Collateral Agent under this Agreement extends to all Collateral which any Assignor may acquire, or with respect to which any Assignor may obtain rights, at any time during the term of this Agreement.

(c)    Notwithstanding anything herein to the contrary, the relative rights and remedies of First-Lien Collateral Agent shall be subject to and governed by the terms of the Intercreditor Agreement at any time the Intercreditor Agreement is in effect. In the event of any inconsistency between the terms hereof and the Intercreditor Agreement, the Intercreditor Agreement shall control at any time the Intercreditor Agreement is in effect.

1.2 Power of Attorney. Each Assignor hereby constitutes and appoints the First-Lien Collateral Agent its true and lawful attorney, irrevocably, with full power after the occurrence of and during the continuance of an Event of Default (in the name of such Assignor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to such Assignor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the First-Lien Collateral Agent may deem to be necessary or advisable to protect the interests of the Secured Creditors, which appointment as attorney is coupled with an interest.

ARTICLE II

GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Assignor represents, warrants and covenants, which representations, warranties and covenants shall survive execution and delivery of this Agreement, as follows:

2.1 Necessary Filings. All filings, registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted by such Assignor to the First-Lien Collateral Agent hereby in respect of the Collateral have been accomplished (or will be accomplished within 5 days after the Initial Borrowing Date or, with respect to Marks, Patents and Copyrights, within 30 days of the date of the Initial Borrowing

Date) and the security interest granted to the First-Lien Collateral Agent pursuant to this Agreement in and to the Collateral creates a valid and, together with all such filings, registrations, recordings and other actions, a perfected security interest therein prior to the rights of all other Persons therein and subject to no other Liens (other than Permitted Liens) and is entitled to all the rights, priorities and benefits afforded by the Uniform Commercial Code or other relevant law as enacted in any relevant jurisdiction to perfected security interests, in each case to the extent that the Collateral consists of the type of property in which a security interest may be perfected by possession or control (within the meaning of the UCC as in effect on the date hereof in the State of New York), by filing a financing statement under the Uniform Commercial Code as enacted in any relevant jurisdiction or by a filing of a Grant of Security Interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office.  Each Assignor hereby authorizes the First-Lien Collateral Agent to make duplicate filings as if such Assignor is a Transmitting Utility, or alternatively, as if such Assignor is a Person which is not a Transmitting Utility.

2.2  <u>No Liens</u>.  Such Assignor is, and as to all Collateral acquired by it from time to time after the date hereof such Assignor will be, the owner of all Collateral free from any Lien, security interest, encumbrance or other right, title or interest of any Person (other than Permitted Liens), and such Assignor shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the First-Lien Collateral Agent.

2.3  <u>Other Financing Statements</u>.  As of the date hereof, there is no financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Collateral (other than financing statements filed in respect of Permitted Liens), and so long as the Termination Date has not occurred, such Assignor will not execute or authorize to be filed in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) or statements relating to the Collateral, except financing statements filed or to be filed in respect of and covering the security interests granted hereby by such Assignor or in connection with Permitted Liens.

2.4  <u>Chief Executive Office, Record Locations</u>.  The chief executive office of such Assignor is, on the date of this Agreement, located at the address indicated on Annex A hereto for such Assignor.  During the period of the four calendar months preceding the date of this Agreement, the chief executive office of such Assignor has not been located at any address other than that indicated on Annex A in accordance with the immediately preceding sentence, in each case unless each such other address is also indicated on Annex A hereto for such Assignor.

2.5  <u>Location of Inventory and Equipment</u>.  All Inventory and Equipment held on the date hereof, or held at any time during the four calendar months prior to the date hereof, by each Assignor is located at one of the locations shown on Annex B hereto for such Assignor.

2.6  <u>Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; Location; Organizational Identification Numbers; Changes Thereto; etc.</u>  The exact legal name of each Assignor, the type of organization of such Assignor, whether or not such Assignor is a Registered Organization, the jurisdiction of

organization of such Assignor, such Assignor's Location, the organizational identification number (if any) of such Assignor is listed on Annex C hereto for such Assignor. Such Assignor shall not change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its jurisdiction of organization, its Location, or its organizational identification number (if any) from that used on Annex C hereto, except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) such Assignor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the First-Lien Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex C (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex C which shall correct all information contained therein for such Assignor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the First-Lien Collateral Agent to maintain the security interests of the First-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect. In addition, to the extent that such Assignor does not have an organizational identification number on the date hereof and later obtains one, such Assignor shall promptly thereafter notify the First-Lien Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the First-Lien Collateral Agent to the extent necessary to maintain the security interest of the First-Lien Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

2.7 <u>Trade Names; Etc.</u> Such Assignor has or operates in any jurisdiction under, or in the preceding five years has had or has operated in any jurisdiction under, no trade names, fictitious names or other names except its legal name as specified in Annex C and such other trade or fictitious names as are listed on Annex D hereto for such Assignor. Such Assignor shall not assume or operate in any jurisdiction under any new trade, fictitious or other name until (i) it shall have given to the First-Lien Collateral Agent not less than 15 days' written notice of its intention so to do, clearly describing such new name and the jurisdictions in which such new name will be used and providing such other information in connection therewith as the First-Lien Collateral Agent may reasonably request and (ii) with respect to such new name, it shall have taken all action reasonably requested by the First-Lien Collateral Agent to maintain the security interest of the First-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.

2.8 <u>Certain Significant Transactions.</u> During the one year period preceding the date of this Agreement, no Person shall have merged or consolidated with or into any Assignor, and no Person shall have liquidated into, or transferred all or substantially all of its assets to, any Assignor, in each case except as described in Annex E hereto. With respect to any transactions so described in Annex E hereto, the respective Assignor shall have furnished such information with respect to the Person (and the assets of the Person and locations thereof) which merged with or into or consolidated with such Assignor, or was liquidated into or transferred all or substantially all of its assets to such Assignor, and shall have furnished to the First-Lien Collateral Agent such UCC lien searches as may have been requested with respect to such Person and its assets, to establish that no security interest (excluding Permitted Liens) continues

perfected on the date hereof with respect to any Person described above (or the assets transferred to the respective Assignor by such Person), including without limitation pursuant to Section 9-316(a)(3) of the UCC.

2.9 <u>Non-UCC Property</u>.  The aggregate fair market value (as determined by the Assignors in good faith) of all property of the Assignors of the types described in clauses (1), (2) and (3) of Section 9-311(a) of the UCC does not exceed $____.  If the aggregate value of all such property at any time owned by all Assignors exceeds $_____, the Assignors shall provide prompt written notice thereof to the First-Lien Collateral Agent and, upon the reasonable request of the First-Lien Collateral Agent, the Assignors shall promptly (and in any event within 30 days) (or such longer period as the First-Lien Collateral Agent may agree to in writing) take such actions (at their own cost and expense) as may be required under the respective United States, State or other laws referenced in Section 9-311(a) of the UCC to perfect the security interests granted herein in any Collateral where the filing of a financing statement does not perfect the security interest in such property in accordance with the provisions of Section 9-311(a) of the UCC.

2.10 <u>As-Extracted Collateral; Timber-to-be-Cut</u>.  On the date hereof, such Assignor does not own, or expect to acquire, any property which constitutes, or would constitute, As-Extracted Collateral or Timber-to-be-Cut.  If at any time after the date of this Agreement such Assignor owns, acquires or obtains rights to any As-Extracted Collateral or Timber-to-be-Cut, such Assignor shall furnish the First-Lien Collateral Agent with prompt written notice thereof (which notice shall describe in reasonable detail the As-Extracted Collateral and/or Timber-to-be-Cut and the locations thereof) and shall take all actions as may be deemed reasonably necessary or desirable by the First-Lien Collateral Agent to perfect the security interest of the First-Lien Collateral Agent therein.

2.11 <u>Collateral in the Possession of a Bailee</u>.  If any Inventory or other Goods are at any time in the possession of a bailee, such Assignor shall promptly notify the First-Lien Collateral Agent thereof and, if requested by the First-Lien Collateral Agent, shall use its commercially reasonable efforts to promptly obtain an acknowledgment from such bailee, in form and substance reasonably satisfactory to the First-Lien Collateral Agent, that the bailee holds such Collateral for the benefit of the First-Lien Collateral Agent and shall act upon the instructions of the First-Lien Collateral Agent, without the further consent of such Assignor. The First-Lien Collateral Agent agrees with such Assignor that the First-Lien Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the respective Assignor with respect to any such bailee.

2.12 <u>Recourse</u>.  This Agreement is made with full recourse to each Assignor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Assignor contained herein, in the Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

ARTICLE III

## SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER COLLATERAL

3.1 <u>Additional Representations and Warranties</u>.  As of the time when each of its Accounts arises, each Assignor shall be deemed to have represented and warranted that each such Account, and all records, papers and documents relating thereto (if any) are genuine and what they purport to be, and that all papers and documents (if any) relating thereto (i) will, to the knowledge of such Assignor, represent the genuine, legal, valid and binding obligation of the account debtor evidencing indebtedness unpaid and owed by the respective account debtor arising out of the performance of labor or services or the sale or lease and delivery of the merchandise listed therein, or both, (ii) will be the only original writings evidencing and embodying such obligation of the account debtor named therein (other than copies created for general accounting purposes), (iii) will, to the knowledge of such Assignor, evidence true and valid obligations, enforceable in accordance with their respective terms, and (iv) will be in compliance and will conform in all material respects with all applicable federal, state and local laws and applicable laws of any relevant foreign jurisdiction.

3.2 <u>Maintenance of Records</u>.  Each Assignor will keep and maintain at its own cost and expense accurate records of its Accounts and Contracts, including, but not limited to, originals of all documentation (including each Contract) with respect thereto, records of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and such Assignor will make the same available on such Assignor's premises to the First-Lien Collateral Agent for inspection, at such Assignor's own cost and expense, at any and all reasonable times upon prior notice to such Assignor and otherwise in accordance with the Credit Agreement.  Upon the occurrence and during the continuance of an Event of Default and at the request of the First-Lien Collateral Agent, such Assignor shall, at its own cost and expense, deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the First-Lien Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Assignor).  Upon the occurrence and during the continuance of an Event of Default and if the First-Lien Collateral Agent so directs, such Assignor shall legend, in form and manner satisfactory to the First-Lien Collateral Agent, the Accounts and the Contracts, as well as books, records and documents (if any) of such Assignor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the First-Lien Collateral Agent and that the First-Lien Collateral Agent has a security interest therein.

3.3 <u>Direction to Account Debtors; Contracting Parties; etc.</u>  Upon the occurrence and during the continuance of an Event of Default, if the First-Lien Collateral Agent so directs any Assignor, such Assignor agrees (x) to cause all payments on account of the Accounts and Contracts to be made directly to the Cash Collateral Account, (y) that the First-Lien Collateral Agent may, at its option, directly notify the obligors with respect to any Accounts and/or under any Contracts to make payments with respect thereto as provided in the preceding clause (x), and (z) that the First-Lien Collateral Agent may enforce collection of any such Accounts and Contracts and may adjust, settle or compromise the amount of payment thereof, in the same manner and to the same extent as such Assignor.  Without notice to or assent by any Assignor, the First-Lien Collateral Agent may, upon the occurrence and during the continuance of an Event

of Default, apply any or all amounts then in, or thereafter deposited in, the Cash Collateral Account toward the payment of the Obligations in the manner provided in Section 7.4 of this Agreement. The reasonable costs and expenses of collection (including reasonable attorneys' fees), whether incurred by an Assignor or the First-Lien Collateral Agent, shall be borne by the relevant Assignor. The First-Lien Collateral Agent shall deliver a copy of each notice referred to in the preceding clause (y) to the relevant Assignor, provided that (x) the failure by the First-Lien Collateral Agent to so notify such Assignor shall not affect the effectiveness of such notice or the other rights of the First-Lien Collateral Agent created by this Section 3.3 and (y) no such notice shall be required if an Event of Default of the type described in Section 10.05 of the Credit Agreement has occurred and is continuing.

3.4  Modification of Terms; etc.  Except in accordance with such Assignor's ordinary course of business and consistent with reasonable business judgment or as permitted by Section 3.5, no Assignor shall rescind or cancel any indebtedness evidenced by any Account or under any Contract, or modify any material term thereof or make any material adjustment with respect thereto, or extend or renew the same, or compromise or settle any material dispute, claim, suit or legal proceeding relating thereto, or sell any Account or Contract, or interest therein, without the prior written consent of the First-Lien Collateral Agent.  No Assignor will do anything to impair the rights of the First-Lien Collateral Agent in the Accounts or Contracts.

3.5  Collection.  Each Assignor shall endeavor in accordance with reasonable business practices to cause to be collected from the account debtor named in each of its Accounts or obligor under any Contract, as and when due (including, without limitation, amounts which are delinquent, such amounts to be collected in accordance with generally accepted lawful collection procedures) any and all amounts owing under or on account of such Account or Contract, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or under such Contract. Except as otherwise directed by the First-Lien Collateral Agent after the occurrence and during the continuation of an Event of Default, any Assignor may allow in the ordinary course of business as adjustments to amounts owing under its Accounts and Contracts (i) an extension or renewal of the time or times of payment, or settlement for less than the total unpaid balance, which such Assignor finds appropriate in accordance with reasonable business judgment and (ii) a refund or credit due as a result of returned or damaged merchandise or improperly performed services or for other reasons which such Assignor finds appropriate in accordance with reasonable business judgment.  The reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) of collection, whether incurred by an Assignor or the First-Lien Collateral Agent, shall be borne by the relevant Assignor.

3.6  Instruments.  If any Assignor owns or acquires any Instrument in excess of $[____] constituting Collateral (other than checks and other payment instruments received and collected in the ordinary course of business), such Assignor will within 10 Business Days notify the First-Lien Collateral Agent thereof, and upon request by the First-Lien Collateral Agent will promptly deliver such Instrument to the First-Lien Collateral Agent appropriately endorsed to the order of the First-Lien Collateral Agent.

3.7  Assignors Remain Liable Under Accounts.  Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Accounts to observe and

perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts. Neither the First-Lien Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the First-Lien Collateral Agent or any other Secured Creditor of any payment relating to such Account pursuant hereto, nor shall the First-Lien Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.8 <u>Assignors Remain Liable Under Contracts</u>. Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Contracts to observe and perform all of the conditions and obligations to be observed and performed by them thereunder, all in accordance with and pursuant to the terms and provisions of each Contract. Neither the First-Lien Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Contract by reason of or arising out of this Agreement or the receipt by the First-Lien Collateral Agent or any other Secured Creditor of any payment relating to such Contract pursuant hereto, nor shall the First-Lien Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any performance by any party under any Contract, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.9 <u>Deposit Accounts; Etc.</u> (a) No Assignor maintains, or at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for such accounts maintained with a bank (as defined in Section 9-102 of the UCC) whose jurisdiction (determined in accordance with Section 9-304 of the UCC) is within a State of the United States. Annex F hereto accurately sets forth, as of the date of this Agreement, for each Assignor, each Deposit Account maintained by such Assignor (including a description thereof and the respective account number), the name of the respective bank with which such Deposit Account is maintained, and the jurisdiction of the respective bank with respect to such Deposit Account. For each Deposit Account (other than the Cash Collateral Account or any other Deposit Account maintained with the First-Lien Collateral Agent), the respective Assignor shall cause the bank with which the Deposit Account is maintained to execute and deliver to the First-Lien Collateral Agent, within 30 days after the date of this Agreement (as such date may be extended by the First-Lien Collateral Agent) or, if later, at the time of the establishment of the respective Deposit Account, a "control agreement" in the form of Annex G hereto (appropriately completed), with such changes thereto as may be acceptable to the First-Lien Collateral Agent. If any bank with which a Deposit Account is maintained refuses to, or does not, enter into such a "control agreement", then the respective Assignor shall promptly (and in any event within 30 days after the date of this Agreement or, if later, 30 days after the establishment of such account) close the respective Deposit Account and transfer all

balances therein to the Cash Collateral Account or another Deposit Account meeting the requirements of this Section 3.9. If any bank with which a Deposit Account is maintained refuses to subordinate all its claims, subject to customary exceptions, with respect to such Deposit Account to the First-Lien Collateral Agent's security interest therein on terms satisfactory to the First-Lien Collateral Agent, then the First-Lien Collateral Agent, at its option, may (x) require that such Deposit Account be terminated in accordance with the immediately preceding sentence or (y) agree to a "control agreement" without such subordination, provided that in such event the First-Lien Collateral Agent may at any time, at its option, subsequently require that such Deposit Account be terminated (within 30 days after notice from the First-Lien Collateral Agent) (as such date may be extended by the First-Lien Collateral Agent) in accordance with the requirements of the immediately preceding sentence.

(b)     After the date of this Agreement, no Assignor shall establish any new demand, time, savings, passbook or similar account, except for Deposit Accounts established and maintained with banks and meeting the requirements of preceding clause (a). At the time any such Deposit Account is established, the appropriate "control agreement" shall be entered into in accordance with the requirements of preceding clause (a) and the respective Assignor shall furnish to the First-Lien Collateral Agent a supplement to Annex F hereto containing the relevant information with respect to the respective Deposit Account and the bank with which same is established.

3.10 <u>Letter-of-Credit Rights</u>. If any Assignor is at any time a beneficiary under a letter of credit with a stated amount of $1,000,000 or more, such Assignor shall promptly notify the First-Lien Collateral Agent thereof and, at the request of the First-Lien Collateral Agent, such Assignor shall, pursuant to an agreement in form and substance reasonably satisfactory to the First-Lien Collateral Agent, use its reasonable best efforts to (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the First-Lien Collateral Agent of the proceeds of any drawing under such letter of credit or (ii) arrange for the First-Lien Collateral Agent to become the transferee beneficiary of such letter of credit, with the First-Lien Collateral Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement after the occurrence and during the continuance of an Event of Default.

3.11 <u>Commercial Tort Claims</u>. All Commercial Tort Claims of each Assignor in existence on the date of this Agreement are described in Annex H hereto. If any Assignor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $1,000,000 or more, such Assignor shall promptly notify the First-Lien Collateral Agent thereof in a writing signed by such Assignor and describing the details thereof and shall grant to the First-Lien Collateral Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the First-Lien Collateral Agent.

3.12 <u>Chattel Paper</u>. Upon the request of the First-Lien Collateral Agent made at any time or from time to time, each Assignor shall promptly furnish to the First-Lien Collateral Agent a list of all Electronic Chattel Paper held or owned by such Assignor. Furthermore, if requested by the First-Lien Collateral Agent, each Assignor shall promptly take all actions which

are reasonably practicable so that the First-Lien Collateral Agent has "control" of all Electronic Chattel Paper in accordance with the requirements of Section 9-105 of the UCC. Each Assignor will promptly (and in any event within 10 days) following any request by the First-Lien Collateral Agent, deliver all of its Tangible Chattel Paper to the First-Lien Collateral Agent.

       3.13 <u>Further Actions</u>.  Each Assignor will, at its own expense, make, execute, endorse, acknowledge, file and/or deliver to the First-Lien Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps, including any and all actions as may be necessary or required under the Federal Assignment of Claims Act, relating to its Accounts, Contracts, Instruments and other property or rights covered by the security interest hereby granted, as the First-Lien Collateral Agent may reasonably require.

## ARTICLE IV

## SPECIAL PROVISIONS CONCERNING TRADEMARKS AND DOMAIN NAMES

4.1 <u>Additional Representations and Warranties</u>. Each Assignor represents and warrants that it is the true and lawful owner of all right, title and interest in and to the registered Marks and Domain Names listed in Annex I hereto for such Assignor and that said listed Marks and Domain Names include all United States marks and applications for United States marks owned or purported to be owned by such Assignor registered in the United States Patent and Trademark Office, as well as all Domain Names that such Assignor owns or purports to own as of the date hereof. Each Assignor represents and warrants that it owns, is licensed to use or otherwise has the right to use any trademarks, service marks or other indicia of origin, including trade dress, and any Internet domain names, that it uses. Each Assignor further warrants that it has no knowledge of any third party claim received by it that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any trademark, service mark or trade name of any other Person other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Assignor represents and warrants that the registrations of Marks listed in Annex I hereto are valid, subsisting, have not been canceled and that such Assignor is not aware of any third-party claim that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said applications will not mature into registrations, other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Assignor hereby grants to the First-Lien Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the United States Patent and Trademark Office or similar registrar in order to effect an absolute assignment of all right, title and interest in each Mark and/or Domain Name, and record the same.

4.2 <u>Licenses and Assignments</u>. Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any Mark or Domain Name absent prior written approval of the First-Lien Collateral Agent.

4.3 <u>Infringements</u>. Each Assignor agrees, promptly upon learning thereof, to notify the First-Lien Collateral Agent in writing of the name and address of, and to furnish such pertinent information that may be available with respect to, any party who such Assignor believes is, or is likely to be, infringing or diluting or otherwise violating any of such Assignor's rights in and to any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect, or with respect to any party claiming that such Assignor's use of any Mark or Domain Name material to such Assignor's business violates in any material respect any property right of that party. Each Assignor further agrees to prosecute diligently in accordance with reasonable business practices any Person infringing any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect.

4.4 <u>Preservation of Marks and Domain Names</u>. Each Assignor agrees to use its Marks and Domain Names which are material to such Assignor's business in interstate commerce during the time in which this Agreement is in effect and to take all such other actions

as are reasonably necessary to preserve such Marks as trademarks or service marks under the laws of the United States (other than any such Marks which Assignor reasonably determines are no longer used or useful in its business or operations).

4.5 <u>Maintenance of Registration</u>. Each Assignor shall, at its own expense, diligently process all documents reasonably required to maintain all Mark and/or Domain Name registrations, including but not limited to affidavits of use and applications for renewals of registration in the United States Patent and Trademark Office for all of its material registered Marks, and shall pay all fees and disbursements in connection therewith and shall not abandon any such filing of affidavit of use or any such application of renewal prior to the exhaustion of all administrative and judicial remedies without prior written consent of the First-Lien Collateral Agent (other than with respect to registrations and applications deemed by such Assignor in its reasonable business judgment to be no longer prudent to pursue).

4.6 <u>Future Registered Marks and Domain Names</u>. If any Mark registration is issued hereafter to any Assignor as a result of any application now or hereafter pending before the United States Patent and Trademark Office or any Domain Name is registered by Assignor, within 60 days of receipt of such certificate or similar indicia of ownership, such Assignor shall deliver to the First-Lien Collateral Agent a copy of such registration certificate or similar indicia of ownership, and a grant of a security interest in such Mark and/or Domain Name, to the First-Lien Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest in such Mark and/or Domain Name to the First-Lien Collateral Agent hereunder, the form of such security to be substantially in the form of Annex L hereto or in such other form as may be reasonably satisfactory to the First-Lien Collateral Agent.

4.7 <u>Remedies</u>. If an Event of Default shall occur and be continuing, the First-Lien Collateral Agent may, by written notice to the relevant Assignor, take any or all of the following actions: (i) declare the entire right, title and interest of such Assignor in and to each of the Marks and Domain Names, together with all trademark rights and rights of protection to the same, vested in the First-Lien Collateral Agent for the benefit of the Secured Creditors, in which event such rights, title and interest shall immediately vest, in the First-Lien Collateral Agent for the benefit of the Secured Creditors, and the First-Lien Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 4.1 hereof to execute, cause to be acknowledged and notarized and record said absolute assignment with the applicable agency or registrar; (ii) take and use or sell the Marks or Domain Names and the goodwill of such Assignor's business symbolized by the Marks or Domain Names and the right to carry on the business and use the assets of such Assignor in connection with which the Marks or Domain Names have been used; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from using the Marks or Domain Names in any manner whatsoever, directly or indirectly, and such Assignor shall execute such further documents that the First-Lien Collateral Agent may reasonably request to further confirm this and to transfer ownership of the Marks or Domain Names and registrations and any pending trademark applications in the United States Patent and Trademark Office or applicable Domain Name registrar to the First-Lien Collateral Agent.

SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND TRADE SECRETS

5.1 <u>Additional Representations and Warranties</u>. Each Assignor represents and warrants that it is the true and lawful owner of all rights in (i) the Trade Secret Rights, (ii) all right, title and interest in and to the Patents listed in Annex J hereto for such Assignor and that said Patents include all the United States patents and applications for United States patents that such Assignor owns as of the date hereof and (iii) all right, title and interest in and to the registered Copyrights listed in Annex K hereto for such Assignor and that said Copyrights include all the United States copyrights registered with the United States Copyright Office and applications to United States copyrights that such Assignor owns as of the date hereof. Each Assignor further warrants that it has no knowledge of any third party claim that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any patent of any other Person or such Assignor has misappropriated any trade secret or proprietary information which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Each Assignor represents and warrants that the Patents listed in Annex J hereto are valid, subsisting, have not been canceled and that such Assignor is not aware of any third-party claim that any of said Patents are invalid or unenforceable, and is not aware that there is any reason that any of said Patents are invalid or unenforceable, and is not aware that there is any reason that any of said Patent applications will not mature into issued Patents. Each Assignor hereby grants to the First-Lien Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Patent and Trademark Office or the United States Copyright Office in order to effect an absolute assignment of all right, title and interest in each Patent or Copyright, and to record the same.

5.2 <u>Licenses and Assignments</u>. Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any Patent or Copyright absent prior written approval of the First-Lien Collateral Agent.

5.3 <u>Infringements</u>. Each Assignor agrees, promptly upon learning thereof, to furnish the First-Lien Collateral Agent in writing with all pertinent information available to such Assignor with respect to any infringement, contributing infringement or active inducement to infringe or other violation of such Assignor's rights in any Patent or Copyright or to any claim that the practice of any Patent or use of any Copyright violates any property right of a third party, or with respect to any misappropriation of any Trade Secret Right or any claim that practice of any Trade Secret Right violates any property right of a third party, in each case, in any manner which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Each Assignor further agrees, absent direction of the First-Lien Collateral Agent to the contrary, to diligently prosecute, in accordance with its reasonable business judgment, any Person infringing any Patent or Copyright or any Person misappropriating any Trade Secret Right, in each case to the extent that such infringement or misappropriation, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.4 <u>Maintenance of Patents or Copyrights</u>. At its own expense, each Assignor shall make timely payment of all post-issuance fees required to maintain in force its rights under

each Patent or Copyright, absent prior written consent of the First-Lien Collateral Agent (other than any such Patents or Copyrights which are no longer used or are deemed by such Assignor in its reasonable business judgment to no longer be useful in its business or operations).

5.5 <u>Prosecution of Patent Applications</u>.  At its own expense, each Assignor shall diligently prosecute all material applications for the United States Patents listed in Annex J hereto, in each case for such Assignor and shall not abandon any such application prior to exhaustion of all administrative and judicial remedies (other than applications that are deemed by such Assignor in its reasonable business judgment to no longer be necessary in the conduct of the Assignor's business), absent written consent of the First-Lien Collateral Agent.

5.6 <u>Other Patents and Copyrights</u>.  Within 30 days of the acquisition or issuance of a United States Patent, registration of a Copyright, or acquisition of a registered Copyright, or of filing of an application for a United States Patent or Copyright, the relevant Assignor shall deliver to the First-Lien Collateral Agent a copy of said Copyright or Patent, or certificate or registration of, or application therefor, as the case may be, with a grant of a security interest as to such Patent or Copyright, as the case may be, to the First-Lien Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest, the form of such grant of a security interest to be substantially in the form of Annex M or N hereto, as appropriate, or in such other form as may be reasonably satisfactory to the First-Lien Collateral Agent.

5.7 <u>Remedies</u>.  If an Event of Default shall occur and be continuing, the First-Lien Collateral Agent may, by written notice to the relevant Assignor, take any or all of the following actions:  (i) declare the entire right, title, and interest of such Assignor in each of the Patents and Copyrights vested in the First-Lien Collateral Agent for the benefit of the Secured Creditors, in which event such right, title, and interest shall immediately vest in the First-Lien Collateral Agent for the benefit of the Secured Creditors, in which case the First-Lien Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 5.1 hereof to execute, cause to be acknowledged and notarized and to record said absolute assignment with the applicable agency; (ii) take and practice or sell the Patents and Copyrights; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from practicing the Patents and using the Copyrights directly or indirectly, and such Assignor shall execute such further documents as the First-Lien Collateral Agent may reasonably request further to confirm this and to transfer ownership of the Patents and Copyrights to the First-Lien Collateral Agent for the benefit of the Secured Creditors.

ARTICLE VI

PROVISIONS CONCERNING ALL COLLATERAL

6.1 <u>Protection of First-Lien Collateral Agent's Security</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor will do nothing to impair the rights of the First-Lien Collateral Agent in the Collateral.  Each Assignor will at all times maintain insurance, at such Assignor's own expense to the extent and in the manner provided in the Secured Debt Agreements.  Except to the extent otherwise permitted to be retained by such Assignor or applied by such Assignor pursuant to the terms of the Secured Debt Agreements, the First-Lien Collateral Agent shall, at the time any proceeds of such insurance are distributed to the

Secured Creditors, apply such proceeds in accordance with Section 7.4 hereof. Each Assignor assumes all liability and responsibility in connection with the Collateral acquired by it and the liability of such Assignor to pay the Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Assignor.

6.2 <u>Warehouse Receipts Non-Negotiable</u>. To the extent practicable, each Assignor agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued with respect to any of its Inventory, such Assignor shall request that such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7-104 of the Uniform Commercial Code as in effect in any relevant jurisdiction or under other relevant law).

6.3 <u>Additional Information.</u> Each Assignor will, at its own expense, from time to time upon the reasonable request of the First-Lien Collateral Agent, promptly (and in any event within 10 days after its receipt of the respective request) furnish to the First-Lien Collateral Agent such information with respect to the Collateral (including the identity of the Collateral or such components thereof as may have been requested by the First-Lien Collateral Agent, the value and location of such Collateral, etc.) as may be requested by the First-Lien Collateral Agent. Without limiting the forgoing, each Assignor agrees that it shall promptly (and in any event within 10 days after its receipt of the respective request) furnish to the First-Lien Collateral Agent such updated Annexes hereto as may from time to time be reasonably requested by the First-Lien Collateral Agent.

6.4 <u>Further Actions</u>. Each Assignor will, at its own expense and upon the reasonable request of the First-Lien Collateral Agent, make, execute, endorse, acknowledge, file and/or deliver to the First-Lien Collateral Agent from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps relating to the Collateral and other property or rights covered by the security interest hereby granted, which the First-Lien Collateral Agent deems reasonably appropriate or advisable to perfect, preserve or protect its security interest in the Collateral.

6.5 <u>Financing Statements</u>. Each Assignor agrees to execute and deliver to the First-Lien Collateral Agent such financing statements, in form reasonably acceptable to the First-Lien Collateral Agent, as the First-Lien Collateral Agent may from time to time reasonably request or as are reasonably necessary or desirable in the opinion of the First-Lien Collateral Agent to establish and maintain a valid, enforceable, perfected security interest in the Collateral as provided herein and the other rights and security contemplated hereby. Each Assignor will pay any applicable filing fees, recordation taxes and related expenses relating to its Collateral. Each Assignor hereby authorizes the First-Lien Collateral Agent to file any such financing statements without the signature of such Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets" of such Assignor).

## ARTICLE VII

## REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

7.1 Remedies; Obtaining the Collateral Upon Default.  Each Assignor agrees that, if any Event of Default shall have occurred and be continuing, then and in every such case, the First-Lien Collateral Agent, in addition to any rights now or hereafter existing under applicable law and under the other provisions of this Agreement, shall have all rights as a secured creditor under any UCC, and such additional rights and remedies to which a secured creditor is entitled under the laws in effect in all relevant jurisdictions and may:

(i)       personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from such Assignor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon such Assignor's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of such Assignor;

(ii)      instruct the obligor or obligors on any agreement, instrument or other obligation (including, without limitation, the Accounts and the Contracts) constituting the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the First-Lien Collateral Agent and may exercise any and all remedies of such Assignor in respect of such Collateral;

(iii)     instruct all banks which have entered into a control agreement with the First-Lien Collateral Agent to transfer all monies, securities and instruments held by such depositary bank to the Cash Collateral Account;

(iv)      sell, assign or otherwise liquidate any or all of the Collateral or any part thereof in accordance with Section 7.2 hereof, or direct such Assignor to sell, assign or otherwise liquidate any or all of the Collateral or any part thereof, and, in each case, take possession of the proceeds of any such sale or liquidation;

(v)       take possession of the Collateral or any part thereof, by directing such Assignor in writing to deliver the same to the First-Lien Collateral Agent at any reasonable place or places designated by the First-Lien Collateral Agent, in which event such Assignor shall at its own expense:

(x)       forthwith cause the same to be moved to the place or places so designated by the First-Lien Collateral Agent and there delivered to the First-Lien Collateral Agent;

(y)       store and keep any Collateral so delivered to the First-Lien Collateral Agent at such place or places pending further action by the First-Lien Collateral Agent as provided in Section 7.2 hereof; and

(z)     while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be reasonably necessary to protect the same and to preserve and maintain it in good condition;

(vi)     subject to any exclusive license issued prior to the Event of Default, license or sublicense, whether on an exclusive or nonexclusive basis, any Marks, Domain Names, Patents or Copyrights included in the Collateral for such term and on such conditions and in such manner as the First-Lien Collateral Agent shall in its sole judgment determine; provided in the case of Marks to the maintenance of quality standards, not less than comparable to the standards in place at the time of the Event of Default;

(vii)     apply any monies constituting Collateral or proceeds thereof in accordance with the provisions of Section 7.4; and

(viii)     take any other action as specified in clauses (1) through (5), inclusive, of Section 9-607 of the UCC;

it being understood that each Assignor's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the First-Lien Collateral Agent shall be entitled to a decree requiring specific performance by such Assignor of said obligation.  By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors expressly acknowledge and agree that this Agreement and each other Security Document may be enforced only by the action of the First-Lien Collateral Agent acting upon the instructions of the Required Secured Creditors and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the First-Lien Collateral Agent or the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Agreement and the other Security Documents. Furthermore, each Assignor agrees to upon the occurrence and continuance of an Event of Default, use its commercially reasonable efforts to assist the First-Lien Collateral Agent in obtaining any approvals or assignments or licenses from any relevant Governmental Authority that may be necessary for the exercise of the rights and remedies of the First-Lien Collateral Agent with respect to the Collateral.

7.2  Remedies; Disposition of the Collateral.  If any Event of Default shall have occurred and be continuing, then any Collateral repossessed by the First-Lien Collateral Agent under or pursuant to Section 7.1 hereof and any other Collateral whether or not so repossessed by the First-Lien Collateral Agent, may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as the First-Lien Collateral Agent may, in compliance with any mandatory requirements of applicable law, determine to be commercially reasonable.  Any of the Collateral may be sold, leased or otherwise disposed of, in the condition in which the same existed when taken by the First-Lien Collateral Agent or after any overhaul or repair at the expense of the relevant Assignor which the First-Lien Collateral Agent shall determine to be commercially

reasonable. Any such sale, lease or other disposition may be effected by means of a public disposition or private disposition, effected in accordance with the applicable requirements (in each case if and to the extent applicable) of Sections 9-610 through 9-613 of the UCC and/or such other mandatory requirements of applicable law as may apply to the respective disposition. The First-Lien Collateral Agent may, without notice or publication, adjourn any public or private disposition or cause the same to be adjourned from time to time by announcement at the time and place fixed for the disposition, and such disposition may be made at any time or place to which the disposition may be so adjourned. To the extent permitted by any such requirement of law, the First-Lien Collateral Agent may bid for and become the purchaser (and may pay all or any portion of the purchase price by crediting Obligations against the purchase price) of the Collateral or any item thereof, offered for disposition in accordance with this Section 7.2 without accountability to the relevant Assignor. If, under applicable law, the First-Lien Collateral Agent shall be permitted to make disposition of the Collateral within a period of time which does not permit the giving of notice to the relevant Assignor as hereinabove specified, the First-Lien Collateral Agent need give such Assignor only such notice of disposition as shall be required by such applicable law. Each Assignor agrees to do or cause to be done all such other acts and things as may be reasonably necessary to make such disposition or dispositions of all or any portion of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at such Assignor's expense.

7.3 <u>Waiver of Claims</u>. Except as otherwise provided in this Agreement, EACH ASSIGNOR HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE FIRST-LIEN COLLATERAL AGENT'S TAKING POSSESSION OR THE FIRST-LIEN COLLATERAL AGENT'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES, and each Assignor hereby further waives, to the extent permitted by law:

(i) all damages occasioned by such taking of possession or any such disposition except any damages which are the direct result of the First-Lien Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision);

(ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the First-Lien Collateral Agent's rights hereunder; and

(iii) all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any applicable law in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and each Assignor, for itself and all who may claim under it, insofar as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws.

Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the

relevant Assignor therein and thereto, and shall be a perpetual bar both at law and in equity against such Assignor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through and under such Assignor.

7.4 <u>Application of Proceeds</u>. (a) All moneys collected by the First-Lien Collateral Agent (or, to the extent the Pledge Agreement or any other Security Document requires proceeds of collateral under such other Security Document to be applied in accordance with the provisions of this Agreement, the Pledgee or First-Lien Collateral Agent under such other Security Document) upon any sale or other disposition of the Collateral, together with all other moneys received by the First-Lien Collateral Agent hereunder, shall be applied as follows:

(i) <u>first</u>, to the payment of all amounts owing the First-Lien Collateral Agent of the type described in clauses (iii), (iv) and (v) of the definition of "Obligations";

(ii) <u>second</u>, to the extent proceeds remain after the application pursuant to the preceding clause (i), to the payment of all amounts owing to any Agent of the type described in clauses (v) and (vi) of the definition of "Obligations";

(iii) <u>third</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) and (ii), an amount equal to the outstanding Primary Obligations shall be paid to the Secured Creditors as provided in Section 7.4(e) hereof, with each Secured Creditor receiving an amount equal to its outstanding Primary Obligations or, if the proceeds are insufficient to pay in full all such Primary Obligations, its Pro Rata Share of the amount remaining to be distributed;

(iv) <u>fourth</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) through (iii), inclusive, an amount equal to the outstanding Secondary Obligations shall be paid to the Secured Creditors as provided in Section 7.4(e) hereof, with each Secured Creditor receiving an amount equal to its outstanding Secondary Obligations or, if the proceeds are insufficient to pay in full all such Secondary Obligations, its Pro Rata Share of the amount remaining to be distributed; and

(v) <u>fifth</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) through (iv), inclusive, and following the termination of this Agreement pursuant to Section 10.8(a) hereof, to the relevant Assignor or to whomever may be lawfully entitled to receive such surplus.

(b) For purposes of this Agreement, (x) "<u>Pro Rata Share</u>" shall mean, when calculating a Secured Creditor's portion of any distribution or amount, that amount (expressed as a percentage) equal to a fraction the numerator of which is the then unpaid amount of such Secured Creditor's Primary Obligations or Secondary Obligations, as the case may be, and the denominator of which is the then outstanding amount of all Primary Obligations or Secondary Obligations, as the case may be, (y) "<u>Primary Obligations</u>" shall mean (i) in the case of the Credit Document Obligations, all principal of, premium, fees and interest on, all Loans, all Unpaid Drawings, the Stated Amount of all outstanding Letters of Credit and all Fees and (ii) in the case of the Other Obligations, all amounts due under each Interest Rate Protection

Agreement and each Other Hedging Agreement with an Other Creditor (other than indemnities, fees (including, without limitation, attorneys' fees) and similar obligations and liabilities) and (z) "Secondary Obligations" shall mean all Obligations other than Primary Obligations.

(c)     When payments to Secured Creditors are based upon their respective Pro Rata Shares, the amounts received by such Secured Creditors hereunder shall be applied (for purposes of making determinations under this Section 7.4 only) (i) first, to their Primary Obligations and (ii) second, to their Secondary Obligations. If any payment to any Secured Creditor of its Pro Rata Share of any distribution would result in overpayment to such Secured Creditor, such excess amount shall instead be distributed in respect of the unpaid Primary Obligations or Secondary Obligations, as the case may be, of the other Secured Creditors, with each Secured Creditor whose Primary Obligations or Secondary Obligations, as the case may be, have not been paid in full to receive an amount equal to such excess amount multiplied by a fraction the numerator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of such Secured Creditor and the denominator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of all Secured Creditors entitled to such distribution.

(d)     Each of the Secured Creditors, by their acceptance of the benefits hereof and of the other Security Documents, agrees and acknowledges that if the Lender Creditors receive a distribution on account of undrawn amounts with respect to Letters of Credit issued under the Credit Agreement (which shall only occur after all outstanding Revolving Loans under the Credit Agreement and Unpaid Drawings have been paid in full), such amounts shall be paid to the Administrative Agent under the Credit Agreement and held by it, for the equal and ratable benefit of the Lender Creditors, as cash security for the repayment of Obligations owing to the Lender Creditors as such. If any amounts are held as cash security pursuant to the immediately preceding sentence, then upon the termination of all outstanding Letters of Credit under the Credit Agreement, and after the application of all such cash security to the repayment of all Obligations owing to the Lender Creditors after giving effect to the termination of all such Letters of Credit, if there remains any excess cash, such excess cash shall be returned by the Administrative Agent to the First-Lien Collateral Agent for distribution in accordance with Section 7.4(a) hereof.

(e)     All payments required to be made hereunder shall be made (x) if to the Lender Creditors, to the Administrative Agent for the account of the Lender Creditors and (y) if to the Other Creditors, to the trustee, paying agent or other similar representative (each, a "Representative") for the Other Creditors or, in the absence of such a Representative, directly to the Other Creditors.

(f)     For purposes of applying payments received in accordance with this Section 7.4, the First-Lien Collateral Agent shall be entitled to rely upon (i) the Administrative Agent and (ii) the Representative or, in the absence of such a Representative, upon the Other Creditors for a determination (which the Administrative Agent, each Representative and the Other Creditors agree (or shall agree) to provide upon request of the First-Lien Collateral Agent) of the outstanding Primary Obligations and Secondary Obligations owed to the Lender Creditors or the Other Creditors, as the case may be. Unless it has received written notice from a Lender Creditor or an Other Creditor to the contrary, the Administrative Agent and each Representative, in furnishing information pursuant to the preceding sentence, and the First-Lien Collateral Agent,

in acting hereunder, shall be entitled to assume that no Secondary Obligations are outstanding. Unless it has written notice from an Other Creditor to the contrary, the First-Lien Collateral Agent, in acting hereunder, shall be entitled to assume that no Interest Rate Protection Agreements or Other Hedging Agreements are in existence.

(g)     It is understood that the Assignors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

7.5 <u>Remedies Cumulative</u>.   Each and every right, power and remedy hereby specifically given to the First-Lien Collateral Agent shall be in addition to every other right, power and remedy specifically given to the First-Lien Collateral Agent under this Agreement, the other Secured Debt Agreements or now or hereafter existing at law, in equity or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the First-Lien Collateral Agent.   All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others.   No delay or omission of the First-Lien Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence thereof.   No notice to or demand on any Assignor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the First-Lien Collateral Agent to any other or further action in any circumstances without notice or demand.   In the event that the First-Lien Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the First-Lien Collateral Agent may recover reasonable expenses, including reasonable attorneys' fees, and the amounts thereof shall be included in such judgment.

7.6 <u>Discontinuance of Proceedings</u>.   In case the First-Lien Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the First-Lien Collateral Agent, then and in every such case the relevant Assignor, the First-Lien Collateral Agent and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Agreement, and all rights, remedies and powers of the First-Lien Collateral Agent shall continue as if no such proceeding had been instituted.

ARTICLE VIII

INDEMNITY

8.1 <u>Indemnity</u>.   (a) Each Assignor jointly and severally agrees to indemnify, reimburse and hold the First-Lien Collateral Agent, each other Secured Creditor and their respective successors, assigns, employees, affiliates and agents (hereinafter in this Section 8.1 referred to individually as "<u>Indemnitee</u>," and collectively as "<u>Indemnitees</u>") harmless from any

and all liabilities, obligations, damages, injuries, penalties, claims, demands, actions, suits, judgments and any and all costs, expenses or disbursements (including reasonable attorneys' fees and expenses) (for the purposes of this Section 8.1 the foregoing are collectively called "expenses") of whatsoever kind and nature imposed on, asserted against or incurred by any of the Indemnitees in any way relating to or arising out of this Agreement, any other Secured Debt Agreement or any other document executed in connection herewith or therewith or in any other way connected with the administration of the transactions contemplated hereby or thereby or the enforcement of any of the terms of, or the preservation of any rights under any thereof, or in any way relating to or arising out of the manufacture, ownership, ordering, purchase, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition, or use of the Collateral (including, without limitation, latent or other defects, whether or not discoverable), the violation of the laws of any country, state or other governmental body or unit, any tort (including, without limitation, claims arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any Person (including any Indemnitee), or property damage), or contract claim; provided that no Indemnitee shall be indemnified pursuant to this Section 8.1(a) for losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision). Each Assignor agrees that upon written notice by any Indemnitee of the assertion of such a liability, obligation, damage, injury, penalty, claim, demand, action, suit or judgment, the relevant Assignor shall assume full responsibility for the defense thereof. Each Indemnitee agrees to use its best efforts to promptly notify the relevant Assignor of any such assertion of which such Indemnitee has knowledge.

(b)     Without limiting the application of Section 8.1(a) hereof, each Assignor agrees, jointly and severally, to pay or reimburse the First-Lien Collateral Agent for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the First-Lien Collateral Agent's Liens on, and security interest in, the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, payment or discharge of any taxes or Liens upon or in respect of the Collateral, premiums for insurance with respect to the Collateral and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the First-Lien Collateral Agent's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

(c)     Without limiting the application of Section 8.1(a) or (b) hereof, each Assignor agrees, jointly and severally, to pay, indemnify and hold each Indemnitee harmless from and against any loss, costs, damages and expenses which such Indemnitee may suffer, expend or incur in consequence of or growing out of any misrepresentation by any Assignor in this Agreement, any other Secured Debt Agreement or in any writing contemplated by or made or delivered pursuant to or in connection with this Agreement or any other Secured Debt Agreement.

(d)     If and to the extent that the obligations of any Assignor under this Section 8.1 are unenforceable for any reason, such Assignor hereby agrees to make the maximum

contribution to the payment and satisfaction of such obligations which is permissible under applicable law.

8.2 <u>Indemnity Obligations Secured by Collateral; Survival</u>. Any amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement shall constitute Obligations secured by the Collateral. The indemnity obligations of each Assignor contained in this Article VIII shall continue in full force and effect notwithstanding the full payment of all of the other Obligations and notwithstanding the full payment of all the Notes issued, and Loans made, under the Credit Agreement, the termination of all Letters of Credit issued under the Credit Agreement, the termination of all Interest Rate Protection Agreements and Other Hedging Agreements entered into with the Other Creditors and the payment of all other Obligations and notwithstanding the discharge thereof and the occurrence of the Termination Date.

## ARTICLE IX

## DEFINITIONS

The following terms shall have the meanings herein specified. Such definitions shall be equally applicable to the singular and plural forms of the terms defined.

"<u>Account</u>" shall mean any "account" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event shall include but shall not be limited to, all rights to payment of any monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. Without limiting the foregoing, the term "account" shall include all Health-Care-Insurance Receivables.

"<u>Administrative Agent</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Agreement</u>" shall mean this Security Agreement as the same may be amended, modified, restated and/or supplemented from time to time in accordance with its terms.

"<u>As-Extracted Collateral</u>" shall mean "as-extracted collateral" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Assignor</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Borrower</u>" shall have the meaning provided in the recitals of this Agreement.

"Cash Collateral Account" shall mean a non-interest bearing cash collateral account maintained with, and in the sole dominion and control of, the First-Lien Collateral Agent for the benefit of the Secured Creditors.

"Chattel Paper" shall mean "chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York. Without limiting the foregoing, the term "Chattel Paper" shall in any event include all Tangible Chattel Paper and all Electronic Chattel Paper.

"Class" shall have the meaning provided in Section 10.2 of this Agreement.

"Collateral" shall have the meaning provided in Section 1.1(a) of this Agreement.

"Commercial Tort Claims" shall mean "commercial tort claims" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Contract Rights" shall mean all rights of any Assignor under each Contract, including, without limitation, (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"Contracts" shall mean all contracts between any Assignor and one or more additional parties (including, without limitation, any Interest Rate Protection Agreements, Other Hedging Agreements, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"Copyrights" shall mean any United States or foreign copyright now or hereafter owned by any Assignor, including any registrations of any copyrights in the United States Copyright Office or any foreign equivalent office, as well as any application for a copyright registration now or hereafter made with the United States Copyright Office or any foreign equivalent office by any Assignor.

"Credit Agreement" shall have the meaning provided in the recitals of this Agreement.

"Credit Document Obligations" shall have the meaning provided in the definition of "Obligations" in this Article IX.

"Deposit Accounts" shall mean all "deposit accounts" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Documents" shall mean "documents" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Domain Names" shall mean all Internet domain names and associated URL addresses in or to which any Assignor now or hereafter has any right, title or interest.

"Electronic Chattel Paper" shall mean "electronic chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Equipment" shall mean any "equipment" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, fixtures and vehicles now or hereafter owned by any Assignor and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Event of Default" shall mean any Event of Default under, and as defined in, the Credit Agreement and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"First-Lien Collateral Agent" shall have the meaning provided in the first paragraph of this Agreement.

"General Intangibles" shall mean "general intangibles" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Goods" shall mean "goods" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Health-Care-Insurance Receivable" shall mean any "health-care-insurance receivable" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Indemnitee" shall have the meaning provided in Section 8.1(a) of this Agreement.

"Instrument" shall mean "instruments" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Inventory" shall mean merchandise, inventory and goods, and all additions, substitutions and replacements thereof and all accessions thereto, wherever located, together with all goods, supplies, incidentals, packaging materials, labels, materials and any other items used or to be used in manufacturing, processing, packaging or shipping same, in all stages of production from raw materials through work in process to finished goods, and all products and proceeds of whatever sort and wherever located any portion thereof which may be returned, rejected, reclaimed or repossessed by the First-Lien Collateral Agent from any Assignor's customers, and shall specifically include all "inventory" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Investment Property" shall mean "investment property" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Lender Creditors</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Lenders</u>" shall have the meaning provided in the recitals of this Agreement.

"<u>Letter-of-Credit Rights</u>" shall mean "letter-of-credit rights" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"<u>Location</u>" of any Assignor, shall mean such Assignor's "location" as determined pursuant to Section 9-307 of the UCC.

"<u>Marks</u>" shall mean all right, title and interest in and to any trademarks, service marks, trade names, trade dress, logos, fictitious business names, and other business identifiers, including the goodwill of the business of such Assignor associated with each of the foregoing, now held or hereafter acquired by any Assignor, the right to sue for past or future infringement thereof and including any registration or application for registration or renewals thereof of any trademarks and service marks now held or hereafter acquired by any Assignor, which are registered or filed in the United States Patent and Trademark Office or the equivalent thereof in any state of the United States or any equivalent foreign office or agency.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on the business, property, assets, liabilities (actual or contingent), operations or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole.

"<u>Obligations</u>" shall mean and include, as to any Assignor, all of the following:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), reimbursement obligations under Letters of Credit, fees, costs and indemnities) of such Assignor to the Lender Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Credit Agreement and the other Credit Documents to which such Assignor is a party (including, without limitation, in the event such Assignor is a Guarantor, all such obligations, liabilities and indebtedness of such Assignor under its Guaranty) and the due performance and compliance by such Assignor with all of the terms, conditions and agreements contained in the Credit Agreement and in such other Credit Documents (all such obligations, liabilities and indebtedness under this clause (i), except to the extent consisting of obligations or indebtedness with respect to Interest Rate Protection Agreements or Other Hedging Agreements, being herein collectively called the "<u>Credit Document Obligations</u>");

(ii) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without

limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding) owing by such Assignor to the Other Creditors, now existing or hereafter incurred under, arising out of or in connection with any Interest Rate Protection Agreement or Other Hedging Agreement, whether such Interest Rate Protection Agreement or Other Hedging Agreement is now in existence or hereinafter arising (including, without limitation, in the case of a Assignor that is a Guarantor, all obligations, liabilities and indebtedness of such Assignor under its Guaranty in respect of the Interest Rate Protection Agreements and Other Hedging Agreements), and the due performance and compliance by such Assignor with all of the terms, conditions and agreements contained in each such Interest Rate Protection Agreement and Other Hedging Agreement (all such obligations, liabilities and indebtedness under this clause (ii) being herein collectively called the "Other Obligations");

(iii) any and all sums advanced by the First-Lien Collateral Agent in order to preserve the Collateral or preserve its security interest in the Collateral;

(iv) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities of such Assignor referred to in clauses (i) and (ii) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the First-Lien Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs;

(v) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 8.1 of this Agreement; and

(vi) all amounts owing to any Agent pursuant to any of the Credit Documents in its capacity as such;

it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

"Other Creditors" shall have the meaning provided in the recitals of this Agreement.

"Other Obligations" shall have the meaning provided in the definition of "Obligations" in this Article IX.

"Patents" shall mean any patent in or to which any Assignor now or hereafter has any right, title or interest therein, and any divisions, continuations (including, but not limited to, continuations-in-parts) and improvements thereof, including the right to sue for any past or future infringement thereof, as well as any application for a patent now or hereafter made by any Assignor.

"Permits" shall mean, to the extent permitted to be assigned by the terms thereof or by applicable law, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any governmental authority or agency.

"Primary Obligations" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Pro Rata Share" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Proceeds" shall mean all "proceeds" as such term is defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the First-Lien Collateral Agent or any Assignor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Assignor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Registered Organization" shall have the meaning provided in the Uniform Commercial Code as in effect in the State of New York.

"Representative" shall have the meaning provided in Section 7.4(e) of this Agreement.

"Required Secured Creditors" shall mean (i) at any time when any Credit Document Obligations are outstanding or any Commitments under the Credit Agreement exist, the Required Lenders (or, to the extent provided in Section [13.12] of the Credit Agreement, each of the Lenders) and (ii) at any time after all of the Credit Document Obligations have been paid in full and all Commitments under the Credit Agreement have been terminated and no further Commitments may be provided thereunder, the holders of a majority of the Other Obligations.

"Requisite Creditors" shall have the meaning provided in Section 10.2 of this Agreement.

"Secondary Obligations" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Secured Creditors" shall have the meaning provided in the recitals of this Agreement.

"Secured Debt Agreements" shall mean and include this Agreement, the other Credit Documents and the Interest Rate Protection Agreements and Other Hedging Agreements entered into with an Other Creditor.

"Software" shall mean "software" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Supporting Obligations" shall mean any "supporting obligation" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, now or hereafter owned by any Assignor, or in which any Assignor has any rights, and, in any event, shall include, but shall not be limited to all of such Assignor's rights in any Letter-of-Credit Right or secondary obligation that supports the payment or performance of, and all security for, any Account, Chattel Paper, Document, General Intangible, Instrument or Investment Property.

"Tangible Chattel Paper" shall mean "tangible chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Termination Date" shall have the meaning provided in Section 10.8(a) of this Agreement.

"Timber-to-be-Cut" shall mean "timber-to-be-cut" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Trade Secrets" shall mean any secretly held existing engineering or other data, information, production procedures and other know-how relating to the design manufacture, assembly, installation, use, operation, marketing, sale and/or servicing of any products or business of an Assignor worldwide whether written or not.

"Trade Secret Rights" shall mean the rights of an Assignor in any Trade Secret it holds.

"Transmitting Utility" shall have the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

## ARTICLE X

## MISCELLANEOUS

10.1 <u>Notices</u>.  Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the First-Lien Collateral Agent or any Assignor shall not be effective until received by the First-Lien Collateral Agent or such Assignor, as the case may be. All notices and other communications shall be in writing and addressed as follows:

(a)     if to any Assignor, c/o:

c/o RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Attention:  General Counsel
Telephone No.:  (609) 734-3811
Telecopier No.:  (609) 734-3830

(b)     if to the First-Lien Collateral Agent, at:

60 Wall Street
New York, New York 10005
Attention:  _____
Telephone No.:  _____
Telecopier No.:  _____

(c)     if to any Lender Creditor (other than the First-Lien Collateral Agent), at such address as such Lender Creditor shall have specified in the Credit Agreement;

(d)     if to any Other Creditor, at such address as such Other Creditor shall have specified in writing to each Assignor and the First-Lien Collateral Agent;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

10.2 <u>Waiver; Amendment</u>.  Except as provided in Sections 10.8 and 10.12, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Assignor directly affected thereby (it being understood that the addition or release of any Assignor hereunder shall not constitute a change, waiver, discharge or termination affecting any Assignor other than the Assignor so added or released) and the First-Lien Collateral Agent (with the written consent of the Required Secured Creditors); <u>provided</u>, <u>however</u>, that any change, waiver, modification or variance affecting the rights and benefits of a single Class of Secured Creditors (and not all Secured

Creditors in a like or similar manner) also shall require the written consent of the Requisite Creditors of such affected Class. For the purpose of this Agreement, the term "Class" shall mean each class of Secured Creditors, i.e., whether (x) the Lender Creditors as holders of the Credit Document Obligations or (y) the Other Creditors as the holders of the Other Obligations. For the purpose of this Agreement, the term "Requisite Creditors" of any Class shall mean each of (x) with respect to the Credit Document Obligations, the Required Lenders (or, to the extent provided in Section 13.12 of the Credit Agreement, each of the Lenders), and (y) with respect to the Other Obligations, the holders of at least a majority of all Other Obligations outstanding from time to time.

10.3 Obligations Absolute. The obligations of each Assignor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of such Assignor; (b) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Agreement or any other Secured Debt Agreement; or (c) any amendment to or modification of any Secured Debt Agreement or any security for any of the Obligations; whether or not such Assignor shall have notice or knowledge of any of the foregoing.

10.4 Successors and Assigns. This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 10.8, (ii) be binding upon each Assignor, its successors and assigns; provided, however, that no Assignor shall assign any of its rights or obligations hereunder without the prior written consent of the First-Lien Collateral Agent (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the First-Lien Collateral Agent hereunder, to the benefit of the First-Lien Collateral Agent, the other Secured Creditors and their respective successors, transferees and assigns. All agreements, statements, representations and warranties made by each Assignor herein or in any certificate or other instrument delivered by such Assignor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

10.5 Headings Descriptive. The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH ASSIGNOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND

UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH ASSIGNOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK JURISDICTION OVER SUCH ASSIGNOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS JURISDICTION OVER SUCH ASSIGNOR. EACH ASSIGNOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH ASSIGNOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 10.1 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE FIRST-LIEN COLLATERAL AGENT UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY ASSIGNOR IN ANY OTHER JURISDICTION.

(b) EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.7 Assignor's Duties. It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Assignor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the First-Lien Collateral Agent shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, nor shall the First-Lien Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of any Assignor under or with respect to any Collateral.

10.8 Termination; Release. (a) After the Termination Date, this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation in Section 8.1 hereof, shall survive such termination) and the First-Lien Collateral Agent, at the request and

expense of the respective Assignor, will promptly execute and deliver to such Assignor a proper instrument or instruments (including Uniform Commercial Code termination statements on form UCC-3) acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the First-Lien Collateral Agent and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement. As used in this Agreement, "Termination Date" shall mean the date upon which the Total Commitment under the Credit Agreement has been terminated and all Interest Rate Protection Agreements and Other Hedging Agreements entered into with any Other Creditor have been terminated, no Note under the Credit Agreement is outstanding and all Loans thereunder have been repaid in full, all Letters of Credit issued under the Credit Agreement have been terminated and all Obligations then due and payable have been paid in full.

(b)     In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (x) at any time prior to the time at which all Credit Document Obligations have been paid in full and all Commitments and Letters of Credit under the Credit Agreement have been terminated, in connection with a sale or disposition permitted by Section 9.02 of the Credit Agreement or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section 13.12 of the Credit Agreement) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Credit Agreement or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, the First-Lien Collateral Agent, at the request and expense of such Assignor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or otherwise disposed of, or released, and as may be in the possession of the First-Lien Collateral Agent and has not theretofore been released pursuant to this Agreement.  Furthermore, upon the release of any Subsidiary Guarantor from the Subsidiaries Guaranty in accordance with the provisions thereof, such Assignor (and the Collateral at such time assigned by the respective Assignor pursuant hereto) shall be released from this Agreement.

(c)     At any time that an Assignor desires that the First-Lien Collateral Agent take any action to acknowledge or give effect to any release of Collateral pursuant to the foregoing Section 10.8(a) or (b), such Assignor shall deliver to the First-Lien Collateral Agent a certificate signed by a principal executive officer of such Assignor stating that the release of the respective Collateral is permitted pursuant to such Section 10.8(a) or (b).  At any time that the Borrower or the respective Assignor desires that a Subsidiary of the Borrower which has been released from the Subsidiaries Guaranty be released hereunder as provided in the last sentence of Section 10.8(b), it shall deliver to the First-Lien Collateral Agent a certificate signed by a principal executive officer of the Borrower and the respective Assignor stating that the release of the respective Assignor (and its Collateral) is permitted pursuant to such Section 10.8(b). If reasonably requested by the First-Lien Collateral Agent (although the First-Lien Collateral Agent shall have not obligation to make such request), the relevant Assignor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the First-Lien Collateral Agent) to the effect set forth in this Section 10.8(c).

(d)     The First-Lien Collateral Agent shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the First-Lien Collateral Agent in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 10.8.

10.9  Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the First-Lien Collateral Agent.

10.10  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11  The First-Lien Collateral Agent and the other Secured Creditors.  The First-Lien Collateral Agent will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement.  It is expressly understood and agreed that the obligations of the First-Lien Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section 12 of the Credit Agreement.  The First-Lien Collateral Agent shall act hereunder on the terms and conditions set forth herein and in Section 12 of the Credit Agreement.

10.12  Additional Assignors.  It is understood and agreed that any Subsidiary Guarantor that desires to become an Assignor hereunder, or is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of the Credit Agreement or any other Credit Document, shall become an Assignor hereunder by executing a counterpart hereof and delivering same to the First-Lien Collateral Agent, or by executing an assumption agreement in form and substance satisfactory to the First-Lien Collateral Agent, (y) delivering supplements to Annexes A through F, inclusive, and H through K, inclusive, hereto as are necessary to cause such Annexes to be complete and accurate with respect to such additional Assignor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Assignor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the First-Lien Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the First-Lien Collateral Agent.

10.13  Compliance with Laws.  Each Assignor agrees to use commercially reasonable efforts, including taking any action which the First-Lien Collateral Agent and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the Federal Communications Commission (the "FCC") or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the First-Lien Collateral Agent and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the

FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

Each Assignor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to First-Lien Collateral Agent and the Secured Creditors as permitted by applicable law.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

RCN CORPORATION, as an Assignor

By: _____
    Name:
    Title:

BRAINSTORM NETWORKS, INC., as an Assignor

By: _____
    Name:
    Title:

HOT SPOTS PRODUCTIONS, INC., as an Assignor

By: _____
    Name:
    Title:

ON TV, INC., as an Assignor

By: _____
    Name:
    Title:

RCN-BECOCOM, LLC, as an Assignor

By: RCN Telecom Services of
    Massachusetts, Inc., its managing
    member

By: _____
    Name:
    Title:

RCN CABLE TV OF CHICAGO, INC., as an
Assignor

By: _____
    Name:
    Title:

RCN ENTERTAINMENT, INC., as an
Assignor

By: _____
    Name:
    Title:

RCN FINANCE, LLC, as an Assignor

    By:  RCN Corporation, its managing
          member

By: _____
    Name:
    Title:

RCN FINANCIAL MANAGEMENT, INC., as
an Assignor

By: _____
    Name:
    Title:

RCN INTERNATIONAL HOLDINGS, INC.,
as an Assignor

By: _____
    Name:
    Title:

RCN INTERNET SERVICES, INC., as an
Assignor


By: _____
    Name:
    Title:


RCN TELECOM SERVICES, INC., as an
Assignor


By: _____
    Name:
    Title:


RCN TELECOM SERVICES OF ILLINOIS,
LLC, as an Assignor

    By:  RCN CORPORATION, its managing
        member

By: _____
    Name:
    Title:


RCN TELECOM SERVICES OF
MASSACHUSETTS, INC., as an Assignor


By: _____
    Name:
    Title:


RCN TELECOM SERVICES OF
PHILADELPHIA, INC., as an Assignor


By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF VIRGINIA, INC., as an Assignor

By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF WASHINGTON, D.C., INC., as an Assignor

By: _____
    Name:
    Title:

RFM 2, LLC, as an Assignor

    By: RCN Corporation, its managing
        member

By: _____
    Name:
    Title:

RLH PROPERTY CORPORATION, as an Assignor

By: _____
    Name:
    Title:

STARPOWER COMMUNICATIONS, LLC, as an Assignor

    By: RCN Telecom Services of
        Washington, D.C., Inc., its managing
        member

By: _____
    Name:
    Title:

TEC AIR, INC., as an Assignor


By: _____
    Name:
    Title:

21ST CENTURY TELECOM SERVICES,
INC., as an Assignor


By: _____
    Name:
    Title:


UNET HOLDING, INC., as an Assignor


By: _____
    Name:
    Title:

Accepted and Agreed to:

DEUTSCHE BANK AG CAYMAN ISLANDS
BRANCH,
  as First-Lien Collateral Agent


By: _____
      Name:
      Title:

SCHEDULE OF CHIEF EXECUTIVE OFFICES

Name of Assignor                    Address(es) of Chief Executive Office[1]

---

[1] For each Assignor, list the address of its chief executive office on the date of the Security Agreement and each other location (if any) of its chief executive office in the four calendar months preceding said date.

SCHEDULE OF INVENTORY AND EQUIPMENT LOCATIONS

Assignor                    Location[1]

---

[1]     For each Assignor, list each location at which any Inventory or Equipment was located on the date of the Security Agreement or at any time during the preceding four calendar months.

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION), JURISDICTION OF ORGANIZATION,
LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

| Exact Legal Name of Each Assignor | Type of Organization (or, if the Assignor is an Individual, so indicate) | Registered Organization? (Yes/No) | Jurisdiction of Organization | Assignor's Location (for purposes of NY UCC § 9-307) | Assignor's Organization Identification Number (or, if it has none, so indicate) |
|---|---|---|---|---|---|

SCHEDULE OF TRADE AND FICTITIOUS NAMES

| Name of Assignor | Trade and/or Fictitious Names |
| --- | --- |

DESCRIPTION OF CERTAIN SIGNIFICANT TRANSACTIONS OCCURRING WITHIN
ONE YEAR PRIOR TO THE DATE OF THE SECURITY AGREEMENT

<u>Name of Assignor</u>

<u>Description of any Transactions as required
by Section 2.8 of the Security Agreement</u>

Schedule of Deposit Accounts

| Name of Assignor | Description of Deposit Account | Account Number | Name of Bank, Address and Contact Information | Jurisdiction of Bank (determined in accordance with UCC § 9-304) |
|---|---|---|---|---|
| | | | | |

Form of Control Agreement Regarding Deposit Accounts

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, ____], among the undersigned assignor (the "Assignor"), Deutsche Bank AG Cayman Islands Branch, not in its individual capacity but solely as First-Lien Collateral Agent under the First-Lien Security Agreement referred to below (in such capacity, the "First-Lien Collateral Agent"), _____, not in its individual capacity but solely as Trustee under the Second-Lien Security Agreement referred to below (in such capacity, the "Second-Lien Collateral Agent"), [HSBC Bank USA, not in its individual capacity but solely as Third-Lien Collateral Agent under the Third-Lien Security Agreement referred to below (in such capacity, the "Third-Lien Collateral Agent"),][1] and [_____] (the "Deposit Account Bank"), as the bank (as defined in Section 9-102 of the UCC as in effect on the date hereof in the State of New York (the "UCC")) with which one or more deposit accounts (as defined in Section 9-102 of the UCC) are maintained by the Assignor (with all such deposit accounts now or at any time in the future maintained by the Assignor with the Deposit Account Bank being herein called the "Deposit Accounts").

W I T N E S S E T H :

WHEREAS, the Assignor, various other Assignors and the First-Lien Collateral Agent have entered into a First-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "First-Lien Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the First-Lien Security Agreement), the Assignor has granted a security interest to the First-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the First-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "First-Lien Collateral");

WHEREAS, the Assignor, various other Assignors and the Second-Lien Collateral Agent have entered into a Second-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Second-Lien Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Second-Lien Security Agreement), the Assignor has granted a

---

[1] Include references to the Third-Lien Collateral Agent and the Third-Lien Security Documents if and only if the Assignor is the Borrower.

security interest to the Second-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the Second-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "<u>Second-Lien Collateral</u>");

WHEREAS, the Assignor and the Third-Lien Collateral Agent have entered into a Third-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "<u>Third-Lien Security Agreement</u>" and, together with the First-Lien Security Agreement and the Second-Lien Security Agreement, the "<u>Security Agreements</u>"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Third-Lien Security Agreement), the Assignor has granted a security interest to the Third-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the Third-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "<u>Third-Lien Collateral</u>", and together with the First-Lien Collateral and the Second-Lien Collateral, the "<u>Collateral</u>");

WHEREAS, [RCN Corporation] [the Assignor], the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent have entered into an Intercreditor Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "<u>Intercreditor Agreement</u>"), governing the relative rights and priorities of the Secured Creditors (as defined in each Security Agreement) in respect of the Collateral; and

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. <u>Assignor's Dealings with Deposit Accounts; Notice of Exclusive Control</u>. Until the Deposit Account Bank shall have received from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent a Notice of Exclusive Control (as defined below), the Assignor shall be entitled to present items drawn on and otherwise to withdraw or direct the disposition of funds from the Deposit Accounts and give instructions in respect of the Deposit Accounts; <u>provided</u>, <u>however</u>, that the Assignor may not, and the Deposit Account Bank agrees that it shall not permit the Assignor to, close any Deposit Account, in any case without the prior written consent of each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent. If the First-Lien Collateral Agent or the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall give to the Deposit Account Bank a notice of the First-Lien Collateral Agent's or the Second-Lien Collateral Agent's or the Third-Lien Collateral Agent's exclusive control of the Deposit Accounts, which notice states that it is a "Notice of Exclusive Control" (a "<u>Notice of Exclusive Control</u>"), only the First-Lien Collateral Agent or the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, shall be entitled to withdraw funds from the Deposit

Accounts, to give any instructions in respect of the Deposit Accounts and any funds held therein or credited thereto or otherwise to deal with the Deposit Accounts.

2. <u>First-Lien Collateral Agent's, Second-Lien Collateral Agent's and Third-Lien Collateral Agent's Rights to Give Instructions as to Deposit Accounts</u>. (a) Notwithstanding the foregoing or any separate agreement that the Assignor may have with the Deposit Account Bank, each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent shall be entitled, for purposes of this Agreement, at any time to give the Deposit Account Bank instructions as to the withdrawal or disposition of any funds from time to time credited to any Deposit Account, or as to any other matters relating to any Deposit Account or any other Collateral, without further consent from the Assignor or any other Person. The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank, and the Deposit Account Bank hereby agrees, to comply with any such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent without any further consent from the Assignor or any other Person. Such instructions may include the giving of stop payment orders for any items being presented to any Deposit Account for payment. The Deposit Account Bank shall be fully entitled to rely on, and shall comply with, such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent even if such instructions are contrary to any instructions or demands that the Assignor may give to the Deposit Account Bank. In case of any conflict between instructions received by the Deposit Account Bank from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, on the one hand, and the Assignor, on the other hand, the instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, shall prevail. In case of any conflict between instructions received by the Deposit Account Bank from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent, the instructions from the First-Lien Collateral Agent shall prevail.

(b) It is understood and agreed that the Deposit Account Bank's duty to comply with instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent regarding the Deposit Accounts is absolute, and the Deposit Account Bank shall be under no duty or obligation, nor shall it have the authority, to inquire or determine whether or not such instructions are in accordance with the Security Agreements, the Intercreditor Agreement or any other Credit Document (as defined in each of the Security Agreements), nor seek confirmation thereof from the Assignor or any other Person.

3. <u>Assignor's Exculpation and Indemnification of Depository Bank</u>. The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank to follow instructions from each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent regarding the Deposit Accounts even if the result of following such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent is that the Deposit Account Bank dishonors items presented for payment from any Deposit Account. The Assignor further confirms that the Deposit Account Bank shall have no liability to the Assignor for wrongful dishonor of such items in following such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent. The Deposit Account Bank shall have no duty to inquire or

determine whether the Assignor's obligations to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent are in default or whether the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent is entitled, under any separate agreement between the Assignor and the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, to give any such instructions. The Assignor further agrees to be responsible for the Deposit Account Bank's customary charges and to indemnify the Deposit Account Bank from and to hold the Deposit Account Bank harmless against any loss, cost or expense that the Deposit Account Bank may sustain or incur in acting upon instructions which the Deposit Account Bank believes in good faith to be instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent.

4.     Subordination of Security Interests; Deposit Account Bank's Recourse to Deposit Accounts. The Deposit Account Bank hereby subordinates any claims and security interests it may have against, or with respect to, any Deposit Account at any time established or maintained with it by the Assignor (including any amounts, investments, instruments or other Collateral from time to time on deposit therein) to the security interests of the First-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the First-Lien Security Agreement), the Second-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Second-Lien Security Agreement) and the Third-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Third-Lien Security Agreement), and agrees that no amounts shall be charged by it to, or withheld or set-off or otherwise recouped by it from, any Deposit Account of the Assignor or any amounts, investments, instruments or other Collateral from time to time on deposit therein; provided that the Deposit Account Bank may, however, from time to time debit the Deposit Accounts for any of its customary charges in maintaining the Deposit Accounts or for reimbursement for the reversal of any provisional credits granted by the Deposit Account Bank to any Deposit Account, to the extent, in each case, that the Assignor has not separately paid or reimbursed the Deposit Account Bank therefor.

5.     Representations, Warranties and Covenants of Deposit Account Bank. The Deposit Account Bank represents and warrants to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the and the Second-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Second-Lien Security Agreement) and hereby agrees that:

(a)     The Deposit Account Bank constitutes a "bank" (as defined in Section 9-102 of the UCC), that the jurisdiction (determined in accordance with Section 9-304 of the UCC) of the Deposit Account Bank for purposes of each Deposit Account maintained by the Assignor with the Deposit Account Bank is _____.

(b)     The Deposit Account Bank shall not permit any Assignor to establish any demand, time, savings, passbook or other account with it which does not constitute a "deposit account" (as defined in Section 9-102 of the UCC).

(c)     The Deposit Account Bank will not, without the prior written consent of each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent, amend any account agreement between it and the Assignor governing any Deposit Account so that the Deposit Account Bank's jurisdiction for purposes of Section 9-304 of the UCC is other than the jurisdiction specified in the preceding clause (a).  All account agreements in respect of each Deposit Account in existence on the date hereof are listed on Annex F hereto and copies of all such account agreements have been furnished to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent.  The Deposit Account Bank will promptly furnish to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent a copy of the account agreement for each Deposit Account hereafter established by the Deposit Account Bank for the Assignor.

(d)     The Deposit Account Bank has not entered and will not enter, into any agreement with any other Person by which the Deposit Account Bank is obligated to comply with instructions from such other Person as to the disposition of funds from any Deposit Account or other dealings with any Deposit Account or other of the Collateral.

(e)     On the date hereof, the Deposit Account Bank maintains no Deposit Accounts for the Assignor other than the Deposit Accounts specifically identified in Annex F hereto.

(f)     Any items or funds received by the Deposit Account Bank for the Assignor's account will be credited to said Deposit Accounts specified in paragraph (e) above or to any other Deposit Accounts hereafter established by the Deposit Account Bank for the Assignor in accordance with this Agreement.

(g)     The Deposit Account Bank will promptly notify the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent of each Deposit Account hereafter established by the Deposit Account Bank for the Assignor (which notice shall specify the account number of such Deposit Account and the location at which the Deposit Account is maintained), and each such new Deposit Account shall be subject to the terms of this Agreement in all respects.

6.     <u>Deposit Account Statements and Information</u>.  The Deposit Account Bank agrees, and is hereby authorized and instructed by the Assignor, to furnish to each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent, and the Third-Lien Collateral Agent, at its address indicated below, copies of all account statements and other information relating to each Deposit Account that the Deposit Account Bank sends to the Assignor and to disclose to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent all information requested by the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, regarding any Deposit Account.

7.     <u>Conflicting Agreements</u>.  This Agreement shall have control over any conflicting agreement between the Deposit Account Bank and the Assignor.

8.  Merger or Consolidation of Deposit Account Bank.  Without the execution or filing of any paper or any further act on the part of any of the parties hereto, any bank into which the Deposit Account Bank may be merged or with which it may be consolidated, or any bank resulting from any merger to which the Deposit Account Bank shall be a party, shall be the successor of the Deposit Account Bank hereunder and shall be bound by all provisions hereof which are binding upon the Deposit Account Bank and shall be deemed to affirm as to itself all representations and warranties of the Deposit Account Bank contained herein.

9.  Notices.  (a) All notices and other communications provided for in this Agreement shall be in writing (including facsimile) and sent to the intended recipient at its address or telex or facsimile number set forth below:

If to the First-Lien Collateral Agent, at:

60 Wall Street
New York, New York 10005
Attention: _____
Telephone: _____
Facsimile: _____

If to the Second-Lien Collateral Agent, at:

_____
_____
Attention: _____
Telephone: _____
Facsimile: _____

If to the Third-Lien Collateral Agent, at:

_____
_____
Attention: _____
Telephone: _____
Facsimile: _____

If to the Assignor, at:

C/o RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Attention: General Counsel
Telephone: (609) 734-3811
Facsimile: (609) 734-3830

<u>If to the Deposit Account Bank, at:</u>

_____

_____

_____

or, as to any party, to such other address or telex or facsimile number as such party may designate from time to time by notice to the other parties.

(b)     Except as otherwise provided herein, all notices and other communications hereunder shall be delivered by hand or by commercial overnight courier (delivery charges prepaid), or mailed, postage prepaid, or telexed or faxed, addressed as aforesaid, and shall be effective (i) three business days after being deposited in the mail (if mailed), (ii) when delivered (if delivered by hand or courier) and (iii) or when transmitted with receipt confirmed (if telexed or faxed); provided that notices to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall not be effective until actually received by it.

10.     <u>Amendment</u>.     This Agreement may not be amended, modified or supplemented except in writing executed and delivered by all the parties hereto.

11.     <u>Binding Agreement</u>.     This Agreement shall bind the parties hereto and their successors and assign and shall inure to the benefit of the parties hereto and their successors and assigns.  Without limiting the provisions of the immediately preceding sentence, the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent may at any time or from time to time designate in writing to the Deposit Account Bank a successor First-Lien Collateral Agent, Second-Lien Collateral Agent or Third-Lien Collateral Agent, as the case may be (at such time, if any, as such entity becomes the "First-Lien Collateral Agent" under the First-Lien Security Agreement, the "Second-Lien Collateral Agent" under the Second-Lien Security Agreement or the "Third-Lien Collateral Agent" under the Third-Lien Security Agreement, or at any time thereafter), and such successor shall thereafter succeed to the rights of the existing First-Lien Collateral Agent, Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be,  hereunder and shall be entitled to all of the rights and benefits provided hereunder.

12.     <u>Continuing Obligations</u>.     The rights and powers granted herein to each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent have been granted in order to protect and further perfect its security interests in the Deposit Accounts and other relevant Collateral and are powers coupled with an interest and will be affected neither by any purported revocation by the Assignor of this Agreement or the rights granted to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent hereunder or by the bankruptcy, insolvency, conservatorship or receivership of the Assignor, the Deposit Account Bank, the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent or by the lapse of time.  The rights of the First-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other First-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the First-Lien Collateral Agent in the Deposit

Accounts and such other First-Lien Collateral have been terminated and the First-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing. The rights of the Second-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other Second-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the Second-Lien Collateral Agent in the Deposit Accounts and such other Second-Lien Collateral have been terminated and the Second-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing. The rights of the Third-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other Third-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the Third-Lien Collateral Agent in the Deposit Accounts and such other Third-Lien Collateral have been terminated and the Third-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing.

13. <u>Compliance with Intercreditor Agreement</u>. The First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent hereby acknowledge and agree as between themselves that, notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Second-Lien Collateral Agent or the Third-Lien Collateral Agent hereunder (including, without limitation, its right to deliver a Notice of Exclusive Control or any other instruction to the Deposit Account Bank and to withdraw funds from a Deposit Account) is subject to the provisions of the Intercreditor Agreement.

14 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

15. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

Assignor:

[NAME OF ASSIGNOR]


By:_____
    Name:
    Title:



First-Lien Collateral Agent:

DEUTSCHE BANK AG CAYMAN ISLANDS
    BRANCH


By:_____
    Name:
    Title:



Second-Lien Collateral Agent:

[_____]


By:_____
    Name:
    Title: Authorized Officer



Third-Lien Collateral Agent:

HSBC BANK USA


By:_____
    Name:
    Title:



Deposit Account Bank:

[NAME OF DEPOSIT ACCOUNT BANK]


By:_____
    Name:
    Title:

ANNEX H
to
SECURITY AGREEMENT

DESCRIPTION OF COMMERCIAL TORT CLAIMS

Name of Assignor                    Description of Commercial Tort Claims

SCHEDULE OF MARKS AND APPLICATIONS;
INTERNET DOMAIN NAME REGISTRATIONS

**1.     Marks and Applications:**

| Marks | Country | Registration No. |
|-------|---------|------------------|

**2.     Internet Domain Name Registrations:**

| Internet Domain Names | Country | Registration No. (or other applicable identifier) |
|-----------------------|---------|---------------------------------------------------|

SCHEDULE OF PATENTS

SCHEDULE OF COPYRIGHTS

| NUMBERS REGISTRATION | PUBLICATION DATE | COPYRIGHT TITLE |
| --- | --- | --- |

GRANT OF SECURITY INTEREST
IN UNITED STATES TRADEMARKS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Grantor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Deutsche Bank AG Cayman Islands Branch, as First-Lien Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005, (the "Grantee"), a security interest in (i) all of the Grantor's right, title and interest in and to the United States trademarks, trademark registrations and trademark applications (the "Marks") set forth on Schedule A attached hereto, (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Marks, (iii) the goodwill of the businesses with which the Marks are associated and (iv) all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of _____, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Marks acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this

Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the

_____ day of _____, 2004.

[NAME OF GRANTOR], Grantor


By_____
    Name:
    Title:



DEUTSCHE BANK AG CAYMAN ISLANDS
    BRANCH, as First-Lien Collateral Agent and
    Grantee


By_____
    Name:
    Title:

STATE OF _____ )
                          ) ss.:
COUNTY OF _____ )

On this _____ day of _____, _____, before me personally came _____

_____ who, being by me duly sworn, did state as follows:   that [s]he is

_____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant

on behalf of said _____ and that [s]he did so by authority of the [Board of Directors] of

said _____.


_____
Notary Public

STATE OF NEW YORK    )

                           ) ss:

COUNTY OF NEW YORK  )

On this _____ day of _____, 2004, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Deutsche Bank AG Cayman Islands Branch, that [s]he is authorized to execute the foregoing Grant on behalf of said banking corporation and that [s]he did so by authority of the Board of Directors of said banking corporation.

_____
Notary Public

| MARK | REG. NO. | REG. DATE |
| --- | --- | --- |

GRANT OF SECURITY INTEREST
IN UNITED STATES PATENTS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Grantor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Deutsche Bank AG Cayman Islands Branch, as First-Lien Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005 (the "Grantee"), a security interest in (i) all of the Grantor's rights, title and interest in and to the United States patents (the "Patents") set forth on Schedule A attached hereto, in each case together with (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Patents, and (iii) all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of _____, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Patents acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the ____ day of _____, 2004.

[NAME OF GRANTOR], Grantor

By_____
   Name:
   Title:

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH, as First-Lien Collateral Agent and Grantee

By_____
   Name:
   Title:

STATE OF _____ )

                              ) ss:

COUNTY OF_____)

On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows: that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

                              _____

                                  Notary Public

STATE OF NEW YORK    )
                                ) ss:
COUNTY OF NEW YORK  )

On this ____ day of _____, 2004, before me personally came _____

_____ who, being by me duly sworn, did state as follows: that [s]he is

_____ of Deutsche Bank AG Cayman Islands Branch, that [s]he is authorized to

execute the foregoing Grant on behalf of said banking corporation and that [s]he did so by

authority of the Board of Directors of said banking corporation.

_____
Notary Public

| PATENT | PATENT NO. | ISSUE DATE |
| --- | --- | --- |

GRANT OF SECURITY INTEREST
IN UNITED STATES COPYRIGHTS


WHEREAS, [Name of Grantor], a _____ _____ (the "Grantor"), having its chief executive office at _____, _____, is the owner of all right, title and interest in and to the United States copyrights and associated United States copyright registrations and applications for registration set forth in Schedule A attached hereto;

WHEREAS, Deutsche Bank AG Cayman Islands Branch, as First-Lien Collateral Agent, having its principal offices at 60 Wall Street, New York, New York 10005 (the "Grantee"), desires to acquire a security interest in said copyrights and copyright registrations and applications therefor; and

WHEREAS, the Grantor is willing to grant to the Grantee a security interest in and lien upon the copyrights and copyright registrations and applications therefor described above.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions of the Security Agreement, dated as of _____, 2004, made by the Grantor, the other assignors from time to time party thereto and the Grantee (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"), the Grantor hereby assigns to the Grantee as collateral security, and grants to the Grantee a security interest in, the copyrights and copyright registrations and applications therefor set forth in Schedule A attached hereto.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the _____ day of _____, 2004.

[NAME OF GRANTOR], Grantor

By_____
   Name:
   Title:

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH, as First-Lien Collateral Agent and Grantee

By_____
   Name:
   Title:

STATE OF                         )

                                        ) ss:

COUNTY OF                      )

On this __ day of _____, ____, before me personally came _____

_____, who being duly sworn, did depose and say that [s]he is

_____ of [Name of Grantor], that [s]he is authorized to execute the foregoing

Grant on behalf of said corporation and that [s]he did so by authority of the Board of Directors of

said corporation.

_____
Notary Public

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK      )


On this _____ day of _____, 2004, before me personally came _____ _____ who, being by me duly sworn, did state as follows: that [s]he is _____ of Deutsche Bank AG Cayman Islands Branch, that [s]he is authorized to execute the foregoing Grant on behalf of said banking corporation and that [s]he did so by authority of the Board of Directors of said banking corporation.

_____
Notary Public

FORM OF INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated as of December __, 2004, and entered into by and among RCN CORPORATION, a Delaware corporation (the "Borrower"), each other Grantor (as hereinafter defined) from time to time party hereto, DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH ("DBAG"), in its capacities as administrative agent and collateral agent under the First-Lien Credit Documents (as defined below) (together with its successors and assigns from time to time in such capacities, the "First-Lien Collateral Agent"), [NAME OF SECOND-LIEN COLLATERAL AGENT], in its capacities as trustee and collateral agent under the Second-Lien Note Documents (as defined below) (together with its successors and assigns from time to time in such capacities, the "Second-Lien Collateral Agent") and HSBC BANK USA ("HSBC"), in its capacities as administrative agent and collateral agent under the Third-Lien Credit Documents (as defined below) (together with its successors and assigns from time to time, the "Third-Lien Collateral Agent"). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1 below.

RECITALS

WHEREAS, the Borrower, the lenders party thereto and DBAG, as administrative agent (in such capacity, together with any successor or assigns, the "First-Lien Administrative Agent"), have entered into that certain Credit Agreement, dated as of the date hereof (as amended, restated, supplemented, modified and/or Refinanced from time to time, the "First-Lien Credit Agreement");

WHEREAS, the Borrower and the Second-Lien Collateral Agent, as trustee (in such capacity, together with any successors and assigns, the "Second-Lien Trustee"), have entered into that certain Indenture, dated as of the date hereof (as amended, restated, supplemented, modified and/or Refinanced from time to time, the "Second-Lien Note Indenture") pursuant to which the Borrower will issue its 7⅜% Convertible Second Lien Notes due 2012;

WHEREAS, the Borrower, the lenders party thereto and HSBC, as agent (in such capacity, together with any successor or assigns, the "Third-Lien Administrative Agent") have entered into that certain Amended and Restated Term Loan and Credit Agreement, dated as of December__, 2004 (as amended, restated, supplemented, modified and/or Refinanced from time to time, the "Third-Lien Credit Agreement");

WHEREAS, the obligations of the Borrower and the other Grantors under the First-Lien Credit Documents, and all Hedging Obligations under Interest Rate Protection Agreements with one or more Hedging Creditors, will be secured by substantially all the assets of the Borrower and the other Grantors, respectively, pursuant to the terms of the First-Lien Security Documents;

WHEREAS, the obligations of the Borrower and the other Grantors under the Second-Lien Note Documents will be secured by substantially all the assets of the Borrower and the other Grantors, respectively, pursuant to the terms of the Second-Lien Security Documents;

Exhibit I
Page 2

WHEREAS, the obligations of the Borrower under the Third-Lien Credit Documents will be secured by substantially all the assets of the Borrower (but not any other Grantor) pursuant to the terms of the Third-Lien Security Documents;

WHEREAS, the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral;

WHEREAS, in order to induce the First-Lien Collateral Agent and the First-Lien Creditors to consent to the Grantors incurring the Second-Lien Obligations and the Borrower incurring the Third-Lien Obligations and to induce the First-Lien Creditors to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor, the Second-Lien Collateral Agent on behalf of the Second-Lien Creditors (and each Second-Lien Creditor by its acceptance of the benefits of the Second-Lien Security Documents) and the Third-Lien Collateral Agent on behalf of the Third-Lien Creditors (and each Third-Lien Creditor by its acceptance of the benefits of the Third-Lien Security Documents) has agreed to the subordination, intercreditor and other provisions set forth in this Agreement;

WHEREAS, in order to induce the Second-Lien Collateral Agent and the Second-Lien Creditors to consent to the Grantors incurring the Second-Lien Obligations and the Borrower incurring the Third-Lien Obligations and to induce the Second-Lien Creditors to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor, the First-Lien Collateral Agent on behalf of the First-Lien Creditors (and each First-Lien Creditor by its acceptance of the benefits of the First-Lien Security Documents) and the Third-Lien Collateral Agent on behalf of the Third-Lien Creditors (and each Third-Lien Creditor by its acceptance of the benefits of the Third-Lien Security Documents) has agreed to the intercreditor and other provisions set forth in this Agreement;

WHEREAS, the Borrower and the Subsidiary Guarantors may, from time to time, incur additional secured debt which the Borrower and the First-Lien Collateral Agent may agree may share a first-priority security interest in the Collateral in accordance with the First-Lien Credit Documents in existence at the time of such incurrence but such additional secured debt shall constitute First-Lien Obligations only to the extent provided in the definition thereof contained herein; and

WHEREAS, the Borrower and the Subsidiary Guarantors may, from time to time, incur additional secured debt which the Borrower and the Second-Lien Collateral Agent may agree may share a second-priority security interest in the Collateral in accordance with the Second-Lien Note Documents in existence at the time of such incurrence but such additional secured debt shall constitute Second-Lien Obligations only to the extent provided in the definition thereof contained herein;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

Exhibit I
Page 3

SECTION 1.  Definitions.

1.1    Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"Agreement" means this Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning set forth in Section 6.1(b) hereof.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrower" has the meaning provided in the first paragraph of this Agreement.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting First-Lien Collateral, Second-Lien Collateral and/or Third-Lien Collateral.

"Collateral Agent" means, as the context requires, collectively, the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent.

"Comparable Second-Lien Security Document" means, in relation to any Collateral subject to any Lien created under any First-Lien Security Document, that Second-Lien Security Document which creates a Lien on the same Collateral, granted by the same Grantor.

"Comparable Third-Lien Security Document" means, in relation to any Collateral of the Borrower subject to any Lien created under any First-Lien Security Document, that Third-Lien Security Document which creates a Lien on the same Collateral, granted by the Borrower.

"Consolidated EBITDA" has the meaning provided in the First-Lien Credit Agreement, as originally in effect.

"Creditors" means, collectively, the First-Lien Creditors, the Second-Lien Creditors and the Third-Lien Creditors.

"DBAG" has the meaning provided in the first paragraph of this Agreement.

"Defaulting Creditor" has the meaning set forth in Section 5.7(d) hereto.

"Discharge of First-Lien Obligations" means, except to the extent otherwise provided in Section 5.6 (and subject to Section 6.5), (a) payment in full in cash of the principal

Exhibit I
Page 4

of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the First-Lien Documents, (b) payment in full of all other First-Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid, (c) termination (without any prior demand for payment thereunder having been made or, if made, with such demand having been fully reimbursed in cash) or cash collateralization (in an amount and manner, and on terms, satisfactory to the First-Lien Collateral Agent) of all letters of credit and Interest Rate Protection Agreements issued or entered into, as the case may be, by any Hedging Creditor and (d) termination of all other commitments of the First-Lien Creditors under the First-Lien Credit Documents.

"Discharge of Second-Lien Obligations" means, except to the extent otherwise provided in Section 5.6 (and subject to Section 6.5), (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the Second-Lien Note Documents and (b) payment in full of all other Second-Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid. Notwithstanding anything to the contrary contained above, for purposes of this Agreement, any Second-Lien Obligations converted into equity of the Borrower (or any other Person) at the option of the holder of the respective Second-Lien Obligations shall be deemed to constitute the payment in full in cash of the Second-Lien Obligations so converted.

"Discharge of Third-Lien Obligations" means, except to the extent otherwise provided in Section 5.6, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the Third-Lien Credit Documents, (b) payment in full of all other Third-Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid and (c) termination of all other commitments of the Third-Lien Creditors under the Third-Lien Credit Documents.

"Disposition" has the meaning set forth in Section 5.1(a)(ii) hereto.

"Documents" means, as the context requires, collectively, the First-Lien Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents.

"Eligible Purchaser" has the meaning set forth in Section 5.7(a) hereto.

"First-Lien Administrative Agent" has the meaning set forth in the recitals hereto.

"First-Lien Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or has been purported to be granted) as security for any First-Lien Obligations; provided that all property and assets of the types described in the last sentence of Section 1.1(b) of the First-Lien Security Agreement (or

Exhibit I
Page 5

any substantially similar provision contained in any other First-Lien Security Document) or the last sentence of Section 3.1 of the First-Lien Pledge Agreement (or any substantially similar provision contained in any other First-Lien Security Document) or consisting of FCC Licenses or Governmental Authorizations (in each case as defined in the First-Lien Credit Agreement as originally in effect), shall be deemed to constitute First-Lien Collateral for purposes of this Agreement notwithstanding the fact that a Lien is not granted (or purported to be granted) therein.

"First-Lien Collateral Agent" has the meaning provided in the first paragraph of this Agreement.

"First-Lien Credit Agreement" has the meaning set forth in the recitals hereto.

"First-Lien Credit Documents" means the First-Lien Credit Agreement and the Credit Documents (as defined in the First-Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other First-Lien Obligation and any other document or instrument executed or delivered at any time in connection with any First-Lien Obligation (including any intercreditor or joinder agreement among holders of First-Lien Obligations but excluding Interest Rate Protection Agreements), to the extent such are effective at the relevant time, as each may be amended, modified, restated, supplemented, replaced and/or Refinanced from time to time; provided that no such modification of the First-Lien Credit Agreement shall increase the maximum aggregate principal amount of Loans and stated amount of Letters of Credit thereunder to amount in excess of the Maximum First-Lien Credit Documents Principal Amount as then in effect.

"First-Lien Creditors" means, at any relevant time, the holders of First-Lien Obligations at such time, including, without limitation, the First-Lien Lenders, the Hedging Creditors, the First-Lien Collateral Agent, the First-Lien Administrative Agent and the other agents under the First-Lien Credit Agreement.

"First-Lien Documents" shall mean and include the First-Lien Credit Documents and the Interest Rate Protection Agreements entered into with one or more Hedging Creditors.

"First-Lien Lenders" means the "Lenders" under, and as defined in, the First-Lien Credit Agreement; provided that the term "First-Lien Lender" shall in any event include each letter of credit issuer and each swingline lender under the First-Lien Credit Agreement.

"First-Lien Obligations" means (i) all Obligations outstanding under the First-Lien Credit Agreement and the other First-Lien Credit Documents, and (ii) all Hedging Obligations. "First-Lien Obligations" shall in any event include: (a) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First-Lien Document, whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the First-Lien Collateral Agent, the First-Lien Administrative Agent and the First-Lien Creditors after the commencement

Exhibit I
Page 6

of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed under Section 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or Bankruptcy Law as a claim in such Insolvency or Liquidation Proceeding and (c) all obligations and liabilities of each Grantor under each First-Lien Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due. The First-Lien Obligations shall not include (x) principal of Loans or stated amounts of Letters of Credit in excess of the Maximum First-Lien Credit Documents Principal Amount as in effect at the time incurred or (y) any amount in clauses (a) through (c) of the preceding sentence incurred in connection with the enforcement of the excess amounts referred to in preceding clause (x).

"First-Lien Pledge Agreement" means the Pledge Agreement, dated as of the date hereof, among the Borrower, the other Grantors from time to time party thereto and the First-Lien Collateral Agent, as the same may be amended, supplemented, restated, modified and/or Refinanced from time to time.

"First-Lien Required Lenders" shall mean the "Required Lenders" under, and as defined in, the First-Lien Credit Agreement.

"First-Lien Security Agreement" means the Security Agreement, dated as of the date hereof, among the Borrower, the other Grantors from time to time party thereto and the First-Lien Collateral Agent, as the same may be amended, supplemented, restated, modified and/or Refinanced from time to time.

"First-Lien Security Documents" means the Security Documents (as defined in the First-Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First-Lien Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, supplemented, restated, modified and/or Refinanced from time to time.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grantors" means the Borrower and each of the Subsidiary Guarantors that have executed and delivered, or may from time to time hereafter execute and deliver, a First-Lien Security Document, a Second-Lien Security Document or a Third-Lien Security Document.

"Hedging Creditor" means (i) each First-Lien Lender or any affiliate thereof (even if the respective First-Lien Lender subsequently ceases to be a First-Lien Lender under the Credit Agreement for any reason) party to an Interest Rate Protection Agreement with any Grantor and (ii) the respective successors and assigns of each such First-Lien Lender, affiliate or other financial institution referred to in clause (i) above.

Exhibit I
Page 7

"Hedging Obligations" means (i) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities (including, without limitation, indemnities, fees and interest thereon and all interest that accrues after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such Insolvency or Liquidation Proceeding) of each Grantor owing to the Hedging Creditors, now existing or hereafter incurred under, arising out of or in connection with each Interest Rate Protection Agreement (including all such obligations and indebtedness under any guarantee to which each Grantor is a party) and (ii) the due performance and compliance by each Grantor with the terms, conditions and agreements of each Interest Rate Protection Agreement; provided that (x) any Interest Rate Protection Agreement which expressly states that it is not entitled to the benefits of the First-Lien Security Documents shall not be entitled to the benefits thereof (or constitute Hedging Obligations for purposes hereof) and (y) if any Interest Rate Protection Agreement is entered into at a time when, immediately after giving effect thereto, the aggregate notional amount of all then outstanding Interest Rate Protection Agreements constituting Hedging Obligations hereunder (after giving effect to the provisions of preceding clause (x)) would exceed the Maximum Hedging Obligations Notional Amount, then amounts owing with respect to such excess shall not constitute Hedging Obligations hereunder; provided further that, if at the time of the entering into of any Interest Rate Protection Agreement the respective Hedging Creditors obtained an officer's certificate of the Borrower or a representation by the Borrower that the aggregate notional amount thereof when added to the aggregate notional amount of all other then outstanding Interest Rate Protection Agreements which constitute Hedging Obligations hereunder, shall not or not exceed the Maximum Hedging Obligations Notional Amount, then such Interest Rate Protection Agreement (and all obligations thereunder as described above) shall constitute Hedging Obligations for all purposes hereof notwithstanding the fact that the Maximum Hedging Obligations Notional Amount has actually been exceeded..

"HSBC" has the meaning provided in the first paragraph of this Agreement.

"Indebtedness" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First-Lien Credit Agreement, the Second-Lien Note Indenture or the Third-Lien Credit Agreement.

"Insolvency or Liquidation Proceeding" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

Exhibit I
Page 8

"Letters of Credit" shall mean "Letters of Credit" under, and as defined in, the First-Lien Credit Agreement.

"Lien" shall mean any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any similar recording or notice statute, and any lease having substantially the same effect as the foregoing).

"Loans" shall mean "Loans" under, and as defined in, the First-Lien Credit Agreement.

"Maximum First-Lien Credit Documents Principal Amount" shall mean, as determined on any date, the greater of (x) an amount equal to four times Consolidated EBITDA for the last four consecutive fiscal quarters for which financial statements have been delivered to the First-Lien Administrative Agent pursuant to the First-Lien Credit Agreement (as determined on the basis of such financial statements) prior to the incurrence of the respective Indebtedness incurred in reliance on this clause (x) (as may be increased as provided below) and (y) $400 million; in the case of each of the preceding clauses (x) and (y), plus an amount equal to $325 million.

"Maximum Second-Lien Principal Amount" shall mean $[   ] million.

"Maximum Third-Lien Credit Documents Principal Amount" has the meaning provided in the definition of "Third-Lien Credit Documents".

"Megacable" shall mean Megacable, S.A. de C.V.

"Megacable Entities" shall mean collectively, Megacable, Megacable Telecommunications, S.A. de C.V. and MCM Holdings, S.A. de C.V.

"New Agent" has the meaning set forth in Section 5.6(a) hereto.

"New Second-Lien Agent" has the meaning set forth in Section 5.6(b) hereto.

"Obligations" means any and all obligations (including guaranty obligations) with respect to the payment and performance of (a) any principal of or interest or premium on any indebtedness, including, without limitation, any reimbursement obligation in respect of any letter of credit, or any other liability, including interest that accrues after the commencement of any Insolvency or Liquidation Proceeding of any Grantor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such Insolvency or Liquidation Proceeding, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any indebtedness (including, without limitation, the retaking, holding, selling or otherwise disposing of or realizing on the Collateral), (c) any obligation to post cash collateral in respect of letters of credit or any other obligations, and (d) all performance obligations under the documentation governing any indebtedness.

Exhibit I
Page 9

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Pledge Agreements" means, collectively, (i) the First-Lien Pledge Agreement, (ii) the Second-Lien Pledge Agreement and (iii) the Third-Lien Pledge Agreement.

"Pledged Collateral" means (a) the "Collateral" under, and as defined in, the First-Lien Pledge Agreement, the Second-Lien Pledge Agreement and the Third-Lien Pledge Agreement, respectively, and (b) any other Collateral in the possession of any Collateral Agent (or its agents or bailees), in each case to the extent that possession thereof is taken to perfect a Lien thereon under the Uniform Commercial Code.

"Post-Petition Financing" has the meaning set forth in Section 6.1(a) hereto.

"Priority Lien" has the meaning set forth in Section 5.1(d)(i) hereto.

"Recovery" has the meaning set forth in Section 6.5(a) hereof.

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such indebtedness. "Refinanced" and "Refinancing" shall have correlative meanings.

"Remedial Action" has the meaning set forth in Section 5.1(a)(i) hereto.

"Required First-Lien Creditors" shall mean (i) at all times prior to the occurrence of the Discharge of First-Lien Obligations, the First-Lien Required Lenders (or, to the extent required by the First-Lien Credit Agreement, each of the First-Lien Lenders), and (ii) at all times after the occurrence of the Discharge of First-Lien Obligations, the holders of at least the majority of the then outstanding Hedging Obligations (determined by the First-Lien Collateral Agent in such reasonable manner as is acceptable to it).

"Required Second-Lien Creditors" shall mean the [Required Lenders] under, and as defined in, the Second-Lien Note Indenture.

"Second-Lien Trustee" has the meaning set forth in the recitals hereto.

"Second-Lien Collateral" means all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or has been purported to be granted) as security for any Second-Lien Obligations; provided that all property and assets of the types described in the last sentence of Section 1.1(b) of the Second-Lien Security Agreement (or any substantially similar provision contained in any other Second-Lien Security Document) or the last sentence of Section 3.1 of the Second-Lien Pledge Agreement (or any substantially similar provision contained in any other Second-Lien Security Document) or consisting of FCC licenses or Governmental Authorization (in each case as defined in the First-Lien Credit Agreement as originally in effect), shall be deemed to constitute Second-Lien Collateral for purposes of this Agreement notwithstanding the fact that a Lien is not granted (or purported to be granted) therein.

Exhibit I
Page 10

"Second-Lien Collateral Agent" has the meaning provided in the first paragraph of this Agreement.

"Second-Lien Creditors" means, at any relevant time, the holders of Second-Lien Obligations at such time, including without limitation the Second-Lien Lenders, the Second-Lien Collateral Agent, the Second-Lien Trustee and any other agents under the Second-Lien Note Indenture.

"Second-Lien Disposition" has the meaning set forth in Section 5.1(b)(ii) hereto.

"Second-Lien Lenders" means the "Holders" under and as defined in the Second-Lien Note Indenture.

"Second-Lien Mortgages" means a collective reference to each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secure any Second-Lien Obligations or under which rights or remedies with respect to any such Liens are governed.

"Second-Lien Note Documents" means the Second-Lien Note Indenture and the Note Documents (as defined in the Second-Lien Note Indenture) and each of the other agreements, documents and instruments providing for or evidencing any other Second-Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second-Lien Obligation, as the same may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, thereof and the First-Lien Credit Agreement; provided that any such modification does not increase the aggregate principal amount thereof beyond the limit set forth in the First-Lien Credit Agreement and is otherwise in accordance with the provisions of this First-Lien Credit Agreement; and provided further, that any such modification does not increase the aggregate principal amount of Second-Lien Obligations beyond the Maximum Second-Lien Principal Amount.

"Second-Lien Note Indenture" has the meaning set forth in the recitals hereto.

"Second-Lien Note Indenture Priority Lien" has the meaning set forth in Section 5.1(d)(ii) hereto.

"Second-Lien Obligations" means all Obligations outstanding under the Second-Lien Note Indenture and the other Second-Lien Note Documents. "Second-Lien Obligations" shall in any event include: (a) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second-Lien Note Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding and (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the Second-Lien Collateral Agent, the Second-Lien Administrative Agent and the Second-Lien Creditors after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed under Section 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or

Exhibit I
Page 11

Bankruptcy Law as a claim in such Insolvency or Liquidation Proceeding. The Second-Lien Obligations shall not include (x) principal in excess of the Maximum Second-Lien Principal Amount or (y) any amount in clauses (a) through (c) of the preceding sentence incurred in connection with the enforcement of the excess amounts referred to in preceding clause (x).

"Second-Lien Pledge Agreement" means the Pledge Agreement, dated as of the date hereof, among the Borrower, the other Grantors and the Second-Lien Collateral Agent, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Second-Lien Post-Petition Financing" has the meaning set forth in Section 6.1(c) hereto.

"Second-Lien Remedial Action" has the meaning set forth in Section 5.1(b)(i) hereto.

"Second-Lien Recovery" has the meaning set forth in Section 6.5(b) hereto.

"Second-Lien Security Agreement" means the Security Agreement, dated as of the date hereof, among the Borrower, the other Grantors and the Second-Lien Collateral Agent, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Second-Lien Security Documents" means the Security Documents (as defined in the Second-Lien Note Indenture) and any other agreement, document, mortgage or instrument pursuant to which a Lien is granted securing any Second-Lien Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Second-Lien Trustee" has the meaning set forth in the recitals hereto.

"Security Documents" means, collectively, the First-Lien Security Documents, the Second-Lien Security Documents and the Third-Lien Security Documents.

"Subsidiary" of any Person shall mean and include (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (ii) any partnership, limited liability company, association, joint venture or other entity (other than a corporation) in which such Person directly or indirectly through Subsidiaries, has more than a 50% equity interest at the time.

"Subsidiary Guarantors" means each Subsidiary of the Borrower which enters into a guaranty of any First-Lien Obligations, or Second-Lien Obligations.

Exhibit I
Page 12

"Third-Lien Administrative Agent" has the meaning set forth in the recitals hereto.

"Third-Lien Collateral" means all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or has been purported to be granted) as security for any Third-Lien Obligations.

"Third-Lien Collateral Agent" has the meaning set forth in the preamble hereof.

"Third-Lien Credit Agreement" has the meaning set forth in the recitals hereto.

"Third-Lien Credit Documents" means the Third-Lien Credit Agreement and the Credit Documents (as defined in the Third-Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Third-Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Third-Lien Obligation, as the same may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, thereof and the First-Lien Credit Agreement; provided that any such modification does not increase the aggregate principal amount thereof beyond the lesser of the limit set forth in either the First-Lien Credit Agreement or the Second-Lien Note Indenture (such lesser amount being herein called the "Maximum Third-Lien Credit Documents Principal Amount") and is otherwise in accordance with the provisions of the First-Lien Credit Agreement and the Second-Lien Note Indenture.

"Third-Lien Creditors" means, at any relevant time, the holders of Third-Lien Obligations at such time, including without limitation the Third-Lien Lenders, the Third-Lien Collateral Agent, the Third-Lien Administrative Agent and any other agents under the Third-Lien Credit Agreement.

"Third-Lien Lenders" means the "Lenders" under and as defined in the Third-Lien Credit Agreement.

"Third-Lien Mortgages" means a collective reference to each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned or leased by any Grantor is granted to secure any Third-Lien Obligations or under which rights or remedies with respect to any such Liens are governed.

"Third-Lien Obligations" means all Obligations outstanding under the Third-Lien Credit Agreement and the other Third-Lien Credit Documents. "Third-Lien Obligations" shall in any event include: (a) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Third-Lien Credit Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding and (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the Third-Lien Collateral Agent, the Third-Lien Administrative Agent and the Third-Lien Creditors after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed

Exhibit I
Page 13

under Section 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or Bankruptcy Law as a claim in such Insolvency or Liquidation Proceeding. The Third-Lien Obligations shall not include (x) principal in excess of the Maximum Third-Lien Credit Documents Principal Amount as in effect at the time incurred or (y) any amount in clauses (a) through (c) of the preceding sentence incurred in connection with the enforcement of the excess amounts referred to in preceding clause (x).

"<u>Third-Lien Pledge Agreement</u>" means the Pledge Agreement, dated as of [_____ __, ____], among the Borrower and the Third-Lien Collateral Agent, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"<u>Third-Lien Security Agreement</u>" means the Security Agreement, dated as of [_____ __, ____], among the Borrower and the Third-Lien Collateral Agent, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"<u>Third-Lien Security Documents</u>" means the Security Documents (as defined in the Third-Lien Credit Agreement) and any other agreement, document, mortgage or instrument pursuant to which a Lien is granted securing any Third-Lien Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York.

1.2    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "<u>include</u>", "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "<u>without limitation</u>."  The word "<u>will</u>" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "<u>herein</u>", "<u>hereof</u>" and "<u>hereunder</u>", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement, (e) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (f) terms defined in the UCC but not otherwise defined herein shall have the same meanings herein as are assigned thereto in the UCC, (g) reference to any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder and (h) underscored references to Sections or clauses shall refer to those portions of this Agreement, and

Exhibit I
Page 14

any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs.

SECTION 2.  Priority of Liens; Etc.

2.1  Subordination of Liens; Etc.  Notwithstanding the date, manner or order of grant, attachment or perfection of (x) any Liens securing  the First-Lien Obligations granted on the Collateral, (y) any Liens securing  the Second-Lien Obligations granted on the Collateral or (z) any Liens securing the Third-Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, any applicable law, the Second-Lien Note Documents or the Third-Lien Credit Documents or any other circumstance whatsoever (including any invalidity or non-perfection of any Lien purporting to secure the First-Lien Obligations, the Second-Lien Obligations and/or the Third-Lien Obligations), the Second-Lien Collateral Agent, on behalf of itself and the other Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents) and the Third-Lien Collateral Agent, on behalf of itself and the other Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents) hereby agree that:

(a)      (i)  any Lien on the Collateral securing  any First-Lien Obligations now or hereafter held by or on behalf of the First-Lien Collateral Agent or any First-Lien Creditors or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second-Lien Obligations and to any Lien on the Collateral securing any of the Third-Lien Obligations;

(ii)      any Lien on the Collateral securing any Second-Lien Obligations now or hereafter held by or on behalf of the Second-Lien Collateral Agent or any Second-Lien Creditors or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise shall be senior in all respects and prior to any Lien on the Collateral securing any of the Third-Lien Obligations;

(iii)      any Lien on the Collateral now or hereafter held by or on behalf of (x) the Second-Lien Collateral Agent, any Second-Lien Creditors or any agent or trustee therefor and/or (y) the Third-Lien Collateral Agent, any Third-Lien Creditors or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing  any First-Lien Obligations;

(iv)      any Lien on the Collateral now or hereafter held by or on behalf of the Third-Lien Collateral Agent, any Third-Lien Creditors or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any Second-Lien Obligations;

(v)      all Liens on the Collateral securing any First-Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second-

Exhibit I
Page 15

Lien Obligations and/or any Third-Lien Obligations for all purposes, whether or not such Liens securing any First-Lien Obligations are subordinated to any Lien securing any other obligation of the Borrower, any other Grantor or any other Person;

(vi)     all Liens on the Collateral securing any Second-Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Third-Lien Obligations for all purposes, whether or not such Liens securing any Second-Lien Obligations are subordinated to any Lien securing any other obligation of the Borrower, any other Grantor or any other Person; and

(vii)     it is their intent that (x) the First-Lien Obligations (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the Second-Lien Obligations (and the security therefor) and the Third-Lien Obligations (and the security therefor), (y) the Second-Lien Obligations (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the First-Lien Obligations (and the security therefor) and the Third-Lien Obligations (and the security therefor) and (z) the Third-Lien Obligations (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the First-Lien Obligations (and the security therefor) and the Second-Lien Obligations (and the security therefor).

Notwithstanding anything to contrary contained above or elsewhere in this Agreement, for all purposes of this Agreement (x) the First-Lien Obligations shall be deemed secured by Liens on all First-Lien Collateral regardless of whether a Lien or security interest has in fact been granted (or purported to be granted) with respect thereto and (y) the Second-Lien Obligations shall be deemed secured by Liens on all Second-Lien Collateral regardless of whether a Lien or security interest has in fact been granted (or purported to be granted) with respect thereto

2.2     Prohibition on Contesting Liens.  Each of the Third-Lien Collateral Agent, for itself and on behalf of each Third-Lien Creditor, the Second-Lien Collateral Agent, for itself and on behalf of each Second-Lien Creditor, and the First-Lien Collateral Agent, for itself and on behalf of each First-Lien Creditor, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including, without limitation, any Insolvency or Liquidation Proceeding), (i) the validity or enforceability of any Security Document or any Obligation thereunder, (ii) the validity, perfection, priority or enforceability of the Liens, mortgages, assignments and security interests granted (or purported to be granted) pursuant to the Security Documents with respect to the First-Lien Obligations, the Second-Lien Obligations or the Third-Lien Obligations, (iii) in the case of the Third-Lien Collateral Agent, for itself and on behalf of each Third-Lien Creditors, only, the validity, perfection, priority or enforceability of the Liens, mortgages, assignments and security interests granted (or purported to be granted) pursuant to the Security Documents with respect to the Second-Lien Obligations, or (iv) the relative rights and duties of the holders of the First-Lien Obligations, the Second-Lien Obligations and the Third-Lien Obligations granted and/or established in this Agreement or any other Security Document (to the extent not inconsistent with the terms of this Agreement) with respect to such Liens, mortgages, assignments, and security interests; provided that nothing in this Agreement shall be construed to prevent or impair

Exhibit I
Page 16

the rights of any Collateral Agent or any other Creditor to enforce this Agreement, including the priority of the Liens securing the respective Obligations as provided in Section 3.1.

      2.3    <u>No New Liens</u>. (a) So long as the Discharge of First-Lien Obligations has not occurred, the parties hereto agree that the Borrower shall not, and shall not permit any of its Subsidiaries to, grant or permit any additional Liens, or take any action to perfect any additional Liens, on any asset or property to secure any Second-Lien Obligation or Third-Lien Obligation unless the Borrower or the respective such Subsidiary is a Grantor hereunder and has also granted a Lien on such asset or property to secure the First-Lien Obligations in accordance with the relevant priority set forth in this Agreement. To the extent that the forgoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First-Lien Collateral Agent and/or the other First-Lien Creditors, the Second-Lien Collateral Agent on behalf of itself and the other Second-Lien Creditors and the Third-Lien Collateral Agent on behalf of itself and the other Third-Lien Creditors, and each Second-Lien Creditor and Third-Lien Creditor (in each case by its acceptance of the benefits of the respective Security Documents), agrees that any amounts received by or distributed to any of them pursuant to or as a result liens granted in contravention of this Section 2.3(a) shall be subject to Section 4.2(a).

      (b)    So long as the Discharge of Second-Lien Obligations has not occurred, the parties hereto agree that the Borrower shall not, and shall not permit any of its Subsidiaries to, grant or permit any additional Liens, or take any action to perfect any additional Liens, on any asset or property to secure any Third-Lien Obligation unless such Lien is expressly permitted by the Second-Lien Note Documents and the Borrower or the respective such Subsidiary is a Grantor hereunder and has also granted a Lien on such asset or property to secure the Second-Lien Obligations in accordance with the relevant priority set forth in this Agreement. To the extent that the forgoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the Second-Lien Collateral Agent and/or the other Second-Lien Creditors, the Third-Lien Collateral Agent on behalf of itself and the other Third-Lien Creditors, and each Third-Lien Creditor (in each case by its acceptance of the benefits of the respective Security Documents), agrees that any amounts received by or distributed to any of them pursuant to or as a result liens granted in contravention of this Section 2.3(b) shall be subject to Section 4.2(b).

      2.4    <u>Similar Liens and Agreements</u>. The parties hereto agree that it is their intention that (x) none of the Second-Lien Collateral be more expansive in any respect than the First-Lien Collateral and (y) none of the Third-Lien Collateral be more expansive in any respect than the Second-Lien Collateral or the First-Lien Collateral and that the Third-Lien Collateral not include any First-Lien Collateral or Second-Lien Collateral granted by any Grantor other than the Borrower (except that if the foregoing provisions are not complied with, for any reason, without limiting any other rights and remedies available to the First-Lien Collateral Agent and/or the other First-Lien Creditors and the Second-Lien Collateral Agent on behalf of itself and the other Second-Lien Creditors, each Third-Lien Creditor (by its acceptance of the benefits of the respective Security Documents), agrees that the provisions of Section 2.6 shall apply). In furtherance of the foregoing and of Section 8.9, each Collateral Agent, on behalf of itself and the Creditors for which it is Collateral Agent, and each other Creditor (by its acceptance of the

Exhibit I
Page 17

benefits of the respective Security Documents), agree, subject to the other provisions of this Agreement:

(i)     upon request by any Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First-Lien Collateral, the Second-Lien Collateral and the Third-Lien Collateral and the steps taken to perfect the Liens thereon and the identity of the respective parties obligated under the respective Documents; and

(ii)     that the guarantees for the First-Lien Obligations, and the Second-Lien Obligations entered into by any Subsidiary of the Borrower after the date of this Agreement shall be in substantially the same form (with any necessary reference changes, etc.) as the respective guarantees provided for the respective such Obligations by Subsidiary Guarantors on or prior to the date of this Agreement.

2.5     Sequencing of Security Filings.     Each of the Collateral Agents hereby agrees that it shall cooperate in good faith with the First-Lien Collateral Agent so that filings of financing statements (including without limitation UCC-1 financing statements), mortgages and other security filings are sequentially made as follows: (i) the respective filings with respect to the First-Lien Collateral shall be made first, (ii) the respective filings with respect to the Second-Lien Collateral shall be made second and (iii) the respective filings with respect to the Third-Lien Collateral shall be made third.  The Third-Lien Collateral Agent agrees to terminate all filings of financing statements (including without limitation UCC-1 financing statements), mortgages and other security filings made prior to the Initial Borrowing Date with respect to the facility which, when amended and restated, became the Third-Lien Credit Agreement, and to make any filings to be made on or after the Initial Borrowing Date in accordance with the preceding sentence.  The respective priorities to Collateral (and subordination and other agreements) contained herein shall be fully effective in accordance with their terms notwithstanding any failure to make (or terminate) filings as otherwise required above in this Section 2.5.

2.6     Certain Overriding Agreements with Respect to Third-Lien Obligations. Notwithstanding anything to the contrary contained elsewhere in this Agreement or in any Third-Lien Credit Document, it is acknowledged and agreed by parties hereto that:

(i)     no Subsidiary of the Borrower shall at any time provide any guarantee (directly or indirectly) of any Third-Lien Obligations; and

(ii)     no Subsidiary of the Borrower shall provide, or grant a security interest in, any of its assets or property (and accordingly, the Third-Lien Collateral shall consist solely of assets of the Borrower).

If any Third-Lien Creditor breaches the agreements contained in this Section 2.6 in any respect, any proceeds obtained as a result thereof shall be turned over for distribution pursuant to Section 4 in the same manner as proceeds of Collateral are required to be distributed.

Exhibit I
Page 18

SECTION 3.  Enforcement.

3.1    Exercise of Remedies.  (a)  The provisions of this clause (a) are subject to clause (f) below.  So long as the Discharge of First-Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor:  (i) neither (x) the Second-Lien Collateral Agent and the other Second-Lien Creditors nor (y) the Third-Lien Collateral Agent and the other Third-Lien Creditors, will exercise or seek to exercise any rights or remedies (including, without limitation, setoff) with respect to any Collateral (including, without limitation, the exercise of any right under any lockbox agreement, control account agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any of (x) the Second-Lien Collateral Agent or any Second-Lien Creditor or (y) the Third-Lien Collateral Agent or any Third-Lien Creditor is a party) or institute or commence, or join with any Person in commencing, any action or proceeding with respect to such rights or remedies (including, without limitation, any action of foreclosure, enforcement, collection or execution and any Insolvency or Liquidation Proceeding), and will not contest, protest or object to any foreclosure proceeding or action brought by the First-Lien Collateral Agent or any First-Lien Creditor or any other exercise by the First-Lien Collateral Agent or any First-Lien Creditor, of any rights and remedies relating to the Collateral under the First-Lien Credit Documents or otherwise, or object to the forbearance by the First-Lien Collateral Agent or the First-Lien Creditors from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and (ii) the First-Lien Collateral Agent shall have the exclusive right, and the Required First-Lien Creditors shall have the exclusive right to instruct the First-Lien Collateral Agent, to enforce rights, exercise remedies (including, without limitation, set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of any of (x) the Second-Lien Collateral Agent or any Second-Lien Creditor or (y) the Third-Lien Collateral Agent or any Third-Lien Creditor, all as though the Second-Lien Obligations and the Third-Lien Obligations did not exist; provided, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Borrower or any other Grantor, (x) the Second-Lien Collateral Agent and, if applicable, each other Second-Lien Creditor may file a claim or statement of interest with respect to the Second-Lien Obligations and (y) the Third-Lien Collateral Agent and, if applicable, each other Third-Lien Creditor may file a claim or statement of interest with respect to the Third-Lien Obligations, (B) the Second-Lien Collateral Agent and the Third-Lien Collateral Agent may take any action (not adverse to the prior Liens on the Collateral securing the First-Lien Obligations, or the rights of the First-Lien Collateral Agent or the First-Lien Creditors to exercise remedies in respect thereof) in order to preserve or protect their respective Liens on the Collateral in accordance with the terms of this Agreement and (C) (x) the Second-Lien Creditors shall be entitled to file any necessary responsive or defensive pleading in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second-Lien Creditors and (y) the Third-Lien Creditors shall be entitled to file any necessary responsive or defensive pleading in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Third-Lien Creditors, including any claim secured by the Collateral, if any, in each case in accordance with the terms of this Agreement.  In exercising rights and remedies with respect to the Collateral, the

Exhibit I
Page 19

First-Lien Collateral Agent and the First-Lien Creditors may enforce the provisions of the First-Lien Credit Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction. In any case, and to the extent, that the provisions of following clause (f) are applicable, and enforcement actions are being pursued by the Second-Lien Collateral Agent or any other Second-Lien Creditors prior to the Discharge of First-Lien Obligations, the foregoing provisions of this Section 3.1(a) shall apply with respect to the Third-Lien Collateral Agent and the other Third-Lien Creditors as fully as if the respective enforcement proceeding were being pursued by the First-Lien Collateral Agent or First-Lien Creditors.

(b)  So long as the Discharge of First-Lien Obligations has occurred, but the Discharge of Second-Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor: (i) the Third-Lien Collateral Agent and the other Third-Lien Creditors, will not exercise or seek to exercise any rights or remedies (including, without limitation, setoff) with respect to any Collateral (including, without limitation, the exercise of any right under any lockbox agreement, control account agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Third-Lien Collateral Agent or any Third-Lien Creditor is a party) or institute or commence, or join with any Person in commencing, any action or proceeding with respect to such rights or remedies (including, without limitation, any action of foreclosure, enforcement, collection or execution and any Insolvency or Liquidation Proceeding), and will not contest, protest or object to any foreclosure proceeding or action brought by the Second-Lien Collateral Agent or any Second-Lien Creditor or any other exercise by the Second-Lien Collateral Agent or any Second-Lien Creditor, of any rights and remedies relating to the Collateral under the Second-Lien Note Documents or otherwise, or object to the forbearance by the Second-Lien Collateral Agent or the Second-Lien Creditors from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and (ii) the Second-Lien Collateral Agent shall have the exclusive right, and the Required Second-Lien Creditors shall have the exclusive right to instruct the First-Lien Collateral Agent, to enforce rights, exercise remedies (including, without limitation, set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Third-Lien Collateral Agent or any Third-Lien Creditor, all as though the Third-Lien Obligations did not exist; provided, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Borrower or any other Grantor, the Third-Lien Collateral Agent may file a claim or statement of interest with respect to the Third-Lien Obligations, (B) the Third-Lien Collateral Agent may take any action (not adverse to the prior Liens on the Collateral securing the Second-Lien Obligations, or the rights of the Second-Lien Collateral Agent or the Second-Lien Creditors to exercise remedies in respect thereof) in order to preserve or protect its Liens on the Collateral in accordance with the terms of this Agreement and (C) the Third-Lien Creditors shall be entitled to file any necessary responsive or defensive pleading in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the

Exhibit I
Page 20

disallowance of the claims of the Third-Lien Creditors, including any claim secured by the Collateral, if any, in each case in accordance with the terms of this Agreement. In exercising rights and remedies with respect to the Collateral, the Second-Lien Collateral Agent and the Second-Lien Creditors may enforce the provisions of the Second-Lien Note Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)     The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), agree that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including, without limitation, setoff) with respect to any Collateral, unless and until the Discharge of First-Lien Obligations has occurred and, in the case of the Third-Lien Collateral Agent and the Third-Lien Creditors, the Discharge of Second-Lien Obligations has occurred. Without limiting the generality of the foregoing, (x) unless and until the Discharge of First-Lien Obligations has occurred, the sole right of the Second-Lien Collateral Agent and the Second-Lien Creditors with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second-Lien Security Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of the First-Lien Obligations has occurred in accordance with the terms of Section 4 hereof, the Second-Lien Note Documents and applicable law, and (y) unless and until the Discharge of First-Lien Obligations and the Discharge of the Second-Lien Obligations has occurred, the sole right of the Third-Lien Collateral Agent and the Third-Lien Creditors with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Third-Lien Security Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of the First-Lien Obligations and the Discharge of the Second-Lien Obligations has occurred in accordance with the terms of Section 4 hereof, the Third-Lien Credit Documents and applicable law.

(d)     (i)     The Second-Lien Collateral Agent, for itself and on behalf of the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), (x) agrees that the Second-Lien Collateral Agent and the other Second-Lien Creditors will not take any action that would hinder, delay, limit or prohibit any exercise of remedies under the First-Lien Credit Documents, including any collection, sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, or that would limit, invalidate, avoid or set aside any Lien or First-Lien Security Document or subordinate the priority of the First-Lien Obligations to the Second-Lien Obligations or grant the Liens securing the Second-Lien Obligations equal ranking to the Liens securing the First-Lien Obligations and (y) hereby waives any and all rights it or the Second-Lien Creditors may have as a junior lien creditor or otherwise (whether arising under the UCC or under any other law) to object to the manner in which the First-Lien Collateral Agent or the

Exhibit I
Page 21

First-Lien Creditors seek to enforce or collect the First-Lien Obligations or the Liens granted in any of the First-Lien Collateral, regardless of whether any action or failure to act by or on behalf of the First-Lien Collateral Agent or First-Lien Creditors is adverse to the interests of the Second-Lien Creditors and/or the Third-Lien Creditors.

(ii)    The Second-Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second-Lien Security Documents or any other Second-Lien Note Document shall be deemed to restrict in any way the rights and remedies of the First-Lien Collateral Agent or the First-Lien Creditors with respect to the Collateral as set forth in this Agreement and the First-Lien Credit Documents.

(e)    (i)    The Third-Lien Collateral Agent, for itself and on behalf of the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), (x) agrees that the Third-Lien Collateral Agent and the other Third-Lien Creditors will not take any action that would hinder, delay, limit or prohibit any exercise of remedies under the First-Lien Credit Documents or Second-Lien Note Documents, including any collection, sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, or that would limit, invalidate, avoid or set aside any Lien or First-Lien Security Document or Second-Lien Security Document, or subordinate the priority of the First-Lien Obligations to the Second-Lien Obligations and/or the Third-Lien Obligations, or subordinate the priority of the Second-Lien Obligations to the Third-Lien Obligations or grant the Liens securing the Third-Lien Obligations equal ranking to the Liens securing the First-Lien Obligations or the Second-Lien Obligations and (y) hereby waives any and all rights it or any of the Third-Lien Creditors may have as a junior lien creditor or otherwise (whether arising under the UCC or under any other law) to object to the manner in which the First-Lien Collateral Agent or the First-Lien Creditors, or the Second-Lien Collateral Agent or Second-Lien Creditors, seek to enforce or collect the First-Lien Obligations or the Liens granted in any of the First-Lien Collateral or Second-Lien Obligations or the Liens granted in any of the Second-Lien Collateral, regardless of whether any action or failure to act by or on behalf of the First-Lien Collateral Agent or First-Lien Creditors, or the Second-Lien Collateral Agent or Second-Lien Creditors, is adverse to the interests of the Second-Lien Creditors and/or the Third-Lien Creditors.

(ii)    The Third-Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Third-Lien Security Documents or any other Third-Lien Credit Document shall be deemed to restrict in any way the rights and remedies of the First-Lien Collateral Agent or the First-Lien Creditors, or the Second-Lien Collateral Agent or Second-Lien Creditors, with respect to the Collateral as set forth in this Agreement and the First-Lien Credit Documents or Second-Lien Note Documents, as the case may be.

(f)    Notwithstanding anything to the contrary in the preceding clauses (a) through (e), at any time while a payment default exists with respect to the Second-Lien Obligations following the final maturity of the Second-Lien Obligations, or the acceleration by the relevant Second-Lien Creditors of the maturity of all then outstanding Second-Lien Obligations, and in either case so long as 120 days have elapsed after notice thereof (and requesting that enforcement action be taken with respect to the Collateral) has been received by the First-Lien Collateral Agent and so long as the respective payment default shall not have been

Exhibit I
Page 22

cured or waived (or the respective acceleration rescinded), the Second-Lien Collateral Agent, for itself and on behalf of the Second-Lien Creditors, and the other Second-Lien Creditors may, but only if the First-Lien Collateral Agent or the First-Lien Creditors are not pursuing enforcement preceding with respect to the Collateral in a commercially reasonable manner (with any determination of which Collateral to proceed against, and in what order, to be made by the First-Lien Collateral Agent or such First-Lien Creditors in their reasonable judgment), enforce the Liens on Collateral granted pursuant to the Second-Lien Security Documents, provided that (x) any Collateral or any proceeds of Collateral received by the Second-Lien Collateral Agent or such other Second-Lien Creditor, as the case may be, in connection with the enforcement of such Lien (net of reasonable costs actually incurred in connection with such enforcement) shall be applied in accordance with the following Section 4 hereof and (y) the First-Lien Collateral Agent or any other First-Lien Creditors may at any time take over such enforcement proceedings, provided that the First-Lien Collateral Agent or such First-Lien Creditors, as the case may be, pursues enforcement proceedings in respect of the Collateral in a commercially reasonably manner, with any determination of which Collateral to proceed against, and in what order, to be made by the First-Lien Collateral Agent or such First-Lien Creditors in their reasonable judgment, and provided further that the Second-Lien Collateral Agent or Second-Lien Creditors, as the case may be, shall only be able to recoup (from amounts realized by the First-Lien Collateral Agent or any First-Lien Creditor(s) in any enforcement proceeding with respect to the collateral (whether initiated by the First-Lien Collateral Agent or First-Lien Creditor(s) or taken over by them as contemplated above) any expenses incurred by them in accordance with the priorities set forth in following Section 4.

SECTION 4. Payments.

4.1     Application of Proceeds.     (a) So long as the Discharge of First-Lien Obligations has not occurred, any proceeds of any Collateral pursuant to the enforcement of any Security Document or the exercise of any remedial provision thereunder, together with all other proceeds received by any Creditor (including all funds received in respect of post-petition interest or fees and expenses) as a result of any such enforcement or the exercise of any such remedial provision or as a result of any distribution of or in respect of any Collateral (whether or not expressly characterized as such) upon or in any Insolvency or Liquidation Proceeding with respect to any Grantor, or the application of any Collateral (or proceeds thereof) to the payment thereof or any distribution of Collateral (or proceeds thereof) upon the liquidation or dissolution of any Grantor, shall be applied by the First-Lien Collateral Agent (or paid over to the First-Lien Collateral Agent and applied by it) to the First-Lien Obligations in such order as specified in the relevant First-Lien Security Document. Upon the Discharge of the First-Lien Obligations, the First-Lien Collateral Agent shall deliver to the Second-Lien Collateral Agent any proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Second-Lien Collateral Agent in accordance with the provisions of following clause (b).

(b)     So long as the Discharge of First-Lien Obligations has occurred and the Discharge of Second-Lien Obligations has not occurred, any proceeds of any Collateral pursuant to the enforcement of any Security Document or the exercise of any remedial provision thereunder, together with all other proceeds received by any Creditor (including all funds

Exhibit I
Page 23

received in respect of post-petition interest or fees and expenses) as a result of any such enforcement or the exercise of any such remedial provision or as a result of any distribution of or in respect of any Collateral (whether or not expressly characterized as such) upon or in any Insolvency or Liquidation Proceeding with respect to any Grantor, or the application of any Collateral (or proceeds thereof) to the payment thereof or any distribution of Collateral (or proceeds thereof) upon the liquidation or dissolution of any Grantor, shall be applied by the Second-Lien Collateral Agent (or paid over to the Second-Lien Collateral Agent and applied by it) to the Second-Lien Obligations in such order as specified in the relevant Second-Lien Security Document. Upon the Discharge of the Second-Lien Obligations (so long as the Discharge of the First-Lien Obligations has occurred), the Second-Lien Collateral Agent shall deliver to the Third-Lien Collateral Agent any proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Third-Lien Collateral Agent to the Third-Lien Obligations in such order as specified in the Third-Lien Security Documents and this Agreement.

4.2     Payments Over.     (a) Until such time as the Discharge of First-Lien Obligations has occurred, any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3(a)) (or any distribution in respect of the Collateral, whether or not expressly characterized as such) received by any of (x) the Second-Lien Collateral Agent or any Second-Lien Creditors or (y) the Third-Lien Collateral Agent or any Third-Lien Creditors in connection with the exercise of any right or remedy (including set-off) relating to the Collateral or otherwise that is inconsistent with this Agreement shall be segregated and held in trust and forthwith paid over to the First-Lien Collateral Agent for the benefit of the First-Lien Creditors in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The First-Lien Collateral Agent is hereby authorized to make any such endorsements as agent for any of (x) the Second-Lien Collateral Agent or any such Second-Lien Creditors or (y) the Third-Lien Collateral Agent or any such Third-Lien Creditors. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)     After the Discharge of First-Lien Obligations has occurred, and thereafter until such time as the Discharge of Second-Lien Obligations has occurred, any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3(b)) (or any distribution in respect of the Collateral, whether or not expressly characterized as such) received by any of the Third-Lien Collateral Agent or any Third-Lien Creditors in connection with the exercise of any right or remedy (including set-off) relating to the Collateral or otherwise that is inconsistent with this Agreement shall be segregated and held in trust and forthwith paid over to the Second-Lien Collateral Agent for the benefit of the Second-Lien Creditors in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Second-Lien Collateral Agent is hereby authorized to make any such endorsements as agent for any of the Third-Lien Collateral Agent or any such Third-Lien Creditors. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

Exhibit I
Page 24

SECTION 5.  Other Agreements.

5.1    Releases.  (a)  If, in connection with:

(i)    the exercise of the First-Lien Collateral Agent's remedies in respect of the Collateral provided for in Section 3.1, including any sale, lease, exchange, transfer or other disposition of any such Collateral (any of the foregoing, a "Remedial Action");

(ii)    any sale, lease, exchange, transfer or other disposition (any of the foregoing, a "Disposition") of any Collateral permitted under the terms of the First-Lien Credit Documents (whether or not an "event of default" thereunder or under any Second-Lien Note Document or any Third-Lien Credit Document has occurred and is continuing), but without waiver of any right of the Second-Lien Creditors or Third-Lien Creditors to enforce their right to accelerate under the Second-Lien Note Indenture or Third-Lien Credit Agreement, as the case may be, if an event of default occurs thereunder because such transfer was not permitted thereunder; or

(iii)    any agreement (not contravening the First-Lien Credit Documents) between the First-Lien Collateral Agent and the Borrower or any other Grantor (x) to release the First-Lien Collateral Agent's Lien on any portion of the Collateral (other than (1) in connection with, or in anticipation of, a Discharge of First-Lien Obligations or a Discharge of First-Lien Obligations or (2) unless consented to by the Required Second-Lien Creditors, where the aggregate fair market value (as determined in good faith by the Borrower and certified by it to the First-Lien Collateral Agent) released in a given calendar year would exceed $5.0 million) or (y) to release any Grantor from its obligations under its guaranty of the First-Lien Obligations (other than (1) in connection with, or in anticipation of, a Discharge of First-Lien Obligations or a Discharge of First-Lien Obligations or (2) unless consented to by the Required Second-Lien Creditors, where the aggregate fair market value (as determined by the Borrower in good faith and certified to the First-Lien Collateral Agent) of the assets of all Grantors so released from guarantees during any calendar year would exceed $5.0 million);

there occurs the release by the First-Lien Collateral Agent, acting on its own or at the direction of the Required First-Lien Creditors, of any of its Liens on any part of the Collateral, or of any Grantor from its obligations under its guaranty of the First-Lien Obligations, then the Liens, if any, of the Second-Lien Collateral Agent, for itself and for the benefit of the Second-Lien Creditors, of any other Second-Lien Creditor, of the Third-Lien Collateral Agent, for itself and for the benefit of the Third-Lien Creditors, and of any other Third-Lien Creditor, on such Collateral, and the obligations of such Grantor under its guaranties (if any) of the Second-Lien Obligations and Third-Lien Obligations, shall be automatically, unconditionally and simultaneously released, and the Second-Lien Collateral Agent, for itself and on behalf of any such Second-Lien Creditors, and the Third-Lien Collateral Agent, for itself and on behalf of any such Third-Lien Creditors, promptly shall execute and deliver to the First-Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the First-Lien Collateral Agent or such Grantor may request to effectively confirm such release; provided however that if an "event of default" then exists under the Second-Lien Note Indenture or the Third-Lien Credit Agreement and the Discharge of First-Lien Obligations occurs concurrently

Exhibit I

Page 25

with any such release, the Second-Lien Collateral Agent shall be entitled to receive the residual cash or cash equivalents (if any) remaining after giving effect to such release and the Discharge of the First-Lien Obligations for application in accordance with the provisions of Section 4 hereof.

(b)     If, after the Discharge of First-Lien Obligations in the case of following clauses (ii) and (iii), in connection with:

(i)     the exercise of the Second-Lien Collateral Agent's remedies in respect of the Collateral provided for in Section 3.1, including, without limitation, any sale, lease, exchange, transfer or other disposition of any such Collateral (any of the foregoing, a "Second-Lien Remedial Action"); or

(ii)     any sale, lease, exchange, transfer or other disposition (any of the foregoing, a "Second-Lien Disposition") of any Collateral permitted under the terms of the Second-Lien Note Documents (whether or not an "event of default" thereunder or any Third-Lien Credit Document has occurred and is continuing), but without waiver of any right of the Third-Lien Creditors to enforce their right to accelerate under the Third-Lien Credit Agreement, if an event of default occurs thereunder because such transfer was not permitted thereunder;

the release by the Second-Lien Collateral Agent, at the direction of the Second-Lien Creditors, of any of its Liens on any part of the Collateral, or of any Grantor from any of its obligations under any guaranty of the Second-Lien Obligations, then the Liens, if any, of the Third-Lien Collateral Agent, for itself and for the benefit of the Third-Lien Creditors and of any other Third-Lien Creditor, on such Collateral, and the obligations of such Grantor under any of its guaranty of the Third-Lien Obligations, shall be automatically, unconditionally and simultaneously released, and the Third-Lien Collateral Agent, for itself and for the benefit of the Third-Lien Creditors, promptly shall execute and deliver to the Second-Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the Second-Lien Collateral Agent or such Grantor may request to effectively confirm such release; provided, however, that if an "event of default" then exists under any Third-Lien Credit Document and the Discharge of Second-Lien Obligations occurs concurrently with any such Second-Lien Remedial Action, Second-Lien Disposition or release, the Third-Lien Collateral Agent (on behalf of the Third-Lien Creditors) shall be entitled to receive the residual cash or cash equivalents (if any) remaining after giving effect to such Second-Lien Remedial Action, Second-Lien Disposition or release and the Discharge of the Second-Lien Obligations for application in accordance with the provisions of Section 4 hereof.

(c)     (i)     Until the Discharge of First-Lien Obligations occurs, the Second-Lien Collateral Agent, for itself and on behalf of the Second-Lien Creditors, hereby irrevocably constitutes and appoints the First-Lien Collateral Agent and any officer or agent of the First-Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second-Lien Collateral Agent or such holder or in the First-Lien Collateral Agent's own name, from time to time in the First-Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may

Exhibit I
Page 26

be necessary or desirable to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release;

(ii)    Until the Discharge of First-Lien Obligations occurs, the Third-Lien Collateral Agent, for itself and on behalf of the Third-Lien Creditors, hereby irrevocably constitutes and appoints the First-Lien Collateral Agent and any officer or agent of the First-Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Third-Lien Collateral Agent or such other Third-Lien Creditor or in the First-Lien Collateral Agent's own name, from time to time in the First-Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Section 5.1, including, without limitation, any endorsements or other instruments of transfer or release; and

(iii)   After the Discharge of the First-Lien Obligations occurs, and until the Discharge of Second-Lien Obligations occurs, the Third-Lien Collateral Agent, for itself and on behalf of the Third-Lien Creditors, hereby irrevocably constitutes and appoints the Second-Lien Collateral Agent and any officer or agent of the Second-Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Third-Lien Collateral Agent or such other Third-Lien Creditor or in the Second-Lien Collateral Agent's own name, from time to time in the Second-Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Section 5.1, including, without limitation, any endorsements or other instruments of transfer or release.

(d)    (i)    If, prior to the Discharge of First-Lien Obligations, a subordination of the First-Lien Collateral Agent's Lien on any Collateral is permitted (or in good faith believed by the First-Lien Collateral Agent to be permitted) under the First-Lien Credit Agreement, to another Lien permitted under the First-Lien Credit Agreement (a "Priority Lien"), then the First-Lien Collateral Agent is authorized to execute and deliver a subordination agreement with respect thereto in form and substance satisfactory to it, and (x) the Second-Lien Collateral Agent, for itself and on behalf of the Second-Lien Creditors and (y) the Third-Lien Collateral Agent, for itself and on behalf of the Third-Lien Creditors, shall promptly execute and deliver to the First-Lien Collateral Agent or the relevant Grantor an identical subordination agreement subordinating the Liens of (x) the Second-Lien Collateral Agent for the benefit of the Second-Lien Creditors or (y) the Third-Lien Collateral Agent for the benefit of the Third-Lien Creditors, as the case may be, to such Priority Lien.

(ii)    If, after the Discharge of First-Lien Obligations and prior to the Discharge of the Second-Lien Obligations, a subordination of the Second-Lien Collateral Agent's Lien on any Collateral is permitted (or in good faith believed by the Second-Lien Collateral Agent to be permitted) under the Second-Lien Note Indenture, to another Lien permitted under the Second-Lien Note Indenture (a "Second-Lien Note Indenture Priority Lien"), then the Second-Lien Collateral Agent is authorized to execute and deliver a subordination agreement with respect thereto in form and substance satisfactory to it, and the Third-Lien Collateral Agent, for itself and on behalf of the Third-Lien Creditors, shall promptly execute and

Exhibit I
Page 27

deliver to the Second-Lien Collateral Agent or the relevant Grantor an identical subordination agreement subordinating the Liens of the Third-Lien Collateral Agent for the benefit of the Third-Lien Creditors to such Second-Lien Note Indenture Priority Lien.

5.2     Insurance.  (i)  Unless and until the Discharge of First-Lien Obligations has occurred, the First-Lien Collateral Agent (acting at the direction of the Required First-Lien Creditors) shall have the sole and exclusive right, subject to the rights of the Grantors under the First-Lien Credit Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  Unless and until the Discharge of First-Lien Obligations has occurred, and subject to the rights of the Grantors under the First-Lien Security Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) in respect to the Collateral shall be paid to the First-Lien Collateral Agent for the benefit of the First-Lien Creditors pursuant to the terms of the First-Lien Credit Documents (including, without limitation, for purposes of cash collateralization of First-Lien Obligations consisting of commitments, letters of credit and Interest Rate Protection Agreements) and, after the Discharge of First-Lien Obligations has occurred, to the Second-Lien Collateral Agent for the benefit of the Second-Lien Creditors to the extent required under the Second-Lien Security Documents and, after the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations has occurred, to the Third-Lien Collateral Agent for the benefit of the Third-Lien Creditors to the extent required under the Third-Lien Security Documents and then, to the extent no Second-Lien Obligations and no Third-Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.  If either the Second-Lien Collateral Agent or any Second-Lien Creditors or the Third-Lien Collateral Agent or any Third-Lien Creditors shall, at any time prior to the Discharge of First-Lien Obligations, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the First-Lien Collateral Agent in accordance with the terms of Section 4.2(a) of this Agreement.

(ii)     After the Discharge of First-Lien Obligations has occurred and until the Discharge of the Second-Lien Obligations has occurred, the Second-Lien Collateral Agent (acting at the direction of the Required Second-Lien Creditors) shall have the sole and exclusive right, subject to the rights of the Grantors under the Second-Lien Note Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  After the Discharge of First-Lien Obligations has occurred and until the Discharge of the Second-Lien Obligations has occurred, and subject to the rights of the Grantors under the Second-Lien Security Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) in respect to the Collateral shall be paid to the Second-Lien Collateral Agent for the benefit of the Second-Lien Creditors pursuant to the terms of the Second-Lien Note Documents and, after the Discharge of Second-Lien Obligations has occurred, to the Third-Lien Collateral Agent for the benefit of the Third-Lien Creditors to the extent required under the Third-Lien Security Documents and then, to the extent no Third-Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or

Exhibit I
Page 28

as a court of competent jurisdiction may otherwise direct.  If the Third-Lien Collateral Agent or any Third-Lien Creditors shall, at any time after the Discharge of First-Lien Obligations, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the Second-Lien Collateral Agent in accordance with the terms of Section 4.2(b) of this Agreement.

        5.3   <u>Amendments to Second-Lien Security Documents and Third-Lien Security Documents</u>.  (a) (i)  Without the prior written consent of the First-Lien Collateral Agent (acting at the direction of the Required First-Lien Creditors), no Second-Lien Security Document or Third-Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second-Lien Security Document or Third-Lien Security Document, would contravene the provisions of this Agreement or any First-Lien Credit Document.

        (ii)   Without the prior written consent of the Second-Lien Collateral Agent (acting at the direction of the Required Second-Lien Creditors), no Third-Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Third-Lien Security Document, would contravene the provisions of this Agreement or any Second-Lien Note Document.

        (iii)   Each Grantor and each Second-Lien Creditor agrees that each Second-Lien Security Document shall include the following language (or language to similar effect approved by the First-Lien Collateral Agent).

        "Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second-Lien Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Second-Lien Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of _____ __, _____ (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "<u>Intercreditor Agreement</u>"), among [DESCRIBE INTERCREDITOR AGREEMENT] and certain other persons party or that may become party thereto from time to time.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, the Borrower agrees that each Second-Lien Mortgage covering any Collateral shall contain such other language as the First-Lien Collateral Agent may reasonably request to reflect the subordination of such Second-Lien Mortgage to the First-Lien Security Document covering such Collateral.

        (iv)   Each Grantor and each Third-Lien Creditor agrees that each Third-Lien Security Document shall include the following language (or language to similar effect approved by the First-Lien Collateral Agent).

Exhibit I
Page 29

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Third-Lien Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Third-Lien Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of _____ __, _____ (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Intercreditor Agreement"), among [DESCRIBE INTERCREDITOR AGREEMENT] and certain other persons party or that may become party thereto from time to time. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, the Borrower agrees that each Third-Lien Mortgage covering any Collateral shall contain such other language as the First-Lien Collateral Agent may reasonably request to reflect the subordination of such Third-Lien Mortgage to the First-Lien Security Document and the Second-Lien Security Document covering such Collateral.

(b)    (i)    In the event that, at any time prior to the Discharge of First-Lien Obligations, the First-Lien Collateral Agent or the First-Lien Creditors and the relevant Grantor(s) enter into any amendment, waiver or consent in respect of any of the First-Lien Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First-Lien Security Document or changing in any manner the rights of the First-Lien Collateral Agent, the First-Lien Creditors, the Borrower or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of (x) the Second-Lien Note Indenture and the Comparable Second-Lien Security Document without the consent of the Second-Lien Collateral Agent or the Second-Lien Creditors and without any action by the Second-Lien Collateral Agent, the Borrower or any other Grantor and (y) the Third-Lien Credit Agreement and the Comparable Third-Lien Security Document without the consent of the Third-Lien Collateral Agent or the Third-Lien Creditors and without any action by the Third-Lien Collateral Agent, the Borrower or any other Grantor, provided, that (A) no such amendment, waiver or consent shall have the effect of (i) removing assets subject to the Lien of the Second-Lien Security Documents or the Third-Lien Security Documents, except to the extent that a release of such Lien is permitted by Section 5.1 of this Agreement, (ii) imposing additional duties on the Second-Lien Collateral Agent without its consent or on the Third-Lien Collateral Agent without its consent, or (iii) permitting other liens on the Collateral not permitted under the terms of the Second-Lien Note Documents, or Section 6 hereof and (B) notice of such amendment, waiver or consent shall have been given to the Second-Lien Collateral Agent and the Third-Lien Collateral Agent (although the failure to give any such notice shall in no way affect the effectiveness of any such amendment, waiver or consent). Nothing in this clause (b) shall affect the amount of the Obligations or Hedging Obligations that shall constitute First-Lien Obligations.

(ii)    In the event that, at any time after the Discharge of First-Lien Obligations, the Second-Lien Collateral Agent or the Second-Lien Creditors and the relevant Grantor(s) enter into any amendment, waiver or consent in respect of any of the Second-Lien Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Second-Lien Security Document or changing in any

Exhibit I
Page 30

manner the rights of the Second-Lien Collateral Agent, the Second-Lien Creditors, the Borrower or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Third-Lien Credit Agreement and the Comparable Third-Lien Security Document without the consent of the Third-Lien Collateral Agent or the Third-Lien Creditors and without any action by the Third-Lien Collateral Agent, the Borrower or any other Grantor, provided, that (A) no such amendment, waiver or consent shall have the effect of (i) removing assets subject to the Lien of the Third-Lien Security Documents, except to the extent that a release of such Lien is permitted by Section 5.1 of this Agreement, (ii) imposing additional duties on the Third-Lien Collateral Agent without its consent, or (iii) permitting other liens on the Collateral not permitted under the terms of the Section 6 hereof and (B) notice of such amendment, waiver or consent shall have been given to the Third-Lien Collateral Agent (although the failure to give any such notice shall in no way affect the effectiveness of any such amendment, waiver or consent). Nothing in this clause (b)(ii) shall affect the amount of the Obligations that shall constitute Second-Lien Obligations.

       5.4   <u>Rights As Unsecured Creditors</u>. Except as otherwise set forth in this Agreement, the Second-Lien Collateral Agent, the Second-Lien Creditors, the Third-Lien Collateral Agent and the Third-Lien Creditors may exercise rights and remedies as unsecured creditors against the Borrower or any Subsidiary Guarantor that has guaranteed (x) the Second-Lien Obligations in accordance with the terms of the Second-Lien Note Documents and applicable law or, as the case may be, (y) the Third-Lien Obligations in accordance with the terms of the Third-Lien Credit Documents and applicable law. Except as otherwise set forth in this Agreement nothing in this Agreement shall prohibit the receipt by either (x) the Second-Lien Collateral Agent or any Second-Lien Creditors of the required payments of interest and principal on the Second-Lien Obligations or (y) the Third-Lien Collateral Agent or any Third-Lien Creditors of the required payments of interest and principal on the Third-Lien Obligations so long as such receipt is not the direct or indirect result of the exercise by the Second-Lien Collateral Agent or any Second-Lien Creditor or the Third-Lien Collateral Agent or any Third-Lien Creditor of rights or remedies as a secured creditor (including set-off) or enforcement in contravention of this Agreement of any Lien held by any of them. In the event the Second-Lien Collateral Agent or any Second-Lien Creditor or the Third-Lien Collateral Agent or any Third-Lien Creditor becomes a judgment lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subordinated to the Liens securing First-Lien Obligations (and in the case of any such judgment lien in favor of the Third-Lien Collateral Agent or any Third-Lien Creditors, same shall also be subordinated to the Liens securing the Second-Lien Obligations) on the same basis as the other Liens securing the Second-Lien Obligations or the Third-Lien Obligations, as the case may be, are so subordinated to the First-Lien Obligations (and the Second-Lien Obligations in the case of a judgment lien in favor of the Third-Lien Collateral Agent or any Third-Lien Creditors) under this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First-Lien Collateral Agent or the First-Lien Creditors may have with respect to the First-Lien Collateral.

Exhibit I
Page 31

5.5    Bailee for Perfection.    (a) The First-Lien Collateral Agent agrees to acquire and acknowledges it holds any Pledged Collateral or other Collateral actually in its possession or control (or in the possession or control of its agents or bailees) on behalf of itself and the Second-Lien Collateral Agent and any assignee and, to the extent the Collateral constitutes assets of the Borrower, the Third-Lien Collateral Agent and any assignee solely for the purpose of perfecting the security interest granted under the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents, subject to the terms and conditions of this Section 5.5.  Upon the Discharge of the First-Lien Obligations, the Second-Lien Collateral Agent agrees to acquire and acknowledges that it will hold any Pledged Collateral or other Collateral (to the extent the Collateral constitutes assets of the Borrower) actually in its possession or control (or on the possession or control of its agents or bailees) on behalf of itself and the Third-Lien Collateral Agent and any assignee, subject to the terms and conditions of this Section 5.5.   To the extent any other Collateral Agent holds any Pledged Collateral or other Collateral is actually in its possession or control (or in the possession or control of its agents or bailees), then it acknowledges that it holds such Pledged Collateral or Collateral on behalf of itself and the other Collateral Agents (other than the Third-Lien Collateral Agent, except to the extent constituting assets of the Borrower) solely for the purpose of perfecting the security interests granted under the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents, subject to the terms and conditions of this Section 5.5.

(b)    Until the Discharge of First-Lien Obligations has occurred, the First-Lien Collateral Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the First-Lien Credit Documents as if the Liens of the Second-Lien Collateral Agent under the Second-Lien Security Documents and the Third-Lien Collateral Agent under the Third-Lien Security Documents did not exist.  After the Discharge of First-Lien Obligations has occurred and until the Discharge of Second-Lien Obligations has occurred, the Second-Lien Collateral Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the Second-Lien Note Documents as if the Liens of the Third-Lien Collateral Agent under the Third-Lien Security Documents did not exist.  The rights of the Second-Lien Collateral Agent and the Third-Lien Collateral Agent shall at all times be subject to the terms of this Agreement, to the First-Lien Collateral Agent's rights under the First-Lien Credit Documents and, in the case of the Third-Lien Collateral Agent, to the Second-Lien Collateral Agent's rights under the Second-Lien Note Documents.

(c)    (i)    The First-Lien Collateral Agent shall have no obligation whatsoever to the First-Lien Creditors, the Second-Lien Collateral Agent, any Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor to assure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve any rights or benefits of any Person except as expressly set forth in this Section 5.5.  The duties or responsibilities of the First-Lien Collateral Agent under this Section 5.5 shall be limited solely to holding any Pledged Collateral actually in its possession or control as bailee in accordance with this Section 5.5.

(ii)    After the Discharge of First-Lien Obligations has occurred, the Second-Lien Collateral Agent shall have no obligations whatsoever to the Second-Lien Creditors, the Third-Lien Collateral Agent or any Third-Lien Creditor to assure that the Pledged

Exhibit I
Page 32

Collateral is genuine or owned by any of the Guarantors or to preserve any rights or benefits of any Person except as expressly set forth in this Section 5.5. The duties or responsibilities of the Second-Lien Collateral Agent under this Section 5.5 shall be limited solely to holding any Pledged Collateral actually in its possession or control as bailee in accordance with this Section 5.5.

(d) No Collateral Agent acting pursuant to this Section 5.5 shall have by reason of the First-Lien Security Documents, the Second-Lien Security Documents, the Third-Lien Security Documents, this Agreement or any other document a fiduciary relationship in respect of the any other Collateral Agent, the First-Lien Creditors, the Second-Lien Creditors or the Third-Lien Creditors.

(e) (i) Upon the Discharge of First-Lien Obligations, the First-Lien Collateral Agent shall deliver the remaining Pledged Collateral (if any) (or proceeds thereof) in its possession, together with any necessary endorsements, (i), to the Second-Lien Collateral Agent, unless the Discharge of Second-Lien Obligations has occurred, (ii) if preceding clause (i) does not apply, to the Third-Lien Collateral Agent (to the extent constituting assets of the Borrower) unless the Discharge of Third-Lien Obligations has occurred, and (iii) if (or to the extent) preceding clauses (i) and (ii) are inapplicable, to the Borrower or the relevant Grantor (in each case, so as to allow such Person to obtain control of such Pledged Collateral). The First-Lien Collateral Agent further agrees to take all other action reasonably requested by such Person in connection with such Person's obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

(ii) Upon the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations, the Second-Lien Collateral Agent shall deliver the remaining Pledged Collateral (if any) (or proceeds thereof) in its possession together with any necessary endorsements, (i) to the Third-Lien Collateral Agent (to the extent constituting assets of the Borrower), unless the Discharge of Third-Lien Obligations shall have occurred and (ii) if (or to the extent) preceding clause (i) is not applicable, to the Borrower or relevant Guarantor (in each case, so as to allow such Person to obtain control of such Pledged Collateral). The Second-Lien Collateral Agent further agrees to take all other action reasonably requested by such Person in connection with such Person's obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

5.6 <u>When Discharge of First-Lien Obligations or Second-Lien Obligations Deemed to Not Have Occurred</u>. (a) If at any time after the Discharge of First-Lien Obligations has occurred, the Borrower immediately thereafter enters into any Refinancing of any First-Lien Credit Document evidencing a First-Lien Obligation which Refinancing is permitted hereby, then such Discharge of First-Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement, and the obligations under such Refinancing First-Lien Credit Document shall automatically be treated as First-Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent under such First-Lien Credit Documents shall be the First-Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice stating that the Borrower has entered into a new First-Lien Credit Document (which notice shall include the identity of the new agent, such agent, the "<u>New Agent</u>"), the Second-Lien Collateral Agent

Exhibit I
Page 33

and the Third-Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Borrower or such New Agent may reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement. In addition, a Discharge of First-Lien Obligations shall be deemed not to have occurred in the circumstances described in Section 6.5.

   (b) If at any time after the Discharge of Second-Lien Obligations has occurred, the Borrower immediately thereafter enters into any Refinancing of any Second-Lien Note Document evidencing a Second-Lien Obligation which Refinancing is permitted hereby (and by the terms of any First-Lien Credit Documents then in effect), then such Discharge of Second-Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement, and the obligations under such Refinancing Second-Lien Note Document shall automatically be treated as Second-Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the collateral agent under such Second-Lien Note Documents shall be the Second-Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice stating that the Borrower has entered into a new Second-Lien Note Document in accordance with the foregoing requirements (which notice shall include the identity of the new agent, such agent, the "New Second-Lien Agent"), the First-Lien Collateral Agent and the Third-Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Borrower or such New Second-Lien Agent may reasonably request in order to provide to the New Second-Lien Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.

   5.7 <u>Option to Purchase First-Lien Debt</u>. (a) Without prejudice to the enforcement of remedies by the First-Lien Creditors, so long as the Discharge of Second-Lien Obligations has not occurred, any Person or Persons (in each case who must meet all eligibility standards contained in all relevant First-Lien Credit Documents) at any time or from time to time designated by the holders of more than 50% in outstanding principal amount of the Second-Lien Obligations as entitled to exercise all default purchase options as to the Second-Lien Obligations then outstanding (an "<u>Eligible Purchaser</u>") shall have the right to purchase by way of assignment (and shall thereby also assume all commitments and duties of the First-Lien Creditors), at any time during the exercise period described in clause (c) below, all, but not less than all, of the First-Lien Obligations, including all principal of and interest and fees on and all prepayment or acceleration penalties and premiums in respect of all First-Lien Obligations, outstanding at the time of purchase; <u>provided</u> that at time of (and as a condition to) any purchase pursuant to this Section 5.7, all commitments pursuant to any then outstanding First-Lien Credit Agreement shall have terminated and all Interest Rate Protection Agreements constituting First-Lien Credit Documents shall also have been terminated in accordance with their terms. Any purchase pursuant to this Section 5.7(a) shall be made as follows:

   (1) for (x) a purchase price equal to the sum of (A) in the case of all loans, advances or other similar extensions of credit that constitute First-Lien Obligations (including unreimbursed amounts drawn in respect of Letters of Credit, but excluding the undrawn amount of then outstanding Letters of Credit), 100% of the principal amount

Exhibit I
Page 34

thereof and all accrued and unpaid interest thereon through the date of purchase, (B) in the case of any Interest Rate Protection Agreement, the aggregate amount then owing to each Hedging Creditor thereunder pursuant to the terms of the respective Interest Rate Protection Agreement, including without limitation all amounts owing to such Hedging Creditor as a result of the termination (or early termination) thereof plus (C) all unpaid fees, expenses, indemnities and other amounts which are then due and payable to the various First-Lien Creditors, pursuant to the terms of the various First-Lien Credit Documents; and (y) an obligation on the part of the respective Eligible Purchasers (which shall be expressly provided in the assignment documentation described below) to reimburse each issuing lender (or any First-Lien Creditor required to pay same) for all amounts thereafter drawn with respect to any Letters of Credit constituting First-Lien Obligations which remain outstanding after the date of any purchase pursuant to this Section 5.7, together with all facing fees and other amounts which may at any future time be owing to the respective issuing lender with respect to such Letters of Credit;

(2)     with the purchase price described in preceding clause (a)(1)(x) payable in cash on the date of purchase against transfer to the respective Eligible Purchaser or Eligible Purchasers (without recourse and without any representation or warranty whatsoever, whether as to the enforceability of any First-Lien Obligation or the validity, enforceability, perfection, priority or sufficiency of any Lien securing or guarantee or other supporting obligation for any First-Lien Obligation or as to any other matter whatsoever, except only the representation and warranty that the transferor owns free and clear of all Liens and encumbrances (other than participation interests not prohibited by the First-Lien Credit Agreement, in which case the purchase price described in preceding clause (a)(1)(x) shall be appropriately adjusted so that the Eligible Purchaser does not pay amounts represented by any participation interest which remains in effect), and has the right to convey, whatever claims and interests it may have in respect of the First-Lien Obligations); provided that the purchase price in respect of any outstanding Letter of Credit that remains undrawn on the date of purchase shall be payable as and when such Letter of Credit is drawn upon (i) first, from the cash collateral account described in clause (a)(3) below, until the amounts contained therein have been exhausted, and (ii) thereafter, directly by the purchaser;

(3)     with such purchase accompanied by a deposit of cash collateral under the sole dominion and control of the First-Lien Collateral Agent or its designee in an amount equal to 110% of the sum of the aggregate undrawn amount of all then outstanding Letters of Credit pursuant to the First-Lien Credit Documents and the aggregate facing and similar fees which will accrue thereon through the stated maturity of the Letters of Credit (assuming no drawings thereon before stated maturity), as security for the purchaser's obligation to pay amounts as provided in preceding clause (a)(1)(y) , it being understood and agreed that (x) at the time any facing or similar fees are owing to an issuer with respect to any Letter of Credit, the First-Lien Collateral Agent may apply amounts deposited with it as described above to pay same and (y) upon any drawing under any Letter of Credit, the First-Lien Collateral Agent shall apply amounts deposited with it as described above to repay the respective unpaid drawing.  After giving effect to any payment made as described above in this clause (3), those amounts (if any) then on

Exhibit I
Page 35

deposit with the First-Lien Collateral Agent as described in this item (3) which exceed 110% of the sum of the aggregate undrawn amount of all then outstanding Letters of Credit and the aggregate facing and similar fees (to the respective issuers) which will accrue thereon through the stated maturity of the then outstanding Letters of Credit (assuming no drawings thereon before stated maturity), shall be returned to the respective Eligible Purchaser or Eligible Purchasers (as their interests appear). Furthermore, at such time as all Letters of Credit have been cancelled, expired or been fully drawn, as the case may be, and after all applications described above have been made, any excess cash collateral deposited as described above in this clause (iii) (and not previously applied or released as provided above) shall be returned to the respective Eligible Purchaser or Eligible Purchasers, as their interests appear;

(4)     with the purchase price described in preceding clause (a)(1)(x) accompanied by (i) a release in favor of the First-Lien Collateral Agent and the First-Lien Creditors from all the Grantors and the Eligible Purchaser or Eligible Purchasers, in form and substance reasonably satisfactory to the First-Lien Collateral Agent, of all obligations and liabilities of the First-Lien Collateral Agent, the First-Lien Creditors and their respective affiliates, officers, directors, employees and agents and (ii) a waiver by the Second-Lien Collateral Agent (on behalf of itself and the other Second-Lien Creditors) of all claims arising out of this Agreement and the transactions contemplated hereby as a result of exercising the purchase option contemplated by this Section 5.7;

(5)     with all amounts payable to the various First-Lien Creditors in respect of the assignments described above to be distributed to them by the First-Lien Collateral Agent in accordance with their respective holdings of the various First-Lien Obligations; and

(6)     with such purchase to be made pursuant to assignment documentation in form and substance reasonably satisfactory to, and prepared by counsel for, the First-Lien Collateral Agent (with the cost of such counsel to be paid by the Grantors or, if the Grantors do not make such payment, by the respective Eligible Purchaser or Eligible Purchasers, who shall have the right to obtain reimbursement of same from the Grantors); it being understood and agreed that the First-Lien Collateral Agent and each other First-Lien Creditor shall retain all rights to indemnification as provided in the relevant First-Lien Credit Documents for all periods prior to any assignment by them pursuant to the provisions of this Section 5.7. The relevant assignment documentation shall also provide that, if for any reason (other than the gross negligence or willful misconduct of the First-Lien Collateral Agent), the amount of cash collateral held by the First-Lien Collateral Agent or its designee pursuant to preceding item (a)(3) is at any time less than the full amounts owing with respect to any Letter of Credit described above (including facing and similar fees) then the respective Eligible Purchaser or Eligible Purchasers shall promptly reimburse the First-Lien Collateral Agent (who shall pay the respective issuing bank) the amount of deficiency.

(b)     The right to exercise the purchase option described in Section 5.7(a) shall be exercisable and legally enforceable upon at least fifteen Business Days' prior written notice of exercise (which notice, once given, shall be irrevocable and fully finding on the respective,

Exhibit I
Page 36

Eligible Purchaser) given to the First-Lien Collateral Agent by an Eligible Purchaser. Neither the First-Lien Collateral Agent or any other First-Lien Creditor shall have any disclosure obligation to any Eligible Purchaser, the Second-Lien Collateral Agent, any other Second-Lien Creditor, the Third-Lien Collateral Agent or any other Third-Lien Creditor in connection with any exercise of such purchase option.

(c)     The right to purchase the First-Lien Obligations as described in this Section 5.7 may be exercised (by giving the irrevocable written notice described in preceding clause (b)) during the period that (1) begins on the date occurring 10 Business Days after the first to occur of (x) the date of the acceleration of the final maturity of the Loans under the First-Lien Credit Agreement or (y) the occurrence of the final maturity of the Loans under the First-Lien Agreement (in each case, so long as the acceleration or failure to pay amounts due at final maturity has not been rescinded or cured within such 10 Business Day Period, and so long as any unpaid amounts constituting First-Lien Obligations remain owing); provided that if there is any failure to meet the condition described in the proviso immediately preceding clause (a)(1) hereof, the aforementioned date shall be extended until the first date upon which such condition is satisfied, and (2) ends on the 90th day after the start of the period described above.

(d)     The obligations of the First-Lien Creditors to sell their respective First-Lien Obligations under this Section 5.7 are several and not joint and several. To the extent any First-Lien Creditor (a "Defaulting Creditor") breaches its obligation to sell its First-Lien Obligations under this Section 5.7, nothing in this Section 5.7 shall be deemed to require the First-Lien Collateral Agent or any other First-Lien Creditor to purchase such Defaulting Creditor's First-Lien Obligations for resale to the holders of Second-Lien Obligations and in all cases, the First-Lien Collateral Agent and each First-Lien Creditor complying with the terms of this Section 5.7 shall not be deemed to be in default of this Agreement or otherwise be deemed liable for any action or inaction of any Defaulting Creditor; provided that nothing in this clause (d) shall require any Eligible Purchaser to purchase less than all of the First-Lien Obligations.

(e)     Each Grantor irrevocably consents to any assignment effected to one or more Eligible Purchasers (so long as they meet all eligibility standards contained in all relevant First-Lien Credit Documents, other than obtaining the consent of any Grantor to an assignment) for purposes of all First-Lien Credit Documents and hereby agree that no further consent from them shall be required.

5.8     Special Agreements Relating to Subsidiary Guaranties.     (a) It is understood and agreed that various Subsidiaries of the Borrower shall from time to time guaranty the First-Lien Obligations pursuant to a "Subsidiaries Guaranty". Each Subsidiary which so guaranties the First-Lien Obligations will also guaranty the Second-Lien Obligations. The guaranties described above shall be in substantially identical form, except that (i) the fraudulent conveyance paragraph contained in each such guaranty of First-Lien Obligations shall be in substantially the form set forth below:

Each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any similar Federal or state law. To effectuate the

Exhibit I
Page 37

foregoing intention, each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Guaranteed Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws (it being understood that it is the intention of the parties to this Guaranty and the parties to any guaranty of the Second-Lien Note Indenture that, to the maximum extent permitted under applicable laws, the liabilities in respect of the guarantees of the Second-Lien Note Indenture shall not be included for the foregoing purposes and that, if any reduction is required to the amount guaranteed by any Guarantor hereunder and with respect to the Second-Lien Note Indenture that its guarantee of amounts owing in respect of the Second-Lien Note Indenture shall first be reduced) and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

and (ii) the fraudulent conveyance paragraph in each such guaranty of Second-Lien Obligations shall be in substantially the form set forth below:

Each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act of any similar Federal or state law. To effectuate the foregoing intention, each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Guaranteed Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws (it being understood that it is the intention of the parties to this Guaranty and the parties to any guaranty of the First-Lien Obligations that, to the maximum extent permitted under applicable laws, the liabilities in respect of the guarantees of the First-Lien Obligations shall not be included for the foregoing purposes and that, if any reduction is required to the amount guaranteed by any Guarantor hereunder and with respect to the First-Lien Obligations that its guarantee of amounts owing in respect of the Second-Lien Note Indenture shall first be reduced) and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

(b)     Notwithstanding anything to the contrary contained above, it is acknowledged and agreed that, with respect to any guaranty of Second-Lien Obligations provided by RCN International, which is the Subsidiary of the Borrower which owns the equity interests owned by the Borrower and its Subsidiaries in the Megacable Entities, that such guaranty shall be subordinated in right of payment to RCN International's guaranty of First-Lien Obligations on terms (typical for high-yield subordinated debt securities) to be agreed by the First-Lien Collateral Agent and Second-Lien Collateral Agent, and contained in the respective

Exhibit I
Page 38

such guaranty as executed by RCN International on (or about) the date hereof. Furthermore, and without limiting the foregoing, any RCN International guaranty shall contain express provisions that upon any substantive consolidation of the assets of RCN International with the Borrower and/or one or more of its other Subsidiaries, the benefits of such subordination shall be preserved with respect to the assets of RCN International (specifically including all equity interests in the Megacable Entities) before giving effect to the respective such substantive consolidation.

SECTION 6. Insolvency or Liquidation Proceedings.

6.1 Finance and Sale Issues. (a) If the Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First-Lien Collateral Agent (acting at the direction of the Required First-Lien Creditors) shall desire to permit the use of Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) on which the First-Lien Collateral Agent or any other creditor of the Borrower or any other Grantor has a Lien or to permit the Borrower or any other Grantor to obtain financing (including on a priming basis), whether from the First-Lien Creditors or any other third party under Section 362, 363 or 364 of the Bankruptcy Code or any other Bankruptcy Law (each, a "Post-Petition Financing"), then (x) the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and (y) the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that it will not oppose or raise any objection to or contest (or join with or support any third party opposing, objecting to or contesting), such use of Cash Collateral or Post-Petition Financing and will not request adequate protection or any other relief in connection therewith (except as expressly agreed in writing by the First-Lien Collateral Agent or to the extent permitted by Section 6.3) and, to the extent the Liens securing the First-Lien Obligations are subordinated to or pari passu with such Post-Petition Financing, its Liens on the Collateral shall be deemed to be subordinated, without any further action on the part of any Person, to the Liens securing such Post-Petition Financing (and all Obligations relating thereto), and the Liens securing the Second-Lien Obligations and the Third-Lien Obligations shall have the same priority with respect to the Collateral relative to the Liens securing the First-Lien Obligations as if such Post-Petition Financing had not occurred. Neither the Third-Lien Collateral Agent nor any Third-Lien Creditor shall object to any Post-Petition Financing for any reason, or on any basis, whatsoever. Neither the Second-Lien Collateral Agent nor any Second-Lien Creditor shall object to any Post-Petition Financing for any reason, or on any basis, whatsoever, so long as the aggregate principal amount of financing to be provided pursuant thereto, when added (without duplication of amounts) to any principal amount (for this purpose, including the maximum undrawn amounts of any then outstanding Letters of Credit) which would at the same time be outstanding pursuant to any First-Lien Credit Agreement then in effect (thereby permitting, without limitation, a "roll-up" of any prepetition First-Lien Obligations into a Post-Petition Financing), would not exceed the Maximum First-Lien Credit Documents Principal Amount at such time. Furthermore, and notwithstanding anything to the contrary contained above in this Section 6.1, the Second-Lien Collateral Agent and the Second-Lien Creditors (but not the Third-Lien Collateral Agent and not the Third-Lien Creditors) may object to any Post-Petition Financing which is in excess of the amount described in the immediately preceding sentence, but solely on grounds which general unsecured creditors in the

Exhibit I
Page 39

Insolvency or Liquidation Proceeding would have standing to raise (without regard to whether there actually are general unsecured creditors in the Insolvency or Liquidation Proceeding, or whether any such creditors actually oppose the respective Post-Petition Financing) and for the avoidance of doubt, not on the basis of lack of adequate protection or other grounds applicable solely to a secured party.

(b)     The Second-Lien Collateral Agent, on behalf of itself and the other Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the other Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that it will raise no objection to, oppose or contest (or join with or support any third party opposing, objecting to or contesting), a sale or other disposition of any Collateral free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the First-Lien Creditors (or, in the case of the Third-Lien Collateral Agent and any other Third-Lien Creditor, if the First-Lien Creditors or the Second-Lien Creditors) have consented to such sale or disposition of such assets; provided, however, that, in the case of the agreements of the Second-Lien Collateral Agent and Second-Lien Creditors only (with this proviso being inapplicable to the Third-Lien Collateral Agent and the Third-Lien Creditors), any such sale or disposition must be approved by the bankruptcy court with jurisdiction over the sale (the "Bankruptcy Court") by an order that: (a) contains a specific finding that the sale or disposition being approved is commercially reasonable; and (b) provides that any consideration received in connection with such sale or disposition that exceeds the amount of the First-Lien Obligations shall be used to satisfy the Second-Lien Obligations, or shall remain encumbered by the Second-Lien Obligations, with the same priority and subject to the same limitations set forth herein with respect to their Liens on the Collateral. The Second-Lien Collateral Agent and the Second-Lien Creditors (but not the Third-Lien Collateral Agent and not the Third-Lien Creditors) shall be entitled to object to any proposed form of order that does not contain the foregoing provisions.

(c)     If (x) the Discharge of First-Lien Obligations shall have occurred prior to the Borrower or any other Grantor being subject to any Insolvency or Liquidation Proceeding, (y) the Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and (z) the Second-Lien Collateral Agent (acting at the direction of the Second-Lien Creditors) shall desire to permit the use of cash collateral on which the Second-Lien Collateral Agent or any other Second-Lien Creditor has a Lien or to permit the Borrower or any other Grantor to obtain financing (including, without limitation, on a priming basis), whether from the Second-Lien Creditors or any other third party under Section 362, 363 or 364 of Title 11 of the United States Code or any similar Bankruptcy Law (each, a "Second-Lien Post-Petition Financing"), then the Third-Lien Collateral Agent, on behalf of itself and the other Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that it will not oppose or raise any objection to such use of cash collateral or Second-Lien Post-Petition Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by Section 6.3) and, to the extent the Liens securing the Second-Lien Obligations are subordinated to or pari passu with such Second-Lien Post-Petition Financing, its Liens on the Collateral shall be deemed to be subordinated without any further action on the part of any Person to the Liens securing such

Exhibit I
Page 40

Second-Lien Post-Petition Financing (and all obligations relating thereto) and the Liens securing the Third-Lien Obligations shall have the same priority with respect to the Collateral relative to the Liens securing the Second-Lien Obligations as if such Second-Lien Post-Petition Financing had not occurred. Neither the Third-Lien Collateral Agent nor any Third-Lien Creditor shall object to any Second-Lien Post-Petition Financing for any reason, or on any basis, whatsoever.

6.2 <u>Relief from the Automatic Stay</u>. Until (x) the Discharge of First-Lien Obligations has occurred, the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and (y) the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations have each occurred, the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), in each case agree that none of them shall seek relief, pursuant to Section 362(d) of the Bankruptcy Code or otherwise, from the automatic stay of Section 362(a) of the Bankruptcy Code or from any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First-Lien Collateral Agent (or, in the case of preceding clause (y), if the Discharge of First-Lien Obligations has occurred, without the prior written consent of the Second-Lien Collateral Agent).

6.3 <u>Adequate Protection</u>. (a) The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents) and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that, until the Discharge of First-Lien Obligations has occurred, none of them shall (i) oppose, object to or contest (or join with or support any third party opposing, objecting to or contesting) (a) any request by the First-Lien Collateral Agent or the First-Lien Creditors for adequate protection in any Insolvency or Liquidation Proceeding (or any granting of such request) or (b) any objection by the First-Lien Collateral Agent or the First-Lien Creditors to any motion, relief, action or proceeding based on the First-Lien Collateral Agent or the First-Lien Creditors claiming a lack of adequate protection or (ii) seek or accept any form of adequate protection under any of Sections 362, 363 and/or 364 of the Bankruptcy Code with respect to the Collateral, except to the extent that, in the reasonable discretion of the First-Lien Creditors, the receipt by the Second-Lien Creditors or the Third-Lien Creditors of any such adequate protection would not reduce (or would not have the effect of reducing) or adversely affect the adequate protection that the First-Lien Creditors otherwise would be entitled to receive (it being understood that, in any event, (A) no adequate protection shall be requested or accepted by (x) the Second-Lien Creditors or by the Second-Lien Collateral Agent on their behalf or (y) by the Third-Lien Creditors or by the Third-Lien Collateral Agent on their behalf unless the First-Lien Creditors are satisfied in their reasonable discretion with the adequate protection afforded to the First-Lien Creditors, and (B) any such adequate protection is in the form of a replacement Lien on the Grantors' assets, which Lien will be subordinated to the Liens securing the First-Lien Obligations (including any replacement Liens granted in respect of the First-Lien Obligations) and any Post-Petition Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Lien Obligations are so subordinated to the First-Lien Obligations under this Agreement.

Exhibit I
Page 41

(b)    The Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that, after the Discharge of First-Lien Obligations has occurred, none of them shall (i) oppose, object to or contest (or join with or support any third party opposing, objecting to or contesting) (a) any request by the Second-Lien Collateral Agent or the Second-Lien Creditors for adequate protection in any Insolvency or Liquidation Proceeding (or any granting of such request) or (b) any objection by the Second-Lien Collateral Agent or the Second-Lien Creditors to any motion, relief, action or proceeding based on the Second-Lien Collateral Agent or the Second-Lien Creditors claiming a lack of adequate protection or (ii) seek or accept any form of adequate protection under any of Sections 362, 363 and/or 364 of the Bankruptcy Code with respect to the Collateral, except to the extent that, in the reasonable discretion of the Second-Lien Creditors, the receipt by the Third-Lien Creditors of any such adequate protection would not reduce (or would not have the effect of reducing) or adversely affect the adequate protection that the Second-Lien Creditors otherwise would be entitled to receive (it being understood that, in any event, (A) no adequate protection shall be requested or accepted by the Third-Lien Creditors or by the Third-Lien Collateral Agent on their behalf unless the Second-Lien Creditors are satisfied in their reasonable discretion with the adequate protection afforded to the Second-Lien Creditors, and (B) any such adequate protection is in the form of a replacement Lien on the Grantors' assets, which Lien will be subordinated to the Liens securing the Second-Lien Obligations (including any replacement Liens granted in respect of the Second-Lien Obligations) and any Post-Petition Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Third-Lien Obligations are so subordinated to the Second-Lien Obligations under this Agreement.

6.4    No Waiver; Voting Rights.  (a)  Nothing contained herein shall prohibit or in any way limit the First-Lien Collateral Agent or any First-Lien Creditor from objecting on any basis in any Insolvency or Liquidation Proceeding or otherwise to any action taken by (x) the Second-Lien Collateral Agent or any Second-Lien Creditor and/or (y) the Third-Lien Collateral Agent or any Third-Lien Creditor, including the seeking by (x) the Second-Lien Collateral Agent or any Second-Lien Creditor and/or (y) the Third-Lien Collateral Agent or any Third-Lien Creditor of adequate protection or the assertion by (x) the Second-Lien Collateral Agent or any Second-Lien Creditor and/or (y) the Third-Lien Collateral Agent or any Third-Lien Creditor of any of its rights and remedies under the Second-Lien Note Documents, the Third-Lien Credit Documents or otherwise.  In any Insolvency or Liquidation Proceeding, neither (x) the Second-Lien Collateral Agent nor any other Second-Lien Creditor nor (y) the Third-Lien Collateral Agent nor any Third-Lien Creditor shall propose or support any plan of reorganization or disclosure statement, or join with or support any third party in doing so, to the extent the terms of such plan or disclosure statement does not provide: (i) for the payment in full in cash of all First-Lien Obligations (including all post-petition interest, fees and expenses as provided in Section 6.6) on the effective date of such plan of reorganization, or (ii) for the retention by the First-Lien Collateral Agent, for the benefit of the First-Lien Creditors, of the Liens on the Collateral securing the First-Lien Obligations, and on all proceeds thereof, and provides that any Liens retained by, or granted to, the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent are only on assets or property securing the First-Lien Obligations and shall have the same relative priority and rights with respect to the Collateral or other assets or property, respectively, as provided in this Agreement with respect to the Collateral (and with the First-Lien Collateral

Exhibit I
Page 42

Agent and First-Lien Creditors to have the benefits of this Agreement or a successor agreement which provides them substantially the same rights and protections as are provided herein), and to the extent such plan provides for deferred cash payments, or for the distribution of any other property of any kind or nature, on account of the First-Lien Obligations, the Second-Lien Obligations and/or the Third-Lien Obligations, that any such deferred cash payments or other distributions in respect of the Second-Lien Obligations and/or the Third-Lien Obligations shall be delivered to the First-Lien Collateral Agent and distributed in accordance with the priorities provided in Section 4.1(a).

(b)     Nothing contained herein shall prohibit or in any way limit the Second-Lien Collateral Agent or any Second-Lien Creditor from:  (i) objecting on any basis in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Third-Lien Collateral Agent or any Third-Lien Creditor, including the seeking by the Third-Lien Collateral Agent or any Third-Lien Creditor of adequate protection or the assertion by the Third-Lien Collateral Agent or any Third-Lien Creditor of any of its rights and remedies under the Third-Lien Credit Documents or otherwise; or (ii) objecting to, voting against, or otherwise opposing any proposed plan of reorganization or liquidation in any Insolvency or Liquidation Proceeding.

(c)     Nothing contained herein shall prohibit or in any way limit the Second-Lien Collateral Agent or any Second-Lien Creditor from objecting to, voting against, or otherwise opposing any proposed plan of reorganization or liquidation in any Insolvency or Liquidation Proceeding.

6.5     <u>Preference Issues</u>.  (a) If any First-Lien Creditor is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower or any other Grantor any amount (a "<u>Recovery</u>"), then the First-Lien Obligations shall be reinstated to the extent of such Recovery and the First-Lien Creditors shall be entitled to a reinstatement of First-Lien Obligations with respect to all such recovered amounts.  In such event, any Discharge of First-Lien Obligations for all purposes of this Agreement shall be deemed to have not occurred (unless and until same subsequently occurs with respect to the First-Lien Obligations after giving effect to the provisions to this Section 6.5(a)).  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect (and any prior Discharge of First-Lien Obligations shall be deemed not to have occurred), and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.  Any amounts received by the Second-Lien Collateral Agent or any Second-Lien Creditor on account of the Second-Lien Obligations, or by the Third-Lien Collateral Agent or any Third-Lien Creditor on account of the Third-Lien Obligations, after the termination of this Agreement (or any prior Discharge of First-Lien Obligations) shall, in the event of a reinstatement pursuant to this Section 6.5(a), be held in trust for and paid over to the First-Lien Collateral Agent for the benefit of the First-Lien Creditors, for application to the reinstated First-Lien Obligations.

(b)     If any Second-Lien Creditor is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower or any other Grantor any amount (a "<u>Second-Lien Recovery</u>"), then the Second-Lien Obligations shall be reinstated to the extent of such Second-Lien Recovery and the Second-Lien Creditors shall be entitled to a reinstatement of Second-Lien Obligations with respect to all such recovered

Exhibit I
Page 43

amounts. In such event, any Discharge of Second-Lien Obligations for all purposes of this Agreement shall be deemed to have not occurred (unless and until same subsequently occurs with respect to the Second-Lien Obligations after giving effect to the provisions to this Section 6.5(b)). If this Agreement shall have been terminated prior to such Second-Lien Recovery, this Agreement shall be reinstated in full force and effect (and any prior Discharge of Second-Lien Obligations shall be deemed not to have occurred), and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. Any amounts received by the Third-Lien Collateral Agent or any Third-Lien Creditor on account of the Third-Lien Obligations, after the termination of this Agreement (or any prior Discharge of Second-Lien Obligations) shall, in the event of a reinstatement pursuant to this Section 6.5(b), be held in trust for and paid over to the Second-Lien Collateral Agent for the benefit of the Second-Lien Creditors, for application to the reinstated Second-Lien Obligations.

(c)     This Section 6.5 shall survive termination of this Agreement.

6.6     <u>Post-Petition Interest</u>. (a) Neither (x) the Second-Lien Collateral Agent nor any Second-Lien Creditor nor (y) the Third-Lien Collateral Agent nor any Third-Lien Creditor shall oppose or seek to challenge any claim by the First-Lien Collateral Agent or any First-Lien Creditor for allowance in any Insolvency or Liquidation Proceeding of First-Lien Obligations consisting of post-petition interest, fees or expenses. Regardless of whether any such claim for post-petition interest, fees or expenses is allowed or allowable, and without limiting the generality of the other provisions of this Agreement, this Agreement expressly is intended to include and does include the "rule of explicitness" in that this Agreement expressly entitles the First-Lien Creditors, and is intended to provide the First-Lien Creditors with the right, to receive payment of all post-petition interest, fees or expenses through distributions made pursuant to the provisions of this Agreement even though such interest, fees and expenses are not allowed or allowable against the bankruptcy estate of the Borrower or any other Grantor under Section 502(b)(2) or Section 506(b) of the Bankruptcy Code or under any other provision of the Bankruptcy Code or any other Bankruptcy Law.

(b)     Neither the Third-Lien Collateral Agent nor any Third-Lien Creditor shall oppose or seek to challenge any claim by the Second-Lien Collateral Agent or any Second-Lien Creditor for allowance in any Insolvency or Liquidation Proceeding of Second-Lien Obligations consisting of post-petition interest, fees or expenses. Regardless of whether any such claim for post-petition interest, fees or expenses is allowed or allowable, and without limiting the generality of the other provisions of this Agreement, this Agreement expressly is intended to include and does include the "rule of explicitness" in that this Agreement expressly entitles the Second-Lien Creditors (after the Discharge of First-Lien Obligations has occurred, including as to amounts described in preceding clause (a)), and is intended to provide the Second-Lien Creditors (after the Discharge of First-Lien Obligations has occurred, including as to amounts described in preceding clause (a)) with the right, to receive payment of all post-petition interest, fees or expenses through distributions made pursuant to the provisions of this Agreement even though such interest, fees and expenses are not allowed or allowable against the bankruptcy estate of the Borrower or any other Grantor under Section 502(b)(2) or Section 506(b) of the

Exhibit I
Page 44

Bankruptcy Code or under any other provision of the Bankruptcy Code or any other Bankruptcy Law.

      (c)     Without limiting the foregoing, it is the intention of the parties hereto that (and to the maximum extent permitted by law the parties hereto agree that) (x) the First-Lien Obligations (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the Second-Lien Obligations (and the security therefor) and the Third-Lien Obligations (and the security therefor), (y) the Second-Lien Obligations (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the First-Lien Obligations (and the security therefor) and the Third-Lien Obligations (and the security therefor) and (z) the Third-Lien Obligations (and the security therefor) constitute a separate and distinct class (and separate and distinct claims) from the First-Lien Obligations (and the security therefor) and the Second-Lien Obligations (and the security therefor).

      6.7     <u>Waiver</u>.  (a)  Each of the Second-Lien Collateral Agent, for itself and on behalf of the other Second-Lien Creditors, and the Third-Lien Collateral Agent, for itself and on behalf of the other Third-Lien Creditors, waives any claim it may hereafter have against any First-Lien Creditor arising out of the election by any First-Lien Creditor of the application to the claims of any First-Lien Creditor of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any Cash Collateral or Post-Petition Financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

      (b)     Each of the Third-Lien Collateral Agent, for itself and on behalf of the other Third-Lien Creditors, waives any claim it may hereafter have against any Second-Lien Creditor arising out of the election by any Second-Lien Creditor of the application to the claims of any Second-Lien Creditor of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any Cash Collateral or Second-Lien Post-Petition Financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

      6.8     <u>Limitations</u>.  (a)  So long as the Discharge of First-Lien Obligations has not occurred, without the express written consent of the First-Lien Collateral Agent, none of the Second-Lien Creditors and/or the Third-Lien Creditors shall (or shall join with or support any third party making, opposing, objecting or contesting, as the case may be), in any Insolvency or Liquidation Proceeding involving any Grantor, (i) make an election for application to its claims of Section 1111(b)(2) of the Bankruptcy Code, (ii) oppose, object to or contest the determination of the extent of any Liens held by any of the First-Lien Creditors or the value of any claims of First-Lien Creditors under Section 506(a) of the Bankruptcy Code or (iii) oppose, object to or contest the payment to the First-Lien Creditors of interest, fees or expenses under Section 506(b) of the Bankruptcy Code.

      (b)     So long as the Discharge of First-Lien Obligations has occurred and the Discharge of Second-Lien Obligations has not occurred, without the express written consent of the Second-Lien Collateral Agent, none of the Third-Lien Creditors shall (or shall join with or support any third party making, opposing, objecting or contesting, as the case may be), in any Insolvency or Liquidation Proceeding involving any Grantor, (i) make an election for application to its claims of Section 1111(b)(2) of the Bankruptcy Code, (ii) oppose, object to or contest the determination of the extent of any Liens held by any of the Second-Lien Creditors or the value of

Exhibit I
Page 45

any claims of Second-Lien Creditors under Section 506(a) of the Bankruptcy Code or (iii) oppose, object to or contest the payment to the Second-Lien Creditors of interest, fees or expenses under Section 506(b) of the Bankruptcy Code.

SECTION 7.  Reliance; Waivers; Etc.

7.1  Reliance.  Other than any reliance on the terms of this Agreement, the First-Lien Collateral Agent, on behalf of itself and the First-Lien Creditors under its First-Lien Credit Documents, acknowledges that it and such First-Lien Creditors have, independently and without reliance on the Second-Lien Collateral Agent, any Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First-Lien Credit Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First-Lien Credit Agreement or this Agreement. The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, acknowledges that it and the Second-Lien Creditors have, independently and without reliance on the First-Lien Collateral Agent, any First-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second-Lien Note Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second-Lien Note Documents or this Agreement.  The Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, acknowledges that it and the Third-Lien Creditors have, independently and without reliance on the First-Lien Collateral Agent, any First-Lien Creditor, the Second-Lien Collateral Agent or any Second-Lien Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Third-Lien Credit Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Third-Lien Credit Documents or this Agreement.

7.2  No Warranties or Liability.  Each of (x) the First-Lien Collateral Agent, on behalf of itself and the First-Lien Creditors under its First-Lien Credit Documents, and (y) the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors under its Third-Lien Credit Documents, acknowledge and agree that each of the Second-Lien Collateral Agent and the Second-Lien Creditors have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second-Lien Note Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The Second-Lien Creditors will be entitled to manage and supervise their respective loans and extensions of credit under the Second-Lien Note Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Each of (x) the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors under its Second-Lien Credit Documents, and (y) the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors under its Third-Lien Credit Documents,  acknowledge and agree that each of the First-Lien Collateral Agent and the First-Lien Creditors have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First-Lien Documents, the

Exhibit I
Page 46

ownership of any Collateral or the perfection or priority of any Liens thereon. The First-Lien Creditors will be entitled to manage and supervise their respective loans and extensions of credit under their respective First-Lien Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Each of (x) the First-Lien Collateral Agent, on behalf of itself and the First-Lien Creditors under its First-Lien Credit Documents, and (y) the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors under its Second-Lien Credit Documents, acknowledge and agree that each of the Third-Lien Collateral Agent and the Third-Lien Creditors have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Third-Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Third-Lien Creditors will be entitled to manage and supervise their respective loans and extensions of credit under the Third-Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second-Lien Collateral Agent, the Second-Lien Creditors, the Third-Lien Collateral Agent and the Third-Lien Creditors shall have no duty to the First-Lien Collateral Agent or any of the First-Lien Creditors, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Borrower or any Subsidiary Guarantor (including the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with. The First-Lien Collateral Agent, the First-Lien Creditors, the Third-Lien Collateral Agent and the Third-Lien Creditors shall have no duty to the Second-Lien Collateral Agent or any of the Second-Lien Creditors, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Borrower or any Subsidiary Guarantor (including the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with. The First-Lien Collateral Agent, the First-Lien Creditors, the Second-Lien Collateral Agent and the Second-Lien Creditors shall have no duty to the Third-Lien Collateral Agent or any of the Third-Lien Creditors, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Borrower or any Subsidiary Guarantor (including the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

       7.3   <u>No Waiver of Lien Priorities</u>. (a) No right of the First-Lien Creditors, the First-Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First-Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Borrower or any other Grantor or by any act or failure to act by any First-Lien Creditor or the First-Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First-Lien Credit Documents, any of the Second-Lien Note Documents or any of the Third-Lien Credit Documents, regardless of any knowledge thereof which the First-Lien Collateral Agent or the First-Lien Creditors, or any of them, may have or be otherwise charged with.

       (b)     Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Borrower and the other Grantors under the First-Lien Credit

Exhibit I

Page 47

Documents), the First-Lien Creditors, the First-Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First-Lien Credit Documents and/or applicable law, without the consent of, or notice to, the Second-Lien Collateral Agent, any other Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor without incurring any liabilities to the Second-Lien Collateral Agent, any other Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second-Lien Collateral Agent, any Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor is affected, impaired or extinguished thereby) do any one or more of the following:

(i) make loans and advances to any Grantor or issue, guaranty or obtain letters of credit for account of any Grantor or otherwise extend credit to any Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(ii) change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First-Lien Obligations or any Lien on any First-Lien Collateral or guaranty thereof or any liability of the Borrower or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First-Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First-Lien Collateral Agent or any of the First-Lien Creditors, the First-Lien Obligations or any of the First-Lien Credit Documents;

(iii) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First-Lien Collateral or any liability of the Borrower or any other Grantor to the First-Lien Creditors or the First-Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(iv) settle or compromise any First-Lien Obligation or any other liability of the Borrower or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First-Lien Obligations) in any manner or order;

(v) exercise or delay in or refrain from exercising any right or remedy against the Borrower or any other Grantor or any other Person or with respect to any security, elect any remedy and otherwise deal freely with the Borrower, any other Grantor or any First-Lien Collateral and any security and any guarantor or any liability of the Borrower or any other Grantor to the First-Lien Creditors or any liability incurred directly or indirectly in respect thereof; and

Exhibit I
Page 48

(vi)     release or discharge any First-Lien Obligation or any guaranty thereof or any agreement or obligation of any Grantor or any other Person with respect thereto.

Nothing in this Section 7.3, however, shall affect the amount of Obligations or Hedging Obligations which shall constitute First-Lien Obligations and/or Second-Lien Obligations.

(b)     (i)     The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

(ii)     The Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

7.4     <u>Waiver of Liability; Indemnity</u>.  (a) The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each also agree that the First-Lien Creditors and the First-Lien Collateral Agent shall have no liability to any of the Second-Lien Collateral Agent, any Second-Lien Creditors, the Third-Lien Collateral Agent or any Third-Lien Creditors; and the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents) each hereby waive any claim against any First-Lien Creditor or the First-Lien Collateral Agent, arising out of any and all actions which the First-Lien Creditors or the First-Lien Collateral Agent may take or permit or omit to take with respect to:  (i) the First-Lien Credit Documents (including, without limitation, any failure to perfect or obtain perfected security interests in the First-Lien Collateral), (ii) the collection of the First-Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any First-Lien Collateral.  The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that the First-Lien Creditors and the First-Lien Collateral Agent have no duty, express or implied, fiduciary or otherwise, to any of them in

Exhibit I
Page 49

respect of the maintenance or preservation of the First-Lien Collateral, the First-Lien Obligations or otherwise. Neither the First-Lien Collateral Agent nor any other First-Lien Creditor nor any of their respective directors, officers, employees or agents will be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so, or will be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Grantor or upon the request of the Second-Lien Collateral Agent, the Third-Lien Collateral Agent, any other holder of Second-Lien Obligations, any other holder of Third-Lien Obligations or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. Without limiting the foregoing, the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents) and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), each agree that neither the First-Lien Collateral Agent nor any other First-Lien Creditor (in directing the Collateral Agent to take any action with respect to the Collateral) shall have any duty or obligation to realize first upon any type of Collateral or to sell, dispose of or otherwise liquidate all or any portion of the Collateral in any manner, including as a result of the application of the principles of marshaling or otherwise, that would maximize the return to any class of Creditors holding Obligations of any type (whether First-Lien Obligations, Second-Lien Obligations or Third-Lien Obligations), notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by such class of Creditors from such realization, sale, disposition or liquidation.

(b)     With respect to its share of the Obligations, any Collateral Agent which is independently a Creditor shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other Creditor, all as if such Collateral Agent were not a Collateral Agent. The term "Creditors" or any similar term shall, unless the context clearly otherwise indicates, include any Collateral Agent in its individual capacity as a Creditor. Each Collateral Agent and its affiliates may lend money to, and generally engage in any kind of business with, the Grantors or any of their Affiliates as if such Collateral Agent were not acting as a Collateral Agent and without any duty to account therefor to any other Creditor.

7.5    Obligations Unconditional.    All rights, interests, agreements and obligations of the First-Lien Collateral Agent and the First-Lien Creditors, the Second-Lien Collateral Agent and the Second-Lien Creditors, and the Third-Lien Collateral Agent and the Third-Lien Creditors, respectively, hereunder (including the Lien priorities established hereby) shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any First-Lien Credit Document, any Second-Lien Note Document or any Third-Lien Credit Document;

(b)     any change in the time, manner or place of payment of, or in any other terms of, all or any of the First-Lien Obligations or Second-Lien Obligations or Third-Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First-Lien Credit Document, any Second-Lien Note Document or any Third-Lien Credit Document;

Exhibit I
Page 50

(c)     any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First-Lien Obligations, Second-Lien Obligations or Third-Lien Obligations or any guarantee thereof;

(d)     the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrower or any other Grantor; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Borrower or any other Grantor in respect of any of the First-Lien Obligations, or of the Second-Lien Collateral Agent or any Second-Lien Creditor in respect of this Agreement, or of the Third-Lien Collateral Agent or any Third-Lien Creditor in respect of this Agreement.

SECTION 8.  Miscellaneous.

8.1    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of the First-Lien Credit Documents, the Second-Lien Note Documents or the Third-Lien Credit Documents, the provisions of this Agreement shall govern and control.

8.2    Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of lien subordination and the First-Lien Creditors may continue, at any time and without notice to the Second-Lien Collateral Agent or any Second-Lien Creditor or the Third-Lien Collateral Agent or any Third-Lien Creditor, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any Grantor constituting First-Lien Obligations in reliance hereof.  The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Without limiting the generality of the foregoing, this Agreement is intended to constitute and shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable nonbankruptcy law.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Borrower or any other Grantor shall include the Borrower or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Borrower or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second-Lien Collateral Agent, the Second-Lien Creditors and the Second-Lien Obligations, upon the Discharge of Second-Lien Obligations (in a manner

Exhibit I
Page 51

which is not in contravention of the terms of this Agreement), subject to the rights of the First-Lien Creditors and the Second-Lien Creditors under Section 6.5, (ii) with respect to the First-Lien Collateral Agent, the First-Lien Creditors and the First-Lien Obligations, the date of the Discharge of First-Lien Obligations, subject to the rights of the First-Lien Creditors under Section 6.5(c), and (iii) with respect to the Third-Lien Collateral Agent, the Third-Lien Creditors and the Third-Lien Obligations, upon the Discharge of Third-Lien Obligations (in a manner not in contravention of the terms of this Agreement), subject to the rights of the First-Lien Creditors and the Second-Lien Creditors under Section 6.5.

8.3    Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall be made unless the same shall be in writing signed on behalf of each party hereto; provided that (x) the First-Lien Collateral Agent (at the direction of the Required First-Lien Creditors) may, without the written consent of any other Creditor, agree to modifications of this Agreement for the purpose of securing additional extensions of credit (including pursuant to the First-Lien Credit Agreement or any Refinancing or extension thereof) and adding new creditors as "First-Lien Creditors" and "Creditors" hereunder, so long as such extensions (and resulting additions) do not otherwise give rise to a violation of the express terms of the First-Lien Credit Agreement and, without the prior written consent of the Second-Lien Collateral Agent and Third-Lien Collateral Agent, would not cause the Maximum First-Lien Credit Documents Principal Amount and/or Maximum Hedging Obligations Notional Amount (as relevant) to be exceeded as a result of the inclusion of such extensions of credit, and (y) additional Grantors may be added as parties hereto in accordance with the provisions of Section 8.18 of this Agreement. Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall not impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights, interests, liabilities or privileges are directly affected.

8.4    Information Concerning Financial Condition of the Borrower and its Subsidiaries.  The First-Lien Collateral Agent and the First-Lien Creditors, the Second-Lien Collateral Agent and the Second-Lien Creditors, and the Third-Lien Collateral Agent and the Third-Lien Creditors, shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrower and its Subsidiaries and all endorsers and/or guarantors of the First-Lien Obligations, the Second-Lien Obligations or the Third-Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First-Lien Obligations, the Second-Lien Obligations or the Third-Lien Obligations.  The First-Lien Collateral Agent  and the First-Lien Creditors shall have no duty to advise any of the Second-Lien Collateral Agent, any Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First-Lien Collateral Agent or any of the First-Lien Creditors, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second-Lien Collateral Agent, any Second-Lien Creditor, the Third-Lien Collateral Agent or any Third-Lien Creditor, it or they shall be under no obligation (w) to make, and the First-Lien

Exhibit I
Page 52

Collateral Agent and the First-Lien Creditors shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5    Subrogation.    Subject to the Discharge of First-Lien Obligations, with respect to the value of any payments or distributions in cash, property or other assets that any of (x) the Second-Lien Creditors, the Second-Lien Collateral Agent, the Third-Lien Creditors or the Third-Lien Collateral Agent pay over to the First-Lien Collateral Agent or First-Lien Creditors under the terms of this Agreement or (y) the Third-Lien Collateral Agent or the Third-Lien Creditors pay over to the Second-Lien Collateral Agent or Second-Lien Creditors under the terms of this Agreement, the respective paying Creditors shall be subrogated to the rights of the payee Creditors; provided that, the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), hereby agree not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until (x) in the case of the Second-Lien Collateral Agent and Second-Lien Creditors, the Discharge of First-Lien Obligations has occurred and (y) in the case of the Third-Lien Collateral Agent and Third-Lien Creditors, the Discharge of First-Lien Obligations and the Discharge of Second-Lien Obligations have each occurred.  The Borrower acknowledges and agrees that the value of any payments or distributions in cash, property or other assets (x) received by any of the Second-Lien Collateral Agent, the Second-Lien Creditors, the Third-Lien Collateral Agent or the Third-Lien Creditors and paid over to the First-Lien Collateral Agent or the First-Lien Creditors pursuant to, and applied in accordance with this Agreement, shall not relieve or reduce any of the Obligations owed by the Borrower under the Second-Lien Note Documents or the Third-Lien Credit Documents and (y) received by any of the Third-Lien Collateral Agent or the Third-Lien Creditors and paid over to the Second-Lien Collateral Agent or the Second-Lien Creditors pursuant to, and applied in accordance with this Agreement, shall not relieve or reduce any of the Obligations owed by the Borrower under the Third-Lien Credit Documents.

8.6    Application of Payments.    All payments received by the First-Lien Collateral Agent or the First-Lien Creditors may be applied, reversed and reapplied, in whole or in part, to such part of the First-Lien Obligations as the First-Lien Creditors, in their sole discretion, deem appropriate.  The Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and each other Second-Lien Creditor (by its acceptance of the benefits of the Second-Lien Note Documents), and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and each other Third-Lien Creditor (by its acceptance of the benefits of the Third-Lien Credit Documents), assent to any extension or postponement of the time of payment of the First-Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time

Exhibit I
Page 53

secure any part of the First-Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

   8.7 <u>SUBMISSION TO JURISDICTION; WAIVERS</u>. (a) THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

   (b) THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH EACH MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN SECTION 8.7(a). EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

   (c) EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

   8.8 <u>Notices</u>. All notices to the First-Lien Creditors, the Second-Lien Creditors or the Third-Lien Creditors permitted or required under this Agreement may be sent, respectively, to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent. Unless otherwise specifically provided herein, any notice or other

Exhibit I
Page 54

communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.9    Further Assurances.  Each of the First-Lien Collateral Agent, on behalf of itself and the First-Lien Creditors, the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, and the Borrower, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as any of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement. Each Second-Lien Creditor, by its acceptance of the benefits of the Second-Lien Note Documents, agrees to be bound by the agreements herein made by it and the Second-Lien Collateral Agent, on its behalf. Each Third-Lien Creditor, by its acceptance of the benefits of the Third-Lien Credit Documents, agrees to be bound by the agreements herein made by it and the Third-Lien Collateral Agent, on its behalf.

8.10    APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK INCLUDING GENERAL OBLIGATIONS LAW 5-1401.

8.11    Binding on Successors and Assigns.  This Agreement shall be binding upon First-Lien Collateral Agent, the First-Lien Creditors, the Second-Lien Collateral Agent, the Second-Lien Creditors, the Third-Lien Collateral Agent, the Third-Lien Creditors and their respective successors and assigns, including without limitation any successor or assign to all or a portion of the duties of any Collateral Agent (or any sub-agent or sub-collateral agent appointed by it).

8.12    Specific Performance. Each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent may demand specific performance of this Agreement. Each of the First-Lien Collateral Agent, on behalf of itself and the First-Lien Creditors, the Second-Lien Collateral Agent, on behalf of itself and the Second-Lien Creditors, and the Third-Lien Collateral Agent, on behalf of itself and the Third-Lien Creditors, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be.

8.13    Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

Exhibit I
Page 55

8.14     Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

8.15     Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.  Each Second-Lien Creditor, by its acceptance of the benefits of the Second-Lien Note Documents, and each Third-Lien Creditor, by its acceptance of the benefits of the Third-Lien Credit Documents, agrees to be bound by the agreements made herein.

8.16     No Third Party Beneficiaries; Effect of Agreement.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First-Lien Creditors, the Second-Lien Creditors and the Third-Lien Creditors.  No other Person shall have or be entitled to assert rights or benefits hereunder.  Nothing in this Agreement shall impair, as between the Borrower and the First-Lien Collateral Agent and the First-Lien Creditors, the Borrower and the Second-Lien Collateral Agent and the Second-Lien Creditors, or the Borrower and the Third-Lien Collateral Agent and the Third-Lien Creditors, the obligations of the Borrower to pay principal, interest, fees and other amounts as provided in the First-Lien Credit Documents, the Second-Lien Note Documents and the Third-Lien Credit Documents, respectively.

8.17     Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First-Lien Creditors and the First-Lien Collateral Agent, the Second-Lien Creditors and the Second-Lien Collateral Agent, and the Third-Lien Creditors and the Third-Lien Collateral Agent.  None of the Borrower, any other Grantor or any other creditor thereof shall have any rights hereunder.  Nothing in this Agreement is intended to or shall impair the obligations of the Borrower or any other Grantor, which are absolute and unconditional, to pay the First-Lien Obligations, the Second-Lien Obligations and the Third-Lien Obligations as and when the same shall become due and payable in accordance with their terms.

8.18     Grantors; Additional Grantors.  It is understood and agreed that the Borrower and each Subsidiary Guarantor on the date of this Agreement shall constitute the original Grantors party hereto. The original Grantors hereby covenant and agree to cause each Subsidiary of the Borrower which becomes a Subsidiary Guarantor after the date hereof to contemporaneously become a party hereto (as a Grantor) by executing delivering a counterpart hereof to the First-Lien Collateral Agent or by executing and delivering an assumption agreement in form and substance reasonably satisfactory to the First-Lien Collateral Agent. The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Subsidiary Guarantor at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as

Exhibit I
Page 56

if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

First-Lien Collateral Agent

Notice Address:

[_____]
[_____]
Telephone:  (___) ___-____
Telecopier:  (___) ___-____
Attention:   [_____]

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH,
in its capacity as First-Lien Collateral Agent


By:_____
     Name:
     Title:


Second-Lien Collateral Agent

Notice Address:

[_____]
[_____]
Telephone:  (___) ___-____
Telecopier:  (___) ___-____
Attention:   [_____]

[_____],
in its capacity as Second-Lien Collateral Agent


By:_____
     Name:
     Title:


Third-Lien Collateral Agent

Notice Address:

452 Fifth Avenue
New York, New York 10018
Telephone:  (212) 525-1316
Telecopier:  (212) 525-1300
Attention:   Frank J. Godino

HSBC BANK USA,
in its capacity as Third-Lien Collateral Agent


By:_____
     Name:
     Title:

Notice Address:                          RCN CORPORATION

105 Carnegie Center
Princeton, NJ 08540                       By:_____
Telephone:  (609) 734-3700                     Name:
Telecopier:  (609) 734-3830                    Title:
Attention:    [_____]

Notice Address:                          BRAINSTORM NETWORKS, INC.,
                                         as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700                By:_____
Telecopier:  (609) 734-3830                    Name:
Attention:    [_____]                     Title:

Notice Address:                          HOT SPOTS PRODUCTIONS, INC.,
                                         as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700                By:_____
Telecopier:  (609) 734-3830                    Name:
Attention:    [_____]                     Title:

Notice Address:                          ON TV, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700                By:_____
Telecopier:  (609) 734-3830                    Name:
Attention:    [_____]                     Title:

Notice Address:                          RCN-BECOCOM, LLC, as a Guarantor

105 Carnegie Center                      By: RCN Telecom Services of
Princeton, NJ 08540                           Massachusetts, Inc., its managing
Telephone:  (609) 734-3700                    member
Telecopier:  (609) 734-3830
Attention:    [_____]
                                         By:_____
                                               Name:
                                               Title:

Notice Address:                          RCN CABLE TV OF CHICAGO, INC.,
                                         as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700              By:_____
Telecopier:  (609) 734-3830                 Name:
Attention:    [_____]                  Title:


Notice Address:                          RCN ENTERTAINMENT, INC.,
                                         as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700              By:_____
Telecopier:  (609) 734-3830                 Name:
Attention:    [_____]                  Title:


Notice Address:                          RCN FINANCE, LLC, as a Guarantor

105 Carnegie Center                      By: RCN Corporation, its managing member
Princeton, NJ 08540
Telephone:  (609) 734-3700              By:_____
Telecopier:  (609) 734-3830                 Name:
Attention:    [_____]                  Title:


Notice Address:                          RCN FINANCIAL MANAGEMENT, INC.,
                                         as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700              By:_____
Telecopier:  (609) 734-3830                 Name:
Attention:    [_____]                  Title:


Notice Address:                          RCN INTERNATIONAL HOLDINGS,
                                         INC., as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700              By:_____
Telecopier:  (609) 734-3830                 Name:
Attention:    [_____]                  Title:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN INTERNET SERVICES, INC.,
as a Guarantor


By:_____
    Name:
    Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN TELECOM SERVICES, INC.,
as a Guarantor


By:_____
    Name:
    Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN TELECOM SERVICES OF
ILLINOIS, LLC, as a Guarantor

By:  RCN CORPORATION, its managing
    member


By:_____
    Name:
    Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN TELECOM SERVICES OF
MASSACHUSETTS, INC., as a Guarantor


By:_____
    Name:
    Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN TELECOM SERVICES OF
PHILADELPHIA, INC., as a Guarantor


By:_____
    Name:
    Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN TELECOM SERVICES OF
VIRGINIA, INC., as a Guarantor


By:_____
   Name:
   Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RCN TELECOM SERVICES OF
WASHINGTON, D.C., INC., as a Guarantor


By:_____
   Name:
   Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RFM 2, LLC, as a Guarantor

By: RCN Corporation, its managing member


By:_____
   Name:
   Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

RLH PROPERTY CORPORATION,
as a Guarantor


By:_____
   Name:
   Title:

Notice Address:

105 Carnegie Center
Princeton, NJ 08540
Telephone:  (609) 734-3700
Telecopier:  (609) 734-3830
Attention:    [_____]

STARPOWER COMMUNICATIONS,
LLC, as a Guarantor

By:  RCN Telecom Services of Washington,
     D.C., Inc., its managing member


By:_____
   Name:
   Title:

Notice Address:                          TEC AIR, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540                       By:_____
Telephone:  (609) 734-3700                   Name:
Telecopier:  (609) 734-3830                  Title:
Attention:    [_____]

Notice Address:                          21ST CENTURY TELECOM SERVICES,
                                         INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540                       By:_____
Telephone:  (609) 734-3700                   Name:
Telecopier:  (609) 734-3830                  Title:
Attention:    [_____]

Notice Address:                          UNET HOLDING, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540                       By:_____
Telephone:  (609) 734-3700                   Name:
Telecopier:  (609) 734-3830                  Title:
Attention:    [_____]

## COMPLIANCE CERTIFICATE

        This Compliance Certificate is delivered to you pursuant to Section 8.01(f) of the Credit Agreement, dated as of _____ \_\_, 2004 (as amended, supplemented or modified from time to time, the "Credit Agreement"), among RCN Corporation (the "Borrower"), the lenders from time to time party thereto, and Deutsche Bank AG Cayman Islands Branch, as Administrative Agent. Terms defined in the Credit Agreement and not otherwise defined herein are used herein as therein defined.

        1. I am the duly elected, qualified and acting Chief Financial Officer of the Borrower.

        2. I have reviewed and am familiar with the contents of this Compliance Certificate. I am providing this Compliance Certificate solely in my capacity as an officer of the Borrower. The matters set forth herein are true to the best of my knowledge after due inquiry.

        3. I have reviewed the terms of the Credit Agreement and the other Credit Documents and have made or caused to be made under my supervision a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the accounting period covered by the financial statements attached hereto as ANNEX 1 (the "Financial Statements"). Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Compliance Certificate, of any condition or event which constitutes a Default or an Event of Default [, except as set forth below].

        4. Attached hereto as ANNEX 2 are the computations showing (in reasonable detail) compliance with the covenants specified therein.

        5. Attached hereto as ANNEX 3 is the information required by Section 8.01(f)(iii) of the Credit Agreement as of the date of this Compliance Certificate and the Borrower and its Subsidiaries have taken all actions required to be taken by them pursuant to the Security Documents in connection with the information set forth on ANNEX 3.

        6. Attached hereto as ANNEX 4 is the information required to establish compliance with Sections 4.02(e) and 4.02(g) for the Test Period ended on _____, \_\_\_.

        IN WITNESS WHEREOF, I have executed this Compliance Certificate this \_\_\_\_ day of _____.

        RCN CORPORATION

        By_____
          Name:
          Title:  Chief Financial Officer

The information described herein is as of _____, _____ (the "Computation Date") and pertains to (i) in the case of items I.A below, I.D below and I.E below, the respective amounts outstanding as of the Computation Date, (ii) in the case of items I.B below, I.C below and I.F.1(i) below, the period from [the Initial Borrowing Date] [January 1, 200_] through the last day of the Test Period referred to in succeeding clause (iii) (the "Year-to-Date Period") and (iii) in the case of items I.F.2 below, I.F.3 below and I.F.4 below, the period from _____ __, _____ to _____ __, _____ (the "Test Period").

I.      Negative and Financial Covenants

        A.      Liens (Section 9.01)

        | | Section | Amount |
        |---|---|---|
        | (i) | 9.01(x) | $_____ |
        | (ii) | 9.01(xii) | $_____ |

        B.      Asset Sales, etc. (Section 9.02)

        | Section | Amount |
        |---|---|
        | 9.02(iv) | $_____ |

        C.      Dividends (Section 9.03)

        | Section | Amount |
        |---|---|
        | 9.03(iii) and (v) | $_____ |

        D.      Indebtedness (Section 9.04)

        | Section | Amount |
        |---|---|
        | 9.04(iii) | $_____ |

        E.      Investments (Section 9.05)

        | Section | Amount |
        |---|---|
        | 9.05(v) | $_____ |

        F.      Financial Covenants

                1.      Capital Expenditures (Sections 9.07(a), (b) and (c))

(i)  Capital Expenditures for the Fiscal
     Year (Section 9.07(a))                    $_____ (of
                                               which $___
                                               constitutes the
                                               rollover
                                               amount from
                                               the preceding
                                               fiscal year)

(ii) Capital Expenditures for the Test
     Period (Section 9.07(b))                  $_____

(iii) Capital Expenditures for the Test
      Period (Section 9.07(c))                 $_____

2.   Consolidated Interest Coverage
     Ratio (Section 9.08)

     a.   Consolidated EBITDA[1]
          for the Test Period                  $_____

     b.   Consolidated Interest Expense[2]
          for the Test Period                  $_____

     c.   Ratio of line a to line b            _____:1.00

3.   Consolidated EBITDA (Section 9.09)

     a.   Consolidated EBITDA for the
          Test Period                          $_____

4.   Total Leverage Ratio (Section 9.10)

     a.   Consolidated Indebtedness[3] as at
          the Computation Date                 $_____

     b.   Consolidated EBITDA for the
          Test Period                          $_____

     c.   Ratio of line a to line b            ____:1.00

---

[1]  Attach hereto in reasonable detail the calculations required to arrive at Consolidated EBITDA.

[2]  Attached hereto in reasonable detail the calculations required to arrive at Consolidated Interest Expense.

[3]  Attach hereto in reasonable detail the calculations required to arrive at Consolidated Indebtedness.

5.        Senior Leverage Ratio (Section 9.11)

        a.        Consolidated Senior Indebtedness[4]
                  as at the Computation Date        $_____

        b.        Consolidated EBITDA for the
                  Test Period        $_____

        c.        Ratio of line a to line b        _____:1.00

[6.        Minimum Cash on Hand (Section 9.12)

        a.        Minimum Cash on Hand
                  as at the Computation Date        $_____]

II.        Excess Cash Flow[5]

The amount of Excess Cash Flow[6] for the Test Period was $_____.

---

[4]    Attach hereto in reasonable detail the calculations required to arrive at Consolidated Senior Indebtedness.

[5]    Include only for Test Periods which end on December 31.

[6]    Attach hereto in reasonable detail the calculations required to establish Excess Cash Flow.

FORM OF ASSIGNMENT
AND
ASSUMPTION AGREEMENT[1]

This Assignment and Assumption Agreement (this "Assignment"), is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item [1][2] below ([the] [each, an] "Assignor") and [the] [each] Assignee identified in item 2 below ([the] [each, an] "Assignee"). [It is understood and agreed that the rights and obligations of such [Assignees][and Assignors] hereunder are several and not joint.] Capitalized terms used herein but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented and/or otherwise modified from time to time, the "Credit Agreement"). The Standard Terms and Conditions for Assignment and Assumption Agreement set forth in Annex 1 hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the] [each] Assignee, and [the] [each] Assignee hereby irrevocably purchases and assumes from [the][each] Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of [the][each] Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the [respective] Assignor's outstanding rights and obligations under the respective Tranches identified below (including, to the extent included in any such Tranches, Letters of Credit and Swingline Loans) ([the] [each, an] "Assigned Interest"). [Each] [Such] sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment, without representation or warranty by [the][any] Assignor.

[1.    Assignor:    _____

2.    Assignee:    _____][2]

---

[1]   This Form of Assignment and Assumption Agreement should be used by Lenders for an assignment to a single Assignee or to funds managed by the same or related investment managers.

[2]   If the form is used for a single Assignor and Assignee, items 1 and 2 should list the Assignor and the Assignee, respectively. In the case of an assignment to funds managed by the same or related investment managers, or an assignment by multiple Assignors, the Assignors and the Assignee(s) should be listed in the table under bracketed item 2 below.

Exhibit L
Page 2

[1][3]. Credit Agreement:     Credit Agreement, dated as of [_____ __, 2004], among RCN Corporation (the "Borrower"), the lenders from time to time party thereto, Deutsche Bank Cayman Islands Branch, as Administrative Agent, and Deutsche Bank Securities Inc., as Sole Lead Arranger and Sole Book Manager.

[2.     Assigned Interest:[3]

| Assignor | Assignee | Tranche Assigned[4] | Aggregate Amount of Commitment/Loans under Relevant Tranche for all Lenders | Amount of Commitment/Loans under Relevant Tranche Assigned |
|---|---|---|---|---|
| [Name of Assignor] | [Name of Assignee] | | _____ | _____ |
| [Name of Assignor] | [Name of Assignee] | | _____ | _____ |

[4.     Assigned Interest:[5]

| Tranche Assigned | Aggregate Amount of Commitment/Loans under Relevant Tranche for all Lenders | Amount of Commitment/Loans under Relevant Tranche Assigned |
|---|---|---|
| Term Loans | $_____ | $_____ |
| L/C Commitment/ Letters of Credit | $_____ | $_____ |

---

[3]     Insert this chart if this Form of Assignment and Assumption Agreement is being used for assignments to funds managed by the same or related investment managers or for an assignment by multiple Assignors. Insert additional rows as needed.

[4]     For complex multi-tranche assignments a separate chart for each tranche should be used for ease of reference.

[5]     Insert this chart if this Form of Assignment and Assumption Agreement is being used by a single Assignor for an assignment to a single Assignee.

Exhibit L
Page 3

Effective Date _____, ____, 200__.

**Assignor[s] Information**          **Assignee[s] Information**

Payment Instructions:    _____    Payment Instructions:    _____

     _____         _____

     _____         _____

     _____         _____

     Reference:_____         Reference:_____

Notice Instructions:    _____    Notice Instructions:    _____

     _____         _____

     _____         _____

     _____         _____

     Reference:_____         Reference:_____

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR                    ASSIGNEE
[NAME OF ASSIGNOR]          [NAME OF ASSIGNEE][6]

By:_____    By:_____
   Name:                               Name:
   Title:                              Title:

---

[6]    Add additional signature blocks, as needed, if this Form of Assignment and Assumption Agreement is being used by funds managed by the same or related investment managers.

Exhibit L
Page 4

[Consented to and][7] Accepted:

DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH,
    as Administrative Agent


By:_____
    Name:
    Title:


[RCN CORPORATION


By:_____
    Name:
    Title:][8]


[[NAME OF EACH LETTER OF CREDIT ISSUER],
    as Letter of Credit Issuer


By:_____
    Name:
    Title:][9]

---

[7]    Insert only if assignment is being made to an Eligible Transferee pursuant to Section 13.04(b)(y) of the Credit Agreement.  Consent of the Administrative Agent shall not be unreasonably withheld or delayed.

[8]    Insert only if (i) no Event of Default or Default under Section 10.01 or 10.05 of the Credit Agreement is then in existence, (ii) the assignment is being made to an Eligible Transferee pursuant to 13.04(b)(y) of the Credit Agreement and (iii) assignment is not being made within four weeks of the Initial Borrowing Date and as part of the primary syndication of the Loans and Commitments. Consent of the Borrower shall not be unreasonably withheld or delayed.

[9]    Insert for any assignment of a L/C Commitment pursuant to clause (x) or (y) of Section 13.04(b) of the Credit Agreement.

RCN CORPORATION

CREDIT AGREEMENT

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.      <u>Representations and Warranties</u>.

1.1.      <u>Assignor</u>. [The] [Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [its] Assigned Interest, (ii) [the] [its] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Credit Document or any other instrument or document delivered pursuant thereto (other than this Assignment) or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.      <u>Assignee</u>. [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it confirms that it is (A) a Lender, (B) a parent company and/or an affiliate of [the][each] Assignor which is at least 50% owned by [the][each] Assignor or its parent company, (C) a fund that invests in bank loans and is managed by the same investment advisor as a Lender, by an affiliate of such investment advisor or by a Lender or (D) an Eligible Transferee under Section 13.04(b) of the Credit Agreement; (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of [the][its] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 8.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase [the][its] Assigned Interest on the basis of which it has made such analysis and decision and (v) if it is organized under the laws of a jurisdiction outside the United States, it has attached to this Assignment any tax documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by it; (b) agrees that it will, independently and without reliance upon the Administrative Agent, [the][each] Assignor, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (c) appoints and authorizes each of the Administrative Agent, the Syndication Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Credit Documents as are delegated to or otherwise conferred

upon the Administrative Agent, the Syndication Agent or the Collateral Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto; and (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.      Payment.  From and after the Effective Date, the Administrative Agent shall make all payments in respect [the] [each] Assigned Interest (including payments of principal, interest, fees, commissions and other amounts) to [the][each] Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [each] Assignee for amounts which have accrued from and after the Effective Date.

3.      Effect of Assignment.  Upon the delivery of a fully executed original hereof to the Administrative Agent, as of the Effective Date, (i) [the][each] Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender thereunder and under the other Credit Documents and (ii) [the][each] Assignor shall, to the extent provided in this Assignment, relinquish its rights and be released from its obligations under the Credit Agreement and the other Credit Documents.

4.      General Provisions.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of the Assignment.   THIS ASSIGNMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5.1401 OF THE GENERAL OBLIGATIONS LAW).

*      *      *

## FORM OF SUBSIDIARIES GUARANTY

SUBSIDIARIES GUARANTY (as amended, modified, restated and/or supplemented from time to time, this "<u>Guaranty</u>"), dated as of December __, 2004, made by and among each of the undersigned guarantors (each, a "<u>Guarantor</u>" and, together with any other entity that becomes a guarantor hereunder pursuant to Section 22 hereof, collectively, the "<u>Guarantors</u>") in favor of Deutsche Bank AG Cayman Islands Branch, as Administrative Agent (together with any successor administrative agent, the "<u>Administrative Agent</u>"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

## W I T N E S S E T H :

WHEREAS, RCN Corporation (the "<u>Borrower</u>"), the lenders from time to time party thereto (the "<u>Lenders</u>"), Deutsche Bank Securities Inc., as Sole Lead Arranger and Sole Book Manager, and the Administrative Agent, have entered into a Credit Agreement, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "<u>Credit Agreement</u>"), providing for the making of Loans to, and the issuance of, and participation in, Letters of Credit for the account of the Borrower, all as contemplated therein (the Lenders, each Issuing Lender, the Administrative Agent, the Collateral Agent, each other Agent and the Pledgee are herein called the "<u>Lender Creditors</u>");

WHEREAS, the Borrower [and/or one or more of its Subsidiaries] may at any time and from time to time enter into one or more Interest Rate Protection Agreements and/or Other Hedging Agreements with one or more Lenders or any affiliate thereof (each such Lender or affiliate, even if the respective Lender subsequently ceases to be a Lender under the Credit Agreement for any reason, together with such Lender's or affiliate's successors and assigns, if any, collectively, the "<u>Other Creditors</u>" and, together with the Lender Creditors, the "<u>Secured Creditors</u>");

WHEREAS, each Guarantor is a direct or indirect Subsidiary of the Borrower;

WHEREAS, it is a condition precedent to the making of Loans to the Borrower and the issuance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and to the Other Creditors entering into Interest Rate Protection Agreements and Other Hedging Agreements that each Guarantor shall have executed and delivered to the Administrative Agent this Guaranty; and

WHEREAS, each Guarantor will obtain benefits from the incurrence of Loans by the Borrower and the issuance of, and participation in, Letters of Credit for the account of the Borrower under the Credit Agreement and the entering into by the Borrower [and/or one or more of its Subsidiaries] of Interest Rate Protection Agreements or Other Hedging Agreements and,

accordingly, desires to execute this Guaranty in order to satisfy the condition described in the preceding paragraph and to induce the Lenders to make Loans to the Borrower and issue, and/or participate in, Letters of Credit for the account of the Borrower and the Other Creditors to enter into Interest Rate Protection Agreements or Other Hedging Agreements with the Borrower [and/or one or more of its Subsidiaries];

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Guarantor, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby makes the following representations and warranties to the Administrative Agent for the benefit of the Secured Creditors and hereby covenants and agrees with each other Guarantor and the Administrative Agent for the benefit of the Secured Creditors as follows:

1. <u>GUARANTY</u>.     (a)     Each Guarantor, jointly and severally, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety:

(i)     to the Lender Creditors the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Loans made to, the Borrower under the Credit Agreement, and all reimbursement obligations and Unpaid Drawings with respect to Letters of Credit and (y) all other obligations (including, without limitation, obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness owing by the Borrower to the Lender Creditors under the Credit Agreement and each other Credit Document to which the Borrower is a party (including, without limitation, indemnities, Fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in the Credit Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with the Credit Agreement and any such other Credit Document and the due performance and compliance by the Borrower with all of the terms, conditions, covenants and agreements contained in all such Credit Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause (i), except to the extent consisting of obligations or liabilities with respect to Interest Rate Protection Agreements or Other Hedging Agreements, being herein collectively called the "<u>Credit Document Obligations</u>"); and

(ii)     to each Other Creditor the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) of all obligations (including, without limitation, obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in the respective Interest Rate Protection Agreements or Other Hedging Agreements, whether or not such interest is an allowed claim in any such proceeding) owing by the Borrower and/or any other Guaranteed Party under any Interest Rate Protection Agreement and any Other Hedging Agreement to which it is a party, whether

now in existence or hereafter arising, and the due performance and compliance by the Borrower and each such other Guaranteed Party with all of the terms, conditions, covenants and agreements contained therein (all such obligations, liabilities and indebtedness being herein collectively called the "<u>Other Obligations</u>", and together with the Credit Document Obligations are herein collectively called the "<u>Guaranteed Obligations</u>").

As used herein, the term "<u>Guaranteed Party</u>" shall mean the Borrower and each Subsidiary of the Borrower party to any Interest Rate Protection Agreement or Other Hedging Agreement with an Other Creditor. Each Guarantor understands, agrees and confirms that the Secured Creditors may enforce this Guaranty up to the full amount of the Guaranteed Obligations against such Guarantor without proceeding against any other Guarantor, the Borrower or any other Guaranteed Party, or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations. This Guaranty is a guaranty of prompt payment and performance and not of collection.

(b)     Additionally, each Guarantor, jointly and severally, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower or any other Guaranteed Party upon the occurrence in respect of the Borrower or any other Guaranteed Party of any of the events specified in Section 10.05 of the Credit Agreement, and unconditionally, absolutely and irrevocably, jointly and severally, promises to pay such Guaranteed Obligations to the Secured Creditors, or order, on demand.

2. <u>LIABILITY OF GUARANTORS ABSOLUTE</u>.     The liability of each Guarantor hereunder is primary, absolute, joint and several, and unconditional and is exclusive and independent of any security for or other guaranty of the indebtedness of the Borrower or any other Guaranteed Party whether executed by such Guarantor, any other Guarantor, any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by any circumstance or occurrence whatsoever, including, without limitation: (a) any direction as to application of payment by the Borrower, any other Guaranteed Party or any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of a Guarantor or of any other party as to the Guaranteed Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower or any other Guaranteed Party, (e) the failure of the Guarantor to receive any benefit from or as a result of its execution, delivery and performance of this Guaranty, (f) any payment made to any Secured Creditor on the indebtedness which any Secured Creditor repays the Borrower or any other Guaranteed Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (g) any action or inaction by the Secured Creditors as contemplated in Section 5 hereof or (h) any invalidity, rescission, irregularity or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

eex_truncate

3.  <u>OBLIGATIONS OF GUARANTORS INDEPENDENT</u>.  The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party and whether or not any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party be joined in any such action or actions.  Each Guarantor waives (to the fullest extent permitted by applicable law) the benefits of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or any other Guaranteed Party or other circumstance which operates to toll any statute of limitations as to the Borrower or such other Guaranteed Party shall operate to toll the statute of limitations as to each Guarantor.

4.  <u>WAIVERS BY GUARANTORS</u>. (a)    Each Guarantor hereby waives (to the fullest extent permitted by applicable law) notice of acceptance of this Guaranty and notice of the existence, creation or incurrence of any new or additional liability to which it may apply, and waives promptness, diligence, presentment, demand of payment, demand for performance, protest, notice of dishonor or nonpayment of any such liabilities, suit or taking of other action by the Administrative Agent or any other Secured Creditor against, and any other notice to, any party liable thereon (including such Guarantor, any other Guarantor, any other guarantor, the Borrower or any other Guaranteed Party) and the Guarantor further hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations and notice or proof of reliance by any Secured Creditor upon this Guaranty, and the Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended, modified, supplemented or waived, in reliance upon this Guaranty.

(b)    Each Guarantor waives any right to require the Secured Creditors to:  (i) proceed against the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; (ii) proceed against or exhaust any security held from the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; or (iii) pursue any other remedy in the Secured Creditors' power whatsoever.  Each Guarantor waives any defense based on or arising out of any defense of the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party other than payment in full in cash of the Guaranteed Obligations, including, without limitation, any defense based on or arising out of the disability of the Borrower, any other Guaranteed Party, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party, or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower or any other Guaranteed Party other than payment in full in cash of the Guaranteed Obligations.  The Secured Creditors may, at their election, foreclose on any collateral serving as security held by the Administrative Agent, the Collateral Agent or the other Secured Creditors by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against the Borrower, any other Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full in cash.  Each Guarantor waives any defense arising out of any such

election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement, contribution, indemnification or subrogation or other right or remedy of such Guarantor against the Borrower, any other Guaranteed Party, any other guarantor of the Guaranteed Obligations or any other party or any security.

(c)     Each Guarantor has knowledge and assumes all responsibility for being and keeping itself informed of the Borrower's, each other Guaranteed Party's and each other Guarantor's financial condition, affairs and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Guarantor assumes and incurs hereunder, and has adequate means to obtain from the Borrower, each other Guaranteed Party and each other Guarantor on an ongoing basis information relating thereto and the Borrower's, each other Guaranteed Party's and each other Guarantor's ability to pay and perform its respective Guaranteed Obligations, and agrees to assume the responsibility for keeping, and to keep, so informed for so long as this Guaranty is in effect.  Each Guarantor acknowledges and agrees that (x) the Secured Creditors shall have no obligation to investigate the financial condition or affairs of the Borrower, any other Guaranteed Party or any other Guarantor for the benefit of such Guarantor nor to advise such Guarantor of any fact respecting, or any change in, the financial condition, assets or affairs of the Borrower, any other Guaranteed Party or any other Guarantor that might become known to any Secured Creditor at any time, whether or not such Secured Creditor knows or believes or has reason to know or believe that any such fact or change is unknown to such Guarantor, or might (or does) increase the risk of such Guarantor as guarantor hereunder, or might (or would) affect the willingness of such Guarantor to continue as a guarantor of the Guaranteed Obligations hereunder and (y) the Secured Creditors shall have no duty to advise any Guarantor of information known to them regarding any of the aforementioned circumstances or risks.

(d)     Each Guarantor hereby acknowledges and affirms that it understands that to the extent the Guaranteed Obligations are secured by Real Property located in the State of California, such Guarantor shall be liable for the full amount of the liability hereunder notwithstanding foreclosure on such Real Property by trustee sale or any other reason impairing such Guarantor's or any Secured Creditors' right to proceed against any Borrower, any other Guaranteed Party or any other guarantor of the Guaranteed Obligations.

(e)     Each Guarantor hereby waives (to the fullest extent permitted by applicable law) all rights and benefits under Section 580a, 580b, 580d and 726 of the California Code of Civil Procedure.  Each Guarantor hereby further waives (to the fullest extent permitted by applicable law), without limiting the generality of the foregoing or any other provision hereof, all rights and benefits which might otherwise be available to such Guarantor under Sections 2809, 2810, 2815, 2819, 2821, 2839, 2845, 2848, 2849, 2850, 2899 and 3433 of the California Civil Code.

(f)     Until the Guaranteed Obligations have been paid in full in cash, each Guarantor waives its rights of subrogation and reimbursement and any other rights and defenses available to such Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, including, without limitation, (1) any defenses such Guarantor may have to this Guaranty by reason of an election of remedies by the Secured Creditors and (2) any rights or defenses such

Guarantor may have by reason of protection afforded to any Borrower or any other Guaranteed Party pursuant to the antideficiency or other laws of California limiting or discharging such Borrower's or such other Guaranteed Party's indebtedness, including, without limitation, Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure. In furtherance of such provisions, each Guarantor hereby waives all rights and defenses arising out of an election of remedies by the Secured Creditors, even though that election of remedies, such as a nonjudicial foreclosure, destroys such Guarantor's rights of subrogation and reimbursement against any Borrower or any other Guaranteed Party by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(g)     Each Guarantor hereby acknowledges and agrees that no Secured Creditor nor any other Person shall be under any obligation (a) to marshal any assets in favor of the Guarantor or in payment of any or all of the liabilities of any Guaranteed Party under the Documents or the obligation of the Guarantor hereunder or (b) to pursue any other remedy that the Guarantor may or may not be able to pursue itself any right to which the Guarantor hereby waives.

(h)     Each Guarantor warrants and agrees that each of the waivers set forth in Section 3 and in this Section 4 is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective only to the maximum extent permitted by applicable law.

5. RIGHTS OF SECURED CREDITORS.  Subject to Sections 4 and 13, any Secured Creditor may (except as shall be required by applicable statute and cannot be waived) at any time and from time to time without the consent of, or notice to, any Guarantor, without incurring responsibility to such Guarantor, without impairing or releasing the obligations or liabilities of such Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(a)     change the manner, place or terms of payment of, and/or change, increase or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including, without limitation, any increase or decrease in the rate of interest thereon or the principal amount thereof), any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, increased, accelerated, renewed or altered;

(b)     take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, surrender, impair, realize upon or otherwise deal with in any manner and in any order any property or other collateral by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)     exercise or refrain from exercising any rights against the Borrower, any other Guaranteed Party, any other Credit Party, any Subsidiary thereof, any other guarantor of the Borrower or others or otherwise act or refrain from acting;

(d)     release or substitute any one or more endorsers, Guarantors, other guarantors, the Borrower, any other Guaranteed Party or other obligors;

(e)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower or any other Guaranteed Party to creditors of the Borrower or such other Guaranteed Party other than the Secured Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower or any other Guaranteed Party to the Secured Creditors regardless of what liabilities of the Borrower or such other Guaranteed Party remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, any of the Interest Rate Protection Agreements or Other Hedging Agreements, the Credit Documents or any of the instruments or agreements referred to therein, or otherwise amend, modify or supplement any of the Interest Rate Protection Agreements or Other Hedging Agreements, the Credit Documents or any of such other instruments or agreements;

(h)     act or fail to act in any manner which may deprive such Guarantor of its right to subrogation against the Borrower or any other Guaranteed Party to recover full indemnity for any payments made pursuant to this Guaranty; and/or

(i)     take any other action or omit to take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Guarantor from its liabilities under this Guaranty (including, without limitation, any action or omission whatsoever that might otherwise vary the risk of the Guarantor or constitute a legal or equitable defense to or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against the Guarantor).

No invalidity, illegality, irregularity or unenforceability of all or any part of the Guaranteed Obligations, the Credit Documents or any other agreement or instrument relating to the Guaranteed Obligations or of any security or guarantee therefor shall affect, impair or be a defense to this Guaranty, and this Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Guaranteed Obligations.

6. <u>CONTINUING GUARANTY</u>.  This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.  No failure or delay on the part of any Secured Creditor in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which any Secured Creditor would otherwise have.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Secured Creditor to any other or further action in any circumstances without notice or demand.  It is not necessary for any Secured Creditor to inquire into the capacity or powers of the Borrower or any other Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on its or their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

7. <u>SUBORDINATION OF INDEBTEDNESS HELD BY GUARANTORS</u>.  Any indebtedness of the Borrower or any other Guaranteed Party now or hereafter held by any Guarantor is hereby subordinated to the indebtedness of the Borrower or such other Guaranteed Party to the Secured Creditors; and such indebtedness of the Borrower or such other Guaranteed Party to any Guarantor, if the Administrative Agent or the Collateral Agent, after an Event of Default has occurred and is continuing, so requests, shall be collected, enforced and received by such Guarantor as trustee for the Secured Creditors and be paid over to the Secured Creditors on account of the indebtedness of the Borrower or such other Guaranteed Party to the Secured Creditors, but without affecting or impairing in any manner the liability of such Guarantor under the other provisions of this Guaranty.  Prior to the transfer by any Guarantor of any note or negotiable instrument evidencing any indebtedness of the Borrower or any other Guaranteed Party to such Guarantor, such Guarantor shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.  Without limiting the generality of the foregoing, each Guarantor hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash; <u>provided</u>, that if any amount shall be paid to the Guarantor on account of such subrogation rights at any time prior to the irrevocable payment in full in cash of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the Secured Creditors and shall forthwith be paid to the Secured Creditors to be credited and applied upon the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Credit Documents or, if the Credit Documents do not provide for the application of such amount, to be held by the Secured Creditors as collateral security for any Guaranteed Obligations thereafter existing.

8. <u>GUARANTY ENFORCEABLE BY ADMINISTRATIVE AGENT OR COLLATERAL AGENT</u>.  Notwithstanding anything to the contrary contained elsewhere in this Guaranty, the Secured Creditors agree (by their acceptance of the benefits of this Guaranty) that this Guaranty may be enforced only by the action of the Administrative Agent or the Collateral Agent, in each case acting upon the instructions of the Required Lenders (or, after the date on

which all Credit Document Obligations have been paid in full, the holders of at least a majority of the outstanding Other Obligations) and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Guaranty or to realize upon the security to be granted by the Security Documents, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent or the Collateral Agent or, after all the Credit Document Obligations have been paid in full, by the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Guaranty and the Security Documents. The Secured Creditors further agree that this Guaranty may not be enforced against any director, officer, employee, partner, member or stockholder of any Guarantor (except to the extent such partner, member or stockholder is also a Guarantor hereunder). It is understood and agreed that the agreement in this Section 8 is among and solely for the benefit of the Secured Creditors and that, if the Required Lenders (or, after the date on which all Credit Document Obligations have been paid in full, the holders of at least a majority of the outstanding Other Obligations) so agree (without requiring the consent of any Guarantor), this Guaranty may be directly enforced by any Secured Creditor.

9. <u>REPRESENTATIONS, WARRANTIES AND COVENANTS OF GUARANTORS</u>. In order to induce the Lenders to make Loans to, and issue Letters of Credit for the account of, the Borrower pursuant to the Credit Agreement, and in order to induce the Other Creditors to execute, deliver and perform the Interest Rate Protection Agreements and Other Hedging Agreements to which they are a party, each Guarantor represents, warrants and covenants that:

(a)      such Guarantor (i) is a duly organized and validly existing corporation, partnership or limited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the corporate, partnership or limited liability company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business requires such qualification except for failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(b)      such Guarantor has the corporate, partnership or limited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of this Guaranty and each other Credit Document (such term, for purposes of this Guaranty, to mean each Credit Document (as defined in the Credit Agreement) and each Interest Rate Protection Agreement and Other Hedging Agreement with an Other Creditor) to which it is a party and has taken all necessary corporate, partnership or limited liability company action, as the case may be, to authorize the execution, delivery and performance by it of this Guaranty and each such other Credit Document;

(c)      such Guarantor has duly executed and delivered this Guaranty and each other Credit Document to which it is a party, and this Guaranty and each such other Credit Document constitutes the legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms, except to the extent that the enforceability

hereof or thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

(d)     neither the execution, delivery or performance by such Guarantor of this Guaranty or any other Credit Document to which it is a party, nor compliance by it with the terms and provisions hereof and thereof, will (i) contravene any provision of any applicable law, statute, rule or regulation or any applicable order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of such Guarantor or any of its Subsidiaries pursuant to the terms of any indenture, material mortgage, material deed of trust, loan agreement, credit agreement, or any other material agreement, contract or instrument to which such Guarantor or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject or (iii) violate any provision of the certificate or articles of incorporation, by-laws, partnership agreement or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Guarantor or any of its Subsidiaries;

(e)     no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made prior to the date when required and which remain in full force and effect), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance of this Guaranty by such Guarantor or any other Credit Document to which such Guarantor is a party or (ii) the legality, validity, binding effect or enforceability of this Guaranty or any other Document to which such Guarantor is a party;

(f)     there are no actions, suits or proceedings pending or, to such Guarantor's knowledge, threatened (i) with respect to this Guaranty or any other Credit Document to which such Guarantor is a party, (ii) with respect to such Guarantor or any of its Subsidiaries that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (iii) that could reasonably be expected to have a material adverse effect on the rights or remedies of the Secured Creditors or on the ability of such Guarantor to perform its obligations to the Secured Creditors hereunder and under the other Credit Documents to which it is a party;

(g)     until the termination of the Total Commitment and all Interest Rate Protection Agreements and Other Hedging Agreements with an Other Creditor and until such time as no Note or Letter of Credit remains outstanding and all Guaranteed Obligations have been paid in full (other than indemnities described in Section 12.06 of the Credit Agreement and analogous provisions in the Security Documents which are not then due and payable), such Guarantor will comply, and will cause each of its Subsidiaries to comply, with all of the applicable provisions, covenants and agreements

contained in Sections 8 and 9 of the Credit Agreement, and will take, or will refrain from taking, as the case may be, all actions that are necessary to be taken or not taken so that no violation of any provision, covenant or agreement contained in Section 12.06 of the Credit Agreement, and so that no Default or Event of Default, is caused by the actions of such Guarantor or any of its Subsidiaries; and

(h)     an executed (or conformed) copy of each of the Credit Documents, the Interest Rate Protection Agreements and the Other Hedging Agreements has been made available to a senior officer of such Guarantor and such officer is familiar with the contents thereof.

10.  EXPENSES.  The Guarantors hereby jointly and severally agree to pay all reasonable out-of-pocket costs and expenses of the Collateral Agent, the Administrative Agent and each other Secured Creditor in connection with the enforcement of this Guaranty and the protection of the Secured Creditors' rights hereunder and any amendment, waiver or consent relating hereto (including, in each case, without limitation, the reasonable fees and disbursements of counsel (including in-house counsel) employed by the Collateral Agent, the Administrative Agent and each other Secured Creditor).

11.  BENEFIT AND BINDING EFFECT.  This Guaranty shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the Secured Creditors and their successors and assigns.

12.  AMENDMENTS; WAIVERS.  Neither this Guaranty nor any provision hereof may be changed, waived, discharged or terminated except with the written consent of each Guarantor directly affected thereby (it being understood that the addition or release of any Guarantor hereunder shall not constitute a change, waiver, discharge or termination affecting any Guarantor other than the Guarantor so added or released) and with the written consent of either (x) the Required Lenders (or, to the extent required by Section 13.12 of the Credit Agreement, with the written consent of each Lender) at all times prior to the time at which all Credit Document Obligations have been paid in full or (y) the holders of at least a majority of the outstanding Other Obligations at all times after the time at which all Credit Document Obligations have been paid in full; provided, that any change, waiver, modification or variance affecting the rights and benefits of a single Class (as defined below) of Secured Creditors (and not all Secured Creditors in a like or similar manner) shall also require the written consent of the Requisite Creditors (as defined below) of such Class of Secured Creditors.  For the purpose of this Guaranty, the term "Class" shall mean each class of Secured Creditors, i.e., whether (x) the Lender Creditors as holders of the Credit Document Obligations or (y) the Other Creditors as the holders of the Other Obligations.  For the purpose of this Guaranty, the term "Requisite Creditors" of any Class shall mean (x) with respect to the Credit Document Obligations, the Required Lenders (or, to the extent required by Section 13.12 of the Credit Agreement, each Lender) and (y) with respect to the Other Obligations, the holders of at least a majority of all Other Obligations outstanding from time to time under the Interest Rate Protection Agreements and Other Hedging Agreements.

13. <u>SET OFF</u>. In addition to any rights now or hereafter granted under applicable law (including, without limitation, Section 151 of the New York Debtor and Creditor Law) and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default (such term to mean and include any "Event of Default" as defined in the Credit Agreement and any payment default under any Interest Rate Protection Agreement or Other Hedging Agreement with an Other Creditor continuing after any applicable grace period), each Secured Creditor is hereby authorized, at any time or from time to time, without notice to any Guarantor or to any other Person, any such notice being expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by such Secured Creditor to or for the credit or the account of such Guarantor, against and on account of the obligations and liabilities of such Guarantor to such Secured Creditor under this Guaranty, irrespective of whether or not such Secured Creditor shall have made any demand hereunder and although said obligations, liabilities, deposits or claims, or any of them, shall be contingent or unmatured. Notwithstanding anything to the contrary contained in this Guaranty, at any time that the Guaranteed Obligations shall be secured by any Real Property located in the State of California, no Secured Creditor shall exercise any right of set-off, lien or counterclaim or take any court or administrative action or institute any proceedings to enforce any provision of this Guaranty without the prior consent of the Administrative Agent or the Required Lenders or, to the extent required by Section 13.12 of the Credit Agreement, all of the Lenders, if such setoff or action or proceeding would or might (pursuant to Sections 580a, 580b, 580d and 726 of the California Code of Civil Procedure or Section 2924 of the California Civil Code, if applicable, or otherwise) affect or impair the validity, priority, or enforceability of the liens granted to the Collateral Agent pursuant to the Security Documents or the enforceability of the Guaranteed Obligations hereunder, and any attempted exercise by any Secured Creditor or the Administrative Agent of any such right without obtaining such consent of the Required Lenders or the Administrative Agent shall be null and void. It is understood and agreed that the foregoing sentence of this Section 13 is for the sole benefit of the Secured Creditors and may be amended, modified or waived in any respect by the Required Lenders (without any requirement of prior notice to or consent by any Credit Party or any other Person) and does not constitute a waiver of any rights against any Credit Party or against any Collateral. Each Secured Creditor (by its acceptance of the benefits hereof) acknowledges and agrees that the provisions of this Section 13 are subject to the sharing provisions set forth in Section 13.06 of the Credit Agreement.

14. <u>NOTICE</u>. Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent or any Guarantor shall not be effective until received by the Administrative Agent or such Guarantor, as the case may be. All notices and other communications shall be in writing and addressed to such party at (i) in the case of any Lender Creditor, as provided in the Credit Agreement, (ii) in the case of any Guarantor, at its address set forth opposite its signature page below, and (iii) in the case of any Other Creditor, at such address as such Other Creditor shall have specified in writing to the Guarantors; or in any

case at such other address as any of the Persons listed above may hereafter notify the others in writing.

15. <u>REINSTATEMENT</u>.  If any claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including, without limitation, the Borrower or any other Guaranteed Party), then and in such event each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any Note, any Interest Rate Protection Agreement, any Other Hedging Agreement or any other instrument evidencing any liability of the Borrower or any other Guaranteed Party, and such Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

16. <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS; AND WAIVER OF TRIAL BY JURY</u>.  (a)  THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE SECURED CREDITORS AND OF THE UNDERSIGNED HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.  Any legal action or proceeding with respect to this Guaranty or any other Credit Document to which any Guarantor is a party may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, in each case located within the City of New York, and, by execution and delivery of this Guaranty, each Guarantor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each Guarantor hereby further irrevocably waives any claim that any such courts lack jurisdiction over such Guarantor, and agrees not to plead or claim, in any legal action or proceeding with respect to this Guaranty or any other Credit Document to which such Guarantor is a party brought in any of the aforesaid courts, that any such court lacks jurisdiction over such Guarantor.  Each Guarantor further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to each Guarantor at its address set forth opposite its signature below, such service to become effective 30 days after such mailing.  Each Guarantor hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document to which such Guarantor is a party that such service of process was in any way invalid or ineffective. Nothing herein shall affect the right of any of the Secured Creditors to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against each Guarantor in any other jurisdiction.

(b)    Each Guarantor hereby irrevocably waives (to the fullest extent permitted by applicable law) any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Guaranty or any other Credit Document to which such Guarantor is a party brought in the courts referred to in

clause (a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that such action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)     EACH GUARANTOR AND EACH SECURED CREDITOR (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS GUARANTY) HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTY, THE OTHER CREDIT DOCUMENTS TO WHICH SUCH GUARANTOR IS A PARTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17.  RELEASE OF LIABILITY OF GUARANTOR UPON SALE OR DISSOLUTION.  In the event that all of the capital stock or other equity interests of one or more Guarantors is sold or otherwise disposed of or liquidated in compliance with the requirements of Section 9.02 of the Credit Agreement (or such sale, other disposition or liquidation has been approved in writing by the Required Lenders (or all the Lenders if required by Section 12.06 of the Credit Agreement)) and the proceeds of such sale, disposition or liquidation are applied in accordance with the provisions of the Credit Agreement, to the extent applicable, such Guarantor shall, upon consummation of such sale or other disposition (except to the extent that such sale or disposition is to Holdings or another Subsidiary thereof), be released from this Guaranty automatically and without further action and this Guaranty shall, as to each such Guarantor or Guarantors, terminate, and have no further force or effect (it being understood and agreed that the sale of one or more Persons that own, directly or indirectly, all of the capital stock or other equity interests of any Guarantor shall be deemed to be a sale of such Guarantor for the purposes of this Section 17).

18.  CONTRIBUTION.  At any time a payment in respect of the Guaranteed Obligations is made under this Guaranty, the right of contribution of each Guarantor against each other Guarantor shall be determined as provided in the immediately following sentence, with the right of contribution of each Guarantor to be revised and restated as of each date on which a payment (a "Relevant Payment") is made on the Guaranteed Obligations under this Guaranty. At any time that a Relevant Payment is made by a Guarantor that results in the aggregate payments made by such Guarantor in respect of the Guaranteed Obligations to and including the date of the Relevant Payment exceeding such Guarantor's Contribution Percentage (as defined below) of the aggregate payments made by all Guarantors in respect of the Guaranteed Obligations to and including the date of the Relevant Payment (such excess, the "Aggregate Excess Amount"), each such Guarantor shall have a right of contribution against each other Guarantor who has made payments in respect of the Guaranteed Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Guarantor's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Guarantors in respect of the Guaranteed Obligations (the aggregate amount of such deficit, the "Aggregate Deficit Amount") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Guarantor and the denominator of which is the Aggregate Excess Amount of all Guarantors multiplied by (y) the Aggregate Deficit Amount of such other Guarantor.  A Guarantor's right of contribution pursuant to the preceding sentences shall arise at the time of each computation, subject to adjustment to the time of each

computation; _provided_ that no Guarantor may take any action to enforce such right until the Guaranteed Obligations have been irrevocably paid in full in cash and the Total Commitment and all Letters of Credit have been terminated, it being expressly recognized and agreed by all parties hereto that any Guarantor's right of contribution arising pursuant to this Section 18 against any other Guarantor shall be expressly junior and subordinate to such other Guarantor's obligations and liabilities in respect of the Guaranteed Obligations and any other obligations owing under this Guaranty. As used in this Section 18: (i) each Guarantor's "Contribution Percentage" shall mean the percentage obtained by dividing (x) the Adjusted Net Worth (as defined below) of such Guarantor by (y) the aggregate Adjusted Net Worth of all Guarantors; (ii) the "Adjusted Net Worth" of each Guarantor shall mean the greater of (x) the Net Worth (as defined below) of such Guarantor and (y) zero; and (iii) the "Net Worth" of each Guarantor shall mean the amount by which the fair saleable value of such Guarantor's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Guaranteed Obligations arising under this Guaranty or any guaranteed obligations arising under any guaranty of the Second-Lien Note Indenture) on such date. Notwithstanding anything to the contrary contained above, any Guarantor that is released from this Guaranty pursuant to Section 17 hereof shall thereafter have no contribution obligations, or rights, pursuant to this Section 18, and at the time of any such release, if the released Guarantor had an Aggregate Excess Amount or an Aggregate Deficit Amount, same shall be deemed reduced to $0, and the contribution rights and obligations of the remaining Guarantors shall be recalculated on the respective date of release (as otherwise provided above) based on the payments made hereunder by the remaining Guarantors. All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 18 each Guarantor who makes any payment in respect of the Guaranteed Obligations shall have no right of contribution or subrogation against any other Guarantor in respect of such payment until all of the Guaranteed Obligations have been irrevocably paid in full in cash. Each of the Guarantors recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution. In this connection, each Guarantor has the right to waive its contribution right against any Guarantor to the extent that after giving effect to such waiver such Guarantor would remain solvent, in the determination of the Required Lenders.

19. LIMITATION ON GUARANTEED OBLIGATIONS. Each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any similar Federal or state law. To effectuate the foregoing intention, each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Guaranteed Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws (it being understood that it is the intention of the parties to this Guaranty and the parties to any guaranty of the Second-Lien Note Indenture that, to the maximum extent permitted under applicable laws, the liabilities in respect of the guarantees of the Second-Lien Note Indenture shall not be included for the foregoing purposes and that, if any reduction is required to the amount guaranteed by any Guarantor hereunder and with respect to the Second-Lien Note Indenture that its guarantee of amounts owing in respect of

the Second-Lien Note Indenture shall first be reduced) and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

20. COUNTERPARTS.  This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

21. PAYMENTS.  All payments made by any Guarantor hereunder will be made without setoff, counterclaim or other defense and on the same basis as payments are made by the Borrower under Sections 4.01 and 4.012 of the Credit Agreement.

22. ADDITIONAL GUARANTORS.  It is understood and agreed that any Subsidiary of Holdings that is required to execute a counterpart of this Guaranty after the date hereof pursuant to the Credit Agreement shall become a Guarantor hereunder by (x) executing and delivering a counterpart hereof to the Administrative Agent or (y) executing a joinder agreement and delivering same to the Administrative Agent, in each case as may be requested by (and in form and substance satisfactory to) the Administrative Agent and (y) taking all actions as specified in this Guaranty as would have been taken by such Guarantor had it been an original party to this Guaranty, in each case with all documents and actions required to be taken to be taken above to the reasonable satisfaction of the Administrative Agent.

23. HEADINGS DESCRIPTIVE.  The headings of the several Sections of this Guaranty are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Guaranty.

24. FCC CONSENT.  Notwithstanding anything herein which may be construed to the contrary, no action shall be taken by any of the Administrative Agent and the Secured Creditors with respect to any license of the Federal Communications Commission ("FCC") unless and until any applicable rules and regulations thereunder, requiring the consent to or approval of such action by the FCC or any governmental or other authority, have been satisfied. Each Guarantor agrees to use its best efforts, including taking any action which the Administrative Agent and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the FCC or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Administrative Agent and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

Each Guarantor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit,

license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to Administrative Agent and the Secured Creditors as permitted by applicable law.

\* \* \*

IN WITNESS WHEREOF, each Guarantor has caused this Guaranty to be executed and delivered as of the date first above written.

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

BRAINSTORM NETWORKS, INC., as a Guarantor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

HOT SPOTS PRODUCTIONS, INC., as a Guarantor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

ON TV, INC., as a Guarantor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN-BECOCOM, LLC, as a Guarantor

By: RCN Telecom Services of
    Massachusetts, Inc., its managing
    member

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN CABLE TV OF CHICAGO, INC., as a Guarantor

By: _____
    Name:
    Title:

Address:                                RCN ENTERTAINMENT, INC., as a
                                        Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                RCN FINANCE, LLC, as a Guarantor

105 Carnegie Center                         By: RCN Corporation, its managing
Princeton, NJ 08540                             member
Tel: (609) 734-3700
Fax: (609) 734-3830                     By: _____
                                            Name:
                                            Title:


Address:                                RCN FINANCIAL MANAGEMENT, INC., as
                                        a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                RCN INTERNATIONAL HOLDINGS, INC.,
                                        as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                RCN INTERNET SERVICES, INC., as a
                                        Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                     By: _____
Fax: (609) 734-3830                         Name:
                                            Title:

Address:                                    RCN TELECOM SERVICES, INC., as a
                                            Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                              Name:
                                                 Title:


Address:                                    RCN TELECOM SERVICES OF ILLINOIS,
                                            LLC, as a Guarantor

105 Carnegie Center
Princeton, NJ 08540                              By:  RCN CORPORATION, its managing
Tel: (609) 734-3700                                  member
Fax: (609) 734-3830
                                            By: _____
                                                 Name:
                                                 Title:


Address:                                    RCN TELECOM SERVICES OF
                                            MASSACHUSETTS, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                              Name:
                                                 Title:


Address:                                    RCN TELECOM SERVICES OF
                                            PHILADELPHIA, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                              Name:
                                                 Title:


Address:                                    RCN TELECOM SERVICES OF VIRGINIA,
                                            INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                              Name:
                                                 Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES OF
WASHINGTON, D.C., INC., as a Guarantor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RFM 2, LLC, as a Guarantor

    By: RCN Corporation, its managing
        member

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RLH PROPERTY CORPORATION, as a
Guarantor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

STARPOWER COMMUNICATIONS, LLC,
as a Guarantor

    By: RCN Telecom Services of
        Washington, D.C., Inc., its managing
        member

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

TEC AIR, INC., as a Guarantor

By: _____
    Name:
    Title:

Address:                              21ST CENTURY TELECOM SERVICES,
                                      INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                   By: _____
Fax: (609) 734-3830                       Name:
                                          Title:


Address:                              UNET HOLDING, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                   By: _____
Fax: (609) 734-3830                       Name:
                                          Title:

Accepted and Agreed to:

DEUTSCHE BANK AG CAYMAN
    ISLANDS BRANCH, as Collateral Agent
    and Pledgee

By:_____
    Name:
    Title:

Address:

60 Wall Street
New York, New York 10005
Tel: [_____]
Fax: [_____]

Table of Contents

Page

1. GUARANTY ...................................................................................................2
2. LIABILITY OF GUARANTORS ABSOLUTE ......................................................3
3. OBLIGATIONS OF GUARANTORS INDEPENDENT .......................................4
4. WAIVERS BY GUARANTORS............................................................................4
5. RIGHTS OF SECURED CREDITORS .............................................................6
6. CONTINUING GUARANTY ...............................................................................8
7. SUBORDINATION OF INDEBTEDNESS HELD BY GUARANTORS............................8
8. GUARANTY ENFORCEABLE BY ADMINISTRATIVE AGENT OR COLLATERAL
   AGENT........................................................................................................8
9. REPRESENTATIONS, WARRANTIES AND COVENANTS OF GUARANTORS ...........9
10. EXPENSES....................................................................................................11
11. BENEFIT AND BINDING EFFECT..................................................................11
12. AMENDMENTS; WAIVERS ...........................................................................11
13. SET OFF ......................................................................................................12
14. NOTICE........................................................................................................12
15. REINSTATEMENT ........................................................................................13
16. CONSENT TO JURISDICTION; SERVICE OF PROCESS; AND WAIVER OF TRIAL BY
    JURY ..........................................................................................................13
17. RELEASE OF LIABILITY OF GUARANTOR UPON SALE OR DISSOLUTION .........14
18. CONTRIBUTION...........................................................................................14
19. LIMITATION ON GUARANTEED OBLIGATIONS........................................15
20. COUNTERPARTS..........................................................................................16
21. PAYMENTS ..................................................................................................16
22. ADDITIONAL GUARANTORS.......................................................................16
23. HEADINGS DESCRIPTIVE............................................................................16
24. FCC CONSENT.............................................................................................16

(i)

## [FORM OF] INTERCOMPANY NOTE

**[This Note, and the obligations of [NAME OF PAYOR] (the "Payor") hereunder, shall be subordinate and junior in right of payment to all Senior Indebtedness (as defined in Section 1.07 of Annex A hereto) on the terms and conditions set forth in Annex A hereto, which Annex A is herein incorporated by reference and made a part hereof as if set forth herein in its entirety.]**[1]

New York, New York

_____, ____

FOR VALUE RECEIVED, _____, a _____ corporation (the "Payor"), hereby promises to pay [on demand] [on [DATE]] _____ to the order of _____, or its assigns (the "Payee"), in lawful money of the United States of America in immediately available funds, at such location in the United States of America as the Payee shall from time to time designate, the unpaid principal amount of all loans and advances made by the Payee to the Payor.

The Payor promises also to pay interest on the unpaid principal amount hereof in like money at said location from the date hereof until paid at such rate per annum as shall be agreed upon from time to time by the Payor and Payee.

Upon the earlier to occur of (x) the commencement of any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar proceeding of any jurisdiction relating to the Payor or (y) any exercise of remedies (including the termination of the Total Commitment) pursuant to Section 10 of the First-Lien Credit Agreement, Section __ of the Second-Lien Note Indenture or Section __ of the Third-Lien Credit Agreement[2] referred to below, the unpaid principal amount hereof shall become immediately due and payable without presentment, demand, protest or notice of any kind in connection with this Note.

This Note is one of the Intercompany Notes referred to in (i) the Credit Agreement, dated as of December __, 2004, among RCN CORPORATION, a Delaware corporation (the "Borrower"), the lenders party thereto from time to time (the "Lenders"), [_____], as syndication agent (in such capacity, the "Syndication Agent"), [_____], as documentation agent (in such capacity, the "Documentation Agent"), DEUTSCHE BANK

---

[1]     EACH PROMISSORY NOTE EVIDENCING AN INTERCOMPANY LOAN INCURRED BY ANY OTHER LOAN PARTY OWING TO ANY SUBSIDIARY OF THE BORROWER THAT IS NOT A LOAN PARTY THAT IS PERMITTED BY THE CREDIT AGREEMENT SHALL HAVE INCLUDED ON ITS FACE THIS BRACKETED LEGEND AND SHALL HAVE "ANNEX A TO NOTE" ATTACHED THERETO AND MADE A PART THEREOF.

[2]     IF EITHER THE FIRST-LIEN CREDIT AGREEMENT, THE SECOND-LIEN NOTE INDENTURE OR THE THIRD-LIEN CREDIT AGREEMENT IS PAID OFF IN FULL, REFERENCES HEREIN TO SUCH AGREEMENTS MAY BE DELETED.

AG CAYMAN ISLANDS BRANCH, as administrative agent and as collateral agent for the Lenders, DEUTSCHE BANK SECURITIES INC., as sole lead arranger and sole book runner (as amended, restated, modified and/or supplemented from time to time, the "First-Lien Credit Agreement"), (ii) the Indenture, dated as of December __, 2004, among the Borrower, the lenders from time to time party thereto (the "Second-Lien Creditors") and [_____], as trustee for the Second-Lien Creditors (as amended, restated, modified and/or supplemented from time to time, the "Second-Lien Note Indenture") and (iii) to the extent the Payee is the Borrower, the Amended and Restated Term Loan and Credit Agreement, dated as of December __, 2004, among the Borrower, the lenders party thereto from time to time (the "Third-Lien Creditors") and HSBC BANK USA as administrative agent and as collateral agent (as amended, restated, modified and/or supplemented from time to time, the "Third-Lien Credit Agreement" and together with the First-Lien Credit Agreement and the Second-Lien Note Indenture, the "Credit Agreements") and is subject to the terms of each such Credit Agreement[, and shall be pledged by the Payee pursuant to each Pledge Agreement (as defined in each Credit Agreement). The Payor hereby acknowledges and agrees that each Pledgee (as defined in each Pledge Agreement) may, pursuant to each Pledge Agreement as in effect from time to time (but subject to the terms of the Intercreditor Agreement), exercise all rights provided therein with respect to this Note].[3]

       The Payee is hereby authorized (but shall not be required) to record all loans and advances made by it to the Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein.

       This Note, and all of the Payor's obligations hereunder, shall be subordinate and junior to all Senior Indebtedness (as defined in Section 1.07 of Annex A hereto) on the terms and conditions set forth in Annex A hereto, which Annex A is incorporated herein by reference and made a part hereof as if set forth herein in its entirety.

       All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

       The Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

---

[3]      INSERT IN EACH INTERCOMPANY NOTE UNDER WHICH THE PAYEE IS A LOAN PARTY (AS DEFINED IN THE CREDIT AGREEMENT).

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.**

[NAME OF PAYOR]

By:_____
    Name:
    Title:

Pay to the order of

_____

[NAME OF PAYEE]

By:_____
    Name:
    Title:

Section 1.01.  Subordination of Liabilities.  [NAME OF PAYOR] (the "Payor"), for itself, and its successors and assigns, covenants and agrees and each holder of the promissory note to which this Annex A is attached (the "Note") by its acceptance thereof likewise covenants and agrees that the payment of the principal of, and interest on, and all other amounts owing in respect of, the Note (the "Subordinated Indebtedness") is hereby expressly subordinated, to the extent and in the manner hereinafter set forth, to the prior payment in full in cash of all Senior Indebtedness (as defined in Section 1.07 of this Annex A).  The provisions of this Annex A shall constitute a continuing offer to all persons or other entities who, in reliance upon such provisions, become holders of, or continue to hold, Senior Indebtedness, and such provisions are made for the benefit of the holders of Senior Indebtedness, and such holders are hereby made obligees hereunder the same as if their names were written herein as such, and they and/or each of them may proceed to enforce such provisions.

Section 1.02.  Payor Not to Make Payments with Respect to Subordinated Indebtedness in Certain Circumstances.  (a) Upon the maturity of any Senior Indebtedness (including interest thereon or fees or any other amounts owing in respect thereof), whether at stated maturity, by acceleration or otherwise, all Obligations (as defined in Section 1.07 of this Annex A) owing in respect thereof, in each case to the extent due and owing, shall first be paid in full, in cash, before any payment of any kind or character (whether in cash, property, securities or otherwise) is made on account of the Subordinated Indebtedness.

(b) Payor may not (and no other person or other entity on behalf of Payor may), directly or indirectly, make any payment of Subordinated Indebtedness and may not acquire any Subordinated Indebtedness for cash, property, securities or otherwise until all Senior Indebtedness has been paid in full in cash if any Default under Section 10 of either Credit Agreement (as defined below), any Event of Default under (and as defined in) either Credit Agreement or any event of default under any other issue of Senior Indebtedness is then in existence or would result therefrom.  Each holder of the Note hereby agrees that, so long as any such Default or Event of Default under either Credit Agreement or event of default under any other issue of Senior Indebtedness exists, it will not ask, demand, sue for, or otherwise take, accept or receive, any amounts owing in respect of the Subordinated Indebtedness.

(c)    In the event that, notwithstanding the provisions of the preceding sub-section (a) and (b) of this Section 1.02, Payor (or any person or other entity on behalf of Payor) shall make (or the holder of the Note shall receive) any payment on account of the Subordinated Indebtedness at a time when payment is not permitted by said subsection (a) or (b), such payment shall be held by the holder of the Note, in trust for the benefit of, and shall be paid forthwith over and delivered to, the holders of Senior Indebtedness or their representative or the trustee under the indenture or other agreement pursuant to which any instruments evidencing any Senior Indebtedness may have been issued, as their respective interests may appear, for application pro rata to the payment of all Senior Indebtedness (after giving effect to the relative priorities of such Senior Indebtedness pursuant to the Intercreditor Agreement (as defined in the First-Lien Credit Agreement) or otherwise) remaining unpaid to the extent necessary to pay all Senior Indebtedness in full in cash in accordance with the terms of such Senior Indebtedness,

after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness. Without in any way modifying the provisions of this Annex A or affecting the subordination effected hereby if the hereafter referenced notice is not given, Payor shall give the holder of the Note prompt written notice of any event which would prevent payments under Section 1.02(a) or (b) hereof.

Section 1.03. <u>Subordination to Prior Payment of All Senior Indebtedness on Dissolution, Liquidation or Reorganization of Payor</u>. Upon any distribution or payment of assets of Payor upon any total or partial dissolution, winding up, liquidation or reorganization of Payor (whether in bankruptcy, insolvency, receivership or similar proceedings or upon an assignment for the benefit of creditors, marshalling of assets or otherwise, and whether voluntary or involuntary):

(a) the holders of all Senior Indebtedness shall first be entitled to receive payment in full in cash of all Senior Indebtedness (including, without limitation, post-petition interest at the rate provided for in the documentation with respect to the Senior Indebtedness, whether or not such post-petition interest is an allowed claim against the debtor in any bankruptcy or similar proceeding) before the holder of the Note is entitled to receive any payment of any kind or character (whether in cash, property, securities or otherwise) on account of the Subordinated Indebtedness;

(b) any payment or distribution of assets of Payor of any kind or character (whether in cash, property, securities or otherwise) to which the holder of the Note would be entitled except for the provisions of this Annex A, shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the holders of Senior Indebtedness or their representative or representatives, or to the trustee or trustees under any indenture or other agreement under which any instruments evidencing any such Senior Indebtedness may have been issued, to the extent necessary to make payment in full in cash of all Senior Indebtedness remaining unpaid (after giving effect to the relative priorities of such Senior Indebtedness pursuant to the Intercreditor Agreement or otherwise), after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness; and

(c) in the event that, notwithstanding the foregoing provisions of this Section 1.03, any payment or distribution of assets of Payor of any kind or character (whether in cash, property, securities or otherwise) shall be received by the holder of the Note on account of Subordinated Indebtedness before all Senior Indebtedness is paid in full in cash, such payment or distribution shall be received and held in trust for and shall forthwith be paid over to the holders of the Senior Indebtedness (after giving effect to the relative priorities of such Senior Indebtedness pursuant to the Intercreditor Agreement or otherwise) remaining unpaid or their representative or representatives, or to the trustee or trustees under any indenture or other agreement under which any instruments evidencing any of such Senior Indebtedness may have been issued, for application to the payment of such Senior Indebtedness until all such Senior Indebtedness shall have been paid in full in

cash, after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness.

To the extent any payment of Senior Indebtedness (whether by or on behalf of Payor, as proceeds of security or enforcement of any right of setoff or otherwise) is declared to be fraudulent or preferential, set aside or required to be paid to any receiver, trustee in bankruptcy, liquidating trustee, agent or other similar person under any bankruptcy, insolvency, receivership, fraudulent conveyance or similar law, then, if such payment is recovered by, or paid over to, such receiver, trustee in bankruptcy, liquidating trustee, agent or other similar person, the Senior Indebtedness or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment has not occurred.

If the holder of the Note does not file a proper claim or proof of debt in the form required in any proceeding or other action referred to in the introduction paragraph of this Section 1.03 prior to 30 days before the expiration of the time to file such claim or claims, then any of the holders of the Senior Indebtedness or their representative is hereby authorized to file an appropriate claim for and on behalf of the holder of the Note.

Without in any way modifying the provisions of this Annex A or affecting the subordination effected hereby if the hereafter referenced notice is not given, Payor shall give prompt written notice to the holder of the Note of any dissolution, winding up, liquidation or reorganization of Payor (whether in bankruptcy, insolvency or receivership proceedings or upon assignment for the benefit of creditors, marshalling of assets or otherwise).

Section 1.04. <u>Subrogation</u>. Subject to the prior payment in full in cash of all Senior Indebtedness, the holder of the Note shall be subrogated to the rights of the holders of Senior Indebtedness to receive payments or distributions of assets of Payor applicable to the Senior Indebtedness until all amounts owing on the Note shall be paid in full, and for the purpose of such subrogation no payments or distributions to the holders of the Senior Indebtedness by or on behalf of Payor or by or on behalf of the holder of the Note by virtue of this Annex A which otherwise would have been made to the holder of the Note shall, as between Payor, its creditors other than the holders of Senior Indebtedness, and the holder of the Note, be deemed to be payment by Payor to or on account of the Senior Indebtedness, it being understood that the provisions of this Annex A are and are intended solely for the purpose of defining the relative rights of the holder of the Note, on the one hand, and the holders of the Senior Indebtedness, on the other hand.

Section 1.05. <u>Obligation of Payor Unconditional</u>. Nothing contained in this Annex A or in the Note is intended to or shall impair, as between Payor and the holder of the Note, the obligation of Payor, which is absolute and unconditional, to pay to the holder of the Note the principal of and interest on the Note as and when the same shall become due and payable in accordance with their terms, or is intended to or shall affect the relative rights of the holder of the Note and other creditors of Payor other than the holders of the Senior Indebtedness, nor shall anything herein or therein prevent the holder of the Note from exercising all remedies otherwise permitted by applicable law upon an event of default under the Note, subject to the

rights, if any, under this Annex A of the holders of Senior Indebtedness in respect of cash, property, or securities of Payor received upon the exercise of any such remedy.

Section 1.06. <u>Subordination Rights Not Impaired by Acts or Omissions of Payor or Holders of Senior Indebtedness</u>. No right of any present or future holders of any Senior Indebtedness to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Payor or by any act or failure to act in good faith by any such holder, or by any noncompliance by Payor with the terms and provisions of the Note, regardless of any knowledge thereof which any such holder may have or be otherwise charged with. The holders of the Senior Indebtedness may, without in any way affecting the obligations of the holder of the Note with respect hereto, at any time or from time to time and in their absolute discretion, change the manner, place or terms of payment of, change or extend the time of payment of, or renew, increase or otherwise alter, any Senior Indebtedness, or amend, modify or supplement any agreement or instrument governing or evidencing such Senior Indebtedness or any other document referred to therein, or exercise or refrain from exercising any other of their rights under the Senior Indebtedness including, without limitation, the waiver of default thereunder and the release of any collateral securing such Senior Indebtedness, all without notice to or assent from the holder of the Note.

Section 1.07. <u>Senior Indebtedness</u>. Ther term "<u>Senior Indebtedness</u>" shall mean all Obligations of Payor under, or in respect of, (i) the Credit Agreement, dated as of December __, 2004, among RCN CORPORATION (the "<u>Borrower</u>"), the lenders party thereto from time to time (the "<u>Lenders</u>"), [_____], as Syndication Agent, [_____], as Documentation Agent, DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH, as administrative agent and as collateral agent for the Lenders, DEUTSCHE BANK SECURITIES INC., as sole lead arranger and sole book runner, as the same may be amended, modified, extended, renewed, restated, and/or supplemented from time to time, (the "<u>First-Lien Credit Agreement</u>"), and each other Credit Document (as defined in the First-Lien Credit Agreement) to which Payor is a party, and any renewal, extension, restatement, refinancing or refunding of any thereof, (ii) the Indenture, dated as of December __, 2004, among the Borrower, the lenders party thereto from time to time (the "<u>Second-Lien Creditors</u>"), [_____], as trustee for the Second-Lien Creditors (as amended, restated, modified and/or supplemented from time to time, the "<u>Second-Lien Note Indenture</u>"), and each other [Second-Lien Note Document] (as defined in the Second-Lien Note Indenture) to which Payor is a party, and any renewal, extension, restatement, refinancing or refunding of any thereof, (iii) the Amended and Restated Term Loan and Credit Agreement, dated as of December __, 2004, among the Borrower, the lenders party thereto from time to time (the "<u>Third-Lien Creditors</u>"), HSBC BANK USA, as administrative agent and as collateral agent for the Third-Lien Creditors, as the same may be amended, modified, extended, renewed, restated, and/or supplemented from time to time (the "<u>Third-Lien Credit Agreement</u>") and (iv) each Secured Hedging Agreement (as defined in the Security Agreement referred to in the First-Lien Credit Agreement), including any guaranty thereof under any Guaranty of Payor. As used herein, the term "<u>Obligation</u>" shall mean all principal, interest, premium, reimbursement obligations, penalties, fees, expenses, indemnities and other liabilities and obligations (including any guaranties of the foregoing liabilities and obligations) payable under the documentation governing any indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided in the

documentation with respect thereto, whether or not such interest is an allowed claim against the debtor in any such proceeding).

\*       \*       \*

**EXHIBIT G**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**CONVERTIBLE SECOND-LIEN NOTES FINANCING**

RCN CORPORATION,

as the Company,

THE GUARANTORS,

as defined herein,

and

THE PURCHASERS,

as defined herein.

NOTE PURCHASE AGREEMENT

7 3/8% Convertible Second-Lien Notes due 2012

Dated as of [_____], 2004

## TABLE OF CONTENTS

Page

SECTION 1.  AUTHORIZATION; PURCHASE AND SALE OF NOTES................................2

    (a)    Authorization of Notes.................................................................2
    (b)    Purchase and Sale of Notes .......................................................2
    (c)    Closing .......................................................................................2
    (d)    Form of Payment .......................................................................3

SECTION 2.  PURCHASERS' REPRESENTATIONS AND WARRANTIES. .........................3

    (a)    Investment Purpose...................................................................3
    (b)    Accredited Investor Status.........................................................3
    (c)    Reliance on Exemptions.............................................................3
    (d)    Information ................................................................................3
    (e)    No Governmental Review ..........................................................4
    (f)    Transfer or Resale .....................................................................4
    (g)    Authorization; Enforcement; Validity.......................................4
    (h)    Residency ..................................................................................4

SECTION 3.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE GUARANTORS. ...............................................................................................4

    (a)    Organizational Status ................................................................4
    (b)    Power and Authority ..................................................................5
    (c)    No Violation ..............................................................................5
    (d)    The Security Documents ............................................................5
    (e)    Capitalization.............................................................................6
    (f)    Subsidiaries...............................................................................6
    (g)    Issuance of Securities................................................................7
    (h)    Approvals...................................................................................7
    (i)    Compliance with Statutes, etc ...................................................7
    (j)    SEC Documents.........................................................................8
    (k)    Financial Statements; Financial Condition; Undisclosed Liabilities; Projections...8
    (l)    True and Complete Disclosure ...................................................9
    (m)    Use of Proceeds; Margin Regulations........................................9
    (n)    Indebtedness ............................................................................10
    (o)    Litigation .................................................................................10
    (p)    Intellectual Property, etc ..........................................................10
    (q)    Insurance .................................................................................10
    (r)    Tax Returns and Payments .......................................................10
    (s)    Foreign Corrupt Practices Act ..................................................11
    (t)    Transactions With Affiliates......................................................11
    (u)    Representations and Warranties in Other Documents .......................11
    (v)    FCC Licenses and Other Governmental Authorizations....................11
    (w)    Compliance with ERISA...........................................................13
    (x)    Labor Relations.........................................................................14

| (y) | Properties | 14 |
| (z) | Environmental Matters | 14 |
| (aa) | Intercreditor Agreement | 15 |
| (bb) | Certain Agreements | 15 |
| (cc) | Event of Default | 15 |
| (dd) | Dilutive Effect | 15 |
| (ee) | Insolvency | 16 |
| (ff) | Effect of Transactions | 16 |
| (gg) | Registration Rights | 16 |
| (hh) | No Integrated Offering | 16 |
| (ii) | Application of Takeover Protections | 17 |
| (jj) | Investment Company Act | 17 |
| (kk) | Public Utility Holdings Company Act | 17 |
| (ll) | No Subsidiary Restrictions | 17 |
| (mm) | Internal Controls | 17 |
| (nn) | Independent Accountants | 18 |
| (oo) | Sarbanes-Oxley Act | 18 |
| (pp) | RCN International | 18 |
| (qq) | Brokers and Finders | 18 |
| SECTION 4. | COVENANTS OF THE PARTIES. | 18 |
| (a) | Obligations | 18 |
| (b) | Form D and Blue Sky | 18 |
| (c) | Reporting Status | 19 |
| (d) | Use of Proceeds | 19 |
| (e) | Reservation of Shares | 19 |
| (f) | Fees and Expenses | 19 |
| (g) | Limits on Additional Issuances | 19 |
| (h) | No Solicitation | 20 |
| (i) | Independent Nature of Purchasers' Obligations and Rights | 20 |
| (j) | Board Seat | 20 |
| (k) | Listing of Common Stock | 21 |
| (l) | Compliance with Laws | 22 |
| (m) | Takeover Provisions | 22 |
| (n) | PORTAL Market | 23 |
| SECTION 5. | TRANSFER AGENT INSTRUCTIONS. | 23 |
| SECTION 6. | CONDITIONS TO THE COMPANY'S OBLIGATION TO CLOSE. | 23 |
| (a) | Representations and Warranties; Covenants | 23 |
| (b) | Payment of Purchase Price | 24 |
| SECTION 7. | CONDITIONS TO EACH PURCHASER'S OBLIGATION TO PURCHASE THE NOTES. | 24 |
| (a) | Representations and Warranties; Covenants | 24 |
| (b) | Indebtedness | 24 |
| (c) | Plan of Reorganization | 24 |

| (d) | Confirmation Order | 24 |
| (e) | First-Lien Credit Facility | 25 |
| (f) | Purchase of Notes | 25 |
| (g) | No Material Adverse Effect | 25 |
| (h) | No Legal Impediment to Issuance | 25 |
| (i) | Laminar Board Member | 25 |
| (j) | Payment of Fees | 25 |
| (k) | Registration Rights Agreement | 25 |
| (l) | Indenture | 25 |
| (m) | Intercreditor Agreement | 25 |
| (n) | Guaranty Agreement | 26 |
| (o) | Security Agreement | 26 |
| (p) | Pledge Agreement | 26 |
| (q) | Mortgages; Title Insurance; Surveys; etc | 27 |
| (r) | Solvency Opinion; Insurance Certificates | 28 |
| (s) | Delivery of Notes | 28 |
| (t) | Reservation of Common Stock | 28 |
| (u) | Opinion of Counsel for the Company and the Guarantors | 28 |
| (v) | Good Standings | 29 |
| (w) | Secretary's Certificates | 29 |
| (x) | Filings; Authorizations | 29 |
| (y) | Irrevocable Transfer Agent Instructions | 30 |
| (z) | Financing Statements | 30 |
| (aa) | Company Certificate | 30 |
| (bb) | Guarantors' Certificate | 30 |
| (cc) | Approval of Proceedings | 30 |

SECTION 8. INDEMNIFICATION. ........ 30

| (a) | Indemnification by the Company and the Guarantors | 30 |
| (b) | No Liability | 31 |
| (c) | Procedures for Indemnification | 31 |
| (d) | Contribution | 32 |
| (e) | Survival of Representations and Warranties; Indemnification Obligations | 32 |

SECTION 9. MISCELLANEOUS. ........ 32

| (a) | Terms Defined | 32 |
| (b) | Governing Law; Jurisdiction; Waiver of Jury Trial | 37 |
| (c) | Counterparts | 37 |
| (d) | Headings | 38 |
| (e) | Entire Agreement | 38 |
| (f) | Consents | 38 |
| (g) | Amendments, Modifications and Waivers | 38 |
| (h) | Notices | 38 |
| (i) | Further Assurances | 39 |
| (j) | Third-Party Beneficiaries | 39 |
| (k) | Severability | 39 |
| (l) | Successors and Assigns | 39 |

(m)   Publicity ........................................................................................................40
(n)   Termination ....................................................................................................40
(o)   Payment Set Aside ........................................................................................40
(p)   Taxes ..............................................................................................................40

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the "Agreement") is dated as of [_____], 2004, and entered into by and among RCN Corporation, a Delaware corporation (the "Company"), each subsidiary of the Company listed on Schedule I hereto that is required to be a guarantor under the Indenture (as defined below) (each a "Guarantor", and collectively, the "Guarantors"), and the institutional investors whose names and addresses are listed on Schedule II hereto (each a "Purchaser", and collectively, the "Purchasers"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Section 9.1 of this Agreement.

WHEREAS, subject to the terms and conditions of this Agreement, the Company has agreed to issue and sell, and the Purchasers have severally agreed to purchase in the aggregate [One Hundred Fifty] Million Dollars ($[150],000,000) principal amount of the Company's 7 3/8% Convertible Second-Lien Notes due 2012 substantially in the form attached as Exhibit A to the Indenture (as defined below), as such form of note may be amended, modified or supplemented from time to time in accordance with the terms thereof (each a "Note" and collectively, the "Notes"), which shall be convertible into shares of the common stock outstanding after giving effect to the Joint Plan of Reorganization of the Company and certain of its Subsidiaries filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on October 12, 2004, and any amendments or supplements thereto (as so amended or supplemented, the "Plan of Reorganization") and pursuant to Section 1145 of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), par value [$0.01] per share, of the Company (the "Common Stock"; and the shares of Common Stock into which the Notes are convertible are sometimes referred to herein as the "Conversion Shares"). The Notes will be issued pursuant to an Indenture, dated as of [_____], 2004 (the "Indenture"), by and among the Company, the Guarantors and [_____], as Trustee (the "Trustee");

WHEREAS, Deutsche Bank Securities Inc. has agreed to provide financial advisory services to the Company in connection with the offer and sale by the Company of the Notes;

WHEREAS, contemporaneously with the execution and delivery of this Agreement, the Company and each of the Purchasers are entering into a Registration Rights Agreement substantially in the form attached hereto as Exhibit A (as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "Registration Rights Agreement") pursuant to which the Company will agree to provide the Purchasers with the benefit of certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act"), and applicable state securities laws, on the terms and subject to the conditions set forth therein;

WHEREAS, to induce the Purchasers to enter into this Agreement, the Company and the Guarantors have agreed to enter into a Pledge Agreement in a form mutually satisfactory to the Company, the Guarantors and the Purchasers (as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "Pledge Agreement"), a Security Agreement in a form mutually satisfactory to the Company, the Guarantors and the

Purchasers (as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "Security Agreement"), an Intercreditor Agreement (as defined in the Indenture), a Subsidiaries Guaranty Agreement in a form mutually satisfactory to the Company, the Guarantors and the Purchasers (as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "Guaranty Agreement") and such other documents required to grant a valid and perfected second-priority lien and security interest in the collateral of the Company and the Guarantors (collectively, with the Pledge Agreement, Security Agreement and Guaranty Agreement, the "Security Documents"); and

WHEREAS, the Notes will be secured by the collateral so described in the Security Documents, subject to the limitations specified therein.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company, the Guarantors and each of the Purchasers hereby agree as follows:

SECTION 1.  AUTHORIZATION; PURCHASE AND SALE OF NOTES.

(a)  Authorization of Notes.  The Company has duly authorized the issue and sale of (i) $[150],000,000 aggregate principal amount of the Notes and (ii) the Common Stock issuable upon conversion of the Notes in accordance with the terms of the Indenture and the Notes.  The Notes are being issued pursuant to the Indenture.

(b)  Purchase and Sale of Notes.  On the basis of the representations, warranties and agreements contained herein, and subject to the terms and conditions hereof, including, without limitation, the satisfaction (or waiver, to the extent permitted by this Agreement and applicable law) of the conditions set forth in Section 6 and Section 7 of this Agreement, on the Closing Date the Company shall issue and sell to each Purchaser, and each Purchaser severally and not jointly agrees to purchase from the Company, the respective aggregate principal amount of Notes set forth opposite such Purchaser's name on Schedule II hereto.  The Company shall issue to each Purchaser One Thousand United States Dollars ($1,000) principal amount of the Notes for each One Thousand United States Dollars ($1,000) tendered by each such Purchaser.

(c)  Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m., New York City time, on the second Business Day (as defined below) following the date on which the last to be fulfilled or waived of the conditions set forth in Section 6 and Section 7 hereof shall have been fulfilled or waived in accordance with this Agreement, or on such other date as may be mutually agreed to by the Company and the Purchasers (the "Closing Date"), at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, or such other location as the Purchasers and the Company shall mutually select.  As used herein, "Business Day" shall mean any day other than a Saturday, a Sunday or any day on which commercial banks are permitted or required to be closed in New York City.

(d)    Form of Payment.  On the Closing Date, (i) each Purchaser shall pay the Company for the Notes to be issued and sold to such Purchaser, by wire transfer of immediately available funds in accordance with the Company's wire transfer instructions attached hereto on Exhibit B, (ii) the Company shall reimburse each Purchaser for its expenses to the extent required by Section 4(f) of this Agreement, and (iii) the Company shall issue [to each Purchaser or in the name of its nominee or other designee properly authenticated Notes (in the denominations of not less than One Thousand United States Dollars ($1,000) as such Purchaser shall request) representing the aggregate principal amount of Notes which such Purchaser is then purchasing hereunder duly executed on behalf of the Company and registered in the name of such Purchaser or, at the request of such Purchaser, the Purchaser's designees.] **[PURCHASERS AND THE COMPANY TO DISCUSS WHETHER THE NOTES WILL INITIALLY BE IN DEFINITIVE OR GLOBAL FORM.]**  The parties hereto acknowledge that the Company's agreements with each of the Purchasers are separate agreements and the sale to each of the Purchasers are separate sales.

SECTION 2.    PURCHASERS' REPRESENTATIONS AND WARRANTIES.

Each Purchaser severally and not jointly represents and warrants to the Company as follows:

(a)    Investment Purpose.  Purchaser is acquiring the Notes for its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the Securities Act; provided, however, that by making the representations herein, Purchaser does not agree to hold any of the Notes or the Conversion Shares (collectively, the "Securities") for any minimum or other specific term and reserves the right to dispose of the Securities at any time.

(b)    Accredited Investor Status.  Purchaser is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act.

(c)    Reliance on Exemptions.  Purchaser understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of the United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and such Purchaser's compliance with, the representations and warranties of Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of Purchaser to acquire the Securities.

(d)    Information.  Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Company as contemplated by this Agreement, and is able to bear the economic risk of such investment for an indefinite period of time.  Purchaser has been furnished access to such information and documents as it has requested and has been afforded an opportunity to ask questions of and receive answers from representatives of the Company concerning the terms and conditions of this Agreement and the purchase of the Securities contemplated hereby.  Neither such inquiries nor any other due diligence investigations conducted by such Purchaser or its advisors, if any, or its representatives shall limit, modify, amend or affect the Company's

representations and warranties contained in this Agreement or any other Transaction Document and Purchaser's right to rely thereon.

(e)     No Governmental Review.  Such Purchaser understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(f)     Transfer or Resale. Purchaser understands that the Securities have not been registered under the Securities Act or any state securities laws.  Purchaser further understands that, except as and to the extent provided in the Registration Rights Agreement, the Company has not agreed to cause the Securities to be so registered, and that the Securities may not be offered for sale, sold, assigned or transferred without registration under the Securities Act or an exemption therefrom and that, in the absence of an effective registration statement under the Securities Act, such Securities may only be sold under certain circumstances as set forth in the Securities Act .

(g)     Authorization; Enforcement; Validity.  Purchaser has taken all action necessary for the authorization, execution, delivery and performance of this Agreement and its obligations hereunder, and, upon execution and delivery by the Company and the Guarantors, this Agreement shall constitute the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and by general principles of equity.

(h)     Residency.  Purchaser is a resident of that country or state specified in its address on Schedule II attached hereto.

The Purchaser's representations and warranties made in this Section 2 are made solely for the purpose of permitting the Company to make a determination that the offer and sale of the Notes pursuant to this Agreement complies with applicable United States federal and state securities laws and not for any other purpose.  Accordingly, the Company shall not rely on such representations and warranties for any other purpose.

SECTION 3.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE GUARANTORS.

The Company and the Guarantors jointly and severally represent and warrant to each of the Purchasers as follows:  **[REPRESENTATIONS AND WARRANTIES BELOW THAT ARE THE SAME AS THOSE GIVEN BY THE COMPANY AND THE GUARANTORS IN THE DEUTSCHE BANK CREDIT AGREEMENT ARE SUBJECT TO FURTHER REVISIONS BASED ON REVISIONS MADE IN THE CREDIT AGREEMENT.]**

(a)     Organizational Status.  The Company and each of its Subsidiaries (i) is a duly organized and validly existing corporation, partnership or limited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the

corporate, partnership or limited liability company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     <u>Power and Authority</u>.  The Company and each Guarantor has the corporate, partnership or limited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of this Agreement and each of the Transaction Documents to which it is party and has taken all necessary corporate, partnership or limited liability company action, as the case may be, to authorize the execution, delivery and performance by it of this Agreement and each of the Transaction Documents.  The Company and each Guarantor has duly executed and delivered this Agreement and each of the Transaction Documents to which it is party, and this Agreement and each of the Transaction Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)     <u>No Violation</u>.  Neither the execution, delivery or performance by the Company or any Guarantor of this Agreement or any of the Transaction Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality or the terms of any FCC License (as defined herein) or other Governmental Authorization (as defined herein), (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of the Company or any Guarantor or any of their respective Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust or credit agreement or any other material agreement, contract or instrument, in each case to which the Company, any Guarantor or any of their respective Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject, except for such conflicts, breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of the Company or any Guarantor or any of their respective Subsidiaries.

(d)     <u>The Security Documents</u>.

(1)     The provisions of the Security Agreement are effective to create in favor of [_____], as Collateral Agent (the "<u>Collateral Agent</u>"), for the benefit of the Secured Creditors, a legal, valid and enforceable security interest in all right, title and interest of the Company and each of the Guarantors in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has (or will have within ten (10)

days of the Closing Date) a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral described therein, subject to no other Liens other than Permitted Liens.  Following the recordation of (x) the grant of security interest in U.S. patents, if applicable, and (y) the grant of security interest in U.S. trademarks, if applicable, in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, the Collateral Agent for the benefit of the Secured Creditors will have, as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Security Agreement, and following the recordation of the grant of security interest in U.S. copyrights, if applicable, in the form attached to the Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, the Collateral Agent for the benefit of the Secured Creditors will have, as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Security Agreement.

(2)     The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person.  No filings or recordings are required in order to perfect (or maintain the perfection or priority of) the security interests created in the Pledge Agreement Collateral under the Pledge Agreement other than with respect to that portion of the Pledge Agreement Collateral constituting a "general intangible" under the UCC.

(3)     Each Mortgage creates, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest and mortgage lien created on such Mortgaged Property may be subject to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Liens related thereto).

(e)     Capitalization.  On the Closing Date, the authorized capital stock of the Company consists of [_____] shares of Common Stock, of which [____] shares are issued and outstanding.  All outstanding shares of capital stock of the Company have been duly and validly issued and are fully paid and non-assessable.

(f)     Subsidiaries.  On and as of the Closing Date and after giving effect to the Transaction, the Company has no Subsidiaries other than those Subsidiaries listed on Schedule 3(f).  Schedule 3(f) correctly sets forth, as of the Closing Date and after giving effect to the Transaction, (i) the percentage ownership (direct and indirect) of the Company in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof and (ii) the jurisdiction of organization of each such Subsidiary.  All outstanding shares of capital stock or other Equity Interests of each Subsidiary have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  On the Closing Date and after giving effect to the Transaction, except as set forth on Schedule 3(f), no Subsidiary of the Company has outstanding any securities convertible into or exchangeable for its capital stock or other Equity Interests or outstanding any right to subscribe for or to purchase,

or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its capital stock or other Equity Interests or any stock appreciation or similar rights.

(g)     Issuance of Securities.  All of the (i) shares of capital stock of the Company outstanding after giving effect to the Plan of Reorganization and pursuant to Section 1145 of the Bankruptcy Code and (ii) outstanding shares of capital stock of the Guarantors have, in each case, been duly and validly issued and are fully paid and nonassessable, and were issued in accordance with the registration or qualification requirements of the Securities Act and any relevant state securities laws or pursuant to valid exemptions therefrom.  Upon issuance, sale and delivery as contemplated by this Agreement, the Notes will be duly authorized and fully paid and free and clear of any and all security interests, pledges, liens, charges, claims, options, restrictions on transfer, preemptive or similar rights, proxies and voting or other agreements, or other encumbrances of any nature whatsoever ("Encumbrances"), except for those created by the Security Documents and other than restrictions on transfer imposed by United States federal or state securities laws.  At the Closing, at least [_____] shares of Common Stock will have been duly authorized and reserved for issuance upon conversion of the Notes.  Upon conversion or issuance in accordance with the Notes, the Conversion Shares will be duly authorized, validly issued, fully paid and nonassessable and free and clear of any and all Encumbrances, except for those created by the Security Documents, those created by the documents required to grant a valid and perfected first-priority lien and security interest in the collateral of the Company and the Guarantors and other than restrictions on transfer imposed by United States federal or state securities laws.  Upon conversion or issuance in accordance with the Notes, the holders of the Conversion Shares will be entitled to all rights accorded to a holder of Common Stock.  Subject to the accuracy of the representations and warranties of the Purchasers, the issuance by the Company of the Securities is exempt from registration under the Securities Act and applicable state securities laws.

(h)     Approvals.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (y) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (z) filings which are necessary to perfect the security interests created under the Security Documents, which filings shall have been made (or will be made within ten (10) days of the Closing Date), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, the Company or any Guarantor to authorize, or is required to be obtained or made by, or on behalf of, the Company or any Guarantor in connection with, (i) the execution, delivery and performance of this Agreement or any Transaction Document or (ii) the legality, validity, binding effect or enforceability of this Agreement or any Transaction Document.

(i)     Compliance with Statutes, etc.  The Company and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business, the holding of the FCC Licenses and the other Governmental Authorizations and the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such

noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(j)     <u>SEC Documents</u>.  The Company has made available to the Purchasers true and complete copies of the Company's (i) Annual Reports on Form 10-K for the fiscal years ended December 31, 2001, December 31, 2002, as amended, and December 31, 2003, as amended, as filed with the SEC, (ii) Quarterly Reports on Form 10-Q for the quarters ended March 31, 2004, as amended, June 30, 2004 and September 30, 2004, as filed with the SEC, (iii) proxy statements related to all meetings of its stockholders (whether annual or special) held since January 1, 2003, and (iv) all other reports filed with or registration statements declared effective by the SEC since January 1, 2003, except registration statements on Form S-8 relating to employee benefit plans, which are all the documents (other than preliminary material) that the Company was required to file with the SEC since that date (clauses (i) through (iv) being referred to herein collectively as the "<u>Company SEC Reports</u>").  After giving effect to the filing of Form 12b-25, the Company has timely made all filings required under the Exchange Act during the twelve months preceding the date of this Agreement.  As of their respective dates, the Company SEC Reports were duly filed and complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations of the SEC thereunder applicable to such Company SEC Reports, <u>including</u>, <u>but not limited to</u>, the Sarbanes-Oxley Act (as defined below).  As of their respective dates, the Company SEC Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(k)     <u>Financial Statements; Financial Condition; Undisclosed Liabilities; Projections</u>.

(1)     The consolidated balance sheets of the Company and its Subsidiaries as at [December 31, 2001, December 31, 2002, December 31, 2003, March 31, 2004, June 30, 2004 and September 30, 2004], and the related consolidated statements of income, cash flows and retained earnings of the Company for the fiscal years ended December 31, 2001, 2002 and 2003 and the six- and nine-month periods ended June 30, 2004 and September 30, 2004, [copies of which have been furnished to the Purchasers prior to the Closing Date,] present fairly in all material respects the consolidated financial position of the Company at the dates of such balance sheets and the consolidated results of the operations of the Company for the periods covered thereby.  [All interim monthly or quarterly financial statements furnished to the Purchasers prior to the Closing Date, present fairly in all material respects in accordance with GAAP the consolidated results of the operations of the Company and its Subsidiaries, for the periods covered thereby (except, in the case of the aforementioned quarterly or monthly financial statements, for normal year-end audit adjustments and the absence of footnotes).]  All of the foregoing historical financial statements have been prepared in accordance with GAAP consistently applied (except, in the case of the aforementioned quarterly or monthly financial statements, for normal year-end audit adjustments and the absence of footnotes).
**[BRACKETED LANGUAGE REGARDING FINANCIALS FURNISHED TO THE PURCHASERS WILL BE DELETED IF NOT APPLICABLE TO PURCHASERS.]**

(2)     [The Pro Forma Financials, copies of which have been furnished to the Purchasers prior to the Closing Date, present in all material respects the pro forma consolidated financial position and results of operations of the Company and its Subsidiaries (after giving effect to the Transaction) as at the dates and for the periods covered thereby.] **[BRACKETED LANGUAGE WILL BE DELETED IF NOT APPLICABLE TO PURCHASERS.]**

(3)     Except as fully disclosed in the financial statements delivered pursuant to Section [3(k)(1)] there were as of the Closing Date no liabilities or obligations with respect to the Company or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be material to the Company or any of its Subsidiaries.  As of the Closing Date, the Company knows of no basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements delivered pursuant to Section [3(k)(1)] or referred to in the immediately preceding sentence which, either individually or in the aggregate, could reasonably be expected to be material to the Company or any of its Subsidiaries.

(4)     [The Projections delivered to the Purchasers on or prior to the Closing Date, have been prepared in good faith and are based on reasonable assumptions, and there are no statements or conclusions in the Projections which are based upon or include information known to the Company to be misleading in any material respect or which fail to take into account material information known to the Company regarding the matters reported therein.  On the Closing Date, the Company believes that the Projections are reasonable and attainable, it being recognized by the Purchaser, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results and such differences may be material.] **[BRACKETED LANGUAGE WILL BE DELETED IF NOT APPLICABLE TO PURCHASERS.]**

(5)     Since December 31, 2003, there has been no changes, events and/or occurrences that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(l)     <u>True and Complete Disclosure</u>.  All factual information (taken as a whole) furnished by or on behalf of the Company in writing to the Purchasers (<u>including</u>, <u>without limitation</u>, all information contained in this Agreement and the Transaction Documents) for purposes of or in connection with this Agreement, the Transaction Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Company in writing to any Purchaser will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

(m)     <u>Use of Proceeds; Margin Regulations</u>.  All proceeds from the issuance of the Notes will be used by the Company to consummate its Plan of Reorganization and to pay the fees and expenses incurred therewith.  The proceeds from the issuance of the Notes will not be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or

carrying any Margin Stock. The issuance of the Notes will not violate or be inconsistent with the provisions of Regulation T, Regulation U or Regulation X.

(n) Indebtedness. Schedule 3(n) sets forth a true and complete list of all Indebtedness (including Contingent Obligations) of the Company and its Subsidiaries as of the Closing Date (excluding Indebtedness incurred pursuant to First-Lien Credit Agreement, this Agreement, the Indenture and the Third-Lien Credit Agreement) (the "Existing Indebtedness") which is to remain outstanding after giving effect to the Transaction, in each case showing the aggregate principal amount thereof and the name of the respective borrower and the Company, any Guarantor or any of their respective Subsidiaries which directly or indirectly guarantees such debt.

(o) Litigation. There are no actions, suits or proceedings pending or, to the knowledge of the Company or any Guarantor, threatened (i) with respect to the Transaction, this Agreement or any Transaction Document or (ii) that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

(p) Intellectual Property, etc. The Company and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, necessary for the conduct of its business (the "Business Intellectual Property") without any known conflict with the rights of others arising from the Company or its Subsidiaries' use of the Business Intellectual Property which, or the failure to obtain which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

(q) Insurance. Schedule 3(q) sets forth a true and complete listing of all insurance maintained by the Company and its Subsidiaries as of the Closing Date, with the amounts insured (and any deductibles) set forth therein.

(r) Tax Returns and Payments. The Company and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all federal income tax and other material returns, statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of, the Company and/or any of its Subsidiaries. The Returns accurately reflect in all material respects all liability for taxes of the Company and its Subsidiaries for the periods covered thereby. The Company and each of its Subsidiaries has paid all taxes and assessments payable by it which have become due, other than (i) those that are immaterial, (ii) those being contested in good faith and adequately disclosed and fully provided for on the financial statements of the Company and its Subsidiaries in accordance with GAAP, (iii) those discharged pursuant to the Plan of Reorganization [and (iv) those payable over time pursuant to the Plan of Reorganization (which taxes and assessments, in the case of this clause (iv) and to the extent due in accordance with the Plan of Reorganization, have been paid in all material respects in accordance with the terms of the Plan of Reorganization)]. There is no action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of the Company threatened by any authority regarding any material taxes relating to the Company or any of its Subsidiaries. [Except as provided in Schedule __,] as of the Closing Date,

neither the Company nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of the Company or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Company or any of its Subsidiaries not to be subject to the normally applicable statute of limitations. [Except as provided on Schedule __,] neither the Company nor any of its Subsidiaries has incurred, nor will any of them incur, any material tax liability in connection with the Transaction or any other transactions contemplated hereby (it being understood that the representation contained in this sentence does not cover any future tax liabilities of the Company or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business).

(s)     Foreign Corrupt Practices Act.  Neither the Company nor any of its Subsidiaries, nor, to the Company's knowledge, any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company or any Subsidiary used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the United States Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

(t)     Transactions With Affiliates.  Neither the Company nor any Subsidiary is a party to any agreement with any of the Company's directors, officers or stockholders or any Affiliate or family member of any of the foregoing under which it: (i) leases any real or personal property (either to or from such Person); (ii) licenses technology (either to or from such Person); (iii) is obligated to purchase any tangible or intangible asset from or sell such asset to such Person; (iv) purchases products or services from such Person or provides products or services to such person; (v) has borrowed money from or lent money to such Person; or (vi) would be required to be disclosed pursuant to Item 404 of Regulation S-K promulgated under the Securities Act.  Neither the Company nor any Subsidiary employs as an employee or engages as a consultant any family member of any of the Company's directors, officers or stockholders or any Affiliate or family member of any of the foregoing.  To the best knowledge of the Company, there exist no agreements among stockholders of the Company to act in concert with respect to their voting or holding of Company securities.

(u)     Representations and Warranties in Other Documents.  All representations and warranties set forth in the First-Lien Credit Facility, Third-Lien Credit Facility and the other Transaction Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Closing Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

(v)     FCC Licenses and Other Governmental Authorizations.

(1)     The Company and its Subsidiaries hold all FCC licenses, registrations and authorizations as are necessary to the Company's and its Subsidiaries' businesses (collectively, the "FCC Licenses").  Each of the FCC Licenses that is material to the business of the Company or any of its Subsidiaries has been validly issued and is in full force and effect.  All FCC Licenses in effect on the Closing Date and their respective expiration dates are listed and described on Schedule 3(v) and true copies of such FCC Licenses, with any and all modifications, amendments, and pending applications therefor or relating thereto, as of the Closing Date have been furnished to the Purchasers.  The Company has no knowledge of any condition imposed by the FCC as part of any FCC License which is neither set forth on the face thereof as issued by the FCC nor contained in the policies, rules and regulations of the FCC applicable generally to business of the type, nature, class or location of the Company and its Subsidiaries.  The Company and its Subsidiaries are in compliance in all material respects with the terms and conditions of the FCC Licenses applicable to it and with the policies, rules and regulations of the FCC and the Communications Act of 1934, as amended (the "Communications Act").  No proceedings are pending or are, to the knowledge of the Company, threatened which may reasonably be expected to result in the revocation, rescission, modification, non-renewal or suspension of any FCC License that is material to the business of the Company or any of its Subsidiaries, the denial of any pending applications, the issuance of any cease and desist order or the imposition of any fines, forfeitures or other administrative actions by the FCC with respect to the Company or any of its Subsidiaries.  All reports, applications, tariffs and other documents required to be filed by the Company or any of its Subsidiaries, as appropriate, with the FCC have in all material respects been timely filed and all such reports, applications, tariffs and documents are true, correct and complete in all material respects.  To the knowledge of the Company, there are no unsatisfied or otherwise outstanding citations, complaint proceedings, notices of liability or notices of forfeiture issued by the FCC and received by the Company or a Subsidiary thereof with respect to the Company or any of its Subsidiaries or any of their respective operations.

(2)     In addition to the FCC Licenses issued by the FCC, the Company and its Subsidiaries hold all material licenses, certificates, registrations and authorizations issued by any other governmental entity (domestic and foreign) necessary to operate their respective businesses for each line of business of the Company or any of its Subsidiaries requiring such authorization and in each jurisdiction in which the Company or any of its Subsidiaries may be deemed to be conducting their respective businesses under applicable law (collectively, the "Governmental Authorizations").  Each of the Governmental Authorizations has been validly issued and is in full force and effect.  The Governmental Authorizations as of the Closing Date are listed on Schedule 3(v), with any expiration date for any such authorization identified on Schedule 3(v), with authorizations issued by state public service or utility commissions (or analogous state authorities) listed in Part A of Schedule 3(v) and other Governmental Authorizations listed in Part B of Schedule 3(v).  None of the Governmental Authorizations contain any conditions or limitations outside the normal course that would materially and adversely restrict the operations of the Company or any of its Subsidiaries.  The Company and its Subsidiaries have been and are in compliance in all material respects with the terms and conditions of the Governmental Authorizations applicable to them.  Other than the proceedings of a general nature, no proceedings are pending or are, to the knowledge of the Company, threatened, and, to the Company's knowledge, no event has occurred, which may reasonably be expected to result in the revocation, rescission, adverse modification, non-renewal or suspension of any Governmental Authorization that is material to the business of the Company or any of its Subsidiaries, the

denial of any pending applications therefor, the issuance of any cease and desist order, or the imposition of any material fines, forfeitures, or other administrative actions by a governmental entity. All reports, applications, tariffs and other documents required to be filed by the Company or any of its Subsidiaries, as appropriate, with the governmental entity issuing a Government Authorization have in all material respects been timely filed, and all such reports, applications, tariffs and documents are true, correct and complete in all material respects. To the knowledge of the Company, there are no material unsatisfied or otherwise outstanding citations issued by any governmental entity and received by the Company or a Subsidiary thereof with respect to the Company or any of its Subsidiaries. Schedule 3(v) separately lists all pending applications for certificates or other authorizations from any state public service or utility commission (or analogous state authority).

(3)     The transactions contemplated herein, under applicable law (including the Communications Act) and the applicable policies, rules, regulations and practices of the FCC and other governmental entities, would not disqualify the Company or any of its Subsidiaries as an assignee or transferee of the FCC Licenses or the Governmental Authorizations or result in the imposition of any materially adverse condition on or modification of the FCC Licenses or the Governmental Authorizations. **[Note from Deutsche Bank Credit Agreement: License Subsidiary to be discussed]**

(w)     Compliance with ERISA. Schedule 3(w) sets forth, as of the Closing Date, the name of each Plan. Each Plan (and each related trust) is in substantial compliance with its terms and with all applicable laws, including, without limitation, ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received or timely applied for a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code within the preceding six years; neither the Company nor any of its Subsidiaries or ERISA Affiliates has ever maintained or contributed to, or had any obligation to maintain or contribute to (or borne any liability with respect to) any "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, that is a "multiemployer plan," within the meaning of Section 3(37) of ERISA, or that is subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA or subject to Title IV of ERISA; neither the Company nor any of its Subsidiaries or ERISA Affiliates has any obligation to maintain or contribute to (or borne any liability with respect to) any Foreign Pension Plan; all contributions required to be made with respect to a Plan have been timely made; neither the Company nor any of its Subsidiaries nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4204 or 4212 of ERISA or Section 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a material risk to the Company or any of its Subsidiaries or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, expected or, to the knowledge of the Company, threatened; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Company, any of its Subsidiaries, or any ERISA Affiliate has at all times been operated in compliance with the provisions of Part 6 of subtitle B of Title I of ERISA

and Section 4980B of the Code, except to the extent that any failure to comply could not reasonably be expected to result in a material liability to the Company or any of its Subsidiaries; each group health plan (as defined in 45 Code of Federal Regulations Section 160.103) which covers or has covered employees or former employees of the Company, any of its Subsidiaries or any ERISA Affiliate has at all times been operated in compliance with the provisions of the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder, except to the extent that any failure to comply could not reasonably be expected to result in a material liability to the Company or any of its Subsidiaries; no lien imposed under the Code or ERISA on the assets of the Company or any of its Subsidiaries or any ERISA Affiliate exists or is likely to arise on account of any Plan; and the Company and its Subsidiaries may cease contributions to or terminate any employee benefit plan maintained by any of them without incurring any material liability.

(x)    Labor Relations.  Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against the Company or any of its Subsidiaries or, to the knowledge of the Company, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Company or any of its Subsidiaries or, to the knowledge of the Company, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Company or any of its Subsidiaries or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries and (iii) no union representation question exists with respect to the employees of the Company or any of its Subsidiaries, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

(y)    Properties.  All Real Property [having a [book/fair market] value in excess of $_____ that is] owned [or leased] by the Company or any of its Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in Schedule 3(y).  The Company and each of its Subsidiaries has good and indefeasible title to all material properties owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 3(k) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

(z)    Environmental Matters.

(1)    The Company and each of its Subsidiaries is in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws.  There are no pending or, to the knowledge of the Company, threatened Environmental Claims against the Company or any of its Subsidiaries or any Real Property owned, leased or operated by the Company or any of its Subsidiaries (including, to the Company's knowledge, any such claim arising out of the ownership, lease or operation by the Company or any of its Subsidiaries of any Real Property formerly owned, leased or operated by the Company or any of its Subsidiaries but no longer owned, leased or operated by the Company or any of its Subsidiaries).  There are no facts, circumstances, conditions or occurrences with respect to the

business or operations of the Company or any of its Subsidiaries, or any Real Property owned, leased or operated by the Company or any of its Subsidiaries (including, to the Company's knowledge, any Real Property formerly owned, leased or operated by the Company or any of its Subsidiaries but no longer owned, leased or operated by the Company or any of its Subsidiaries) or, to the knowledge of the Company, any property adjoining or adjacent to any such Real Property that could be reasonably expected (i) to form the basis of an Environmental Claim against the Company or any of its Subsidiaries or any Real Property owned, leased or operated by the Company or any of its Subsidiaries or (ii) to cause any Real Property owned, leased or operated by the Company or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such Real Property by the Company or any of its Subsidiaries under any applicable Environmental Law.

(2) Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Real Property owned, leased or operated by the Company or any of its Subsidiaries or, to the knowledge of the Company, any property adjoining or adjacent to any Real Property, where such generation, use, treatment, storage, transportation or Release has violated or could be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim.

(3) Notwithstanding anything to the contrary in this Section 3(z), the representations and warranties made in this Section 3(z) shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliances of the types described above could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(aa) Intercreditor Agreement. The Intercreditor Agreement is enforceable against the Company and each of the Guarantors.

(bb) Certain Agreements.

(1) Neither the Company nor any of its Subsidiaries is a party to any agreement or instrument or subject to any corporate, partnership or limited liability company restriction, as the case may be, that, either individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.

(2) Neither the Company nor any of its Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, if such default, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(cc) Event of Default. No event has occurred or is continuing which constitutes, or with notice or lapse of time could constitute, an Event of Default (as defined in Indenture and the Note).

(dd) Dilutive Effect. The Company understands and acknowledges that the number of Conversion Shares issuable upon conversion of the Notes will increase in certain circumstances. The Company further acknowledges that its obligation to issue Conversion

PDFfile.doc

Shares upon conversion of the Notes in accordance with this Agreement, the Indenture and the Notes is, in each case, absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other shareholders of the Company.

(ee)  Insolvency.  On and as of the Closing Date and after giving effect to the Transaction and to all Indebtedness (including the term loans contemplated by the First-Lien Credit Facility and Indebtedness incurred pursuant to this Agreement, the Indenture and the Third-Lien Credit Agreement) being incurred or assumed and Liens created by the Company and each of the Guarantors in connection therewith (i) the sum of the assets, at a fair valuation, of the Company on a stand-alone basis and of the Company and its Subsidiaries taken as a whole will exceed their respective debts, (ii) each of the Company on a stand-alone basis and the Company and its Subsidiaries taken as a whole have not incurred and do not intend to incur, and do not believe that they will incur, debts beyond their respective ability to pay such debts as such debts mature, and (iii) the Company on a stand-alone basis and the Company and its Subsidiaries taken as a whole will have sufficient capital with which to conduct their respective businesses.  For purposes of this Section 3(ee), "debt" means any liability on a claim, and "claim" means (a) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or (b) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

(ff)  Effect of Transactions.  Neither (a) the purchase of the Notes by the Purchasers, (b) the issuance of the Conversion Shares to the Purchasers nor (c) the consummation of the transactions contemplated by this Agreement will result in (i) any Material Adverse Effect, (ii) the acceleration of any rights under any Contract to which the Company or any of its Subsidiaries is a party, the vesting of any outstanding option, warrant, call, conversion right, preemptive right or other right to subscribe for, purchase or otherwise acquire any of the shares of the capital stock of the Company or any Subsidiary or any of the stock of the Company or any of its Subsidiaries, or debt securities of the Company or any of its Subsidiaries (collectively "Commitments", and each individually a "Commitment"), (iii) any obligation of the Company to grant, extend or enter into any Contract or Commitment, or (iv) any right in favor of any Person to terminate or cancel any Contract to which the Company or any of its Subsidiaries is a party.

(gg)  Registration Rights.  Except for the Registration Rights Agreement and the registration rights agreement between the Company and [ ], dated [ ], 2004, neither the Company nor any its Subsidiaries will, as of the Closing Date, be under any obligation to register any of its securities under the Securities Act.

(hh)  No Integrated Offering.  Neither the Company, nor any of its Subsidiaries or Affiliates, nor any person acting on its or their behalf, has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that could cause this offering of the Securities to be integrated with any other offerings by the

16

Company for purposes of the Securities Act or any applicable shareholder approval provisions, nor will the Company or any of its Affiliates (including the Guarantors) take any action or steps that could cause the offering of the Securities to be integrated with other offerings. Subject to the truth, correctness and completeness of the Purchasers' representations and warranties set forth in Section 2 hereof, the offer, issuance and sale of the Notes and the Conversion Shares are and will be exempt from the registration and prospectus delivery requirements of the Securities Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws.

(ii) Application of Takeover Protections. The Company and its Board of Directors (the "Board") have taken all necessary action in order to render inapplicable any corporate takeover provision under laws of the State of Delaware or any other state or federal "fair price", "moratorium", "control share acquisition", "business combination" or other similar anti-takeover statute or regulation, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Certificate of Incorporation of the Company or the Bylaws of the Company (each, a "Takeover Provision") which is, or could be, applicable to the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and the Purchasers' ownership, voting (to the extent applicable) or disposition of the Securities.

(jj) Investment Company Act. Neither the Company nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(kk) Public Utility Holdings Company Act. Neither the Company nor any of its Subsidiaries is a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company" within the meaning of the Public Utility Holdings Company Act of 1935, as amended.

(ll) No Subsidiary Restrictions. The Company or its Subsidiaries has the unrestricted right to vote all capital securities of its Subsidiaries. Except for limitations imposed by the First-Lien Credit Facility, Indenture and Third-Lien Credit Facility, the Company has the unrestricted right to receive dividends and distributions on all capital securities of its Subsidiaries.

(mm) Internal Controls. The management of the Company has (i) designed disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated Subsidiaries, is made known to the management of the Company by others within those entities, and (ii) has disclosed, based on its most recent evaluation prior to the date hereof, to the Company's auditors and the audit committee of the Company's Board of Directors (A) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and have identified for the Company's auditors any material weaknesses in internal controls and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

(nn)    Independent Accountants.  [_____] have advised the Company that they are, and to the best knowledge of the Company they are, independent accountants as required by the Securities Act.

(oo)    Sarbanes-Oxley Act.  The Company and each of its officers are in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act of 2002 and the related rules and regulations promulgated under such act or the Exchange Act (the "Sarbanes-Oxley Act").  Except as permitted by Sections 13(k)(2) and (3) of the Exchange Act, since the enactment of the Sarbanes-Oxley Act, neither the Company nor any of its Affiliates has made, arranged or modified (in any material way) personal loans to any executive officer or director of the Company.

(pp)    RCN International.  RCN International is a Delaware corporation which has no significant assets or material liabilities except as permitted in accordance with the relevant provisions of Section 9.16(b) of the First-Lien Credit Facility.

(qq)    Brokers and Finders.  No consultant, broker, finder or investment banker (other than Deutsche Bank) is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or its Subsidiaries.


Any certificate signed by any officer of the Company or any Guarantor and delivered to the Purchasers or counsel for the Purchasers pursuant to the terms of this Agreement shall be deemed a representation and warranty by the Company or Guarantor, as applicable, as to matters covered thereby, to each Purchaser.

SECTION 4.   COVENANTS OF THE PARTIES.

(a)    Obligations.  Each party hereto shall use commercially reasonable efforts to timely satisfy each of the conditions to be satisfied by it as provided in Section 6 and Section 7 of this Agreement.

(b)    Form D and Blue Sky.  The Company agrees to timely file a Form D with the Securities and Exchange Commission (the "Commission") with respect to the Securities to the extent required under Regulation D of the Securities Act and to provide, upon request, a copy thereof to each Purchaser.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Purchasers at the Closing pursuant to this Agreement under applicable securities and "blue sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to the Purchasers on or prior to the Closing Date.  The Company shall make all timely filings and reports relating to the offer and sale of the Securities required under applicable securities and "blue sky" laws of the states of the United States following the Closing Date.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(b).

(c)     Reporting Status.  With a view to making available to the Purchasers the benefits of Rule 144 promulgated under the Securities Act or any similar rule or regulation of the Commission that may at any time permit the Purchasers to sell securities of the Company to the public without registration ("Rule 144"), the Company shall: (1) keep adequate current public information available (as required by Rule 144); (2) file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"); and (3) furnish to each Purchaser, so long as such Purchaser owns Registrable Securities (as defined in the Registration Rights Agreement) (the "Reporting Period"), promptly upon request, (A) a written statement by the Company, if true, that it has complied with the applicable reporting requirements of Rule 144, the Securities Act and the Exchange Act, (B) a copy of the most recent annual or quarterly report of the Company and copies of such other reports and documents so filed by the Company, (C) the information required by Rule 144A(d)(4) (or any successor rule) under the Securities Act, and (D) such other information as may be reasonably requested to permit the Purchasers to sell such securities pursuant to Rule 144 (without regard to Rule 144(k)) without registration.  Notwithstanding the foregoing, the provisions of clauses (1) and (2) shall not apply with respect to the filing by the Company of its annual report on Form 10-K for the year ended December 31, 2004 by [_____] **[DATE TO BE AGREED TO BY COMPANY AND PURCHASERS].**

(d)     Use of Proceeds.  The Company intends to use the net proceeds from the sale of the Notes to consummate its Plan of Reorganization (as defined herein) and to pay the fees and expenses incurred therewith.

(e)     Reservation of Shares.  The Company shall take all actions necessary to at all times have authorized, and reserved for the purpose of issuance, no less than one hundred five percent (105%) of the number of shares of Common Stock (the "Reservation Amount") needed to provide for the issuance of the Conversion Shares upon conversion of all of the Notes without regard to any limitations on conversions or exercise.

(f)     Fees and Expenses.  At the Closing, the Company shall reimburse the Purchasers for the Purchasers' reasonable and documented fees and disbursements of legal counsel (including the fees and expenses of Willkie Farr & Gallagher LLP incurred on or after August 1, 2004) and consultants and such other expenses, including search fees, diligence fees and expenses, documentation fees and filing fees, incurred by the Purchasers or them in connection with (i) the negotiation and execution and delivery of this Agreement and any instrument delivered in connection therewith as well as any amendments, modifications or waivers thereto, (ii) the Purchasers' due diligence investigation and (iii) the transactions contemplated by this Agreement and the other Transaction Documents.  Reimbursement of such fees, disbursements and expenses shall be made by wire transfer of immediately available funds to an account or accounts designated by the Purchasers, set forth in a statement delivered to the Company on or prior to the Closing Date, and thereafter the Company will pay, promptly upon receipt of a supplemental statement therefor, such additional reasonable fees, disbursements and expenses, if any, as may be incurred by the Purchasers in connection with such transactions.

(g)     Limits on Additional Issuances.  Neither the Company, any of its Subsidiaries nor any of their respective Affiliates will sell, offer for sale or solicit offers to buy or

otherwise negotiate in respect of any "security" (as defined in the Securities Act) that could be integrated with the sale of the Securities in a manner that could require the registration of the Securities under the Securities Act.

(h)     No Solicitation.  The Company will not, and will not permit any of its Subsidiaries or any of their respective Affiliates to, engage in any form of general solicitation or general advertising (as those terms are used in Regulation D under the Securities Act) in connection with the offering of the Securities or in any manner involving a public offering within the meaning of Section 4(2) of the Securities Act.  Except as contemplated by the Registration Rights Agreement, neither the Company, any of its Subsidiaries nor any of their respective Affiliates, nor any authorized person acting on its or their behalf will, directly or indirectly, make offers or sales of any security, or solicit offers to buy any security, under circumstances that could require the registration of the Securities under the Securities Act.

(i)     Independent Nature of Purchasers' Obligations and Rights.  The obligations of each Purchaser under this Agreement are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance of the obligations of any other Purchaser under this Agreement.  Subject to all of the terms and conditions of this Agreement, including, without limitation, Section 7, each Purchaser commits to perform its obligations hereunder and to fund the amount set forth opposite such Purchaser's name on Schedule II attached hereto.  Nothing contained herein or in any other document related to the transactions contemplated hereby, including the Indenture, the Security Documents and Registration Rights Agreement (collectively, the "Transaction Documents"), and no action taken by any Purchaser pursuant hereto or thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by hereby and thereby.  Each Purchaser confirms that it has independently participated in the negotiation of the transactions contemplated hereby with the advice of its own counsel and advisors.  Except as provided by this Agreement and Transaction Documents, each Purchaser shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose.

(j)     Board Seat.  For as long as D. E. Shaw Laminar Lending 2, Inc., a Delaware corporation ("Laminar"), together with any Affiliates thereof, beneficially owns (within the meaning of Rule 13d-3 under the Exchange Act) at least Twenty-Five Million Dollars ($25,000,000) of the outstanding aggregate principal amount of the Notes, the Company will nominate and use its best efforts to have elected to the Board one individual designated by Laminar (the "Laminar Board Member").  The Company's proxy statement for the election of directors shall include the Laminar Board Member and the recommendation of the Board in favor of election of the Laminar Board Member.  For so long as Laminar is otherwise entitled under the provisions of this Agreement to nominate a Laminar Board Member, any vacancy created by the death, disability, retirement or removal (with or without cause) of the Laminar Board Member may be filled by Laminar.  Subject to applicable law and any rules or regulations of any stock exchange on which the Common Stock is listed, in the event the Board shall at any time create a committee of the Board, the Company shall use its best efforts to cause the Laminar

Board Member to be a member of any such committee so created; provided, however, the foregoing shall not apply to any committee formed for the purpose of considering a transaction between the Company and Laminar. The Laminar Board Member shall be given notice of (in the same manner that notice is given to other members of the Board) all meetings (whether in person, telephonic or otherwise) of the Board, including all committee meetings with respect to committees on which the Laminar Board Member serves. The Laminar Board Member shall be provided with the same information, and access thereto, provided to other members of Board. In addition to any other indemnification rights the Laminar Board Member has pursuant to this Agreement, the Transaction Documents, the Certificate of Incorporation of the Company and the Bylaws of the Company, each Laminar Board Member that serves on the Board shall have the right to enter into, and the Company agrees to enter into, the Director and Officer Indemnification Agreement in the form attached hereto as Exhibit C (the "Indemnification Agreement"), with such changes as the Laminar Board Member and the Company may agree to at the time of execution of such Agreement. **[THE COMPANY TO PROVIDE DRAFT OF INDEMNIFICATION AGREEMENT.]**

   (k)  Listing of Common Stock.

   (1)  Listing Generally. The Company shall promptly use its best efforts to secure the listing of the Common Stock on either The New York Stock Exchange, Inc. ("NYSE") or the Nasdaq National Market ("NASDAQ"). In the event the Company does not secure the listing of the (i) Common Stock on either NYSE or NASDAQ (an "Initial Listing Default") on or before the date that is ninety (90) days from the Closing Date (the "Initial Listing Deadline") or (ii) Conversion Shares on either NYSE or NASDAQ (a "Subsequent Listing Default") on or before the date that the registration statement for the Notes contemplated by the Registration Rights Agreement becomes effective, and, in no event later than September 30, 2005 (the "Subsequent Listing Deadline"), in each case, the Company and the Purchasers agree that the Purchasers will suffer damages and that it would not be feasible to ascertain the extent of such damages with precision. In the event of any adjustment to the conversion price of the Notes, the Company shall use its best efforts to cause any additional shares of Common Stock that may be issued upon conversion of all of the Notes then outstanding to be reserved for issuance and to be approved for listing on the NYSE or NASDAQ, as applicable.

   (2)  Initial Listing Default. Upon an Initial Listing Default, commencing on the day after the Initial Listing Deadline, the interest rate on the Notes then in effect shall automatically increase in an amount equal to 0.25% per annum of the principal amount of the Notes and thereafter the interest rate on the Notes shall automatically increase by an additional amount equal to 0.25% per annum each subsequent 90-day period until the Initial Listing Default has been cured, subject to a maximum increase in the interest rate pursuant to this Section 4(l)(2) of 2.0%.

   (3)  Subsequent Listing Default. Upon a Subsequent Listing Default, commencing on the day after the Subsequent Listing Deadline, the interest rate on the Notes then in effect shall automatically increase in an amount equal to 0.25% per annum of the principal amount of the Notes and thereafter the interest rate on the Notes shall automatically increase by an additional amount equal to 0.25% per annum each

subsequent 90-day period until the Subsequent Listing Default has been cured, subject to a maximum increase in the interest rate pursuant to this Section 4(l)(3) of 2.0%.

(4)    Listing Default Procedures and Payments.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(l). Additional interest on the Notes as a result of this Section 4(l) shall cease to accrue and the interest rate on the Notes will revert to the original interest rate of the Notes on the date on which the Initial Listing Default or Subsequent Listing Default, as applicable, is cured; provided, however, any additional interest that has accrued as a result of an Initial Listing Default or Subsequent Listing Default, as applicable, and remains unpaid prior to the date on which the Company's obligation to pay additional interest pursuant to this Section 4(l) ceases, shall be payable to the holders of the Notes; provided further, that if additional interest on the Notes is owed pursuant to the Registration Rights Agreement or default interest is owed on the Notes pursuant to the terms of the Indenture, then on the date on which the Initial Listing Default or Subsequent Listing Default, as applicable, is cured, the interest rate on the Notes will revert to the then applicable rate on the Notes. Additional interest shall be computed based on the actual number of days elapsed during which any such Initial Listing Default or Subsequent Listing Default, as applicable, exists.  So long as the Notes remain outstanding, the Company shall notify the Trustee within five (5) Business Days after an Initial Listing Default or Subsequent Listing Default, as applicable.  Any amounts of additional interest due pursuant to this Section 4(l) will be payable in cash semi-annually on each January 15 and July 15 (each, an "Additional Interest Payment Date"), commencing with the first such date occurring after any such additional interest commences to accrue, to holders of the Notes to whom regular interest on the Notes is payable on such Additional Interest Payment Date.  If there is an Initial Listing Default and Subsequent Listing Default occurring at the same time, then the holders of the Notes shall be entitled to the additional interest contemplated by both Sections 4(k)(2) and 4(k)(3) above.  Notwithstanding the foregoing, the maximum increase in the interest rate on the Notes pursuant to Section 3 of the Registration Rights Agreement and this Section 4(k) shall not in the aggregate exceed 2.0% per annum.

(l)    Compliance with Laws.  So long as any of the Notes remain outstanding, the Company shall comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with the Securities Act and the Exchange Act, subject to the last sentence of Section 4(c) hereof.

(m)    Takeover Provisions.  If any Takeover Provision shall become applicable to the Purchasers or the transactions contemplated hereby, including, without limitation, as a result of the conversion of the Notes into Common Stock, the Company and the Board shall grant such approvals and take such actions as are necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such statue or regulation on the Purchasers and the transactions contemplated hereby.

(n)     PORTAL Market.  The Company will cooperate with the Purchasers and use its commercially reasonable efforts to (i) permit the Notes to be eligible for clearance and settlement through the facilities of the Depository Trust Company ("DTC") and such other clearance and settlement systems that the Purchasers may designate and (ii) arrange to have the Notes be designated as PORTAL-eligible securities in accordance with the rules and regulations of the NASD, Inc. relating to The PORTAL Market operated by The NASDAQ Stock Market, Inc. (or any successor thereto, including any successor PORTAL market).

SECTION 5.   TRANSFER AGENT INSTRUCTIONS.

The Company shall issue irrevocable instructions to its transfer agent, and any subsequent transfer agent, to issue certificates or credit shares to the applicable balance accounts at DTC, registered in the name of each Purchaser or their respective nominee(s), for the Conversion Shares in such amounts as specified from time to time by a Purchaser to the Company upon conversion of the Notes and in accordance with their respective terms, substantially in the form attached hereto as Exhibit D (the "Irrevocable Transfer Agent Instructions").  The Company represents and warrants that no instruction inconsistent with the Irrevocable Transfer Agent Instructions referred to in this Section 5 will be given by the Company to its transfer agent and that, subject to applicable law, the Securities shall be freely transferable on the books and records of the Company as and to the extent provided in this Agreement, the Notes, the Indenture, the Pledge Agreement, the Security Agreement, the Intercreditor Agreement and the Registration Rights Agreement.  If a Purchaser provides the Company with an opinion of counsel, in form reasonably acceptable to the Company, to the effect that a public sale, assignment or transfer of the Securities has been made without registration under the Securities Act or that the Securities can be sold pursuant to Rule 144, the Company shall permit the transfer, and, in the case of the Conversion Shares, promptly instruct its transfer agent to issue one or more certificates, or credit shares to one or more balance accounts at DTC, in such name and in such denominations as specified by such Purchaser and without any restrictive legend.  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Purchasers by vitiating the intent and purpose of the transactions contemplated hereby.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5, that the Purchasers shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

SECTION 6.   CONDITIONS TO THE COMPANY'S OBLIGATION TO CLOSE.

The obligation of the Company to issue and sell the Notes to each respective Purchaser at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions:

(a)     Representations and Warranties; Covenants.  The representations and warranties of each Purchaser shall be true and correct on the date hereof and on and as of the Closing Date as though made at that time; and each Purchaser shall have performed, satisfied and

complied with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by such Purchaser at or prior to the Closing Date.

        (b)    <u>Payment of Purchase Price</u>.  Each Purchaser shall have delivered to the Company the aggregate purchase price for the Notes being purchased by such Purchaser at the Closing, by wire transfer of immediately available funds pursuant to the wire instructions attached hereto as <u>Exhibit B</u>.

SECTION 7.   CONDITIONS TO EACH PURCHASER'S OBLIGATION TO PURCHASE THE NOTES.

        The obligation of each Purchaser to purchase the Notes from the Company at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions:

        (a)    <u>Representations and Warranties; Covenants</u>.  The representations and warranties of the Company and each Guarantor shall be true and correct on the date hereof and on and as of the Closing Date as though made at that time; and the Company and each Guarantor shall have performed, satisfied and complied with the covenants, agreements and conditions required by this Agreement and the Transaction Documents to be performed, satisfied or complied with by the Company and each Guarantor at or prior to the Closing Date.

        (b)    <u>Indebtedness</u>.  On the Closing Date, the Company and its Subsidiaries shall have no outstanding Indebtedness except Indebtedness resulting from (i) the issuance of the Notes, (ii) the initial draw under the First-Lien Credit Facility (as defined below) and (iii) certain Indebtedness in an aggregate amount not in excess of $50,000,000 assumed by the Company and its Subsidiaries pursuant to the Plan of Reorganization (as defined below).

        (c)    <u>Plan of Reorganization</u>.  The Plan of Reorganization shall have been delivered to the Purchasers and shall expressly provide for and describe the issuance of the Notes pursuant to this Agreement.  The Purchasers shall be given reasonable notice of and opportunity to review any amendment or supplement to the Plan of Reorganization.  The Plan of Reorganization shall have been approved by the Bankruptcy Court.  The Plan of Reorganization shall have become effective in accordance with its terms without waiver of any condition to such effectiveness that, in the Purchaser's reasonable judgment, is material.  The effective date of the Plan of Reorganization shall have occurred on or prior to the Closing Date.

        (d)    <u>Confirmation Order</u>.  The Plan of Reorganization shall have been confirmed pursuant to a confirmation order (the "<u>Confirmation Order</u>") in accordance with Sections 1128 and 1129 of the Bankruptcy Code.  The Confirmation Order shall have been delivered to the Purchasers, shall address the granting of all liens required under the Indenture and the Security Documents and shall be in form and substance reasonably satisfactory to the Purchasers.  The Confirmation Order shall be in full force and effect and shall not have been stayed pending appeal, no appeal or petition for review or rehearing shall have been taken or shall be pending.  The Confirmation Order shall be final and not be subject to appeal and not less than eleven (11) days shall have elapsed since entry of the Confirmation Order and the Purchasers shall have received evidence satisfactory to it demonstrating such facts.

(e)     First-Lien Credit Facility.  The Company and the Guarantors shall have, simultaneously with the Closing Date, executed the $[355] million first-lien credit facility with a syndicate of lenders led by Deutsche Bank AG Cayman Islands Branch and Deutsche Bank Securities Inc. containing the terms set forth in that certain Commitment Letter, dated May 24, 2004, among the Company, Deutsche Bank AG Cayman Islands Branch and Deutsche Bank Securities Inc. (but excluding the terms with respect to the Second-Lien Credit Facility, as defined therein), which terms shall be satisfactory to the Purchasers (the "First-Lien Credit Facility").  The Company shall have, simultaneously with the Closing Date, received aggregate proceeds of $[330] million from its initial draw under the First-Lien Credit Facility.

(f)     Purchase of Notes.  The Company shall have confirmed in writing to the Purchasers that it will be issuing an aggregate of $[150],000,000 principal amount of Notes to the Purchasers on the Closing Date.

(g)     No Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred a Material Adverse Effect.

(h)     No Legal Impediment to Issuance.  There shall exist no action, suit, investigation, litigation or proceeding affecting the Company, any Subsidiary or any of their respective Affiliates pending or threatened before any court, governmental agency or arbitrator that (i) has had, or will have, a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this Agreement or any Transaction Document or the consummation of the transactions contemplated hereby and thereby.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority that could, as of the Closing Date, prevent the issuance or sale of the Securities and no injunction or order of any federal, state or foreign court shall have been issued that could, as of the Closing Date, prevent the issuance or sale of the Securities.

(i)     Laminar Board Member.  Daniel Kar Keung Tseung shall have been elected to the Board to serve as the Laminar Board Member.  The Indemnification Agreement shall have been duly executed and delivered by the Company.

(j)     Payment of Fees.  The Company shall have paid all fees that are due and payable pursuant to Section 4(f) of this Agreement.

(k)     Registration Rights Agreement.  The Purchasers shall have received the Registration Rights Agreement duly executed and delivered by the Company.

(l)     Indenture.  The Purchasers shall have received the Indenture duly executed and delivered by the Company, the Guarantors and the Trustee, and the Notes shall have been duly (i) executed by the Company and (ii) authenticated by the Trustee.

(m)     Intercreditor Agreement.  The Purchasers shall have received the Intercreditor Agreement duly executed and delivered by the Company, the Guarantors and the other parties thereto.

(n)     Guaranty Agreement.  Each Guarantor shall have duly authorized, executed and delivered the Guaranty Agreement, guaranteeing all of the obligations of the Company as more fully provided therein, and the Guaranty Agreement shall be in full force and effect.

(o)     Security Agreement.  The Company and each Guarantor shall have duly authorized, executed and delivered the Security Agreement covering all the Company's and each Guarantor's Security Agreement Collateral, together with:

(1)     proper financing statements (Form UCC-1 or the equivalent) fully executed for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests purported to be created by the Security Agreement, with arrangements having been made by the Company which are satisfactory to the Collateral Agent to ensure that such financing statements are filed after any financing statements are filed in connection with the First-Lien Credit Facility but before any financing statements are filed in connection with the Third-Lien Credit Agreement;

(2)     certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Company or any of its Subsidiaries as debtor and that are filed in the jurisdictions referred to in clause (i) above and in such other jurisdictions in which Collateral is located on the Closing Date, together with copies of such other financing statements that name the Company or any of its Subsidiaries as debtor (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Collateral Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(3)     evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests intended to be created by the Security Agreement; and

(4)     evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect and protect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect.

(p)     Pledge Agreement.  The Company and each Guarantor shall have duly authorized, executed and delivered the Pledge Agreement and shall have delivered to the Collateral Agent, as Pledgee thereunder, copies of all of the Pledge Agreement Collateral, if any, referred to therein and then owned by the Company and each Guarantor, (i) endorsed in blank in the case of promissory notes constituting Pledge Agreement Collateral and (ii) together with executed and undated endorsements for transfer in the case of equity interests constituting certificated Pledge Agreement Collateral, along with evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests

purported to be created by the Pledge Agreement have been taken and the Pledge Agreement shall be in full force and effect.

(q)     Mortgages; Title Insurance; Surveys; etc.  The Collateral Agent shall have received:

(1)     fully executed counterparts of a Mortgage, in form and substance reasonably satisfactory to the Purchasers, which Mortgage shall cover the Real Property owned or leased by the Company or a Guarantor and designated as a "Mortgaged Property" on Schedule [3(y)], together with evidence that counterparts of such Mortgage have been delivered to the title insurance company insuring the Lien of such Mortgage for recording in all places to the extent necessary or, in the reasonable opinion of the Collateral Agent desirable, to effectively create a valid and enforceable second priority mortgage lien, subject only to Permitted Encumbrances, on the Mortgaged Property described therein in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors;

(2)     such consents, approvals, amendments, supplements, estoppels, tenant subordination agreements or other instruments as shall be reasonably deemed necessary by the Collateral Agent in order for the owner or holder of the fee interest constituting such Mortgaged Property to grant the Lien contemplated by the Mortgage with respect to such Mortgaged Property;

(3)     a Mortgage Policy relating to the Mortgage on each Mortgaged Property referred to above issued by a title insurer reasonably satisfactory to the Collateral Agent and in amounts satisfactory to the Collateral Agent and assuring the Collateral Agent that the Mortgage on such Mortgaged Property is a valid and enforceable second priority mortgage lien on such Mortgaged Property, free and clear of all defects and encumbrances except Permitted Encumbrances, and such Mortgage Policy shall otherwise be in form and substance reasonably satisfactory to the Collateral Agent and shall include an endorsement for any matter that the Collateral Agent in its discretion may reasonably request, shall not include a survey exception or an exception for mechanics' liens, and shall provide for affirmative insurance and such reinsurance as the Collateral Agent in its discretion may reasonably request;

(4)     such affidavits, certificates, information (including financial data) and instruments of indemnification (including, without limitation, a so-called "gap" indemnification) as shall be required to induce the title company to issue the Mortgage Policies referred to in subsection (3) above;

(5)     evidence reasonably acceptable to the Collateral Agent of payment by the Company of all Mortgage Policy premiums in respect of such Mortgage Property, search and examination charges, and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of such Mortgage Policies;

(6)     a copy of a recent survey of each Mortgaged Property;

(7)     to the extent obtainable on or prior to the Closing Date, fully executed landlord waivers in respect of those Leaseholds of the Company designated as "Leaseholds

Subject to Landlord Waivers" on <u>Schedule [3(y)]</u>, each of which landlord waivers shall be in form and substance reasonably satisfactory to the Collateral Agent;

(8) to the extent requested by the Collateral Agent, copies of all leases in which the Company holds the lessor's interest or other agreements relating to possessory interests, if any; <u>provided</u> that, to the extent any of the foregoing affect such Mortgaged Property, such agreements shall be subordinate to the Liens of the Mortgage to be recorded against such Mortgaged Property, either expressly by its terms or pursuant to a subordination, non-disturbance and attornment agreement (with any such agreement being reasonably acceptable to the Collateral Agent); and

(9) flood certificates covering such Mortgaged Property in form and substance acceptable to the Collateral Agent, and certifying whether or not each such Mortgaged Property is located in a flood hazard area, as determined by reference to the applicable FEMA map.

(r) <u>Solvency Opinion; Insurance Certificates</u>. The Purchasers shall have received:

(1) a solvency opinion from the chief financial officer of the Company in the same form provided to the lenders under the First-Lien Credit Facility; and

(2) copies of certificates of insurance complying with the requirements of Section 5.7 of the Indenture for the business and properties of the Company and its Subsidiaries, in form and substance reasonably satisfactory to the Collateral Agent.

(s) <u>Delivery of Notes</u>. The Company shall have executed and delivered to each Purchaser the Notes being purchased by such Purchaser at the Closing.

(t) <u>Reservation of Common Stock</u>. As of the Closing Date, the Company shall have reserved out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Notes, the number of shares of Common Stock equal to the Reservation Amount.

(u) <u>Opinion of Counsel for the Company and the Guarantors</u>. The Purchasers shall have received from (i) Skadden, Arps, Slate, Meagher & Flom LLP, counsel to the Company and the Guarantors, an opinion addressed to each Purchaser and dated the Closing Date substantially in the form of <u>Annex A-1</u>, (ii) [Deborah M. Royster], general counsel to the Company and the Guarantors, an opinion addressed to each Purchaser and dated the Closing Date substantially in the form of <u>Annex A-2</u> and (iii) from local counsel to the Company and the Guarantors reasonably satisfactory to the Purchasers practicing in those jurisdictions in which Mortgaged Properties are located and/or the Company and the Guarantors are organized (if organized other than under the laws of Delaware or New York), which opinions shall be addressed to each of the Purchasers and dated the Closing Date and shall cover the perfection of the security interests and/or liens granted pursuant to the relevant Security Documents (and matters relating to the organization, good standing and due authorization, execution and delivery of this Agreement and the various Transaction Documents in the case of any Guarantor organized in that jurisdiction) and such other opinions as the Purchasers may reasonably request and shall be in form and substance reasonably satisfactory to the Purchasers.

(v)     Good Standings.  The Purchasers shall have received a copy of a certificate of the Secretary of State (or equivalent authority) of the jurisdiction of incorporation, organization or formation of the Company and each Guarantor, dated on or about the Closing Date, certifying, if and to the extent such certification is generally available for entities of the type of Guarantor (i) that the Company and each Guarantor has paid all franchise taxes to the date of such certificate and (ii) that the Company and each Guarantor is duly incorporated, organized or formed and in good standing or presently subsisting under the laws of the jurisdiction of its incorporation, organization or formation

(w)     Secretary's Certificates.  The Purchasers shall have received a certificate, dated the Closing Date, from the Company and each Guarantor, signed on behalf of the Company and each Guarantor, by its President and its Secretary or any Assistant Secretary (or those of its general partner or managing member, if applicable), certifying as to (A) a true and correct copy of the bylaws, operating agreement, partnership agreement or other governing document of the Company and each Guarantor as in effect on the date on which the resolutions referred to in Section 3 were adopted and on the Closing Date, (B) the due incorporation, organization or formation and good standing or valid existence of the Company and each Guarantor as a corporation, limited liability company or partnership organized under the laws of the jurisdiction of its incorporation, organization or formation and the absence of any proceeding for the dissolution or liquidation of the Company and each Guarantor, (C) (i) a true and correct copy of the charter, certificate of limited partnership, limited liability company agreement or other organizational document of the Company and each Guarantor and each amendment thereto on file in the office of  Secretary of State (or equivalent authority) of the jurisdiction of incorporation, organization or formation of the Company and each Guarantor and (ii) such amendments are the only amendments to the charter, certificate of limited partnership, limited liability company agreement or other organizational document, as applicable, of the Company and each Guarantor, (D) the truth of the representations and warranties contained in this Agreement as though made on and as of the Closing Date, (E) the names and true signatures of the officers of the Company and each Guarantor authorized to sign this Agreement and each Transaction Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder and (F)  resolutions of the Board of Directors, general partner or managing member, as applicable, of the Company and each Guarantor and of each Board of Directors, general partner or managing member (if any) of each Guarantor approving the transactions contemplated by this Agreement and each Transaction Document to which it is or is to be a party, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to the transactions under this Agreement and each Transaction Document to which it is or is to be a party.

(x)     Filings; Authorizations.  The Company shall have made all filings under all applicable federal and state securities laws necessary to consummate the issuance of the Securities pursuant to this Agreement in compliance with such laws, and shall have obtained all authorizations, approvals and permits necessary to consummate the transactions contemplated by this Agreement and the Transaction Documents and such authorizations, approvals and permits shall be effective as of the Closing Date.

(y) Irrevocable Transfer Agent Instructions. The Company shall have delivered the Irrevocable Transfer Agent Instructions to the Company's transfer agent.

(z) Financing Statements. The Collateral Agent shall have received evidence in form and substance satisfactory to it that all filings, recordings, registrations and other actions, including, without limitation, the filing of duly executed financing statements on Form UCC-1, necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the liens created by the Security Documents shall have been completed or shall be ready to be completed promptly following the Closing Date, and all agreements, statements and other documents relating thereto shall be in form and substance reasonably satisfactory to the Collateral Agent.

(aa) Company Certificate. The Purchasers shall have received a certificate, dated the Closing Date, signed by each of the President and the Chief Restructuring Officer of the Company certifying that the conditions in Sections 7(a), (b), (e), (g), (h), (i), (j), (t), (x) and (y) above have been satisfied.

(bb) Guarantors' Certificate. The Purchasers shall have received a certificate, dated the Closing Date, signed by the President and the Chief Financial Officer (or those of its general partner or managing member, as applicable) of each Guarantor certifying that the conditions in Sections 7(a), (e) and (h) above have been satisfied.

(cc) Approval of Proceedings. All proceedings to be taken in connection with the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to Purchasers and to Willkie Farr & Gallagher LLP, counsel to Laminar; and the Purchasers shall have received copies of all documents or other evidence which they and Willkie Farr & Gallagher LLP may reasonably request in connection with such transactions and of all records of corporate proceedings in connection therewith in form and substance reasonably satisfactory to the Purchasers and Willkie Farr & Gallagher LLP.

SECTION 8. INDEMNIFICATION.

(a) Indemnification by the Company and the Guarantors. Notwithstanding the Closing or the delivery of the Notes and regardless of any investigation at any time made by or on behalf of an Indemnified Party (as defined below) or of any knowledge or information that the Indemnified Party may have, the Company and each Guarantor (the "Indemnifying Parties") jointly and severally agrees, to the fullest extent permitted by law, to indemnify, defend and save and hold harmless each Purchaser, its members and its Affiliates and each of their respective officers, directors, trustees, partners, members, employees, representatives, agents and advisors, and each person who controls the Purchaser or any of its members (each, an "Indemnified Party" and collectively, the "Indemnified Parties") from and against, and shall pay on demand, against any and all claims, actions, judgments, suits, losses, liabilities, damages, expenses and other costs (including, without limitation, fees and expenses of counsel to the Indemnified Parties) (collectively, "Losses") incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation, action or other proceeding (including any governmental action or proceeding) (whether or not any Indemnified Party is a party thereto) related to the entering into and/or performance of this

Agreement or the use of any proceeds of any Notes hereunder or the consummation of any transactions contemplated herein or any other legal, administrative or other proceeding arising out of the transactions contemplated hereby, other than such Losses which are judicially determined in a final and non-appealable decision to have resulted from the gross negligence or willful misconduct of the Indemnified Party, (b) the exercise of any of the Indemnified Parties rights or remedies provided herein or in the other Transaction Documents, (c) any untruth or inaccuracy in any representation by the Indemnifying Parties or the breach of any warranty by the Indemnifying Parties contained in this Agreement, the Transaction Documents or any certificate, schedule, exhibit or annex or other document furnished to the Purchasers pursuant to this Agreement or in connection with the Closing, and (d) any failure by the Indemnifying Parties duly to perform or observe any term, provision, covenant, agreement or condition on the part of the Indemnifying Parties to be performed or observed under this Agreement or the Transaction Documents.

(b)     No Liability.  The Indemnifying Parties hereby agree that none of the Indemnified Parties shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Indemnifying Parties or any of their respective Affiliates or their respective officers, directors, trustees, partners, members, employees, representatives, agents and advisors, and the Indemnifying Parties hereby agree not to assert any claim against any Indemnified Party on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Note, the actual or proposed use of the proceeds from the Notes, this Agreement or any of the transactions contemplated by the Transaction Documents.

(c)     Procedures for Indemnification.  Promptly after an Indemnified Party has actual knowledge of any Loss as to which such Indemnified Party reasonably believes indemnification may be sought or promptly after such Indemnified Party receives notice of the commencement of any investigation, litigation, action or other proceeding (including any governmental action or proceeding) involving a Loss, such Indemnified Party shall, if a Loss in respect thereof is to be made against the Indemnifying Parties under this Section 8, deliver to the Indemnifying Parties a written notice of such Loss, and the Indemnifying Parties shall have the right to participate in, and, to the extent the Indemnifying Parties so desire, to assume control of the defense thereof with counsel mutually satisfactory to Indemnifying Parties and the Indemnified Party; provided, however, that an Indemnified Party shall have the right to retain its own counsel (the fees and expenses of which shall be borne by the Indemnifying Parties) if, in the reasonable opinion of counsel retained by the Indemnifying Parties, the representation by such counsel of the Indemnified Party and the Indemnifying Parties would be inappropriate due to actual or potential differing interests between such Indemnified Party and the Indemnifying Parties.  In the case of an Indemnified Party, the legal counsel referred to in the immediately preceding sentence shall be selected by the Purchasers holding at least a majority in interest of the Securities to which the Loss relates. The Indemnified Party shall cooperate with the Indemnifying Parties in connection with any negotiation or defense of any such action or Loss by the Indemnifying Parties and shall furnish to the Indemnifying Parties information reasonably available to the Indemnified Party which relates to such action or Loss.  The Indemnifying Parties shall keep the Indemnified Party fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto.  The Indemnifying Parties shall not be liable for any settlement of any Claim effected without its prior written consent; provided, however, that the Indemnifying Parties shall not unreasonably withhold, delay or condition its consent.

The Indemnifying Parties shall not, without the prior written consent of the Indemnified Party, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a full release from all liability in respect to such Loss, action and proceeding.  The failure to deliver written notice to the Indemnifying Parties as provided in this Agreement shall not relieve the Indemnifying Parties of any liability to the Indemnified Parties under this Section 8, except to the extent that the Indemnifying Parties are materially prejudiced in their ability to defend such action.

(d)     Contribution.  To the extent that the undertaking to indemnify, pay or hold harmless the Indemnified Parties set forth in Section 8(a) above may be unenforceable because it is violative of any law or public policy, the Indemnifying Parties shall jointly and severally make the maximum contribution to the payment and satisfaction of each of the Losses which is permissible under applicable law.

(e)     Survival of Representations and Warranties; Indemnification Obligations. The representations and warranties of the Purchasers, the Company and the Guarantors set forth herein and the obligations of the Company and the Guarantors under Sections 4, 5, 8 and 9 shall survive the execution, delivery and termination of this Agreement, the transfer of the Securities by the Purchasers and the repayment, cancellation or conversion of the Notes.

SECTION 9.   MISCELLANEOUS.

(a)     Terms Defined.  As used in this Agreement, the following terms have the respective meanings set forth below:

"Affiliate"  means any Person or entity, directly or indirectly, controlling, controlled by or under common control with such Person or entity.

"Assumed Indebtedness" shall mean the Indebtedness assumed by the Company and its Subsidiaries pursuant to the Plan of Reorganization, if any, which Indebtedness is specifically listed as Assumed Indebtedness on Schedule [3(n)], which Assumed Indebtedness shall not exceed $[15],000,000 in the aggregate.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.  Section references to the Code are to the Code as in effect at the date of this Agreement and any subsequent provisions of the Code amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall have the meaning set forth in the Security Agreement.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any

obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Contract" means agreements, contracts, instruments, arrangements, guarantees, licenses, commitments, undertakings or understandings, in each case, whether written or oral.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"Environmental Law" shall mean any Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, guideline, policy and rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"Equity Interests" shall mean of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.  Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Company or a Subsidiary of the Company would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or (ii) as a result of the Company or a Subsidiary of the Company being or having been a general partner of such person.

"FCC" shall mean the U.S. Federal Communications Commission, or any successor thereto.

"Foreign Pension Plan" shall mean each employee benefit plan, employment, bonus, incentive, stock purchase and stock option plan, program, agreement or arrangement; and each severance, termination pay, salary continuation, retention, accrued leave, vacation, sick pay, sick leave, medical, life insurance, disability, accident, profit-sharing, fringe benefit, pension, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the fifty states of the United States of America, by the Company or any of its Subsidiaries, including, without limitation, any such plan, fund, program, agreement or arrangement sponsored by a government or governmental entity.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time-to-time.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any governmental authority.

"Indebtedness"  shall have the meaning set forth in the Indenture.

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean any change, circumstance or effect that has had, or could reasonably be expected to have, a material adverse effect on (i) the assets, nature of assets, property, liabilities, business, operations, condition (financial or otherwise) or prospects of the Company and its Subsidiaries taken as a whole or (ii) the ability of the Company or Guarantors, in a timely manner, to perform their respective obligations under this Agreement or consummate the transactions contemplated by this Agreement or (iii) the rights and remedies of the Purchasers pursuant to this Agreement.

"Mortgage" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument.

"Mortgage Policy" shall mean a mortgage title insurance policy or a binding commitment with respect thereto.

"Mortgaged Property" shall mean any Real Property owned or leased by the Company or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage.

"Permitted Encumbrance" shall mean, with respect to any Mortgaged Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, all of which exceptions must be acceptable to the Collateral Agent in its reasonable discretion.

"Permitted Lien" shall have the meaning set forth in the Indenture.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Company or a Subsidiary of the Company or an ERISA Affiliate, and each such plan for the five year period immediately following the latest date on which the Company, a Subsidiary of the

Company or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement.

["Pro Forma Financials" shall mean the pro forma consolidated financial statements of the Company and its Subsidiaries (after giving effect to the Transaction and any other significant transactions in the case of said pro forma financial statements), which Pro Forma Financials were delivered to the Purchasers prior to the Closing Date.]

["Projections" shall mean the projections that are contained in the Confidential Information Memorandum dated November 2004 and that were prepared by or on behalf of the Borrower in connection with the Transaction and delivered to the Purchasers prior to the Closing Date.]

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Release" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"Secured Creditors" shall have the meaning assigned that term in the respective Security Documents.

"Security Agreement Collateral" shall mean all "Collateral" as defined in the Security Agreement.

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint

venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.  All references herein to the Company's Subsidiaries shall include the Guarantors.

"Third-Lien Credit Agreement" shall mean the Credit Agreement, dated as of the date hereof, among the Company, the lenders party thereto, and HSBC Bank USA, as agent, as the same may be amended, modified, and (or supplemented from time to time in accordance with the terms hereof and thereof.).

"Third-Lien Credit Documents" shall mean the Third-Lien Credit Agreement, and the related guarantees, pledge agreements, security agreements, mortgages, notes and other agreements and instruments entered into in connection with the Third-Lien Credit Agreement, in each case as the same may be amended, modified and/or supplemented from time to time in accordance with the terms hereof and thereof.

"Transaction" shall mean, collectively, (i) the consummation of the Plan of Reorganization, (ii) the entering into of the First-Lien Credit Facility and the making of any term loans or the issuance of any letters of credit thereunder on the Closing Date, (iii) the entering into of this Agreement, the Transaction Documents and the issuance of all of the Notes hereunder on the Closing Date, (iv) the entering into of the Third-Lien Credit Documents and (as defined in the First-Lien Credit Facility) (v) the payment of all fees and expenses in connection with the foregoing.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

(b)     Governing Law; Jurisdiction; Waiver of Jury Trial.  All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH RESPECT TO THIS AGREEMENT AND REPRESENTS THAT COUNSEL HAS BEEN CONSULTED SPECIFICALLY AS TO THIS WAIVER.

(c)     Counterparts.  This Agreement may be executed in identical counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement.  This Agreement, once executed by a party, may be delivered to the other parties

hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

(d)  Headings.  The headings of this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(e)  Entire Agreement.  This Agreement, the Registration Rights Agreement, the Indenture, the Notes, the Security Documents, the Transactions Documents and the documents referenced herein and therein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof.  This Agreement, the Registration Rights Agreement, the Indenture, the Notes and the Transaction Documents and the documents referenced herein and therein supersede all prior agreements and understandings among the parties hereto with respect to the subject matter hereof and thereof.

(f)  Consents.  All consents and other determinations required to be made by the Purchasers pursuant to this Agreement shall be made, unless otherwise specified in this Agreement, by Purchasers holding at least a majority of the Conversion Shares, determined as if all of the Notes held by Purchasers then outstanding have been converted into Conversion Shares without regard to any limitations on conversion of the Notes (the "Majority Purchasers").

(g)  Amendments, Modifications and Waivers.  No provision of this Agreement may be amended, modified or waived other than by an instrument in writing signed by the Company, the Guarantors and the Majority Purchasers; provided, however, Section 4(j) may only be amended, modified or waived with an instrument in writing signed by the Company and Laminar and the consent of the other Purchasers shall not be required to amend, modify or waive such provision.  The Company shall pay for all reasonable fees and expenses incurred by the Purchasers in connection with any amendment, waiver or consent relating hereto (whether or not such amendment, waiver or consent shall become effective).

(h)  Notices.  Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile; or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Facsimile No.:  (609) 734-3701
Attention:  Deborah M. Royster, Esq.

with a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile No.:  (212) 735-2000
Attention:  Alan G. Straus, Esq.

If to a Purchaser, to its address and facsimile number set forth on Schedule II attached hereto, with copies to such Purchaser's representatives as set forth on Schedule II attached hereto,

or at such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party.  Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a nationally recognized overnight delivery service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

(i)     Further Assurances.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(j)     Third-Party Beneficiaries.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns.

(k)     Severability.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(l)     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any successor purchasers of the Securities.  Neither the Company nor any Guarantor shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the Majority Purchasers, including by merger, consolidation, sale of all or substantially all of its assets, or others, except pursuant to a Change of Control (as defined in the Indenture) with respect to which the Company is in compliance with all of the terms of the Indenture and the Notes.  A Purchaser and any successor Purchaser may assign some or all of its rights and obligations hereunder without the consent of the Company or the Guarantors; provided, however, Laminar shall not have the right to assign its rights pursuant to Section 4(j) unless the prior written consent of the Company is obtained; provided further, however, that Laminar shall have the right to assign its rights pursuant to Section 4(j) to any corporation, limited liability company, partnership or other entity resulting from the reorganization, merger or consolidation of Laminar

with or into any other corporation, limited liability company, partnership or other entity or any corporation, limited liability company, partnership or other entity to or with which all or substantially all of Laminar's assets may be sold, exchanged or transferred.

(m)　Publicity.  Laminar shall have the right to approve prior to issuance (which approval shall not be unreasonably withheld or delayed), any press releases or any other public statements with respect to the transactions contemplated by the this Agreement and the Transaction Documents that refer to Laminar.

(n)　Termination.  In the event that the Closing shall not have occurred with respect to a Purchaser on or before five (5) Business Days from the date hereof due to the Company's, a Guarantor's or such Purchaser's failure to satisfy the conditions set forth in Sections 6 and 7 of this Agreement (and the nonbreaching party's failure to waive such unsatisfied conditions), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party; provided, however, that if this Agreement is terminated pursuant to this Section 9(n), the Company shall remain obligated to reimburse any nonbreaching Purchaser for the expenses described in Section 4(f) of this Agreement.

(o)　Payment Set Aside.  To the extent that the Company or any Guarantor makes a payment or payments to any Purchaser hereunder or pursuant to any of the other Transaction Documents, or the Purchasers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a Guarantor a trustee, receiver or any other person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

(p)　Taxes.  The Company shall pay and hold the Purchasers harmless from and against any and all present and future stamp, excise and other similar taxes with respect to the Notes or the Conversion Shares and save the Purchasers harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Note Purchase Agreement as of the date first written above.

RCN CORPORATION

By: _____
      Name:
      Title:

D.E. SHAW LAMINAR LENDING 2, INC.

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the parties have executed this Note Purchase Agreement as of the date first written above.

RCN CORPORATION

By: _____
    Name:
    Title:

[NAME OF PURCHASER]

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Note Purchase Agreement as of the date first written above.

[NAME OF GUARANTOR]

By: _____
     Name:
     Title:

[NAME OF GUARANTOR]

By: _____
     Name:
      Title:

**SCHEDULE I**

***Guarantors***

# SCHEDULE II

## *Purchasers*

**Name and Address**                                        **Aggregate Principal Amount of Notes to Be Purchased by the Purchaser**

D.E. Shaw Laminar Lending 2, Inc.                           $
120 West 45th Street
New York, New York 10036
Facsimile: (212) 845-0100
Attention: Max Holmes (with a copy of the same to attn: General Counsel)

Residency:  Delaware

with copies to (which shall not constitute notice):
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Facsimile No.:  (212) 728-9512
Attention:  Holly K. Youngwood, Esq.


[_____]                                        **$**
[_____]
Facsimile: (    )
Attention:

Residency:

with copies to (which shall not constitute notice):
[_____]
[_____]
Facsimile: (    )
Attention:

[_____]                                        **$**
[_____]
Facsimile: (    )
Attention:

Residency:

with copies to (which shall not constitute notice):
[_____]
[_____]
Facsimile: (    )
Attention:

[_____]                                    $

[_____]
Facsimile: (    )
Attention:

with copies to (which shall not constitute notice):
[_____]
[_____]
Facsimile: (    )
Attention:

# SCHEDULE 3(f)

## *Subsidiaries*

# SCHEDULE 3(n)

## *Indebtedness*

**SCHEDULE 3(q)**

**_Insurance_**

**SCHEDULE 3(v)**

_**FCC and Other Governmental Authorizations**_

**SCHEDULE 3(w)**

***Compliance with ERISA***

**SCHEDULE 3(y)**

***<u>Properties</u>***

**EXHIBIT A**

***<u>Registration Rights Agreement</u>***

**EXHIBIT B**

*<u>Wire Transfer Instructions</u>*

# EXHIBIT C

## *<u>Indemnification Agreement</u>*

**EXHIBIT D**

**_Irrevocable Transfer Agent Instructions_**

FORM OF IRREVOCABLE TRANSFER AGENT INSTRUCTIONS

[_____], 2004

[TRANSFER AGENT]
[_____]
[_____]
Attn:

Re:     Reservation of Shares of Common Stock Pursuant to Sale by RCN Corporation of $[150],000,000 in
        Aggregate Principal Amount of 7 3/8% Convertible Second-Lien Notes due 2012

Ladies and Gentlemen:

RCN Corporation, a Delaware corporation (the "Company"), has agreed to sell to the institutional investors listed on
Schedule A hereto (the "Purchasers"), on the date hereof, [One Hundred Fifty] Million Dollars ($[150],000,000) in
aggregate principal amount of 7 3/8% Convertible Second-Lien Notes due 2012 (the "Notes") that are convertible
into shares of the common stock, par value $[0.01] per share (the "Common Stock"), of the Company pursuant to
that certain Note Purchase Agreement, dated as of [_____], 2004, by and among the Company, certain
subsidiary guarantors of the Company and each Purchaser (the "Note Purchase Agreement"). Capitalized terms
used herein without definition have the meanings ascribed to such terms in the Note Purchase Agreement.

You are hereby irrevocably instructed to establish, as of the date of this letter, a reserve of [_____] shares of
Common Stock for issuance to holders of the Notes upon conversion of the Notes (the "Conversion Share
Reserve"). The Conversion Share Reserve shall be adjusted to appropriately reflect the effect of any stock split,
reverse stock split, stock dividend (including any dividend or distribution of securities convertible into Common
Stock), reorganization, recapitalization, reclassification, exchange or other like change with respect to the Common
Stock occurring on or after the date hereof.

The Company expects that a registration statement on Form S-1 to register the Notes and the Common Stock
issuable out of the Conversion Share Reserve (the "Registration Statement") will be filed with the Securities and
Exchange Commission (the "Commission") and declared effective by the Commission on or before September 30,
2005. We will forward to you copies of the filing promptly after it is declared or deemed effective by the
Commission.

Until the Registration Statement is declared effective by the Commission, the certificates evidencing the shares of
Common Stock issued out of the Conversion Share Reserve will bear the restrictive legend set forth below:

> THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE
> SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES
> LAWS AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE
> REGISTRATION UNDER THE ACT OR SUCH LAWS OR IN A TRANSACTION WHICH
> QUALIFIES AS AN EXEMPT TRANSACTION UNDER THE ACT AND SUCH LAWS AND
> THE RULES AND REGULATIONS PROMULGATED THEREUNDER.

So long as you have previously received (i) an opinion of the Company's outside counsel (which the Company shall
direct be delivered to you by such outside counsel upon the effectiveness of the Registration Statement covering the
resales of the Common Stock) stating that a Registration Statement covering the resales of the Common Stock has
been declared effective by the Commission under the Securities Act, (ii) a copy of the Registration Statement and
(iii) confirmation from the Company that sales are permitted under the Registration Statement at that time, the
certificates representing the Common Stock sold pursuant to the Registration Statement shall not bear any legend
restricting transfer of the Common Stock thereby and should not be subject to any stop-transfer restriction.

We have enclosed for you review and files a copy of the Note Purchase Agreement.

PDFfile.doc

Please be advised that the Purchasers have relied upon this instruction letter as an inducement to enter into the Note Purchase Agreement and, accordingly, each of the Purchasers is a third party beneficiary to these instructions.

Please sign in the space provided below to evidence your acceptance and acknowledgment of your responsibilities under this letter.  Please contact the undersigned at (     )              if you require any further information.

Very truly yours,

RCN CORPORATION


By:_____
   Name:
   Title:


Acknowledged and Agreed:


[TRANSFER AGENT]


By:_____
   Name:
   Title:


Enclosure

**ANNEX A-1**

***Opinion of Skadden, Arps, Slate, Meagher & Flom LLP***

**ANNEX A-2**

***<u>Opinion of General Counsel</u>***

2690094.11
WFG Draft of November 19, 2004


**THIS DRAFT REMAINS SUBJECT TO THE REVIEW AND COMMENT OF**

**D. E. SHAW LAMINAR.**


All references to 2012 assume the Evergreen Credit Facility  maturity is more than 7.5 years after closing.  If not, the maturity will be revised, per term sheet, so that the maturity date of the Second Lien Notes will be the same.


RCN CORPORATION,

as Issuer

and

[_____, as

as Trustee

INDENTURE

Dated as of December __, 2004

7-3/8% Convertible Second Lien Notes due 2012

CROSS-REFERENCE TABLE*

**[TO BE UPDATED**.]  Provisions of Trust Indenture Act of 1939 and Indenture, dated as of December __, 2004, by and among RCN Corporation, certain Guarantors (as hereinafter defined) and _____, as Trustee, providing for the 7-3/8% Convertible Second Lien Notes due 2012:

| Section of the Act | Section of the Indenture |
|---|---|
| 310(a)(1) and (2) | 8.9 |
| 310(a)(3) and (4) | N.A.** |
| 310(b) | 8.8 and 8.10(b) and (d) |
| 310(c) | N.A. |
| 311(a) | 8.13 |
| 311(b) | 8.13 |
| 311(c) | N.A. |
| 312(a) | 6.1 and 6.2(a) |
| 312(b) | 6.2(b) |
| 312(c) | 6.2(c) |
| 313(a) | 6.2(a) |
| 313(b)(1) | N.A. |
| 313(b)(2) | 6.3(a) |
| 313(c) | 6.3(a) |
| 313(d) | 6.3(b) |
| 314(a) | 6.4 |
| 314(b) | 17.4 |
| 314(c)(1) and (2) | 18.5 |
| 314(c)(3) | 17.6 |
| 314(d) | N.A. |
| 314(e) | 18.5 |
| 314(f) | N.A. |
| 315(a), (c) and (d) | 8.1 |
| 315(b) | 7.8 |
| 315(e) | 7.9 |
| 316(a)(1) | 7.7 |
| 316(a)(2) | Not required |
| 316(a) (last sentence) | 9.4 |
| 316(b) | 11.2 |

_____

\*      This Cross-Reference Table shall not, for any purpose, be deemed a part of this Indenture.

\*\*     N.A. means Not Applicable.

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ..................................................................................................1
    Section 1.1.    Definitions. ................................................................................1
    Section 1.2.    Other Definitions.......................................................................27
    Section 1.3.    Rules of Construction.................................................................28
    Section 1.4.    Acts of Holders..........................................................................28

ARTICLE II. ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND
               EXCHANGE OF NOTES ................................................................29

    Section 2.1.    Designation, Amount and Issue of Notes ...............................29
    Section 2.2.    Form of Notes ...........................................................................29
    Section 2.3.    Date and Denomination of Notes; Payments of Interest .........30
    Section 2.4.    Execution of Notes ...................................................................32
    Section 2.5.    Exchange and Registration of Transfer of Notes; Restrictions on
               Transfer....................................................................................32
    Section 2.6.    Mutilated, Destroyed, Lost or Stolen Notes.............................46
    Section 2.7.    Temporary Notes.......................................................................47
    Section 2.8.    Cancellation of Notes Paid, Etc................................................47
    Section 2.9.    CUSIP Numbers .......................................................................48

ARTICLE III. OPTIONAL REDEMPTION OF NOTES SECTION .......................................48

    Section 3.1.    Redemption Price ......................................................................48
    Section 3.2.    Notice of Redemption; Selection of Notes ..............................49
    Section 3.3.    Payment of Notes Called for Redemption ................................50
    Section 3.4.    Conversion Arrangement on Call for Redemption ..................51

ARTICLE IV. COLLATERAL AND SECURITY DOCUMENTS AND
               GUARANTEES; AGREEMENTS IN INTERCREDITOR
               AGREEMENT ..............................................................................52

    Section 4.1.    Collateral and Security Documents and Guarantee Agreement;
               Agreements in Intercreditor Agreement ..................................52
    Section 4.2.    Application of Proceeds of Collateral and Guarantee Payments. .............52
    Section 4.3.    Possession, Use and Release of Collateral................................52
    Section 4.4.    Opinion of Counsel...................................................................53
    Section 4.5.    Further Assurances ...................................................................53
    Section 4.6.    Trust Indenture Act Requirements ...........................................53
    Section 4.7.    Suits to Protect Collateral ........................................................54
    Section 4.8.    Purchaser Protected ..................................................................54
    Section 4.9.    Powers Exercisable by Receiver or Trustee..............................54
    Section 4.10.   Release upon Termination of Company's Obligations.............................54
    Section 4.11.   Limitation on Duty of Trustee in Respect of Collateral ..........................54
    Section 4.12.   Authorization of Trustee...........................................................55
    Section 4.13.   Intercreditor Agreement Controls ............................................55

ARTICLE V. COVENANTS ........................................................................56

    Section 5.1.    Payment of Principal, Premium and Interest. .........................56
    Section 5.2.    Maintenance of Office or Agency. ..........................................56
    Section 5.3.    Money for Note Payments To Be Held in Trust. ....................57
    Section 5.4.    Corporate Existence.................................................................58
    Section 5.5.    Payment of Taxes and Other Claims. ......................................58
    Section 5.6.    Maintenance of Properties. .....................................................58
    Section 5.7.    Insurance..................................................................................59
    Section 5.8.    Books and Records...................................................................59
    Section 5.9.    Provision of Financial Statements...........................................59
    Section 5.10.   Change of Control. ..................................................................60
    Section 5.11.   Limitation on Additional Indebtedness; Offer to Repurchase upon Incurrence of Indebtedness not Permitted ..............................62
    Section 5.12.   Statement by Officers as to Default..........................................62
    Section 5.13.   Limitation on Restricted Payments. ........................................63
    Section 5.14.   Limitation on Transactions with Affiliates. .............................65
    Section 5.15.   Disposition of Proceeds of Asset Sales. .................................66
    Section 5.16.   Limitation on Liens. ...............................................................69
    Section 5.17.   Limitation on Business. ..........................................................69
    Section 5.18.   Limitation on Certain Guarantees and Indebtedness of Restricted Subsidiaries; Domestic Restricted Subsidiaries to Become Guarantors and Provide Collateral ..........................................69
    Section 5.19.   Limitation on Issuances and Sales of Preferred Stock by Restricted Subsidiaries. ...........................................................................71
    Section 5.20.   Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries...........................................................71
    Section 5.21.   Designations of Unrestricted Subsidiaries...............................72
    Section 5.22.   Compliance Certificates and Opinions. ..................................73
    Section 5.23.   Reports....................................................................................74

ARTICLE VI. NOTEHOLDERS' LISTS AND REPORTS BY THE COMPANY AND THE TRUSTEE......................................................................74

    Section 6.1.    Noteholders Lists.....................................................................74
    Section 6.2.    Preservation and Disclosure of Lists .......................................74
    Section 6.3.    Reports by Trustee...................................................................75
    Section 6.4.    Reports by Company ...............................................................75

ARTICLE VII. DEFAULTS AND REMEDIES ........................................75

    Section 7.1.    Events of Default......................................................................75
    Section 7.2.    Payments of Notes on Default; Suit Therefor..........................78
    Section 7.3.    Application of Monies Collected by Trustee ...........................80
    Section 7.4.    Proceedings by Noteholder .....................................................80
    Section 7.5.    Proceedings by Trustee............................................................81
    Section 7.6.    Remedies Cumulative and Continuing ...................................81
    Section 7.7.    Direction of Proceedings and Waiver of Defaults by Majority of Noteholders ............................................................................82

Section 7.8.    Notice of Defaults ............................................................82
Section 7.9.    Undertaking to Pay Costs .................................................82
Section 7.10.   Delay or Omission Not Waiver .........................................83

ARTICLE VIII. CONCERNING THE TRUSTEE ..............................................83

Section 8.1.    Duties and Responsibilities of Trustee ...............................83
Section 8.2.    Reliance on Documents, Opinions, Etc. ..............................84
Section 8.3.    No Responsibility for Recitals, Etc. ..................................86
Section 8.4.    Trustee, Paying Agents, Conversion Agents or Note Registrar May
                Own Notes ....................................................................86
Section 8.5.    Monies to be Held in Trust ...............................................86
Section 8.6.    Compensation and Expenses of Trustee ..............................86
Section 8.7.    Officer's Certificate as Evidence ......................................87
Section 8.8.    Conflicting Interests of Trustee.........................................87
Section 8.9.    Eligibility of Trustee.......................................................87
Section 8.10.   Resignation or Removal of Trustee....................................88
Section 8.11.   Acceptance by Successor Trustee ......................................89
Section 8.12.   Succession by Merger, Etc...............................................89
Section 8.13.   Limitation on Rights of Trustee as Creditor ........................90

ARTICLE IX. CONCERNING THE NOTEHOLDERS.....................................90

Section 9.1.    Action by Noteholders.....................................................90
Section 9.2.    Proof of Execution by Noteholders ...................................91
Section 9.3.    Who Are Deemed Absolute Owners ...................................91
Section 9.4.    Company-Owned Notes Disregarded .................................91
Section 9.5.    Revocation of Consents; Future Holders Bound....................92

ARTICLE X. NOTEHOLDERS' MEETINGS .................................................92

Section 10.1.   Purpose of Meetings .......................................................92
Section 10.2.   Call of Meetings by Trustee .............................................93
Section 10.3.   Call of Meetings by Company or Noteholders ......................93
Section 10.4.   Qualifications for Voting .................................................93
Section 10.5.   Regulations ..................................................................93
Section 10.6.   Voting .........................................................................94
Section 10.7.   No Delay of Rights by Meeting .........................................94

ARTICLE XI. AMENDMENTS; SUPPLEMENTAL INDENTURES ....................95

Section 11.1.   Amendments; Supplemental Indentures without Consent of
                Noteholders ..................................................................95
Section 11.2.   Amendments; Supplemental Indentures with Consent of
                Noteholders ..................................................................96
Section 11.3.   Effect of Amendments and Supplemental Indentures .............97
Section 11.4.   Notation on Notes..........................................................97
Section 11.5.   Evidence of Compliance of Amendment or Supplemental
                Indenture to be Furnished to Trustee...................................98
Section 11.6.   Intercreditor Agreement...................................................98

ARTICLE XII. CONSOLIDATION, MERGER, SALE, CONVEYANCE AND
    LEASE................................................................................................98

    Section 12.1.  Company May Consolidate, Etc..............................................98
    Section 12.2.  Successor Entity to be Substituted .......................................99
    Section 12.3.  Opinion of Counsel to be Given Trustee .............................100

ARTICLE XIII. SATISFACTION AND DISCHARGE OF INDENTURE ...........................100

    Section 13.1.  Discharge of Indenture .......................................................100
    Section 13.2.  Deposited Monies to be Held in Trust by Trustee ...............100
    Section 13.3.  Paying Agent to Repay Monies Held ...................................101
    Section 13.4.  Return of Unclaimed Monies ..............................................101
    Section 13.5.  Reinstatement ....................................................................101

ARTICLE XIV. NO RECOURSE AGAINST OTHERS ....................................................101

    Section 14.1.  Indenture and Notes Solely Corporate Obligations..............101

ARTICLE XV. CONVERSION OF NOTES .....................................................................102

    Section 15.1.  Right to Convert .................................................................102
    Section 15.2.  Exercise of Conversion Privilege; Issuance of Common Stock on
                  Conversion ......................................................................102
    Section 15.3.  Intentionally Omitted.........................................................104
    Section 15.4.  Cash Payments in Lieu of Fractional Shares .......................104
    Section 15.5.  Conversion Price ...............................................................104
    Section 15.6.  Adjustment of Conversion Price .........................................104
    Section 15.7.  Effect of Reclassification, Consolidation, Merger or Sale ...111
    Section 15.8.  Taxes on Shares Issued......................................................112
    Section 15.9.  Reservation of Shares; Shares to be Fully Paid; Listing of Common
                  Stock ...............................................................................113
    Section 15.10. Responsibility of Trustee ................................................114
    Section 15.11. Notice to Holders Prior to Certain Actions...........................114
    Section 15.12. Holder Not Deemed a Shareholder .....................................115

ARTICLE XVI. MISCELLANEOUS PROVISIONS ..........................................................115

    Section 16.1.  Provisions Binding on Company's Successors.....................115
    Section 16.2.  Official Acts by Successor Corporation ...............................116
    Section 16.3.  Addresses for Notices, Etc..................................................116
    Section 16.4.  Governing Law; Jurisdiction; Jury Trial...............................117
    Section 16.5.  Evidence of Compliance with Conditions Precedent; Certificates to
                  Trustee ...........................................................................117
    Section 16.6.  Legal Holidays ..................................................................118
    Section 16.7.  Trust Indenture Act............................................................118
    Section 16.8.  Benefits of Indenture .........................................................118
    Section 16.9.  Table of Contents, Headings, Etc........................................118
    Section 16.10. Authenticating Agent .......................................................118
    Section 16.11. Execution in Counterparts ................................................119
    Section 16.12. No Adverse Interpretation of Other Agreements ..................119

ARTICLE XVII. DEFEASANCE OR COVENANT DEFEASANCE ................................... 119

    Section 17.1.  Company's Option To Effect Defeasance or Covenant Defeasance ....... 119
    Section 17.2.  Defeasance and Discharge. ................................................................. 120
    Section 17.3.  Covenant Defeasance. ...................................................................... 120
    Section 17.4.  Conditions to Defeasance or Covenant Defeasance ............................ 121
    Section 17.5.  Deposited Money and U.S. Government Obligations To Be Held in
                     Trust; Other Miscellaneous Provisions .................................................. 123
    Section 17.6.  Reinstatement ..................................................................................... 123

| | |
|---|---|
| EXHIBIT A | Form of 7-3/8% Convertible Second Lien Notes due 2012 |
| EXHIBIT B | Form of Conversion Notice |
| EXHIBIT C | Form of Option to Elect Repayment Upon a Change of Control Offer or Asset Sale Offer |
| EXHIBIT D | Form of Certificate of Transfer |
| EXHIBIT E | Form of Certificate of Exchange |
| EXHIBIT F | Form of Transfer Letter of Representations |
| EXHIBIT G | Form of Security Agreement |
| EXHIBIT H | Form of Guarantee Agreement |
| EXHIBIT I | Form of Pledge Agreement |
| EXHIBIT J | Form of Intercreditor Agreement |
| Schedule 1.01A | Certain Permitted Liens |
| Schedule 1.01B | Certain Permitted Investments |
| Schedule 5.11 | Existing Indebtedness |
| Schedule 5.20 | Certain Restrictions |

INDENTURE, dated as of December __, 2004, by and among RCN Corporation, a Delaware corporation (hereinafter sometimes called the "Company", as more fully set forth in Section 1.1), the Guarantors (as herein defined), and _____, a _____ banking corporation, as trustee (hereinafter sometimes called the "Trustee", as more fully set forth in Section 1.1).

W I T N E S S E T H :

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issue of its 7-3/8% Convertible Second Lien Notes due 2012 (hereinafter sometimes called the "Notes"), in an aggregate principal amount not to exceed One Hundred Fifty Million United States Dollars ($150,000,000) and to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, the Notes, the certificate of authentication to be borne by the Notes, a form of assignment, forms of option to elect repayment upon certain events, and a form of conversion notice and transfer to be borne by the Notes are to be substantially in the forms hereinafter provided for; and

WHEREAS, all acts and things necessary to make the Notes, when executed by the Company and authenticated and delivered by the Trustee or a duly authorized authenticating agent, as provided in this Indenture, the valid, binding and legal obligations of the Company, and to make this Indenture a valid agreement of the Company according to its terms, have been done and performed, and the execution of this Indenture and the issue hereunder of the Notes have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the holders thereof, the Company and the Guarantors covenant and agree with the Trustee for the equal and proportionate benefit of the respective holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE I.

DEFINITIONS

Section 1.1.    Definitions.

"144A Global Note" means the Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"Acquired Indebtedness" means Indebtedness of a person existing at the time such person becomes a Restricted Subsidiary or assumed in connection with an Asset Acquisition by such person and not incurred in connection with, or in anticipation of, such person becoming a Restricted Subsidiary or such Asset Acquisition; provided that Indebtedness of such person which is redeemed, defeased, retired or otherwise repaid at the time of or immediately upon consummation of the transactions by which such person becomes a Restricted Subsidiary or such Asset Acquisition shall not constitute Acquired Indebtedness.

"Affiliate" of any specified person means any other person which, directly or indirectly, controls, is controlled by or is under direct or indirect common control with, such specified person. For the purposes of this definition, "control" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "affiliated," "controlling" and "controlled" have meanings correlative to the foregoing.

"Applicable Procedures" shall mean, with respect to any transfer or exchange of beneficial ownership interests in a Global Note, the rules and procedures of the Depositary that are applicable to such transfer or exchange.

"Asset Acquisition" means (i) any capital contribution (by means of transfers of cash or other property to others or payments for property or services for the account or use of others, or otherwise) by the Company or any Restricted Subsidiary to any other person, or any acquisition or purchase of Capital Stock of any other person by the Company or any Restricted Subsidiary, in either case pursuant to which such person shall (a) become a Restricted Subsidiary or (b) shall be merged with or into the Company or any Restricted Subsidiary or (ii) any acquisition by the Company or any Restricted Subsidiary of the assets of any person which constitute substantially all of an operating unit or line of business of such person or which is otherwise outside of the ordinary course of business.

"Asset Sale" means any direct or indirect sale, conveyance, transfer or lease (that has the effect of a disposition and is not for security purposes) or other disposition (that is not for security purposes) to any person other than the Company or a Restricted Subsidiary, in one transaction or a series of related transactions, of (i) any Capital Stock of any Restricted Subsidiary (other than customary stock option programs), (ii) any assets of the Company or any Restricted Subsidiary which constitute substantially all of an operating unit or line of business of the Company and the Restricted Subsidiaries or (iii) any other property or asset of the Company or any Restricted Subsidiary outside of the ordinary course of business. For the purposes of this definition, the term "Asset Sale" shall not include (i) any disposition of properties and assets of the Company and/or the Restricted Subsidiaries that is governed under Section 12.1, (ii) sales of property or equipment that have become worn out, obsolete or damaged or otherwise unsuitable for use in connection with the business of the Company or any Restricted Subsidiary, as the case may be, and (iii) for purposes of Section 5.15 any sale, conveyance, transfer, lease or other disposition of any property or asset, whether in one transaction or a series of related transactions occurring within one year, either (x) involving assets with a Fair Market Value not in excess of $5,000,000 or (y) which constitutes the incurrence of a Capitalized Lease Obligation.

"Average Life to Stated Maturity" means, with respect to any Indebtedness, as at any date of determination, the quotient obtained by dividing (i) the sum of the products of (a) the number of years from such date to the date or dates of each successive scheduled principal payment (including, without limitation, any sinking fund requirements) of such Indebtedness multiplied by (b) the amount of each such principal payment by (ii) the sum of all such principal payments; provided that, in the case of any Capitalized Lease Obligation, all calculations hereunder shall give effect to any applicable options to renew in favor of the Company or any Restricted Subsidiary.

"Bankruptcy Code" has the meaning given to it in Section 7.1(g).

"Board of Directors" shall mean the Board of Directors of the Company or a committee of such Board of Directors duly authorized to act for it hereunder (to the extent permitted by applicable law).

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which the banking institutions in the City of New York or the city in which the Corporate Trust Office is located are authorized or obligated by law or executive order to close or be closed.

"Calculation Period" shall mean, in the case of any Permitted Acquisition, the Test Period most recently ended prior to the date of any such Permitted Acquisition for which financial statements are available.

"Capital Stock" means, with respect to any person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting and/or non-voting) of, such person's capital stock, whether outstanding on the Issue Date or issued after the Issue Date, and any and all rights (other than any evidence of Indebtedness), warrants or options exchangeable for or convertible into such capital stock.

"Capitalized Lease Obligation" means any obligation to pay rent or other amounts under a lease of (or other agreement conveying the right to use) any property (whether real, personal or mixed, immovable or movable) that is required to be classified and accounted for as a capitalized lease obligation under GAAP, and, for the purpose of this Indenture, the amount of such obligation at any date shall be the capitalized amount thereof at such date, determined in accordance with GAAP.

"Cash Equivalents" means (i) shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from

either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, and (vi) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"Change of Control" means the occurrence of any of the following events:

(a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person shall be deemed to have "beneficial ownership" of all securities that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 40% of the total Voting Stock of the Company; or

(b) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of the Company to any Person or group of related Persons for purposes of Section 13(d) of the Exchange Act; or

(c) during any consecutive two-year period, individuals who at the beginning of such period constituted the Board (together with any new directors whose election by the Board or whose nomination for election by the stockholders of the Company was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board then in office.

"Close of business" means 5 p.m. (New York City time).

"Collateral" has the meaning set forth in the Security Agreement.

"Collateral Agent" means the Trustee in its capacity as Collateral Agent under the Security Agreement, together with any other successor collateral agent.

"Commission" or "SEC" shall mean the Securities and Exchange Commission.

"Common Stock" shall mean with respect to the Company, any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, which is not subject to redemption by the Company and which entitles the holder thereof to vote generally for the election of directors. Subject to the provisions of Section 15.6, however, shares issuable on conversion of Notes shall include only shares of the class designated as common stock of the

Company at the date of this Indenture or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company; provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.  With respect to any other person, the term "Common Stock" means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such person's common stock whether outstanding at the Issue Date, and includes, without limitation, all series and classes of such common stock.

"Communications Act" means the Communications Act of 1934, as amended.

"Company" shall mean RCN Corporation, a Delaware corporation, and subject to the provisions of Article XII, shall include its successors and assigns.

"Company Request" or "Company Order" means a written request or order signed in the name of the Company by any one of its Chairman of the Board, its Vice-Chairman, its Chief Executive Officer, its President or a Vice President, and by its Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer, and delivered to the Trustee.

"Consolidated EBITDA" shall be computed in accordance with GAAP and shall mean, for any period, Consolidated Net Income for such period, without giving effect (x) to any extraordinary gains or any extraordinary non-cash losses (except to the extent that any such extraordinary non-cash losses will require a cash payment in a future period) and (y) to any gains or losses from sales of assets other than from sales of inventory in the ordinary course of business, adjusted by (1) adding thereto (i) the consolidated interest expense of the Company and its [Restricted] Subsidiaries for such period (to the extent that such consolidated interest expense was deducted in arriving at Consolidated Net Income for such period), (ii) provisions for taxes based on income that were deducted in arriving at Consolidated Net Income for such period, (iii) the amount of all amortization of intangibles and depreciation that were deducted in arriving at Consolidated Net Income for such period, (iv) the amount of all expenses incurred in connection with the Transaction for such period to the extent that same were deducted in arriving at Consolidated Net Income for such period, (v) the amount of all non-cash deferred compensation expense for such period to the extent that same was deducted in arriving at the Consolidated Net Income for such period and (vi) any non-cash, non-recurring charges and any non-cash charges associated with stock-based compensation, provided that if any cash amounts are paid in any subsequent period with respect to amounts described above in this clause (vi), the amounts so paid in any subsequent period shall be subtracted in determining Consolidated EBITDA for such subsequent period as provided in clause 2(i) below, and (2) deducting therefrom (i) the amount of all cash payments during such period that are associated with any non-cash loss, change (including, without limitation, as described in preceding clause (1)(vi)) or expense that was added back to Consolidated Net Income in a previous period and (ii) the amount of all consolidated interest income of the Company and its Restricted Subsidiaries to the extent same increased Consolidated Net Income for such period.

5

"Consolidated Interest Coverage Ratio" shall mean, for any period, the ratio of Consolidated EBITDA to Consolidated Interest Expense for such period, computed on a Pro Forma basis.

"Consolidated Interest Expense" shall be computed in accordance with GAAP and shall mean, for any period, the sum of the total consolidated interest expense of the Company and its [Restricted] Subsidiaries for such period (calculated without regard to any limitations on the payment thereof) plus, without duplication, that portion of Capitalized Lease Obligations of the Company and its [Restricted Subsidiaries] representing the interest factor for such period[; provided that the amortization of deferred financing, legal and accounting costs with respect to the First-Lien Credit Agreement, the Notes and the Third-Lien Credit Agreement in each case shall be excluded from Consolidated Interest Expense to the extent same would otherwise have been included therein.] [Also include preferred stock dividends?.]

[Alternative Definition, including as interest expense amounts on Disqualified Stock] "Consolidated Interest Expense" means, with respect to any period, without duplication, the sum of (i) the interest expense of the Company and the Restricted Subsidiaries for such period as determined on a consolidated basis in accordance with GAAP, including, without limitation, (a) any amortization of debt discount, (b) the net cost under Interest Rate Obligations (including any amortization of discounts), (c) the interest portion of any deferred payment obligation, (d) all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and similar transactions and (e) all accrued interest, (ii) the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued during such period as determined on a consolidated basis in accordance with GAAP and (iii) the amount of dividends in respect of Disqualified Stock paid during such period.

"Consolidated Net Income" shall mean, for any period, the net income (or loss) of the Company and its Subsidiaries for such period, determined on a consolidated basis (after any deduction for minority interests), provided that (i) in determining Consolidated Net Income, the net income of any other Person which is not a [Restricted] Subsidiary of the Company or is accounted for by the Company by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Company or a [Restricted] Subsidiary thereof during such period, (ii) the net income of any [Restricted] Subsidiary of the Company (other than the Company) shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such [Restricted] Subsidiary and (iii) the net income (or loss) of any other Person acquired by the Company or a [Restricted] Subsidiary of the Company in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded.

"Consolidation" means, with respect to the Company, the consolidation of the accounts of the Restricted Subsidiaries with those of the Company all in accordance with GAAP; provided that "consolidation" will not include consolidation of the accounts of any Unrestricted Subsidiary with the accounts of the Company. The term "consolidated" has a correlative meaning to the foregoing.

"Conversion Shares" means all shares of Common Stock into which the Notes are convertible pursuant to Article XV of this Indenture.

"Corporate Trust Office" means the principal office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of execution of this Indenture is located at _____ Attention: _____ or at any other time at such other address as the Trustee may designate from time to time by notice to the Noteholders.

"Custodian" shall mean the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"Default" shall mean any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"Definitive Note" shall mean a certificated Note registered in the name of the holder thereof and issued in accordance with Section 2.5, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Delayed Filing Authorization" has the meaning set forth in Section 5.9.

"Depositary" shall mean, with respect to the Notes issuable or issued in whole or in part in global form, The Depository Trust Company, its nominees, and their respective successors.

"Designation" has the meaning set forth under Section 5.21.

"Discharge of First-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"Disinterested Director" means, with respect to any transaction or series of related transactions, a member of the Board of the Company other than a director who (i) has any material direct or indirect financial interest in or with respect to such transaction or series of related transactions or (ii) is an employee or officer of the Company or an Affiliate that is itself a party to such transaction or series of transactions or an Affiliate of a party to such transaction or series of related transactions.

"Disqualified Stock" means, with respect to any person, any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or becomes mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or becomes exchangeable for Indebtedness at the option of the holder thereof, or becomes redeemable at the option of the holder thereof, in whole or in part, on or prior to the final maturity date of the Notes; provided such Capital Stock shall only constitute Disqualified Stock to the extent it so matures or becomes so redeemable or exchangeable on or prior to the final maturity date of the Notes; provided, further, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the

final maturity date of the Notes shall not constitute Disqualified Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in Section 5.15 and Section 5.10 hereof and such Capital Stock specifically provides that such person will not repurchase or redeem any such stock pursuant to such provision prior to the Company's repurchase of such Notes as are required to be repurchased pursuant to Section 5.15 and Section 5.10 hereof and at all times subject to 5.13 hereof.

"Domestic Restricted Subsidiary" means a Restricted Subsidiary that is organized under the laws of a state of the United States or the District of Columbia. [Conform to definition in the DB Credit Agreement.]

"Domestic Subsidiary Guarantor" means a Domestic Restricted Subsidiary so long as such Domestic Restricted Subsidiary is also a Guarantor.

"Equity Interests" shall mean capital stock or warrants, options or other rights to subscribe for, acquire or receive capital stock (but excluding any debt security which is convertible into, or exchangeable for, capital stock).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the Issue Date and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"Event of Default" shall mean any event specified in Section 7.1, continued for the period of time, if any, and after the giving of notice, if any, therein designated.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

"Evergreen Credit Agreement" means the Amended and Restated Credit Agreement dated as of the date hereof, among the Company, the lenders party thereto and HSBC Bank USA, as agent.

"Evergreen Lien" means, subject to the Intercreditor Agreement, the Lien on substantially all of the assets of the Company.

"Fair Market Value" means, with respect to any asset or property, the price that could be negotiated in an arms-length free market transaction, for cash, between a willing seller and a willing buyer, neither of whom is under pressure or compulsion to complete the transaction. [Still relevant? -- Any Asset Sale pursuant to the terms of the deadlock event "buy-sell" arrangements in Section 7.15 of the Amended and Restated Operating Agreement of Starpower Communications, LLC, as in effect on the Issue Date, shall be deemed to have been made for Fair Market Value.] Unless otherwise specified in this Indenture, Fair Market Value shall be determined by the Board acting in good faith and shall be evidenced by a Board Resolution.

"FCC" shall mean the U.S. Federal Communications Commission, or any successor thereto.

"FCC Licenses" shall mean FCC licenses, registrations and authorizations as are necessary to the Company's and its Restricted Subsidiaries' businesses.

"First-Lien Collateral Agent" has the meaning given to it in the Intercreditor Agreement.

"First-Lien Collateral" has the meaning given to it in the Intercreditor Agreement.

"First-Lien Credit Agreement" has the meaning given to it in the Intercreditor Agreement.

"First-Lien Credit Document" has the meaning given to it in the Intercreditor Agreement.

"First-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"GAAP" means, at any date of determination, generally accepted accounting principles in effect in the United States and which are applicable as of the date of determination and which are consistently applied for all applicable periods.

"Global Notes" shall mean, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes, issued in accordance with Section 2.2, 2.5(c)(iv) or 2.5(e)(ii).

"Global Note Legend" shall mean the legend set forth in Section 2.5(h)(iii), which is required to be placed on all Global Notes issued under this Indenture.

"Guarantee" means, as applied to any obligation, (i) a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner, of any part or all of such obligation and (ii) an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to assure in any way the payment or performance (or payment of damages in the event of non-performance) of all or any part of such obligation, including, without limiting the foregoing, the payment of amounts drawn down by letters of credit.

"Guarantors" means initially ____ and such other Subsidiaries of the Company which are required to enter into the Guarantee Agreement pursuant to Section 5.18.

"Guarantee Agreement" means the Guarantee Agreement, dated as of December __, 2004, among the Guarantors and the Collateral Agent, as the same may be modified, supplemented or amended from time to time, which initially is substantially in the form of Exhibit H hereto.

"Holder" or "Noteholder" means a person in whose name a Note is registered in the Note Register.

"IAI Global Note" shall mean the Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that shall be issued in a

denomination equal to the outstanding principal amount of the Notes held by Institutional Accredited Investors or Individual Accredited Investors.

"Indebtedness" means, with respect to any person, without duplication, (i) any liability, contingent or otherwise, of such person (A) for borrowed money (whether or not the recourse of the lender is to the whole of the assets of such person or only to a portion thereof) or (B) evidenced by a note, debenture or similar instrument or letter of credit (including a purchase money obligation) or (C) for the payment of money relating to a Capitalized Lease Obligation or other obligation relating to the deferred purchase price of property or (D) in respect of an Interest Rate Obligation or currency agreement; or (ii) any liability of others of the kind described in the preceding clause (i) which the person has guaranteed or which is otherwise its legal liability; or (iii) any obligation secured by a Lien (other than Liens on Capital Stock or Indebtedness of any Unrestricted Subsidiary) to which the property or assets of such person are subject, whether or not the obligations secured thereby shall have been assumed by or shall otherwise be such person's legal liability (the amount of such obligation being deemed to be the lesser of the value of such property or asset or the amount of the obligation so secured); (iv) all Disqualified Stock valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued and unpaid dividends; and (v) any and all deferrals, renewals, extensions and refundings of, or amendments, modifications or supplements to, any liability of the kind described in any of the preceding clauses (i), (ii), (iii) or (iv). In no event shall "Indebtedness" include trade payables and accrued liabilities that are current liabilities incurred in the ordinary course of business, excluding the current maturity of any obligation which would otherwise constitute Indebtedness. For purposes of Section 5.11 and Section 5.13 hereof and the definition of "Events of Default," in determining the principal amount of any Indebtedness to be incurred by the Company or a Restricted Subsidiary or which is outstanding at any date, the principal amount of any Indebtedness which provides that an amount less than the principal amount at maturity thereof shall be due upon any declaration of acceleration thereof shall be the accreted value thereof at the date of determination. Indebtedness of any person that becomes a Restricted Subsidiary shall be deemed incurred at the time that such a person becomes a Restricted Subsidiary.

"Indenture" means this instrument as originally executed (including all exhibits and schedules hereto) and as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof.

"Indenture Obligations" means the obligations of the Company under this Indenture or under the Notes, to pay principal of, premium, if any, and interest on the Notes when due and payable, whether at maturity, by acceleration, call for redemption or repurchase or otherwise, and all other amounts (including Liquidated Damages) due or to become due under or in connection with this Indenture or the Notes and the performance of all other obligations to the Trustee (including, but not limited to, payment of all amounts due the Trustee under Section 8.6) and the Holders of the Notes under this Indenture and the Notes, according to the terms thereof.

"Independent Financial Advisor" means a United States investment banking, consulting or accounting firm of national standing in the United States (i) which does not, and whose directors, officers and employees or Affiliates do not, have a material direct or indirect financial interest in the Company or any of its Subsidiaries or Affiliates and (ii) which, in the judgment of

["

"Issue Date" means the date of original issuance of the Notes (being December __, 2004).

"Junior Liens" means the Liens on the Collateral granted by the Company and the Guarantors to the Collateral Agent to secure the payment and performance of all or any Obligations, and all replacements, renewals and other modifications of such Liens.

"Laminar" means D.E. Shaw Laminar Lending 2, Inc. [and its Affiliates].

"Lien" means any mortgage, charge, pledge, lien (statutory or other), security interest, hypothecation, assignment for security, claim, or preference or priority or other encumbrance upon or with respect to any property of any kind. A person shall be deemed to own subject to a Lien any property which such person has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement.

"Liquidated Damages" means all additional interest then owing pursuant to Section 3 of the Registration Rights Agreement, Section 4(k) of the Note Purchase Agreement and Section 15.2.

"Material Adverse Effect" means (i) a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its Restricted Subsidiaries taken as a whole since December 31, 2003 (other than the commencement of the bankruptcy cases filed prior to the Issue Date with respect to the Debtors-In-Possession) or (ii) a material adverse effect (x) on the rights or remedies of the Holders or the Trustee or Collateral Agent hereunder or under any other Transaction Document or (y) on the ability of the Company or any Guarantor to perform its obligations to the Noteholders or the Trustee or any Collateral Agent under any other Transaction Documents.

"Material Asset Sale" shall mean any Asset Sale where the gross proceeds received by the Company and its Restricted Subsidiaries (taking the amount of cash and Cash Equivalents received, the principal amount of Indebtedness received and the fair market value of all other consideration) is in excess of [$5,000,000].

"Maturity Date" means, with respect to any Note, the date specified in such Note as the fixed date on which the principal of such Note is due and payable.

"Maximum First-Lien Credit Documents Principal Amount" shall have the meaning given to it in the Intercreditor Agreement. [Discuss possible periodic reporting obligation setting forth this amount.]

["Megacable Entities" shall mean, collectively, Megacable, S.A. de C.V., Megacable Telecommunications, S.A. de C.V. and MCM Holdings, S.A. de C.V. ]

"Moody's" means Moody's Investors Service.

"Mortgage" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument which shall be, prior the date of Discharge of First-Lien Obligations, in substantially the same form

delivered under the First-Lien Credit Agreement, and, thereafter, in a form reasonably acceptable to the Trustee.

"Mortgage Policy" shall mean a mortgage title insurance policy or a binding commitment with respect thereto.

"Mortgaged Property" shall mean any Real Property owned or leased by the Company or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds thereof in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary or any Restricted Affiliate) net of (i) brokerage commissions and other fees and expenses (including fees and expenses of legal counsel, accountants, consultants and investment bankers) related to such Asset Sale, (ii) provisions for all taxes payable as a result of such Asset Sale, (iii) amounts required to be paid to any person (other than the Company or any Restricted Subsidiary or any Restricted Affiliate) owning a beneficial interest in or having a Permitted Lien on the assets subject to the Asset Sale and (iv) appropriate amounts to be provided by the Company or any Restricted Subsidiary or any Restricted Affiliate, as the case may be, as a reserve required in accordance with GAAP against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary or any Restricted Affiliate, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officers' Certificate delivered to the Trustee.

"Non-U.S. Person" has the meaning assigned to such term in Regulation S.

"Non-Wholly Owned Subsidiary" shall mean any Subsidiary of the Company that is not a Wholly-Owned Subsidiary of the Company.

"Note" or "Notes" shall mean any Note or Notes, as the case may be, authenticated and delivered under this Indenture.

"Noteholder" or "holder" as applied to any Note, or other similar terms (but excluding the term "beneficial holder"), shall mean any Person in whose name at the time a particular Note is registered on the Note Register.

"Note Purchase Agreement" means that certain Note Purchase Agreement, dated as of December __, 2004, among the Company, the Guarantors and the parties listed as purchasers on Schedule II attached thereto, as such agreement may be amended from time to time.

"Obligations" shall have the meaning assigned thereto in the Security Agreement but shall in any event include the Indenture Obligations.

"Officer" means, with respect to the Company, the Chairman of the Board, a Vice Chairman, the President, a Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer.

"Officer's Certificate", when used with respect to the Company, shall mean a certificate signed by one of the President, the Chief Executive Officer, Chief Financial Officer, Executive or Senior Vice President or any Vice President, that is delivered to the Trustee. Each such certificate shall include the statements provided for in Section 16.5 if and to the extent required by the provisions of such Section.

"144A Global Note" means a permanent global note in registered form representing the aggregate principal amount of Notes sold in reliance on Rule 144A under the Securities Act.

"Opinion of Counsel" shall mean an opinion in writing signed by legal counsel, who may be an employee of or counsel to the Company, which is delivered to the Trustee. Each such opinion shall include the statements provided for in Section 16.5 if and to the extent required by the provisions of such Section.

"Other Senior Debt Pro Rata Share" means the amount of the applicable Excess Proceeds obtained by multiplying the amount of such Excess Proceeds by a fraction, (i) the numerator of which is the aggregate accreted value and/or principal amount, as the case may be, of all Indebtedness (other than (x) the Notes, (y) Third-Lien Obligations and (z) Subordinated Indebtedness) of the Company outstanding at the time of the applicable Asset Sale with respect to which the Company is required to use Excess Proceeds to repay or make an offer to purchase or repay and (ii) the denominator of which is the sum of (a) the aggregate principal amount of all Notes outstanding at the time of the offer to purchase or repay with respect to the applicable Asset Sale and (b) the aggregate principal amount or the aggregate accreted value, as the case may be, of all other Indebtedness (other than the Third-Lien Obligations and Subordinated Indebtedness) of the Company outstanding at the time of the applicable Asset Sale Offer with respect to which the Company is required to use the applicable Excess Proceeds to offer to repay or make an offer to purchase or repay.

"Outstanding," when used with reference to Notes, shall, subject to the provisions of Section 9.4, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under this Indenture, except:

        (a)      Notes theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

        (b)      Notes, or portions thereof, for the payment, or redemption of which monies in the necessary amount shall have been deposited in trust with the Trustee or with any paying agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own paying agent); provided that if such Notes are to be redeemed, as the case may be, prior to the maturity thereof, notice of such redemption shall have been given as provided in Section 3.2, or provision satisfactory to the Trustee shall have been made for giving such notice;

(c) Notes paid pursuant to Section 2.6 and Notes in lieu of which, or in substitution for which, other Notes shall have been authenticated and delivered pursuant to the terms of Section 2.6 unless proof satisfactory to the Trustee is presented that any such Notes are held by bona fide holders in due course;

(d) Notes converted into Common Stock pursuant to Article XV and Notes deemed not outstanding pursuant to Section 3.2; and

(e) Notes with respect to which the Company has effected defeasance or covenant defeasance as provided in Article XVII, to the extent provided in Sections 17.2 and 17.3 except as otherwise provided in Article XVII with respect to the obligations of the Company under Section 5.10 or under Article XV.

"Participant" shall mean, with respect to the Depositary, a Person who has an account with the Depositary.

"Permitted Acquisition" means [to come. Used in definitions of Pro Forma and Permitted Indebtedness]

"Permitted Business" means _____ [to come. Used in Section 5.15.]

"Permitted Credit Facility" means (i) any term loan and/or revolving credit facility (including any letter of credit facility) entered into principally with commercial banks and/or other financial institutions and lenders typically party to loan agreements and (ii) any senior credit facility entered into with any vendor or supplier (or any financial institution acting on behalf of or for the purpose of directly financing purchases from such vendor or supplier) to the extent the Indebtedness thereunder is incurred for the purpose of financing the cost (including the cost of design, development, construction, manufacture or acquisition) of property or assets used or to be used in a business in which the Company and its Restricted Subsidiaries are permitted to engage under Section 5.17.

"Permitted Indebtedness" means the following Indebtedness (each of which shall be given independent effect): **[Subject to change depending upon terms of the DB Credit Agreement with certain specific dollar baskets being looser than those in the DB Credit Agreement.]**

(a) Indebtedness under the Notes and this Indenture

(b) Indebtedness of the Company and/or any Restricted Subsidiary outstanding on the Issue Date and set forth on Schedule 5.11 (which shall not include the Indebtedness under clause (h) below);

(c) (i) Indebtedness of any Restricted Subsidiary owed to and held by the Company or a Restricted Subsidiary [that is a Guarantor] and (ii) Indebtedness of the Company, not secured by any Lien, owed to and held by any Restricted Subsidiary that is a Guarantor; provided that an incurrence of Indebtedness shall be deemed to have occurred upon (x) any sale or other disposition (excluding assignments as security to financial institutions) of any Indebtedness of the Company or a Restricted Subsidiary

15

referred to in this clause (c) to a person (other than the Company or a Restricted Subsidiary) or (y) any sale or other disposition by the Company or any Restricted Subsidiary of Capital Stock of a Restricted Subsidiary, or Designation of an Unrestricted Subsidiary, which holds Indebtedness of the Company or Restricted Subsidiary such that such Restricted Subsidiary, in any such case, ceases to be a Restricted Subsidiary;

(d)     Interest Rate Obligations of the Company and/or any Restricted Subsidiary relating to Indebtedness of the Company and/or such Restricted Subsidiary, as the case may be so long as the entering into of such Interest Rate Obligations are bona fide hedging activities and are not for speculative purposes;

(e)     Indebtedness of the Company and/or any Restricted Subsidiary in respect of performance bonds of the Company or any Restricted Subsidiary or surety bonds provided by the Company or any Restricted Subsidiary incurred in the ordinary course of business;

(f)     Indebtedness of the Company and its Restricted Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness described in clause (vii) of the definition of Permitted Liens, provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (iii) exceed $_____ at any time outstanding;

(g)     Indebtedness of a Restricted Subsidiary of the Company acquired pursuant to a Permitted Acquisition (or Indebtedness assumed at the time of a Permitted Acquisition of an asset securing such Indebtedness), provided that (x) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition, (y) such Indebtedness does not constitute debt for borrowed money, it being understood and agreed that Capitalized Lease Obligations and purchase money Indebtedness shall not constitute debt for borrowed money for purposes of this clause (g) and (z) the aggregate principal amount of all Indebtedness permitted by this clause (g) shall not exceed $_____ at any one time outstanding;

(h)     Indebtedness of the Company (which Indebtedness may in no event be guaranteed by, or secured by the assets of, any Subsidiary of the Company) under the Third-Lien Credit Agreement the other Third-Lien Credit Documents in an aggregate original principal amount not to exceed $[35],000,000 plus any increase in the principal amount thereof resulting from the payment-in-kind or capitalization, of interest accruing thereon after the Issue Date as contemplated by the terms thereof;

(i)     Indebtedness of the Company and/or any Restricted Subsidiary to the extent it represents a replacement, renewal, refinancing or extension (a "Refinancing") of outstanding Indebtedness of the Company and/or any Restricted Subsidiary incurred or outstanding pursuant to clause (a), or (b), of this definition or the proviso of Section 5.11 hereof, provided that (1) Indebtedness of the Company may not be Refinanced to such extent under this clause (i) with Indebtedness of any Restricted Subsidiary, and (2) any such Refinancing shall only be permitted under this clause (i) to the extent that (x) it does not result in a lower Average Life to Stated Maturity of such Indebtedness as compared

with the Indebtedness being Refinanced and (y) it does not exceed the sum of the principal amount (or, if such Indebtedness provides for a lesser amount to be due and payable upon a declaration of acceleration thereof, an amount no greater than such lesser amount) of the Indebtedness being Refinanced plus the amount of accrued interest thereon and the amount of any reasonably determined prepayment premium necessary to accomplish such Refinancing and such reasonable fees and expenses incurred in connection therewith;

      (j)     Indebtedness of the Company and/or any Restricted Subsidiary incurred under one or more Permitted Credit Facilities, and any Refinancings of the foregoing, such that the aggregate principal amount of such Indebtedness of the Company and the Restricted Subsidiaries does not exceed, at the time of the incurrence of such Indebtedness, the Maximum First-Lien Credit Documents Principal Amount then in effect; and

      (k)     guarantees by the Company of Indebtedness or operating lease payment obligations of any Wholly Owned Domestic Restricted Subsidiary Guarantor and by any Wholly Owned Domestic Restricted Subsidiary Guarantor of Indebtedness or operating lease payment obligations of any other Wholly Owned Domestic Restricted Subsidiary Guarantor, in each case so long as the respective underlying guaranteed Indebtedness or operating lease payment obligations are otherwise permitted in accordance with the relevant terms of this Agreement (other than this clause (k)); and

      (l)     in addition to the items referred to in clauses (a) through (k) above, Indebtedness of the Company and/or the Restricted Subsidiaries having an aggregate principal amount not to exceed $_____ at any time outstanding.

"Permitted Investments" means Investments consisting of:

      (i)     accounts receivables owing to the Company or any Restricted Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Company or such Restricted Subsidiary;

      (ii)     cash and Cash Equivalents;

      (iii)     Investments held by the Company or any Restricted Subsidiary on the Issue Date and described on Schedule 1.01B, provided that any additional Investments made with respect thereto shall constitute Permitted Investments only if permitted under the other provisions of this definition;

      (iv)     Investments acquired by the Company or any Restricted Subsidiary (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

      (v)     loans and advances by the Company or any Restricted Subsidiary to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not

to exceed [$500,000] at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(vi)    Interest Rate Obligations of counterparties under agreements permitted under clause (d) of the definition of "Permitted Indebtedness";

(vii)    intercompany loans and advances between and among the Company and the Domestic Subsidiary Guarantors (collectively, "Intercompany Loans"), provided that each such Intercompany Loan shall be evidenced by an Intercompany Note (which Intercompany Note shall include the subordination provisions attached as Annex A to the form of Intercompany Note attached to the First-Lien Credit Agreement) which shall be pledged to the Collateral Agent pursuant to, and to the extent required by, the Pledge Agreement but subject to the Intercreditor Agreement;

(viii)    [Permitted Acquisitions] and the Starpower Acquisition;

(ix)    Investments by the Company and its Restricted Subsidiaries in Capital Stock of Subsidiaries that are Domestic Subsidiary Guarantors both before and after such investments; provided that any such Capital Stock held by the Company or a Guarantor shall be pledged pursuant to the Pledge Agreement;

(x)    loans by the Company to the Employee Stock Ownership Plan of the Company, 100% of the gross proceeds of which (without reduction for costs, fees and expenses or other items) are immediately thereafter utilized by such Employee Stock Ownership Plan to purchase from the Company not more than [2,000,000] shares of the Company's common stock (such number of shares to be adjusted to reflect stock splits, stock dividends, stock combinations and similar events); and

(xi)    other investments in an aggregate amount not to exceed $[_____] (net of any return of capital or Net Cash Proceeds in respect of any such investment and valued at the time of the making thereof).

"Permitted Encumbrance" shall mean, with respect to any Mortgaged Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, which exceptions prior to the date of Discharge of First-Lien Obligations must be acceptable to the Administrative Agent under the First-Lien Credit Agreement in its reasonable discretion.

"Permitted Liens" means:

(i)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with generally accepted accounting principles;

(ii)    Liens in respect of property or assets of the Company or any of its Restricted Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in

the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Company's or such Restricted Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Company or such Restricted Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(iii)    Liens in existence on the Issue Date which are listed, and the property subject thereto described, in Schedule 1.01, but only to the respective date, if any, set forth in such Schedule 1.01 for the removal, replacement and termination of any such Liens, plus renewals, replacements and extensions of such Liens to the extent set forth on such Schedule 1.01, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of the Company or any of its Restricted Subsidiaries;

(iv)    Liens created by or pursuant to (x) the First-Lien Credit Documents Documents, (y) the Second-Lien Note Documents and (z) the Third-Lien Credit Documents, so long as the Liens created pursuant to the Third-Lien Credit Documents are limited to assets constituting Collateral of the Company and are at all times subordinated to the Liens pursuant to the Security Documents on the terms provided in the Intercreditor Agreement;

(v)    licenses, sublicenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Company or any of its Restricted Subsidiaries;

(vi)    Liens upon assets of the Company or any of its Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by clause (f) of the definition of "Permitted Indebtedness", provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of the Company or any other asset of the Company or any Restricted Subsidiary of the Company;

(vii)    Liens placed upon equipment or machinery acquired after the Issue Date and used in the ordinary course of business of the Company or any of its Restricted Subsidiaries and placed at the time of the acquisition thereof by the Company or such Restricted Subsidiary or within 180 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by clause (f) of the definition of "Permitted Indebtedness" and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any asset of the Company or any other asset of the Company or such Restricted Subsidiary;

(viii)   easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Company or any of its Restricted Subsidiaries;

(ix)   Liens arising from precautionary Uniform Commercial Code financing statement filings regarding operating leases entered into in the ordinary course of business;

(x)   Liens arising out of the existence of judgments or awards in respect of which the Company or any of its Restricted Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings, provided that the aggregate amount of all cash (including the stated amount of all letters of credit) and the fair market value of all other property subject to such Liens does not exceed $5,000,000 at any time outstanding;

(xi)   statutory and common law landlords' liens under leases to which the Company or any of its Restricted Subsidiaries is a party;

(xii)   Liens (other than Liens imposed under ERISA), including deposits, incurred in the ordinary course of business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business and consistent with past practice (exclusive of obligations in respect of the payment for borrowed money), provided that the aggregate amount of all cash and the fair market value of all other property subject to all Liens permitted by this clause (xii) shall not at any time exceed $5,000,000;

(xiii)   Permitted Encumbrances;

(xiv)   Liens on property or assets acquired pursuant to a Permitted Acquisition, or on property or assets of a Restricted Subsidiary of the Company in existence at the time such Restricted Subsidiary is acquired pursuant to such an acquisition, provided that (x) any Indebtedness that is secured by such Liens is permitted to exist under clause (g) of the definition of "Permitted Indebtedness", and (y) such Liens are not incurred in connection with, or in contemplation or anticipation of, such acquisition and do not attach to any asset of the Company or any other asset of the Company or any of its Restricted Subsidiaries;

(xv)   restrictions on the transfer or pledge of assets contained in any FCC License or imposed by the Communications Act, comparable state or local legislation, regulations or ordinances or the terms of cable TV franchises;

(xvi)   Liens consisting of customary options, calls, puts or restrictions on transfer relating to Equity Interests of Non-Wholly Owned Subsidiaries and arising under

joint venture arrangements with other holders (other than the Company and its Affiliates) of such Equity Interests; and

(xvii)   other Liens, so long as neither the aggregate fair market value of all assets subject thereto, nor the aggregate amount of Indebtedness or other obligations secured thereby, exceeds $_____.

"Person" shall mean an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"Plan of Reorganization" shall mean the chapter 11 plan of reorganization relating to the Company and its Subsidiaries subject thereto, dated August 20, 2004, including the exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof and hereof.

"Pledge Agreement" means that certain Pledge Agreement, dated as of December __, 2004, among the Company, the Guarantors and the Collateral Agent, granting, among other things, a second priority Lien on the Collateral described therein in favor of the Collateral Agent for the benefit of the Trustee and Noteholders, as amended, modified, restated, supplemented or replaced from time to time, which initially is substantially in the form of Exhibit I.

"Preferred Stock" means, with respect to any person, any and all shares, interests, participations or other equivalents (however designated) of such person's preferred or preference stock whether now outstanding, or issued after the Issue Date, and including, without limitation, all classes and series of preferred or preference stock of such person.

"Predecessor Note" of any particular Note shall mean every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.6 in lieu of a lost, destroyed or stolen Note shall be deemed to evidence the same debt as the lost, destroyed or stolen Note that it replaces.

"Private Placement Legend" shall mean the legend set forth in Section 2.5(h)(i) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"Pro Forma Basis" shall mean, in connection with any calculation of compliance with any financial covenant or financial term, the calculation thereof after giving effect on a pro forma basis to (x) the incurrence of any Indebtedness (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness or to finance a Permitted Acquisition) after the first day of the relevant Calculation Period as if such Indebtedness had been incurred (and the proceeds thereof applied) on the first day of the relevant Calculation Period, (y) the permanent repayment of any Indebtedness (other than revolving Indebtedness except to the extent accompanied by a corresponding permanent commitment reduction) after the first day of the relevant Calculation Period as if such Indebtedness had been retired or redeemed on the first day of the relevant Calculation Period and/or (z) the Permitted Acquisition, if any, then being consummated as well as any other Permitted Acquisition or Material Asset Sale

consummated after the first day of the relevant Calculation Period and on or prior to the date of the respective Permitted Acquisition then being effected, as the case may be, with the following rules to apply in connection therewith:

(i) all Indebtedness (x) (other than revolving Indebtedness, except to the extent same is incurred to refinance other outstanding Indebtedness or to finance a Permitted Acquisition) incurred or issued after the first day of the relevant Calculation Period (whether incurred to finance a Permitted Acquisition, to refinance Indebtedness or otherwise) shall be deemed to have been incurred or issued (and the proceeds thereof applied) on the first day of the respective Calculation Period and remain outstanding through the date of determination and (y) (other than revolving Indebtedness except to the extent accompanied by a corresponding permanent commitment reduction) permanently retired or redeemed after the first day of the relevant Calculation Period shall be deemed to have been retired or redeemed on the first day of the respective Calculation Period and remain retired through the date of determination;

(ii) all Indebtedness assumed to be outstanding pursuant to preceding clause (i) shall be deemed to have borne interest at (x) the rate applicable thereto, in the case of fixed rate indebtedness, or (y) at the rate which would have been applicable thereto on the last day of the respective Calculation Period, in the case of floating rate Indebtedness (although interest expense with respect to any Indebtedness for periods while same was actually outstanding during the respective period shall be calculated using the actual rates applicable thereto while same was actually outstanding); and

(iii) in making any determination of Consolidated EBITDA, pro forma effect shall be given to any Permitted Acquisition or Material Asset Sale consummated during the periods described above, with such Consolidated EBITDA to be determined as if such Permitted Acquisition or Material Asset Sale was consummated on the first day of the relevant Calculation Period, taking into account, for any portion of the relevant period being tested occurring prior to the consummation of any Permitted Acquisition or Material Asset Sale, demonstrable cost savings actually achieved simultaneously with, or to be achieved within a 1-year period following, the closing of the respective Permitted Acquisition or Material Asset Sales, which cost savings would be permitted to be recognized in pro forma financial statements prepared in accordance with Regulation S-X under the Securities Act, as if such cost-savings were realized on the first day of the relevant period.

"QIB" shall mean a "qualified institutional buyer" as defined in Rule 144A.

"Redemption Date" means, with respect to any Note to be redeemed, the date fixed by the Company for such redemption pursuant to this Indenture and the Notes.

"Redemption Price" means, with respect to any Note to be redeemed, the price fixed for such redemption pursuant to the terms of this Indenture and the Notes.

"Refinancing" has the meaning set forth in clause (f) of the definition of "Permitted Indebtedness."

"Registrable Securities" shall have the meaning specified in the Registration Rights Agreement.

"Regular Record Date" means the Regular Record Date specified in the Notes.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of December __, 2004, among the Company and the Purchasers as defined therein, as such agreement may be amended from time to time, which agreement is initially in the form attached as to the Note Purchase Agreement as Exhibit A.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the Corporate Trust Office including any Vice President, Managing Director, Assistant Vice President, Secretary, Assistant Secretary or Assistant Treasurer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge and familiarity with the particular subject.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" shall mean a permanent Global Note substantially in the form of Exhibit A attached hereto that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing a series of Notes that bear the Private Placement Legend.

"Restricted Payment" means any of the following: (i) the declaration or payment of any dividend or any other distribution on Capital Stock of the Company or any payment made to the direct or indirect holders (in their capacities as such) of Capital Stock of the Company other than dividends or distributions payable solely in Capital Stock (other than Disqualified Stock) of the Company or in options, warrants or other rights to purchase Capital Stock (other than Disqualified Stock) of the Company; (ii) the purchase, redemption or other acquisition or retirement for value of any Capital Stock of the Company (other than any such Capital Stock owned by the Company or a Wholly Owned Restricted Subsidiary); (iii) the purchase, redemption, defeasance or other acquisition or retirement for value prior to any scheduled repayment, sinking fund or maturity of any Third-Lien Obligation or Subordinated Indebtedness (other than any Subordinated Indebtedness held by the Company or a Wholly Owned Restricted Subsidiary); or (iv) the making by the Company or any Restricted Subsidiary of any Investment (other than a Permitted Investment) in any person.

"Restricted Subsidiary" means any Subsidiary of the Company that has not been designated by the Board, by a Board Resolution delivered to the Trustee, as an Unrestricted Subsidiary pursuant to and in compliance with Section 5.21 hereof. Any such designation may be revoked by a Board Resolution delivered to the Trustee, subject to the provisions of such covenant.

"Restricted Subsidiary Indebtedness" means Indebtedness of any Restricted Subsidiary (i) which is not subordinated to any other Indebtedness of such Restricted Subsidiary and (ii) in respect of which the Company is not also obligated (by means of a guarantee or otherwise) other than, in the case of this clause (ii), Indebtedness under any Permitted Credit Facilities.

"Rule 144" shall mean Rule 144 promulgated under the Securities Act.

"S&P" means Standard & Poor's Corporation.

"Second Priority Lien" shall mean the Junior Liens and Liens that secure obligations under any other agreements evidencing indebtedness secured by a second priority Lien on any assets or properties of the Company.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" means that certain Security Agreement, dated as of December __, 2004, among the Company, the Guarantors and the Collateral Agent, granting, among other things, a second priority Lien on the Collateral described therein in favor of the Collateral Agent for the benefit of the Trustee and Noteholders, as amended, modified, restated, supplemented or replaced from time to time, which initially is substantially in the form of Exhibit G.

"Security Documents" means, collectively, the Security Agreement, the Pledge Agreement, the Mortgages, the Intercreditor Agreement and all other security agreements, pledges, collateral assignments or other instruments evidencing or creating any Security Interests in favor of the Collateral Agent, for the benefit of the Trustee and the Noteholders, in all or any portion of the Collateral, in each case, as amended, modified, restated, supplemented or replaced from time to time. The Guarantee Agreement is not a Security Document.

"Security Interests" means the Liens on the Collateral created by the Security Documents in favor of the Collateral Agent for the benefit of the Trustee and the Noteholders.

"Senior Liens" means the Liens on the Collateral granted by the Company or the Guarantors to secure the payment of any First-Lien Obligations, and all replacements, renewals and other modifications of such Liens.

"Shelf Registration Statement" means the Shelf Registration Statement contemplated by the Registration Rights Agreement.

"Significant Restricted Subsidiary" means any Restricted Subsidiary (or group of Restricted Subsidiaries) that would constitute a Significant Subsidiary, as defined under Regulation S-X (or any successor regulation) under the Securities Act of 1933, as amended, but substituting therein 5% for each reference to 10%.

"Special Change of Control" means a Change of Control pursuant to which 75.00% or more of the consideration for the Company's Common Stock payable in the event constituting the Change of Control consists of cash, Cash Equivalents or property or securities that are not listed on a national securities exchange or quoted on a national inter-dealer quotation system.

"Special Default" means (a) a Default under Section 7.1(a), (b) or, to the extent constituting a failure to make a payment in a Change of Control Offer or an Asset Sale Offer when due, 7.1(c) or (b) any other Event of Default.

"Starpower" means Starpower Communications, LLC, a Delaware limited liability company.

"Starpower Acquisition" means the acquisition by the Company of the 50% of the Equity Interests in Starpower not owned by the Company for aggregate consideration not exceeding $[32,000,000].

"Starpower Group" means Starpower and its Subsidiaries.

"Stated Maturity" means, with respect to any Note or any installment of interest thereon, the dates specified in such Note as the fixed date on which the principal of such Note or such installment of interest is due and payable and, when used with respect to any other Indebtedness, means the date specified in the instrument governing such Indebtedness as the fixed date on which the principal of such Indebtedness, or any installment of interest, is due and payable.

"Subordinated Indebtedness" means any Indebtedness of the Company or any Guarantor which is expressly subordinated in right of payment to any other Indebtedness of the Company or such Guarantor.

"Subsidiary" means, with respect to any person, (i) any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors shall at the time be owned, directly or indirectly, by such person, or (ii) any other person of which at least a majority of voting interest is at the time, directly or indirectly, owned by such person.  For the purposes of this definition, "voting stock" means stock which ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of stock has such voting power by reason of any contingency.

"Test Period" shall mean (i) for the period ended March 31, 2005, the fiscal quarter  of the Company then ended, (ii) for the period ended June 30, 2005, the two consecutive fiscal quarters (taken as one accounting period) of the Company then ended, (iii) for the period ended September 30, 2005, the three consecutive fiscal quarters (taken as one accounting period) of the Company then ended and (iv) thereafter, each period of four consecutive fiscal quarters of the Company then last ended (in each case taken as one accounting period).

"Third-Lien Administrative Agent" shall mean HSBC Bank USA in its capacity as agent for the secured creditors under the Third-Lien Credit Documents.

"Third-Lien Collateral Agent" shall mean HSBC Bank USA in its capacity as collateral agent for the secured creditors under the Third-Lien Credit Documents.

"Third-Lien Credit Agreement" shall mean the Credit Agreement, dated as of [_____], among the Company, the lenders party thereto, and HSBC Bank USA, as agent[, as the same may be amended, modified, and (or supplemented from time to time in accordance with the terms hereof and thereof.]

"Third-Lien Credit Documents" shall mean the Third-Lien Credit Agreement, and the related guarantees, pledge agreements, security agreements, mortgages, notes and other agreements and instruments entered into in connection with the Third-Lien Credit Agreement, in each case as the same may be amended, modified and/or supplemented from time to time in accordance with the terms hereof and thereof; provided no Liens thereunder shall be granted by any Person other than the Company.

"Third-Lien Obligations" has the meaning given to it in the Intercreditor Agreement.

"Transaction" shall mean, collectively, (i) the consummation of the Plan of Reorganization, (ii) the entering into of the First-Lien Credit Documents and the occurrence of the borrowings under the First-Lien Credit Agreement on the initial borrowing date thereunder, (iii) the entering into of the Second-Lien Note Documents and the issuance of all Second-Lien Notes thereunder on the date of initial borrowing under the First-Lien Credit Agreement Date, (iv) the entering into of the Third-Lien Credit Documents and  (v) the payment of all fees and expenses in connection with the foregoing.

 "Transaction Documents" shall mean the Note Purchase  Agreement, the Guarantee Agreement, the Registration Rights Agreement, the Notes, the Indenture, the Security Documents and each of the other agreements entered into by the parties thereto in connection with the transactions contemplated by the Note Purchase  Agreement.

"Trust Indenture Act" means the Trust Indenture Act of 1939, as amended, from time to time.

"Trustee" means _____  and its successors and any corporation resulting from or surviving any consolidation or merger to which it or its successors may be a party and any successor trustee at the time serving as successor trustee hereunder.

"Unrestricted Global Note" shall mean a permanent Global Note substantially in the form of Exhibit A attached hereto that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing a series of Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Definitive Note" shall mean one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Subsidiary" means any Subsidiary of the Company designated as such pursuant to and in compliance with Section 5.21 hereof.  Any such designation may be revoked by a Board Resolution delivered to the Trustee, subject to the provisions of such covenant.

"U.S. Government Securities" means securities that are direct non-callable obligations of the United States of America or securities the timely payment of whose principal and interest is unconditionally guaranteed by the full faith and credit of the United States of America.

"Voting Stock" means, with respect to any person, the Capital Stock of any class or kind ordinarily having the power to vote for the election of directors or other members of the governing body of such person.

"Wholly Owned Restricted Subsidiary" means any Restricted Subsidiary of which all of the outstanding Capital Stock is owned by the Company or another Wholly Owned Restricted Subsidiary. For the purposes of this definition, any directors' qualifying shares or investments by foreign nationals mandated by applicable law shall be disregarded in determining the ownership of a Restricted Subsidiary.

"Wholly Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

"Wholly Owned Domestic Restricted Subsidiary" shall mean, as to any Person, any Wholly Owned Subsidiary of such Person which is a Restricted Subsidiary and is incorporated or organized in the United States or any State thereof.

"Wholly Owned Domestic Restricted Subsidiary Guarantor" shall mean any Wholly Owned Domestic Subsidiary of the Company, which is also a Guarantor.

Section 1.2.    Other Definitions

| Term | Defined in Section |
|---|---|
| "Act" | 1.4 |
| "Additional Securities" | 15.6(d) |
| "Affiliate Transaction" | 5.14 |
| "Agent Members" | 2.2(b) |
| "Asset Sale Offer" | 5.15 |
| "Asset Sale Offer Purchase Date" | 5.15 |
| "assumed liabilities" | 5.15 |
| "Authentication Order" | 2.1 |
| "Change of Control Date" | 5.10 |
| "Change of Control Offer" | 5.10 |
| "Change of Control Payment Date" | 5.10 |
| "Closing Price" | 15.6(f)(1) |
| "Company Notice" | 16.2(a) |
| "Continuing Director" | 16.3(c) |
| "Conversion Date" | 15.2 |
| "Conversion Notice" | 15.2 |
| "Conversion Price" | 15.5 |
| "covenant defeasance" | 17.3 |
| "Current Market Price" | 15.6(f)(2) |
| "defeasance" | 17.2 |

| Term | Defined in Section |
|------|--------------------|
| "Defeased Notes" | 17.1 |
| "Designation" | 5.21 |
| "Excess Proceeds" | 5.15 |
| "fair market value" | 15.6(f)(4) |
| "Guaranteed Obligations" | 18.1 |
| "incur" | 5.11 |
| "insolvent person" | 17.4 |
| "Interest Payment Date" | 2.3 |
| "non-electing share" | 15.7 |
| "Note Register" | 2.5(a) |
| "Note Registrar" | 2.5(a) |
| "Offer Excess Proceeds" | 5.15 |
| "Paying Agent" | 5.2 |
| "Proceeding" | 4.3(a) |
| "record date" | 2.3 |
| "Record Date" | 15.6(f)(4) |
| "Reference Period" | 15.6(d) |
| "Replacement Assets" | 5.15 |
| "Revocation" | 5.21 |
| "Restricted Securities" | 2.5(h)(i) |
| "Senior Indebtedness" | 4.1 |
| "Starpower Acquisition" | 15.6(e) |
| "Statutory Exchange" | 15.7 |
| "Trading Day" | 15.6(f)(5) |
| "Trigger Event" | 15.6(d) |
| "Designation Amount" | 5.21 |
| "Vice President" | 2.1 |

Section 1.3.    Rules of Construction

All other terms used in this Indenture, which are defined in the Trust Indenture Act or which are by reference therein defined in the Securities Act (except as herein otherwise expressly provided or unless the context otherwise requires) shall have the meanings assigned to such terms in the Trust Indenture Act and in the Securities Act as in force at the date of the execution of this Indenture.  The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision.  The terms defined in this Article I include the plural as well as the singular.

Section 1.4.    Acts of Holders.

(a)        Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered

to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution (as provided below in subsection (b) of this Section 1.4) of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.1 hereof) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b) The fact and date of the execution by any person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient.

(c) The ownership of Notes shall be proved by the Note Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note or the Holder of every Note issued upon the transfer thereof or in exchange therefor or in lieu thereof to the same extent as the original Holder, in respect of anything done, suffered or omitted to be done by the Trustee, any Paying Agent or the Company in reliance thereon, whether or not notation of such action is made upon such Note.

## ARTICLE II.

## ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.1. Designation, Amount and Issue of Notes

The Notes shall be designated as "7-3/8% Convertible Second Lien Notes due 2012." Notes not to exceed the aggregate principal amount of One Hundred Fifty Million United States Dollars ($150,000,000) upon the execution of this Indenture, or (except pursuant to Sections 2.5, 2.6, 3.3 and 15.2) from time to time thereafter, may be executed by the Company and delivered to the Trustee for authentication, and the Trustee shall thereupon authenticate and deliver said Notes upon the written order of the Company (the "Authentication Order"), signed by the Company's (a) President, Chief Executive Officer, Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title, a "Vice President") and (b) Chief Financial Officer, Treasurer or Assistant Treasurer or its Secretary or any Assistant Secretary, without any further action by the Company hereunder.

Section 2.2. Form of Notes

(a) Notes issued in global form shall be substantially in the form of Exhibit A attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto), which is incorporated in and made a part of this Indenture. Notes issued in definitive form shall be substantially in the form of Exhibit A attached hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it shall represent the aggregate principal amount of

outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect purchases, conversions and redemptions. Any endorsement of a Global Note to reflect the amount of any decrease or increase in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the holder thereof as required by Section 2.5.

The Trustee's certificate of authentication to be borne by such Notes shall be substantially in the form set forth in Exhibit A.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends and endorsements as the officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage.

The terms and provisions contained in the form of Note attached as Exhibit A hereto shall constitute, and are hereby expressly made, a part of this Indenture and to the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

(b) Members of, or Participants in, the Depositary ("Agent Members") shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary or under any Global Note, and the Depositary (including, for this purpose, its nominee) shall be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner and holder of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall (i) prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or (ii) impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any Note.

Section 2.3.    Date and Denomination of Notes; Payments of Interest

The Notes shall be issuable in registered form without coupons in denominations of One Thousand United States Dollars ($1,000) principal amount and integral multiples thereof. Every Note shall be dated the date of its authentication, and shall bear interest on the principal sum outstanding from time to time under the Note, at the rate per annum specified in the title of the form of Note attached as Exhibit A hereto, accrued from the date of issuance of the Note and payable semi-annually on January 15 and July 15 of each year (each, an "Interest Payment Date"), commencing July 15, 2005, as specified on the face of the form of Note attached as Exhibit A hereto.

Interest on the Notes shall be deemed to have commenced accruing on the Issue Date.

The Person in whose name any Note, or portion thereof (or its Predecessor Note) is registered at the close of business on any record date with respect to any Interest Payment Date (including any Note that is converted after the record date and on or before the Interest Payment Date) shall be entitled to receive the interest payable on such Interest Payment Date notwithstanding the cancellation of such Note upon any transfer, exchange or conversion subsequent to the record date and on or prior to such Interest Payment Date; provided that, in the case of any Note, or portion thereof, called for redemption or converted pursuant to Article III or Article XV on a redemption date or conversion date, as applicable, during the period from the close of business on the record date to the close of business on the Business Day next preceding the following Interest Payment Date, interest shall not be paid to the Person in whose name the Note, or portion thereof, is registered on the close of business on such record date, and the Company shall have no obligation to pay interest on such Note or portion thereof except to the extent required to be paid upon such redemption or conversion in accordance with Article III or Article XV.  Interest may, at the option of the Company, be paid by check mailed to the address of such Person on the Note Register; provided that, with respect to any holder of Notes with an aggregate principal amount equal to or in excess of Five Hundred Thousand United States Dollars ($500,000), interest on such holder's Notes shall be paid by wire transfer in immediately available funds to any bank located in the United States in accordance with the wire transfer instruction supplied by such holder from time to time to the Trustee and paying agent (if different from Trustee) at least five (5) Business Days prior to the applicable record date.  The term "record date" with respect to any Interest Payment Date shall mean the first day of the month in which the Interest Payment Date shall occur, whether or not such date is a Business Day.  Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.  Any accrued and unpaid interest which is not paid within five (5) Business Days of the Interest Payment Date on which such payment of interest was due shall bear interest at the rate of  2% plus the interest rate otherwise in effect and borne by the Notes (including Liquidating Damages) from such Interest Payment Date until the same is paid in full (or, if less, the maximum interest rate then permitted by applicable law) (the "Default Interest").  In addition, at any time when an Event of Default shall have occurred and be continuing, the interest rate on the Notes shall be equal to 2% plus the interest rate otherwise accruing thereon (including Liquidated Damages).

If the Company defaults in a payment of interest on the Notes, it shall pay the defaulted interest in any lawful manner plus, to the extent lawful, the Default Interest, to the Persons who are holders on a subsequent special record date.  The Company shall promptly notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Company shall fix or cause to be fixed each such special record date and payment date, provided that no such special record date shall be less than ten (10) days prior to the related payment date for such defaulted interest.  At least fifteen (15) days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) shall mail or cause to be mailed to holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.4.    Execution of Notes

The Notes shall be signed in the name and on behalf of the Company by the facsimile signature of its President, its Chief Executive Officer, or any of its Vice Presidents, and attested by the facsimile signature of its Chief Financial Officer, Treasurer or its Assistant Treasurer, or Secretary or any of its Assistant Secretaries (which may be printed, engraved or otherwise reproduced thereon, by facsimile or otherwise).   Only such Notes as shall bear thereon a certificate of authentication substantially in the form set forth on the form of Note attached as Exhibit A hereto, manually executed by the Trustee (or an authenticating agent appointed by the Trustee as provided by Section 16.10), shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose.   Such certificate by the Trustee (or such authenticating agent) upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the holder thereof is entitled to the benefits of this Indenture.

In case any officer of the Company who shall have signed any of the Notes shall cease to be such officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the person who signed such Notes had not ceased to be such officer of the Company; and any Note may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Note, shall be the proper officers of the Company, although at the date of the execution of this Indenture any such person was not such an officer.

Section 2.5.    Exchange and Registration of Transfer of Notes; Restrictions on Transfer

(a)    Note Register.  The Company shall cause to be kept at the Corporate Trust Office a register (the register maintained in such office and in any other office or agency of the Company designated pursuant to Section 5.2 being herein sometimes collectively referred to as the "Note Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Notes and of transfers of Notes.  Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time.  The Trustee is hereby appointed "Note Registrar" for the purpose of registering Notes and transfers of Notes as herein provided.  The Company may appoint one or more co-registrars in accordance with Section 5.2.  The Company shall be the Note Registrar in the absence of any other Note Registrar.

(b)    Transfer and Exchange of Global Notes.  A Global Note may not be transferred except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.  All Global Notes will be exchanged by the Company for Definitive Notes if (i) the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary or (ii) the Company in its sole discretion determines that the Global

Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee. Upon the occurrence of either of the preceding events in (i) or (ii) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.6 and 2.7. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.5(b) or Section 2.6 or 2.7, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.5(b), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.5(c) or (d).

(c)     Transfer and Exchange of Beneficial Interests in the Global Notes. The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)     Transfer of Beneficial Interests in the Same Global Note. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Note Registrar to effect the transfers described in this Section 2.5(c)(i).

(ii)     All Other Transfers and Exchanges of Beneficial Interests in Global Notes. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.5(c)(i) above, the transferor of such beneficial interest must deliver to the Note Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in

33

an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depositary to the Note Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above.  Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.5(l).

(iii)   Transfer of Beneficial Interests to Another Restricted Global Note. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.5(c)(ii) above and the Note Registrar receives the following:

(A)   if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit D hereto, including the certifications in item (1) thereof; and

(B)   if the transferee will take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit D hereto, including the certifications and certificates and Opinion of Counsel required by item (2) thereof, if applicable.

(iv)   Transfer of Beneficial Interests in a Restricted Global Note for Beneficial Interests in the Unrestricted Global Note.  A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the transfer complies with the requirements of Section 2.5(c)(ii) above and

(A)   such transfer is effected pursuant to a registration statement filed in accordance with the Registration Rights Agreement; or

(B)   the Note Registrar receives the following:

(1)   if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the

34

form of Exhibit E hereto, including the certifications in item (1)(a) thereof; or

(2)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit D hereto, including the certifications in item (3) thereof;

and, in each such case set forth in this subparagraph (B), if the Note Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Note Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.1, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(d)    Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i)    Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.  If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Note Registrar of the following documentation:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit E hereto, including the certifications in item (2)(a) thereof;

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a

certificate to the effect set forth in Exhibit D hereto, including the certifications in item (1) thereof;

(C) if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (2)(a) thereof;

(D) if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) and (C) above, a certificate to the effect set forth in Exhibit D hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable;

(E) if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (2)(b) thereof; or

(F) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (2)(c) thereof;

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.5(l), and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.5(d) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Note Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.5(d)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii) Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if:

(A)     such transfer is effected pursuant to a registration statement filed in accordance with the Registration Rights Agreement; or

(B)     the Note Registrar receives the following:

(1)     if the holder of such beneficial interest in a Restricted Global Notes proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit E hereto, including the certifications in item (1)(b) thereof; or

(2)     if the holder of such beneficial interest in a Restricted Global Notes proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit D hereto, including the certifications in item (3) thereof;

and, in each such case set forth in this subparagraph (B), if the Note Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Note Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)     Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes.  If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.5(c)(ii), the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.5(l), and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions an Unrestricted Definitive Note in the appropriate principal amount.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.5(d)(iii) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Note Registrar through

instructions from the Depositary and the Participant or Indirect Participant.  The Trustee shall deliver such Unrestricted Definitive Notes to the Persons in whose names such Notes are so registered. Any Unrestricted Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.5(d)(iii) shall not bear the Private Placement Legend.

(e)    Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)    Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.  If any holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Note Registrar of the following documentation:

(A)    if the holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such holder in the form of Exhibit E hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A under the Securities Act, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144 under the Securities Act, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (2)(a) thereof;

(D)    if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) and (C) above, a certificate to the effect set forth in Exhibit D hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable;

(E)    if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (2)(b) thereof; or

(F)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit D hereto, including the certifications in item (2)(c) thereof;

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, and in all other cases, the IAI Global Note.

(ii)    Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.  A holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A)    such transfer is effected pursuant to a registration statement filed in accordance with the Registration Rights Agreement; or

(B)    the Note Registrar receives the following:

(1)    if the holder of such Restricted Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such holder in the form of Exhibit E hereto, including the certifications in item (1)(c) thereof; or

(2)    if the holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such holder in the form of Exhibit D hereto, including the certifications in item (3) thereof;

and, in each such case set forth in this subparagraph (B), if the Note Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Note Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.5(e)(ii), the Trustee shall cancel the Restricted Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)     Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.  A holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Unrestricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time.  Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from an Unrestricted Definitive Note to a beneficial interest is effected pursuant to subparagraphs (ii)(A), (ii)(B) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.1, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Unrestricted Definitive Notes so transferred.

(f)     Transfer and Exchange of Definitive Notes for Definitive Notes.  Upon request by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.5(f), the Note Registrar shall register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Note Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Note Registrar duly executed by such holder or by its attorney, duly authorized in writing.  In addition, the requesting holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.5(f).

(i)     Restricted Definitive Notes to Restricted Definitive Notes.  Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Note Registrar receives the following:

(A)     if the transfer will be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form of Exhibit D hereto, including the certifications in item (1) thereof; and

(B)     if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act,

then the transferor must deliver a certificate in the form of Exhibit D hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable.

(ii) Restricted Definitive Notes to Unrestricted Definitive Notes. Any Restricted Definitive Note may be exchanged by the holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

(A) any such transfer is effected pursuant to a registration statement filed in accordance with the Registration Rights Agreement; or

(B) the Note Registrar receives the following:

(1) if the holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit E hereto, including the certifications in item (1)(d) thereof; or

(2) if the holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit D hereto, including the certifications in item (3) thereof;

and, in each such case set forth in this subparagraph (B), if the Note Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii) Unrestricted Definitive Notes to Unrestricted Definitive Notes. A holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Note Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the holder thereof.

(g) General Provisions Relating to Transfers and Exchanges.

Upon surrender for registration of transfer of any Note to the Note Registrar or any co-registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.5, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

No service charge shall be charged to the Noteholder for any exchange or registration of transfer of Notes, but the Company may require payment of a sum sufficient to cover any tax, assessments or other governmental charges that may be imposed in connection therewith.

None of the Company, the Trustee, the Note Registrar or any co-registrar shall be required to exchange or register a transfer of (a) any Notes for a period of fifteen (15) days next preceding the mailing of the notice of redemption or (b) any Notes called for redemption or, if a portion of any Note is selected or called for redemption, such portion thereof selected or called for redemption or (c) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion or (d) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn) in connection with an Asset Sale Offer or Change of Control Offer.

All Notes issued upon any transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

The Trustee shall authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.1.

(h)     Legends.

(i)     Private Placement Legend on the Notes.  Every Note that bears or is required under this Section 2.5(h)(i) to bear the legend set forth in this Section 2.5(h)(i) (together with any Common Stock issued upon conversion of the Notes and required to bear the legend set forth in Section 2.5(h)(ii), collectively, the "Restricted Securities") shall be subject to the restrictions on transfer set forth in this Section 2.5(h)(i) (including the legend set forth below), unless such restrictions on transfer shall be waived by written consent of the Company, and the holder of each such Restricted Security, by such holder's acceptance thereof, agrees to be bound by all such restrictions on transfer.  As used in Sections 2.5(h)(i) and 2.5(h)(ii), the term "transfer" encompasses any sale, transfer or other disposition (excluding any pledge unless or until any foreclosure on such pledge) whatsoever of any Restricted Security.

Until two (2) years after the original issuance date of any Note, any certificate evidencing such Note (and all securities

issued in exchange therefor or substitution thereof, other than Common Stock, if any, issued upon conversion thereof which shall bear the legend set forth in Section 2.5(h)(ii), if applicable) shall bear a legend in substantially the following form (unless such Note has been transferred pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer), or the Note has been transferred pursuant to the exemption from registration provided by Rule 144 under the Securities Act, or unless otherwise agreed by the Company in writing, with notice thereof to the Trustee):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION THEREFROM. THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY THIS SECURITY.

The Company may, but is not obligated to, instruct the Trustee to place the following legend on any Note held by or transferred to an "affiliate" (as defined in Rule 501(b) of Regulation D under the Securities Act):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE HELD BY A PERSON WHO MAY BE DEEMED TO BE AN AFFILIATE OF THE ISSUER FOR PURPOSES OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY BE SOLD ONLY IN COMPLIANCE WITH RULE 144, PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO A VALID EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT. THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY THE SECURITIES.

Any Note (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of such Note for exchange to the Note Registrar in accordance with the provisions of this Section 2.5, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this Section 2.5(h)(i).

(ii)     Private Placement Legend on Stock Certificate. Until two (2) years after the original issuance date of any Note, any stock certificate representing Common Stock issued upon conversion of such Note shall bear a legend in substantially the following form (unless such Common Stock has been transferred pursuant to a

registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer), or the Notes from which such Common Stock was converted were transferred pursuant to a registration statement that has been declared effective under the Securities Act and which was effective at the time of such transfer, or the Common Stock has been transferred pursuant to an exemption from registration provided by Rule 144 under the Securities Act, or unless otherwise agreed by the Company in writing with written notice thereof to the Trustee and any transfer agent for the Common Stock):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION THEREFROM. THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY THE SECURITIES.

The Company may, but is not obligated to, instruct the transfer agent for the Company's Common Stock to place the following legend on any certificate evidencing shares of Common Stock held by or transferred to an "affiliate" (as defined in Rule 501(b) of Regulation D under the Securities Act) of the Company:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE HELD BY A PERSON WHO MAY BE DEEMED TO BE AN AFFILIATE OF THE ISSUER FOR PURPOSES OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY BE SOLD ONLY IN COMPLIANCE WITH RULE 144, PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO A VALID EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT. THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY THE SECURITIES.

Any such Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock, be exchanged for a new certificate or certificates for a like aggregate number of shares of Common Stock, which shall not bear the restrictive legend required by this Section 2.5(h)(ii).

(iii)   Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.6 OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.5(b) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.8 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

(i)     Resale of Notes Purchased by the Company or an Affiliate.  Any Note or Common Stock issued upon the conversion or exchange of a Note that, prior to the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor rule), is purchased or owned by the Company or any Affiliate thereof may not be resold by the Company or such Affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Notes or Common Stock, as the case may be, no longer being "restricted securities" (as defined under Rule 144).

(j)     Changes in Law.  Notwithstanding any provision of Section 2.5 to the contrary, in the event Rule 144(k) as promulgated under the Securities Act (or any successor rule) is amended to change the two-year period under Rule 144(k) (or the corresponding period under any successor rule), from and after receipt by the Trustee of the Officer's Certificate and Opinion of Counsel provided for in this Section 2.5(j), (i) each reference in Section 2.5(h)(i) to "two (2) years" shall be deemed for all purposes hereof to be references to such changed period, (ii) each reference in Section 2.5(h)(ii) to "two (2) years" shall be deemed for all purposes hereof to be references to such changed period and (iii) all corresponding references in the Notes shall be deemed for all purposes hereof to be references to such changed period, provided that such changes shall not become effective if they are otherwise prohibited by, or would otherwise cause a violation of, the then-applicable federal securities laws.  As soon as practicable after the Company has knowledge of the effectiveness of any such amendment to change the two-year period under Rule 144(k) (or the corresponding period under any successor rule), unless such changes would otherwise be prohibited by, or would otherwise cause a violation of, the then-applicable securities law, the Company shall provide to the Trustee an Officer's Certificate and Opinion of Counsel informing the Trustee of the effectiveness of such amendment and the effectiveness of the foregoing changes to Sections 2.5(h)(i) and 2.5(h)(ii) and the Notes.  The provisions of this Section 2.5(j) will not be effective until such time as the Opinion of Counsel and Officer's Certificate have been received by the Trustee hereunder.  This Section 2.5(j) shall apply to successive amendments to Rule 144(k) (or any successor rule) changing the holding period thereunder.

(k)     Limitation on Trustee's Duties.  The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(l)     Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.8.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

Section 2.6.     Mutilated, Destroyed, Lost or Stolen Notes

In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon its request the Trustee or an authenticating agent appointed by the Trustee shall authenticate and deliver, a new Note, bearing a number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen.  In every case the applicant for a substituted Note shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company, to the Trustee and, if applicable, to such authenticating agent evidence to their reasonable satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee or such authenticating agent may authenticate any such substituted Note and deliver the same upon the receipt of such security or indemnity as the Trustee, the Company and, if applicable, such authenticating agent may reasonably require.  Upon the issuance of any substituted Note, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.  Once any substitute Note has been issued pursuant to this Section 2.6, the original Note being replaced by such substitute Note shall automatically be deemed canceled.  In case any Note which has matured or is about to mature or has been called for redemption or is about to be converted into Common Stock shall become mutilated or be destroyed, lost or stolen,

the Company may, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as will be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in case of destruction, loss or theft, evidence reasonably satisfactory to the Company, the Trustee and, if applicable, any paying agent or conversion agent of the destruction, loss or theft of such Note and of the ownership thereof.

Every substitute Note issued pursuant to the provisions of this Section 2.6 by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder. To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement or payment or conversion of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement or payment or conversion of negotiable instruments or other securities without their surrender.

Section 2.7.    Temporary Notes

Pending the preparation of definitive Notes, the Company may execute and the Trustee or an authenticating agent appointed by the Trustee shall, upon written request of the Company, authenticate and deliver temporary Notes (printed or lithographed). Temporary Notes shall be issuable in any authorized denomination, and substantially in the form of the Global Notes or the Definitive Notes, as the case may be, but with such omissions, insertions and variations as may be appropriate for temporary Notes, all as may be determined by the Company. Every such temporary Note shall be executed by the Company and authenticated by the Trustee or such authenticating agent upon the same conditions and in substantially the same manner, and with the same effect, as the Definitive Notes or Global Notes. Without unreasonable delay the Company will execute and deliver to the Trustee or such authenticating agent Definitive Notes and Global Notes and thereupon any or all temporary Notes may be surrendered in exchange for the applicable replacement Note, at each office or agency maintained by the Company pursuant to Section 5.2 and the Trustee or such authenticating agent shall authenticate and deliver in exchange for such temporary Notes an equal aggregate principal amount of Definitive Notes or Global Notes, as the case may be. Such exchange shall be made by the Company at its own expense and without any charge therefor. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and subject to the same limitations under this Indenture as Definitive Notes or Global Notes, as the case may be, authenticated and delivered hereunder.

Section 2.8.    Cancellation of Notes Paid, Etc.

All Notes surrendered for the purpose of payment, redemption, repurchase, conversion, exchange or registration of transfer, shall, if surrendered to the Company or any paying agent or

any Note Registrar or any conversion agent, be surrendered to the Trustee and promptly canceled by it, or, if surrendered to the Trustee, shall be promptly canceled by it, and no Notes shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Indenture. Upon written instructions of the Company, the Trustee shall dispose of canceled Notes in accordance with its customary procedures. If the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the indebtedness represented by such Notes unless and until the same are delivered to the Trustee for cancellation.

Section 2.9. CUSIP Numbers

The Company in issuing the Notes shall use "CUSIP" numbers and the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers. The Company will promptly notify the Trustee of any change in the "CUSIP" numbers.

ARTICLE III.

OPTIONAL REDEMPTION OF NOTES SECTION

Section 3.1. Redemption Price

The Notes will be redeemable for cash, if and only if the Common Sock of the Company has a Closing Price of at least 150% of the Conversion Price for 30 consecutive Trading Days ending on the Trading Day prior to delivery of notice of redemption to the Trustee at the option of the Company, in whole or in part, on or after December __, 2007 upon not less than 30 nor more than 60 days' written notice at the redemption prices (expressed as percentages of principal amount at maturity) set forth below, plus accrued and unpaid interest thereon, if any, to the applicable redemption date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
|---|---|
| 2007 | 107.000% |
| 2008 | 106.000% |
| 2009 | 105.000% |
| 2010 | 104.000% |
| 2011 and thereafter | 103.000% |

Notwithstanding the foregoing, to the extent that the Shelf Registration Statement is required by the terms of the Registration Rights Agreement to remain effective as of the date that notice of redemption is provided in accordance with Section 3.2, no such redemption shall be permitted unless the Shelf Registration Statement is effective and available during the 30 day period prior to the giving of such notice and at all times from the date of such notice until the redemption date.

Section 3.2.    Notice of Redemption; Selection of Notes

In case the Company shall desire to exercise the right to redeem all or, as the case may be, any part of the Notes pursuant to Section 3.1, it shall fix a date for redemption, and it, or at its request (which must be received by the Trustee at least ten (10) Business Days prior to the date the Trustee is requested to give notice as described below unless a shorter period is agreed to by the Trustee), the Trustee in the name of and at the expense of the Company, shall mail or cause to be mailed a notice of such redemption at least thirty (30) and not more than sixty (60) days prior to the date fixed for redemption to the holders of Notes so to be redeemed as a whole or in part at their last addresses as the same appear on the Note Register (provided that if the Company shall give such notice, it shall also give such notice, and notice of the aggregate amount of Notes to be redeemed, to the Trustee).  Such notice shall be irrevocable.  Notice shall be mailed by first class mail.  The notice if mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the holder receives such notice.  In any case, failure to give such notice by mail or any defect in the notice to the holder of any Note designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Note.

Each such notice of redemption shall specify the aggregate principal amount of Notes to be redeemed, the "CUSIP" number or numbers of such Notes, the date fixed for redemption, the redemption price at which Notes are to be redeemed, the place or places of payment, that payment will be made upon presentation and surrender of such Notes, that interest accrued to, but excluding, the date fixed for redemption will be paid as specified in said notice, and that on and after said date interest thereon or on the portion thereof to be redeemed will cease to accrue.  Such notice shall also state the current Conversion Price and the date on which the right to convert such Notes or portions thereof into Common Stock will expire, which shall be the close of business on the redemption date.  If fewer than all the Notes are to be redeemed, the notice of redemption shall identify the Notes to be redeemed.  In case any Note is to be redeemed in part only, the notice of redemption shall state the portion of the principal amount thereof to be redeemed and shall state that on and after the date fixed for redemption, upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion thereof will be issued.

On or prior to the redemption date specified in the notice of redemption given as provided in this Section, the Company will deposit with the Trustee or with one or more paying agents (or, if the Company is acting as its own paying agent, set aside, segregate and hold in trust as provided in Section 5.3) an amount of money sufficient to redeem on the redemption date all the Notes (or portions thereof) so called for redemption (other than those theretofore surrendered for conversion into Common Stock) at the appropriate redemption price, together with accrued interest to, but excluding, the date fixed for redemption; provided that if such payment is made on the redemption date it must be received by the Trustee or paying agent, as the case may be, by 1:00 p.m.  New York City time, on such date.  If any Note called for redemption is converted pursuant hereto, any money deposited with the Trustee or any paying agent or so segregated and held in trust for the redemption of such Note shall be paid to the Company upon its request, or, if then held by the Company shall be discharged from such trust.

If fewer than all the Notes are to be redeemed, the Company will give the Trustee written notice in the form of an Officer's Certificate not fewer than forty-five (45) days (or such shorter period of time as may be acceptable to the Trustee) prior to the redemption date as to the aggregate principal amount of Notes to be redeemed, and the Company, or at its request, the Trustee in the name of and at the expense of the Company, shall give the holders at least thirty (30) days' notice in advance of the date fixed for redemption as to the aggregate principal amount of Notes to be redeemed. If fewer than all the Notes are to be redeemed, the Trustee shall select the Notes or portions thereof to be redeemed (in principal amounts of One Thousand United States Dollars ($1,000) or integral multiples thereof), on a pro rata basis or by lot. If any Note selected for partial redemption is converted in part after such selection, the converted portion of such Note shall be deemed (so far as is possible) to be the portion to be selected for redemption. The Notes (or portions thereof) so selected shall be deemed duly selected for redemption for all purposes hereof, notwithstanding that any such Note is converted as a whole or in part before the mailing of the notice of redemption.

Upon any redemption of less than all Notes, the Company and the Trustee may (but need not) treat as outstanding any Notes surrendered for conversion during the period of fifteen (15) days next preceding the mailing of a notice of redemption and may (but need not) treat as not outstanding any Note authenticated and delivered during such period in exchange for the unconverted portion of any Note converted in part during such period.

Section 3.3. Payment of Notes Called for Redemption

If notice of redemption has been given as above provided, the Notes or portion of Notes with respect to which such notice has been given shall, unless converted into Common Stock pursuant to the terms hereof, become due and payable on the date and at the place or places stated in such notice at the applicable redemption price, and interest accrued to, but excluding, the date fixed for redemption, and on and after said date (unless the Company shall default in the payment of such Notes at the redemption price and interest accrued to, but excluding, said date) interest on the Notes or portion of Notes so called for redemption shall cease to accrue and such Notes shall cease at the close of business on the date fixed for redemption to be convertible into Common Stock and, except as provided in Sections 8.5 and 13.4, to be entitled to any benefit or security under this Indenture, and the holders thereof shall have no right in respect of such Notes except the right to receive the redemption price thereof and unpaid interest to, but excluding, the date fixed for redemption. On presentation and surrender of such Notes at a place of payment specified in said notice, the said Notes or the specified portions thereof to be redeemed shall be paid and redeemed by the Company at the applicable redemption price and interest accrued thereon to, but excluding, the date fixed for redemption; provided that, if the applicable redemption date is an Interest Payment Date, the semi-annual payment of interest becoming due on such date shall be payable to the holders of such Notes registered as such on the relevant record date subject to the terms and provisions of Section 2.3.

Upon presentation of any Note redeemed in part only, the Company shall execute and the Trustee shall authenticate and deliver to the holder thereof, at the expense of the Company, a new Note or Notes, of authorized denominations, in principal amount equal to the unredeemed portion of the Notes so presented.

Notwithstanding the foregoing, the Trustee shall not redeem any Notes or mail any notice of optional redemption during the continuance of a default in payment of interest or premium on the Notes or of any Event of Default of which, in the case of any Event of Default other than under Section 7.1(a), a Responsible Officer of the Trustee has actual knowledge. If any Note called for redemption shall not be so paid upon surrender thereof for redemption, the principal and premium, if any, shall, until paid or duly provided for, bear interest from the date fixed for redemption at the rate borne by the Note and such Note shall remain convertible into Common Stock until the principal and premium, if any, shall have been paid or duly provided for.

Section 3.4.    Conversion Arrangement on Call for Redemption

In connection with any redemption of Notes, the Company may arrange for the purchase and conversion of any Notes not converted prior to the expiration of such conversion right by an agreement with one or more investment bankers or other purchasers to purchase such Notes by paying to the Trustee in trust for the Noteholders, on or before the date fixed for redemption, an amount not less than the applicable redemption price and interest accrued to the date fixed for redemption, of such Notes. Notwithstanding anything to the contrary contained in this Article III, the obligation of the Company to pay the redemption price of such Notes and interest accrued to, but excluding, the date fixed for redemption, shall be deemed to be satisfied and discharged to the extent such amount is so paid by such purchasers to such Noteholders. If such an agreement is entered into, a copy of which, certified as true and correct by the Secretary or Assistant Secretary of the Company will be filed with the Trustee prior to the date fixed for redemption, any Notes not duly surrendered for conversion by the holders thereof may, at the option of the Company, be deemed, to the fullest extent permitted by law, acquired by such purchasers from such holders and (notwithstanding anything to the contrary contained in Article XV) surrendered by such purchasers for conversion, all as of immediately prior to the close of business on the date fixed for redemption (and the right to convert any such Notes shall be deemed to have been extended through such time), subject to payment of the above amount as aforesaid. At the written direction of the Company, the Trustee shall hold and dispose of any such amount paid to it in the same manner as it would monies deposited with it by the Company for the redemption of Notes. Without the Trustee's prior written consent, no arrangement between the Company and such purchasers for the purchase and conversion of any Notes shall increase or otherwise affect any of the powers, duties, responsibilities or obligations of the Trustee as set forth in this Indenture, and the Company agrees to indemnify the Trustee from, and hold it harmless against, any loss, liability or expense arising out of or in connection with any such arrangement for the purchase and conversion of any Notes between the Company and such purchasers, including the costs and expenses incurred by the Trustee in the defense of any claim or liability arising out of or in connection with the exercise or performance of any of its powers, duties, responsibilities or obligations under this Indenture.

# ARTICLE IV.

## COLLATERAL AND SECURITY DOCUMENTS AND GUARANTEES; AGREEMENTS IN INTERCREDITOR AGREEMENT

Section 4.1.　　Collateral and Security Documents and Guarantee Agreement; Agreements in Intercreditor Agreement

In order to secure the due and punctual payment of the Notes and the other Obligations, (i) the Guarantors have entered into the Guarantee Agreement and (ii) the Company and the Guarantors have entered into the Security Agreement and the other Security Documents to create the Junior Liens on the Collateral in accordance with the terms thereof.  Pursuant to the provisions of the Security Agreement, the other Security Documents and this Indenture, the rights and remedies of the Trustee and the Holders of the Notes in the Collateral shall be subordinate and subject to the rights and remedies of the holders of the Senior Liens in accordance with the terms of the Security Agreement and the other Security Documents.  The rights of the Trustee and the Holders of the Notes under the Notes and under the Guarantees are not subordinated except to the extent specifically provided in the Intercreditor Agreement [with respect to [specify applicable provisions in Intercreditor Agreement relating to deemed collateral] and, in the case of the Guarantee provided by [**the holding company for Megacable**] as provided in its Guarantee..

(a)　　Each Holder of a Note, by accepting such Note, agrees to all the terms and provisions of the Guarantee Agreement, the Intercreditor Agreement, the Security Agreement and the other Security Documents.

(b)　　The Collateral Agent is hereby authorized and directed to enter into the Guarantee Agreement, the Intercreditor Agreement and the Security Documents, and to execute such agreements as attorney-in-fact on behalf of the holders, and take any and all actions required or permitted by the terms hereof and thereof.

Section 4.2.　　Application of Proceeds of Collateral and Guarantee Payments.

Upon any realization upon the Collateral by the Collateral Agent or receipt of any payments under the Guarantee Agreement, the proceeds thereof shall be applied in accordance with the terms of the Security Documents or the Guarantee Agreement, as applicable,  and the terms hereof.

Section 4.3.　　Possession, Use and Release of Collateral.

(a)　　Unless an Event of Default shall have occurred and be continuing, subject to the terms of the Security Documents, the Company and the Guarantors will have the right to remain in possession and retain exclusive control of the Collateral securing the Notes (other than any cash, securities, obligations and cash equivalents constituting part of the Collateral and deposited with the Collateral Agent in accordance with the provisions of the Security Documents and other than as set forth in the Security Documents), to freely operate the Collateral and to collect, invest and dispose of any income thereon subject to the terms and provisions of this Indenture.

PDFfile.doc

(b)     Each holder, by accepting such Note, agrees that Collateral securing the Notes shall be automatically released to the extent and under the circumstances set forth in Section 5.1(a) of the Intercreditor Agreement.

(c)     Notwithstanding the provisions set forth in this Section 4.3, the Company and its Subsidiaries may, without any release or consent by the Collateral Agent or the Trustee, perform a number of activities in the ordinary course in respect of the Collateral to the extent permitted pursuant to the Security Documents and this Indenture.

Section 4.4.     Opinion of Counsel

So long as the Security Documents have not been terminated in accordance with the terms thereof, the Company shall deliver to the Trustee, so long as such delivery is required by Section 314(b) of the TIA, on the Closing Date and thereafter, at least annually, within 30 days of June 1 of each year (commencing with June 1, 2005), an Opinion of Counsel either stating that in the opinion of such counsel, such action has been taken with respect to the recording, filing, rerecording and refiling of this Indenture or any Security Document as is necessary to maintain the Security Interests, and reciting the details of such action, or stating that in the opinion of such counsel, no such action is necessary to maintain such Security Interests.

Section 4.5.     Further Assurances

Upon the reasonable request of the Collateral Agent, the Company and the Guarantors shall, each at its own expense, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments and take such further steps relating to the Collateral and other property or rights covered by the Security Interests, as are reasonably necessary to perfect, preserve or protect the Collateral Agent's Security Interest in the Collateral.

Section 4.6.     Trust Indenture Act Requirements

The release of any Collateral from the Junior Lien of any of the Security Documents or the release of, in whole or in part, the Junior Liens created by any of the Security Documents, will not be deemed to impair the Security Interests in contravention of the provisions hereof if and to the extent the Collateral or Junior Liens are released pursuant to the applicable Security Documents and pursuant to the terms hereof.  Each holder of the Notes acknowledges that a release of Collateral or Liens strictly in accordance with the terms of the Security Documents and the terms hereof will not be deemed for any purpose to be an impairment of the Security Documents or otherwise contrary to the terms of this Indenture.  So long as any First-Lien Obligations are outstanding, the Company and the Guarantor shall comply with TIA Section 314(d) relating to the release of property or securities from the Junior Lien hereof but only to the extent required by the TIA; provided that, to the extent permitted by applicable law, any failure by the Company or any Guarantor shall not affect or impair the validity of any release made in accordance with the Intercreditor Agreement.

Section 4.7.    Suits to Protect Collateral

The Trustee shall have the authority to direct the Collateral Agent to institute and to maintain such suits and proceedings as the Trustee may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of any of the Security Documents or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the holders of the Notes in the Collateral (including suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the Security Interests or be prejudicial to the interests of the holders of the Notes).

Section 4.8.    Purchaser Protected

In no event shall any purchaser in good faith or other transferee of any property purported to be released hereunder be bound to ascertain the authority of the Trustee to direct the Collateral Agent to execute the release or to inquire as to the satisfaction of any conditions required by the provisions hereof for the exercise of such authority or to see to the application of any consideration given by such purchaser or other transferee; nor shall any purchaser or other transferee of any property or rights permitted to be sold by this Article IV, be under obligation to ascertain or inquire into the authority of the Company or the Guarantors, as applicable, to make any such sale or other transfer.

Section 4.9.    Powers Exercisable by Receiver or Trustee

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article IV, upon the Company or the Guarantors, as applicable, with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Company or the Guarantors, as applicable, or of any officer or officers thereof required by the provisions of this Article IV.

Section 4.10.    Release upon Termination of Company's Obligations

In the event that the Company delivers an Officers' Certificate and Opinion of Counsel certifying that (a) its obligations under this Indenture have been satisfied and discharged by complying with the provisions of Article XIII [or the applicable provisions of Article XIII], the Trustee shall, or shall cause the Collateral Agent to, (i) execute, deliver and authorize such releases, termination statements and other instruments (in recordable form, where appropriate) as the Company or the Guarantors, as applicable, may reasonably request to evidence the termination of the Security Interests created by the Security Documents and (ii) not be deemed to hold the Security Interests for its benefit and the benefit of the holders of the Notes.

Section 4.11.    Limitation on Duty of Trustee in Respect of Collateral

(a)    Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty under this Indenture as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to

preservation of rights against prior parties or any other rights pertaining thereto and the Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(b)      The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Company to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture or the Security Documents by the Company or the Collateral Agent.

Section 4.12.   Authorization of Trustee

The Trustee is hereby authorized to enter into, or cause any co-collateral agent to enter into, any Security Document or any other document necessary or appropriate in connection with any such Security Document. The Trustee shall have no duty to act outside of the United States in respect of any Collateral located in any jurisdiction other than the United States ("Foreign Collateral") but shall to the extent required to create Liens on the Foreign Collateral, or on part thereof, for the benefit of the holders and at the specific request of the Company, appoint for and on behalf of the holders one of more co-collateral agents to act on behalf of the holders with respect to such Foreign Collateral.

Section 4.13.   Intercreditor Agreement Controls

Notwithstanding anything herein to the contrary, (x) the Lien and security interest granted to the Trustee pursuant to this Indenture and the exercise of any right or remedy by the Trustee hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Indenture, the terms of the Intercreditor Agreement will govern and (y) the Noteholders are subject to the agreements made by the Trustee on their behalf in the Intercreditor Agreement but no such agreement shall obligate any Noteholder to purchase additional Notes.

## ARTICLE V.

### COVENANTS

Section 5.1.     Payment of Principal, Premium and Interest.

The Company shall duly and punctually pay the principal of, premium, if any, and interest on the Notes and Liquidated Damages in accordance with the terms of the Notes and this Indenture.

Section 5.2.     Maintenance of Office or Agency.

The Company shall maintain in the Borough of Manhattan in The City of New York, State of New York, an office or agency (the "Paying Agent") where Notes may be presented or surrendered for payment, where Notes may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The office of the Trustee at its Corporate Trust Office will be such office or agency of the Company, unless the Company shall designate and maintain some other office or agency for one or more of such purposes.  The Company will give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

The Company may also from time to time designate one or more other offices or agencies (in or outside of The City of New York, State of New York) where the Notes may be presented or surrendered for any or all such purposes, and may from time to time rescind such designation; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in The City of New York, State of New York for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such other office or agency.

The Company may have one or more co-registrars and one or more additional Paying Agents.  The term "Paying Agent" includes any additional paying agent.  The Company may act as its own Paying Agent, except for the purposes of payments on account of principal on the Notes pursuant to Sections 5.10 and 5.15.

The Company shall enter into an appropriate agency agreement with any Paying Agent not a party to this Indenture, which shall incorporate the provisions of the Trust Indenture Act.  The agreement shall implement the provisions of this Indenture that relate to such Paying Agent.  The Company shall notify the Trustee of the name and address of any such Paying Agent.  If the Company fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such and shall be entitled to appropriate compensation in accordance with Section 8.6.

The Company initially appoints the Trustee as the registrar and Paying Agent and agent for service of notices and demands in connection with the Notes.

Section 5.3.    Money for Note Payments To Be Held in Trust.

If the Company shall at any time act as its own Paying Agent, it will, on or before each due date of the principal of, premium, if any, or interest on any of the Notes, segregate and hold in trust for the benefit of the Holders entitled thereto a sum sufficient to pay the principal, premium, if any, or interest so becoming due until such sums shall be paid to such persons or otherwise disposed of as herein provided, and will promptly notify the Trustee of its action or failure so to act.

If the Company is not acting as Paying Agent, the Company will, on or before each due date of the principal of, premium, if any, or interest on, any Notes, deposit with a Paying Agent a sum in same day funds sufficient to pay the principal, premium, if any, or interest so becoming due, such sum to be held in trust for the benefit of the Holders entitled to such principal, premium or interest, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of such action or any failure so to act.

If the Company is not acting as Paying Agent, the Company will cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent will agree with the Trustee, subject to the provisions of this Section 5.3, that such Paying Agent will:

(a)    hold all sums held by it for the payment of the principal of, premium, if any, or interest on Notes in trust for the benefit of the Holders entitled thereto until such sums shall be paid to such Holders or otherwise disposed of as herein provided;

(b)    give the Trustee notice of any Default by the Company (or any other obligor upon the Notes) in the making of any payment of principal of, premium, if any, or interest on the Notes;

(c)    at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent; and

(d)    acknowledge, accept and agree to comply in all aspects with the provisions of this Indenture relating to the duties, rights and liabilities of such Paying Agent.

The Company may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent will be released from all further liability with respect to such money.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company upon receipt of a Company Request therefor, or (if then held by the Company) will be discharged from such trust; and the Holder of such Note will thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, at the option of the Company in the The New York Times or The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which shall be not less than 30 days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Company.

Section 5.4.    Corporate Existence.

Subject to Article XII, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect the corporate existence, rights (charter and statutory), licenses and franchises of the Company and each of the Restricted Subsidiaries; provided, however, that the Company will not be required to preserve the existence (in the case of any Restricted Subsidiary) or any such right, license or franchise (in the case of the Company or any Restricted Subsidiary) if the Board shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and the Restricted Subsidiaries as a whole or the loss thereof would not be reasonably likely to result in a Material Adverse Effect; provided, further, that the foregoing will not prohibit a sale, transfer or conveyance of a Subsidiary of the Company or any of its assets in compliance with the terms of this Indenture.

Section 5.5.    Payment of Taxes and Other Claims.

The Company shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material taxes, assessments and governmental charges levied or imposed (i) upon the Company or any of its Restricted Subsidiaries or (ii) upon the income, profits or property of the Company or any of the Restricted Subsidiaries and (b) all material lawful claims for labor, materials and supplies, which, if unpaid, could reasonably be expected to become a Lien upon the property of the Company or any of the Restricted Subsidiaries; provided, however, that the Company will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim (x) whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted or (y) if the failure to so pay, discharge or cause to be paid or discharged would not reasonably be expected to have a Material Adverse Effect.

Section 5.6.    Maintenance of Properties.

The Company will, and will cause each of its Restricted Subsidiaries to, keep all property necessary to the business of the Company and its Restricted Subsidiaries taken as a whole in good working order and condition, ordinary wear and tear excepted; provided that the

foregoing covenant shall not be violated by reason of any failures which, individually and in the aggregate would not be reasonably likely to have a Material Adverse Effect.

Section 5.7.    Insurance.

(a)    The Company will, and will cause each of its Restricted Subsidiaries to, maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Company and its Restricted Subsidiaries, and furnish to the Trustee, upon its request therefor, full information as to the insurance carried.  The provisions of this Section 5.7 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)    From and after the date of the Discharge of First-Lien Obligations, the Company will, and will cause each of its Restricted Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Company and/or such Restricted Subsidiaries) (i) shall be endorsed to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 30 days' prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors, and (iv) shall be deposited with the Collateral Agent.

(c)    From and after the date of the Discharge of First-Lien Obligations, if the Company or any of its Restricted Subsidiaries shall fail to maintain insurance in accordance with this Section 5.7, or if the Company or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Trustee shall have the right (but shall be under no obligation) to procure such insurance and the Company agrees to reimburse the Trustee for all reasonable costs and expenses of procuring such insurance.

(d)    The rights under this Section 5.7 are subject to the provisions of the Intercreditor Agreement (including, without limitation, Section 5.2 thereof).

Section 5.8.    Books and Records.

The Company shall keep proper books of record and account, in which full and correct entries will be made of all material financial transactions and the assets and business of the Company and each Restricted Subsidiary of the Company in material compliance with GAAP.

Section 5.9.    Provision of Financial Statements.

The Company shall file with the SEC (so long as the SEC will accept any such filings), the Trustee and the Holders the annual reports, quarterly reports and other documents required to be filed with the SEC pursuant to Sections 13 and 15 of the Exchange Act, whether or not the Company has a class of securities registered under the Exchange Act.  The Company will also

comply with the other provisions of Section 314(a) of the Trust Indenture Act. Notwithstanding the foregoing, the Company need not file its Form 10-Q for the first fiscal quarter of 2005 until July 31, 2005 or for the second fiscal quarter of 2005 until October 31, 2005 and need not file its Form 10-K for 2004 until May 31, 2005 (such authorization to delayed filing being herein called the "Delayed Filing Authorization").

Section 5.10.   Change of Control.

Upon the occurrence of a Change of Control (the date of such occurrence being the "Change of Control Date"), the Company shall make an offer to purchase (the "Change of Control Offer"), on a business day (the "Change of Control Payment Date") not later than 60 days following the Change of Control Date, all Notes then outstanding at a purchase price equal to 101% (or, in the case of a Special Change of Control which occurs on or prior to June __, 2007, 107%) of the principal amount thereof on any Change of Control Payment Date, plus accrued and unpaid interest, if any, to any Change of Control Payment Date.  Notice of a Change of Control Offer shall be given to Holders and the Trustee not less than 25 days nor more than 45 days before the Change of Control Payment Date.  The Change of Control Offer is required to remain open for at least 20 business days and until the close of business on the Change of Control Payment Date.  Failure to mail the notice of a Change of Control Offer on the date specified below or to have satisfied the foregoing condition precedent by the date that such notice is required to be mailed will constitute a Default under Section 7.1(c).

Notice of a Change of Control Offer shall be mailed by the Company not more than 20 Business Days after the Change of Control Date to the Holders of Notes at their last registered addresses with a copy to the Trustee and the Paying Agent.  The Change of Control Offer shall remain open from the time of mailing for at least 20 Business Days and until 5:00 p.m., New York City time, on the Change of Control Payment Date.  The notice, which shall govern the terms of the Change of Control Offer, shall include such disclosures as are required by law and shall state:

(a)   that the Change of Control Offer is being made pursuant to this Section 5.10 and that all Notes tendered into the Change of Control Offer will be accepted for payment;

(b)   the purchase price (including the amount of accrued interest, if any) for each Note, the Change of Control Payment Date and the date on which the Change of Control Offer expires;

(c)   that any Note not tendered for payment will continue to accrue interest and Liquidated Damages  in accordance with the terms thereof and continue to be convertible;

(d)   that, unless the Company shall default in the payment of the purchase price, any Note accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest and Liquidated Damages after the Change of Control Payment Date;

(e)   that Holders electing to have Notes purchased pursuant to a Change of Control Offer will be required to surrender their Notes to the Paying Agent at the address

specified in the notice prior to 5:00 p.m., New York City time, on the Change of Control Payment Date and must complete any form letter of transmittal proposed by the Company and acceptable to the Trustee and the Paying Agent;

(f) that Holders of Notes will be entitled to withdraw their election if the Paying Agent receives, not later than 5:00 p.m., New York City time, on the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holders, the principal amount of Notes the Holders delivered for purchase, the Note certificate number (if any) and a statement that such Holder is withdrawing his election to have such Notes purchased;

(g) that Holders whose Notes are purchased only in part will be issued Notes of like tenor equal in principal amount to the unpurchased portion of the Notes surrendered;

(h) the instructions that Holders must follow in order to tender their Notes; and

(i) information concerning the business of the Company, the most recent annual and quarterly reports of the Company filed with the SEC pursuant to the Exchange Act (or, if the Company is not required to file any such reports with the SEC, the comparable reports prepared pursuant to Section 5.23), a description of material developments in the Company's business, information with respect to pro forma historical financial information after giving effect to such Change of Control and such other information concerning the circumstances and relevant facts regarding such Change of Control and Change of Control Offer as would, in the good faith judgment of the Company, be material to a Holder of Notes in connection with the decision of such Holder as to whether or not it should tender Notes pursuant to the Change of Control Offer.

On the Change of Control Payment Date, the Company will (i) accept for payment Notes or portions thereof tendered pursuant to the Change of Control Offer, (ii) deposit with the Paying Agent money, in immediately available funds, sufficient to pay the purchase price of all Notes or portions thereof so tendered and accepted and (iii) deliver to the Trustee the Notes so accepted together with an Officers' Certificate setting forth the Notes or portions thereof tendered to and accepted for payment by the Company. The Paying Agent will promptly mail or deliver to the Holders of Notes so accepted payment in an amount equal to the purchase price, and the Trustee shall promptly authenticate and mail or deliver to such Holders a new Note of like tenor equal in principal amount to any unpurchased portion of the Note surrendered. Any Notes not so accepted shall be promptly mailed or delivered by the Company to the Holder thereof. The Company will publicly announce the results of the Change of Control Offer not later than the first Business Day following the Change of Control Payment Date. The Company shall not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements applicable to a Change of Control Offer made by the Company and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer.

If the Company is required to make a Change of Control Offer, the Company will comply with all applicable tender offer laws and regulations, including, to the extent applicable, Section 14(e) and Rule 14e-1 under the Exchange Act, and any other applicable securities laws and regulations. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 5.10, the Company will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 5.10 by virtue thereof.

Section 5.11. Limitation on Additional Indebtedness; Offer to Repurchase upon Incurrence of Indebtedness not Permitted

The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume, issue, guarantee or in any manner become directly or indirectly liable for or with respect to, contingently or otherwise, the payment of (collectively to "incur") any Indebtedness (including any Acquired Indebtedness), except for Permitted Indebtedness; provided, that the Company and any Restricted Subsidiary will be permitted to incur Indebtedness (including Acquired Indebtedness) if, immediately after giving pro forma effect to such incurrence (including the application of the net proceeds therefrom), the Consolidated Interest Coverage Ratio for the most recent four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred would be at least [_____ to 1.00] [determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been issued and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

For purposes of determining compliance with this Section 5.11, in the event that an item of Indebtedness meets the criteria of more than one of the types of Indebtedness permitted in the definition of Permitted Indebtedness permitted by this covenant, the Company in its sole discretion shall classify (and may reclassify) such item of Indebtedness and only be required to include the amount of such Indebtedness as one of such types. Acquired Indebtedness shall be deemed to have been incurred at the time of the acquisition (by merger or otherwise) of the Person or asset subject to such Acquired Indebtedness.

Section 5.12. Statement by Officers as to Default.

The Company will deliver to the Trustee, within 120 days after the end of each fiscal year of the Company ending after the date hereof, a written statement signed by the chairman or a chief executive officer, the principal financial officer or principal accounting officer of the Company, stating (i) that a review of the activities of the Company during the preceding fiscal year has been made under the supervision of the signing officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and (ii) that, to the knowledge of each officer signing such certificate, the Company has kept, observed, performed and fulfilled each and every covenant and condition contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions, conditions and covenants hereof (or, if a Default shall have occurred, describing all such Defaults of which such officers may have knowledge, their status and what action the Company is taking or proposes to take with respect thereto). When any Default under this

Indenture has occurred and is continuing, or if the Trustee or any Holder or the trustee for or the holder of any other evidence of Indebtedness of the Company or any Restricted Subsidiary gives any notice or takes any other action with respect to a claimed default (other than with respect to Indebtedness (other than Indebtedness evidenced by the Notes) in the principal amount of less than $5.0 million), the Company will promptly notify the Trustee of such Default, notice or action and will deliver to the Trustee by registered or certified mail or by telegram, or facsimile transmission followed by hard copy by registered or certified mail an Officers' Certificate specifying such event, notice or other action within five Business Days after the Company becomes aware of such occurrence and what action the Company is taking or proposes to take with respect thereto.

Section 5.13.   Limitation on Restricted Payments.

The Company shall not, and shall not permit any of the Restricted Subsidiaries to, make, directly or indirectly, any Restricted Payment unless:

(i)      no Default shall have occurred and be continuing at the time of or upon giving effect to such Restricted Payment;

(ii)      immediately after giving effect to such Restricted Payment, the Company would be able to incur $1.00 of Indebtedness (other than Permitted Indebtedness) under Section 5.11 hereof; and

(iii)      immediately after giving effect to such Restricted Payment, the aggregate amount of all Restricted Payments declared or made on or after the Issue Date and all Designation Amounts does not exceed an amount equal to the sum of, without duplication, (a) 50% of the cumulative Consolidated Net Income accrued on a cumulative basis during the period beginning on the first day of the first fiscal quarter commencing after the Issue Date (being January 1, 2005)  and ending on the last day of the fiscal quarter of the Company immediately preceding the date of such proposed Restricted Payment (or, if such cumulative Consolidated Net Income for such period is a deficit, minus 100% of such deficit), plus (b) the aggregate net cash proceeds received by the Company from the issue or sale (other than to a Restricted Subsidiary of the Company) of its Capital Stock (other than Disqualified Stock) after the Issue Date (including, without duplication, upon exercise of warrants, options or rights), plus (c) the aggregate net cash proceeds received by the Company from the issuance (other than to a Restricted Subsidiary of the Company) after the Issue Date of its Capital Stock (other than Disqualified Stock) upon the conversion of, or exchange for, Indebtedness of the Company or a Restricted Subsidiary, plus (d) in the case of the disposition or repayment of any Investment constituting a Restricted Payment (other than an Investment made pursuant to clause (d), (e) or (f) of the following paragraph) made after the Issue Date, an amount equal to the lesser of the return of capital with respect to such Investment and the cost of such Investment, in either case, less the cost of the disposition of such Investment to the extent such cost is in excess of any gain in respect of the disposition, plus (e) in the case of any Revocation of the Designation of a Subsidiary as an Unrestricted Subsidiary, an amount equal to the consolidated net Investment in such Subsidiary on the date of Revocation but not in an amount exceeding the net amount of any Investments

constituting Restricted Payments made (or deemed made) in such Subsidiary after the Issue Date. For purposes of the preceding clauses (b) and (c) and without duplication, the value of the aggregate net cash proceeds received by the Company upon the issuance of Capital Stock either upon the conversion of convertible Indebtedness or in exchange for outstanding Indebtedness or upon the exercise of options, warrants or rights will be the net cash proceeds received upon the issuance of such Indebtedness, options, warrants or rights plus the incremental amount received by the Company upon the conversion, exchange or exercise thereof.

For purposes of determining the amount expended for Restricted Payments, cash distributed shall be valued at the face amount thereof and property other than cash shall be valued at its Fair Market Value.

The provisions of this Section 5.13 shall not prohibit (each of which shall be given independent effect):

(a) the payment of any dividend or other distribution within 60 days after the date of declaration thereof, if at such date of declaration such payment would comply with the provisions of this Indenture;

(b) so long as no Default shall have occurred and be continuing, the purchase, redemption, retirement or other acquisition of any shares of Capital Stock of the Company (A) in exchange for or conversion into or (B) out of the net cash proceeds of the substantially concurrent issue and sale (other than to a Restricted Subsidiary) of shares of Capital Stock of the Company (other than Disqualified Stock); provided that any such net cash proceeds pursuant to the immediately preceding subclause (B) are excluded from clause (iii)(b) of the preceding paragraph;

(c) so long as no Default shall have occurred and be continuing, the purchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Indebtedness made by exchange for (including any such exchange pursuant to the exercise of a conversion right or privilege in which cash is paid in lieu of fractional shares or scrip), or out of the net cash proceeds of, a substantially concurrent issue or sale (other than to a Restricted Subsidiary) of (A) Capital Stock (other than Disqualified Stock) of the Company; provided that any such net cash proceeds, to the extent so used, are excluded from clause (iii)(b) of the preceding paragraph, and/or (B) other Subordinated Indebtedness, having an Average Life to Stated Maturity that is equal to or greater than the Average Life to Stated Maturity of the Subordinated Indebtedness being purchased, redeemed, defeased or otherwise acquired or retired;

(d) so long as no Special Default shall have occurred and be continuing, Investments constituting a Restricted Payment made by the Company or any Restricted Subsidiary in any person (including any Unrestricted Subsidiary) in an amount not to exceed [$____ million][Note: will be looser than basket in the DB Credit Agreement and will include a subbasket for Megacable if included in the DB Credit Agreement] in the aggregate at any time outstanding;

(e)    so long as no Default shall have occurred and be continuing, the making of a direct or indirect Investment constituting a Restricted Payment out of the proceeds of the issue or sale (other than to a Subsidiary) of Capital Stock (other than Disqualified Stock) of the Company; provided that any such net cash proceeds are excluded from clause (iii)(b) of the preceding paragraph; or

(f)  so long as no Default or Event of Default exists at the time of the respective Restricted Payment or would exist immediately after giving effect thereto, Restricted Payments by the Company consisting of a redemption or repurchase of Equity Interests of the Company from officers, employees and directors of the Company or its Subsidiaries (or their estates) after the death, disability, retirement or termination of employment or service as a director of any such Person, or otherwise in accordance with any stock option plan or any employee stock ownership plan that has been approved by the Board of Directors of the Company provided that the aggregate amount of Restricted Payments made by the Company pursuant to this clause (f), and the aggregate amount paid shall not (net of any proceeds received by the Company from issuances of its Equity Interests and contributed to the Company in connection with such redemption or repurchase) exceed either (x) during any fiscal year of the Company, [$1,500,000] or (y) for all periods after the Issue Date (taken as a single period), [$7,500,000].

Restricted Payments of the type set forth in the preceding clause (d) and (f) shall be included in making the determination of available amounts under clause (iii) of the preceding paragraph to the extent they are outstanding.

In no event shall a Restricted Payment made on the basis of consolidated financial statements prepared in good faith in accordance with GAAP be subject to rescission or constitute a Default by reason of any requisite subsequent restatement of such financial statements which would have made such Restricted Payment prohibited at the time that it was made.

Section 5.14.   Limitation on Transactions with Affiliates.

The Company shall not, and shall not permit, cause or suffer any Restricted Subsidiary to, conduct any business or enter into any transaction (or series of related transactions which are similar or part of a common plan) with or for the benefit of any of their respective Affiliates or any beneficial holder of 10% or more of the Common Stock of the Company or any officer or director of the Company (each, an "Affiliate Transaction"), unless the terms of the Affiliate Transaction are set forth in writing, and are fair and reasonable to the Company or such Restricted Subsidiary, as the case may be.  Each Affiliate Transaction involving aggregate payments or other Fair Market Value in excess of $5,000,000  be approved by a majority of the Disinterested Directors or by Board, such approval to be evidenced by a Board Resolution stating that the Board has determined that such transaction or transactions comply with the foregoing provisions provided that, in lieu of such approval by the Disinterested Directors, the Company may obtain a written opinion from an Independent Financial Advisor stating that the terms of such Affiliate Transaction to the Company or the Restricted Subsidiary, as the case may be, are fair from a financial point of view.  In addition to the foregoing, the Company shall obtain, with respect to each Affiliate Transaction involving aggregate consideration of $25,000,000 a written opinion from an Independent Financial Advisor stating that the terms of

such Affiliate Transaction to the Company or the Restricted Subsidiary, as the case may be, are fair from a financial point of view. For purposes of this covenant but without limiting the requirements of the two preceding sentences, when any Affiliate Transaction approved by a majority of the Disinterested Directors or as to which a written opinion has been obtained from an Independent Financial Advisor, on the basis set forth in the preceding sentences, such Affiliate Transaction shall be deemed to be on terms that are fair and reasonable to the Company and the Restricted Subsidiaries, as the case may be, and therefore shall be permitted under this covenant.

Notwithstanding the foregoing, the restrictions set forth in this covenant shall not apply to (i) transactions with or among, or solely for the benefit of, the Company and/or any of the Restricted Subsidiaries, (ii) transactions pursuant to agreements and arrangements existing on the Issue Date, (iii) transactions under the First-Lien Credit Documents (as defined in the Intercreditor Agreement), the Note Purchase Agreement and the Registration Rights Agreement and other Transaction Documents, (iv) dividends paid by the Company pursuant to and in compliance with this Section 5.14, (v) customary directors' fees, indemnification and similar arrangements, consulting fees, employee salaries bonuses, employment agreements and arrangements, compensation or employee benefit arrangements or legal fees, (vi) grants of customary registration rights with respect to securities of the Company, (vii) Restricted Payments permitted under Section 5.13 provided that any Investments and purchases constituting Restricted Payments must be fair and reasonable to the Company or such Restricted Subsidiary, as the case may be.

Section 5.15. Disposition of Proceeds of Asset Sales.

The Company shall not, and shall not permit any Restricted Subsidiary to, make any Asset Sale unless (a) the Company or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the shares or assets sold or otherwise disposed of and (b) at least 75% of such consideration consists of cash or Cash Equivalents; provided that the amount of any liabilities (other than Subordinated Indebtedness or Indebtedness of a Restricted Subsidiary that would not constitute Restricted Subsidiary Indebtedness) that are assumed by the transferee of any such assets pursuant to an agreement that unconditionally releases the Company or such Restricted Subsidiary, as the case may be, from further liability shall be treated as cash for purposes of this Section 5.15. The Company or the applicable Restricted Subsidiary, as the case may be, may (i) apply the Net Cash Proceeds from any such Asset Sale by the Company or a Restricted Subsidiary within 365 days of the receipt thereof (x) to repay an amount of Indebtedness (other than Subordinated Indebtedness and First-Lien Obligations) of the Company in an amount not exceeding the Other Senior Debt Pro Rata Share and elect to permanently reduce the amount of the commitments thereunder by the amount of the Indebtedness so repaid or (y) to repay First-Lien Obligations, (ii) apply the Net Cash Proceeds from such Asset Sale by the Company or a Restricted Subsidiary to repay any Restricted Subsidiary Indebtedness and elect to permanently reduce the commitments thereunder by the amount of the Indebtedness so repaid or (iii) apply the Net Cash Proceeds from any Asset Sale by the Company or a Restricted Subsidiary within 365 days thereof, to an investment in properties and assets that will be used in a Permitted Business (or in Capital Stock and other securities of any person that will become a Restricted Subsidiary as a result of such investment to the extent such person owns properties and assets that will be used in

a Permitted Business) of the Company or any Restricted Subsidiary ("Replacement Assets"). Any Net Cash Proceeds from any Asset Sale that are neither used as described in clause (i)(x) of the preceding sentence or to repay, and permanently reduce the commitments under, any Restricted Subsidiary Indebtedness as set forth in clause (ii) of the preceding sentence or invested in Replacement Assets within the 365-day period as set forth in clause (iii) shall constitute "Excess Proceeds." Any Excess Proceeds not used as set forth in clause (i)(y) of the second preceding sentence shall constitute "Offer Excess Proceeds" subject to disposition as provided below.

When the aggregate amount of Offer Excess Proceeds equals or exceeds $10.0 million, the Company shall make an offer to purchase (an "Asset Sale Offer"), from all Holders issued under this Indenture, that aggregate principal amount of Notes as can be purchased by application of such Offer Excess Proceeds at a price in cash equal to 100% of the principal amount thereof plus, in each case, accrued and unpaid interest, if any, to the purchase date. Each Asset Sale Offer shall remain open for a period of 20 business days or such longer period as may be required by law. To the extent that the aggregate purchase price for the applicable issue of Notes tendered pursuant to an Asset Sale Offer is less than the Offer Excess Proceeds, the Company or any Restricted Subsidiary may use such deficiency for general corporate purposes. If the aggregate purchase price for the Notes validly tendered and not withdrawn by holders thereof exceeds the amount of Notes which can be purchased with the Offer Excess Proceeds, Notes to be purchased will be selected on a pro rata basis. Upon completion of such Asset Sale Offer, the amount of Offer Excess Proceeds shall be reset to zero.

Notwithstanding the two immediately preceding paragraphs, the Company and the Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such paragraphs to the extent (i) at least 75% of the consideration of such Asset Sale constitutes Replacement Assets, cash or Cash Equivalents (including obligations deemed to be cash under this covenant) and (ii) such Asset Sale is for Fair Market Value; provided that any consideration constituting (or deemed to constitute) cash or Cash Equivalents received by the Company or any of the Restricted Subsidiaries in connection with any Asset Sale permitted to be consummated under this paragraph shall constitute Net Cash Proceeds subject to the provisions of the two preceding paragraphs.

Notice of an Asset Sale Offer shall be mailed by the Company not more than 20 Business Days after the obligation to make such Asset Sale Offer arises to the Holders of Notes at their last registered addresses with a copy to the Trustee and the Paying Agent. The Asset Sale Offer shall remain open from the time of mailing for at least 20 Business Days and until 5:00 p.m., New York City time, on the date fixed for Purchase of Notes validly tendered and not withdrawn, which date shall be not later than the 30th Business Day following the mailing of such Asset Sale Offer (the "Asset Sale Offer Purchase Date"). The notice, which shall govern the terms of the Asset Sale Offer, shall include such disclosures as are required by law and shall state:

(a) that the Asset Sale Offer is being made pursuant to this Section 5.15 and that the Asset Sale Offer shall remain open for a period of 20 Business Days or such longer period as may be required by law;

(b)     the purchase price (including the amount of accrued interest, if any) for each Note, the Asset Sale Offer Purchase Date and the date on which the Asset Sale Offer expires;

(c)     that any Note not tendered for payment will continue to accrue interest and Liquidated Damages in accordance with the terms thereof and will continue to be convertible;

(d)     that, unless the Company shall default in the payment of the purchase price, any Note accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest and Liquidated Damages after the Asset Sale Offer Purchase Date;

(e)     that Holders electing to have Notes purchased pursuant to an Asset Sale Offer will be required to surrender their Notes to the Paying Agent at the address specified in the notice prior to 5:00 p.m., New York City time, on the Asset Sale Offer Purchase Date and must complete any form letter of transmittal proposed by the Company and acceptable to the Trustee and the Paying Agent;

(f)     that Holders of Notes will be entitled to withdraw their election if the Paying Agent receives, not later than 5:00 p.m., New York City time, on the Asset Sale Offer Purchase Date, a facsimile transmission or letter setting forth the name of the Holders, the principal amount of Notes the Holders delivered for purchase, the Note certificate number (if any) and a statement that such Holder is withdrawing his election to have such Notes purchased;

(g)     that Holders whose Notes are purchased only in part will be issued Notes of like tenor equal in principal amount to the unpurchased portion of the Notes surrendered;

(h)     the instructions that Holders must follow in order to tender their Notes; and

(i)     information concerning the business of the Company, the most recent annual and quarterly reports of the Company filed with the Commission pursuant to the Exchange Act (or, if the Company is not required to file any such reports with the SEC, the comparable reports prepared pursuant to Section 5.23), a description of material developments in the Company's business, information with respect to pro forma historical financial information after giving effect to such Asset Sale and such other information concerning the circumstances and relevant facts regarding such Asset Sale and Asset Sale Offer as would, in the good faith judgment of the Company, be material to a Holder of Notes in connection with the decision of such Holder as to whether or not it should tender Notes pursuant to the Asset Sale Offer.

On the Asset Sale Offer Purchase Date, the Company will (i) accept for payment Notes or portions thereof tendered pursuant to the Asset Sale Offer, (ii) deposit with the Paying Agent money, in immediately available funds, sufficient to pay the purchase price of all Notes or portions thereof so tendered and accepted and (iii) deliver to the Trustee the Notes so accepted together with an Officers' Certificate setting forth the Notes or portions thereof tendered to and

accepted for payment by the Company.  The Paying Agent will promptly mail or deliver to the Holders of Notes so accepted payment in an amount equal to the purchase price, and the Trustee shall promptly authenticate and mail or deliver to such Holders a new Note of like tenor equal in principal amount to any unpurchased portion of the Note surrendered.  Any Notes not so accepted shall be promptly mailed or delivered by the Company to the Holder thereof.  The Company will publicly announce the results of the Asset Sale Offer not later than the first Business Day following the Asset Sale Offer Purchase Date.

If the Company is required to make an Asset Sale Offer, the Company shall comply with all applicable tender offer rules, including to the extent applicable, Section 14(e) and Rule 14e-1 under the Exchange Act, and any other applicable securities laws or regulations.

Section 5.16.  Limitation on Liens.

The Company shall not, and shall not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any Liens of any kind against or upon any property or assets of the Company or any Restricted Subsidiary, whether now owned or hereafter acquired, or any proceeds therefrom, other than Permitted Liens.

Section 5.17.  Limitation on Business.

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than the businesses [primarily] engaged in by the Company and its Restricted Subsidiaries  as of the Issue Date and reasonable extensions thereof and businesses ancillary or complementary thereto.

Section 5.18.  Limitation on Certain Guarantees and Indebtedness of Restricted Subsidiaries; Domestic Restricted Subsidiaries to Become Guarantors and Provide Collateral

(a)  Each Domestic Restricted Subsidiary on the Issue Date shall, and each Person (including Starpower upon the consummation of the Starpower Acquisition) who becomes a Domestic Subsidiary at any time after the Issue Date shall within one Business Day of becoming a Domestic Restricted Subsidiary, execute and deliver the Guarantee Agreement or a counterpart thereof to the Trustee together with an Opinion of Counsel stating that such Guarantor is validly existing, has the corporate power and authority to execute and deliver such Guarantee Agreement  or counterpart, has duly executed and delivered such Guarantee Agreement or counterpart and such Guarantee constitutes the legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms (subject to such usual and customary exceptions as shall be set forth in such Opinion of Counsel).  Notwithstanding the foregoing, prior to the Discharge of First-Lien Obligations, no Domestic Restricted Subsidiary shall be required to execute and deliver a Guarantee Agreement or counterpart thereof if it is not required to do so under the First-Lien Credit Documents (as defined in the Intercreditor Agreement).

(b)  Each guarantee of the Notes created pursuant to this Section 5.18 is referred to as a "Guarantee" and the issuer of each such Guarantee, so long as the Guarantee remains outstanding, is referred to as a "Guarantor."

(c)     Upon any sale or disposition (by merger or otherwise) of any Guarantor by the Company or a Restricted Subsidiary to any person that is not an Affiliate of the Company or any of the Restricted Subsidiaries which is otherwise in compliance with the terms of this Indenture and as a result of which such Guarantor ceases to be a Restricted Subsidiary of the Company, such Guarantor will be deemed to be automatically and unconditionally released from all obligations under its Guarantee; provided that each such Guarantor is sold or disposed of in accordance with Section 5.15 hereof.  The Guarantee of such Guarantor shall, in any event, be released to the extent and under the circumstances set forth in Section 5.1 of the Intercreditor Agreement.

(d)     [Clauses (d), (e) and (f) will be conformed to Section 8.12 of the DB Credit Agreement when finalized and may need to require delivery of mortgages, etc. post closing if the Credit Agreement is revised to permit them to be delivered post closing.]  The Company will, and will cause each Domestic Restricted Subsidiary, to grant to the Collateral Agent for the benefit of the Noteholders security interests and Mortgages in such assets, properties [and owned real properties having a [book/fair market] value in excess of $[_____] of the Company and such other Domestic Restricted Subsidiaries as are not covered by the original Security Documents and as may be reasonably requested pursuant to the terms of the First-Lien Documents and, after the date of Discharge of First-Lien Obligations by the Trustee (collectively, the "<u>Additional Security Documents</u>")**;** provided that the Company and Restricted Subsidiaries shall not be required to grant Liens on all assets that are subject to express exclusions in the Security Documents until such exclusions are no longer applicable.  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent under the First-Lien Credit Documents and, after the date of Discharge of First-Lien Obligations, the Trustee and shall constitute valid and enforceable perfected security interests and Mortgages superior to and prior to the rights of all third Persons and subject to no other Liens except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall be paid in full.  The Company shall make arrangements to ensure that all such recordations and filings made pursuant to this Section 5.18(c) or any of the Security Documents or Additional Security Documents are made at least one Business Day before any equivalent recordations or filings are made pursuant to the Third-Lien Credit Documents and the filings made be made one Business Day after any equivalent recordation or filing is made pursuant to the First-Lien Credit Documents..   Notwithstanding the foregoing, the Company and its Domestic Subsidiaries shall not be required to grant the Liens and take thee other actions in respect thereof under this clause (d) to the extent they are not required to grant Liens and take such actions under the First-Lien Documents.

(e)     From and after the date of the Discharge of First-Lien Obligations, the Company will, and will cause each of the Domestic Restricted Subsidiaries, at the expense of such Persons, to make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports, landlord waivers, bailee agreements, control agreements and other assurances or

instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require. Furthermore, from and after the date of the Discharge of First-Lien Obligations, the Company will, and will cause the Domestic Restricted Subsidiaries to, deliver to the Collateral Agent such Opinions of Counsel, title insurance and other related documents as may be reasonably requested by the Trustee to assure itself that this Section 5.18 has been complied with.

(f)     From and after the date of the Discharge of First-Lien Obligations, the Company agrees that each action required by clauses (d) through (e) of this Section 8.12 shall be completed as soon as possible, but in no event later than 60 days after such action is requested to be taken by the Trustee; provided that, in no event will the Company or any of its Restricted Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 5.18.

(g)     To the extent required by the First-Lien Credit Documents, the Company shall at all times cause all of the equity interests of the Megacable Entities which are owned by the Company or any of its Subsidiaries to be directly owned by RCN International, Inc.

Section 5.19.   Limitation on Issuances and Sales of Preferred Stock by Restricted Subsidiaries.

The Company (i) shall not permit any Restricted Subsidiary to issue any Preferred Stock (other than to the Company or a Restricted Subsidiary) and (ii) shall not permit any person (other than the Company or a Restricted Subsidiary) to own any Preferred Stock of any Restricted Subsidiary.

Section 5.20.   Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries.

The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise enter into or cause to become effective any consensual encumbrance or consensual restriction of any kind on the ability of any Restricted Subsidiary to (a) pay dividends, in cash or otherwise, or make any other distributions on its Capital Stock or any other interest or participation in, or measured by, its profits to the extent owned by the Company or any Restricted Subsidiary, (b) pay any Indebtedness owed to the Company or any Restricted Subsidiary, (c) make any Investment in the Company or any other Restricted Subsidiary or (d) transfer any of its properties or assets to the Company or to any Restricted Subsidiary, except for (i) any encumbrance or restriction in existence on the Issue Date and set forth on Schedule 5.20, (ii) any encumbrance or restriction set forth in any First-Lien Credit Document and any other Indebtedness of the type described in clauses (i)(A), (i)(B) or (i)(D) of the definition of the term "Indebtedness" so long as such encumbrances and restrictions are not materially less favorable to the Holders than those under the First-Lien Credit Documents, (iii) customary non-assignment provisions, (iv) any encumbrance or restriction pertaining to an asset subject to a Lien to the extent set forth in the security documentation governing such Lien, (v) any encumbrance or restriction applicable to a Restricted Subsidiary at the time that it becomes a Restricted Subsidiary that is not created in contemplation thereof, (vi) any encumbrance or restriction existing under any agreement that refinances or replaces an agreement containing a

restriction permitted by clause (iv) above; provided that the terms and conditions of any such encumbrance or restriction are not materially less favorable to the Holders than those under or pursuant to the agreement being replaced or the agreement evidencing the Indebtedness refinanced, (vi) any encumbrance or restriction imposed upon a Restricted Subsidiary pursuant to an agreement which has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary or any Asset Sale to the extent limited to the Capital Stock or assets in question, and (vii) any customary encumbrance or restriction applicable to a Restricted Subsidiary that is contained in an agreement or instrument governing or relating to Indebtedness contained in any Permitted Credit Facility; provided that (subject to customary net worth, leverage, invested capital and other financial covenants) the provisions of such agreement permit the payment of interest and principal and mandatory repurchases pursuant to the terms of this Indenture and the Notes and other indebtedness that is solely an obligation of the Company; provided further that such agreement may contain customary covenants regarding the merger of or sale of all or any substantial part of the assets of the Company or any Restricted Subsidiary, customary restrictions on transactions with affiliates, and customary subordination provisions governing indebtedness owed to the Company or any Restricted Subsidiary.

Section 5.21.  Designations of Unrestricted Subsidiaries.

The Company shall not designate any Subsidiary of the Company (other than a newly created Subsidiary in which no Investment has previously been made) as an "Unrestricted Subsidiary" under this Indenture (a "Designation") unless:

(a)     no Default shall have occurred and be continuing at the time of or after giving effect to such Designation;

(b)     the Company would be able to incur $1.00 of Indebtedness (other than Permitted Indebtedness) under Section 5.11; and

(c)     the Company would not be prohibited under this Indenture from making an Investment at the time of Designation (assuming the effectiveness of such Designation) in an amount (the "Designation Amount") equal to the Fair Market Value of the net Investment of the Company or any other Restricted Subsidiary in such Restricted Subsidiary on such date.

In the event of any such Designation, the Company shall be deemed to have made an Investment constituting a Restricted Payment pursuant to Section 5.13 hereof for all purposes of this Indenture in the Designation Amount.  Neither the Company nor any Restricted Subsidiary shall at any time (x) provide a guarantee of, or similar credit support to, any Indebtedness of any Unrestricted Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness); provided that the Company may pledge Capital Stock or Indebtedness of any Unrestricted Subsidiary on a nonrecourse basis such that the pledgee has no claim whatsoever against the Company other than to obtain such pledged property, (y) be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary or (z) be directly or indirectly liable for any other Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon (or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity) upon the occurrence of a default with respect to any other

Indebtedness that is Indebtedness of an Unrestricted Subsidiary, including any corresponding right to take enforcement action against such Unrestricted Subsidiary, except in the case of clause (x) or (y) to the extent permitted under Section 5.13 and Section 5.14 hereof.

The Company will not revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") unless:

(a)     no Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(b)     all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if incurred at such time, have been permitted to be incurred for all purposes of this Indenture.

All Designations and Revocations must be evidenced by Board Resolutions delivered to the Trustee certifying compliance with the foregoing provisions.

Section 5.22.    Compliance Certificates and Opinions.

Upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company will furnish to the Trustee an Officers' Certificate stating that all conditions precedent, if any, provided for in this Indenture (including any covenants compliance with which constitutes a condition precedent) relating to the proposed action have been complied with, and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that, in the case of any such application or request as to which the furnishing of such documents, certificates and/or opinions is specifically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture will include:

(i)     a statement that each individual signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;

(ii)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(iii)     a statement that, in the opinion of each such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether such covenant or condition has been complied with; and

(iv)     a statement as to whether, in the opinion of each such individual, such condition or covenant has been complied with.

Section 5.23.   Reports.

Subject to the Delayed Filing Authorization, the Company shall, whether or not it has a class of securities registered under the Exchange Act, furnish without cost to each Holder (in sufficient quantities for distribution to beneficial holders) and file with the Trustee and the SEC, (i) within the applicable time period required under the Exchange Act, after the end of each fiscal year of the Company, the information required by Form 10-K (or any successor form thereto) under the Exchange Act with respect to such period, (ii) within the applicable time period required under the Exchange Act after the end of each of the first three fiscal quarters of each fiscal year of the Company, the information required by Form 10-Q (or any successor form thereto) under the Exchange Act with respect to such period and (iii) any current reports on Form 8-K (or any successor forms) required to be filed under the Exchange Act.

## ARTICLE VI.

## NOTEHOLDERS' LISTS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 6.1.   Noteholders Lists

The Company covenants and agrees that it will furnish or cause to be furnished to the Trustee, semi-annually, not more than fifteen (15) days after each June 1 and December 1 in each year beginning with June 1, 2005 and at such other times as the Trustee may request in writing, within thirty (30) days after receipt by the Company of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form as the Trustee may reasonably require of the names and addresses of the holders of Notes as of a date not more than fifteen (15) days (or such other date as the Trustee may reasonably request in order to so provide any such notices) prior to the time such information is furnished, except that no such list need be furnished so long as the Trustee is acting as Note Registrar.

Section 6.2.   Preservation and Disclosure of Lists

(a)   The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the olders of Notes contained in the most recent list furnished to it as provided in Section 6.1 or maintained by the Trustee in its capacity as Note Registrar, if so acting. The Trustee may destroy any list furnished to it as provided in Section 6.1 upon receipt of a new list so furnished.

(b)   The rights of Noteholders to communicate with other holders of Notes with respect to their rights under this Indenture or under the Notes and the corresponding rights and duties of the Trustee, shall be as provided by the Trust Indenture Act.

(c)   Every Noteholders, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the trustee nor any agent of either of them shall be held accountable by reason of any disclosure of information as to names and addresses of holders of Notes made pursuant to the Trust Indenture Act.

Section 6.3.    Reports by Trustee

After this Indenture has been qualified under the Trust Indenture Act, the Trustee shall transmit to holders of Notes such reports concerning the Trustee and its actions under this Indenture as may be required pursuant to the Trust Indenture Act at the times and in the manner provided pursuant thereto.  If required by Section 313(a) of the Trust Indenture Act, the Trustee shall, within sixty (60) days after each May 15 following the date of this Indenture deliver to holders a brief report, dated as of such May 15 which complies with the provisions of such Section 313(a).

A copy of such report shall, at the time of such transmission to holders of Notes, be filed by the Trustee with each stock exchange and automated quotation system upon which the Notes are listed, if any, and with the Company.  The Company will promptly notify the Trustee as soon as practicable when the Notes are listed on any stock exchange or automated quotation system and when any such listing is discontinued.

Section 6.4.    Reports by Company

After this Indenture has been qualified under the Trust Indenture Act, the Company shall file with the Trustee and the Commission, and transmit to holders of Notes, such information, documents and other reports and such summaries thereof, as may be required pursuant to the Trust Indenture Act at the times (but subject to the Delayed Filing Authorization) and in the manner provided pursuant to such Act; provided that any such information, documents or reports required to be filed with the Commission pursuant to Section 13 or 15(d) of the Exchange Act shall be filed with the Trustee within fifteen (15) days after the same is so required to be filed with the Commission.

ARTICLE VII.

DEFAULTS AND REMEDIES

Section 7.1.    Events of Default

"Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    default in the payment of interest (or Liquidated Damages) on the Notes when it becomes due and payable and continuance of such default for a period of 10 Business Days or more; or

(b)    default in the payment of the principal of, or premium, if any, on the Notes when due; or

(c)    default in the performance, or breach, of any covenant described under Section 5.10, Section 5.15 or Article XII; or

(d)     default in the performance, or breach, of any covenant (including, without limitation, failure by the Company to deliver shares of Common Stock required to be delivered upon conversion of a Note in accordance with Article XV) in this Indenture (other than defaults specified elsewhere in this Section 7.1) or the other Transaction Documents, and continuance of such default or breach for a period of 30 days or more after written notice to the Company by the Trustee or to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the outstanding Notes (in each case, when such notice is deemed received in accordance with this Indenture); or

(e)     failure to perform any term, covenant, condition or provision of one or more classes or issues of Indebtedness in an aggregate principal amount outstanding of $10,000,000 or more under which the Company or a Significant Restricted Subsidiary is obligated, and either (a) such Indebtedness is already due and payable in full or (b) such failure results in the acceleration of the maturity of such Indebtedness; or

(f)     one or more non-appealable judgments, orders or decrees for the payment of money of $10,000,000 or more, either individually or in the aggregate, shall be entered into against the Company or any Significant Restricted Subsidiary or any of their respective properties that is not paid or fully covered by a reputable and solvent insurance company  and shall not be discharged and there shall have been a period of 60 days or more during which a stay of enforcement of such judgment or order, by reason of pending appeal or otherwise, shall not be in effect; or

(g)     the Company or any of its Significant Restricted Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against the Company or any of its Significant Restricted Subsidiaries, and the petition is not controverted within 10 days, or is not dismissed within 60 days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Company or any of its Significant Restricted Subsidiaries, or the Company or any of its Significant Restricted Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Company or any of its Significant Restricted Subsidiaries, or there is commenced against the Company or any of its Significant Restricted Subsidiaries any such proceeding which remains undismissed for a period of 60 days, or the Company or any of its Significant Restricted Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Company or any of its Significant Restricted Subsidiaries suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 days; or the Company or any of its Significant Restricted Subsidiaries makes a general assignment for the benefit of creditors; or any corporate, limited liability company or similar action is taken by the Company or any of its Significant Restricted Subsidiaries for the purpose of effecting any of the foregoing;

(h) the representations or warranties made by the Company or any Guarantor herein or in the Transaction Documents shall be false or misleading in any material respect at the time made and the same shall be reasonably likely to adversely affect either (i) the ability of the Company or the Guarantors to make payments required hereunder or the other Transaction Documents when due or (ii) the validity or enforceability of any Transaction Document or the rights or remedies of the Holders or the Trustee or Collateral Agent hereunder or under any other Transaction Document; or

(i) unless all the Collateral has been released from the Second Priority Liens in accordance with the provisions of the Security Documents, default by the Company or any Guarantor in the performance of the Security Documents, or the occurrence of any event, which adversely affects the enforceability, validity, perfection or priority of the Second Priority Lien on a material portion of the Collateral granted to the Collateral Agent for the benefit of the Trustee and the Holders, the repudiation or disaffirmation by the Company or any Guarantor of any of its material obligations under the Security Documents or the determination in a judicial proceeding that the Security Documents are unenforceable or invalid against the Company or any Guarantor for any reason with respect to a material portion of the Collateral (which default, repudiation, disaffirmation or determination is not rescinded, stayed or waived by the Persons having such authority pursuant to the Security Documents or otherwise cured within 30 days or more after written notice to the Company by the Trustee or to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the outstanding Notes (in each case, when such notice is deemed received in accordance with this Indenture);

then, and in each and every such case (other than an Event of Default specified in Section 7.1(g) with respect to the Company), so long as the respective Event of Default has occurred and is continuing, unless the principal of all of the Notes shall have already become due and payable, and unless the Event of Default shall have been waived in writing in accordance with the provisions of Section 7.7, either the Trustee or the holders of not less than 25% in aggregate principal amount of the Notes then outstanding hereunder determined in accordance with Section 9.4, by notice in writing to the Company (and to the Trustee if given by Noteholders), may declare the principal of and premium, if any, on all the Notes and the interest accrued thereon (including Liquidated Damages to the extent accrued and unpaid) to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Notes contained to the contrary notwithstanding. If an Event of Default specified in Section 7.1(g) occurs and is continuing with respect to the Company, the principal of all the Notes and the interest accrued thereon (including Liquidated Damages to the extent accrued and unpaid) shall be immediately due and payable. In addition to the foregoing, any amount payable hereunder by the Company not paid when due shall bear interest at a rate per annum equal to the interest rate otherwise borne by the Notes (including Liquidated Damages) plus two percent (2%) per annum or if less, increased to the maximum interest rate then permitted by applicable law. Any such interest which is not paid when due shall, to the maximum extent permitted by law, accrue interest until paid at the rate from time to time applicable to the interest on the Notes. Notwithstanding the foregoing if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum sufficient to pay all

matured installments of interest upon all Notes and the principal of and premium, if any, on any and all Notes which shall have become due otherwise than by acceleration (with interest on overdue installments of interest (to the extent that payment of such interest is enforceable under applicable law) and on such principal and premium, if any, at the rate borne by the Notes, to the date of such payment or deposit) and amounts due to the Trustee pursuant to Section 8.6, and if any and all defaults under this Indenture, other than the nonpayment of principal of and premium, if any, and accrued interest on Notes which shall have become due by acceleration, shall have been cured or waived pursuant to Section 7.7, then and in every such case the holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all defaults or Events of Default and rescind and annul such acceleration and its consequences; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent default or Event of Default, or shall impair any right consequent thereon. The Company shall notify the Responsible Officer of the Trustee, within three (3) Business Days of becoming aware thereof, of any default or Event of Default and shall deliver to the Trustee a statement specifying such default or Event of Default and the action the Company has taken, is taking or proposes to take with respect thereto.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of such waiver or rescission and annulment or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the holders of Notes, and the Trustee shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the holders of Notes, and the Trustee shall continue as though no such proceeding had been instituted.

Section 7.2.    Payments of Notes on Default; Suit Therefor

The Company covenants that (a) in case default shall be made in the payment by the Company of any installment of interest upon any of the Notes as and when the same shall become due and payable, and such default shall have continued for a period of thirty (30) days, or (b) in case default shall be made in the payment of the principal of or premium, if any, on any of the Notes as and when the same shall have become due and payable, whether at maturity of the Notes or in connection with any redemption or repurchase, by declaration under this Indenture or otherwise, then, upon demand of the Trustee, the Company will pay to the Trustee, for the benefit of the holders of the Notes, the whole amount that then shall have become due and payable on all such Notes for principal and premium, if any, or interest, or both, as the case may be, with interest upon the overdue principal and premium, if any, and (to the extent that payment of such interest is enforceable under applicable law) upon the overdue installments of interest at the rate borne by the Notes; and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable compensation to the Trustee, its agents, attorneys and counsel, and any expenses or liabilities incurred by the Trustee hereunder other than through its negligence or bad faith. Until such demand by the Trustee, the Company may pay the principal of and premium, if any, and interest on the Notes to the registered holders, whether or not the Notes are overdue.

In case the Company shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to

institute any actions or proceedings at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Company or any other obligor on the Notes and collect in the manner provided by law out of the property of the Company or any other obligor on the Notes wherever situated the monies adjudged or decreed to be payable.

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 7.2, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal, premium, if any, and interest (including Liquidated Damages, if any) owing and unpaid in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee and of the Noteholders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due the Trustee under Section 8.6; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Noteholders to make such payments to the Trustee, and, in the event that the Trustee shall consent to the making of such payments directly to the Noteholders, to pay to the Trustee any amount due it for reasonable compensation, expenses, advances and disbursements, including agents and counsel fees incurred by it up to the date of such distribution. To the extent that such payment of reasonable compensation, expenses, advances and disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property which the holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof on any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the holders of the Notes.

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the holders of the Notes, and it shall not be necessary to make any holders of the Notes parties to any such proceedings.

Section 7.3.    Application of Monies Collected by Trustee

Any monies collected by the Trustee pursuant to this Article VII shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies, upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

First:  To the payment of all amounts due the Trustee under Section 8.6;

Second:  To the payment of all First-Lien Obligations to the extent required by the Intercreditor Agreement;

Third:  In case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on the Notes in default in the order of the maturity of the installments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon the overdue installments of interest at the rate borne by the Notes, such payments to be made ratably to the Persons entitled thereto;

Fourth:  In case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid, to the payment of the whole amount then owing and unpaid upon the Notes for principal and premium, if any, and interest, with interest on the overdue principal and premium, if any, and (to the extent that such interest has been collected by the Trustee) upon overdue installments of interest at the rate borne by the Notes; and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal and premium, if any, and interest without preference or priority of principal and premium, if any, over interest, or of interest over principal and premium, if any, or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal and premium, if any, and accrued and unpaid interest; and

Fifth:  To the payment of the remainder, if any, to the Company.

Section 7.4.    Proceedings by Noteholder

Subject to the last two paragraphs of this Section 7.4, no holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such indemnity as may be reasonably satisfactory to the Trustee against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee for sixty (60) days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 7.7; it being understood and intended, and being expressly covenanted by the

taker and holder of every Note with every other taker and holder and the Trustee, that no one or more holders of Notes shall have any right in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other holder of Notes, or to obtain or seek to obtain priority over or preference to any other such holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all holders of Notes (except as otherwise provided herein).  For the protection and enforcement of this Section 7.4, each and every Noteholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provision of this Indenture and any provision of any Note, the right of any holder of any Note to receive payment of the principal of and premium, if any, and interest (including Liquidated Damages to the extent accrued but unpaid) on such Note, on or after the respective due dates expressed in such Note, or to institute suit for the enforcement of any such payment on or after such respective dates against the Company shall not be impaired or affected without the consent of such holder.

Anything in this Indenture or the Notes to the contrary notwithstanding, the holder of any Note, without the consent of either the Trustee or the holder of any other Note, in his own behalf and for his own benefit, may enforce, and may institute and maintain any proceeding suitable to enforce, such holder's rights of conversion as provided herein.

Section 7.5.    Proceedings by Trustee

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 7.6.    Remedies Cumulative and Continuing

Except as provided in the last paragraph of Section 2.6, all powers and remedies given by this Article VII to the Trustee or to the Noteholders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any holder of any of the Notes to exercise any right or power accruing upon any default or Event of Default occurring and continuing as aforesaid shall impair any such right or power, or shall be construed to be a waiver of any such default or any acquiescence therein; and, subject to the provisions of Section 7.4, every power and remedy given by this Article VII or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Noteholders.

Section 7.7.    Direction of Proceedings and Waiver of Defaults by Majority of Noteholders

The holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 9.4 shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee; provided, however, that (a) such direction shall not be in conflict with any rule of law or with this Indenture or any Security Document, and (b) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.  The holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 9.4 may on behalf of the holders of all of the Notes waive any past default or Event of Default hereunder and its consequences except (i) a default in the payment of interest or premium, if any, on, or the principal of, the Notes when due, (ii) a failure by the Company to convert any Notes into Common Stock or (iii) a default in respect of a covenant or provisions hereof which under Article XI cannot be modified or amended without the consent of all affected holders of Notes then outstanding.  Upon any such waiver the Company, the Trustee and the holders of the Notes shall be restored to their former positions and rights hereunder; said default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon.

Section 7.8.    Notice of Defaults

The Trustee shall, within ninety (90) days after the Trustee obtains knowledge of the occurrence of a default, mail to all Noteholders, as the names and addresses of such holders appear upon the Note Register, notice of all defaults actually known to a Responsible Officer, unless such defaults shall have been cured or waived before the giving of such notice; and provided that, except in the case of default in the payment of the principal of, or premium, if any, or interest (including Liquidated Damages to the extent accrued but unpaid) on any of the Notes, including without limiting the generality of the foregoing any default in the payment of any Repurchase Price or in the payment of any amount due in connection with any redemption of Notes, then in any such event the Trustee shall be protected in withholding such notice if and so long as a trust committee of directors and/or Responsible Officers of the Trustee in good faith determine that the withholding of such notice is in the interests of the Noteholders.

Section 7.9.    Undertaking to Pay Costs

All parties to this Indenture agree, and each holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided that the provisions of this Section 7.9 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the

aggregate more than 25% in principal amount of the Notes at the time outstanding determined in accordance with Section 9.4, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or premium, if any, or interest (including Liquidated Damages to the extent accrued but unpaid) on any Note (including, but not limited to, the redemption price or Repurchase Price with respect to the Notes being redeemed or repurchased as provided in this Indenture) on or after the due date expressed in such Note or to any suit for the enforcement of the right to convert any Note in accordance with the provisions of Article XV.

Section 7.10.   Delay or Omission Not Waiver

No delay or omission of the Trustee or of any holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or any acquiescence therein.  Every right and remedy given by this Article VII or by law to the Trustee or to the holders of Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the holders of Notes, as the case may be.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE

Section 8.1.    Duties and Responsibilities of Trustee

The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and the Trust Indenture Act.  In case an Event of Default has occurred (which has not been cured or waived) the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that

(a)     prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred:

(1)     the duties and obligations of the Trustee shall be determined solely by the Trust Indenture Act and the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture and the Trust Indenture Act against the Trustee; and

(2)     in the absence of bad faith or willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or

opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture;

(b)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(c)     the Trustee shall not be liable to any Noteholder with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the holders of not less than a majority in principal amount of the Notes at the time outstanding determined as provided in Section 9.4 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(d)     whether or not therein provided, every provision of this Indenture relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

Section 8.2.     Reliance on Documents, Opinions, Etc.

Except as otherwise provided in Section 8.1:

(a)     the Trustee may conclusively rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, note, coupon or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed) and any resolution of the Board of Directors may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

(c)     the Trustee may consult with counsel of its selection, and any advice of such counsel or Opinion of Counsel as to matters of law shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel if such counsel was selected with due care;

(d)     the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Noteholders pursuant to the provisions of this Indenture, unless such Noteholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its reasonable discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require indemnity reasonably satisfactory to the Trustee from the Noteholders against such expenses or liability as a condition to so proceeding; the reasonable expenses of every such examination shall be paid by the Company or, if paid by the Trustee or any predecessor Trustee, shall be repaid by the Company upon demand;

(f)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder or under the Security Documents either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed by it with due care hereunder;

(g)     the Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture;

(h)     the Trustee shall not be deemed to have notice of any default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default or Event of Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture;

(i)     the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder; and

(j)     the Trustee may request that the Company deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

In no event shall the Trustee be liable for any consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 8.3.    No Responsibility for Recitals, Etc.

The recitals contained herein and in the Notes (except in the Trustee's certificate of authentication) shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same.  The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Notes.  The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated and delivered by the Trustee in conformity with the provisions of this Indenture.

Section 8.4.    Trustee, Paying Agents, Conversion Agents or Note Registrar May Own Notes

The Trustee, any paying agent, any conversion agent or Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not Trustee, paying agent, conversion agent or Note Registrar.

Section 8.5.    Monies to be Held in Trust

Subject to the provisions of Section 13.4, all monies received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received.  Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as may be agreed in writing from time to time by the Company and the Trustee.

Section 8.6.    Compensation and Expenses of Trustee

The Company covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, such compensation as the Company and the Trustee shall from time to time agree in writing for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as may arise from its negligence, willful misconduct or bad faith.  The Company also covenants to indemnify the Trustee or any predecessor Trustee in any capacity under this Indenture and its agents and any authenticating agent for, and to hold them harmless against, any and all loss, damages, claims, liability or expense, including taxes (other than those based upon, measured by or determined by the income of the Trustee), incurred without negligence, willful misconduct or bad faith on the part of the Trustee or such agent or authenticating agent, as the case may be, and arising out of or in connection with the acceptance or administration of this trust or in any other capacity hereunder, including the costs and expenses of defending themselves against any claim (whether asserted by the Company, a holder

or any other Person) of liability in the premises. The obligations of the Company under this Section 8.6 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a lien upon all property and funds held or collected by the Trustee as such, except, subject to the effect of Sections 4.3 and 7.5, funds held in trust herewith for the benefit of the holders of particular Notes prior to the date of the accrual of such unpaid compensation or indemnifiable claim. The obligation of the Company under this Section 8.6 shall survive the satisfaction and discharge of this Indenture and the resignation or removal of the Trustee. The indemnification provided in this Section 8.6 shall extend to the officers, directors, agents and employees of the Trustee.

When the Trustee and its agents and any authenticating agent incur expenses or render services after an Event of Default specified in Section 7.1(g) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws.

Section 8.7.    Officer's Certificate as Evidence

Except as otherwise provided in Section 8.1, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence, willful misconduct or bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Trustee, and such Officer's Certificate, in the absence of negligence, willful misconduct or bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 8.8.    Conflicting Interests of Trustee

If the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture.

Section 8.9.    Eligibility of Trustee

There shall at all times be a Trustee hereunder that shall be a Person that is eligible pursuant to the Trust Indenture Act to act as such and has a combined capital and surplus (together with its corporate parent) of at least Fifty Million United States Dollars ($50,000,000). If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section 8.9, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 8.9, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VIII.

Section 8.10.   Resignation or Removal of Trustee

(a)      The Trustee may at any time resign by giving written notice of such resignation to the Company and by mailing notice thereof to the holders of Notes at their addresses as they shall appear on the Note Register.   Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee.   If no successor trustee shall have been so appointed and have accepted appointment sixty (60) days after the mailing of such notice of resignation to the Noteholders, the resigning Trustee may, at the expense of the Company, petition any court of competent jurisdiction for the appointment of a successor trustee, or any Noteholder who has been a bona fide holder of a Note or Notes for at least six months may, subject to the provisions of Section 7.9, on behalf of himself and all others similarly situated, petition any such court for the appointment of a successor trustee.   Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(b)      In case at any time any of the following shall occur:

(1)      the Trustee shall fail to comply with Section 8.8 within a reasonable time after written request therefor by the Company or by any Noteholder who has been a bona fide holder of a Note or Notes for at least six months, or

(2)      the Trustee shall cease to be eligible in accordance with the provisions of Section 8.9 and shall fail to resign after written request therefor by the Company or by any such Noteholder, or

(3)      the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, the Company may by a Board Resolution remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 7.9, any Noteholder who has been a bona fide holder of a Note or Notes for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee.   Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(c)      The holders of a majority in aggregate principal amount of the Notes at the time outstanding may at any time remove the Trustee and nominate a successor trustee which shall be deemed appointed as successor trustee unless within ten (10) days after

notice to the Company of such nomination the Company objects thereto, in which case the Trustee so removed or any Noteholder, upon the terms and conditions and otherwise as in Section 8.10(a) provided, may, at the expense of the Company, petition any court of competent jurisdiction for an appointment of a successor trustee.

(d)     Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 8.10 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 8.11.

(e)     If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within thirty (30) days after the giving of such notice of removal, the Trustee being removed may petition, at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Securities of such series.

Section 8.11.   Acceptance by Successor Trustee

Any successor trustee appointed as provided in Section 8.10 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due it pursuant to the provisions of Section 8.6, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers.   Any trustee ceasing to act shall, nevertheless, retain a lien upon all property and funds held or collected by such trustee as such, except for funds held in trust for the benefit of holders of particular Notes, to secure any amounts then due it pursuant to the provisions of Section 8.6.

No successor trustee shall accept appointment as provided in this Section 8.11 unless at the time of such acceptance such successor trustee shall be qualified under the provisions of Section 8.8 and be eligible under the provisions of Section 8.9.

Upon acceptance of appointment by a successor trustee as provided in this Section 8.11, the Company shall mail or cause to be mailed notice of the succession of such trustee hereunder to the holders of Notes at their addresses as they shall appear on the Note Register.   If the Company fails to mail such notice within ten (10) days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Company.

Section 8.12.   Succession by Merger, Etc.

Any corporation or other entity into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or

consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the trust created by this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto, provided that in the case of any corporation succeeding to all or substantially all of the corporate trust business of the Trustee such corporation shall be qualified under the provisions of Section 8.8 and eligible under the provisions of Section 8.9.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee or authenticating agent appointed by such predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee or an authenticating agent appointed by such successor trustee may authenticate such Notes either in the name of any predecessor trustee hereunder or in the name of the successor trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have; provided, however, that the right to adopt the certificate of authentication of any predecessor Trustee or to authenticate Notes in the name of any predecessor Trustee shall apply only to its successor or successors by merger, conversion or consolidation.

Section 8.13.   Limitation on Rights of Trustee as Creditor

If and when the Trustee shall be or become a creditor of the Company (or any other obligor upon the Notes), the Trustee shall be subject to the provisions of the Trust Indenture Act regarding the collection of the claims against the Company (or any such other obligor).

Section 8.14.   Intercreditor Agreement.

The Trustee, any successor trustee and any Collateral Agent or sub-Collateral Agent shall each be bound by the terms and provisions of the Intercreditor Agreement.

ARTICLE IX.

CONCERNING THE NOTEHOLDERS

Section 9.1.    Action by Noteholders

Whenever in this Indenture it is provided that the holders of a specified percentage in aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the holders of such specified percentage have joined therein may be evidenced (a) by any instrument or any number of instruments of similar tenor executed by Noteholders in person or by agent or proxy appointed in writing, or (b) by the record of the holders of Notes voting in favor thereof at any meeting of Noteholders duly called and held in accordance with the provisions of Article X, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Noteholders.  Whenever the Company or the Trustee solicits the taking of any action by the holders of the Notes, the

Company or the Trustee may fix in advance of such solicitation, a date as the record date for determining holders entitled to take such action. The record date shall be not more than fifteen (15) days prior to the date of commencement of solicitation of such action.

Section 9.2.    Proof of Execution by Noteholders

Subject to the provisions of Sections 8.1, 8.2 and 10.5, proof of the execution of any instrument by a Noteholder or his agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee. The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar. The record of any Noteholders' meeting shall be proved in the manner provided in Section 10.6.

Section 9.3.    Who Are Deemed Absolute Owners

The Company, the Trustee, any authenticating agent, any paying agent, any conversion agent and any Note Registrar shall deem the Person in whose name such Note shall be registered upon the Note Register to be, and shall treat him as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon) for the purpose of receiving payment of or on account of the principal of, premium, if any, and interest (including Liquidated Damages to the extent accrued but unpaid) on such Note, for conversion of such Note and for all other purposes; and neither the Company nor the Trustee nor any authenticating agent nor any paying agent nor any conversion agent nor any Note Registrar shall be affected by any notice to the contrary. All such payments so made to any holder for the time being, or upon his order, shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for monies payable upon any such Note.

Section 9.4.    Company-Owned Notes Disregarded

In determining whether the holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are owned by the Company or any other obligor on the Notes or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any other obligor on the Notes shall be disregarded and deemed not to be outstanding for the purpose of any such determination; provided that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes which a Responsible Officer actually knows are so owned shall be so disregarded. Nothing in this Section 9.4 shall cause Notes owned by Laminar to be disregarded and deemed not to be outstanding. Notes so owned which have been pledged in good faith may be regarded as outstanding for the purposes of this Section 9.4 if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to vote such Notes and that the pledgee is not the Company, any other obligor on the Notes or a Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any such other obligor. In the case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee. Upon request of the Trustee, the Company shall furnish to the Trustee promptly an Officer's Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the

above described Persons; and, subject to Section 8.1, the Trustee shall be entitled to accept such Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes listed therein are not outstanding for the purpose of any such determination.

Section 9.5.    Revocation of Consents; Future Holders Bound

At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 9.1, of the taking of any action by the holders of the percentage in aggregate principal amount of the Notes specified in this Indenture in connection with such action, any holder of a Note which is shown by the evidence to be included in the Notes the holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 9.2, revoke such action so far as concerns such Note.  Except as aforesaid, any such action taken by the holder of any Note shall be conclusive and binding upon such holder and upon all future holders and owners of such Note and of any Notes issued in exchange or substitution therefor, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor.

ARTICLE X.

NOTEHOLDERS' MEETINGS

Section 10.1.  Purpose of Meetings

A meeting of Noteholders may be called at any time and from time to time pursuant to the provisions of this Article X for any of the following purposes:

(1)    to give any notice to the Company or to the Trustee or to give any directions to the Trustee permitted under this Indenture, or to consent to the waiving of any default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Noteholders pursuant to any of the provisions of Article VII;

(2)    to remove the Trustee and nominate a successor trustee pursuant to the provisions of Article VIII;

(3)    to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Section 11.2;

(4)    to take any other action authorized to be taken by or on behalf of the holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture or under applicable law; or

(5)    to take any other action authorized by this Indenture or under applicable law.

Section 10.2.  Call of Meetings by Trustee

The Trustee may at any time call a meeting of Noteholders to take any action specified in Section 10.1, to be held at such time and at such place as the Trustee shall determine.  Notice of every meeting of the Noteholders, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting and the establishment of any record date pursuant to Section 9.1, shall be mailed to holders of Notes at their addresses as they shall appear on the Note Register.  Such notice shall also be mailed to the Company.  Such notices shall be mailed not less than twenty (20) nor more than ninety (90) days prior to the date fixed for the meeting.

Any meeting of Noteholders shall be valid without notice if the holders of all Notes then outstanding are present in person or by proxy or if notice is waived before or after the meeting by the holders of all Notes outstanding, and if the Company and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

Section 10.3.  Call of Meetings by Company or Noteholders

In case at any time the Company, pursuant to a resolution of its Board of Directors, or the holders of at least 10% in aggregate principal amount of the Notes then outstanding, shall have requested the Trustee to call a meeting of Noteholders, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have mailed the notice of such meeting within twenty (20) days after receipt of such request, then the Company or such Noteholders may determine the time and the place for such meeting and may call such meeting to take any action authorized in Section 10.1, by mailing notice thereof as provided in Section 10.2.

Section 10.4.  Qualifications for Voting

To be entitled to vote at any meeting of Noteholders a Person shall (a) be a holder of one or more Notes on the record date pertaining to such meeting or (b) be a Person appointed by an instrument in writing as proxy by a holder of one or more Notes.  The only Persons who shall be entitled to be present or to speak at any meeting of Noteholders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

Section 10.5.  Regulations

Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Noteholders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Noteholders as provided in Section 10.3, in which case the Company or the Noteholders calling the meeting, as

the case may be, shall in like manner appoint a temporary chairman.  A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the holders of a majority in principal amount of the Notes represented at the meeting and entitled to vote at the meeting.

Subject to the provisions of Section 9.4, at any meeting each Noteholder or proxyholder shall be entitled to one vote for each One Thousand United States Dollars ($1,000) principal amount of Notes held or represented by such Noteholder; provided, however, that no vote shall be cast or counted at any meeting in respect of any Note challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding.  The chairman of the meeting shall have no right to vote other than by virtue of Notes held by him or instruments in writing as aforesaid duly designating him as the proxy to vote on behalf of other Noteholders.  Any meeting of Noteholders duly called pursuant to the provisions of Section 10.2 or 10.3 may be adjourned from time to time by the holders of a majority of the aggregate principal amount of Notes represented at the meeting, whether or not constituting a quorum, and the meeting may be held as so adjourned without further notice.

Section 10.6.   Voting

The vote upon any resolution submitted to any meeting of Noteholders shall be by written ballot on which shall be subscribed the signatures of the holders of Notes or of their representatives by proxy and the principal amount of the Notes held or represented by them.  The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting.  A record in duplicate of the proceedings of each meeting of Noteholders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was mailed as provided in Section 10.2.  The record shall show the principal amount of the Notes voting in favor of or against any resolution.  The record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

Section 10.7.   No Delay of Rights by Meeting

Nothing contained in this Article X shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Noteholders or any rights expressly or implicitly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Noteholders under any of the provisions of this Indenture or of the Notes.

PDFfile.doc

ARTICLE XI.

AMENDMENTS; SUPPLEMENTAL INDENTURES

Section 11.1.  Amendments; Supplemental Indentures without Consent of Noteholders

The Company, when authorized by the resolutions of the Board of Directors, and the Trustee may from time to time and at any time amend or supplement this Indenture and the Security Documents or the Notes without notice to or the consent of any Holder for one or more of the following purposes:

(a)  to make provision with respect to the conversion rights of the holders of Notes pursuant to the requirements of Section 15.6;

(b)  to convey, transfer, assign, mortgage or pledge to the Trustee as security for the Notes, any property or assets;

(c)  to evidence the succession of another corporation, limited liability company, partnership or trust to the Company, or successive successions, and the assumption by the successor corporation, limited liability company, partnership or trust of the covenants, agreements and obligations of the Company pursuant to Article XII;

(d)  to add to the covenants of the Company such further covenants, restrictions or conditions as the Board of Directors and the Trustee shall consider to be for the benefit of the holders of Notes, including without limitation any reduction of the Conversion Price, and to make the occurrence, or the occurrence and continuance, of a default in any such additional covenants, restrictions or conditions a default or an Event of Default permitting the enforcement of all or any of the several remedies provided in this Indenture as herein set forth; provided, however, that in respect of any such additional covenant, restriction or condition such supplemental indenture may provide for a particular period of grace after default (which period may be shorter or longer than that allowed in the case of other defaults) or may provide for an immediate enforcement upon such default or may limit the remedies available to the Trustee upon such default;

(e)  to provide for the issuance under this Indenture of Notes in coupon form (including Notes registrable as to principal only) and to provide for exchangeability of such Notes with the Notes issued hereunder in fully registered form and to make all appropriate changes for such purpose;

(f)  to cure any ambiguity or to correct or supplement any provision contained herein or in any supplemental indenture which may be defective or inconsistent with any other provision contained herein or in any supplemental indenture, or to make such other provisions in regard to matters or questions arising under this Indenture which shall not adversely affect the interests of the holders of the Notes;

(g)  to evidence and provide for the acceptance of appointment hereunder by a successor Trustee with respect to the Notes; or

95

(h)     to modify, eliminate or add to the provisions of this Indenture to such extent as shall be necessary to effect the qualifications of this Indenture under the Trust Indenture Act, or under any similar federal statute hereafter enacted.

(i)     to mortgage, pledge, hypothecate or grant a security interest in any property or assets in favor of the Trustee for the benefit of the Holders as security for the payment and performance of this Indenture Obligations; or

(j)     release Collateral from the Liens under this Indenture and the Security Documents when permitted or required by this Indenture or the Security Documents and to otherwise give effect to the Intercreditor Agreement or Section 17.3;

(k)     to allow any Guarantor to execute a supplemental indenture or Guarantee with respect to the Notes.

The Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations which may be therein contained and to accept the conveyance, transfer and assignment of any property thereunder; provided, however, the Trustee shall not be obligated to and may, in its discretion, enter into any supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Any amendment or supplemental indenture authorized by the provisions of this Section 11.1 may be executed by the Company and the Trustee without the consent of the holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 11.2.

Section 11.2.   Amendments; Supplemental Indentures with Consent of Noteholders

With the consent (evidenced as provided in Article IX) of the holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding (determined in accordance with Section 9.4), the Company, when authorized by the resolutions of the Board of Directors, and the Trustee may from time to time and at any time amend or supplement, the Notes, the Security Documents or this Indenture for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the holders of the Notes; provided, however, that no such amendment or supplemental indenture shall (i) extend the fixed maturity of any Note, or reduce the rate or extend the time of payment of interest thereon, or reduce the principal amount thereof or premium, if any, thereon, or reduce any amount payable on redemption or repurchase thereof, impair, or change in any respect adverse to the holder of Notes, the obligation of the Company to repurchase any Note at the option of the Holder pursuant to Sections 5.10 or 5.15, or impair or adversely affect the right of any Noteholder to institute suit for the payment thereof, or change the currency in which the Notes are payable, or impair or change in any respect adverse to the Noteholders the right to convert the Notes into Common Stock subject to the terms set forth herein, including Section 15.6, without the consent of the holder of each Note so affected, or (ii) reduce the aforesaid percentage of Notes, the holders of which are required to consent to any such supplemental indenture, or modify this paragraph, without the consent of the holders of all Notes then outstanding; provided, further,

however, that any amendment or supplemental indenture that disproportionately affects the rights of a Noteholder or a class of Noteholder shall require the prior consent of such Noteholder or the prior consent of Noteholders holding a majority of the principal amount of Notes then held by such class, as applicable.

Upon the request of the Company, accompanied by a copy of the resolutions of the Board of Directors certified by its Secretary or Assistant Secretary authorizing the execution of any such amendment or supplemental indenture, and upon the filing with the Trustee of evidence of the consent of Noteholders as aforesaid, the Trustee shall join with the Company in the execution of such amendment or supplemental indenture unless such amendment or supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in is discretion, but shall not be obligated to, enter into such amendment or supplemental indenture.

It shall not be necessary for the consent of the Noteholders under this Section 11.2 to approve the particular form of any proposed amendment or supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

Section 11.3.  Effect of Amendments and Supplemental Indentures

Any amendment or supplemental indenture executed pursuant to the provisions of this Article XI shall comply with the Trust Indenture Act, as then in effect; provided that this Section 11.3 shall not require such amendment or supplemental indenture or the Trustee to be qualified under the Trust Indenture Act prior to the time such qualification is in fact required under the terms of the Trust Indenture Act or the Indenture has been qualified under the Trust Indenture Act, nor shall it constitute any admission or acknowledgement by any party to such amendment or supplemental indenture that any such qualification is required prior to the time such qualification is in fact required under the terms of the Trust Indenture Act or the Indenture has been qualified under the Trust Indenture Act.  Upon the execution of any amendment or supplemental indenture pursuant to the provisions of this Article XI, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the holders of Notes shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 11.4.  Notation on Notes

Notes authenticated and delivered after the execution of any amendment or supplemental indenture pursuant to the provisions of this Article XI may bear a notation in form approved by the Trustee as to any matter provided for in such amendment or supplemental indenture.  If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such amendment or supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated by the Trustee (or an authenticating agent duly

appointed by the Trustee pursuant to Section 16.10) and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding.

Section 11.5.  Evidence of Compliance of Amendment or Supplemental Indenture to be Furnished to Trustee

The Trustee, subject to the provisions of Sections 8.1 and 8.2, shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any amendment or supplemental indenture executed pursuant hereto complies with the requirements of this Article XI.

Section 11.6.  Intercreditor Agreement.

Amendments to the Security Documents shall be subject to Section 5.3 of the Intercreditor Agreement.

# ARTICLE XII.

## CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 12.1.  Company May Consolidate, Etc.

The Company shall not, directly or indirectly, consolidate with or merge with or into any other Person or sell, lease, convey or transfer all or substantially all its assets, whether in a single transaction or a series of related transactions, to any Person or group of affiliated Persons (other than any of the foregoing involving solely the Company and a Restricted Subsidiary in which the Company is the survivor or the purchaser) unless:

(a)  either (i) the Company is the surviving entity or (ii) in case the Company shall consolidate with or merge into another Person or sell, lease, convey or transfer all or substantially all of its properties and assets, whether in a single transaction or a series of related transactions, to any Person, the Person formed by such consolidation or into which the Company is merged, or the Person which acquires by sale, conveyance or transfer, or which leases the properties and assets of the Company substantially as an entirety, shall be a corporation, limited liability company, partnership or trust, shall be organized and validly existing under the laws of the United States of America, any state thereof or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, the due and punctual payment of the principal of, premium, if any, and interest (including Liquidated Damages, if any) on all of the Notes as applicable, and the performance or observance of every covenant of this Indenture and the Security Documents on the part of the Company to be performed or observed and shall have provided for the applicable conversion rights set forth in Section 15.6;

(b)  immediately after giving effect to such transaction on a pro forma basis (including, without limitation, any Indebtedness incurred or anticipated to be incurred in

connection with or in respect of such transaction immediately after giving effect to such transaction) no Default or Event of Default shall have happened and be continuing;

(c) immediately after giving effect to such transaction on a pro forma basis (including, without limitation, any Indebtedness incurred or anticipated to be incurred in connection with or in respect of such transaction), the Company or the surviving entity (assuming such surviving entity's assumption of the Company's obligations under the Notes and this Indenture), as the case may be, would be able to incur $1.00 of Indebtedness (other than Permitted Indebtedness) under Section 5.11; and

(d) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture complies with this Article XII and that all conditions precedent herein provided for relating to such transaction have been complied with, together with any documents required under Article IX.

Section 12.2.   Successor Entity to be Substituted

In case of any such consolidation, merger, sale, conveyance or lease in accordance with Section 12.1, and, where required in accordance with Section 12.1(a) upon the assumption by the successor entity, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the due and punctual payment of the principal of and premium, if any, and interest (including Liquidated Damages, if any) on all of the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such successor entity shall succeed to and be substituted for the Company, with the same effect as if it had been named herein as the party of the first part.  Such successor entity thereupon may cause to be signed, and may issue either in its own name or in the name of RCN Corporation any or all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such successor entity instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver, or cause to be authenticated and delivered, any Notes which previously shall have been signed and delivered by the officers of the Company to the Trustee for authentication, and any Notes which such successor entity thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Notes so issued shall in all respects have the same legal rank and benefit under this Indenture as the Notes theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Notes had been issued at the date of the execution hereof.  In the event of any such consolidation, merger, sale, conveyance or lease, the Person named as the "Company" in the first paragraph of this Indenture or any successor which shall thereafter have become such in the manner prescribed in this Article XII may be dissolved, wound up and liquidated at any time thereafter and such Person shall be released from its liabilities as obligor and maker of the Notes and from its obligations under this Indenture.

In case of any such consolidation, merger, sale, conveyance or lease, such changes in phraseology and form (but not in substance) may be made in the Notes thereafter to be issued as may be appropriate.

Section 12.3.  Opinion of Counsel to be Given Trustee

The Trustee, subject to Sections 8.1 and 8.2, shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance or lease and any such assumption complies with the provisions of this Article XII.

## ARTICLE XIII.

## SATISFACTION AND DISCHARGE OF INDENTURE

Section 13.1.  Discharge of Indenture

When (a) the Company shall deliver to the Trustee for cancellation all Notes theretofore authenticated (other than any Notes that have been destroyed, lost or stolen and in lieu of or in substitution for which other Notes shall have been authenticated and delivered) and not theretofore canceled, or (b) all the Notes not theretofore canceled or delivered to the Trustee for cancellation shall have become due and payable, or are by their terms to become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption, and the Company shall deposit with the Trustee, in trust, funds sufficient to pay at maturity or upon redemption of all of the Notes (other than any Notes which shall have been mutilated, destroyed, lost or stolen and in lieu of or in substitution for which other Notes shall have been authenticated and delivered) not theretofore canceled or delivered to the Trustee for cancellation, including principal and premium, if any, and interest (including Liquidated Damages, if any) due or to become due to such date of maturity or redemption date, as the case may be, and if in either case the Company shall also pay or cause to be paid all other sums payable hereunder by the Company, then this Indenture shall cease to be of further effect (except as to (i) remaining rights of registration of transfer, substitution and exchange and conversion of Notes, (ii) rights hereunder of Noteholders to receive payments of principal of and premium, if any, and interest on, the Notes and the other rights, duties and obligations of Noteholders, as beneficiaries hereof with respect to the amounts, if any, so deposited with the Trustee and (iii) the rights, obligations and immunities of the Trustee hereunder), and the Trustee, on demand of the Company accompanied by an Officer's Certificate and an Opinion of Counsel as required by Section 16.5 and at the cost and expense of the Company, shall execute proper instruments acknowledging satisfaction of and discharging this Indenture; the Company, however, hereby agreeing to reimburse the Trustee for any costs or expenses thereafter reasonably and properly incurred by the Trustee and to compensate the Trustee for any services thereafter reasonably and properly rendered by the Trustee in connection with this Indenture or the Notes.

Section 13.2.  Deposited Monies to be Held in Trust by Trustee

Subject to Section 13.4, all monies deposited with the Trustee pursuant to Section 13.1 shall be held in trust and applied by it to the payment, either directly or through any paying agent (including the Company if acting as its own paying agent), to the holders of the particular Notes for the payment or redemption of which such monies have been deposited with the Trustee, of all sums due and to become due thereon for principal and interest and premium, if any.

Section 13.3.   Paying Agent to Repay Monies Held

Upon the satisfaction and discharge of this Indenture, all monies then held by any paying agent of the Notes (other than the Trustee) shall, upon demand of the Company, be repaid to it or paid to the Trustee, and thereupon such paying agent shall be released from all further liability with respect to such monies.

Section 13.4.   Return of Unclaimed Monies

Subject to the requirements of applicable law, any monies deposited with or paid to the Trustee for payment of the principal of, premium, if any, or interest on Notes and not applied but remaining unclaimed by the holders of Notes for two (2) years after the date upon which the principal of, premium, if any, or interest (including Liquidated Damages, if any) on such Notes, as the case may be, shall have become due and payable, shall be repaid to the Company by the Trustee on written demand and all liability of the Trustee shall thereupon cease with respect to such monies; and the holder of any of the Notes shall thereafter look only to the Company for any payment which such holder may be entitled to collect unless an applicable abandoned property law designates another Person.

Section 13.5.   Reinstatement

If (i) the Trustee or the paying agent is unable to apply any money in accordance with Section 13.2 by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application and (ii) the holders of at least a majority in principal amount of the then outstanding Notes so request by written notice to the Trustee, the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 13.1 until such time as the Trustee or the paying agent is permitted to apply all such money in accordance with Section 13.2; provided, however, that if the Company makes any payment of interest on or principal of any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the holders of such Notes to receive such payment from the money held by the Trustee or paying agent.

ARTICLE XIV.

NO RECOURSE AGAINST OTHERS

Section 14.1.   Indenture and Notes Solely Corporate Obligations

No direct or indirect partner, employee, incorporator, shareholder, director or officer, as such, past, present or future of the Company or any successor corporation or any Subsidiary or any of the Company's Affiliates, shall have any personal liability in respect of the obligations of the Company under the Notes or this Indenture solely by reason of his, her or its status as such partner, employee, incorporator, shareholder, director or officer.  Nothing herein shall, however, affect the liability of any Guarantor.  Each Noteholder by accepting a Note waives and releases all such liability.  Such waiver and release are part of the consideration for the issuance of the Notes.

ARTICLE XV.

CONVERSION OF NOTES

Section 15.1.   Right to Convert

Subject to and upon compliance with the provisions of this Indenture, the holder of any Note shall have the right, at the holder's option, at any time following the date of original issuance of the Notes (except that, with respect to any Note or portion of a Note that shall be called for redemption, such right shall terminate, except as provided in the fifth paragraph of Section 15.2 and Section 3.4, at the close of business on the last Business Day prior to the date fixed for redemption of such Note or portion of a Note unless the Company shall default in payment due upon redemption thereof), to convert the principal amount of any such Note, or any portion of such principal amount which is One Thousand United States Dollars ($1,000) or an integral multiple thereof, into that number of fully paid and non-assessable shares of Common Stock (as such shares shall then be constituted) obtained by dividing the principal amount of the Note or portion thereof surrendered for conversion by the Conversion Price in effect at such time, by surrender of the Note so to be converted in whole or in part in the manner provided in Section 15.2.

Section 15.2.   Exercise of Conversion Privilege; Issuance of Common Stock on Conversion

In order to exercise the conversion privilege with respect to any Definitive Note, the holder of such Definitive Note then registered on the books of the Company shall (i) deliver a written notice, in the form of the conversion notice attached hereto as Exhibit B, or a facsimile thereof (the "Conversion Notice"), to the Trustee, the Company (with a copy to the Company's legal counsel) and the transfer agent at _____, telephone _____, facsimile _____, Attention: _____, of such holder's election to convert, which notice shall specify that all of such Note shall be converted or the portion thereof to be converted (which shall be One Thousand United States Dollars ($1,000) or an integral multiple thereof) and the name or names (with address) in which the shares of Common Stock which shall be issuable on such conversion shall be issued, (ii) pay by wire transfer of immediately available funds or other method acceptable to the Company the transfer, registration or other similar taxes, if any, required pursuant to Section 15.7, and (iii) surrender the Definitive Note to be converted in whole or in part to a common carrier for overnight delivery to the Company as soon as practicable following such date (or an indemnification undertaking or other form of security reasonably satisfactory to the Company with respect to the Definitive Note in the case of its loss, theft or destruction).  Anything herein to the contrary notwithstanding, in the case of Global Securities, conversion notices may be delivered and a Participant's interest in a Global Note may be surrendered for conversion in accordance with the Applicable Procedures as in effect from time to time.  Each Note surrendered for conversion shall, unless the shares issuable on conversion are to be issued in the same name as the registration of such Note, be duly endorsed by, or be accompanied by instruments of transfer (including a broker's letter regarding compliance with the prospectus delivery requirement, if applicable) in form satisfactory to the Company duly executed by, the holder or his duly authorized attorney.

102

The Company shall use its best efforts to, within three (3) Business Days after the Conversion Date (as defined below) with respect to any Note, subject to compliance with any restrictions on transfer if shares issuable on conversion are to be issued in a name other than that of the Noteholder (as if such transfer were a transfer of the Note or Notes (or portion thereof) so converted) (a)(i) in the case of a public resale of the Common Stock issuable upon such conversion, at the holder's request, credit such aggregate number of shares of Common Stock to which the holder shall be entitled to the holder's or its designee's balance account with The Depository Trust Company through its Deposit Withdrawal Agent Commission system or (ii) issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the holder or its designee, for the number of full shares of Common Stock to which the holder shall be entitled upon such conversion, and (b) deliver to such holder a check or cash in respect of any fractional interest in respect of a share of Common Stock arising upon such conversion, as provided in Section 15.4 (which payment, if any, shall be paid no later than five (5) Business Days after the Conversion Date).  In case any Note of a denomination greater than One Thousand United States Dollars ($1,000) shall be surrendered for partial conversion, and subject to Section 2.3, the Company shall execute and the Trustee shall authenticate and deliver to the holder of the Note so surrendered, without charge to him, a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note.

Subject to Article IV, if the Company shall not have delivered the number of shares of Common Stock issued upon conversion of Notes by any holder within five (5) Business Days after the Conversion Date with respect to such Notes, the Company shall pay Liquidated Damages to such holder at the rate of one-half percent (0.5%) per month of the outstanding principal amount of Notes so converted by such holder.

The conversion shall be deemed to have been effected as to any such Note (or portion thereof) on the date on which the requirements set forth above in this Section 15.2 have been satisfied as to such Note (or portion thereof) (such date, the "Conversion Date"), and the Person in whose name any shares of Common Stock shall be issuable upon such conversion shall be deemed to have become on the Conversion Date the holder of record of the shares represented thereby; provided, however, that any such surrender on any date when the stock transfer books of the Company shall be closed shall constitute the Person in whose name the certificates are to be issued as the record holder thereof for all purposes on the next succeeding day on which such stock transfer books are open, but such conversion shall be at the Conversion Price in effect on the date upon which such Note shall be surrendered.  For purposes of determining satisfaction of the requirement set forth above with respect to the Conversion Date for any Note, any facsimile required to be sent shall be deemed to have been sent on a given day if such facsimile was received before 1:00 p.m., New York City time, on such date, to the number listed above (unless a different number is specified in a notice filed with the Trustee and mailed by the Trustee, at the Company's expense, to each holder of the Notes at such holder's address appearing in the Note Register, as provided for in Section 2.5 of this Indenture) and a confirmation of transmission of such facsimile is obtained.

The Company shall pay in cash, on any Note or portion thereof surrendered for conversion during the period from the close of business on any Interest Payment Date to which interest has been fully paid through the close of business on the Business Day preceding the

record date for the next such Interest Payment Date, accrued and unpaid interest, if any, on the Note or portion thereof surrendered for conversion to, but excluding, the date of conversion, and Liquidated Damages, if any. Subject to Article IV, any such payment of interest shall be made with respect to such Note within ten (10) Business Days after the Conversion Date. Nothing in this Section 15.2 shall affect the right of a holder in whose name any Note is registered at the close of business on a record date to receive the interest payable on such Note on the related Interest Payment Date in accordance with the terms of this Indenture and the Note. Except as provided in this Section 15.2, no adjustment shall be made for interest accrued on any Note converted or for dividends on any shares issued upon the conversion of such Note as provided in this Article.

Section 15.3. Intentionally Omitted

Section 15.4. Cash Payments in Lieu of Fractional Shares

No fractional shares of Common Stock or scrip representing fractional shares shall be issued upon conversion of Notes. If more than one Note shall be surrendered for conversion at one time by the same holder, the number of full shares which shall be issuable upon conversion thereof shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted hereby) so surrendered for conversion. If any fractional share of stock otherwise would be issuable upon the conversion of any Note or Notes, the Company shall calculate and pay a cash adjustment in lieu of such fractional share at the current market value thereof to the holder of Notes. For purposes of this Section 15.4, the current market value of a share of Common Stock shall be the Closing Price (determined as provided in Section 15.6(f)) on the first Trading Day immediately preceding the day on which the Notes (or specified portions thereof) are deemed to have been converted.

Section 15.5. Conversion Price

The conversion price shall be as specified in the form of Note (herein called the "Conversion Price") attached as Exhibit A hereto, subject to adjustment as provided in this Article XV.

Section 15.6. Adjustment of Conversion Price

The Conversion Price shall be adjusted from time to time by the Company as follows:

(a) In case the Company shall hereafter pay a dividend or make a distribution to all holders of the outstanding Common Stock in shares of Common Stock, the Conversion Price in effect at the opening of business on the date following the date fixed for the determination of shareholders entitled to receive such dividend or other distribution shall be reduced by multiplying such Conversion Price by a fraction of which (i) the numerator shall be the number of shares of Common Stock outstanding at the close of business on the Record Date (as defined in Section 15.6(f)) fixed for such determination and (ii) the denominator shall be the sum of such number of shares and the total number of shares constituting such dividend or other distribution, such reduction in the Conversion Price to become effective immediately after the opening of business on the day following the Record Date. If any dividend or distribution of the type described

in this Section 15.6(a) is declared but not so paid or made, the Conversion Price shall again be adjusted to the Conversion Price which would then be in effect if such dividend or distribution had not been declared.

(b)     In case the outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such subdivision becomes effective shall be proportionately reduced, and conversely, in case outstanding shares of Common Stock shall be combined into a smaller number of shares of Common Stock, the Conversion Price in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately increased, such reduction or increase, as the case may be, to become effective immediately after the opening of business on the day following the day upon which such subdivision or combination becomes effective.

(c)     In case the Company shall issue rights or warrants to all holders of its outstanding shares of Common Stock entitling them to subscribe for or purchase shares of Common Stock at a price per share less than the Current Market Price (as defined in Section 15.6(f)) on the Record Date fixed for the determination of shareholders entitled to receive such rights or warrants, the Conversion Price shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Price in effect at the opening of business on the date after such Record Date by a fraction of which (i) the numerator shall be the sum of the number of shares of Common Stock outstanding at the close of business on the Record Date plus the number of shares that the aggregate offering price of the total number of shares so offered for subscription or purchase would purchase at such Current Market Price, and of which (ii) the denominator shall be the sum of the number of shares of Common Stock outstanding at the close of business on the Record Date plus the total number of additional shares of Common Stock so offered for subscription or purchase.  Such adjustment shall become effective immediately after the opening of business on the day following the Record Date fixed for determination of shareholders entitled to receive such rights or warrants.  To the extent that shares of Common Stock are not delivered pursuant to such rights or warrants, upon the expiration or termination of such rights or warrants the Conversion Price shall be readjusted to the Conversion Price that would then be in effect had the adjustments made upon the issuance of such rights or warrants been made on the basis of delivery of only the number of shares of Common Stock actually delivered.  In the event that such rights or warrants are not so issued, the Conversion Price shall again be adjusted to be the Conversion Price that would then be in effect if such date fixed for the determination of shareholders entitled to receive such rights or warrants had not been fixed.  In determining whether any rights or warrants entitle the holders to subscribe for or purchase shares of Common Stock at less than such Current Market Price, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received for such rights or warrants, the value of such consideration, if other than cash, to be determined in good faith by the Board of Directors.

(d)     In case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock shares of any class of capital stock of the Company (other

than any dividends or distributions to which Section 15.6(a) applies) or evidences of its indebtedness or other assets (including securities, but excluding (1) any rights or warrants referred to in Section 15.6(c) and (2) dividends and distributions paid exclusively in cash (except as set forth in Section 15.6(f), (the foregoing hereinafter in this Section 15.6(d) called the "Additional Securities")), unless the Company elects to reserve such Additional Securities for distribution to the Noteholders upon conversion of the Notes so that any such holder converting Notes will receive upon such conversion, in addition to the shares of Common Stock to which such holder is entitled, the amount and kind of such Additional Securities which such holder would have received if such holder had converted its Notes into Common Stock immediately prior to the Record Date (as defined in Section 15.6(f)) for such distribution of the Additional Securities then, in each such case, the Conversion Price shall be reduced so that the same shall be equal to the price determined by multiplying the Conversion Price in effect immediately prior to the close of business on the Record Date with respect to such distribution by a fraction of which (i) the numerator shall be the Current Market Price (determined as provided in Section 15.6(f)) on such date less the fair market value (as determined in good faith by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution) on such date of the portion of the Additional Securities so distributed applicable to one share of Common Stock and (ii) the denominator shall be such Current Market Price, such reduction to become effective immediately prior to the opening of business on the day following the Record Date; provided, however, that in the event the then fair market value (as so determined) of the portion of the Additional Securities so distributed applicable to one share of Common Stock is equal to or greater than the Current Market Price on the Record Date, in lieu of the foregoing adjustment, adequate provision shall be made so that each Noteholder shall have the right to receive upon conversion of a Note (or any portion thereof) the amount of Common Stock such holder would have received had such holder converted such Note (or portion thereof) immediately prior to such Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price which would then be in effect if such dividend or distribution had not been declared. If the Board of Directors determines the fair market value of any distribution for purposes of this Section 15.6(d) by reference to the actual or when issued trading market for any securities comprising all or part of such distribution, it must in doing so consider the prices in such market over the same period (the "Reference Period") used in computing the Current Market Price pursuant to Section 15.6(f) to the extent possible, unless the Board of Directors in a Board Resolution determines in good faith that determining the fair market value during the Reference Period would not be in the best interest of the Noteholder.

In the event that the Company implements a new shareholder rights plan, such rights plan shall provide that upon conversion of the Notes the holders will receive, in addition to the Common Stock issuable upon such conversion, the rights issued under such rights plan as if the holders had converted the Notes prior to implementing the rights plan and notwithstanding the occurrence of an event causing such rights to separate from the Common Stock at or prior to the time of conversion. Any distribution of rights or warrants pursuant to a shareholder rights plan complying with the requirements set forth in the immediately preceding sentence of this

paragraph shall not constitute a distribution of rights or warrants for the purposes of this Section 15.6(d).

Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's capital stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events ("Trigger Event"): (i) are deemed to be transferred with such shares of Common Stock; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of Common Stock, shall be deemed not to have been distributed for purposes of this Section 15.6(d) (and no adjustment to the Conversion Price under this Section 15.6(d) will be required) until the occurrence of the earliest Trigger Event. If such right or warrant is subject to subsequent events, upon the occurrence of which such right or warrant shall become exercisable to purchase different securities, evidences of indebtedness or other assets or entitles the holder to purchase a different number or amount of the foregoing or to purchase any of the foregoing at a different purchase price, then the occurrence of each such event shall be deemed to be the date of issuance and record date with respect to a new right or warrant (and a termination or expiration of the existing right or warrant without exercise by the holder thereof). In addition, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in the preceding sentence) with respect thereto, that resulted in an adjustment to the Conversion Price under this Section 15.6(d), (1) in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by any holders thereof, the Conversion Price shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase price received by a holder of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase, and (2) in the case of such rights or warrants all of which shall have expired or been terminated without exercise, the Conversion Price shall be readjusted as if such rights and warrants had never been issued.

For purposes of this Section 15.6(d) and Sections 15.6(a) and (c), any dividend or distribution to which this Section 15.6(d) is applicable that also includes shares of Common Stock, or rights or warrants to subscribe for or purchase shares of Common Stock to which Section 15.6(a) or 15.6(c) applies (or both), shall be deemed instead to be (1) a dividend or distribution of the evidences of indebtedness, assets, shares of capital stock, rights or warrants other than such shares of Common Stock or rights or warrants to which Section 15.6(c) applies (and any Conversion Price reduction required by this Section 15.6(d) with respect to such dividend or distribution shall then be made) immediately followed by (2) a dividend or distribution of such shares of Common Stock or such rights or warrants (and any further Conversion Price reduction required by Sections 15.6(a) and (c) with respect to such dividend or distribution shall then be made, except (A) the Record Date of such dividend or distribution shall be substituted as "the date fixed for the determination of shareholders entitled to receive such dividend or other distribution", "Record Date fixed for such determination" and "Record Date" within the meaning of Section 15.6(a) and as "the Record Date fixed for the determination of the shareholders entitled to receive such rights or warrants" and "such Record Date" within the meaning of Section 15.6(c) and (B) any shares of Common Stock included in such dividend or

distribution shall not be deemed "outstanding at the close of business on the Record Date fixed for such determination" within the meaning of Section 15.6(a).

In case the Company shall, by dividend or otherwise, distribute to all holders of its Common Stock cash (excluding any cash that is distributed upon a merger or consolidation to which Section 15.7 applies or as part of a distribution referred to in Section 15.6), then immediately after the close of business on the Record Date for the distribution, the Conversion Price shall be reduced so that the same shall equal the price determined by multiplying the Conversion Price in effect immediately prior to the close of business on such Record Date by a fraction (i) the numerator of which shall be equal to the Current Market Price on the Record Date less an amount equal to the quotient of (x) such combined amount and (y) the number of shares of Common Stock outstanding on the Record Date and (ii) the denominator of which shall be equal to the Current Market Price on such date; provided, however, that in the event the portion of the cash so distributed applicable to one (1) share of Common Stock is equal to or greater than the Current Market Price of the Common Stock on the Record Date, in lieu of the foregoing adjustment, adequate provision shall be made so that each holder shall have the right to receive upon conversion of a Note (or any portion thereof) the amount of cash such holder would have received had such holder converted such Note (or portion thereof) immediately prior to such Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Price shall again be adjusted to be the Conversion Price that would then be in effect if such dividend or distribution had not been declared.

(e)     In the event that (i) no later than one (1) Business Day following the Issue Date, the Company irrevocably acquires ownership of 100% of the membership interests of Starpower Communications, LLC not owned by the Company on the Issue Date (such acquisition, the "Starpower Acquisition") and (ii) no later than 9:00 a.m. on the date that is two (2) Business Days following the Issue Date, the Company files with the Trustee and any conversion agent other than the Trustee an Officer's Certificate setting forth the Conversion Price after such adjustment and setting forth a summary of the terms of the Starpower Acquisition, which Officer's Certificate shall include a certification that the Company irrevocably acquired, on or before 12:00 p.m. New York City time on that date that is the first Business Day following the Issue Date, ownership of 100% of the membership interests of Starpower, then the Conversion Price on the Notes shall increase from $24.00 (subject to adjustments to the Conversion Price resulting from Sections 15.6(a) through (d) above occurring on or after the Issue Date and on or before the date of consummation of the Starpower Acquisition) to $25.16.

(f)     For purposes of this Section 15.6, the following terms shall have the meaning indicated:

(1)     "Closing Price" with respect to any securities on any day shall mean the closing sale price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in each case on the Nasdaq National Market or New York Stock Exchange, as applicable, or, if such security is not listed or admitted to trading on such National Market or Exchange, on the principal national security exchange or quotation system on which such security is quoted or listed or admitted to trading,

or, if not quoted or listed or admitted to trading on any national securities exchange or quotation system, the average of the closing bid and asked prices of such security on the over-the-counter market on the day in question as reported by the National Quotation Bureau Incorporated, or a similar generally accepted reporting service, or if not so available, in such manner as furnished by any New York Stock Exchange member firm selected from time to time by the Board of Directors for that purpose, or a price determined in good faith by the Board of Directors, whose determination shall be conclusive and described in a Board Resolution.

(2)      "Current Market Price" shall mean the average of the daily Closing Prices per share of Common Stock for the ten (10) consecutive Trading Days immediately prior to the date in question; provided, however, that (1) if the "ex" date (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 15.6(a), (b), (c) or (d) occurs during such ten (10) consecutive Trading Days, the Closing Price for each Trading Day prior to the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the same fraction by which the Conversion Price is so required to be adjusted as a result of such other event, (2) if the "ex" date for any event (other than the issuance or distribution requiring such computation) that requires an adjustment to the Conversion Price pursuant to Section 15.6(a), (b), (c) or (d) occurs on or after the "ex" date for the issuance or distribution requiring such computation and prior to the day in question, the Closing Price for each Trading Day on and after the "ex" date for such other event shall be adjusted by multiplying such Closing Price by the reciprocal of the fraction by which the Conversion Price is so required to be adjusted as a result of such other event, and (3) if the "ex" date for the issuance or distribution requiring such computation is prior to the day in question, after taking into account any adjustment required pursuant to clause (1) or (2) of this proviso, the Closing Price for each Trading Day on or after such "ex" date shall be adjusted by adding thereto the amount of any cash and the fair market value (as determined in good faith by the Company's Board of Directors in a manner consistent with any determination of such value for purposes of Section 15.6(d), whose determination shall be conclusive and described in a Board Resolution) of the evidences of indebtedness, shares of capital stock or assets being distributed applicable to one share of Common Stock as of the close of business on the day before such "ex" date.  For purposes of this paragraph, the term "ex" date, (1) when used with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution and (2) when used with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective. Notwithstanding the foregoing, whenever successive adjustments to the Conversion Price are called for pursuant to this Section 15.6, such adjustments shall be made to the Current Market Price as may be necessary or appropriate to

109

effectuate the intent of this Section 15.6 and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

(3) "fair market value" shall mean the amount which a willing buyer would pay a willing seller in an arm's length transaction.

(4) "Record Date" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of shareholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

(5) "Trading Day" shall mean (x) if the applicable security is listed or admitted for trading on the New York Stock Exchange or another national security exchange, a day on which the New York Stock Exchange or such other national security exchange, as applicable, is open for business or (y) if the applicable security is quoted on the Nasdaq National Market, a day on which trades may be made thereon or (z) if the applicable security is not so listed, admitted for trading or quoted, a Business Day.

(g) The Company may make such reductions in the Conversion Price, in addition to those required by Sections 15.6(a), (b), (c), (d) or (e), as the Board of Directors considers to be advisable to avoid or diminish any income tax to holders of Common Stock or rights to purchase Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

(h) To the extent permitted by applicable law, the Company from time to time may reduce the Conversion Price by any amount for any period of time if the period is at least twenty (20) days, the reduction is irrevocable during the period and the Board of Directors shall have made a determination that such reduction would be in the best interests of the Company, which determination shall be conclusive and described in a Board Resolution. Whenever the Conversion Price is reduced pursuant to the preceding sentence, the Company shall mail to the holder of each Note at his last address appearing on the Note Register provided for in Section 2.5 a notice of the reduction at least five (5) days prior to the date the reduced Conversion Price takes effect, and such notice shall state the reduced Conversion Price and the period during which it will be in effect.

(i) Except for an adjustment pursuant to Section 15.6(e), no adjustment in the Conversion Price shall be required under this Section 15.6 unless such adjustment would require an increase or decrease of at least one percent (1%) in such price; provided, however, that any adjustments which by reason of this Section 15.6(i) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Article XV shall be made by the Company and shall be made

to the nearest cent or to the nearest one hundredth of a share, as the case may be. No adjustment need be made for a change in the par value or no par value of the Common Stock.

(j)    Subject to the requirements of Section 15.6(e), whenever the Conversion Price is adjusted as provided in this Section 15.6, the Company shall promptly, and in no event later than five (5) Business Days following the date of the adjustment, file with the Trustee and any conversion agent other than the Trustee an Officer's Certificate setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Promptly after the filing of such certificate, and in no event later than five (5) Business Days following the date on which the Officer's Certificate is filed with the Trustee pursuant to this Section 15.6(j), the Company shall prepare a notice of such adjustment of the Conversion Price setting forth the adjusted Conversion Price and the date on which each adjustment becomes effective and shall mail such notice of such adjustment of the Conversion Price to the holder of each Note at his last address appearing on the Note Register provided for in Section 2.5, within twenty (20) days of the effective date of such adjustment. Failure to deliver such notice shall not effect the legality or validity of any such adjustment.

(k)    In any case in which this Section 15.6 provides that an adjustment shall become effective immediately after a Record Date for an event, the Company may defer until the occurrence of such event (i) issuing to the holder of any Note converted after such Record Date and before the occurrence of such event the additional shares of Common Stock issuable upon such conversion by reason of the adjustment required by such event over and above the Common Stock issuable upon such conversion before giving effect to such adjustment and (ii) paying to such holder any amount in cash in lieu of any fraction pursuant to Section 15.4.

(l)    For purposes of this Section 15.6, the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock. The Company will not pay any dividend or make any distribution on shares of Common Stock held in the treasury of the Company.

Section 15.7.  Effect of Reclassification, Consolidation, Merger or Sale

If any of the following events occur, namely (i) any reclassification or change of the outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination), (ii) any consolidation, merger or combination of the Company with another Person as a result of which holders of Common Stock shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock (other than as a result of a change in name, a change in par value or a change in the jurisdiction of incorporation), (iii) any statutory exchange as a result of which holders of Common Stock generally shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock (such transaction, a "Statutory Exchange"), or (iv) any sale or conveyance of the properties and assets of the Company as, or substantially as, an entirety to

111

any other Person as a result of which holders of Common Stock shall be entitled to receive stock, securities or other property or assets (including cash) with respect to or in exchange for such Common Stock, then the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture (which shall comply with the Trust Indenture Act as in force at the date of execution of such supplemental indenture if such supplemental indenture is then required to so comply) providing that such Note shall be convertible into the kind and amount of shares of stock and other securities or property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, combination, Statutory Exchange, sale or conveyance by a holder of a number of shares of Common Stock issuable upon conversion of such Notes (assuming, for such purposes, a sufficient number of authorized shares of Common Stock available to convert all such Notes) immediately prior to such reclassification, change, consolidation, merger, combination, Statutory Exchange, sale or conveyance assuming such holder of Common Stock did not exercise his rights of election, if any, that holders of Common Stock who were entitled to vote or consent to such transaction had as to the kind or amount of securities, cash or other property receivable upon such consolidation, merger, combination, Statutory Exchange, sale or conveyance (provided that, if the kind or amount of securities, cash or other property receivable upon such consolidation, merger, combination, Statutory Exchange, sale or conveyance is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("non-electing share"), then for the purposes of this Section 15.7 the kind and amount of securities, cash or other property receivable upon such consolidation, merger, combination, Statutory Exchange, sale or conveyance for each non-electing share shall be deemed to be the kind and amount so receivable per share by a plurality of the non-electing shares). Such supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article XV. If, in the case of any such reclassification, change, consolidation, merger, combination, Statutory Exchange, sale or conveyance, the stock or other securities and assets receivable thereupon by a holder of shares of Common Stock include shares of stock or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such reclassification, change, consolidation, merger, combination, Statutory Exchange, sale or conveyance, then such supplemental indenture shall also be executed by such other Person and shall contain such additional provisions to protect the interests of the holders of the Notes as the Company's Board of Directors shall reasonably consider necessary by reason of the foregoing.

The Company shall cause notice of the execution of such supplemental indenture to be mailed to each holder of Notes, at his address appearing on the Note Register provided for in Section 2.5 of this Indenture, within twenty (20) days after execution thereof. Failure to deliver such notice the legality or validity of such supplemental indenture shall not affect the legality or validity of such supplemental indenture.

The above provisions of this Section 15.7 shall similarly apply to successive reclassifications, changes, consolidations, mergers, combinations, sales and conveyances.

Section 15.8.   Taxes on Shares Issued

The issue of stock certificates on conversions of Notes shall be made without charge to the converting Noteholder for any tax in respect of the issue thereof. The Company shall not,

however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of stock in any name other than that of the holder of any Note converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the Person or Persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 15.9.   Reservation of Shares; Shares to be Fully Paid; Listing of Common Stock

The Company shall provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, reserved for the purpose of issuance, no less than one hundred five percent (105%) of the number of shares of Common Stock needed to provide for the issuance of Common Stock upon conversion of all of the Notes without regard to any limitations on conversions or exercise.

The Company will not, by amendment of its articles of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed by it hereunder.  Without limiting the generality of the foregoing, the Company (i) will not increase the par value of any shares of Common Stock issuable upon conversion of the Notes above the Conversion Price then in effect, (ii) will take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Notes and (iii) will not take any action which results in any adjustment of the Conversion Price if the total number of shares of Common Stock issuable after the conversion of all of the Notes would exceed the total number of shares of Common Stock then authorized by the Company's articles of incorporation and available for the purpose of issue upon such exercise.

The Company covenants that all shares of Common Stock issued upon conversion of Notes will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

The Company is obligated to register the Notes and the shares of Common Stock issuable upon conversion of the Notes for resale under the Securities Act pursuant to the Registration Rights Agreement.  The Notes and the shares of Common Stock issuable upon conversion of the Notes shall constitute Registrable Securities (as such term is defined in the Registration Rights Agreement).  Each holder of Notes shall be entitled to all of the benefits afforded to a holder of Registrable Securities under the Registration Rights Agreement and such holder, by its acceptance of a Note, agrees and shall agree to be bound by and to comply with the terms and conditions of the Registration Rights Agreement applicable to such holder as a holder of such Registrable Securities.

The Company shall use its best efforts to promptly secure the listing of the shares of Common Stock issuable upon conversion of a Note upon each national securities exchange and automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance upon conversion of such Note) and shall use its best efforts to maintain, so long as any other shares of Common Stock shall be so listed, such listing of all

shares of Common Stock from time to time issuable upon the conversion of all then outstanding Notes; and the Company shall use its best efforts to list on each national securities exchange or automated quotation system, as the case may be, and shall maintain such listing of, any other shares of capital stock of the Company issuable upon conversion of the Notes if and so long as any shares of the same class shall be listed on such national securities exchange or automated quotation system. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 15.9.

Section 15.10. Responsibility of Trustee

The Trustee and any other conversion agent shall not at any time be under any duty or responsibility to any holder of Notes to determine whether any facts exist which may require any adjustment of the Conversion Price, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same. The Trustee and any other conversion agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock, or of any securities or property, which may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other conversion agent make no representations with respect thereto. Subject to the provisions of Section 8.1, neither the Trustee nor any conversion agent shall be responsible for any failure of the Company to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion or to comply with any of the duties, responsibilities or covenants of the Company contained in this Article. Without limiting the generality of the foregoing, neither the Trustee nor any conversion agent shall be under any responsibility to determine whether a supplemental indenture need be entered into under Section 15.7 or the correctness of any provisions contained in any supplemental indenture entered into pursuant to such section relating either to the kind or amount of shares of stock or securities or property (including cash) receivable by Noteholders upon the conversion of their Notes after any event referred to in such Section 15.7 or to any adjustment to be made with respect thereto, but, subject to the provisions of Section 8.1, may accept as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officer's Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such supplemental indenture) with respect thereto.

Section 15.11. Notice to Holders Prior to Certain Actions

In case:

(a)     the Company shall declare a dividend (or any other distribution) on its Common Stock; or

(b)     the Company shall authorize the granting to the holders of its Common Stock of rights or warrants to subscribe for or purchase any share of any class or any other rights or warrants; or

(c)     of any reclassification of the Common Stock of the Company (other than a subdivision or combination of its outstanding Common Stock, or a change in par value,

or from par value to no par value, or from no par value to par value), or of any consolidation or merger to which the Company is a party and for which approval of any shareholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

> (d) of the voluntary or involuntary dissolution, liquidation or winding-up of the Company;

the Company shall cause to be filed with the Trustee and to be mailed to each holder of Notes at his address appearing on the Note Register, provided for in Section 2.5 of this Indenture, as promptly as possible but in any event at least fifteen (15) days prior to the applicable date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights or warrants, or, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.

Section 15.12. Holder Not Deemed a Shareholder

Except as otherwise specifically provided herein, prior to a Noteholder's receipt of Common Stock upon conversion of a Note, the Noteholder shall not be entitled, as such, to any rights of a shareholder of the Company, including, without limitation, the right to vote or to consent to any action of the shareholders of the Company, to receive dividends or other distributions, to exercise any preemptive right or to receive dividends or other distributions, or to receive any notice of meetings of shareholders of the Company, and shall not be entitled to receive any notice of any proceedings of the Company. In addition, nothing contained in this Indenture shall be construed as imposing any liabilities on such holder to purchase any securities (upon conversion of a Note or otherwise) or as a shareholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

ARTICLE XVI.

MISCELLANEOUS PROVISIONS

Section 16.1. Provisions Binding on Company's Successors

All the covenants, stipulations, promises and agreements of the Company contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 16.2.   Official Acts by Successor Corporation

Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation that shall at the time be the lawful sole successor of the Company.

Section 16.3.   Addresses for Notices, Etc.

Any notice or demand which by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the holders of Notes on the Company or any Guarantor and any notice, direction, request or demand hereunder to or upon the Trustee or to or upon any Noteholder shall be deemed to have been sufficiently given or made, for all purposes (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (evidence by mechanically or electronically generated receipt by the sender's facsimile machine); or (iii) one (1) Business Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same.  The addresses and facsimile numbers of such communications shall be:

If to the Company or any Guarantor:

RCN                                                          Corporation
105                              Carnegie                    Center
Princeton, NJ  08540
Telephone:
Facsimile:
Attention:

If to the Trustee:

_____
_____
_____
Attention:
Facsimile:

If to a Noteholder:

At the address and facsimile number of such Noteholder, as set forth on the Note Register, which shall initially include the information set forth in the Note Purchase  Agreement regarding notices.

The Trustee, by notice to the Company, may designate additional or different addresses for subsequent notices or communications.  The Trustee shall use reasonable commercial efforts to provide any notice of default, notice of redemption and notice of conversion to each holder by facsimile, if and to the extent such holder's facsimile number is set forth in the Note Register.

Failure to give a notice or communication to a Noteholder or any defect in it shall not affect its sufficiency with respect to other Noteholders. If a notice or communication is given or made in the manner provided above, it is duly given or made, whether or not the addressee receives it.

Section 16.4. Governing Law; Jurisdiction; Jury Trial

This Indenture and each Note shall be deemed to be a contract made under the laws of the State of New York and for all purposes shall be construed in accordance with the internal laws of the State of New York without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in the City of New York, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Indenture and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. If any provision of this Indenture shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Indenture in that jurisdiction or the validity or enforceability of any provision of this Indenture in any other jurisdiction. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

Section 16.5. Evidence of Compliance with Conditions Precedent; Certificates to Trustee

Upon any application or demand by the Company to the Trustee to take any action under any of the provisions of this Indenture, the Company shall furnish to the Trustee an Officer's Certificate stating that in the opinion of the person executing such Officer's Certificate all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been satisfied, and an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent have been satisfied.

Each certificate or opinion provided for by or on behalf of the Company in this Indenture and delivered to the Trustee with respect to compliance with a condition or covenant provided for in this Indenture shall include (1) a statement that the person making such certificate or opinion has read such covenant or condition; (2) a brief statement as to the nature and scope of the examination or investigation upon which the statement or opinion contained in such certificate or opinion is based; (3) a statement that, in the opinion of such person, he has made

such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and (4) a statement as to whether or not, in the opinion of such person, such condition or covenant has been satisfied or waived.

Section 16.6.   Legal Holidays

In any case where the date of maturity of interest on or principal of the Notes or the date fixed for redemption of any Note will not be a Business Day, then payment of such interest on or principal of the Notes need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date of maturity or the date fixed for redemption, and no interest shall accrue for the period from and after such date.

Section 16.7.   Trust Indenture Act

This Indenture is hereby made subject to, and shall be governed by, the provisions of the Trust Indenture Act required to be part of and to govern indentures qualified under the Trust Indenture Act; provided, however, that this Section 16.7 shall not require that this Indenture or the Trustee be qualified under the Trust Indenture Act prior to the time such qualification is in fact required under the terms of the Trust Indenture Act, nor shall it constitute any admission or acknowledgment by any party hereto that any such qualification is required prior to the time such qualification is in fact required under the terms of the Trust Indenture Act.  If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in an indenture qualified under the Trust Indenture Act, such required provision shall control.

Section 16.8.   Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto, any paying agent, any authenticating agent, any Note Registrar and their successors hereunder, the holders of Notes and the holders of Senior Indebtedness, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 16.9.   Table of Contents, Headings, Etc.

The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 16.10. Authenticating Agent

The Trustee may appoint an authenticating agent which shall be authorized to act on its behalf and subject to its direction in the authentication and delivery of Notes in connection with the original issuance thereof and transfers and exchanges of Notes hereunder, including under Sections 2.4, 2.5, 2.6, 2.7 and 3.3, as fully for all intents and purposes as though the authenticating agent had been expressly authorized by this Indenture and those Sections to authenticate and deliver Notes.  For all purposes of this Indenture, the authentication and delivery of Notes by the authenticating agent shall be deemed to be authentication and delivery of such Notes "by the Trustee" and a certificate of authentication executed on behalf of the

118

Trustee by an authenticating agent shall be deemed to satisfy any requirement hereunder or in the Notes for the Trustee's certificate of authentication.  Such authenticating agent shall at all times be a Person eligible to serve as trustee hereunder pursuant to Section 8.9.

Any corporation into which any authenticating agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any authenticating agent shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of any authenticating agent, shall be the successor of the authenticating agent hereunder, if such successor corporation is otherwise eligible under this Section, without the execution or filing of any paper or any further act on the part of the parties hereto or the authenticating agent or such successor corporation.

Any authenticating agent may at any time resign by giving written notice of resignation to the Trustee and to the Company.  The Trustee may at any time terminate the agency of any authenticating agent by giving written notice of termination to such authenticating agent and to the Company.  Upon receiving such a notice of resignation or upon such a termination, or in case at any time any authenticating agent shall cease to be eligible under this Section, the Trustee shall promptly appoint a successor authenticating agent (which may be the Trustee), shall give written notice of such appointment to the Company and shall mail notice of such appointment to all holders of Notes as the names and addresses of such holders appear on the Note Register.

The Company agrees to pay to the authenticating agent from time to time reasonable compensation for its services.

The provisions of Sections 8.2, 8.3, 8.4, 9.3 and this Section 16.10 shall be applicable to any authenticating agent.

Section 16.11. Execution in Counterparts

This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Section 16.12. No Adverse Interpretation of Other Agreements

This Indenture may not be used to interpret another indenture, loan or debt agreement of the Company or any Subsidiary of the Company.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

## ARTICLE XVII.

## DEFEASANCE OR COVENANT DEFEASANCE

Section 17.1.  Company's Option To Effect Defeasance or Covenant Defeasance.

The Company may, at its option by Board Resolution, at any time, with respect to the Notes, elect to have either Section 17.2 or Section 17.3 be applied to all of the Outstanding Notes (the "Defeased Notes"), upon compliance with the conditions set forth below in this Article XVII.  Notwithstanding any provision in this Article XVII to the contrary, the obligations of the

Company and the Guarantors under Article XV and under Sections 5.10 and all provisions of this Indenture related thereto shall not be affected by any defeasance effected under this Article XVII and such Persons shall continue to be obligated to perform their obligations thereunder as if defeasance had not occurred. [Note: additional language may be added to protect all equity provisions and change of control provisions will be exempt from the operation of Article XVII]

Section 17.2. Defeasance and Discharge.

Upon the Company's exercise under Section 17.1 hereof of the option applicable to this Section 17.2, the Company shall be deemed to have been discharged from its obligations with respect to the Defeased Notes on the date the conditions set forth below are satisfied (hereinafter, "defeasance"). For this purpose, such defeasance means that the Company shall be deemed to have paid and discharged the entire indebtedness represented by the Defeased Notes, which shall thereafter be deemed to be "Outstanding" only for the purposes of Section 17.5 and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes and this Indenture insofar as such Notes are concerned (and the Trustee, at the expense of the Company, and, upon Company Request, shall execute proper instruments acknowledging the same), except for the following, which shall survive until otherwise terminated or discharged hereunder: (a) the rights of Holders of Defeased Notes to receive, solely from the trust fund described in Section 17.4 hereof and as more fully set forth in such Section, payments in respect of the principal of, premium, if any, and interest on such Notes when such payments are due, (b) the Company's obligations with respect to such Defeased Notes under Sections [3.4, 3.5, 3.6], 5.2 and 5.3 hereof, (c) the rights, powers, trusts, duties and immunities of the Trustee hereunder, including, without limitation, the Trustee's rights under Sections 17.5 and 8.6, and (d) this Article XVII. Subject to compliance with this Article XVII, the Company may exercise its option under this Section 17.2 notwithstanding the prior exercise of its option under Section 17.3 hereof with respect to the Notes.

Section 17.3. Covenant Defeasance.

Upon the Company's exercise under Section 17.1 of the option applicable to this Section 17.3, the Company shall be released from its obligations under any covenant or provision contained in Sections 5.6 through 5.22 (other than any which relate to obligations under Article XV or Section 5.10) and the provisions of clause (c) of Section 12.1 shall not apply, with respect to the Defeased Notes, on and after the date the conditions set forth below are satisfied (hereinafter, "covenant defeasance"), and the Defeased Notes shall thereafter be deemed not to be "Outstanding" for the purposes of any direction, waiver, consent or declaration or Act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "Outstanding" for all other purposes hereunder. For this purpose, such covenant defeasance means that, with respect to the Defeased Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such Section or Article, whether directly or indirectly, by reason of any reference elsewhere herein to any such Section or Article or by reason of any reference in any such Section or Article to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under 7.1(a), (b) or (c), but, except as specified above, the remainder of this Indenture and such Defeased Notes shall be unaffected thereby.

Section 17.4.   Conditions to Defeasance or Covenant Defeasance.

The following shall be the conditions to application of either Section 17.2 or Section 17.3 hereof to the Defeased Notes:

(1)     The Company shall irrevocably have deposited or caused to be deposited with the Trustee (or another trustee satisfying the requirements of Section 8.9 who shall agree to comply with the provisions of this Article XVII applicable to it) as trust funds in trust for the purpose of making the following payments, specifically pledged as security for, and dedicated solely to, the benefit of the Holders of such Notes, (a) money in an amount, or (b) U.S. Government Obligations which through the scheduled payment of principal, premium, if any, and interest in respect thereof in accordance with their terms will provide, not later than the due date of any payment, money in an amount, or (c) a combination thereof, in any such case, sufficient without reinvestment, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, to pay and discharge the entire Indebtedness in respect of, and which shall be applied by the Trustee (or other qualifying trustee) to pay and discharge, the principal of, premium, if any, and interest on the Defeased Notes at the Stated Maturity of such principal or installment of principal, premium, if any, or interest (provided, however, that the amount in respect of principal and premium shall not in any event be less than the amount required to purchase all Notes at the price required to be paid in connection with a Change of Control pursuant to Section 5.10) or (if the Company has made irrevocable arrangements satisfactory to such Trustee for the giving of notice of redemption by such Trustee in the name and at the expense of the Company) the redemption date thereof, as the case may be, in accordance with the terms of the Indenture and the Notes; provided, however, that the Trustee shall have been irrevocably instructed to apply such cash or the proceeds of such U.S. Government Obligations to said payments with respect to the Notes;

(2)     No Default with respect to the Outstanding Notes shall have occurred and be continuing on the date of such deposit or, insofar as Section 17.2 hereof is concerned, at any time during the period ending on the ninety-first day after the date of such deposit (it being understood that this condition shall not be deemed satisfied until the expiration of such period) no Default relating to Section 7.1(g);

(3)     Neither the Company nor any Subsidiary of the Company is an "insolvent person" within the meaning of any applicable Bankruptcy Law on the date of such deposit or at any time during the period ending on the ninety-first day after the date of such deposit (it being understood that this condition shall not be deemed satisfied until the expiration of such period);

(4)     Such defeasance or covenant defeasance shall not cause the Trustee for the Notes to have a conflicting interest in violation of Section 8.8 and

for purposes of the Trust Indenture Act with respect to any securities of the Company;

(5)     Such defeasance or covenant defeasance shall not result in a breach or violation of, or constitute a default under, this Indenture or any other material agreement or instrument to which the Company is a party or by which it is bound;

(6)     In the case of an election under Section 17.2, the Company shall have delivered to the Trustee an Opinion of Counsel stating that (x) the Company has received from, or there has been published by, the Internal Revenue Service a ruling or (y) since the date hereof, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such opinion shall confirm that, the Holders of the Outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such deposit, defeasance and discharge to be effected with respect to the Notes and will be subject to federal income tax on the same amount, in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred;

(7)     In the case of an election under Section 17.3 hereof, the Company shall have delivered to the Trustee an Opinion of Counsel to the effect that the Holders of the Outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of the deposit and covenant defeasance to be effected with respect to the Notes and will be subject to U.S. federal income tax on the same amount, in the same manner and at the same times as would have been the case if such deposit and covenant defeasance had not occurred;

(8)     The Company shall have delivered to the Trustee, an Opinion of Counsel to the effect that, immediately following the ninety-first day after the deposit, the trust funds established pursuant to this Article will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally under any applicable U.S. federal or state law;

(9)     The Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit made by the Company pursuant to its election under Section 4.2 or 4.3 hereof was not made by the Company with the intent of preferring the Holders over the other creditors of the Company or with the intent of defeating, hindering, delaying or defrauding creditors of the Company or others;

(10)     The Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that (i) all conditions precedent (other than conditions requiring the passage of time) provided for relating to either the defeasance under Section 17.2 or the covenant defeasance under Section 17.3 (as the case may be) have been complied with as contemplated by this Section 17.4 and (ii) if any other Indebtedness of the Company shall then be outstanding or committed, such defeasance or covenant defeasance will not

122

violate the provisions of the agreements or instruments evidencing such Indebtedness; and

(11)    Such defeasance or covenant defeasance shall not result in a trust arising from such deposit constituting an investment company within the meaning of the Investment Company Act of 1940, as amended, unless such trust shall be registered under the Act or exempt from registration thereunder.

Opinions required to be delivered under this Section may have such qualifications as are customary for opinions of the type required and reasonably acceptable to the Trustee.

Section 17.5.   Deposited Money and U.S. Government Obligations To Be Held in Trust; Other Miscellaneous Provisions.

Subject to the proviso of the last paragraph of Section 5.3, all money and U.S. Government Obligations (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 17.5, the "Trustee") pursuant to Section 17.4 in respect of the Defeased Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (other than the Company) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee, its officers, directors and agents and hold such harmless against any tax, fee or other charge imposed on or assessed against the U.S. Government Obligations deposited pursuant to Section 17.4 or the principal, premium, if any, and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the Defeased Notes.

Anything in this Article XVII to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon Company Request any money or U.S. Government Obligations held by it as provided in Section 17.4 which, in the opinion of an internationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee, are in excess of the amount thereof which would then be required to be deposited to effect an equivalent defeasance or covenant defeasance.

Section 17.6.   Reinstatement.

If the Trustee or Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with Section 17.2 or 17.3, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the obligations of the Company under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 17.2 or 17.3, as the case may be, until such time as the Trustee or Paying Agent is permitted to apply all such money and U.S. Government Obligations in accordance with Section 17.2 or 17.3, as the case may be; provided, however, that if the Company makes any payment of principal, premium, if any, or interest on any Note following the reinstatement of its obligations, the Company shall

be subrogated to the rights of the Holders of such Notes to receive such payment from the money and U.S. Government Obligations held by the Trustee or Paying Agent.

IN WITNESS WHEREOF, all of the parties hereto have caused this Indenture to be duly signed as of the date first written above.

RCN CORPORATION

By _____
    Name:
    Title:

Attest:

By _____
    Name:
    Title:

_____
    as Trustee

By _____
    Name:
    Title:

[SIGNATURE PAGE TO INDENTURE]

EXHIBIT A

Form of 7-3/8% Convertible Second Lien Secured Note due 2012 [See General Note on cover]

RCN CORPORATION

[FORM OF FACE OF NOTE]

[THE FOLLOWING PARAGRAPH SHALL APPEAR ON THE FACE OF EACH RESTRICTED NOTE.]

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION THEREFROM.

[THE COMPANY MAY, BUT IS NOT OBLIGATED TO, INSTRUCT THE TRUSTEE TO PLACE THE FOLLOWING PARAGRAPH ON THE FACE OF EACH NOTE HELD BY OR TRANSFERRED TO AN "AFFILIATE" (AS DEFINED IN RULE 501(B) OF REGULATION D UNDER THE SECURITIES ACT) OF THE COMPANY:]

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE HELD BY A PERSON WHO MAY BE DEEMED TO BE AN AFFILIATE OF THE ISSUER FOR PURPOSES OF RULE 144 PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY BE SOLD ONLY IN COMPLIANCE WITH RULE 144, PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO A VALID EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT.

[THE FOLLOWING PARAGRAPH SHALL APPEAR ON THE FACE OF EACH GLOBAL NOTE.]

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.6 OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.5(b) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.8 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

RCN CORPORATION

7-3/8% Convertible Second Lien Secured Note due 2012 [See General Note on cover]

No. _____                                                                                   $_____

CUSIP No. _____

      RCN Corporation, a corporation duly organized and validly existing under the laws of the State of Delaware (herein called the "Company", which term includes any successor corporation under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to _____, or registered assigns, the principal sum of _____ United States Dollars on June ___, 2012 and to pay interest on said principal sum semi-annually on January 15 and July 15 of each year (each, an "Interest Payment Date"), commencing January 15, 2005, at the rate per annum specified in the title of this Note, accrued from December __, 2004.  The interest so payable on any January 15 or July 15 will be paid to the person in whose name this Note, or portion thereof (or one or more Predecessor Notes) is registered at the close of business on the record date, which shall be the first day of the month in which the Interest Payment Date shall occur, whether or not such date is a Business Day; provided that any such interest not punctually paid or duly provided for shall be payable as provided in the Indenture.  Payment of the principal of and interest accrued on this Note (including Liquidated Damages, if any) shall be made at the office or agency of the Company maintained for that purpose, which shall be the Corporate Trust Office of the Trustee, or at any other office or agency permitted by the Indenture, in such lawful money of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts; provided further, however, that, with respect to any holder of Notes with an aggregate principal amount equal to or in excess of Five Hundred Thousand United States Dollars ($500,000), interest on such holder's Notes shall be paid by wire transfer in immediately available funds in accordance with the written wire transfer instruction supplied by such holder from time to time to the Trustee and paying agent (if different from the Trustee) at least five (5) Business Days prior to the applicable record date.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving a holder of this Note the right to convert this Note into Common Stock of the Company on the terms and subject to the limitations referred to on the reverse hereof and as more fully specified in the Indenture.  Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be construed in accordance with and governed by the laws of said State.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been manually signed by the Trustee or a duly authorized authenticating agent under the Indenture.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

RCN CORPORATION

By: _____
　　　　Name:
　　　　Title:

Attest:

_____
Name:
Title:

　[INSERT NAME OF TRUSTEE]
　as Trustee, certifies that this is one of
　the Notes described in the within-named
　Indenture

By: _____
　　　Authorized Signatory

[FORM OF REVERSE OF NOTE]

RCN CORPORATION

7-3/8% Convertible Second Lien Secured Note due 2012 [See General Note on cover]

This Note is one of a duly authorized issue of Notes of the Company, designated as its 7-3/8% Convertible Second Lien Notes due 2012 [see general note on cover re maturity date] (herein called the "Notes"), limited to the aggregate principal amount of One Hundred Fifty Million United States Dollars, ($150,000,000) all issued or to be issued under and pursuant to an Indenture dated as of December __, 2004 (herein called the "Indenture"), between the Company and [INSERT NAME OF TRUSTEE] (herein called the "Trustee"), to which the Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the holders of the Notes. All capitalized terms used herein without definition shall have the meaning set forth in the Indenture. Any accrued and unpaid interest which is not paid within five (5) Business Days of the Interest Payment Date on which such payment of interest was due shall bear interest at the rate of 2% plus the interest rate otherwise in effect and borne by the Notes (including Liquidating Damages) from such Interest Payment Date until the same is paid in full (or, if less, the maximum interest rate then permitted by applicable law). In addition, at any time when an Event of Default shall have occurred and be continuing, the interest rate on the Notes shall be equal to 2% plus the interest rate otherwise accruing thereon (including Liquidated Damages).

In case an Event of Default, as defined in the Indenture, shall have occurred and be continuing, the principal of, premium, if any, and accrued interest on all Notes may be declared, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions provided in the Indenture. Liquidated damages paid pursuant to Section 15.2 of the Indenture, if any, shall be paid within ten (10) Business Days of the date from which such liquidated damages accrued pursuant to Section 15.2. Liquidated Damages on the Notes paid pursuant to Section 4(k) of the Note Purchase Agreement, if any, shall be paid at the times and in the manner provided therein. Liquidated Damages on the Notes paid pursuant to Section 3 of the Registration Rights Agreement, if any, shall be paid at the times and in the manner provided therein.

The Indenture contains provisions permitting the Company and the Trustee in certain limited circumstances, without the consent of the holders of the Notes, and in other circumstances, with the consent of the holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute amendments to the Indenture or supplemental indentures adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of any supplemental indenture or modifying in any manner the rights of the holders of the Notes; provided, however, that certain amendments or supplemental indentures require the consent of the holder of each Note so affected by such amendment or supplemental indenture or, in some cases, the consent of the holders of all Notes then outstanding.

It is also provided in the Indenture that the holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the holders of all of the Notes waive any past default or Event of Default under the Indenture and its consequences except (i) a default in the payment of interest or premium, if any, on, or the principal of, the Notes when due, (ii) a failure by the Company to convert any Notes into Common Stock or (iii) a default in respect of a covenant or provisions of the Indenture which under Article XI thereof cannot be modified or amended without the consent of the holders of all Notes then outstanding. Any such consent or waiver by a holder of this Note (unless revoked as provided in the Indenture) shall be conclusive and binding upon such holder and upon all future holders and owners of this Note and any Notes which may be issued in exchange or substitution hereof, irrespective of whether any notation thereof is made upon this Note or such other Notes.

The Liens securing the payment of principal of, premium, if any, and interest on the Notes will be subordinated to the Liens securing Senior Indebtedness as set forth in Article IV of the Indenture and in the Intercreditor Agreement.

Interest on the Notes shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

The Notes are issuable in registered form without coupons in denominations of One Thousand United States Dollars ($1,000) principal amount and integral multiples thereof. At the office of Trustee or the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, without payment of any service charge but with payment of a sum sufficient to cover any tax, assessments or other governmental charges that may be imposed in connection with any registration or exchange of Notes, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations.

The Notes will be redeemable for cash, if and only if the Common Sock of the Company has a Closing Price of at least 150% of the Conversion Price for 30 consecutive Trading Days ending on the Trading Day prior to delivery of notice of redemption to the Trustee at the option of the Company, in whole or in part, on or after December __, 2007 upon not less than 30 nor more than 60 days' written notice at the redemption prices (expressed as percentages of principal amount at maturity) set forth below, plus accrued and unpaid interest thereon, if any, to the applicable redemption date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
|---|---|
| 2007 | 107.000% |
| 2008 | 106.000% |
| 2009 | 105.000% |
| 2010 and thereafter | 104.000% |

Notwithstanding the foregoing, to the extent that the Shelf Registration Statement is required by the terms of the Registration Rights Agreement to remain effective as of the date that notice of redemption is provided in accordance with Section 3.2, no such redemption shall be permitted unless the Shelf Registration Statement is effective and available during the 30 day period prior

to the giving of such notice and at all times from the date of such notice until the redemption date.

If such notice of redemption has been given as provided in the Indenture, the Notes or portion of Notes called for redemption shall, unless converted into Common Stock pursuant to the terms of the Indenture, become due and payable on the date and at the place or places stated in such notice at the applicable redemption price and interest accrued to, but excluding, the date fixed for redemption, and on and after such date (unless the Company shall default in the payment of such Notes at the redemption price and interest accrued to, but excluding, said date) interest on the Notes or portion of Notes so called for redemption shall cease to accrue and such Notes shall cease after the close of business on the Business Day next preceding the date fixed for redemption to be convertible into Common Stock and, except as provided in Sections 8.5, 13.4 and 17.5 of the Indenture, to be entitled to any benefit or security under the Indenture, and the holders of such Notes shall have no right in respect of such Notes except the right to receive the redemption price and unpaid interest to, but excluding, the date fixed for redemption. On presentation and surrender of such Notes at a place of payment specified in such notice, such Notes or the specified portions thereof to be redeemed shall be paid and redeemed by the Company at the applicable redemption price and interest accrued thereon to, but excluding, the date fixed for redemption; provided that, if the applicable redemption date is an Interest Payment Date, then the semi-annual payment of interest becoming due on such date shall be payable to the holders of such Notes registered as such on the relevant record date subject to the terms and provisions of Section 2.3 of the Indenture.

The Notes are not subject to redemption through the operation of any sinking fund.

Sections 5.10 and 5.15 of the Indenture provide that upon the occurrence of a Change of Control and following certain Asset Sales, and subject to certain conditions and limitations contained therein, the Company shall make an offer to purchase all or a portion of the Notes in accordance with the procedures set forth in the Indenture.

The rights of the Trustee, any Collateral Agent and the Holders are subject to the terms and provisions of the Intercreditor Agreement.

The Indenture contains provisions (which provisions apply to this Note) for defeasance at any time of (a) the entire indebtedness of the Company on this Note and (b) certain restrictive covenants and related Defaults and Events of Default, in each case upon compliance by the Company with certain conditions set forth therein.

Subject to the provisions of the Indenture, the holder hereof has the right, at its option, at any time following the date of original issuance of the Notes (except that, with respect to any Note or portion of a Note that shall be called for redemption, such right shall terminate, except as otherwise provided in the Indenture, at the close of business on the Business Day next preceding the date fixed for redemption unless the Company shall default in payment due upon redemption), to convert the principal hereof or any portion of such principal which is One Thousand United States Dollars ($1,000) or an integral multiple thereof, into that number of fully paid and non-assessable shares of the Company's Common Stock, as said shares shall be constituted at the date of conversion, obtained by dividing the principal amount of this Note or

portion thereof to be converted by the initial conversion price of $[24.00] or such conversion price as adjusted from time to time as provided in the Indenture. To convert a Note, a Holder must deliver this Note, together with a conversion notice as provided in the Indenture and this Note, to the Company at the office or agency of the Company maintained for that purpose, which shall be the Corporate Trust Office of the Trustee, or at any other office or agency permitted by the Indenture, and, unless the shares issuable on conversion are to be issued in the same name as this Note, duly endorsed by, or accompanied by instruments of transfer in form satisfactory to the Company duly executed by, the holder or by his duly authorized attorney. The Notes shall initially be convertible for [41.6667] shares of Common Stock. [NOTE: IF STARPOWER IS ACQUIRED PRIOR TO THE ISSUE DATE, WE WOULD REVISE THE $24.00 TO REFLECT $25.16 AND 41.6667 TO REFLECT 39.7456 AND WOULD DELETE 15.6(E) OF THE INDENTURE.] The Company shall pay in cash, on this Note or portion thereof surrendered for conversion during the period from the close of business on any Interest Payment Date to which interest has been fully paid through the close of business on the Business Day preceding the record date for the next such Interest Payment Date, accrued and unpaid interest, if any, to, but excluding, the date of conversion. Any such payment of interest shall be made with ten (10) Business Days after the Conversion Date. No fractional shares of Common Stock will be issued upon any conversion, but an adjustment in cash will be paid to the holder, as provided in the Indenture, in respect of any fraction of a share which would otherwise be issuable upon the surrender of any Note or Notes for conversion.

In connection with any redemption of Notes, the Company may arrange for the purchase and conversion of any Notes not converted prior to the expiration of such conversion right by an agreement with one or more investment bankers or other purchasers to purchase such Notes by paying to the Trustee in trust for the Noteholders, on or before the date fixed for redemption, an amount not less than the applicable redemption price and interest accrued to the date fixed for redemption, of such Notes.

Upon due presentment for registration of transfer of this Note and any other documents as may be required to be delivered by the Indenture at the office or agency of the Company which shall be the Corporate Trust Office of the Trustee, or at any other office or agency permitted by the Indenture, a new Note or Notes of authorized denominations for an equal aggregate principal amount will be issued to the transferee in exchange thereof, subject to the requirements and limitations provided in the Indenture, without charge except for any tax or other governmental charge imposed in connection therewith.

The Company, the Trustee, any authenticating agent, any paying agent, any conversion agent and any Note Registrar shall deem and treat a registered holder hereof as the absolute owner of this Note (whether or not this Note shall be overdue and notwithstanding any notation of ownership or other writing hereon), for the purpose of receiving payment hereof (including Liquidated Damages to the extent accrued but unpaid), or on account hereof, for the conversion hereof and for all other purposes; and neither the Company nor the Trustee nor any other authenticating agent nor any paying agent nor any other conversion agent nor any Note Registrar shall be affected by any notice to the contrary. All such payments so made to, or upon the order of, such registered holder for the time being shall be valid, and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for monies payable on this Note.

No direct or indirect partner, employee, incorporator, stockholder, director or officer, as such, past, present or future of the Company or any successor corporation or any Subsidiary or any of the Company's Affiliates, shall have any personal liability in respect of the obligations of the Company under this Note solely by reason of his, her or its status as such partner, employee, incorporator, stockholder, director or officer.  Nothing in this paragraph affects the liability of any Guarantor.  The holder hereof by accepting this Note waives and releases all such liability. Such waiver and release are part of the consideration for the issuance of this Note.

The Company will furnish to any Holder of a Note upon written request and without charge a copy of the Indenture. Requests may be made to: RCN CORPORATION, 105 Carnegie Center, Princeton, New Jersey 08540-6215.

# ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM - as tenants in common        UNIF GIFT MIN ACT -

_____ Custodian
(Cust)

TENANT - as tenants by the entireties     _____
(Minor)

JT TEN - as joint tenants with right of survivorship and    Uniform Gifts to Minors Act    _____
not as tenants in common                                        (State)

Additional abbreviations may also be used though not in the above list.

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|

EXHIBIT B

[FORM OF CONVERSION NOTICE]

RCN Corporation
105 Carnegie Center
Princeton, NJ  08540
Attention:  Chief Financial Officer

[INSERT NAME OF TRUSTEE]

_____

_____

Attention:  Corporate Trust Administration

Fax:  _____

        The undersigned registered owner of this Note hereby irrevocably exercises the option to convert this Note, or the portion hereof (which is One Thousand United States Dollars ($1,000) principal amount or an integral multiple thereof) below designated, into shares of Common Stock in accordance with the terms of the Indenture referred to in this Note, and directs that the shares issuable and deliverable upon such conversion, together with any check in payment for fractional shares and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered holder hereof unless a different name has been indicated below.  If shares or any portion of this Note not converted are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer, registration or other similar taxes payable with respect thereto.  Any amount required to be paid by the undersigned on account of interest accompanies this Note.

        If you want the shares issuable on conversion of this Note credited to your balance account with The Depositary Trust Company through its Deposit Withdrawal Agent Commission system, check the box:  [ ]

Dated:  _____

_____

_____

Signature(s)

_____

Signature Guarantee

        Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if shares of Common Stock are to be issued, or Notes to be delivered, other than to and in the name of the registered holder.

Fill in for registration of shares if to be issued, and Notes if to be delivered, other than to and in the name of the registered holder:

_____
(Name)
_____
(Street Address)
_____
(City, State and Zip Code)

Please print name and address

Principal amount to be converted (if less \ than all): $_____,000

_____
Social Security or Other Taxpayer Identification Number

EXHIBIT C

ASSIGNMENT FORM

If you the holder want to assign this Note, fill in the form below and have your signature guaranteed:

I or we assign and transfer this Note to

_____

(Insert assignee's social security or tax ID number) _____

_____

_____

(Print or type assignee's name, address and zip code) and irrevocably appoint

_____

agent to transfer this Note on the books of the Company. The agent may substitute another to act for such agent.

Date: _____          Your signature: _____

(Sign exactly as your name appears on the other side of this Note)

By: _____

NOTICE: To be executed by an executive officer

Signature Guarantee: _____

OPTION OF HOLDER TO ELECT PURCHASE

If you wish to have this Note purchased by the Company pursuant to Section 5.10, 5.11 or 5.15 of the Indenture, check the appropriate box:

Section 5.10 [ ]

Section 5.15 [ ]

If you wish to have a portion of this Note purchased by the Company pursuant to Section 5.10 or 5.15 of the Indenture, state the amount:

$_____

Date: _____          Your signature: _____

(Sign exactly as your name appears on the other side of this Note)

By: _____

NOTICE: To be executed by an executive officer

Signature Guarantee: _____

PDFfile.doc

EXHIBIT D

FORM OF CERTIFICATE OF TRANSFER

RCN Corporation
105 Carnegie Center
Princeton, NJ 08540
Attention: Chief Financial Officer

[INSERT NAME OF TRUSTEE]

_____
_____

Attention: Corporate Trust Administration
Fax: _____

Re:   7-3/8% Convertible Second Lien Notes due 2012 [see general note on cover re maturity date]

Reference is hereby made to the Indenture, dated as of December __, 2004 (the "Indenture"), among RCN Corporation, as issuer (the "Company"), and [INSERT NAME OF TRUSTEE] (the "Trustee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "Transferor") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $ in             such Note[s] or interests (the "Transfer"), to _____(the "Transferee"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

2.      CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE 144A GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO RULE 144A.

The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believed and believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private

Placement Legend printed on the 144A Global Note and/or the Definitive Note and in the Indenture and the Securities Act.

3.     CHECK AND COMPLETE IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE IAI GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO ANY PROVISION OF THE SECURITIES ACT OTHER THAN RULE 144A OR RULE 144.

The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)     such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)     such Transfer is being effected to the Company or a subsidiary thereof;

or

(c)     such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act;

or

(d)     such Transfer is being effected to an Institutional Accredited Investor and pursuant to an exemption from the registration requirements of the Securities Act other than Rule 144A or Rule 144, and the Transferor hereby further certifies that it has not engaged in any general solicitation within the meaning of Regulation D under the Securities Act and the Transfer complies with the transfer restrictions applicable to beneficial interests in a Restricted Global Note or Restricted Definitive Notes and the requirements of the exemption claimed, which certification is supported by (1) a certificate executed by the Transferee in the form of Exhibit F to the Indenture and (2) an Opinion of Counsel provided by the Transferor or the Transferee (a copy of which the Transferor has attached to this certification), to the effect that such Transfer is in compliance with the Securities Act.  Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the IAI Global Note and/or the Definitive Notes and in the Indenture and the Securities Act.

4.     CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE UNRESTRICTED GLOBAL NOTE OR OF AN UNRESTRICTED DEFINITIVE NOTE.

(a)     CHECK IF TRANSFER IS PURSUANT TO RULE 144.  (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)     CHECK IF TRANSFER IS PURSUANT TO OTHER EXEMPTION.  (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____
[Insert Name of Transferor]

By:_____
        Name:
        Title:

Dated:_____

_____
Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if shares of Common Stock are to be

issued, or Notes to be delivered, other than to
and in the name of the registered holder.

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

                    [CHECK ONE OF (a) OR (b)]

    (a)      a beneficial interest in the:

        (i)      144A Global Note (CUSIP _____), or

        (ii)      IAI Global Note (CUSIP _____); or

    (b)      a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

                    [CHECK ONE]

    (a)      a beneficial interest in the:

        (i)      144A Global Note (CUSIP _____), or

        (ii)      IAI Global Note (CUSIP _____),

        (iii)      Unrestricted Global Note (CUSIP ); or _____); or

    (b)      a Restricted Definitive Note; or

    (c)      an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

EXHIBIT E

FORM OF CERTIFICATE OF EXCHANGE

RCN Corporation
105 Carnegie Center
Princeton, NJ  08540
Attention:  Chief Financial Officer
[INSERT NAME OF TRUSTEE]
_____
_____

Attention:  Corporate Trust Administration
Fax:  _____

       Re:  7-3/8% Convertible Second Lien Notes due 2012 [see general note on cover re maturity date]

(CUSIP _____])

       Reference is hereby made to the Indenture, dated as of December __, 2004 (the "Indenture"), among RCN Corporation, as issuer (the "Company"), and [INSERT NAME OF TRUSTEE] (the "Trustee").  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

       _____, (the "Owner") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $     in such Note[s] or interests (the "Exchange").  In connection with the Exchange, the Owner hereby certifies that:

       1.    EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN A RESTRICTED GLOBAL NOTE FOR UNRESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN AN UNRESTRICTED GLOBAL NOTE.

       (a)    CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the United States Securities Act of 1933, as amended (the "Securities Act"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

       (b)    CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO UNRESTRICTED DEFINITIVE NOTE.  In

connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)     CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE.   In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)     CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO UNRESTRICTED DEFINITIVE NOTE.  In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2.     EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES FOR RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES.

(a)     CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO RESTRICTED DEFINITIVE NOTE.   In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b)     CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE.  In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] 144A Global Note, IAI Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

[Insert Name of Transferor]

By:_____
          Name:
          Title:

Dated:_____

_____
Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad-15 if shares of Common Stock are to be issued, or Notes to be delivered, other than to and in the name of the registered holder.

EXHIBIT F

FORM OF TRANSFER LETTER OF REPRESENTATIONS

(TO BE DELIVERED BY HOLDER

UPON CERTAIN TRANSFERS OF NOTES WITHOUT

EFFECTIVE REGISTRATION STATEMENT)

We are delivering this letter in connection with the sale or transfer to us of Notes (as defined in the Indenture, dated as of December __, 2004, between RCN Corporation, a Delaware corporation (the "Company") and [INSERT NAME OF TRUSTEE], a _____ corporation (the "Trustee")) other than pursuant to a registration statement that has been declared effective under the Securities Act of 1933, as amended (the "Securities Act").

We hereby confirm that:

(i)     we are an "accredited investor" within the meaning of Rule 501(a)(1),(2), (3), (5), (6), (7) or (8) under the Securities Act;

(ii)    any purchase or receipt of the Notes by us will be for investment purposes and for our own account, not as a nominee or agent;

(iii)   we have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks of purchasing or receiving the Notes;

(iv)    we do not have need for liquidity in our investment in the Notes, we have the ability to bear the economic risks of our investment in the Notes for an indefinite period of time and we are able to afford the complete loss of our investment in the Notes;

(v)     we are not acquiring the Notes with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities laws of any State of the United States or any other applicable jurisdiction, and we have no present intention of selling, granting any participation in, or otherwise distributing the same;

(vi)    we have had access to such information regarding the Company necessary in order for us to make an informed decision and any such information which we have requested have been made available for us or our attorney, accountant, or advisor; and

(vii)   we or our attorney, accountant, or advisor have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the business, management and financial affairs of the Company and the terms and

conditions of the acquisition by us of the Notes and all such questions have been answered to our full satisfaction, and we have acquired sufficient information about the Company to make an informed and knowledgeable decision to acquire the Notes.

We understand that the Notes have not been registered under the Securities Act, and we agree, on our own behalf and on behalf of each account for which we acquire any Notes, that such Notes may be offered, resold, pledged or otherwise transferred only (i) in accordance with an exemption from the registration requirements of the Securities Act, (ii) to the Company or (iii) pursuant to an effective registration statement, and, in each case, in accordance with any applicable securities laws of any State of the United States or any other applicable jurisdiction. We agree that we will furnish the Company and the Trustee an opinion of counsel, if the Company so requests, that the foregoing restrictions on transfer have been complied with. We understand that the Trustee will not be required to accept for registration of transfer any Notes, except upon presentation of evidence satisfactory to the Company, including an opinion of counsel if the Company so requests, that the foregoing restrictions on transfer have been complied with.

We acknowledge that the Company and others will rely upon our confirmations, acknowledgements and agreements set forth herein, and we agree to notify you promptly in writing if any of our representations or warranties herein ceases to be accurate and complete.

_____
(Name)

By: _____

      Name:
      Title:
      Address:

FORM OF SECURITY AGREEMENT

among

RCN CORPORATION,

CERTAIN SUBSIDIARIES OF RCN CORPORATION

and

[_____],
as SECOND-LIEN COLLATERAL AGENT

_____

Dated as of December ___, 2004
_____

# SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of December __, 2004, made by each of the undersigned assignors (each, an "<u>Assignor</u>" and, together with any other entity that becomes an assignor hereunder pursuant to Section 10.12 hereof, the "<u>Assignors</u>") in favor of [_____], as trustee (together with any successor trustee, the "<u>Second-Lien Collateral Agent</u>"), for the benefit of the Secured Creditors (as defined below). Certain capitalized terms as used herein are defined in Article IX hereof. Except as otherwise defined herein, all capitalized terms used herein and defined in the Second-Lien Note Indenture (as defined below) shall be used herein as therein defined.

W I T N E S S E T H:

WHEREAS, RCN Corporation (the "<u>Borrower</u>"), the noteholders from time to time party thereto (the "<u>Noteholders</u>") and Second-Lien Collateral Agent, as trustee, have entered into an Indenture, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "<u>Second-Lien Note Indenture</u>"), providing for the issuance of Second-Lien Notes by the Borrower, all as contemplated therein (the Noteholders and the Second-Lien Collateral Agent are herein called the "<u>Secured Creditors</u>");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the issuance of Second-Lien Notes by the Borrower under the Second-Lien Note Indenture that each Assignor shall have executed and delivered to the Second-Lien Collateral Agent this Agreement;

WHEREAS, the Borrower, various financial institutions from time to time party thereto and DBCI, as administrative agent and collateral agent (in such capacity, the "<u>First-Lien Collateral Agent</u>"), have entered into a credit agreement, dated as of the date hereof (as amended, restated, modified, extended, renewed, replaced, supplemented, restructured and/or refinanced from time to time, the "<u>First-Lien Credit Agreement</u>");

WHEREAS, each Assignor will obtain benefits from the issuance of Second-Lien Notes by the Borrower under the Second-Lien Note Indenture and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the preceding paragraph; and

WHEREAS, in order to secure the obligations under the Second-Lien Note Indenture, each Pledgor is concurrently granting to the First-Lien Collateral Agent, for the benefit of the holders of obligations under the First-Lien Credit Agreement, a first priority security interest in the Collateral (it being understood that the relative rights and priorities of the grantees in respect of the Collateral are governed by the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>"), among the Borrower, the First-Lien Collateral Agent, the Second-

Lien Collateral Agent and certain other persons party or that may become party thereto from time to time);

NOW, THEREFORE, in consideration of the benefits accruing to each Assignor, the receipt and sufficiency of which are hereby acknowledged, each Assignor hereby makes the following representations and warranties to the Second-Lien Collateral Agent for the benefit of the Secured Creditors and hereby covenants and agrees with the Second-Lien Collateral Agent for the benefit of the Secured Creditors as follows:

## ARTICLE I

## SECURITY INTERESTS

1.1 <u>Grant of Security Interests</u>.  (a)  Subject to the terms of the Intercreditor Agreement with respect to rights and remedies between the First-Lien Collateral Agent and the Second-Lien Collateral Agent, as security for the prompt and complete payment and performance when due of all of its Obligations, each Assignor does hereby assign and transfer unto the Second-Lien Collateral Agent, and does hereby pledge and grant to the Second-Lien Collateral Agent, for the benefit of the Secured Creditors, a continuing security interest in all of the right, title and interest of such Assignor in, to and under all of the following personal property and fixtures (and all rights therein) of such Assignor, or in which or to which such Assignor has any rights, in each case whether now existing or hereafter from time to time acquired:

    (i)     each and every Account;

    (ii)    all cash and Cash Equivalents;

    (iii)   the Cash Collateral Account and all monies, securities, Instruments and other investments deposited or required to be deposited in the Cash Collateral Account;

    (iv)   all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

    (v)    all Commercial Tort Claims;

    (vi)   all computer programs of such Assignor and all intellectual property rights therein and all other proprietary information of such Assignor, including but not limited to all Software, and all Software licensing rights, all writings, plans, specifications and schematics, all engineering drawings, customer lists, goodwill and licenses, and all recorded data of any kind or nature, regardless of the medium of recording;

    (vii)   all Domain Names;

    (viii)  all Trade Secret Rights;

(ix)     Contracts, together with all Contract Rights arising thereunder;

(x)      all Copyrights;

(xi)     all Equipment;

(xii)    all Deposit Accounts and all other demand, deposit, time, savings, cash management and passbook accounts maintained by such Assignor with any Person and all monies, securities, Instruments and other investments deposited in any of the foregoing;

(xiii)   all Documents;

(xiv)    all General Intangibles;

(xv)     all Goods;

(xvi)    all Instruments;

(xvii)   all Inventory;

(xviii)  all Investment Property;

(xix)    all Letter-of-Credit Rights (whether or not the respective letter of credit is evidenced by a writing);

(xx)     all Marks;

(xxi)    all Patents;

(xxii)   all Permits;

(xxiii)  all Supporting Obligations; and

(xxiv)   all Proceeds and products of any and all of the foregoing and any item excluded pursuant to the next succeeding sentence (except to the extent such proceeds would independently be excluded pursuant to said sentence) (all of the above, the "Collateral").

Notwithstanding anything to the contrary contained above, in no event shall the Collateral include, and no Assignor shall be deemed to have granted a security interest (unless and until as further provided below) in (a) any lease, license, contract, property rights or agreement to which any Assignor is a party or any of its rights or interests thereunder or property subject thereto if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of same or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term in the case of preceding clause (i) or (ii) , as applicable) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of

the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity), provided, however, that (x) the security interests hereunder, shall attach immediately to any portion of such lease, license, contact, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) and (y) to any property or assets described above in this clause (a) on the first date upon which the circumstances described in preceding clauses (i) and/or (ii) (as relevant) no longer exist with respect thereto, or (b) the equity interests of (x) Megacable, S.A. de C.V., MCM Holdings, S.A. de C.V. and Megacable Telecommunicaciones, S.A. de C.V. for so long as the organizational documents of such entities prohibits the granting of a security interest in such equity interests; provided that such security interest shall attach immediately when such prohibition is no longer in effect or (y) more than 65% of the Voting Equity Interests of any Foreign Corporation; provided that each Pledgor shall be required to pledge hereunder 100% of any Non-Voting Equity Interests at any time and from time to time acquired by such Pledgor of any Foreign Corporation.

(b)  The security interest of the Second-Lien Collateral Agent under this Agreement extends to all Collateral which any Assignor may acquire, or with respect to which any Assignor may obtain rights, at any time during the term of this Agreement.

(c)  Notwithstanding anything herein to the contrary, the relative rights and remedies of Second-Lien Collateral Agent shall be subject to and governed by the terms of the Intercreditor Agreement at any time the Intercreditor Agreement is in effect. In the event of any inconsistency between the terms hereof and the Intercreditor Agreement, the Intercreditor Agreement shall control at any time the Intercreditor Agreement is in effect.

1.2 Power of Attorney. Subject to the terms of the Intercreditor Agreement, each Assignor hereby constitutes and appoints the Second-Lien Collateral Agent its true and lawful attorney, irrevocably, with full power after the occurrence of and during the continuance of an Event of Default (in the name of such Assignor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to such Assignor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Second-Lien Collateral Agent may deem to be necessary or advisable to protect the interests of the Secured Creditors, which appointment as attorney is coupled with an interest.

ARTICLE II

GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Assignor represents, warrants and covenants, which representations, warranties and covenants shall survive execution and delivery of this Agreement, as follows:

2.1 Necessary Filings. All filings, registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted by such Assignor to the Second-Lien Collateral Agent hereby in respect of the Collateral have been accomplished (or will be accomplished within 5 days after the date of this Agreement or, with

respect to Marks, Patents and Copyrights, within 30 days of the date of this Agreement) and the security interest granted to the Second-Lien Collateral Agent pursuant to this Agreement in and to the Collateral creates a valid and, together with all such filings, registrations, recordings and other actions, a perfected security interest therein prior to the rights of all other Persons therein and subject to no other Liens (other than Permitted Liens) and is entitled to all the rights, priorities and benefits afforded by the Uniform Commercial Code or other relevant law as enacted in any relevant jurisdiction to perfected security interests, in each case to the extent that the Collateral consists of the type of property in which a security interest may be perfected by possession or control (within the meaning of the UCC as in effect on the date hereof in the State of New York), by filing a financing statement under the Uniform Commercial Code as enacted in any relevant jurisdiction or by a filing of a Grant of Security Interest in the respective form attached hereto in the United States Patent and Trademark Office or in the United States Copyright Office. Each Assignor hereby authorizes the Second-Lien Collateral Agent to make duplicate filings as if such Assignor is a Transmitting Utility, or alternatively, as if such Assignor is a Person which is not a Transmitting Utility.

2.2 <u>No Liens</u>. Such Assignor is, and as to all Collateral acquired by it from time to time after the date hereof such Assignor will be, the owner of all Collateral free from any Lien, security interest, encumbrance or other right, title or interest of any Person (other than Permitted Liens), and such Assignor shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to the Second-Lien Collateral Agent.

2.3 <u>Other Financing Statements</u>. As of the date hereof, there is no financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Collateral (other than financing statements filed in respect of Permitted Liens), and so long as the Termination Date has not occurred, such Assignor will not execute or authorize to be filed in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) or statements relating to the Collateral, except financing statements filed or to be filed in respect of and covering the security interests granted hereby by such Assignor or in connection with Permitted Liens.

2.4 <u>Chief Executive Office, Record Locations</u>. The chief executive office of such Assignor is, on the date of this Agreement, located at the address indicated on Annex A hereto for such Assignor. During the period of the four calendar months preceding the date of this Agreement, the chief executive office of such Assignor has not been located at any address other than that indicated on Annex A in accordance with the immediately preceding sentence, in each case unless each such other address is also indicated on Annex A hereto for such Assignor.

2.5 <u>Location of Inventory and Equipment</u>. All Inventory and Equipment held on the date hereof, or held at any time during the four calendar months prior to the date hereof, by each Assignor is located at one of the locations shown on Annex B hereto for such Assignor.

2.6 <u>Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; Location; Organizational Identification Numbers; Changes Thereto; etc.</u> The exact legal name of each Assignor, the type of organization of such

Assignor, whether or not such Assignor is a Registered Organization, the jurisdiction of organization of such Assignor, such Assignor's Location, the organizational identification number (if any) of such Assignor is listed on Annex C hereto for such Assignor. Such Assignor shall not change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its jurisdiction of organization, its Location, or its organizational identification number (if any) from that used on Annex C hereto, except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) such Assignor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Second-Lien Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex C (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex C which shall correct all information contained therein for such Assignor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Second-Lien Collateral Agent to maintain the security interests of the Second-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect. In addition, to the extent that such Assignor does not have an organizational identification number on the date hereof and later obtains one, such Assignor shall promptly thereafter notify the Second-Lien Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Second-Lien Collateral Agent to the extent necessary to maintain the security interest of the Second-Lien Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

2.7 <u>Trade Names; Etc.</u> Such Assignor has or operates in any jurisdiction under, or in the preceding five years has had or has operated in any jurisdiction under, no trade names, fictitious names or other names except its legal name as specified in Annex C and such other trade or fictitious names as are listed on Annex D hereto for such Assignor. Such Assignor shall not assume or operate in any jurisdiction under any new trade, fictitious or other name until (i) it shall have given to the Second-Lien Collateral Agent not less than 15 days' written notice of its intention so to do, clearly describing such new name and the jurisdictions in which such new name will be used and providing such other information in connection therewith as the Second-Lien Collateral Agent may reasonably request and (ii) with respect to such new name, it shall have taken all action reasonably requested by the Second-Lien Collateral Agent to maintain the security interest of the Second-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.

2.8 <u>Certain Significant Transactions.</u> During the one year period preceding the date of this Agreement, no Person shall have merged or consolidated with or into any Assignor, and no Person shall have liquidated into, or transferred all or substantially all of its assets to, any Assignor, in each case except as described in Annex E hereto. With respect to any transactions so described in Annex E hereto, the respective Assignor shall have furnished such information with respect to the Person (and the assets of the Person and locations thereof) which merged with or into or consolidated with such Assignor, or was liquidated into or transferred all or substantially all of its assets to such Assignor, and shall have furnished to the Second-Lien Collateral Agent such UCC lien searches as may have been requested with respect to such

Person and its assets, to establish that no security interest (excluding Permitted Liens) continues perfected on the date hereof with respect to any Person described above (or the assets transferred to the respective Assignor by such Person), including without limitation pursuant to Section 9-316(a)(3) of the UCC.

2.9 <u>Non-UCC Property</u>.  The aggregate fair market value (as determined by the Assignors in good faith) of all property of the Assignors of the types described in clauses (1), (2) and (3) of Section 9-311(a) of the UCC does not exceed $____.  If the aggregate value of all such property at any time owned by all Assignors exceeds $_____, the Assignors shall provide prompt written notice thereof to the Second-Lien Collateral Agent and, upon the reasonable request of the Second-Lien Collateral Agent, the Assignors shall promptly (and in any event within 30 days) (or such longer period as the Second-Lien Collateral Agent may agree to in writing) take such actions (at their own cost and expense) as may be required under the respective United States, State or other laws referenced in Section 9-311(a) of the UCC to perfect the security interests granted herein in any Collateral where the filing of a financing statement does not perfect the security interest in such property in accordance with the provisions of Section 9-311(a) of the UCC.

2.10 <u>As-Extracted Collateral; Timber-to-be-Cut</u>.  On the date hereof, such Assignor does not own, or expect to acquire, any property which constitutes, or would constitute, As-Extracted Collateral or Timber-to-be-Cut.  If at any time after the date of this Agreement such Assignor owns, acquires or obtains rights to any As-Extracted Collateral or Timber-to-be-Cut, such Assignor shall furnish the Second-Lien Collateral Agent with prompt written notice thereof (which notice shall describe in reasonable detail the As-Extracted Collateral and/or Timber-to-be-Cut and the locations thereof) and shall take all actions as may be deemed reasonably necessary or desirable by the Second-Lien Collateral Agent to perfect the security interest of the Second-Lien Collateral Agent therein.

2.11 <u>Collateral in the Possession of a Bailee</u>.  If any Inventory or other Goods are at any time in the possession of a bailee (other than the First-Lien Collateral Agent), such Assignor shall promptly notify the Second-Lien Collateral Agent thereof and, if requested by the Second-Lien Collateral Agent, shall use its commercially reasonable efforts to promptly obtain an acknowledgment from such bailee, in form and substance reasonably satisfactory to the Second-Lien Collateral Agent, that the bailee holds such Collateral for the benefit of the Second-Lien Collateral Agent and shall act upon the instructions of the Second-Lien Collateral Agent, without the further consent of such Assignor. The Second-Lien Collateral Agent agrees with such Assignor that the Second-Lien Collateral Agent shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the respective Assignor with respect to any such bailee.

2.12 <u>Recourse</u>.  This Agreement is made with full recourse to each Assignor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Assignor contained herein, in the Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

ARTICLE III

## SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER COLLATERAL

3.1 <u>Additional Representations and Warranties</u>.  As of the time when each of its Accounts arises, each Assignor shall be deemed to have represented and warranted that each such Account, and all records, papers and documents relating thereto (if any) are genuine and what they purport to be, and that all papers and documents (if any) relating thereto (i) will, to the knowledge of such Assignor, represent the genuine, legal, valid and binding obligation of the account debtor evidencing indebtedness unpaid and owed by the respective account debtor arising out of the performance of labor or services or the sale or lease and delivery of the merchandise listed therein, or both, (ii) will be the only original writings evidencing and embodying such obligation of the account debtor named therein (other than copies created for general accounting purposes), (iii) will, to the knowledge of such Assignor, evidence true and valid obligations, enforceable in accordance with their respective terms, and (iv) will be in compliance and will conform in all material respects with all applicable federal, state and local laws and applicable laws of any relevant foreign jurisdiction.

3.2 <u>Maintenance of Records</u>.  Each Assignor will keep and maintain at its own cost and expense accurate records of its Accounts and Contracts, including, but not limited to, originals of all documentation (including each Contract) with respect thereto, records of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and such Assignor will make the same available on such Assignor's premises to the Second-Lien Collateral Agent for inspection, at such Assignor's own cost and expense, at any and all reasonable times upon prior notice to such Assignor and otherwise in accordance with the Second-Lien Note Indenture.  Upon the occurrence and during the continuance of an Event of Default and at the request of the Second-Lien Collateral Agent, such Assignor shall, at its own cost and expense, deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the Second-Lien Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Assignor).  Upon the occurrence and during the continuance of an Event of Default and if the Second-Lien Collateral Agent so directs, such Assignor shall legend, in form and manner satisfactory to the Second-Lien Collateral Agent, the Accounts and the Contracts, as well as books, records and documents (if any) of such Assignor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Second-Lien Collateral Agent and that the Second-Lien Collateral Agent has a security interest therein.

3.3 <u>Direction to Account Debtors; Contracting Parties; etc.</u>  Upon the occurrence and during the continuance of an Event of Default, if the Second-Lien Collateral Agent so directs any Assignor, such Assignor agrees (x) to cause all payments on account of the Accounts and Contracts to be made directly to the Cash Collateral Account, (y) that the Second-Lien Collateral Agent may, at its option, directly notify the obligors with respect to any Accounts and/or under any Contracts to make payments with respect thereto as provided in the preceding clause (x), and (z) that the Second-Lien Collateral Agent may enforce collection of any such Accounts and Contracts and may adjust, settle or compromise the amount of payment thereof, in the same manner and to the same extent as such Assignor.  Without notice to or assent by any Assignor, the Second-Lien Collateral Agent may, upon the occurrence and during the continuance of an

Event of Default, apply any or all amounts then in, or thereafter deposited in, the Cash Collateral Account toward the payment of the Obligations in the manner provided in Section 7.4 of this Agreement. The reasonable costs and expenses of collection (including reasonable attorneys' fees), whether incurred by an Assignor or the Second-Lien Collateral Agent, shall be borne by the relevant Assignor. The Second-Lien Collateral Agent shall deliver a copy of each notice referred to in the preceding clause (y) to the relevant Assignor, provided that (x) the failure by the Second-Lien Collateral Agent to so notify such Assignor shall not affect the effectiveness of such notice or the other rights of the Second-Lien Collateral Agent created by this Section 3.3 and (y) no such notice shall be required if an Event of Default of the type described in Section [__] of the Second-Lien Note Indenture has occurred and is continuing.

3.4 <u>Modification of Terms; etc.</u> Except in accordance with such Assignor's ordinary course of business and consistent with reasonable business judgment or as permitted by Section 3.5, no Assignor shall rescind or cancel any indebtedness evidenced by any Account or under any Contract, or modify any material term thereof or make any material adjustment with respect thereto, or extend or renew the same, or compromise or settle any material dispute, claim, suit or legal proceeding relating thereto, or sell any Account or Contract, or interest therein, without the prior written consent of the Second-Lien Collateral Agent. No Assignor will do anything to impair the rights of the Second-Lien Collateral Agent in the Accounts or Contracts.

3.5 <u>Collection.</u> Each Assignor shall endeavor in accordance with reasonable business practices to cause to be collected from the account debtor named in each of its Accounts or obligor under any Contract, as and when due (including, without limitation, amounts which are delinquent, such amounts to be collected in accordance with generally accepted lawful collection procedures) any and all amounts owing under or on account of such Account or Contract, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Account or under such Contract. Except as otherwise directed by the Second-Lien Collateral Agent after the occurrence and during the continuation of an Event of Default, any Assignor may allow in the ordinary course of business as adjustments to amounts owing under its Accounts and Contracts (i) an extension or renewal of the time or times of payment, or settlement for less than the total unpaid balance, which such Assignor finds appropriate in accordance with reasonable business judgment and (ii) a refund or credit due as a result of returned or damaged merchandise or improperly performed services or for other reasons which such Assignor finds appropriate in accordance with reasonable business judgment. The reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) of collection, whether incurred by an Assignor or the Second-Lien Collateral Agent, shall be borne by the relevant Assignor.

3.6 <u>Instruments.</u> If any Assignor owns or acquires any Instrument in excess of $[____] constituting Collateral (other than checks and other payment instruments received and collected in the ordinary course of business), such Assignor will within 10 Business Days notify the Second-Lien Collateral Agent thereof, and upon request by the Second-Lien Collateral Agent will promptly deliver such Instrument to the Second-Lien Collateral Agent appropriately endorsed to the order of the Second-Lien Collateral Agent.

3.7 <u>Assignors Remain Liable Under Accounts.</u> Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Accounts to observe and

perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts. Neither the Second-Lien Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Second-Lien Collateral Agent or any other Secured Creditor of any payment relating to such Account pursuant hereto, nor shall the Second-Lien Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.8  <u>Assignors Remain Liable Under Contracts</u>.  Anything herein to the contrary notwithstanding, the Assignors shall remain liable under each of the Contracts to observe and perform all of the conditions and obligations to be observed and performed by them thereunder, all in accordance with and pursuant to the terms and provisions of each Contract. Neither the Second-Lien Collateral Agent nor any other Secured Creditor shall have any obligation or liability under any Contract by reason of or arising out of this Agreement or the receipt by the Second-Lien Collateral Agent or any other Secured Creditor of any payment relating to such Contract pursuant hereto, nor shall the Second-Lien Collateral Agent or any other Secured Creditor be obligated in any manner to perform any of the obligations of any Assignor under or pursuant to any Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any performance by any party under any Contract, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

3.9  <u>Deposit Accounts; Etc.</u>  (a) No Assignor maintains, or at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for such accounts maintained with a bank (as defined in Section 9-102 of the UCC) whose jurisdiction (determined in accordance with Section 9-304 of the UCC) is within a State of the United States. Annex F hereto accurately sets forth, as of the date of this Agreement, for each Assignor, each Deposit Account maintained by such Assignor (including a description thereof and the respective account number), the name of the respective bank with which such Deposit Account is maintained, and the jurisdiction of the respective bank with respect to such Deposit Account. For each Deposit Account (other than the Cash Collateral Account or any other Deposit Account maintained with the Second-Lien Collateral Agent), the respective Assignor shall cause the bank with which the Deposit Account is maintained to execute and deliver to the Second-Lien Collateral Agent, within 30 days after the date of this Agreement (as such date may be extended by the Second-Lien Collateral Agent) or, if later, at the time of the establishment of the respective Deposit Account, a "control agreement" in the form of Annex G hereto (appropriately completed), with such changes thereto as may be acceptable to the Second-Lien Collateral Agent. If any bank with which a Deposit Account is maintained refuses to, or does not, enter into such a "control agreement", then the respective Assignor shall promptly (and in any event within 30 days after the date of this Agreement or, if later, 30 days after the establishment of such account) close the respective Deposit Account and

transfer all balances therein to the Cash Collateral Account or another Deposit Account meeting the requirements of this Section 3.9. If any bank with which a Deposit Account is maintained refuses to subordinate all its claims, subject to customary exceptions, with respect to such Deposit Account to the Second-Lien Collateral Agent's security interest therein on terms satisfactory to the Second-Lien Collateral Agent, then the Second-Lien Collateral Agent, at its option, may (x) require that such Deposit Account be terminated in accordance with the immediately preceding sentence or (y) agree to a "control agreement" without such subordination, provided that in such event the Second-Lien Collateral Agent may at any time, at its option, subsequently require that such Deposit Account be terminated (within 30 days after notice from the Second-Lien Collateral Agent) (as such date may be extended by the Second-Lien Collateral Agent) in accordance with the requirements of the immediately preceding sentence.

(b) After the date of this Agreement, no Assignor shall establish any new demand, time, savings, passbook or similar account, except for Deposit Accounts established and maintained with banks and meeting the requirements of preceding clause (a). At the time any such Deposit Account is established, the appropriate "control agreement" shall be entered into in accordance with the requirements of preceding clause (a) and the respective Assignor shall furnish to the Second-Lien Collateral Agent a supplement to Annex F hereto containing the relevant information with respect to the respective Deposit Account and the bank with which same is established.

3.10 Letter-of-Credit Rights. If any Assignor is at any time a beneficiary under a letter of credit with a stated amount of $1,000,000 or more, such Assignor shall promptly notify the Second-Lien Collateral Agent thereof and, at the request of the Second-Lien Collateral Agent, such Assignor shall, pursuant to an agreement in form and substance reasonably satisfactory to the Second-Lien Collateral Agent, use its reasonable best efforts to (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Second-Lien Collateral Agent of the proceeds of any drawing under such letter of credit or (ii) arrange for the Second-Lien Collateral Agent to become the transferee beneficiary of such letter of credit, with the Second-Lien Collateral Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are (subject to the terms of the Intercreditor Agreement) to be applied as provided in this Agreement after the occurrence and during the continuance of an Event of Default.

3.11 Commercial Tort Claims. All Commercial Tort Claims of each Assignor in existence on the date of this Agreement are described in Annex H hereto. If any Assignor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $1,000,000 or more, such Assignor shall promptly notify the Second-Lien Collateral Agent thereof in a writing signed by such Assignor and describing the details thereof and shall grant to the Second-Lien Collateral Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Second-Lien Collateral Agent.

3.12 Chattel Paper. Upon the request of the Second-Lien Collateral Agent made at any time or from time to time, each Assignor shall promptly furnish to the Second-Lien

Collateral Agent a list of all Electronic Chattel Paper held or owned by such Assignor. Furthermore, if requested by the Second-Lien Collateral Agent, each Assignor shall promptly take all actions which are reasonably practicable so that the Second-Lien Collateral Agent has "control" of all Electronic Chattel Paper in accordance with the requirements of Section 9-105 of the UCC. Each Assignor will promptly (and in any event within 10 days) following any request by the Second-Lien Collateral Agent, deliver all of its Tangible Chattel Paper to the Second-Lien Collateral Agent.

3.13 <u>Further Actions</u>. Each Assignor will, at its own expense, make, execute, endorse, acknowledge, file and/or deliver to the Second-Lien Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps, including any and all actions as may be necessary or required under the Federal Assignment of Claims Act, relating to its Accounts, Contracts, Instruments and other property or rights covered by the security interest hereby granted, as the Second-Lien Collateral Agent may reasonably require.

## ARTICLE IV

## SPECIAL PROVISIONS CONCERNING TRADEMARKS AND DOMAIN NAMES

4.1 <u>Additional Representations and Warranties</u>. Each Assignor represents and warrants that it is the true and lawful owner of all right, title and interest in and to the registered Marks and Domain Names listed in Annex I hereto for such Assignor and that said listed Marks and Domain Names include all United States marks and applications for United States marks owned or purported to be owned by such Assignor registered in the United States Patent and Trademark Office, as well as all Domain Names that such Assignor owns or purports to own as of the date hereof. Each Assignor represents and warrants that it owns, is licensed to use or otherwise has the right to use any trademarks, service marks or other indicia of origin, including trade dress, and any Internet domain names, that it uses. Each Assignor further warrants that it has no knowledge of any third party claim received by it that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any trademark, service mark or trade name of any other Person other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Assignor represents and warrants that the registrations of Marks listed in Annex I hereto are valid, subsisting, have not been canceled and that such Assignor is not aware of any third-party claim that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said registrations is invalid or unenforceable, and is not aware that there is any reason that any of said applications will not mature into registrations, other than as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Assignor hereby grants to the Second-Lien Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of an Event of Default, any document which may be required by the United States Patent and Trademark Office or similar registrar in order to effect an absolute assignment of all right, title and interest in each Mark and/or Domain Name, and record the same.

4.2 <u>Licenses and Assignments</u>.  Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any Mark or Domain Name absent prior written approval of the Second-Lien Collateral Agent.

4.3 <u>Infringements</u>.  Each Assignor agrees, promptly upon learning thereof, to notify the Second-Lien Collateral Agent in writing of the name and address of, and to furnish such pertinent information that may be available with respect to, any party who such Assignor believes is, or is likely to be, infringing or diluting or otherwise violating any of such Assignor's rights in and to any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect, or with respect to any party claiming that such Assignor's use of any Mark or Domain Name material to such Assignor's business violates in any material respect any property right of that party.  Each Assignor further agrees to prosecute diligently in accordance with reasonable business practices any Person infringing any Mark or Domain Name in any manner that could reasonably be expected to have a Material Adverse Effect.

4.4 <u>Preservation of Marks and Domain Names</u>.  Each Assignor agrees to use its Marks and Domain Names which are material to such Assignor's business in interstate commerce during the time in which this Agreement is in effect and to take all such other actions as are reasonably necessary to preserve such Marks as trademarks or service marks under the laws of the United States (other than any such Marks which Assignor reasonably determines are no longer used or useful in its business or operations).

4.5 <u>Maintenance of Registration</u>.  Each Assignor shall, at its own expense, diligently process all documents reasonably required to maintain all Mark and/or Domain Name registrations, including but not limited to affidavits of use and applications for renewals of registration in the United States Patent and Trademark Office for all of its material registered Marks, and shall pay all fees and disbursements in connection therewith and shall not abandon any such filing of affidavit of use or any such application of renewal prior to the exhaustion of all administrative and judicial remedies without prior written consent of the Second-Lien Collateral Agent (other than with respect to registrations and applications deemed by such Assignor in its reasonable business judgment to be no longer prudent to pursue).

4.6 <u>Future Registered Marks and Domain Names</u>.  If any Mark registration is issued hereafter to any Assignor as a result of any application now or hereafter pending before the United States Patent and Trademark Office or any Domain Name is registered by Assignor, within 60 days of receipt of such certificate or similar indicia of ownership, such Assignor shall deliver to the Second-Lien Collateral Agent a copy of such registration certificate or similar indicia of ownership, and a grant of a security interest in such Mark and/or Domain Name, to the Second-Lien Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest in such Mark and/or Domain Name to the Second-Lien Collateral Agent hereunder, the form of such security to be substantially in the form of Annex L hereto or in such other form as may be reasonably satisfactory to the Second-Lien Collateral Agent.

4.7 <u>Remedies</u>.  Subject to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing, the Second-Lien Collateral Agent may, by written notice to the relevant Assignor, take any or all of the following actions:  (i) declare the entire right, title and interest of such Assignor in and to each of the Marks and Domain Names, together with all

trademark rights and rights of protection to the same, vested in the Second-Lien Collateral Agent for the benefit of the Secured Creditors, in which event such rights, title and interest shall immediately vest, in the Second-Lien Collateral Agent for the benefit of the Secured Creditors, and the Second-Lien Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 4.1 hereof to execute, cause to be acknowledged and notarized and record said absolute assignment with the applicable agency or registrar; (ii) take and use or sell the Marks or Domain Names and the goodwill of such Assignor's business symbolized by the Marks or Domain Names and the right to carry on the business and use the assets of such Assignor in connection with which the Marks or Domain Names have been used; and (iii) direct such Assignor to refrain, in which event such Assignor shall refrain, from using the Marks or Domain Names in any manner whatsoever, directly or indirectly, and such Assignor shall execute such further documents that the Second-Lien Collateral Agent may reasonably request to further confirm this and to transfer ownership of the Marks or Domain Names and registrations and any pending trademark applications in the United States Patent and Trademark Office or applicable Domain Name registrar to the Second-Lien Collateral Agent.

## ARTICLE V

## SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND TRADE SECRETS

5.1 <u>Additional Representations and Warranties</u>. Each Assignor represents and warrants that it is the true and lawful owner of all rights in (i) the Trade Secret Rights, (ii) all right, title and interest in and to the Patents listed in Annex J hereto for such Assignor and that said Patents include all the United States patents and applications for United States patents that such Assignor owns as of the date hereof and (iii) all right, title and interest in and to the registered Copyrights listed in Annex K hereto for such Assignor and that said Copyrights include all the United States copyrights registered with the United States Copyright Office and applications to United States copyrights that such Assignor owns as of the date hereof. Each Assignor further warrants that it has no knowledge of any third party claim that any aspect of such Assignor's present or contemplated business operations infringes or will infringe any patent of any other Person or such Assignor has misappropriated any trade secret or proprietary information which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Each Assignor represents and warrants that the Patents listed in Annex J hereto are valid, subsisting, have not been canceled and that such Assignor is not aware of any third-party claim that any of said Patents are invalid or unenforceable, and is not aware that there is any reason that any of said Patents are invalid or unenforceable, and is not aware that there is any reason that any of said Patent applications will not mature into issued Patents. Each Assignor hereby grants to the Second-Lien Collateral Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Patent and Trademark Office or the United States Copyright Office in order to effect an absolute assignment of all right, title and interest in each Patent or Copyright, and to record the same.

5.2 <u>Licenses and Assignments</u>. Except as otherwise permitted by the Secured Debt Agreements, each Assignor hereby agrees not to divest itself of any right under any Patent or Copyright absent prior written approval of the Second-Lien Collateral Agent.

5.3  Infringements.  Each Assignor agrees, promptly upon learning thereof, to furnish the Second-Lien Collateral Agent in writing with all pertinent information available to such Assignor with respect to any infringement, contributing infringement or active inducement to infringe or other violation of such Assignor's rights in any Patent or Copyright or to any claim that the practice of any Patent or use of any Copyright violates any property right of a third party, or with respect to any misappropriation of any Trade Secret Right or any claim that practice of any Trade Secret Right violates any property right of a third party, in each case, in any manner which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Assignor further agrees, absent direction of the Second-Lien Collateral Agent to the contrary, to diligently prosecute, in accordance with its reasonable business judgment, any Person infringing any Patent or Copyright or any Person misappropriating any Trade Secret Right, in each case to the extent that such infringement or misappropriation, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.4  Maintenance of Patents or Copyrights.  At its own expense, each Assignor shall make timely payment of all post-issuance fees required to maintain in force its rights under each Patent or Copyright, absent prior written consent of the Second-Lien Collateral Agent (other than any such Patents or Copyrights which are no longer used or are deemed by such Assignor in its reasonable business judgment to no longer be useful in its business or operations).

5.5  Prosecution of Patent Applications.  At its own expense, each Assignor shall diligently prosecute all material applications for the United States Patents listed in Annex J hereto, in each case for such Assignor and shall not abandon any such application prior to exhaustion of all administrative and judicial remedies (other than applications that are deemed by such Assignor in its reasonable business judgment to no longer be necessary in the conduct of the Assignor's business), absent written consent of the Second-Lien Collateral Agent.

5.6  Other Patents and Copyrights.  Within 30 days of the acquisition or issuance of a United States Patent, registration of a Copyright, or acquisition of a registered Copyright, or of filing of an application for a United States Patent or Copyright, the relevant Assignor shall deliver to the Second-Lien Collateral Agent a copy of said Copyright or Patent, or certificate or registration of, or application therefor, as the case may be, with a grant of a security interest as to such Patent or Copyright, as the case may be, to the Second-Lien Collateral Agent and at the expense of such Assignor, confirming the grant of a security interest, the form of such grant of a security interest to be substantially in the form of Annex M or N hereto, as appropriate, or in such other form as may be reasonably satisfactory to the Second-Lien Collateral Agent.

5.7  Remedies.  Subject to the terms of the Intercreditor Agreement, if an Event of Default shall occur and be continuing, the Second-Lien Collateral Agent may, by written notice to the relevant Assignor, take any or all of the following actions:  (i) declare the entire right, title, and interest of such Assignor in each of the Patents and Copyrights vested in the Second-Lien Collateral Agent for the benefit of the Secured Creditors, in which event such right, title, and interest shall immediately vest in the Second-Lien Collateral Agent for the benefit of the Secured Creditors, in which case the Second-Lien Collateral Agent shall be entitled to exercise the power of attorney referred to in Section 5.1 hereof to execute, cause to be acknowledged and notarized and to record said absolute assignment with the applicable agency; (ii) take and practice or sell the Patents and Copyrights; and (iii) direct such Assignor to refrain, in which event such

Assignor shall refrain, from practicing the Patents and using the Copyrights directly or indirectly, and such Assignor shall execute such further documents as the Second-Lien Collateral Agent may reasonably request further to confirm this and to transfer ownership of the Patents and Copyrights to the Second-Lien Collateral Agent for the benefit of the Secured Creditors.

ARTICLE VI

PROVISIONS CONCERNING ALL COLLATERAL

6.1 <u>Protection of Second-Lien Collateral Agent's Security</u>. Except as otherwise permitted by the Secured Debt Agreements and the Intercreditor Agreement, each Assignor will do nothing to impair the rights of the Second-Lien Collateral Agent in the Collateral. Each Assignor will at all times maintain insurance, at such Assignor's own expense to the extent and in the manner provided in the Secured Debt Agreements. Except to the extent otherwise permitted to be retained by such Assignor or applied by such Assignor pursuant to the terms of the Secured Debt Agreements, the Second-Lien Collateral Agent shall, at the time any proceeds of such insurance are distributed to the Secured Creditors, apply such proceeds in accordance with Section 7.4 hereof. Each Assignor assumes all liability and responsibility in connection with the Collateral acquired by it and the liability of such Assignor to pay the Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Assignor.

6.2 <u>Warehouse Receipts Non-Negotiable</u>. To the extent practicable, each Assignor agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued with respect to any of its Inventory, such Assignor shall request that such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7-104 of the Uniform Commercial Code as in effect in any relevant jurisdiction or under other relevant law).

6.3 <u>Additional Information.</u> Each Assignor will, at its own expense, from time to time upon the reasonable request of the Second-Lien Collateral Agent, promptly (and in any event within 10 days after its receipt of the respective request) furnish to the Second-Lien Collateral Agent such information with respect to the Collateral (including the identity of the Collateral or such components thereof as may have been requested by the Second-Lien Collateral Agent, the value and location of such Collateral, etc.) as may be requested by the Second-Lien Collateral Agent. Without limiting the forgoing, each Assignor agrees that it shall promptly (and in any event within 10 days after its receipt of the respective request) furnish to the Second-Lien Collateral Agent such updated Annexes hereto as may from time to time be reasonably requested by the Second-Lien Collateral Agent.

6.4 <u>Further Actions</u>. Subject to the terms of the Intercreditor Agreement, each Assignor will, at its own expense and upon the reasonable request of the Second-Lien Collateral Agent, make, execute, endorse, acknowledge, file and/or deliver to the Second-Lien Collateral Agent from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such

further steps relating to the Collateral and other property or rights covered by the security interest hereby granted, which the Second-Lien Collateral Agent deems reasonably appropriate or advisable to perfect, preserve or protect its security interest in the Collateral.

6.5 <u>Financing Statements</u>. Each Assignor agrees to execute and deliver to the Second-Lien Collateral Agent such financing statements, in form reasonably acceptable to the Second-Lien Collateral Agent, as the Second-Lien Collateral Agent may from time to time reasonably request or as are reasonably necessary or desirable in the opinion of the Second-Lien Collateral Agent to establish and maintain a valid, enforceable, second-priority perfected security interest in the Collateral (subject to the first-priority lien of the First-Lien Collateral Agent in and in accordance with the terms of the Intercreditor Agreement) as provided herein and the other rights and security contemplated hereby. Each Assignor will pay any applicable filing fees, recordation taxes and related expenses relating to its Collateral. Each Assignor hereby authorizes the Second-Lien Collateral Agent to file any such financing statements without the signature of such Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets" of such Assignor).

## ARTICLE VII

## REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT

7.1 <u>Remedies; Obtaining the Collateral Upon Default</u>. Each Assignor agrees that, to the extent not inconsistent with the Intercreditor Agreement, if any Event of Default shall have occurred and be continuing, then and in every such case, the Second-Lien Collateral Agent, in addition to any rights now or hereafter existing under applicable law and under the other provisions of this Agreement, shall have all rights as a secured creditor under any UCC, and such additional rights and remedies to which a secured creditor is entitled under the laws in effect in all relevant jurisdictions and may:

(i) personally, or by agents or attorneys, immediately take possession of the Collateral or any part thereof, from such Assignor or any other Person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon such Assignor's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of such Assignor;

(ii) instruct the obligor or obligors on any agreement, instrument or other obligation (including, without limitation, the Accounts and the Contracts) constituting the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Second-Lien Collateral Agent and may exercise any and all remedies of such Assignor in respect of such Collateral;

(iii) instruct all banks which have entered into a control agreement with the Second-Lien Collateral Agent to transfer all monies, securities and instruments held by such depositary bank to the Cash Collateral Account;

(iv)    sell, assign or otherwise liquidate any or all of the Collateral or any part thereof in accordance with Section 7.2 hereof, or direct such Assignor to sell, assign or otherwise liquidate any or all of the Collateral or any part thereof, and, in each case, take possession of the proceeds of any such sale or liquidation;

(v)    take possession of the Collateral or any part thereof, by directing such Assignor in writing to deliver the same to the Second-Lien Collateral Agent at any reasonable place or places designated by the Second-Lien Collateral Agent, in which event such Assignor shall at its own expense:

(x)    forthwith cause the same to be moved to the place or places so designated by the Second-Lien Collateral Agent and there delivered to the Second-Lien Collateral Agent;

(y)    store and keep any Collateral so delivered to the Second-Lien Collateral Agent at such place or places pending further action by the Second-Lien Collateral Agent as provided in Section 7.2 hereof; and

(z)    while the Collateral shall be so stored and kept, provide such security and maintenance services as shall be reasonably necessary to protect the same and to preserve and maintain it in good condition;

(vi)    subject to any exclusive license issued prior to the Event of Default, license or sublicense, whether on an exclusive or nonexclusive basis, any Marks, Domain Names, Patents or Copyrights included in the Collateral for such term and on such conditions and in such manner as the Second-Lien Collateral Agent shall in its sole judgment determine; provided in the case of Marks to the maintenance of quality standards, not less than comparable to the standards in place at the time of the Event of Default;

(vii)    apply any monies constituting Collateral or proceeds thereof in accordance with the provisions of Section 7.4; and

(viii)    take any other action as specified in clauses (1) through (5), inclusive, of Section 9-607 of the UCC;

it being understood that each Assignor's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the Second-Lien Collateral Agent shall be entitled to a decree requiring specific performance by such Assignor of said obligation. By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors expressly acknowledge and agree that this Agreement and each other Security Document may be enforced only by the action of the Second-Lien Collateral Agent acting upon the instructions of the Required Secured Creditors and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Second-Lien Collateral Agent or the holders of at least a majority of the outstanding Other Obligations, as the case may be, for the benefit of the Secured Creditors upon the terms of this Agreement and the other Security

Documents. Furthermore, each Assignor agrees to upon the occurrence and continuance of an Event of Default, use its commercially reasonable efforts to assist the Second-Lien Collateral Agent in obtaining any approvals or assignments or licenses from any relevant Governmental Authority that may be necessary for the exercise of the rights and remedies of the Second-Lien Collateral Agent with respect to the Collateral.

7.2 <u>Remedies; Disposition of the Collateral</u>. Subject to the terms of the Intercreditor Agreement, if any Event of Default shall have occurred and be continuing, then any Collateral repossessed by the Second-Lien Collateral Agent under or pursuant to Section 7.1 hereof and any other Collateral whether or not so repossessed by the Second-Lien Collateral Agent, may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as the Second-Lien Collateral Agent may, in compliance with any mandatory requirements of applicable law, determine to be commercially reasonable. Any of the Collateral may be sold, leased or otherwise disposed of, in the condition in which the same existed when taken by the Second-Lien Collateral Agent or after any overhaul or repair at the expense of the relevant Assignor which the Second-Lien Collateral Agent shall determine to be commercially reasonable. Any such sale, lease or other disposition may be effected by means of a public disposition or private disposition, effected in accordance with the applicable requirements (in each case if and to the extent applicable) of Sections 9-610 through 9-613 of the UCC and/or such other mandatory requirements of applicable law as may apply to the respective disposition. The Second-Lien Collateral Agent may, without notice or publication, adjourn any public or private disposition or cause the same to be adjourned from time to time by announcement at the time and place fixed for the disposition, and such disposition may be made at any time or place to which the disposition may be so adjourned. To the extent permitted by any such requirement of law, the Second-Lien Collateral Agent may bid for and become the purchaser (and may pay all or any portion of the purchase price by crediting Obligations against the purchase price) of the Collateral or any item thereof, offered for disposition in accordance with this Section 7.2 without accountability to the relevant Assignor. If, under applicable law, the Second-Lien Collateral Agent shall be permitted to make disposition of the Collateral within a period of time which does not permit the giving of notice to the relevant Assignor as hereinabove specified, the Second-Lien Collateral Agent need give such Assignor only such notice of disposition as shall be required by such applicable law. Each Assignor agrees to do or cause to be done all such other acts and things as may be reasonably necessary to make such disposition or dispositions of all or any portion of the Collateral valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at such Assignor's expense.

7.3 <u>Waiver of Claims</u>. Except as otherwise provided in this Agreement, EACH ASSIGNOR HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE FIRST-LIEN COLLATERAL AGENT'S TAKING POSSESSION OR THE FIRST-LIEN COLLATERAL AGENT'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY

PREJUDGMENT REMEDY OR REMEDIES, and each Assignor hereby further waives, to the extent permitted by law:

(i)  all damages occasioned by such taking of possession or any such disposition except any damages which are the direct result of the Second-Lien Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision);

(ii)  all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Second-Lien Collateral Agent's rights hereunder; and

(iii)  all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any applicable law in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and each Assignor, for itself and all who may claim under it, insofar as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws.

Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the relevant Assignor therein and thereto, and shall be a perpetual bar both at law and in equity against such Assignor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through and under such Assignor.

7.4  <u>Application of Proceeds</u>.  (a)  Subject to the terms of the Intercreditor Agreement, all moneys collected by the Second-Lien Collateral Agent (or, to the extent the Pledge Agreement or any other Security Document requires proceeds of collateral under such other Security Document to be applied in accordance with the provisions of this Agreement, the Pledgee or Second-Lien Collateral Agent under such other Security Document) upon any sale or other disposition of the Collateral, together with all other moneys received by the Second-Lien Collateral Agent hereunder, shall be applied as follows:

(i)  <u>first</u>, to the payment of all amounts owing the Second-Lien Collateral Agent of the type described in clauses (iii), (iv) and (v) of the definition of "Obligations";

(ii)  <u>second</u>, to the extent proceeds remain after the application pursuant to the preceding clause (i), to the payment of all amounts owing to any Agent of the type described in clauses (v) and (vi) of the definition of "Obligations";

(iii)  <u>third</u>, to the extent proceeds remain after the application pursuant to the preceding clauses (i) and (ii), an amount equal to the outstanding Primary Obligations shall be paid to the Secured Creditors as provided in Section 7.4(e) hereof, with each Secured Creditor receiving an amount equal to its outstanding Primary Obligations or, if the proceeds are insufficient to pay in full all such Primary Obligations, its Pro Rata Share of the amount remaining to be distributed;

(iv)    fourth, to the extent proceeds remain after the application pursuant to the preceding clauses (i) through (iii), inclusive, an amount equal to the outstanding Secondary Obligations shall be paid to the Secured Creditors as provided in Section 7.4(e) hereof, with each Secured Creditor receiving an amount equal to its outstanding Secondary Obligations or, if the proceeds are insufficient to pay in full all such Secondary Obligations, its Pro Rata Share of the amount remaining to be distributed; and

(v)    fifth, to the extent proceeds remain after the application pursuant to the preceding clauses (i) through (iv), inclusive, and following the termination of this Agreement pursuant to Section 10.8(a) hereof, to the relevant Assignor or to whomever may be lawfully entitled to receive such surplus.

(b)    For purposes of this Agreement, (x) "Pro Rata Share" shall mean, when calculating a Secured Creditor's portion of any distribution or amount, that amount (expressed as a percentage) equal to a fraction the numerator of which is the then unpaid amount of such Secured Creditor's Primary Obligations or Secondary Obligations, as the case may be, and the denominator of which is the then outstanding amount of all Primary Obligations or Secondary Obligations, as the case may be, (y) "Primary Obligations" shall mean all principal of, premium, fees and interest on, all Second-Lien Notes and all Fees and (z) "Secondary Obligations" shall mean all Obligations other than Primary Obligations.

(c)    When payments to Secured Creditors are based upon their respective Pro Rata Shares, the amounts received by such Secured Creditors hereunder shall be applied (for purposes of making determinations under this Section 7.4 only) (i) first, to their Primary Obligations and (ii) second, to their Secondary Obligations. If any payment to any Secured Creditor of its Pro Rata Share of any distribution would result in overpayment to such Secured Creditor, such excess amount shall instead be distributed in respect of the unpaid Primary Obligations or Secondary Obligations, as the case may be, of the other Secured Creditors, with each Secured Creditor whose Primary Obligations or Secondary Obligations, as the case may be, have not been paid in full to receive an amount equal to such excess amount multiplied by a fraction the numerator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of such Secured Creditor and the denominator of which is the unpaid Primary Obligations or Secondary Obligations, as the case may be, of all Secured Creditors entitled to such distribution.

(d)    Subject to the terms of the Intercreditor Agreement, all payments required to be made hereunder shall be made to the Administrative Agent for the account of the Secured Parties.

(e)    For purposes of applying payments received in accordance with this Section 7.4, the Second-Lien Collateral Agent shall be entitled to rely upon the Administrative Agent for a determination (which the Administrative Agent agrees (or shall agree) to provide upon request of the Second-Lien Collateral Agent) of the outstanding Primary Obligations and Secondary Obligations owed to the Secured Creditors. Unless it has received written notice from a Secured Creditor to the contrary, the Administrative Agent and each Representative, in furnishing information pursuant to the preceding sentence, and the Second-Lien Collateral Agent, in acting hereunder, shall be entitled to assume that no Secondary Obligations are outstanding.

(f)     It is understood that the Assignors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

7.5  Remedies Cumulative.   Subject to the terms of (and to the extent not inconsistent with) the Intercreditor Agreement, each and every right, power and remedy hereby specifically given to the Second-Lien Collateral Agent shall be in addition to every other right, power and remedy specifically given to the Second-Lien Collateral Agent under this Agreement, the other Secured Debt Agreements or now or hereafter existing at law, in equity or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Second-Lien Collateral Agent.  All such rights, powers and remedies shall be cumulative and the exercise or the beginning of the exercise of one shall not be deemed a waiver of the right to exercise any other or others.  No delay or omission of the Second-Lien Collateral Agent in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence thereof.  No notice to or demand on any Assignor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Second-Lien Collateral Agent to any other or further action in any circumstances without notice or demand.  In the event that the Second-Lien Collateral Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Second-Lien Collateral Agent may recover reasonable expenses, including reasonable attorneys' fees, and the amounts thereof shall be included in such judgment.

7.6  Discontinuance of Proceedings.   In case the Second-Lien Collateral Agent shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Second-Lien Collateral Agent, then and in every such case the relevant Assignor, the Second-Lien Collateral Agent and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Agreement, and all rights, remedies and powers of the Second-Lien Collateral Agent shall continue as if no such proceeding had been instituted.

ARTICLE VIII

INDEMNITY

8.1  Indemnity.   (a) Each Assignor jointly and severally agrees to indemnify, reimburse and hold the Second-Lien Collateral Agent, each other Secured Creditor and their respective successors, assigns, employees, affiliates and agents (hereinafter in this Section 8.1 referred to individually as "Indemnitee," and collectively as "Indemnitees") harmless from any and all liabilities, obligations, damages, injuries, penalties, claims, demands, actions, suits, judgments and any and all costs, expenses or disbursements (including reasonable attorneys' fees and expenses) (for the purposes of this Section 8.1 the foregoing are collectively called "expenses") of whatsoever kind and nature imposed on, asserted against or incurred by any of

the Indemnitees in any way relating to or arising out of this Agreement, any other Secured Debt Agreement or any other document executed in connection herewith or therewith or in any other way connected with the administration of the transactions contemplated hereby or thereby or the enforcement of any of the terms of, or the preservation of any rights under any thereof, or in any way relating to or arising out of the manufacture, ownership, ordering, purchase, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition, or use of the Collateral (including, without limitation, latent or other defects, whether or not discoverable), the violation of the laws of any country, state or other governmental body or unit, any tort (including, without limitation, claims arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any Person (including any Indemnitee), or property damage), or contract claim; provided that no Indemnitee shall be indemnified pursuant to this Section 8.1(a) for losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision). Each Assignor agrees that upon written notice by any Indemnitee of the assertion of such a liability, obligation, damage, injury, penalty, claim, demand, action, suit or judgment, the relevant Assignor shall assume full responsibility for the defense thereof. Each Indemnitee agrees to use its best efforts to promptly notify the relevant Assignor of any such assertion of which such Indemnitee has knowledge.

(b)     Without limiting the application of Section 8.1(a) hereof, each Assignor agrees, jointly and severally, to pay or reimburse the Second-Lien Collateral Agent for any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the Second-Lien Collateral Agent's Liens on, and security interest in, the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, payment or discharge of any taxes or Liens upon or in respect of the Collateral, premiums for insurance with respect to the Collateral and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the Second-Lien Collateral Agent's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

(c)     Without limiting the application of Section 8.1(a) or (b) hereof, each Assignor agrees, jointly and severally, to pay, indemnify and hold each Indemnitee harmless from and against any loss, costs, damages and expenses which such Indemnitee may suffer, expend or incur in consequence of or growing out of any misrepresentation by any Assignor in this Agreement, any other Secured Debt Agreement or in any writing contemplated by or made or delivered pursuant to or in connection with this Agreement or any other Secured Debt Agreement.

(d)     If and to the extent that the obligations of any Assignor under this Section 8.1 are unenforceable for any reason, such Assignor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law.

8.2     <u>Indemnity Obligations Secured by Collateral; Survival</u>.  Any amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement shall constitute

Obligations secured by the Collateral. The indemnity obligations of each Assignor contained in this Article VIII shall continue in full force and effect notwithstanding the full payment of all of the other Obligations and notwithstanding the full payment of all the Notes issued, and Loans made, under the Second-Lien Note Indenture and the payment of all other Obligations and notwithstanding the discharge thereof and the occurrence of the Termination Date.

ARTICLE IX

DEFINITIONS

The following terms shall have the meanings herein specified. Such definitions shall be equally applicable to the singular and plural forms of the terms defined.

"Account" shall mean any "account" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event shall include but shall not be limited to, all rights to payment of any monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. Without limiting the foregoing, the term "account" shall include all Health-Care-Insurance Receivables.

"Administrative Agent" shall have the meaning provided in the recitals of this Agreement.

"Agreement" shall mean this Security Agreement as the same may be amended, modified, restated and/or supplemented from time to time in accordance with its terms.

"As-Extracted Collateral" shall mean "as-extracted collateral" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Assignor" shall have the meaning provided in the first paragraph of this Agreement.

"Borrower" shall have the meaning provided in the recitals of this Agreement.

"Cash Collateral Account" shall mean a non-interest bearing cash collateral account maintained with, and in the sole dominion and control of, the Second-Lien Collateral Agent for the benefit of the Secured Creditors.

"Chattel Paper" shall mean "chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York. Without limiting the

foregoing, the term "Chattel Paper" shall in any event include all Tangible Chattel Paper and all Electronic Chattel Paper.

"Collateral" shall have the meaning provided in Section 1.1(a) of this Agreement.

"Commercial Tort Claims" shall mean "commercial tort claims" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Contract Rights" shall mean all rights of any Assignor under each Contract, including, without limitation, (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"Contracts" shall mean all contracts between any Assignor and one or more additional parties (including, without limitation, any interest rate protection agreements, hedging agreements, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"Copyrights" shall mean any United States or foreign copyright now or hereafter owned by any Assignor, including any registrations of any copyrights, in the United States Copyright Office or any foreign equivalent office, as well as any application for a copyright registration now or hereafter made with the United States Copyright Office or any foreign equivalent office by any Assignor.

"Credit Document Obligations" shall have the meaning provided in the definition of "Obligations" in this Article IX.

"Deposit Accounts" shall mean all "deposit accounts" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Documents" shall mean "documents" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Domain Names" shall mean all Internet domain names and associated URL addresses in or to which any Assignor now or hereafter has any right, title or interest.

"Electronic Chattel Paper" shall mean "electronic chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Equipment" shall mean any "equipment" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, fixtures and vehicles now or hereafter owned by any Assignor and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, together with

all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Event of Default" shall mean any Event of Default under, and as defined in, the Second-Lien Note Indenture and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"First-Lien Collateral Agent" shall have the meaning provided in the recitals to this Agreement.

"First-Lien Credit Agreement" shall have the meaning provided in the recitals to this Agreement.

"General Intangibles" shall mean "general intangibles" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Goods" shall mean "goods" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Health-Care-Insurance Receivable" shall mean any "health-care-insurance receivable" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Indemnitee" shall have the meaning provided in Section 8.1(a) of this Agreement.

"Instrument" shall mean "instruments" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Intercreditor Agreement" shall have the meaning provided in the recitals to this Agreement.

"Inventory" shall mean merchandise, inventory and goods, and all additions, substitutions and replacements thereof and all accessions thereto, wherever located, together with all goods, supplies, incidentals, packaging materials, labels, materials and any other items used or to be used in manufacturing, processing, packaging or shipping same, in all stages of production from raw materials through work in process to finished goods, and all products and proceeds of whatever sort and wherever located any portion thereof which may be returned, rejected, reclaimed or repossessed by the Second-Lien Collateral Agent from any Assignor's customers, and shall specifically include all "inventory" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Investment Property" shall mean "investment property" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Letter-of-Credit Rights" shall mean "letter-of-credit rights" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Location" of any Assignor, shall mean such Assignor's "location" as determined pursuant to Section 9-307 of the UCC.

"Majority Noteholders" shall mean the holders of not less than a majority in aggregate principal amount of the Second-Lien Notes at the time outstanding (as determined in accordance with Section 9.4 of the Second-Lien Note Indenture).

"Marks" shall mean all right, title and interest in and to any trademarks, service marks, trade names, trade dress, logos, fictitious business names, and other business identifiers, including the goodwill of the business of such Assignor associated with each of the foregoing, now held or hereafter acquired by any Assignor, the right to sue for past or future infringement thereof and including any registration or application for registration or renewals thereof of any trademarks and service marks now held or hereafter acquired by any Assignor, which are registered or filed in the United States Patent and Trademark Office or the equivalent thereof in any state of the United States or any equivalent foreign office or agency.

"Material Adverse Effect" shall mean a material adverse effect on the business, property, assets, liabilities (actual or contingent), operations or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole.

"Noteholders" shall have the meaning provided in the recitals of this Agreement.

"Obligations" shall mean and include, as to any Assignor, all of the following:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Assignor at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), fees, costs and indemnities) of such Assignor to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Second-Lien Note Indenture and the other Credit Documents to which such Assignor is a party (including, without limitation, in the event such Assignor is a Guarantor, all such obligations, liabilities and indebtedness of such Assignor under its Guaranty) and the due performance and compliance by such Assignor with all of the terms, conditions and agreements contained in the Second-Lien Note Indenture and in such other Credit Documents (all such obligations, liabilities and indebtedness under this clause (i), being herein collectively called the "Credit Document Obligations");

(ii) any and all sums advanced by the Second-Lien Collateral Agent in order to preserve the Collateral or preserve its security interest in the Collateral;

(iii) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities of such Assignor referred to in clause (i) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or

realizing on the Collateral, or of any exercise by the Second-Lien Collateral Agent of its rights hereunder, together with reasonable attorneys' fees and court costs;

(iv) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 8.1 of this Agreement; and

(v) all amounts owing to any Agent pursuant to any of the Credit Documents in its capacity as such;

it being acknowledged and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

"Patents" shall mean any patent in or to which any Assignor now or hereafter has any right, title or interest therein, and any divisions, continuations (including, but not limited to, continuations-in-parts) and improvements thereof, including the right to sue for past or future infringement thereof, as well as any application for a patent now or hereafter made by any Assignor.

"Permits" shall mean, to the extent permitted to be assigned by the terms thereof or by applicable law, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any governmental authority or agency.

"Primary Obligations" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Pro Rata Share" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Proceeds" shall mean all "proceeds" as such term is defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Second-Lien Collateral Agent or any Assignor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Assignor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Registered Organization" shall have the meaning provided in the Uniform Commercial Code as in effect in the State of New York.

"Second-Lien Collateral Agent" shall have the meaning provided in the first paragraph of this Agreement.

"Second-Lien Note Indenture" shall have the meaning provided in the recitals of this Agreement.

"Secondary Obligations" shall have the meaning provided in Section 7.4(b) of this Agreement.

"Secured Creditors" shall have the meaning provided in the recitals of this Agreement.

"Secured Debt Agreements" shall mean and include this Agreement and the other Second-Lien Note Documents.

"Software" shall mean "software" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Supporting Obligations" shall mean any "supporting obligation" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York, now or hereafter owned by any Assignor, or in which any Assignor has any rights, and, in any event, shall include, but shall not be limited to all of such Assignor's rights in any Letter-of-Credit Right or secondary obligation that supports the payment or performance of, and all security for, any Account, Chattel Paper, Document, General Intangible, Instrument or Investment Property.

"Tangible Chattel Paper" shall mean "tangible chattel paper" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Termination Date" shall have the meaning provided in Section 10.8(a) of this Agreement.

"Timber-to-be-Cut" shall mean "timber-to-be-cut" as such term is defined in the Uniform Commercial Code as in effect on the date hereof in the State of New York.

"Trade Secrets" shall mean any secretly held existing engineering or other data, information, production procedures and other know-how relating to the design manufacture, assembly, installation, use, operation, marketing, sale and/or servicing of any products or business of an Assignor worldwide whether written or not.

"Trade Secret Rights" shall mean the rights of an Assignor in any Trade Secret it holds.

"Transmitting Utility" shall have the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

## ARTICLE X

## MISCELLANEOUS

10.1 <u>Notices</u>. Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Second-Lien Collateral Agent or any Assignor shall not be effective until received by the Second-Lien Collateral Agent or such Assignor, as the case may be. All notices and other communications shall be in writing and addressed as follows:

       (a)      if to any Assignor, c/o:

                c/o RCN Corporation
                105 Carnegie Center
                Princeton, New Jersey 08540
                Attention: General Counsel
                Telephone No.: (609) 734-3811
                Telecopier No.: (609) 734-3830

       (b)      if to the Second-Lien Collateral Agent, at:

                _____
                _____
                Attention: _____
                Telephone No.: _____
                Telecopier No.: _____

       (c)      if to any Secured Creditor (other than the Second-Lien Collateral Agent), at such address as such Secured Creditor shall have specified in the Second-Lien Note Indenture;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

10.2 <u>Waiver; Amendment</u>. Except as provided in Sections 10.8 and 10.12, subject to the terms of the Intercreditor Agreement (including, without limitation, Section 5.3 thereof), none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Assignor directly affected thereby (it being understood that the addition or release of any Assignor hereunder shall not constitute a change, waiver, discharge or termination affecting any Assignor other than the Assignor so added or released) and the Second-Lien Collateral Agent (with the written consent of the Required Secured Creditors).

10.3 <u>Obligations Absolute</u>. Subject to the terms of the Intercreditor Agreement, the obligations of each Assignor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of such Assignor; (b) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this

Agreement or any other Secured Debt Agreement; or (c) any amendment to or modification of any Secured Debt Agreement or any security for any of the Obligations; whether or not such Assignor shall have notice or knowledge of any of the foregoing.

10.4 <u>Successors and Assigns</u>.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 10.8, (ii) be binding upon each Assignor, its successors and assigns; <u>provided</u>, <u>however</u>, that no Assignor shall assign any of its rights or obligations hereunder without the prior written consent of the Second-Lien Collateral Agent (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Second-Lien Collateral Agent hereunder, to the benefit of the Second-Lien Collateral Agent, the other Secured Creditors and their respective successors, transferees and assigns. All agreements, statements, representations and warranties made by each Assignor herein or in any certificate or other instrument delivered by such Assignor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

10.5 <u>Headings Descriptive</u>.  The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

10.6 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.</u>  (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH ASSIGNOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH ASSIGNOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK JURISDICTION OVER SUCH ASSIGNOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS JURISDICTION OVER SUCH ASSIGNOR.  EACH ASSIGNOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH ASSIGNOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 10.1 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR

UNDER ANY OTHER CREDIT DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE FIRST-LIEN COLLATERAL AGENT UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY ASSIGNOR IN ANY OTHER JURISDICTION.

(b)      EACH ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)      EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.7  Assignor's Duties.  It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Assignor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Second-Lien Collateral Agent shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, nor shall the Second-Lien Collateral Agent be required or obligated in any manner to perform or fulfill any of the obligations of any Assignor under or with respect to any Collateral.

10.8  Termination; Release.  (a)  After the Termination Date, this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation in Section 8.1 hereof, shall survive such termination) and the Second-Lien Collateral Agent, at the request and expense of the respective Assignor, will promptly execute and deliver to such Assignor a proper instrument or instruments (including Uniform Commercial Code termination statements on form UCC-3) acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Second-Lien Collateral Agent and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement.  As used in this Agreement, "Termination Date" shall mean the date upon which no Second-Lien Note under  the Second-Lien Note Indenture is outstanding and all Loans thereunder have been repaid in full and all Obligations then due and payable have been paid in full.

(b)      Subject to the terms of the Intercreditor Agreement, in the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (x) at any time prior to the time at which all Second-Lien Note Obligations have been paid in full in

connection with a sale or disposition permitted by Section [__] of the Second-Lien Note Indenture or is otherwise released at the direction of the Majority Noteholders (or all the Noteholders if required by Section [__] of the Second-Lien Note Indenture) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Second-Lien Note Indenture or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, the Second-Lien Collateral Agent, at the request and expense of such Assignor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Assignor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or otherwise disposed of, or released, and as may be in the possession of the Second-Lien Collateral Agent and has not theretofore been released pursuant to this Agreement. Furthermore, upon the release of any Subsidiary Guarantor from the Subsidiaries Guaranty in accordance with the provisions thereof, such Assignor (and the Collateral at such time assigned by the respective Assignor pursuant hereto) shall be released from this Agreement.

(c)      At any time that an Assignor desires that the Second-Lien Collateral Agent take any action to acknowledge or give effect to any release of Collateral pursuant to the foregoing Section 10.8(a) or (b), such Assignor shall deliver to the Second-Lien Collateral Agent a certificate signed by a principal executive officer of such Assignor stating that the release of the respective Collateral is permitted pursuant to such Section 10.8(a) or (b). At any time that the Borrower or the respective Assignor desires that a Subsidiary of the Borrower which has been released from the Subsidiaries Guaranty be released hereunder as provided in the last sentence of Section 10.8(b), it shall deliver to the Second-Lien Collateral Agent a certificate signed by a principal executive officer of the Borrower and the respective Assignor stating that the release of the respective Assignor (and its Collateral) is permitted pursuant to such Section 10.8(b). If reasonably requested by the Second-Lien Collateral Agent (although the Second-Lien Collateral Agent shall have not obligation to make such request), the relevant Assignor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Second-Lien Collateral Agent) to the effect set forth in this Section 10.8(c).

(d)      The Second-Lien Collateral Agent shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Second-Lien Collateral Agent in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 10.8.

10.9 Counterparts. This Agreement may be executed in any number of counter-parts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Second-Lien Collateral Agent.

10.10 Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any

such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11 The Second-Lien Collateral Agent and the other Secured Creditors. Subject to the terms of the Intercreditor Agreement, the Second-Lien Collateral Agent will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement. It is expressly understood and agreed that the obligations of the Second-Lien Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section [__] of the Second-Lien Note Indenture. The Second-Lien Collateral Agent shall act hereunder on the terms and conditions set forth herein and in Section [__] of the Second-Lien Note Indenture.

10.12 Additional Assignors. It is understood and agreed that any Subsidiary Guarantor that desires to become an Assignor hereunder, or is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of the Second-Lien Note Indenture or any other Credit Document, shall become an Assignor hereunder by executing a counterpart hereof and delivering same to the Second-Lien Collateral Agent, or by executing an assumption agreement in form and substance satisfactory to the Second-Lien Collateral Agent, (y) delivering supplements to Annexes A through F, inclusive, and H through K, inclusive, hereto as are necessary to cause such Annexes to be complete and accurate with respect to such additional Assignor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Assignor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Second-Lien Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Second-Lien Collateral Agent.

10.13 Compliance with Laws. Each Assignor agrees to use commercially reasonable efforts, including taking any action which the Second-Lien Collateral Agent and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the Federal Communications Commission (the "FCC") or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Second-Lien Collateral Agent and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

Each Assignor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to Second-Lien Collateral Agent and the Secured Creditors as permitted by applicable law.

10.14 Conflicts; Intercreditor Agreement. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent pursuant to this

Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

RCN CORPORATION, as an Assignor

By: _____
    Name:
    Title:

BRAINSTORM NETWORKS, INC., as an Assignor

By: _____
    Name:
    Title:

HOT SPOTS PRODUCTIONS, INC., as an Assignor

By: _____
    Name:
    Title:

ON TV, INC., as an Assignor

By: _____
    Name:
    Title:

RCN-BECOCOM, LLC, as an Assignor

By: RCN Telecom Services of
    Massachusetts, Inc., its managing
    member

By: _____
    Name:
    Title:

RCN CABLE TV OF CHICAGO, INC., as an Assignor

By: _____
    Name:
    Title:

RCN ENTERTAINMENT, INC., as an Assignor

By: _____
    Name:
    Title:

RCN FINANCE, LLC, as an Assignor

    By:  RCN Corporation, its managing
          member

By: _____
    Name:
    Title:

RCN FINANCIAL MANAGEMENT, INC., as an Assignor

By: _____
    Name:
    Title:

RCN INTERNATIONAL HOLDINGS, INC., as an Assignor

By: _____
    Name:
    Title:

RCN INTERNET SERVICES, INC., as an Assignor

By: _____
    Name:
    Title:

RCN TELECOM SERVICES, INC., as an Assignor

By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF ILLINOIS, LLC, as an Assignor

    By:  RCN CORPORATION, its managing member

By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF MASSACHUSETTS, INC., as an Assignor

By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF PHILADELPHIA, INC., as an Assignor

By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF VIRGINIA, INC., as an Assignor

By: _____
    Name:
    Title:

RCN TELECOM SERVICES OF WASHINGTON, D.C., INC., as an Assignor

By: _____
    Name:
    Title:

RFM 2, LLC, as an Assignor

    By:  RCN Corporation, its managing
           member

By: _____
    Name:
    Title:

RLH PROPERTY CORPORATION, as an Assignor

By: _____
    Name:
    Title:

STARPOWER COMMUNICATIONS, LLC, as an Assignor

    By:  RCN Telecom Services of
           Washington, D.C., Inc., its managing
           member

By: _____
    Name:
    Title:

TEC AIR, INC., as an Assignor


By: _____
    Name:
    Title:

21ST CENTURY TELECOM SERVICES, INC., as an Assignor


By: _____
    Name:
    Title:


UNET HOLDING, INC., as an Assignor


By: _____
    Name:
    Title:

Accepted and Agreed to:

[_____],
  as Second-Lien Collateral Agent


By: _____
    Name:
    Title:

## SCHEDULE OF CHIEF EXECUTIVE OFFICES

Name of Assignor                    Address(es) of Chief Executive Office[1]

---

[1]   For each Assignor, list the address of its chief executive office on the date of the Security Agreement and each other location (if any) of its chief executive office in the four calendar months preceding said date.

SCHEDULE OF INVENTORY AND EQUIPMENT LOCATIONS

Assignor                    Location[1]

---

[1]    For each Assignor, list each location at which any Inventory or Equipment was located on the date of the Security Agreement or at any time during the preceding four calendar months.

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION),
JURISDICTION OF ORGANIZATION,
LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

| Exact Legal Name of Each Assignor | Type of Organization (or, if the Assignor is an Individual, so indicate) | Registered Organization? (Yes/No) | Jurisdiction of Organization | Assignor's Location (for purposes of NY UCC § 9-307) | Assignor's Organization Identification Number (or, if it has none, so indicate) |
|---|---|---|---|---|---|

## SCHEDULE OF TRADE AND FICTITIOUS NAMES

Name of                                    Trade and/or
Assignor                                   Fictitious Names

DESCRIPTION OF CERTAIN SIGNIFICANT TRANSACTIONS OCCURRING WITHIN
ONE YEAR PRIOR TO THE DATE OF THE SECURITY AGREEMENT


Name of Assignor                        Description of any Transactions as required
                                        by Section 2.8 of the Security Agreement

Schedule of Deposit Accounts

| Name of Assignor | Description of Deposit Account | Account Number | Name of Bank, Address and Contact Information | Jurisdiction of Bank (determined in accordance with UCC § 9-304) |
|---|---|---|---|---|

Form of Control Agreement Regarding Deposit Accounts

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, ____], among the undersigned assignor (the "Assignor"), Deutsche Bank AG Cayman Islands Branch, not in its individual capacity but solely as First-Lien Collateral Agent under the First-Lien Security Agreement referred to below (in such capacity, the "First-Lien Collateral Agent"), _____, not in its individual capacity but solely as Second-Lien Collateral Agent under the Second-Lien Security Agreement referred to below (in such capacity, the "Second-Lien Collateral Agent"), [HSBC Bank USA, not in its individual capacity but solely as Third-Lien Collateral Agent under the Third-Lien Security Agreement referred to below (in such capacity, the "Third-Lien Collateral Agent"),][1] and [_____] (the "Deposit Account Bank"), as the bank (as defined in Section 9-102 of the UCC as in effect on the date hereof in the State of New York (the "UCC")) with which one or more deposit accounts (as defined in Section 9-102 of the UCC) are maintained by the Assignor (with all such deposit accounts now or at any time in the future maintained by the Assignor with the Deposit Account Bank being herein called the "Deposit Accounts").

W I T N E S S E T H :

WHEREAS, the Assignor, various other Assignors and the First-Lien Collateral Agent have entered into a First-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "First-Lien Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the First-Lien Security Agreement), the Assignor has granted a security interest to the First-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the First-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "First-Lien Collateral");

WHEREAS, the Assignor, various other Assignors and the Second-Lien Collateral Agent have entered into a Second-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Second-Lien Security Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Second-Lien Security Agreement), the Assignor has granted a

_____

[1] Include references to the Third-Lien Collateral Agent and the Third-Lien Security Documents if and only if the Assignor is the Borrower.

security interest to the Second-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the Second-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "Second-Lien Collateral");

WHEREAS, the Assignor and the Third-Lien Collateral Agent have entered into a Third-Lien Security Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Third-Lien Security Agreement" and, together with the First-Lien Security Agreement and the Second-Lien Security Agreement, the "Security Agreements"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Third-Lien Security Agreement), the Assignor has granted a security interest to the Third-Lien Collateral Agent for the benefit of the Secured Creditors (as defined in the Third-Lien Security Agreement) in all of the right, title and interest of the Assignor in and into any and all deposit accounts (as defined in Section 9-102 of the UCC) and in all monies, securities, instruments and other investments deposited therein from time to time (collectively, herein called the "Third-Lien Collateral", and together with the First-Lien Collateral and the Second-Lien Collateral, the "Collateral");

WHEREAS, [RCN Corporation] [the Assignor], the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent have entered into an Intercreditor Agreement, dated as of _____ __, 2004 (as amended, restated, modified and/or supplemented from time to time, the "Intercreditor Agreement"), governing the relative rights and priorities of the Secured Creditors (as defined in each Security Agreement) in respect of the Collateral; and

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     Assignor's Dealings with Deposit Accounts; Notice of Exclusive Control. Until the Deposit Account Bank shall have received from the First-Lien Collateral Agent and/or the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent a Notice of Exclusive Control (as defined below), the Assignor shall be entitled to present items drawn on and otherwise to withdraw or direct the disposition of funds from the Deposit Accounts and give instructions in respect of the Deposit Accounts; provided, however, that the Assignor may not, and the Deposit Account Bank agrees that it shall not permit the Assignor to, close any Deposit Account, in any case without the prior written consent of each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent. If the First-Lien Collateral Agent or the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall give to the Deposit Account Bank a notice of the First-Lien Collateral Agent's or the Second-Lien Collateral Agent's or the Third-Lien Collateral Agent's exclusive control of the Deposit Accounts, which notice states that it is a "Notice of Exclusive Control" (a "Notice of Exclusive Control"), only the First-Lien Collateral Agent or the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, shall be entitled to withdraw funds from the Deposit

Accounts, to give any instructions in respect of the Deposit Accounts and any funds held therein or credited thereto or otherwise to deal with the Deposit Accounts.

        2.    <u>First-Lien Collateral Agent's, Second-Lien Collateral Agent's and Third-Lien Collateral Agent's Rights to Give Instructions as to Deposit Accounts</u>. (a) Notwithstanding the foregoing or any separate agreement that the Assignor may have with the Deposit Account Bank, each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent shall be entitled, for purposes of this Agreement, at any time to give the Deposit Account Bank instructions as to the withdrawal or disposition of any funds from time to time credited to any Deposit Account, or as to any other matters relating to any Deposit Account or any other Collateral, without further consent from the Assignor or any other Person.  The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank, and the Deposit Account Bank hereby agrees, to comply with any such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and/or the Third-Lien Collateral Agent without any further consent from the Assignor or any other Person.  Such instructions may include the giving of stop payment orders for any items being presented to any Deposit Account for payment.  The Deposit Account Bank shall be fully entitled to rely on, and shall comply with, such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent even if such instructions are contrary to any instructions or demands that the Assignor may give to the Deposit Account Bank.  In case of any conflict between instructions received by the Deposit Account Bank from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, on the one hand, and the Assignor, on the other hand, the instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, shall prevail.  In case of any conflict between instructions received by the Deposit Account Bank from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent, the instructions from the First-Lien Collateral Agent shall prevail.

        (b)    It is understood and agreed that the Deposit Account Bank's duty to comply with instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent regarding the Deposit Accounts is absolute, and the Deposit Account Bank shall be under no duty or obligation, nor shall it have the authority, to inquire or determine whether or not such instructions are in accordance with the Security Agreements, the Intercreditor Agreement or any other Credit Document (as defined in each of the Security Agreements), nor seek confirmation thereof from the Assignor or any other Person.

        3.    <u>Assignor's Exculpation and Indemnification of Depository Bank</u>.  The Assignor hereby irrevocably authorizes and instructs the Deposit Account Bank to follow instructions from each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent regarding the Deposit Accounts even if the result of following such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent is that the Deposit Account Bank dishonors items presented for payment from any Deposit Account.  The Assignor further confirms that the Deposit Account Bank shall have no liability to the Assignor for wrongful dishonor of such items in following such instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent.  The Deposit Account Bank shall have no duty to inquire or

determine whether the Assignor's obligations to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent are in default or whether the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent is entitled, under any separate agreement between the Assignor and the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, to give any such instructions. The Assignor further agrees to be responsible for the Deposit Account Bank's customary charges and to indemnify the Deposit Account Bank from and to hold the Deposit Account Bank harmless against any loss, cost or expense that the Deposit Account Bank may sustain or incur in acting upon instructions which the Deposit Account Bank believes in good faith to be instructions from the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent.

4. <u>Subordination of Security Interests; Deposit Account Bank's Recourse to Deposit Accounts</u>. The Deposit Account Bank hereby subordinates any claims and security interests it may have against, or with respect to, any Deposit Account at any time established or maintained with it by the Assignor (including any amounts, investments, instruments or other Collateral from time to time on deposit therein) to the security interests of the First-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the First-Lien Security Agreement), the Second-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Second-Lien Security Agreement) and the Third-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Third-Lien Security Agreement), and agrees that no amounts shall be charged by it to, or withheld or set-off or otherwise recouped by it from, any Deposit Account of the Assignor or any amounts, investments, instruments or other Collateral from time to time on deposit therein; <u>provided</u> that the Deposit Account Bank may, however, from time to time debit the Deposit Accounts for any of its customary charges in maintaining the Deposit Accounts or for reimbursement for the reversal of any provisional credits granted by the Deposit Account Bank to any Deposit Account, to the extent, in each case, that the Assignor has not separately paid or reimbursed the Deposit Account Bank therefor.

5. <u>Representations, Warranties and Covenants of Deposit Account Bank</u>. The Deposit Account Bank represents and warrants to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the and the Second-Lien Collateral Agent (for the benefit of the Secured Creditors under, and as defined in, the Second-Lien Security Agreement) and hereby agrees that:

(a) The Deposit Account Bank constitutes a "bank" (as defined in Section 9-102 of the UCC), that the jurisdiction (determined in accordance with Section 9-304 of the UCC) of the Deposit Account Bank for purposes of each Deposit Account maintained by the Assignor with the Deposit Account Bank is _____.

(b) The Deposit Account Bank shall not permit any Assignor to establish any demand, time, savings, passbook or other account with it which does not constitute a "deposit account" (as defined in Section 9-102 of the UCC).

(c)     The Deposit Account Bank will not, without the prior written consent of each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent, amend any account agreement between it and the Assignor governing any Deposit Account so that the Deposit Account Bank's jurisdiction for purposes of Section 9-304 of the UCC is other than the jurisdiction specified in the preceding clause (a).  All account agreements in respect of each Deposit Account in existence on the date hereof are listed on Annex F hereto and copies of all such account agreements have been furnished to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent.  The Deposit Account Bank will promptly furnish to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent a copy of the account agreement for each Deposit Account hereafter established by the Deposit Account Bank for the Assignor.

(d)     The Deposit Account Bank has not entered and will not enter, into any agreement with any other Person by which the Deposit Account Bank is obligated to comply with instructions from such other Person as to the disposition of funds from any Deposit Account or other dealings with any Deposit Account or other of the Collateral.

(e)     On the date hereof, the Deposit Account Bank maintains no Deposit Accounts for the Assignor other than the Deposit Accounts specifically identified in Annex F hereto.

(f)     Any items or funds received by the Deposit Account Bank for the Assignor's account will be credited to said Deposit Accounts specified in paragraph (e) above or to any other Deposit Accounts hereafter established by the Deposit Account Bank for the Assignor in accordance with this Agreement.

(g)     The Deposit Account Bank will promptly notify the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent of each Deposit Account hereafter established by the Deposit Account Bank for the Assignor (which notice shall specify the account number of such Deposit Account and the location at which the Deposit Account is maintained), and each such new Deposit Account shall be subject to the terms of this Agreement in all respects.

6.     <u>Deposit Account Statements and Information</u>.  The Deposit Account Bank agrees, and is hereby authorized and instructed by the Assignor, to furnish to each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent, and the Third-Lien Collateral Agent, at its address indicated below, copies of all account statements and other information relating to each Deposit Account that the Deposit Account Bank sends to the Assignor and to disclose to the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent all information requested by the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be, regarding any Deposit Account.

7.     <u>Conflicting Agreements</u>.  This Agreement shall have control over any conflicting agreement between the Deposit Account Bank and the Assignor.

8.      Merger or Consolidation of Deposit Account Bank.  Without the execution or filing of any paper or any further act on the part of any of the parties hereto, any bank into which the Deposit Account Bank may be merged or with which it may be consolidated, or any bank resulting from any merger to which the Deposit Account Bank shall be a party, shall be the successor of the Deposit Account Bank hereunder and shall be bound by all provisions hereof which are binding upon the Deposit Account Bank and shall be deemed to affirm as to itself all representations and warranties of the Deposit Account Bank contained herein.

9.      Notices.  (a) All notices and other communications provided for in this Agreement shall be in writing (including facsimile) and sent to the intended recipient at its address or telex or facsimile number set forth below:

If to the First-Lien Collateral Agent, at:

60 Wall Street
New York, New York 10005
Attention: _____
Telephone: _____
Facsimile: _____

If to the Second-Lien Collateral Agent, at:

_____
_____
Attention: _____
Telephone: _____
Facsimile: _____

If to the Third-Lien Collateral Agent, at:

_____
_____
Attention: _____
Telephone: _____
Facsimile: _____

If to the Assignor, at:

C/o RCN Corporation
105 Carnegie Center
Princeton, New Jersey 08540
Attention: General Counsel
Telephone: (609) 734-3811
Facsimile: (609) 734-3830

<u>If to the Deposit Account Bank, at:</u>

_____

_____

_____

or, as to any party, to such other address or telex or facsimile number as such party may designate from time to time by notice to the other parties.

(b)     Except as otherwise provided herein, all notices and other communications hereunder shall be delivered by hand or by commercial overnight courier (delivery charges prepaid), or mailed, postage prepaid, or telexed or faxed, addressed as aforesaid, and shall be effective (i) three business days after being deposited in the mail (if mailed), (ii) when delivered (if delivered by hand or courier) and (iii) or when transmitted with receipt confirmed (if telexed or faxed); provided that notices to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent shall not be effective until actually received by it.

10.     <u>Amendment</u>.     This Agreement may not be amended, modified or supplemented except in writing executed and delivered by all the parties hereto.

11.     <u>Binding Agreement</u>.     This Agreement shall bind the parties hereto and their successors and assign and shall inure to the benefit of the parties hereto and their successors and assigns.  Without limiting the provisions of the immediately preceding sentence, the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent may at any time or from time to time designate in writing to the Deposit Account Bank a successor First-Lien Collateral Agent, Second-Lien Collateral Agent or Third-Lien Collateral Agent, as the case may be (at such time, if any, as such entity becomes the "First-Lien Collateral Agent" under the First-Lien Security Agreement, the "Second-Lien Collateral Agent" under the Second-Lien Security Agreement or the "Third-Lien Collateral Agent" under the Third-Lien Security Agreement, or at any time thereafter), and such successor shall thereafter succeed to the rights of the existing First-Lien Collateral Agent, Second-Lien Collateral Agent or the Third-Lien Collateral Agent, as the case may be,  hereunder and shall be entitled to all of the rights and benefits provided hereunder.

12.     <u>Continuing Obligations</u>.     The rights and powers granted herein to each of the First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent have been granted in order to protect and further perfect its security interests in the Deposit Accounts and other relevant Collateral and are powers coupled with an interest and will be affected neither by any purported revocation by the Assignor of this Agreement or the rights granted to the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent hereunder or by the bankruptcy, insolvency, conservatorship or receivership of the Assignor, the Deposit Account Bank, the First-Lien Collateral Agent, the Second-Lien Collateral Agent or the Third-Lien Collateral Agent or by the lapse of time.  The rights of the First-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other First-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the First-Lien Collateral Agent in the Deposit

Accounts and such other First-Lien Collateral have been terminated and the First-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing. The rights of the Second-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other Second-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the Second-Lien Collateral Agent in the Deposit Accounts and such other Second-Lien Collateral have been terminated and the Second-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing. The rights of the Third-Lien Collateral Agent hereunder and in respect of the Deposit Accounts and the other Third-Lien Collateral, and the obligations of the Assignor and Deposit Account Bank hereunder, shall continue in effect until the security interests of the Third-Lien Collateral Agent in the Deposit Accounts and such other Third-Lien Collateral have been terminated and the Third-Lien Collateral Agent has notified the Deposit Account Bank of such termination in writing.

13.   Compliance with Intercreditor Agreement.   The First-Lien Collateral Agent, the Second-Lien Collateral Agent and the Third-Lien Collateral Agent hereby acknowledge and agree as between themselves that, notwithstanding anything herein to the contrary, the exercise of any right or remedy by the Second-Lien Collateral Agent or the Third-Lien Collateral Agent hereunder (including, without limitation, its right to deliver a Notice of Exclusive Control or any other instruction to the Deposit Account Bank and to withdraw funds from a Deposit Account) is subject to the provisions of the Intercreditor Agreement.

14   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

15.   Counterparts.   This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

Assignor:

[NAME OF ASSIGNOR]

By:_____
    Name:
    Title:

First-Lien Collateral Agent:

DEUTSCHE BANK AG CAYMAN ISLANDS
    BRANCH

By:_____
    Name:
    Title:

Second-Lien Collateral Agent:

[_____]

By:_____
    Name:
    Title: Authorized Officer

Third-Lien Collateral Agent:

HSBC BANK USA

By:_____
    Name:
    Title:

Deposit Account Bank:

[NAME OF DEPOSIT ACCOUNT BANK]


By:_____
    Name:
    Title:

<u>DESCRIPTION OF COMMERCIAL TORT CLAIMS</u>

<u>Name of Assignor</u>                    <u>Description of Commercial Tort Claims</u>

SCHEDULE OF MARKS AND APPLICATIONS;
INTERNET DOMAIN NAME REGISTRATIONS

1.      **Marks and Applications:**

|           Marks           |           Country           |           Registration No.           |
|---------------------------|-----------------------------|--------------------------------------|

2.      **Internet Domain Name Registrations:**

| Internet Domain Names | Country | Registration No. (or other applicable identifier) |
|-----------------------|---------|----------------------------------------------------|

SCHEDULE OF PATENTS

SCHEDULE OF COPYRIGHTS

| NUMBERS REGISTRATION | PUBLICATION DATE | COPYRIGHT TITLE |
|---|---|---|

GRANT OF SECURITY INTEREST
IN UNITED STATES TRADEMARKS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Grantor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Deutsche Bank AG Cayman Islands Branch, as Second-Lien Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005, (the "Grantee"), a security interest in (i) all of the Grantor's right, title and interest in and to the United States trademarks, trademark registrations and trademark applications (the "Marks") set forth on Schedule A attached hereto, (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Marks, (iii) the goodwill of the businesses with which the Marks are associated and (iv) all causes of action arising prior to or after the date hereof for infringement of any of the Marks or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of _____, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Marks acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this

Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the

_____ day of _____, 2004.

[NAME OF GRANTOR], Grantor

By_____
   Name:
   Title:

DEUTSCHE BANK AG CAYMAN ISLANDS
BRANCH, as Second-Lien Collateral Agent and
Grantee

By_____
   Name:
   Title:

STATE OF _____ )
                         ) ss.:
COUNTY OF _____ )


       On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows: that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the [Board of Directors] of said _____.

                                       _____
                                           Notary Public

STATE OF NEW YORK    )
                             ) ss:
COUNTY OF NEW YORK  )


        On this ____ day of _____, 2004, before me personally came _____ _____ who, being by me duly sworn, did state as follows:  that [s]he is _____ of Deutsche Bank AG Cayman Islands Branch, that [s]he is authorized to execute the foregoing Grant on behalf of said banking corporation and that [s]he did so by authority of the Board of Directors of said banking corporation.

                                                 _____
                                                    Notary Public

| MARK | REG. NO. | REG. DATE |
| --- | --- | --- |

GRANT OF SECURITY INTEREST
IN UNITED STATES PATENTS


FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, [Name of Grantor], a _____ _____ (the "Grantor") with principal offices at _____, hereby grants to Deutsche Bank AG Cayman Islands Branch, as Second-Lien Collateral Agent, with principal offices at 60 Wall Street, New York, New York 10005 (the "Grantee"), a security interest in (i) all of the Grantor's rights, title and interest in and to the United States patents (the "Patents") set forth on Schedule A attached hereto, in each case together with (ii) all Proceeds (as such term is defined in the Security Agreement referred to below) and products of the Patents, and (iii) all causes of action arising prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same.

THIS GRANT is made to secure the satisfactory performance and payment of all the Obligations of the Grantor, as such term is defined in the Security Agreement among the Grantor, the other assignors from time to time party thereto and the Grantee, dated as of _____, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"). Upon the occurrence of the Termination Date (as defined in the Security Agreement), the Grantee shall execute, acknowledge, and deliver to the Grantor an instrument in writing releasing the security interest in the Patents acquired under this Grant.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the _____ day of _____, 2004.

[NAME OF GRANTOR], Grantor

By_____
   Name:
   Title:

[_____], as Second-Lien Collateral Agent and Grantee

By_____
   Name:
   Title:

STATE OF _____ )

                               ) ss:

COUNTY OF_____)

      On this ____ day of _____, ____, before me personally came _____ _____ who, being by me duly sworn, did state as follows: that [s]he is _____ of [Name of Grantor], that [s]he is authorized to execute the foregoing Grant on behalf of said _____ and that [s]he did so by authority of the Board of Directors of said _____.

                                        _____

                                            Notary Public

STATE OF NEW YORK       )
                        ) ss:
COUNTY OF NEW YORK  )


      On this _____ day of _____, 2004, before me personally came _____

_____ who, being by me duly sworn, did state as follows:  that [s]he is

_____ of [_____], that [s]he is authorized to execute the

foregoing Grant on behalf of said banking corporation.


                                        _____
                                                Notary Public

| <u>PATENT</u> | <u>PATENT NO.</u> | <u>ISSUE DATE</u> |
|---|---|---|

GRANT OF SECURITY INTEREST
IN UNITED STATES COPYRIGHTS

WHEREAS, [Name of Grantor], a _____ _____ (the "Grantor"), having its chief executive office at _____, _____, is the owner of all right, title and interest in and to the United States copyrights and associated United States copyright registrations and applications for registration set forth in Schedule A attached hereto;

WHEREAS, [_____], as Second-Lien Collateral Agent, having its principal offices at [_____] (the "Grantee"), desires to acquire a security interest in said copyrights and copyright registrations and applications therefor; and

WHEREAS, the Grantor is willing to grant to the Grantee a security interest in and lien upon the copyrights and copyright registrations and applications therefor described above.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions of the Security Agreement, dated as of _____, 2004, made by the Grantor, the other assignors from time to time party thereto and the Grantee (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement"), the Grantor hereby assigns to the Grantee as collateral security, and grants to the Grantee a security interest in, the copyrights and copyright registrations and applications therefor set forth in Schedule A attached hereto.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Security Agreement, the provisions of the Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the

____ day of _____, 2004.

[NAME OF GRANTOR], Grantor


By_____
   Name:
   Title:


[_____], as Second-Lien
   Collateral Agent and Grantee


By_____
   Name:
   Title:

STATE OF                )

                         ) ss:

COUNTY OF          )

         On this __ day of _____, ____, before me personally came _____

_____, who being duly sworn, did depose and say that [s]he is

_____ of [Name of Grantor], that [s]he is authorized to execute the foregoing

Grant on behalf of said corporation and that [s]he did so by authority of the Board of Directors of

said corporation.


                                      _____

                                           Notary Public

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK  )


      On this _____ day of _____, 2004, before me personally came _____ _____ who, being by me duly sworn, did state as follows:   that [s]he is _____ of [_____], that [s]he is authorized to execute the foregoing Grant on behalf of said banking corporation.

 

                                          _____
                                              Notary Public

# TABLE OF CONTENTS

Page

ARTICLE I SECURITY INTERESTS ..................................................................................2

    1.1 Grant of Security Interests ............................................................................2
    1.2 Power of Attorney.........................................................................................4

ARTICLE II GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS ..........4

    2.1 Necessary Filings..........................................................................................4
    2.2 No Liens........................................................................................................5
    2.3 Other Financing Statements .........................................................................5
    2.4 Chief Executive Office, Record Locations ...................................................5
    2.5 Location of Inventory and Equipment ..........................................................5
    2.6 Legal Names; Type of Organization (and Whether a Registered Organization);
        Jurisdiction of Organization; Location; Organizational Identification
        Numbers; Changes Thereto; etc................................................................5
    2.7 Trade Names; Etc. .........................................................................................6
    2.8 Certain Significant Transactions. ..................................................................6
    2.9 Non-UCC Property .......................................................................................7
    2.10 As-Extracted Collateral; Timber-to-be-Cut ...............................................7
    2.11 Collateral in the Possession of a Bailee .....................................................7
    2.12 Recourse .....................................................................................................7

ARTICLE III SPECIAL PROVISIONS CONCERNING ACCOUNTS; CONTRACT
    RIGHTS; INSTRUMENTS; CHATTEL PAPER AND CERTAIN OTHER
    COLLATERAL.......................................................................................................8

    3.1 Additional Representations and Warranties..................................................8
    3.2 Maintenance of Records................................................................................8
    3.3 Direction to Account Debtors; Contracting Parties; etc. ..............................8
    3.4 Modification of Terms; etc............................................................................9
    3.5 Collection .....................................................................................................9
    3.6 Instruments ...................................................................................................9
    3.7 Assignors Remain Liable Under Accounts...................................................9
    3.8 Assignors Remain Liable Under Contracts.................................................10
    3.9 Deposit Accounts; Etc.................................................................................10
    3.10 Letter-of-Credit Rights.............................................................................11
    3.11 Commercial Tort Claims ..........................................................................11
    3.12 Chattel Paper ............................................................................................11
    3.13 Further Actions .........................................................................................12

ARTICLE IV SPECIAL PROVISIONS CONCERNING TRADEMARKS AND
    DOMAIN NAMES................................................................................................12

    4.1 Additional Representations and Warranties................................................12

4.2 Licenses and Assignments ...................................................................13
4.3 Infringements...................................................................................13
4.4 Preservation of Marks and Domain Names ...........................................13
4.5 Maintenance of Registration .............................................................13
4.6 Future Registered Marks and Domain Names .......................................13
4.7 Remedies ........................................................................................13

ARTICLE V SPECIAL PROVISIONS CONCERNING PATENTS, COPYRIGHTS AND
TRADE SECRETS................................................................................14

5.1 Additional Representations and Warranties...........................................14
5.2 Licenses and Assignments ...............................................................14
5.3 Infringements...................................................................................15
5.4 Maintenance of Patents or Copyrights.................................................15
5.5 Prosecution of Patent Applications.....................................................15
5.6 Other Patents and Copyrights............................................................15
5.7 Remedies ........................................................................................15

ARTICLE VI PROVISIONS CONCERNING ALL COLLATERAL.......................16

6.1 Protection of Second-Lien Collateral Agent's Security..........................16
6.2 Warehouse Receipts Non-Negotiable .................................................16
6.3 Additional Information. ....................................................................16
6.4 Further Actions ...............................................................................16
6.5 Financing Statements ......................................................................17

ARTICLE VII REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT .............17

7.1 Remedies; Obtaining the Collateral Upon Default.................................17
7.2 Remedies; Disposition of the Collateral ..............................................19
7.3 Waiver of Claims.............................................................................19
7.4 Application of Proceeds....................................................................20
7.5 Remedies Cumulative ......................................................................22
7.6 Discontinuance of Proceedings .........................................................22

ARTICLE VIII INDEMNITY.........................................................................22

8.1 Indemnity .......................................................................................22
8.2 Indemnity Obligations Secured by Collateral; Survival .........................23

ARTICLE IX DEFINITIONS .........................................................................24

ARTICLE X MISCELLANEOUS ...................................................................29

10.1 Notices ........................................................................................30
10.2 Waiver; Amendment ......................................................................30
10.3 Obligations Absolute .....................................................................30
10.4 Successors and Assigns...................................................................31
10.5 Headings Descriptive .....................................................................31

10.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
      WAIVER OF JURY TRIAL. ...........................................................31
10.7 Assignor's Duties.........................................................................32
10.8 Termination; Release ...................................................................32
10.9 Counterparts ...............................................................................33
10.10 Severability.................................................................................33
10.11 The Second-Lien Collateral Agent and the other Secured Creditors.....................34
10.12 Additional Assignors....................................................................34
10.13 Compliance with Laws..................................................................34
10.14 Conflicts; Intercreditor Agreement ...............................................34

| | |
|---|---|
| ANNEX A | Schedule of Chief Executive Offices Address(es) of Chief Executive Office |
| ANNEX B | Schedule of Inventory and Equipment Locations |
| ANNEX C | Schedule of Legal Names, Type of Organization (and Whether a Registered Organization), Jurisdiction of Organization, Location and Organizational Identification Numbers |
| ANNEX D | Schedule of Trade and Fictitious Names |
| ANNEX E | Description of Certain Significant Transactions Occurring Within One Year Prior to the Date of the Security Agreement |
| ANNEX F | Schedule of Deposit Accounts |
| ANNEX G | Form of Control Agreement Regarding Deposit Accounts |
| ANNEX H | Schedule of Commercial Tort Claims |
| ANNEX I | Schedule of Marks and Applications; Internet Domain Name Registrations |
| ANNEX J | Schedule of Patents |
| ANNEX K | Schedule of Copyrights |
| ANNEX L | Grant of Security Interest in United States Trademarks |
| ANNEX M | Grant of Security Interest in United States Patents |
| ANNEX N | Grant of Security Interest in United States Copyrights |

**[Remainder of this page intentionally left blank]**

FORM OF SUBSIDIARIES GUARANTY

SUBSIDIARIES GUARANTY (as amended, modified, restated and/or supplemented from time to time, this "Guaranty"), dated as of December __, 2004, made by and among each of the undersigned guarantors (each, a "Guarantor" and, together with any other entity that becomes a guarantor hereunder pursuant to Section 22 hereof, collectively, the "Guarantors") in favor of [_____], as trustee (together with any successor trustee, the "Administrative Agent"), for the benefit of the Secured Creditors (as defined below).  Except as otherwise defined herein, all capitalized terms used herein and defined in the Second-Lien Note Indenture (as defined below) shall be used herein as therein defined.

W I T N E S S E T H :

WHEREAS, RCN Corporation (the "Borrower"), the noteholders from time to time party thereto (the "Noteholders") and the Administrative Agent, as trustee, have entered into an Indenture, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "Second-Lien Note Indenture"), providing for the issuance of Second-Lien Notes by the Borrower, all as contemplated therein (the Noteholders, the Administrative Agent, the Collateral Agent and the Pledgee are herein called the "Secured Creditors");

WHEREAS, each Guarantor is a direct or indirect Subsidiary of the Borrower;

WHEREAS, it is a condition precedent to the issuance of Second-Lien Notes under the Second-Lien Note Indenture that each Guarantor shall have executed and delivered to the Administrative Agent this Guaranty; and

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Guarantor, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby makes the following representations and warranties to the Administrative Agent for the benefit of the Secured Creditors and hereby covenants and agrees with each other Guarantor and the Administrative Agent for the benefit of the Secured Creditors as follows:

1. GUARANTY.  (a)  Each Guarantor, jointly and severally, irrevocably, absolutely and unconditionally guarantees as a primary obligor and not merely as surety to the Secured Creditors the full and prompt payment when due (whether at the stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) of the principal of, premium, if any, and interest on the Second-Lien Notes issued by the Borrower under the Second-Lien Note Indenture (including, without limitation, obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and each other Second-Lien Note Document to which the Borrower is a party (including, without limitation, indemnities, Fees and interest thereon (including, without limitation, any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate

provided for in the Second-Lien Note Indenture, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with the Second-Lien Note Indenture and any such other Second-Lien Note Document and the due performance and compliance by the Borrower with all of the terms, conditions, covenants and agreements contained in all such Second-Lien Note Documents (all such principal, premium, interest, liabilities, indebtedness and obligations under this clause (a), being herein collectively called the "Guaranteed Obligations").

Each Guarantor understands, agrees and confirms that the Secured Creditors may enforce this Guaranty up to the full amount of the Guaranteed Obligations against such Guarantor without proceeding against any other Guarantor, the Borrower, or against any security for the Guaranteed Obligations, or under any other guaranty covering all or a portion of the Guaranteed Obligations. This Guaranty is a guaranty of prompt payment and performance and not of collection.

(b)     Additionally, each Guarantor, jointly and severally, unconditionally, absolutely and irrevocably, guarantees the payment of any and all Guaranteed Obligations whether or not due or payable by the Borrower upon the occurrence in respect of the Borrower of any of the events specified in Section [__] of the Second-Lien Note Indenture, and unconditionally, absolutely and irrevocably, jointly and severally, promises to pay such Guaranteed Obligations to the Secured Creditors, or order, on demand.

2. LIABILITY OF GUARANTORS ABSOLUTE.     The liability of each Guarantor hereunder is primary, absolute, joint and several, and unconditional and is exclusive and independent of any security for or other guaranty of the indebtedness of the Borrower whether executed by such Guarantor, any other Guarantor, any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by any circumstance or occurrence whatsoever, including, without limitation:  (a) any direction as to application of payment by the Borrower or any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of a Guarantor or of any other party as to the Guaranteed Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, (e) the failure of the Guarantor to receive any benefit from or as a result of its execution, delivery and performance of this Guaranty, (f) any payment made to any Secured Creditor on the indebtedness which any Secured Creditor repays the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (g) any action or inaction by the Secured Creditors as contemplated in Section 5 hereof or (h) any invalidity, rescission, irregularity or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor.

3. OBLIGATIONS OF GUARANTORS INDEPENDENT.  The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other guarantor, the Borrower, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor, any other guarantor, the Borrower and whether or not any other Guarantor, any other guarantor, the Borrower be joined in any such action or actions.  Each Guarantor waives (to the fullest extent

permitted by applicable law) the benefits of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each Guarantor.

4. <u>WAIVERS BY GUARANTORS</u>. (a) Each Guarantor hereby waives (to the fullest extent permitted by applicable law) notice of acceptance of this Guaranty and notice of the existence, creation or incurrence of any new or additional liability to which it may apply, and waives promptness, diligence, presentment, demand of payment, demand for performance, protest, notice of dishonor or nonpayment of any such liabilities, suit or taking of other action by the Administrative Agent or any other Secured Creditor against, and any other notice to, any party liable thereon (including such Guarantor, any other Guarantor, any other guarantor, the Borrower) and the Guarantor further hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations and notice or proof of reliance by any Secured Creditor upon this Guaranty, and the Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended, modified, supplemented or waived, in reliance upon this Guaranty.

(b) Each Guarantor waives any right to require the Secured Creditors to: (i) proceed against the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; (ii) proceed against or exhaust any security held from the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party; or (iii) pursue any other remedy in the Secured Creditors' power whatsoever. Each Guarantor waives any defense based on or arising out of any defense of the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party other than payment in full in cash of the Guaranteed Obligations, including, without limitation, any defense based on or arising out of the disability of the Borrower, any other Guarantor, any other guarantor of the Guaranteed Obligations or any other party, or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment in full in cash of the Guaranteed Obligations. The Secured Creditors may, at their election, foreclose on any collateral serving as security held by the Administrative Agent, the Collateral Agent or the other Secured Creditors by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against the Borrower, or any other party, or any security, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been paid in full in cash. Each Guarantor waives any defense arising out of any such election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement, contribution, indemnification or subrogation or other right or remedy of such Guarantor against the Borrower, any other guarantor of the Guaranteed Obligations or any other party or any security.

(c) Each Guarantor has knowledge and assumes all responsibility for being and keeping itself informed of the Borrower's and each other Guarantor's financial condition, affairs and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Guarantor

assumes and incurs hereunder, and has adequate means to obtain from the Borrower and each other Guarantor on an ongoing basis information relating thereto and the Borrower's and each other Guarantor's ability to pay and perform its respective Guaranteed Obligations, and agrees to assume the responsibility for keeping, and to keep, so informed for so long as this Guaranty is in effect. Each Guarantor acknowledges and agrees that (x) the Secured Creditors shall have no obligation to investigate the financial condition or affairs of the Borrower or any other Guarantor for the benefit of such Guarantor nor to advise such Guarantor of any fact respecting, or any change in, the financial condition, assets or affairs of the Borrower or any other Guarantor that might become known to any Secured Creditor at any time, whether or not such Secured Creditor knows or believes or has reason to know or believe that any such fact or change is unknown to such Guarantor, or might (or does) increase the risk of such Guarantor as guarantor hereunder, or might (or would) affect the willingness of such Guarantor to continue as a guarantor of the Guaranteed Obligations hereunder and (y) the Secured Creditors shall have no duty to advise any Guarantor of information known to them regarding any of the aforementioned circumstances or risks.

(d)    Each Guarantor hereby acknowledges and affirms that it understands that to the extent the Guaranteed Obligations are secured by Real Property located in the State of California, such Guarantor shall be liable for the full amount of the liability hereunder notwithstanding foreclosure on such Real Property by trustee sale or any other reason impairing such Guarantor's or any Secured Creditors' right to proceed against any Borrower or any other guarantor of the Guaranteed Obligations.

(e)    Each Guarantor hereby waives (to the fullest extent permitted by applicable law) all rights and benefits under Section 580a, 580b, 580d and 726 of the California Code of Civil Procedure. Each Guarantor hereby further waives (to the fullest extent permitted by applicable law), without limiting the generality of the foregoing or any other provision hereof, all rights and benefits which might otherwise be available to such Guarantor under Sections 2809, 2810, 2815, 2819, 2821, 2839, 2845, 2848, 2849, 2850, 2899 and 3433 of the California Civil Code.

(f)    Until the Guaranteed Obligations have been paid in full in cash, each Guarantor waives its rights of subrogation and reimbursement and any other rights and defenses available to such Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, including, without limitation, (1) any defenses such Guarantor may have to this Guaranty by reason of an election of remedies by the Secured Creditors and (2) any rights or defenses such Guarantor may have by reason of protection afforded to any Borrower pursuant to the antideficiency or other laws of California limiting or discharging such Borrower's indebtedness, including, without limitation, Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure. In furtherance of such provisions, each Guarantor hereby waives all rights and defenses arising out of an election of remedies by the Secured Creditors, even though that election of remedies, such as a nonjudicial foreclosure, destroys such Guarantor's rights of subrogation and reimbursement against any Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(g)　Each Guarantor hereby acknowledges and agrees that no Secured Creditor nor any other Person shall be under any obligation (a) to marshal any assets in favor of the Guarantor or the obligation of the Guarantor hereunder or (b) to pursue any other remedy that the Guarantor may or may not be able to pursue itself any right to which the Guarantor hereby waives.

(h)　Each Guarantor warrants and agrees that each of the waivers set forth in Section 3 and in this Section 4 is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective only to the maximum extent permitted by applicable law.

5.　RIGHTS OF SECURED CREDITORS.　Subject to Sections 4 and 13, any Secured Creditor may (except as shall be required by applicable statute and cannot be waived) at any time and from time to time without the consent of, or notice to, any Guarantor, without incurring responsibility to such Guarantor, without impairing or releasing the obligations or liabilities of such Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(a)　change the manner, place or terms of payment of, and/or change, increase or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including, without limitation, any increase or decrease in the rate of interest thereon or the principal amount thereof), any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guaranty herein made shall apply to the Guaranteed Obligations as so changed, extended, increased, accelerated, renewed or altered;

(b)　take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, surrender, impair, realize upon or otherwise deal with in any manner and in any order any property or other collateral by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)　exercise or refrain from exercising any rights against the Borrower, any other Credit Party, any Subsidiary thereof, any other guarantor of the Borrower or others or otherwise act or refrain from acting;

(d)　release or substitute any one or more endorsers, Guarantors, other guarantors, the Borrower, or other obligors;

(e)　settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Secured Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Secured Creditors regardless of what liabilities of the Borrower remain unpaid;

(g)     act or fail to act in any manner which may deprive such Guarantor of its right to subrogation against the Borrower to recover full indemnity for any payments made pursuant to this Guaranty; and/or

(h)     take any other action or omit to take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Guarantor from its liabilities under this Guaranty (including, without limitation, any action or omission whatsoever that might otherwise vary the risk of the Guarantor or constitute a legal or equitable defense to or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against the Guarantor).

No invalidity, illegality, irregularity or unenforceability of all or any part of the Guaranteed Obligations, the Second-Lien Note Documents or any other agreement or instrument relating to the Guaranteed Obligations or of any security or guarantee therefor shall affect, impair or be a defense to this Guaranty, and this Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Guaranteed Obligations.

6.  CONTINUING GUARANTY.   This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.  No failure or delay on the part of any Secured Creditor in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which any Secured Creditor would otherwise have.  No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Secured Creditor to any other or further action in any circumstances without notice or demand.  It is not necessary for any Secured Creditor to inquire into the capacity or powers of the Borrower or the officers, directors, partners or agents acting or purporting to act on its or their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

7.  SUBORDINATION OF INDEBTEDNESS HELD BY GUARANTORS.  Any indebtedness of the Borrower now or hereafter held by any Guarantor is hereby subordinated to the indebtedness of the Borrower to the Secured Creditors; and such indebtedness of the Borrower to any Guarantor, if the Administrative Agent or the Collateral Agent, after an Event of Default has occurred and is continuing, so requests, shall be collected, enforced and received by such Guarantor as trustee for the Secured Creditors and be paid over to the Secured Creditors on account of the indebtedness of the Borrower to the Secured Creditors, but without affecting or impairing in any manner the liability of such Guarantor under the other provisions of this

Guaranty. Prior to the transfer by any Guarantor of any note or negotiable instrument evidencing any indebtedness of the Borrower to such Guarantor, such Guarantor shall mark such note or negotiable instrument with a legend that the same is subject to this subordination. Without limiting the generality of the foregoing, each Guarantor hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash; provided, that if any amount shall be paid to the Guarantor on account of such subrogation rights at any time prior to the irrevocable payment in full in cash of all the Guaranteed Obligations, such amount shall be held in trust for the benefit of the Secured Creditors and shall forthwith be paid to the Secured Creditors to be credited and applied upon the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Second-Lien Note Documents or, if the Second-Lien Note Documents do not provide for the application of such amount, to be held by the Secured Creditors as collateral security for any Guaranteed Obligations thereafter existing.

8. GUARANTY ENFORCEABLE BY ADMINISTRATIVE AGENT OR COLLATERAL AGENT. Notwithstanding anything to the contrary contained elsewhere in this Guaranty, the Secured Creditors agree (by their acceptance of the benefits of this Guaranty) that this Guaranty may be enforced only by the action of the Administrative Agent or the Collateral Agent, in each case acting upon the instructions of the Majority Noteholders and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Guaranty or to realize upon the security to be granted by the Security Documents, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent or the Collateral Agent for the benefit of the Secured Creditors upon the terms of this Guaranty and the Security Documents. The Secured Creditors further agree that this Guaranty may not be enforced against any director, officer, employee, partner, member or stockholder of any Guarantor (except to the extent such partner, member or stockholder is also a Guarantor hereunder). It is understood and agreed that the agreement in this Section 8 is among and solely for the benefit of the Secured Creditors and that, if the Majority Noteholders so agree (without requiring the consent of any Guarantor), this Guaranty may be directly enforced by any Secured Creditor.

9. REPRESENTATIONS, WARRANTIES AND COVENANTS OF GUARANTORS. In connection with the issuance of Second-Lien Notes by the Borrower pursuant to the Second-Lien Note Indenture, each Guarantor represents, warrants and covenants that:

(a) such Guarantor (i) is a duly organized and validly existing corporation, partnership or limited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the corporate, partnership or limited liability company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business requires such qualification except for

failures to be so qualified which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(b)     such Guarantor has the corporate, partnership or limited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of this Guaranty and each other Second-Lien Note Document (such term, for purposes of this Guaranty, to mean each Second-Lien Note Document (as defined in the Second-Lien Note Indenture)) to which it is a party and has taken all necessary corporate, partnership or limited liability company action, as the case may be, to authorize the execution, delivery and performance by it of this Guaranty and each such other Second-Lien Note Document;

(c)     such Guarantor has duly executed and delivered this Guaranty and each other Second-Lien Note Document to which it is a party, and this Guaranty and each such other Second-Lien Note Document constitutes the legal, valid and binding obligation of such Guarantor enforceable in accordance with its terms, except to the extent that the enforceability hereof or thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

(d)     neither the execution, delivery or performance by such Guarantor of this Guaranty or any other Second-Lien Note Document to which it is a party, nor compliance by it with the terms and provisions hereof and thereof, will (i) contravene any provision of any applicable law, statute, rule or regulation or any applicable order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of such Guarantor or any of its Subsidiaries pursuant to the terms of any indenture, material mortgage, material deed of trust, loan agreement, Second-Lien Note Indenture, or any other material agreement, contract or instrument to which such Guarantor or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject or (iii) violate any provision of the certificate or articles of incorporation, by-laws, partnership agreement or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Guarantor or any of its Subsidiaries;

(e)     no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made prior to the date when required and which remain in full force and effect), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance of this Guaranty by such Guarantor or any other Second-Lien Note Document to which such Guarantor is a party or (ii) the legality, validity, binding effect or enforceability of this Guaranty or any other Second-Lien Note Document to which such Guarantor is a party;

(f)     there are no actions, suits or proceedings pending or, to such Guarantor's knowledge, threatened (i) with respect to this Guaranty or any other Second-Lien Note Document to which such Guarantor is a party, (ii) with respect to such Guarantor or any of its Subsidiaries that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or (iii) that could reasonably be expected to have a material adverse effect on the rights or remedies of the Secured Creditors or on the ability of such Guarantor to perform its obligations to the Secured Creditors hereunder and under the other Second-Lien Note Documents to which it is a party;

(g)     until such time as no Second-Lien Note remains outstanding and all Guaranteed Obligations have been paid in full (other than indemnities described in Section [__] of the Second-Lien Note Indenture and analogous provisions in the Security Documents which are not then due and payable), such Guarantor will comply, and will cause each of its Subsidiaries to comply, with all of the applicable provisions, covenants and agreements contained in Sections [__] and [__] of the Second-Lien Note Indenture, and will take, or will refrain from taking, as the case may be, all actions that are necessary to be taken or not taken so that no violation of any provision, covenant or agreement contained in Section [__] of the Second-Lien Note Indenture, and so that no Default or Event of Default, is caused by the actions of such Guarantor or any of its Subsidiaries; and

(h)     an executed (or conformed) copy of each of the Second-Lien Note Documents, has been made available to a senior officer of such Guarantor and such officer is familiar with the contents thereof.

10.     <u>EXPENSES</u>.  The Guarantors hereby jointly and severally agree to pay all reasonable out-of-pocket costs and expenses of the Collateral Agent, the Administrative Agent and each other Secured Creditor in connection with the enforcement of this Guaranty and the protection of the Secured Creditors' rights hereunder and any amendment, waiver or consent relating hereto (including, in each case, without limitation, the reasonable fees and disbursements of counsel (including in-house counsel) employed by the Collateral Agent, the Administrative Agent and each other Secured Creditor).

11.     <u>BENEFIT AND BINDING EFFECT</u>.  This Guaranty shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the Secured Creditors and their successors and assigns.

12.     <u>AMENDMENTS; WAIVERS</u>.  Subject to the terms of the Intercreditor Agreement, neither this Guaranty nor any provision hereof may be changed, waived, discharged or terminated except with the written consent of each Guarantor directly affected thereby (it being understood that the addition or release of any Guarantor hereunder shall not constitute a change, waiver, discharge or termination affecting any Guarantor other than the Guarantor so added or released) and with the written consent of the Majority Noteholders (or, to the extent required by Section [__] of the Second-Lien Note Indenture, with the written consent of each Noteholder) at all times prior to the time at which all Second-Lien Note Document Obligations have been paid in full.

13. <u>SET OFF</u>. In addition to any rights now or hereafter granted under applicable law (including, without limitation, Section 151 of the New York Debtor and Creditor Law) and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default (such term to mean and include any "Event of Default" as defined in the Second-Lien Note Indenture), each Secured Creditor is hereby authorized, at any time or from time to time, without notice to any Guarantor or to any other Person, any such notice being expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by such Secured Creditor to or for the credit or the account of such Guarantor, against and on account of the obligations and liabilities of such Guarantor to such Secured Creditor under this Guaranty, irrespective of whether or not such Secured Creditor shall have made any demand hereunder and although said obligations, liabilities, deposits or claims, or any of them, shall be contingent or unmatured. Notwithstanding anything to the contrary contained in this Guaranty, at any time that the Guaranteed Obligations shall be secured by any Real Property located in the State of California, no Secured Creditor shall exercise any right of set-off, lien or counterclaim or take any court or administrative action or institute any proceedings to enforce any provision of this Guaranty without the prior consent of the Administrative Agent or the Majority Noteholders or, to the extent required by Section [__] of the Second-Lien Note Indenture, all of the Noteholders, if such setoff or action or proceeding would or might (pursuant to Sections 580a, 580b, 580d and 726 of the California Code of Civil Procedure or Section 2924 of the California Civil Code, if applicable, or otherwise) affect or impair the validity, priority, or enforceability of the liens granted to the Collateral Agent pursuant to the Security Documents or the enforceability of the Guaranteed Obligations hereunder, and any attempted exercise by any Secured Creditor or the Administrative Agent of any such right without obtaining such consent of the Majority Noteholders or the Administrative Agent shall be null and void. It is understood and agreed that the foregoing sentence of this Section 13 is for the sole benefit of the Secured Creditors and may be amended, modified or waived in any respect by the Majority Noteholders (without any requirement of prior notice to or consent by any Credit Party or any other Person) and does not constitute a waiver of any rights against any Credit Party or against any Collateral. Each Secured Creditor (by its acceptance of the benefits hereof) acknowledges and agrees that the provisions of this Section 13 are subject to the sharing provisions set forth in Section [__] of the Second-Lien Note Indenture.

14. <u>NOTICE</u>. Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent or any Guarantor shall not be effective until received by the Administrative Agent or such Guarantor, as the case may be. All notices and other communications shall be in writing and addressed to such party at (i) in the case of any Secured Creditor, as provided in the Second-Lien Note Indenture, and (ii) in the case of any Guarantor, at its address set forth opposite its signature page below; or in any case at such other address as any of the Persons listed above may hereafter notify the others in writing.

15. <u>REINSTATEMENT</u>.  If any claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including, without limitation, the Borrower or any other Guarantor), then and in such event each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any Second-Lien Note or any other instrument evidencing any liability of the Borrower, and such Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

16. <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS; AND WAIVER OF TRIAL BY JURY</u>.  (a)    THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE SECURED CREDITORS AND OF THE UNDERSIGNED HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.  Any legal action or proceeding with respect to this Guaranty or any other Second-Lien Note Document to which any Guarantor is a party may be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, in each case located within the City of New York, and, by execution and delivery of this Guaranty, each Guarantor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each Guarantor hereby further irrevocably waives any claim that any such courts lack jurisdiction over such Guarantor, and agrees not to plead or claim, in any legal action or proceeding with respect to this Guaranty or any other Second-Lien Note Document to which such Guarantor is a party brought in any of the aforesaid courts, that any such court lacks jurisdiction over such Guarantor.  Each Guarantor further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to each Guarantor at its address set forth opposite its signature below, such service to become effective 30 days after such mailing.  Each Guarantor hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Second-Lien Note Document to which such Guarantor is a party that such service of process was in any way invalid or ineffective. Nothing herein shall affect the right of any of the Secured Creditors to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against each Guarantor in any other jurisdiction.

(b)    Each Guarantor hereby irrevocably waives (to the fullest extent permitted by applicable law) any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Guaranty or any other Second-Lien Note Document to which such Guarantor is a party brought in the courts referred to in clause (a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that such action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)     EACH GUARANTOR AND EACH SECURED CREDITOR (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS GUARANTY) HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTY, THE OTHER SECOND-LIEN NOTE DOCUMENTS TO WHICH SUCH GUARANTOR IS A PARTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17.     <u>RELEASE OF LIABILITY OF GUARANTOR UPON SALE OR DISSOLUTION</u>.  Subject to the terms of the Intercreditor Agreement, in the event that all of the capital stock or other equity interests of one or more Guarantors is sold or otherwise disposed of or liquidated in compliance with the requirements of Section [__] of the Second-Lien Note Indenture (or such sale, other disposition or liquidation has been approved in writing by the Majority Noteholders (or all the Noteholders if required by Section [__] of the Second-Lien Note Indenture)) and the proceeds of such sale, disposition or liquidation are applied in accordance with the provisions of the Second-Lien Note Indenture, to the extent applicable, such Guarantor shall, upon consummation of such sale or other disposition (except to the extent that such sale or disposition is to Holdings or another Subsidiary thereof), be released from this Guaranty automatically and without further action and this Guaranty shall, as to each such Guarantor or Guarantors, terminate, and have no further force or effect (it being understood and agreed that the sale of one or more Persons that own, directly or indirectly, all of the capital stock or other equity interests of any Guarantor shall be deemed to be a sale of such Guarantor for the purposes of this Section 17).

18.     <u>CONTRIBUTION</u>.  At any time a payment in respect of the Guaranteed Obligations is made under this Guaranty, the right of contribution of each Guarantor against each other Guarantor shall be determined as provided in the immediately following sentence, with the right of contribution of each Guarantor to be revised and restated as of each date on which a payment (a "<u>Relevant Payment</u>") is made on the Guaranteed Obligations under this Guaranty. At any time that a Relevant Payment is made by a Guarantor that results in the aggregate payments made by such Guarantor in respect of the Guaranteed Obligations to and including the date of the Relevant Payment exceeding such Guarantor's Contribution Percentage (as defined below) of the aggregate payments made by all Guarantors in respect of the Guaranteed Obligations to and including the date of the Relevant Payment (such excess, the "<u>Aggregate Excess Amount</u>"), each such Guarantor shall have a right of contribution against each other Guarantor who has made payments in respect of the Guaranteed Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Guarantor's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Guarantors in respect of the Guaranteed Obligations (the aggregate amount of such deficit, the "<u>Aggregate Deficit Amount</u>") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Guarantor and the denominator of which is the Aggregate Excess Amount of all Guarantors multiplied by (y) the Aggregate Deficit Amount of such other Guarantor.  A Guarantor's right of contribution pursuant to the preceding sentences shall arise at the time of each computation, subject to adjustment to the time of each computation; <u>provided</u> that no Guarantor may take any action to enforce such right until the Guaranteed Obligations have been irrevocably paid in full in cash, it being expressly recognized and agreed by all parties hereto that any Guarantor's right of contribution arising pursuant to this

Section 18 against any other Guarantor shall be expressly junior and subordinate to such other Guarantor's obligations and liabilities in respect of the Guaranteed and any other obligations Obligations owing under this Guaranty. As used in this Section 18: (i) each Guarantor's "Contribution Percentage" shall mean the percentage obtained by dividing (x) the Adjusted Net Worth (as defined below) of such Guarantor by (y) the aggregate Adjusted Net Worth of all Guarantors; (ii) the "Adjusted Net Worth" of each Guarantor shall mean the greater of (x) the Net Worth (as defined below) of such Guarantor and (y) zero; and (iii) the "Net Worth" of each Guarantor shall mean the amount by which the fair saleable value of such Guarantor's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Guaranteed Obligations arising under this Guaranty or any guaranteed obligations arising under any guaranty of the Second-Lien Note Indenture) on such date. Notwithstanding anything to the contrary contained above, any Guarantor that is released from this Guaranty pursuant to Section 17 hereof shall thereafter have no contribution obligations, or rights, pursuant to this Section 18, and at the time of any such release, if the released Guarantor had an Aggregate Excess Amount or an Aggregate Deficit Amount, same shall be deemed reduced to $0, and the contribution rights and obligations of the remaining Guarantors shall be recalculated on the respective date of release (as otherwise provided above) based on the payments made hereunder by the remaining Guarantors. All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 18 each Guarantor who makes any payment in respect of the Guaranteed Obligations shall have no right of contribution or subrogation against any other Guarantor in respect of such payment until all of the Guaranteed Obligations have been irrevocably paid in full in cash. Each of the Guarantors recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution. In this connection, each Guarantor has the right to waive its contribution right against any Guarantor to the extent that after giving effect to such waiver such Guarantor would remain solvent, in the determination of the Majority Noteholders.

19. LIMITATION ON GUARANTEED OBLIGATIONS. Each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act or any similar Federal or state law. To effectuate the foregoing intention, each Guarantor and each Secured Creditor (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Guaranteed Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws (it being understood that it is the intention of the parties to this Guaranty and the parties to any guaranty of the First-Lien Obligations (as defined in the Intercreditor Agreement) that, to the maximum extent permitted under applicable laws, the liabilities in respect of the guarantees of the First-Lien Obligations shall not be included for the foregoing purposes and that, if any reduction is required to the amount guaranteed by any Guarantor hereunder and with respect to the First-Lien Obligations that its guarantee of amounts owing in respect of the Second-Lien Note Indenture shall first be reduced) and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Guaranteed Obligations of such

-navigation

Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

20. <u>COUNTERPARTS</u>.   This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

21. <u>PAYMENTS</u>.  All payments made by any Guarantor hereunder will be made without setoff, counterclaim or other defense and on the same basis as payments are made by the Borrower under Sections [__] and [__] of the Second-Lien Note Indenture.

22. <u>ADDITIONAL GUARANTORS</u>.   It is understood and agreed that any Subsidiary of Holdings that is required to execute a counterpart of this Guaranty after the date hereof pursuant to the Second-Lien Note Indenture shall become a Guarantor hereunder by (x) executing and delivering a counterpart hereof to the Administrative Agent or (y) executing a joinder agreement and delivering same to the Administrative Agent, in each case as may be requested by (and in form and substance satisfactory to) the Administrative Agent and (y) taking all actions as specified in this Guaranty as would have been taken by such Guarantor had it been an original party to this Guaranty, in each case with all documents and actions required to be taken to be taken above to the reasonable satisfaction of the Administrative Agent.

23. <u>HEADINGS DESCRIPTIVE</u>.  The headings of the several Sections of this Guaranty are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Guaranty.

24. <u>FCC CONSENT</u>.  Notwithstanding anything herein which may be construed to the contrary, no action shall be taken by any of the Administrative Agent and the Secured Creditors with respect to any license of the Federal Communications Commission ("<u>FCC</u>") unless and until any applicable rules and regulations thereunder, requiring the consent to or approval of such action by the FCC or any governmental or other authority, have been satisfied. Each Guarantor agrees to use its best efforts, including taking any action which the Administrative Agent and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the FCC or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Administrative Agent and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

Each Guarantor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or

exercise of other remedies available to Administrative Agent and the Secured Creditors as permitted by applicable law.

25. <u>CONFLICTS; INTERCREDITOR AGREEMENT</u>. The parties hereto acknowledge that the relative rights of the Noteholders under this Agreement and the lenders under the First-Lien Credit Agreement shall be governed by the Intercreditor Agreement. In the event of any conflicts between the provisions of this Agreement and the provisions of the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall govern and control.

\* \* \*

IN WITNESS WHEREOF, each Guarantor has caused this Guaranty to be executed and delivered as of the date first above written.

Address:

BRAINSTORM NETWORKS, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

By: _____
   Name:
   Title:


Address:

HOT SPOTS PRODUCTIONS, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

By: _____
   Name:
   Title:


Address:

ON TV, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

By: _____
   Name:
   Title:


Address:

RCN-BECOCOM, LLC, as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

By: RCN Telecom Services of
    Massachusetts, Inc., its managing
    member

By: _____
   Name:
   Title:


Address:

RCN CABLE TV OF CHICAGO, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

By: _____
   Name:
   Title:

Address:                                          RCN ENTERTAINMENT, INC., as a
                                                  Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                    By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                          RCN FINANCE, LLC, as a Guarantor

105 Carnegie Center                         By:  RCN Corporation, its managing
Princeton, NJ 08540                               member
Tel: (609) 734-3700
Fax: (609) 734-3830                    By: _____
                                            Name:
                                            Title:


Address:                                          RCN FINANCIAL MANAGEMENT, INC., as
                                                  a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                    By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                          RCN INTERNATIONAL HOLDINGS, INC.,
                                                  as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                    By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                          RCN INTERNET SERVICES, INC., as a
                                                  Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                    By: _____
Fax: (609) 734-3830                         Name:
                                            Title:

Address:                                              RCN TELECOM SERVICES, INC., as a
                                                      Guarantor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                          By: _____
Fax: (609) 734-3830                               Name:
                                                  Title:


Address:                                              RCN TELECOM SERVICES OF ILLINOIS,
                                                      LLC, as a Guarantor
105 Carnegie Center
Princeton, NJ 08540                             By:  RCN CORPORATION, its managing
Tel: (609) 734-3700                                  member
Fax: (609) 734-3830
                                             By: _____
                                                  Name:
                                                  Title:


Address:                                              RCN TELECOM SERVICES OF
                                                      MASSACHUSETTS, INC., as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                          By: _____
Fax: (609) 734-3830                               Name:
                                                  Title:


Address:                                              RCN TELECOM SERVICES OF
                                                      PHILADELPHIA, INC., as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                          By: _____
Fax: (609) 734-3830                               Name:
                                                  Title:


Address:                                              RCN TELECOM SERVICES OF VIRGINIA,
                                                      INC., as a Guarantor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                          By: _____
Fax: (609) 734-3830                               Name:
                                                  Title:

Address:                                      RCN TELECOM SERVICES OF
                                              WASHINGTON, D.C., INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                   By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                      RFM 2, LLC, as a Guarantor

105 Carnegie Center                         By:  RCN Corporation, its managing
Princeton, NJ 08540                              member
Tel: (609) 734-3700
Fax: (609) 734-3830                   By: _____
                                            Name:
                                            Title:


Address:                                      RLH PROPERTY CORPORATION, as a
                                              Guarantor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                   By: _____
Fax: (609) 734-3830                         Name:
                                            Title:


Address:                                      STARPOWER COMMUNICATIONS, LLC,
                                              as a Guarantor

105 Carnegie Center
Princeton, NJ 08540                         By:  RCN Telecom Services of
Tel: (609) 734-3700                              Washington, D.C., Inc., its managing
Fax: (609) 734-3830                              member

                                      By: _____
                                            Name:
                                            Title:


Address:                                      TEC AIR, INC., as a Guarantor

105 Carnegie Center
Princeton, NJ 08540                   By: _____
Tel: (609) 734-3700                         Name:
Fax: (609) 734-3830                         Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

21ST CENTURY TELECOM SERVICES,
INC., as a Guarantor


By: _____
   Name:
   Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

UNET HOLDING, INC., as a Guarantor


By: _____
   Name:
   Title:

Accepted and Agreed to:

[_____], as Second-Lien Collateral
    Agent and Pledgee


By:_____
    Name:
    Title:

Address:

[_____]
[_____]
Tel: [_____]
Fax: [_____]

<u>Table of Contents</u>

Page

1. GUARANTY ............................................................................................1
2. LIABILITY OF GUARANTORS ABSOLUTE ...............................................2
3. OBLIGATIONS OF GUARANTORS INDEPENDENT ....................................2
4. WAIVERS BY GUARANTORS..................................................................3
5. RIGHTS OF SECURED CREDITORS .........................................................5
6. CONTINUING GUARANTY ....................................................................6
7. SUBORDINATION OF INDEBTEDNESS HELD BY GUARANTORS .............6
8. GUARANTY ENFORCEABLE BY ADMINISTRATIVE AGENT OR COLLATERAL
    AGENT...............................................................................................7
9. REPRESENTATIONS, WARRANTIES AND COVENANTS OF GUARANTORS ...........7
10. EXPENSES.........................................................................................9
11. BENEFIT AND BINDING EFFECT...........................................................9
12. AMENDMENTS; WAIVERS ...................................................................9
13. SET OFF ..........................................................................................10
14. NOTICE............................................................................................10
15. REINSTATEMENT ..............................................................................11
16. CONSENT TO JURISDICTION; SERVICE OF PROCESS; AND WAIVER OF TRIAL BY
    JURY................................................................................................11
17. RELEASE OF LIABILITY OF GUARANTOR UPON SALE OR DISSOLUTION .........12
18. CONTRIBUTION.................................................................................12
19. LIMITATION ON GUARANTEED OBLIGATIONS.......................................13
20. COUNTERPARTS................................................................................14
21. PAYMENTS .......................................................................................14
22. ADDITIONAL GUARANTORS................................................................14
23. HEADINGS DESCRIPTIVE...................................................................14
24. FCC CONSENT...................................................................................14
25. CONFLICTS; INTERCREDITOR AGREEMENT.........................................15

(i)

<u>FORM OF PLEDGE AGREEMENT</u>

PLEDGE AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "<u>Agreement</u>"), dated as of December __, 2004, among each of the undersigned pledgors (each, a "<u>Pledgor</u>" and, together with any other entity that becomes a pledgor hereunder pursuant to Section 30 hereof, the "<u>Pledgors</u>") and [_____], as trustee (together with any successor trustee, the "<u>Pledgee</u>"), for the benefit of the Secured Creditors (as defined below). Except as otherwise defined herein, all capitalized terms used herein and defined in the Second-Lien Note Indenture (as defined below) shall be used herein as therein defined.

<u>W I T N E S S E T H</u> :

WHEREAS, RCN Corporation (the "<u>Borrower</u>"), the noteholders from time to time party thereto (the "<u>Noteholders</u>"), _____, as trustee (together with any successor trustee, the "<u>Second-Lien Collateral Agent</u>"), have entered into an Indenture, dated as of December __, 2004 (as amended, modified, restated and/or supplemented from time to time, the "<u>Second-Lien Note Indenture</u>"), providing for the issuance of Second-Lien Notes by the Borrower, all as contemplated therein (the Noteholders and the Pledgee are herein called the "<u>Secured Creditors</u>");

WHEREAS, pursuant to the Subsidiaries Guaranty, each Subsidiary Guarantor has jointly and severally guaranteed to the Secured Creditors the payment when due of all Guaranteed Obligations as described therein;

WHEREAS, it is a condition precedent to the issuance of Second-Lien Notes by the Borrower under the Second-Lien Note Indenture that each Pledgor shall have executed and delivered to the Pledgee this Agreement; and

WHEREAS, the Borrower, various financial institutions from time to time party thereto and DBCI, as administrative agent and collateral agent (in such capacity, the "<u>First-Lien Collateral Agent</u>"), have entered into a credit agreement, dated as of the date hereof (as amended, restated, modified, extended, renewed, replaced, supplemented, restructured and/or refinanced from time to time, the "<u>First-Lien Credit Agreement</u>");

WHEREAS, each Pledgor will obtain benefits from the issuance of Second-Lien Notes by the Borrower and, accordingly, desires to execute this Agreement in order to satisfy the condition described in the second preceding paragraph; and

WHEREAS, in order to secure the obligations under the Second-Lien Note Indenture, each Pledgor is concurrently granting to the First-Lien Collateral Agent, for the benefit of the holders of obligations under the First-Lien Credit Agreement, a first priority security interest in the Collateral (it being understood that the relative rights and priorities of the grantees in respect of the Collateral are governed by the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>"), among the Borrower, the First-Lien Collateral Agent, the Second-

Exhibit I
Page 2

Lien Collateral Agent and certain other persons party or that may become party thereto from time to time);

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby makes the following representations and warranties to the Pledgee for the benefit of the Secured Creditors and hereby covenants and agrees with the Pledgee for the benefit of the Secured Creditors as follows:

1. SECURITY FOR OBLIGATIONS. This Agreement is made by each Pledgor for the benefit of the Secured Creditors to secure:

(i) the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium, interest (including, without limitation, all interest that accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor or any Subsidiary thereof at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such proceeding), fees, costs and indemnities) of such Pledgor owing to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Second-Lien Note Indenture and the other Second-Lien Note Documents to which such Pledgor is a party (including, in the case of each Pledgor that is a Guarantor, all such obligations, liabilities and indebtedness of such Pledgor under its Guaranty) and the due performance and compliance by such Pledgor with all of the terms, conditions and agreements contained in the Second-Lien Note Indenture and in such other Second-Lien Note Documents (all such obligations, liabilities and indebtedness under this clause (i), entitled to the benefits of this Agreement being herein collectively called the "Second-Lien Note Document Obligations");

(ii) any and all sums advanced by the Pledgee in order to preserve the Collateral (as hereinafter defined) or preserve its security interest in the Collateral;

(iii) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of such Pledgor referred to in clause (i) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Pledgee of its rights hereunder, together with reasonable attorneys' fees and court costs;

(iv) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement under Section 11 of this Agreement; and

(v) all amounts owing to any Agent or any of its affiliates pursuant to any of the Second-Lien Note Documents in its capacity as such;

all such obligations, liabilities, indebtedness, sums and expenses set forth in clauses (i) through (v) of this Section 1 being herein collectively called the "Obligations", it being acknowledged

Exhibit I
Page 3

and agreed that the "Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

2.  DEFINITIONS.  (a)  Unless otherwise defined herein, all capitalized terms used herein and defined in the Second-Lien Note Indenture shall be used herein as therein defined.  Reference to singular terms shall include the plural and vice versa.

(b) The following capitalized terms used herein shall have the definitions specified below:

"Adverse Claim" shall have the meaning given such term in Section 8-102(a)(1) of the UCC.

"Agreement" shall have the meaning set forth in the first paragraph hereof.

"Borrower" shall have the meaning set forth in the recitals hereto.

"Certificated Security" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"Clearing Corporation" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"Collateral" shall have the meaning set forth in Section 3.1 hereof.

"Collateral Accounts" shall mean any and all accounts established and maintained by the Pledgee in the name of any Pledgor to which Collateral may be credited.

"Domestic Corporation" shall mean any corporation or similar entity organized under the laws of the United States or any State or territory thereof or the District of Columbia.

"Event of Default" shall mean any Event of Default under, and as defined in, the Second-Lien Note Indenture and shall in any event include, without limitation, any payment default on any of the Obligations after the expiration of any applicable grace period.

"Exempted Foreign Entity" shall mean any Foreign Corporation and any limited liability company organized under the laws of a jurisdiction other than the United States or any State or Territory thereof that, in any such case, is treated as a corporation or an association taxable as a corporation for U.S. Federal income tax purposes.

"Financial Asset" shall have the meaning given such term in Section 8-102(a)(9) of the UCC.

"First-Lien Collateral Agent" has the meaning given such term in the Recitals hereto.

Exhibit I
Page 4

"Foreign Corporation" shall mean any corporation or similar entity organized under the laws of any jurisdiction other than the United States or any State or territory thereof or the District of Columbia.

"Holdings" shall have the meaning set forth in the recitals hereto.

"Indemnitees" shall have the meaning set forth in Section 11 hereof.

"Instrument" shall have the meaning given such term in Section 9-102(a)(47) of the UCC.

"Intercreditor Agreement" has the meaning given such term in the Recitals hereto.

"Investment Property" shall have the meaning given such term in Section 9-102(a)(49) of the UCC.

"Limited Liability Company Assets" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all limited liability company capital and interest in other limited liability companies), at any time owned by any Pledgor or represented by any Limited Liability Company Interest.

"Limited Liability Company Interests" shall mean the entire limited liability company membership interest at any time owned by any Pledgor in any limited liability company.

"Location" of any Pledgor has the meaning given such term in Section 9-307 of the UCC.

"Majority Noteholders" shall mean the holders of not less than a majority in aggregate principal amount of the Second-Lien Notes at the time outstanding (as determined in accordance with Section 9.4 of the Second-Lien Note Indenture).

"Non-Voting Equity Interests" shall mean all Equity Interests of any Person which are not Voting Equity Interests.

"Noteholders" shall have the meaning set forth in the recitals hereto.

"Notes" shall mean all promissory notes, including all intercompany notes at any time issued to any Pledgor.

"Obligations" shall have the meaning set forth in Section 1 hereof.

"Partnership Assets" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all partnership capital and interest in other partnerships), at any time owned by any Pledgor or represented by any Partnership Interest.

Exhibit I
Page 5

"Partnership Interest" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Pledgor in any general partnership or limited partnership.

"Pledged Notes" shall mean all Notes at any time pledged or required to be pledged hereunder.

"Pledgee" shall have the meaning set forth in the first paragraph hereof.

"Pledgor" shall have the meaning set forth in the first paragraph hereof.

"Proceeds" shall have the meaning given such term in Section 9-102(a)(64) of the UCC.

"Registered Organization" shall have the meaning given such term in Section 9-102(a)(70) of the UCC.

"Required Secured Creditors" shall have the meaning provided in the Security Agreement.

"Second-Lien Collateral Agent" shall have the meaning set forth in the recitals hereto.

"Second-Lien Note Document Obligations" shall have the meaning set forth in Section 1(i) hereof.

"Second-Lien Note Indenture" shall have the meaning set forth in the recitals hereto.

"Secured Creditors" shall have the meaning set forth in the recitals hereto.

"Secured Debt Agreements" shall mean and includes this Agreement and the other Second-Lien Note Documents.

"Securities Account" shall have the meaning given such term in Section 8-501(a) of the UCC.

"Securities Act" shall mean the Securities Act of 1933, as amended, as in effect from time to time.

"Securities Intermediary" shall have the meaning given such term in Section 8-102(14) of the UCC.

"Security" and "Securities" shall have the meaning given such term in Section 8-102(a)(15) of the UCC and shall in any event also include all Stock and all Notes.

"Security Entitlement" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

Exhibit I
Page 6

"Specified Default" shall have the meaning set forth in Section 5 hereof.

"Stock" shall mean all of the issued and outstanding shares of capital stock or similar equity interests of any Domestic Corporation or Foreign Corporation at any time owned by any Pledgor.

"Termination Date" shall have the meaning set forth in Section 20 hereof.

"Transmitting Utility" has the meaning given such term in Section 9-102(a)(80) of the UCC.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided that all references herein to specific Sections or subsections of the UCC are references to such Sections or subsections, as the case may be, of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

"Uncertificated Security" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

"Voting Equity Interests" of any Person shall mean all classes of Equity Interests of such Person entitled to vote.

3.  PLEDGE OF SECURITIES, ETC.

3.1  Pledge.  To secure the Obligations now or hereafter owed or to be performed by such Pledgor (but the rights and remedies between the First-Lien Collateral Agent and the Second-Lien Collateral Agent are subject to the terms of the Intercreditor Agreement), each Pledgor does hereby grant, pledge and assign to the Pledgee for the benefit of the Secured Creditors, and does hereby create a continuing security interest (subject to those Liens permitted to exist with respect to the Collateral pursuant to the terms of all Secured Debt Agreements then in effect) in favor of the Pledgee for the benefit of the Secured Creditors in, all of its right, title and interest in and to the following, whether now existing or hereafter from time to time acquired (collectively, the "Collateral"):

(a)  each of the Collateral Accounts (to the extent a security interest therein is not created pursuant to the Security Agreement), including any and all assets of whatever type or kind deposited by such Pledgor in any such Collateral Account, whether now owned or hereafter acquired, existing or arising, including, without limitation, all Financial Assets, Investment Property, monies, checks, drafts, Instruments, Securities or interests therein of any type or nature deposited or required by the Second-Lien Note Indenture or any other Secured Debt Agreement to be deposited in such Collateral Account, and all investments and all certificates and other Instruments (including depository receipts, if any) from time to time representing or evidencing the same, and all dividends, interest, distributions, cash and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing;

Exhibit I
Page 7

(b) all Securities owned or held by such Pledgor from time to time and all options and warrants owned by such Pledgor from time to time to purchase Securities;

(c) all Limited Liability Company Interests owned by such Pledgor from time to time and all of its right, title and interest in each limited liability company to which each such Limited Liability Company Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Limited Liability Company Interests and applicable law:

(A) all its capital therein and its interest in all profits, income, surpluses, losses, Limited Liability Company Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Limited Liability Company Interests;

(B) all other payments due or to become due to such Pledgor in respect of Limited Liability Company Interests, whether under any limited liability company agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C) all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any limited liability company agreement or operating agreement, or at law or otherwise in respect of such Limited Liability Company Interests;

(D) all present and future claims, if any, of such Pledgor against any such limited liability company for monies loaned or advanced, for services rendered or otherwise;

(E) all of such Pledgor's rights under any limited liability company agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Limited Liability Company Interests, including any power to terminate, cancel or modify any such limited liability company agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of such Pledgor in respect of such Limited Liability Company Interests and any such limited liability company, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Limited Liability Company Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F) all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and

Exhibit I
Page 8

other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(d) all Partnership Interests owned by such Pledgor from time to time and all of its right, title and interest in each partnership to which each such Partnership Interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Partnership Interests and applicable law:

(A)     all its capital therein and its interest in all profits, income, surpluses, losses, Partnership Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Partnership Interests;

(B)     all other payments due or to become due to such Pledgor in respect of Partnership Interests, whether under any partnership agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any partnership agreement or operating agreement, or at law or otherwise in respect of such Partnership Interests;

(D)     all present and future claims, if any, of such Pledgor against any such partnership for monies loaned or advanced, for services rendered or otherwise;

(E)     all of such Pledgor's rights under any partnership agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Partnership Interests, including any power to terminate, cancel or modify any partnership agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of such Pledgor in respect of such Partnership Interests and any such partnership, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Partnership Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof;

(e) all Financial Assets and Investment Property owned by such Pledgor from time to time;

Exhibit I
Page 9

     (f)  all Security Entitlements owned by such Pledgor from time to time in any and all of the foregoing; and

     (g)  all Proceeds of any and all of the foregoing.

Notwithstanding anything to the contrary contained herein, no Pledgor shall be required at any time to pledge hereunder (x) any equity interests of Megacable, S.A. de C.V., MCM Holdings, S.A. de C.V. and Megacable Telecommunicaciones, S.A. de C.V. for so long as the organizational documents of such entities prohibits the granting of a security interest in such equity interests; provided that such security interest shall attach immediately when such prohibition is no longer in effect or (y) more than 65% of the Voting Equity Interest of any Foreign Corporation; provided that each Pledgor shall be required to pledge hereunder 100% of any Non-Voting Equity Interest at any time and from time to time acquired by such Pledgor of any Foreign Corporation.

     3.2  Procedures.  (a)  To the extent that any Pledgor at any time or from time to time owns, acquires or obtains any right, title or interest in any Collateral, such Collateral shall automatically (and without the taking of any action by such Pledgor) be pledged pursuant to Section 3.1 of this Agreement and, in addition thereto (but subject to the terms of the Intercreditor Agreement), such Pledgor shall (to the extent provided below and not inconsistent with the terms of the Intercreditor Agreement) take the following actions as set forth below (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) for the benefit of the Pledgee and the other Secured Creditors:

     (i)  with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall physically deliver such Certificated Security to the Pledgee, endorsed to the Pledgee or endorsed in blank;

     (ii)  with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or Securities Intermediary), such Pledgor shall cause the issuer of such Uncertificated Security to duly authorize, execute, and deliver to the Pledgee, an agreement for the benefit of the Pledgee and the other Secured Creditors substantially in the form of Annex H hereto (appropriately completed to the satisfaction of the Pledgee and with such modifications, if any, as shall be satisfactory to the Pledgee) pursuant to which such issuer agrees to comply with any and all instructions originated by the Pledgee in accordance with this Agreement without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security (and any Partnership Interests and Limited Liability Company Interests issued by such issuer) originated by any other Person other than a court of competent jurisdiction;

     (iii)  with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), such Pledgor shall promptly notify the Pledgee thereof and shall promptly take (x) all actions required (i) to comply with the

Exhibit I
Page 10

applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Pledgee under applicable law (including, in any event, under Sections 9-314(a), (b) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Pledgee deems necessary or desirable to effect the foregoing;

(iv)   with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (1) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, the procedure set forth in Section 3.2(a)(i) hereof, and (2) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, the procedure set forth in Section 3.2(a)(ii) hereof;

(v)   with respect to any Note, physical delivery of such Note to the Pledgee, endorsed in blank, or, at the request of the Pledgee, endorsed to the Pledgee; and

(vi)   with respect to cash proceeds from any of the Collateral described in Section 3.1 hereof, (i) establishment by the Pledgee of a cash account in the name of such Pledgor over which the Pledgee shall have "control" within the meaning of the UCC and at any time any Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Pledgee and (ii) deposit of such cash in such cash account.

(b)   In addition to the actions required to be taken pursuant to Section 3.2(a) hereof, each Pledgor shall take the following additional actions with respect to the Collateral:

(i)   with respect to all Collateral of such Pledgor whereby or with respect to which the Pledgee may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), such Pledgor shall take all actions as may be requested from time to time by the Pledgee (to the extent not inconsistent with the Intercreditor Agreement) so that "control" of such Collateral is obtained and at all times held by the Pledgee; and

(ii)   each Pledgor shall from time to time cause appropriate financing statements (on appropriate forms) under the Uniform Commercial Code as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Pledgee), to be filed in the relevant filing offices so that at all times the Pledgee's security interest in all Investment Property and other Collateral which can be perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC) is so perfected.

3.3   Subsequently Acquired Collateral.  If any Pledgor shall acquire (by purchase, stock dividend, distribution or otherwise) any additional Collateral at any time or from time to time after the date hereof, (i) such Collateral shall automatically (and without any further action

Exhibit I
Page 11

being required to be taken) be subject to the pledge and security interests created pursuant to Section 3.1 hereof and, furthermore, such Pledgor will, to the extent not inconsistent with the Intercreditor Agreement, thereafter take (or cause to be taken) all action (as promptly as practicable and, in any event, within 10 days after it obtains such Collateral) with respect to such Collateral in accordance with the procedures set forth in Section 3.2 hereof and the Intercreditor Agreement, and will, to the extent not inconsistent with the Intercreditor Agreement, promptly thereafter deliver to the Pledgee (i) a certificate executed by an authorized officer of such Pledgor describing such Collateral and certifying that the same has been duly pledged in favor of the Pledgee (for the benefit of the Secured Creditors) hereunder and (ii) supplements to Annexes A through G hereto as are necessary to cause such Annexes to be complete and accurate at such time.  Notwithstanding the foregoing, no Pledgor shall be required to pledge hereunder the equity interests of any Exempted Foreign Entity.

       3.4  <u>Transfer Taxes</u>.  Each pledge of Collateral under Section 3.1 or Section 3.3 hereof shall be accompanied by any transfer tax stamps required in connection with the pledge of such Collateral.

       3.5  <u>Certain Representations and Warranties Regarding the Collateral</u>.  Each Pledgor represents and warrants that on the date hereof: (i) each Subsidiary of such Pledgor, and the direct ownership thereof, is listed in Annex B hereto; (ii) the Stock (and any warrants or options to purchase Stock) held by such Pledgor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex C hereto; (iii) such Stock referenced in clause (ii) of this paragraph constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex C hereto; (iv) the Notes held by such Pledgor consist of the promissory notes described in Annex D hereto where such Pledgor is listed as the lender; (v) the Limited Liability Company Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex E hereto; (vi) each such Limited Liability Company Interest referenced in clause (v) of this paragraph constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex E hereto; (vii) the Partnership Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex F hereto; (viii) each such Partnership Interest referenced in clause (viii) of this paragraph constitutes that percentage or portion of the entire partnership interest of the Partnership as set forth in Annex F hereto; (ix) the exact address of each chief executive office of such Pledgor is listed on Annex G hereto; (x) the Pledgor has complied with the respective procedure set forth in Section 3.2(a) hereof with respect to each item of Collateral described in Annexes C through F hereto; and (xi) on the date hereof, such Pledgor owns no other Securities, Stock, Notes, Limited Liability Company Interests or Partnership Interests.

      4.  APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.  Subject to the terms of the Intercreditor Agreement, the Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of the Collateral, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or in favor of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee.

Exhibit I
Page 12

5. VOTING, ETC., WHILE NO EVENT OF DEFAULT OR SPECIFIED DEFAULT. Unless and until there shall have occurred and be continuing any Event of Default under the Second-Lien Note Indenture or a Default under Section [__] or [__] of the Second-Lien Note Indenture (each such Default, a "Specified Default"), each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral owned by it, and to give consents, waivers or ratifications in respect thereof; provided that, in each case, no vote shall be cast or any consent, waiver or ratification given or any action taken or omitted to be taken which would violate, result in a breach of any covenant contained in, or be inconsistent with any of the terms of any Secured Debt Agreement, or which could reasonably be expected to have the effect of impairing the value of the Collateral or any part thereof or the position or interests of the Pledgee or any other Secured Creditor in the Collateral, unless expressly permitted by the terms of the Secured Debt Agreements. All such rights of each Pledgor to vote and to give consents, waivers and ratifications shall cease in case an Event of Default has occurred and is continuing, and Section 7 hereof shall become applicable.

6. DIVIDENDS AND OTHER DISTRIBUTIONS. Subject to the terms of the Intercreditor Agreement, unless and until there shall have occurred and be continuing an Event of Default, all cash dividends, cash distributions, cash Proceeds and other cash amounts payable in respect of the Collateral shall be paid to the respective Pledgor. The Pledgee shall be entitled to receive directly, and to retain as part of the Collateral:

(i)     all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash dividends other than as set forth above) paid or distributed by way of dividend or otherwise in respect of the Collateral;

(ii)     all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash (although such cash may be paid directly to the respective Pledgor so long as no Event of Default then exists)) paid or distributed in respect of the Collateral by way of stock-split, spin-off, split-up, reclassification, combination of shares or similar rearrangement; and

(iii)     all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) which may be paid in respect of the Collateral by reason of any consolidation, merger, exchange of stock, conveyance of assets, liquidation or similar corporate or other reorganization.

Except as otherwise provided in the Intercreditor Agreement, nothing contained in this Section 6 shall limit or restrict in any way the Pledgee's right to receive the proceeds of the Collateral in any form in accordance with Section 3 of this Agreement. To the extent not inconsistent with the terms of the Intercreditor Agreement, all dividends, distributions or other payments which are received by any Pledgor contrary to the provisions of this Section 6 or Section 7 hereof shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to the Pledgee as Collateral in the same form as so received (with any necessary endorsement).

Exhibit I
Page 13

7. REMEDIES IN CASE OF AN EVENT OF DEFAULT OR A SPECIFIED DEFAULT. (a) If there shall have occurred and be continuing an Event of Default, then and in every such case, to the extent not inconsistent with the terms of the Intercreditor Agreement, the Pledgee shall be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any other Secured Debt Agreement or by law) for the protection and enforcement of its rights in respect of the Collateral, and the Pledgee shall be entitled to exercise all the rights and remedies of a secured party under the UCC as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights, which each Pledgor hereby agrees to be commercially reasonable:

(i) to receive all amounts payable in respect of the Collateral otherwise payable under Section 6 hereof to the respective Pledgor;

(ii) to transfer all or any part of the Collateral into the Pledgee's name or the name of its nominee or nominees;

(iii) to accelerate any Pledged Note which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Pledged Note (including, without limitation, to make any demand for payment thereon);

(iv) to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so);

(v) at any time and from time to time to sell, assign and deliver, or grant options to purchase, all or any part of the Collateral, or any interest therein, at any public or private sale, without demand of performance, advertisement or, notice of intention to sell or of the time or place of sale or adjournment thereof or to redeem or otherwise purchase or dispose (all of which are hereby waived by each Pledgor), for cash, on credit or for other property, for immediate or future delivery without any assumption of credit risk, and for such price or prices and on such terms as the Pledgee in its absolute discretion may determine, provided at least 10 days' written notice of the time and place of any such sale shall be given to the respective Pledgor. The Pledgee shall not be obligated to make any such sale of Collateral regardless of whether any such notice of sale has theretofore been given. Each Pledgor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security or the Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Pledgee on behalf of the Secured Creditors may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Pledgee nor any other Secured Creditor shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall

Exhibit I
Page 14

any of them be under any obligation to take any action whatsoever with regard thereto; and

(vi)     to set off any and all Collateral against any and all Obligations, and to withdraw any and all cash or other Collateral from any and all Collateral Accounts and to apply such cash and other Collateral to the payment of any and all Obligations.

(b)     If there shall have occurred and be continuing a Specified Default, then and in every such case but subject to the terms of the Intercreditor Agreement, the Pledgee shall be entitled to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so).

8.  REMEDIES, CUMULATIVE, ETC.  Each and every right, power and remedy of the Pledgee provided for in this Agreement or in any other Secured Debt Agreement (including, without limitation, the Intercreditor Agreement), or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by the Pledgee or any other Secured Creditor of any one or more of the rights, powers or remedies provided for in this Agreement or any other Secured Debt Agreement (including, without limitation, the Intercreditor Agreement) or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the Pledgee or any other Secured Creditor of all such other rights, powers or remedies, and no failure or delay on the part of the Pledgee or any other Secured Creditor to exercise any such right, power or remedy shall operate as a waiver thereof.  Notice to or demand on any Pledgor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Pledgee or any other Secured Creditor to any other or further action in any circumstances without notice or demand.  The Secured Creditors agree that this Agreement may be enforced only by the action of the Pledgee, in each case, acting upon the instructions of the Required Secured Creditors, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Pledgee for the benefit of the Secured Creditors upon the terms of this Agreement and the Security Agreement.

9.  APPLICATION OF PROCEEDS.  (a)  All monies collected by the Pledgee upon any sale or other disposition of the Collateral pursuant to the terms of this Agreement, together with all other monies received by the Pledgee hereunder, shall be applied in the manner provided in the Security Agreement.

(b)     It is understood and agreed that each Pledgor shall remain jointly and severally liable with respect to its Obligations to the extent of any deficiency between the amount of the proceeds of the Collateral pledged by it hereunder and the aggregate amount of such Obligations.

Exhibit I
Page 15

10. PURCHASERS OF COLLATERAL. Upon any sale of the Collateral by the Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the Pledgee or the officer making such sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Pledgee or such officer or be answerable in any way for the misapplication or nonapplication thereof.

11. INDEMNITY. Each Pledgor jointly and severally agrees (i) to indemnify, reimburse and hold harmless the Pledgee and each other Secured Creditor and their respective successors, assigns, employees, agents and affiliates (individually an "Indemnitee", and collectively, the "Indemnitees") from and against any and all obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) of whatsoever kind or nature, and (ii) to reimburse each Indemnitee for all reasonable costs, expenses and disbursements, including reasonable attorneys' fees and expenses, in each case arising out of or resulting from this Agreement or the exercise by any Indemnitee of any right or remedy granted to it hereunder or under any other Secured Debt Agreement (but excluding any obligations, damages, injuries, penalties, claims, demands, losses, judgments and liabilities (including, without limitation, liabilities for penalties) or expenses of whatsoever kind or nature to the extent incurred or arising by reason of gross negligence or willful misconduct of such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision)). In no event shall the Pledgee hereunder be liable, in the absence of gross negligence or willful misconduct on its part (as determined by a court of competent jurisdiction in a final and non-appealable decision), for any matter or thing in connection with this Agreement other than to account for monies or other property actually received by it in accordance with the terms hereof. If and to the extent that the obligations of any Pledgor under this Section 11 are unenforceable for any reason, such Pledgor hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable law. The indemnity obligations of each Pledgor contained in this Section 11 shall continue in full force and effect notwithstanding the full payment of all the Second-Lien Notes issued under the Second-Lien Note Indenture and the payment of all other Obligations and notwithstanding the discharge thereof.

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER. (a) Nothing herein shall be construed to make the Pledgee or any other Secured Creditor liable as a member of any limited liability company or as a partner of any partnership and neither the Pledgee nor any other Secured Creditor by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership. The parties hereto expressly agree that, unless the Pledgee shall become the absolute owner of Collateral consisting of a Limited Liability Company Interest or a Partnership Interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Pledgee, any other Secured Creditor, any Pledgor and/or any other Person.

(b) Except as provided in the last sentence of paragraph (a) of this Section 12, the Pledgee, by accepting this Agreement, did not intend to become a member of any limited liability company or a partner of any partnership or otherwise be deemed to be a co-venturer with

Exhibit I
Page 16

respect to any Pledgor, any limited liability company, partnership and/or any other Person either before or after an Event of Default shall have occurred. The Pledgee shall have only those powers set forth herein and the Secured Creditors shall assume none of the duties, obligations or liabilities of a member of any limited liability company or as a partner of any partnership or any Pledgor except as provided in the last sentence of paragraph (a) of this Section 12.

(c)     The Pledgee and the other Secured Creditors shall not be obligated to perform or discharge any obligation of any Pledgor as a result of the pledge hereby effected.

(d)     The acceptance by the Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate the Pledgee or any other Secured Creditor to appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or to take any action hereunder or thereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY. (a) Each Pledgor agrees that it will join with the Pledgee in executing and, at such Pledgor's own expense, file and refile under the UCC or other applicable law such financing statements, continuation statements and other documents, in form reasonably acceptable to the Pledgee, in such filing offices as the Pledgee (acting on its own or on the instructions of the Required Secured Creditors) may reasonably deem necessary or appropriate (to the extent not inconsistent with the Intercreditor Agreement) and wherever required or permitted by law in order to perfect and preserve the Pledgee's security interest in the Collateral hereunder and hereby authorizes the Pledgee to file financing statements and amendments thereto relative to all or any part of the Collateral (including, without limitation, (x) financing statements which list the Collateral specifically and/or "all assets" as collateral and (y) "in lieu of" financing statements) without the signature of such Pledgor where permitted by law, and agrees to do such further acts and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or deem advisable to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee its rights, powers and remedies hereunder or thereunder.

(b)     Each Pledgor hereby constitutes and appoints the Pledgee its true and lawful attorney-in-fact, irrevocably, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time after the occurrence and during the continuance of an Event of Default, in the Pledgee's discretion, to act, require, demand, receive and give acquittance for any and all monies and claims for monies due or to become due to such Pledgor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings and to execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, which appointment as attorney is coupled with an interest.

14. THE PLEDGEE AS SECOND-LIEN COLLATERAL AGENT. Subject to the terms of the Intercreditor Agreement, the Pledgee will hold in accordance with this Agreement all items of the Collateral at any time received under this Agreement. It is expressly

Exhibit I
Page 17

understood, acknowledged and agreed by each Secured Creditor that by accepting the benefits of this Agreement each such Secured Creditor acknowledges and agrees that the obligations of the Pledgee as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement and in Section [__] of the Second-Lien Note Indenture.  The Pledgee shall act hereunder on the terms and conditions set forth herein and in Section [__] of the Second-Lien Note Indenture.

15.  TRANSFER BY THE PLEDGORS.  Except as permitted (i) prior to the date all Second-Lien Note Document Obligations have been paid in full pursuant to the Second-Lien Note Indenture, and (ii) thereafter, pursuant to the other Secured Debt Agreements, no Pledgor will sell or otherwise dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral or any interest therein.

16.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS.  (a) Each Pledgor represents, warrants and covenants as to itself and each of its Subsidiaries that:

(i)  it is the legal, beneficial and record owner of, and has good and marketable title to, all of its Collateral consisting of one or more Securities, Partnership Interests and Limited Liability Company Interests and that it has sufficient interest in all of its Collateral in which a security interest is purported to be created hereunder for such security interest to attach (subject, in each case, to no pledge, lien, mortgage, hypothecation, security interest, charge, option, Adverse Claim or other encumbrance whatsoever, except the liens and security interests created by this Agreement or permitted under the Secured Debt Agreements);

(ii)  it has full power, authority and legal right to pledge all the Collateral pledged by it pursuant to this Agreement;

(iii)  this Agreement has been duly authorized, executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor enforceable against such Pledgor in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(iv)  except to the extent already obtained or made, no consent of any other party (including, without limitation, any stockholder, partner, member or creditor of such Pledgor or any of its Subsidiaries) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required to be obtained by such Pledgor in connection with (a) the execution, delivery or performance of this Agreement by such Pledgor, (b) the validity or enforceability of this Agreement against such Pledgor (except as set forth in clause (iii) above), (c) the perfection or enforceability of the Pledgee's security interest in such Pledgor's Collateral or (d) except for compliance with or as may be required by applicable securities laws, the exercise by the Pledgee of any of its rights or remedies provided herein;

Exhibit I
Page 18

(v) neither the execution, delivery or performance by such Pledgor of this Agreement, or any other Secured Debt Agreement to which it is a party, nor compliance by it with the terms and provisions hereof and thereof nor the consummation of the transactions contemplated therein: (i) will contravene any provision of any applicable law, statute, rule or regulation, or any applicable order, writ, injunction or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to such Pledgor; (ii) will conflict or be inconsistent with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the properties or assets of such Pledgor or any of its Subsidiaries pursuant to the terms of any indenture, material lease, material mortgage, material deed of trust, credit agreement, loan agreement or any other material agreement, contract or other instrument to which such Pledgor or any of its Subsidiaries is a party or is otherwise bound, or by which it or any of its properties or assets is bound or to which it may be subject; or (iii) will violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Pledgor or any of its Subsidiaries;

(vi) all of such Pledgor's Collateral (consisting of Securities, Limited Liability Company Interests and Partnership Interests) has been duly and validly issued, is fully paid and non-assessable and is subject to no options to purchase or similar rights;

(vii) each of such Pledgor's Pledged Notes constitutes, or when executed by the obligor thereof will constitute, the legal, valid and binding obligation of such obligor, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law);

(viii) the pledge, collateral assignment and delivery to the Pledgee of such Pledgor's Collateral consisting of Certificated Securities and Pledged Notes pursuant to this Agreement creates a valid and perfected second priority security interest in such Certificated Securities and Pledged Notes (subject in priority to the Lien of the First-Lien Collateral Agent in accordance with the terms of the Intercreditor Agreement), and the proceeds thereof, subject to no prior Lien or encumbrance or to any agreement purporting to grant to any third party a Lien or encumbrance on the property or assets of such Pledgor which would include the Securities (other than the liens and security interests permitted under the Secured Debt Agreements then in effect) and the Pledgee is entitled to all of the rights, priorities and benefits afforded by the UCC or other relevant law as enacted in any relevant jurisdiction to perfect security interests in respect of such Collateral; and

(ix) "control" (as defined in Section 8-106 of the UCC) has been obtained by the Pledgee over all of such Pledgor's Collateral consisting of Securities (including, without limitation, Notes which are Securities) with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC, except to the extent that the obligation

Exhibit I
Page 19

of the applicable Pledgor to provide the Pledgee with "control" of such Collateral has not yet arisen under this Agreement; provided that in the case of the Pledgee obtaining "control" over Collateral consisting of a Security Entitlement, such Pledgor shall have taken all steps in its control so that the Pledgee obtains "control" over such Security Entitlement.

(b)     Each Pledgor covenants and agrees that it will defend the Pledgee's right, title and security interest in and to such Pledgor's Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and each Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee by such Pledgor as Collateral hereunder and will likewise defend the right thereto and security interest therein of the Pledgee and the other Secured Creditors.

(c)     Each Pledgor covenants and agrees that it will take no action which would violate any of the terms of any Secured Debt Agreement.

(d)     Each Pledgor hereby authorizes the Pledgee to make duplicate filings as if such Pledgor is a Transmitting Utility, or alternatively, as if such Pledgor is a Person which is not a Transmitting Utility.

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED ORGANIZATION); JURISDICTION OF ORGANIZATION; LOCATION; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO; ETC.     The exact legal name of each Pledgor, the type of organization of such Pledgor, whether or not such Pledgor is a Registered Organization, the jurisdiction of organization of such Pledgor, such Pledgor's Location, the organizational identification number (if any) of each Pledgor is listed on Annex A hereto for such Pledgor.     No Pledgor shall change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), its jurisdiction of organization, its Location, or its organizational identification number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) any Pledgor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (i) it shall have given to the Second-Lien Collateral Agent not less than 15 days' prior written notice of each change to the information listed on Annex A (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex A which shall correct all information contained therein for such Pledgor, and (ii) in connection with the respective such change or changes, it shall have taken all action reasonably requested by the Second-Lien Collateral Agent to maintain the security interests of the Second-Lien Collateral Agent in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect.     In addition, to the extent that any Pledgor does not have an organizational identification number on the date hereof and later obtains one, such Pledgor shall promptly thereafter deliver a notification of the Second-Lien Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Second-Lien Collateral Agent to the extent necessary to maintain the security interest of the Second-Lien

Exhibit I
Page 20

Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

18.  PLEDGORS' OBLIGATIONS ABSOLUTE, ETC.  The obligations of each Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever (other than termination of this Agreement pursuant to Section 20 hereof), including, without limitation:

(i)  any renewal, extension, amendment or modification of, or addition or supplement to or deletion from any Secured Debt Agreement (other than this Agreement in accordance with its terms), or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof;

(ii)  any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument including, without limitation, this Agreement (other than a waiver, consent or extension with respect to this Agreement in accordance with its terms);

(iii)  any furnishing of any additional security to the Pledgee or its assignee or any acceptance thereof or any release of any security by the Pledgee or its assignee;

(iv)  any limitation on any party's liability or obligations under any such instrument or agreement or any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof; or

(v)  any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to any Pledgor or any Subsidiary of any Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not such Pledgor shall have notice or knowledge of any of the foregoing.

19.  SALE OF COLLATERAL WITHOUT REGISTRATION.  Subject to the terms of the Intercreditor Agreement:

(a)  If an Event of Default shall have occurred and be continuing and any Pledgor shall have received from the Pledgee a written request or requests that such Pledgor cause any registration, qualification or compliance under any federal or state securities law or laws to be effected with respect to all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests, such Pledgor as soon as practicable and at its expense will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests, including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with any other governmental requirements; provided, that the Pledgee shall furnish to such Pledgor such information

Exhibit I
Page 21

regarding the Pledgee as such Pledgor may request in writing and as shall be required in connection with any such registration, qualification or compliance. Each Pledgor will cause the Pledgee to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to the Pledgee such number of prospectuses, offering circulars and other documents incident thereto as the Pledgee from time to time may reasonably request, and will indemnify, to the extent permitted by law, the Pledgee and all other Secured Creditors participating in the distribution of such Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to such Pledgor by the Pledgee or such other Secured Creditor expressly for use therein.

(b) If at any time when the Pledgee shall determine to exercise its right to sell all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests pursuant to Section 7 hereof, and such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, the Pledgee may, in its sole and absolute discretion, sell such Collateral or part thereof by private sale in such manner and under such circumstances as the Pledgee may deem necessary or advisable in order that such sale may legally be effected without such registration. Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion (i) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof. In the event of any such sale, the Pledgee shall incur no responsibility or liability for selling all or any part of the Collateral at a price which the Pledgee, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until the registration as aforesaid.

20. TERMINATION; RELEASE. (a) On the Termination Date (as defined below), this Agreement shall terminate (provided that all indemnities set forth herein including, without limitation, in Section 11 hereof shall survive any such termination) and the Pledgee, at the request and expense of such Pledgor, will execute and deliver to such Pledgor a proper instrument or instruments (including UCC termination statements) acknowledging the satisfaction and termination of this Agreement (including, without limitation, UCC termination statements and instruments of satisfaction, discharge and/or reconveyance), and will duly release from the security interest created hereby and assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Pledgee and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, together with any moneys at the time held by the Pledgee or any of its sub-agents hereunder and, with respect to any Collateral consisting of an Uncertificated

Exhibit I
Page 22

Security, a Partnership Interest or a Limited Liability Company Interest (other than an Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), a termination of the agreement relating thereto executed and delivered by the issuer of such Uncertificated Security pursuant to Section 3.2(a)(ii) or by the respective partnership or limited liability company pursuant to Section 3.2(a)(iv)(2). As used in this Agreement, "<u>Termination Date</u>" shall mean the date upon which all Second-Lien Notes under the Second-Lien Note Indenture have been repaid in full and all other Obligations (other than indemnities described in Section 11 hereof and described in Section [__] of the Second-Lien Note Indenture, and any other indemnities set forth in any other Security Documents, in each case which are not then due and payable) then due and payable have been paid in full.

(b)     In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party) (x) at any time prior to the time at which all Second-Lien Note Document Obligations have been paid in full, in connection with a sale or disposition permitted by the Second-Lien Note Indenture or is otherwise released at the direction of the Majority Noteholders (or all the Noteholders if required by Section [__] of the Second-Lien Note Indenture) or (y) at any time thereafter, to the extent permitted by the other Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Second-Lien Note Indenture or such other Secured Debt Agreement, as the case may be, to the extent required to be so applied, the Pledgee, at the request and expense of such Pledgor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or released and as may be in the possession of the Pledgee (or, in the case of Collateral held by any sub-agent designated pursuant to Section 4 hereto, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(c)     At any time that any Pledgor desires that Collateral be released as provided in the foregoing Section 20(a) or (b), it shall deliver to the Pledgee (and the relevant sub-agent, if any, designated pursuant to Section 4 hereof) a certificate signed by an authorized officer of such Pledgor stating that the release of the respective Collateral is permitted pursuant to Section 20(a) or (b) hereof. If reasonably requested by the Pledgee (although the Pledgee shall have no obligation to make any such request), the relevant Pledgor shall furnish appropriate legal opinions (from counsel, reasonably acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence.

(d)     The Pledgee shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Second-Lien Collateral Agent in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 20.

21. NOTICES, ETC.  Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be sent or delivered by mail, telegraph, telex, telecopy, cable or courier service and all such notices and

Exhibit I
Page 23

communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Pledgee or any Pledgor shall not be effective until received by the Pledgee or such Pledgor, as the case may be.  All notices and other communications shall be in writing and addressed as follows:

    (a)    if to any Pledgor, at its address set forth opposite its signature below;

    (b)    if to the Pledgee, at:

        [_____]
        [_____]
        Attention:  [_____]
        Telephone No.:  [_____]
        Telecopier No.:  [_____]

    (c)    if to any Secured Creditor, either (x) to the Administrative Agent, at the address of the Administrative Agent specified in the Second-Lien Note Indenture, or (y) at such address as such Secured Creditor shall have specified in the Second-Lien Note Indenture;

or at such other address or addressed to such other individual as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.

22. WAIVER; AMENDMENT.  Except as contemplated by the Intercreditor Agreement and as provided in Sections 30 and 32 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in accordance with the requirements specified in the Security Agreement.

23. SUCCESSORS AND ASSIGNS.  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 20, (ii) be binding upon each Pledgor, its successors and assigns; provided, however, that no Pledgor shall assign any of its rights or obligations hereunder without the prior written consent of the Pledgee (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Pledgee hereunder, to the benefit of the Pledgee, the other Secured Creditors and their respective successors, transferees and assigns.  All agreements, statements, representations and warranties made by each Pledgor herein or in any certificate or other instrument delivered by such Pledgor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

24. HEADINGS DESCRIPTIVE.  The headings of the several Sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Exhibit I
Page 24

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. (a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER SECOND-LIEN NOTE DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PLEDGOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH PLEDGOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PLEDGOR, AND AGREES NOT TO PLEAD OR CLAIM IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER SECOND-LIEN NOTE DOCUMENT BROUGHT IN ANY OF THE AFORESAID COURTS THAT ANY SUCH COURT LACKS PERSONAL JURISDICTION OVER SUCH PLEDGOR. EACH PLEDGOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ANY SUCH PLEDGOR AT ITS ADDRESS FOR NOTICES AS PROVIDED IN SECTION 21 ABOVE, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER SECOND-LIEN NOTE DOCUMENT THAT SUCH SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PLEDGEE UNDER THIS AGREEMENT, OR ANY SECURED CREDITOR, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY PLEDGOR IN ANY OTHER JURISDICTION.

(b) EACH PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJEC-TION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER SECOND-LIEN NOTE DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVO-CABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE

Exhibit I
Page 25

OTHER SECOND-LIEN NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

26. PLEDGOR'S DUTIES. It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Pledgor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Pledgee shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, except for the safekeeping of Collateral actually in Pledgor's possession, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of any Pledgor under or with respect to any Collateral.

27. COUNTERPARTS. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with each Pledgor and the Pledgee.

28. SEVERABILITY. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

29. RECOURSE. This Agreement is made with full recourse to each Pledgor and pursuant to and upon all the representations, warranties, covenants and agreements on the part of such Pledgor contained herein and in the other Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

30. ADDITIONAL PLEDGORS. It is understood and agreed that any Subsidiary of Holdings that is required to become a party to this Agreement after the date hereof pursuant to the requirements of the Second-Lien Note Indenture or any other Second-Lien Note Document, shall become a Pledgor hereunder by (x) executing a counterpart hereof and delivering same to the Pledgee, (y) delivering supplements to Annexes A through G, hereto as are necessary to cause such annexes to be complete and accurate with respect to such additional Pledgor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Pledgor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Pledgee and with all documents and actions required above to be taken to the reasonable satisfaction of the Pledgee.

31. LIMITED OBLIGATIONS. It is the desire and intent of each Pledgor and the Secured Creditors that this Agreement shall be enforced against each Pledgor to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought. Notwithstanding anything to the contrary contained herein, in furtherance of the foregoing, it is noted that the obligations of each Pledgor constituting a Subsidiary Guarantor have been limited as provided in the Subsidiaries Guaranty.

Exhibit I
Page 26

32. RELEASE OF PLEDGORS. If at any time all of the Equity Interests of any Pledgor owned by the Borrower or any of its Subsidiaries are sold (to a Person other than a Credit Party) in a transaction permitted pursuant to the Second-Lien Note Indenture (and which does not violate the terms of any other Secured Debt Agreement then in effect), then, such Pledgor shall be released as a Pledgor pursuant to this Agreement without any further action hereunder (it being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in any Pledgor shall be deemed to be a sale of all of the Equity Interests in such Pledgor for purposes of this Section), and the Pledgee is authorized and directed to execute and deliver such instruments of release as are reasonably satisfactory to it. At any time that the Borrower desires that a Pledgor be released from this Agreement as provided in this Section 32, the Borrower shall deliver to the Pledgee a certificate signed by a principal executive officer of the Borrower stating that the release of such Pledgor is permitted pursuant to this Section 32. If requested by Pledgee (although the Pledgee shall have no obligation to make any such request), the Borrower shall furnish legal opinions (from counsel acceptable to the Pledgee) to the effect set forth in the immediately preceding sentence. The Pledgee shall have no liability whatsoever to any other Secured Creditor as a result of the release of any Pledgor by it in accordance with, or which it believes to be in accordance with, this Section 32.

33. COMPLIANCE WITH LAWS. Each Pledgor agrees to use commercially reasonable efforts, including taking any action which the Pledgee and the Secured Creditors may reasonably request, to assist in obtaining any required consent or approval of the Federal Communications Commission (the "FCC") or any other governmental or other authority for any sale or transfer of control of the Collateral contemplated by the security documents pursuant to the exercise of the rights and remedies of the Pledgee and the Secured Creditors thereunder, including, upon request, to prepare, sign and file with the FCC the assignor's or transferor's and licensee's portions of any applications required under the rules of the FCC for consent to the assignment or transfer of control of any FCC construction permit, license or other authorization.

Each Pledgor further consents, subject to obtaining any necessary approvals, to the assignment or transfer of control of any FCC or other governmental construction permit, license, or other authorization to operate, to a receiver, trustee, or similar official or to any purchaser of the Collateral pursuant to any public or private sale, judicial sale, foreclosure, or exercise of other remedies available to Pledgee and the Secured Creditors as permitted by applicable law.

34. CONFLICTS; INTERCREDITOR AGREEMENT. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second-Lien Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Second-Lien Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

* * * *

Exhibit I
Page 27

IN WITNESS WHEREOF, each Pledgor and the Pledgee have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

Address:                                              RCN CORPORATION, as a Pledgor

105 Carnegie Center
Princeton, NJ 08540                                   By: _____
Tel: (609) 734-3700                                        Name:
Fax: (609) 734-3830                                        Title:

Address:                                              BRAINSTORM NETWORKS, INC., as a
                                                      Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                                   By: _____
Fax: (609) 734-3830                                        Name:
                                                           Title:

Address:                                              HOT SPOTS PRODUCTIONS, INC., as a
                                                      Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                                   By: _____
Fax: (609) 734-3830                                        Name:
                                                           Title:

Address:                                              ON TV, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540                                   By: _____
Tel: (609) 734-3700                                        Name:
Fax: (609) 734-3830                                        Title:

Address:                                              RCN-BECOCOM, LLC, as a Pledgor

105 Carnegie Center                                   By: RCN Telecom Services of
Princeton, NJ 08540                                       Massachusetts, Inc., its managing
Tel: (609) 734-3700                                       member
Fax: (609) 734-3830

                                                      By: _____
                                                           Name:
                                                           Title:

Exhibit I
Page 28

Address:                                           RCN CABLE TV OF CHICAGO, INC., as a
                                                   Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                                By: _____
Fax: (609) 734-3830                                    Name:
                                                       Title:


Address:                                           RCN ENTERTAINMENT, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                                By: _____
Fax: (609) 734-3830                                    Name:
                                                       Title:


Address:                                           RCN FINANCE, LLC, as a Pledgor

105 Carnegie Center                                   By:  RCN Corporation, its managing
Princeton, NJ 08540                                        member
Tel: (609) 734-3700
Fax: (609) 734-3830                                By: _____
                                                       Name:
                                                       Title:


Address:                                           RCN FINANCIAL MANAGEMENT, INC., as
                                                   a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                                By: _____
Fax: (609) 734-3830                                    Name:
                                                       Title:


Address:                                           RCN INTERNATIONAL HOLDINGS, INC.,
                                                   as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                                By: _____
Fax: (609) 734-3830                                    Name:
                                                       Title:

Exhibit I
Page 29

Address:                                    RCN INTERNET SERVICES, INC., as a
                                            Pledgor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                             Name:
                                                Title:


Address:                                    RCN TELECOM SERVICES, INC., as a
                                            Pledgor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                             Name:
                                                Title:


Address:                                    RCN TELECOM SERVICES OF ILLINOIS,
                                            LLC, as a Pledgor
105 Carnegie Center
Princeton, NJ 08540                             By:  RCN CORPORATION, its managing
Tel: (609) 734-3700                                  member
Fax: (609) 734-3830
                                            By: _____
                                                Name:
                                                Title:


Address:                                    RCN TELECOM SERVICES OF
                                            MASSACHUSETTS, INC., as a Pledgor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                             Name:
                                                Title:


Address:                                    RCN TELECOM SERVICES OF
                                            PHILADELPHIA, INC., as a Pledgor
105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                         By: _____
Fax: (609) 734-3830                             Name:
                                                Title:

Exhibit I
Page 30

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES OF VIRGINIA, INC., as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RCN TELECOM SERVICES OF WASHINGTON, D.C., INC., as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RFM 2, LLC, as a Pledgor

    By: RCN Corporation, its managing member

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

RLH PROPERTY CORPORATION, as a Pledgor

By: _____
    Name:
    Title:

Address:

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700
Fax: (609) 734-3830

STARPOWER COMMUNICATIONS, LLC, as a Pledgor

    By: RCN Telecom Services of Washington, D.C., Inc., its managing member

By: _____
    Name:
    Title:

Exhibit I
Page 31

Address:                                          TEC AIR, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                               By: _____
Fax: (609) 734-3830                                  Name:
                                                     Title:

Address:                                          21ST CENTURY TELECOM SERVICES,
                                                  INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                               By: _____
Fax: (609) 734-3830                                  Name:
                                                     Title:

Address:                                          UNET HOLDING, INC., as a Pledgor

105 Carnegie Center
Princeton, NJ 08540
Tel: (609) 734-3700                               By: _____
Fax: (609) 734-3830                                  Name:
                                                     Title:

Exhibit I
Page 32

Accepted and Agreed to:

[_____], as Second-Lien Collateral
    Agent and Pledgee


By:_____
    Name:
    Title:

Address:

[_____]
[_____]
Tel: [_____]
Fax: [_____]

SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION
(AND WHETHER A REGISTERED ORGANIZATION), JURISDICTION OF
ORGANIZATION, LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

| Exact Legal Name of Each Pledgor | Registered Organization? (Yes/No) | Jurisdiction of Organization | Pledgor's Location (for purposes of NY UCC § 9-307) | Pledgor's Organization Identification Number (or, if it has none, so indicate) |
|---|---|---|---|---|

SCHEDULE OF SUBSIDIARIES

| Entity | Ownership | Jurisdiction of Organization |
|---|---|---|

<u>SCHEDULE OF STOCK</u>

1.      [PLEDGOR]

| Name of Issuing <u>Corporation</u> | Type of <u>Shares</u> | Number of <u>Shares</u> | Certificate <u>No.</u>[1] | Percentage <u>Owned</u>[2] | Sub-clause of Section 3.2(a) of Pledge <u>Agreement</u> |
|---|---|---|---|---|---|

2.      [ADDITIONAL PLEDGOR(S)]

| Name of Issuing <u>Corporation</u> | Type of <u>Shares</u> | Number of <u>Shares</u> | Certificate <u>No.</u>[16] | Percentage <u>Owned</u>[17] | Sub-clause of Section 3.2(a) of Pledge <u>Agreement</u> |
|---|---|---|---|---|---|

---

[1]     Specify if uncertificated.

[2]     Specify for each Foreign Subsidiary the percentage owned of (x) Voting Equity Interests and (y) Non-Voting Equity Interests.

## SCHEDULE OF NOTES

1.      RCN CORPORATION

|  |  |  | Sub-clause of |
| Amount | Maturity Date | Obligor | Section 3.2(a) |
|  |  |  | of Pledge Agreement |

2.      [ADDITIONAL PLEDGOR(S)]

|  |  |  | Sub-clause of |
| Amount | Maturity Date | Obligor | Section 3.2(a) |
|  |  |  | of Pledge Agreement |

## SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

1.      RCN CORPORATION

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|
|  |  |  |  |

2.      [ADDITIONAL PLEDGOR(S)]

| Name of Issuing Limited Liability Company | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|
|  |  |  |  |

SCHEDULE OF PARTNERSHIP INTERESTS

1.    RCN CORPORATION

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

2.    [ADDITIONAL PLEDGOR(S)]

| Name of Issuing Partnership | Type of Interest | Percentage Owned | Sub-clause of Section 3.2(a) of Pledge Agreement |
|---|---|---|---|

SCHEDULE OF CHIEF EXECUTIVE OFFICES

Name of Pledgor                    Address(es) of Chief Executive Office[1]

---

[1]    For each Pledgor, list the address of its chief executive office on the date of the Security Agreement and each other location (if any) of its chief executive office in the four calendar months preceding said date.

Form of Agreement Regarding Uncertificated Securities, Limited Liability
Company Interests and Partnership Interests

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "Agreement"), dated as of [_____ __, 2004], among the undersigned pledgor (the "Pledgor"), Deutsche Bank AG Cayman Islands Branch, not in its individual capacity but solely as Second-Lien Collateral Agent (the "Pledgee"), and [_____], as the issuer of the Uncertificated Securities, Limited Liability Company Interests and/or Partnership Interests (each as defined below) (the "Issuer").

W I T N E S S E T H :

WHEREAS, the Pledgor, certain of its affiliates and the Pledgee have entered into a Pledge Agreement, dated as of [_____ __, 2004] (as amended, modified, restated and/or supplemented from time to time, the "Pledge Agreement"), under which, among other things, in order to secure the payment of the Obligations (as defined in the Pledge Agreement), the Pledgor has or will pledge to the Pledgee for the benefit of the Secured Creditors (as defined in the Pledge Agreement), and grant a security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all ["uncertificated securities" (as defined in Section 8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York) ("Uncertificated Securities")] [Partnership Interests (as defined in the Pledge Agreement)] [Limited Liability Company Interests (as defined in the Pledge Agreement)], from time to time by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "Issuer Pledged Interests"); and

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interest of the Pledgee under the Pledge Agreement in the Issuer Pledged Interests, to vest in the Pledgee control of the Issuer Pledge Interests and to provide for the rights of the parties under this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Subject to the terms of the Intercreditor Agreement, the Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the Pledgee (and its successors and assigns) regarding any and all of the Issuer Pledged Interests without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any

person or entity other than the Pledgee (and its successors and assigns) or a court of competent jurisdiction.

2.  The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Pledgee) has been received by it, and (ii) the security interest of the Pledgee in the Issuer Pledged Interests has been registered in the books and records of the Issuer.

3.  The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Pledgee, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

4.  All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Pledgee at the following address:

> [_____]
> [_____]
> Attention:  [_____]
> Telephone No.:  [_____]
> Telecopier No.:  [_____]

5.  Following its receipt of a notice from the Pledgee stating that the Pledgee is exercising exclusive control of the Issuer Pledged Interests and until the Pledgee shall have delivered written notice to the Issuer that all of the Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Pledgee only by wire transfers to such account as the Pledgee shall instruct.

6.  Except as expressly provided otherwise in Sections 4 and 5, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Pledgee or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

(a)     if to the Pledgor, at:

> _____
> _____
> _____
> _____
> Attention:  _____

Telephone No.:
Fax No.:

(b)      if to the Pledgee, at the address given in Section 4 hereof;

(c)      if to the Issuer, at:

           _____
           _____
           _____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder. As used in this Section 6, "Business Day" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

7. This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Pledgee and its successors and assigns. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument. In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto. None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Pledgee, the Issuer and the Pledgor.

8. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

IN WITNESS WHEREOF, the Pledgor, the Pledgee and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____],
   as Pledgor


By_____
   Name:
   Title:


[_____], not in its individual capacity but solely as Second-Lien Collateral Agent and Pledgee

By_____
   Name:
   Title:


[_____],
   as the Issuer


By_____
   Name:
   Title:

## Table of Contents

Page

1. SECURITY FOR OBLIGATIONS ........................................................................2

2. DEFINITIONS ...............................................................................................3

3. PLEDGE OF SECURITIES, ETC ........................................................................6

    3.1 Pledge ...................................................................................................6
    3.2 Procedures .............................................................................................9
    3.3 Subsequently Acquired Collateral ..............................................................10
    3.4 Transfer Taxes .......................................................................................11
    3.5 Certain Representations and Warranties Regarding the Collateral ...........................11

4. APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC ...........................................11

5. VOTING, ETC., WHILE NO EVENT OF DEFAULT OR SPECIFIED DEFAULT .............12

6. DIVIDENDS AND OTHER DISTRIBUTIONS ..............................................................12

7. REMEDIES IN CASE OF AN EVENT OF DEFAULT OR A SPECIFIED DEFAULT .......13

8. REMEDIES, CUMULATIVE, ETC ........................................................................14

9. APPLICATION OF PROCEEDS ..........................................................................14

10. PURCHASERS OF COLLATERAL ......................................................................15

11. INDEMNITY ...............................................................................................15

12. PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER ...........15

13. FURTHER ASSURANCES; POWER-OF-ATTORNEY .....................................................16

14. THE PLEDGEE AS SECOND-LIEN COLLATERAL AGENT .........................................16

15. TRANSFER BY THE PLEDGORS ........................................................................17

16. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS ........17

17. LEGAL NAMES; TYPE OF ORGANIZATION (AND WHETHER A REGISTERED
    ORGANIZATION); JURISDICTION OF ORGANIZATION; LOCATION;
    ORGANIZATIONAL IDENTIFICATION NUMBERS; CHANGES THERETO;
    ETC ...........................................................................................................19

18. PLEDGORS' OBLIGATIONS ABSOLUTE, ETC ........................................................20

i

19. SALE OF COLLATERAL WITHOUT REGISTRATION ...................................20

20. TERMINATION; RELEASE ...........................................................................21

21. NOTICES, ETC ..............................................................................................22

22. WAIVER; AMENDMENT .............................................................................23

23. SUCCESSORS AND ASSIGNS .....................................................................23

24. HEADINGS DESCRIPTIVE..........................................................................23

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF
    JURY TRIAL ...............................................................................................24

26. PLEDGOR'S DUTIES....................................................................................25

27. COUNTERPARTS ..........................................................................................25

28. SEVERABILITY .............................................................................................25

29. RECOURSE.....................................................................................................25

30. ADDITIONAL PLEDGORS ...........................................................................25

31. LIMITED OBLIGATIONS .............................................................................25

32. RELEASE OF PLEDGORS ............................................................................26

33. COMPLIANCE WITH LAWS ........................................................................26

34. CONFLICTS; INTERCREDITOR AGREEMENT...........................................26

ANNEX A   -    SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION,
                      JURISDICTION OF ORGANIZATION, LOCATION AND
                      ORGANIZATIONAL IDENTIFICATION NUMBERS
ANNEX B   -    SCHEDULE OF SUBSIDIARIES
ANNEX C   -    SCHEDULE OF STOCK
ANNEX D   -    SCHEDULE OF NOTES
ANNEX E   -    SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS
ANNEX F   -    SCHEDULE OF PARTNERSHIP INTERESTS
ANNEX G   -    SCHEDULE OF CHIEF EXECUTIVE OFFICES
ANNEX H   -    FORM OF AGREEMENT REGARDING UNCERTIFICATED
                      SECURITIES, LIMITED LIABILITY COMPANY INTERESTS AND
                      PARTNERSHIP INTERESTS

NEWYORK 4441014 (2K)

PDFfile.doc

**<u>Certain Permitted Liens</u>**

**<u>[THIS SHOULD BE THE SAME SCHEDULE AS SCHEDULE VII TO THE DB CREDIT AGREEMENT]</u>**

PDFfile.doc

Schedule 1.01B

**<u>Certain Permitted Investments</u>**

**[<u>THIS SHOULD BE THE SAME SCHEDULE AS SCHEDULE IX TO THE DB CREDIT AGREEMENT</u>]**

Schedule 5.11

## **EXISTING INDEBTEDNESS**

## **[THIS SCHEDULE SHOULD BE THE SAME SCHEDULE AS SCHEDULE VI TO THE DB CREDIT AGREEMENT]**

Schedule 5.20

**<u>Certain Restrictions</u>**

**EXHIBIT H**

**TO**

**PLAN SUPPLEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF RCN CORPORATION AND CERTAIN SUBSIDIARIES**

_____

**SCHEDULE OF INTERCOMPANY CLAIMS**

**RCN Corporation et. al.,**
**Intercompany Recevables and Payables Account Balances as of September 30, 2004***
**(Net of Intercompany Setoffs)**

**Intercomapany Receivables**

| Creditor | Debtor | Reinstated | Released, Waived, and Discharged | Contribution to Capital | Total Receivable (Net of Setoff) |
|---|---|---|---|---|---|
| Hot Spots Productions, Inc. | RCN Corporation | $7,416 | $0 | $0 | $7,416 |
| On TV, Inc. | RCN Telecom Services, Inc. | $198,089 | $0 | $0 | $198,089 |
| On TV, Inc. | RCN Entertainment, Inc. | $75,264 | $0 | $0 | $75,264 |
| On TV, Inc. | RCN Financial Management, Inc. | $55,143 | $0 | $0 | $55,143 |
| RCN Corporation | RCN Telecom Services of IL, LLC | $79,974 | $0 | $0 | $79,974 |
| RCN Corporation | RCN Internet Services, Inc | $28,546 | $0 | $0 | $28,546 |
| RCN Entertainment, Inc. | TEC Air, Inc. | $947 | $0 | $0 | $947 |
| RCN Finance, LLC | RCN Corporation | $674,192,396 | $0 | $0 | $674,192,396 |
| RLH Property Corporation | RCN Financial Management, Inc. | $9,230,920 | $0 | $0 | $9,230,920 |
| | | **$683,868,695** | **$0** | **$0** | **$683,868,695** |

**Intercompany Payables**

| Debtor | Creditor | Reinstated | Released, Waived, and Discharged | Contribution to Capital | Total Payable (Net of Setoff) |
|---|---|---|---|---|---|
| RCN Corporation | RCN Finance, LLC | $674,192,396 | $0 | $0 | $674,192,396 |
| RCN Corporation | RCN-BecoCom, LLC | $72,078,985 | $0 | $0 | $72,078,985 |
| RCN Corporation | RFM 2, LLC | $2,447,021 | $0 | $0 | $2,447,021 |
| RCN Corporation | Hot Spots Productions, Inc. | $7,416 | $0 | $0 | $7,416 |
| RCN Entertainment, Inc. | RCN Telecom Services, Inc. | $1,264,789 | $0 | $0 | $1,264,789 |
| RCN Entertainment, Inc. | RCN Financial Management, Inc. | $1,196,501 | $0 | $0 | $1,196,501 |
| RCN Entertainment, Inc. | On TV, Inc. | $75,264 | $0 | $0 | $75,264 |
| RCN Finance, LLC | RCN Financial Management, Inc. | $352,612,580 | $0 | $0 | $352,612,580 |
| RCN Finance, LLC | RCN Telecom Services, Inc. | $281,177 | $0 | $0 | $281,177 |
| RLH Property Corporation | RCN Telecom Services of Philadelphia, Inc. | $1,793,510 | $0 | $0 | $1,793,510 |
| Tec Air, Inc. | RCN Financial Management, Inc. N/P | $1,508,307 | $0 | $0 | $1,508,307 |
| Tec Air, Inc. | RCN Financial Management, Inc. A/P | $15,725 | $0 | $0 | $15,725 |
| Tec Air, Inc. | RCN Entertainment, Inc. | $947 | $0 | $0 | $947 |
| Tec Air, Inc. | RCN Telecom Services, Inc. | $334 | $0 | $0 | $334 |
| | | **$1,107,474,952** | **$0** | **$0** | **$1,107,474,952** |

* The Debtors reserve the right to modify this schedule, with the consent of the Creditors' Committee, prior to the Confirmation Date.

**11/19/2004**
**534743.01 NY 4A**