UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------ X
                                    :
In Re:                              :  Case No. 04-13638
                                    :
       RCN CORPORATION, et al.      :
                                    :  One Bowling Green
                   Debtors.         :  New York, NY 10004
                                    :  December 22, 2005
------------------------------------X
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Mega Cable,<br>MCM Holding and<br>Majority Shareholders: | JAY TEITELBAUM, ESQ.<br>WENDY WALKER, ESQ.<br>MORGAN, LEWIS & BOCKIUS LLP<br>101 Park Avenue<br>New York, NY  10178 |
| For RCN Corp.: | SUSHEEL KIRPALANI, ESQ.<br>DENNIS DUNNE, ESQ.<br>LENA MANDEL, ESQ.<br>MILBANK, TWEED, HADLEY<br> & McCLOY LLP<br>1 Chase Manhattan Plaza<br>New York, NY  10005 |
| Court Transcriber: | TRACY A. GEGENHEIMER, CERT*D-282<br>TypeWrite Word Processing Service<br>356 Eltingville Boulevard<br>Staten Island, New York 10312 |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1          THE COURT:  The RCN matter?

2          MR. TEITELBAUM:  Good morning, Your Honor.  Jay

3  Teitelbaum and Wendy Walker, Morgan, Lewis & Bockius on behalf

4  of Mega Cable, MCM Holding and the majority shareholders of

5  those companies.

6          MR. KIRPALANI:  Good morning, Your Honor.  Susheel

7  Kirpalani of Milbank, Tweed, Hadley & McCloy on behalf of

8  reorganized RCN Corp.  With me is my partner, Dennis Dunne and

9  my colleague Lena Mandel.

10         MR. TEITELBAUM:  Your Honor, this is Jay Teitelbaum.

11  I'm assuming that given the way the hearing on the 16th ended,

12  I should pick up where we left off to address the concerns of

13  Your Honor.

14         THE COURT:  Okay.

15         MR. TEITELBAUM:  If that's acceptable.

16         Your Honor raised some very serious concerns on -- at

17  the hearing on the 16th.  Later that day, we submitted a letter

18  to Your Honor with an attachment which included a letter from

19  the attorneys from Milbank dated August 10th, 2005 and I'll get

20  to that, but I just wanted to note that we did have that hand

21  delivered to chambers and we received a call from your clerk

22  yesterday and we wound up electronically filing it yesterday.

23  Hopefully you received a copy of that --

24         THE COURT:  I read it.

25         MR. TEITELBAUM:  Thank you.

3

1          THE COURT:  As well as the arbitration pleading.

2          MR. TEITELBAUM:  Thank you, Your Honor.

3          Your Honor, to address the point that you raised on

4   the 16th, I want to state that Mega Cable has never asserted

5   that there was no agreement between RCN and it with respect to

6   the support and guaranty agreement.

7          To the contrary, Your Honor, since 1997, it's been

8   our position that there was a meeting of the minds that both

9   Mega Cable and RCN would be bound by the terms of the support

10  and guaranty agreement.  And as we discussed on the 16th, as it

11  turned out, a formal assumption document that was provided to

12  C-Tech and RCN in 1997 was never executed.  But the fact of the

13  matter is that -- and that document is Exhibit B to the

14  debtor's motion as you referred to it at the last hearing.

15         The fact of the matter is, Your Honor, that the

16  parties, from 1997 until at least the petition was filed in

17  2004, operated under the support and guaranty agreement.  And

18  in fact, Your Honor, up until December 15th, 2005, the day

19  before our last hearing, RCN took the position that there was

20  an agreement.

21         And let me try to address how we've established that

22  and we didn't really have an opportunity to get into the

23  details of it at the last hearing.  On the 18th of November of

24  this year, RCN filed the motion which brings us all here today

25  and which brought us here on the 15th.  And the motion that

4

1  they filed was a motion seeking an order of this Court to

2  interpret or clarify the confirmation order to the affect that

3  the support and guaranty agreement was either not rejected or

4  that the obligations thereunder were not discharged.

5          In the alternative, they sought an order of this

6  Court, Your Honor, modifying the confirmation order to provide

7  that the support and guaranty agreement was explicitly assumed.

8          Your Honor, we would submit that that initial

9  pleading had a predicate that in fact there was an agreement.

10 But, as alleged in that motion in paragraph 25, RCN alleged

11 that they inadvertently omitted the support and guaranty

12 agreement from the schedule D and the prior motions for

13 assumption or rejection in or about December of 2005, but

14 because they didn't know about the support and guaranty

15 agreement.

16         Your Honor, that -- with a little bit of that

17 background, we would submit that that position is fundamentally

18 inconsistent with -- and quite frankly took us by surprise on

19 the 16th -- with the position --

20         THE COURT:  You believe that page 3 of RCN's original

21 motion which says RCN has no evidence of ever actually

22 executing the assumption nevertheless took you by surprise?

23         MR. TEITELBAUM:  (No audible response)

24         THE COURT:  Particularly given the context of this

25 matter?

5

1          MR. TEITELBAUM:  Your Honor, what took us by surprise

2     was the fact that they took the position that there was no

3     agreement.  Not the fact that the formal documentation wasn't

4     executed.  The fact that they have now raised the issue of

5     well, we may need more discovery to determine if there was in

6     fact an agreement when the background, as Your Honor -- as I'd

7     like to point out, is very simple, quite frankly.

8          Exhibit B to the Mega Cable -- to RCN's initial

9     motion is the September 12, 1997 consent that was never

10    formally executed.  And that dealt with the fact that in 1997,

11    C-Tech spun off RCN and there was an issue because C-Tech was a

12    party to the support and guaranty agreement.  My clients needed

13    assurance that RCN would take up those obligations because they

14    contain very material limitations and restrictions upon the

15    ability of the parent of the ultimate owner of the 49 percent

16    minority stake in Mega Cable to dispose of that entity, acquire

17    more stock, compete with Mega Cable.  And that was a very

18    significant piece of the transaction.

19          Now even though the document was never formally

20    executed by RCN, the parties performed as if it had been.  The

21    fact of the matter is RCN did not dispose of any interest in

22    RCN International, which was never a debtor before this Court;

23    never took any action contrary to.  And notwithstanding Mr.

24    Kirpalani's statements about the fact that we weren't the

25    greatest of joint venture partners with one another, the fact

6

1  of the matter is that the parties did act as joint venture

2  partners and to best of my knowledge, Your Honor, at no time

3  during the course of the bankruptcy case before Your Honor did

4  the debtors raise an issue that hey, Mega Cable is not

5  performing up to snuff on the support and guaranty agreement,

6  they're not providing us with documentation and they had more

7  than ample opportunity to do that.

8          Fact of the matter is that, Your Honor, there was an

9  agreement and it's further evidence by Exhibit D to our

10 objection, which is a letter dated September 2004 sent to Mr.

11 David McCourt as chairman and CEO of RCN Corp.  It was an offer

12 to purchase back the 49 percent stake.  And that letter was

13 sent, as Your Honor may recall, about two months before the

14 confirmation hearings.

15         Now just by way of just a little bit of background,

16 Mr. McCourt, as I'm sure the Court is aware, was the CEO and

17 chairman of RCN Corp.  Not only that though, he was the CEO and

18 chairman of C-Tech.  He was the man who executed the original

19 support and guaranty agreement, negotiated its term and he was

20 also the man who signed the plan and disclosure statement in

21 negotiating those terms.

22         It's therefore a bit hard to swallow when the debtor

23 says he didn't know about the support and guaranty agreement.

24 This isn't a situation where there was change of management.

25 The same chairman and CEO was in place at all times.

7

1          THE COURT:  I'm sorry, how does the exhibit pertain

2  to this issue that you just referred to?

3          MR. TEITELBAUM:  Exhibit D, Your Honor.

4          THE COURT:  Right.

5          MR. TEITELBAUM:  That letter is addressed to Mr.

6  McCourt as chairman and CEO of RCN Corporation.  Not to RCN

7  International, Your Honor.  And the point of that is that Mr.

8  McCourt was chairman and CEO of not only RCN Corp., he was

9  formerly the chairman of C-Tech in connection with the original

10  support and guaranty agreement and there was -- this document

11  reflects that the parties were dealing with one another

12  pursuant to the various agreements that they had in place --

13  since 1997.

14          THE COURT:  Does this letter refer to the guaranty

15  agreement?

16          MR. TEITELBAUM:  It does not refer to the guaranty

17  agreement, Your Honor.

18          THE COURT:  All right.

19          MR. TEITELBAUM:  Your Honor, on December 16th, as I

20  mentioned, we provided -- another piece of background here is

21  that we provided the Court with a copy of a letter from Milbank

22  and this letter further reflects that prior to the filing of

23  any pleadings, whether in this court or in Paris in connection

24  with the arbitration, the parties believed that RCN and were

25  operating under the assumption that the parties -- that RCN had

8

1   assumed the obligations from C-Tech under the support and

2   guaranty agreement.

3           The letter dated August 10th, 2005 from Mr. Janson of

4   C-Tech -- of Milbank to the chairman of the board of Mega Cable

5   is attached and just for in part, the letter states in

6   connection with that spin off back in 1997, RCN assumed the

7   rights and obligations of C-Tech under the agreement.  He then

8   goes on to say RCN remains a party to the S and G agreement.

9           Your Honor, this was in August of 2005.  The parties

10  were continually operating and there was a good faith basis for

11  my clients to believe that in fact there was an agreement.

12          THE COURT:  Didn't your clients create this whole

13  problem by asking whether there's a continuing obligation to

14  perform?

15          MR. TEITELBAUM:  No, Your Honor, we did not create

16  this problem.  The reason that we asked the question was

17  because the parties were in disagreements which are not

18  necessarily pertinent to this issue.  But the fact of the

19  matter is that there was disagreement among the joint venture

20  parties and there was -- there were questions asked from

21  Mexican counsel to Milbank.  Milbank responded and in the

22  August 10th letter, not only say yes, there is an agreement;

23  went on to say here's the effect of what the plan was on that

24  agreement.  My clients didn't accept that because their review

25  of -- with prior counsel of the bankruptcy laws came to a

9

1  different conclusion as to the effect of the plan on the

2  agreement.

3          So, no, Your Honor, we did not create this situation.

4   The fact of the matter is that when we filed the arbitration

5  petition and we filed our objection, there was a basis for all

6  parties and assertions by all parties that the support and

7  guaranty agreement existed.

8          It was only on the even of the hearing as I said,

9  Your Honor, that RCN now raises the prospect of we need

10 discovery to ascertain whether in fact there is an agreement.

11         THE COURT:  Well, why does there have to be

12 discovery?  You've acknowledged that there's no written

13 agreement, correct?

14         MR. TEITELBAUM:  We've acknowledged that there was no

15 signed assumption from RCN to -- by RCN.  That is correct --

16         THE COURT:  So you're relying on a course of dealing,

17 correct?

18         MR. TEITELBAUM:  Yes, Your Honor.  And that was our

19 basis --

20         THE COURT:  All right.

21         MR. TEITELBAUM:  But --

22         THE COURT:  And then you're saying that the debtor

23 should be held to a confirmation order that says that all

24 executory contracts are deemed rejected, even if it's not one

25 that's actually in writing, but based on the course of dealing.

1   That's essentially what you're saying, right?

2           MR. TEITELBAUM:  Well, no, Your Honor.  Our position

3   is very simply this:  Based upon the debtors' motion in which

4   they sought a clarification of the order to provide that this

5   agreement was either not rejected or not discharged, we said

6   the plan on its face is crystal clear.  It said if the -- if

7   executory contracts are not assumed by the voting deadline,

8   they are deemed rejected.

9           THE COURT:  I'm just trying to figure out for

10  purposes of today's hearing whether the issue of discovery is

11  at all relevant.

12          MR. TEITELBAUM:  Well, Your Honor, I would submit to

13  you that it is not and I want to get -- and I can address that.

14   The reason that I submit that it is not is as follows:  If we

15  assume for a second that December 15th didn't occur and we

16  don't have the pleading that we have which raises this question

17  of was there a support and guaranty agreement or wasn't and we

18  have the debtors' motion which asks for a clarification,

19  interpretation and modification of the plan, then, Your Honor,

20  it is our position that there is either no justiciable

21  controversy here under Article III or there's no post-

22  confirmation jurisdiction to interpret or enforce the plan.

23          Let me put the justiciable controversy on the side

24  for a second.  The fact of the matter is to the extent that the

25  debtors are asking for an interpretation of the plan, there is

11

1   in fact nothing to interpret.  The plan is crystal clear.  This

2   is not like the seventh circuit case of <u>Weber</u> [Ph.] that the

3   debtors cited where the plan was a mess.  This case, the plan

4   says this is precisely what happens to executory contracts and

5   this is what happens to other obligations.  In fact, they are

6   discharged whether or not a claim has been filed.  All

7   obligations are discharged, unless explicitly carved out.

8           We -- there is no dispute that the support and

9   guaranty agreement was never assumed.  So, if it was executory,

10  it was discharged.

11          There's also no dispute that if it was not an

12  executory contract, if it was a one-sided guaranty, for

13  example, that it wasn't excluded from the discharge

14  provisions --

15          THE COURT:  Well, let's explore that for a minute.

16  Although frankly I think it's unnecessary to resolve this

17  matter.  What debt pre-petition does your client have under the

18  so-called support and guaranty agreement?

19          MR. TEITELBAUM:  Your Honor, there were --

20          THE COURT:  That you claim was discharged.

21          MR. TEITELBAUM:  Your Honor, there were contingent

22  obligations which arose from the negative covenants in the

23  support and guaranty agreement.  There were conditions not to

24  compete.  There were conditions --

25          THE COURT:  Has any debt arisen pre-petition as a

12

1   result of that agreement?

2          MR. TEITELBAUM:  No debt to my knowledge arose in a

3   liquidated sum pre-petition.

4          THE COURT:  All right.

5          MR. TEITELBAUM:  All right, but that --

6          THE COURT:  What is there to be discharged?

7          MR. TEITELBAUM:  Your Honor, what could have been

8   discharged and what the code provides I believe, Your Honor, is

9   in the definition of a claim is broad and very -- and broad

10  enough to provide that claims include contingent obligations

11  which for the purposes of bankruptcy could have been estimated.

12   Fact of the matter is we had -- there were contingent --

13         THE COURT:  Has there been any breach of this

14  agreement?  Let's stop talking double talk here.  You want a

15  determination that the agreement has been breached.  The

16  debtors want a determination that it has not been breached.

17  You have just the opposite position of a normal case because

18  you want to assert that the breach of this agreement permits

19  you to cause the debtors to have a forfeiture.  So let's get

20  real here.  As I told you last hearing, I'm really getting

21  tired of the double talk.  Has there been a breach or not?

22         MR. TEITELBAUM:  Your Honor, there's -- under the

23  plan -- pre-petition, there was no breach.

24         THE COURT:  All right.

25         MR. TEITELBAUM:  Under --

13

1          THE COURT:  That's enough.  You can continue on with

2   your argument now.

3          MR. TEITELBAUM:  Thank you, Your Honor.  With respect

4   to the concept -- and if I may just address a point that Your

5   Honor just raised which is forfeiture, there is no forfeiture

6   being sought here.  The --

7          THE COURT:  Are you seeking in the arbitration a

8   determination that you can buy out the minority interest at

9   book value?

10         MR. TEITELBAUM:  That, Your Honor, is what the

11  documents provide and that's --

12         THE COURT:  All right.

13         MR. TEITELBAUM:  -- the demand.

14         THE COURT:  All right.  Very well.  Continue.

15         MR. TEITELBAUM:  Your Honor, and in contrast to, for

16  example, 401 East 89th Street which is relied upon by the

17  debtors, there was a forfeiture where the property that the

18  creditor held was going to be lost with no compensation after

19  the debtor failed to abide by court orders and provide adequate

20  notice to the parties.  That's not what we have here.

21         We are availing ourselves of the rights that we have

22  under the contract which provide in the event of a breach, the

23  parties may seek arbitration to resolve issues relating to that

24  breach --

25         THE COURT:  Right.

14

1          MR. TEITELBAUM:   -- and --

2          THE COURT:  A breach that you admit has never

3  occurred and which the debtors are prepared today to stipulate

4  and have always been prepared to stipulate once this issue was

5  raised they are prepared to avoid by again continuing as their

6  course of dealing to honor whatever contract you say exists.

7  So why is that not a forfeiture?  Why are you trying to hold

8  the debtors to a breach that they're prepared to say they won't

9  commit in the future and that you acknowledge has not occurred

10  in the past?

11          MR. TEITELBAUM:  Your Honor, because that is what the

12  document provided and that's what the law provides on the plan.

13   It's not a forfeiture.  We are simply seeking to exercise our

14  rights.  And if I -- and the point that I'd like to try to make

15  on that issue of equities and that's where Your Honor is

16  appropriately considering the equities of what is going on

17  here, and that's why I raised the issue of this to the Court

18  earlier on.

19          Fact of the matter is, Your Honor, that under

20  applicable Mexican law, Mega -- RCN could not dispossess itself

21  of its interest in RCN International -- of RCN's

22  International's interest in Mega Cable without approval of the

23  government authorities.  However, RCN may have been able to

24  sell its interest in RCN International as a whole and therefore

25  change the ownership interest of Mega Cable.

15

1          It was only the support and guaranty agreement which

2     prevented that, Your Honor.  And I would submit to you that

3     this may not have been so inadvertent and if we're going to

4     consider the equities, we need to consider really what happened

5     in this bankruptcy case.  And I would submit to Your Honor that

6     there may well have been a conscientious decision by RCN to let

7     this document lapse and see where the chips fell.  Because it's

8     kind of a heads they win, tails we lose situation if that

9     happens.

10          THE COURT:  Is there any evidence of that to

11     counteract the documents that are in the record that suggest

12     just the contrary?

13          MR. TEITELBAUM:  Your Honor, there are no documents

14     in the record which I believe suggest to the contrary and --

15          THE COURT:  What about the August 10 letter in

16     response to the June 22nd letter?

17          MR. TEITELBAUM:  Your Honor, that letter was raised

18     in response to the very issue of we think the plan effected a

19     discharge.  That was -- or rejection or a termination.  That

20     was raised in response.  That was not a unilateral offer by RCN

21     to fix a, quote, mistake that they had made.  It was a response

22     to RCN saying wait a -- to Mega Cable saying wait a second.  We

23     think the effect of the plan is rejection, termination of the

24     agreement.

25          So, Your Honor, I -- this --

16

1          THE COURT:  But in -- I'm sorry, but in response to
2    the points you were just making, which is that maybe there was
3    something nefarious in RCN's not assuming a course of dealing
4    agreement that arguably it -- you say it was nevertheless aware
5    of, because maybe it didn't want to be bound by that agreement,
6    isn't the first response by RCN to such a suggestion that
7    replied it -- which is in fact what happened—"no, we are bound
8    by such an agreement if it exists," completely contrary to the
9    allegation you're making that there was something nefarious
10   done?

11         MR. TEITELBAUM:  Well, Your Honor, that's where I'm a
12   little bit confused because if their -- their position is -- if
13   their position is that we never executed the 1997 assumption
14   consent and therefore there's no agreement --

15         THE COURT:  No, no, I'm going just to your last
16   point.  I'm just dealing with your last point where you allege
17   that there was something nefarious done.

18         MR. TEITELBAUM:  Well, Your Honor, I raised that
19   point because when we step back and look objectively at the
20   facts of this case and the fact that the parties involved were
21   the same parties that were in the initial transaction, so it's
22   harder to -- for a debtor to say we have all new people.  All
23   new people came in.  We didn't know what was going on.  The
24   debtors' books and records were a mess.  We had no clue.

25         That wasn't the case here.  Mr. McCourt was the

17

1  continuum from 1997 through the plan.  This asset was worth

2  several hundred million dollars at least on the debtors' books

3  and records.  It wasn't something that was some lease of a

4  photocopier that no one realized.

5              It's a little bit difficult objectively to say that

6  when the debtors allege in an affidavit before this Court that

7  they took extraordinary measures to identify every contract

8  that was potentially executory or beneficial and out of an

9  excess of caution included those contracts in schedule D to the

10 plan that somehow they forgot about this one?  Had they

11 really --

12             THE COURT:  Well, this one is what again?  It's a

13 course of dealing, correct?

14             MR. TEITELBAUM:  Well, no, Your Honor --

15             THE COURT:  That's it.  I mean you can look in your

16 files and find a course of dealing?

17             MR. TEITELBAUM:  No, there was the support and

18 guaranty agreement, the underlying agreement with C-Tech and

19 the September 12th, 1997 consent which was --

20             THE COURT:  Neither which was signed by the debtor,

21 correct?

22             MR. TEITELBAUM:  But it was in their possession, Your

23 Honor.  They had the document.  So it's not like they can say

24 we never know about the document.  It wasn't -- we weren't

25 playing hide the ball with the document.  We didn't sign their

18

1  name and say you're bound.  They had these things in their

2  files.  And notwithstanding the allegations to this Court of

3  the extraordinary measures they took to locate and identify all

4  of those documents, it was never included in the pleadings

5  filed before the Court and notwithstanding the fact that two

6  months before the plan confirmation hearing, the parties were

7  even in discussions about selling back the minority interest.

8  This was on the forefront of parties' minds and it's just a bit

9  much for --

10         THE COURT:  What was on -- you're saying that the

11  support and guaranty agreement was on the forefront?

12         MR. TEITELBAUM:  The relationship between RCN Corp.

13  and my client was on --

14         THE COURT:  Do you have any evidence that the parties

15  were actually discussing the support and guaranty agreement

16  before confirmation of the plan?

17         MR. TEITELBAUM:  At this time, Your Honor, all I have

18  is -- not hearsay, I have statements of my clients as to the

19  negotiations that were going back and forth or not going back

20  and forth, calls attempted to be made regarding a reacquisition

21  of the minority interest.

22         Your Honor, I cannot sit here today or stand here

23  today and tell you unequivocally that the support and guaranty

24  agreement was mentioned.  I can tell you that all of the

25  parties that were involved in the discussions were the parties

19

1  to the original support and guaranty agreement and were the

2  same parties that were part of the discussions up to, including

3  and through the bankruptcy.  And therefore, Your Honor, I

4  submit there's a reasonable conclusion, given the magnitude of

5  the dollars involved, that this was something which was not

6  inadvertently omitted.

7          And, Your Honor, I would then -- I would address the

8  other -- some of the other concerns that we have flip flopped.

9  We have not flip flopped, Your Honor, on this issue at all.

10  We have never changed our position that there was an agreement.

11  We've never changed their agreement -- our understanding as to

12  what happened between C-Tech and RCN.

13          THE COURT:  Well, you're telling me that your

14  position was always clear to the debtor and to this Court that

15  the agreement that you've been relying upon was merely a course

16  of dealing, as opposed to a written contract that RCN had

17  signed?

18          MR. TEITELBAUM:  Your Honor -- no, I didn't say that,

19  Your Honor.  What we --

20          THE COURT:  All right.

21          MR. TEITELBAUM:  -- relied upon was we didn't -- we

22  relied upon an agreement.

23          THE COURT:  You don't think that that makes any sort

24  of legal distinction that is perhaps worth noting to the

25  parties and certainly to me?

20

1          MR. TEITELBAUM:  Your Honor --

2          THE COURT:  As opposed to letting me discover it

3 halfway through the litigation?

4          MR. TEITELBAUM:  Well, Your Honor --

5          THE COURT:  By asking you a question?

6          MR. TEITELBAUM:  I understand the question, Your

7 Honor.  The point is that we had a 1997 agreement with C-Tech.

8  It was a spin off.  Whether by operation of law or otherwise,

9 there was a -- there were numerous acknowledgments by RCN that

10 they were bound by the support and guaranty agreement.  The

11 fact of the matter --

12          THE COURT:  When?  When were those numerous

13 acknowledgements -- are they all the ones that are in the

14 record?  Were there any earlier ones that you're aware of?

15          MR. TEITELBAUM:  I'm aware of the August 10th letter

16 that we've attached and provided to Your Honor.  And, Your

17 Honor, based upon my understanding from facts from the client

18 during the course of dealing with the parties, there were

19 acknowledgments that RCN is bound by the support and guaranty

20 agreement; we're not going to do anything; this relationship is

21 important to us.

22          And, Your Honor, if we had to go down the route --

23 and that's why we started talk a little bit about discovery.

24 If we're down there, those are some of the issues that need to

25 be addressed.

1            But, Your Honor, we don't think that we need to get

2    there.  And the reason that we don't believe that we need to

3    get there, Your Honor, is because of the threshold

4    jurisdictional issues that we raised.

5            Milbank has raised -- Mr. Kirpalani has raised at the

6    last hearing an e-mail where he states -- he quoted from an e-

7    mail from Mexican counsel to Mr. Kirpalani that so far -- it's

8    the last line.  And this is Exhibit D to the RCN motion, Your

9    Honor.  "So far Mega Cable has been under the assumption that

10   RCN assumed the S and G agreement, the support and guaranty

11   agreement, without ever having been guided otherwise."  And Mr.

12   Kirpalani concluded or asserted to this Court that that word

13   assumed referred to a 365 assumption.

14           Your Honor, if Your Honor would look at Exhibit D,

15   the second paragraph of that e-mail makes it crystal clear that

16   the word assumed is the reference to assumed by RCN from C-Tech

17   back in 1997.  Moreover, Milbank at that time, obviously

18   bankruptcy experts, knew the fact that if Mr. Rios [Ph.] and

19   Mr. Kirpalani agreed that the document was -- the agreement was

20   somehow, quote, assumed under 365, that's irrelevant.  There

21   was no order ever issued by this Court, assuming or rejecting

22   that agreement and the Bankruptcy Code 365 explicitly requires

23   an order of the court.

24           So the fact is, Your Honor, the reference to this

25   Exhibit D in the debtors' -- in RCN's original motion is

22

1   misleading and irrelevant.  We've never taken the position that

2   the support and guaranty agreement was assumed pursuant to the

3   plan.  In fact, we raised the question with Milbank.  They took

4   a position that of course it's okay.  Don't worry about it.

5   And Mega Cable took an opposite view on that.

6          MR. TEITELBAUM:  To turn, Your Honor, to the -- I

7   think I've addressed or tried to address the issue of a

8   windfall or a forfeiture by -- of what Mr. Kirpalani has

9   referred to legal fiat.  And that's not what we've done.  We're

10  simply seeking, in contractually agreed upon arbitration

11  proceedings, to enforce our rights to reacquire the minority

12  stake.  And as I said, the demand pursuant to the document has

13  to be by -- for the book value or the carry value of the stock,

14  but as we know and we expect, that's not the way arbitration

15  proceedings work.

16         Your Honor, what that takes us to, I believe, is the

17  substance of the threshold issues before the Court which is

18  whether there is in fact jurisdiction.  Not jurisdiction to

19  decide if the support and guaranty agreement was an agreement.

20   Not the jurisdiction to decide if the support and guaranty

21  agreement was an executory contract or not.  That's not what's

22  been asked for here.

23         What we have is a confirmed and substantially

24  consummated plan of reorganization.  Bankruptcy Code Section

25  1141 provides that a plan binds not only the creditors and

23

1 parties in interest, but the debtors to all -- not just the

2 terms they like -- all of the terms and conditions of that

3 plan.  And Judge Bernstein in the Rickle [Ph.] case noted that

4 the confirmation in fact sets the plan in stone.  The whole

5 plan.  Not just the parts that debtor wants are in stone and

6 everything else is kind of still mud, everything is hardened in

7 stone.

8          And that's all we are asking this Court to look at,

9 which is that Article 7 of the plan dealing with executory

10 contracts is crystal clear; if it's not assumed, it's deemed

11 rejected.  Article 14 is crystal clear; obligations not carved

12 out are discharged.  Article 11 on modifications is crystal

13 clear; modifications of the plan after substantial consummation

14 are prohibited and that's obviously consistent with 1127(b).

15          Your Honor, as the second circuit in Victory Markets

16 held, there's nothing for this Court to do.  The plan terms are

17 clear on their face and when they are, there is no reason to

18 try to divine the intent or motivations of the parties to that

19 agreement; particularly when that -- when the purpose of that

20 is to effect the rights of third parties in a proceeding not

21 before the Court and where those third parties, by the way,

22 were never even before the Court.

23          As the court in NTL noted, in that very context, Your

24 Honor, the real issues do not involve the interpretation of the

25 order because the order in that case was clear, but rather its

24

1  affect on the rights of the parties to private contracts.   And

2  the court in NTL, Your Honor, because the case had not been

3  substantially consummated, found that there may have been some

4  minimal impact on the estate, found the matter related to and

5  rather than say I have no jurisdiction, abstained from hearing

6  the matter.

7          And that is a viable alternative for this Court.   Not

8  only do we think that it would be appropriate for the Court to

9  say we have -- I have no jurisdiction, we think that if the

10 Court found that there was some marginal nexus which gave rise

11 to related to jurisdiction, that abstention would be

12 appropriate under the standards set forth in NTL, which as the

13 Court indicated, there would be little impact on the

14 administration of the estate.   Well, quite frankly, there is no

15 estate.   Everything has been distributed in this case.   All the

16 property's been distributed.   The stock has been distributed.

17 I believe Your Honor still has a few claims objections lurking

18 around.

19         State law or other laws predominate.   This is not an

20 issue of bankruptcy law that we're before the Court.   Related

21 proceedings have been commenced.   The arbitration has been

22 commenced.   And this is not a court proceeding before Your

23 Honor.

24         And under those conditions, the court in NTL held

25 that abstention was appropriate and the court refused to render

25

the precisely the type of adversary proceeding that RCN is
asking this Court to do, which is essentially to tell the
arbitrators and decide for the arbitrators fundamental facts
underlying that arbitration.

        The arbitrators, as the court in _NTL_ has held as
well, are able to look at the plan of reorganization which is
the equivalent of a contract under state law and by the
unequivocal terms of that contract, figure out what it means.
They don't, with all due respect, need an opinion of this Court
to tell them what the explicit words of the plan mean, and that
has been the holding in the cases that we have cited in our
brief, including _NTL_.

        And based upon some of those issues, Your Honor, we
raise the Article III issue, which is there is no justiciable
controversy.  Why?  Because there's nothing -- there's no
ruling here that will have an impact upon the parties before
the Court.

        The fact of the matter is there's no estate.  RCN is
seeking a decision for the benefit of a third party, not for
itself.  It's admitted in paragraph 37 of its motion that
the -- that it will have absolutely no impact upon the
administration of the cases.  It in fact can't.  The cases are
fully administered.

        So that was the predicate, Your Honor, for our
Article III justiciable controversy threshold point.  We also

26

1  raise, Your Honor, 1334 and 157 that there is no jurisdiction.

2   Both parties concede that obviously this Court is court of

3  limited jurisdiction determined by those provisions, but where

4  we differ, Your Honor, is RCN asserts that anytime a debtor

5  passes through the halls of this Court and gets an order, it

6  has the ability to come back to this Court and ask that court

7  what does the -- please interpret and enforce the order.  And

8  not only does this Court have jurisdiction, but if that

9  original order was rendered in court proceedings, as this

10  admittedly was, it was a confirmation order, then the

11  subsequent request is similarly a court proceeding.

12          Well, Your Honor, that's just not the case.  That's

13  just not the law.  The fact of the matter is the third circuit

14  recently in Resorts International, the second circuit in

15  PSINet, have said that in the post-confirmation context, the

16  request for the interpretation or enforcement needs to go to

17  essentially one of two things; has to arise by a substantive

18  right created by the code, such as preference action, just by

19  way of example, or go to the core of the bankruptcy.  What is

20  it that the bankruptcy court was trying to do and accomplish?

21  For example, deal with inter-creditor issues, resolve creditor

22  claims.

23          None of that is before you, Your Honor.  And

24  therefore, it's a stretch and it's inappropriate we would

25  submit for the debtor -- for RCN to suggest that anytime they

27

1  come before this Court seeking a, quote, interpretation or

2  enforcement of any order that this Court has ever issued, this

3  Court should entertain that as jurisdictionally correct and/or

4  in particular, a court proceeding.

5          Now, the motion was not brought under any substantive

6  right under the code.  It was brought under Rule 60(b) of the

7  Federal Rules of Civil Procedure.  As I said, there is no

8  estate to administer, so there's at best an argument that this

9  maybe have -- may have been related to the prior bankruptcy at

10 best.  But given the tenuous nature of the fact that this

11 motion can affect the estate, we have submitted, Your Honor,

12 that there is not even related to jurisdiction.

13         And, Your Honor, the cases cited by the -- by RCN

14 actually highlight the point.  For example, there was much

15 emphasis placed upon the seventh circuit decision in Cox v.

16 Zale Jewelers and what the court there was dealing with was not

17 a simple, as was characterized, $200 post-confirmation dispute

18 that the court took jurisdiction on.  In that case, yeah, it

19 was substantially consummated.  But it was a class action

20 brought by a group of discharged Chapter 7 debtors who owed

21 money to Zale Jewelers.

22         There was a reaffirmation agreement with Zale

23 Jewelers -- reaffirmation agreements with Zale Jewelers which

24 was never filed or followed procedures as required under 524©).

25  So this group of class action plaintiffs came back and said,

28

1  "Your Honor, we need you to enforce the provisions of our

2  discharge and the code."  And what the seventh circuit said in

3  that context was the remedies against debt affirmation

4  agreements contended to violated the bankruptcy code are a

5  matter exclusively of federal law -- federal bankruptcy law,

6  I'm sorry.  That was a case that was materially different.

7  There are no exclusive federal bankruptcy law issues, and

8  therefore the --

9          THE COURT:  Aren't you asking the arbitrators to

10 determine the effect of a discharge under 1141?

11         MR. TEITELBAUM:  To the extent that we are, Your

12 Honor, the case law holds that discharge in bankruptcy is

13 always a defense that state court and other courts are fully

14 capable of ascertaining.  It's not for a bankruptcy court to

15 render an advisory opinion for another court to determine the

16 effect of a discharge.  That's --

17         THE COURT:  And you say that the bankruptcy court

18 lacks jurisdiction to determine that issue?

19         MR. TEITELBAUM:  Your Honor, what I -- what we have

20 submitted is that there is -- it would not be an appropriate

21 exercise if there were jurisdiction, which we don't believe in

22 this case and I'll address that, but to your question, if there

23 were jurisdiction, that's what abstention is for and that's

24 what NTL says.  Because discharge is an appropriate defense

25 that's raised in -- not even ancillary because that's a term of

1  art, obviously -- in non-bankruptcy proceedings.  And where

2  there's a confirmed plan which is on its face clear and

3  unambiguous, courts that we've cited in our -- cases we've

4  cited in our memo of law have held that those courts are

5  perfectly capable just as if it were a contract or release

6  provision in a contract to ascertain what does that lease

7  provision mean, what is the extent and effect of it.

8        And, Your Honor, to the jurisdictional point, even if

9  we were to assume for a second that the umbrella of

10 jurisdiction is broad enough to deal with any action brought

11 before Your Honor to interpret or enforce a prior order, RCN's

12 reliance upon Petrie makes the point for us we believe.  As we

13 -- as I think I said a couple of times, there's nothing here to

14 interpret.  The words are clear.  They're not even asking for

15 enforcement, as was the case in Petrie.

16       In Petrie, Your Honor -- and I know Your Honor knows

17 the case, but I'll just very quickly.  In that case, there was

18 a creditor that was attempting to assert a claim against the

19 debtor based upon a lease.  The court was faced with is this a

20 valid claim in connection with the debtor's attempt to assume

21 and assign that lease to a third party.

22       In connection with the 363 order -- in connection

23 with the assumption and assignment order, Your Honor, the court

24 issued an injunction and said to the creditor "You can't pursue

25 this claim.  I've determined that this claim doesn't exist or

30

1   is discharged and the new party is taking it free and clear."

2          Well, post -- and that agreement and that order was

3   embodied in the plan of reorganization.  Post-confirmation,

4   that creditor went after the assignee.  The parties then were

5   back before the bankruptcy court to specifically deal with the

6   force of the injunction.

7          And what the court in _Petrie_ -- in the second circuit

8   _Petrie_ found in exercising jurisdiction -- and it didn't do

9   this lightly.  It found three criteria which are absent in this

10  case.  The dispute in the case was based upon rights

11  established in the prior sale order.  The consummation motion,

12  which was the interpretation motion, sought enforcement of a

13  pre-existing injunction issued as part of a bankruptcy court

14  sale order.  And the dispute involved an issue that was already

15  directly before the court.

16         And what the second circuit concluded was that as

17  such it is uniquely affected and was uniquely affected by the

18  bankruptcy court's core functions of determining claims and

19  administering the estate.

20         We were never before Your Honor in the course of the

21  bankruptcy case, Your Honor.  There were no claims adjudicated

22  by Your Honor in connection with my clients.  We -- there was

23  no core order issued by this Court which affected us.

24         THE COURT:  Wait a minute.  You are relying on the

25  order confirming the plan and the plan itself.  What are you

31

1 talking about?

2          MR. TEITELBAUM:  We were bound by the final order

3 confirming the plan --

4          THE COURT:  Which you're relying on.

5          MR. TEITELBAUM:  We were bound --

6          THE COURT:  Which you're relying on.

7          MR. TEITELBAUM:  We're not --

8          THE COURT:  Yes.

9          MR. TEITELBAUM:  -- trying to get around that order.

10 But the difference between us and in Petrie, Your Honor, and

11 the reason that the court in Petrie exercised jurisdiction is

12 because it dealt with the specific issue head on during the

13 course of the case as a core proceeding.  That didn't happen

14 here.

15          And just in Wood, the fifth circuit case -- and I'm

16 just trying to hit the couple of cases that Mr. Kirpalani

17 addressed at the last hearing.  That case held -- and I think

18 Your Honor's alluded to this -- don't I have jurisdiction to

19 determine if the debtor's discharged.  Well, in Wood, the fifth

20 circuit said yes.  But what happened in Wood?  That wasn't a

21 post-confirmation dispute.  That was an adversary proceeding

22 commenced during the course of the case alleging fraud which

23 went to discharge issues.  That was a core function.  That's

24 not what we have here.

25          And the point that I keep coming back to is that even

32

1    if there's an argument that there's some nexus such that this

2    is related to, the fact of the matter is there is no

3    jurisdiction because there's nothing to interpret and nothing

4    to enforce.

5           Your Honor --

6           THE COURT:  So you would leave Rule 60(b) out of any

7    order I issue --

8           MR. TEITELBAUM:  Absolutely not.

9           THE COURT:  -- post --

10          MR. TEITELBAUM:  Absolutely --

11          THE COURT:  Post-confirmation, you're saying it

12   doesn't apply to any order I issue?

13          MR. TEITELBAUM:  Absolutely not.  I'm not saying that

14   at all.  I am saying that under 28 USC 2075, to the extent that

15   rules conflict with the substantive provisions of the code, the

16   code wins.  And what 1127 says -- and what even the cases that

17   RCN has cited say, pre-substantial consummation, the court will

18   consider a modification of confirmation order under the

19   parameters and under the guidelines or Rule 60(b) motions;

20   excusable neglect, inadvertence, et cetera.

21          But -- and to the extent that those two provisions

22   can co-exist, that's -- we're perfectly fine with that and

23   that's what the law is.  But, once you hit the substantial

24   consummation point, 1127 is crystal clear, as was Article 11 of

25   the plan; no modifications of the plan.

33

1          And in fact, Your Honor, in -- I referred earlier to

2    Judge Bernstein in _Rickle_ and he was faced with this issue and

3    it was a tough case.  And the reason it was a very tough case

4    was he acknowledged in that case that the modification of the

5    order in a matter where there was substantial consummation was

6    to allow the debtors to take found money and distribute it to

7    equity.  And Judge Bernstein said, "No one's ox is being gored

8    here."  You know, "There's no reason that I shouldn't do this,

9    except I can't do it."  "And the reason I can't do it," he

10   said, "is that a debtor cannot circumvent 1127(b) and change

11   the plan simply by calling its request a motion to modify the

12   confirmation order."

13         And where the debtors allege that the court could

14   modify the order pursuant to either its equitable powers in the

15   105 or Rule 60(b), the court -- Judge Bernstein said, "Neither

16   contention has merit.  A bankruptcy court cannot exercise its

17   equitable powers outside the confines of the bankruptcy code or

18   disregard its specific commands."  That's --

19         THE COURT:  What party in interest in connection with

20   the plan is affected in any way by modification of this order?

21

22         MR. TEITELBAUM:  I'm not aware of any party in

23   interest that would be affected by a -- well, we would be

24   affected to the extent, Your Honor, that we relied upon the

25   plan.

34

1          THE COURT:  Only --

2          MR. TEITELBAUM:  And we would be --

3          THE COURT:  Only in the way that they purport -- only

4    in the way that your clients purport they want to be affected.

5          MR. TEITELBAUM:  Well, but, Your Honor, the fact is

6    that that's not a legal fiat, that's what -- we didn't draft

7    the plan.  They did.  We had no duty to come in and say hey,

8    you got --

9          THE COURT:  All right, I think you've answered my

10   question.

11         MR. TEITELBAUM:  Your Honor, we -- Your Honor, the --

12   dealing with -- well, we jumped to the modification issue and

13   Rule 60(b) and that -- we don't believe that Rule 60(b) is an

14   appropriate vehicle here and if we get to down to brass tax

15   essentially, since there is no clarification sought, because

16   the words are clear on their face, what is being asked, as is

17   in the wherefor clause of the initial motion, is a modification

18   of the plan to provide for an explicit assumption of the

19   agreement.

20         Your Honor, time has passed and I will further submit

21   that it's inappropriate to do it at this point because what

22   does that mean?  It gets opened up to the world?  We didn't

23   have a chance to vote on the plan.  If the plan is now changed

24   to be modified such that this is deemed an executory

25   contract --

35

1        THE COURT:  Why would you have a right to vote on the

2  plan?

3        MR. TEITELBAUM:  Well, if our rights were arguably --

4        THE COURT:  You've already acknowledged there was no

5  claim.

6        MR. TEITELBAUM:  But, Your Honor, if we're turning

7  back the hands of time, essentially, and creating an executory

8  contract that the debtors want to either assume or reject, we

9  would have rights under the bankruptcy code to be before you.

10  We were not.  We did not have those rights at that time.  We

11  received publication notice of the plan and we relied upon the

12  plan, and we're now seeking to have the plan enforced according

13  to its terms.  We're not looking for any modification or any

14  changes of the plan.

15        Your Honor, the -- perhaps the last point, because

16  I've been up here a bit, that I'd like to make is that the

17  agreements that are at play here -- arguably at least the

18  support and guaranty agreement, the subscription and the

19  shareholder agreements which are agreements between non-debtor

20  entities -- are governed by the Federal Arbitration Act as

21  specific provisions in the agreements that say any disputes,

22  including any dispute relating to whether the agreements have

23  been breached or terminated, shall be determined by arbitration

24  and the parties to that agreement are also parties to the

25  convention on the recognition and enforcement of foreign

36

1  arbitral awards.  And as the second circuit held in <u>NBC v.</u>

2  <u>Stern</u>, arbitration in those circumstances is appropriate.

3        And, Your Honor, as the southern district has held in

4  <u>Winamo</u> [Ph.] where a matter is even core, arbitration should be

5  enforced where it's related to --

6        THE COURT:  What agreement is RCN a party to that

7  requires arbitration?

8        MR. TEITELBAUM:  Well, Your Honor, that's why I said

9  arguably the support and guaranty agreement because that is

10  obviously a issue of dispute right now, but --

11        THE COURT:  Well, does -- is it -- does it require

12  arbitration?

13        MR. TEITELBAUM:  The S and G agreement?  There is

14  an --

15        THE COURT:  Yes.

16        MR. TEITELBAUM:  -- arbitration clause in that

17  agreement, yes, sir.  And that clause in that agreement is

18  identical to the clause which the Southern District of New York

19  in <u>Newbridge Acquisition</u> held was broad enough to require

20  courts to require arbitration.  Oddly enough, that was --

21  <u>Newbridge Acquisition</u> was a case involving shareholder interest

22  with a Mexican counter party and American counter parties and

23  the issue was would an arbitration be required.

24        Your Honor, the fact of the matter is that whether or

25  not the matter is core, even if we assume for a second that it

37

1   is core, it's not core in the way of going through the

2   fundamental proceedings before this Court.  So as the court in

3   Hagerstown held, the arbitration of a procedurally core dispute

4   rarely conflicts with any policy of the bankruptcy code.  And

5   in that court, distinguish the case of U.S. Lines, the court

6   required arbitration.

7           Your Honor, and U.S. Lines contains a similar clause,

8   but in contrast, because the issue at arbitration in that case

9   dealt with the proceeds of an insurance policy that provided

10  the sole basis for paying creditors, the court held onto it and

11  didn't send it to arbitration.  We don't have that here, Your

12  Honor.

13          Your Honor --

14          THE COURT:  Well, RCN is not a party to the

15  arbitration in Paris, is it?

16          MR. TEITELBAUM:  RCN has not -- no, the arbitration

17  in Paris is between Mega Cable, MCM Holdings and RCN

18  International.

19          But, Your Honor, what our -- the point is that to the

20  extent that there needs to be a determination of whether or not

21  there was a breach of the support and guaranty agreement, that

22  also is subject to arbitration.  And that was --

23          THE COURT:  And also you believe that the effect of

24  1141 is covered by the arbitration clause?  And that's what

25  they should be determining too?

38

1           MR. TEITELBAUM:  The effect of the discharge

2    provisions of 1141?  Yes, Your Honor.

3           THE COURT:  Yeah.

4           MR. TEITELBAUM:  Yes, sir, and that --

5           THE COURT:  Okay.

6           MR. TEITELBAUM:  And that's what the court in NTL

7    specifically held is not the interpretation of the order, but

8    how the order affects the rights of other parties.

9           THE COURT:  Wait a minute.  You're saying that Judge

10   Gropper held that in NTL?

11          MR. TEITELBAUM:  In NTL, Your Honor --

12          THE COURT:  There was no arbitration in NTL.  He let

13   it go to the --

14          MR. TEITELBAUM:  It was a --

15          THE COURT:  -- on an abstention basis.  He didn't --

16          MR. TEITELBAUM:  It was a --

17          THE COURT:  He wasn't applying the Arbitration Act.

18          MR. TEITELBAUM:  It was a state court -- I'm sorry,

19   Your Honor, it was a state court matter that was abstained.

20   But the concept was the same, it wasn't an arbitration.  The

21   concept was the court wasn't rendering an advisory opinion for

22   another body to determine whether the discharge applied or

23   didn't apply.  I apologize, I did get that confused with the

24   Winamo case.

25          Your Honor --

39

1          THE COURT:  Okay.

2          MR. TEITELBAUM:  -- I thank you for your time and I

3    would ask that the motion of RCN be denied.

4          THE COURT:  Okay.

5          MR. KIRPALANI:  Thank you, Your Honor.  Susheel

6    Kirpalani of Milbank, Tweed on behalf of reorganized RCN.

7          Your Honor, I've been thinking about how to present

8    this since the last time we were here and there were a lot of

9    statements about -- from Mega Cable side saying that RCN has

10   been flip flopping and -- so, in all honesty, I asked my second

11   grade year old daughter who flip flops with me a lot, you know,

12   what do you think?  How should I talk to the Judge today?  And

13   she said, "Why don't you just tell him everything that happened

14   and if you really were in the right, it'll come out okay."

15         So, with respect to the e-mail that Mr. Teitelbaum

16   mentioned that we cited in our papers, I really think it's

17   critical to understand the genesis of that exchange, the

18   genesis of my partner, Tom Janson's letter, because I think it

19   provides the really relevant picture for the Court.

20         It was June 22nd and I received a call from Mexican

21   counsel to Mega Cable.  Following that, I wrote an e-mail to

22   him, saying:

23   "Ricardo, it was nice talking to you.  I'm sure we

24         can sort this issue out.  Let me just take

25         a look at the relevant agreement and to the

40

1          extent RCN Corp. is really a party, we can

2          determine how best to clarify that it was

3          unaffected by the bankruptcy with the US

4          Court.  As discussed, we don't believe RCN

5          Corp. was a party to any agreement.  We

6          believe it was a non-debtor entity.  In the

7          interest of time, could you please send us

8          a copy of the agreement you believe is with

9          RCN Corp.  We will turn to this right

10         away."

11         It was Mega Cable's counsel that told us there is an

12  agreement and then we started scrambling to find it.

13         Immediately after that, Mr. Rios wrote to me, saying:

14  "Susheel, while we put the contract in digital form,

15         here's the reference:  Support and guaranty

16         agreement; parties, C-Tech Corporation, now

17         RCN Corporation, Mega Cable and the private

18         shareholders; January 19th, 1995."

19         I wrote back the same day a few minutes later:

20  "Ricardo, I think there may be some confusion.  It is

21         not my understanding that C-Tech Corp. is

22         the same entity as RCN Corp.  I believe C-

23         Tech Corp. is a separate entity and remains

24         a non-debtor company.  If we can confirm

25         this to you, would it solve the confusion?"

1          Because, Judge, we really were confused as to where
2    this was going.  For example, there were four other executory
3    contract parties that contacted us and said, "Oops, I think you
4    mistakenly might have rejected our contract.  We had an
5    agreement with you.  It was an unsigned or we couldn't find it
6    or you didn't find it.  Can you do a stipulation if you really
7    intended to assume it?  We assume you did because you've been
8    performing it."  We said, "Yes, sure.  Of course, that's what
9    we intended to do.  It was mistake."  And we submitted those
10   stipulations to the Court.  I remember HBO was one of them that
11   I had reviewed.
12          Mr. Rios wrote back again the same day:
13   "Indeed, it will be very useful to know what exactly
14          happened because it seems that after a
15          spinoff or some sort of corporate
16          reorganization, RCN assumed C-Tech's
17          obligations."
18          In response, I wrote -- this is all the same day as
19   that very e-mail.  These are the precursors it.  I wrote to
20   him:
21   "There was a spinoff of a portion of C-Tech, but I
22          don't believe this obligation ever left C-
23          Tech.  I will confirm, but please let me
24          know if you are relying on any specific
25          assumption assignment of the agreement.  We

42

1              do not believe it ever occurred, but you

2              may have a document that we don't have.

3              Thanks."

4          Because again, we really weren't sure what their

5    motives or what the intent was here, so we're just trying to

6    make sure they understood that the bottom line is we didn't

7    intend to do anything to Mega Cable and if you've got an

8    agreement, show it to us.  We'll go to Your Honor and we'll fix

9    it.  At no time did they say no, no, no, we don't want you to

10   fix it.  They just said, "Well, you have to tell us exactly

11   what happened here."

12         Mr. Rios wrote that final e-mail, which is the one

13   that Mr. Teitelbaum was discussing, saying:

14   "It seems that in 1997 C-Tech Corp. distributed 100

15              percent of the shares it held in RCN Corp.

16              to its own shareholders.  If so, what is C-

17              Tech Corp.'s role now?  If the S and G

18              agreement was assigned by C-Tech to RCN

19              Corp. or if the latter assumed that

20              contract, did it ask for Mega Cable's

21              consent in either case?  Not that we know

22              of.  If, on the other hand, the contract

23              was somehow transferred to RCN Corp., how

24              did the bankruptcy proceeding affect it as

25              we discussed this morning?  If not, the

43

1    issue would be the original intent of Mega

2    Cable to execute the transaction documents

3    with the continuing support of a real

4    holding company having the means to back

5    RCN International's commitments thereunder.

6     So far, Mega Cable has been under the

7    assumption that RCN assumed the S and G

8    agreement without ever having been guided

9    otherwise."

10   I appreciate your indulgence, Your Honor.  That ends

11 the background and kind of the whole truth, the whole story.

12 The reason I raised it is Mr. Teitelbaum said -- we quoted this

13 -- "So far Mega Cable has been under the assumption that RCN

14 assumed the S and G agreement without having ever been guided

15 otherwise" for a reason that we didn't cite it.

16   We're citing it, Your Honor, to show there's no

17 detrimental reliance.  That's the reason that we cite it.  It

18 was really for no other reason.

19   It was to show really consistent with the UAL

20 decision in the seventh circuit, Your Honor, which was an

21 1110(a) case.  And in that case, the debtor mistakenly didn't

22 abandon three aircraft leases.  The methodology was if we owe

23 money, we're abandoning it.  If we don't owe money, we'll take

24 it.  Might as well take it.  And three banks had seen that

25 their particular leases were not abandoned and then said, "Ah

44

1  ha, you owe us big money on these leases."  And the debtor

2  said, "Oh, we made a mistake.  If we had known that we were

3  owing you money, we would have abandoned them."  And they filed

4  a motion for 60(b).

5        And the seventh circuit held one of the key things to

6  think about is whether the airplane owners had relied to their

7  detriment on it.  Because if so, the debtors would not be

8  entitled to this type of relief.  But ultimately it concluded

9  that we agree with the bankruptcy court this is a case of

10 excusable neglect within the meaning of Rule 60(b).

11       Your Honor, the point in 1110 that's important for

12 the dispute today, which is the jurisdictional dispute, is

13 1110(a) goes a lot farther than 1127 goes with respect to what

14 the Court's power is following substantial consummation.

15 1110(a) is clear that after that 60 day period where the debtor

16 must make a decision with respect to its leases, the lessor has

17 the right to repossess their aircraft, period, end of story.

18 And it even says expressly in 1110(a) that that right "Is not

19 limited or otherwise affected by any other provision of this

20 title or by any power of the court," period, end of story.

21       That took jurisdiction arguably away from the court.

22  It can't be more expressed than that to say that that right to

23 repossess or demand payment is not limited by any power of the

24 court.  Eleven twenty-seven doesn't say that.  Doesn't say

25 that, Your Honor.

45

1          And what's really important on the 1127 argument

2    which I tried to touch on last time is what we are talking

3    about here is whether this course of performance or what have

4    you was assumed or rejected.  That's how this all started.

5          The plan itself says in Article 7(a)(2), the

6    confirmation order and scope of assumption:

7    "The confirmation order shall constitute an order of

8              the bankruptcy court under Section 365 of

9              the Bankruptcy Code, approving the contract

10             and lease assumptions and rejections

11             described above as of the effective date."

12         Mr. Teitelbaum already conceded to Your Honor that

13   60(b) is not automatically inapplicable every time a

14   confirmation order is entered.  What he's saying is that it is

15   when it's trying to violate 1127.  We agree.  But we're not

16   violating 1127.  The plan itself says that the confirmation

17   order is a 365 order.

18         We cited cases last time, Your Honor, that Rule 60(b)

19   of course applies under Section 365 orders.  The --

20         THE COURT:  Doesn't the confirmation order also say

21   that to the extent inconsistent, the confirmation order governs

22   over the plan?

23         MR. KIRPALANI:  Yes, it does, Your Honor.  And we are

24   seeking clarification, modification, mistake.  Now we have

25   finally confirmed it was actually a mutual mistake.

46

1          One of the reasons why -- if we can call it flip

2   flopping, one of the reasons why -- I really like to call it we

3   were stabbing ghosts, Your Honor -- is that a ghost came up

4   here and we took a stab at it.  A ghost came up there and we

5   took a stab at it.  And one of the reasons why we've been

6   arguing in the alternative with Mega Cable for the better part

7   of six months is because that's what we were forced to do.

8          We thought they had a contract that they were just

9   not telling us about, as evidence by these e-mails.  They

10  seemed to know that there was some background to these

11  transactions, so we called Davis Poke [Ph.] which was counsel

12  to C-Tech at the time, called Skadden, talked to Jay Alex

13  [Ph.], talked to everybody at the company.  Everyone said the

14  same thing.

15         And the issue on discovery, Your Honor, now that it

16  is stipulated that there is no written contract, that what

17  we're talking about is a course of performance which we agree

18  with, Your Honor, the only issue is whether that footnote that

19  Mega Cable cited in its papers where it said there may be some

20  nefarious motive here, maybe RCN actually wanted to reject the

21  contract so that they could take advantage of various remedies

22  against us and be relieved of certain obligations that they

23  might otherwise have.

24         Well, if that is truly a continuing allegation, even

25  though it's just buried in a footnote, that's the only thing I

47

1  think we need discovery on; otherwise we really don't.  We

2  could bring everybody -- all the participants in the case,

3  including large creditors as to what everyone intended to the

4  extent that's relevant.  We don't think it's really in dispute.

5           Your Honor, another thing to point out though is the

6  shareholder agreement between Mega Cable and RCN International?

7   It contains the same negative covenant that Mr. Teitelbaum is

8  saying that RCN Corp. is bound by -- of course by now a course

9  of performance, not really an executory contract.  And it's for

10  this reason, too, that RCN kept taking the position and

11  continues take the position that there's been no breach here.

12  We're not doing anything that's in violation of any agreement.

13   We've been standing by these obligations since 1997.  The fact

14  that there was no signed agreement never troubled you for eight

15  years.  It's only now because there's a confirmation order, you

16  found some very bright lawyers and they've said, "Hey, we've

17  got you."

18           But, Section 6.1 of the shareholder agreement, Your

19  Honor, says specifically -- and I'm going to substitute the

20  word investor for RCN International:

21  "RCN International hereby covenants and agrees that

22           it shall not and shall cause its

23           affiliates" -- which would include RCN

24           Corp. -- "not to compete in any manner with

25           the company" -- which is Mega Cable -- "or

48

1           any of its subsidiaries by directly or

2           indirectly owning, managing, operating,

3           controlling or being a consultant to,

4           engaging, participating or having any

5           interest in" -- it goes on -- "a cable

6           business in Mexico."

7           So, RCN Corp., as the parent of this very valuable

8  subsidiary, has been abiding by the covenants that are in its

9  subsidiaries' agreements with Mega Cable.  There's never been

10 an allegation that that has actually been breached.

11          And what we're talking about here is whether a legal

12 fiat before this Court terminated obligations of RCN Corp.

13 What flows from that I agree with Mr. Teitelbaum, nobody's

14 asking the Court to try and get into what's actually in the

15 arbitration, except if there's actually falsehoods alleged in

16 the arbitration.  Because we think -- and if it's confusion,

17 that's okay.  It's not really sanctionable.  If it's confusion,

18 let's clear it up.

19          We're not saying that there's something in the

20 confirmation order that needs interpreting per se; that the

21 language is not clear.  We've come clean, Your Honor.  There's

22 a mistake.  There's an error.  Somebody made a judgment or

23 erroneous mistake that this order would have a negative impact

24 on Mega Cable.

25          If that's the case, all we've said -- and we've said

49

1  this since the beginning.  It's in paragraph 8 of our motion.

2  "Upon further investigation, RCN has come to the

3          conclusion that even if it has not executed

4          the assumption" -- which now we have

5          finally learned is the truth -- "it either

6          ratified its obligations under the guaranty

7          agreement through performance" -- which I

8          think is what Mr. Teitelbaum was saying --

9          "or Mega Cable has waived this condition

10         through acceptance of such performance" --

11         because again it happened back in 1997.

12 "In any case, RCN has assured Mega Cable that it

13         never intended to impair its obligations,

14         if any, under the guaranty agreement.  RCN

15         further assured Mega Cable that it was

16         willing to give Mega Cable and its non-RCN

17         shareholders any assurances they desires

18         that RCN and its affiliates fully intended

19         to continue to perform under all of the

20         Mega Cable agreements, including the

21         guaranty agreement."

22         The letter that Mr. Teitelbaum cites in September

23 2004 from Mega Cable to Mr. McCourt doesn't say anything about

24 there being some alleged breach or an unliquidated claim that

25 may be due and owing under an agreement because everybody

50

1  understood that.  And the best evidence of that, Your Honor,

2  which has never been refuted is that e-mail that we started the

3  discussion with; where at the end, he said, "We've never been

4  guided otherwise.  We thought these were all ongoing

5  obligations.  We agree."

6          And so that's why, thinking what best to do, which we

7  offered and told Mr. Rios that we would do, is we'd come to

8  court and we'd clarify don't worry about this.  If this

9  happened or something bad happened, we're going to go fix it

10 because neither you intended it, nor we intended it.  Nor did

11 the creditors intend it.

12         And to the extent, Your Honor, that there is any

13 mistake or anything to clarify or interpret, it's the plan --

14 the plan, the confirmation order.  The plan, Your Honor, is a

15 contract.  That contract is between the debtors and its

16 creditors.  The debtors and its creditors always believed, as

17 discussed in the disclosure statement, this asset was not going

18 to be impaired.

19         Then Mr. Teitelbaum is asking the Court to take the

20 position that because RCN International is the party to a

21 contract with an arbitration clause and because Mega Cable has

22 commenced an arbitration in accordance with that contract with

23 that non-debtor that our debtor in this court -- in your court,

24 Your Honor, is deprived of jurisdiction to ask the Court for

25 help, to ask the Court under Rule 60(b) to fix something that a

51

party in a bizarre twist or kind of an ironic result that it is
seeking, trying to ask the Court to fix what should be a
detriment to a third party and say no, we are not trying to
harm the third party, nothing in the confirmation order would
have done that.

         And it was really a series of these confusions
starting back in June, Your Honor, that resulted in us filing
the papers after it became clear later that there's some sort
of gotcha or some sort of ah ha that now we figured out how to
finally get a cheap sale out of our joint venture partner.

         Your Honor, I think it's very clear from Mr.
Teitelbaum's comments today that there is no executory contract
that was capable of assumption or rejection; that there was if
any -- if there was any mistake, it was in fact mutual, even
post-confirmation.  At no time up until just prior to the
filing of the motion, did we understand that Mega Cable
actually wanted to be discharged, actually wanted to be
impaired, to be rejected because they found some sort of
loophole that they can then try and use against us.

         So, although I do apologize for any inconsistencies
and arguing the alternative and letters that my partners may
have written, the fact remains the same; the intent was always
that we're not impairing this obligation, you know, and this is
really less about the niceties of the technical legal arguments
as it is more about equity.

52

1        And to the extent this is a jurisdictional hearing, I

2   understand that, you know, equity may be nice, but I need to

3   hit it on the merits, Your Honor, and I think we've done that.

4    Think we've done that because even the seventh circuit in the

5   UAL case, you know, clearly had a stronger no jurisdiction

6   argument; 60(b) always can bring us back to court.

7   Jurisdiction is not deprived, you know, in that instance, Your

8   Honor.

9        In terms of the subject matter jurisdiction, the core

10  jurisdiction, even the arbitration petition, even Mr.

11  Teitelbaum today says there are three things that this case is

12  about:  executory contract, rejection and discharge.  Those are

13  core.

14        The fact that a state court, an arbitrator could go

15  and make a determination as to whether a discharge actually

16  took out this particular obligation, that's a separate issue,

17  Your Honor.  You would have concurrent jurisdiction to

18  determine whether your own order actually did affect the

19  discharge.  What would flow from that is really what's going on

20  in the arbitration.

21        They're not even asking the arbitrators, Your Honor,

22  to determine whether there was a discharge.  That's a red

23  herring.  They're saying it occurred.

24        As a matter of fact, Judge -- as a matter of fact, in

25  their arbitration, they're saying this bankruptcy fiat

53

occurred, the plan and the confirmation is clear and the time

to fix it, it's gone.  That's what -- I'm paraphrasing, but

that's what their arbitration petition says.  And so we are

trying to seek this Court's help in fixing the confirmation

order to make it clear that to the extent there are any

obligations, whether it's a course of performance or not, that

those obligations were not impaired by the bankruptcy, they

weren't discharged, there was no contract to be rejected, Your

Honor.

        And we think after you're done with that, if you

would grant us that relief that we've been requesting, we don't

ask you to do anything with respect to the arbitration.  We

think that they should be directed to withdraw it, frankly,

because it would contain falsehoods, but if Your Honor is not

inclined to do that, we will just file our papers in the

arbitration and take that result to them and then let the facts

-- the real facts speak for themselves, Your Honor.

        And unless Your Honor has questions for me about the

case law which I'm prepared to address, the only thing that I

would just raise because it goes back to that jurisdiction

issue and it goes to the 1127 issue, even though I do think

that's also a red herring, is the Judge Brozman case I

discussed last time, the 401 East 89th Street case.  Went

through the facts, Judge, and Your Honor asked Mr. Teitelbaum

"Well, what do you make of the Brozman decision" and Mr.

54

1 Teitelbaum said, "Well, that's a very distinguishable case.

2 And the truth is, Judge" -- and again I'm paraphrasing -- "bad

3 facts make bad law.  And in that case, the debtor's conduct was

4 so reprehensible, it was so inequitable that there had to be

5 jurisdiction."  That just doesn't make sense to me.  There's

6 jurisdiction or there's not jurisdiction.

7       Judge Brozman got it right; 60(b) still exists

8 particularly where the issues in the plan that we're talking

9 about are not even distribution functions.  These are the 365

10 issue, Your Honor.  There's no case in the land that says 60(b)

11 doesn't apply to Section 365.

12       If inequitable conduct creates jurisdiction -- which

13 I don't believe that it necessarily does, I think the

14 jurisdiction exists or it doesn't exist.  But if it ever does,

15 we think that this is the case for it, too, Your Honor.

16       THE COURT:  Okay, thank you.

17       MR. KIRPALANI:  Thank you.

18       MR. TEITELBAUM:  Your Honor, very briefly, if I may?

19  Very briefly.

20       Your Honor certainly can read 401 East 89th Street

21 and see that that case was not a substantial consummation case

22 and Judge Brozman, as I said, was using 50(b) and 1127

23 inconsistently.  I just need to reserve my --

24       THE COURT:  Well, why wasn't it a substantial

25 consummation case?  The share sale had already -- well, I mean

55

1  these were the only people who had not bought their shares back

2  and it's because they didn't get notice.  So why wasn't the

3  plan -- I mean she doesn't say it, but it certainly appears to

4  be a substantially consummated plan.

5              MR. TEITELBAUM:  Your Honor, the point was that I was

6  trying to make is it wasn't clear to me that --

7              THE COURT:  It didn't deal with the issue.

8              MR. TEITELBAUM:  It didn't --

9              THE COURT:  It didn't squarely address 1127.

10             MR. TEITELBAUM:  It did not, nor did the 115 Third

11  Street -- Third Avenue Restaurant case cited in the brief,

12  which RCN says well, they didn't address substantial

13  consummation, so therefore we can assume that it was

14  consummated.  I don't get there.  And --

15             THE COURT:  Okay.

16             MR. TEITELBAUM:  -- Your Honor can read East 89th

17  Street.

18             Very briefly, Your Honor, I do need to reserve my

19  right to the objections of reading e-mails which were not part

20  of any of the motion papers.  I commend Mr. Kirpalani on his

21  kind of My Cousin Vinny intonations with some of, you know, the

22  I shot the clerk to became I shot the clerk?

23             I object to that and to the extent that we're going

24  to take evidence, it should be done appropriately.

25             THE COURT:  That's right.  The evidence will show

56

1  exactly what happened here.

2          MR. TEITELBAUM:  That's right, Your Honor.  The

3  fact --

4          THE COURT:  I have no problem with that whatsoever.

5          MR. TEITELBAUM:  With respect to UAL, Your Honor, two

6  points on that; 60(b) very different.  As we know, UAL is not a

7  case which has even been confirmed.  I happened to represent

8  the DIP lenders in that case and I know the 1110 issues were

9  materially different than we've got here.  We had hundreds and

10 hundreds of lessors, stipulations extending the time under 1110

11 and much confusion on those issues.

12         And that was part of the basis.  The issue there was

13 excusable neglect.  And to that point, to the extent Mr.

14 Kirpalani says we've come clean, it was excusable neglect,

15 well, if that's where we're headed, I would submit to Your

16 Honor that there is some -- nothing more fact sensitive than

17 was the neglect excusable or not.

18         Less than a month ago, the circuit court in Linch

19 [Ph.] held, Your Honor, that the failure to follow the clear

20 dictates of a statute as a matter of law is not excusable

21 neglect.  And, Your Honor, beyond that, the issue is fact

22 specific.  And so, I would submit to Your Honor that if that is

23 where this is all headed, we -- with all due respect to Mr.

24 Kirpalani, it's not just a matter of his word that we came

25 clean and that there would need to be discovery on those

57

1   issues.

2          And one or two final points.  This is not a 365

3   issue.  None of the cases cited by RCN deal with post-

4   confirmation revisions of a plan under the, quote, guise of

5   365.  They dealt with Rule 60(b) dealing with a 365 order.

6          And the one exception, Your Honor, that I'll address

7   on that is Petrie.  But that wasn't a 365 issue, it was an

8   injunction issue under -- that was embodied within the plan.

9          Your Honor, the last point that I want to make is it

10  is about the technical issues and we need to address them, and

11  we need to address whether in fact in the first instance this

12  Court has jurisdiction or doesn't.  I agree with Mr. Kirpalani.

13   Bad acts don't create jurisdiction.  Jurisdiction is created

14  by acts of congress for this court.  And I submit that on the

15  facts as presented in this case, which is that we've got a

16  confirmed, substantially consummated plan that's clear on its

17  face, there is no jurisdiction.  Thank you.

18          THE COURT:  Okay.

19          All right, I have in front of me a motion by the

20  reorganized debtor, RCN Corporation, for an order clarifying

21  certain terms of the confirmation order or in the alternative,

22  modifying certain terms of the confirmation order as it

23  implements RCN's plan, pursuant to Rule 60(b) as incorporated

24  by Bankruptcy Rule 9024.

25          In a pretrial conference, it was determined that the

58

1   objection to the motion by Mega Cable, or really more

2   practically speaking Mega Cable's majority shareholders, who

3   obviously control the corporation, would be dealt with in two

4   parts.  The first part being Mega Cable's objections based on

5   jurisdictional grounds, as well as abstention.  And second if

6   the Court found jurisdiction, then on the merits to the extent

7   that there are remaining factual issues.  And so we have had

8   briefing and oral argument on the first part, on the

9   jurisdictional issues.

10          I note that this is the second hearing on those

11  jurisdictional issues, because at the first hearing, in

12  response to an inquiry by the Court, Mega Cable's counsel

13  revealed for the first time, notwithstanding there having been

14  two prior  conferences in this case and all of the pleadings

15  filed, that there was, in fact, no written contract between RCN

16  Corporation and Mega Cable, although MegaCable in this

17  proceeding and in its Paris arbitration has been asserting that

18  there was a contract with RCN Corp. and claiming that that

19  contract had been rejected pursuant to the Chapter 11 plan and

20  confirmation order.

21          I was, to say the least, dismayed by that revelation

22  and gave counsel for Mega Cable a week to think about the

23  proper course of this litigation.  Mega Cable has done that,

24  and has responded with a letter, dated December 16th, asserting

25  that notwithstanding the absence of a written contract, there

59

1  was a contract between the parties, which was really based on a

2  course of dealing, that had been acknowledged by RCN.

3          What should be noted here is that RCN's

4  "acknowledgment" of such a "course of dealing"  a contract

5  between the parties as referred to in MegaCable's December 16

6  letter was really only an acknowledgment that was made only

7  after the plan was confirmed and after Mega Cable had raised

8  the issue of whether that it said it had a contract with RCN

9  was continuing -- was enforceable after the confirmation of

10  RCN's plan.  And frankly in reviewing the exhibits filed, it

11  seems clear to me that at least on this record, which is only

12  one for purposes of this hearing on whether I have

13  jurisdiction, the response really was one of confusion on RCN's

14  part as to whether in fact there was a contract, but one also

15  of reasonableness, in that RCN, to the extent there was a

16  contract, had no issue in reassuring Mega Cable that it was

17  going to continue to perform it.  That is, making the

18  reasonable assumption that Mega Cable did not want the

19  "contract" breached, RCN responded by trying to moot the issue,

20  by saying it would perform.  It turns out, however, that

21  MegaCable wanted a breach.

22          Mega Cable has raised today certain factual issues

23  related to RCN's knowledge of any sort of course of dealing

24  between the parties and I'll address those later.  But I

25  continue to be dismayed at the position taken by Mega Cable

60

with respect to the way it has described in this litigation

RCN's "obligations."

More particularly, I am very troubled by the notion,

which is clear to me, that notwithstanding, A, Mega Cable's

acknowledgment that there has been no breach, in fact, by RCN

of whatever contract it contends exists, other than a breach as

a result of alleged rejection under section 365, and, B, RCN's

continuing statements whenever asked by Mega Cable whether it

intends to perform this alleged agreement going forward that

RCN does fully intend to perform it,  and, C, the fact that it

appears that this agreement is in no way onerous to Mega Cable,

but in fact if it imposes any obligations on any party, those

obligations are imposed on RCN--  I am quite dismayed that Mega

Cable seems to have seized upon a argument to obtain a

forfeiture, in essence, asserting a breach that has not

occurred, in fact, and asserting concern about future

performance, which it has been assured will occur,  all so that

it can pursue litigation against RCN's subsidiary in Paris

which would provoke, if Mega Cable succeeds, a forfeiture

asserting as the basis for that litigation RCN's breach under

section 365 as allegedly approved by this court.

Mega Cable has made the argument here that this Court

does not have jurisdiction and that RCN's motion should never

have been brought.  As I will discuss in a moment, I disagree

with that point.  I do believe, however, that RCN's motion

61

1  never should have been brought, but I do sobecause the issue

2  that the motion seeks to address should never have been raised

3  by Mega Cable in the first place.

4         And one of the reasons that I find jurisdiction here

5  is that I believe that Mega Cable and its counsel's conduct of

6  the litigation over this issue -- and I include the litigation

7  in Paris -- is a perversion of the Bankruptcy Code and the

8  bankruptcy system in that Mega Cable is trying to seize upon an

9  alleged breach which it acknowledges has not occurred, in fact,

10  of a contract it belatedly acknowledged was only a "course of

11  dealing" and an allegation, which also is not true, that RCN

12  does not intend to perform in the future, and based upon those

13  allegations, has brought an action, the consequences of which

14  will be to deprive RCN's subsidiary, MegaCable's minority

15  shareholder to whom I assume under Mexican law Mega Cable and

16  its majority shareholders owe fiduciary duties, of extremely

17  valuable property rights.

18         I will return at the end of this opinion to the

19  discovery that needs to take place, but I believe based upon

20  what I have seen so far that one of the issues that should be

21  determined here is whether 28 USC § 1927 applies.  I don't say

22  that lightly.  I've only imposed such sanctions once in almost

23  four years, but I'm very concerned about the vexatious

24  multiplication of litigation here over what appears to be a

25  completely trumped up claim.

62

1          The discovery will show whether in fact there's a

2   defense to that allegation.  It has been alleged here, although

3   there's been no support for the allegation, that RCN's failure

4   to list the "course of dealing" in its list of contracts to be

5   assumed under the plan was not inadvertent or mistaken, but

6   rather based on, "nefarious" purposes.  And certainly, Mega

7   Cable should have the right to take discovery on that point.

8   But it ought to ask itself very carefully whether in fact it

9   has a valid legal basis to pursue such as assertion.

10          Now turning to the jurisdictional issues, they should

11  be perceived in context.  RCN was obviously a Chapter 11 debtor

12  in this court.  It confirmed its plan and the plan has been

13  substantially consummated.

14          The plan provided that all executory contracts that

15  were not otherwise identified for assumption or previously

16  assumed in the case would be deemed rejected as of the

17  confirmation of the plan, and that the confirmation order would

18  provide that such rejection would occur under Section 365 of

19  the Code and set forth a bar date for asserting  any rejection

20  damages.  The confirmation order also provided that if there

21  were any inconsistencies between the confirmation order and the

22  plan, the confirmation order would govern.

23          Several months after RCN's plan was confirmed, it

24  appears on this record that in-house counsel for Mega Cable

25  contacted RCN's new counsel, bankruptcy counsel, to discuss the

63

1  effect, if any, of the confirmation of the plan on the

2  continuing relationship between RCN and Mega Cable.

3         As an aside, Mega Cable is a large Mexican

4  corporation controlled by majority shareholders represented by

5  Morgan Lewis in which a subsidiary of RCN has a large minority

6  interest.  I say "large" both in terms of stock and also in

7  terms of value.

8         As described in the disclosure statement of RCN's

9  plan and more than once in RCN's Chapter 11 case, RCN's

10 indirect interest through its subsidiary, RCN International,

11 Inc., was a significant aspect of RCN's estate and the

12 realization on that interest was an important aspect of the

13 reorganization process for the new shareholders of RCN, its

14 former creditors.

15        It appears that Mega Cable asserted post-confirmation

16 that there was an agreement with it to which RCN itself was a

17 party, even though the relationship directly was through RCN

18 International, the minority shareholder -- a so-called "support

19 and guaranty agreement."  It now appears clear, although it

20 apparently didn't at the time to RCN's new counsel, that there

21 was no such written agreement and that the agreement, as

22 acknowledged now by Mega Cable, although not until the Court

23 questioned its counsel at last week's hearing is one only based

24 on an alleged course of dealing arising out of an undertaking

25 in connection with a 1997 transaction whereby C-Tech, the

64

former parent of RCN International, transferred its shares,
pursuant to which, it appears that C-Tech undertook to have RCN
assume C-Tech's obligations under the support and guaranty
agreement.

        In any event, whether any course of dealing agreement
exists or not should be irrelevant, except possibly for the
issue of whether it was reasonably determinable by RCN and its
counsel in connection with the plan and confirmation order--
that is, whether the "course of dealing" should have appeared
on the list of contracts to be assumed under the plan.  I say
that it should be irrevolent because in response to all of the
inquiries, at least in this record, by Mega Cable with respect
to the status of any continuing performance by RCN of any such
agreement, RCN has been crystal clear that it continues to
perform and it will continue to perform what it understands
Mega Cable understands to be the agreement.

        This appeared to be all that Mega Cable wanted and
frankly, it should be all that Mega Cable should want because,
again, as I pointed out before, there does not appear to be any
onerous obligation in return under the agreement on Mega
Cable's behalf.  Rather, the burdens to the extent there are
any belong to RCN under the "course of dealing" agreement.

        Nevertheless, RCN was concerned that in light of a
September 2nd, 2005 letter by Mega Cable asserting a breach of
the agreement as a result of the confirmation of the plan, Mega

65

1  Cable would assert that that alleged breach, notwithstanding

2  RCN's willingness to perform going forward and the absence of

3  any actual breach except for the alleged deemed breach under

4  the confirmation order, would enable Mega Cable to unwind the

5  relationship between RCN International and its majority

6  shareholders and force RCN International to accept a put or a

7  purchase of the shares at book value, which, it is asserted, is

8  considerably less than the actual value of the shares.

9        When this was first brought before me at a pretrial

10 conference, I was concerned that there was no case or

11 controversy actually involved because no such attempt had been

12 made by Mega Cable, and that was one of the issues I asked the

13 parties to address.  Shortly thereafter, however, Mega Cable

14 brought an arbitration in Paris against RCN International,

15 alleging the very issues that RCN had expressed concern about.

16       I've had a chance now to review, since it was

17 provided to me recently, the arbitration petition by Mega Cable

18 and the majority shareholders.  It is clear to me that what

19 they are alleging throughout is that as a result of, A, the

20 plan and the confirmation order providing that the support and

21 guaranty agreement was rejected and B, RCN's discharge under

22 Section 1141 of the Code, Mega Cable indeed has the right to

23 unwind the relationship between the parties and force the

24 purchase of the stock held by RCN International at book value.

25

66

1              The references to RCN's breach of a support and

2    guaranty agreement are pervasive in the arbitration demand.

3    For example, in paragraph 3, page 7, it says:

4    "As discussed below, pursuant to the plan of

5              reorganization and the confirmation order,

6              RCN Corp. was required to either expressly

7              assume the support and guaranty agreement

8              pursuant to the provisions of the

9              Bankruptcy Code or was required to

10             expressly accept its pre-bankruptcy

11             obligations" -- of course it was

12             acknowledged today that there were none --

13             "under the support and guaranty agreement

14             from the discharge provisions of the plan

15             and the Bankruptcy Code.  RCN Corp. did

16             neither, resulting in a breach of the

17             support and guaranty agreement and/or a

18             release of all of RCN Corp.'s obligations

19             under the support and guaranty agreement."

20

21             Similar language appears on page 9 in paragraph 4.3,

22   where again it is alleged that RCN is a party to the support

23   and guaranty agreement and has breached it.  Also it appears in

24   the last paragraph of page 5 of the arbitration demand.

25             And on page 17, again it states:

67

1   "None of the transaction documents, including the

2          support and guaranty agreement" -- which

3          Mega Cable has since acknowledged RCN never

4          signed—"were listed in the schedule of

5          contracts to be assumed under the plan and

6          that this consequently constitutes a

7          breach."

8          Indeed, the arbitration demand goes so far as to

9   state in paragraph 15:

10  "In recent interviews among certain private

11          shareholders" -- I'm assuming that refers

12          to the majority shareholders -- "and

13          certain RCN Corporation officers, RCN Corp.

14          specifically manifested that RCN Corp. was

15          contemplating to file a petition in the

16          bankruptcy court to seek a reaffirmation or

17          assumption of the support and guaranty

18          agreement, regardless of the plaintiff's

19          opinion that it has been breached."

20          And then here is a sentence that really sends me over

21  the top:

22  "Again, RCN Corporation's bad faith is event

23          (phonetic)" -- I assume that means

24          "evident" -- "by virtue of the fact that

25          having decided to reject the support and

68

1          guaranty agreement and now by manifesting

2          the possibility to seek its reaffirmation,

3          shows the arbitrary way in which the

4          original contractual terms of the

5          transaction documents are being manipulated

6          by RCN Corp. without plaintiff's

7          concurrence."

8          You know, at times, I believe, even in large

9   corporate cases and in large law firms, people should live up

10  to the consequences of what they say in print.  And I'm not

11  going to forget this paragraph during the rest of the course of

12  this litigation.  It of course apparently flips on its head all

13  of the equities in this case.

14          The arbitration demand sums up:

15  "The effects of the breach or termination of the

16          support and guaranty agreement is that RCN

17          Corp. no longer has continuing negative

18          covenants or obligations before Mega Cable

19          and the private shareholders who are left

20          without a material inducement to honor the

21          rest of the transaction documents."

22          Of course that completely ignores all of RCN

23  Corporation's undertakings to continue to perform, leaving

24  aside, of course, the history of how this "contract" was

25  represented to this Court by Mega Cable and, I'm assuming, to

69

1   the arbitrators, who I'm assuming will be as dismayed as I am,

2   not as a course of dealing that RCN is prepared to continue to

3   follow, but, apparently falsely, as a written agreement

4   consciously breached.

5           Now as to the jurisdictional point.  Oh, I do want to

6   raise one other point first because again I think people's

7   words should be given the importance that they aspire to.

8           And again discovery will show this or not.  But it is

9   alleged at paragraph -- well, in paragraph little Roman ii on

10  page 3 of Mega Cable's objection:

11  "Notwithstanding RCN's specious" -- that's a quote --

12          "conclusory statements to the contrary, RCN

13          knew or should have known that it was a

14          party to the S and G agreement."

15          Discovery will show whether RCN's reservations as to

16  the existence of a contract with Mega Cable were in fact

17  specious or whether Mega Cable's statement itself was specious.

18

19          Turning to the jurisdictional points.  Both parties

20  recognize that the leading case for the jurisdictional issues

21  is the Second Circuit's opinion In re Petrie Retail, 304 F.3d

22  223 (2d Cir. 2002), where post-consummation of a plan, the

23  bankruptcy court was asked to enjoin a third party from

24  proceeding with litigation against another third party, the

25  purchaser of the debtor's lease.

70

As the Second Circuit noted:

"Whether a contract proceeding is core under Section

1334 depends on, one, whether the contract

is antecedent to the reorganization

petition and, two, the degree to which the

proceeding is independent of the

reorganization."

The second prong of the inquiry hinges on the nature

of the proceeding:

"Proceedings can be core by virtue of their nature if

either, one, the type of proceeding is

unique to or uniquely affected by the

bankruptcy proceedings or, two, the

proceedings directly affect the core

bankruptcy function."

The Second Circuit goes on to say:

"The plan consummation motion in this case involves a

post-petition dispute that arose over a

pre-petition lease.  The fact that the

lease was executed pre-petition and that

the dispute between Luan and Marianne could

arise outside of bankruptcy proceedings

weighs against its core status" -- and

that's the case here as well.

"However" -- the Second Circuit continues -- "due to

71

1            a combination of factors, the contract

2            dispute in this case was not independent of

3            the reorganization.  Accordingly, the

4            impact of the plan consummation motion on

5            other core bankruptcy functions renders it

6            core."

7       The Second Circuit in weighing the factors that were

8  applicable there, saw three:

9  "First, the dispute in this case was based on rights

10           established in the sale order."

11      Of course here, the dispute is based upon rights

12 established by the confirmation order and the plan, --the two

13 central documents of RCN's Chapter 11 case—as well as the

14 effect of a discharge under section 1141.

15 "Second, the plan consummation motion sought

16           enforcement of a preexisting injunction

17           issued as part of the bankruptcy court sale

18           order and confirmation order."

19      Mega Cable argues that since there is no particular

20 injunction here that is being breached, this factor's absence

21 requires me to find that there is no post-consummation

22 jurisdiction.  I disagree.  I do not believe that the court was

23 hanging its ruling on the fact that this was a injunction

24 order, but rather that there was an order sought to be

25 enforced.

72

1          I take that from the next sentence in the quote,

2    which is:

3    "A bankruptcy court retains post-confirmation

4              jurisdiction to interpret and enforce its

5              own orders.  Particularly when disputes

6              arise over a bankruptcy plan of

7              reorganization."

8          I believe here, as I will discuss in a minute when I

9    specifically address Rule 60(b), that is appropriate.

10   Particularly given what I view to be so far on this record a

11   bad faith manipulation of the Bankruptcy Code and the Court by

12   Mega Cable.

13         The third factor was that the dispute between the

14   parties was already before the bankruptcy court as part of the

15   consideration of a party's claim against the estate.  Here,

16   there was no dispute pending prior to the confirmation of the

17   plan, and, therefore, Mega Cable argues that this factor

18   doesn't apply, either.  However, again there appears to me to

19   be nothing more "core" than the determination whether a

20   contract is executory and subject to rejection under Section

21   365 and the effect of a discharge under section 1141 of the

22   Bankruptcy Code, the two wrongs that Mega Cable is asserting in

23   front of the Paris arbitrators occurred here.

24         And so, therefore, again, as the court made clear in

25   Petrie, this factor relates more to the fact that the court was

73

dealing with core functions and I believe, as I said, there's

nothing more of a core bankruptcy function, than what is

occurring here, which is the implementation of -- or in this

case, the alleged attempted perversion by Mega Cable of --the

confirmation order.

Mega Cable also argues that this matter will have no

effect on the debtor, primarily because the debtor has emerged

from bankruptcy, and, therefore, that this is not a matter that

I should take jurisdiction over.  Judge Jacobs' dissent in

Petrie made the point, which is certainly a legitimate one,

that in Petrie, the dispute between the two third parties would

have no impact whatsoever upon the debtor or the recovery by

creditors.  Notwithstanding that cogent argument, however, the

majority in Petrie found jurisdiction under section 1334.

But in any event, here, the impact of Mega Cable's

interpretation of section 1141 of the Bankruptcy Code and the

plan and confirmation order would have a substantial impact

upon RCN's former creditors, who are now RCN's shareholders

pursuant to the plan.  And so to the extent that that point has

any relevance as set forth in Judge Jacobs' dissent, I do not

find under the facts here that it applies.

Given the holding in Petrie, I don't believe that the

assertion of a lack of jurisdiction prevails here.  I will note

again that the interpretation of the effect of a discharge and

the consequences of post-petition -- I'm sorry, post-

74

1  consummation performance notwithstanding the discharge, I

2  believe, are core bankruptcy functions and have been so

3  recognized by the Second Circuit and other courts.

4        I note -- and this may not be a case particularly

5  familiar to those who practice in the corporate context, but

6  the Second Circuit in In re Boodrow, 126 F.3d 43 (2d Cir.

7  1997), has held that notwithstanding a discharge and

8  notwithstanding the fact that a debtor did not reaffirm a debt,

9  the debtor could keep the benefits of a lender's collateral so

10 long as the debtor performed without default, pre-and post-

11 discharge, which of course is exactly what RCN has been doing

12 and says that it will continue to do.  The Second Circuit had

13 no problem whatsoever finding jurisdiction in Boodrow.

14       I'll also note a similar issue that arose in In re

15 Kewanee Boiler Corporation, 270 B.R. 912 (Bankr. ND Ill. 2002),

16 in which the court determined that it had jurisdiction with

17 respect to whether a party had rights under an indemnification

18 agreement or not, despite the discharge.

19       That court had the benefit of the Seventh Circuit's

20 opinion in Cox v. Zale Delaware, Inc., 239 F.3d 910 and 917.

21 In light of that opinion, which found core jurisdiction, found

22 that it kept jurisdiction, notwithstanding the fact that the

23 debtor had raised the discharge in state court litigation.

24       Let me turn briefly to the argument that I should

25 abstain in this case because there is a pending arbitration

75

proceeding.  Mega Cable has argued primarily for that

proposition on the basis of Judge Gropper's opinion in In re

NTL Corporation, 295 B.R. 706 (Bankr. S.D.N.Y 2003).

          I note before addressing the particular facts of that

case that in that case Judge Gropper found post-confirmation

jurisdiction in response to a motion by the debtors to

"clarify" one of his orders with respect to a modification of

the plan that had permitted trading -- I'm sorry, that

permitted a lower number of shares or a different number of

shares to be issued, that the court had jurisdiction to grant

the relief requested,  finding that the court had a strong

interest in the integrity and reliability of its orders.  It

abstained -- or Judge Gropper abstained --as is clear from the

facts of the case, because of the particular facts, which it is

very clear from the opinion were a plethora of litigations that

could best be decided in one uniform proceeding, that did not

involve the debtor, but involved numerous other third parties,

including brokers and subsequent transferees who had nothing to

do even with the initial transferees, in a omnibus state court

proceeding.

          I find the facts of NTL to be distinguishable, and I

believe that since the key issue here and really the only issue

raised in the arbitration is an interpretation of the effect of

Bankruptcy Code section 1141 and the confirmation order and

plan, it makes all the sense in the world to keep the case

76

1   here.  If there is any issue as to a multiplication of

2   proceedings, it seems to me that the arbitrators would

3   logically await the decision of the judge that issued the order

4   at issue, and the judge that is familiar with section 1141,

5   before they went forward.

6          It is also argued by Mega Cable that what is being

7   sought here under the guise of Rule 60(b) is in fact a

8   modification of RCN's plan under Section 1127.  Section 1127(b)

9   provides that the proponent of a plan or the reorganized debtor

10  may modify such plan at any time after confirmation of such

11  plan and before substantial consummation of such plan, but may

12  not modify such plan -- and then it goes on, but the key

13  language is the suggestion that a plan cannot be modified after

14  substantial consummation.

15         The issue here is, is the relief sought by RCN a

16  modification of the plan, because it's conceded by all parties

17  that the plan has been substantially consummated.

18         Certainly as to the interpretation of the effect of

19  the discharge under 1141, which is one of the grounds that Mega

20  Cable relies upon in its -- one of the two grounds that it

21  relies upon in its arbitration, that is not the case.  That's

22  simply an interpretation of the law.  And I certainly have

23  jurisdiction to do that, and it doesn't affect modification of

24  the plan in any respect to determine whether the discharge here

25  precludes RCN from performing the "course of dealing" on a

77

going forward basis, pursuant to the course of dealing that it

has allegedly continued post-petition, if it were to show that

it has so established one or otherwise --particularly, of

course, based on the equities, which is that Mega Cable is at

one and the same time basing its claims of breach on RCN's

failure to perform post-confirmation and at the same time

refusing RCN's performance.

The remaining issue is whether Section 1127(b) of the

Bankruptcy Code trumps Rule 60(b)-- which as we know provides

that on motion one may seek relief from a final judgment, order

or proceeding for mistake, inadvertence, surprise or excusable

neglect, provided it's made within a reasonable time-- with

regard to the other issue raised by Mega Cable in the

arbitration-- the alleged deemed rejection of the support and

gurantee "agreement" under the plan and the confirmation order.

As former Chief Judge Brozman held in 401 East 89th

Street Owners, Inc., 223 B.R. 75 (Bankr. S.D.N.Y 1998),

confirmation of a plan of reorganization has the equivalent

effect of a final judgment by the court, binding both the

debtor and its creditors.  Res judicata principles apply to

confirmed plans to bar the re-litigation of issues that were or

could have been raised in the confirmation proceedings.

She concluded in that case, however, that

notwithstanding the finality of an order of confirmation, it

78

1    may be affected by relief granted under Federal Rule 60(b) to

2    the extent that the movant could show that Rule 60(b) should

3    apply, which is not an easy burden, as she points out:

4            "The Second Circuit," she says:

5    "The Second Circuit has declared that since 60(b)

6            allows extraordinary judicial relief, it is

7            invoked only if the moving party meets its

8            burden of demonstrating exceptional

9            circumstances."

10           Notwithstanding that heavy burden, she found in that

11   case that Rule 60(b) did apply to avoid what she viewed would

12   be a forfeiture given the absence of notice to the party that

13   would suffer the forfeiture otherwise.   It appears to me that

14   the plan in that cases was substantially consummated, although

15   Judge Brozman did not discuss section 1127 of the Bankruptcy

16   Code.

17           I conclude that just as I have jurisdiction to

18   interpret my orders, I have jurisdiction to apply Rule 60(b) if

19   a proper showing is made that it should be applied with respect

20   to the portion of the order here providing for the rejection of

21   executory contracts except those listed on schedule D of the

22   plan.   It is perfectly clear to me on this record at least that

23   no creditor of RCN is in any way prejudiced by such relief, no

24   distributions would be affected by such relief, no expectations

25   of any party in interest – no legitimate expectations of any

1  party in interest-- would be affected by such relief and that

2  whatever anyone voted on in connection with the plan would not

3  be at all changed by such relief.

4        What is sought here is not a modification of any

5  distribution provisions under the plan, either, but, rather, at

6  worst for RCN, a correction of a mistake on RCN's part with

7  respect to what should have been listed as an executory

8  contract to be rejected under the confirmation order.  And of

9  course when one imagines that list, one has some difficulty in

10 seeing what would be on the list, given that there was no

11 written agreement, as acknowledged the other day by Mega Cable.

12  And, at best for RCN, if there was no binding agreement

13 between RCN and Mega Cable, there is not even an issue of

14 modifiying a substantially consummated plan.

15       The only one potentially affected it appears on this

16 record, is Mega Cable.  But of course as I noted earlier, the

17 only reason Mega Cable is potentially affected is that it does

18 not want to receive the performance of RCN, notwithstanding

19 that it's basing its breach claim on RCN's failure to perform.

20

21       Therefore, I believe that the key document here is my

22 order, which implemented Section 365 and 1123 to provide for

23 the rejection, and as I noted earlier, which also provided that

24 to the extent of any inconsistency with the plan, the order

25 would govern.  I have jurisdiction to determine whether this

80

1   "course of dealing" fits within the order.  I also believe that

2   I have jurisdiction under these unusual facts to apply Rule

3   60(b) even if it appears that the "course of dealing" rose to

4   the level of an executory contract, because it appears that the

5   parties are not in a dispute over a right "bought and paid for

6   under the plan."  In re Rickel Associates, Inc., 260 B.R. 673,

7   677 (Bankr. S.D.N.Y. 2001) but over something RCN seems

8   perfectly prepared to give Mega Cable but  Mega Cable will

9   accept although Mega Cable is at the same time relying upon

10  RCN's alleged breach.

11          Finally, it is suggested by Mega Cable that this

12  matter is trumped by the Federal Arbitration Act.  That is said

13  despite the fact that RCN itself is not a party to the pending

14  arbitration, which RCN is not seeking to enjoin.

15          Moreover, as I believe I made clear already, the

16  issues here are not those arising under the support and

17  guaranty agreement or with respect to the parties' rights

18  thereunder, but, as made completely clear by my review of the

19  arbitration demand, they all have to do with interpretation of

20  section 1141 of the Bankruptcy Code, the confirmation order and

21  the plan, and the parties' conduct in this bankruptcy case,

22  having made certain allegations and taken certain positions as

23  a consequence purportedly of the effect of that order, and

24  again in my view, although the facts may ultimately bear out

25  differently, in derogation of what the Bankruptcy Code is all

81

1  about.

2        This matter therefore fits into the unusual case where

3  unique core bankruptcy issues trump the Arbitration Act, even

4  if RCN were a party to the arbitration, which of course it

5  isn't.  See In re U.S. Lines, Inc., 197 F.3d 631 (2d Cir. 1999)

6  at 634 -- I'm sorry, 639-41, and Vesta Fire Insurance v. New

7  Cap Reinsurance Corporation,  244 B.R. 209 at 216 (S.D.N.Y.

8  2000), affirmed 238 F.3d 185 (2d Cir. 2001).

9        Now as far as the discovery – but first, just to

10 conclude, the motion which we had deemed to be a motion to

11 dismiss for jurisdictional reasons, including a lack of case or

12 controversy, lack of subject matter jurisdiction, Federal

13 Arbitration Act preemption, and abstention, as well as Mega

14 Cable's reliance upon Section 1127(b) is denied in full.

15       Now as far as discovery going forward is concerned,

16 if the parties wish to pursue this matter, I believe it is

17 appropriate to have discovery on the Rule 60(b) issues, which

18 include whether the omission of the "course of dealing" from

19 schedule D to the plan was by mistake or inadvertent or

20 otherwise excusable or rather, as has been asserted today, was

21 for nefarious purposes.  But that's not the only issue for

22 discovery.  Anything that is pertinent to Rule 60(b) is subject

23 to discovery, as is whether there was an executory contract.

24       As I often do with lengthy bench rulings, I will

25 review the transcript of this ruling to make sure that it's

82

1   properly recorded and actually expresses the intent of my

2   ruling.  So, before you all get the transcript, I will have

3   gone over it.

4           MR. KIRPALANI:  Thank you, Your Honor.

5           Your Honor --

6           THE COURT:  Yeah.

7           MR. KIRPALANI:  -- would it make sense to schedule a

8   status conference for, you know, three weeks or so from now

9   so --

10          THE COURT:  I would like you all to meet and

11  confer --

12          MR. KIRPALANI:  Right.

13          THE COURT:  -- about the issues.  Frankly, as I said,

14  I did not raise 28 USC Section 1927 lightly.  I am also

15  distressed by the notion which permeated this litigation from

16  its beginning that this is all designed by Mega Cable as a

17  pressure tactic.  So I really would urge the parties to meet

18  and confer.  They certainly have all of their rights in this

19  case, including with respect to making their evidentiary

20  showing that needs to be made.  But, I'm really troubled by

21  this whole matter.

22          So, after you meet and confer, you can schedule a

23  conference roughly a month from now.

24          MR. KIRPALANI:  Okay.  Thank you, Your Honor.

25          MR. TEITELBAUM:  Thank you, Your Honor.

83

1          THE COURT:  Okay.

2                          *  *  *  *  *  *

84

1      I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5

6                          Tracy A. Gegenheimer, CERT*D-282

7 Dated:   December 26, 2005

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1